**No. 26-10155-D**
**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

WILLIAM LEE LAWSHE,
*Plaintiff-Appellant,*

v.

MIKAYLA PRESTON,
and
KATHLEEN DULLY,
*Defendants-Appellees.*

Appeal from the United States District Court for
the Middle District of Florida, Jacksonville
Division

3:24-cv-00044-MMH-MCR

**APPENDIX VOLUME I**

**LAW OFFICES OF NOONEY,
ROBERTS, HEWETT, AND
NOWICKI**

*/s/ Michael K. Roberts*
**Michael K. Roberts, Esquire**
Florida Bar No. 0077974
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
mroberts@nrhnlaw.com
*Counsel for Appellant*

# INDEX

## VOLUME 1

Docket Sheet

Complaint against All Defendants with Jury Demand………..…………………………1

Motion to Dismiss for Failure to State a Claim by Katheen Dully …………....…..10

Amended Complaint against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand filed by Willam Lee Lawshe……………………………… …26

Answer and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston……………………………………………………………………...34

Second Amended Complaint against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand filed by William Lee Lawshe………………………...40

Answer and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston………………………………………………………………...........43

Answer and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully………………………………………………………………………….54

Motion of Partial Summary Judgment Against Preston by William Lee Lawshe...66

Zoom Videotaped Deposition Transcript of Kathleen Dully M.D dated April 28, 2025…………………………………………………………………..…..66 – 1

Letter to Mikayla Preston from Kathleen Dully M.D dated February 22, 2023..66-2

Letter to Mikayla Preston from Kathleen Dully M.D dated April 5, 2023……66 – 3

## VOLUME 2

Docket Sheet

Letter to Mikayla Preston from Kathleen Dully M.D dated April 5, 2023……66 – 4

Expert Report of Dr. Scott Krugman……………………………………………66 – 5

Continued Remote Video Deposition Transcript of Kathleen Dully M.D dated June 18, 2025……………………………………………………………………66 – 6

Motion of Partial Summary Judgment Against Preston by William Lee Lawshe...67

Affidavit for Search Warrant dated February 28, 2023…………………………67 – 1

Cyber Tipline Report 153739160……………………………………...…67 – 2

Remote Deposition Transcript of Eugine Tolbert dated December 17, 2024…67 – 3

Remote Deposition Transcript of Kevin Greene dated December 17, 2024……67-4

## VOLUME 3

Docket Sheet

Videotaped Deposition Transcript of Fallon McNulty dated June 12, 2025…....67-5

Video-Recorded Deposition Transcript of Mikayla Preston dated March 13, 2025
…………………………………………………………………………..67-6

Remote Deposition Transcript of Dennis Camden dated December 17, 2024.…67-7

Affidavit of Jeffrey J. Douglas………………………………………………67-8

Letter to Mikayla Preston from Kathleen Dully M.D dated February 22, 2023..67-9

## VOLUME 4

Docket Sheet

Zoom Videotaped Deposition Transcript of Kathleen Dully MD dated April 28, 2025………………………………………………………………...…67-10

Continued Remote Video Deposition Transcript of Kathleen Dully M.D dated June 18, 2025……………………………………………………………..67-11

Deposition Transcript of Mikayla Preston dated November 21, 2023………...67-12

Affidavit for Search Warrant dated April 12, 2023..………………...……...67-13

St. Johns County Sheriffs Office Arrest Report……...…………………...67-14

Felony Information Sheet………………………………………………...67-15

Email Correspondence re Nolle Prosse dated December 22, 2023………...…..67-16

Response in Opposition re 66 Motion for Partial Summary Judgment filed by Kathleen Dully……………………………………………………………………75

Response in Opposition re 67 Motion for Partial Summary Judgment filed by Mikayla Preston…………………………………………………………………...78

Motion for Summary Judgment filed by Mikayla Preston………………….… 83

## VOLUME 5

Docket Sheet

Motion for Summary Judgment filed by Kathleen Dully…………………………85

Reply to Response to Motion re 67 Motion for Partial Summary Judgment filed by William Lee Lawshe……...……………………….…………………………90

Reply to Response to Motion re 66 Motion filed by William Lee Lawshe……….91

Response to Motion re 85 Motion for Summary Judgment filed by William Lee Lawshe……………………………………………………………………………95

Response to Motion re 83 Motion for Summary Judgment filed by William Lee Lawshe……………………………………………………………………………96

Report of Patrick Siewert……………………………………….……...…… 96-1

Reply to Response to Motion re 85 Motion for Summary Judgment filed by Kathleen Dully…………………………………………………………………...100

Reply to Response to Motion re 83 Motion for Summary Judgment filed by Mikayla Preston………………………………………………………………….101

Opinion and Order re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary Judgment; denying as moot 71 Motion in Limine; granting 83 Motion for Summary Judgment; granting 85 Motion for Summary Judgment……..…………………103

Judgment is entered in favor of Defendants and against Plaintiff……………….104

APPEAL,CLOSED,MEDIATION,SL DOC,STAYED,TANGIBLE

# U.S. District Court
# Middle District of Florida (Jacksonville)
# CIVIL DOCKET FOR CASE #: 3:24-cv-00044-JAR-MCR

Lawshe v. Hardwick et al
Assigned to: Judge Jane A. Restani
Referred to: Magistrate Judge Monte C. Richardson
Case in other court: 11th Circuit, 26-10155-D
Cause: 42:1983 Civil Rights Act

Date Filed: 01/12/2024
Date Terminated: 12/19/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

## Plaintiff

**William Lee Lawshe**
*an individual*

represented by **Michael Keith Roberts , II**
Law Offices of Nooney & Roberts
1680 Emerson St
Jacksonville, FL 32207
904/398-1992
Fax: 904/858-9943
Email: mroberts@nooneyandroberts.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Scott Nooney , Jr.**
The Law Offices of Nooney & Roberts
1680 Emerson St.
Jacksonville, FL 32207
904-398-1992
Fax: 904-858-9943
Email: jnooney@nooneyandroberts.com
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Robert A. Hardwick**
*in his official capacity as Sheriff of St. Johns
County*
*TERMINATED: 10/29/2024*

represented by **Michael P. Spellman**
Spellman Law, P.A.
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: michael@spellman.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
Spellman Law, P.A.
905 E. Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: cpetruzzelli@spellman.law
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Carson**
Spellman Law, PA
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: mcarson@spellman.law
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mikayla Preston**                            represented by   **Michael P. Spellman**
*in her induvial capacity as a Detective for*                   (See above for address)
*St. Johns County Sheriff's Office*                             *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Christen Ann Petruzzelli**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Jami McFatter Kimbrell**
                                                                Howell, Buchan & Strong
                                                                2898-6 Mahan Drive
                                                                Tallahassee, FL 32308
                                                                850-877-7776
                                                                Email: jami@kimbrellfirm.com
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Matthew Joseph Carson**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**University of Florida Board of Trustees**    represented by   **Todd Anderson Wright**
*TERMINATED: 03/28/2024*                                        Alexander DeGance Barnett, P.A.
                                                                1500 Riverside Avenue
                                                                Jacksonville, FL 32204
                                                                904-345-3284
                                                                Fax: 904-345-3294
                                                                Email: todd.wright@adblegal.com
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Dully**                             represented by   **Jami McFatter Kimbrell**
*in her individual capacity as medical*                         (See above for address)
*director of the UF Child Protection Team*                      *LEAD ATTORNEY*

                                                                **Robert B. Buchanan**
                                                                Banker Lopez Gassler P.A.
                                                                1900 SE 18th Street
                                                                Suite 300
                                                                Ocala, FL 34475-8237
                                                                352-629-4099
                                                                Fax: 352-629-3975
                                                                Email: aperry@bankerlopez.com

*TERMINATED: 05/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Shevlin**
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471
352-629-4099
Email: ashevlin@rbtrial.com
*ATTORNEY TO BE NOTICED*

**John Wilson**
Howell, Buchan and Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: johnwilson@jsh-pa.com
*ATTORNEY TO BE NOTICED*

**Mediator**

| | |
|---|---|
| **Thomas H. Bateman, III**<br>*TERMINATED: 08/07/2025* | represented by **Thomas H. Bateman , III**<br>Messer Caparello, PA<br>2618 Centennial Place<br>Tallahassee, FL 32308<br>850/222-0720<br>Fax: 850/558-0674<br>Email: tbateman@lawfla.com<br>*TERMINATED: 08/07/2025*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2024 | 1 | STRICKEN per 23 Order; COMPLAINT against All Defendants with Jury Demand (Filing fee $405 receipt number AFLMDC-21652226) filed by William L Lawshe. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons Hardwick Summons, # 3 Proposed Summons Preston Summons, # 4 Proposed Summons UF BOT Summons, # 5 Proposed Summons Dully Summons)(Roberts, Michael) Modified on 4/2/2024 to edit docket text (JDR). (Entered: 01/12/2024) |
| 01/12/2024 | 2 | NEW CASE ASSIGNED to Judge Marcia Morales Howard and Magistrate Judge Monte C. Richardson. New case number: 3:24-cv-44-MMH-MCR. (JCG) (Entered: 01/12/2024) |
| 01/16/2024 | 3 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (JW) (Entered: 01/16/2024) |

| | | |
|---|---|---|
| 01/16/2024 | 4 | SUMMONS issued as to Kathleen Dully, Robert Hardwick, Mikayla Preston, University of Florida Board of Trustees. (MCB) (Entered: 01/16/2024) |
| 02/08/2024 | 5 | NOTICE TO ALL COUNSEL of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who - unless the party changes the designation - remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (GL) (Entered: 02/08/2024) |
| 02/15/2024 | 6 | NOTICE of Lead Counsel Designation by Michael Keith Roberts, II on behalf of William Lee Lawshe. Lead Counsel: Michael K Roberts, Esq.. (Roberts, Michael) (Entered: 02/15/2024) |
| 02/19/2024 | 7 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 8 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 9 | NOTICE of Appearance by Robert B. Buchanan on behalf of Kathleen Dully (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/19/2024 | 10 | MOTION to Dismiss for Failure to State a Claim by Kathleen Dully. (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/20/2024 | 11 | **ORDER directing Defendant to file a supplement to her [Doc. 10] Motion to Dismiss Plaintiff's Complaint on or before February 27, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 2/20/2024. (JPA)** (Entered: 02/20/2024) |
| 02/20/2024 | 12 | MOTION to Dismiss Count VIII of Plaintiff's Complaint by University of Florida Board of Trustees. (Wright, Todd) (Entered: 02/20/2024) |
| 02/22/2024 | 13 | MOTION for Clerk's Default against Robert Hardwick, Mikayla Preston by William Lee Lawshe. (Nooney, Jeffrey) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/22/2024) |
| 02/27/2024 | 14 | Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 02/27/2024) |
| 02/27/2024 | 15 | NOTICE of Appearance by Michael P. Spellman on behalf of Robert Hardwick, Mikayla Preston (Spellman, Michael) (Entered: 02/27/2024) |
| 02/27/2024 | 16 | MOTION for Extension of Time to File Response/Reply as to 1 Complaint , MOTION to Set Aside Clerk Default *(Deny Entry)* by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Declaration of Trae Wylie)(Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/27/2024) |
| 02/28/2024 | 17 | NOTICE of supplemental authority re 16 MOTION for Extension of Time to File Response/Reply as to 1 Complaint MOTION to Set Aside Clerk Default *(Deny Entry) RE: Local Rule 3.01(g) Conferral* by Robert Hardwick, Mikayla Preston. (Spellman, Michael) (Entered: 02/28/2024) |
| 03/08/2024 | 18 | NOTICE of voluntary dismissal by William Lee Lawshe (Roberts, Michael) (Entered: 03/08/2024) |
| 03/08/2024 | 19 | RESPONSE in Opposition re 14 Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 03/08/2024) |
| 03/13/2024 | 20 | RESPONSE to 16 MOTION to Deny Entry of Default filed by William Lee Lawshe. (Roberts, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |

| | | |
|---|---|---|
| 03/13/2024 | 21 | NOTICE of Supplemental Authority to 16 MOTION to Deny Entry of Clerk's Default and for Extension of Time by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Savoia-McHugh v. Glass)(Spellman, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |
| 03/28/2024 | 22 | **ORDER dismissing, without prejudice, the claims raised against Defendant University of Florida Board of Trustees; terminating 12 Motion to Dismiss; and directing the Clerk of the Court to terminate this Defendant. Signed by Judge Marcia Morales Howard on 3/28/2024. (JW)** (Entered: 03/28/2024) |
| 04/02/2024 | 23 | **ORDER striking 1 Complaint filed by William Lee Lawshe. Plaintiff shall file a corrected complaint on or before April 22, 2024. Signed by Judge Marcia Morales Howard on 4/2/2024. (JPA)** (Entered: 04/02/2024) |
| 04/12/2024 | 24 | CASE MANAGEMENT REPORT. (Spellman, Michael) (Entered: 04/12/2024) |
| 04/15/2024 | 25 | **CASE MANAGEMENT AND SCHEDULING ORDER AND REFERRAL TO MEDIATION:** **Disclosure statements due by 4/26/2024. Discovery due by 6/20/2025. Dispositive motions due by 7/21/2025. Conduct mediation hearing by 8/15/2025. Final Pretrial Conference set for 12/15/2025 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 1/5/2026 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Signed by Judge Marcia Morales Howard on 4/15/2024. (Attachments: # 1 Mediation Report Form, # 2 Court Docket)(JW)** (Entered: 04/15/2024) |
| 04/16/2024 | 26 | AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) (Entered: 04/16/2024) |
| 04/19/2024 | 27 | **ORDER denying as moot 13 Plaintiff's Motion for Entry of Clerk's Default; denying as moot 14 Defendant Kathleen Dully's Motion to Dismiss; denying as moot 16 Motion to Deny Entry of Clerk's Default and for Extension of Time to Respond to Complaint. Signed by Judge Marcia Morales Howard on 4/19/2024. (JW)** (Entered: 04/19/2024) |
| 04/26/2024 | 28 | CORPORATE Disclosure Statement by Kathleen Dully. (Buchanan, Robert) (Entered: 04/26/2024) |
| 04/29/2024 | 29 | CORPORATE Disclosure Statement by Mikayla Preston. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 30 | CORPORATE Disclosure Statement by Robert Hardwick. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 31 | ***INCORRECT EVENT. COUNSEL TO REFILE AS "CORPORATE DISCLOSURE STATEMENT"***AMENDED document by Kathleen Dully. *Defendant Kathleen Dully's Amended Corporate Disclosure Statement.* (Buchanan, Robert) Modified on 4/30/2024 (LSS). (Entered: 04/29/2024) |
| 04/30/2024 | 32 | AMENDED Disclosure Statement Under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Kathleen Dully. (Buchanan, Robert) (Modified on 4/30/2024, to edit text) (BGR). (Entered: 04/30/2024) |
| 04/30/2024 | 33 | NOTICE of Appearance by Matthew Joseph Carson on behalf of Robert Hardwick, Mikayla Preston (Carson, Matthew) (Entered: 04/30/2024) |

| 04/30/2024 | 34 | ANSWER and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston.(Carson, Matthew) (Entered: 04/30/2024) |
|---|---|---|
| 04/30/2024 | 35 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew). Added MOTION to Strike on 5/2/2024 (AM). (Entered: 04/30/2024) |
| 05/02/2024 | 36 | **ORDER directing Plaintiff to show cause why this case should not be dismissed for failure to prosecute or sanctions imposed due to his failure to comply with the Local Rules and this Court's Order. Show Cause Response due by 5/16/2024. Signed by Judge Marcia Morales Howard on 5/2/2024. (JW)** (Entered: 05/02/2024) |
| 05/02/2024 | 37 | CORPORATE Disclosure Statement by William Lee Lawshe. (Roberts, Michael) (Entered: 05/02/2024) |
| 05/02/2024 | 38 | RESPONSE TO ORDER TO SHOW CAUSE re 36 Order to show cause filed by William Lee Lawshe. (Roberts, Michael) Modified on 5/3/2024 to edit text (ELM). (Entered: 05/02/2024) |
| 05/03/2024 | 39 | **ENDORSED ORDER discharging 36 Order to Show Cause. Signed by Judge Marcia Morales Howard on 5/3/2024. (JW)** (Entered: 05/03/2024) |
| 05/20/2024 | 40 | SECOND AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/20/2024 | 41 | NOTICE of Filing 40 Second Amended Complaint by William Lee Lawshe (Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/23/2024 | 42 | **ORDER denying as moot 35 Defendant Sheriff Hardwick's Motion to Dismiss and Motion to Strike. Signed by Judge Marcia Morales Howard on 5/23/2024. (JW)** (Entered: 05/23/2024) |
| 06/03/2024 | 43 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston. (Attachments: # 1 Exhibit CybeTip Report, # 2 Exhibit Dully Opinion f6a487, # 3 Exhibit Dully Opinion 59 and 65, # 4 Exhibit Dully Opinion Screenshot Duckduckgo)(Carson, Matthew) (Entered: 06/03/2024) |
| 06/03/2024 | 44 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew) (Entered: 06/03/2024) |
| 06/19/2024 | 45 | MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint *or Alternatively, Motion for a More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 06/19/2024) |
| 06/24/2024 | 46 | RESPONSE to Motion re 44 MOTION to Dismiss for Failure to State a Claim filed by William Lee Lawshe. (Roberts, Michael) (Entered: 06/24/2024) |
| 07/12/2024 | 47 | RESPONSE to Motion re 45 MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint *or Alternatively, Motion for a More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 07/12/2024) |
| 08/16/2024 | 48 | NOTICE of Appearance by Christen Ann Petruzzelli on behalf of Robert A. Hardwick, Mikayla Preston (Petruzzelli, Christen) (Entered: 08/16/2024) |
| 08/16/2024 | 49 | MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Request for Production* by Mikayla Preston. (Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/16/2024) |
| 08/17/2024 | 50 | SUPPLEMENT re 49 MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Request for Production* by Mikayla Preston. (Spellman, Michael) |

(Entered: 08/17/2024)

| Date | No. | Description |
|---|---|---|
| 08/19/2024 | 51 | **ENDORSED ORDER granting 49 Defendant Preston's Motion for Extension of Time to Respond to Plaintiff's First Request for Production. Defendant shall have until August 26, 2024, to respond to Plaintiff's First Request for Production. Signed by Magistrate Judge Monte C. Richardson on 8/19/2024. (JRC)** (Entered: 08/19/2024) |
| 10/03/2024 | 52 | **ORDER: To the extent that Plaintiff requests affirmative relief from the Court, 46 Plaintiff's Response to Defendant Hardwick's Motion to Dismiss is denied without prejudice. See Order for details. Signed by Judge Marcia Morales Howard on 10/3/2024. (JPA)** (Entered: 10/03/2024) |
| 10/29/2024 | 53 | **ORDER granting 44 Motion to Dismiss for Failure to State a Claim and denying 45 Motion to Dismiss. The Clerk of the Court is directed to terminate Defendant Robert Hardwick. Defendant Kathleen Dully shall respond to Plaintiff's Second Amended Complaint on or before November 13, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 10/29/2024. (JPA)** (Entered: 10/29/2024) |
| 11/13/2024 | 54 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully.(Buchanan, Robert) (Entered: 11/13/2024) |
| 02/01/2025 | 55 | MOTION to Compel Production of Documents by William Lee Lawshe. (Attachments: # 1 Exhibit Ex A - Plaintiff RTP, # 2 Exhibit Ex B - Def RTP response, # 3 Exhibit Ex C - Email Correspondence)(Roberts, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/01/2025) |
| 02/05/2025 | 56 | NOTICE of Withdrawal Motion to Compel Production of Documents by William Lee Lawshe. (Roberts, Michael) Modified on 2/6/2025 to edit text (ELA). (Entered: 02/05/2025) |
| 05/16/2025 | 57 | MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/16/2025) |
| 05/19/2025 | 58 | **ENDORSED ORDER denying without prejudice 57 Defendant Kathleen Dully's Motion for Substitution of Counsel because it fails to comply with Local Rule 3.01(g). Signed by Magistrate Judge Monte C. Richardson on 5/19/2025. (SBL)** (Entered: 05/19/2025) |
| 05/22/2025 | 59 | Amended MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/22/2025) |
| 05/27/2025 | 60 | **ENDORSED ORDER granting 59 Defendant Kathleen Dully's Amended Motion for Substitution of Counsel. Robert B. Buchanan, Esq. is relieved of any further responsibility as counsel for Defendant in this matter, but he shall comply with all applicable obligations on withdrawing counsel, including any applicable Bar rules. Jami Kimbrell, Esq. is substituted as counsel of record for Defendant. Signed by Magistrate Judge Monte C. Richardson on 5/27/2025. (SBL)** (Entered: 05/27/2025) |
| 05/27/2025 | 61 | NOTICE of Appearance by John Wilson on behalf of Kathleen Dully (Wilson, John) (Entered: 05/27/2025) |
| 06/06/2025 | 62 | Unopposed MOTION for Extension of Time to Complete Discovery by Kathleen Dully. (Wilson, John) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 6/9/2025 to edit the docket text (MLB). (Entered: 06/06/2025) |
| 06/09/2025 | 63 | **ORDER granting 62 Unopposed Motion for Extension of Deadlines to Complete Discovery and File Dispositive Motions. Discovery deadline is 8/4/2025. Dispositive and Daubert motions due 9/5/2025. Final pretrial conference continued to 1/20/2026, at 10:00 a.m. Jury trial set for trial term commencing on 2/2/2026, at 9:00 a.m. See** |

| | | |
|---|---|---|
| | | **Order for additional deadlines. Signed by Judge Marcia Morales Howard on 6/9/2025. (JW)** (Entered: 06/09/2025) |
| 06/09/2025 | | Set / Reset Scheduling Order Deadlines/Hearings per 63: Discovery due by 8/4/2025. Dispositive motions due by 9/5/2025. All other motions due by 12/29/2025. Final Pretrial Conference set for 1/20/2026 at 10:00 AM before Judge Marcia Morales Howard. Jury Trial set for 2/2/2026 at 09:00 AM before Judge Marcia Morales Howard. (EVK) (Entered: 06/10/2025) |
| 06/18/2025 | 64 | NOTICE of mediation conference/hearing to be held on 8/6/25 at 10AM before Thomas H. Bateman, III. (Carson, Matthew) (Entered: 06/18/2025) |
| 08/06/2025 | 65 | MEDIATION report Hearing held on 8-6-2025. Hearing outcome: Impasse.. (Bateman, Thomas) (Entered: 08/06/2025) |
| 08/12/2025 | 66 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/12/2025 | 67 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/13/2025 | 68 | **SUMMARY JUDGMENT NOTICE AND COURTESY COPIES. Signed by Deputy Clerk on 8/13/2025. (JW)** (Entered: 08/13/2025) |
| 08/29/2025 | 69 | Unopposed MOTION for Extension of Time to File Response/Reply as to 67 MOTION for Partial Summary Judgment , 66 MOTION for Partial Summary Judgment Set / Reset Scheduling Order Deadlines/Hearings *and Extension of Time to File Motions for Summary Judgment* by All Defendants. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/29/2025) |
| 09/03/2025 | 70 | **ENDORSED ORDER granting 69 Defendants' Joint Unopposed Motion for Extension of Time. Defendants shall respond to Plaintiff's Motions for Partial Summary Judgment on or before September 9, 2025. The deadline for Defendants to file dispositive motions is extended until September 12, 2025. The granting of this Motion shall not serve as a basis for seeking to extend any other deadlines in the Case Management and Scheduling Order. Signed by Magistrate Judge Monte C. Richardson on 9/3/2025. (SBL)** (Entered: 09/03/2025) |
| 09/05/2025 | 71 | MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) by Mikayla Preston. (Attachments: # 1 Exhibit 1 = Siewert CV, # 2 Exhibit 2 - Siewert Report) (Carson, Matthew) (Entered: 09/05/2025) |
| 09/08/2025 | 72 | Unopposed MOTION to file DOCUMENT under seal by Kathleen Dully, Mikayla Preston (Attachments: # 1 Proposed Sealed Item Redacted f6a487, # 2 Proposed Sealed Item Redacted 0065(1), # 3 Proposed Sealed Item Redacted 0059, # 4 Proposed Sealed Item Redacted DuckDuckGo, # 5 Proposed Sealed Item Redacted VVFQ_o, # 6 Appendix Unredacted File Names and Sizes)(Carson, Matthew).Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 09/08/2025) |
| 09/08/2025 | 73 | Consent MOTION to File Excess Pages in Response to Motion for Partial Summary Judgment by Kathleen Dully. (Kimbrell, Jami) Modified text on 9/9/2025 (MGB). (Entered: 09/08/2025) |

| 09/09/2025 | 74 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
|---|---|---|
| 09/09/2025 | 75 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
| 09/09/2025 | 76 | NOTICE by Kathleen Dully re 75 Response in Opposition to Motion *Filing Exhibits to* (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 Exhibit K, # 7 Exhibit L)(Kimbrell, Jami) Modified text on 9/10/2025 (ABM). (Entered: 09/09/2025) |
| 09/09/2025 | 77 | NOTICE by Mikayla Preston *documents in support of her response in opposition to Plaintiff's motion for partial summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty, # 3 Exhibit Deposition of Detective Mikayla Preston, # 4 Exhibit Deposition of Detective Kevin Greene, # 5 Exhibit Deposition of Sergeant Eugene Tolbert, # 6 Exhibit Deposition of Dr. Kathleen Dully I, # 7 Exhibit Deposition of Dr. Kathleen Dully II, # 8 Exhibit Affidavit of Kaitlyn M. Paine, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe)(Carson, Matthew) (Entered: 09/09/2025) |
| 09/09/2025 | 78 | RESPONSE in Opposition re 67 MOTION for Partial Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 09/09/2025) |
| 09/10/2025 | 79 | **ENDORSED ORDER granting 73 Defendant Kathleen Dully's Motion for Leave to Exceed the Page Limit and accepting as filed 75 Defendant Kathleen Dully's response to Plaintiff's Motion for Partial Summary Judgment. Signed by Judge Marcia Morales Howard on 9/10/2025. (JW)** (Entered: 09/10/2025) |
| 09/10/2025 | 80 | NOTICE by Kathleen Dully re 74 Response in Opposition to Motion *to Disregard* (Kimbrell, Jami) (Entered: 09/10/2025) |
| 09/11/2025 | 81 | **ORDER granting 72 Defendant's Unopposed Motion to Seal. See Order for details. Signed by Magistrate Judge Monte C. Richardson on 9/11/2025. (SBL)** (Entered: 09/11/2025) |
| 09/12/2025 | 82 | NOTICE by Mikayla Preston *of filing documents in support of her motion for final summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty (corporate representative for the National Center for Missing and Exploited Children) taken June 12, 2025 (excerpts), # 3 Exhibit Deposition of Detective Mikayla Preston taken March 13, 2025 (excerpts), # 4 Exhibit Deposition of Detective Kevin Greene taken December 17, 2024 (excerpts), # 5 Exhibit Deposition of Sergeant Eugene Tolbert taken December 17, 2024 (excerpts), # 6 Exhibit Deposition of Dr. Kathleen Dully taken April 28, 2025 (excerpts), # 7 Exhibit Deposition of Dr. Kathleen Dully taken June 18, 2025 (excerpts), # 8 Exhibit Affidavit of Kaitlyn M. Paine dated August 28, 2025, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe taken March 14, 2025 (excerpts))(Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 83 | MOTION for Summary Judgment by Mikayla Preston. (Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 84 | MOTION to File Excess Pages by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 85 | MOTION for Summary Judgment by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 86 | NOTICE of Filing Exhibits by Kathleen Dully re 85 MOTION for Summary Judgment. (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 |

| | | Exhibit K, # 7 Exhibit L, # 8 Exhibit M)(Kimbrell, Jami) Modified docket text on 9/15/2025 (JOS). (Entered: 09/12/2025) |
|---|---|---|
| 09/16/2025 | 88 | **ENDORSED ORDER granting 84 Defendant Kathleen Dully's Motion for Leave to File an Over-Length Motion for Summary Judgment and accepting as filed 85 Defendant Kathleen Dully's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 9/16/2025. (JW)** (Entered: 09/16/2025) |
| 09/16/2025 | 90 | REPLY to Response to Motion re 67 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/16/2025 | 91 | REPLY to Response to Motion re 66 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/19/2025 | 92 | RESPONSE to Motion re 71 MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 09/19/2025) |
| 09/24/2025 | 93 | SEALED DOCUMENT re 81 Sealed Order on Motion to Seal by Mikayla Preston (Attachments: # 1 Exhibit Redacted f6a487, # 2 Exhibit Redacted 0065(1), # 3 Exhibit Redacted 0059, # 4 Exhibit Redacted DuckDuckGo, # 5 Exhibit Redacted VVFQ_o) (Carson, Matthew). (Entered: 09/24/2025) |
| 10/03/2025 | 94 | MOTION to File Excess Pages by William Lee Lawshe. (Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 95 | RESPONSE to Motion re 85 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 96 | RESPONSE to Motion re 83 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/06/2025 | 97 | **ENDORSED ORDER granting 94 Plaintiff's Unopposed Motion for an Extension of Page Limit and accepting as filed 96 Plaintiff's Response to Defendant Preston's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 10/6/2025. (JW)** (Entered: 10/06/2025) |
| 10/16/2025 | 98 | **ORDER REASSIGNING CASE to Senior Judge Jane A. Restani. Signed by Judge Marcia Morales Howard on 10/16/2025. (MHM)** (Entered: 10/16/2025) |
| 10/17/2025 | 99 | Case Reassigned to Judge Jane A. Restani. New case number: 3:24-cv-44-JAR-MCR. Judge Marcia Morales Howard no longer assigned to the case. (MDC) (Entered: 10/17/2025) |
| 10/17/2025 | 100 | REPLY to Response to Motion re 85 MOTION for Summary Judgment filed by Kathleen Dully. (Wilson, John) (Entered: 10/17/2025) |
| 10/17/2025 | 101 | REPLY to Response to Motion re 83 MOTION for Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 10/17/2025) |
| 11/17/2025 | 102 | Notice to counsel that pursuant to the summary judgment notice 68, the parties must submit courtesy copies of any motion, response, and authorized reply that exceeds twenty-five (25) pages (including exhibits or other supporting evidentiary materials) in length. Courtesy copies should be mailed by United States mail or other reliable service to Hon. Jane A. Restani, United States Court of International Trade, 1 Federal Plaza, Suite 694, New York, NY 10278-0001 (jkl) (Entered: 11/17/2025) |
| 12/18/2025 | 103 | **OPINION AND ORDER re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary** |

| | | |
|---|---|---|
| | | Judgment; denying as moot [71](#) Motion in Limine; granting [83](#) Motion for Summary Judgment; granting [85](#) Motion for Summary Judgment. The Clerk shall enter judgment in favor of Defendants Preston and Dully and against Plaintiff Lawshe, terminate any pending motions, and close the case. Signed by Judge Jane A. Restani on 12/18/2025. (SJW) (Modified on 12/18/2025)(SJW). (Entered: 12/18/2025) |
| 12/19/2025 | [104](#) | **JUDGMENT is entered in favor of Defendants and against Plaintiff. Signed by Deputy Clerk on 12/19/2025. (JTM)** (Entered: 12/19/2025) |
| 12/19/2025 | 105 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (JTM) (Entered: 12/19/2025) |
| 01/06/2026 | [106](#) | NOTICE of change of address by Christen Ann Petruzzelli (Petruzzelli, Christen) (Entered: 01/06/2026) |
| 01/06/2026 | [107](#) | MOTION for Extension of Time to File Motion for Entitlement to Costs by Mikayla Preston. (Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 01/06/2026) |
| 01/16/2026 | [108](#) | NOTICE OF APPEAL as to [103](#) Order on Motion for Partial Summary Judgment Order on Motion in Limine, Order on Motion for Summary Judgment, [104](#) Judgment by William Lee Lawshe. Filing fee $605, receipt number AFLMDC-24340578. ***Case Stayed. (Roberts, Michael) (Entered: 01/16/2026) |
| 01/16/2026 | [109](#) | TRANSMITTAL of initial appeal package to the U.S. Court of Appeals - 11th Circuit re [108](#) Notice of Appeal,. Filing fee paid. (JDR) (Entered: 01/16/2026) |
| 01/20/2026 | [110](#) | RESPONSE in Opposition re [107](#) MOTION for Extension of Time to File Motion for Entitlement to Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 01/20/2026) |
| 01/20/2026 | | ***11th Circuit Case Number: 26-10155-D for [108](#) Notice of Appeal, filed by William Lee Lawshe. (SJW) (Entered: 01/22/2026) |
| 01/30/2026 | 111 | **ENDORSED ORDER granting [107](#) Defendant Mikayla Preston's Motion for Extension of Time. The Court has considered Plaintiff's arguments but finds that good cause exists for the requested extension. Defendant shall file the subject Motion on or before February 5, 2026. Signed by Magistrate Judge Monte C. Richardson on 1/30/2026. (SBL)** (Entered: 01/30/2026) |
| 01/30/2026 | [112](#) | TRANSCRIPT information form filed by William Lee Lawshe re [108](#) Notice of Appeal USCA number: 26-10155-D. No transcript(s) requested. (Roberts, Michael) (Entered: 01/30/2026) |
| 02/05/2026 | [113](#) | MOTION for Taxation of Costs by Mikayla Preston. (Attachments: # [1](#) Affidavit of Matthew Carson, # [2](#) Exhibit Bill of Costs)(Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/05/2026) |
| 02/06/2026 | [114](#) | NOTICE by Mikayla Preston re [113](#) MOTION for Taxation of Costs *of Filing Supplement Pursuant to M.D. Fla. Loc. R. 3.01(g).* (Petruzzelli, Christen) (Entered: 02/06/2026) |
| 02/19/2026 | [115](#) | MEMORANDUM in opposition re [113](#) Motion for Taxation of Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 02/19/2026) |

# PACER Service Center

## Transaction Receipt

### 03/04/2026 09:26:31

| PACER Login: | mroberts00779741 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 3:24-cv-00044-JAR-MCR |
| Billable Pages: | 11 | Cost: | 1.10 |

# ECF 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

       Plaintiff,

v.                                     Case No.

ROBERT HARDWICK,
in his official capacity as Sheriff of St. Johns County,
MIKAYLA PRESTON,
in her induvial capacity as a Detective for St. Johns County Sheriff's Office,
UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, and
KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

       Defendants.

_____/

## COMPLAINT

Plaintiff, WILLIAM LEE LAWSHE ("Plaintiff"), sues Defendants, ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her induvial capacity as a Detective for St. Johns County Sheriff's Office, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team, and alleges:

1.     This is an action pursuant to 42 U.S.C. § 1983.

## **COMMON ALLEGATIONS - THE ARREST**

2. The Plaintiff William Lee Lawshe resides in St. Augustine, St. Johns County, Florida.

3. Until the events which are the subject of this action, Mr. Lawshe was a respected and valued law enforcement officer with the Florida Fish and Wildlife Conservation Commission (here-in-after referred to as FWC) for over 15 years.

4. FWC officers are highly trained, versatile law enforcement officers with full police powers and statewide jurisdiction.

5. In 2014, Mr. Lawshe was named both FWC Officer of the Year and National Wildlife Officer of the Year for his distinguished service.

6. Prior to joining FWC, Mr. Lawshe served as a Non-Commissioned Officer in the United State Army.

7. Mr. Lawshe served as a light infantry fire team leader, completed airborne school, Air Assault School and Ranger R.I.P training. Mr. Lawshe received an honorable discharge in 1994.

8. At all times material to this action, Defendant, Robert Hardwick was the elected Sheriff of St. Johns County, Florida and the administrative head of the St Johns County Sheriff's Office (hereinafter referred to as SJSO).

9.   SJSO is a law enforcement agency acting on behalf of and pursuant to the power vested to it by the State of Florida pursuant to Fla. Stat. § 30.15.

10.  Defendant Mikayla Preston is a detective employed with the SJSO, assigned to the Special Victims Unit (SVU).

11.  Det. Preston is a member of the North Florida Internet Crimes against Children Task Force, who holds herself out as an expert in the investigation of crimes involving the online sexual-solicitation and exploitation of children. This expertise specifically includes specialized high-tech training and experience in investigating the collection and trading of images of Child Sexual Abuse Material (CSAM) and child pornography.

12.  On April 12, 2023, Det. Preston, arrested Plaintiff William Lee Lawshe on charges of Possession of CSAM pursuant to F.S.S. 827.071(5), which makes the knowing possession of child pornography a felony.

13.  Prior to the arrest, Det. Preston knew that the charge of possession of child pornography carried a severe social stigma and that the mere allegation (whether proven or not) would likely destroy Mr. Lawshe's personal and professional reputation.

14. Despite the certainty of injury to the Plaintiff, the arrest was made without a reasonable investigation into the truth of the allegations and represented a reckless disregard for the rights of Plaintiff.

15. The arrest was made without warning, under the guise of a ruse designed to trick Plaintiff into believing that he was aiding in an official investigation, rather than being the target of an imminent arrest.

16. Mr. Lawshe was not confronted with the facts or evidence supporting these accusations prior to his arrest.

17. In fact, Mr. Lawshe's employer FWC, which was not an investigative agency in this matter, was informed of the charges prior to Mr. Lawshe. As a result, Mr. Lawshe was confronted by his superior officer (FWC) at the SJSO facility just moments after his arrest and was forced to resign or be fired, having been threatened with the loss of his pension.

18. Upon making the arrest, SJSO alerted media outlets and publicized Plaintiff arrest.

19. On April 13, 2023, acting in the place and function of a complaining witness, Assistant State Attorney (ASA) Kaitlyn Payne affirmed and verified the allegations of possession of CSAM without ever viewing the alleged images or vetting any evidence to support the charges. ASA Payne's

4

verification was a necessary predicate used to file formal charges against Plaintiff for possession of CSAM.

20.    In the following days, numerous media outlets published news articles and TV segments describing the arrest and allegations against Mr. Lawshe. His name was smeared on social media platforms, and he was ostracized from the community that he had dedicated his professional life to serving.

21.    Furthermore, his employer FWC published to media outlets false and defamatory statements that Plaintiff had "betrayed the oath that all law enforcement officers take to protect the public" and promised that Mr. Lawshe would "be held accountable for his actions."

22.    Despite the devastating injury to his reputation and career, Mr. Lawshe never viewed, downloaded, searched for, clicked on, or sought out, in any way, images of CSAM.

23.    No CSAM was ever found on his phone, computer, cloud storge, hard drive, thumb drive or any other electronic storage device owned or controlled by Mr. Lawshe.

24.    No analog photographs of CSAM were ever found in Mr. Lawshe's possession.

25. No images of CSAM were ever found in an email account or attachments to emails either sent to or received by Mr. Lawshe.

26. No virtual or artificial intelligence generated images mimicking CSAM were ever viewed, possessed, controlled or downloaded by Mr. Lawshe.

27. Mr. Lawshe never visited or sought out any "dark web" or message boards which were known to trade in images of CSAM.

28. At all times relevant, including prior to the arrest, there was known or readily discoverable exculpatory evidence, easily accessible and available to the SJSO and the SJSAO which proved Mr. Lawshe's innocence.

29. In fact, there was never any competent evidence to support the allegation that Mr. Lawshe had knowingly possessed CSAM.

30. Despite knowledge of the total lack of competent evidence, ASA Payne, with the approval of her supervisors, attempted to coerce Plaintiff to plead guilty to the charges, by withholding access to the evidence against Plaintiff. This tactic was specifically designed to thwart justice and significantly delayed the outcome of the case.

31. As a result of these baseless charges, Mr. Lawshe was forced to personally finance an investigation into the allegations, at a significant expense.

32. Fortunately, through these private efforts, Mr. Lawshe was able to conclusively prove that the charges and allegations against him were objectively false and entirely baseless.

33. After presenting the exculpatory evidence to the SAO on December 20, 2023 via email, the charges were dropped on December 27, 2023, just three business days later.

## COMMON ALLEGATIONS – THE INVESTIGATION

34. The facts and circumstances surrounding the investigation of William Lee Lawshe on charges of possession of CSAM show a conscious disregard and reckless indifference to the truth, to the Constitution of the United States and the rights of the Plaintiff thereunder.

35. The subject case was opened on February 20, 2023, when SJSO received a cyber tip (#153739160) from the National Center for Missing and Exploited Children (NCMEC).

36. This cyber tip report stated that William Lawshe was in possession of 1 (one) image of "Apparent Child Pornography (Unconfirmed)."

37. NCMEC is a non-profit organization which operates a cyber tip line receiving and reporting allegations of CSAM. The tip line functions as a

7

clearing house of CSAM, funded and regulated by the laws of the United States of America.

38. In addition to describing the report as "unconfirmed," the NCMEC cyber tip (#153739160) stated that the content had "not been viewed by NCMEC staff."

39. Det. Preston and other officers of SJSO knew or should have known that it was the policy of NCMEC to forward all cyber tip reports to law enforcement, regardless of their veracity.

40. Moreover, Det. Preston, and other officers of SJSO, knew that there had been prior false reports of CSAM made by NCMEC to SJSO.

41. Based on the circumstances, it was not reasonable for a law enforcement officer or agency to rely on the assertions of criminal conduct in the NCMEC cyber tip (#153739160) .

42. The cyber tip report (#153739160) indicated that the image had been identified as suspected child pornography by the Plaintiff's Electronic Service Provider (ESP) Verizon through the use of an encryption and algorithm "hash." A "hash," is nothing more than a digital flag or marker designed to identify images through the use of image recognition technology or artificial intelligence.

8

43.  A copy of the subject image was attached to the cyber tip report.

44.  This image (#153739160) did not contain CSAM.

45.  On February 20, 2023, Det. Preston viewed the subject image attached to the NCMEC report.

46.  The cyber tip described the image as containing a "prepubescent" female. Det. Preston knew this description was false from her review of the subject image.

47.  Upon review of the image, Det. Preston saw, acknowledged and recorded that the image contained a watermark of the website domain: Met-art.com. Watermarks are commonly used to indicate legal copyright and/or ownership of the subject image.

48.  At the time of review, Det. Preston believed that Met-art.com had published, owned or controlled the subject image.

49.  Det. Preston, due to her high-tech training in the investigation of cyber exploitation, understood that the Met-art.com domain was public and easily accessible through any internet service provider.

50.  The cyber tip report stated that the that the image was not available publicly. Det. Preston knew this was a false statement.

9

51. Met-art.com, through its public website, operates a business engaged in the publication of adult entertainment material and images of consenting adults.

52. As indicated on the image, Met-art.com had, in fact, published the image which was the subject of the cyber tip report (#153739160).

53. The model, who was known as "Milena D.," was a consenting adult and paid model at the time the image was taken and published, in 2010.

54. At the time of the incident which is the subject of this action, the subject image (#153739160) was and continues to be available through a common Google search.

55. The subject image (#153739160) contains partial nudity in a professional "photo shoot" setting consistent with a "centerfold" type photograph found in any number of print publications, such as Playboy or Penthouse.

56. Det. Preston, given her extensive training, experience and expertise in investigating CSAM knew or should have known that the subject model was a consenting adult based on the following available information:

   a) The website in question (Met-art.com) clearly and unequivocally states that the subject model was over 18 years of age.

b) Met-art.com describes the model as "verified" and states that it operates in compliance with 18 USC §2257, 28 CFR 75, which requires publishers of pornographic images to keep and maintain records verifying the age of all models.

c) Met-art.com provides a link to a representative along with legal compliance and contact information.

d) The identified legal representative, Jeffrey J. Douglas, is a licensed attorney in the State of California. He is also the designated records custodian of Met-art.com.

e) Met-Art.com, in fact, maintains records verifying the age of all models and makes those records available to any appropriate investigating authority.

f) Additionally, there is no indicia, description, suggestion, information, depiction, or other objective reason found on the image itself or the Met-art.com website that would lead a reasonable person to believe that the model in the subject image was a minor.

57.    At no time did Det. Preston or any other officer of SJSO officer, have a reasonable basis to believe that the image contained CSAM.

58. Additionally, because the internet publication claimed that the model was an adult, and nothing on the images or the website would lead a reasonable person to believe that the representations of age were false, it would be highly unlikely for any law enforcement agency to prove, establish or believe that possession of the image could ever constitute knowing possession of CSAM.

59. However, even if there were some indication that the model may have been a minor, Det. Preston knew or should have known that compliance with 18 USC §2257 was specifically designed and intended to reduce the risk of CSAM and make age verification by law enforcement easy and accessible.

60. Det. Preston knew or should have known that compliance with 18 USC §2257 required Met-art.com to make records readily available which would verify the age of any model.

61. At no time, prior to the arrest, did Det. Preston, or any other representative of SJSO, contact Met-art.com or its legal representative to obtain age verification of the subject model.

62. Failure to investigate the publishing website and failure to utilize the provisions of 18 USC §2257 was a conscious decision and wanton

dereliction of duty which would cause a reasonable person to question the motives of the investigative authorities.

63. Significantly, no one from SJSO ever pursued criminal action or investigation against the owner and publisher of the alleged child pornography, Met-art.com, including but not limited to referral to another appropriate law enforcement agency.

64. Rather, SJSO and Det. Preston singled out Plaintiff William Lee Lawshe, at least in part, due to his position as a respected law enforcement officer and the potential for publicity associated with arresting a law such an officer.

65.  On February 20, 2023, after viewing the subject image Det. Preston and SJSO knew or should have known that there was no competent evidence to establish a reasonable belief that the Plaintiff was in knowing possession of child pornography.

66. Thereafter, Det. Preston and SJSO's SVU unit devised a scheme to manufacture the illusion of evidence in an attempt to thwart the judicial process, including but not limited to the search warrant requirement of the Fourth Amendment of the Constitution of the United State of America.

67. In execution of this scheme, Det. Preston communicated with and/or conspired with Defendant, Dr. Kathleen Dully for the purpose of

13

manufacturing false, misleading, unsupported evidence in the form of fake or pseudo-scientific opinions.

68.   Dr. Kathleen Dully is a medical doctor, board certified in both pediatrics and child abuse. She is an associate professor of pediatrics at the University of Florida. She is aware of the scope and limitations of medical science and her role as a physician.

69.   Despite the availability of objective proof of the subject model's age (photograph of valid issued government ID), Det. Preston requested that Dr. Dully estimate the age of the model by viewing the studio produced photograph which was the subject of the NECMEC cyber tip report (#153739160).

70.   There is no scientifically accepted medical test or methodology to estimate the precise age of a female, from review of professionally produced photographs.

71.   Despite knowing that there is no scientific method for precisely establishing the age of a female from viewing professionally produced photographs, Dr. Dully agreed to the scheme suggested by Det. Preston.

14

72.    On February 22, 2023, Det. Preston met Dr. Dully and presented her with the single image of the alleged CSAM which was subject of the NCMEC cyber tip report (#153739160).

73.    Prior to or during the review, Det. Preston told Dr. Dully that the image had been reported by NCMEC as CSAM.

74.    During the review of February 22, 2023, Det. Preston failed to disclose that the image was publicly available on the internet through a public domain website.

75.    During the review of February 22, 2023, Det. Preston failed to disclose that the model was purported to be 18 years of age and had been claimed to be verified as such by the image's publisher.

76.    During the review of February 22, 2023, Dr. Dully intentionally misapplied a clinical rating scale, known as the "Tanner Scale" or Sexual Maturity Rating (SMR).

77.    The Tanner Scale or SMR is a method by which clinicians can measure and quantify the sexual development of children into and through the process of puberty. It was specifically designed to ascertain whether young persons were developing appropriately, and as a tool to diagnose endocrinological decease which could cause either premature or delayed puberty.  It is not a

scientific or medically accepted method of determining the age of a patient/individual.

78. Dr. Dully knew that the Tanner or SMR evaluation was not a method of determining a person's age with any reasonable degree of medical certainty or probability.

79. In a report dated February 22, 2023, Dr. Dully stated that the model "appears to be younger than the age of 18" estimating that the model was as young as 12 years old.

80. The model was, in fact, a consenting adult, over the age of 18.

81. Dr. Dully knew or should have known that this report would be presented to the Court and/or used in some other official capacity to aid a criminal investigation against the Plaintiff.

82. Thereafter, Det. Preston continued the scheme to manufacture probable cause by drafting an affidavit for presentation to a court of competent jurisdiction, for the purpose of obtaining a search warrant directed to the Plaintiff's phone/internet service provider, Verizon.

83. This affidavit represents a conscious scheme to deprive a judicial officer of the then known or knowable facts and obtain a warrant by unlawful means.

84.     The affidavit contains multiple statements which were false, misleading and omit substantial exculpatory evidence then known to SJSO:

(a) Det. Preston swore, under oath, that the website met-art.com "has a known history of displaying CSAM of teenage girls…"

This statement is false. No CSAM exists or has ever been published on Met-art.com. The website has consistently and thoroughly complied with the requirements of 18 USC §2257.[1]

(b) The affidavit represents that the image was not publicly available.

This representation was false and Det. Preston knew that it was false. The availability of a particular image on a public website is a significant indication that the image is not CSAM.

(c) The Affidavit, as written, suggests that the tip or allegation was reviewed, vetted or validated by NCMEC. While tips from citizen groups could be relevant (even presumptively truthful) the "tip" in this case stated that the report was "unconfirmed." In fact, the cyber tip report stated that "NCMEC staff have not viewed the

---

[1] Although objectively false, this statement raises the horrifying probability that there are currently individuals in prison who were not able to afford the expense of a private investigation to disprove similar false allegations.

17

following uploaded files and have no information concerning the content of the uploaded files."

Although certain sections of the report were quoted directly in the Affidavit to the Court, this section or the information contained in it was omitted and never related to the Court.

(d) Detective Preston did not show the subject image to the Court making the determination of Probable Cause.

Because there is no objective information, representation or depiction which would tend to prove or even suggest that the model was a minor, it was exculpatory by its very nature.

(e) The Detective did not inform the Court, through her affidavit, that the published image was purportedly that of an adult.

(f) The Detective did not inform the Court that the publisher of the image claimed to be in compliance with 18 USC §2257 and the models were purportedly verified.

(g) Det. Preston included the non-expert, subjective and false opinion of Dr. Dully who she knew or should have known is not an expert in determining the age of young women from a photograph with any degree of certainty.

18

Presenting the subjective lay opinion of a medical doctor that the model "appears to be younger than the age of 18," created a false and misleading impression that the opinion was scientific or expert in some way.  It was not.

85. The scheme of Det. Preston and SJSO succeeded in obtaining a warrant directed to the Plaintiff's phone/internet service provider, Verizon.

86. The search warrant was executed upon the Plaintiff's Electronic Service Provider (ESP) on February 28, 2023.

87. On April 4, 2023, the ESP complied with the subject search warrant.

88. On or about that date, Det. Preston and SJSO had full access to all of Plaintiff's private content available on his phone.

89. No images of CSAM were discovered within the data review or contained in the files provided by the ESP.

90. Despite the fact that no CSAM was present, Det. Preston and SJSO chose, apparently at random, another image of a second model, which was also published on the Met-art.com website.

91. Again, this image was of a model who was purportedly verified as an adult and the image was consistent with a partial-nudity professional photoshoot, similar to those published in a Playboy or Penthouse centerfold article.

19

92.   Again, this image was taken to Defendant, Dr. Kathleen Dully.

93.   Again, knowing that she was not expert in determining age from a professionally produced photograph, on April 5, 2023, Dr. Dully estimated, based entirely on the fact that the model did not have visible pubic hair (SMR I), that the model was less than or equal to 9 – 13.5 years old.

94.   This second model was, in fact a consenting adult, over the age of 18.

95.   Dr. Dully knew this opinion would be used in an official capacity and/or presented to a court. This opinion represented a knowing and intentional misrepresentation of fact to the court, as it was not supported by any scientific or medical principle.

96.   Furthermore, Det. Preston and SJSO knew or should have known that the opinion was baseless and not grounded in scientific probability or reality.

97.   After discovering no CSAM in the possession of Plaintiff, SJSO arrested Plaintiff on charges of Knowing Possession of CSAM pursuant to F.S.S. 827.071(5), on April 12, 2023.

98.   After substantial discovery and multiple depositions to understand the facts set forth above, representatives of Plaintiff contacted the legal representative of Met-art.com on December 18, 2023.

99. The following day, December 19, 2023, Met-art.com's representative forwarded photographic imagines of government issued ID of both models along with the dates of the photography sessions. He confirmed that no CSAM has ever been published on their website and age verification exists for all models pursuant to 18 USC §2257.

## COUNT I – DET. PRESTON - VIOLATION OF THE FOURTH AMENDMENT - UNREASONABLE SEARCH

100. Plaintiff realleges the allegations contained in paragraphs 1-99.

101. At all times material, Defendant Det. Preston was acting under color of state law.

102. At all times material, Defendant was acting within the course and scope of her duty as law enforcement officers.

103. Defendant sought and obtained search warrants from a Court of competent jurisdiction without probable cause to believe the Plaintiff had or was imminently planning to commit a crime.

104. Defendant obtained a search warrant by making false statements in an affidavit presented to a judicial officer.

105. At the time the false statements were made, Defendants knew that the statements were false or would have known they were false had they not recklessly disregarded the truth.

106. Defendant obtained a warrant by omission of facts, then known or reasonably knowable, that any reasonable person would have known the judge would wish to have brought to his attention.

107. These false statements and/or omissions of fact were material.

108. The right to be free from unreasonable search and seizure is protected by the Fourth Amendment to the Constitution of the United States of America.

109. At all times material to this action, the right to be free from unreasonable search and seizure was well and clearly established.

110. Defendant violated Plaintiff's Fourth Amendment rights, as the search was intentional and unreasonable.

111. Furthermore, Defendant's conduct exhibited and was motivated by a malicious or reckless indifference to the rights of Plaintiff.

112. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal

prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT II – SJSO - VIOLATION OF THE FOURTH AMENDMENT - UNREASONABLE SEARCH

113. The Plaintiff incorporates by reference the allegations contained in paragraphs 1-102.

114. The actions, investigation and application for the above referenced search was approved and ratified by SJSO.

115. The actions, investigation and application for the above referenced search was authorized by the Defendant SJSO's policy and procedures.

116. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

23

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT II – DET. PRESTON - VIOLATION OF THE FOURTH AMENDMENT, UNREASONABLE ARREST

117. Plaintiff incorporates the allegations contained in paragraphs 1-102.

118. Defendant's decision to effectuate an arrest and determination of probable cause was based entirely on the possession of material which was legal and protected by the First Amendment of the Constitution of the United States of America.

119. Furthermore, the material was published on a website which alerted the public and law enforcement that the material was legal and published in compliance with federal law.

120. An objectively reasonable and prudent law enforcement officer would not have believed that that Plaintiff had or was committing a crime solely by the possession of legal and constitutionally protected material.

121. The private possession of publicly available, constitutionally protected speech cannot be the basis for arrest in a free society.

122. The arrest was made without probable cause.

24

123. The right to be free of an unreasonable arrest is protected by the Fourth Amendment of the Constitution of the United States of America.

124. The right is well and clearly established.

125. The Defendant violated the Plaintiff's Fourth Amendment Right.

126. The Defendant's conduct exhibited and was motivated by a malicious or reckless indifference to the rights of Plaintiff.

127. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT IV – SJSO - VIOLATION OF THE FOURTH AMENDMENT, UNREASONABLE ARREST

128.   The Plaintiff incorporates the allegations contained in paragraphs 1-102 and 117-126.

129.   The investigation and arrest was approved and ratified by SJSO.

130.   The investigation and arrest was the result of policies and procedures of SJSO.

131.   As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

26

## COUNT V – DET. PRESTON VIOLATION OF THE FIRST AMENDMENT

132. Plaintiff incorporates the allegations contained in paragraphs 1-102.

133. At all times material, Plaintiff was in possession of material which was protected by the First Amendment of the Constitution of the United States.

134. This right is clearly established.

135. The Defendant arrested Plaintiff based on the possession of constitutionally protected material.

136. Arrest would chill a person of ordinary firmness from continuing to engage in the protected activity.

137. Plaintiff's possession of the constitutionally protected material was a substantial or motivating factor in the arrest.

138. The arrest violated the protections afforded by the First Amendment.

139. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT VI – SJSO VIOLATION OF THE FIRST AMENDMENT

140.  Plaintiff reincorporates the allegations in paragraphs 1-102 and 132-138.

141.  The arrest was the result of SJSO policy and procedure.

142.  The arrest was approved and/or ratified by SJSO.

143.  As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT VII – DR. KATHLEEN DULLY - VIOLATION OF FOURTEENTH AMENDMENT – DUE PROCESS

144. Plaintiff incorporates the allegations contained in paragraphs 1-99.

145. At all times relevant, the UF Child Protection Team was an organization authorized and established by F.S.S. 39.303 to aid state investigations into allegations of child abuse in its various forms.

146. At all times relevant, Dr. Kathleen Dully was the Medical Director of the UF Child Protection Team.

147. At all times, Dr. Kathleen Dully was acting under color of State Law.

148. At all times relevant, Defendant Dully was acting in the course and scope of her role as the Medical Director of the UF Child protection team.

149. The Fourteenth Amendment protects against being subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the defendant.

150. This right was well and clearly established.

151. Defendant Dully provided deliberately false and fabricated evidence which she knew would be used in the criminal charge and prosecution of Plaintiff.

152. Defendant Dully provided false or misleading evidence which was the result of a deliberate indifference to the Plaintiff's innocence which she knew would be used in the criminal charge and prosecution of Plaintiff.

153. Defendant Dully intentionally applied techniques which would yield false information, which was then used to charge or prosecute the Plaintiff.

154. These actions violated the Fourteenth Amendment to the Constitution of the United States of America.

155. Defendant Dully's conduct evidences and was motivated by a malicious or reckless indifference to the Plaintiff's rights.

156. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

30

## COUNT VIII – UNIVERSITY OF FLORIDA BOARD OF TRUSTEES -

## VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS

157. Plaintiff incorporates the allegations contained in paragraphs 1-99 and 144-155.

158. UF Child Protection Team is a division and organization within the University of Florida system and controlled by The Board of Trustees.

159. This conduct was approved or ratified by UF Child Protection Team, as Dr. Dully was the Medical Director of the organization.

160. This conduct was the result of the then policy and procedures of the UF Child Protection Team.

161. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

31

Dated on this 12th day of January 2024.

**LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI**

*/s/ Michael K. Roberts*

_____

**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
**Jeffery S. Nooney, Esquire**
Florida Bar No. 1011565
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
(904) 858-9943 facsimile
mroberts@nrhnlaw.com
jnooney@nrhnlaw.com
Attorney for Plaintiff

# ECF 10

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISON**

WILLIAM LAWSHE,
An individual,

        Plaintiff,                          Case No. 3:24-cv-00044

v.

ROBERT HARDWICK,
In his official capacity as Sheriff of St. John's County,
MIKAYLA PRESTON,
In her individual capacity as a Detective for St. John's
County Sheriff's Office,
UNIVERSITY OF FLORIDA BOARD OF TRUSTEES,
And KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

        Defendants.
_____/

**DEFENDANT KATHLEEN DULLY, SUED IN HER INDIVIDUAL**
**CAPACITY AS MEDICAL DIRECTOR OF THE UF CHILD**
**PROTECTION TEAM, MOTION TO DISMISS PLAINTIFF'S**
**COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH**
**RELIEF CAN BE GRANTED WITH SUPPORTING MEMORANDUM OF**
**LAW**

Comes Now Defendant Kathleen Dully, sued in her individual capacity as

medical director of the UF Child Protection Team (hereinafter referred to as "Dr.

Dully"), by and through her undersigned counsel, pursuant to Rule 12(b)(6), Fed. R.

Civ. P., and files his Motion to Dismiss Count VII of Plaintiff's Complaint for failure

1

to state a claim upon which relief can be granted. As grounds in support of this Motion, Dr. Dully states:

## **FACTS**

1. Plaintiff William Lawshe (hereinafter referred to as "Plaintiff") filed a multiple count Complaint and specifically, as to Dr. Dully, alleged a violation of 42 U.S.C. §1983 Fourteenth Amendment.

2. At all times material, Dr. Dully was and is a medical director of the UF Child Protection Team, an agency of the State of Florida. (See Plaintiff's Complaint, ¶ 146).

3. Plaintiff states Dr. Dully was acting in the course and scope of her role as the Medical Director of the UF Child protection team. (*Id.* at ¶ 148).

4. Further, Plaintiff alleges UF Child Protection Team is a division and organization within the University of Florida system. (*Id.* at ¶ 158).

5. Plaintiff continues to state that alleged conduct "was approved or ratified by UF Child Protection Team, as Dr. Dully was the Medical Director of the organization." (*Id.* at ¶ 159).

6. Plaintiff alleges Dr. Dully was at all times relevant acting within the course and scope of her role as the Medical Director of the UF Child protection team. (*Id.* ¶ 148).

7. Plaintiff's Complaint is devoid of any allegations that Dr. Dully individually

2

acted outside the scope of her employment on its face. In fact, Plaintiff's Complaint establishes its claim that Dr. Dully was acting within the scope of her employment.

8. Plaintiff failed to state a cause of action against Dr. Dully individually; Plaintiff is barred from bringing a cause of action against Dr. Dully in her individual capacity under §1983 pursuant to the 11th Amendment of the United States Constitution.

## **MEMORANDUM OF LAW**

Rule 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted.  Dr. Dully is immune from suit pursuant to the Eleventh Amendment of the United States Constitution. The Eleventh Amendment expressly provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced on or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  The law in this area is well-settled in that, "absent several limited exceptions, the Eleventh Amendment is an absolute bar to suit for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities." *McCurry v. Moore*, 242 F.Supp.2d 1167, 1183 (N.D. Fla. 2002), *citing Edelman v. Jordan*, 415 U.S. 651 (1974); *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc*. 506 U.S. 139

3

(1993); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996); *Carr v. City of Florence*, 916 F.2d 1521, 1524 (11th Cir. 1990).

Eleventh Amendment immunity "confers immunity from suit, not just from liability." *Riddle v. Secretary, Dept. of Corrections*, Slip Copy, 2008 WL 4790516 (M.D. Fla.). A suit against a state official in his or her official capacity "is not a suit against the official but rather is a suit against the official's office." *Riddle,* Slip Copy, 2008 WL 4790516, citing *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989). In other words, it is no different from a suit against the State itself. *Riddle,* Slip Copy, 2008 WL 4790516, citing *Will,* 491 U.S. at 71.

Unless Congress, expressly and unequivocally, abrogates this immunity, or unless the State waives its immunity and consents to suit in federal court, Plaintiff's claims are absolutely barred. *Fletcher v. State of Florida*, 858 F.Supp. 169 (M.D. Fla. 1994); *Gamble v. Florida Dept. of Health & Rehab. Services*, 779 F.2d 1509 (11th Cir. 1986); *Edelman v. Jordan*, 415 U.S. 651 (1974). Furthermore, "States and their officials no longer need to rely exclusively on eleventh amendment immunity to avoid liability in their official capacities in section 1983 cases" because, as held in *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), "states and state officials acting in their official capacities are not 'persons' subject to liability under 42 U.S.C. §1983." *Farrell v. Woodham*, 2002 WL 32107645 (M.D. Fla.), citing to *Carr*, 916 F.2d at 1524.

4

Applying these rules to the instant matter, the issue is clear—the claim brought against Dr. Dully in Count VII of Plaintiff's Complaint is barred by the Eleventh Amendment. The University of Florida Board of Trustees is a state agency, indisputably an arm of the State of Florida. (Plaintiff sued Dr. Dully individually in her capacity as a medical director of the UF Child Protection Team with the University of Florida.)  Thus, the remedy Plaintiff seeks is against the University of Florida Board of Trustees and not an individual employee of the University of Florida Board of Trustees. Based on the foregoing, Plaintiff's claim against Dr. Dully for alleged violation of 42 U.S.C. §1983 is completely barred by the Eleventh Amendment of the United States Constitution.

Finally, no exception to immunity applies in this case.  The Supreme Court of the United States already declared that Congress did not abrogate state immunity to suit under §1983.  *Will,* 491 U.S. at 66-67; *Fletcher,* 858 F.Supp. at 172, citing *Gamble,* 779 F.2d 1509; *Hill v. Department of Corrections, State of Florida*, 513 So.2d 129 (Fla. 1987).  Further, the State has not statutorily waived its immunity in the federal courts.  A waiver by the State is found only when stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.[1]  *Fletcher,* 858 F.Supp. at 172, citing *Florida Department of Health and Rehabilitative Services v. Florida Nursing Home*

---

[1] §768.28 is Florida's general waiver of sovereign immunity statute.

5

*Association,* 450 U.S. 147 (1981); *John Doe, et al, v. Moore*, 410 F.3d 1337, 1349 (11th Cir. 2005).

Florida courts, including the 11th Circuit, have previously addressed whether Florida's general waiver of sovereign immunity statute constitutes a waiver of Eleventh Amendment immunity.  These courts have ruled that it does not.  *Hill,* 513 So. 2d 129; *Fletcher,* 858 F.Supp. at 172; *Shinholster v. Graham*, 527 F.Supp 1318 (N.D. Fla. 1981); *Gamble,* 779 F.2d 1509.  "The State of Florida has not statutorily waived its Eleventh Amendment immunity for itself, nor for any arms of the state, nor for its officers, employees or agents sued in their official capacities…[T]he Florida legislature's intent to limit the waiver of sovereign immunity solely to tort claims and to the exclusion of federal civil rights suits is abundantly clear." *Shinholster,* 527 F.Supp. 1318.

## <u>CONCLUSION</u>

Plaintiff's Complaint fails to state a claim upon which relief can be granted against Dr. Dully in her individual capacity, as the claim alleges she was acting within the scope of her employment with the state agency that employed her. Dr. Dully is immune from suit.

WHEREFORE, Defendant Dr. Kathleen Dully respectfully requests this Honorable Court to dismiss Count VII of Plaintiff's Complaint for failure to state a claim upon which relief can be granted, as to Defendant Dr. Dully.

6

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy hereof was served via Florida e-Portal this **19th** day of **February 2024** upon **Michael K. Roberts, Esquire**, Law Offices of Nooney, Roberts, Hewett, and Nowicki, 1680 Emerson Street, Jacksonville, Florida 32207 mroberts@nrhnlaw.com  jnooney@nrhnlaw.com  (*Counsel for Plaintiff*);

BUCHANAN & BUCHANAN, P.A.
Attorney for Defendant Kathleen Dully
1900 SE 18th Avenue, Suite 300
Ocala, Florida 34471
Tel:   (352) 629-4099
Fax:   (352) 629-3975
Primary Email: rbuchanan@rbtrial.com
                    cdelrosso@rbtrial.com
Secondary Email: aperry@rbtrial.com
                    nkirbas@rbtrial.com
                    rscinta@rbtrial.com

By: /s/ Robert B. Buchanan
Robert B. Buchanan
Florida Bar No. 063400
Claire Del Rosso
Florida Bar No. 1001010

7

# ECF 26

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WILLIAM LEE LAWSHE,
an individual,

      Plaintiff,

v.                                                            Case No. 3:24-cv-00044-MMH-MCR

ROBERT HARDWICK,
in his official capacity as Sheriff of St. Johns County,
MIKAYLA PRESTON,
in her induvial capacity as a Detective for St. Johns County Sheriff's Office, and
KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

      Defendants.

_____/

**<u>AMENDED COMPLAINT</u>**

Plaintiff, WILLIAM LEE LAWSHE ("Plaintiff"), sues Defendants, ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her induvial capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team, and alleges:

1. This is an action pursuant to 42 U.S.C. § 1983.

**<u>COMMON ALLEGATIONS - THE ARREST</u>**

2. The Plaintiff William Lee Lawshe resides in St. Augustine, St. Johns County, Florida.

1

3. Until the events which are the subject of this action, Mr. Lawshe was a respected and valued law enforcement officer with the Florida Fish and Wildlife Conservation Commission (here-in-after referred to as FWC) for over 15 years.

4. FWC officers are highly trained, versatile law enforcement officers with full police powers and statewide jurisdiction.

5. In 2014, Mr. Lawshe was named both FWC Officer of the Year and National Wildlife Officer of the Year for his distinguished service.

6. Prior to joining FWC, Mr. Lawshe served as a Non-Commissioned Officer in the United State Army.

7. Mr. Lawshe served as a light infantry fire team leader, completed airborne school, Air Assault School and Ranger R.I.P training. Mr. Lawshe received an honorable discharge in 1994.

8. At all times material to this action, Defendant, Robert Hardwick was the elected Sheriff of St. Johns County, Florida and the administrative head of the St Johns County Sheriff's Office (hereinafter referred to as SJSO).

9. SJSO is a law enforcement agency acting on behalf of and pursuant to the power vested to it by the State of Florida pursuant to Fla. Stat. § 30.15.

2

10. Defendant Mikayla Preston is a detective employed with the SJSO, assigned to the Special Victims Unit (SVU).

11. Det. Preston is a member of the North Florida Internet Crimes against Children Task Force, who holds herself out as an expert in the investigation of crimes involving the online sexual-solicitation and exploitation of children. This expertise specifically includes specialized high-tech training and experience in investigating the collection and trading of images of Child Sexual Abuse Material (CSAM) and child pornography.

12. On April 12, 2023, Det. Preston, arrested Plaintiff William Lee Lawshe on charges of Possession of CSAM pursuant to F.S.S. 827.071(5), which makes the knowing possession of child pornography a felony.

13. Prior to the arrest, Det. Preston knew that the charge of possession of child pornography carried a severe social stigma and that the mere allegation (whether proven or not) would likely destroy Mr. Lawshe's personal and professional reputation.

14. Despite the certainty of injury to the Plaintiff, the arrest was made without a reasonable investigation into the truth of the allegations and represented a reckless disregard for the rights of Plaintiff.

15.    The arrest was made without warning, under the guise of a ruse designed to trick Plaintiff into believing that he was aiding in an official investigation, rather than being the target of an imminent arrest.

16.    Mr. Lawshe was not confronted with the facts or evidence supporting these accusations prior to his arrest.

17.    In fact, Mr. Lawshe's employer FWC, which was not an investigative agency in this matter, was informed of the charges prior to Mr. Lawshe. As a result, Mr. Lawshe was confronted by his superior officer (FWC) at the SJSO facility just moments after his arrest and was forced to resign or be fired, having been threatened with the loss of his pension.

18.    Upon making the arrest, SJSO alerted media outlets and publicized Plaintiff arrest.

19.    On April 13, 2023, acting in the place and function of a complaining witness, Assistant State Attorney (ASA) Kaitlyn Payne affirmed and verified the allegations of possession of CSAM without ever viewing the alleged images or vetting any evidence to support the charges. ASA Payne's verification was a necessary predicate used to file formal charges against Plaintiff for possession of CSAM.

4

20. In the following days, numerous media outlets published news articles and TV segments describing the arrest and allegations against Mr. Lawshe. His name was smeared on social media platforms, and he was ostracized from the community that he had dedicated his professional life to serving.

21. Furthermore, his employer FWC published to media outlets false and defamatory statements that Plaintiff had "betrayed the oath that all law enforcement officers take to protect the public" and promised that Mr. Lawshe would "be held accountable for his actions."

22. Despite the devastating injury to his reputation and career, Mr. Lawshe never viewed, downloaded, searched for, clicked on, or sought out, in any way, images of CSAM.

23. No CSAM was ever found on his phone, computer, cloud storge, hard drive, thumb drive or any other electronic storage device owned or controlled by Mr. Lawshe.

24. No analog photographs of CSAM were ever found in Mr. Lawshe's possession.

25. No images of CSAM were ever found in an email account or attachments to emails either sent to or received by Mr. Lawshe.

26. No virtual or artificial intelligence generated images mimicking CSAM were ever viewed, possessed, controlled or downloaded by Mr. Lawshe.

27. Mr. Lawshe never visited or sought out any "dark web" or message boards which were known to trade in images of CSAM.

28. At all times relevant, including prior to the arrest, there was known or readily discoverable exculpatory evidence, easily accessible and available to the SJSO and the SJSAO which proved Mr. Lawshe's innocence.

29. In fact, there was never any competent evidence to support the allegation that Mr. Lawshe had knowingly possessed CSAM.

30. Despite knowledge of the total lack of competent evidence, ASA Payne, with the approval of her supervisors, attempted to coerce Plaintiff to plead guilty to the charges, by withholding access to the evidence against Plaintiff. This tactic was specifically designed to thwart justice and significantly delayed the outcome of the case.

31. As a result of these baseless charges, Mr. Lawshe was forced to personally finance an investigation into the allegations, at a significant expense.

32. Fortunately, through these private efforts, Mr. Lawshe was able to conclusively prove that the charges and allegations against him were objectively false and entirely baseless.

33.   After presenting the exculpatory evidence to the SAO on December 20, 2023 via email, the charges were dropped on December 27, 2023, just three business days later.

## COMMON ALLEGATIONS – THE INVESTIGATION

34.   The facts and circumstances surrounding the investigation of William Lee Lawshe on charges of possession of CSAM show a conscious disregard and reckless indifference to the truth, to the Constitution of the United States and the rights of the Plaintiff thereunder.

35.   The subject case was opened on February 20, 2023, when SJSO received a cyber tip (#153739160) from the National Center for Missing and Exploited Children (NCMEC).

36.   This cyber tip report stated that William Lawshe was in possession of 1 (one) image of "Apparent Child Pornography (Unconfirmed)."

37.   NCMEC is a non-profit organization which operates a cyber tip line receiving and reporting allegations of CSAM. The tip line functions as a clearing house of CSAM, funded and regulated by the laws of the United States of America.

7

38. In addition to describing the report as "unconfirmed," the NCMEC cyber tip (#153739160) stated that the content had "not been viewed by NCMEC staff."

39. Det. Preston and other officers of SJSO knew or should have known that it was the policy of NCMEC to forward all cyber tip reports to law enforcement, regardless of their veracity.

40. Moreover, Det. Preston, and other officers of SJSO, knew that there had been prior false reports of CSAM made by NCMEC to SJSO.

41. Based on the circumstances, it was not reasonable for a law enforcement officer or agency to rely on the assertions of criminal conduct in the NCMEC cyber tip (#153739160) .

42. The cyber tip report (#153739160) indicated that the image had been identified as suspected child pornography by the Plaintiff's Electronic Service Provider (ESP) Verizon through the use of an encryption and algorithm "hash." A "hash," is nothing more than a digital flag or marker designed to identify images through the use of image recognition technology or artificial intelligence.

43. A copy of the subject image was attached to the cyber tip report.

44. This image (#153739160) did not contain CSAM.

45.   On February 20, 2023, Det. Preston viewed the subject image attached to the NCMEC report.

46.   The cyber tip described the image as containing a "prepubescent" female. Det. Preston knew this description was false from her review of the subject image.

47.   Upon review of the image, Det. Preston saw, acknowledged and recorded that the image contained a watermark of the website domain: Met-art.com. Watermarks are commonly used to indicate legal copyright and/or ownership of the subject image.

48.   At the time of review, Det. Preston believed that Met-art.com had published, owned or controlled the subject image.

49.   Det. Preston, due to her high-tech training in the investigation of cyber exploitation, understood that the Met-art.com domain was public and easily accessible through any internet service provider.

50.   The cyber tip report stated that the that the image was not available publicly. Det. Preston knew this was a false statement.

51.   Met-art.com, through its public website, operates a business engaged in the publication of adult entertainment material and images of consenting adults.

52.    As indicated on the image, Met-art.com had, in fact, published the image which was the subject of the cyber tip report (#153739160).

53.    The model, who was known as "Milena D.," was a consenting adult and paid model at the time the image was taken and published, in 2010.

54.    At the time of the incident which is the subject of this action, the subject image (#153739160) was and continues to be available through a common Google search.

55.    The subject image (#153739160) contains partial nudity in a professional "photo shoot" setting consistent with a "centerfold" type photograph found in any number of print publications, such as Playboy or Penthouse.

56.    Det. Preston, given her extensive training, experience and expertise in investigating CSAM knew or should have known that the subject model was a consenting adult based on the following available information:

   a) The website in question (Met-art.com) clearly and unequivocally states that the subject model was over 18 years of age.

   b) Met-art.com describes the model as "verified" and states that it operates in compliance with 18 USC §2257, 28 CFR 75, which

10

requires publishers of pornographic images to keep and maintain records verifying the age of all models.

c) Met-art.com provides a link to a representative along with legal compliance and contact information.

d) The identified legal representative, Jeffrey J. Douglas, is a licensed attorney in the State of California. He is also the designated records custodian of Met-art.com.

e) Met-Art.com, in fact, maintains records verifying the age of all models and makes those records available to any appropriate investigating authority.

f) Additionally, there is no indicia, description, suggestion, information, depiction, or other objective reason found on the image itself or the Met-art.com website that would lead a reasonable person to believe that the model in the subject image was a minor.

57.    At no time did Det. Preston or any other officer of SJSO officer, have a reasonable basis to believe that the image contained CSAM.

58.    Additionally, because the internet publication claimed that the model was an adult, and nothing on the images or the website would lead a reasonable

11

person to believe that the representations of age were false, it would be highly unlikely for any law enforcement agency to prove, establish or believe that possession of the image could ever constitute knowing possession of CSAM.

59.    However, even if there were some indication that the model may have been a minor, Det. Preston knew or should have known that compliance with 18 USC §2257 was specifically designed and intended to reduce the risk of CSAM and make age verification by law enforcement easy and accessible.

60.    Det. Preston knew or should have known that compliance with 18 USC §2257 required Met-art.com to make records readily available which would verify the age of any model.

61.    At no time, prior to the arrest, did Det. Preston, or any other representative of SJSO, contact Met-art.com or its legal representative to obtain age verification of the subject model.

62.    Failure to investigate the publishing website and failure to utilize the provisions of 18 USC §2257 was a conscious decision and wanton dereliction of duty which would cause a reasonable person to question the motives of the investigative authorities.

63. Significantly, no one from SJSO ever pursued criminal action or investigation against the owner and publisher of the alleged child pornography, Met-art.com, including but not limited to referral to another appropriate law enforcement agency.

64. Rather, SJSO and Det. Preston singled out Plaintiff William Lee Lawshe, at least in part, due to his position as a respected law enforcement officer and the potential for publicity associated with arresting a law such an officer.

65. On February 20, 2023, after viewing the subject image Det. Preston and SJSO knew or should have known that there was no competent evidence to establish a reasonable belief that the Plaintiff was in knowing possession of child pornography.

66. Thereafter, Det. Preston and SJSO's SVU unit devised a scheme to manufacture the illusion of evidence in an attempt to thwart the judicial process, including but not limited to the search warrant requirement of the Fourth Amendment of the Constitution of the United State of America.

67. In execution of this scheme, Det. Preston communicated with and/or conspired with Defendant, Dr. Kathleen Dully for the purpose of manufacturing false, misleading, unsupported evidence in the form of fake or pseudo-scientific opinions.

13

68.  Dr. Kathleen Dully is a medical doctor, board certified in both pediatrics and child abuse. She is an associate professor of pediatrics at the University of Florida. She is aware of the scope and limitations of medical science and her role as a physician.

69.  Despite the availability of objective proof of the subject model's age (photograph of valid issued government ID), Det. Preston requested that Dr. Dully estimate the age of the model by viewing the studio produced photograph which was the subject of the NECMEC cyber tip report (#153739160).

70.  There is no scientifically accepted medical test or methodology to estimate the precise age of a female, from review of professionally produced photographs.

71.  Despite knowing that there is no scientific method for precisely establishing the age of a female from viewing professionally produced photographs, Dr. Dully agreed to the scheme suggested by Det. Preston.

72.  On February 22, 2023, Det. Preston met Dr. Dully and presented her with the single image of the alleged CSAM which was subject of the NCMEC cyber tip report (#153739160).

14

73. Prior to or during the review, Det. Preston told Dr. Dully that the image had been reported by NCMEC as CSAM.

74. During the review of February 22, 2023, Det. Preston failed to disclose that the image was publicly available on the internet through a public domain website.

75. During the review of February 22, 2023, Det. Preston failed to disclose that the model was purported to be 18 years of age and had been claimed to be verified as such by the image's publisher.

76. During the review of February 22, 2023, Dr. Dully intentionally misapplied a clinical rating scale, known as the "Tanner Scale" or Sexual Maturity Rating (SMR).

77. The Tanner Scale or SMR is a method by which clinicians can measure and quantify the sexual development of children into and through the process of puberty. It was specifically designed to ascertain whether young persons were developing appropriately, and as a tool to diagnose endocrinological decease which could cause either premature or delayed puberty. It is not a scientific or medically accepted method of determining the age of a patient/individual.

78. Dr. Dully knew that the Tanner or SMR evaluation was not a method of determining a person's age with any reasonable degree of medical certainty or probability.

79. In a report dated February 22, 2023, Dr. Dully stated that the model "appears to be younger than the age of 18" estimating that the model was as young as 12 years old.

80. The model was, in fact, a consenting adult, over the age of 18.

81. Dr. Dully knew or should have known that this report would be presented to the Court and/or used in some other official capacity to aid a criminal investigation against the Plaintiff.

82. Thereafter, Det. Preston continued the scheme to manufacture probable cause by drafting an affidavit for presentation to a court of competent jurisdiction, for the purpose of obtaining a search warrant directed to the Plaintiff's phone/internet service provider, Verizon.

83. This affidavit represents a conscious scheme to deprive a judicial officer of the then known or knowable facts and obtain a warrant by unlawful means.

84. The affidavit contains multiple statements which were false, misleading and omit substantial exculpatory evidence then known to SJSO:

(a) Det. Preston swore, under oath, that the website met-art.com "has a known history of displaying CSAM of teenage girls…"

This statement is false. No CSAM exists or has ever been published on Met-art.com. The website has consistently and thoroughly complied with the requirements of 18 USC §2257.[1]

(b) The affidavit represents that the image was not publicly available.

This representation was false and Det. Preston knew that it was false. The availability of a particular image on a public website is a significant indication that the image is not CSAM.

(c) The Affidavit, as written, suggests that the tip or allegation was reviewed, vetted or validated by NCMEC. While tips from citizen groups could be relevant (even presumptively truthful) the "tip" in this case stated that the report was "unconfirmed." In fact, the cyber tip report stated that "NCMEC staff have not viewed the following uploaded files and have no information concerning the content of the uploaded files."

---

[1] Although objectively false, this statement raises the horrifying probability that there are currently individuals in prison who were not able to afford the expense of a private investigation to disprove similar false allegations.

17

Although certain sections of the report were quoted directly in the Affidavit to the Court, this section or the information contained in it was omitted and never related to the Court.

(d) Detective Preston did not show the subject image to the Court making the determination of Probable Cause.

Because there is no objective information, representation or depiction which would tend to prove or even suggest that the model was a minor, it was exculpatory by its very nature.

(e) The Detective did not inform the Court, through her affidavit, that the published image was purportedly that of an adult.

(f) The Detective did not inform the Court that the publisher of the image claimed to be in compliance with 18 USC §2257 and the models were purportedly verified.

(g) Det. Preston included the non-expert, subjective and false opinion of Dr. Dully who she knew or should have known is not an expert in determining the age of young women from a photograph with any degree of certainty.

Presenting the subjective lay opinion of a medical doctor that the model "appears to be younger than the age of 18," created a false

18

and misleading impression that the opinion was scientific or expert in some way.  It was not.

85.   The scheme of Det. Preston and SJSO succeeded in obtaining a warrant directed to the Plaintiff's phone/internet service provider, Verizon.

86.   The search warrant was executed upon the Plaintiff's Electronic Service Provider (ESP) on February 28, 2023.

87.   On April 4, 2023, the ESP complied with the subject search warrant.

88.   On or about that date, Det. Preston and SJSO had full access to all of Plaintiff's private content available on his phone.

89.   No images of CSAM were discovered within the data review or contained in the files provided by the ESP.

90.   Despite the fact that no CSAM was present, Det. Preston and SJSO chose, apparently at random, another image of a second model, which was also published on the Met-art.com website.

91.   Again, this image was of a model who was purportedly verified as an adult and the image was consistent with a partial-nudity professional photoshoot, similar to those published in a Playboy or Penthouse centerfold article.

92.   Again, this image was taken to Defendant, Dr. Kathleen Dully.

93. Again, knowing that she was not expert in determining age from a professionally produced photograph, on April 5, 2023, Dr. Dully estimated, based entirely on the fact that the model did not have visible pubic hair (SMR I), that the model was less than or equal to 9 – 13.5 years old.

94.  This second model was, in fact a consenting adult, over the age of 18.

95. Dr. Dully knew this opinion would be used in an official capacity and/or presented to a court.  This opinion represented a knowing and intentional misrepresentation of fact to the court, as it was not supported by any scientific or medical principle.

96. Furthermore, Det. Preston and SJSO knew or should have known that the opinion was baseless and not grounded in scientific probability or reality.

97. After discovering no CSAM in the possession of Plaintiff, SJSO arrested Plaintiff on charges of Knowing Possession of CSAM pursuant to F.S.S. 827.071(5), on April 12, 2023.

98. After substantial discovery and multiple depositions to understand the facts set forth above, representatives of Plaintiff contacted the legal representative of Met-art.com on December 18, 2023.

99. The following day, December 19, 2023, Met-art.com's representative forwarded photographic imagines of government issued ID of both models

along with the dates of the photography sessions. He confirmed that no CSAM has ever been published on their website and age verification exists for all models pursuant to 18 USC §2257.

## COUNT I – DET. PRESTON - VIOLATION OF THE FOURTH AMENDMENT - UNREASONABLE SEARCH

100. Plaintiff realleges the allegations contained in paragraphs 1-99.

101. At all times material, Defendant Det. Preston was acting under color of state law.

102. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

103. Defendant sought and obtained search warrants from a Court of competent jurisdiction without probable cause to believe the Plaintiff had or was imminently planning to commit a crime.

104. Defendant obtained a search warrant by making false statements in an affidavit presented to a judicial officer.

105. At the time the false statements were made, Defendants knew that the statements were false or would have known they were false had they not recklessly disregarded the truth.

21

106. Defendant obtained a warrant by omission of facts, then known or reasonably knowable, that any reasonable person would have known the judge would wish to have brought to his attention.

107. These false statements and/or omissions of fact were material.

108. The right to be free from unreasonable search and seizure is protected by the Fourth Amendment to the Constitution of the United States of America.

109. At all times material to this action, the right to be free from unreasonable search and seizure was well and clearly established.

110. Defendant violated Plaintiff's Fourth Amendment rights, as the search was intentional and unreasonable.

111. Furthermore, Defendant's conduct exhibited and was motivated by a malicious or reckless indifference to the rights of Plaintiff.

112. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for

compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT II – SJSO - VIOLATION OF THE FOURTH AMENDMENT - UNREASONABLE SEARCH

113. The Plaintiff incorporates by reference the allegations contained in paragraphs 1-99.

114. At all times material, Defendant Det. Preston was acting under color of state law.

115. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

116. The actions, investigation and application for the above referenced search was approved and ratified by SJSO.

117. The actions, investigation and application for the above referenced search was authorized by the Defendant SJSO's policy and procedures.

118. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal

prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## <u>COUNT III – DET. PRESTON - VIOLATION OF THE FOURTH AMENDMENT, UNREASONABLE ARREST</u>

119.  Plaintiff incorporates the allegations contained in paragraphs 1-99.

120.  At all times material, Defendant Det. Preston was acting under color of state law.

121.  At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

122.  Defendant's decision to effectuate an arrest and determination of probable cause was based entirely on the possession of material which was legal and protected by the First Amendment of the Constitution of the United States of America.

123.  Furthermore, the material was published on a website which alerted the public and law enforcement that the material was legal and published in compliance with federal law.

24

124.  An objectively reasonable and prudent law enforcement officer would not have believed that that Plaintiff had or was committing a crime solely by the possession of legal and constitutionally protected material.

125.  The private possession of publicly available, constitutionally protected speech cannot be the basis for arrest in a free society.

126.  The arrest was made without probable cause.

127.  The right to be free of an unreasonable arrest is protected by the Fourth Amendment of the Constitution of the United States of America.

128.  The right is well and clearly established.

129.  The Defendant violated the Plaintiff's Fourth Amendment Right.

130.  The Defendant's conduct exhibited and was motivated by a malicious or reckless indifference to the rights of Plaintiff.

131.  As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for

compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT IV – SJSO - VIOLATION OF THE FOURTH AMENDMENT, UNREASONABLE ARREST

132. The Plaintiff incorporates the allegations contained in paragraphs 1-99.

133. At all times material, Defendant Det. Preston was acting under color of state law.

134. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

135. Defendant's decision to effectuate an arrest and determination of probable cause was based entirely on the possession of material which was legal and protected by the First Amendment of the Constitution of the United States of America.

136. Furthermore, the material was published on a website which alerted the public and law enforcement that the material was legal and published in compliance with federal law.

137. An objectively reasonable and prudent law enforcement officer would not have believed that that Plaintiff had or was committing a crime solely by the possession of legal and constitutionally protected material.

138. The private possession of publicly available, constitutionally protected speech cannot be the basis for arrest in a free society.

139. The arrest was made without probable cause.

140. The right to be free of an unreasonable arrest is protected by the Fourth Amendment of the Constitution of the United States of America.

141. The right is well and clearly established.

142. The Defendant violated the Plaintiff's Fourth Amendment Right.

143. The Defendant's conduct exhibited and was motivated by a malicious or reckless indifference to the rights of Plaintiff.

144. The investigation and arrest was approved and ratified by SJSO.

145. The investigation and arrest was the result of policies and procedures of SJSO.

146. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary

damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT V – DET. PRESTON VIOLATION OF THE FIRST AMENDMENT

147. Plaintiff incorporates the allegations contained in paragraphs 1-99.

148. At all times material, Defendant Det. Preston was acting under color of state law.

149. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

150. At all times material, Plaintiff was in possession of material which was protected by the First Amendment of the Constitution of the United States.

151. This right is clearly established.

152. The Defendant arrested Plaintiff based on the possession of constitutionally protected material.

28

153. Arrest would chill a person of ordinary firmness from continuing to engage in the protected activity.

154. Plaintiff's possession of the constitutionally protected material was a substantial or motivating factor in the arrest.

155. The arrest violated the protections afforded by the First Amendment.

156. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT VI – SJSO VIOLATION OF THE FIRST AMENDMENT

157. Plaintiff reincorporates the allegations in paragraphs 1-99.

158. At all times material, Defendant Det. Preston was acting under color of state law.

29

159. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

160. At all times material, Plaintiff was in possession of material which was protected by the First Amendment of the Constitution of the United States.

161. This right is clearly established.

162. The Defendant arrested Plaintiff based on the possession of constitutionally protected material.

163. Arrest would chill a person of ordinary firmness from continuing to engage in the protected activity.

164. Plaintiff's possession of the constitutionally protected material was a substantial or motivating factor in the arrest.

165. The arrest violated the protections afforded by the First Amendment.

166. The arrest was the result of SJSO policy and procedure.

167. The arrest was approved and/or ratified by SJSO.

168. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal

prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT VII – DR. KATHLEEN DULLY - VIOLATION OF FOURTEENTH AMENDMENT – DUE PROCESS

169. Plaintiff incorporates the allegations contained in paragraphs 1-99.

170. At all times relevant, the UF Child Protection Team was an organization authorized and established by F.S.S. 39.303 to aid state investigations into allegations of child abuse in its various forms.

171. At all times relevant, Dr. Kathleen Dully was the Medical Director of the UF Child Protection Team.

172. At all times, Dr. Kathleen Dully was acting under color of State Law.

173. At all times relevant, Defendant Dully was acting in the course and scope of her role as the Medical Director of the UF Child protection team.

31

174. The Fourteenth Amendment protects against being subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the defendant.

175. This right was well and clearly established.

176. Defendant Dully provided deliberately false and fabricated evidence which she knew would be used in the criminal charge and prosecution of Plaintiff.

177. Defendant Dully provided false or misleading evidence which was the result of a deliberate indifference to the Plaintiff's innocence which she knew would be used in the criminal charge and prosecution of Plaintiff.

178. Defendant Dully intentionally applied techniques which would yield false information, which was then used to charge or prosecute the Plaintiff.

179. These actions violated the Fourteenth Amendment to the Constitution of the United States of America.

180. Defendant Dully's conduct evidences and was motivated by a malicious or reckless indifference to the Plaintiff's rights.

181. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal

prosecution, the loss of ability to enjoy life, emotional distress, mental

anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for

compensatory damages, punitive damages and reasonable attorney's fees and cost

against Defendant. Plaintiff demands a jury trial.

Dated on this 16th day of April 2024.


**LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI**

*/s/ Michael K. Roberts*

_____

**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
**Jeffery S. Nooney, Esquire**
Florida Bar No. 1011565
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
(904) 858-9943 facsimile
mroberts@nrhnlaw.com
jnooney@nrhnlaw.com
Attorney for Plaintiff

# ECF 34

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

     Plaintiff,

v.                                Case No.: 3:24-cv-00044-MMH-MCR

ROBERT HARDWICK, in his official
capacity as Sheriff of St. Johns County,
MIKAYLA PRESTON, in her individual
capacity as a Detective for St. Johns County
Sheriff's Office, and KATHLEEN
DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

     Defendants.
_____/

**DEFENDANT DETECTIVE MIKAYLA PRESTON'S ANSWER
TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant MIKAYLA PRESTON, through undersigned counsel, files her answer and affirmative defenses to Plaintiff's Amended Complaint [ECF No. 26].

1.    Admitted that this action purports to be brought under 42 U.S.C. § 1983, but denied that the claims have any merit whatsoever or that Plaintiff is entitled to relief.

**COMMON ALLEGATIONS – THE ARREST**

2.    Without knowledge, therefore denied.

3.    Without knowledge, therefore denied.

4.    Without knowledge, therefore denied.

5. Without knowledge, therefore denied.

6. Without knowledge, therefore denied.

7. Without knowledge, therefore denied.

8. Admitted.

9. Denied, as phrased.

10. Admitted.

11. Admitted that Detective Preston is a member of the North Florida Internet Crimes Against Children Task Force. Admitted that Detective Preston has training and experience in the investigation of crimes involving the online sexual-solicitation and exploitation of children, including investigating the collection and trading of images of Child Sexual Abuse Material (CSAM) and child pornography. The remainder of this paragraph is denied.

12. Admitted.

13. Denied, as phrased.

14. Denied.

15. Admitted.

16. Admitted.

17. Admitted that FWC was informed of the charges prior to Plaintiff. Regarding the remainder of this paragraph, without knowledge, therefore denied.

18. Without knowledge, therefore denied.

19. The first sentence is denied. Regarding the second sentence, without knowledge, therefore denied.

2

20. Without knowledge, therefore denied.

21. Without knowledge, therefore denied.

22. Without knowledge, therefore denied.

23. Without knowledge, therefore denied.

24. Without knowledge, therefore denied.

25. Without knowledge, therefore denied.

26. Without knowledge, therefore denied.

27. Without knowledge, therefore denied.

28. Denied.

29. Denied.

30. Without knowledge, therefore denied.

31. Denied.

32. Denied.

33. Without knowledge, therefore denied.

### COMMON ALLEGATIONS – THE INVESTIGATION

34. Denied.

35. Admitted.

36. Denied, as phrased.

37. The first sentence is admitted. The second sentence is denied.

38. Denied, as phrased.

39. Admitted.

40. Denied, as phrased.

41. Denied, as phrased.

42. Denied, as phrased.

43. Denied.

44. Without knowledge, therefore denied.

45. Denied, as phrased.

46. Denied, as phrased.

47. The first sentence is admitted. Regarding the second sentence, watermarks are used for a number of purposes. The remainder of this paragraph is denied.

48. Denied.

49. Denied.

50. Denied.

51. Without knowledge, therefore denied.

52. Denied, as phrased.

53. Without knowledge, therefore denied.

54. Without knowledge, therefore denied.

55. Without knowledge, therefore denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied

60. Denied.

61. Admitted.

62. Denied.

63. Without knowledge, therefore denied.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. The first and second sentences are admitted. Regarding the third sentence, without knowledge, therefore denied.

69. Denied, as phrased.

70. Denied, as phrased.

71. Denied, as phrased.

72. Admitted.

73. Without knowledge, therefore denied.

74. Denied, as phrased.

75. Denied, as phrased.

76. Without knowledge, therefore denied.

77. Denied, as phrased.

78. Without knowledge, therefore denied.

79. Denied, as phrased.

80. Without knowledge, therefore denied.

81. Admitted.

82.   Denied.

83.   Denied.

84.   Denied.

85.   Denied, as phrased.

86.   Denied, as phrased.

87.   Admitted.

88.   Admitted.

89.   Without knowledge, therefore denied.

90.   Denied, as phrased.

91.   Without knowledge, therefore denied.

92.   Admitted.

93.   Denied, as phrased.

94.   Without knowledge, therefore denied.

95.   The first sentence is admitted. The second sentence is denied.

96.   Denied.

97.   Denied, as phrased.

98.   Without knowledge, therefore denied.

99.   Without knowledge, therefore denied.

## COUNT I – DETECTIVE PRESTON – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEARCH

100.   The responses to paragraphs 1 through 99 are incorporated as well as if fully set forth herein.

101.   Admitted.

102.   Admitted.

103.   Denied.

104.   Denied.

105.   Denied.

106.   Denied.

107.   Denied.

108.   Admitted.

109.   Denied, as phrased.

110.   Denied.

111.   Denied.

112.   Denied.

Denied that Plaintiff is entitled to the relief sought in the *ad damnum* clause following paragraph 112 of his Amended Complaint, or any relief whatsoever.

**COUNT II – SJSO – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEARCH**

113. – 118.   Detective Preston is not a party to this Count, and therefore declines to respond to the allegations contained therein.

**COUNT III – DETECTIVE PRESTON – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE ARREST**

119.   The responses to paragraphs 1 through 99 are incorporated as well as if fully set forth herein.

120.   Admitted.

121. Admitted.

122. Denied.

123. Denied.

124. Denied.

125. Denied, as phrased.

126. Denied.

127. Admitted.

128. Denied, as phrased.

129. Denied.

130. Denied.

131. Denied.

Denied that Plaintiff is entitled to the relief sought in the *ad damnum* clause following paragraph 131 of his Amended Complaint, or any relief whatsoever.

**COUNT IV – SJSO – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE ARREST**

132. – 146.   Detective Preston is not a party to this Count, and therefore declines to respond to the allegations contained therein.

**COUNT V – DETECTIVE PRESTON – VIOLATION OF THE FIRST AMENDMENT**

147.   The responses to paragraphs 1 through 99 are incorporated as well as if fully set forth herein.

148. Admitted.

149. Admitted.

150. Without knowledge, therefore denied.

151. Denied, as phrased.

152. Denied.

153. Denied.

154. Denied.

155. Denied.

156. Denied.

Denied that Plaintiff is entitled to the relief sought in the *ad damnum* clause following paragraph 156 of his Amended Complaint, or any relief whatsoever.

## COUNT VI – SJSO – VIOLATION OF THE FIRST AMENDMENT

157. – 168. Detective Preston is not a party to this Count, and therefore declines to respond to the allegations contained therein.

## COUNT VII – DR. KATHLEEN DULLY – VIOLATION OF THE FOURTEENTH AMENDMENT – DUE PROCESS

169. – 181. Detective Preston is not a party to this Count, and therefore declines to respond to the allegations contained therein.

## DEMAND FOR TRIAL BY JURY

Detective Preston demands a jury trial on all issues raised in the amended complaint.

## AFFIRMATIVE DEFENSES

1. No federally protected rights of Plaintiff have been infringed or violated.

2. Plaintiff's allegations, even if true, fail to state a claim for violation of an

9

individual's civil or constitutional rights under 42 U.S.C. § 1983.

3. Any injuries incurred by Plaintiff are the result of his own actions or omissions.

4. At all times pertinent hereto, Detective Preston was acting within the scope of her employment as a law enforcement officer employed by the Sheriff of St. Johns County, Florida, and was not violating clearly established law of which a reasonable law enforcement officer would be aware. Detective Preston's actions were taken pursuant to her discretionary authority, and her conduct did not violate any clearly established statutory or constitutional right of which a reasonable person would have known. Furthermore, at all times material, Detective Preston acted in good faith, reasonably and without malice towards Plaintiff. Thus, she is entitled to qualified immunity for the claims made against her.

5. Plaintiff's arrest and/or detention was based upon probable cause and/or arguable probable cause.

6. Detective Preston is not liable for punitive damages because none of her actions were taken or committed with malice, fraud, wantonness, or oppression, or entire want of cause, which would raise the presumption of conscious indifference to the rights of Plaintiff by clear and convincing evidence.

7. The conduct of Detective Preston was not the proximate cause of any of the alleged injuries to Plaintiff because the events and circumstances leading to the alleged injuries were not foreseeable to Detective Preston, or were consequences of

10

Plaintiff's conduct, that the alleged injuries were not the proximate result of any conduct of Detective Preston.

Respectfully submitted this 30th day of April 2024.

/s/ *Matthew J. Carson*
**MATTHEW J. CARSON**
Florida Bar No. 0827711
E-mail: mcarson@sniffenlaw.com
**MICHAEL P. SPELLMAN**
Florida Bar No. 0937975
Email: mspellman@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Attorneys for Mikayla Preston, in her individual capacity as a Detective for St. Johns County Sheriff's Office*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of April 2024, a true and correct copy of the foregoing was electronically filed in the United States District Court for the Middle District of Florida using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ *Matthew J. Carson*
**MATTHEW J. CARSON**

# ECF 40

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WILLIAM LEE LAWSHE,
an individual,

        Plaintiff,

v.                                Case No. 3:24-cv-00044-MMH-MCR

ROBERT HARDWICK,
in his official capacity as Sheriff of St. Johns County,
MIKAYLA PRESTON,
in her induvial capacity as a Detective for St. Johns County Sheriff's Office, and
KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

        Defendants.

_____/

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff, WILLIAM LEE LAWSHE ("Plaintiff"), sues Defendants, ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her induvial capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team, and alleges:

1.     This is an action pursuant to 42 U.S.C. § 1983.

## <u>COMMON ALLEGATIONS - THE ARREST</u>

2.     The Plaintiff William Lee Lawshe resides in St. Augustine, St. Johns County, Florida.

3. Until the events which are the subject of this action, Mr. Lawshe was a respected and valued law enforcement officer with the Florida Fish and Wildlife Conservation Commission (here-in-after referred to as FWC) for over 15 years.

4. FWC officers are highly trained, versatile law enforcement officers with full police powers and statewide jurisdiction.

5. In 2014, Mr. Lawshe was named both FWC Officer of the Year and National Wildlife Officer of the Year for his distinguished service.

6. Prior to joining FWC, Mr. Lawshe served as a Non-Commissioned Officer in the United States Army.

7. Mr. Lawshe served as a light infantry fire team leader, completed airborne school, Air Assault School and Ranger R.I.P training. Mr. Lawshe received an honorable discharge in 1994.

8. At all times material to this action, Defendant, Robert Hardwick was the elected Sheriff of St. Johns County, Florida and the administrative head of the St Johns County Sheriff's Office (hereinafter referred to as SJSO).

9. SJSO is a law enforcement agency acting on behalf of and pursuant to the power vested to it by the State of Florida pursuant to Fla. Stat. § 30.15.

10. Defendant Mikayla Preston is a detective employed with the SJSO, assigned to the Special Victims Unit (SVU).

11. Det. Preston is a member of the North Florida Internet Crimes against Children Task Force, who holds herself out as an expert in the investigation of crimes involving the online sexual-solicitation and exploitation of children. This expertise specifically includes specialized high-tech training and experience in investigating the collection and trading of images of Child Sexual Abuse Material (CSAM) and child pornography.

12. On April 12, 2023, Det. Preston, arrested Plaintiff William Lee Lawshe on charges of Possession of CSAM pursuant to F.S.S. 827.071(5), which makes the knowing possession of child pornography a felony.

13. Prior to the arrest, Det. Preston knew that the charge of possession of child pornography carried a severe social stigma and that the mere allegation (whether proven or not) would likely destroy Mr. Lawshe's personal and professional reputation.

14. Despite the certainty of injury to the Plaintiff, the arrest was made without a reasonable investigation into the truth of the allegations and represented a reckless disregard for the rights of Plaintiff.

15. The arrest was made without warning, under the guise of a ruse designed to trick Plaintiff into believing that he was aiding in an official investigation, rather than being the target of an imminent arrest.

16. Mr. Lawshe was not confronted with the facts or evidence supporting these accusations prior to his arrest.

17. In fact, Mr. Lawshe's employer FWC, which was not an investigative agency in this matter, was informed of the charges prior to Mr. Lawshe. As a result, Mr. Lawshe was confronted by his superior officer (FWC) at the SJSO facility just moments after his arrest and was forced to resign or be fired, having been threatened with the loss of his pension.

18. Upon making the arrest, SJSO alerted media outlets and publicized Plaintiff's arrest.

19. On April 13, 2023, acting in the place and function of a complaining witness, Assistant State Attorney (ASA) Kaitlyn Payne affirmed and verified the allegations of possession of CSAM without ever viewing the alleged images or vetting any evidence to support the charges. ASA Payne's verification was a necessary predicate used to file formal charges against Plaintiff for possession of CSAM.

20. In the following days, numerous media outlets published news articles and TV segments describing the arrest and allegations against Mr. Lawshe. His name was smeared on social media platforms, and he was ostracized from the community that he had dedicated his professional life to serving.

21. Furthermore, his employer FWC published to media outlets false and defamatory statements that Plaintiff had "betrayed the oath that all law enforcement officers take to protect the public" and promised that Mr. Lawshe would "be held accountable for his actions."

22. Despite the devastating injury to his reputation and career, Mr. Lawshe never viewed, downloaded, searched for, clicked on, or sought out, in any way, images of CSAM.

23. No CSAM was ever found on his phone, computer, cloud storge, hard drive, thumb drive or any other electronic storage device owned or controlled by Mr. Lawshe.

24. No analog photographs of CSAM were ever found in Mr. Lawshe's possession.

25. No images of CSAM were ever found in an email account or attachments to emails either sent to or received by Mr. Lawshe.

26. No virtual or artificial intelligence generated images mimicking CSAM were ever viewed, possessed, controlled or downloaded by Mr. Lawshe.

27. Mr. Lawshe never visited or sought out any "dark web" or message boards which were known to trade in images of CSAM.

28. At all times relevant, including prior to the arrest, there was known or readily discoverable exculpatory evidence, easily accessible and available to the SJSO and the SJSAO which proved Mr. Lawshe's innocence.

29. In fact, there was never any competent evidence to support the allegation that Mr. Lawshe had knowingly possessed CSAM.

30. Despite knowledge of the total lack of competent evidence, ASA Payne, with the approval of her supervisors, attempted to coerce Plaintiff to plead guilty to the charges, by withholding access to the evidence against Plaintiff. This tactic was specifically designed to thwart justice and significantly delayed the outcome of the case.

31. As a result of these baseless charges, Mr. Lawshe was forced to personally finance an investigation into the allegations, at a significant expense.

32. Fortunately, through these private efforts, Mr. Lawshe was able to conclusively prove that the charges and allegations against him were objectively false and entirely baseless.

33.    After presenting the exculpatory evidence to the SAO on December 20, 2023 via email, the charges were dropped on December 27, 2023, just three business days later.

## **COMMON ALLEGATIONS – THE INVESTIGATION**

34.    The facts and circumstances surrounding the investigation of William Lee Lawshe on charges of possession of CSAM show a conscious disregard and reckless indifference to the truth, to the Constitution of the United States and the rights of the Plaintiff thereunder.

35.    The subject case was opened on February 20, 2023, when SJSO received a cyber tip (#153739160) from the National Center for Missing and Exploited Children (NCMEC).

36.    This cyber tip report stated that William Lawshe was in possession of 1 (one) image of "Apparent Child Pornography (Unconfirmed)."

37.    NCMEC is a non-profit organization which operates a cyber tip line receiving and reporting allegations of CSAM. The tip line functions as a clearing house of CSAM, funded and regulated by the laws of the United States of America.

38.   In addition to describing the report as "unconfirmed," the NCMEC cyber tip (#153739160) stated that the content had "not been viewed by NCMEC staff."

39.   Det. Preston and other officers of SJSO knew or should have known that it was the policy of NCMEC to forward all cyber tip reports to law enforcement, regardless of their veracity.

40.   Moreover, Det. Preston, and other officers of SJSO, knew that there had been prior false reports of CSAM made by NCMEC to SJSO.

41.   Based on the circumstances, it was not reasonable for a law enforcement officer or agency to rely on the assertions of criminal conduct in the NCMEC cyber tip (#153739160) .

42.   The cyber tip report (#153739160) indicated that the image had been identified as suspected child pornography by the Plaintiff's Electronic Service Provider (ESP) Verizon through the use of an encryption and algorithm "hash." A "hash," is nothing more than a digital flag or marker designed to identify images through the use of image recognition technology or artificial intelligence.

43.   A copy of the subject image was attached to the cyber tip report.

44.   This image (#153739160) did not contain CSAM.

8

45. On February 20, 2023, Det. Preston viewed the subject image attached to the NCMEC report.

46. The cyber tip described the image as containing a "prepubescent" female. Det. Preston knew this description was false from her review of the subject image.

47. Upon review of the image, Det. Preston saw, acknowledged and recorded that the image contained a watermark of the website domain: Met-art.com. Watermarks are commonly used to indicate legal copyright and/or ownership of the subject image.

48. At the time of review, Det. Preston believed that Met-art.com had published, owned or controlled the subject image.

49. Det. Preston, due to her high-tech training in the investigation of cyber exploitation, understood that the Met-art.com domain was public and easily accessible through any internet service provider.

50. The cyber tip report stated that the that the image was not available publicly. Det. Preston knew this was a false statement.

51. Met-art.com, through its public website, operates a business engaged in the publication of adult entertainment material and images of consenting adults.

52.   As indicated on the image, Met-art.com had, in fact, published the image which was the subject of the cyber tip report (#153739160).

53.   The model, who was known as "Milena D.," was a consenting adult and paid model at the time the image was taken and published, in 2010.

54.   At the time of the incident which is the subject of this action, the subject image (#153739160) was and continues to be available through a common Google search.

55.   The subject image (#153739160) contains partial nudity in a professional "photo shoot" setting consistent with a "centerfold" type photograph found in any number of print publications, such as Playboy or Penthouse.

56.   Det. Preston, given her extensive training, experience and expertise in investigating CSAM knew or should have known that the subject model was a consenting adult based on the following available information:

  a) The website in question (Met-art.com) clearly and unequivocally states that the subject model was over 18 years of age.

  b) Met-art.com describes the model as "verified" and states that it operates in compliance with 18 USC §2257, 28 CFR 75, which

requires publishers of pornographic images to keep and maintain records verifying the age of all models.

c) Met-art.com provides a link to a representative along with legal compliance and contact information.

d) The identified legal representative, Jeffrey J. Douglas, is a licensed attorney in the State of California. He is also the designated records custodian of Met-art.com.

e) Met-Art.com, in fact, maintains records verifying the age of all models and makes those records available to any appropriate investigating authority.

f) Additionally, there is no indicia, description, suggestion, information, depiction, or other objective reason found on the image itself or the Met-art.com website that would lead a reasonable person to believe that the model in the subject image was a minor.

57. At no time did Det. Preston or any other officer of SJSO officer, have a reasonable basis to believe that the image contained CSAM.

58. Additionally, because the internet publication claimed that the model was an adult, and nothing on the images or the website would lead a reasonable

11

person to believe that the representations of age were false, it would be highly unlikely for any law enforcement agency to prove, establish or believe that possession of the image could ever constitute knowing possession of CSAM.

59. However, even if there were some indication that the model may have been a minor, Det. Preston knew or should have known that compliance with 18 USC §2257 was specifically designed and intended to reduce the risk of CSAM and make age verification by law enforcement easy and accessible.

60. Det. Preston knew or should have known that compliance with 18 USC §2257 required Met-art.com to make records readily available which would verify the age of any model.

61. Compliance with §2257 for a given image or model, creates proof of innocence for persons charged with possession of that image or depictions of that model.

62. SJSO, its leaders and policymakers knew that compliance with 18 USC §2257 required Met-art.com to maintain records which would verify the age of any model.

63. SJSO, its leaders and policymakers knew that records maintained pursuant 18 USC §2257 would be made available to their investigators and detectives.

12

64. SJSO, its leaders and policymakers devised and implemented policies and procedures for the investigation of internet crimes involving possession of child pornography.

65. SJSO, its leaders and policy makers provided training to its Detectives in the investigation of crimes involving possession of child pornography.

66. This training was necessary due to the sensitivity of the content involved and the implications of the First and Fourth Amendment.

67. As to the investigation of images published on public websites, these policies and procedures did not require, suggest, or encourage detectives to utilize age verification documentation potentially available through the particular website's published administrator.

68. To this extent, SJSO's policy and/or custom was to ignore the existence of not just exculpatory evidence, but proof of innocence.

69. SJSO, through its leaders and policymakers, knew that the custom of ignoring proof of innocence would frustrate the purpose of the Fourth Amendment's prohibition against unreasonable search and seizure, along with the requirement of probable cause in obtaining of a warrant.

70. SJSO's failure to train detectives and officers on the existence and availability of federally mandated age verification records, in this context,

represents a deliberate indifference to the Plaintiff's First and Fourth Amendment rights.

71. SJSO's failure to require detectives to obtain or request federally mandated age verification records from publishers of publicly available adult content represents a deliberate indifference to the Plaintiff's rights as defined in the First and Fourth Amendments.

72. Evidenced by all three images charged in this case, it was the practice and custom of SJSO and Det. Preston to not obtain or inquire as to the existence of federally mandated age verification records.

73. This custom was not isolated to these instances and was practiced by other officers and detectives at SJSO.

74. This custom was widespread, known to and approved by the leaders and policymakers of SJSO.

75. At no time, prior to the arrest, did Det. Preston, or any other representative of SJSO, contact Met-art.com or its legal representative to obtain age verification of the subject model.

76. Failure to investigate the publishing website and failure to utilize the provisions of 18 USC §2257 was a conscious decision and wanton

14

dereliction of duty which would cause a reasonable person to question the motives of the investigative authorities.

77. This failure was the result of the then custom, practice, policy and procedure of SJSO.

78. This failure was the result of SJSO's lack of reasonable training of investigators, such as Det. Preston.

79. Significantly, no one from SJSO ever pursued criminal action or investigation against the owner and publisher of the alleged child pornography, Met-art.com, including but not limited to referral to another appropriate law enforcement agency.

80. Rather, SJSO and Det. Preston singled out Plaintiff William Lee Lawshe, at least in part, due to his position as a respected law enforcement officer and the potential for publicity associated with arresting a law such an officer.

81. On February 20, 2023, after viewing the subject image Det. Preston and SJSO knew or should have known that there was no competent evidence to establish a reasonable belief that the Plaintiff was in knowing possession of child pornography.

82. Thereafter, Det. Preston and SJSO's SVU unit devised a scheme to manufacture the illusion of evidence in an attempt to thwart the judicial

process, including but not limited to the search warrant requirement of the Fourth Amendment of the Constitution of the United State of America.

83. In execution of this scheme, Det. Preston communicated with and/or conspired with Defendant, Dr. Kathleen Dully for the purpose of manufacturing false, misleading, unsupported evidence in the form of fake or pseudo-scientific opinions.

84. Det. Preston regularly utilized Dr. Dully, or some other Child Protection Team doctor, to manufacture pseudo-scientific opinions regarding photographic images depicting individuals whose age was indeterminate or difficult to determine by visual inspection.

85. This practice was widespread within SJSO's SVU and was known to and approved by policymakers.

86. This practice was the policy or custom of SJSO at all times relevant to this action.

87. This was the practice and custom of SJSO, even when there existed age verification documentation pursuant to 18 USC §2257.

88. SJSO and its policymakers knew that many of the opinions regularly offered by Dr. Dully were not reliable and not based on scientific principles or areas within the expertise of Dr. Dully or other such medical doctors.

16

89. The practice of using such pseudo-scientific opinions to obtain search warrants was the policy and procedure at SJSO's SVU.

90. The practice was widespread and regularly employed.

91. The practice was known to and approved by policymakers at SJSO.

92. SJSO, through its leaders and policymakers, knew that the custom or policy of utilizing unreliable and unscientific opinions in establishing probable cause would frustrate the purpose of the Fourth Amendment's prohibition against unreasonable search and seizure.

93. SJSO's use of unreliable and unscientific opinions represents a deliberate indifference to the Plaintiff's rights as defined in the First and Fourth Amendments.

94. Furthermore, SJSO's failure to train its detectives, including Det. Preston, in the scope and limitations of such expert opinion represents a deliberate indifference to the Plaintiff's rights as defined in the First and Fourth Amendments.

95. Dr. Kathleen Dully is a medical doctor, board certified in both pediatrics and child abuse. She is an associate professor of pediatrics at the University of Florida. She is aware of the scope and limitations of medical science and her role as a physician.

96. Despite the availability of objective proof of the subject model's age (photograph of valid issued government ID), Det. Preston requested that Dr. Dully estimate the age of the model by viewing the studio produced photograph which was the subject of the NCMEC cyber tip report (#153739160).

97. There is no scientifically accepted medical test or methodology to estimate the precise age of a female, from review of professionally produced photographs.

98. Despite knowing that there is no scientific method for precisely establishing the age of a female from viewing professionally produced photographs, Dr. Dully agreed to the scheme suggested by Det. Preston.

99. On February 22, 2023, Det. Preston met Dr. Dully and presented her with the single image of the alleged CSAM which was subject of the NCMEC cyber tip report (#153739160).

100. Prior to or during the review, Det. Preston told Dr. Dully that the image had been reported by NCMEC as CSAM.

101. During the review of February 22, 2023, Det. Preston failed to disclose that the image was publicly available on the internet through a public domain website.

102. During the review of February 22, 2023, Det. Preston failed to disclose that the model was purported to be 18 years of age and had been claimed to be verified as such by the image's publisher.

103. During the review of February 22, 2023, Dr. Dully intentionally misapplied a clinical rating scale, known as the "Tanner Scale" or Sexual Maturity Rating (SMR).

104. The Tanner Scale or SMR is a method by which clinicians can measure and quantify the sexual development of children into and through the process of puberty. It was specifically designed to ascertain whether young persons were developing appropriately, and as a tool to diagnose endocrinological decease which could cause either premature or delayed puberty. It is not a scientific or medically accepted method of determining the age of a patient/individual.

105. Dr. Dully knew that the Tanner or SMR evaluation was not a method of determining a person's age with any reasonable degree of medical certainty or probability.

106. In a report dated February 22, 2023, Dr. Dully stated that the model "appears to be younger than the age of 18" estimating that the model was as young as 12 years old.

107.    The model was, in fact, a consenting adult, over the age of 18.

108.    Dr. Dully knew or should have known that this report would be presented to the Court and/or used in some other official capacity to aid a criminal investigation against the Plaintiff.

109.    Thereafter, Det. Preston continued the scheme to manufacture probable cause by drafting an affidavit for presentation to a court of competent jurisdiction, for the purpose of obtaining a search warrant directed to the Plaintiff's phone/internet service provider, Verizon.

110.    This affidavit represents a conscious scheme to deprive a judicial officer of the then known or knowable facts and obtain a warrant by unlawful means.

111.    The affidavit contains multiple statements which were false, misleading and omit substantial exculpatory evidence then known to SJSO:

   (a) Det. Preston swore, under oath, that the website met-art.com "has a known history of displaying CSAM of teenage girls…"

   This statement is false. No CSAM exists or has ever been published on Met-art.com. The website has consistently and thoroughly complied with the requirements of 18 USC §2257.[1]

---

[1] Although objectively false, this statement raises the horrifying probability that there are currently individuals in prison who were not able to afford the expense of a private investigation to disprove similar false allegations.

(b) The affidavit represents that the image was not publicly available.

This representation was false and Det. Preston knew that it was false. The availability of a particular image on a public website is a significant indication that the image is not CSAM.

(c) The Affidavit, as written, suggests that the tip or allegation was reviewed, vetted or validated by NCMEC. While tips from citizen groups could be relevant (even presumptively truthful) the "tip" in this case stated that the report was "unconfirmed." In fact, the cyber tip report stated that "NCMEC staff have not viewed the following uploaded files and have no information concerning the content of the uploaded files."

Although certain sections of the report were quoted directly in the Affidavit to the Court, this section or the information contained in it was omitted and never related to the Court.

(d) Detective Preston did not show the subject image to the Court making the determination of Probable Cause.

Because there is no objective information, representation or depiction which would tend to prove or even suggest that the model was a minor, it was exculpatory by its very nature.

21

(e) The Detective did not inform the Court, through her affidavit, that the published image was purportedly that of an adult.

(f) The Detective did not inform the Court that the publisher of the image claimed to be in compliance with 18 USC §2257 and the models were purportedly verified.

(g) Det. Preston included the non-expert, subjective and false opinion of Dr. Dully who she knew or should have known is not an expert in determining the age of young women from a photograph with any degree of certainty.

Presenting the subjective lay opinion of a medical doctor that the model "appears to be younger than the age of 18," created a false and misleading impression that the opinion was scientific or expert in some way.  It was not.

112.   It was the policy, procedure and custom of SJSO that detectives not include the description of "unconfirmed" child pornography in application for search warrants.

113.   The description of "unconfirmed" means that there is a reasonable possibility that the individual depicted is an adult.

114.   This practice was widespread and regularly employed.

22

115.  This practice was known to and approved by policymakers at SJSO.

116.  SJSO's practice or custom of omission of this exculpatory evidence from applications for search warrants represents a deliberate indifference to the Plaintiff's rights as defined in the First and Fourth Amendments.

117.  The scheme of Det. Preston and SJSO succeeded in obtaining a warrant directed to the Plaintiff's phone/internet service provider, Verizon.

118.  The search warrant was executed upon the Plaintiff's Electronic Service Provider (ESP) on February 28, 2023.

119.  On April 4, 2023, the ESP complied with the subject search warrant.

120.  On or about that date, Det. Preston and SJSO had full access to all of Plaintiff's private content available on his phone.

121.  No images of CSAM were discovered within the data review or contained in the files provided by the ESP.

122.  Despite the fact that no CSAM was present, Det. Preston and SJSO chose, apparently at random, another image of a second model, which was also published on the Met-art.com website.

123.  Again, this image was of a model who was purportedly verified as an adult and the image was consistent with a partial-nudity professional photoshoot, similar to those published in a Playboy or Penthouse centerfold article.

124. Again, this image was taken to Defendant, Dr. Kathleen Dully.

125. Again, knowing that she was not expert in determining age from a professionally produced photograph, on April 5, 2023, Dr. Dully estimated, based entirely on the fact that the model did not have visible pubic hair (SMR I), that the model was less than or equal to 9 – 13.5 years old.

126. This second model was, in fact a consenting adult, over the age of 18.

127. Dr. Dully knew this opinion would be used in an official capacity and/or presented to a court.  This opinion represented a knowing and intentional misrepresentation of fact to the court, as it was not supported by any scientific or medical principle.

128. Furthermore, Det. Preston and SJSO knew or should have known that the opinion was baseless and not grounded in scientific probability or reality.

129. After discovering no CSAM in the possession of Plaintiff, SJSO arrested Plaintiff on charges of Knowing Possession of CSAM pursuant to F.S.S. 827.071(5), on April 12, 2023.

130. After substantial discovery and multiple depositions to understand the facts set forth above, representatives of Plaintiff contacted the legal representative of Met-art.com on December 18, 2023.

131. The following day, December 19, 2023, Met-art.com's representative forwarded photographic imagines of government issued ID of both models along with the dates of the photography sessions. He confirmed that no CSAM has ever been published on their website and age verification exists for all models pursuant to 18 USC §2257.

## COUNT I – DET. PRESTON - VIOLATION OF THE FOURTH AMENDMENT - UNREASONABLE SEARCH

132. Plaintiff realleges the allegations contained in paragraphs 1-131.

133. At all times material, Defendant Det. Preston was acting under color of state law.

134. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

135. Defendant sought and obtained search warrants from a Court of competent jurisdiction without probable cause to believe the Plaintiff had or was imminently planning to commit a crime.

136. Defendant obtained a search warrant by making false statements in an affidavit presented to a judicial officer.

137. At the time the false statements were made, Defendants knew that the statements were false or would have known they were false had they not recklessly disregarded the truth.

138. Defendant obtained a warrant by omission of facts, then known or reasonably knowable, that any reasonable person would have known the judge would wish to have brought to his attention.

139. These false statements and/or omissions of fact were material.

140. The right to be free from unreasonable search and seizure is protected by the Fourth Amendment to the Constitution of the United States of America.

141. At all times material to this action, the right to be free from unreasonable search and seizure was well and clearly established.

142. Defendant violated Plaintiff's Fourth Amendment rights, as the search was intentional and unreasonable.

143. Furthermore, Defendant's conduct exhibited and was motivated by a malicious or reckless indifference to the rights of Plaintiff.

144. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal

prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## <u>COUNT II – SJSO - VIOLATION OF THE FOURTH AMENDMENT - UNREASONABLE SEARCH</u>

145. The Plaintiff incorporates by reference the allegations contained in paragraphs 1-131.

146. At all times material, Defendant Det. Preston was acting under color of state law.

147. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

148. The right to be free from unreasonable search and seizure is protected by the Fourth Amendment to the Constitution of the United States of America.

149. At all times material to this action, the right to be free from unreasonable search and seizure was well and clearly established.

150. The actions, investigation and application for the above referenced search was approved and ratified by SJSO.

151. The actions, investigation and application for the above referenced search was authorized by the Defendant SJSO's policy, procedures and customary practices.

152. Adherence to and compliance with SJSO's policy, procedures and customary practices caused the violation of Plaintiff's rights.

153. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT III – DET. PRESTON - VIOLATION OF THE FOURTH AMENDMENT, UNREASONABLE ARREST

154. Plaintiff incorporates the allegations contained in paragraphs 1-131.

155. At all times material, Defendant Det. Preston was acting under color of state law.

156. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

157. Defendant's decision to effectuate an arrest and determination of probable cause was based entirely on the possession of material which was legal and protected by the First Amendment of the Constitution of the United States of America.

158. Furthermore, the material was published on a website which alerted the public and law enforcement that the material was legal and published in compliance with federal law.

159. An objectively reasonable and prudent law enforcement officer would not have believed that that Plaintiff had or was committing a crime solely by the possession of legal and constitutionally protected material.

160. The private possession of publicly available, constitutionally protected speech cannot be the basis for arrest in a free society.

161. The arrest was made without probable cause.

162. The right to be free of an unreasonable arrest is protected by the Fourth Amendment of the Constitution of the United States of America.

163.  The right is well and clearly established.

164.  The Defendant violated the Plaintiff's Fourth Amendment Right.

165.  The Defendant's conduct exhibited and was motivated by a malicious or reckless indifference to the rights of Plaintiff.

166.  As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT IV – SJSO - VIOLATION OF THE FOURTH AMENDMENT, UNREASONABLE ARREST

167.  The Plaintiff incorporates the allegations contained in paragraphs 1-131.

168.  At all times material, Defendant Det. Preston was acting under color of state law.

169. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

170. Defendant's decision to effectuate an arrest and determination of probable cause was based entirely on the possession of material which was legal and protected by the First Amendment of the Constitution of the United States of America.

171. Furthermore, the material was published on a website which alerted the public and law enforcement that the material was legal and published in compliance with federal law.

172. An objectively reasonable and prudent law enforcement officer would not have believed that that Plaintiff had or was committing a crime solely by the possession of legal and constitutionally protected material.

173. The private possession of publicly available, constitutionally protected speech cannot be the basis for arrest in a free society.

174. The arrest was made without probable cause.

175. The right to be free of an unreasonable arrest is protected by the Fourth Amendment of the Constitution of the United States of America.

176. The right is well and clearly established.

177. The Defendant violated the Plaintiff's Fourth Amendment Right.

31

178.   The Defendant's conduct exhibited and was motivated by a malicious or reckless indifference to the rights of Plaintiff.

179.   The investigation and arrest were approved and ratified by SJSO.

180.   The investigation and arrest were the result of policies, procedures and customary practices of SJSO.

181.   Adherence to and compliance with SJSO's policy, procedures and customary practices caused the violation of Plaintiff's rights.

182.   As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT V – DET. PRESTON VIOLATION OF THE FIRST AMENDMENT

183. Plaintiff incorporates the allegations contained in paragraphs 1-131.

184. At all times material, Defendant Det. Preston was acting under color of state law.

185. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

186. At all times material, Plaintiff was in possession of material which was protected by the First Amendment of the Constitution of the United States.

187. This right is clearly established.

188. The Defendant arrested Plaintiff based on the possession of constitutionally protected material.

189. Arrest would chill a person of ordinary firmness from continuing to engage in the protected activity.

190. Plaintiff's possession of the constitutionally protected material was a substantial or motivating factor in the arrest.

191. The arrest violated the protections afforded by the First Amendment.

192. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary

damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT VI – SJSO VIOLATION OF THE FIRST AMENDMENT

193. Plaintiff reincorporates the allegations in paragraphs 1-131.

194. At all times material, Defendant Det. Preston was acting under color of state law.

195. At all times material, Defendant Det. Preston was acting within the course and scope of her duty as a law enforcement officer.

196. At all times material, Plaintiff was in possession of material which was protected by the First Amendment of the Constitution of the United States.

197. This right is clearly established.

198. The Defendant arrested Plaintiff based on the possession of constitutionally protected material.

199. Arrest would chill a person of ordinary firmness from continuing to engage in the protected activity.

200. Plaintiff's possession of the constitutionally protected material was a substantial or motivating factor in the arrest.

201. The arrest violated the protections afforded by the First Amendment.

202. The arrest was the result of SJSO policy, procedure, and customary practice.

203. The arrest was approved and/or ratified by SJSO.

204. Adherence to and compliance with SJSO's policy, procedures and customary practices caused the violation of Plaintiff's rights.

205. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

## COUNT VII – DR. KATHLEEN DULLY - VIOLATION OF FOURTEENTH AMENDMENT – DUE PROCESS

206. Plaintiff incorporates the allegations contained in paragraphs 1-131.

207. At all times relevant, the UF Child Protection Team was an organization authorized and established by F.S.S. 39.303 to aid state investigations into allegations of child abuse in its various forms.

208. At all times relevant, Dr. Kathleen Dully was the Medical Director of the UF Child Protection Team.

209. At all times, Dr. Kathleen Dully was acting under color of State Law.

210. At all times relevant, Defendant Dully was acting in the course and scope of her role as the Medical Director of the UF Child protection team.

211. The Fourteenth Amendment protects against being subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the defendant.

212. This right was well and clearly established.

213. Defendant Dully provided deliberately false and fabricated evidence which she knew would be used in the criminal charge and prosecution of Plaintiff.

36

214. Defendant Dully provided false or misleading evidence which was the result of a deliberate indifference to the Plaintiff's innocence which she knew would be used in the criminal charge and prosecution of Plaintiff.

215. Defendant Dully intentionally applied techniques which would yield false information, which was then used to charge or prosecute the Plaintiff.

216. These actions violated the Fourteenth Amendment to the Constitution of the United States of America.

217. Defendant Dully's conduct evidences and was motivated by a malicious or reckless indifference to the Plaintiff's rights.

218. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees related to the subsequent criminal prosecution, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

**WHEREFORE**, Plaintiff, WILLIAM LEE LAWSHE, demands judgement for compensatory damages, punitive damages and reasonable attorney's fees and cost against Defendant. Plaintiff demands a jury trial.

Dated on this 20th day of May 2024.

37

**LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI**

*/s/ Michael K. Roberts*

_____

**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
**Jeffery S. Nooney, Esquire**
Florida Bar No. 1011565
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
(904) 858-9943 facsimile
mroberts@nrhnlaw.com
jnooney@nrhnlaw.com
Attorney for Plaintiff

38

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

with the Clerk of Court using the CM/ECF system on May 20th 2024.

**LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI**

*/s/ Michael K. Roberts*

_____

**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
**Jeffery S. Nooney, Esquire**
Florida Bar No. 1011565
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
(904) 858-9943 facsimile
mroberts@nrhnlaw.com
jnooney@nrhnlaw.com
Attorney for Plaintiff

ECF 43

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**WILLIAM LEE LAWSHE,**
**an individual,**

      **Plaintiff,**

**v.**                                                  **Case No.: 3:24-cv-00044-MMH-MCR**

**ROBERT HARDWICK, in his official**
**capacity as Sheriff of St. Johns County,**
**MIKAYLA PRESTON, in her individual**
**capacity as a Detective for St. Johns County**
**Sheriff's Office, and KATHLEEN**
**DULLY, in her individual capacity as**
**medical director of the UF Child Protection Team,**

      **Defendants.**
_____/

### DEFENDANT DETECTIVE MIKAYLA PRESTON'S ANSWER
### TO PLAINTIFF'S AMENDED COMPLAINT

Defendant MIKAYLA PRESTON, through undersigned counsel, files her answer and affirmative defenses to Plaintiff's Second Amended Complaint [ECF No. 40].

1.      Admitted that this action purports to be brought under 42 U.S.C. § 1983, but denied that the claims have any merit whatsoever or that Plaintiff is entitled to relief.

### COMMON ALLEGATIONS – THE ARREST

2.      Without knowledge, therefore denied.

3.      Without knowledge, therefore denied.

4. Without knowledge, therefore denied.

5. Without knowledge, therefore denied.

6. Without knowledge, therefore denied.

7. Without knowledge, therefore denied.

8. Admitted.

9. Denied, as phrased.

10. Admitted.

11. Admitted that Detective Preston is a member of the North Florida Internet Crimes Against Children Task Force. Admitted that Detective Preston has training and experience in the investigation of crimes involving the online sexual-solicitation and exploitation of children, including investigating the collection and trading of images of Child Sexual Abuse Material (CSAM) and child pornography. The remainder of this paragraph is denied.

12. Admitted.

13. Denied, as phrased.

14. Denied.

15. Admitted.

16. Admitted.

17. Admitted that FWC was informed of the charges prior to Plaintiff. Regarding the remainder of this paragraph, without knowledge, therefore denied.

18. Without knowledge, therefore denied.

2

19.   The first sentence is denied. Regarding the second sentence, without knowledge, therefore denied.

20.   Without knowledge, therefore denied.

21.   Without knowledge, therefore denied.

22.   Without knowledge, therefore denied.

23.   Without knowledge, therefore denied.

24.   Without knowledge, therefore denied.

25.   Without knowledge, therefore denied.

26.   Without knowledge, therefore denied.

27.   Without knowledge, therefore denied.

28.   Denied.

29.   Denied.

30.   Without knowledge, therefore denied.

31.   Denied.

32.   Denied.

33.   Without knowledge, therefore denied.

### COMMON ALLEGATIONS – THE INVESTIGATION

34.   Denied.

35.   Admitted.

36.   Denied, as phrased.

37.   The first sentence is admitted. The second sentence is denied.

38.   Denied, as phrased.

39. Admitted.

40. Denied, as phrased.

41. Denied, as phrased.

42. Denied, as phrased.

43. Denied.

44. Without knowledge, therefore denied.

45. Denied, as phrased.

46. Denied, as phrased.

47. The first sentence is admitted. Regarding the second sentence, watermarks are used for a number of purposes. The remainder of this paragraph is denied.

48. Denied.

49. Denied.

50. Denied.

51. Without knowledge, therefore denied.

52. Denied, as phrased.

53. Without knowledge, therefore denied.

54. Without knowledge, therefore denied.

55. Without knowledge, therefore denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied

60. Denied.

61. Denied, as phrased.

62. Denied, as phrased.

63. Denied.

64. Denied, as phrased.

65. Admitted.

66. Denied, as phrased.

67. Denied, as phrased.

68. Denied.

69. Denied, as phrased.

70. Denied, as phrased.

71. Denied, as phrased.

72. Denied, as phrased.

73. Denied, as phrased.

74. Denied, as phrased.

75. Admitted.

76. Denied.

77. Denied, as phrased.

78. Denied, as phrased.

79. Without knowledge, therefore denied.

80. Denied.

81. Denied.

82. Denied.

83. Denied.

84. Denied.

85. Denied, as phrased.

86. Denied, as phrased.

87. Denied, as phrased.

88. Denied.

89. Denied, as phrased.

90. Denied, as phrased.

91. Denied, as phrased.

92. Denied, as phrased.

93. Denied.

94. Denied.

95. The first and second sentences are admitted. Regarding the third sentence, without knowledge, therefore denied.

96. Denied, as phrased.

97. Denied, as phrased.

98. Denied, as phrased.

99. Admitted.

100. Without knowledge, therefore denied.

101. Denied, as phrased.

102. Denied, as phrased.

103. Without knowledge, therefore denied.

104. Denied, as phrased.

105. Without knowledge, therefore denied.

106. Denied, as phrased.

107. Without knowledge, therefore denied.

108. Admitted.

109. Denied.

110. Denied.

111. Denied.

112. Denied, as phrased.

113. Denied, as phrased.

114. Denied, as phrased.

115. Denied, as phrased.

116. Denied.

117. Denied, as phrased.

118. Denied, as phrased.

119. Admitted.

120. Admitted.

121. Without knowledge, therefore denied.

122. Denied, as phrased.

123. Without knowledge, therefore denied.

124. Admitted.

125. Denied, as phrased.

126. Without knowledge, therefore denied.

127. The first sentence is admitted. The second sentence is denied.

128. Denied.

129. Denied, as phrased.

130. Without knowledge, therefore denied.

131. Without knowledge, therefore denied.

## COUNT I – DETECTIVE PRESTON – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEARCH

132. The responses to paragraphs 1 through 131 are incorporated as well as if fully set forth herein.

133. Admitted.

134. Admitted.

135. Denied.

136. Denied.

137. Denied.

138. Denied.

139. Denied.

140. Admitted.

141. Denied, as phrased.

142. Denied.

143.   Denied.

144.   Denied.

Denied that Plaintiff is entitled to the relief sought in the *ad damnum* clause following paragraph 144 of his Amended Complaint, or any relief whatsoever.

## COUNT II – SJSO – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEARCH

145. – 153.   Detective Preston is not a party to this Count, and therefore declines to respond to the allegations contained therein.

## COUNT III – DETECTIVE PRESTON – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE ARREST

154.   The responses to paragraphs 1 through 131 are incorporated as well as if fully set forth herein.

155.   Admitted.

156.   Admitted.

157.   Denied.

158.   Denied.

159.   Denied.

160.   Denied, as phrased.

161.   Denied.

162.   Admitted.

163.   Denied, as phrased.

164.   Denied.

165.   Denied.

166. Denied.

Denied that Plaintiff is entitled to the relief sought in the *ad damnum* clause following paragraph 166 of his Amended Complaint, or any relief whatsoever.

## COUNT IV – SJSO – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE ARREST

167. – 182.   Detective Preston is not a party to this Count, and therefore declines to respond to the allegations contained therein.

## COUNT V – DETECTIVE PRESTON – VIOLATION OF THE FIRST AMENDMENT

183.   The responses to paragraphs 1 through 131 are incorporated as well as if fully set forth herein.

184.   Admitted.

185.   Admitted.

186.   Without knowledge, therefore denied.

187.   Denied, as phrased.

188.   Denied.

189.   Denied.

190.   Denied.

191.   Denied.

192.   Denied.

Denied that Plaintiff is entitled to the relief sought in the *ad damnum* clause following paragraph 192 of his Amended Complaint, or any relief whatsoever.

## COUNT VI – SJSO – VIOLATION OF THE FIRST AMENDMENT

193. – 205.   Detective Preston is not a party to this Count, and therefore declines to respond to the allegations contained therein.

## COUNT VII – DR. KATHLEEN DULLY – VIOLATION OF THE FOURTEENTH AMENDMENT – DUE PROCESS

206. – 218.   Detective Preston is not a party to this Count, and therefore declines to respond to the allegations contained therein.

All allegations not specifically admitted are denied.

## DEMAND FOR TRIAL BY JURY

Detective Preston demands a jury trial on all issues raised in the amended complaint.

## AFFIRMATIVE DEFENSES

1.     No federally protected rights of Plaintiff have been infringed or violated.

2.     Plaintiff's allegations, even if true, fail to state a claim for violation of an individual's civil or constitutional rights under 42 U.S.C. § 1983.

3.     Any injuries incurred by Plaintiff are the result of his own actions or omissions.

4.     At all times pertinent hereto, Detective Preston was acting within the scope of her employment as a law enforcement officer employed by the Sheriff of St. Johns County, Florida, and was not violating clearly established law of which a reasonable law enforcement officer would be aware. Detective Preston's actions were taken pursuant to her discretionary authority, and her conduct did not violate any

11

clearly established statutory or constitutional right of which a reasonable person would have known. Furthermore, at all times material, Detective Preston acted in good faith, reasonably and without malice towards Plaintiff. Thus, she is entitled to qualified immunity for the claims made against her.

5.      The search of Plaintiff's cell phone and/or uploaded content pursuant to a search warrant, and Plaintiff's subsequent arrest and detention, were based upon probable cause and/or arguable probable cause. Detective Preston was investigating NCMEC CyberTipline Report 153739160 (attached hereto as Exhibit 1), regarding Filename d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d17313cf 489728f19896c5f79e9d4c63b80f6a487 (hereinafter "f6a487") uploaded from Plaintiff's cell phone. Detective Preston sought and received an opinion (attached hereto as Exhibit 2) regarding the age of the female child depicted in f6a487 from Dr. Kathleen Dully, Child Abuse Pediatrician, Sex Assault Forensic Examiner, and Medical Director of the First Coast Child Protection Team. Detective Preston later discovered in Plaintiff's possession the following three images:

Filename: Screenshot_20230122_174408_DuckDuckGo

Filename: 0059.jpg

Filename: 0065(1).jpg

Detective Preston sought and received an opinion (attached hereto as Exhibit 3) regarding the age of the female child depicted in 0059 and 0065(1) from Dr. Dully. Detective Preston sought and received an opinion (attached hereto as Exhibit 4) regarding      the      age      of      the      female      child      depicted      in

Screenshot_20230122_174408_DuckDuckGo from Dr. Dully.

6.     Detective Preston is not liable for punitive damages because none of her actions were taken or committed with malice, fraud, wantonness, or oppression, or entire want of cause, which would raise the presumption of conscious indifference to the rights of Plaintiff by clear and convincing evidence.

7.     The conduct of Detective Preston was not the proximate cause of any of the alleged injuries to Plaintiff because the events and circumstances leading to the alleged injuries were not foreseeable to Detective Preston, or were consequences of Plaintiff's conduct, that the alleged injuries were not the proximate result of any conduct of Detective Preston.

Respectfully submitted this 3rd day of June, 2024.

/s/ Matthew J. Carson
**MATTHEW J. CARSON**
Florida Bar No. 0827711
E-mail: mcarson@sniffenlaw.com
**MICHAEL P. SPELLMAN**
Florida Bar No. 0937975
Email: mspellman@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Attorneys for Mikayla Preston, in her individual capacity as a Detective for St. Johns County Sheriff's Office*

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of June, 2024, a true and correct copy of the foregoing was electronically filed in the United States District Court for the Middle District of Florida using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s/ Matthew J. Carson*
**MATTHEW J. CARSON**

14

# ECF 54

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISON**

WILLIAM LAWSHE,
An individual,

          Plaintiff,                                Case No. 3:24-cv-00044

v.

ROBERT HARDWICK,
In his official capacity as Sheriff of St. John's County,
MIKAYLA PRESTON,
In her individual capacity as a Detective for St. John's
County Sheriff's Office,
UNIVERSITY OF FLORIDA BOARD OF TRUSTEES,
And KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

          Defendants.

_____/

**DEFENDANT KATHLEEN DULLY'S, SUED IN HER INDIVIDUAL**
**CAPACITY AS MEDICAL DIRECTOR OF THE UF CHILD**
**PROTECTION TEAM ANSWER AND AFFIRMATIVE DEFENSES TO**
**PLAINTIFF'S SECOND AMENDED COMPLAINT**

    Comes Now Defendant Kathleen Dully (hereinafter referred to as "Dr. Dully"),

by and through her undersigned counsel, and hereby responds to Plaintiff William

Lawshe in his individual capacity, Second Amended Complaint as follows:

**SECOND AMENDED COMPLAINT**

1. Admitted that this action purports to be brought under 42 U.S.C. § 1983, but

    denied that the claims have merit or that Plaintiff is entitled to relief.

Page **1** of **16**

## COMMON ALLEGATIONS – THE ARREST

2.  Without knowledge, therefore denied.

3.  Without knowledge, therefore denied.

4.  Without knowledge, therefore denied.

5.  Without knowledge, therefore denied.

6.  Without knowledge, therefore denied.

7.  Without knowledge, therefore denied.

8.  Without knowledge, therefore denied.

9.  Without knowledge, therefore denied.

10. Without knowledge, therefore denied.

11. Without knowledge, therefore denied.

12. Without knowledge, therefore denied.

13. Without knowledge, therefore denied.

14. Denied.

15. Without knowledge, therefore denied.

16. Without knowledge, therefore denied.

17. Without knowledge, therefore denied.

18. Without knowledge, therefore denied.

19. Without knowledge, therefore denied.

20. Without knowledge, therefore denied.

21. Without knowledge, therefore denied.

22. Without knowledge, therefore denied.

23. Without knowledge, therefore denied.

24. Without knowledge, therefore denied.

25. Without knowledge, therefore denied.

26. Without knowledge, therefore denied.

27. Without knowledge, therefore denied.

28. Without knowledge, therefore denied.

29. Without knowledge, therefore denied.

30. Without knowledge, therefore denied.

31. Without knowledge, therefore denied.

32. Denied.

33. Without knowledge, therefore denied.

## COMMON ALLEGATIONS – THE INVESTIGATION

34. Denied.

35. Without knowledge, therefore denied.

36. Without knowledge, therefore denied.

37. Admitted that  NCMEC is a non-profit organization which operates a cyber tip line receiving and reporting allegations of CSAM. Otherwise, without knowledge, therefore denied.

38. Without knowledge, therefore denied.

39. Without knowledge, therefore denied.

40. Without knowledge, therefore denied.

41. Without knowledge, therefore denied.

42. Without knowledge, therefore denied.

43. Without knowledge, therefore denied.

44. Without knowledge, therefore denied.

45. Without knowledge, therefore denied.

46. Without knowledge, therefore denied.

47. Without knowledge, therefore denied.

48. Without knowledge, therefore denied.

49. Without knowledge, therefore denied.

50. Without knowledge, therefore denied.

51. Without knowledge, therefore denied.

52. Without knowledge, therefore denied.

53. Without knowledge, therefore denied.

54. Without knowledge, therefore denied.

55. Without knowledge, therefore denied.

56. Without knowledge, therefore denied.

    a. Without knowledge, therefore denied.

    b.  Without knowledge, therefore denied.

    c.  Without knowledge, therefore denied.

    d.  Without knowledge, therefore denied.

    e.  Without knowledge, therefore denied.

    f.  Without knowledge, therefore denied.

57. Without knowledge, therefore denied.

58. Without knowledge, therefore denied.

59. Without knowledge, therefore denied.

60. Without knowledge, therefore denied.

61. Without knowledge, therefore denied.

62. Without knowledge, therefore denied.

63. Without knowledge, therefore denied.

64. Without knowledge, therefore denied.

65. Without knowledge, therefore denied.

66. Without knowledge, therefore denied.

67. Without knowledge, therefore denied.

68. Without knowledge, therefore denied.

69. Without knowledge, therefore denied.

70. Without knowledge, therefore denied.

71. Without knowledge, therefore denied.

72. Without knowledge, therefore denied.

73. Without knowledge, therefore denied.

74. Without knowledge, therefore denied.

75. Without knowledge, therefore denied.

76. Without knowledge, therefore denied.

77. Without knowledge, therefore denied.

78. Without knowledge, therefore denied.

79. Without knowledge, therefore denied.

80. Without knowledge, therefore denied.

81. Without knowledge, therefore denied.

82. Without knowledge, therefore denied.

83. Denied.

84. Denied.

85. Without knowledge, therefore denied.

86. Without knowledge, therefore denied.

87. Without knowledge, therefore denied.

88. Denied.

89. Without knowledge, therefore denied.

90. Without knowledge, therefore denied.

91. Without knowledge, therefore denied.

92. Without knowledge, therefore denied.

93. Without knowledge, therefore denied.

94. Without knowledge, therefore denied.

95. Admitted that Dr. Kathleen Dully is a medical doctor, board certified in pediatrics and child abuse. Otherwise, denied as phrased.

96. Denied as phrased.

97. Denied as phrased.

98. Denied.

99. Admitted that Dr. Dully met with Detective Preston on February 22, 2023. Otherwise, without knowledge and therefore denied.

100. Without knowledge, therefore denied.

101. Admitted.

102. Without knowledge, therefore denied.

103. Denied.

104. Denied as phrased.

105. Denied.

106. Denied as phrased.

107. Without knowledge, therefore denied.

108. Denied.

109. Without knowledge, therefore denied.

110.    Without knowledge, therefore denied.

111.    Without knowledge, therefore denied.

    a.  Without knowledge, therefore denied.

    b.  Without knowledge, therefore denied.

    c.  Without knowledge, therefore denied.

    d.  Without knowledge, therefore denied.

    e.  Without knowledge, therefore denied.

    f.  Without knowledge, therefore denied.

    g.  Denied.

112.    Without knowledge, therefore denied.

113.    Without knowledge, therefore denied.

114.    Without knowledge, therefore denied.

115.    Without knowledge, therefore denied.

116.    Without knowledge, therefore denied.

117.    Without knowledge, therefore denied.

118.    Without knowledge, therefore denied.

119.    Without knowledge, therefore denied.

120.    Without knowledge, therefore denied.

121.    Without knowledge, therefore denied.

122.    Without knowledge, therefore denied.

123.     Without knowledge, therefore denied.

124.     Admitted that Dr. Dully viewed a second image after February 22, 2023. Otherwise, without knowledge, therefore denied.

125.     Denied.

126.     Without knowledge, therefore denied.

127.     Denied.

128.     Denied that Dr. Dully's opinion was baseless and not grounded in scientific probability or reality.   Otherwise, without knowledge, therefore denied.

129.     Without knowledge, therefore denied.

130.     Without knowledge, therefore denied.

131.     Without knowledge, therefore denied.

## COUNT I – DET. PRESTON – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEARCH

132.-144.     The allegations in these paragraphs do not require a response from Defendant Dr. Dully and none is offered. To the extent that the allegations in these paragraphs imply liability on the part of Defendant Dr. Dully, they are denied.

## COUNT II – SJSO – VIOLATION OF THE FOURTH AMENDMENT – UNREASONABLE SEARCH

145.-153. The allegations in these paragraphs do not require a response from Defendant Dr. Dully and none is offered. To the extent that the allegations in these paragraphs imply liability on the part of Defendant Dr. Dully, they are denied.

## COUNT III – DET. PRESTON – VIOLATION OF THE FOURTH AMENDMENT, UNREASONABLE ARREST

154.-166. The allegations in these paragraphs do not require a response from Defendant Dr. Dully and none is offered. To the extent that the allegations in these paragraphs imply liability on the part of Defendant Dr. Dully, they are denied.

## COUNT IV – SJSO – VIOLATIONOF THE FOURTH AMENDMENT, UNREASONABLE ARREST

167.-182. The allegations in these paragraphs do not require a response from Defendant Dr. Dully and none is offered. To the extent that the allegations in these paragraphs imply liability on the part of Defendant Dr. Dully, they are denied.

## COUNT V – DET. PRESTON VIOLATION OF THE FIRST AMENDMENT

183.-192.    The allegations in these paragraphs do not require a response from Defendant Dr. Dully and none is offered. To the extent that the allegations in these paragraphs imply liability on the part of Defendant Dr. Dully, they are denied.

## COUNT VI – SJSO VIOLATION OF THE FIRST AMENDMENT

193.-205.    The allegations in these paragraphs do not require a response from Defendant Dr. Dully and none is offered. To the extent that the allegations in these paragraphs imply liability on the part of Defendant Dr. Dully, they are denied.

## COUNT VII – DR. KATHLEEN DULLY – VIOLATION OF FOURTEENTH AMENDMENT – DUE PROCESS

206.    Dr. Dully restates and incorporates her answers to the allegations contained in paragraphs 1-131 as though fully restated herein.

207.    Without knowledge, therefore denied.

208.    Admitted.

209.    Admitted.

210.    Admitted.

211.    Denied.

212.    Without knowledge, therefore denied.

Page **11** of **16**

213. Denied.

214. Denied.

215. Denied.

216. Denied.

217. Denied.

218. Denied.

## AFFIRMATIVE DEFENSES

Having fully answered the Amended Complaint, Defendant Dr. Dully now asserts the following as further, separate, and alternate, affirmative defenses to the claims of Plaintiff:

219. Plaintiff failed to state claims upon which relief may be granted.

220. Defendant Dr. Dully, in the performance of her duties as an official of the State of Florida, is entitled to qualified immunity from Plaintiffs' claims and from suit.

221. Defendant Dr. Dully's conduct did not subject Plaintiffs to a deprivation of rights, privileges or immunities secured by the United States Constitution or laws.

222. Defendant Dr. Dully was acting in good faith as an official of the State of Florida at all times material to this action.

223.     Defendant Dr. Dully has not violated clearly established law.

224.     Plaintiffs' claims are barred by the statute of limitations.

225.     Plaintiffs' claims are barred by the doctrine of laches.

226.     Any recovery by Plaintiffs in this action must be reduced by the value of all benefits received by Plaintiff from collateral sources.

227.     Any damages suffered by Plaintiffs is the result of superseding, independent or intervening causes over which Defendant Dr. Dully had no control and for which she is not responsible.

228.     Plaintiff failed to mitigate his damages.

229.     As a further affirmative defense, pursuant to the provisions of §768.81 Fla. Stat. and the applicable case law found in Messmer v. Teacher's Insurance Company, 597 So.2d 10 (Fla. 5th DCA 1991) and Fabre v. Marin, 623 So.2d 1182 (Fla. 1992), and subsequent case law interpreting the same, Defendant Dr. Dully is entitled to have the alleged damages of Plaintiff, if any, apportioned among all persons or entities responsible, such apportionment to be determined by the trier of fact herein.  Insofar as Plaintiff has alleged that Robert Hardwick, and Mikayla Preston are responsible for some or all of the damages claimed, Defendant Dr. Dully gives notice that she intends to request that such responsible parties, persons or entities, including Plaintiff, if applicable, be placed on the verdict form in this cause.  Defendant Dr. Dully gives notice that she also intends

to request that the St. John's County Sheriff's Office (SJSO), Kaitlyn Payne, St. John's County State Attorney Office (SJSAO), the Florida Wildlife Commission (FWC), and the National Center for Missing and Exploited Children (NCMEC) be placed on the verdict form in this cause.   Discovery is continuing and there may be other persons or entities whose identity is presently unknown, or whose identity is known but their potential responsibility is not yet ascertained, who may be responsible.

230.	Plaintiff's allegations, even if true, fail to state a claim for violation of an

individual's civil or constitutional rights under 42 U.S.C. § 1983.

231.	Any damages allegedly incurred by Plaintiff are the result of his own actions or omissions.

232.	Defendant Dr. Dully was acting reasonably as an official of the State of Florida at all times material to this action.

233.	Defendant Dr. Dully was acting without malice as an official of the State of Florida at all times material to this action.

234.	The search of Plaintiff's cell phone and/or uploaded content pursuant to a search warrant, and Plaintiff's subsequent arrest and detention, were based upon probable cause and/or arguable probable cause.

235.    Defendant Dr. Dully did not act with malice, fraud, wantonness, oppression, or want of cause.

236.    The conduct of Defendant Dr. Dully was not the proximate cause of Plaintiff's alleged damages because the events and circumstances leading to the alleged injuries were not foreseeable to Defendant Dr. Dully, or were consequences of Plaintiff's conduct.

237.    Plaintiff's alleged damages are purely speculative.

238.    Plaintiff's alleged damages were caused by the acts or omissions of other parties or entities over which Defendant Dr. Dully had no control.

**Dr. Dully reserves the right to amend or supplement her Answer and Affirmative Defenses as necessary.**

## DEMAND FOR JURY TRIAL

Dr. Dully demands trial by jury on all issues so triable as to all counts of Plaintiff's Second Amended Complaint.

## CERTIFICATE OF SERVICE

I hereby certify that a copy hereof was served via Florida e-Portal this **13th** day of **November 2024** upon **Michael K. Roberts, Esquire**, **Jeffrey S. Nooney, Esquire** Law Offices of Nooney, Roberts, Hewett, and Nowicki, 1680 Emerson Street, Jacksonville, Florida 32207  mroberts@nrhnlaw.com    jnooney@nrhnlaw.com

(*Counsel for Plaintiff*); **Matthew J. Carson, Esquire**, Sniffen & Spellman, P.A.,

123 North Monroe Street, Tallahassee, Florida 32301 mcarson@sniffenlaw.com

*(Counsel for Defendants Robert Hardwick and Mikayla Preston).*

BUCHANAN & BUCHANAN, P.A.
Attorney for Defendant Dr. Kathleen Dully
1900 SE 18th Avenue, Suite 300
Ocala, Florida 34471
Tel:   (352) 629-4099
Fax:   (352) 629-3975
Primary Email: rbuchanan@rbtrial.com
                    ashevlin@rbtrial.com
Secondary Email: aperry@rbtrial.com
                    rscinta@rbtrial.com

By: /s/ Robert B. Buchanan
Robert B. Buchanan
Florida Bar No. 063400
Amy Shevlin
Florida Bar No. 44944

# ECF 66

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


WILLIAM LEE LAWSHE,
an individual,

        Plaintiff,

v.                                 Case No. 3:24-cv-00044-MMH-MCR

MIKAYLA PRESTON,
in her induvial capacity as a Detective for St. Johns County Sheriff's Office, and
KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

        Defendants.
_____/


## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST KATHLEEN DULLY

Plaintiff hereby moves this Court for Partial Summary Judgment, pursuant

to Fed. R. Civ. Pro. 56, on the issue of liability under 42 U.S.C. § 1983 against

Defendant, Kathleen Dully.

### FACTUAL BACKGROUND

Defendant Dully is a board-certified child abuse pediatrician employed

with the University of Florida's Child Protection Team (CPT). (*Dully Deposition

April 28, 2025* p.6 ln. 9-15, attached as Exhibit A) The CPT is created by and is an

arm of the State of Florida. *Fla. Stat. §39.303.* It functions as a body of experts

1

that consult for DCF and law enforcement on suspected cases of child abuse. (*Dully Deposition April 28, 2025* p.6 ln.21 – p.7 ln. 5)  They offer opinions or determinations on the likelihood of child abuse, including crimes involving child sexual abuse material. (*Dully Deposition April 28, 2025* p.6 ln.21 – p.7 ln. 5; *Dully Report February 22, 2023*, Exhibit B) Dr. Dully understands that her opinions can have serious legal consequences (*Dully Deposition April 28, 2025* p. 49 ln.17-24) and knows that her opinions may be presented in a court of law. (*Dully Deposition April 28, 2025* p. 49 ln.25 -.p50 ln.19)

<u>Sexual Maturity Rating</u>

Sexual Maturity Rating (SMR) (sometimes referred to as the Tanner Scale) is a clinical assessment designed to help doctors monitor a patient's progress through puberty. (*Dully Deposition April 28, 2025* p.19) It is not designed to estimate chronological age. (*Dully Deposition April 28, 2025* p.21 ln.5-17)

SMR applies Grade levels of 1-5 to both breast development (in females) and pubic hair growth. Grade 1 is pre-pubescent to Grade 5, which is fully developed. Although it should be noted that adult women, depending on certain variables, can appear Grade 4 for their entire life. (*Dully Deposition April 28, 2025* p.35-43)

There is no scientific or medically reliable way to apply SMR to pornographic images published on the internet.  There is no factual dispute on this point.  Dr. Dully has testified:

> Q.    Do you agree that it is not scientifically

2

> reliable to use SMR ratings to determine the actual chronological age of a model depicted in a pornographic image on the internet?
>
> A.    Yes.

(*Dully Deposition, April* P.46 ln.13-18) Dully has known this for years prior to the subject events described in the operative complaint. (*Dully Deposition April 28, 2025* p. 45 ln. 19 – p.46 ln.18)

<u>Meeting with Defendant Det. Preston</u>

On February 22, 2023, in her capacity as a medical doctor with the CPT, Dr. Dully met with Defendant Preston, a detective with SJSO. Preston had contacted Defendant Dully for the purpose of evaluating an image which had been reported in the CyberTip report #153739160 from the National Center for Missing and Exploited Children (NCMEC). (*Dully Report February 22, 2023*, Exhibit B).

During the meeting, Preston presented Dully with one pornographic image on a law enforcement laptop. (*Dully Report February 22, 2023*, Exhibit B). Preston communicated to Dully that the image was reported by NCMEC. *Id.*

<u>Dr. Dully's Report- February 22, 2023</u>

On February 22, 2023, Dully presented Preston with a report. This report was addressed to Det. Preston as a law enforcement officer and made on CPT letterhead. (*Dully Report February 22, 2023*, Exhibit B) Dully's opinions are as follows: "This female child appears younger than 18 years of age. She would have reached this genital appearance of SMR IV at 12-15 years of age. She does not

3

appear to be shaved as her anterior pubic hair is still present." Dully used only SMR to reach her opinions. (Dully Deposition April 28, 2025 p.61 ln.20 – p.62 ln.21)

<u>Dr. Dully's Second and Third Reports – April 5, 2023</u>

On April 5, 2023, Preston met once again with Dr. Dully to review four additional images.  First, Preston identified two additional photographs from the same photoshoot which was the subject of the CyberTip Report #153739160. These images depicted the same model in different poses. (see *Dully Report #1 April 5*, Exhibit C) These are identified as files 0059 and 0065(1). *Id*. Again, Dr. Dully opined that the model initially depicted in NCMEC CyberTip Report#153739160 was Grade IV and was a minor. *Id*.

At this April 5, 2023 meeting, Det. Preston presented another image of who she believed was the same person depicted in the CyberTipline Report #153739160.  This model was later identified by the name "Melania D." This image is identified as ycbLVVFQ_0.jpg. *Id*. (see *Dully Report #2 April 5*, Exhibit D). Dully opined that this model was SMR I or prepubescent.

Finally, Preston identified one last image which she characterized as CSAM.  This image depicted a model's body from the stomach to the knees, along with a partially exposed vagina.   This image is identified in the report as "Screenshot_20230122_174408_DuckDuckGo.jpg." *Id*.  Again, Dully opined that because there appeared to be no pubic hair development, the model was SMR I,

4

pre-pubescent, and therefore, appeared developmentally less than 9-13.5 years

old.  (*see Dully Report #2 April 5, Exhibit D*)

"Appearance" of SMR

Dully claims that she was not offering an opinion about the chronological

age of these two models in her reports. Rather, she claims that she was offering

an opinion about the "appearance of age." Dully testifies:

> Q.  Do you use sexual maturity rating to
> chronologically estimate the age of individuals in
> digital pornographic photographs?
>
> A.· ·It is not to estimate the age, it's to
> estimate the appearance of the age, yes.
>
> Q.· ·What does that mean?
>
> A.· ·The appearance of the age is not the same
> thing as knowing the chronological age. (*Dully Deposition April
> 28,2025* p.21 ln.5-13)

Dully testifies that this opinion of "appearance" means that if a model does not

appear to have pubic hair in a digital photograph, for whatever reason, then that

model would be a SMR 1 or pre-pubescent:

> Q.· ·Well, I guess for whatever reason, right,
> I'm just asking, brunette, red head or whatever[1], if
> you look at an image and you do not see any pubic
> hair, that would result in a sexual maturity rating
> of one in terms of appearance?
>
>  A.· ·Yes.

(*Dully Deposition April 28, 2025* p.72 ln.6-11)

---

[1] Dully suggested that Blonde hair could be more difficult to see and may affect the "appearance" of SMR.

The folly of this "method" is illustrated by Dully's opinion of the model depicted in image *ycbLVVFQ_0.jpg*. Dully writes in her report dated April 2, 2023, that the individual's:

> *breasts are partially visible and could be SMR IV-V [fully mature], however her genitals are plainly visible with her thighs splayed widely-apart and showing she is SMR I with-respect-to-public hair. This developmental appearance is ≤ 9-13.5 years of age.*

According to Dully, the model has potentially adult breasts, but no pubic hair. Therefore, she is pre-pubescent. (*Dully Deposition April 28, 2025* p.81-84) This is an eye-brow-raising conclusion. (see *Expert Report of Krugman*, Exhibit E)

Remarkably, Dr. Dully believes that this image (*ycbLVVFQ_0.jpg*) depicts ***an older version*** of the Melania D. shown in files 0059 and 0065(1)) but rates her as SMR I or pre-pubescent – as opposed to the SMR IV previously given:

> Q· · ·Do you recognize this model as the same
> model which is the subject of the knees-to-chest and
> 0059 and 0065(1)?
>
> A· · ·I think she is the same model.· She looks
> older to me, but I think she is the same model based
> on appearance.
>
> Q· · ·And the appearance to you is that this is
> an older version of the model, correct?
>
> A· · ·Yes.
>
> Q· · ·All right.· Despite that, when in the
> knees-to-chest 0059 you have this model, we'll call
> her Melania D, as a Grade III or IV sexual maturity
> rating, now, even though you think that she appears
> older, you have the same model as a sexual maturity
> rating of I, prepubescent. Can you please explain that?

> A· · ·That is based on the view of her pubic hair
> being completely absent.
>
> Q· · ·Right.· But you just testified under oath
> that looking at her, she appears to be older than
> when she was depicted in 0059, correct?
>
> A· · ·I think so, yes.· That is my opinion.

(*Dully Deposition June 18, 2025* p. 70 ln7 – p.71 ln3, attached as Exhibit F) This testimony demonstrates the total lack of any scientific or medical reliability of Dr. Dully's opinions.  Furthermore, it illustrates how her opinions are in no way related to chronological age.  Her opinions are nothing more than – if I cannot see pubic hair – then the model is prepubescent. Her opinions totally ignore the possibility or probability that the model has engaged in grooming that cannot be seen or the image has been digitally altered for cosmetic purposes:

> Q.· Now, you know, as a medical doctor that
> there can be multiple explanations for a model in an
> image not having the appearance of pubic hair,
> correct?
>
> A.· ·There can be, yes.
>
> Q.· ·Right. One of those is that the image has just
> been digitally altered to remove evidence of pubic
> hair, correct?
>
> A.· ·Yes.
>
> Q.· ·One of those would be waxing or
> electrolysis or some form of hair removal that did
> not leave any visible evidence of hair, correct?
>
> A.· ·Yes.

Q.· ·All right.· One of the explanations would
be that the model has not reached a certain level of
puberty, correct?

A.· ·Yes.

Q. So as a medical doctor, this would be what
we call kind of a differential diagnosis, correct?
You got -- you got three different things that could
explain what you are observing; is that a fair
characterization?

A.· ·Potentially, yes.

Q.· ·What makes you think that pubertal
development would be more likely than digitally
altering the image or some sort form of hair removal
that you couldn't see on the picture?

A.· ·I am not saying how likely or unlikely it
is, I'm only saying what the appearance is.

 Q.· ·So when you're entering these opinions,
you're not saying with any degree of reliability that
they're correct?

A.· ·It's not chronological age, their
appearance.

(*Dully Deposition April 28, 2025* p. 78 ln.25 – p.80 ln.8)

There is no factual dispute that Dully's opinions are not reliable or useful in

making a determination of chronological age. Her own testimony establishes this:

Q. If I was someone who was being
asked to make a factual determination about whether
or not a model depicted in a pornographic image on
the internet was a minor; in fact, a minor, would
your opinion about the appearance be a reliable
opinion for me to base that decision on?

A. No, that's what the investigation is for.

8

(*Dully Deposition, April 28,2025* p.30 ln.9-19)

<u>Willfully False Information Contained in Dully's Report</u>

These opinions were willfully misleading and false. At the time that Dr. Dully wrote all three reports to Det. Preston, she knew there was no reliable scientific method to determine or estimate the chronological age of a model from a digital photograph.

Dully's opinions were not within a reasonable degree of medical probability. In fact, they were not scientific at all:

> Q.· ·Do you mean that, in part, that your opinions are not enough to establish the actual age of the individuals depicted from a medical standpoint?
>
> A.· ·Right. (Dully 70 13-17)

Again:

> Q. You have not -- in these -- in these three reports that I have that you produced in this case, you have not rendered a reliable medical opinion on the actual age of the individuals depicted in this -- in these images, correct?
>
> A.· ·Correct.

(*Dully Deposition April 28, 2025* p.71 ln.5-10) Put another way, Dully testifies that "What I see on the image does not necessarily give an indication of the actual chronological age that may be discovered during investigations." (*Dully Deposition, April* 28, 2025 p.35 ln 1-4). There is no warning or disclaimer about the lack of reliability or scientific method underlying the "opinions" contained in these reports.

<u>Dully's Verbal Warning to Preston Regarding Use of Report</u>

Dully knew there was a lack of medical/scientific reliability regarding her report at the time she produced the report. Dully testifies repeatedly that she informed Preston, during their meetings, that her opinion was not a reliable medical opinion as to the age of the individual depicted:

> Q.· ·So when Detective Preston came to you with these images and she left, you would have told her that you cannot give her any reliable information about the actual age of this individual depicted in this image?
>
> A.· ·Yes. (*Dully Deposition, April 28, 2025 P. 47* ln. 12-17)

Again, in Defendant Dully's continued deposition she confirmed the warning to Preston:

> Q. So I believe you testified in your original deposition you do have some recollection of meeting with Detective Preston; correct?
>
> A· · ·Yes.
>
> Q· · ·All right.· And when you met with her, you explained to her that you could not offer her scientific reliable opinions regarding the actual age of the models depicted in these images, correct?
>
> A· · ·Yes.

(*Dully Deposition June 18, 2025* p. 12 ln.18 − p.13 ln.1) Additionally, Dr. Dully understands that she has the ability to tell law enforcement that she cannot help them medically with offering opinions about SMR or age. (*Dully Deposition April 28, 2025* p.67). But for reasons that can only be explained by a malicious

10

disregard for the truth or consequences of her actions, Dully still writes three reports containing opinions about the chronological age of the individual's depicted.

Intent to Deceive

Dr. Dully' knew that she could not and was not offering a reliable medical opinion regarding the actual age of the individuals depicted in the subject images. Despite this, she repeatedly describes each model as a "child" or under the age of 18.  Clearly, Dully intended for anyone reading her reports to believe that she was offering a medical opinion about the actual age of the individuals.

Although proof of intent is often a matter of circumstantial evidence.  Dr. Dully offers direct proof that she intended to deceive in her reports:

> Q· · ·Okay.· I want to share again Exhibit 5 -- I
> mean, I am sorry, Exhibit 4 from the original
> deposition, and let me go to the February 22nd.· I am
> going to read a line.· You say, "This female child
> appears younger than the age of 18."
> Is that what you mean when you say
> "appears," that makes it obvious that you are just
> talking about appearance, not her actual age?[2]
>
> A· · ·Yes.
>
> Q· · ·Okay.· April 5th, and I am moving down to
> the third letter in our exhibit, in the second
> paragraph you wrote, "This image shows a female child
> with her black top parted and her underwear down
> around her parted thighs, exposing her genital area
> clearly." You didn't use the word appear in that
> sentence.· Why not?

---

[2] In earlier testimony, Dully claims that the use of the word "appears" in her report makes it obvious that she is talking about something other than chronological age. (*Dully Deposition April 28, 2025,* p. 50)

A· · ·I don't know why not.· Maybe I did or maybe
I didn't.· What does it say?· It is very easy to see.
She has -- she's prepubertal.

Q· · ·You say, "This image shows a female child
with her black top parted and underwear down around
her parted thighs, exposing her genital area
clearly," but you don't say anything about
appearances or appear in that.

A· · ·"She appears to have no pubic hair
development in" –

Q· · ·Right.· But did you call her a female
child?· Do you see if I read that sentence how a
person might interpret that as you saying that this
person is a child, an actual child?

A· · ·Well, I hope so, yes, but I don't know
that.

Q· · ·Wait, wait, wait, wait.· You hope that
someone would interpret this as you -- as you
offering the opinion that this was actually a child,
like her actual age was under the age of 18?

A· · ·Her age is indeterminant.· But she is well
under the age of 18, and that is her appearance.

Q· · ·So are you offering an opinion now on this
image that the actual age of the model -- not just
the appearance, but the actual age of the model is
under the age of 18?

A· · ·No.· Her appearance is under the age of 18
very clearly.

Dully fully understood and intended to communicate that the models were

children under the age of 18.  She did this with clear language that could only be

interpreted as a medical opinion of chronological age, specifically that the models were under the age of 18.

Reliance on Dully's Opinion for Criminal Charges

There is no factual dispute that Dr. Dully's opinions were the critical factor in deciding to move forward with the investigation, search warrant and charges. Det. Preston establishes this in her testimony taken in this case:

> Q You believed that she [Dully] had more qualifications than you to determine who's -- what the age of an individual is on a digital photograph?
>
> A Yes, sir.
>
> Q And was it true that, I mean, that expertise -- did you get the understanding that that expertise was sort of the reason why, when there was disagreement, that you guys would kind of go and defer to Dr. Dully?
>
> A What do you mean?
>
> THE WITNESS: Like, her, I guess, opinion was kind of like our -- I guess are you saying, like, the reason that pushed us further into continuing with the case?
>
> Q Yes.
>
> A Yes, uh-huh.
>
> Q You guys might have disagreed, but you've said that you're not really an expert on determining if someone is an adult or a minor; correct?
>
> A Yes, sir.
>
> Q But if this doctor, who has specialized knowledge, can say whether it was an adult or a minor, then -- then you would rely on that?

13

A Yes, sir.

Q Okay. And that's what you did in this case?

A Yes, sir.

(*Preston Deposition April 28, 2025* p.125 ln.6 – p.125 ln.13, attached as Exhibit G) All of the testimony in this case will be that Dully was the deciding factor in the criminal investigation of Mr. Lawshe.

<u>Undisputed Facts</u>

1. Dr. Dully produced three separate reports in the investigation of Mr. Lawshe.

2. She knew that these reports were part of a criminal investigation and may be used in court.

3. These reports were written on UF Child Protection Team letterhead with all indicia that they were reliable medical opinions, signed by the medical director.

4. In each of these reports, Dr. Dully offers opinions, in clear plain language, that the individuals depicted were children, under the age of 18.

5. Dr. Dully intended and hoped that anyone reading these reports would understand that she, as medical director of the Child Protection Team, was offering an opinion about the actual chronological age of the individuals depicted.

14

6. At the time these reports were produced, Dr. Dully knew that there was no medically reliable method of determining the chronological age of an individual from digital photographs.

7. She knew that these opinions were not probative of the actual chronological age of the individuals depicted or helpful to a finder of fact trying to determine the actual age of the individuals depicted.

8. Det. Preston relied on these opinions to make the probable cause determination for a search and arrest.

9. These opinions were quoted in both Affidavits in support of the search warrants in this case.

Dr. Dully has confessed to fabricating false and misleading evidence in a criminal investigation. And there is no dispute that it was the major contributing factor in charges being brought against Mr. Lawshe.

## MEMORANDUM OF LAW

### Standard for Summary Judgment

In seeking summary judgement on any issue, the moving party bears the burden of establishing there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. See *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003).  Once the party moving for summary judgment satisfies its initial burden, the burden shifts to the non-moving party to come forward with specific facts showing a genuine dispute for trial. *Hinson v. Bias*, 927 F.3d 1103, 1115 (11th Cir. 2019). In determining whether

15

a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the non-moving party. *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County*, 630 F.3d 1346, 1353 (11th Cir. 2011).

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  There must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Grp., Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989)). "If the evidence [produced by the nonmoving party] is merely colorable or is not significantly probative summary judgment must be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citations omitted). As such, "speculation [is] insufficient to create a genuine issue of material fact." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015)

<u>Fabrication of Evidence</u>

In the Eleventh Circuit, a fabrication-of-evidence claim is really just a species of malicious prosecution. *Watkins v. Session*, No. 19-60810, 2021 U.S. Dist. LEXIS 31032, 2021 WL 663762, at *10 & n.6 (S.D. Fla. Feb. 19, 2021) Put differently, in this Circuit, the right a fabrication-of-evidence claim vindicates is

16

the right not to be prosecuted with fabricated evidence. *See, e.g., Kingsland*, 382 F.2d at 1234 ("Kingsland also asserts a § 1983 claim for malicious prosecution based on the defendants' alleged fabrication of evidence against her.) see also *Williams v. Miami-Dade Police Dep't*, 297 F. App'x 941, 947 (11th Cir. 2008) ("Williams's malicious prosecution claim against Baaske is based upon Baaske's alleged act of fabricating evidence, which resulted in the prosecutor being presented with false and [*27] misleading evidence."). *accord Ashley v. City of New York*, 992 F.3d 128, 2021 WL 1149115, at *1 n.1 (2d Cir. 2021) ("[A] claim for fabricated evidence does not require that a plaintiff have been subjected to trial; it is enough that the fabrication results in a deprivation of the plaintiff's liberty."); [*16] *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) ("The basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" (citation omitted)); *Black v. Montgomery County*, 835 F.3d 358, 371 (3d Cir. 2016) ("[W]e hold that an acquitted criminal defendant may have a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged.")" *Foulke v. Morgan*, 2021 U.S. Dist. LEXIS 270319, *15-16.

When forensic experts, working as state employees, fabricate evidence used by law enforcement to bring charges, there is a violation of due process. The case

of *Aguirre-Jarquin v. Hemmert* is instructive. *Aguirre-Jarquin v. Hemmert,* 2023 U.S. Dist. LEXIS 46013, *21 (Fla M.D. 2023)  In that case, the District Court was presented with allegations that an FDLE forensic fingerprint expert had fabricated a false match with the plaintiff in an underlying criminal investigation and prosecution.

In denying summary judgment for the defendant, the court writes that drawing all "inferences from this evidence in the light most favorable to Aguirre, reasonable jurors could conclude that Birks [the fingerprint expert] intentionally sent the print in Aguirre's case to McQuay for an unquestioned verification—indicating Birks knew the match was false or harbored serious doubts about the veracity of her findings." *Id.*  Where a state actor fabricates false or misleading evidence intentionally or with serious doubts about its veracity, and that evidence is used to bring about a deprivation of liberty, they have violated the due process clause.

<u>Qualified Immunity</u>

Government officials sued for violating constitutional rights under § 1983 may invoke qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The inquiry has two steps: first, the government official must show she was engaged in a discretionary function. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). Second, the plaintiff must show: (1) the official violated his constitutional right; and (2) the right was clearly established at the time of the violation. *Id.* To be

18

"clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). *Aguirre-Jarquin v. Hemmert*, 2023 U.S. Dist. LEXIS 46013, *21 (Fla. M.D. 2023)

It has long been clearly established that fabricating incriminating evidence violates the right to due process. Aguirre-Jarquin v. Hemmert, 2023 U.S. Dist. LEXIS 46013, *21 (Fla M.D. 2023) citing *Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997) ("It was well established in 1989 that fabricating incriminating evidence violated constitutional rights.")

## ARGUMENT

Here, unlike the facts in *Aquirre-Jarquin*, Dully does not deny the lack of scientific reliability in her reports.   Under oath, she states plainly that they are not scientific or medically reliable opinions about the age of the models in question. Moreover, she admits that they would not be useful to a finder of fact in determining whether the models in question were in fact under the age of 18.

Despite this knowledge, she clearly and unequivocally labels the models as children and below the age of eighteen in her written report to law enforcement. When confronted in her deposition with the risk that readers may interpret these reports as an opinion on chronological age, Dully unabashedly acknowledges her intent and hope that they would.

19

Dr. Dully has disclosed no expert which may rehabilitate her testimony or positions in this case. Therefore, her testimony on the reliability of her opinions is the only defense she can present. Taking all her testimony in the light most favorable to her, she cannot prevail and there is no material factual dispute for a jury to decide.  Plaintiff is entitled to Partial Summary Judgment on the issue of liability.

Dated: August 12, 2025

**LAW OFFICES OF NOONEY,
ROBERTS, HEWETT, AND NOWICKI**

*/s/ Michael K. Roberts*

**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
mroberts@nrhnlaw.com
Attorney for Plaintiff

20

66-1

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


CASE NO.:  3:24-cv-00044-MMH-MCR


WILLIAM LEE LAWSHE,
an individual,

        Plaintiff,

vs.

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's office
and KATHLEEN DULLY, in her
individual capacity as
medical director of the UF
Child Protection Team,

        Defendants.
                                        /



ZOOM VIDEOTAPED DEPOSITION OF:  KATHLEEN DULLY,
                                M.D.

DATE:           April 28, 2025

TIME:           10:00 a.m. - 12:26 p.m.

LOCATION:    Via Zoom

REPORTED BY:  LISA K. PENKACIK, RMR

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 2

A P P E A R A N C E S:

MICHAEL K. ROBERTS, ESQUIRE
Law Offices of Nooney, Roberts
Hewett and Nowicki
1680 Emerson Street
Jacksonville, Fl  32207
mroberts@nrhnlaw.com
    On behalf of the Plaintiff.

AMY SHEVLIN, ESQUIRE
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471-8237
ashevlin@rbtrial.com
    On behalf of the Defendant Kathleen Dully,
    M.D.

MATTHEW CARSON, ESQUIRE
Sniffen & Spellman, P.A.
123 N Monroe Street
Tallahassee, FL 32301-1509
mcarson@sniffenlaw.com

    On behalf of Defendant Mikayla Preston.

ALSO PRESENT:  Danny Holguin, videographer
              Shayne A. Thomas, Esquire
              (University of Florida)
              Autumn Zepf, paralegal

Page 3

I N D E X

TESTIMONY OF:  KATHLEEN DULLY, M.D.

DIRECT EXAMINATION by Mr. Roberts . . . . . . 4

CERTIFICATE OF OATH . . . . . . . . . . . . . 87
CERTIFICATE OF REPORTER . . . . . . . . . . . 88
ERRATA SHEET. . . . . . . . . . . . . . . . . 89
PLAINTIFF'S EXHIBITS:
1 (Articles). . . . . . . . . . . . . . . . . 85
2 (Dr. Krugman's report). . . . . . . . . . . 85
3 (Demonstrative image) . . . . . . . . . . . 85
4 (Dr. Dully's letters) . . . . . . . . . . . 85

S T I P U L A T I O N S

    It is hereby stipulated and agreed by and
between counsel for the respective parties and the
deponent that the reading and signing of the
deposition be reserved.

Page 4

P R O C E E D I N G S
    THE VIDEOGRAPHER:  Good morning, this is
the beginning of media one in the deposition of
Dr. Kathleen Dully in the matter of William Lee
Lawshe versus Mikayla Preston, case number
3:24-cv-00044-MMH.  Today's date is April 28,
2025 and the time is 10:01 a.m.  My name is Danny
Holguin.  I am the videographer.  The court
reporter is Lisa Penkacik.  We are here with
Huseby Global Litigation.
    Counsel please introduce yourselves after
which the court reporter will swear in the
witness.  Thank you.
    MR. ROBERTS:  Michael Roberts for the
plaintiff, Mr. Lawshe.
    MS. SHEVLIN:  Amy Shevlin on behalf of Dr.
Dully.
    MR. CARSON:  Matt Carson representing
Detective Preston.
        KATHLEEN DULLY, M.D.,
having been first duly sworn by the reporter,
thereupon testified upon her oath as follows:
    THE WITNESS:  I do.
        DIRECT EXAMINATION
BY MR. ROBERTS:

Page 5

    Q.    Okay.  Dr. Dully, I introduced myself a
little bit earlier, my name is Michael Roberts, I'm
here to ask some questions today.  I assume -- you've
had your deposition taken before?
    A.    Yes, but never as a defendant, but, yes.
    Q.    Okay.  You've had it taken as an expert
witness?
    A.    Yes.
    Q.    Well, a deposition is a deposition, same
ground rules apply, you're under oath, and I'll be
asking you questions.  At any time if you don't
understand a question that I've asked you, please let
me know and I'll try to rephrase it.  I don't have a
script that I'm going from, so it's probable that I
will ask a bad question, so don't hesitate to
question me if you don't understand.  Also, there is
a court reporter who is trying to take down
everything that we say, question and answer, so we'll
just try to be mindful of the job that she's trying
to do and not speak over one another; sometimes
that's difficult for me and sometimes it's difficult
for witnesses.  So we'll do the best we can.  But the
last thing that I'll say is, a lot of times we'll
speak colloquially, we'll say uh-huh or uh-huh or
they'll be a nod of the head, I'll ask for a verbal

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 6

response, if I catch it, just because the court reporter will not be able to describe un-huh, uh-huh, I'll know what you mean by a nod of the head, but she can't write that down so...

A.    Thanks.

Q.    With that, can you just state your full name for the record?

A.    Kathleen Mary Dully, D-u-l-l-y.

Q.    And where are you currently employed?

A.    The University of Florida College of Medicine in Jacksonville.

Q.    And I understand you work for the Child Protection Team?

A.    Yes, I'm the medical director of the Child Protection Team for the University of Florida.

Q.    And what does that mean; what is a medical director of the Child Protection Team?

A.    I supervise the medical care that we deliver on a case by case basis and solve problems and help hire people, essentially.

Q.    And just for those who may not know, what is the Child Protection Team?

A.    The Child Protection Team is the body of experts that consults for DCF usually and sometimes law enforcement as well on suspected or advertised

Page 7

child maltreatment cases. And offers them determinations on the likelihood of abuse or that it is not abuse. We cover the eight counties -- this Child Protection Team covers the eight northeast counties of Florida.

Q.    What is -- well, what is your training and background?

A.    So in 1981 I graduated from Cornell University College of Arts and Sciences, in Ithaca, New York with a Bachelor of Arts and I graduated with distinction in all subjects and Cum Laude. In 1986, I graduated from the F. Edward Hebert, H-e-b-e-r-t School of Medicine in Bethesda, Maryland, which is Fed Med or the military medical school.

And from there I went to pediatric internship followed by residency training at Naval Hospital Oakland, California from 1986 through 1989. In 1989, I was transferred to my first duty station as a pediatrician, and that was here at Naval Air Station Jacksonville, Florida where I served for two years. I was assigned to be the Chair of the Child Abuse Case Review Committee here at this military region Navy Marine Corps while I was there.

At the time the only training that was available was in the conference format, so although I

Page 8

had seen and cared for children of possible child maltreatment before, I had only learned about it as a resident and on the job training is what that is and by reading and studying the cases in the medical literature.

Then in 1990 the Navy sent me to my first child abuse conference in January in San Diego, California, which was the child maltreatment conference that is offered by what is called now Navy Children's Hospital in San Diego and the American Academy of Pediatrics and the American Professional Society of Abusive Children. The conference format for many years was all that was available in terms of getting additional medical training and consultation and so I continued to pursue that all the time every year, and then in 1980 -- sorry, during Desert Shield. 1991, the Navy moved me to Naval Medical Center San Diego.

In San Diego they made me in charge because I had the training, child abuse case review, subcommittees for physical abuse, sexual abuse and something they called the multi-problem family unit. And those I was the Chair, but actually functioned as the medical consultant to a team of people doing case reviews for military commanders.

Page 9

In 1993, there was some ability to propose to the military that specialized fellowships could be developed, and were slowly becoming available, and in 1994 the Navy sent me to the Chadwick Center for Children & Families, which was Rady Children's Hospital for a year of fellowship. And there I was able to see cases under supervision of people who had been working in the field for 30 and more years, and do the medical assessments on suspected child maltreatment cases, as well as that which is not. So that was a specialized opportunity.

When I finished that in 1994, the Navy moved me to the Naval Hospital Camp Pendleton, California, and there I was again the medical consultant for the child abuse case review committee for Marine Corps Commanders and then I was also the domestic violence consultant for their domestic violence case review committees.

In all of this time I had served as faculty and am a teacher for medical residents and positions in training at all levels in child maltreatment, be it radiology or orthopedics, or OB/GYN or pediatrics, of course, and emergency medicine.

And after 1994 when I finished the fellowship, my additional training went back to

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 10

conferences and continuing medical education and then I was able -- though I had passed the general pediatric specialty boards in 1989, the first child abuse specialty board became available in 2009 and I was grandmothered into the field with about 200 others, and I was able to sit for and pass that EXAMINATION in 2009 to be a board certified specialist in child abuse pediatrics.

Q. Very good. Thank you for that.

So currently at the Child Protection Team, do you -- do you see -- do you have patients; do you form a patient -- a doctor/patient relationship with the people that you examine?

A. On a case by case basis, yes.

Q. And tell me, what do you mean by that?

A. So I am consultant. I don't become the child's pediatrician, but I consult for DCF and law enforcement and the hospitals and so I have a time of a doctor/patient relationship, but the relationship goes back to the primary care pediatrician.

Q. In the time that you consult, do you -- do you agree that you have to practice within the standard of applicable care, medical care?

A. Yes.

MS. SHEVLIN: Form.

Page 11

Q. And so this child abuse board certification, is that a medical/legal certification?

MS. SHEVLIN: Form.

A. It's a medical from -- administered by the American Board of Pediatrics.

Q. Is there a legal component to it?

MS. SHEVLIN: Form.

A. No.

Q. Okay. All right. Is part of that curriculum designed to help you interface with law enforcement or DCF?

MS. SHEVLIN: Form.

A. Not in any direct way, no. Of course you have to be able to do that.

Q. Do you understand that the child abuse -- that the purpose of the child abuse certification is to aid DCF and law enforcement in investigations?

MS. SHEVLIN: Form.

A. That is not the purpose, that is one of the practice points, I would say yes, but it is to take care of kids and try to stop whatever is going on, if, in fact, something is going on.

Q. Okay. Well, what do you mean by "trying to stop something that's going on"?

A. If there is child maltreatment going on,

Page 12

sometimes it can be stopped and then the child can have a more normal life.

Q. Do doctors stop that?

MS. SHEVLIN: Form, speculation.

Q. Well, let me ask you a better way.

As a doctor, are you trained in your -- in your child abuse specialty, are you trained to stop child abuse in a home setting?

MS. SHEVLIN: Form.

You can answer, Dr. Dully. I'm laying a record. Unless I tell you not to answer a question, just go ahead and answer to the best of your ability if you understand the question, I'm just making some objections for the record.

A. I was missing those completely. I'm sorry, I didn't understand.

MS. SHEVLIN: That's okay. I just objected to form. If you understood the question and you can answer, you can go ahead and answer.

A. I have no ability to stop it, but by helping to assess the evidence that is present that may contribute to stopping it.

Q. Okay. So who -- who stops it? As a medical doctor, what are you talking about?

MS. SHEVLIN: Form.

Page 13

A. The community, which involves responsible investigators and agencies.

Q. So is it not a fair statement to say that the child abuse board -- like that training exist to provide expertise to determine what is and what is not child abuse?

MS. SHEVLIN: Form.

A. There is various levels of certainty, but at one end of the spectrum, it may not be child abuse and at the other end of the spectrum, it may only be child abuse.

Q. Right. But to treat the condition or the injury, you were qualified to treat injuries or illnesses as a pediatrician without the child abuse specialty; do I understand that correctly?

MS. SHEVLIN: Form.

A. I think I do, as a general pediatrician, I take care of kids.

Q. Right. So the only -- what I'm trying to get at, the child abuse specialty is really solely aimed at the distinction or you making a distinction between what may or may not constitute abuse, correct?

MS. SHEVLIN: Form, mischaracterization of her prior testimony.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 14

A. There are things that look like child abuse that are not and I'm consulted in those and there are things where we can't say for sure, and there are things that are child abuse and not something else. And that is part of the determination and diagnostic process.

Q. And that, grappling with those decisions, that is the job of a child abuse specialist, correct?

MS. SHEVLIN: Form.

A. That is what we do in the medical case, yes.

Q. And that's what I'm getting at, right. I understand that you're a pediatrician, but the board certification specifically regarding child abuse, that is what gives you the purported expertise of making a determination or an opinion about whether something is or is not child abuse; is that a fair characterization of what that specialty is?

MS. SHEVLIN: Form.

A. The board certification is a board certification and I passed it because of a lot of other things, and so there's training, experience, literature and the years that go by and the things that children and parents have taught me. So it doesn't distill down to an exam or a -- a yes or no

Page 15

determination.

Q. And I am sorry if you took that question as being like what the test entails. What I'm trying to understand, and I'll just ask you the question.

What does it mean to be a child abuse -- do you consider you to be an expert on child abuse medicine?

MS. SHEVLIN: Form.

A. -- abuse pediatrics.

Q. What does that mean?

A. That is what the board -- American Board of Pediatrics decided to call it, and it is a specialty where we can see the children and put the time in, and whatever else is required to help determine how correct that concern may be or not.

Q. And when you say concern, you're talking about abuse?

A. Yes.

Q. Concern for abuse, correct?

A. So people report things and then I am in a position if there are medical concerns to bring those to bear on what they reported to help decide if they could be right or not right or we cannot say for sure.

Q. And so how long have you been with the

Page 16

University of Florida?

A. 10 and a half years now.

Q. And other than the Navy is the University of Florida the only other employer that you had in your career?

A. No. I also did the same work as a child abuse pediatrician and sex assault examiner for the Rady Children's Hospital before I came here. There I was not medical director, and there, technically, I worked for their specialty group, not necessary -- not for the center -- not for the hospital. Although those are the patients that I saw.

Q. Do you -- and I'm going to use the term "moonlight"; do you know what that means?

A. Yes.

Q. Have you moonlighted anywhere else as a pediatrician or anything like that?

MS. SHEVLIN: Form.

A. When I was active duty military, my work for Rady Children's, Chadwick Center for Children & Families as a child abuse pediatrician and sex assault examiner, that was considered moonlighting through 2006 and I retired upon my return from Iraq. The moonlighting after that, I did not do or need to do because I was able to work continuously in my

Page 17

specialty.

Q. So how many physicians currently work for your department that you're a medical director of?

A. In the division, there are three of us and all three of us participate on the team.

Q. And are you responsible for setting policies and procedures?

MS. SHEVLIN: Form.

A. I contribute to them. I make recommendations about them, I may be the person who writes and signs them, but these other two pediatricians are also board certified child abuse pediatricians with many years experience and I consult with them before putting things in writing in general.

Q. Okay. So we're here today about a case that you consulted on -- do you understand that correctly; did you consult on the case against Mr. Lawshe?

MS. SHEVLIN: Form.

A. I did not know that person's name at the time. I consulted for a detective at the St. Johns Sheriff's office.

Q. Subsequently have you learned that Mr. Lawshe was the subject of that investigation?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 18

A. Yes.

Q. I have three letters; one is dated February 22nd; one is April 5th and the other is April 5th; do you have access to those as we sit here today?

A. I do not have the February 22 letter. I can't find it.

Q. I'll share it with you when we get to that.

I want to ask you just to start off, some general -- some general questions.

So what is sexual maturity rating?

A. Sexual maturity rating is a way of stating how close to puberty or in the middle of puberty or completed puberty may be progressing.

Q. I've also seen it referred to as Tanner staging; is Tanner staging and SMR or sexual maturity, is that the same thing; are those two terms synonymous?

MS. SHEVLIN: Form.

A. In the 1980s and 1990s early, it was called Tanner staging. In about 1998 it changed because there had been so many other studies both before and after Tanner and Marshall and it was changed to sexual maturity rating. As the years go by, there's more data than just Dr. Tanner's data.

Q. All right. And so when did you first

Page 19

learn -- when you first learned about it, it was called Tanner staging?

MS. SHEVLIN: Form.

A. Well, it didn't have a formal name and I actually don't remember what the other pediatricians were calling it in fellowship.

Q. Okay. And do you know what the -- the test was designed to do?

MS. SHEVLIN: Form.

A. In the clinical setting?

Q. In the clinical setting, yes.

A. Yes.

Q. First of all, was it designed as a clinical test?

MS. SHEVLIN: Form, speculation.

A. It was -- sexual maturity rating was designed to be able to monitor progress through puberty or a completion thereof or delay thereof, as well as early puberty.

Q. So a pediatrician would be able to assess whether or not there were any delays or abnormal start to puberty in their patients; that was sort of the reason -- that was the function of Tanner staging or sexual maturity rating as you understand it?

MS. SHEVLIN: Form, prior

Page 20

mischaracterization of prior testimony.

A. For most pediatricians that is its function.

Q. Okay. And what do you mean by that "for most pediatricians that's its function"?

A. Well, even newborns aren't Tanner two or SMR two, so it is normal to have some variability in the development of puberty. Sometimes it's actually the sign of a tumor, so we want to have some idea of what's normal, so that we can identify deviations from normal. For instance, a three year old who already has Tanner three or SMR three breast buds, plus pubic hair, that would not be normal. So we use it on the very little kids as well as those who are approaching puberty and in reference to the concerns from the parents or the child, sometimes a teen-age child is worried that they're not normal.

Q. But that is not the way in which you employ sexual maturity rating in this case, is it?

A. In this case, the opportunity to assess the patient never occurred.

Q. But you did use the sexual maturity rating in forming your opinions in this case?

A. Yes.

Q. All right, okay. So let me -- let's just

Page 21

go back.

How long have you been using sexual maturity rating to -- let me ask you this. Looking for predicate for this.

Do you use sexual maturity rating to chronologically estimate the age of individuals in digital pornographic photographs?

MS. SHEVLIN: Form.

A. It is not to estimate the age, it's to estimate the appearance of the age, yes.

Q. What does that mean?

A. The appearance of the age is not the same thing as knowing the chronological age.

Q. What's the difference?

A. One is in terms of years of age and has documents to go with it. And the other is based on appearance and in this case, in photographs.

Q. So I'm struggling with that distinction. So you -- so you're -- you're not attempting to state or estimate how old the individual depicted in the photograph is, you are trying to estimate how old they appear to be?

A. Yes.

Q. So any type of -- you're aware that photographs can be digitally edited?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 22

MS. SHEVLIN:  Form.

A.   Yes.

Q.   You're aware that models can remove pubic hair through multiple different modalities, correct?

MS. SHEVLIN:  Form.

A.   Yes.

Q.   Any digital altering of a photograph would render your opinion say -- would not make it a reliable opinion, correct?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

A.   That's not true, it will be a reliable opinion about the appearance of the image.

Q.   But it would not be a reliable opinion about the actual age of the individual that is depicted?

A.   It may not be.

Q.   And that's true as well as grooming.  If somebody had been groomed, it may not be -- it may be an -- you may be given an accurate depiction or opinion about the appearance, but if there were grooming that was undetectable to you, it would not be an accurate opinion or reliable opinion about the actual age of the individual?

MS. SHEVLIN:  Form.

Page 23

A.   The chronological age is a different question.  This is just the appearance of the image.

Q.   Okay.  So from a scientific -- you understand that -- let me just ask you.

Would you agree with me that that is a -- a limitation on what your opinion could be accurately understood to be?

A.   Yes.

MS. SHEVLIN:  Form.

Q.   Can you describe that limitation for me?

A.   It is not an opinion about chronological age, it is an opinion about the apparent appearance of the image and what its age may be.  It's not the same thing.

Q.   How long have you interacted with law enforcement -- let me ask you this question.

How long do you think you have been using SMR in this way, to look at a pornographic image and estimate the appearance of chronological age?

MS. SHEVLIN:  Form.

A.   Since shortly after 1994.

Q.   And is that sort of like the burst of the internet or like widely used internet, what was 1994?

MS. SHEVLIN:  Form.

A.   It was just my fellowship.

Page 24

Q.   Okay.  What was special about that fellowship that that's what made you start doing that?

MS. SHEVLIN:  Form.

A.   Law enforcement was bringing cases for evaluation to Rady Children's and my colleague pediatricians were also doing these evaluations.  I had not been aware of it before 1994.

Q.   And when is the last time you did an evaluation like this?

A.   2024.  Maybe Nassau County Sheriff.  I know I did at least one for them in 2024.

Q.   You don't think you've done any this year?

A.   I have not.

Q.   Has there been any change in your practice or policies since 2023 in regards to evaluation of these types of images?

MS. SHEVLIN:  Wait, Dr. Dully, hang on a second.  Michael, we're getting into subsequent remedial measures, there's case law on this.  I'm not going to let her answer this question.

MR. ROBERTS:  You can't direct her not to answer questions, whether it's relevant or not is not a reason for you to instruct her not to answer.

Page 25

MS. SHEVLIN:  It's not relevant.  It's subsequent remedial measures.  There's case law on it.

MR. ROBERTS:  That's not -- that's not the law.  And you cannot -- and you can't -- you can, but there's two reasons why you can instruct the witness not to answer and they both deal with privilege.

MS. SHEVLIN:  You're asking her for subsequent remedial measures.

MR. ROBERTS:  And that is perfectly discoverable.  That is perfectly discoverable.

MS. SHEVLIN:  If you want to provide me case law on your position, I'm happy to look at it.

MR. ROBERTS:  Are you instructing her -- are you instructing her not to answer that question?

MS. SHEVLIN:  At this time I'm instructing her not to answer that question.  If there is case law, tell me that I'm wrong, I'm happy to look at it.

MR. ROBERTS:  I haven't briefed the issue, I've only done this for 21 years but --

Q.   Have you -- have you read my -- or Mr.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 26

Lawshe's expert report in this case?

A. I saw it on Friday, yes.

Q. Okay. What was your impression of that?

MS. SHEVLIN: Form.

A. I don't agree with it.

Q. Have you read the article The Difficult Issue of Age Assessment on pedo-pornographic material?

A. Not to my knowledge, no.

Q. The last time you attempted to do any research on the reliability of applying sexual maturity rating to online pornographic images?

MS. SHEVLIN: Form.

A. I was reviewing what I already have last night.

Q. What is it that you already have?

A. I have the original Tanner and Marshall articles from 1959 and '70, the Noshney (ph) publication that came a decade or so later. It's sort of an update on sexual maturity ratings. The Herman and Giddens work that came about 10 years after that in the 1990s on sexual maturity in American girls. I do have some other population evaluation articles such as from Switzerland or from Hong Kong or Asia, but those don't really apply in

Page 27

this case to my knowledge, and I did not review them much at all. And what else? I did look at an American Academy of Pediatrics publication that summarizes all of the pubertal stage photographs from, I think it's from 1996 and then also the -- was there anything else good? There is another article that I reviewed. Let me see. I don't know if I have -- well, and of course, the standard textbook that I use which is the 15th Edition of Nelson's textbook of pediatrics.

Q. So those sound like journals that are pediatric journals about Tanners staging or sexual maturity rating in the clinical setting?

A. They -- they are and also a -- a publication, I think it's a desktop publication from the military from the Armed Forces Center for Child Protection in 1998, I think it was. I looked at it, that was -- I was actually asked to help get these images taken care of by the Armed Forces Center for Child Protection about that time when I was active duty.

Q. And just so -- anyway, clinical setting by clinical setting, I mean and I want to make sure we're on the same page, a pediatrician who is treating a patient in the clinical or office setting;

Page 28

is that -- is that a fair way to use clinical?

A. Yes. Except that all the work was done from photographs -- where most of the work was done from photographs as a study modality. So it is a clinical tool, and if you ever get access to the child, then you can use it that way. But sometimes in child abuse pediatrics, you do or do not have access to the child; you do have access to the images and are consulted to estimate the appearance of their sexual maturity based on photographs.

Q. Okay. So I want to share the screen here. This is an article that we disclosed to you a month ago, a couple months ago. Can you see this on your screen?

A. Okay. Yeah, that's a lot of fine print.

Q. Let me -- Forensic Science international; have you heard of that journal?

A. Well, it's not a medical journal, but I have heard of it.

Q. I just want to go down here to the conclusion. I'm going to read some of these -- well, let me just read this. We'll start with this. Much pornographic, pedo-pornographic material depicts women who seem sexually mature and who may be late teenagers or women over the 18 years of age. Our

Page 29

study, in fact, proves that it is nearly impossible to say that adults who look like sub adults are indeed adults, which obviously may apply to all those sub adults who seem sexually mature. Did I read that correctly?

A. You read it out loud, yes.

Q. And it says, forensic and medical experts should avoid using such unscientific behavior which may have drastic consequences in a Court of law; did I read that correctly?

A. Yes.

Q. Now, you're unfamiliar with this, but I'd ask you to get familiar with it. This study shows that pediatricians who attempt to age pornographic images of women are wrong between 95 and 73 percent of the time when they do that; does that surprise you?

A. Well, they're against it, so it doesn't surprise me. I think that's what they wanted to find.

Q. This study was funded by the E.U. Project to help develop ways of detecting child ponography online; why do you see that this is what they wanted?

MS. SHEVLIN: Form, she has not had an opportunity to read the entire article.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 30

MR. ROBERTS:  Stop, stop, I don't want a speaking objection.  She said this article was published by people who wanted to find that.

Q.    Dr. Dully, why do you think the people who wrote this article wanted to find that?

MS. SHEVLIN:  Form.

A.    Because their conclusion and their tables say that in what you have shown me.  It needs to be read critically with a jaundiced eye because it appears on the surface that that is their aim.  It's also a legal journal, not a medical journal.  It would be read with a jaundiced eye.

Q.    So you're discounting an article that you've never seen or read?

MS. SHEVLIN:  Form.

A.    I am discounting a journal that is not a medical journal and I would read it critically if you give me the chance.

Q.    Well, you had a chance and you haven't done it, have you?

MS. SHEVLIN:  Form.

A.    I haven't seen this before.

Q.    Well, you -- you -- you had access to the article last week.

MS. SHEVLIN:  Form.

Page 31

A.    I have never seen this before.

Q.    Because you chose not to look at it.

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

A.    I have never seen this before.

Q.    Why have you not seen it before?

A.    It was not provided to me.  I have never seen it before.

Q.    It was in the expert's report that you said you read last week?

A.    It's certainly not in there.

Q.    Okay.  I'm going to share what we'll mark as Exhibit 2.  That will be Exhibit 1.

This is the report of Scott Krugman; does this look familiar to you?

A.    Yes.

Q.    See three here, The Difficult Issue of Age Assessment on Pedo Pornographic Material?

A.    It is a reference, yes.

Q.    You agree it was -- the name of the article, the journal and the citation was provided in his report?

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

A.    The citation is there.

Page 32

Q.    So why -- why didn't you look at it?

MS. SHEVLIN:  Form.

A.    Because I know it's a difficult assessment.  I know that it's difficult.

Q.    Why do you say that it's difficult?

A.    Because it is an appearance, it is not a chronicle age.  Chronological age, sorry, not enough syllables.

Q.    So let me ask you this.  So if I was a person who had to make a legal determination about whether or not someone was, in fact, or -- let me re-ask the question.  If I was someone who was being asked to make a factual determination about whether or not a model depicted in a pornographic image on the internet was a minor; in fact, a minor, would your opinion about the appearance be a reliable opinion for me to base that decision on?

MS. SHEVLIN:  Form.

A.    No, that's what the investigation is for.

Q.    That seems like a major limitation in your opinion about age; would you agree with that?

MS. SHEVLIN:  Form.

Q.    I'm sorry, almost all of your answers are being interrupted by Amy's objection.  Was that a yes?

Page 33

A.    It was a correct.

MS. SHEVLIN:  Give us just like one second so I can make an objection and then we won't talk over other.

A.    Sorry, sorry.

Q.    And maybe I'm -- do you tell law enforcement officers about the limitations in your opinions before you give them to them?

MS. SHEVLIN:  Form.

A.    Yes.

Q.    It happened again.  It happened again.  So you said yes to that question, correct?

A.    Yes.

Q.    Can you tell me what you explain to law enforcement officers when you give them your opinion?

A.    That this is the appearance of the person in the image, and that is, if I can see the image; sometimes the images are too blurry or just not good enough to even see.  So they know quality of the image and they know that it is only an image and that the appearance depicts something that is based on sexual maturity rating that may or may not prove to be a minor.  They don't bring the little kids, they bring these borderline kids to be looked at or images and they investigate after that.  Because I can only

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 34

give them appearance.

Q.   So you're aware that a lot -- I mean, do you have any impression of how much or how many images that are published on the internet have been digitally altered in some way?

MS. SHEVLIN:  Form.

A.   I'm sure it's an astrological number.  I don't know the number.

Q.   As we sit here, I mean, you're -- I mean, you believe -- let me just -- you think that most images have some sort of digital altering on them for aesthetic purposes?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

A.   No.  A lot of images have -- may have alterations and a lot of images may not have alterations, I don't know what those numbers might be.

Q.   And that is a fair answer.  If you don't know the answer, just say I don't know.

But whether or not there were alterations would have a significant impact on the accuracy or the reliability of your opinion as to the actual age of the model?

MS. SHEVLIN:  Form, speculation.

Page 35

A.   What I see on the image does not necessarily give an indication of the actual chronological age that may be discovered during investigations.

Q.   So what is -- what do you see -- what is the value -- I mean, your -- your job is to consult with law enforcement in these cases, correct?

A.   Yes.

Q.   What do you see the value of your opinions being?

MS. SHEVLIN:  Form.

A.   There are times when it leads to a real child or a trafficked child and it may be local; it may not have any bearing at all because it may turn out to be modified images that were made to look like an adolescent.  So I don't know what direction it will go after I tell them, yes, they have an appearance of an adolescent going through puberty and that is its only value.

Q.   So, okay.  I'm going to put a pin in that statement.  I want to go to actually sexual maturity rating.  In terms -- and let's just have this and just talk about females.  All of the images you reviewed in this case were females, correct?

A.   Yes.

Page 36

Q.   So and let's just start with a genital or vaginal appearance in females.  Can you describe what the grades of sexual maturity -- first of all, what are the grades of sexual maturity rating?

A.   I, II, III, IV, V and for pubic hair there may be a VI.

Q.   Okay.  So can you just give me the pubic hair -- first of all, in the genital region is there any other factor other than pubic hair development in sexual maturity rating?

A.   There is another factor but we usually can't see it and that is the appearance of the hymen itself.

Q.   And that's an internal anatomical body part?

A.   It's a little bit internal; it's not -- it's still considered external, but it's not readily visible.

Q.   Did that have any bearing on your opinions in this case, the hymen?

A.   No, I could not see that structure.

Q.   So, the only, I guess anatomical appearance would be the appearance of pubic hair in terms of genital development?

A.   Generally speaking, yes.  I don't have the

Page 37

images, so I haven't seen them in two years, so...

Q.   Well, we'll talk about that because, Amy, I thought that's what we were doing, is you were going to give her the images.

MS. SHEVLIN:  I meant to talk to you about that on Friday.  When we take a break, I'll call you.

MR. ROBERTS:  Okay.  All right.

Q.   So, grade- -- what's grade I?  I'm sorry, we're just talking about genitals or pubertal hair --

A.   For the female child, that's the little girl, so she will have fully developed labia majora if she's a term infant and that appearance will continue until she becomes -- developed some pubic hair.  So once she starts developing some pubic hair that is not vellus hair, different from the hair on her abdomen, she could be called SMR II.

Q.   Okay.  And grade -- what is grade III?

A.   Grade III is a little bit more pubic hair on the labia and also where the labia come together up front that will no longer be clearly or plainly visible because there is pubic hair at the top of that, the labia majora where they come together, the interior commissure, and part of the mons pubis is covered with pubic hair that is not the same as

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 38

vellus hairs on the abdomen.

Q.   And grade IV.

A.   Grade IV fills out the entire triangle shape of the labia majora, the anterior commissure and the mons pubis over to, but not involving where the thighs join at the pelvis.

Q.   What do you mean by triangle?

A.   That is the shape when the legs are together of the hair bearing parts over the mons pubis in front of the anterior commissure and on either side it's wider and between the legs, it will come to appointment so it may look like an inverted triangle.

Q.   And grade IV?

A.   Grade IV will involve the inner thighs as well.  And also hair will be thicker or more abundant.

Q.   So, I mean, human beings are all different; the thickness is a very subjective evaluation, I would imagine?

MS. SHEVLIN:  Form.

A.   Is that a clinical question or --

Q.   Yeah, it is.  Between making the distinction between IV and V, I mean, how -- what is the thickness of a V versus the thickness of a IV?

Page 39

A.   I would look at the inner thighs to tell the difference.  And most -- most of the children are shaved, so we don't get to assess thickness, there isn't anything to see, there are whiskers there.

Q.   Because most -- most people at that age do groom themselves at least at the thigh level?

MS. SHEVLIN:  Form, speculation.

Q.   Well, I think that was just your testimony, wasn't it?

A.   No, that wasn't my testimony, but --

Q.   What did you say?  I'm sorry, can you just say it again, you don't get to see at the thigh, you said something about shaving?

A.   There are whiskers.  We cannot judge the thickness of the pubic hair, we can only look at the location of the hair bearing parts by looking for the whiskers, the obvious shaving.

Q.   So, really, the difference between four and five is whether or not you see over the inguinal notch, that crease between our thighs and the pubic level, the pubic area?

A.   Practically speaking, it is the inner thighs.

Q.   Yep, okay.  And if there were waxing or grooming such that you couldn't see whiskers or

Page 40

something, but it was obviously being groomed, you would not be able to distinguish between IV and V?

A.   So I can see whiskers on the inner thighs, that distinguishes V from IV.

Q.   But if you can't, because of the method of grooming or the digital altering, you would not be able to tell the difference between a IV and a V?

MS. SHEVLIN:  Form.

A.   I'm talking about an actual patient. You're talking about images?

Q.   Oh, is there a difference?

MS. SHEVLIN:  Form.

A.   An actual patient, I can see the difference because I can see the hair follicles.

Q.   So what's the difference when you're evaluating an image?

A.   There isn't as much fine focus or close view to necessarily be able to see and blond individuals may be less obvious as well.

Q.   So it's much more difficult or it's more difficult for you to make the distinction between a IV and a V on -- on a digital image?

MS. SHEVLIN:  Form.

A.   On any image, yes.

Q.   Okay, okay.  All right.

Page 41

So this triangle of pubic hair, what -- what's the significance of that?  Why do you say a triangle?

A.   Because I'm trying to be descriptive.

Q.   No, but I mean, is that the way that pubic hair grows in on females is in a triangle -- is that the way it's supposed to grow in?

A.   At a certain maturity, it will look like a triangle.  Early on it does not look like a triangle.

Q.   But at the IV to V stage, an ungroomed female model should have a triangle shape to her pubic hair?

MS. SHEVLIN:  Form.

A.   Roughly, except for what's out on the inner thigh they're going more posterior.  Some people have it going up to their belly button as well, that's called a six.

Q.   Okay.  Pubic hair that goes up to your belly button would be a VI?  Grade VI; is that correct?

A.   In a straight line up the midline lafay (ph), there can be a VI, and it may go posterior around the anus, too.

Q.   How long can people appear to be -- well, before I ask that question.  Give me the same rundown

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 42

with breasts.  Grades IV through V in breasts, just describe what those are.

A.    Grade IV, just grade IV and V?

Q.    No, I'm sorry, grade I through V.  I'm sorry if I asked that question wrong.

A.    Okay.  So most newborns are II, maybe III in their sexual maturity rating, they've been exposed to estrogen in utero.  Even the male infant has breast buds, so the newborn is, by definition, a sexual maturity rating of II and sometimes III.  As the estrogen effect from being a fetus goes down in their bloodstream in little girls that takes two to four years.  The breast buds become small and flat and no longer palpable.  So there will be a flat little pale nipple and if they're cold, they may have a papilla protruding in the middle.  As the -- that is an SMR I, which is sometime after birth until estrogen effects starts being produced by their own body.  The breast buds will then redevelop and when it's confined to just under the nipple and its areola, then that is an SMR II.

When there is a little bit more enlargement of a mound outside the area of the pink areola, then that's a III.  When the breast tissue is beginning to meet at the sternum and the midline, then it is a IV

Page 43

when looking at it an anterior/posterior way, so we're looking directly at the person's chest.  If we look from the side, you -- or have a side view, you can see that a IV has two mounds; one mound for the breast tissue and a separate mound on top of it for the nipple for areola and papilla.  So IV, sexual maturity rating is two mounds instead of one.  V has become a single globular shape, and so it has a papilla at the top of the nipple, but there is one mound that is under the pink of the areola and the breast tissue all the way to the chest wall.

Q.    Okay.  So how long in chronological age can a female present as a grade IV on clinical exam?

MS. SHEVLIN:  Form.

A.    About 20 percent of women who are not pregnant revert to a IV.  And will be that way through parts of their adulthood.

Q.    So a female being a grade IV is not inconsistent with them being over the age of 18?

A.    Correct.

MS. SHEVLIN:  Form.

Q.    And when you meet with detectives, do you give them some explanation of what the -- the sexual maturity rating is; do you give them like a little primer course if you've never met them before?

Page 44

MR. STEWART:  Form.

A.    In general, I don't -- I'm not the first pediatrician that they have met with, but I will ask them if they have any questions and show them what I use, my reference.

Q.    You show them a reference book or something like that?

A.    The pediatric, Nelson's Textbook of Pediatrics, yes.

Q.    Okay.  Actually, and I'm just going to show you this.  It's just -- and you can tell me if it's helpful or not helpful.  I guess that means it's a demonstrative aid, it just has -- it's like a textbook, I don't know if it's from your textbook or not, and you can tell me if it's not helpful.  Do you see this?

A.    I can see it.

Q.    Is that a visual depiction of what you just testified to, that image there?  What's that?

A.    Yes, they are trying to depict that here.

Q.    And I understand it's like -- it's a drawing, it's probably just a pen drawing, but this -- this is kind of -- I see a triangle at IV and I see a larger triangle at V; is this generally what you were testifying to earlier?

Page 45

A.    Yes, roughly.

MS. SHEVLIN:  Are you making that as an exhibit?

MR. ROBERTS:  We can mark that as 3.  1 was the article.  2 was the expert report and 3 was that demonstrative image.

Q.    I want to go back to Exhibit 2, which is Dr. Krugman's report and you said you disagreed with the report, but I just want to maybe dial in on that.

For example, I just want to go to the -- the letter E here, Dr. Dully.  It's well-known and documented that adult females can exhibit and appear to be SMR IV; you would agree with Dr. Krugman on that point?

A.    Yes.

Q.    Do you know Dr. Krugman?

A.    I know Dick Krugman, I don't think I know Scott Krugman.

Q.    Okay.  In this he says that you're a member of a list serves that he's a member of and this issue about the concerns and limitations of using SMR in CSAM investigations has been raised in that -- in that e-mail list serve; is that true?

A.    It's been discussed off and on for at least a decade, yes.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 46

Q.   I mean, has anyone suggested on there that it is not scientific to be applying SMR ratings to the pornographic images on the internet to determine chronological age?

MS. SHEVLIN:  Form.

A.   I don't remember anybody saying that it was unscientific, but we all agree that there are limitations to stating what the appearance may be versus what the age of the patient may actually be.

Q.   Let me ask a question in a different way, because we may be just ships passing in the nights here.

Do you agree that it is not scientifically reliable to use SMR ratings to determine the actual chronological age of a model depicted in a pornographic image on the internet?

MS. SHEVLIN:  Form.

A.   Yes.

Q.   Yes.  Sorry.

So you agree that that's not scientific to say the actual age of the model?

A.   I agree.

Q.   What you are saying is, is that you can apply SMR and say what it appears to be, irrespective of the possibility of grooming or digital

Page 47

manipulation?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

Q.   I didn't even -- I don't even know I know what your answer is there, so can you restate your answer?

A.   I said correct.

Q.   Correct, okay.

Do you think that you communicate that idea to law enforcement when they come to you?

A.   Yes.

Q.   So when Detective Preston came to you with these images and she left, you would have told her that you cannot give her any reliable information about the actual age of this individual depicted in this image?

A.   Yes.

Q.   All right.  So, in some ways, I think maybe you agree with Dr. Krugman if he is talking about actual age; is that fair enough -- is that a fair statement?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

Q.   Do you understand my question, Dr. Dully?

A.   I'm -- I'm not sure how your question is

Page 48

different from all the others.  I guess I'm not sure. I must be missing the nuance.

Q.   Well, you said originally that you disagreed with his opinions; do you remember that testimony?

A.   I disagreed with his opinion about my opinion.

Q.   If he thought that your opinion was stating the actual age of the individual, rather than just the appearance, would that be an explanation for the disagreement between Dr. Krugman and yourself?

MS. SHEVLIN:  Form, speculation.

A.   Yes.

Q.   Okay.  So did you understand that your opinions were going to be used in a probable cause affidavit to seek a search warrant?

MS. SHEVLIN:  Form.

A.   No.

Q.   What did you think that they were going to be used for?

A.   That there were probably other files to be looked at or other circumstances and there would be some determination on whether they would move forward or not.

Q.   Do you think -- I'm sorry, I didn't mean to

Page 49

cut you off.  Were you finished?  I'm sorry.

A.   I think I was finished.

Q.   Okay.  Sometimes on Zoom it's a little hard to know when people are finished or not, but...

Would you be comfortable with your opinions being used in a probable cause affidavit without the caveat --

MS. SHEVLIN:  Form.

Q.   -- that you've just given us here about the limitations of your opinion?

A.   I don't think my comfort matters.  I'm just making a statement about the appearance.  And then there's decisions on whether to move forward with that or not.  Sometimes they do and sometimes they don't, and I don't know that one image is going very far ever; I don't know that.

Q.   Well, no, that's not my -- so it's, you know, as a child abuse expert that your opinion sometimes have serious legal consequences, correct?

A.   Yes.

MS. SHEVLIN:  Form.

Q.   Parents lose their children sometimes because of your opinions.

A.   Yes.

Q.   In this case someone went to jail, in part,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 50

because of your opinion; were you aware of that?

MR. STEWART:  Form.

A.   I was informed after it was published in a newspaper.  A colleague informed me that that had been in the newspaper, but I did not know that.

Q.   Did you suspect that your opinions might be used in front of a judge?

MS. SHEVLIN:  Form.

A.   Sometimes they go before a judge, sometimes they go before a jury; that's not my determination.

Q.   But that's not my question.

My question was, when you gave this -- when you wrote these letters, did you expect that the law enforcement officer, Detective Preston, was -- was going to quote them in a probable cause affidavit for a judge?

A.   I know that she was going to investigate further, but I did not know what the next step might be.

Q.   All right.  So I'm going to just pull up and share the -- you don't have the February 22nd report; did I understand that correctly?

A.   I did not.

Q.   So -- and we'll mark this as Plaintiff's Exhibit 4.  And it will be a composite exhibit

Page 51

because I have them in a PDF that has all three of your letters.  I'll represent to you that this letter is almost verbatim copy and pasted from your -- in your April 5th, so the words are going to probably look very similar, but just take a second and look at it.  Just tell me when you're done.

A.   Okay.

Q.   So my first question is, why did you not include in your letter any commentary on the limitations of your opinion in regards to the actual age of the model or the ima- -- the person depicted in the photograph?

A.   I think the limitations are obvious, and I say what appears to be.  And that is the appearance, the developmental genital appearance and she does not appear to be shaved; the whole thing is about appearance.  I think that's pretty apparent.

Q.   Well, you told -- you've already testified that you would have told Detective Preston explicitly that I am not talking about the actual age of the individual, I'm only talking about the appearance?

A.   I'm only talking about the appearance that's --

Q.   And you would have communicated that to Detective Preston?

Page 52

A.   And it's in writing, yes.

Q.   And when you say it's in writing, you're talking about your use of the word "appears," you use the word appears over and over again?

A.   Yes.

Q.   Okay.  So I understand you don't have the images in front of you and we're going to take a break here in just a minute and I can talk to Amy about that, but I just want -- I want to go through this real quick, okay.

You, in this depict -- you describe the image that you're looking at, correct?

A.   Yes.

Q.   And can you describe for the record -- do you -- first of all, do you remember meeting for the first time Detective Preston?

A.   I remember that I met her, yes.

Q.   Do you remember -- you had that meeting in general, maybe not word for word, but in general do you remember that meeting?

A.   Only vaguely.

Q.   So she showed you an image on her laptop is what's related in this letter.  Can you describe what that image looked like?

A.   I can only read to you what I typed.

Page 53

Q.   Please do.

A.   The image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet.  She is on a wood floor in a knees to chest position with her lower legs and ankles parted to expose her genitalia for the camera.

Q.   So she was in a knees to chest position; is that correct?

A.   Yes.

Q.   Now, you were of the opinion -- Oh, I'm sorry, I didn't mean to stop sharing there, I'm sorry.

Your opinion was that she appeared to be SMR IV; is that correct?

A.   Just of her genitals, yes.

Q.   Because you -- you couldn't evaluate her breasts?

A.   I don't think I was able to see them or I would have put them in there.

Q.   Well, knees to chest, in theory, she would be covering her breasts with her knees or her legs, correct?

MR. KASS:  Form.

A.   That sounds right.

Q.   Yeah.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 54

You put that she would have achieved this developmental genital appearance of SMR IV at 12 to 15 years of age. Why didn't you put that she could -- but she could be 18 or 19 or 20 with an SMR IV?

MS. SHEVLIN: Form.

A. Well, that would depend on the modifications and grooming, as you're calling it, that she would undertake, and I'm not assessing grooming, I'm assessing appearance of the photograph, which is what pornography is all about.

Q. Well, you testified earlier and you agreed with Dr. Krugman that women can present as SMR IV for their entire life?

A. For their breast development, yes.

Q. And genital pubic hair?

A. That depends on shaving and heritage or depilatories or waxing or other things.

Q. You say that she (sic) did not assess her grooming, but you did in the next sentence assess the grooming?

A. She did not appear to be shaved; that, again, is an appearance.

Q. How -- what scientific basis do you have to make that determination?

MS. SHEVLIN: Form.

Page 55

A. I don't see any hair there and so she does not appear, you know, to be shaved. I mean, there is or there isn't hair, right, why say that there is anterior pubic hair present.

Q. But that's just a lay opinion, right, that's not a scientific opinion, you're just saying I don't see any hair?

A. No, I think you mischaracterize it big time, clinically.

Q. Tell me, I asked the question and you didn't answer it.

What is the scientific basis for your opinion that she does not appear to be shaved, medical, scientific basis for your opinion?

A. The hair is still there.

Q. I don't understand, you said the hair is still hair?

A. Shaving removes hair, but the hair is still there; it's present or absent in the image.

Q. Is that a medical opinion?

A. That's a clinical medical assessment what the image looks like.

Q. What about waxing or electrolysis or chemical hair removal?

MS. SHEVLIN: Form, speculation.

Page 56

A. What about it? The hair --

Q. Do those leave visible signs of hair?

MS. SHEVLIN: Same objections.

Q. Well, hold on. You're saying as a medical expert, you can determine whether someone is groomed or not groomed, correct?

MS. SHEVLIN: Form, mischaracterization of her prior testimony.

A. I know what shaving looks like because I see it all the time and it has been that way since the 90's so --

Q. Yeah, and I'm asking about go waxing or electrolysis; you're familiar that there are other types of grooming other than shaving, correct?

A. There are, yes.

Q. And they leave a different -- they look different; the results is different than shaving, correct?

MS. SHEVLIN: Objection, speculation.

A. They're designed to be the same or they can be designed to be different.

Q. Right.

So, how can you look at a pornographic image and determine whether or not they have been waxed or electrolysis hair removal, some other form

Page 57

of hair removal?

A. I'm not assessing the hair removal, I am saying the pubic hair is present.

Q. But if she is groomed that would destroy any validity to your SMR rating as -- as regards to pubic hair, correct?

MS. SHEVLIN: Form.

A. The hair is still present. It can be assessed for its appearance.

Q. We're going to follow back up with that. But before we take a break, I'm going to ask you this quick and I'm going to go back to this image.

Okay. This is the general image and we talked were the triangle. Dr. Dully, you've described this model in the February 22nd, 2023 as sitting towards the camera, knees to chest, correct?

A. Yes.

Q. It would have been impossible for you to determine whether this model had a triangle or not based on the way that she was sitting, correct?

A. I do not know; I do not know what the image looks like.

Q. You've described the image as knees to chest, sitting on the floor, that would obscure the inguinal notch or the inner thigh from your view,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 58

correct?

MS. SHEVLIN:  Form.

A.   No, that depends on the image.

Q.   Well, if the image, because I've seen it, if the image obscured the inguinal notch, it would be impossible for you to determine whether or not the model had a triangle or the hair crossed the inguinal notch to the thigh, correct?

MS. SHEVLIN:  Form.

A.   Well, there is not -- there is no inguinal notch, I don't know what you're talking about, and I can see -- I state that I can see, but I don't have the image, you have an advantage over me, you're not seeing it, correctly.

Q.   Okay.  The thigh -- you testified -- tell me what was the difference between, again, IV and V?

A.   Can I see the image?

Q.   I am not actually comfortable because the image is still on a Nick Nick database because no one is doing their job, and I'm afraid that if we transmit it, we're all going to get investigated for child pornography even though it's an adult, so I'm just going to ask you questions right now based on the hypothetical and I will show you the image, but can you, once again, tell me what is the difference

Page 59

between a IV and a grade V pubic hair?

A.   The presence of hair or the shaved area of hair on the inner thighs, on either side of the fully developed roughly triangle shape of hair.

Q.   So if you could not see the inner thigh, you could not distinguish -- it would be impossible for you to even say what appears to be a grade IV versus a grade V?

MS. SHEVLIN:  Form.

A.   I cannot see the image.  I can't comment one way or the other.

Q.   You have to answer my questions unless you don't understand them.

A.   I can't see the image.  You're asking me --

Q.   I'm asking you a hypothetical question, Dr. Dully.

A.   Okay.  A hypothetical, not about this case, about something else, okay, try that.

Q.   Hypothetically, if the image did not show the inner thigh or the inner section of the inner thigh and the pubic region, you could not distinguish between a grade IV and a grade V in terms of sexual maturity rating appearance?

MS. SHEVLIN:  Form.

A.   I would need to see the image, but I would

Page 60

consider that as facts, yes.

Q.   Evaluating whether or not pubic hair has crossed the line onto the thigh is the distinguishing factor between a grade IV and grade V, pubic hair distribution for sexual maturity rating, correct?

A.   It is the most helpful distinction, yes.

Q.   Okay.  All right.  Why don't we take a break, we've been going for an hour and a half.

Amy, do you want to call me?

MS. SHEVLIN:  Yeah, I'll you on your cell.

THE VIDEOGRAPHER:  Going off the record the time is 11:29 a.m.

(Whereupon a break was taken.)

THE VIDEOGRAPHER:  We're on the record, the time is 11:47 a.m.

Q.   Okay.  So we had an off record discussion and through no fault of Dr. Dully, there's just a logistical issue with Miss Shevlin's office and the photographs did not get sent to her.  So we are going to ask a few more questions, but then continue the deposition to a later time in which she will have access to those photographs and we will reschedule it, Matt raised the concern about him asking questions and that certainly will be accommodated when we reschedule the deposition.  He also has the

Page 61

ability to reset a deposition as well.  Is that a fair summary, Matt and Amy?

MS. SHEVLIN:  I think that's a fair summary.

MR. CARSON:  Agreed.

MS. SHEVLIN:  And I do also want to add just one thing.  The questions that you'll be asking her are largely going to be hypothetical if we're talking about the images from this point forward and then when we have an opportunity for her to look at the images, they'll be specific to those images, correct?

MR. ROBERTS:  Some of them may be hypothetical.  I don't intend to go through every image in a hypothetical way, but I am going to ask about some general principles, you know, that maybe we don't even need the images for, but yeah, some may be hypothetical, but I don't intend to go through everything like that.

Q.   All right, Dr. Dully, I want to ask you -- and this is not a hypothetical, when you were making these assessments at the request of law enforcement, do you use any other set of scientific principles or methods in rendering the opinion on the appearance of the model, other than sexual maturity rating?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 62

A.   Yes, sometimes I do.  It depends on the image.  So sometimes I --

Q.   What would those be?

A.   So sometimes I can see the teeth, and I can tell if they're baby teeth or mixed dentition, which is adult teeth in some stage of eruption, sometimes with missing teeth as well.  And then sometimes if they're very young, I can look at it by proportion, if they're very young, images of the very young, I can look at body proportion which is head size to body size.  And most of the size or height is not visible in most images; sometimes they're standing next to an adult and I can look at approximate height, but most of these images are not that, and so occasionally, you know, there's more information or appearance information on the images and sometimes, there is not.

Q.   If you relied on any other data such as proportion, height, teeth, would that be information that would be included in your report?

A.   Yes.

Q.   So if it's not included in your report, I can take from that that you did not consider other data in forming that opinion?

A.   Not other image data.  Sometimes I look at

Page 63

the bio main or something that's printed on it, or for sexual content, but that's often not helpful either.  It's just all letters and numbers and asterisks, that doesn't help.

Q.   Yeah, I understand.  If -- if there was something, though, you would put that in your report?

A.   I would.

Q.   All right.  So I think when we left off, there was this hypothetical and I don't -- and I apologize, and I'm going to ask this hypothetical again, and I use inguinal notch, but I think it's inguinal -- what is it that --

MS. SHEVLIN:  Form.

A.   I don't know.

Q.   It's -- I'm sorry, do you know the anatomical term that I'm talking about?

MR. CARSON:  Groove.

Q.   Inguinal groove?

A.   Yeah, I don't know what you're referring to.

Q.   It's just an anatomy term.  It's the -- it's the -- it's the line between the abdominal wall and your hip, that groove, that crease.

A.   Oh, that would be -- you could call that an inguinal fold.

Page 64

Q.   Inguinal fold, yeah, I've seen notch, I've seen fold, I've seen groove, I've seen -- but that's the line that you're talking about in the distinction of -- between IV and V, correct?

A.   No, that is very anterior.  I'm talking about medial thighs, which is the inner surface of the upper thighs.

Q.   But if a picture did not -- if an image did not depict the upper thigh or the abdominal wall where it meets the thigh, it would be impossible for you to distinguish between a grade IV and a grade V pubic hair presentation, correct?

MS. SHEVLIN:  Form.

A.   No, that's not the location.  The location isn't abdominal wall and it's not in the inguinal fold.  It is between where the thighs come together in the middle, so it's anterior and medial, the inner thigh.

Q.   Okay.  So if you cannot see in a digital image, the interior thigh, it would be impossible for you to distinguish between a grade IV and a grade V?

MS. SHEVLIN:  Form.

A.   No, it's the anterior, a-n-t-e-r-i-o-r and medial thigh, m-e-d-i-a-l, which is where the legs come together between the upper thighs and on the

Page 65

front of the medial surface of the thighs.

Q.   If you cannot see that area, it would be impossible for you to distinguish between a grade IV or a grade V presentation, correct?

MS. SHEVLIN:  Form.

A.   Probably, but grade IV and grade V are also a subjective determination of quantity amount of pubic hair.

Q.   You would not be able to, scientifically, with any degree of reliability distinguish between a grade IV and grade V if you had not seen the area that you have just described?

MS. SHEVLIN:  Form.

A.   At a hundred percent level of certainty, probably not.

Q.   No, you can't ever say with 100 degree -- 100, you know, that's not -- that's not what I'm talking about.  And I want to -- I'm going to spend as much time on this as we need to.  What I'm going to do, is I'm going to pull back up our demonstrative aid.

Mr. Videographer, do you have this demonstrative aid?

THE VIDEOGRAPHER:  Yes, sir, if I see it?

MR. ROBERTS:  Yeah, can you do like a split

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 66

screen, the ability to do a split screen with the witness in this?

THE VIDEOGRAPHER: I see it now. She's on the -- do you guys see it? She's on the side right now.

MR. ROBERTS: That's fine, yeah, that's fine.

THE VIDEOGRAPHER: Okay.

Q. So we have a -- can you see cursor, Dr. Dully?

A. Yes.

Q. So on grade IV, grade V; is my cursor, the area where my cursor on both the IV and the V, is that the area that you're talking about?

A. Yes. Also between the thighs.

Q. Also between the thighs.

A. To each other.

Q. If you cannot see this area that I am running my cursor on, you cannot do a SMR rating to distinguish between a IV and a V on a pornographic image off the internet, can you?

MS. SHEVLIN: Form.

A. There can be a difference in quality, as you can see, and then also there's medial thighs which you can't see on these diagrams, so if I can

Page 67

see better than just this, maybe.

Q. At what point would you say to -- first of all, have you ever told a law enforcement officer, you know, there's just not enough here for me to reliably give you an opinion about the sexual maturity rating.

A. Yes.

Q. And what would be the criteria for that?

A. Sometimes the image is too pixilated or blurry or the clothes are covering the vital structures.

Q. What are the vital structures?

A. The breast area from more than one view, and the pubic area as well.

Q. Okay. So if the breast area is obscured and the pubic area is obscured, those are circumstances in which you believe you have communicated to a law enforcement officer that this just isn't enough for me to reliably opine on the sexual maturity rating as it appears in the photograph?

MS. SHEVLIN: Form.

A. Correct. Maybe I can see the teeth, maybe it's an image that belongs to a bigger file that shows more information, but based on that one image

Page 68

alone, I can't do the sexual maturity rating.

Q. So you do have -- first of all, do you recall, I think you met with Detective Preston twice; is that what your rec- -- records indicate?

A. Yes.

Q. February 22nd and April 5th. Do you have any calendars or anything in your possession that document those meetings?

A. I have a date and a time on my Outlook calendar.

Q. Have you gone back and checked that Outlook calendar and -- and found an April 5th and a February 22nd?

A. I did not remember the February visit, so when I went back, I did find the February visit on my calendar.

Q. Have you met with her any other times other than April 5th or April (sic) 22nd?

A. Not met with her. I may have seen her in the hallway, potentially, but, no, I didn't share any cases with her to my knowledge.

Q. Okay. Did you check for that?

A. No.

Q. So you just don't recall having any other cases that you consulted with her about?

Page 69

A. I don't know that they were with her; sometimes it's a team. I have seen other St. John's County cases at the hospital --

Q. Right.

A. -- but I don't remember her being a prominent figure in any of the others.

Q. Okay. So do you recall -- so you don't recall her -- meeting her in February with a single image as we sit here today?

A. I do not.

Q. Do you recall meeting her in April with multiple images?

A. Yes, because we scheduled that. And she had images, more than one, yes.

Q. And we've talked a little bit about that meeting. Do you recall the discussions that you had with her during that meeting?

A. In any vivid way, no.

Q. You testified earlier that you would have counseled her on the limitations of your opinions regarding appearance versus actual age; is that correct?

A. In a simple way, yes, that's all I would have said.

Q. In any way you wouldn't be misleading

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 70

anybody in what your opinions are, correct?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

A.    Correct, the investigation needs to occur.

Q.    What do you mean by that, the investigation need to occur?

A.    I have no access to actual -- any additional information at all about the case, the person depicted, other computer's images, I don't have any of that information, so if there is an investigation that's occurring, that I am not part of.

Q.    Do you mean that, in part, that your opinions are not enough to establish the actual age of the individuals depicted from a medical standpoint?

A.    Right.

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

Q.    So, it's okay.  I got your answer that time.

MR. CARSON:  If you don't mind, I didn't hear her.  I think I might have spoken over the witness.

Q.    I think you gave me another "correct"?

Page 71

A.    I think I did, yes.

MR. CARSON:  I apologize, Doctor.

A.    I'm sorry, I'm sorry.

Q.    I'll re-ask it.

You have not -- in these -- in these three reports that I have that you produced in this case, you have not rendered a reliable medical opinion on the actual age of the individuals depicted in this -- in these images, correct?

A.    Correct.

Q.    So let me ask you this and these are kind of hypothetical questions, but they are about the images, so does that mean when you're presented an image and, for example, the model appears, for whatever reason, to have no pubic hair, that in regards to sexual maturity rating is going to be -- that that is a sexual maturity rating of one?

A.    Probably, but I'll look to see if I can see the other areas, too, and countenance of the person.

Q.    Right.  But I mean, you're not, if you're not -- if you can't look at the breast and you don't have a picture of her face or anything like that and you just see a genital area and there's no pubic hair that is visible to you, that's a sexual maturity rating of what?

Page 72

A.    That would be the appearance -- if the person is blonde, I will explain that I might not be able to see blonde pubic hair even if it's there, so I don't know the image, so I don't know if it was a blonde or not.

Q.    Well, I guess for whatever reason, right, I'm just asking, brunette red head or whatever, if you look at an image and you do not see any pubic hair, that would result in a sexual maturity rating of one in terms of appearance?

A.    Yes.

Q.    And do you make any effort to determine whether or not the image has been manipulated, touched up, edited in any way?

A.    No, I have no expertise in that.

Q.    Talk about shaving, do you have any expertise in the appearance of electrolysis, hair removal?

A.    Not to my knowledge, no.

Q.    Do you have any expertise in what an individual who has received electrolysis looks like when you take a picture of them -- of their pubic hair?

A.    No.

Q.    Same question with waxing; do you -- are --

Page 73

do you have any expertise in determining whether or not from looking at a picture someone has been waxed?

A.    If there's folliculitis where the hairs are starting to grow back, maybe, otherwise, no.

Q.    Because your understanding is waxing pulls the hair follicles out of the skin in that process, correct?

A.    Yes.  And there would be a period of time where the follicles look healed over.

Q.    And that would be the appearance of no growth of pubic hair?

A.    Yes.

Q.    Is there a reason why you only say in -- in these opio- -- in these letters that the model or she does not appear to be shaved rather than waxed?

A.    No, I just used shaved as the customary term.

Q.    So by shaved, you mean grooming of any type?

MS. SHEVLIN:  Form.

A.    The after care is still present, not shaved in a general sense, not absent.

Q.    Hold on, I'm not understanding you.  Let's not even look at the first letter, let's just look at April 5th, okay?  You've got an April 5th.  I can

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 74

pull it up.

MS. SHEVLIN:  Could you pull it up, I want to make sure it's the correct one for all of us to pull up at the same time.

MR. ROBERTS:  There's two April 5ths.

Q.   So I'm going to share your report again. I'm going to scroll down to the second -- so, I just want to go over here on the second paragraph, can you see this, the second image is imprinted with white script.  That's the way it begins.  You say she does not appeared to be shaved.  What do you mean by that statement?

A.   That there's no shaving bumps or folliculitis that we might see, and I don't see -- you can see that I say she appears to have no pubic hair development.

Q.   So I guess what I'm saying, what I'm getting at is what if she was waxed?

MS. SHEVLIN:  Form, speculation.

A.   I could have said she does not appear to be waxed, I would be saying the same thing.

Q.   Bill, but -- do you get bumps from waxing?

MS. SHEVLIN:  Form, speculation.

A.   You can.

Q.   But I think we just established that there

Page 75

is a period after waxing where it appears that you have no pubic hair growth, correct?

A.   It may appear you have no hair growth wherever was waxed, I don't know how long that lasted.

Q.   So how could you rule out in giving your opinion here that she hadn't been waxed?

MS. SHEVLIN:  Form.

A.   I'm not making any statement about waxing at all.

Q.   And that's my question, why not?  Why not?

A.   Because the presence of pubic hair is the presence of pubic hair; what cosmetic procedure is not part of the question.

Q.   She doesn't have any presence of pubic hair, so isn't it part of the question, why does she not have pubic hair; your answer is that she's prepubescent, there are other explanations, correct?

MS. SHEVLIN:  Form.

A.   Correct, she has appearance of prepubescent or -- yes.

Q.   Or she has the appearance of one is who is just been waxed?

MS. SHEVLIN:  Form, speculation.

A.   I can't see the image, but hypothetically,

Page 76

that is one explanation.

Q.   Why is that explanation less likely than your given explanation that she's prepubescent?

MS. SHEVLIN:  Form.

A.   Which explanation?

Q.   That she's just been waxed?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

A.   I was a military doctor and all the young women are shaved, they're not waxed.  Waxing and electrolysis and laser hair treatments are expensive, and so in general, they're shaved.  So for me as a military physician, shaved is a general term.

Q.   Whatever happens in the military happens in the military.  I'm not asking about the military; you've been a U.F. physician for 10 years, correct?

A.   And a military physician since 1982.

Q.   And you had no reason to believe that this model was in the military, correct?

MS. SHEVLIN:  Form, speculation.

A.   Correct, but my customary vocabulary is definitely effected,

Q.   No, and I'm not talking semantics, Dr. Dully, and I -- I apologize if you think I am talking semantics, I am not.  You just testified that one

Page 77

possible explanation for her not having the appearance of hair, is that she was waxed?

A.   Okay.

Q.   That's correct, right?

A.   Or shaved or something else, yes.

Q.   Or electrolysis, correct?

A.   Maybe.

Q.   Now, my question to you is, you offered the opinion that the reason why she does not have pubic hair is because she is less than nine to 13 years old, correct?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

A.   Based on the appearance.

Q.   But the appearance is also consistent with someone who's been waxed, correct?

MS. SHEVLIN:  Same objections.

A.   Correct, but I'm not seeing the image, so hypothetically, it could be.

Q.   Right, so here's my question.  What makes it more likely that your opinion, that it is her pubertal development that explains her lack of pubic hair, rather than waxing or electrolysis?

MS. SHEVLIN:  Form.

A.   The investigation will verify or refute.  I

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 78

have no ability to do that.

Q. Well, I'm just asking you from a medical perspective, okay. You get an image, right, from the internet, you knew this was an image from the internet, correct?

A. No, I know it was a Nick Nick tip based on what I was told, I don't actually know.

Q. Actually, and you may not know this, this was not a Nick Nick tip, this picture, you describe it, it had a file name, it's a screen shot and then there is Duck Duck Go dot -- did you not know that that was a screen shot from the internet?

MS. SHEVLIN: Form.

A. No, I didn't know where it came from.

Q. Well, you'll look at it when you look at the image, you'll agree it is from the internet; it has the website.

MS. SHEVLIN: Form.

Q. Well, let's not get into that, we'll ask that later.

You're being asked a medical opinion by the detective, correct?

MS. SHEVLIN: Form.

A. Yes.

Q. Now, you know, as a medical doctor that

Page 79

there can be multiple explanations for a model in an image not having the appearance of pubic hair, correct?

A. There can be, yes.

Q. Right.

One of those is that the image has just been digitally altered to remove evidence of pubic hair, correct?

A. Yes.

MS. SHEVLIN: Form.

Q. One of those would be waxing or electrolysis or some form of hair removal that did not leave any visible evidence of hair, correct?

MS. SHEVLIN: Form.

A. Yes.

Q. All right. One of the explanations would be that the model has not reached a certain level of puberty, correct?

A. Yes.

Q. So as a medical doctor, this would be what we call kind of a differential diagnosis, correct? You got -- you got three different things that could explain what you are observing; is that a fair characterization?

MS. SHEVLIN: Form.

Page 80

A. Potentially, yes.

Q. What makes you think that pubertal development would be more likely than digitally altering the image or some sort form of hair removal that you couldn't see on the picture?

MS. SHEVLIN: Speculation.

A. I am not saying how likely or unlikely it is, I'm only saying what the appearance is.

Q. So when you're entering these opinions, you're not saying with any degree of reliability that they're correct?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. It's not chronological age, their appearance.

Q. Well, why didn't you -- I guess my question here is and I don't think you need to look at the image for this, you acknowledge that waxing can produce the same effect of no visual evidence of pubic hair; why would you as a doctor say that she is an SMR I rather than she just had a really good wax job?

MS. SHEVLIN: Form, speculation.

A. Again, I need to see the patient, which is the image.

Page 81

Q. Okay. Well, we'll certainly do that when we get the images and I guess we can answer those questions then.

In this same -- and this perhaps highlights what we've been going around today more than anything else. In the first paragraph here you review another image, and this is -- let's just call it by its file name: YCBLVVFQ underscore O.JPG. This is an image that you evaluated and I'm just going to read your opinion. Her breasts are partially visible and could be SMR IV to V. However, her genitals -- genitals are plainly visible and her thighs spread widely apart and showing she is SMR I with respect to pubic hair. Then you say this developmental appearance is less than nine to 13 years of age.

So my first question is, what developmental appearance is less than nine to 13 and a half years of age with this model?

MS. SHEVLIN: Form.

A. Absence of hair bearing parts.

Q. Okay. But what about her breasts?

A. Well, I did not have a good view of her breasts, so that was the best that I could do was IV to V.

Q. Yeah, but what's the developmental

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 82

appearance of a V breast; what's the age ra- -- age range of that?

A.    Post pubertal or beyond.

Q.    **Greater than 18 years old, correct?**

A.    Well, no, not necessarily, because part of the sexual maturity rating is looking for disorders that involve estrogen exposure at any age, and the five can -- breast development sometimes starts first and finishes first and so you can have a V during puberty, so it's good to be able to see both areas if possible.

Q.    **What kind of disorder would that be called, someone who has an SMR rating of V breasts, but no pubertal hair development?**

A.    Well, it can be normal, and it can be normal based on the limitations of the photographs, and there are cases of precocious thelarche it's called where breast development happens without actual pubertal development.

Q.    **Your testimony here today is that it is normal for a female to have grade IV to V breasts, but no pubic -- pubertal hair development in a clinical setting?**

A.    It is possible, yes.

Q.    **And if that is possible, you would look at**

Page 83

it and say -- **you would run some diagnostic tests to try to explain why that was happening, correct?**

A.    No, not necessarily. It depends on the whole picture.

Q.    **How many pictures have you seen -- have you ever treated that had grade V breasts, but no pubertal development; is that someone that you've treated before?**

MS. SHEVLIN:  Form.

A.    Yes. I have seen one in the military and she had a sexual development disorder.

Q.    **Okay. So something that was not normal?**

A.    It turned out that it was not normal, but when we started, that was not necessarily so.

Q.    **How old was she when you stopped treating her?**

A.    17.

Q.    **So at 17 she had no pubertal hair development?**

A.    That was why I was seeing her, yes.

Q.    **Did she have pubertal development when she was 18?**

A.    I didn't see her past 17, I don't know.

Q.    **So it's possible for someone to present with an SMR IV -- IV or V breast, no pubertal hair**

Page 84

development and be 18 years-old?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

A.    Well, it's -- it's possible; it would depend on the underlying causes.

Q.    **You would have to be in a clinical setting to diagnose and figure that out, right?**

MS. SHEVLIN:  Form.

A.    Yeah.

Q.    **Why did you -- why in this one, though, would you have -- would you have relied on the pubic hair SMR rating, but not the breast development SMR rating?**

A.    Because I can see the pubic hair development.

Q.    **But there was enough for you to say SMR IV to V?**

A.    I erred on the old side since I could not really see, so the breast development was potentially that mature.

MR. ROBERTS:  Give me one second, okay. I think it's probably a good point to just continue the deposition, go through the photographs and all that stuff, I'm sure there will be a lot more questions. Does that sound good to everybody?

Page 85

MS. SHEVLIN:  Fine with me.

THE VIDEOGRAPHER:  Sorry, Mr. Roberts, no video orders right now?

MR. ROBERTS:  Yeah, no video orders. I will actually order a copy of the transcript.

MS. SHEVLIN:  We'll take a copy as well, just E-Tran.

THE COURT REPORTER:  Mr. Carson, do you need a copy?

MR. CARSON:  I'm good for now.

THE COURT REPORTER:  Read or waive?

MR. ROBERTS:  You know, I don't even know if we're continuing it, if it's an official transcript. It's up to you, Doctor, you can read it if you want.

MS. SHEVLIN:  I'm going to have her read, but given the circumstances, we'll make sure it gets to her as soon as possible as soon as we get it.

THE VIDEOGRAPHER:  The video recorded deposition of Dr. Kathleen Duffy, going off the record, the time is 12:26 p.m. Thank you.

(Plaintiff's Exhibit Nos. 1 through 4 were marked by the reporter subsequent to the deposition.)

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

**Page 86**

(Whereupon the deposition terminated at 12:26 p.m.)

**Page 87**

CERTIFICATE OF OATH

STATE OF FLORIDA  )
COUNTY OF ORANGE  )

I, the undersigned authority, certify that KATHLEEN DULLY, M.D. personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 10th day of May 2025.

_____
LISA K. PENKACIK, RMR
Notary Public - State Of Florida
My Commission expires 9/7/2026
Commission No.:  HH 289853

**Page 88**

CERTIFICATE OF REPORTER

STATE OF FLORIDA  )

COUNTY OF ORANGE  )

I, LISA K. PENKACIK, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of KATHLEEN DULLY, M.D.; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I, further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

Dated this 10th day of May, 2025.

_____
LISA K. PENKACIK, RMR

**Page 89**

ERRATA SHEET

PAGE:    LINE:      CORRECTION:      REASON:

_____
DATE

_____
KATHLEEN DULLY, M.D.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

---

**Exhibits**

---

**Plt Exhibit 1**
  3:8 31:13

**Plt Exhibit 2**
  3:8 31:13
  45:7

**Plt Exhibit 3**
  3:9

**Plt Exhibit 4**
  3:9 50:25

---

**1**

---

**1**  31:13 45:4
  85:23

**10**  16:2 26:21
  76:16

**100**  65:16,17

**10:01**  4:7

**11:29**  60:12

**11:47**  60:15

**12**  54:2

**12:26**  85:22
  86:2

**13**  77:10
  81:15,17

**15**  54:3

**15th**  27:9

**17**  83:17,18,
  23

**18**  28:25

43:19 54:4
82:4 83:22
84:1

**19**  54:4

**1959**  26:18

**1980**  8:16

**1980s**  18:19

**1981**  7:8

**1982**  76:17

**1986**  7:11,17

**1989**  7:17,18
  10:3

**1990**  8:6

**1990s**  18:19
  26:22

**1991**  8:17

**1993**  9:1

**1994**  9:4,12,
  24 23:21,23
  24:8

**1996**  27:5

**1998**  18:20
  27:17

---

**2**

---

**2**  31:13 45:5,
  7

**20**  43:15 54:4

**200**  10:5

**2006**  16:23

**2009**  10:4,7

**2023**  24:16
  57:15

**2024**  24:11,12

**2025**  4:7

**21**  25:24

**22**  18:5

**22nd**  18:3
  50:21 57:15
  68:6,13,18

**28**  4:6

---

**3**

---

**3**  45:4,5

**30**  9:8

**3:24-cv-00044-
mmh**  4:6

---

**4**

---

**4**  50:25 85:23

---

**5**

---

**5th**  18:3 51:4
  68:6,12,18
  73:25

**5ths**  74:5

---

**7**

---

**70**  26:18

**73**  29:15

---

**9**

---

**90's**  56:11

**95**  29:15

---

**A**

---

**a-n-t-e-r-i-o-r**
  64:23

**a.m.**  4:7
  60:12,15

**abdomen**  37:17
  38:1

**abdominal**
  63:22 64:9,
  15

**ability**  9:1
  12:13,20
  61:1 66:1
  78:1

**abnormal**  19:21

**Absence**  81:20

**absent**  55:19
  73:22

**abundant**  38:17

**abuse**  7:2,3,
  22 8:7,20,21
  9:15 10:4,8
  11:1,15,16
  12:7,8 13:4,
  6,9,11,14,
  20,22 14:1,
  4,8,14,17
  15:5,6,9,17,

19 16:7,21 17:12 28:7 49:18

Abusive 8:12

Academy 8:11 27:3

access 18:4 28:5,8 30:23 60:22 70:7

accommodated 60:24

accuracy 34:22

accurate 22:20,23

accurately 23:6

achieved 54:1

acknowledge 80:18

active 16:19 27:20

actual 22:15, 24 34:23 35:2 40:9,13 46:14,21 47:15,20 48:9 51:10, 20 69:21 70:7,14 71:8 82:19

add 61:6

additional 8:14 9:25

70:8

administered 11:4

adolescent 35:16,18

adult 45:12 58:22 62:6, 13

adulthood 43:17

adults 29:2,3, 4

advantage 58:13

advertised 6:25

aesthetic 34:12

affidavit 48:16 49:6 50:15

afraid 58:20

age 21:6,9, 10,12,13,15 22:15,24 23:1,12,13, 19 26:7 28:25 29:14 31:17 32:7, 21 34:23 35:3 39:5 43:12,19 46:4,9,15,21 47:15,20

48:9 51:11, 20 54:3 69:21 70:14 71:8 80:14 81:15,18 82:1,7

agencies 13:2

agree 10:22 23:5 26:5 31:20 32:21 45:13 46:7, 13,20,22 47:19 78:16

agreed 54:11 61:5

ahead 12:12, 19

aid 11:17 44:13 65:21, 23

aim 30:10

aimed 13:21

Air 7:19

alterations 34:16,17,21

altered 34:5 79:7

altering 22:7 34:11 40:6 80:4

American 8:10, 11 11:5 15:11 26:23 27:3

amount 65:7

Amy 4:16 37:2 52:8 60:9 61:2

Amy's 32:24

anatomical 36:14,22 63:16

anatomy 63:21

ankles 53:6

answers 32:23

anterior 38:4, 10 55:4 64:5,17,23

anterior/ posterior 43:1

anus 41:23

apologize 63:10 71:2 76:24

apparent 23:12 51:17

appearance 21:10,12,17 22:13,21 23:2,12,19 28:9 32:6,16 33:16,21 34:1 35:18 36:2,12,22, 23 37:13 46:8 48:10 49:12 51:14, 15,17,21,22

54:2,9,22 57:9 59:23 61:24 62:16 69:21 72:1, 10,17 73:10 75:20,22 77:2,14,15 79:2 80:8,15 81:14,17 82:1

**appeared** 53:13 74:11

**appears** 30:10 46:24 51:14 52:3,4 53:2 59:7 67:20 71:14 74:15 75:1

**applicable** 10:23

**apply** 5:10 26:25 29:3 46:24

**applying** 26:11 46:2

**appointment** 38:12

**approaching** 20:15

**approximate** 62:13

**April** 4:6 18:3 51:4 68:6,12,18 69:11 73:25

74:5

**area** 39:21 42:23 59:2 65:2,11 66:13,14,18 67:13,14,15, 16 71:23

**areas** 71:19 82:10

**areola** 42:21, 23 43:6,10

**Armed** 27:16, 19

**article** 26:6 27:6 28:12 29:25 30:2, 5,13,24 31:21 45:5

**articles** 26:18,24

**Arts** 7:9,10

**Asia** 26:25

**assault** 16:7, 22

**assess** 12:21 19:20 20:20 39:3 54:18, 19

**assessed** 57:9

**assessing** 54:8,9 57:2

**assessment** 26:7 31:18

32:3 55:21

**assessments** 9:9 61:22

**assigned** 7:21

**assume** 5:3

**asterisks** 63:4

**astrological** 34:7

**attempt** 29:14

**attempted** 26:10

**attempting** 21:19

**avoid** 29:8

**aware** 21:24 22:3 24:8 34:2 50:1

---

**B**

---

**baby** 62:5

**Bachelor** 7:10

**back** 9:25 10:20 21:1 45:7 57:10, 12 65:20 68:11,15 73:4

**background** 7:7

**bad** 5:15

**base** 32:17

**based** 21:16

28:10 33:21 57:20 58:23 67:25 77:14 78:6 82:16

**basis** 6:19 10:14 54:23 55:12,14

**bear** 15:22

**bearing** 35:14 36:19 38:9 39:16 81:20

**beginning** 4:3 42:24

**begins** 74:10

**behalf** 4:16

**behavior** 29:8

**beings** 38:18

**belly** 41:16, 19

**belongs** 67:24

**Bethesda** 7:13

**big** 55:8

**bigger** 67:24

**Bill** 74:22

**bio** 63:1

**birth** 42:17

**bit** 5:2 36:16 37:19 42:22 69:15

**blond** 40:18

**blonde** 72:2,3,

5

**bloodstream** 42:12

**blurry** 33:18 67:10

**board** 10:4,7 11:1,5 13:4 14:13,20 15:11 17:12

**boards** 10:3

**body** 6:23 36:14 42:19 62:10,11

**book** 44:6

**borderline** 33:24

**break** 37:6 52:8 57:11 60:8,13

**breast** 20:12 42:9,13,19, 24 43:5,11 54:14 67:13, 15 71:21 82:1,8,18 83:25 84:12, 19

**breasts** 42:1 53:17,21 81:10,21,23 82:13,21 83:6

**briefed** 25:23

**bring** 15:21 33:23,24

**bringing** 24:5

**brunette** 72:7

**buds** 20:12 42:9,13,19

**bumps** 74:13, 22

**burst** 23:22

**button** 41:16, 19

---

**C**

---

**calendar** 68:10,12,16

**calendars** 68:7

**California** 7:17 8:8 9:14

**call** 15:12 37:6 60:9 63:24 79:21 81:7

**called** 8:9,22 18:19 19:2 37:17 41:17 82:12,18

**calling** 19:6 54:7

**camera** 53:6 57:16

**Camp** 9:13

**care** 6:18 10:20,23 11:21 13:18 27:19 73:21

**cared** 8:1

**career** 16:5

**Carson** 4:18 22:11 47:3 61:5 63:17 70:3,18,22 71:2 85:8,10

**case** 4:5 6:19 7:22 8:20,24 9:15,18 10:14 14:10 17:16,18 20:19,20,23 21:17 24:20 25:2,14,21 26:1 27:1 35:24 36:20 49:25 59:17 70:8 71:6

**cases** 7:1 8:4 9:7,10 24:5 35:7 68:21, 25 69:3 82:17

**catch** 6:1

**caveat** 49:7

**cell** 60:10

**center** 8:18 9:4 16:11,20 27:16,19

**certainty** 13:8 65:14

**certification** 11:2,16 14:14,20,21

**certified** 10:7 17:12

**Chadwick** 9:4 16:20

**Chair** 7:21 8:23

**chance** 30:18, 19

**change** 24:15

**changed** 18:20, 22

**characterization** 14:18 79:24

**charge** 8:19

**check** 68:22

**checked** 68:11

**chemical** 55:24

**chest** 43:2,11 53:5,7,20 57:16,24

**child** 6:12, 14,17,22,23 7:1,4,21 8:1,7,8,20 9:9,15,21 10:3,8,10 11:1,15,16, 25 12:1,7,8

13:4,6,9,11, 14,20 14:1, 4,8,14,17 15:5,6 16:6, 21 17:12 20:16,17 27:16,20 28:6,7,8 29:22 35:13 37:11 49:18 53:3 58:22

**child's** 10:17

**children** 8:1, 12 9:5 14:24 15:13 16:20 39:2 49:22

**Children's** 8:10 9:5 16:8,20 24:6

**chose** 31:2

**chronicle** 32:7

**chronological** 21:13 23:1, 11,19 32:7 35:3 43:12 46:4,15 80:14

**chronologically** 21:6

**circumstances** 48:22 67:17 85:17

**citation** 31:21,25

**clinical** 19:10,11,13 27:13,22,23, 25 28:1,5 38:22 43:13 55:21 82:23 84:6

**clinically** 55:9

**close** 18:12 40:17

**clothes** 67:10

**cold** 42:15

**colleague** 24:6 50:4

**College** 6:10 7:9

**colloquially** 5:24

**comfort** 49:11

**comfortable** 49:5 58:18

**commanders** 8:25 9:16

**comment** 59:10

**commentary** 51:9

**commissure** 37:24 38:4, 10

**committee** 7:22 9:15

**committees** 9:18

**communicate** 47:9

**communicated** 51:24 67:18

**community** 13:1

**completed** 18:13

**completely** 12:15

**completion** 19:18

**component** 11:6

**composite** 50:25

**computer's** 70:9

**concern** 15:15, 16,19 60:23

**concerns** 15:21 20:15 45:21

**conclusion** 28:21 30:7

**condition** 13:12

**conference** 7:25 8:7,9, 12

**conferences** 10:1

**confined** 42:20

**consequences** 29:9 49:19

**considered** 16:22 36:17

**consistent** 77:15

**constitute** 13:22

**consult** 10:17, 21 17:14,18 35:6

**consultant** 8:24 9:15,17 10:16

**consultation** 8:14

**consulted** 14:2 17:17,22 28:9 68:25

**consults** 6:24

**content** 63:2

**continue** 37:14 60:20 84:22

**continued** 8:15

**continuing** 10:1 85:13

**continuously** 16:25

**contribute** 12:22 17:9

**copy** 51:3 85:5,6,9

Cornell   7:8

Corps   7:23
   9:16

correct   13:23
   14:8 15:15,
   19 22:4,9
   33:1,12
   35:7,24
   41:20 43:20
   47:7,8 49:19
   52:12 53:8,
   14,22 56:6,
   14,18 57:6,
   16,20 58:1,8
   60:5 61:12
   64:4,12 65:4
   67:23 69:22
   70:1,4,25
   71:9,10 73:7
   74:3 75:2,
   18,20 76:16,
   19,21 77:4,
   6,11,16,18
   78:5,22
   79:3,8,13,
   18,21 80:11
   82:4 83:2

correctly
   13:15 17:18
   29:5,10
   50:22 58:14

cosmetic   75:13

Counsel   4:11

counseled
   69:20

countenance
   71:19

counties   7:3,5

County   24:11
   69:3

couple   28:13

court   4:8,12
   5:17 6:1
   29:9 85:8,11

cover   7:3

covered   37:25

covering   53:21
   67:10

covers   7:4

crease   39:20
   63:23

criteria   67:8

critically
   30:9,17

crossed   58:7
   60:3

CSAM   45:22

Cum   7:11

curriculum
   11:10

cursor   66:9,
   12,13,19

customary
   73:16 76:21

cut   49:1

—————————————
         **D**
—————————————

D-U-L-L-Y   6:8

Danny   4:7

data   18:24
   62:18,24,25

database   58:19

date   4:6 68:9

dated   18:2

DCF   6:24
   10:17 11:11,
   17

deal   25:7

decade   26:19
   45:25

decide   15:22

decided   15:12

decision   32:17

decisions   14:7
   49:13

defendant   5:5

definition
   42:9

degree   65:10,
   16 80:10

delay   19:18

delays   19:21

deliver   6:19

demonstrative
   44:13 45:6
   65:20,23

dentition   62:5

department
   17:3

depend   54:6
   84:5

depends   54:16
   58:3 62:1
   83:3

depict   44:20
   52:11 64:9

depicted   21:20
   22:16 32:14
   46:15 47:15
   51:11 70:9,
   15 71:8

depiction
   22:20 44:18

depicts   28:23
   33:21 53:2

depilatories
   54:17

deposition   4:3
   5:4,9 60:21,
   25 61:1
   84:23 85:21,
   25 86:1

describe   6:2
   23:10 36:2
   42:2 52:11,
   14,23 78:9

descriptive
   41:4

Desert   8:16

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025                     Index: designed..documents

designed   11:10
  19:8,13,17
  56:20,21

desktop   27:15

destroy   57:4

detecting
  29:22

detective   4:19
  17:22 47:12
  50:14 51:19,
  25 52:16
  68:3 78:22

detectives
  43:22

determination
  14:5,16 15:1
  32:10,13
  48:23 50:10
  54:24 65:7

determinations
  7:2

determine   13:5
  15:14 46:3,
  14 56:5,24
  57:19 58:6
  72:12

determining
  73:1

develop   29:22

developed   9:3
  37:12,14
  59:4

developing
  37:15

development
  20:8 36:9,24
  54:14 74:16
  77:22 80:3
  82:8,14,18,
  19,22 83:7,
  11,19,21
  84:1,12,15,
  19

developmental
  51:15 54:2
  81:14,16,25

deviations
  20:10

diagnose   84:7

diagnosis
  79:21

diagnostic
  14:5 83:1

diagrams   66:25

dial   45:9

Dick   45:17

Diego   8:7,10,
  18,19

difference
  21:14 39:2,
  18 40:7,11,
  13,15 58:16,
  25 66:23

differential
  79:21

difficult   5:21
  26:6 31:17
  32:3,4,5

40:20,21

digital   21:7
  22:7 34:11
  40:6,22
  46:25 64:19

digitally
  21:25 34:5
  79:7 80:3

direct   4:24
  11:13 24:22

direction
  35:16

directly   43:2

director   6:14,
  17 16:9 17:3

disagreed   45:8
  48:4,6

disagreement
  48:11

disclosed
  28:12

discounting
  30:13,16

discoverable
  25:12

discovered
  35:3

discussed
  45:24

discussion
  60:16

discussions
  69:16

disorder   82:12
  83:11

disorders   82:6

distill   14:25

distinction
  7:11 13:21
  21:18 38:24
  40:21 60:6
  64:3

distinguish
  40:2 59:6,21
  64:11,21
  65:3,10
  66:20

distinguishes
  40:4

distinguishing
  60:3

distribution
  60:5

division   17:4

doctor   12:6,24
  71:2 76:9
  78:25 79:20
  80:20 85:14

doctor/patient
  10:12,19

doctors   12:3

document   68:8

documented
  45:12

documents
  21:16

**domestic** 9:17

**dot** 78:11

**drastic** 29:9

**drawing** 44:22

**Duck** 78:11

**Duffy** 85:21

**Dully** 4:4,17,
20 5:1 6:8
12:10 24:18
30:4 45:11
47:24 57:14
59:16 60:17
61:20 66:10
76:24

**duly** 4:21

**duty** 7:18
16:19 27:21

**E**

**e-mail** 45:23

**E-TRAN** 85:7

**E.U.** 29:21

**earlier** 5:2
44:25 54:11
69:19

**early** 18:19
19:19 41:9

**earrings** 53:3

**edited** 21:25
72:14

**Edition** 27:9

**education** 10:1

**Edward** 7:12

**effect** 42:11
80:19

**effected** 76:22

**effects** 42:18

**effort** 72:12

**electrolysis**
55:23 56:13,
25 72:17,21
76:11 77:6,
23 79:12

**emergency** 9:23

**employ** 20:18

**employed** 6:9

**employer** 16:4

**end** 13:9,10

**enforcement**
6:25 10:18
11:11,17
23:16 24:5
33:7,15 35:7
47:10 50:14
61:22 67:3,
18

**enlargement**
42:22

**entails** 15:3

**entering** 80:9

**entire** 29:25
38:3 54:13

**erred** 84:18

**eruption** 62:6

**essentially**
6:20

**establish**
70:14

**established**
74:25

**estimate** 21:6,
9,10,20,21
23:19 28:9

**estrogen** 42:8,
11,18 82:7

**evaluate** 53:16

**evaluated** 81:9

**evaluating**
40:16 60:2

**evaluation**
24:6,10,16
26:24 38:19

**evaluations**
24:7

**evidence** 12:21
79:7,13
80:19

**exam** 14:25
43:13

**EXAMINATION**
4:24 10:7

**examine** 10:13

**examiner** 16:7,
22

**exhibit** 31:13

45:3,7,12
50:25 85:23

**exist** 13:4

**expect** 50:13

**expensive**
76:11

**experience**
14:22 17:13

**expert** 5:6
15:6 26:1
45:5 49:18
56:5

**expert's** 31:9

**expertise** 13:5
14:15 72:15,
17,20 73:1

**experts** 6:24
29:7

**explain** 33:14
72:2 79:23
83:2

**explains** 77:22

**explanation**
43:23 48:10
76:1,2,3,5
77:1

**explanations**
75:18 79:1,
16

**explicitly**
51:19

**expose** 53:6

exposed   42:7

exposure   82:7

external   36:17

eye   30:9,12

---

### F

face   71:22

fact   11:22 29:1 32:11, 15

factor   36:9,11 60:4

facts   60:1

factual   32:13

faculty   9:19

fair   13:3 14:17 28:1 34:19 47:20 61:2,3 79:23

familiar   29:13 31:15 56:13

Families   9:5 16:21

family   8:22

fault   60:17

February   18:2, 5 50:21 57:15 68:6, 13,14,15 69:8

Fed   7:14

feet   53:4

fellowship   9:6,25 19:6 23:25 24:2

fellowships   9:2

female   37:11 41:11 43:13, 18 53:3 82:21

females   35:23, 24 36:2 41:6 45:12

fetus   42:11

field   9:8 10:5

figure   69:6 84:7

file   67:24 78:10 81:7

files   48:21

fills   38:3

find   18:6 29:20 30:3,5 68:15

fine   28:15 40:17 66:6,7 85:1

finished   9:12, 24 49:1,2,4

finishes   82:9

flat   42:13,14

floor   53:4 57:24

Florida   6:10, 15 7:5,20 16:1,4

focus   40:17

fold   63:25 64:1,2,16

follicles   40:14 73:6,9

folliculitis   73:3 74:14

follow   57:10

Forces   27:16, 19

forensic   28:16 29:7

form   10:12,25 11:3,7,12,18 12:4,9,18,25 13:7,16,24 14:9,19 15:8 16:18 17:8, 20 18:18 19:3,9,15,25 21:8 22:1,5, 10,25 23:9, 20,24 24:4 26:4,13 29:24 30:6, 15,21,25 31:3,23 32:2,18,22 33:9 34:6, 13,25 35:11

38:21 39:7 40:8,12,23 41:13 43:14, 21 44:1 46:5,17 47:2,22 48:12,17 49:8,21 50:2,8 53:23 54:5,25 55:25 56:7, 25 57:7 58:2,9 59:9, 24 63:13 64:13,22 65:5,13 66:22 67:22 70:2,18 73:20 74:19, 23 75:8,19, 24 76:4,7,20 77:12,24 78:13,18,23 79:10,12,14, 25 80:4,12, 23 81:19 83:9 84:2,8

formal   19:4

format   7:25 8:12

forming   20:23 62:24

forward   48:23 49:13 61:10

found   68:12

Friday   26:2

37:6

**front**   37:21 38:10 50:7 52:7 65:1

**full**   6:6

**fully**   37:12 59:3

**function**   19:23 20:3,5

**functioned**   8:23

**funded**   29:21

---

### G

**gave**   50:12 70:25

**general**   10:2 13:17 17:15 18:9 44:2 52:19 57:13 61:16 73:22 76:12,13

**generally** 36:25 44:24

**genital**   36:1, 8,24 51:15 54:2,15 71:23

**genitalia**   53:6

**genitals**   37:10 53:15 81:11

**Giddens**   26:21

**girl**   37:12

**girls**   26:23 42:12

**give**   30:18 33:2,8,15 34:1 35:2 36:7 37:4 41:25 43:23, 24 47:14 67:5 84:21

**giving**   75:6

**Global**   4:10

**globular**   43:8

**good**   4:2 10:9 27:6 33:18 80:21 81:22 82:10 84:22, 25 85:10

**grade**   37:9, 18,19 38:2, 3,14,15 41:19 42:3,4 43:13,18 59:1,7,8,22 60:4 64:11, 21 65:3,4,6, 11 66:12 82:21 83:6

**grade-**   37:9

**grades**   36:3,4 42:1

**graduated**   7:8, 10,12

**grandmothered**

10:5

**grappling**   14:7

**Greater**   82:4

**groom**   39:6

**groomed**   22:19 40:1 56:5,6 57:4

**grooming** 22:18,22 39:25 40:6 46:25 54:7, 9,19,20 56:14 73:18

**groove**   63:17, 18,23 64:2

**ground**   5:10

**group**   16:10

**grow**   41:7 73:4

**grows**   41:6

**growth**   73:11 75:2,3

**guess**   36:22 44:12 48:1 72:6 74:17 80:16 81:2

**guys**   66:4

---

### H

**H-E-B-E-R-T** 7:12

**hair**   20:13

22:4 36:5,8, 9,23 37:10, 15,16,19,22, 25 38:9,16 39:15,16 40:14 41:1, 6,12,18 54:15 55:1, 3,4,7,15,16, 17,18,24 56:1,2,25 57:1,2,3,6,8 58:7 59:1,2, 3,4 60:2,4 64:12 65:8 71:15,23 72:3,9,17,23 73:6,11 74:16 75:2, 3,12,13,16, 17 76:11 77:2,10,23 79:2,8,12,13 80:4,20 81:14,20 82:14,22 83:18,25 84:12,14

**hairs**   38:1 73:3

**half**   16:2 60:8 81:17

**hallway**   68:20

**hang**   24:18

**happened**   33:11

**happening**   83:2

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**                     Index: happy..informed

**happy** 25:14,
21

**hard** 49:3

**head** 5:25 6:3
62:10 72:7

**healed** 73:9

**hear** 70:23

**heard** 28:17,
19

**Hebert** 7:12

**height** 62:11,
14,19

**helpful** 44:12,
15 60:6 63:2

**helping** 12:21

**heritage** 54:16

**Herman** 26:21

**hesitate** 5:15

**highlights**
81:4

**hip** 63:23

**hire** 6:20

**hold** 56:4
73:23

**Holguin** 4:8

**home** 12:8

**Hong** 26:25

**hospital** 7:17
8:10 9:6,13
16:8,11 69:3

**hospitals**
10:18

**hour** 60:8

**human** 38:18

**hundred** 65:14

**Huseby** 4:10

**hymen** 36:12,
20

**hypothetical**
58:24 59:15,
17 61:8,14,
15,18,21
63:9,10
71:12

**hypothetically**
59:19 75:25
77:19

———————————
**I**
———————————

**idea** 20:9
47:9

**identify** 20:10

**II** 36:5 37:17
42:6,10,21

**III** 36:5
37:18,19
42:6,10,24

**illnesses**
13:14

**ima-** 51:11

**image** 22:13
23:2,13,18

32:14 33:17,
20 35:1
40:16,22,24
44:19 45:6
46:16 47:16
49:15 52:12,
22,24 53:2
55:19,22
56:24 57:12,
13,21,23
58:3,4,5,13,
17,19,24
59:10,14,19,
25 61:15
62:2,25
64:8,20
66:21 67:9,
24,25 69:9
71:14 72:4,
8,13 74:9
75:25 77:18
78:3,4,16
79:2,6 80:4,
18,25 81:7,8

**images** 24:17
26:12 27:19
28:8 29:15
33:18,24
34:4,11,15,
16 35:15,23
37:1,4 40:10
46:3 47:13
52:7 61:9,
11,12,17
62:9,12,14,
16 69:12,14
70:9 71:9,13
81:2

**imagine** 38:20

**impact** 34:22

**impossible**
29:1 57:18
58:6 59:6
64:10,20
65:3

**impression**
26:3 34:3

**imprinted** 74:9

**include** 51:9

**included**
62:20,22

**inconsistent**
43:19

**indication**
35:2

**individual**
21:20 22:15,
24 47:15
48:9 51:21
72:21

**individuals**
21:6 40:19
70:15 71:8

**infant** 37:13
42:8

**information**
47:14 62:15,
16,19 67:25
70:8,10

**informed** 50:3,
4

**inguinal**  39:19 57:25 58:5, 7,10 63:11, 12,18,25 64:1,15

**injuries**  13:13

**injury**  13:13

**instance**  20:11

**instruct**  24:24 25:6

**instructing**  25:16,17,19

**intend**  61:14, 19

**interacted**  23:15

**interface**  11:10

**interior**  37:24 64:20

**internal**  36:14,16

**international**  28:16

**internet**  23:23 32:15 34:4 46:3,16 66:21 78:4, 5,12,16

**internship**  7:16

**interrupted**  32:24

**introduce**  4:11

**introduced**  5:1

**inverted**  38:12

**investigate**  33:25 50:17

**investigated**  58:21

**investigation**  17:25 32:19 70:4,5,11 77:25

**investigations**  11:17 35:4 45:22

**investigators**  13:2

**involve**  38:15 82:7

**involves**  13:1

**involving**  38:5

**Iraq**  16:23

**irrespective**  46:24

**issue**  25:23 26:7 31:17 45:20 60:18

**Ithaca**  7:9

**IV**  36:5 38:2, 3,14,15,24, 25 40:2,4,7, 22 41:10 42:1,3,25 43:4,6,13,

16,18  44:23 45:13 53:14 54:2,4,12 58:16 59:1, 7,22 60:4 64:4,11,21 65:3,6,11 66:12,13,20 81:11,23 82:21 83:25 84:16

**J**

**Jacksonville**  6:11 7:20

**jail**  49:25

**January**  8:7

**jaundiced**  30:9,12

**job**  5:19 8:3 14:8 35:6 58:20 80:22

**John's**  69:2

**Johns**  17:22

**join**  22:11 38:6 47:3 70:3,19

**journal**  28:17, 18 30:11,16, 17 31:21

**journals**  27:11,12

**judge**  39:14 50:7,9,16

**jury**  50:10

**K**

**KASS**  53:23

**Kathleen**  4:4, 20 6:8 85:21

**kids**  11:21 13:18 20:14 33:23,24

**kind**  44:23 71:11 79:21 82:12

**knees**  53:5,7, 20,21 57:16, 23

**knew**  78:4

**knowing**  21:13

**knowledge**  26:9 27:1 68:21 72:19

**Kong**  26:25

**Krugman**  31:14 45:13,16,17, 18 47:19 48:11 54:12

**Krugman's**  45:8

**L**

**labia**  37:12, 20,23 38:4

**lace**  53:4

**lack**  77:22

**lafay** 41:21

**laptop** 52:22

**largely** 61:8

**larger** 44:24

**laser** 76:11

**lasted** 75:5

**late** 28:24

**Laude** 7:11

**law** 6:25 10:17 11:10, 17 23:15 24:5,20 25:2,5,14,21 29:9 33:6,14 35:7 47:10 50:13 61:22 67:3,18

**Lawshe** 4:5,15 17:19,25

**Lawshe's** 26:1

**lay** 55:5

**laying** 12:10

**leads** 35:12

**learn** 19:1

**learned** 8:2 17:24 19:1

**leave** 56:2,16 79:13

**Lee** 4:4

**left** 47:13 63:8

**legal** 11:6 30:11 32:10 49:19

**legs** 38:8,11 53:5,21 64:24

**letter** 18:5 45:11 51:2,9 52:23 73:24

**letters** 18:2 50:13 51:2 63:3 73:14

**level** 39:6,21 65:14 79:17

**levels** 9:21 13:8

**life** 12:2 54:13

**likelihood** 7:2

**limitation** 23:6,10 32:20

**limitations** 33:7 45:21 46:8 49:10 51:10,13 69:20 82:16

**Lisa** 4:9

**list** 45:20,23

**literature** 8:5 14:23

**Litigation** 4:10

**local** 35:13

**location** 39:16 64:14

**logistical** 60:18

**long** 15:25 21:2 23:15, 17 41:24 43:12 75:4

**longer** 37:21 42:14

**looked** 27:17 33:24 48:22 52:24

**lose** 49:22

**lot** 5:23 14:21 28:15 34:2,15,16 84:24

**loud** 29:6

**lower** 53:5

─────────────
**M**
─────────────

**m-e-d-i-a-l** 64:24

**M.D.** 4:20

**made** 8:19 24:2 35:15

**main** 63:1

**major** 32:20

**majora** 37:12, 23 38:4

**make** 17:9 22:8 27:23 32:10,13 33:3 40:21 54:24 72:12 74:3 85:17

**makes** 77:20 80:2

**making** 12:14 13:21 14:16 38:23 45:2 49:12 61:21 75:9

**male** 42:8

**maltreatment** 7:1 8:2,8 9:10,21 11:25

**manipulated** 72:13

**manipulation** 47:1

**Marine** 7:23 9:16

**mark** 31:12 45:4 50:24

**marked** 85:24

**Marshall** 18:22 26:17

**Mary** 6:8

**Maryland** 7:13

**material** 26:8 28:23 31:18

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Index: Matt..moved

Matt  4:18
  60:23 61:2

matter  4:4

matters  49:11

mature  28:24
  29:4 84:20

maturity
  18:10,11,16,
  23 19:16,24
  20:19,22
  21:3,5
  26:12,20,22
  27:13 28:10
  33:22 35:21
  36:3,4,10
  41:8 42:7,10
  43:7,24
  59:23 60:5
  61:25 67:6,
  20 68:1
  71:16,17,24
  72:9 82:6

means  16:14
  44:12

meant  37:5

measures  24:20
  25:2,10

Med  7:14

media  4:3

medial  64:6,
  17,24 65:1
  66:24

medical  6:14,
  16,18 7:14

8:4,14,17,24
9:9,14,20
10:1,23 11:4
12:24 14:10
15:21 16:9
17:3 28:18
29:7 30:11,
17 55:14,20,
21 56:4
70:15 71:7
78:2,21,25
79:20

medical/legal
  11:2

medicine  6:11
  7:13 9:23
  15:7

meet  42:25
  43:22

meeting  52:15,
  18,20 69:8,
  11,16,17

meetings  68:8

meets  64:10

member  45:19,
  20

met  43:25
  44:3 52:17
  68:3,17,19

method  40:5

methods  61:24

Michael  4:14
  5:2 24:19

middle  18:12
  42:16 64:17

midline  41:21
  42:25

Mikayla  4:5

military  7:14,
  22 8:25 9:2
  16:19 27:16
  76:9,13,14,
  15,17,19
  83:10

mind  70:22

mindful  5:19

minor  32:15
  33:23

minute  52:8

mischaracterizat
ion  13:24
  20:1 31:3,23
  34:13 47:22
  56:7 76:7
  77:12 80:12
  84:2

mischaracterize
  55:8

misleading
  69:25

missing  12:15
  48:2 62:7

mixed  62:5

modalities
  22:4

modality  28:4

model  32:14
  34:24 41:11
  46:15,21
  51:11 57:15,
  19 58:7
  61:25 71:14
  73:14 76:19
  79:1,17
  81:18

models  22:3

modifications
  54:7

modified  35:15

monitor  19:17

mons  37:24
  38:5,9

month  28:12

months  28:13

moonlight
  16:14

moonlighted
  16:16

moonlighting
  16:22,24

morning  4:2

mound  42:23
  43:4,5,10

mounds  43:4,7

move  48:23
  49:13

moved  8:17
  9:13

**multi-problem** 8:22

**multiple** 22:4 69:12 79:1

---
### N
---

**naked** 53:3

**Nassau** 24:11

**Naval** 7:16,19 8:17 9:13

**Navy** 7:23 8:6,9,17 9:4,12 16:3

**necessarily** 35:2 40:18 82:5 83:3,14

**Nelson's** 27:9 44:8

**newborn** 42:9

**newborns** 20:6 42:6

**newspaper** 50:4,5

**Nick** 58:19 78:6,9

**night** 26:15

**nights** 46:11

**nipple** 42:15, 20 43:6,9

**nod** 5:25 6:3

**normal** 12:2 20:7,10,11,

13,17 82:15, 16,21 83:12, 13

**northeast** 7:4

**Nos** 85:23

**Noshney** 26:18

**notch** 39:20 57:25 58:5, 8,11 63:11 64:1

**nuance** 48:2

**number** 4:5 34:7,8

**numbers** 34:17 63:3

---
### O
---

**O.JPG.** 81:8

**Oakland** 7:17

**oath** 4:22 5:10

**OB/GYN** 9:22

**Object** 70:18

**objected** 12:17

**objection** 30:2 32:24 33:3 56:19

**objections** 12:14 56:3 77:17

**obscure** 57:24

**obscured** 58:5 67:15,16

**observing** 79:23

**obvious** 39:17 40:19 51:13

**occasionally** 62:15

**occur** 70:4,6

**occurred** 20:21

**occurring** 70:11

**offered** 8:9 77:8

**offers** 7:1

**office** 17:23 27:25 60:18

**officer** 50:14 67:3,18

**officers** 33:7, 15

**official** 85:13

**online** 26:12 29:23

**opine** 67:19

**opinion** 14:16 22:8,9,13, 14,21,23 23:6,11,12 32:16,17,21 33:15 34:23 48:6,7,8 49:10,18

**50:1 51:10 53:10,13 55:5,6,13, 14,20 61:24 62:24 67:5 71:7 75:7 77:9,21 78:21 81:10**

**opinions** 20:23 33:8 35:9 36:19 48:4, 15 49:5,23 50:6 69:20 70:1,14 80:9

**opio-** 73:14

**opportunity** 9:11 20:20 29:25 61:10

**order** 85:5

**orders** 85:3,4

**original** 26:17

**originally** 48:3

**orthopedics** 9:22

**Outlook** 68:9, 11

---
### P
---

**p.m.** 85:22 86:2

**pale** 42:15

**palpable** 42:14

papilla   42:16
  43:6,9

paragraph   74:8
  81:6

parents   14:24
  20:16 49:22

part   11:9
  14:5 36:15
  37:24 49:25
  70:11,13
  75:14,16
  82:5

parted   53:6

partially
  81:10

participate
  17:5

parts   38:9
  39:16 43:17
  81:20

pass   10:6

passed   10:2
  14:21

passing   46:11

past   83:23

pasted   51:3

patient   10:12
  20:21 27:25
  40:9,13 46:9
  80:24

patients   10:11
  16:12 19:22

PDF   51:1

pediatric   7:15
  10:3 27:12
  44:8

pediatrician
  7:19 10:17,
  20 13:14,17
  14:13 16:7,
  17,21 19:20
  27:24 44:3

pediatricians
  17:12,13
  19:5 20:2,5
  24:7 29:14

pediatrics
  8:11 9:22
  10:8 11:5
  15:9,12
  27:3,10 28:7
  44:9

Pedo   31:18

pedo-
pornographic
  26:7 28:23

pelvis   38:6

pen   44:22

Pendleton   9:13

Penkacik   4:9

people   6:20
  8:24 9:7
  10:13 15:20
  30:3,4 39:5
  41:15,24
  49:4

percent   29:15
  43:15 65:14

perfectly
  25:11,12

period   73:8
  75:1

person   17:10
  32:10 33:16
  51:11 70:9
  71:19 72:2

person's   17:21
  43:2

perspective
  78:3

ph   26:18
  41:22

photograph
  21:21 22:7
  51:12 54:9
  67:21

photographs
  21:7,17,25
  27:4 28:3,4,
  10 60:19,22
  82:16 84:23

physical   8:21

physician
  76:13,16,17

physicians
  17:2

picture   64:8
  71:22 72:22
  73:2 78:9
  80:5 83:4

pictures   83:5

pin   35:20

pink   42:23
  43:10 53:3

pixilated   67:9

plainly   37:21
  81:12

plaintiff   4:15

plaintiff's
  50:24 85:23

point   45:14
  61:9 67:2
  84:22

points   11:20

policies   17:7
  24:16

ponography
  29:22

population
  26:23

pornographic
  21:7 23:18
  26:12 28:23
  29:14 31:18
  32:14 46:3,
  16 56:23
  66:20

pornography
  54:10 58:22

position   15:21
  25:14 53:5,7

positions   9:20

possession
  68:7

possibility
  46:25

Post  82:3

posterior
  41:15,22

potentially
  68:20 80:1
  84:19

Practically
  39:22

practice  10:22
  11:20 24:15

precocious
  82:17

predicate  21:4

pregnant  43:16

prepubescent
  75:18,20
  76:3

presence  59:2
  75:12,13,15

present  12:21
  43:13 54:12
  55:4,19
  57:3,8 73:21
  83:24

presentation
  64:12 65:4

presented
  71:13

Preston  4:5,19
  47:12 50:14
  51:19,25
  52:16 68:3

pretty  51:17

primary  10:20

primer  43:25

principles
  61:16,23

print  28:15

printed  63:1

prior  13:25
  19:25 20:1
  31:4,24
  34:14 47:23
  56:8 76:8
  77:13 80:13
  84:3

privilege  25:8

probable  5:14
  48:15 49:6
  50:15

problems  6:19

procedure
  75:13

procedures
  17:7

process  14:6
  73:6

produce  80:19

produced  42:18
  71:6

Professional
  8:11

progress  19:17

progressing
  18:13

Project  29:21

prominent  69:6

proportion
  62:8,10,19

propose  9:1

Protection
  6:13,15,17,
  22,23 7:4
  10:10 27:17,
  20

protruding
  42:16

prove  33:22

proves  29:1

provide  13:5
  25:13

provided  31:7,
  21

pubertal  27:4
  37:10 53:3
  77:22 80:2
  82:3,14,19,
  22 83:7,18,
  21,25

puberty  18:12,
  13 19:18,19,
  22 20:8,15
  35:18 79:18

82:10

pubic  20:13
  22:3 36:5,7,
  9,23 37:14,
  15,19,22,25
  39:15,20,21
  41:1,5,12,18
  54:15 55:4
  57:3,6 59:1,
  21 60:2,4
  64:12 65:8
  67:14,16
  71:15,23
  72:3,8,22
  73:11 74:15
  75:2,12,13,
  15,17 77:9,
  22 79:2,7
  80:20 81:13
  82:22 84:11,
  14

pubis  37:24
  38:5,10

publication
  26:19 27:3,
  15

published  30:3
  34:4 50:3

pull  50:20
  65:20 74:1,
  2,4

pulls  73:5

purported
  14:15

purpose  11:16,

19

**purposes** 34:12

**pursue** 8:15

**put** 15:13 35:20 53:19 54:1,3 63:6

**putting** 17:14

---

### Q

**qualified** 13:13

**quality** 33:19 66:23

**quantity** 65:7

**question** 5:12, 15,16,18 12:12,13,18 15:2,4 23:2, 16 24:21 25:18,20 32:12 33:12 38:22 41:25 42:5 46:10 47:24,25 50:11,12 51:8 55:10 59:15 72:25 75:11,14,16 77:8,20 80:16 81:16

**questions** 5:3, 11 18:9 24:23 44:4 58:23 59:12

60:20,24 61:7 71:12 81:3 84:25

**quick** 52:10 57:12

**quote** 50:15

---

### R

**ra-** 82:1

**radiology** 9:22

**Rady** 9:5 16:8,20 24:6

**raised** 45:22 60:23

**range** 82:2

**rating** 18:10, 11,23 19:16, 24 20:19,22 21:3,5 26:12 27:13 33:22 35:22 36:4, 10 42:7,10 43:7,24 57:5 59:23 60:5 61:25 66:19 67:6,20 68:1 71:16,17,25 72:9 82:6,13 84:12,13

**ratings** 26:20 46:2,14

**re-ask** 32:12 71:4

**reached** 79:17

**read** 25:25 26:6 28:21, 22 29:4,6, 10,25 30:9, 12,14,17 31:10 52:25 81:9 85:11, 14,16

**readily** 36:17

**reading** 8:4

**real** 35:12 52:10

**reason** 19:23 24:24 71:15 72:6 73:13 76:18 77:9

**reasons** 25:6

**rec-** 68:4

**recall** 68:3,24 69:7,8,11,16

**received** 72:21

**recommendations** 17:10

**record** 6:7 12:11,14 52:14 60:11, 14,16 85:22

**recorded** 85:20

**records** 68:4

**red** 72:7

**redevelop** 42:19

**reference** 20:15 31:19 44:5,6

**referred** 18:14

**referring** 63:19

**refute** 77:25

**region** 7:23 36:8 59:21

**related** 52:23

**relationship** 10:12,19

**relevant** 24:23 25:1

**reliability** 26:11 34:23 65:10 80:10

**reliable** 22:9, 12,14,23 32:16 46:14 47:14 71:7

**reliably** 67:5, 19

**relied** 62:18 84:11

**remedial** 24:20 25:2,10

**remember** 19:5 46:6 48:4 52:15,17,18, 20 68:14 69:5

**removal** 55:24

56:25 57:1,2 72:18 79:12 80:4

**remove** 22:3 79:7

**removes** 55:18

**render** 22:8

**rendered** 71:7

**rendering** 61:24

**rephrase** 5:13

**report** 15:20 26:1 31:9, 14,22 45:5, 8,9 50:22 62:20,22 63:6 74:6

**reported** 15:22

**reporter** 4:9, 12,21 5:17 6:2 85:8,11, 24

**reports** 71:6

**represent** 51:2

**representing** 4:18

**request** 61:22

**required** 15:14

**reschedule** 60:22,25

**research** 26:11

**reset** 61:1

**residency** 7:16

**resident** 8:3

**residents** 9:20

**respect** 81:13

**response** 6:1

**responsible** 13:1 17:6

**restate** 47:5

**result** 72:9

**results** 56:17

**retired** 16:23

**return** 16:23

**revert** 43:16

**review** 7:22 8:20 9:15,18 27:1 81:6

**reviewed** 27:7 35:24

**reviewing** 26:14

**reviews** 8:25

**Roberts** 4:14, 25 5:2 24:22 25:4,11,16, 23 30:1 37:8 45:4 61:13 65:25 66:6 74:5 84:21 85:2,4,12

**roughly** 41:14 45:1 59:4

**rule** 75:6

**rules** 5:10

**run** 83:1

**rundown** 41:25

**running** 66:19

---

**S**

---

**San** 8:7,10, 18,19

**scheduled** 69:13

**school** 7:13,14

**Science** 28:16

**Sciences** 7:9

**scientific** 23:3 46:2,20 54:23 55:6, 12,14 61:23

**scientifically** 46:13 65:9

**Scott** 31:14 45:18

**screen** 28:11, 14 66:1 78:10,12

**script** 5:14 74:10

**scroll** 74:7

**search** 48:16

**section** 59:20

**seek** 48:16

**semantics** 76:23,25

**sense** 73:22

**sentence** 54:19

**separate** 43:5

**serve** 45:23

**served** 7:20 9:19

**serves** 45:20

**set** 61:23

**setting** 12:8 17:6 19:10, 11 27:13,22, 23,25 82:23 84:6

**sex** 16:7,21

**sexual** 8:21 18:10,11,15, 23 19:16,24 20:19,22 21:2,5 26:11,20,22 27:12 28:10 33:22 35:21 36:3,4,10 42:7,10 43:6,23 59:22 60:5 61:25 63:2 67:5,20 68:1 71:16,17,24 72:9 82:6 83:11

**sexually** 28:24

29:4

**shape** 38:4,8 41:11 43:8 59:4

**share** 18:7 28:11 31:12 50:21 68:20 74:6

**sharing** 53:11

**shaved** 39:3 51:16 54:21 55:2,13 59:2 73:15,16,18, 21 74:11 76:10,12,13 77:5

**shaving** 39:13, 17 54:16 55:18 56:9, 14,17 72:16 74:13

**Sheriff** 24:11

**Sheriff's** 17:23

**Shevlin** 4:16 10:25 11:3, 7,12,18 12:4,9,17,25 13:7,16,24 14:9,19 15:8 16:18 17:8, 20 18:18 19:3,9,15,25 21:8 22:1,5, 10,25 23:9,

20,24 24:4, 18 25:1,9, 13,19 26:4, 13 29:24 30:6,15,21, 25 31:3,23 32:2,18,22 33:2,9 34:6, 13,25 35:11 37:5 38:21 39:7 40:8, 12,23 41:13 43:14,21 45:2 46:5,17 47:2,22 48:12,17 49:8,21 50:8 54:5,25 55:25 56:3, 7,19 57:7 58:2,9 59:9, 24 60:10 61:3,6 63:13 64:13,22 65:5,13 66:22 67:22 70:2,19 73:20 74:2, 19,23 75:8, 19,24 76:4, 7,20 77:12, 17,24 78:13, 18,23 79:10, 14,25 80:6, 12,23 81:19 83:9 84:2,8 85:1,6,16

**Shevlin's** 60:18

**Shield** 8:17

**ships** 46:11

**shortly** 23:21

**shot** 78:10,12

**show** 44:4,6, 10 58:24 59:19

**showed** 52:22

**showing** 81:13

**shown** 30:8

**shows** 29:13 67:25

**sic** 54:18 68:18

**side** 38:11 43:3 59:3 66:4 84:18

**sign** 20:9

**significance** 41:2

**significant** 34:22

**signs** 17:11 56:2

**similar** 51:5

**simple** 69:23

**single** 43:8 69:8

**sir** 65:24

**sit** 10:6 18:4 34:9 69:9

**sitting** 57:16, 20,24

**size** 62:10,11

**skin** 73:6

**slowly** 9:3

**small** 42:13

**SMR** 18:15 20:7,12 23:18 37:17 42:17,21 45:13,21 46:2,14,24 53:14 54:2, 4,12 57:5 66:19 80:21 81:11,13 82:13 83:25 84:12,16

**Society** 8:12

**socks** 53:4

**solely** 13:20

**solve** 6:19

**sort** 19:22 23:22 26:20 34:11 80:4

**sound** 27:11 84:25

**sounds** 53:24

**speak** 5:20,24

**speaking** 30:2 36:25 39:22

special   24:1

specialist
  10:8  14:8

specialized
  9:2,11

specialty
  10:3,4  12:7
  13:15,20
  14:18  15:12
  16:10  17:1

specific   61:11

specifically
  14:14

spectrum   13:9,
  10

speculation
  12:4  19:15
  34:25  39:7
  48:12  55:25
  56:19  74:19,
  23  75:24
  76:20  80:6,
  23

spend   65:18

split   65:25
  66:1

spoken   70:23

spread   81:12

St   17:22  69:2

stage   27:4
  41:10  62:6

staging   18:15,
  20  19:2,23

27:12

standard   10:23
  27:8

standing   62:12

standpoint
  70:16

start   18:8
  19:22  24:2
  28:22  36:1

started   83:14

starting   73:4

starts   37:15
  42:18  82:8

state   6:6
  21:19  58:12

statement   13:3
  35:21  47:21
  49:12  74:12
  75:9

stating   18:11
  46:8  48:8

station   7:18,
  20

step   50:18

sternum   42:25

STEWART   44:1
  50:2

stop   11:21,24
  12:3,7,20
  30:1  53:11

stopped   12:1
  83:15

stopping   12:22

stops   12:23

straight   41:21

structure
  36:21

structures
  67:11,12

struggling
  21:18

studies   18:21

study   28:4
  29:1,13,21

studying   8:4

stuff   84:24

subcommittees
  8:21

subject   17:25

subjective
  38:19  65:7

subjects   7:11

subsequent
  24:19  25:2,
  10  85:24

Subsequently
  17:24

suggested   46:1

summarizes
  27:4

summary   61:2,4

supervise   6:18

supervision

9:7

supposed   41:7

surface   30:10
  64:6  65:1

surprise
  29:16,19

suspect   50:6

suspected   6:25
  9:9

swear   4:12

Switzerland
  26:24

sworn   4:21

syllables   32:8

synonymous
  18:17

---

**T**

tables   30:7

takes   42:12

talk   33:4
  35:23  37:2,5
  52:8  72:16

talked   57:14
  69:15

talking   12:24
  15:16  37:10
  40:9,10
  47:19  51:20,
  21,22  52:3
  58:11  61:9
  63:16  64:3,5

65:18 66:14 76:23,24

**Tanner** 18:14, 15,20,22 19:2,23 20:6,12 26:17

**Tanner's** 18:24

**Tanners** 27:12

**taught** 14:24

**teacher** 9:20

**team** 6:13,15, 17,22,23 7:4 8:24 10:10 17:5 69:2

**technically** 16:9

**teen-age** 20:16

**teenagers** 28:25

**teeth** 62:4,5, 6,7,19 67:23

**term** 16:13 37:13 63:16, 21 73:17 76:13

**terminated** 86:1

**terms** 8:13 18:16 21:15 35:22 36:23 59:22 72:10

**test** 15:3

19:7,14

**testified** 4:22 44:19 51:18 54:11 58:15 69:19 76:25

**testifying** 44:25

**testimony** 13:25 20:1 31:4,24 34:14 39:8, 10 47:23 48:5 56:8 76:8 77:13 80:13 82:20 84:3

**tests** 83:1

**textbook** 27:8, 9 44:8,14

**thelarche** 82:17

**theory** 53:20

**thereof** 19:18

**thicker** 38:16

**thickness** 38:19,25 39:3,15

**thigh** 39:6,12 41:15 57:25 58:8,15 59:5,20,21 60:3 64:9, 10,18,20,24

**thighs** 38:6,15 39:1,20,23 40:3 59:3 64:6,7,16,25 65:1 66:15, 16,24 81:12

**thing** 5:23 18:16 21:13 23:14 51:16 61:7 74:21

**things** 14:1,3, 4,22,23 15:20 17:14 54:17 79:22

**thought** 37:3 48:8

**time** 4:7 5:11 7:24 8:15 9:19 10:18, 21 15:13 17:22 24:9 25:19 26:10 27:20 29:16 52:16 55:9 56:10 60:12, 15,21 65:19 68:9 70:21 73:8 74:4 85:22

**times** 5:23 35:12 68:17

**tip** 78:6,9

**tissue** 42:24 43:5,11

**today** 5:3

17:16 18:4 69:9 81:5 82:20

**Today's** 4:6

**told** 47:13 51:18,19 67:3 78:7

**tool** 28:5

**top** 37:22 43:5,9

**touched** 72:14

**trafficked** 35:13

**trained** 12:6,7

**training** 7:6, 16,24 8:3, 14,20 9:21, 25 13:4 14:22

**transcript** 85:5,14

**transferred** 7:18

**transmit** 58:21

**treat** 13:12, 13

**treated** 83:6,8

**treating** 27:25 83:15

**treatments** 76:11

**triangle** 38:3,

7,13 41:1,3,
6,9,11
44:23,24
57:14,19
58:7 59:4

**true** 22:12,18
45:23

**tumor** 20:9

**turn** 35:14

**turned** 83:13

**type** 21:24
73:19

**typed** 52:25

**types** 24:17
56:14

---
**U**
---

**U.F.** 76:16

**uh-huh** 5:24
6:2

**un-huh** 6:2

**underlying**
84:5

**underscore**
81:8

**understand**
5:12,16 6:12
11:15 12:13,
16 13:15
14:13 15:4
17:17 19:24
23:4 44:21
47:24 48:14

50:22 52:6
55:16 59:13
63:5

**understanding**
73:5,23

**understood**
12:18 23:7

**undertake** 54:8

**undetectable**
22:22

**unfamiliar**
29:12

**ungroomed**
41:10

**unit** 8:22

**University**
6:10,15 7:9
16:1,3

**unscientific**
29:8 46:7

**update** 26:20

**upper** 64:7,9,
25

**utero** 42:8

---
**V**
---

**vaginal** 36:2

**vaguely** 52:21

**validity** 57:5

**variability**
20:7

**vellus** 37:16
38:1

**verbal** 5:25

**verbatim** 51:3

**verify** 77:25

**versus** 4:5
38:25 46:9
59:8 69:21

**VI** 36:6
41:19,22

**video** 85:3,4,
20

**view** 40:18
43:3 57:25
67:13 81:22

**violence** 9:17,
18

**visible** 36:18
37:22 56:2
62:12 71:24
79:13 81:10,
12

**visit** 68:14,
15

**visual** 44:18
80:19

**vital** 67:10,
12

**vivid** 69:18

**vocabulary**
76:21

---
**W**
---

**Wait** 24:18

**waive** 85:11

**wall** 43:11
63:22 64:9,
15

**wanted** 29:19,
23 30:3,5

**warrant** 48:16

**wax** 80:21

**waxed** 56:25
73:2,15
74:18,21
75:4,7,23
76:6,10
77:2,16

**waxing** 39:24
54:17 55:23
56:12 72:25
73:5 74:22
75:1,9 76:10
77:23 79:11
80:18

**ways** 29:22
47:18

**wearing** 53:3

**website** 78:17

**week** 30:24
31:10

**well-known**
45:11

**whiskers** 39:4,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**                    Index: white..Zoom

14,17,25
40:3

**white** 53:4
74:9

**widely** 23:23
81:12

**wider** 38:11

**William** 4:4

**witnesses** 5:22

**women** 28:24,
25 29:15
43:15 54:12
76:10

**wood** 53:4

**word** 52:3,4,
19

**words** 51:4

**work** 6:12
16:6,19,25
17:2 26:21
28:2,3

**worked** 16:10

**working** 9:8

**worried** 20:17

**write** 6:4

**writes** 17:11

**writing** 17:14
52:1,2

**wrong** 25:21
29:15 42:5

**wrote** 30:5
50:13

---

**Y**

---

**YCBLVVFQ** 81:8

**year** 8:16 9:6
20:11 24:13

**years** 7:21
8:13 9:8
14:23 16:2
17:13 18:23
21:15 25:24
26:21 28:25
37:1 42:13
54:3 76:16
77:10 81:15,
17 82:4

**years-old** 84:1

**York** 7:10

**young** 62:8,9
76:9

---

**Z**

---

**Zoom** 49:3

66-2



College of Medicine – *Jacksonville*
Department of Pediatrics
First Coast Child Protection Team
Fax: (904) 633-0301

4100 Building, 4539 Beach Boulevard
Jacksonville, FL 32207
Tel: (904) 633-0300

February 22, 2023

Detective Mikayla Preston
Internet Crimes Against Children
Saint Johns County Sheriff's Office
4015 Lewis Speedway
St. Augustine, FL  32084

Dear Detective Preston:

I have examined a single color photograph displayed on a law enforcement laptop entitled  d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173 13cf489728f19896c5f79e9d4c63b80f6a487  provided to me by yourself following a cybertip from NCMEC.   This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest position with her lower legs and ankles parted to expose her genitalia for the camera.   This female child appears younger than 18 years of age.  She would have achieved this developmental genital appearance of SMR IV at 12-15 years of age.  She does not appear to be shaved as her anterior pubic hair is still present.

Please contact me if I can provide further assistance.

Sincerely,

Kathleen Dully, M.D.
Child Abuse Pediatrician
Sex Assault Forensic Examiner
Medical Director, First Coast
        Child Protection Team

66-3



| | |
|---|---|
| College of Medicine – *Jacksonville*<br>Department of Pediatrics<br>First Coast Child Protection Team<br>Fax: (904) 633-0301 | 4100 Building, 4539 Beach Boulevard<br>Jacksonville, FL 32207<br>Tel: (904) 633-0300 |

April 5, 2023

Detective Mikayla Preston
Internet Crimes Against Children
Saint Johns County Sheriff's Office
4015 Lewis Speedway
St. Augustine, FL  32084

Dear Detective Preston:

   I previously examined a single color photograph displayed on a law enforcement laptop entitled  d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173 13cf489728f19896c5f79e9d4c63b80f6a487 provided to me by yourself following a cybertip from NCMEC.   This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest position with her lower legs and ankles parted to expose her genitalia for the camera.   This female child appears younger than 18 years of age.  She would have achieved this developmental genital appearance of SMR IV at 12-15 years of age.  She does not appear to be shaved as her anterior pubic hair is still present.

   Today you have shown me two additional images of the same female child and these confirm my previous determination that she is depicted to be at most SMR III or IV and therefore again ≤ 12-15 years of age.  The filenames for these photos are 0059 and 0065(1).

   Please contact me if I can provide further assistance.

                                        Sincerely,

                                        Kathleen Dully, M.D.
                                        Child Abuse Pediatrician
                                        Sex Assault Forensic Examiner
                                        Medical Director, First Coast
                                                Child Protection Team

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on March 4, 2026.

/s/ Michael K. Roberts
**MICHAEL K. ROBERTS**