No. 26-10155-D
# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

WILLIAM LEE LAWSHE,
*Plaintiff-Appellant,*

v.

MIKAYLA PRESTON,
and
KATHLEEN DULLY,
*Defendants-Appellees.*

Appeal from the United States District Court for
the Middle District of Florida, Jacksonville
Division

3:24-cv-00044-MMH-MCR

## APPENDIX VOLUME II

**LAW OFFICES OF NOONEY,
ROBERTS, HEWETT, AND
NOWICKI**

*/s/ Michael K. Roberts*
**Michael K. Roberts, Esquire**
Florida Bar No. 0077974
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
mroberts@nrhnlaw.com
*Counsel for Appellant*

# INDEX

## VOLUME 1

Docket Sheet

Complaint against All Defendants with Jury Demand...............................1

Motion to Dismiss for Failure to State a Claim by Katheen Dully ...............10

Amended Complaint against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand filed by Willam Lee Lawshe....................... ...26

Answer and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston...............................................34

Second Amended Complaint against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand filed by William Lee Lawshe...........................40

Answer and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston...............................................43

Answer and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully...............................................54

Motion of Partial Summary Judgment Against Preston by William Lee Lawshe...66

Zoom Videotaped Deposition Transcript of Kathleen Dully M.D dated April 28, 2025...............................................66 – 1

Letter to Mikayla Preston from Kathleen Dully M.D dated February 22, 2023..66-2

Letter to Mikayla Preston from Kathleen Dully M.D dated April 5, 2023......66 – 3

## VOLUME 2

Docket Sheet

Letter to Mikayla Preston from Kathleen Dully M.D dated April 5, 2023......66 – 4

Expert Report of Dr. Scott Krugman...............................................66 – 5

Continued Remote Video Deposition Transcript of Kathleen Dully M.D dated June 18, 2025...............................................66 – 6

Motion of Partial Summary Judgment Against Preston by William Lee Lawshe...67

Affidavit for Search Warrant dated February 28, 2023............................67 – 1

Cyber Tipline Report 153739160....................................................67 – 2

Remote Deposition Transcript of Eugine Tolbert dated December 17, 2024...67 – 3

Remote Deposition Transcript of Kevin Greene dated December 17, 2024......67-4

## VOLUME 3

Docket Sheet

Videotaped Deposition Transcript of Fallon McNulty dated June 12, 2025........67-5

Video-Recorded Deposition Transcript of Mikayla Preston dated March 13, 2025
..............................................................................67-6

Remote Deposition Transcript of Dennis Camden dated December 17, 2024....67-7

Affidavit of Jeffrey J. Douglas............................................67-8

Letter to Mikayla Preston from Kathleen Dully M.D dated February 22, 2023..67-9

## VOLUME 4

Docket Sheet

Zoom Videotaped Deposition Transcript of Kathleen Dully MD dated April 28, 2025.........................................................................67-10

Continued Remote Video Deposition Transcript of Kathleen Dully M.D dated June 18, 2025...............................................................67-11

Deposition Transcript of Mikayla Preston dated November 21, 2023............67-12

Affidavit for Search Warrant dated April 12, 2023.........................67-13

St. Johns County Sheriffs Office Arrest Report.............................67-14

Felony Information Sheet..................................................67-15

Email Correspondence re Nolle Prosse dated December 22, 2023..............67-16

Response in Opposition re 66 Motion for Partial Summary Judgment filed by Kathleen Dully...................................................................................75

Response in Opposition re 67 Motion for Partial Summary Judgment filed by Mikayla Preston.....................................................................................78

Motion for Summary Judgment filed by Mikayla Preston............................ 83

## VOLUME 5

Docket Sheet

Motion for Summary Judgment filed by Kathleen Dully.............................85

Reply to Response to Motion re 67 Motion for Partial Summary Judgment filed by William Lee Lawshe...........................................................................90

Reply to Response to Motion re 66 Motion filed by William Lee Lawshe..........91

Response to Motion re 85 Motion for Summary Judgment filed by William Lee Lawshe..................................................................................................95

Response to Motion re 83 Motion for Summary Judgment filed by William Lee Lawshe..................................................................................................96

Report of Patrick Siewert........................................................................ 96-1

Reply to Response to Motion re 85 Motion for Summary Judgment filed by Kathleen Dully.....................................................................................100

Reply to Response to Motion re 83 Motion for Summary Judgment filed by Mikayla Preston...................................................................................101

Opinion and Order re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary Judgment; denying as moot 71 Motion in Limine; granting 83 Motion for Summary Judgment; granting 85 Motion for Summary Judgment.................103

Judgment is entered in favor of Defendants and against Plaintiff...................104

APPEAL,CLOSED,MEDIATION,SL DOC,STAYED,TANGIBLE

# U.S. District Court
## Middle District of Florida (Jacksonville)
### CIVIL DOCKET FOR CASE #: 3:24-cv-00044-JAR-MCR

| | |
|---|---|
| Lawshe v. Hardwick et al | Date Filed: 01/12/2024 |
| Assigned to: Judge Jane A. Restani | Date Terminated: 12/19/2025 |
| Referred to: Magistrate Judge Monte C. Richardson | Jury Demand: Both |
| Case in other court: 11th Circuit, 26-10155-D | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

**William Lee Lawshe**
*an individual*

represented by **Michael Keith Roberts , II**
Law Offices of Nooney & Roberts
1680 Emerson St
Jacksonville, FL 32207
904/398-1992
Fax: 904/858-9943
Email: mroberts@nooneyandroberts.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Scott Nooney , Jr.**
The Law Offices of Nooney & Roberts
1680 Emerson St.
Jacksonville, FL 32207
904-398-1992
Fax: 904-858-9943
Email: jnooney@nooneyandroberts.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Robert A. Hardwick**
*in his official capacity as Sheriff of St. Johns County*
*TERMINATED: 10/29/2024*

represented by **Michael P. Spellman**
Spellman Law, P.A.
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: michael@spellman.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
Spellman Law, P.A.
905 E. Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: cpetruzzelli@spellman.law
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Carson**
Spellman Law, PA
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: mcarson@spellman.law
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mikayla Preston**
*in her induvial capacity as a Detective for St. Johns County Sheriff's Office*

represented by **Michael P. Spellman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jami McFatter Kimbrell**
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: jami@kimbrellfirm.com
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**University of Florida Board of Trustees**
*TERMINATED: 03/28/2024*

represented by **Todd Anderson Wright**
Alexander DeGance Barnett, P.A.
1500 Riverside Avenue
Jacksonville, FL 32204
904-345-3284
Fax: 904-345-3294
Email: todd.wright@adblegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Dully**
*in her individual capacity as medical director of the UF Child Protection Team*

represented by **Jami McFatter Kimbrell**
(See above for address)
*LEAD ATTORNEY*

**Robert B. Buchanan**
Banker Lopez Gassler P.A.
1900 SE 18th Street
Suite 300
Ocala, FL 34475-8237
352-629-4099
Fax: 352-629-3975
Email: aperry@bankerlopez.com

*TERMINATED: 05/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Shevlin**
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471
352-629-4099
Email: ashevlin@rbtrial.com
*ATTORNEY TO BE NOTICED*

**John Wilson**
Howell, Buchan and Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: johnwilson@jsh-pa.com
*ATTORNEY TO BE NOTICED*

**Mediator**

**Thomas H. Bateman, III**
*TERMINATED: 08/07/2025*

represented by **Thomas H. Bateman , III**
Messer Caparello, PA
2618 Centennial Place
Tallahassee, FL 32308
850/222-0720
Fax: 850/558-0674
Email: tbateman@lawfla.com
*TERMINATED: 08/07/2025*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2024 | 1 | STRICKEN per 23 Order; COMPLAINT against All Defendants with Jury Demand (Filing fee $405 receipt number AFLMDC-21652226) filed by William L Lawshe. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons Hardwick Summons, # 3 Proposed Summons Preston Summons, # 4 Proposed Summons UF BOT Summons, # 5 Proposed Summons Dully Summons)(Roberts, Michael) Modified on 4/2/2024 to edit docket text (JDR). (Entered: 01/12/2024) |
| 01/12/2024 | 2 | NEW CASE ASSIGNED to Judge Marcia Morales Howard and Magistrate Judge Monte C. Richardson. New case number: 3:24-cv-44-MMH-MCR. (JCG) (Entered: 01/12/2024) |
| 01/16/2024 | 3 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (JW) (Entered: 01/16/2024) |

| | | |
|---|---|---|
| 01/16/2024 | 4 | SUMMONS issued as to Kathleen Dully, Robert Hardwick, Mikayla Preston, University of Florida Board of Trustees. (MCB) (Entered: 01/16/2024) |
| 02/08/2024 | 5 | NOTICE TO ALL COUNSEL of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who - unless the party changes the designation - remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (GL) (Entered: 02/08/2024) |
| 02/15/2024 | 6 | NOTICE of Lead Counsel Designation by Michael Keith Roberts, II on behalf of William Lee Lawshe. Lead Counsel: Michael K Roberts, Esq.. (Roberts, Michael) (Entered: 02/15/2024) |
| 02/19/2024 | 7 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 8 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 9 | NOTICE of Appearance by Robert B. Buchanan on behalf of Kathleen Dully (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/19/2024 | 10 | MOTION to Dismiss for Failure to State a Claim by Kathleen Dully. (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/20/2024 | 11 | **ORDER directing Defendant to file a supplement to her [Doc. 10] Motion to Dismiss Plaintiff's Complaint on or before February 27, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 2/20/2024. (JPA)** (Entered: 02/20/2024) |
| 02/20/2024 | 12 | MOTION to Dismiss Count VIII of Plaintiff's Complaint by University of Florida Board of Trustees. (Wright, Todd) (Entered: 02/20/2024) |
| 02/22/2024 | 13 | MOTION for Clerk's Default against Robert Hardwick, Mikayla Preston by William Lee Lawshe. (Nooney, Jeffrey) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/22/2024) |
| 02/27/2024 | 14 | Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 02/27/2024) |
| 02/27/2024 | 15 | NOTICE of Appearance by Michael P. Spellman on behalf of Robert Hardwick, Mikayla Preston (Spellman, Michael) (Entered: 02/27/2024) |
| 02/27/2024 | 16 | MOTION for Extension of Time to File Response/Reply as to 1 Complaint , MOTION to Set Aside Clerk Default *(Deny Entry)* by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Declaration of Trae Wylie)(Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/27/2024) |
| 02/28/2024 | 17 | NOTICE of supplemental authority re 16 MOTION for Extension of Time to File Response/Reply as to 1 Complaint MOTION to Set Aside Clerk Default *(Deny Entry) RE: Local Rule 3.01(g) Conferral* by Robert Hardwick, Mikayla Preston. (Spellman, Michael) (Entered: 02/28/2024) |
| 03/08/2024 | 18 | NOTICE of voluntary dismissal by William Lee Lawshe (Roberts, Michael) (Entered: 03/08/2024) |
| 03/08/2024 | 19 | RESPONSE in Opposition re 14 Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 03/08/2024) |
| 03/13/2024 | 20 | RESPONSE to 16 MOTION to Deny Entry of Default filed by William Lee Lawshe. (Roberts, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |

| 03/13/2024 | 21 | NOTICE of Supplemental Authority to 16 MOTION to Deny Entry of Clerk's Default and for Extension of Time by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Savoia-McHugh v. Glass)(Spellman, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |
|---|---|---|
| 03/28/2024 | 22 | **ORDER dismissing, without prejudice, the claims raised against Defendant University of Florida Board of Trustees; terminating 12 Motion to Dismiss; and directing the Clerk of the Court to terminate this Defendant. Signed by Judge Marcia Morales Howard on 3/28/2024. (JW) (Entered: 03/28/2024)** |
| 04/02/2024 | 23 | **ORDER striking 1 Complaint filed by William Lee Lawshe. Plaintiff shall file a corrected complaint on or before April 22, 2024. Signed by Judge Marcia Morales Howard on 4/2/2024. (JPA) (Entered: 04/02/2024)** |
| 04/12/2024 | 24 | CASE MANAGEMENT REPORT. (Spellman, Michael) (Entered: 04/12/2024) |
| 04/15/2024 | 25 | CASE MANAGEMENT AND SCHEDULING ORDER AND REFERRAL TO MEDIATION: **Disclosure statements due by 4/26/2024. Discovery due by 6/20/2025. Dispositive motions due by 7/21/2025. Conduct mediation hearing by 8/15/2025. Final Pretrial Conference set for 12/15/2025 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 1/5/2026 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Signed by Judge Marcia Morales Howard on 4/15/2024. (Attachments: # 1 Mediation Report Form, # 2 Court Docket)(JW) (Entered: 04/15/2024)** |
| 04/16/2024 | 26 | AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) (Entered: 04/16/2024) |
| 04/19/2024 | 27 | **ORDER denying as moot 13 Plaintiff's Motion for Entry of Clerk's Default; denying as moot 14 Defendant Kathleen Dully's Motion to Dismiss; denying as moot 16 Motion to Deny Entry of Clerk's Default and for Extension of Time to Respond to Complaint. Signed by Judge Marcia Morales Howard on 4/19/2024. (JW) (Entered: 04/19/2024)** |
| 04/26/2024 | 28 | CORPORATE Disclosure Statement by Kathleen Dully. (Buchanan, Robert) (Entered: 04/26/2024) |
| 04/29/2024 | 29 | CORPORATE Disclosure Statement by Mikayla Preston. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 30 | CORPORATE Disclosure Statement by Robert Hardwick. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 31 | ***INCORRECT EVENT. COUNSEL TO REFILE AS "CORPORATE DISCLOSURE STATEMENT"***AMENDED document by Kathleen Dully. *Defendant Kathleen Dully's Amended Corporate Disclosure Statement.* (Buchanan, Robert) Modified on 4/30/2024 (LSS). (Entered: 04/29/2024) |
| 04/30/2024 | 32 | AMENDED Disclosure Statement Under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Kathleen Dully. (Buchanan, Robert) (Modified on 4/30/2024, to edit text) (BGR). (Entered: 04/30/2024) |
| 04/30/2024 | 33 | NOTICE of Appearance by Matthew Joseph Carson on behalf of Robert Hardwick, Mikayla Preston (Carson, Matthew) (Entered: 04/30/2024) |

| 04/30/2024 | 34 | ANSWER and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston.(Carson, Matthew) (Entered: 04/30/2024) |
| --- | --- | --- |
| 04/30/2024 | 35 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew). Added MOTION to Strike on 5/2/2024 (AM). (Entered: 04/30/2024) |
| 05/02/2024 | 36 | **ORDER directing Plaintiff to show cause why this case should not be dismissed for failure to prosecute or sanctions imposed due to his failure to comply with the Local Rules and this Court's Order. Show Cause Response due by 5/16/2024. Signed by Judge Marcia Morales Howard on 5/2/2024. (JW) (Entered: 05/02/2024)** |
| 05/02/2024 | 37 | CORPORATE Disclosure Statement by William Lee Lawshe. (Roberts, Michael) (Entered: 05/02/2024) |
| 05/02/2024 | 38 | RESPONSE TO ORDER TO SHOW CAUSE re 36 Order to show cause filed by William Lee Lawshe. (Roberts, Michael) Modified on 5/3/2024 to edit text (ELM). (Entered: 05/02/2024) |
| 05/03/2024 | 39 | **ENDORSED ORDER discharging 36 Order to Show Cause. Signed by Judge Marcia Morales Howard on 5/3/2024. (JW) (Entered: 05/03/2024)** |
| 05/20/2024 | 40 | SECOND AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/20/2024 | 41 | NOTICE of Filing 40 Second Amended Complaint by William Lee Lawshe (Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/23/2024 | 42 | **ORDER denying as moot 35 Defendant Sheriff Hardwick's Motion to Dismiss and Motion to Strike. Signed by Judge Marcia Morales Howard on 5/23/2024. (JW) (Entered: 05/23/2024)** |
| 06/03/2024 | 43 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston. (Attachments: # 1 Exhibit CybeTip Report, # 2 Exhibit Dully Opinion f6a487, # 3 Exhibit Dully Opinion 59 and 65, # 4 Exhibit Dully Opinion Screenshot Duckduckgo)(Carson, Matthew) (Entered: 06/03/2024) |
| 06/03/2024 | 44 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew) (Entered: 06/03/2024) |
| 06/19/2024 | 45 | MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint *or Alternatively, Motion for a More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 06/19/2024) |
| 06/24/2024 | 46 | RESPONSE to Motion re 44 MOTION to Dismiss for Failure to State a Claim filed by William Lee Lawshe. (Roberts, Michael) (Entered: 06/24/2024) |
| 07/12/2024 | 47 | RESPONSE to Motion re 45 MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint *or Alternatively, Motion for a More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 07/12/2024) |
| 08/16/2024 | 48 | NOTICE of Appearance by Christen Ann Petruzzelli on behalf of Robert A. Hardwick, Mikayla Preston (Petruzzelli, Christen) (Entered: 08/16/2024) |
| 08/16/2024 | 49 | MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Request for Production* by Mikayla Preston. (Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/16/2024) |
| 08/17/2024 | 50 | SUPPLEMENT re 49 MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Request for Production* by Mikayla Preston. (Spellman, Michael |

| | | (Entered: 08/17/2024) |
|---|---|---|
| 08/19/2024 | 51 | **ENDORSED ORDER granting 49 Defendant Preston's Motion for Extension of Time to Respond to Plaintiff's First Request for Production. Defendant shall have until August 26, 2024, to respond to Plaintiff's First Request for Production. Signed by Magistrate Judge Monte C. Richardson on 8/19/2024. (JRC) (Entered: 08/19/2024)** |
| 10/03/2024 | 52 | **ORDER: To the extent that Plaintiff requests affirmative relief from the Court, 46 Plaintiff's Response to Defendant Hardwick's Motion to Dismiss is denied without prejudice. See Order for details. Signed by Judge Marcia Morales Howard on 10/3/2024. (JPA) (Entered: 10/03/2024)** |
| 10/29/2024 | 53 | **ORDER granting 44 Motion to Dismiss for Failure to State a Claim and denying 45 Motion to Dismiss. The Clerk of the Court is directed to terminate Defendant Robert Hardwick. Defendant Kathleen Dully shall respond to Plaintiff's Second Amended Complaint on or before November 13, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 10/29/2024. (JPA) (Entered: 10/29/2024)** |
| 11/13/2024 | 54 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully.(Buchanan, Robert) (Entered: 11/13/2024) |
| 02/01/2025 | 55 | MOTION to Compel Production of Documents by William Lee Lawshe. (Attachments: # 1 Exhibit Ex A - Plaintiff RTP, # 2 Exhibit Ex B - Def RTP response, # 3 Exhibit Ex C - Email Correspondence)(Roberts, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/01/2025) |
| 02/05/2025 | 56 | NOTICE of Withdrawal Motion to Compel Production of Documents by William Lee Lawshe. (Roberts, Michael) Modified on 2/6/2025 to edit text (ELA). (Entered: 02/05/2025) |
| 05/16/2025 | 57 | MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/16/2025) |
| 05/19/2025 | 58 | **ENDORSED ORDER denying without prejudice 57 Defendant Kathleen Dully's Motion for Substitution of Counsel because it fails to comply with Local Rule 3.01(g). Signed by Magistrate Judge Monte C. Richardson on 5/19/2025. (SBL) (Entered: 05/19/2025)** |
| 05/22/2025 | 59 | Amended MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/22/2025) |
| 05/27/2025 | 60 | **ENDORSED ORDER granting 59 Defendant Kathleen Dully's Amended Motion for Substitution of Counsel. Robert B. Buchanan, Esq. is relieved of any further responsibility as counsel for Defendant in this matter, but he shall comply with all applicable obligations on withdrawing counsel, including any applicable Bar rules. Jami Kimbrell, Esq. is substituted as counsel of record for Defendant. Signed by Magistrate Judge Monte C. Richardson on 5/27/2025. (SBL) (Entered: 05/27/2025)** |
| 05/27/2025 | 61 | NOTICE of Appearance by John Wilson on behalf of Kathleen Dully (Wilson, John) (Entered: 05/27/2025) |
| 06/06/2025 | 62 | Unopposed MOTION for Extension of Time to Complete Discovery by Kathleen Dully. (Wilson, John) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 6/9/2025 to edit the docket text (MLB). (Entered: 06/06/2025) |
| 06/09/2025 | 63 | **ORDER granting 62 Unopposed Motion for Extension of Deadlines to Complete Discovery and File Dispositive Motions. Discovery deadline is 8/4/2025. Dispositive and Daubert motions due 9/5/2025. Final pretrial conference continued to 1/20/2026, at 10:00 a.m. Jury trial set for trial term commencing on 2/2/2026, at 9:00 a.m. See** |

| | | |
|---|---|---|
| | | **Order for additional deadlines. Signed by Judge Marcia Morales Howard on 6/9/2025. (JW)** (Entered: 06/09/2025) |
| 06/09/2025 | | Set / Reset Scheduling Order Deadlines/Hearings per 63: Discovery due by 8/4/2025. Dispositive motions due by 9/5/2025. All other motions due by 12/29/2025. Final Pretrial Conference set for 1/20/2026 at 10:00 AM before Judge Marcia Morales Howard. Jury Trial set for 2/2/2026 at 09:00 AM before Judge Marcia Morales Howard. (EVK) (Entered: 06/10/2025) |
| 06/18/2025 | 64 | NOTICE of mediation conference/hearing to be held on 8/6/25 at 10AM before Thomas H. Bateman, III. (Carson, Matthew) (Entered: 06/18/2025) |
| 08/06/2025 | 65 | MEDIATION report Hearing held on 8-6-2025. Hearing outcome: Impasse.. (Bateman, Thomas) (Entered: 08/06/2025) |
| 08/12/2025 | 66 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/12/2025 | 67 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/13/2025 | 68 | **SUMMARY JUDGMENT NOTICE AND COURTESY COPIES. Signed by Deputy Clerk on 8/13/2025. (JW)** (Entered: 08/13/2025) |
| 08/29/2025 | 69 | Unopposed MOTION for Extension of Time to File Response/Reply as to 67 MOTION for Partial Summary Judgment , 66 MOTION for Partial Summary Judgment Set / Reset Scheduling Order Deadlines/Hearings *and Extension of Time to File Motions for Summary Judgment* by All Defendants. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/29/2025) |
| 09/03/2025 | 70 | **ENDORSED ORDER granting 69 Defendants' Joint Unopposed Motion for Extension of Time. Defendants shall respond to Plaintiff's Motions for Partial Summary Judgment on or before September 9, 2025. The deadline for Defendants to file dispositive motions is extended until September 12, 2025. The granting of this Motion shall not serve as a basis for seeking to extend any other deadlines in the Case Management and Scheduling Order. Signed by Magistrate Judge Monte C. Richardson on 9/3/2025. (SBL)** (Entered: 09/03/2025) |
| 09/05/2025 | 71 | MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) by Mikayla Preston. (Attachments: # 1 Exhibit 1 = Siewert CV, # 2 Exhibit 2 - Siewert Report) (Carson, Matthew) (Entered: 09/05/2025) |
| 09/08/2025 | 72 | Unopposed MOTION to file DOCUMENT under seal by Kathleen Dully, Mikayla Preston (Attachments: # 1 Proposed Sealed Item Redacted f6a487, # 2 Proposed Sealed Item Redacted 0065(1), # 3 Proposed Sealed Item Redacted 0059, # 4 Proposed Sealed Item Redacted DuckDuckGo, # 5 Proposed Sealed Item Redacted VVFQ_o, # 6 Appendix Unredacted File Names and Sizes)(Carson, Matthew).Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 09/08/2025) |
| 09/08/2025 | 73 | Consent MOTION to File Excess Pages in Response to Motion for Partial Summary Judgment by Kathleen Dully. (Kimbrell, Jami) Modified text on 9/9/2025 (MGB). (Entered: 09/08/2025) |

| 09/09/2025 | 74 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
|---|---|---|
| 09/09/2025 | 75 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
| 09/09/2025 | 76 | NOTICE by Kathleen Dully re 75 Response in Opposition to Motion *Filing Exhibits to* (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 Exhibit K, # 7 Exhibit L)(Kimbrell, Jami) Modified text on 9/10/2025 (ABM). (Entered: 09/09/2025) |
| 09/09/2025 | 77 | NOTICE by Mikayla Preston *documents in support of her response in opposition to Plaintiff's motion for partial summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty, # 3 Exhibit Deposition of Detective Mikayla Preston, # 4 Exhibit Deposition of Detective Kevin Greene, # 5 Exhibit Deposition of Sergeant Eugene Tolbert, # 6 Exhibit Deposition of Dr. Kathleen Dully I, # 7 Exhibit Deposition of Dr. Kathleen Dully II, # 8 Exhibit Affidavit of Kaitlyn M. Paine, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe)(Carson, Matthew) (Entered: 09/09/2025) |
| 09/09/2025 | 78 | RESPONSE in Opposition re 67 MOTION for Partial Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 09/09/2025) |
| 09/10/2025 | 79 | **ENDORSED ORDER granting 73 Defendant Kathleen Dully's Motion for Leave to Exceed the Page Limit and accepting as filed 75 Defendant Kathleen Dully's response to Plaintiff's Motion for Partial Summary Judgment. Signed by Judge Marcia Morales Howard on 9/10/2025. (JW) (Entered: 09/10/2025)** |
| 09/10/2025 | 80 | NOTICE by Kathleen Dully re 74 Response in Opposition to Motion *to Disregard* (Kimbrell, Jami) (Entered: 09/10/2025) |
| 09/11/2025 | 81 | **ORDER granting 72 Defendant's Unopposed Motion to Seal. See Order for details. Signed by Magistrate Judge Monte C. Richardson on 9/11/2025. (SBL) (Entered: 09/11/2025)** |
| 09/12/2025 | 82 | NOTICE by Mikayla Preston *of filing documents in support of her motion for final summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty (corporate representative for the National Center for Missing and Exploited Children) taken June 12, 2025 (excerpts), # 3 Exhibit Deposition of Detective Mikayla Preston taken March 13, 2025 (excerpts), # 4 Exhibit Deposition of Detective Kevin Greene taken December 17, 2024 (excerpts), # 5 Exhibit Deposition of Sergeant Eugene Tolbert taken December 17, 2024 (excerpts), # 6 Exhibit Deposition of Dr. Kathleen Dully taken April 28, 2025 (excerpts), # 7 Exhibit Deposition of Dr. Kathleen Dully taken June 18, 2025 (excerpts), # 8 Exhibit Affidavit of Kaitlyn M. Paine dated August 28, 2025, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe taken March 14, 2025 (excerpts))(Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 83 | MOTION for Summary Judgment by Mikayla Preston. (Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 84 | MOTION to File Excess Pages by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 85 | MOTION for Summary Judgment by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 86 | NOTICE of Filing Exhibits by Kathleen Dully re 85 MOTION for Summary Judgment. (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 |

| | | |
|---|---|---|
| | | Exhibit K, # 7 Exhibit L, # 8 Exhibit M)(Kimbrell, Jami) Modified docket text on 9/15/2025 (JOS). (Entered: 09/12/2025) |
| 09/16/2025 | 88 | **ENDORSED ORDER granting 84 Defendant Kathleen Dully's Motion for Leave to File an Over-Length Motion for Summary Judgment and accepting as filed 85 Defendant Kathleen Dully's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 9/16/2025. (JW) (Entered: 09/16/2025)** |
| 09/16/2025 | 90 | REPLY to Response to Motion re 67 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/16/2025 | 91 | REPLY to Response to Motion re 66 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/19/2025 | 92 | RESPONSE to Motion re 71 MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 09/19/2025) |
| 09/24/2025 | 93 | SEALED DOCUMENT re 81 Sealed Order on Motion to Seal by Mikayla Preston (Attachments: # 1 Exhibit Redacted f6a487, # 2 Exhibit Redacted 0065(1), # 3 Exhibit Redacted 0059, # 4 Exhibit Redacted DuckDuckGo, # 5 Exhibit Redacted VVFQ_o) (Carson, Matthew). (Entered: 09/24/2025) |
| 10/03/2025 | 94 | MOTION to File Excess Pages by William Lee Lawshe. (Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 95 | RESPONSE to Motion re 85 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 96 | RESPONSE to Motion re 83 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/06/2025 | 97 | **ENDORSED ORDER granting 94 Plaintiff's Unopposed Motion for an Extension of Page Limit and accepting as filed 96 Plaintiff's Response to Defendant Preston's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 10/6/2025. (JW) (Entered: 10/06/2025)** |
| 10/16/2025 | 98 | **ORDER REASSIGNING CASE to Senior Judge Jane A. Restani. Signed by Judge Marcia Morales Howard on 10/16/2025. (MHM) (Entered: 10/16/2025)** |
| 10/17/2025 | 99 | Case Reassigned to Judge Jane A. Restani. New case number: 3:24-cv-44-JAR-MCR. Judge Marcia Morales Howard no longer assigned to the case. (MDC) (Entered: 10/17/2025) |
| 10/17/2025 | 100 | REPLY to Response to Motion re 85 MOTION for Summary Judgment filed by Kathleen Dully. (Wilson, John) (Entered: 10/17/2025) |
| 10/17/2025 | 101 | REPLY to Response to Motion re 83 MOTION for Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 10/17/2025) |
| 11/17/2025 | 102 | Notice to counsel that pursuant to the summary judgment notice 68, the parties must submit courtesy copies of any motion, response, and authorized reply that exceeds twenty-five (25) pages (including exhibits or other supporting evidentiary materials) in length. Courtesy copies should be mailed by United States mail or other reliable service to Hon. Jane A. Restani, United States Court of International Trade, 1 Federal Plaza, Suite 694, New York, NY 10278-0001 (jkl) (Entered: 11/17/2025) |
| 12/18/2025 | 103 | **OPINION AND ORDER re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary** |

| | | |
|---|---|---|
| | | Judgment; denying as moot <u>71</u> Motion in Limine; granting <u>83</u> Motion for Summary Judgment; granting <u>85</u> Motion for Summary Judgment. The Clerk shall enter judgment in favor of Defendants Preston and Dully and against Plaintiff Lawshe, terminate any pending motions, and close the case. Signed by Judge Jane A. Restani on 12/18/2025. (SJW) (Modified on 12/18/2025)(SJW). (Entered: 12/18/2025) |
| 12/19/2025 | <u>104</u> | **JUDGMENT is entered in favor of Defendants and against Plaintiff. Signed by Deputy Clerk on 12/19/2025. (JTM) (Entered: 12/19/2025)** |
| 12/19/2025 | 105 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (JTM) (Entered: 12/19/2025) |
| 01/06/2026 | <u>106</u> | NOTICE of change of address by Christen Ann Petruzzelli (Petruzzelli, Christen) (Entered: 01/06/2026) |
| 01/06/2026 | <u>107</u> | MOTION for Extension of Time to File Motion for Entitlement to Costs by Mikayla Preston. (Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 01/06/2026) |
| 01/16/2026 | <u>108</u> | NOTICE OF APPEAL as to <u>103</u> Order on Motion for Partial Summary Judgment Order on Motion in Limine, Order on Motion for Summary Judgment, <u>104</u> Judgment by William Lee Lawshe. Filing fee $605, receipt number AFLMDC-24340578. ***Case Stayed. (Roberts, Michael) (Entered: 01/16/2026) |
| 01/16/2026 | <u>109</u> | TRANSMITTAL of initial appeal package to the U.S. Court of Appeals - 11th Circuit re <u>108</u> Notice of Appeal,. Filing fee paid. (JDR) (Entered: 01/16/2026) |
| 01/20/2026 | <u>110</u> | RESPONSE in Opposition re <u>107</u> MOTION for Extension of Time to File Motion for Entitlement to Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 01/20/2026) |
| 01/20/2026 | | ***11th Circuit Case Number: 26-10155-D for <u>108</u> Notice of Appeal, filed by William Lee Lawshe. (SJW) (Entered: 01/22/2026) |
| 01/30/2026 | 111 | **ENDORSED ORDER granting <u>107</u> Defendant Mikayla Preston's Motion for Extension of Time. The Court has considered Plaintiff's arguments but finds that good cause exists for the requested extension. Defendant shall file the subject Motion on or before February 5, 2026. Signed by Magistrate Judge Monte C. Richardson on 1/30/2026. (SBL) (Entered: 01/30/2026)** |
| 01/30/2026 | <u>112</u> | TRANSCRIPT information form filed by William Lee Lawshe re <u>108</u> Notice of Appeal USCA number: 26-10155-D. No transcript(s) requested. (Roberts, Michael) (Entered: 01/30/2026) |
| 02/05/2026 | <u>113</u> | MOTION for Taxation of Costs by Mikayla Preston. (Attachments: # <u>1</u> Affidavit of Matthew Carson, # <u>2</u> Exhibit Bill of Costs)(Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/05/2026) |
| 02/06/2026 | <u>114</u> | NOTICE by Mikayla Preston re <u>113</u> MOTION for Taxation of Costs *of Filing Supplement Pursuant to M.D. Fla. Loc. R. 3.01(g)*. (Petruzzelli, Christen) (Entered: 02/06/2026) |
| 02/19/2026 | <u>115</u> | MEMORANDUM in opposition re <u>113</u> Motion for Taxation of Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 02/19/2026) |

## PACER Service Center

### Transaction Receipt

| 03/04/2026 09:26:31 | | | |
|---|---|---|---|
| **PACER Login:** | mroberts00779741 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:24-cv-00044-JAR-MCR |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

66-4



College of Medicine – *Jacksonville*  
Department of Pediatrics  
First Coast Child Protection Team  
Fax: (904) 633-0301

4100 Building, 4539 Beach Boulevard  
Jacksonville, FL 32207  
Tel: (904) 633-0300

April 5, 2023

Detective Mikayla Preston  
Internet Crimes Against Children  
Saint Johns County Sheriff's Office  
4015 Lewis Speedway  
St. Augustine, FL  32084

Dear Detective Preston:

Today you have provided to me two images for review displayed on a law enforcement laptop. The first is ycbLVVFQ_o.jpg and depicts a female child with no pubic hair development. She does not appear to be shaved. Her breasts are partially visible and could be SMR IV-V, however her genitals are plainly visible with her thighs splayed widely-apart and showing she is SMR I with-respect-to-pubic hair. This developmental appearance is ≤ 9-13.5 years of age.

The second image is imprinted with white script saying "Big Heart" and the filename Screenshot_20230122_174408_DuckDuckGo.jpg. This image shows a female child with her black top parted and underwear down around her parted thighs exposing her genital area clearly. She appears to have no pubic hair development. She does not appear to be shaved. This developmental appearance is also ≤ 9-13.5 years of age.

Please contact me if I can provide further assistance.

Sincerely,

Kathleen Dully, M.D.  
Child Abuse Pediatrician  
Sex Assault Forensic Examiner  
Medical Director, First Coast  
    Child Protection Team

66-5

## EXPERT REPORT OF DR. SCOTT KRUGMAN

(i)    **a complete statement of all opinions the witness will express and the basis and reasons for them;**

I have reviewed three written reports authored by Dr. Kathleen Dully. Each of these reports expresses opinions about the age of a model depicted in various photographs.

In the February 22, 2023 report, Dr. Dully describes review of one digital image of a nude female individual. Dr. Dully concludes "this female child appears to be under 18 years of age. She would have reached this developmental genital appearance of SMR IV at 12-15 years of age. She does not appear to be shaved as her anterior pubic hair is present"

On April 5, 2023, Dr. Dully examined additional images of the same model described in the February 22nd report. Dr. Dully writes that these two additional images "confirm my previous determination that she is depicted to be at most SMR III or IV and therefore, again, ≤ 12-15 years of age."

Dr. Dully produced a third report dated the same day, April 5, 2023. In this report, Dr. Dully evaluates two additional images of a different model, presumably. As to the first image, Dr. Dully describes a "female child with no pubic hair development." However, she describes this model's breast as "could be SMR IV-V." Despite this, Dr. Dully states that "she is SMR I with respect to pubic hair" and concludes that "this developmental appearance is ≤ 9-13.5 years of age.

Finally, Dr. Dully reviews a second image in this report. Dr. Dully observes that "she appears to have no pubic hair development." Based on this, Dr. Dully concludes that "this developmental appearance is also ≤ 9-13.5 years of age.

In my review of her reports, I conclude the following:

a) The opinions, determinations or estimations of age expressed in the 3 written reports, dated February 22, 2023, April 5, 20023 and April 5, 2023 are not supported by medical science.

b) The limitations and risks of using Tanner Staging or Sexual Maturity Rating (SMR) to estimate chronological age based on digital images is well documented. The method is understood to be unreliable and unscientific, especially with SMR ratings of III and above.

c) As to the model depicted in the February 22nd and April 5th reports, the female is described as SMR 4. Based on accepted medical science it is not possible to state with any degree of reliability whether that individual is younger than 18 years of age.

d) Published research has repeatedly shown that chronological age estimation of models depicted in digital pornographic photographs by physicians is not medically or scientifically supported.

e) Additionally, it is well known and documented that adult (18+) females can exhibit and appear to be SMR IV.

f) Dr. Dully is on a list serve email which has explicitly raised the concerns and limitations of using SMR in CSAM investigations in the year prior to these reports being written, especially with an image of just breasts or just genitalia.

g) As to the estimation of age of the model depicted in image "ycbLVVFQ_o," there is no medical/scientific support for the opinion that a female with SMR IV/V breast could be SMR I (based on lack of pubic hair in a digital photo). This opinion does align with accepted medical understanding of pubertal development. Therefore, it is not supported by medical science. This opinion is particularly troubling.

h) There is no recognized medical method or expertise in determining whether a model is shaved or groomed, by simply looking at a digital photograph.

i) There is not a medical method or expertise in determining whether a photo has been digitally altered to remove blemishes or the appearance of pubic hair.

j) The absence of visible pubic hair, in a digital photograph, does not, in and of itself, support an opinion that a female is SMR I.

k) The Child Abuse Board Certification curriculum recognizes the legal aspect of the subspecialty and has standards regarding the

giving of opinions to law enforcement, i.e. they should be within a reasonable degree of medical certainty.

I reserve the right to supplement or alter these opinions, should additional information become available.

**(ii) the facts or data considered by the witness in forming them:**

I have reviewed the three reports outlined above.

**(iii) any exhibits that will be used to summarize or support them;**

"The difficult issue of age assessment on pedo-pornographic material" Forensic Science International 183 (2009) e21–e24.

**(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;**

Please see attached C.V.

**(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and**

Please see attached

**(vi) a statement of the compensation to be paid for the study and testimony in the case.**

Please see attached.

Dr. Scott Krugman

66-6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

  Plaintiff,

vs.               CASE NO.:  3:24-cv-00044-MMH-MCP

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's Office, and
KATHLEEN DULLY, in her individual
capacity as medical director of the
UF Child Protection Team,

  Defendant.

_____

CONTINUED
REMOTE VIDEO
DEPOSITION OF:    KATHLEEN M. DULLY, M.D.


DATE:          June 18th, 2025


TIME:          3:05 p.m. - 5:10 p.m.


PLACE:        Videoconference


STENOGRAPHICALLY
REPORTED BY:    Deborah J. Guest, RPR
            Shorthand Reporter



(1 - 89)

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 2

APPEARANCES:

(All parties appearing via Zoom.)

MICHAEL K. ROBERTS, II, ESQUIRE
OF:  Nooney, Roberts, Hewett & Nowicki
1680 Emerson Street
Jacksonville, FL 32207-6104
Office:  904-398-1992
Cell:  904-398-1992
E-mail:  mroberts@nrhnlaw.com
   Appearing on behalf of the Plaintiff,
William Lee Lawshe

MATTHEW J. CARSON, ESQUIRE
OF:  Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, FL 32301-1509
Office:  850-205-1996
E-mail:  mcarson@sniffenlaw.com

Appearing on behalf of the Defendant,
Mikayla Preston
-and-
JOHN A. WILSON, ESQUIRE
OF:  Howell, Buchan & Strong
2898 Mahan Drive
Suite 6
Tallahassee, FL 32308-5462
Office:  850-877-7776
E-mail:  johnwilson@jsh-pa.com
   Appearing on behalf of the Defendant,
Kathleen M. Dully, M.D.


ALSO PRESENT:  Cameron Hodges, Videographer

Page 3

I N D E X
TESTIMONY OF KATHLEEN M. DULLY, M.D.
                                        PAGE
Review of previously marked exhibits - no
video...................................    4
Direct Examination by Mr. Roberts.........    7
Cross-Examination by Mr Carson............   78
Cross-Examination by Mr. Wilson...........   84
Redirect Examination by Mr. Roberts.......   85
Certificate of Oath.......................   88
Certificate of Reporter...................   89

             INDEX OF EXHIBITS
                                        PAGE
         (DR. DULLY'S FIRST DEPOSITION)
   (Previously marked - attached to first deposition)
No. 3 (a demonstrative diagram of the
pubertal stages)..........................   37

No. 4 (composite exhibit of three letters
written by Dr. Dully in this case)........ 18,50,69
         (DETECTIVE PRESTON'S DEPOSITION)
         (Previously marked - not attached)

8-A (image YCBLVVFQ).....................   69

8-B (image B06FE687).....................   23

8-C (0059)...............................   15,25

8-D (0065(1))............................   25

8-E (20230122_174408DuckDuckGo.jpg)......   53

                - - -

         S T I P U L A T I O N S
      It is hereby stipulated and agreed by and
among the counsel for the respective parties and the
Defendant that the reading and signing of the Zoom
video deposition transcript be waived.

Page 4

            P R O C E E D I N G S
                  * * * *
   MR. WILSON:  Counsel, will you be sharing
exhibits today?
   MR. ROBERTS:  Maybe.
   MR. WILSON:  Maybe.
   MR. ROBERTS:  I don't know that there will
be any other ones, but I'll simply refer to the
images either by their file name or -- and we can
go on the record -- but they were attached in
letter form to Detective Preston's deposition as
lettered exhibits, and so we can refer to them in
both ways.  But we'll make sure that we're on the
same page before we begin discussing the exhibit.
Fair enough?
   MR. WILSON:  Yes.  Can we go through the
exhibits for clarity that were attached to the
first deposition?
   MR. ROBERTS:  Yes.  Exhibit 1 was a journal
article, Exhibit 2 was the affidavit of the
Plaintiff's expert, Dr. Krugman, Exhibit 3 was a
demonstrative diagram of the pubertal stages, and
Exhibit 4 was the -- it's a composite exhibit of
three letters written by Dr. Dully all in this
case.

Page 5

   MR. WILSON:  And you are prepared to show
those on the screen as they come up, if
necessary?
   MR. ROBERTS:  Yes.  I mean, I am not going
to plow the same field.  We're not going to --
you know, I may ask her a question about one or
two, and it may become relevant.
   But as this is a continuation of the prior
deposition, you know, I will assume that these
exhibits are going to be attached as exhibits to
this deposition as well.
   THE VIDEOGRAPHER:  Counselor, is this a
continuation?
   MR. ROBERTS:  It is a continuation, yes.
   THE VIDEOGRAPHER:  All right, perfect.  Are
there any other housekeeping matters?
   MR. WILSON:  I believe Mr. Carson called in
and dropped off of the call.  I do not know what
has happened to Mr. Carson.
   MR. CARSON:  I'm still here.
   MR. WILSON:  Okay, thank you.
   MR. CARSON:  I am trying not to clog the
gallery.  I will probably just stay hidden until
or unless I need to say anything.
   MR. ROBERTS:  All right, thank you.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 6

THE VIDEOGRAPHER: All right, then. Counsel, are we ready to begin?

MR. ROBERTS: Yes.

(Discussion off the record.)

THE VIDEOGRAPHER: Good afternoon. We're now on the record at 3:10 p.m. this June 18th, 2025. This begins the continued deposition of Dr. Kathleen Dully, taken in the matter of William Lee Lawshe versus Mikayla Preston, et al. This deposition is being conducted remotely via Zoom.

My name is Cameron Hodges. I am the videographer. The court reporter is Deborah Guest. We represent Huseby Global Litigation.

Will counsel please introduce themselves, after which will the court reporter please swear in the witness. Thank you.

MR. ROBERTS: Michael Roberts for Mr. Lawshe, the Plaintiff.

MR. WILSON: John Wilson for Dr. Dully.

MR. CARSON: Matt Carson for Detective Mikayla Preston.

COURT REPORTER: Doctor, would you raise your right hand, please.

Do you solemnly swear the testimony you're

Page 7

about to give in this cause today will be the truth, the whole truth, and nothing but the truth?

THE DEFENDANT: I do.

COURT REPORTER: Thank you.

KATHLEEN DULLY, M.D., having been duly sworn to tell the truth, testified as follows:

DIRECT EXAMINATION

BY MR. ROBERTS:

Q    All right. Doctor, it is good to see you again. Where are you currently located?

A    In this particular room?

Q    What building?

A    This is the Forensic Pediatrics Office, sort of that administrative office which is one building over from the clinic building.

Q    And when you say "clinic building," what are you referring to?

A    Well, there's two buildings for this division. And one has the clinic where we actually see children and have our offices and exam rooms and equipment and medication, and then this is an administrative building with a xerox machine and this very nice Zoom/conference room.

Q    And when you say -- and I just made this a

Page 8

little more obvious, but this is the Child Protection Team. When you say "division," you are talking about the Child Protection Team?

A    No, this is not the Child Protection Team office. This is the Division of Forensic Pediatrics for the University of Florida, and the Child Protection Team is part of the division and major activity.

Q    What does forensics mean?

A    Open to debate.

Q    So that is what -- if you say, "I am a forensic PD -- pediatrician," that means it's up for debate, pediatrics?

A    That we specialize in the debates of pediatrics, yes. In this case, I think that applies.

Q    Okay. Sometimes I have heard -- maybe it's colloquially, but forensics as being a subspecialty of either medicine or engineering, some science which attempts to examine or offer opinions on legal questions.

Is that -- are you not familiar with that use of the word forensics?

A    No. I use it as part of pediatrics.

Q    Okay.

A    I don't engage in those other activities.

Page 9

Q    You don't practice -- you don't offer opinions in legal proceedings?

A    I do if I am subpoenaed.

Q    Okay. But isn't that like part of your job, to offer opinions in legal proceedings on behalf of the State of Florida?

A    That is part of my job as a pediatrician, and the American Board of Pediatrics does not like to use the term forensics. That's why they call it child abuse pediatrics.

Q    And, in fact, the statute that establishes the Child Protection Team directs that the Child Protection Team will investigate and support law enforcement activities in regards to child abuse allegations, doesn't it?

A    I don't know the statute by heart. It probably says that or something about like that. It does establish the Child Protection Teams throughout Florida.

Q    Okay, all right. So have you -- this is a continuation of our prior deposition.

Since that time, have you spoken with any representatives of Detective Preston?

A    No.

Q    Have you spoken with Detective Preston?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 10

A    No.

Q    Have you spoken with anyone other than your attorney about the facts or circumstances arising out of this case?

A    No, but the attorneys did change. So I have spoken to two attorneys, the previous and then also Mr. Wilson.

Q    Has anyone from Verizon or Synchronoss Corporations reached out to you about this case?

A    No.

Q    Have you made any statements or conducted any -- or have been part of any interviews regarding the facts and circumstances of this case since we last met?

A    No.

Q    All right. So have you had an opportunity to review your deposition transcript prior to today's continuation of that deposition?

A    I went through it one time today.

Q    Okay, all right. So we ended the last deposition because you did not have the photographs or the digital images which were the subject of your reports in this case. Did I understand that correctly?

A    Yes. And I had not seen them in two years

Page 11

and could not recollect.

Q    Sure. And today, do you have them?

A    I have them, yes.

Q    And have you had a chance to review them prior to us getting on the record here today?

A    Yes.

Q    Okay. So let's -- I am just going to -- we left off in your deposition talking about opinions in general -- your opinions in general, and let's pick up today with your -- your interactions with -- just to set the scene, I guess, so to speak, with -- your interactions with Detective Preston and reviewing these particular photographs because you have them now, and that's really what I intend to go through today.

So at some point, you received an e-mail from Detective Preston introducing herself. Do I understand that correctly?

A    At some point, she was introduced to me at CPT, but I don't remember the specifics.

Q    Do -- have you reviewed any e-mails she sent to you attempting to set up a meeting regarding this particular case?

A    She did send one e-mail between the two dates -- I don't know the date -- asking for another

Page 12

appointment.

Q    So you had one meeting with her on February 22nd, 2023; is that correct?

A    Yes.

Q    And in that meeting, you examined a single colored photograph that she showed you on a law enforcement laptop; is that correct?

A    Yes.

Q    That file name -- I am not going to read the entire file name, but it begins with D263B; is that correct?

A    Yes.

Q    All right. You met with her again on April 5th, 2023; is that correct?

A    Yes.

Q    And you reviewed additional photographs, which we'll get into in a second.

So I believe you testified in your original deposition you do have some recollection of meeting with Detective Preston; correct?

A    Yes.

Q    All right. And when you met with her, you explained to her that you could not offer her scientific reliable opinions regarding the actual age of the models depicted in these images, correct?

Page 13

A    Yes.

Q    You told her that you could only offer her an opinion about what the sexual maturity rating of the appearance of the image was, correct?

A    Yes.

Q    And I think we went through this in your prior deposition. For example, if you were shown a photograph that just showed belly button to thighs and it showed genitals, if there was no pubic hair development, your opinion would be that that is a sexual maturity rating of a woman, correct?

A    In general, yes.

Q    You do not consider the possibility of digital altering of the photograph to make it appear as though there is no pubic hair?

A    That is not my expertise.

Q    And you do not consider that possibility in rendering your opinions?

A    That is always a possibility. However, I am commenting on appearance, not knowing anything more about the photograph.

Q    And you made that clear to Detective Preston in your meeting on February 22nd?

A    I think that's obvious. That's what the investigation is for, which is not something that I

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 14

do.

Q    Whether you think it is obvious or not, your testimony is that you made that clear to Detective Preston in your meeting?

A    Well, it's in writing that it's appearance, and I said it's appearance.

Q    Your prior testimony even today was that you explained to her that you could not give her a scientifically reliable opinion about the actual age of the model depicted, correct?

A    Well, those are your words. That's not my words. I never used the word scientific. It is not -- it's a medical question, and those are your words, not mine. And it has been two years, and I don't remember my exact words.

Q    I am not -- I am not asking you your exact words. I am asking if you related to her -- in whatever words you chose but related to her in what you consider to be a clear manner that you could not offer her a medical opinion about the actual age of the individual depicted in these images, correct?

A    Yes.

Q    All right. One second.

I would like for you to pull up on the laptop the file 0059, and just tell me when you have

Page 15

that image up for you to view.

A    And which letter is that?

(Exhibit 8-C, previously marked in Detective Preston's deposition, was identified for the record.)

BY MR. ROBERTS:

Q    If you can just pull the image up, and then I'll ask questions and direct you. While you are pulling it up, I am going to, for the record, identify this.

The redacted image was attached to Detective Preston's deposition as Exhibit C. Do you have this pulled up in front of you, 0059?

A    That is what the label says, yes.

Q    Okay. This depicts a female model with it looks like a pink lace lingerie -- wearing like a pink lace lingerie. Do you see that?

A    Yes.

Q    A red background?

A    I would call that orange, but yes.

Q    Okay. Maybe we got a different color tone on our screen.

All right. And the model appears to even have her eyes closed or be looking down towards the floor?

A    Yes.

Page 16

Q    All right. This model clearly has utilized some form of grooming of her pubic hair, correct?

A    She may have and so -- you know, maybe, yeah.

Q    It appears -- now, you are a medical doctor and you -- we talked a lot about this in your -- in your prior -- in your original testimony in the beginning of this case.

The appearance of pubic hair is the -- I guess the leading determining factor in the sexual maturity rating as it pertains to female individuals, correct?

A    Yes.

Q    All right. And we went through diagrams about what Grade I, Grade II, Grade III, Grade IV, Grade V pubic hair development looks like, did we not?

A    Yes.

Q    This appearance of pubic hair does not match any of the diagrams that -- or the depictions on the diagrams that we saw, does it?

A    Not very well. It is in the midline and anterior which is how it develops.

Q    Right. But this clearly -- this model has clearly either shaven or waxed or groomed in some way

Page 17

her pubic hair, correct?

A    I don't know if that is clearly, but I think that is a possibility, yes.

Q    Well, your medical opinions are based on the appearance of pubic hair in this case, correct?

A    Yes. To a large degree, yes.

Q    Would you say that by looking at this you cannot determine whether or not this model has utilized some sort of grooming, shaving, waxing, some sort of hair removal process?

A    No. I am saying that she may have --

Q    Okay.

A    -- but I don't know for sure. Usually I ask the child.

Q    Okay. You can't ask the child, though, when you are reviewing images pulled off of the internet, can you?

A    Correct. That's what the investigation is for.

Q    Right. Your opinions were part of the investigation, though, correct?

A    I think I am assuming that they must be because here we are.

Q    Right?

A    But, no, I never know what role my

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 18

statements play.

Q    Well, what did you surmise when a detective, a law enforcement detective, asked you to render some opinions about some images, some pornographic images?  Did you not -- did you not surmise that they were contacting you as part of their investigation?

MR. WILSON:  Object to form, but go ahead.

A    They were contacting me, asking for an opinion.  What they do next, I don't know.  And I don't know that they ever used these until now.

Q    Well --

A    You are telling me so.

Q    And I am sorry for cutting you off.  But you know that the detectives -- you knew that the detective was investigating a potential crime, correct?

A    Yes.  By the 5th of April, I surmised that because she came back with more.

Q    Right.  And you knew that she was coming to you as part of that investigation, did you not?

A    It would be likely.

Q    Yes.

A    I did not pin her down.

(Plaintiff's Exhibit No. 4, previously marked, was

Page 19

identified for the record.)

BY MR. ROBERTS:

Q    Okay.  I am going to share my screen which is Plaintiff's Exhibit 4.

I'm trying to move that.  I don't know what that is on there.  I don't know what this blue line is, I apologize, but do you see this?

A    Yes.

Q    Okay.  I am going to show you what is marked February 22nd.  That is the date that you have.  We looked at this letter, okay?

April 5th, do you see this letter?

A    Yes.

Q    Do you agree that the first paragraph is largely a copy and paste from the February 22nd, 2023 letter?

A    Oh.  It would appear that that is true, yeah.

Q    Can you read the second paragraph of your letter --

A    April --

Q    -- from April 5th, 2023?

A    "Today you have shown me two additional images" --

Is that what you are referring to?

Page 20

Q    Yes.

A    -- "of the same female child, and these confirm my previous determination that she is depicted to be at most sexual maturity of maybe III or IV and, therefore, again less than 12 to 15 years of age."

Q    There is one more sentence.

A    Oh.  "The file names for these photos are 0059 and 0065(1)."

Q    Now, the last sentence of the first paragraph says, "She does not appear to be shaved as her anterior pubic hair is still present."

But on April 5th, 2023, when you saw the 0059 image, you knew that this model had been shaved, waxed, or removed her pubic hair in some way, correct?

A    No.

MR. WILSON:  Object to form.

A    No.

Q    You just testified that the 0059 -- that she very well may have used some form of hair removal process.  Did I understand that correctly?

A    You misstate my testimony.

Q    Please restate it --

A    It was --

Page 21

Q    -- for me.  Please restate it.

A    It was possible, and that's what the investigation is for.

Q    Well, you are the expert on pubic hair development, correct?

A    Yes, but not depilatories, waxes, lasers, and you brought up electrolysis, as I recall.

Q    Or chemical hair removal or just digital alterations of images or all the things that I brought up.  But you made the affirmative statement on April 5th, 2023 that this model does not appear to be shaved, correct?

A    I said that on February 22, and I did not change it on April 5.

Q    That was an untrue statement, though, correct?

A    Not correct.

Q    So is it your testimony that the model depicted in 0059 does not appear to be shaved?

A    Is 0059 the same image as the D2635841644B390?  You know, I don't know if that is actually the same image or not.

Q    It's not the same image.  It's an image taken from the exact same photo shoot.

A    I don't know that.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 22

Q    Well, why don't you look -- why don't you open up the files for -- I'll give you the file number. Why don't you just open up the file that starts in D263B, open that up for me, and also open up 0065. And tell me when they are open.

A    Is this supposed to be --

COURT REPORTER: Ma'am, I can't hear.

THE DEFENDANT: I don't know what I am looking at. I am sorry, I am trying to figure out what I am looking at. This is a different file. I don't know what is what. I don't know what is what.

BY MR. ROBERTS:

Q    So let me read the file name for you, okay? It's B06F --

A    To what? A file name to what? There is more than one file. B06F, that is what that one says here.

Q    Knees-to-chest. So the image that you are looking for is a female model with knees-to-chest.

A    That is not the file name that I looked it up as according to my statements in 2023.

MR. WILSON: Yes. Mr. Roberts, if I may interject for a moment, the file names that we have as evidence in this case for Exhibit 8-B of

Page 23

Detective Preston's interview and the one that is referenced in the first paragraph of the February 22nd letter, they are a different file name than is shown on Dr. Dully's letters here. But the description matches, and it is the image marked for identification purposes in other testimony in this case.

MR. ROBERTS: Thank you, John. I appreciate that.

(Exhibits 8-B and 8-D, previously marked in Detective Preston's deposition, were identified for the record.)

BY MR. ROBERTS:

Q    Let's look at the image that you are describing rather than the file name, okay?

Can you -- can you open the file where it shows the model sitting on a wooden floor in a knees-to-chest position with her lower legs and ankles parted to expose her genital for the camera. I have that -- and it may have been miswritten in the report, but I have that as B06FE687.

A    That is what is on this photo that says Exhibit 8-B.

Q    Okay. Do you agree that that photograph showing the female in the knees-to-chest position was

Page 24

taken at the same photo shoot, the same time as the other two images --

A    I --

Q    -- that you reference in that letter, 0059?

A    I have no idea.

Q    Can you explain why -- can you explain that, why you have no idea?

A    I wasn't at the photo shoot. I have no idea.

Q    Well, does she appear to be wearing the same clothes?

A    What is --

Q    Well, first of all -- sorry, strike that. Strike that.

Is it the same model?

A    What is the second picture that you are referring to?

Q    Okay, all right.

MR. WILSON: I will go ahead and interject again.

MR. ROBERTS: Okay.

MR. WILSON: We have on the screen on this laptop Exhibit 8-B, which we were previously discussing, and Exhibit 8-D, which is also marked in Dr. Dully's reports as image 0065(1). Those

Page 25

are the two images that are currently on the laptop screen.

BY MR. ROBERTS:

Q    Okay. So 0065(1), gotcha, 0059, that is the image that we were originally talking about today, let's just talk about those two images first, okay?

Do you agree that those two images were taken at the same photo shoot around the same time?

MR. WILSON: Let -- let me pull up those two images.

(Exhibits 8-C and 8-D, previously marked in Detective Preston's deposition, were identified for the record.)

MR. WILSON: All right, and now we have on the laptop screen Exhibit 8-C 0059 and Exhibit 8-D 0065(1), both displayed side by side.

MR. ROBERTS: Okay.

BY MR. ROBERTS:

Q    Having a look at those, do they appear to be taken from the same photo shoot?

A    It is all the same accoutrements, so they could be. But, otherwise, I don't actually know.

Q    It's the same model --

A    Probably.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 26

Q    -- correct?

Well, you say -- I think you say it is the same model in your letter of -- let's see.

A    Detective Preston told me that.

Q    April 5th, 2023, you indicate that you show me two -- pardon me, "Today you show me two additional images of the same female child." Did I read that correctly?

A    Yes.

Q    Okay. So it is the same female model that is depicted in the original image which you described as sitting on a wooden floor in a knees-to-chest position, correct?

A    She told me they were the same child, and I did not know any way to validate that. So I accepted it. I do think it looks like the same child, but I am not the investigating person, so...

Q    Okay. She's wearing the same earrings, correct?

A    Oh, I didn't notice the earrings. Sorry.

Q    Yes? Wearing the same earrings?

A    No, I don't know what the earrings are. Maybe you better go back to another screen.

Q    Oh, I am sorry.

MR. ROBERTS: Can you pull this back up?

Page 27

MR. WILSON: They are up.

THE DEFENDANT: No, he's talking back now about the one I saw in February.

MR. WILSON: Oh, okay.

MR. ROBERTS: I'm talking about -- let's pull all three up, okay, the image from February with the knees-to-chest and then the two subsequent images that you viewed April 5th, which are 0059 and 0065(1). And just tell me when you have them up.

THE DEFENDANT: Thank you.

MR. WILSON: You're very welcome.

I am working on it.

THE DEFENDANT: It's going to be very small.

MR. WILSON: All right. I have got all three up, side by side, on the laptop screen.

MR. ROBERTS: Okay.

BY MR. ROBERTS:

Q    So, Dr. Dully, you weren't able to tell me whether or not these appeared to be from the same photo shoot taken at approximately the same time, so I am going to ask you: Is the model wearing the same earrings in all three photographs?

A    It looks like the same earrings, yes.

Page 28

Q    Is her hairstyle the same in all three photographs?

A    Well, with partial views, I -- I think they could be, but I can't really see her whole hairstyle in the first photo.

Q    Wearing the same clothes?

A    No, I don't see the same clothes. I see her knees and her legs and her bare arms.

Q    Do you see some pink lace on the floor?

A    There is something on the floor. I can't see what it is.

Q    Does it appear to be consistent with pink lace --

A    It could --

Q    -- lingerie?

A    Yeah, it could be. Yes.

Q    The same pink lingerie that she's wearing in 0059 and 0065(1)?

A    It could be, yes.

Q    Yeah. The wall color in the background is the same on all three images?

A    Yes.

Q    The drapes are the same in all three images?

A    They look like it, yes.

Page 29

Q    The house plants in the image all appear to be the same house plants?

A    The ones that I can see, yes.

Q    So all indicia seem to be that these were taken at the same location at approximately the same time?

A    No, I don't know that.

Q    Okay, all right.

A    This is a costume.

COURT REPORTER: I'm sorry, ma'am. Could you repeat that, please?

THE DEFENDANT: This is a costume.

BY MR. ROBERTS:

Q    What does that mean?

A    Something that you can put on every time it's time to put it on.

Q    Sure. All clothes are costumes in that way, though, right?

A    No.

Q    I mean, you can put on the dress that you are wearing any time that you want, right?

THE DEFENDANT: Do I have to answer that?

MR. WILSON: Yes.

MR. ROBERTS: Yes, you do.

A    Yes.

Page 30

Q    Okay.  So to the extent that these appear to be -- and I guess I'll just have to ask it in a hypothetical way:  These appear to be part of the same photo shoot.  The model depicted does appear to have, as you put it, shaved her pubic hair, correct?

A    No, not in all three images.  I don't know that it's the same photo shoot.  I think it's likely it's not the same photo shoot, and it is not necessarily something that happened all at one time.  And you are putting words in my mouth, and I --

Q    Ms. Dully -- Dr. Dully, you realize you are under oath today, correct?

A    Yes, I am under oath --

Q    And you swore to tell the truth?

A    -- and you are telling me what I said, and that's not what I said.

Q    Okay.  And you are sworn to tell the truth.  What makes you believe in the original image, knees-to-chest, that her pubic hair grooming is any different than it is in 0059?

A    Because it is different, it is not the same view, and she looks younger to me.

Q    She looks younger to you?  What do you mean by that?

A    She has an immature face, she has large

Page 31

eyes, she has a prominent forehead, she has her labia very well exposed, and she only has a little tiny bit of anterior pubic hair, which is exactly what early pubic hair in puberty looks like.  She still looks young to me.

Q    Why --

A    She's not old- --

Q    Why didn't you include any of that in your letter?

A    No one asked.  You didn't ask.  I did not change my opinion.  It's there in the letter.

Q    So let's just break it down.

On 0059, you agree that there is a -- as you put it, a possibility that she is groomed, correct?

A    Which one is 0059?

Q    That's the one where you can see what I think in common parlance is referred to as a landing strip of pubic hair.

A    Okay, that's the middle image here?

Q    Right.  Do you agree that there is at least a possibility that that is -- that she has shaved or used some sort of grooming?

A    Yes, I said that.  Yes.

Q    Yeah.  Generally, pubic hair doesn't grow

Page 32

in that way, like in a straight line, a straight line up towards your belly button, does it?

A    Not as uniformly, no.

Q    No.  So -- just so we understand and it's clear for the record, if a model has groomed, you cannot offer any opinions about the sexual maturity rating of that model as it pertains to the development of pubic hair, correct?

MR. WILSON:  Object to form.  But go ahead.

A    It is an appearance, and it was not just one photograph.

Q    Well, according to you, on the day that 0059 was taken -- because you, I think, testified earlier that it is likely that these were taken on different days, correct?

A    I think it's likely that the knees exposure is younger but not necessarily the same time.

Q    So like developmentally younger, like her facial features are different, things like that?

A    Yes.

Q    So we're talking years younger in your opinion?

A    No, not necessarily.  Puberty is all happening in a year or two.

Q    Okay.  So I just want to make sure:  Under

Page 33

oath, your testimony is it's your opinion right now that the knees-to-chest was taken how much earlier than 0059 and 0065(1)?

A    It appears to be earlier.  I cannot say how many days or weeks or months.

Q    And so when I read your letter of February -- of April 5th where you write that these two additional photographs confirm your prior opinion, that would be incorrect then, correct?

A    No.  She is older and she was younger, and that's consistent.

Q    But your prior opinion was that she was Grade IV in the -- in the February 22nd letter, correct, a sexual maturity rating IV?

A    That is what it says.

Q    You actually say in your letter that from the second two images, 0059, 0065(1) -- you say III to IV in those images.  So you actually in your letter place her as being younger in the 0059 and the 0065 [sic] than in the knees-to-chest version of the image, correct?

A    Can you say that again?  I didn't follow it.

Q    Yeah.  So on the original image, the February letter that you wrote, you placed the sexual

Page 34

maturity rating at Grade IV, correct?

A    That is what I typed.

Q    Now, you've testified today that you believe that the model was younger, developmentally younger --

A    Yes.

Q    -- in the knees-to-chest picture that was subject of the February 22nd letter, correct?

A    Yes, she appears younger.

Q    But in your letter, you actually put -- of April 5th, you actually state that it confirms your opinion that she's a Grade III or IV by looking at the 0059 and the 0065(1) images, correct?

A    Yes.

Q    So you actually have those as being developmentally younger than the original picture, of the knees-to-chest picture?

A    Well, I did not change my statement in terms of her age. But based on those photographs, I didn't type the exact same thing, no.

Q    What is the appearance of the model -- sexual maturity rating -- what is the appearance of her genitals in terms of sexual maturity rating in the 0059?

A    Okay, which one is the 0059?

Page 35

Q    That's the one with the straight line of pubic hair --

A    Okay, sorry.

Q    -- anterior, I think, to her genitals.

A    She has midline pubic hair development and anterior, like a low maturity that could be a III. That is a distribution that we do see.

I do agree that there is a uniformity that suggests that she could also be altered in one of the ways you already suggested.

Q    And if she has altered her pubic hair, you could not offer any appearance -- any opinion even of her appearance, could you?

A    It's her appearance, and a III and a IV is possible. And I am told it's the same child, and I've already said she's a IV. And now this view, she could also be a III. But I don't think it fits perfectly, no.

Q    That is not my question.

A    She --

Q    Ma'am, that is not my question.

A    What is your question?

Q    In your -- the original part of your deposition, we went through, I thought, in quite a bit of detail regarding the difference between III,

Page 36

IV, and V, the appearance of pubic hair development. And you made it very clear in your deposition that the distinction between a IV and a V or a III and a IV was the distribution of the pubic hair, correct?

A    Yes.

Q    All right. If the pubic hair has been removed so that you cannot see the biological -- the natural distribution of pubic hair, how could you possibly offer an opinion about a sexual maturity rating based on the pubic hair distribution?

A    Because it's based on appearance.

Q    Right. But the appearance here is that she has been shaved.

A    That is your opinion. I think it's possible --

Q    Well, you've acknowledged -- you've acknowledged that that is a -- that that is a possibility here that is consistent with grooming, that this image is consistent with grooming.

And my question to you is: If you saw that she had been groomed, why would you not tell Detective Preston, "Hey, I can't help you here; she's being groomed; I don't know what her pubic hair distribution is"?

MR. WILSON:  Object to form.

Page 37

A    I still have the first image.

Q    Let's talk about the first image. Before we do that, I want to share what was originally an exhibit. It was Exhibit 3 -- Exhibit 3 to your -- to this deposition.

(Plaintiff's Exhibit No. 3, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q    Now, you previously testified that this diagram roughly -- and it is a pen and ink drawing -- displays the development through the stages of pubic hair and breast development, correct?

A    It's close, yes.

Q    All right. And we talked in detail that the development of -- and this is what you said, was a triangle or an inverted triangle in the area above the genitals was the determining or one of the determining factors in assessing whether or not someone was a sexual maturity rating of a III, IV, or a V, correct?

A    If you only have an anterior view, that is what you see. And you see it on your diagram on III, IV, and V.

Q    Right. So I want you to go back now to the knees-to-chest image, the original image that

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 38

Detective Preston brought to you on February 22nd.

MR. ROBERTS: Tell me when that's up. I know it takes some time.

MR. WILSON: It's up. All three images are still open.

MR. ROBERTS: Okay, they're still up.

BY MR. ROBERTS:

Q    Isn't it true, ma'am, that in the knees-to-chest position, you cannot see the anatomical area of the body which is displayed in these diagrams?

A    In your limited diagram, it does not show the same view.

Q    It does not show the area above the genitals, does it?

A    You mean the photograph?

Q    I mean the photograph, yes.

A    It does not. It's not showing the same view at all.

Q    It is impossible for you to tell whether or not that is a III, IV, or V distribution of pubic hair based on the positioning of that model in that photograph, correct?

A    No, not true.

Q    Can you see how the pubic hair is

Page 39

distributed in the inverse triangle that you've described earlier in your testimony?

A    It is not the same view, no.

Q    So you can't?

A    Not with your limited diagram, no.

Q    Is there another diagram that you would refer me to?

A    There are lots of them.

Q    And are there any diagrams that would show females in a knee-to-chest positioning?

A    There certainly are, and there are other positions as well.

Q    Tell me about those. Can you tell me the names of those diagrams? Where can I find them?

A    There are some.

Q    I can't -- I can't see them. What -- can you just tell me the name of the book you are referring to?

A    "Assessment of Sexual Maturity Stages In Girls," American Academy of Pediatrics.

Q    And in that book, does it have diagrams of where doctors are assessing a sexual maturity rating of girls from images where they are on their knees-to-chest, in a knees-to-chest position?

A    It has similar exposures. But, no, they're

Page 40

certainly not in that position.

Q    Okay. Why is that?

A    Because this is not pornography. That is.

Q    Right. The entire test that you are talking about was never intended to use it as you are using it, correct?

A    That is not necessarily true.

Q    Well, the book you just referred to me is a clinical -- clinical treatise, correct?

A    It has diagrams and photographs and answers your question.

Q    But you are not answering my question, Dr. Dully, which is: The book that you are referring to is designed to help clinicians assess the sexual maturity rating of their patients in a clinical setting, does it not?

A    Including me, yes.

Q    And it's also designed to -- really what it's designed to do is to ensure that young people are appropriately developing through the stages of puberty and to help diagnose any sort of disorders that they may have in that regard?

A    In clinical medicine, that is how I use it.

Q    That is, in fact, what the test was designed to do, correct?

Page 41

A    That was what Dr. Tanner did in the 1950s. It certainly has another purpose now as well.

Q    But that other purpose is not to provide reliable opinions on the actual age of models depicted in pornographic images, is it?

A    Only appearance.

Q    Right. And -- and appearance -- there's really no value to your opinion regarding appearance, is there?

A    I am not sure -- I am not doing the investigation. I provide the consultation because I am required to and requested to.

Q    But I am not -- I'm going to ask you the question again.

There really is no value to your opinion regarding the appearance of a sexual maturity rating in a pornographic image, is there?

MR. WILSON: Object to form.

A    I don't --

Q    It's a yes or no. Is there value or is there not value?

A    There is value. In my opinion, there is value.

Q    Okay. You can't tell me if these pictures appear to be from the same day, can you?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 42

A    I cannot.

Q    You can't really tell me -- you don't actually believe they are from the same photo shoot?

A    I do not.

Q    You think that in between some of these photographs, this model groomed her pubic hair; is that right?

A    I think that she matured, and she may have groomed. I cannot rule that out because I would normally ask the patient.

Q    And is there any evidence, like actual evidence, for that testimony that you have today?

A    Well, from many hours of it, I would say, yes.

Q    Tell me -- tell me: What is the evidence that -- between the original knees-to-chest photograph and 0059 that this model groomed her pubic hair?

A    I don't know that she groomed her pubic hair. I think you are testifying she did, but I don't know that. I --

Q    Okay. And I guess that is my point, right? That if you can't even tell if somebody has groomed or not groomed, what is the value of your testimony?

A    Ask law enforcement. They ask for these

Page 43

all the time.

Q    I am asking you. You -- you hold yourself out as an expert to law enforcement in sexual maturity rating, correct?

A    Yes.

Q    And you can't even tell me, as we sit here today with hindsight, whether or not this model in 0059 has groomed her pubic hair; you can't tell me that, can you?

A    No.

Q    So what -- if you can't even say that, how can you in good faith offer any -- any opinions about the sexual maturity rating of these models?

MR. WILSON: Object to form. And your tone is getting awfully accusatory for a deposition.

MR. ROBERTS: All right. Well, hold on. For the record, it is accusatory.

THE DEFENDANT: Yes, I would agree.

BY MR. ROBERTS:

Q    I am telling you, it is accusatory. You cannot tell me whether or not this woman has groomed, can you?

A    That is what the investigation is for. Asked and answered.

Q    I am not asking about the investigation,

Page 44

Dr. Dully. I am asking you.

A    Not what I do. That is not what I do, and I have never offered myself as an expert in pubic hair grooming.

Q    Ma'am, I am going to ask you to go back to your letters in this case. You say, "She does not appear to be shaved."

A    She does not --

Q    You offered that opinion?

A    -- appear to be shaved. Yes, she does not --

Q    And there's no basis for that opinion; is there?

COURT REPORTER: Sir, I didn't get your question. This is the court reporter.

BY MR. ROBERTS:

Q    You offered the opinion to Detective Preston that this model was not shaved; isn't that true?

A    That's my opinion. It is still true.

Q    But today you can't tell me whether or not she was shaved or not?

A    I cannot. That is what the investigation is for.

Q    Do you understand that most people

Page 45

generally understand that to be a false statement?

If you told the detective something and now you say, "I don't know if it is true or not," that would be a false statement, wouldn't it be?

A    No. It is a statement for investigation.

Q    Do you endeavor to give truthful statements to an investigation?

A    Of course.

Q    Why would you say that this model does not appear to be shaved if you cannot tell whether or not she was shaved?

A    We're talking about two different images. So the first image, she does not appear to be shaved. The second image, she could be groomed. I can't say for sure, and the investigation should clear that up.

Q    How would an investigation clear up whether or not she was shaved on the day of this image?

A    When they find her, they can ask her, if they find her.

Q    Why did you not include in your report when you were talking and describing 0059 that this image may represent that it appears she may have groomed or shaved, as you put it?

A    I find it is also possible that she is a III. I did not know which it was, but it is based on

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 46

appearance.

Q     But the appearance -- in every other image, you talk about whether or not they appear to be shaved or not shaved.

I am asking you:  In regards to 0059, why did you not include in your report that it may be that this model has shaved?

A     I don't know.  I don't see that as my expertise.  I think that that needed more investigation.  And that was clearly what was, you know, probably underway because she was back for a second time.

Q     Is it true that you only include a notation on shaving when you say that they do not appear to be shaved?

A     No.  I do that on every medical assessment.

Q     Well, then, why didn't -- I am going to ask you again.  If you do that on every medical assessment, and 0059 you have acknowledged may be shaved, why did you not -- why did you not note that?

A     The comment I make is if they appear to be shaved and usually the answer is yes.

And in this case, I didn't think I could know that statement and the investigation needs to proceed.  In photograph number one, she does not

Page 47

appear to be shaved.

Q     But you don't -- let me ask you this.  If you look at 0059 and the original image, knees-to-chest --

A     The knees-to-chest one, the first one -- yes.  Go ahead.

Q     -- and 0059 that has the very regular, vertical strip of pubic hair, okay, those two presentations of pubic hair are perfectly consistent, correct?

A     No.  They are consistent with a change in age and a change in habits, potentially, but they are not, you know, the same thing twice, no.

Q     The original knees-to-chest image does not show the area of pubic hair that is depicted in 0059, does it?

A     Ah, let me see here.  It's not exactly the same, but the views are -- I would say the second photo is a little more exposed than your diagrams, and then the first photo is a completely different view.

Q     It is a completely different view, and that view hides the area that is exposed in 0059, correct?

A     Partially.

Q     Yeah.  To the extent that you can't tell

Page 48

what her pubic hair looks like above the area that is exposed, can you?

A     Above what area?

Q     There is an area of exposed pubic hair in the original knees-to-chest image, correct?

A     I --

Q     You can see pubic hair exposed in that image, can you not?

A     At the very top of her labial opening, yes.

Q     Above that area of exposed pubic hair, you cannot see that area because of her body positioning, correct?

A     Up towards her belly button and her lower abdomen, I cannot see those areas.

Q     And so it may be that her pubic hair is exactly the same in Image 1, where she has got the knees to the chest, as it is in 0059; there is no way for you to know because you just can't see that area, can you?

MR. WILSON:  Object to form.

A     I disagree.

Q     Okay.  You said earlier that Detective Preston told you that this was the same model.  Do you recall that testimony?

A     Yes.

Page 49

Q     Were you not able to surmise from your review of these images that it was the same model?

A     I suspected they were the same, and she said yes.

Q     Do you agree?  Is there any question in your mind that they are the same model?

A     Well, they appear to be the same model. That's all I have.  But investigators would know better.

Q     When you say "investigators," ma'am, you are a forensic investigator in this case, are you not?

A     I am not.

Q     You didn't offer forensic opinions in this case to Detective Preston?

A     A forensic medical opinion.

Q     Did you offer a forensic medical opinion to Detective Preston in this case?

A     Yes.  On her request, yes.

Q     So you are part of the investigation; you agree with that?

A     It would appear that I am.

Q     Did you not know that at the time?  Did you not realize that at the time?

A     I knew that there was some likelihood, yes.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 50

Q    Okay.

A    I did not know what was happening next.

Q    Now, you say -- you have talked about -- and we talked about this in appearance. And you have testified, I think to be fair, that in your opinion it was obvious that you were not offering any opinions about the actual age of the models in question from the way you wrote your reports. Did I understand that correctly?

A    I think I am pretty clear that it is appearance.

(Plaintiff's Exhibit No. 4, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q    Okay. I want to share again Exhibit 5 -- I mean, I am sorry, Exhibit 4 from the original deposition, and let me go to the February 22nd. I am going to read a line. You say, "This female child appears younger than the age of 18."

Is that what you mean when you say "appears," that makes it obvious that you are just talking about appearance, not her actual age?

A    Yes.

Q    Okay. April 5th, and I am moving down to the third letter in our exhibit, in the second

Page 51

paragraph you wrote, "This image shows a female child with her black top parted and her underwear down around her parted thighs, exposing her genital area clearly."

You didn't use the word appear in that sentence. Why not?

A    I don't know why not. Maybe I did or maybe I didn't. What does it say? It is very easy to see. She has -- she's prepubertal.

Q    You say, "This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly," but you don't say anything about appearances or appear in that.

A    "She appears to have no pubic hair development in" --

Q    Right. But did you call her a female child? Do you see if I read that sentence how a person might interpret that as you saying that this person is a child, an actual child?

A    Well, I hope so, yes, but I don't know that.

Q    Wait, wait, wait, wait. You hope that someone would interpret this as you -- as you offering the opinion that this was actually a child,

Page 52

like her actual age was under the age of 18?

A    Her age is indeterminant. But she is well under the age of 18, and that is her appearance.

Q    So are you offering an opinion now on this image that the actual age of the model -- not just the appearance, but the actual age of the model is under the age of 18?

A    No. Her appearance is under the age of 18 very clearly.

Q    Because she doesn't have pubic hair?

A    We'll need to pull up the image because you are missing the basics.

Q    I am missing what?

A    The basics.

Q    I am missing the basics? Like, what are the basis?

A    I am pulling up the image so I can review them with you. Would you like to pull yours up? I'm not -- what is this one? Is this the DuckDuckGo one?

Q    Correct. This is the one with no face, no breasts, only a magazine cover with belly button to knees. Tell me: What am I leaving out?

MR. WILSON: Before she answers, I am pulling up on the laptop screenshot 20230122_174408DuckDuckGo.jpg which was listed in

Page 53

Detective Preston's deposition as 8-E. And it is focused on the top image that has been colloquially referred to in this case at the Bay Heart image.

MR. ROBERTS: Thank you, John.

(Exhibit 8-E, previously marked in Detective Preston's deposition, was identified for the record.)

BY MR. ROBERTS:

Q    So you said that I was leaving stuff out. What am I leaving out?

A    This child has no pubic hair. It is a very clear view. She has the labial majora that meet right in the middle. She does not have labial minora development as an older child or teen would have. And you can also see her hand. And she is a child by looking at this.

This is an appearance. This is what they look like on the exam table.

Q    You keep saying this is a child. But you are not actually testifying that in chronological age, this person is under the age of 18, are you?

A    I am not giving a chronological age. I am telling you what she looks like.

Q    Right. And so when you say "what she looks like," you are talking about a frontal view of the

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 54

genitals where she is vertically standing I think on her knees, correct?

A    Yes. It's not just frontal. You can see her labial majora and the cleft between them and her buttocks behind those a little bit, just the medial portion, because her legs are parted.

Q    I want you to Zoom in on that image for me.

MR. WILSON:  On?

BY MR. ROBERTS:

Q    When you Zoom in, I want you -- I want you to see how far you can Zoom in before it becomes pixilated.

A    On this particular -- yeah.

Q    You testified earlier in your deposition that if the quality of the photograph isn't good enough, you wouldn't be able to see things like a razor burn or stuff like that.

I am going to ask your opinion:  Is quality of this photograph good enough for you to see whether or not there's evidence of grooming, shaving, waxing, those kinds of things?

A    Yes.

Q    It is good enough?

A    Yes.

Q    Okay.  And so was that a misstatement when

Page 55

you said, "This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly?  Did you mean to say, "This is what appears to be a female child"?

A    This appears to be a female child, and I specified that.  She has no pubic hair development. None.

Q    And you say here again, "She does not appear to be shaved"?

A    She does not.

Q    And what is that based on?

A    She is immature.  She does not need to shave.

Q    Has anyone related -- you know that this is an adult, right?

MR. WILSON:  Form.

A    No, I don't know that.  You are saying so.

Q    Well, not just me.

A    I don't know that.

Q    Okay.  You are saying, though, that this child doesn't need to shave; that's your -- that's your medical opinion today?

A    My medical opinion is she is so immature, she does not need to shave and she does not appear

Page 56

shaved.  She has all the immature anatomy appearance of a child who has not entered puberty.

Q    And you can tell all of that by this photograph?

A    Yes.

Q    And if I showed you a passport and the date of this picture, you would still say that she is prepubescent?

A    Well, I would not know when this picture was taken versus the passport picture taken that --

Q    No, I just said -- I just told that to you. I said if I -- if I showed you the passport and the date that this photograph was taken -- it's actually on the image that you are looking at.

But if I showed you that, you would disagree and you would say, "No, no, she's not an adult"?

A    I would -- I would not presume that those are the same two people.

Q    That is not my question.  You would say, "I don't care what her passport says, I don't care what the date of the photograph is, this is not an adult"?

A    This does not appear to be an adult, and I do not know if there is a passport linked to it or not or if it's a valid passport.  I don't know.

Page 57

Q    Do you know whether or not she waxed?

A    She does not need to wax.

Q    Do you know if this image has been digitally altered?

A    It doesn't appear so, but there are other experts to look at that.

Q    When you say, "it doesn't appear so," what is that based on?

A    How it looks.

Q    Do you have any expertise in that?

A    In how it looks?  Yes.

Q    In what a digitally altered photograph looks like?

A    I do not have the expertise to find out if that's occurred or not.

Q    Why would you be willing to offer an opinion about it appearing not to be digitally altered, then?

A    Because it doesn't appear to be digitally altered.

Q    What do you mean --

A    But there are other experts that can look at that.  It doesn't --

Q    But I am asking you.  You have said it. What is your basis for saying that?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 58

A    This is what little girls look like.  No alteration required or involved.

Q    So I'm very -- you're looking at me in this way and I will be honest with you, I am confused by your testimony, because now you seem to be very emphatically offering an opinion about the actual age of this person and not the appearance.

A    Well, that's your opinion, but that's not what I have said.  She appears to be a child, and she appears to be a child for the reasons that I have stated.  And I have no burden to provide computer-based testimony or expertise in that area.

This is the beginning of looking at images.  This is not necessarily -- sorry, the conclusion that would be reached if a good investigation occurred.  I am not involved in that.  I don't know how that went.

Q    So you -- you indicate in this letter, you say, "She appears to have no pubic hair development."  Why do you put that she does not appear to be shaved?

A    Because she does not.

Q    No, but today you have testified that she doesn't need to shave.

A    She does not appear to need to shave.  Her skin is perfectly smooth.

Q    Why didn't you put that in your report?

Page 59

A    Because that is more information for testimony.  I don't put all the transcript [sic] that I might say in the future in one letter.

Q    So these letters don't include the basis -- all of the bases for your opinions?

A    No.  It is not possible.

Q    Okay.  So "she does not appear to be shaved," that was just -- you just wrote that -- even though you didn't think that she needed to shave, you say "she does not appear to be shaved."  Because to me that sounds like you are saying, "Hey, she might shave but it appears like she hasn't shaved."

MR. WILSON:  Object to form if that -- if there was a question there.

THE DEFENDANT:  I think asked and answered would be good.

MR. ROBERTS:  I think you are not an attorney.

THE DEFENDANT:  I think you are right.

BY MR. ROBERTS:

Q    "She does not appear to be shaved" -- "she does not appear to be shaved," why did you write that?

A    Because she does not appear to be shaved.

Q    Does she appear to be waxed?

Page 60

A    No.  She has perfectly smooth skin.  There are no signs of a pubic hair that would still be there.  There's no folliculitis.  She does not have the signs of somebody who is doing things that they don't even need to do.  She is a -- looks like a child.

Q    We talked a little bit earlier in your deposition the last time we were here about your opinions regarding the model who had the Grade IV to V breasts, but you had her at sexual maturity I.  Do you recall that testimony?

A    Yes.

Q    What do you recall about it?  You are shaking your head for a reason, I guess.  What do you recall about it?

A    I said she could have mature breasts but I could not see them well, so I did not assess them for her maturity rating.  So I can see in that statement that she could be mature which would be, you know, a IV or V.

Q    You said you did not assess her breasts for a sexual maturity rating.

A    Correct.  You cannot see it, which is what my statement says, as I recall.

Q    Well, you do --

Page 61

A    That's what I said in the last deposition as well.

Q    You do say that she could be a sexual maturity rating of a IV or V.

A    Right.  I just said that.

Q    I mean, it seems like that is an assessment.

A    That she could be a IV or a V?

Q    Correct.

A    No, it is a concession.  It is not an assessment.  It is a concession.

Q    What do you mean by concession?

A    I am conceding that I cannot exactly assess her breast development because I cannot see that well, so she could be mature.  I cannot see that well.  And if she was mature, she could be a IV or a V.

Q    Is that in the same way you couldn't really see the pubica -- pubert- -- pubic hair development in the knees-to-chest image?

A    No.

Q    Do you agree that you couldn't really see the area of pubic hair development in the knees-to-chest photograph?

A    I do not agree.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 62

Q   You think you could see the lower abdomen above the genitals where the thighs meet the lower stomach; you think you could see that in that image?

A   We talked about that, no, and that is not the only thing to look at.

Q   Right.  But it is difficult to see that area, correct --

A   That area --

Q   -- in that image?

A   Yes.

Q   In that image?

A   In that image, that area is not well seen or seen at all, but the rest of the genitals are very well-exposed.

Q   Well, why didn't you give the same concession on that knees-to-chest image that you were talking about with the breasts?

A   Because the genitals are well-exposed, and I can see them and so can you.

Q   But the only opinion that you offer is to pubic hair development.

A   Right.

Q   And you cannot see the area where your pubic hair develops clearly in the knees-to-chest photograph, can you?

Page 63

A   Wrong.

Q   Well, I guess the image speaks for itself.  I guess people can just make their own opinion about what it shows.

A   No.

Q   But your testimony is is that it does not show the area where pubic hair begins to develop in children?

A   Yes.

Q   Because your earlier testimony was that it begins in an inverse triangle above the genitals.  That was your earlier testimony.

A   That is what you wanted from your diagram which is very limited.  I am trying to help you with your diagram.

Q   Actually --

A   That is not the only exposure, and her knee-chest is not that exposure.

Q   I am going to share with you your deposition transcript.  This is page 37 going into 38.  I am asking you to describe the grades of sexual maturity rating.  On page 37, I ask about III.  And on 38, I ask about Grade IV.  Can you read your answer for the jury, please?

A   I will read my answer, but there is no

Page 64

jury.  Where am I starting?

Q   Ma'am, this very well may be played in front of a jury.  I hope you understand that.

But it is -- the question is:  At line 2 and Grade IV, can you read your answer at 3?

A   What is Grade IV?  Line 2, Grade IV.

Q   Line 3.

MR. WILSON:  Can you give us the page, please?

MR. ROBERTS:  38.

THE DEFENDANT:  Oh, 38.  Line 2 and Grade IV.  Grade IV, that was it on the end.  Okay, Grade IV --

BY MR. ROBERTS:

Q   Page 38, line 3, can you read your answer when I ask you to describe Grade IV?

A   "Grade IV fills out the entire triangle shape of the labial majora, the anterior commissure, and the mons pubis over to, but not involving, where the thighs join the pelvis."

Q   You could not see -- that's your answer, correct; that's not my -- my words?

A   That is my answering you on asking me what the stage is.  That is not about one of the photographs.

Page 65

Q   And then on -- keep that -- keep that there because I ask you:  "What do you mean by triangle?"  Can you answer that?

A   Is that a question?

Q   Can you read your answer?  Can you read your answer?

A   "That is the shape when the legs are together of the hair-bearing parts over the mons pubis in front of the anterior commissure.  And on either side, it's wider.  In between the legs, it will come to" -- it's supposed to say -- "a point so that it may look like an inverted triangle."

Q   So I asked you to describe the difference between -- or what a Grade IV was.  You told me about an inverted triangle, correct?

A   From your diagram, yes.

Q   Actually, if you go back and look, I don't think I had shown the diagram at that point.

A   I don't know.

Q   Okay.  Are you answering this question on page 38 based on what my diagram was or were you just answering just what Grade IV is?

A   Well, we need to go back and read, then, because I don't --

Q   Take as much time as you'd like.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 66

THE DEFENDANT: Lower. I am getting paged. Let's see.

A You were asking me for a basic description, so I was giving you a description by each grade.

Q And you identified the triangle and distribution of the pubic hair within that triangle, inverted triangle, as the definition for Grade III, Grade IV, and Grade V, correct?

A Well, that is how we teach the basics, yes.

Q You cannot see the development of a triangle in the model depicted in the knees-to-chest image, can you?

A No.

Q And in the 0059, there is no triangle on that model, is there?

A No.

Q And that would indicate the possibility that she has groomed, correct?

A There is a possibility that she groomed.

Q And if the model had groomed, you would not be able to use what you described earlier in your testimony as the definition of Grade IV and Grade V? You would not be able to use that to sexual maturity -- to do a sexual maturity rating of her pubic hair, would you?

Page 67

A I can't use your oversimplified, basic description that you asked me for as the sole source of information for a completely different exposure.

So the first image of the knee-chest is a different exposure and it is a good one, and she does not appear to have mature pubic hair there. It is not in the basic diagram that you have.

The subsequent photograph does not look like it is the same moment in time or the same photo shoot, and there is a possibility that she is groomed.

Also, there are children who can be a sexual maturity rating II to III, or III, and it is on either side of the cleft like this. I think it would be part of the investigation. Or had she been brought to me, I could have asked her and take it from there. I don't think that is different than anything I have tried to keep explaining.

Q So on the date you reviewed these -- let me just ask you a hypothetical question, okay, because I guess we're just not going to agree.

If these images were taken during the same photo shoot at approximately the same time and location, would the fact or the possibility that this model had groomed alter your ultimate opinions that

Page 68

Q you offered to Detective Preston?

A I don't know if I had seen them all. I don't think so because I do think this child in the knee-chest looks younger, and I don't think so. But, of course, that is not what happened.

Q Well, on April 5th, you did have all three images in front of you, correct?

A Not at the same time, but it would appear I had several. I am sorry, there are so many file names I don't know.

Q So you are saying at the time of April 5th when you wrote the letter regarding 0059 and zero, zero, six, paragraph one [sic], you formed the opinion that these images were taken at different times?

A Yes.

Q And it was your opinion back then that she possibly had groomed between the first knees-to-chest image and then the 059 image?

A No. She had aged and developed more pubic hair and could have groomed.

Q But you formed that opinion on April 5th, 2023?

A Yes.

Q You just didn't include it in your -- in

Page 69

your letter?

A Well, it is included because it doesn't change my original determination on the first photo. But I didn't go on for pages about it, no.

Q Well, I am not asking if you went on for pages. But you didn't say something like, "These pictures appear to be taken at different times, at different ages, of the same model"?

A I did not say that.

Q But that was, in fact, your opinion back then?

A Yes.

(Plaintiff's Exhibit No. 4, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q Okay. I am going to share again Exhibit 4, and I am going to go to the first paragraph this time.

This is the YCBLVVFQ. Can you pull this image up?

(Exhibit 8-A, previously marked in Detective Preston's deposition, was identified for the record.)

MR. WILSON: I am pulling up on the laptop what was marked in Detective Preston's deposition as Exhibit 8-A, YCBLVVFQ, it looks like,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 70

underscore 0.

MR. ROBERTS: Thank you, John.

BY MR. ROBERTS:

Q    Have you had a chance to look at that, Doctor?

A    I see it, yes.

Q    Do you recognize this model as the same model which is the subject of the knees-to-chest and 0059 and 0065(1)?

A    I think she is the same model. She looks older to me, but I think she is the same model based on appearance.

Q    And the appearance to you is that this is an older version of the model, correct?

A    Yes.

Q    All right. Despite that, when in the knees-to-chest 0059 you have this model, we'll call her Melania D, as a Grade III or IV sexual maturity rating, now, even though you think that she appears older, you have the same model as a sexual maturity rating of I, prepubescent.

Can you please explain that?

A    That is based on the view of her pubic hair being completely absent.

Q    Right. But you just testified under oath

Page 71

that looking at her, she appears to be older than when she was depicted in 0059, correct?

A    I think so, yes. That is my opinion.

Q    This isn't Benjamin Button, though, is it? I mean, she gets older over time; her puberty gets more developed over time, correct, not less developed? Do I understand that correctly?

A    Yes. That would be the normal sequence, yes.

Q    Yeah. Can you please explain how an older version of Melania D has a lower sexual maturity rating, a prepubescent maturity rating?

A    Well, if she is the same child, then she would be altered.

Q    Is it your testimony that this is an altered image?

A    It could be. I don't know that it is the same child. I am assuming that --

Q    I -- sorry, sorry. I didn't mean to cut you off. Go ahead.

A    I don't know that it is the same child. I am assuming that it is possible that she is the same child.

Q    So when you say "altered," what do you mean?

Page 72

A    That her pubic hair is missing if she is the same child because it would appear she had it before.

Q    Well, in this letter, you specifically say she -- in regards to this image, that she does not appear to be shaved. Was that a lie?

A    Which letter are you talking about?

Q    April 5th --

A    Oh --

Q    -- YCBL. You told the detective that she does not appear to be shaved. Today you are testifying that she must be altered in some way. I am asking: Was that a false statement that you gave Detective Preston?

A    No, I didn't know it was the same child, if it is.

Q    You just testified, Doctor, that you believe that this is the same child but older. Is that not your opinion?

A    I testified that this could be the same child in my opinion, but I don't know.

Q    So you don't know if this model has been shaved or waxed or the image has been digitally altered at all, do you?

A    No, I don't.

Page 73

Q    And yet you told Detective Preston that it did not appear that she had been shaved, right?

A    It does not appear that she was shaved. It does not appear, no.

Q    But now your testimony is that it does appear that she may be shaved.

A    No, your testimony is. She is -- if she is the same child and the child had pubic hair before, then we would know that she could be altered one way or the other, or grooming or computer manipulation. But she does not appear to be shaved in this image.

I -- I don't know if she is the same child. I do think that's possible that it could be her sister or some other child of a same heritage. But the investigation should clear that up.

Q    So you had all of these images on the same day, April 5th, correct?

A    Eventually, there were more images, yes.

Q    On April 5th, you had both 0059 and the YCBLVVFQ, correct?

A    Yes.

Q    And at that time, you thought that they might be the same person, correct?

A    I did not know this was the same person but I thought that they could be. The -- this is not the

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 74

same outfit, the same earrings, the same hair, the same background. None of that is there. This looks pretty different. I don't know if it is the same child or not at a different age in her time of growing up, and it looks pretty clearly like a different photo shoot. If --

Q    Okay. You already testified -- I am sorry. I am sorry.

Yeah, it is clearly a different photo shoot. I agree with you, yes. But I think you testified that you thought that this was an older version possibly of the Melania D that was described in 0059, correct?

A    I am conceding that that is possible.

Q    Right. And so on the day that you wrote this letter, April 5th, you knew -- you knew about this possibility that this was the same model and that she had shaved between the first photo shoot and then this photo shoot, correct? You knew that at the time that you wrote this letter?

A    No, I did not know that. I am still not sure of that. I --

Q    I am not asking you -- sorry, ma'am. I am not asking if you are sure. I said you knew about the possibility that this was the same model that was

Page 75

older; you knew that was a possibility on April 5th when you looked at all of these images, correct?

A    I don't remember assessing that, no.

Q    Well, as we assess it today, do you have any concerns about your affirmative statement to Detective Preston that she does not appear to be shaved?

A    No. I mean, I would concede for a jury that this could have turned out to be the same child at a different age. It's in the separate letter along with the other Bay Heart, and it is not one of the two that she told me was the same female child. And I don't remembering thinking that it was, and it is not the same photo shoot.

Q    Right. Today you've testified that you think maybe it's the same model but she is older, correct?

A    Yeah. And now that I see them in this sequence, it could be the same child. But I said I did not know that.

Q    Well, you had all of these photographs on April 5th in front of you with Detective Preston, correct?

A    And she said the other two were the same child.

Page 76

Q    Right. What I am trying to understand, as we sit here today, is how is it possible that you have given the opinion that an older version of Melania D has a lower or more immature sexual maturity rating?

A    I have conceded that she could be the same person, but I did not know that and I do not know that. If she is the same person, then her pubertal development continued and that would be consistent with -- I'm introducing another term -- her using some sort of alteration, technique, or the computer being done for her.

This was not represented to me as the same person, and I don't know that it is. I am conceding that it could be, but I did not know that and I don't know that now.

Q    While we're conceding things, will you concede that the first three images -- the knees-to-chest, 0059, and 0065(1) -- could be all from the same photo shoot?

A    The child with the knee-chest position looks younger to me. It does not look like the same moment in time to me.

Q    Would you concede that it could be, though?

A    I don't think it looks that way. It is a

Page 77

costume in a set, and the child looks different.

Q    Let me ask the converse. Your entire opinion that you offered to Detective Preston is predicated on the opinion that these photographs were taken at different times, substantially different times?

A    I don't know what "substantially different times" means. I've already said I don't know how many weeks or months might have gone by.

Q    But your entire opinion to Detective Preston is predicated on your opinion that the knees-to-chest photo was taken weeks, months, some time prior to 059 and 0065(1)?

A    That's how it appears to me, yes.

Q    Okay. And when did you develop that opinion that they are different times -- that they were different times? When did you develop that opinion?

A    I don't think I've changed it.

Q    That was your opinion on February -- on April 5th?

A    My assessment on April 5th did not change what I said on February 22.

MR. ROBERTS: Okay. We have been going for a little while. Let me take a break. Everybody

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 78

take a comfort break. We may not have that much longer. Thank you.

THE VIDEOGRAPHER: We're off the record at 4:48 p.m.

(Recess from 4:48 p.m. to 4:55 p.m.)

THE VIDEOGRAPHER: This begins media unit 2. We're back on the record at 4:55 p.m.

MR. ROBERTS: Okay. Dr. Dully, I do not have any other questions. I will turn it over to Mr. Carson.

THE DEFENDANT: Thank you.

CROSS-EXAMINATION

BY MR. CARSON:

Q    Hi, Dr. Dully.

A    Hello. Good afternoon.

Q    Yeah, good afternoon. My name is Matt Carson. We have met one other time I think at your deposition. My law firm represents Detective Preston who has also been sued in this litigation.

I have just a few questions for you just to get on the record kind of what your overall experience is in helping law enforcement as a member of the Child Protective Team.

I think you testified about this a little bit at your first deposition, but there have been

Page 79

other instances where you have had the opportunity to assist law enforcement, correct?

A    Yes.

Q    And would some of those have been when you have been shown pictures, images, videos, and asked to opine on the appearance of the age of the individual in the photograph image or video, correct?

A    Yes.

Q    And those -- have those been mostly close calls? Meaning, does law enforcement come to you when there is -- and, unfortunately, this is, I imagine, part of the work that you do as well as my client -- instances where it is a six-year-old or an eight-year-old or somebody who is, you know, clearly very, very young?

A    That has happened. It used to happen in the past. But now I think most law enforcement agencies are not bringing us the easy ones. They are bringing us the in between children where they might decide to use a medical opinion; they might not.

Q    And is it your understanding that that was a major -- I am sorry, there is background noise.

Is that your understanding, that that is what Detective Preston was asking you to help with?

A    Yes.

Page 80

Q    We talked a little bit about an investigation maybe resulting in the location of the individual in the photograph, correct?

A    Possibly --

Q    Possibly.

A    -- yes.

Q    In your experience, if you know, how often is the individual that is in these photos and these images local or, otherwise, able to be identified and located?

A    I see the patients and am told about the images that have been found but don't see those. But if they have a patient, they will bring me the patient and handle the images on their own.

However, I don't know a number of how many cyber tips go out there and how each law enforcement functions and what the different state laws and UCMJ may be saying now, so I follow law enforcement's leads since they know their local policies and procedures and laws.

Q    Do you understand that at least some of the time that you work with law enforcement in providing an opinion about the age of an individual and an image, that the individual will never be located?

A    I believe that that is probably true very

Page 81

often but I don't know a number.

Q    Does it follow, then, that you understand that a lot of times the investigation is into potential charges for possession of child pornography?

A    That can happen. That is really not my interest. It is in finding the local victims which is the reason that I participate.

Q    Did Detective Preston ever tell you what she was investigating with respect to any of the photographs she showed you?

A    All I knew is this was a National Center For Missing and Exploited Children cyber tip, and that this law enforcement agency had been chosen because there might be proximity. I mean, that is all I knew.

Q    And proximity to what, ma'am, or to who?

A    That maybe this ZIP Code or this area of Florida or that that particular office might have a role to play. I don't know if that's the victim or the possessor or what, but it -- for some reason, the National Center would have picked St. John's Sheriff, and I assume there's a logical reason.

Q    You assist other law enforcement agencies in your general geographic area, correct?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 82

A    Yes.

Q    Like the Jacksonville Sheriff's Office, Nassau Sheriff's Office, that sort of thing?

A    Yes.

Q    Okay.  Same --

A    Clay.

Q    Clay, right.  Same type of work, different law enforcement agencies with a different jurisdiction?

A    Yes.

Q    You understand that when these agencies come to you and ask you to provide your opinion on the appearance of an individual in these images, that they are going to use that opinion, at least in part, in their decision-making moving forward; is that correct?

A    Yes.

Q    For example, if they are going to decide whether or not they are going to seek a search warrant, they might use your opinion in that decision; is that correct?

A    Yes.

Q    In getting the search warrant, they might tell the Judge, "We have shown this image to Dr. Dully, she has these qualifications, and it was

Page 83

her opinion that the individual appeared to be of X or Y age."

Do you understand that that happens from time to time?

A    Yes.

Q    You understand that if you would have looked at any of these pictures and said to Detective Preston that the individual -- let me -- let me start my question all over again.

If law enforcement comes to you and you give an opinion that you believe the individual in an image appears to be 18 years or older, that that would impact the course of the investigation?

A    Yes.

Q    Have you ever been deposed in any other case involving your opinions as it relates to the appearance of individuals in an image?

A    I have testified to them.  The military doesn't do depositions.  They do Article 32s.  And California doesn't do depositions.  I did three in 20 years there.

So, no, I was probably never deposed in these cases, but I was testifying in a handful of them.

Q    And in those cases, were any of those of

Page 84

situations where the individual in the image was not found?

I can ask that in a different way.  Were these possession of child pornography cases?

A    To my knowledge, yes.

Q    Okay.  To your knowledge, was anybody -- law enforcement, anyone else -- ever able to locate the individuals in these photographs?

A    Not to my knowledge, no.

MR. CARSON:  Dr. Dully, that is all the questions I have for you.  Thank you very much.

THE DEFENDANT:  Thank you.

MR. WILSON:  All right.  This is John Wilson for Dr. Dully.  I just have a couple questions for you.

CROSS-EXAMINATION

BY MR. WILSON:

Q    The first is:  Do you know the Plaintiff in this case, William Lee Lawshe?

A    No.

Q    After April 5th when you provided your letters to the detective on this case, did you have any further involvement in the case at all?

A    No.

Q    When was the next time you heard about the

Page 85

case after you authored your April 5th letters?

A    In the Spring of 2024, I was told there had been an article in the newspaper about this particular case, and that's all I knew.

Q    So you didn't participate in a search warrant?

A    No.

Q    And you didn't participate in or were consulted beyond your letters in any sort of decision to make an arrest or file a charge?

A    Not at all.

MR. WILSON:  Thank you.  That is all the questions I have.

MR. ROBERTS:  I just have one -- kind of a follow-up with maybe one or two questions.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q    But, Dr. Dully, if you were told in this case after rendering your opinions that the models in question had been located and identified and that a licensed attorney in California who was a records custodian had produced age verification information, the dates of the photographs that established that the models were 18 at the time of the images, would you have testified in that case consistent with your

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen M. Dully, M.D. on 06/18/2025

Page 86

opinions that you wrote in these three letters?

MR. WILSON: Object to form. But go ahead.

MR. CARSON: Join.

A    I would testify about my work, yes. But I would concede that I am not the end of the case at all and not part of the investigation determinations.

MR. ROBERTS: Okay, thank you. I don't have any other questions.

So we'll order a transcript. And do you guys want to read or waive, Mr. Wilson?

MR. WILSON: Do you know what that question is?

THE DEFENDANT: Oh, I always waive.

MR. WILSON: Okay. We'll waive.

THE VIDEOGRAPHER: Any other transcript orders or video orders, Counsel?

MR. WILSON: Yes. One for John Wilson, Dr. Dully's transcript.

THE VIDEOGRAPHER: We are off the record at 5:06 p.m. This concludes the deposition.

COURT REPORTER: Mr. Wilson, are you ordering a copy, then, of the transcript?

MR. WILSON: Yes.

COURT REPORTER: Mr. Carson, do you need a copy?

Page 87

MR. CARSON: No, ma'am.

(Continued video Zoom deposition concluded at 5:10 p.m.)

*  *  *

Page 88

CERTIFICATE OF OATH

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH  )

I, Deborah J. Guest, RPR, Notary Public, State of Florida, do hereby certify that the witness, KATHLEEN M. DULLY, M.D., remotely appeared before me on June 18th, 2025, and was duly sworn and showed her work identification.

Signed the 25th day of June, 2025.

*Deborah J. Guest*
_____

Deborah J. Guest
Notary Public, State of Florida
Commission Number: HH 280696
Expires: August 6th, 2026

Page 89

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH  )

I, Deborah J. Guest, RPR, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the continued remote video deposition of KATHLEEN M. DULLY, M.D., that a review of the transcript was not requested; and that the foregoing transcript, pages 4 through 87, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this the 25th day of June, 2025.

*Deborah J. Guest*
_____

Deborah J. Guest, RPR
Shorthand Reporter

## 0

0   70:1

0059   14:25 15:12 20:9, 14,20 21:19, 20 24:4 25:4,16 27:9 28:18 30:20 31:13,16 32:13 33:3, 17,19 34:13, 24,25 42:17 43:8 45:21 46:5,19 47:3,7,15,23 48:17 66:14 68:12 70:9, 17 71:2 73:19 74:13 76:19

0065   22:5 33:20

0065(1)   20:9 24:25 25:4, 17 27:9 28:18 33:3, 17 34:13 70:9 76:19 77:13

059   68:19 77:13

## 1

1   4:19 48:16

## 12   20:5

15   20:5

18   50:19 52:1,3,7,8 53:21 83:12 85:24

18th   6:6

1950s   41:1

## 2

2   4:20 64:4, 6,11 78:7

20   83:21

2023   12:3,14 19:15,22 20:13 21:11 22:22 26:5 68:23

20230122_ 174408duckduckgo .jpg   52:25

2024   85:2

2025   6:7

22   21:13 77:23

22nd   12:3 13:23 19:10, 15 23:3 33:13 34:8 38:1 50:17

## 3

3   4:21 37:4,6

64:5,7,15

32s   83:19

37   63:20,22

38   63:21,23 64:10,11,15 65:21

3:10   6:6

## 4

4   4:23 18:25 19:4 50:12, 16 69:13,16

4:48   78:4,5

4:55   78:5,7

## 5

5   21:14 50:15

5:06   86:20

5:10   87:3

5th   12:14 18:18 19:12, 22 20:13 21:11 26:5 27:8 33:7 34:11 50:24 68:6,11,22 72:8 73:17, 19 74:16 75:1,22 77:21,22 84:21 85:1

## 8

8-A   69:21,25

8-B   22:25 23:10,23 24:23

8-C   15:3 25:12,16

8-D   23:10 24:24 25:12, 17

8-E   53:1,6

## A

abdomen   48:14 62:1

absent   70:24

abuse   9:10,14

Academy   39:20

accepted   26:15

accoutrements   25:22

accusatory   43:15,17,20

acknowledged   36:16,17 46:19

activities   8:25 9:14

activity   8:8

actual   12:24 14:9,20 41:4

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025          Index: additional..arms

42:11 50:7, 22 51:20 52:1,5,6 58:6

**additional** 12:16 19:23 26:7 33:8

**administrative** 7:15,23

**adult** 55:16 56:17,22,23

**affidavit** 4:20

**affirmative** 21:10 75:5

**afternoon** 6:5 78:15,16

**age** 12:24 14:9,20 20:6 34:19 41:4 47:12 50:7, 19,22 52:1, 2,3,5,6,7,8 53:21,22 58:6 74:4 75:10 79:6 80:23 83:2 85:22

**aged** 68:20

**agencies** 79:18 81:24 82:8, 11

**agency** 81:14

**ages** 69:8

**agree** 19:14 23:24 25:8 31:13,21 35:8 43:18 49:5,21 61:22,25 67:21 74:10

**ahead** 18:8 24:19 32:9 47:6 71:20 86:2

**allegations** 9:15

**alter** 67:25

**alteration** 58:2 76:11

**alterations** 21:9

**altered** 35:9, 11 57:4,12, 18,20 71:14, 16,24 72:12, 24 73:9

**altering** 13:14

**American** 9:8 39:20

**anatomical** 38:10

**anatomy** 56:1

**ankles** 23:19

**answering** 40:12 64:23 65:20,22

**answers** 40:10 52:23

**anterior** 16:23 20:12 31:3 35:4,6 37:21 64:18 65:9

**apologize** 19:7

**appearance** 13:4,20 14:5,6 16:9, 19 17:5 32:10 34:21, 22 35:12,13, 14 36:1,11, 12 41:6,7,8, 16 46:1,2 50:4,11,22 52:3,6,8 53:17 56:1 58:7 70:12, 13 79:6 82:13 83:17

**appearances** 51:14

**appeared** 27:21 83:1

**appearing** 57:17

**appears** 15:22 16:5 33:4 34:9 45:22 50:19,21 51:15 55:4,6 58:9,10,18 59:12 70:19 71:1 77:14

83:12

**applies** 8:15

**appointment** 12:1

**appropriately** 40:20

**approximately** 27:22 29:5 67:23

**April** 12:14 18:18 19:12, 21,22 20:13 21:11,14 26:5 27:8 33:7 34:11 50:24 68:6, 11,22 72:8 73:17,19 74:16 75:1, 22 77:21,22 84:21 85:1

**area** 37:16 38:10,14 47:15,23 48:1,3,4,10, 11,18 51:3, 12 55:3 58:12 61:23 62:7,8,12,23 63:7 81:18, 25

**areas** 48:14

**arising** 10:3

**arms** 28:8

arrest   85:10

article   4:20
  83:19 85:3

assess   40:14
  60:17,21
  61:13 75:4

assessing
  37:18 39:22
  75:3

assessment
  39:19 46:16,
  19 61:7,11
  77:22

assist   79:2
  81:24

assume   5:9
  81:23

assuming   17:22
  71:18,22

attached   4:10,
  17 5:10
  15:10

attempting
  11:22

attempts   8:19

attorney   10:3
  59:18 85:21

attorneys
  10:5,6

authored   85:1

**B**

B06f   22:15,17

B06fe687   23:21

back   18:19
  26:23,25
  27:2 37:24
  44:5 46:11
  65:17,23
  68:17 69:10
  78:7

background
  15:18 28:20
  74:2 79:22

bare   28:8

based   17:4
  34:19 36:10,
  11 38:22
  45:25 55:12
  57:8 65:21
  70:11,23

bases   59:5

basic   66:3
  67:1,7

basics   52:12,
  14,15 66:9

basis   44:12
  52:16 57:25
  59:4

Bay   53:3
  75:11

begin   4:14
  6:2

beginning   16:8
  58:13

begins   6:7
  12:10 63:7,
  11 78:6

behalf   9:5

belly   13:8
  32:2 48:13
  52:21

Benjamin   71:4

biological
  36:7

bit   31:2
  35:25 54:5
  60:7 78:25
  80:1

black   51:2,11
  55:2

blue   19:6

Board   9:8

body   38:10
  48:11

book   39:17,21
  40:8,13

break   31:12
  77:25 78:1

breast   37:12
  61:14

breasts   52:21
  60:10,16,21
  62:17

bring   80:13

bringing
  79:18,19

brought   21:7,
  10 38:1
  67:16

building   7:13,
  16,17,23

buildings   7:19

burden   58:11

burn   54:17

buttocks   54:5

button   13:8
  32:2 48:13
  52:21 71:4

**C**

California
  83:20 85:21

call   5:18 9:9
  15:19 51:17
  70:17

called   5:17

calls   79:10

camera   23:19

Cameron   6:12

care   56:21

Carson   5:17,
  19,20,22
  6:21 78:10,
  13,17 84:10
  86:3,24 87:1

case  4:25
8:15 10:4,9,
13,23 11:23
16:8 17:5
22:25 23:7
44:6 46:23
49:11,15,18
53:3 83:16
84:19,22,23
85:1,4,19,25
86:5

cases  83:23,
25 84:4

Center  81:12,
22

chance  11:4
70:4

change  10:5
21:14 31:11
34:18 47:11,
12 69:3
77:22

changed  77:19

charge  85:10

charges  81:4

chemical  21:8

chest  48:17

child  8:1,3,
4,6 9:10,12,
14,18 17:14,
15 20:2
26:7,14,16
35:15 50:18
51:1,10,18,

20,25 53:11,
14,15,19
55:1,5,6,22
56:2 58:9,10
60:6 68:3
71:13,18,21,
23 72:2,15,
18,21 73:8,
12,14 74:4
75:9,12,19,
25 76:21
77:1 78:23
81:4 84:4

children  7:21
63:8 67:12
79:19 81:13

chose  14:18

chosen  81:14

chronological
53:20,22

circumstances
10:3,13

clarity  4:17

Clay  82:6,7

clear  13:22
14:3,19 32:5
36:2 45:15,
16 50:10
53:12 73:15

cleft  54:4
67:14

client  79:13

clinic  7:16,
17,20

clinical  40:9,
15,23

clinicians
40:14

clog  5:22

close  37:13
79:9

closed  15:23

clothes  24:11
28:6,7 29:17

Code  81:18

colloquially
8:17 53:3

color  15:20
28:20

colored  12:6

comfort  78:1

comment  46:21

commenting
13:20

commissure
64:18 65:9

common  31:18

completely
47:20,22
67:3 70:24

composite  4:23

computer  73:10
76:11

computer-based
58:12

concede  75:8
76:18,24
86:5

conceded  76:6

conceding
61:13 74:14
76:14,17

concerns  75:5

concession
61:10,11,12
62:16

concluded  87:2

concludes
86:20

conclusion
58:14

conducted  6:10
10:11

confirm  20:3
33:8

confirms  34:11

confused  58:4

consistent
28:12 33:11
36:18,19
47:9,11 76:9
85:25

consultation
41:11

consulted  85:9

contacting
18:6,9

**continuation**
5:8,13,14
9:21 10:18

**continued** 6:7
76:9 87:2

**converse** 77:2

**copy** 19:15
86:22,25

**Corporations**
10:9

**correct** 12:3,
7,11,14,20,
25 13:4,11
14:10,21
16:2,12
17:1,5,18,21
18:17 20:16
21:5,12,16,
17 26:1,13,
19 30:5,12
31:15 32:8,
15 33:9,14,
21 34:1,8,13
36:4 37:12,
20 38:23
40:6,9,25
43:4 47:10,
23 48:5,12
52:20 54:2
60:23 61:9
62:7 64:22
65:15 66:8,
18 68:7
70:14 71:2,6
73:17,20,23
74:13,19

75:2,17,23
79:2,7 80:3
81:25 82:16,
21

**correctly**
10:24 11:18
20:22 26:8
50:9 71:7

**costume** 29:9,
12 77:1

**costumes** 29:17

**counsel** 4:3
6:2,15 86:16

**Counselor** 5:12

**couple** 84:14

**court** 6:13,
16,23 7:4
22:7 29:10
44:14,15
86:21,24

**cover** 52:21

**CPT** 11:20

**crime** 18:16

**CROSS-
EXAMINATION**
78:12 84:16

**custodian**
85:22

**cut** 71:19

**cutting** 18:14

**cyber** 80:16
81:13

————————
D
————————

**D2635841644b390**
21:21

**D263b** 12:10
22:4

**date** 11:25
19:10 56:6,
13,22 67:19

**dates** 11:25
85:23

**day** 32:12
41:25 45:17
73:17 74:15

**days** 32:15
33:5

**debate** 8:10,13

**debates** 8:14

**Deborah** 6:13

**decide** 79:20
82:18

**decision** 82:21
85:9

**decision-making**
82:15

**DEFENDANT** 7:3
22:8 27:2,
11,14 29:12,
22 43:18
59:15,19
64:11 66:1
78:11 84:12
86:13

**definition**
66:7,22

**degree** 17:6

**demonstrative**
4:22

**depicted** 12:25
14:10,21
20:4 21:19
26:11 30:4
41:5 47:15
66:11 71:2

**depictions**
16:20

**depicts** 15:14

**depilatories**
21:6

**deposed** 83:15,
22

**deposition**
4:11,18 5:9,
11 6:7,10
9:21 10:17,
18,21 11:8
12:19 13:7
15:4,11
23:11 25:13
35:24 36:2
37:5 43:15
50:17 53:1,7
54:14 60:8
61:1 63:20
69:22,24
78:18,25
86:20 87:2

**depositions**

83:19,20

describe   63:21
  64:16  65:13

describing
  23:15  45:21

description
  23:5  66:3,4
  67:2

designed
  40:14,18,19,
  25

detail   35:25
  37:14

detective   4:11
  6:21  9:23,25
  11:12,17
  12:20  13:22
  14:4  15:3,11
  18:3,16
  23:1,10
  25:12  26:4
  36:22  38:1
  44:17  45:2
  48:23  49:15,
  18  53:1,6
  68:1  69:21,
  24  72:10,14
  73:1  75:6,22
  77:3,10
  78:18  79:24
  81:9  83:7
  84:22

detectives
  18:15

determination

determinations
  86:6

determine   17:8

determining
  16:10  37:17,
  18

develop   63:7
  77:15,17

developed
  68:20  71:6,7

developing
  40:20

development
  13:10  16:16
  21:5  32:8
  35:5  36:1
  37:11,12,15
  51:16  53:14
  55:7  58:18
  61:14,19,23
  62:21  66:10
  76:9

developmentally
  32:18  34:4,
  16

develops   16:23
  62:24

diagnose   40:21

diagram   4:22
  37:10,22
  38:12  39:5,6
  63:13,15
  65:16,18,21

20:3  69:3

diagrams
  16:14,20,21
  38:11  39:9,
  14,21  40:10
  47:19

difference
  35:25  65:13

difficult   62:6

digital   10:22
  13:14  21:8

digitally
  57:4,12,17,
  19  72:23

direct   7:8
  15:7

directs   9:12

disagree   48:21
  56:16

discussing
  4:14  24:24

discussion   6:4

disorders
  40:21

displayed
  25:17  38:10

displays   37:11

distinction
  36:3

distributed
  39:1

distribution

67:7

35:7  36:4,8,
  10,24  38:21
  66:6

division   7:20
  8:2,5,7

doctor   6:23
  7:10  16:5
  70:5  72:17

doctors   39:22

drapes   28:23

drawing   37:10

dress   29:20

dropped   5:18

Duckduckgo
  52:19

Dully   4:24
  6:8,20  7:5
  27:20  30:11
  40:13  44:1
  78:8,14
  82:25  84:10,
  14  85:18

Dully's   23:4
  24:25  86:18

duly   7:6

E

e-mail   11:16,
  24

e-mails   11:21

earlier   32:14
  33:2,4  39:2

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025                    Index: early..February

48:22 54:14
60:7 63:10,
12 66:21

early 31:3

earrings
26:18,20,21,
22 27:24,25
74:1

easy 51:8
79:18

eight-year-old
79:14

electrolysis
21:7

emphatically
58:6

end 64:12
86:5

endeavor 45:6

ended 10:20

enforcement
9:14 12:7
18:3 42:25
43:3 78:22
79:2,10,17
80:16,22
81:14,24
82:8 83:10
84:7

enforcement's
80:18

engage 8:25

engineering

8:18

ensure 40:19

entered 56:2

entire 12:10
40:4 64:17
77:2,10

equipment 7:22

establish 9:18

established
85:23

establishes
9:11

et al 6:9

Eventually
73:18

evidence 22:25
42:11,12,15
54:20

exact 14:15,
16 21:24
34:20

exam 7:21
53:18

EXAMINATION
7:8 85:16

examine 8:19

examined 12:5

exhibit 4:14,
19,20,21,23
15:3,11
18:25 19:4
22:25 23:23

24:23,24
25:16,17
37:4,6
50:12,15,16,
25 53:6
69:13,16,21,
25

exhibits 4:4,
12,17 5:10
23:10 25:12

experience
78:22 80:7

expert 4:21
21:4 43:3
44:3

expertise
13:16 46:9
57:10,14
58:12

experts 57:6,
22

explain 24:6
70:22 71:10

explained
12:23 14:8

explaining
67:18

Exploited
81:13

expose 23:19

exposed 31:2
47:19,23
48:2,4,7,10

exposing 51:3,
12 55:3

exposure 32:16
63:17,18
67:3,5

exposures
39:25

extent 30:1
47:25

eyes 15:23
31:1

---

**F**

face 30:25
52:20

facial 32:19

fact 9:11
40:24 67:24
69:10

factor 16:10

factors 37:18

facts 10:3,13

fair 4:15
50:5

faith 43:12

false 45:1,4
72:13

familiar 8:21

features 32:19

February 12:3
13:23 19:10,
15 21:13

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025                    Index: female..guys

23:3 27:3,6 33:7,13,25 34:8 38:1 50:17 77:20, 23

**female** 15:14 16:11 20:2 22:20 23:25 26:7,10 50:18 51:1, 10,17 55:1, 4,6 75:12

**females** 39:10

**field** 5:5

**figure** 22:9

**file** 4:9 12:9,10 14:25 20:8 22:2,3,11, 14,16,17,21, 24 23:3,15, 16 68:9 85:10

**files** 22:2

**fills** 64:17

**find** 39:14 45:18,19,24 57:14

**finding** 81:7

**firm** 78:18

**fits** 35:17

**floor** 15:24 23:17 26:12 28:9,10

**Florida** 8:6 9:6,19 81:19

**focused** 53:2

**folliculitis** 60:3

**follow** 33:22 80:18 81:2

**follow-up** 85:15

**forehead** 31:1

**forensic** 7:14 8:5,12 49:11,14,16, 17

**forensics** 8:9, 17,22 9:9

**form** 4:11 16:2 18:8 20:18,21 32:9 36:25 41:18 43:14 48:20 55:17 59:13 86:2

**formed** 68:13, 22

**forward** 82:15

**found** 80:12 84:2

**front** 15:12 64:3 65:9 68:7 75:22

**frontal** 53:25 54:3

**functions** 80:17

**future** 59:3

---

**G**

---

**gallery** 5:23

**gave** 72:13

**general** 11:9 13:12 81:25

**generally** 31:25 45:1

**genital** 23:19 51:3,12 55:3

**genitals** 13:9 34:23 35:4 37:17 38:15 54:1 62:2, 13,18 63:11

**geographic** 81:25

**girls** 39:20, 23 58:1

**give** 7:1 14:8 22:2 45:6 62:15 64:8 83:11

**giving** 53:22 66:4

**Global** 6:14

**good** 6:5 7:10 43:12 54:15, 19,23 58:15 59:16 67:5

78:15,16

**gotcha** 25:4

**grade** 16:15, 16 33:13 34:1,12 60:9 63:23 64:5, 6,11,12,13, 16,17 65:14, 22 66:4,7,8, 22 70:18

**grades** 63:21

**groomed** 16:25 31:14 32:5 36:21,23 42:6,9,17, 19,23,24 43:8,21 45:14,22 66:18,19,20 67:11,25 68:18,21

**grooming** 16:2 17:9 30:19 31:23 36:18, 19 44:4 54:20 73:10

**grow** 31:25

**growing** 74:5

**guess** 11:11 16:10 30:2 42:22 60:14 63:2,3 67:21

**Guest** 6:14

**guys** 86:10

---
**H**
---

**habits** 47:12

**hair** 13:9,15 16:2,9,16,19 17:1,5,10 20:12,15,21 21:4,8 30:5, 19 31:3,4, 19,25 32:8 35:2,5,11 36:1,4,6,8, 10,23 37:12 38:22,25 42:6,18,20 43:8 44:4 47:8,9,15 48:1,4,7,10, 15 51:15 52:10 53:11 55:7 58:18 60:2 61:19, 23 62:21,24 63:7 66:6,25 67:6 68:21 70:23 72:1 73:8 74:1

**hair-bearing** 65:8

**hairstyle** 28:1,4

**hand** 6:24 53:15

**handful** 83:23

**handle** 80:14

**happen** 79:16 81:6

**happened** 5:19 30:9 68:5 79:16

**happening** 32:24 50:2

**head** 60:14

**hear** 22:7

**heard** 8:16 84:25

**heart** 9:16 53:4 75:11

**helping** 78:22

**heritage** 73:14

**Hey** 36:22 59:11

**hidden** 5:23

**hides** 47:23

**hindsight** 43:7

**Hodges** 6:12

**hold** 43:2,16

**honest** 58:4

**hope** 51:21,23 64:3

**hours** 42:13

**house** 29:1,2

**housekeeping** 5:16

**Huseby** 6:14

**hypothetical** 30:3 67:20

---
**I**
---

**idea** 24:5,7,9

**identification** 23:6

**identified** 15:4 19:1 23:11 25:13 37:7 50:13 53:7 66:5 69:14,22 80:9 85:20

**identify** 15:9

**II** 16:15 67:13

**III** 16:15 20:4 33:17 34:12 35:6, 14,17,25 36:3 37:19, 22 38:21 45:25 63:22 66:7 67:13 70:18

**image** 13:4 15:1,6,10 20:14 21:20, 22,23 22:19 23:5,14 24:25 25:5 26:11 27:6 29:1 30:18 31:20 33:21,

24 36:19 37:1,2,25 41:17 45:13, 14,17,21 46:2 47:3,14 48:5,8,16 51:1,10 52:5,11,17 53:2,4 54:7 55:1 56:14 57:3 61:20 62:3,9,11, 12,16 63:2 66:12 67:4 68:19 69:20 71:16 72:5, 23 73:11 79:7 80:24 82:24 83:12, 17 84:1

**images** 4:9 10:22 12:25 14:21 17:16 18:4,5 19:24 21:9 24:2 25:1,6,8,11 26:7 27:8 28:21,24 30:6 33:17, 18 34:13 38:4 39:23 41:5 45:12 49:2 58:13 67:22 68:7, 14 73:16,18 75:2 76:18 79:5 80:9, 12,14 82:13

85:24

imagine   79:12

immature   30:25
  55:13,24
  56:1  76:4

impact   83:13

impossible
  38:20

include   31:8
  45:20  46:6,
  13  59:4
  68:25

included   69:2

Including
  40:17

incorrect   33:9

indeterminant
  52:2

indicia   29:4

individual
  14:21  79:7
  80:3,8,23,24
  82:13  83:1,
  8,11  84:1

individuals
  16:11  83:17
  84:8

information
  59:1  67:3
  85:22

ink   37:10

instances
  79:1,13

intend   11:14

intended   40:5

interactions
  11:10,12

interest   81:7

interject
  22:24  24:19

internet   17:17

interpret
  51:19,24

interview   23:1

interviews
  10:12

introduce   6:15

introduced
  11:19

introducing
  11:17  76:10

inverse   39:1
  63:11

inverted   37:16
  65:12,15
  66:7

investigate
  9:13

investigating
  18:16  26:17
  81:10

investigation
  13:25  17:18,
  21  18:7,21
  21:3  41:11

43:23,25
44:23  45:5,
7,15,16
46:10,24
49:20  58:15
67:15  73:15
80:2  81:3
83:13  86:6

investigator
  49:11

investigators
  49:8,10

involved   58:2,
  16

involvement
  84:23

involving
  64:19  83:16

IV   16:15  20:5
  33:13,14,18
  34:1,12
  35:14,16
  36:1,3,4
  37:19,23
  38:21  60:9,
  20  61:4,8,16
  63:23  64:5,
  6,12,13,16,
  17  65:14,22
  66:8,22
  70:18

_____
|      J      |
_____

Jacksonville
  82:2

job   9:5,7

John   6:20
  23:8  53:5
  70:2  84:13
  86:17

John's   81:22

join   64:20
  86:3

journal   4:19

Judge   82:24

June   6:6

jurisdiction
  82:9

jury   63:24
  64:1,3  75:8

_____
|      K      |
_____

Kathleen   6:8
  7:5

kind   78:21
  85:14

kinds   54:21

knee-chest
  63:18  67:4
  68:4  76:21

knee-to-chest
  39:10

knees   28:8
  32:16  48:17
  52:22  54:2

knees-to-chest
  22:19,20

23:18,25 26:12 27:7 30:19 33:2,20 34:7,17 37:25 38:9 39:24 42:16 47:4,5,14 48:5 61:20,24 62:16,24 66:11 68:18 70:8,17 76:19 77:12

**knew** 18:15,20 20:14 49:25 74:16,19,24 75:1 81:12,16 85:4

**knowing** 13:20

**knowledge** 84:5,6,9

**Krugman** 4:21

---

**L**

**label** 15:13

**labia** 31:1

**labial** 48:9 53:12,13 54:4 64:18

**lace** 15:15,16 28:9,13

**landing** 31:18

**laptop** 12:7 14:25 24:23 25:2,16

27:17 52:24 69:23

**large** 17:6 30:25

**largely** 19:15

**lasers** 21:6

**law** 9:13 12:6 18:3 42:25 43:3 78:18,22 79:2,10,17 80:16,18,22 81:14,24 82:8 83:10 84:7

**laws** 80:17,20

**Lawshe** 6:9,19 84:19

**leading** 16:10

**leads** 80:19

**leaving** 52:22 53:9,10

**Lee** 6:9 84:19

**left** 11:8

**legal** 8:19 9:2,5

**legs** 23:18 28:8 54:6 65:7,10

**letter** 4:11 15:2 19:11,12,16,20 23:3 24:4 26:3 31:9,11

33:6,13,16,19,25 34:8,10 50:25 58:17 59:3 68:12 69:1 72:4,7 74:16,20 75:10

**lettered** 4:12

**letters** 4:24 23:4 44:6 59:4 84:22 85:1,9 86:1

**licensed** 85:21

**lie** 72:6

**likelihood** 49:25

**limited** 38:12 39:5 63:14

**lingerie** 15:15,16 28:15,17

**linked** 56:24

**listed** 52:25

**litigation** 6:14 78:19

**local** 80:9,19 81:7

**locate** 84:7

**located** 7:11 80:10,24 85:20

**location** 29:5

67:24 80:2

**logical** 81:23

**longer** 78:2

**looked** 19:11 22:21 75:2 83:7

**lot** 16:6 81:3

**lots** 39:8

**low** 35:6

**lower** 23:18 48:13 62:1,2 66:1 71:11 76:4

---

**M**

**M.D.** 7:5

**machine** 7:23

**made** 7:25 10:11 13:22 14:3 21:10 36:2

**magazine** 52:21

**major** 8:7 79:22

**majora** 53:12 54:4 64:18

**make** 4:13 13:14 32:25 46:21 63:3 85:10

**makes** 30:18 50:21

manipulation 73:10

manner 14:19

marked 15:3 18:25 19:10 23:6,10 24:24 25:12 37:6 50:12 53:6 69:13, 21,24

match 16:20

matches 23:5

Matt 6:21 78:16

matter 6:8

matters 5:16

mature 60:16, 19 61:15,16 67:6

matured 42:8

maturity 13:3, 11 16:11 20:4 32:6 33:14 34:1, 22,23 35:6 36:9 37:19 39:19,22 40:15 41:16 43:4,13 60:10,18,22 61:4 63:22 66:24 67:13 70:18,20 71:11,12

76:5

Meaning 79:10

means 8:12 77:8

media 78:6

medial 54:5

medical 14:13, 20 16:5 17:4 46:16,18 49:16,17 55:23,24 79:20

medication 7:22

medicine 8:18 40:23

meet 53:12 62:2

meeting 11:22 12:2,5,19 13:23 14:4

Melania 70:18 71:11 74:12 76:4

member 78:22

met 10:14 12:13,22 78:17

Michael 6:18

middle 31:20 53:13

midline 16:22 35:5

Mikayla 6:9,22

military 83:18

mind 49:6

mine 14:14

minora 53:13

missing 52:12, 13,15 72:1 81:13

misstate 20:23

misstatement 54:25

miswritten 23:20

model 14:10 15:14,22 16:1,24 17:8 20:14 21:11, 18 22:20 23:17 24:15 25:24 26:3, 10 27:23 30:4 32:5,7 34:4,21 38:22 42:6, 17 43:7 44:18 45:9 46:7 48:24 49:2,6,7 52:5,6 60:9 66:11,15,20 67:25 69:8 70:7,8,10, 11,14,17,20 72:22 74:17, 25 75:16

models 12:25 41:4 43:13 50:7 85:19, 24

moment 22:24 67:9 76:23

mons 64:19 65:8

months 33:5 77:9,12

mouth 30:10

move 19:5

moving 50:24 82:15

—————————

N

—————————

names 20:8 22:24 39:14 68:10

Nassau 82:3

National 81:12,22

natural 36:8

necessarily 30:9 32:17, 23 40:7 58:14

needed 46:9 59:9

newspaper 85:3

nice 7:24

noise 79:22

normal   71:8

notation   46:13

note   46:20

notice   26:20

number   22:3
46:25  80:15
81:1

---

**O**

oath   30:12,13
33:1  70:25

Object   18:8
20:18  32:9
36:25  41:18
43:14  48:20
59:13  86:2

obvious   8:1
13:24  14:2
50:6,21

occurred   57:15
58:15

offer   8:19
9:1,5  12:23
13:2  14:20
32:6  35:12
36:9  43:12
49:14,17
57:16  62:20

offered   44:3,
9,17  68:1
77:3

offering   50:6
51:25  52:4
58:6

office   7:14,15
8:5  81:19
82:2,3

offices   7:21

old-   31:7

older   33:10
53:14  70:11,
14,20  71:1,
5,10  72:18
74:11  75:1,
16  76:3
83:12

open   8:10
22:2,3,4,5
23:16  38:5

opening   48:9

opine   79:6

opinion   13:3,
10  14:9,20
18:10  31:11
32:22  33:1,
9,12  34:12
35:12  36:9,
14  41:8,15,
22  44:9,12,
17,20  49:16,
17  50:5
51:25  52:4
54:18  55:23,
24  57:17
58:6,8  62:20
63:3  68:14,
17,22  69:10
71:3  72:19,
21  76:3

77:3,4,10,
11,16,18,20
79:20  80:23
82:12,14,20
83:1,11

opinions   8:19
9:2,5  11:8,9
12:24  13:18
17:4,20  18:4
32:6  41:4
43:12  49:14
50:7  59:5
60:9  67:25
83:16  85:19
86:1

opportunity
10:16  79:1

orange   15:19

order   86:9

ordering   86:22

orders   86:16

original   12:18
16:7  26:11
30:18  33:24
34:16  35:23
37:25  42:16
47:3,14  48:5
50:16  69:3

originally
25:5  37:3

outfit   74:1

oversimplified
67:1

---

**P**

p.m.   6:6
78:4,5,7
86:20  87:3

paged   66:1

pages   69:4,6

paragraph
19:14,19
20:11  23:2
51:1  68:13
69:17

pardon   26:6

parlance   31:18

part   8:7,23
9:4,7  10:12
17:20  18:6,
21  30:3
35:23  49:20
67:15  79:12
82:14  86:6

parted   23:19
51:2,3,11,12
54:6  55:2

partial   28:3

Partially
47:24

participate
81:8  85:5,8

parts   65:8

passport   56:6,
10,12,21,24,
25

past 79:17

paste 19:15

patient 42:10 80:13,14

patients 40:15 80:11

PD 8:12

pediatrician 8:12 9:7

pediatrics 7:14 8:5,13, 15,23 9:8,10 39:20

pelvis 64:20

pen 37:10

people 40:19 44:25 56:19 63:3

perfect 5:15

perfectly 35:18 47:9 58:24 60:1

person 26:17 51:19,20 53:21 58:7 73:23,24 76:7,8,14

pertains 16:11 32:7

photo 21:24 23:22 24:1,8 25:9,21 27:22 28:5

30:4,7,8 42:3 47:19, 20 67:9,23 69:3 74:6,9, 18,19 75:14 76:20 77:12

photograph 12:6 13:8, 14,21 23:24 32:11 38:16, 17,23 42:17 46:25 54:15, 19 56:4,13, 22 57:12 61:24 62:25 67:8 79:7 80:3

photographs 10:21 11:13 12:16 27:24 28:2 33:8 34:19 40:10 42:6 64:25 75:21 77:4 81:11 84:8 85:23

photos 20:8 80:8

pick 11:9

picked 81:22

picture 24:16 34:7,16,17 56:7,9,10

pictures 41:24 69:7 79:5 83:7

pin 18:24

pink 15:15,16 28:9,12,17

pixilated 54:12

place 33:19

Plaintiff 6:19 84:18

plaintiff's 4:21 18:25 19:4 37:6 50:12 69:13

plants 29:1,2

play 18:1 81:20

played 64:2

plow 5:5

point 11:16, 19 42:22 65:11,18

policies 80:19

pornographic 18:5 41:5,17

pornography 40:3 81:5 84:4

portion 54:6

position 23:18,25 26:13 38:9 39:24 40:1 76:21

positioning 38:22 39:10 48:11

positions 39:12

possession 81:4 84:4

possessor 81:21

possibility 13:13,17,19 17:3 31:14, 22 36:18 66:17,19 67:10,24 74:17,25 75:1

possibly 36:9 68:18 74:12 80:4,5

potential 18:16 81:4

potentially 47:12

practice 9:1

predicated 77:4,11

prepared 5:1

prepubertal 51:9

prepubescent 56:8 70:21 71:12

**present** 20:12

**presentations** 47:9

**Preston** 6:9,22 9:23,25 11:12,17 12:20 13:23 14:4 26:4 36:22 38:1 44:18 48:23 49:15,18 68:1 72:14 73:1 75:6,22 77:3,11 78:18 79:24 81:9 83:8

**Preston's** 4:11 15:4,11 23:1,11 25:13 53:1,7 69:22,24

**presume** 56:18

**pretty** 50:10 74:3,5

**previous** 10:6 20:3

**previously** 15:3 18:25 23:10 24:23 25:12 37:6,9 50:12 53:6 69:13,21

**prior** 5:8 9:21 10:17 11:5 13:7

14:7 16:7 33:8,12 77:13

**procedures** 80:20

**proceed** 46:25

**proceedings** 9:2,5

**process** 17:10 20:22

**produced** 85:22

**prominent** 31:1

**Protection** 8:1,3,4,7 9:12,13,18

**Protective** 78:23

**provide** 41:3, 11 58:11 82:12

**provided** 84:21

**providing** 80:22

**proximity** 81:15,17

**pubert-** 61:19

**pubertal** 4:22 76:8

**puberty** 31:4 32:23 40:21 56:2 71:5

**pubic** 13:9,15

16:2,9,16,19 17:1,5 20:12,15 21:4 30:5,19 31:3,4,19,25 32:8 35:2,5, 11 36:1,4,6, 8,10,23 37:11 38:21, 25 42:6,17, 19 43:8 44:3 47:8,9,15 48:1,4,7,10, 15 51:15 52:10 53:11 55:7 58:18 60:2 61:19, 23 62:21,24 63:7 66:6,25 67:6 68:20 70:23 72:1 73:8

**pubica** 61:19

**pubis** 64:19 65:9

**pull** 14:24 15:6 25:10 26:25 27:6 52:11,18 69:19

**pulled** 15:12 17:16

**pulling** 15:8 52:17,24 69:23

**purpose** 41:2,3

**purposes** 23:6

**put** 29:15,16, 20 30:5 31:14 34:10 45:23 58:19, 25 59:2

**putting** 30:10

---

**Q**

**qualifications** 82:25

**quality** 54:15, 18

**question** 5:6 14:13 35:19, 21,22 36:20 40:11,12 41:14 44:15 49:5 50:8 56:20 59:14 64:4 65:4,20 67:20 83:9 85:20 86:11

**questions** 8:20 15:7 78:9,20 84:11,15 85:13,15 86:8

---

**R**

**raise** 6:23

**rating** 13:3,11 16:11 32:7 33:14 34:1,

22,23 36:10 37:19 39:22 40:15 41:16 43:4,13 60:18,22 61:4 63:22 66:24 67:13 70:19,21 71:12 76:5

**razor** 54:17

**reached** 10:9 58:15

**read** 12:9 19:19 22:14 26:8 33:6 50:18 51:18 63:23,25 64:5,15 65:5,23 86:10

**ready** 6:2

**realize** 30:11 49:24

**reason** 60:14 81:8,21,23

**reasons** 58:10

**recall** 21:7 48:24 60:11, 13,15,24

**received** 11:16

**recess** 78:5

**recognize** 70:7

**recollect** 11:1

**recollection** 12:19

**record** 4:10 6:4,6 11:5 15:4,8 19:1 23:12 25:14 32:5 37:7 43:17 50:13 53:7 69:14, 22 78:3,7,21 86:19

**records** 85:21

**red** 15:18

**redacted** 15:10

**REDIRECT** 85:16

**refer** 4:8,12 39:7

**reference** 24:4

**referenced** 23:2

**referred** 31:18 40:8 53:3

**referring** 7:18 19:25 24:17 39:18 40:13

**regard** 40:22

**regular** 47:7

**related** 14:17, 18 55:15

**relates** 83:16

**relevant** 5:7

**reliable** 12:24

14:9 41:4

**remember** 11:20 14:15 75:3

**remembering** 75:13

**remotely** 6:10

**removal** 17:10 20:21 21:8

**removed** 20:15 36:7

**render** 18:4

**rendering** 13:18 85:19

**repeat** 29:11

**report** 23:21 45:20 46:6 58:25

**reporter** 6:13, 16,23 7:4 22:7 29:10 44:14,15 86:21,24

**reports** 10:23 24:25 50:8

**represent** 6:14 45:22

**representatives** 9:23

**represented** 76:13

**represents** 78:18

**request** 49:19

**requested** 41:12

**required** 41:12 58:2

**respect** 81:10

**rest** 62:13

**restate** 20:24 21:1

**resulting** 80:2

**review** 10:17 11:4 49:2 52:17

**reviewed** 11:21 12:16 67:19

**reviewing** 11:12 17:16

**Roberts** 4:5,7, 19 5:4,14,25 6:3,18 7:9 15:5 19:2 22:13,23 23:8,13 24:21 25:3, 18,19 26:25 27:5,18,19 29:13,24 37:8 38:2,6, 7 43:16,19 44:16 50:14 53:5,8 54:9 59:17,20 64:10,14 69:15 70:2,3

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**                    Index: role..sort

77:24 78:8
85:14,17
86:7

**role** 17:25
81:20

**room** 7:12,24

**rooms** 7:21

**roughly** 37:10

**rule** 42:9

---

**S**

---

**scene** 11:11

**science** 8:18

**scientific**
12:24 14:12

**scientifically**
14:9

**screen** 5:2
15:21 19:3
24:22 25:2,
16 26:23
27:17

**screenshot**
52:24

**search** 82:19,
23 85:5

**seek** 82:19

**send** 11:24

**sentence** 20:7,
10 51:6,18

**separate** 75:10

**sequence** 71:8
75:19

**set** 11:11,22
77:1

**setting** 40:16

**sexual** 13:3,11
16:10 20:4
32:6 33:14,
25 34:22,23
36:9 37:19
39:19,22
40:14 41:16
43:3,13
60:10,22
61:3 63:21
66:23,24
67:13 70:18,
20 71:11
76:4

**shaking** 60:14

**shape** 64:18
65:7

**share** 19:3
37:3 50:15
63:19 69:16

**sharing** 4:3

**shave** 55:14,
22,25 58:22,
23 59:9,12

**shaved** 20:11,
14 21:12,19
30:5 31:22
36:13 44:7,
10,18,22
45:10,11,13,

17,23 46:4,
7,15,20,22
47:1 55:10
56:1 58:19
59:8,10,12,
21,22,24
72:6,11,23
73:2,3,6,11
74:18 75:7

**shaven** 16:25

**shaving** 17:9
46:14 54:20

**Sheriff** 81:22

**Sheriff's**
82:2,3

**shoot** 21:24
24:1,8 25:9,
21 27:22
30:4,7,8
42:3 67:10,
23 74:6,10,
18,19 75:14
76:20

**show** 5:1 19:9
26:5,6
38:12,14
39:9 47:15
63:7

**showed** 12:6
13:8,9 56:6,
12,15 81:11

**showing** 23:25
38:18

**shown** 13:7
19:23 23:4

65:18 79:5
82:24

**shows** 23:17
51:1,10 55:1
63:4

**sic** 33:20
59:2 68:13

**side** 25:17
27:17 65:10
67:14

**signs** 60:2,4

**similar** 39:25

**simply** 4:8

**single** 12:5

**Sir** 44:14

**sister** 73:14

**sit** 43:6 76:2

**sitting** 23:17
26:12

**situations**
84:1

**six-year-old**
79:13

**skin** 58:24
60:1

**small** 27:15

**smooth** 58:24
60:1

**sole** 67:2

**solemnly** 6:25

**sort** 7:15

17:9,10 31:23 40:21 76:11 82:3 85:9

**sounds** 59:11

**source** 67:2

**speak** 11:11

**speaks** 63:2

**specialize** 8:14

**specifically** 72:4

**specifics** 11:20

**spoken** 9:22,25 10:2,6

**Spring** 85:2

**St** 81:22

**stage** 64:24

**stages** 4:22 37:11 39:19 40:20

**standing** 54:1

**start** 83:8

**starting** 64:1

**starts** 22:4

**state** 9:6 34:11 80:17

**stated** 58:11

**statement** 21:10,15

34:18 45:1, 4,5 46:24 60:18,24 72:13 75:5

**statements** 10:11 18:1 22:22 45:6

**statute** 9:11, 16

**stay** 5:23

**stomach** 62:3

**straight** 32:1 35:1

**strike** 24:13, 14

**strip** 31:19 47:8

**stuff** 53:9 54:17

**subject** 10:22 34:8 70:8

**subpoenaed** 9:3

**subsequent** 27:8 67:8

**subspecialty** 8:17

**substantially** 77:5,7

**sued** 78:19

**suggested** 35:10

**suggests** 35:9

**support** 9:13

**supposed** 22:6 65:11

**surmise** 18:2,6 49:1

**surmised** 18:18

**suspected** 49:3

**swear** 6:16,25

**swore** 30:14

**sworn** 7:6 30:17

**Synchronoss** 10:8

---

**T**

---

**table** 53:18

**takes** 38:3

**talk** 25:6 37:2 46:3

**talked** 16:6 37:14 50:3,4 60:7 62:4 80:1

**talking** 8:2 11:8 25:5 27:2,5 32:21 40:5 45:12, 21 50:22 53:25 62:17 72:7

**Tanner** 41:1

**teach** 66:9

**Team** 8:2,3,4, 7 9:12,13 78:23

**Teams** 9:18

**technique** 76:11

**teen** 53:14

**telling** 18:13 30:15 43:20 53:23

**term** 9:9 76:10

**terms** 34:19, 23

**test** 40:4,24

**testified** 7:6 12:18 20:20 32:13 34:3 37:9 50:5 54:14 58:21 70:25 72:17, 20 74:7,11 75:15 78:24 83:18 85:25

**testify** 86:4

**testifying** 42:20 53:20 72:12 83:23

**testimony** 6:25 14:3,7 16:7 20:23 21:18 23:7 33:1 39:2 42:12, 24 48:24

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025                    Index: thighs..victims

58:5,12 59:2
60:11 63:6,
10,12 66:22
71:15 73:5,7

**thighs** 13:8
51:3,12 55:3
62:2 64:20

**thing** 34:20
47:13 62:5
82:3

**things** 21:9
32:19 54:16,
21 60:4
76:17

**thinking** 75:13

**thought** 35:24
73:22,25
74:11

**time** 9:22
10:19 24:1
25:9 27:22
29:6,15,16,
21 30:9
32:17 38:3
43:1 46:12
49:23,24
60:8 65:25
67:9,23
68:8,11
69:18 71:5,6
73:22 74:4,
20 76:23
77:13 78:17
80:22 83:4
84:25 85:24

**times** 68:15
69:7 77:5,6,
8,16,17 81:3

**tiny** 31:2

**tip** 81:13

**tips** 80:16

**today** 4:4 7:1
10:19 11:2,
5,10,15 14:7
19:23 25:6
26:6 30:12
34:3 42:12
43:7 44:21
55:23 58:21
72:11 75:4,
15 76:2

**today's** 10:17

**told** 13:2
26:4,14
35:15 45:2
48:23 56:11
65:14 72:10
73:1 75:12
80:11 85:2,
18

**tone** 15:20
43:14

**top** 48:9
51:2,11 53:2
55:2

**transcript**
10:17 59:2
63:20 86:9,
15,18,22

**treatise** 40:9

**triangle** 37:16
39:1 63:11
64:17 65:2,
12,15 66:5,
6,7,11,14

**true** 19:17
38:8,24 40:7
44:19,20
45:3 46:13
80:25

**truth** 7:1,2,6
30:14,17

**truthful** 45:6

**turn** 78:9

**turned** 75:9

**type** 34:20
82:7

**typed** 34:2

---

**U**

---

**UCMJ** 80:17

**ultimate** 67:25

**underscore**
70:1

**understand**
10:23 11:18
20:22 32:4
44:25 45:1
50:9 64:3
71:7 76:1
80:21 81:2
82:11 83:3,6

**understanding**
79:21,23

**underway** 46:11

**underwear**
51:2,11 55:2

**uniformity**
35:8

**uniformly** 32:3

**unit** 78:6

**University** 8:6

**untrue** 21:15

**utilized** 16:1
17:9

---

**V**

---

**valid** 56:25

**validate** 26:15

**verification**
85:22

**Verizon** 10:8

**version** 33:20
70:14 71:11
74:12 76:3

**versus** 6:9
56:10

**vertical** 47:8

**vertically**
54:1

**victim** 81:20

**victims** 81:7

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen M. Dully, M.D. on 06/18/2025    Index: video..Zoom/conference

**video** 79:7 86:16 87:2

**videos** 79:5

**view** 15:1 30:22 35:16 37:21 38:13, 19 39:3 47:21,22,23 53:12,25 70:23

**viewed** 27:8

**views** 28:3 47:18

---

### W

**wait** 51:23

**waive** 86:10, 13,14

**wall** 28:20

**wanted** 63:13

**warrant** 82:20, 23 85:6

**wax** 57:2

**waxed** 16:25 20:15 57:1 59:25 72:23

**waxes** 21:6

**waxing** 17:9 54:20

**ways** 4:13 35:10

**wearing** 15:15

24:10 26:18, 21 27:23 28:6,17 29:21

**weeks** 33:5 77:9,12

**well-exposed** 62:14,18

**wider** 65:10

**William** 6:9 84:19

**Wilson** 4:3,6, 16 5:1,17,21 6:20 10:7 18:8 20:18 22:23 24:19, 22 25:10,15 27:1,4,12,16 29:23 32:9 36:25 38:4 41:18 43:14 48:20 52:23 54:8 55:17 59:13 64:8 69:23 84:13, 14,17 85:12 86:2,10,11, 14,17,21,23

**woman** 13:11 43:21

**wooden** 23:17 26:12

**word** 8:22 14:12 51:5

**words** 14:11,

12,14,15,17, 18 30:10 64:22

**work** 79:12 80:22 82:7 86:4

**working** 27:13

**write** 33:7 59:22

**writing** 14:5

**written** 4:24

**Wrong** 63:1

**wrote** 33:25 50:8 51:1 59:8 68:12 74:15,20 86:1

---

### X

**xerox** 7:23

---

### Y

**YCBL** 72:10

**YCBLVVFQ** 69:19,25 73:20

**year** 32:24

**years** 10:25 14:14 20:5 32:21 83:12, 21

**young** 31:5

40:19 79:15

**younger** 30:22, 23 32:17,18, 21 33:10,19 34:4,5,9,16 50:19 68:4 76:22

---

### Z

**ZIP** 81:18

**Zoom** 6:11 54:7,10,11 87:2

**Zoom/conference** 7:24

ECF 67

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

      Plaintiff,

v.                             Case No. 3:24-cv-00044-MMH-MCR

MIKAYLA PRESTON,
in her induvial capacity as a Detective for St. Johns County Sheriff's Office, and
KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

      Defendants.
_____/

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANT PRESTON**

Plaintiff hereby moves this Court for Partial Summary Judgment, pursuant

to Fed. R. Civ. Pro. 56, on the issue of liability under 42 U.S.C. § 1983 against

Defendant, Mikayla Preston.

**FACTUAL BACKGROUND**

On February 20, 2023, the Internet Crimes Against Children (ICAC)

taskforce of St. Johns County Sherriff's Office received the CyberTipline Report

#153739160 from the National Center for Missing and Exploited Children

(NCMEC). (*see Affidavit for Search Warrant February 28, 2023*, Exhibit A) The

CyberTipline Report, which was originated by the electronic service provider,

Verizon and their cloud service provider Synchronoss, identified that a subscriber

by the name of William Lawshe was in possession of a single image, described by

1

the provider as the "lascivious exhibition" of a "prepubescent minor." (see *CyberTipline Report #153739160*, Exhibit B). NCMEC characterized the content in the CyberTip as "CP-unconfirmed."[1][2]

Assignment for Investigation

The supervisor of the ICAC division, Sergent Eugine Tolbert, who initially evaluated the report, immediately recognized the customer identified as a law enforcement officer employed with Florida Fish and Wildlife Commission.

SJSO investigators cannot rely solely on NCMEC Cybertip Reports to establish probable cause[3]. (*Tolbert Deposition* p.36 ln.7-15, attached as Exhibit C) (*Greene Deposition* p.59 ln.3-9, attached as Exhibit D) An investigation is required to establish whether the content is child pornography. *Id.* Therefore, Det. Tolbert assigned the image to Defendant Det. Mikayla Preston for investigation. (*Tolbert Deposition* p.7 ln. 13-15) At that time, he informed Det. Preston that Mr. Lawshe was a law enforcement officer. (*Tolbert Deposition* p.29 ln. 22 – p30 ln.3)

At the time of the assignment, Det. Preston had been an ICAC detective for only a "couple of months." (*Preston Deposition, March 13th 2025,* p.88 ln.2 – P.89 ln.1, Exhibit F). She had not completed ICAC training (*Id.)* and had no

---

[1] Unconfirmed "indicates that when this file was being reviewed and categorized, it depicted either a sex act or lewd and/or lascivious exhibition, but that NCMEC was not able to confirm the age of the individual depicted." (*NCMEC Corp. Rep. Deposition* p. 22 ln.18-24, Exhibit E)

[2] Plaintiff does not dispute that he possessed pornographic images. Mr. Lawshe has testified that he had struggled with low libido and erectile dysfunction for years and had been medically treating for this condition. He was open with his wife about this use of pornography.

[3] Somewhere around 50 percent of CyberTips are not actionable by looking at the image. (*Tolbert Deposition* p.35 ln.7-19)

2

specialized training in distinguishing images of minor children from those of adults. (*Preston Deposition, March 13th 2025,* P.88 ln2 – P.89 ln.1)

The Image

Det. Preston admits that some people, including other detectives, could have interpreted the individual depicted in the subject image as at least 18 years old. (*Preston Deposition, March 13th 2025,* P.93, ln. 6-23) She also agrees that those people would not be "wrong" in that opinion. *Id.4* Furthermore, the model in the image was not portrayed as or pretending to be a minor. (*Preston Deposition, March 13th 2025,* P.62, ln.7-25) However, upon viewing the image attached to the CyberTipline Report, Det. Preston's subjective opinion was that the model displayed in the image was under the age of 18. (*Preston Deposition, November 2023* p.172 ln.14-19)

Det. Preston testifies that although she and Det. Tolbert5 felt the model was "CSAM" (*Preston Deposition, March 13th 2025,* P.96, ln.12-17), there was disagreement in the department about how to interpret the image. (*Preston*

---

4    Q Do you agree that some people could have looked at this model and said, oh, she's 18?
A That could be.
Q Some people could say that; right?
A Yeah.
Q Detective Greene could come to that conclusion?
A Yes.
Q You -- you wouldn't testify under oath that Dr. Greene -- I mean that Detective Greene is wrong in his opinion that this person could have been 18 years old?
A No.

5 Det. Tolbert has no training or expertise in the determination of whether a particular model is a minor or an adult. However, his testimony under oath was that if someone produced identification that showed the model was 18, he would also accept that. (*Tolbert Deposition* P. 17 Ln. 8-21)

3

*Deposition, March 13th 2025, P. 101, ln.5-16)* Another, unidentified detective thought that the model was "age difficult." *(Preston Deposition, March 13th, 2025, P.96, ln.17-19; P.169, ln. 2-17).* "Age difficult" is a term used to describe an individual who may appear to be an adult. *(Preston Deposition, March 13th, 2025, P.57, ln.25 – P.58, ln.3; p.181, ln.1-13)* Although Det. Preston cannot recall who, among her colleagues, questioned whether the model was a minor, SJSO Det. Kevin Greene believed the model was age difficult and that a reasonable person could believe the model to be an adult or a minor. [6] *(Greene Deposition p.65 ln. 7-13)*

### Origin of Image

When reviewing the subject image, Det. Preston observed a watermark of the website, metart.com on the image. Preston acknowledges that the water mark could have been a sign of ownership or a notification of who to contact if there were questions about the image. *(Preston Deposition, March 13th 2025, P.30, ln. 3-24)*

Based on the watermark, Preston had reason to believe that this image was published on a public website. Virtually all models published on public pornographic websites are represented to the public as being adults. *(Preston Deposition, March 13th, 2025, P. 67, ln 23 – P.68, ln.1)* Likewise, Det. Eugine Tolbert, Preston's supervisor at the time of this investigation, testifies that the fact that a model is being represented to the public or a potential suspect as a

---

[6] Det. Greene is a former ICAC investigator and was the forensic detective working on this case with Det. Preston.

verified adult is an important factor in reaching a probable cause decision. (*Tolbert Deposition*, P.26 Ln. 1-12). Her current supervisor, Det. Dennis Camden, also acknowledges that public websites almost always portray models as adults to the consumer. (*Camden Deposition* p. 23 ln.7-15, attached as Exhibit G)

<u>No Evidence to Support Material Element of the Crime</u>

A conviction for the crime of possession of child pornography requires the State to prove beyond a reasonable doubt that the defendant knowingly possess a photograph or other presentation which, in whole or in part, he or she knows to include any sexual conduct by a child. § 827.071(5), Fla. Stat. *Elias v. State*, 308 So. 3d 1127, 1131 (Fla. 5th DCA 2020)

Det. Preston had no evidence to support a reasonable belief that Mr. Lawshe knew or believed that the image (CyberTipline Report#153739160) depicted a minor. In fact, she testifies that any guess as to his knowledge or opinion of the model's age would require her to "speculate," something she was unwilling to do:

> Q All right. What I'm saying is what evidence did you have that led you to believe that Mr. Lawshe thought that this was a minor?
>
> A So I can't speak on his opinion because I'm not him. So I can't say that yes, he for sure thought that that was an adult or he for sure thought that that was something else. Like, I can't speak on somebody else's opinion because I'm not them.
>
> Q Right.
>
> A So I don't want to speculate.

(*Preston Deposition, March 13th, 2025*, P.172, ln. 20 – P.174, ln. 9)

As the testimony leading up to this exchange shows, Det. Preston acknowledges

that some of her colleagues believed that that image could have depicted an adult:

> Q. But you agree that someone else in the
> sheriff's department expressed concern that it might
> look like an adult; correct?
>
> A. Age-difficult but yes.
>
> Q Age-difficult but that means that it may be an
> adult; correct?
>
> A. And it may be a child. So
> age-difficult, like we said, it's -- it could be a
> child, or it could potentially be an adult. That's
> why it's age-difficult. We don't know what age
> range it is.

(*Preston Deposition March 13, 2025*, p. 172 ln 20 - p.173 ln.9)

<u>Unreasonable Investigation</u>

Despite all of this, Preston never went to the website watermarked on the

subject image (metart.com). (*Preston Deposition, March 13th 2025*, P.55, ln. 3-

14) She has no explanation for this omission in her investigation. (*Preston*

*Deposition, March 13th, 2025*, P.67, ln. 4-9; P.185, ln.25 – P.186, ln.13) When

asked why she did not go to the website to further her investigation, Det. Preston

simply replies, "I don't know." *Id.*

In other investigations of NCMEC CyberTips, Preston has visited

pornographic websites as part of her investigation. (*Preston Deposition, March*

*13th 2025*, P. 66, ln. 18 – P.67, ln. 9; P.145, ln. 1-7) Furthermore, Preston admits

that she had the ability to go the website in this case and could have easily

verified that the subject model was on the website. (*Preston Deposition, March*

*13th, 2025, P.68, ln.21 – P.69, ln. 1)* Preston further admits that she was aware

that federal age verification law requires producers and publishers of child

pornography to maintain age documentation and that websites are supposed to

have records custodians to maintain that documentation. (*Preston Deposition,*

*March 13th, 2025, P.141 ln.15-21)*

SJSO officers have testified that a reasonable investigation of possession of

CSAM, under these circumstances, would include visiting the website identified

on the images themselves. (*Greene Deposition, December 17th, 2024, P.46, ln. 13-*

*19; Camden Deposition p40 ln. 20-24)* ICAC investigators are trained to attempt

to identify suspected victims of child sexual abuse. (*Tolbert Deposition,*

*December 17th, 2024, p.46, ln. 5-8)* and every effort should be made to identify

the victim in these cases. (*Greene Deposition p. 61 ln. 15-24)*

When asked if Preston's failure to attempt to identify the alleged victims

was a violation of her oath as a SJSO detective, Tolbert described her conduct as

"sloppy police work." (*Tolbert Deposition, December 17th, 2024, P.46, ln. 9-16).*

Her colleague, Det. Greene expressed regret over the investigation and admitted:

> *"I think they should have taken more time. Honestly, I think*
> *they have probably rushed a little bit and, you know, taken*
> *more time and -- and gone through things a little longer."*
> *(Greene P. 14 Ln. 2-13)*

Under oath, Det. Preston refused to take a position on whether it was reasonable

or not to investigate the image on met-art.com.[7] (*Preston Deposition, March 13th,*

*2025, P.185 ln. 25 – P.186 ln.13)*

---

[7] "I wouldn't say that it's unreasonable, and I wouldn't say that it's reasonable"

<u>Exculpatory Information Readily Available</u>

Only after Mr. Lawshe was arrested[8], and his criminal defense team met with Det. Greene, did someone from SJSO attempt to locate the model(s) on the internet.[9] (*Greene Deposition*, December 17th, 2024, p.33 ln.12 - p.35 ln.11) It took Det. Greene approximately 20-30 minutes to locate both models on two or three websites. All of the information needed to locate the models on the internet was available and included on the images, themselves. Each of the websites described the subject model as a verified adult and purported to comply with federal age verification laws. *Id.*

After the meeting with Det. Greene, Mr. Lawshe's criminal defense team located the contact information of the website's records' custodian (published on the website) and promptly received records with documentation of the models' age. The website's records custodian provided a statement that the models were adults at the time of the photographs. In the statement, the records custodian states that it is the policy of metart.com to obtain age verification documents at the time any content is obtained. (*Age Verification Documents,* Exhibit H) He also provided redacted copies of photographs of the models holding passports. (*Age Verification Documents*, Exhibit H)

Probable cause would not have existed for a search warrant or an arrest had SJSO been in possession of the age verification documentation from the

---

[8] As detailed later, Mr. Lawshe was ultimately charged with possession of two images of the Cybertip model (later identified as Melania D.) taken during the same photo shoot and one image of another model (Sanija a/k/a Kacey Lane), which was not the subject of any NCMEC report.
[9] Due to the alleged nature of the images, Mr. Lawshe's criminal defense team could not possess the subject images. Therefore, they could only view and search the images at SJSO facilities with SJSO staff.

records custodian. (*Tolbert Deposition* p. 53 ln.22 – p.54 ln. 13) Preston acknowledges that the age verification documents "obviously would have changed the entirety of the investigation." (*Preston Deposition, March 13th 2025*, P.154, ln. 12-20)

This age verification information was readily available, prior to the probable cause determination. (*Tolbert Deposition* p.54 ln. 14-24 and *Greene Deposition* p. 41 ln. 6-11) Even Det. Preston admits that she had all of the information that she needed readily available in order to reach out to met-art.com's record custodian to request age verification information prior to making a probable cause decision. (*Preston Deposition, March 13th, 2025* p.147 ln.12-18)

### Child Protection Team Investigation

Rather than make any attempt to identify the alleged "child" depicted in the CyberTipline Report #153739160, at the suggestion of her supervisor, Detective Preston took the image to Dr. Kathleen Dully, a pediatrician employed with the UF Child Protection Team (CPT). This was the custom when there was disagreement among detectives about the age of a subject model. (*Preston Deposition March 13, 2025*, p.96 ln.7-27; *Greene Deposition* p.43 ln.2 – p.44 ln.4)

Preston met with Dully on Feb 22, 2023. Preston does not recall any of the contents of their conversation or discussion. (Preston Deposition March 13, 2025, p. 102 ln.1-23; p.114; p.276 ln. 8) Other than knowing that Dr. Dully was a medical doctor, Preston knew almost nothing about Dr. Dully's qualifications,

methods or reliability in estimating the chronological age of a model from review of digital images prior to the meeting. (*Preston Deposition, March 13, 2025* see generally p.101-106) She does not understand what a Sexual Maturity Rating (SMR) is or how it relates to the opinions of Dr. Dully. (*Preston Deposition, March 13, 2025* see generally p.116; p.206) She does not think that Dr. Dully is an expert on grooming of pubic hair or determining whether a model is groomed from a digital image. (*Deposition of Preston, March 13, 2025* P.119, ln 1-11; P.120, ln.22 – P.121, ln.18) Finally, Preston admits that digital images are often modified or edited for aesthetic reasons, and she does not know whether the subject images were edited or modified. (*Preston Deposition, March 13, 2025* p.77-78)

## Dr. Dully's Report

On February 22, 2023, Dully presented Preston with a Report and her opinion on the age of the model depicted in image attached to the CyberTipline Report #153739160. (*Dully Reports*, Exhibit I) Dully's opinions are as follows: "This female child appears younger than 18 years of age. She would have reached this genital appearance of SMR IV at 12-15 years of age. She does not appear to be shaved as her anterior pubic hair is still present."

## Willfully False Information Contained in Dully's Report

These opinions were willfully misleading and false. At the time that Dr. Dully wrote this letter, she knew there was no reliable scientific method to determine or estimate the chronological age of a model from a digital

10

photograph.  Dully's opinions were not within a reasonable degree of medical probability. In fact, they were not scientific at all:

> Q.    Do you agree that it is not scientifically reliable to use SMR ratings to determine the actual chronological age of a model depicted in a pornographic image on the internet?
>
> A.    Yes.

(*Dully Deposition, April 28, 2025 p.46 ln.13-18*, attached as Exhibit J) Again, asked a different way:

> Q    If I was someone who was being asked to make a factual determination about whether or not a model depicted in a pornographic image on the internet was a minor; in fact, a minor, would your opinion about the appearance be a reliable opinion for me to base that decision on?
>
> A.    No, that's what the investigation is for.

(*Dully Deposition, April 28,2025 p.30 ln.9-19*) Put another way Dully testifies that "What I see on the image does not necessarily give an indication of the actual chronological age that may be discovered during investigations." (*Dully Deposition, April* 28, 2025 p.35 ln 1-4).

There is no warning or disclaimer about the lack of reliability or scientific method underlying this "opinion" contained in these reports.

### Dully's Verbal Warning to Preston Regarding Use of Report

Dr. Dully knew there was a lack of medical/scientific reliability regarding her report, at the time she produced the report. In fact, Dully testifies repeatedly that she informed Preston that her opinions were not reliable medical opinions as to the age of the individual depicted:

Q.··So when Detective Preston came to you with these images and she left, you would have told her that you cannot give her any reliable information about the actual age of this individual depicted in this image?

A.··Yes. (*Dully Deposition, April 28, 2025 P. 47* ln. 12-17)

Again, in Defendant Dully's continued deposition she confirmed the warning to Preston:

Q. So I believe you testified in your original deposition you do have some recollection of meeting with Detective Preston; correct?

A···Yes.

Q.··All right.· And when you met with her, you explained to her that you could not offer her scientific reliable opinions regarding the actual age of the models depicted in these images, correct?

A···Yes.

(*Dully Deposition June 18, 2025* p. 12 ln.18 – p.13 ln.1, attached as Exhibit K)

<u>First Affidavit for Search Warrant</u>

On February 28th, 2023, Preston swore out an affidavit in support of a search warrant. To establish probable cause, the affidavit cites three sources of information: (1) The NCMEC CyberTipline Report (2) Dr. Dully's report and (3) Preston's personal knowledge of the website met-art.com. (*Affidavit for Search Warrant, February 28, 2023*, Exhibit A) [10] Specifically, Preston swore that "There is a watermark of <u>www.met-art.com</u> on the offending image. This site has a known history of displaying CSAM images of teenage girls and CSAM content

---

[10] Preston did not include her subjective opinion of the age of the individual depicted in the CyberTip.

from this site has been encountered by other ICAC investigators in past investigations." (*Affidavit for Search Warrant*, February 28, 2023, Exhibit A)

In this Affidavit Preston made material false and/or misleading statements. Furthermore, she omitting material exculpatory evidence. She did not attach or include the subject image. (*Affidavit for Search Warrant, February 28, 2023*, Exhibit A)

1. Preston omits from her affidavit that NCMEC specifically categorized the image as "unconfirmed" child pornography. This categorization meant that NCMEC determined that the image depicted a model of indeterminant age. (NCMEC Corp. Rep. Deposition p. 22 ln.18-24)

2. Preston omits that there was a material disagreement among detectives about whether the image depicted an adult.

3. Preston knew that Dr. Dully's opinion was not a reliable medical opinion. Despite that, Preston included the report in the Affidavit as though contained reliable opinions.

4. Preston has no personal knowledge about whether or not there is a known history of illegal content on this site. When questioned, she states that she got the information from a "google" search. (*Preston Deposition November 21, 2023* p.30 ln.3-19, attached as Exhibit L) She cannot recount any details of the source or the accuracy of this statement. In fact, she freely acknowledges, specifically regarding the history of metart.com, "you can't believe everything you read on google." *Id.* Not even Preston believed the statement made about metart.com was reliable. *Id.*

5. Preston did not know any ICAC investigators who had encountered this website in past investigations. Under oath, Preston identifies Det. Greene as the ICAC investigator she refers to. (*Preston Deposition March 13, 2025* p.51) However, Det. Greene denies any part in a past investigation of this site and any personal reliable knowledge of whether illegal content has ever been published on met-art.com. (*Greene Deposition* p.52-53; p.80 ln24 – p.81 ln.4; p.87 ln.22 – p.88 ln.11)

Based on these false statements and omissions of exculpatory evidence, the judge executed the Search Warrant.

<u>Compliance with Search Warrant</u>

Based on the Affidavit of Preston, the search warrant was issued to the service provider. On March 3rd, 2023, SJSO received compliance from the ESP, containing all digital information stored in Mr. Lawshe's cell phone cloud storage.

From review of the contents, Preston identified two additional photographs from the same photoshoot which was the subject of the CyberTipline Report #153739160. These images depicted the same model in different poses. (see *Dully Reports*, Exhibit I) These are identified as files 0059 and 0065(1). *Id.* In addition to these images, Det. Preston identified another image of who she believed was the same person depicted in the CyberTipline Report #153739160. (*Preston Deposition March 13, 2023* p.234 ln.17 – p.235 ln.7) This image is identified as ycbLVVFQ_0.jpg. *Id.* This model was later identified by the name "Melania D." (see Age Verification Documents, Exhibit H)

Finally, Preston identified an additional image which she characterized as CSAM. This image depicted a model's body from the knees to the stomach, along with a partially exposed vagina. This image is "Screenshot_20230122_174408 _DuckDuckGo.jpg." *Id.* Preston cannot articulate what caused her to believe that this model was a minor. (*Preston Deposition March 13, 2023* p. 158-159) The image is cut off and does not show the model's face or breasts. (*Preston Deposition March 13, 2023* p.157 ln. 20 – p.158 ln.5) This image contained a website, QR code and identified the model as "Sanija." (Preston Deposition

March 13, 2025 p. 224-229, 244-245) This model also went by the stage name of Kacey Lane. (see *Age Verification Documents*, Exhibit H)

Preston brought these additional images to Dr. Dully for evaluation. Again, Dr. Dully opined that the model initially depicted in NCMEC CyberTipline Report#153739160 was Grade IV and was a minor. As to the model Sanija/Kacey Lane, Dully opinined that because there appeared to be no pubic hair development, the model was SMR I, pre-pubescent, and therefore appeared developmentally less than 9-13.5 years old. (*see Dully's Reports*, Exhibit I)

After taking these images to Dr. Dully for review, Preston sought a search warrant for Mr. Lawshe's home. (see *Affidavit for Search Warrant April 12, 2023,* Exhibit M) This was granted on the same knowingly false evidence of probable cause as presented before, including Preston's alleged knowledge of the website and Dr. Dully's reports *Id.* Upon execution of the warrant, no additional images of CSAM were identified by SJSO.

Thereafter, Preston determined that there was probable cause to arrest Mr. Lawshe and effectuated that arrest. (*Arrest Report*, Exhibit N) He was charged with images 0059, 0065(1) and screenshot_20230122_174408 _DuckDuckGo.jpg. (*Charging Document*, Exhibit O)

After Mr. Lawshe's criminal defense team presented the age verification documents of the two models to the Assistant State Attorney, all charges were dropped. (*Emails to ASA and Nolle Proscequi*, Exhibit P)

## MEMORANDUM OF LAW
### Standard for Summary Judgment

In seeking summary judgement on any issue, the moving party bears the burden of establishing there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. See *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003). Once the party moving for summary judgment satisfies its initial burden, the burden shifts to the non-moving party to come forward with specific facts showing a genuine dispute for trial. *Hinson v. Bias*, 927 F.3d 1103, 1115 (11th Cir. 2019). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the non-moving party. *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County*, 630 F.3d 1346, 1353 (11th Cir. 2011).

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Grp., Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) If the evidence produced by the nonmoving party is merely colorable or is not significantly probative summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) As such, "speculation [is] insufficient to create a genuine issue of material fact." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015)

## Requirement of Probable Cause

An arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003) The requirement of probable cause applies to applications for a search warrant. *Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983)

Probable cause exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing a criminal offense. *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003) Probable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances. *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). However, mere speculation is insufficient to establish probable cause. *Whitaker v. Estelle*, 509 F.2d 194, 196 (5th Cir. 1975).

## False Statements

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a search warrant violates the Fourth Amendment if the affidavit supporting the warrant contains statements that are deliberately false or made with reckless disregard for the truth and such statements are necessary to a finding of probable cause. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1326 (11th Cir. 1997). The rule in *Franks* also extends to omissions "made intentionally or with a reckless disregard for the accuracy of the affidavit" if the inclusion of such omissions

17

"would have prevented a finding of probable cause." *Id.* at 1326-27 "It is clearly established that officers cannot knowingly make false statements in a warrant application where those misstatements are necessary to probable cause. ..." *Goldring v. Henry*, 2021 U.S. App. LEXIS 33621 (11th Cir. 2021) For purposes of Qualified immunity, it is clearly established that intentionally or recklessly omitting material information from a warrant affidavit violates the Fourth Amendment. *See* Paez, 915 F.3d at 1287 (considering it clearly established that a warrant affiant cannot omit known material facts) *Butler v. Smith*, 85 F.4th 1102, 1112. (11th Cir. 2023)

Lack of an Essential Element

"Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify an arrest for a particular crime depends on the elements of the crime." *Crosby v. Monroe County*, 394 F.3d 1328, 1333(11th Cir. 2004). While an officer needn't prove every element of the charged crime, knowledge that an element isn't met—or is exceedingly unlikely to be met—will preclude a finding of probable cause." *Butler v. Smith*, 85 F.4th 1102, 1116 (11th Cir. 2023) citing *Holmes v. Kucynda*, 321 F.3d 1069, 1080 (11th Cir. 2003)

Requirements for a Reasonable Investigation

In establishing probable cause, an arresting officer is required to conduct a reasonable investigation. Rankin v. Evans, 133 F.3d 1425 (1998) quoting *Tillman,* 886 F.2d at 321 and *Harris v. Lewis State Bank,* 482 So. 2d 1378, 1382 (Fla. 1st DCA 1986) ("Where it would appear to a "cautious man' that further investigation is justified before instituting a proceeding, liability may

attach for failure to do so, especially where the information is readily obtainable, or where the accused points out the sources of the information."). An officer, however, need not take "every conceivable step ... at whatever cost, to eliminate the possibility of convicting an innocent person." *Tillman*, 886 F.2d at 321; *see also State v. Riehl*, 504 So. 2d 798, 800 (Fla. 2d DCA 1987)

In evaluating probable cause, an officer may not 'unreasonably disregard certain pieces of evidence by choosing to ignore information that has been offered to him or her or electing not to obtain easily discoverable facts' that might tend to exculpate a suspect." *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (alterations in original) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1229, 1233 (11th Cir. 2004)). In other words, a detective "may not close his or her eyes to facts that would help clarify the circumstances of probable cause," nor are they "permitted to turn a blind eye to exculpatory information that is available to them, and instead support their actions on selected facts they chose to focus upon." *Kingsland v. City of Miami, 382 F.3d 1220, 1228* (11th Cir 2004) *cf. Hernandez v. United States*, 939 F.3d 191, 208 (2d Cir. 2019) see also *Alcocer v. Mills*, 800 Fed. Appx. 860, 866 (11th Cir. 2020) *also Sevigny v. Dicksey*, 846 F.2d 953, 957 n.5 (4th Cir. 1988) ("Objective inquiry into the reasonableness of an officer's perception of the critical facts leading to an arrest . . . must charge him with possession of all the information *reasonably discoverable* by an officer acting reasonably under the circumstances." (emphasis added)

19

## Qualified Immunity

Nevertheless, officers who make an arrest without probable cause are entitled to qualified immunity if there was arguable probable cause for the arrest. *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999). First, the plaintiff must show both that the defendant's conduct violated a statutory or constitutional right and the right was clearly established.  Here, the requirement of probable cause, an objectively reasonable investigation and the prohibition against false statements to judicial authorities were clearly established. *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004)

Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the defendant could have believed that probable cause existed to arrest." *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010) However, a qualified immunity analysis must charge the officer with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances. *Kingsland v. City of Miami*, 382 F.3d 1220, 1222 citing  *Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir. 1988)

## ARGUMENT

At the time of the subject events, it was clearly established that an officer may not unreasonably disregard certain pieces of evidence by choosing to ignore information that has been offered to him or her' or electing not to obtain easily discoverable facts' that might tend to exculpate a suspect. *See generally Rankin* and *Kingsland.* In this matter, there is no factual dispute that, prior to any probable cause determination, Det. Preston knew:

20

1. The image could be reasonably interpreted as depicting an adult. (*Preston Deposition, March 13th 2025, P.93, ln. 6-23*)

2. The image was watermarked with a public website (*Preston Deposition March 13,2023 p.32*; see also *Affidavit for Search Warrant, February 28, 2023,* Exhibit D)

3. Virtually all models published on public pornographic websites are represented to the public as being adults. (*Preston Deposition, March 13th, 2025, P. 67, ln 23 – P.68, ln.1*)

4. Producers and publishers of pornographic websites are required by federal law to maintain age verification evidence which would be exculpatory. (*Preston Deposition, March 13th, 2025, P.141 ln.15-21*)

5. That the website and potential age verification evidence was readily available. (*Preston Deposition, March 13th, 2025 p.147 ln.12-18*)

She admits these facts in her sworn testimony.

There is no factual dispute that under the circumstances, a reasonable investigation would have required going to the website to discover the circumstances of the image's publication. This is the testimony of essentially every SJSO officer who has testified. (*Greene Deposition, December 17th, 2024, P.46, ln. 13-19; Camden Deposition p40 ln. 20-24; Tolbert Deposition, December 17th, 2024, p.46, ln. 5-8*)

Even Preston does not contest this assertion (*Preston Deposition, March 13th, 2025, P.185 ln. 25 – P.186 ln.13*) and her refusal to take a position on whether she should have sought age verification documentation does not create a material factual dispute. The fact is that Preston has investigated other similar allegations by visiting the relevant websites in those cases. She has no

explanation of why she did not do the same in this case. (*Preston Deposition, March 13th 2025*, P. 66, ln. 18 – P.67, ln. 9; P.145, ln. 1-7)

There is simply no evidence which would create a material factual dispute about the reasonableness and ease with which Preston could have discovered the exculpatory information.  As shown in email exchanges between Lawshe's criminal counsel and the records custodian, obtaining the documents took minimal effort. (*Age Verification Documents*, Exhibit D) The only evidence is that she inexplicably ignored this known source of information, in the face of obviously ambiguous facts. This is precisely the conduct prohibited by *Rankin*, *Kingsland*, *Sevigny* and their progeny.

Likewise, there is no dispute that had Preston gone to the website and obtained the age verification information, there would not have been probable cause or arguable probable cause. As noted in *Kingsland* and *Sevigny*, the probable cause and arguable probable cause analysis *must charge Preston with the facts that were reasonably discoverable*. Charging Preston with possession of the facts reasonably discoverable, she would have (1) possession of an image depicting an individual that reasonable people could interpret as an adult, (2) published on a website which claims the model is an adult, (3) published on a website which claims compliance with federal age verification laws and, (4) documents provided by a licensed attorney (records custodian) that the models depicted were adults at the time of the photography.  No objectively reasonable and competent law enforcement officer would believe that probable cause exists under those facts.

Again, Preston does not contest this fact. Preston acknowledges that the age verification documents "obviously would have changed the entirety of the investigation." (*Preston Deposition, March 13th 2025*, P.154, ln. 12-20)[11]

Despite the lack of an objectively reasonable investigation, Preston never had probable cause to seek a search warrant or make an arrest because there was a complete lack of reasonably trustworthy information to support the search warrant. First, it is established that Dr. Dully's opinions are not medically or scientifically reliable. (*Dully Deposition, April* P.46 ln.13-18) Dully testifies that she was not even offering an opinion about the chronological age of the models. The undisputed evidence is that Dr. Dully warned Preston that her opinions regarding age were not reliable. (*Dully Deposition June 18, 2025* p. 12 ln.18 – p.13 ln.1) Preston has not disputed this[12] and has testified that she has no recollection of any of the conversations she had with Dully. (*Preston Deposition March 13, 2025*, p. 102 ln.1-23; p.114; p.276 ln. 8)

Furthermore, Preston has admitted that her statement that met-art.com "has a known history of displaying CSAM images of teenage girls" was not reliable. She has no knowledge of the source of this information, other than

---

[11] Preston complains that the redacted passports and statements of the records custodian do not prove that the models were adults at the time of the photography. This misses the point. They are evidence that the models were adults at the time of the photography. Possession of these documents establishes a reasonable basis to believe the models were adults and any reasonably cautious or prudent officer would not believe that there was probable cause if they had possession of this information.
    This argument is not predicated on Dr. Dully's opinion in any way. Because the models are at best age-difficult, possession of age verification documentation would have prohibited a finding of probable cause, even if Preston reasonably believed that there was some reliability to Dully's opinions.

[12] Neither Preston nor Dully have disclosed any expert in this matter which would create a factual issue as to the reliability of Dully's opinions.

"google." (Preston Deposition November 21, 2023 p.30 ln.3-19) And freely admits that "you can't believe everything you read on google." *Id.* Inclusion of this information in the affidavit represents knowingly false statements or statements made with a reckless disregard for the truth.

When this evidence is removed, all that is left to consider is (1) a report of "unconfirmed" child pornography and (2) an image which even Preston admits could be reasonably characterized as depicting an adult and (3) contained a watermark of a public website. Preston has admitted that she had no evidence to suggest that Mr. Lawshe knew the images portrayed a minor and acknowledged that it would require speculation to discern how Mr. Lawshe interpreted the images in question. This information would be insufficient to establish probable cause that Mr. Lawshe knowingly possessed a sexually explicit image which he knew to depict a minor. § 827.071(5), Fla. Stat.

## Conclusion

The search and arrest in this matter were conducted without probable cause. Taking all the evidence in a light most favorable to Det. Preston and accepting her testimony as true, there is no factual dispute that Det. Preston violated the Plaintiff's constitutional rights. Because Defendant Preston's conduct violated clearly established rights and no objectively reasonable officer would have believed that probable cause existed under the undisputed facts, Det. Preston is not entitled to qualified immunity for these violations. Therefore, Plaintiff is entitled to judgement as a matter of law on the issues of (1) the

violation of his right to be free of unreasonable search and seizure and (2) that

Defendant is not entitled to qualified immunity under 42 U.S.C. § 1983.

Dated: August 12, 2025

**LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI**

*/s/ Michael K. Roberts*

**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
mroberts@nrhnlaw.com
Attorney for Plaintiff

67-1

IN THE CIRCUIT COURT
OF THE 7TH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

IN THE MATTER OF AN APPLICATION FOR A COURT ORDER
PURSUANT TO 18 USC 2703 AND F.S. 934.23
(REQUIRED DISCLOSURE OF CUSTOMER COMMUNICATIONS OR RECORDS)

AUTHORIZING RELEASE OF SIGNALING INFORMATION
(COMMONLY KNOWN AS "CELL SITE INFORMATION")

## AFFIDAVIT FOR SEARCH WARRANT

**BEFORE ME, Sergeant Eugene Tolbert** of the St. Johns County Sheriff's Office, St. Johns County, Florida, personally appeared **Detective Mikayla Preston** of the St. Johns County Sheriff's Office, who being by me first duly sworn, deposes and says:

The St. Johns County Sheriff's Office Special Victims Unit is actively investigating the crime(s):

**Possession of Child Sexual Abuse Imagery; F.S.S. 827.071(5)**

Your Affiant believes the above crime has been committed and that certain evidence relevant to proving these crimes is now being kept as follows, to wit:

**Verizon**
**Attn: VSAT**
**180 Washington Valley Rd**
**Bedminster, NJ 07921**

**These records are requested starting on <u>01/22/2023 thru 01/28/2023</u> for customer/subscriber(s):**

**Phone Number: 904-315-7058 (hereinafter referred to as the target device)**

**Affiant Background:**

Your Affiant is a Detective for the St. Johns County Sheriff's Office, with over 5 years of Law Enforcement experience. Your Affiant is currently assigned to the Special Victims Unit (Internet Crimes against Children) of the St. Johns County Sheriff's Office specializing in internet crimes against children investigations. Your Affiant began her Law Enforcement career in 2017 with the St. Augustine Beach Police Department, before

working for St. Johns County Sheriff's Office, and has worked as a Patrol Deputy and Special Victims Unit/ICAC Detective. Your Affiant is a member of the North Florida Internet Crimes against Children (ICAC) Task Force. ICAC is a national organization which provides specialized high-tech training and resources to law enforcement agencies that investigate crimes dealing with online sexual-solicitation and exploitation of children, including the collection and trading of images of Child Sexual Abuse.

Your Affiant has worked with experienced ICAC Detectives who also investigate Child Exploitation offenses. Your Affiant has investigated or assisted in the investigation of matters involving the possession collection, production, advertisement, receipt, and/or transmission of images of Child Sexual Abuse. Your Affiant has been involved in searches pertaining to the possession, collection, production, and/or transmission of Child Sexual Abuse through the execution of search warrants or through the subject providing written consent to permit a search.

**And the facts which establish Probable Cause:**

Your Affiant received this investigation on February 20th, 2023. The St. Johns County Sheriff's Office received **cyber tip #153739160** from the National Center for Missing and Exploited Children who received the information on 1/25/2023 in reference to a **"9043157058"** uploading child sexual abuse material (CSAM). The cyber tip was reported by Synchronoss Technologies, Inc. and advised the user uploaded one (1) image of possible CSAM.

The following information was listed for the upload:

**Filename:**d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ee421d173 13ef489728f19896e5f79e9d4e63b80f6a487
MD5: b06fe687fae143b4c24f05eb1821ab48
Did Reporting ESP view entire contents of uploaded file? Yes
Did Reporting ESP view the EXIF of uploaded file? No
Were entire contents of uploaded file publicly available? No
Image Categorization by ESP. A2

Phone number **9043157058** is listed on the cyber tip as connected with the suspect, and is assigned to Verizon Wireless.

Your Affiant viewed the image attached to the cyber tip. Additionally, on February 22, 2023, Your Affiant consulted Dr. K. Dully of the First Coast Child Protection Team, who also reviewed the offending image. Dr. Dully provided the following written statement in reference to the CSAM image:

"I have examined a single color photograph displayed on a law enforcement laptop entitled: d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ee421d173 13ef489728f19896e5f79e9d4e63b80f6a487 provided to me by yourself following a cybertip from NCMEC. This image depicts what appears to be a naked pubertal female

Page 2 of 5

SJSO23OFF001895

child wearing pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest position with her lower legs and ankles parted to expose her genitalia for the camera. This female child appears younger than 18 years of age. She would have achieved this developmental genital appearance of SMR IV at 12-15 years of age. She does not appear to be shaved as her anterior pubic hair is still present."

To note, there is a watermark of www.met-art.com on the offending image. This site has a known history of displaying CSAM images of teenage girls and CSAM content from this site has been encountered by other ICAC investigators in past investigations.

Your Affiant queried law enforcement databases and discovered the target device is associated with William Lee Lawshe, a 53-year-old white male who resides in St. Augustine, FL and who is employed as a law enforcement officer with the Florida Fish and Wildlife Commission.

Synchronoss Technologies, Inc. is a cloud storage company for Verizon Wireless, thus the location and user of the target device is relevant to the upload of the offending image in this case. Since cellular technology has the ability to estimate the location of a device during network activity and since call logs, text messages with content, and other account information collected by cellular companies can assist in identifying the user of the device at the time of the upload, Your Affiant is seeking these records to further this investigation and identify evidence, witnesses, suspect(s), and relevant locations.

**Exculpatory nature of these records as it relates to Electronically Stored Information (ESI)**

In your affiant's training and experience, it is known that while the requested information may reveal inculpatory evidence that further shows the listed suspect was involved with the specified crime, there may be exculpatory information also contained within the records requested. For example, the records may show the specific mobile device was in the area of the crime at the time of the crime; however, when reviewed in totality within the entire data set requested, it is possible the mobile device frequents that area and is perfectly consistent with typical patterns and trends identified within the requested data set.

While it is not the intent of a search warrant to preserve exculpatory evidence, in this specific request we are requesting information that we know will be purged based on the retention periods defined by Verizon; Attn: VSAT. These retention periods for some records can be as short as 48 hours. Given the totality of requesting information that is Electronically Stored Information (ESI) with a known retention period, the possible inculpatory and exculpatory nature of these records, in addition to the State's requirement to preserve all potential evidence in the course of a criminal investigation, your affiant is requesting a time period of 7 days of records.

Given the nature of the crime, possible planning period, and the ability to identify common patterns and trends within the requested records, your affiant believes it is reasonable and appropriate to request this period of time. Furthermore, there is probable cause to support

SJSO23OFF001895

the requested records are of evidentiary value and the act of preserving the requested period of time is within the "best practices" of preserving digital evidence as well as ESI.

Through this investigation, your affiant has confirmed the targeted telephone is currently being utilized by Verizon; Attn: VSAT.

**Items requested:**

1.  **All customer/subscriber information**, including any listed addresses, telephone numbers, social security numbers, dates of birth, names, addresses, any other customer identifying information, mobile handset or device identifiers/serial numbers (MEID, ESN, IMSI, IMEI), activation date and deactivation date, and location device was purchased if applicable.

2.  **Device Purchase Information.** This is specifically to include the Date, Time and Location of where the device or any pre-paid refill cards were purchased.

3.  **Any email addresses associated with the account.** This is to specifically include Google Gmail addresses associated with any Android device associated with this device or any email associated with an iPhone and/or iTunes account associated with this device that is currently on file and stored in the normal course of business of Verizon; Attn: VSAT.

4.  **Call detail records**, including detailed information in reference to all known outgoing and incoming calls associated with the account, dates and times calls were made, and duration of all calls made or received. This is to include any other pertinent call detail records including special features codes, or any other codes that are maintained in the normal course of business for Verizon, Attn: VSAT, of any Verizon; Attn. VSAT cellular numbers identified in the course of the investigation. In addition to voice calls, this would also include any detail records showing text messages, MMS messages, or data activity.

5.  **Cell site information**, to include all known cell towers associated with outgoing and incoming calls (Call Detail Records). This information is to include any sector information, if known, cell site location, and any other related material that would be necessary to identify the location and sector in reference to the cell site information associated with the call detail records. In the event text messages, MMS messages, LTE and Data activity including IP session and destination addresses that were produced are also available with cell site information, this information would be included in this request. This would include the Data Sessions report.

6.  **Cell Site locations** for all Verizon; Attn: VSAT Cell Sites, sector information, including Azimuth headings, in the regional market associated with the requested cell site information.

SJSO23OFF001895

7. **Location information**, to include any estimated or known Longitude and Latitude of the cellular device's current location, or approximate location, information received by cell tower(s) in reference to direction and distance from the tower a device may be located (timing and triangulation information). Radio Frequency signal strengths, direction, and transmission information. The geographical constraints of location information will be limited to the United States. Location information can be in the form of historical records. Specific to Verizon, Attn: VSAT, this would include any reports of device activity that would include the approximate latitude and longitude of the device at the time of the activity, direction and distance from the tower, and other location related information commonly referred to as an RTT(Round Trip Timing), EVDO, ALULTE, and Levdort report. This further includes any other report similar in nature.

8. **All text message and/or MMS messages**, including message content, currently stored in the normal course of business for Verizon, Attn. VSAT, to include any cloud services which allow for the long term storage of both voicemails and SMS/MMS messages.

9. **Cloud Data**, any content that may have been backed up to Cloud Storage for the listed dates/times. If said Cloud Storage has been provided by a third-party provider, please provide relevant contact information for that provider.

WHEREFORE, Affiant makes this affidavit and prays the issuance of a Search Warrant in due form of law for the search of the above-described information, subject to the order of a Court having jurisdiction thereof, by the duly constituted officers of the law.

_Det. Mikayla Preston #11243_
Detective Mikayla Preston
St. Johns County Sheriff's Office

SWORN TO and subscribed before me this Tuesday, February 28, 2023

Sergeant Eugene Tolbert
St. Johns County Sheriff's Office
(notary public or law enforcement officer per FSS 117.10)



IN THE CIRCUIT COURT
OF THE 7TH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

IN THE MATTER OF AN APPLICATION FOR A COURT ORDER
PURSUANT TO 18 USC 2703 AND F.S. 934.23
(REQUIRED DISCLOSURE OF CUSTOMER COMMUNICATIONS OR RECORDS)

AUTHORIZING RELEASE OF SIGNALING INFORMATION
(COMMONLY KNOWN AS "CELL SITE INFORMATION")

## SEARCH WARRANT

**NOTE TO PROVIDER:** THIS WARRANT IS ISSUED PURSUANT TO FLORIDA STATUTE S. 92.605. A RESPONSE IS DUE WITHIN 20 BUSINESS DAYS OF RECEIPT OF THIS WARRANT UNLESS A LONGER TIME PERIOD IS STATED HEREIN.

**IN THE NAME OF THE STATE OF FLORIDA**

**TO:    THE SHERIFF OF ST. JOHNS COUNTY, HIS DULY APPOINTED DETECTIVES, THROUGH COOPERATING ASSISTANCE FROM THE LEGAL DEMAND COMPLIANCE GROUP OF VERIZON OR ANY OTHER DIGITAL PROVIDER WHICH MAINTAINS RECORDS RELATED TO THE TARGET ACCOUNT.**

WHEREAS, an affidavit, has been made this date before the undersigned. AND WHEREAS, said facts made known to me have caused me to find there is **PROBABLE CAUSE** to believe that certain laws have been violated, to wit:

**Possession of Child Sexual Abuse Imagery; F.S.S. 827.071(5)**

has been committed and that certain evidence related to the violations, in the form of information related to a cloud storage account described hereinafter is being kept by the following business.

**Verizon**
 **Attn: VSAT**
 **180 Washington Valley Rd**
 **Bedminster, NJ 07921**

These records are requested starting on <u>01/22/2023</u> thru <u>01/28/2023</u>   for customer/subscriber(s):

**Phone Number: 904-315-7058 (Target Device)**

**NOW THEREFORE, you are hereby commanded, in the daytime or in the nighttime, or on Sunday, as the exigencies of the occasion may demand, to produce:**

1.      **All customer/subscriber information**, including any listed addresses, telephone numbers, social security numbers, dates of birth, names, addresses, any other customer identifying information, mobile handset or device identifiers/serial numbers (MEID, ESN, IMSI, IMEI), activation date and deactivation date, and location device was purchased if applicable.

2.      **Device Purchase Information.** This is specifically to include the Date, Time and Location of where the device or any pre-paid refill cards were purchased.

3.      **Any email addresses associated with the account.** This is to specifically include Google Gmail addresses associated with any Android device associated with this device or any email associated with an iPhone and/or iTunes account associated with this device that is currently on file and stored in the normal course of business of Verizon, Attn: VSAT.

4.      **Call detail records**, including detailed information in reference to all known outgoing and incoming calls associated with the account, dates and times calls were made, and duration of all calls made or received. This is to include any other pertinent call detail records including special features codes, or any other codes that are maintained in the normal course of business for Verizon; Attn: VSAT, of any Verizon; Attn: VSAT cellular numbers identified in the course of the investigation. In addition to voice calls, this would also include any detail records showing text messages, MMS messages, or data activity.

5.      **Cell site information**, to include all known cell towers associated with outgoing and incoming calls (Call Detail Records). This information is to include any sector information, if known, cell site location, and any other related material that would be necessary to identify the location and sector in reference to the cell site information associated with the call detail records. In the event text messages, MMS messages, LTE and Data activity including IP session and destination addresses that were produced are also available with cell site information, this information would be included in this request. This would include the Data Sessions report.

6.      **Cell Site locations** for all Verizon, Attn: VSAT Cell Sites, sector information, including Azimuth headings, in the regional market associated with the requested cell site information.

7.      **Location information**, to include any estimated or known Longitude and Latitude of the cellular device's current location, or approximate location, information received by cell tower(s) in reference to direction and distance from the tower a device may be located (timing and triangulation information). Radio Frequency signal strengths, direction, and transmission information. The geographical constraints of location information will be limited to the United States. Location information can be in the form of historical records. Specific to Verizon; Attn: VSAT, this would include any reports of device activity that would include the approximate latitude and longitude of the device at the time of the

SJSO23OFF001895

activity, direction and distance from the tower, and other location related information commonly referred to as an RTT(Round Trip Timing), EVDO, ALULTE, and Levdort report. This further includes any other report similar in nature.

8.    **All text message and/or MMS messages**, including message content, currently stored in the normal course of business for Verizon, Attn: VSAT, to include any cloud services which allow for the long term storage of both voicemails and SMS/MMS messages.

9.    **Cloud Data**, any content that may have been backed up to Cloud Storage for the listed dates/times. If said Cloud Storage has been provided by a third-party provider, please provide relevant contact information for that provider.

**THESE PRESENTS THEREFORE, are to command you with proper and necessary assistance to search said premises and seize described items as evidence.**

In accordance with 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

**Please send the requested data including a certification of records to the St Johns County Sheriff's Office, Attention: Detective Mikayla Preston, via email (preferred) at mpreston@sjso.org or by delivery to 4015 Lewis Speedway St. Augustine, FL 32084.**

Any costs incurred may be billed to: St Johns County Sheriff's Office, Attention Accounts Payable, 4015 Lewis Speedway, St. Augustine, FL 32084 or via electronic mail at SOAccountsPayable@sjso.org.

Due to the sensitivity of this on-going criminal investigation, the notification to the listed subscriber that these records have been released to a law enforcement agency could compromise this investigation. Based on these facts, it is further ordered that the customer/subscriber is not to be notified of the release of this information, as it could jeopardize an on-going criminal investigation.

WITNESS my hand and seal this Tuesday, February 28, 2023

CIRCUIT COURT JUDGE
ST JOHNS COUNTY, FLORIDA

Page 3 of 3

67-2



NATIONAL CENTER FOR
**MISSING &**
**EXPLOITED**
C H I L D R E N'

# CyberTipline Report 153739160

## Priority Level: E
## (Report submitted by a registered Electronic Service Provider)

Received by NCMEC on 01-25-2023 21:18:12 UTC
All dates are displayed as MM-DD-YYYY
Except for times provided in Additional Information sections, all time zones are displayed in UTC

## Executive Summary

The following is a brief overview of information contained in this CyberTipline report:

Total Uploaded Files: 1

| Summary of ESP Reported Files | |
| --- | --- |
| Total Uploaded Files | 1 |
| Viewed by ESP | 1 |
| Publicly Available | 0 |
| ESP Reporter Industry Classification | |
| A2 | 1 |

| Summary of NCMEC File Categorizations | |
| --- | --- |
| Content Categorizations | |
| CP (Unconfirmed) | 1 |

Not all files will have categorizations and some might have multiple categorizations.

Incident Type: Apparent Child Pornography (Unconfirmed)
    Files Not Reviewed by NCMEC, Hash Match

NCMEC Incident Type is based on NCMEC's review of the information or uploaded files in this report OR a "Hash Match" of one or more uploaded files.

The National Center for Missing & Exploited Children (NCMEC) is a private, non-profit 501(c)(3) organization created in 1984 by child advocates to serve as a national clearinghouse and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited child issues. To further NCMEC's mission to reduce child sexual exploitation and prevent future victimization, NCMEC operates the CyberTipline. NCMEC makes information submitted to the CyberTipline by members of the public and Electronic Service Providers available to law enforcement and uses this information to identify online trends endangering children that can be addressed in child safety and prevention messaging. NCMEC offers its programs and services pursuant to its own private mission and independent business operations. NCMEC does not act in the capacity of or under the direction or control of the government or law enforcement agencies. NCMEC does not investigate and cannot verify the accuracy of the information submitted to the CyberTipline.



## Contents

**Section A: Reported Information** — 1

  Reporting Electronic Service Provider (ESP) — 1
  Company Information — 1
  Incident Information — 2
  Suspect — 2
  Uploaded File Information — 2

**Section B: Automated Information Added by NCMEC Systems** — 3

  Explanation of Automated Information (in alphabetical order) — 3
  Further Information on Uploaded Files — 3
  Uploaded File Information — 3
  Phone Number Geo-Lookup (Suspect) — 4
  Auto Refer — 4
  Deconfliction — 4

**Section C: Additional Information Provided by NCMEC** — 5

  Uploaded File Information — 5

**Section D: Law Enforcement Contact Information** — 6

  Gainesville Police Department — 6

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*



# Section A: Reported Information

The following information was submitted to the CyberTipline by the Reporting Person or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

## Reporting Electronic Service Provider (ESP)

**Submitter:**

Synchronoss Technologies, Inc
Verizon

Business Address:
200 Crossing Boulevard
Bridgewater, NJ 08807 United States

**Point of Contact for Law Enforcement:**

Business Phone: 9085476012
Email: Content-Abuse@synchronoss.com (Verified)

## Company Information

Synchronoss Technologies is the cloud-based storage provider for content stored on the Verizon Cloud. To obtain account content, please direct the legal process to Synchronoss Technologies, using the contact information below. All legal process to Synchronoss must include the mobile number for the reported account. To obtain subscriber information for a reported account, please direct legal process to Verizon using the contact information below.
Synchronoss Contact Information:
Email: Content-Abuse@synchronoss.com
Verizon Contact Information:
Verizon Security Assistance Team (VSAT) will only accept valid legal demands (subpoena, court order or search warrant) for records. Please address your legal requests to Verizon.
Contact Information - 800-451-5242
Option 1: Subpoenas
Option 2: Orders & search warrants
Option 3: Electronic surveillance & technical assistance
Option 4: General information
Option 9: Exigent situations ONLY
Mailing address
Verizon
Attn: VSAT
180 Washington Valley Road
Bedminster, NJ 07921
Hours of operation
(Options 1 & 2) 7 a.m. ? 8 p.m. ET
(Options 3, 4 & 9) 24 hours
Fax #s
Subpoena Wireless - 888-667-0028
Subpoena Wireline - 325-949-6916
Orders & Search Warrants for both Wireline and Wireless - 888-667-0026
Surveillances Wireline and Wireless - 800-267-9129
Exigent Situations Wireless - 800-345-6720
Exigent Situations Wireline - 800-997-9981

This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.
Please treat all information in this Report as confidential.



VSAT has a web-based interface LEA Portal that enables users to upload legal demands and receive responsive records via fax, secure email, or secure portal. The portal also provides you with status updates on your requests so that you know it has been received, is being worked on and when it is complete. We encourage you to take advantage of the portal and all of its efficiencies. If you would like more information about the portal?s functionality or would like to set up a portal account, please send an email to: VSAT-lea-accounts-admin@verizon.com.

## Incident Information

| | |
|---|---|
| Incident Type: | Child Pornography (possession, manufacture, and distribution) |
| Incident Time: | 01-25-2023 21:18:12 UTC |

## Suspect

| | |
|---|---|
| Phone: | 9043157058 |

## Uploaded File Information

| | |
|---|---|
| Number of uploaded files: | 1 |

## Uploaded File Information

| | |
|---|---|
| Filename: | d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173 13cf489728f19896c5f79e9d4c63b80f6a487 |
| MD5: | b06fe687fae143b4c24f05eb1821ab48 |
| Did Reporting ESP view entire contents of uploaded file? | Yes |
| Did Reporting ESP view the EXIF of uploaded file? | No |
| Were entire contents of uploaded file publicly available? | No |
| Image Categorization by ESP: (See Section B for further explanation) | A2 |

This concludes Section A. All of the information in this section was submitted electronically to the CyberTipline by the Reporting Person, NCMEC Call Center or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission. Please treat all information in this Report as confidential.*



# Section B: Automated Information Added by NCMEC Systems

Upon receipt of a CyberTipline report, NCMEC Systems may conduct automated processes on the information submitted in Section A. The information found in Section B of this CyberTipline Report has been automatically generated by NCMEC Systems. If the CyberTipline Report was submitted by a member of the public, Section B will be blank.

Date PDF Generated: 02-20-2023 19:43:32 UTC

## Explanation of Automated Information (in alphabetical order)

**Geo-Lookup:** When a reporting party voluntarily reports an IP address and/or phone number, NCMEC Systems will geographically resolve the IP address and/or phone number via publicly-available online queries. The results of the lookups are displayed below.

Geolocation data is approximate and may not display a user's exact location. Please be aware that the geolocation information provided is not exact but is providing a reliable estimate of location based on identifiers voluntarily provided by the reporting party.

## Further Information on Uploaded Files

Number of uploaded files in each categorization category:

A2:             1

The following categorization system was created by various ESPs in January 2014 and updated in June 2022:

| | Content Ranking | 1 | 2 |
|---|---|---|---|
| A | Prepubescent Minor | A1 | A2 |
| B | Pubescent Minor | B1 | B2 |

| Rank | Term | Definition |
|---|---|---|
| 1 | Sex Act | Any imagery depicting sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal whether between person of the same or opposite sex), bestiality, masturbation, sadistic or masochistic abuse, degradation, or any such depiction of the above that lacks serious literary, artistic, political, or scientific value. |
| 2 | Lascivious Exhibition | Any imagery depicting the lascivious exhibition of the anus, genitals, or pubic area of any person, where a minor is engaging in the lascivious exhibition or being used in connection with sexually explicit conduct, which may include but is not limited to imagery where the focal point is on the child's anus, genitals, or pubic area and where the depiction is intended or designed to elicit a sexual response in the viewer. |

## Uploaded File Information

**File Tag(s):** Automated file categorization is based on NCMEC's review of uploaded files in this report **OR** a "Hash Match" of one or more uploaded files to visually similar files that were previously viewed and categorized by NCMEC at the time a PDF of this report was generated.



## Files and Categorization

| Filename | MD5 | Categorization |
|---|---|---|
| d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d1731 3cf489728f19896c5f79e9d4c63b80f6a487 | b06fe687fae143b4c24f05eb1821ab48 | CP (Unconfirmed) |

## Phone Number Geo-Lookup (Suspect)

| Phone Number | Queried Number | First Name | Last Name | Address | City | State | Postal Code | Carrier | Phone Type |
|---|---|---|---|---|---|---|---|---|---|
| 9043157058 | +19043157058 | WILLIAM | LAWSHE | 208 WISTERIA RD | SAINT AUGUSTINE | FL | 32086 | Verizon Wireless | Wireless |

## Auto Refer

Date: 01-25-2023 21:45:15 UTC

The reported information appears to resolve a U.S. state or territory in which there is a designated law enforcement agency that has established a secure connection to NCMEC's CyberTipline. In accordance with current NCMEC policy, this report will be referred automatically to the designated law enforcement agency for potential evaluation, investigation, and/or prosecution. Law enforcement should review all information and uploaded files associated with this report before determining how to proceed. Law enforcement seeking further information relating to this report should submit a request to ecuassistance@ncmec.org.

## Deconfliction

Date: 02-20-2023 19:43:32 UTC

NCMEC systems will perform automated queries on selected reported identifiers from Section A and provide a list of possibly related results at the time a PDF of this report was generated. Please be aware that automated deconfliction queries were not conducted for identifiers not listed below.

At this time, the below reported information appears to match to information seen in additional CyberTipline reports.

| This Report 153739160 | Additional Report ID(s) |
|---|---|
| Suspect | |
| Phone 9043157058 | 137877848 |

**This concludes Section B**

This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission. Please treat all information in this Report as confidential.



# Section C: Additional Information Provided by NCMEC

Section C contains information collected by NCMEC staff based on the information electronically submitted by the Reporting Person, NCMEC Call Center or Reporting ESP. Section C may contain a variety of additional information, including data gathered from queries on publicly-available, open-source websites. Any queries conducted by NCMEC staff will be documented and any query results will be saved to the electronic filing system when possible. The CyberTipline cannot confirm the accuracy of information found in public records or whether the results are affiliated with any parties relating to this report.

Date PDF Generated: 02-20-2023 19:43:32 UTC

| | |
|---|---|
| NCMEC Priority Level: | E (Report submitted by a registered Electronic Service Provider) |
| NCMEC Classification*: | Apparent Child Pornography (Unconfirmed)<br>Files Not Reviewed by NCMEC, Hash Match |
| International Country: | United States |
| NCMEC Date Processed: | 01-25-2023 21:45:15 UTC |
| Made Available to Law Enforcement by NCMEC: | Yes |

*NCMEC Classification is based on NCMEC's review of the report OR a "Hash Match" of one or more uploaded files. NCMEC may not have viewed all uploaded files submitted by the reporting ESP.

## Uploaded File Information

Files Not Viewed by NCMEC:

NCMEC staff have not viewed the following uploaded files and have no information concerning the content of the uploaded files other than information voluntarily provided in the report by the reporting ESP or noted in Section B of the report.

### Files Not Viewed by NCMEC:

| Filename | MD5 |
|---|---|
| d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d17313cf489728f19896c 5f79e9d4c63b80f6a487 | b06fe687fae143b4c24f05eb1821ab48 |

This concludes Section C

If you need further information regarding the contents of this Report, please contact the CyberTipline at ecuassistance@ncmec.org or 1-877-446-2632, ext. 6702.

For more information regarding images containing identified child victims, please contact the Child Victim Identification Program (CVIP) at cvip@ncmec.org.

This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.
Please treat all information in this Report as confidential.



# Section D: Law Enforcement Contact Information

The report was made available to the Law Enforcement Agency listed below.

Gainesville Police Department

Investigator:

| | |
|---|---|
| Assigned Officer: | Access VPN |
| Title: | Mikel Mazlaghani |
| City/State: | Gainesville, FL |
| Country: | United States |
| Phone Number: | 352-393-7688 |
| Email Address: | mazlaghamj@cityofgainesville.org,kingcm@cityofgainesville.org |

Time/Date was made available: 01-25-2023 21:45:15 UTC

This concludes Section D

This concludes CyberTipline Report 153739160

This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.
Please treat all information in this Report as confidential.

67-3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case 3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE, an individual,

Plaintiff,

-vs-

ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

Defendants.

_____/

REMOTE DEPOSITION OF EUGINE TOLBERT

Taken on Behalf of the Plaintiff

DATE TAKEN:    Tuesday, December 17, 2024
TIME:          1:01 p.m. - 2:47 p.m.
PLACE:         Remotely via Zoom

Deposition of the witness taken before:

Maureen Hall, RPR, FPR

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 2

APPEARANCES:
Counsel for Plaintiff:

          MICHAEL K. ROBERTS, ESQUIRE
          LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND
          NOWICKI
          1680 Emerson Street
          Jacksonville, Florida 32207
          mroberts@nrhnlaw.com
Counsel for Defendants, Robert Hardwick and Mikayla
Preston:

          MATTHEW JOSEPH CARSON, ESQUIRE
          SNIFFEN & SPELLMAN, P.A.
          123 Monroe Street
          Tallahassee, Florida 32301-1509
          mcarson@sniffenlaw.com

Counsel for Defendant, Kathleen Dully:
          AMY K. SHEVLIN, ESQUIRE
          BUCHANAN & BUCHANAN, P.A.
          1900 Southeast 18th Avenue, Suite 300
          Ocala, Florida 34471-8237
          ashevlin@rbtrial.com

Page 3

                I N D E X
REMOTE ZOOM DEPOSITION OF EUGINE TOLBERT
DIRECT EXAMINATION BY MR. ROBERTS:            4
CROSS EXAMINATION BY MS. SHEVLIN:            72
REDIRECT EXAMINATION BY MR. ROBERTS:         82
                E X H I B I T S
Plaintiff's Ex. No. 1  CyberTipline Report    49
Plaintiff's Ex. No. 2  4-5-23 Letter          59
Plaintiff's Ex. No. 3  Photo ID               65

Page 4

                PROCEEDINGS
Whereupon,
          EUGINE TOLBERT, called as a witness by the
Plaintiff, having been first duly sworn, testified as
follows:
          THE WITNESS:  I do.
                DIRECT EXAMINATION
BY MR. ROBERTS:
     Q.   Good afternoon, Detective.  Is it detective?
I saw -- are you sergeant detective or detective?
     A.   Yeah, detective sergeant.  Call me anything,
just don't call me late for dinner.
     Q.   It won't be the worst thing you've been
called, right?
          Okay.  So Detective, I introduced myself just
before we got on to the record.  My name is Michael
Roberts.  I'm here to take your deposition today.  I
understand that you have had your deposition taken
before, so I won't go through the -- the kind of ground
rules and procedure stuff with you.
          We're here about a case, it's a -- my client
is a guy named William Lee Lawshe.  Are you familiar
with the investigation or the prosecution of Mr. Lawshe
for allegations of possession of child pornography?
     A.   Can you hear me?

Page 5

     I am.
     Q.   You are.  Okay.
     A.   Yes, sir.
     Q.   Yeah, sorry.
          So first of all, tell me, what -- what's
your -- your title, your job title, as we sit here
today?
     A.   So currently I'm of two sergeants assigned to
supervise the major crimes unit at the St. Johns County
Sheriff's Office.
     Q.   And what was your -- your job back in the
beginning of 2023?
     A.   When this case was going?  Are you referring
to when this case --
     Q.   Yeah.
     A.   -- was going on?
     Q.   Yes.
     A.   I was in -- I was in transition at that
point.  I was transitioning as the supervisor of the
Internet Crimes Against Children Unit, ICAC,
transitioning back to major crimes unit.
     Q.   So how long were you -- I think you -- were
you the supervisor of the ICAC unit --
     A.   Yeah.
     Q.   -- back at that time?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 6

A. Yes.

Q. And how long had you done that? And just give me kind of the timeframe of when you were the supervisor of the ICAC unit.

A. About two years.

Q. And prior to that two years, so I'm guessing '21 to '23 timeframe, you were the ICAC supervisor?

A. Correct.

Q. Prior to that, it sounds like you were in the major crimes unit at that time, too?

A. Correct, prior to. So I was -- I was a patrol deputy from 2001 to 2009, if this makes it easy.

Q. Yeah.

A. 2009 I came to investigations in what was then referred to as robbery/homicide is now referred to as major crimes, so it's changed its name. I was there for ten and-a-half years as a homicide detective. While I was there, I got promoted to sergeant in 2018 and supervised that unit for two additional years. And then in 2020, I rotated back to patrol. I did just a little over a year in patrol. In '21 I transitioned to ICAC as a supervisor of ICAC. I was there for about two years, and then I transitioned back to the supervisor of major crimes because the other sergeant retired.

Page 7

Q. So can you just describe for me what your involvement in the investigation of Mr. Lawshe's case was?

A. Yeah. So as the ICAC supervisor, I reviewed -- received and reviewed the cyber tips that were sent to our agency through the North Florida ICAC task force. And I assigned tips out to detectives for follow-up investigation and then general supervision of the investigation.

Q. In this case, did -- were you the lead investigator investigating Mr. Lawshe's case?

A. I was not, no. I assigned it to a detective.

Q. Now, I understand you assigned it to Detective Preston; is that correct?

A. Yes, correct.

Q. And she was the detective in the ICAC unit at St. Johns County Sheriff's Office?

A. She was, yes. She still is.

Q. Is there any particular reason that you assigned this case to Detective Preston?

A. It was her turn in the barrel.

Q. So let me ask you this. I just want to understand your -- your process of dealing with the -- the -- the cyber tips. That's what we're talking about, correct?

Page 8

A. Yes.

Q. We just had a deposition with Mr. Greene or Detective Greene, and we talked about National Centers for Missing & Exploited Children. That's what we're -- you understand that's what I'm referring to when I say "NCMEC"?

A. Yes.

Q. All right. And do you, when you get the cyber tip -- and we're talking about in the timeframe, let's just say first quarter of 2023, do you refer every cyber tip to an investigator or detective for what you say, further follow-up investigation?

A. No.

Q. Did you cull out any cyber tips prior to assigning them to the detectives?

A. When you say "call out," I'm not quite sure what you mean by that.

Q. Yeah. So cull, my grandmother used to cull things, but --

A. Oh, I'm sorry, cull. I thought you said "call." I apologize.

Q. No, no, cull.

A. Yeah. So not all tips are -- have enough information for a follow-up investigation.

Q. Uh-huh.

Page 9

A. So instead of just drowning the detectives in tips that don't go anywhere, at the supervisor level, we tend to try to triage those to a certain extent for tips that are actionable.

Q. Okay. And what makes a tip actionable? Is it like an identifiable suspect that you can -- you can locate?

A. Those are great tips, sure. Yeah, if -- if we know who the bad guy is when the tip comes in, that's -- that's a great start.

Q. Okay. Do you evaluate whether or not the particular image is or is not of a minor at the time that you're assigning these tips?

A. Yes.

Q. And tell me, how do you do that?

A. Just based on kind of a common sense approach. If it looks like a duck and walks like a duck, then we call it a duck.

Q. So we were talking to Detective Greene, and he described something called age-difficult as a category. Are you familiar with that?

A. I don't know that it's a category, more of a description, but, yes, I understand what you're referring to.

Q. What do you understand that term to mean?

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 10

A. So for instance, in -- in -- and I don't want to get ahead of you, but I think I'm answering your question. But in Mr. Lawshe's case, we received two separate tips on Mr. Lawshe. One of those images I did not assign out because I deemed it to be age-difficult. The second image that we received, I did assign out because I deemed it to be decent.

Q. Okay. Is it sometimes that investigators in your office disagree about what is age-difficult or what is CSAM?

A. I wouldn't say we have a deliberate conversation about it. I can't really remember a time that there was a delineated disagreement. I suppose it's possible that there would be a disagreement, but I just don't remember a time when someone said, No, I don't agree with you.

Q. Okay. Would you -- if something was age-difficult, I mean, do you ever investigate age-difficult images?

A. We do, yes.

Q. Yeah. So do you recall whether or not the images involved in Mr. Lawshe's case were age-difficult?

A. So the initial tip that did not get assigned out, I did deem that to be age-difficult. The second

Page 11

tip that we received in Mr. Lawshe's case, we felt like it was CSAM, but we inquired about a second opinion.

Q. And the reason I ask is, I asked Detective Greene, and in his opinion, all of the images on Mr. Lawshe's phone were age-difficult. Is that just you guys disagree about that, or some people have a different definition of what age-difficult means?

A. No. So I think it's really based on the personal experience in kind of -- so I have two daughters, obviously, you know, there is a point of reference there. Everybody might not have that point of reference when, you know, reviewing these things. I don't know what Detective Greene's point of reference is, so I can't speak to that. But from my point of reference, I felt that it was an actionable tip. But as I said, we did seek a second opinion through Dr. Dully at the Child Protection Team.

Q. Did you communicate to Detective Preston at the time that you communicated the tip that you felt like the image -- image constituted child sexual abuse material?

A. Yes.

Q. Did you ask her to investigate that?

A. Yes.

Q. And -- all right. Were you a part of the

Page 12

investigation?

A. So as far as the -- I went with Detective Preston to see Dr. Dully when we presented the images to the doctor.

Q. Okay.

A. It was more of a -- kind of a let's just get it done and take care of this kind of deal as opposed to kind of holding her hand, so to speak. But that's just kind of how it worked out. It wasn't really that, you know, I had any skin in the game. I just kind of tagged along.

Q. So you went with Detective Preston to the meeting with Dr. Dully?

A. Correct.

Q. All right. I want to -- I'll ask you some more detailed questions about that in a minute.

So other than, you know, the fact that you have two daughters, what training do you have in determining if a particular individual displayed on a -- a photograph is, let's say, the difference between 17 and 18 years old?

A. I don't know that we would get into those leads in an investigation. By that point, you're -- you're kind of past puberty, and those are going to be very difficult images to kind of hash out, between a 17

Page 13

and 18 year old, unless we have some kind of specific information to the identity of the child. So that's probably not a scenario that we would be involved with.

Q. So you say "puberty." What do you mean by that?

A. So I mean, everybody hits puberty a little differently, but it's generally the development of -- like for females it's generally the development of breast buds, you know, body hair, things like that.

Q. And so generally it was y'all's practice if someone had developed pubic hair that you would not get into those weeds as to whether or not this was a 17 or 18 year old?

A. Not -- not in so many words. That might be something that we took the CPT if we -- if we felt a certain way about it, and we felt like that, you know, it presented as CSAM, we might get a second opinion from CPT, and that's what we did in this case.

Q. Yeah, I'm not trying to put words in your -- in your mouth. You said, you know, if someone is experiencing puberty -- I'm trying to understand what training. The original question I asked was, What training do you have to distinguish whether someone is 16, 17, 18, 19, what training do you have to make that determination, other than you have two daughters?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 14

A. Just me being on this earth for 48 years. So there's -- there's not a class that I have taken. There's not a seminar that I have attended that says that this person is 16 versus this person is 17, so...

Q. So you have no specialized training or knowledge in understanding -- in -- in estimating someone's age other than what we all have, just living on the earth?

A. Yeah, I mean, generally speaking, you know, as a layperson, if you're out in public, you can generally look at a person, even an adult, and approximate their age. And that's just based on, you know, your interaction with society, things that you have experienced in your lifetime, you're drawing on all those things, you know, as it is generally termed law enforcement training experience, you know, that personal experience in life weighs heavily in that as well. So...

Q. Right. And -- but I'm just a lawyer, and I'm trying to be, you know -- you have all of that life experience, but you don't have any specialized training; you haven't taken classes or been educated on estimating someone's age in this regard?

A. So, no. But like I said before, I don't know how to better answer your question, so, you know, if

Page 15

you look at a duck, you can usually tell a duck is a duck. I don't mean to be facetious, but this is the best way I can explain it. So if you have a question as to, you know, any further detail, then you might need to dig deeper. And that's what we did in this scenario when we reached out to Dr. Dully and the CPT team. So obviously Dr. Dully has a medical background. She has specialized training and things like that. She has references she can refer to as far as literature to give us a better estimate of age. But it's really just kind of a, you know, this one looks like this and this one looks like that initial assessment of the case.

Q. Okay. So does the fact that you took the image to Dr. Duly mean that there was some question about the -- the model's age?

A. No. So if we didn't feel like it could be CSAM, we wouldn't have taken it to Dr. Dully to begin with. So as I said, in -- in Mr. Lawshe's case, we got two tips. The first tip we deemed not -- to not be actionable right off the bat. We did not take that to Dr. Dully. I just closed that tip out. The second tip I felt like was actionable. We took that tip to Dr. Dully. Dr. Dully agreed that it appeared to be a child, and then we went forward with the investigation from there.

Page 16

Q. Yeah, and I -- and I -- so I'm just -- I'm trying to understand. So sometimes you don't take images to Dr. Dully, correct?

A. That's correct.

Q. If something is obviously a child, you -- you don't take it to -- to Dr. Dully, correct?

A. Correct.

Q. And that's what I'm trying to understand is, in this case, doesn't it say that this was not obviously a minor because you took it to Dr. Dully?

A. I mean, I don't know how to better answer your question. I felt it was a minor when I reviewed the tip. And, you know, to be fair, if we had taken it to Dr. Dully and Dr. Dully said, No, this is not a minor, then we would have went with what Dr. Dully said. You know what I mean? But on face value when I reviewed the tip, when I received the tip, I believed the image to be of a minor. I assigned it to Detective Preston.

Q. Right.

A. And we took the image to Dr. Dully for a second opinion.

Q. For a second opinion. Okay.

A. So I don't have a better answer than that.

Q. Well, really, and you just keep answering the

Page 17

best you can. Okay?

A. Sure.

Q. But -- but when you say you believed that this was a child, it -- it wasn't obviously a child, though, was it?

A. So I can tell you this. And I will give you a scenario. If I --

Q. I really just want you to answer the question, really. I mean, it wasn't obviously a child. You wouldn't have taken it to Dr. Dully if it was obviously a child, would you?

A. Well, it obviously wasn't a two year old, so I believed it to be an early teen child.

Q. And if someone would have told you, no, this -- this is an 18 year old, you would have believed that too?

A. If someone who had the expertise to give that opinion, then, yeah.

Q. What if someone had a copy of her ID and said here's her ID, she's 18, would you have believed that?

A. Oh, absolutely. Yes.

Q. Okay. All right. Okay.

But I guess what I'm saying is, is the type and quality of imaging that we're -- that the model is, it's not something that you would look at and say

Page 18

there's no way this person is 18 years old, correct?

A. Well, I don't know that there is -- I kind of learned my lesson about absolutes in law enforcement.

Q. Sure.

A. So I -- I -- I don't know that there's really a scenario that I would want to submit to an absolute like that.

Q. Right. But you would accept either Dr. Dully's opinion that this particular model was 18, and you would accept that the model was 18 if she had said that it was 18?

A. Absolutely, yes.

Q. And if someone produced a photograph of an ID and said, Hey, she was 18 at the time of the photograph, you would have also accepted that as being she was 18?

MS. SHEVLIN: Form.

THE WITNESS: Considering the source, but, yes.

BY MR. ROBERTS:

Q. Yeah, generally speaking, yes, right?

A. Correct.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q. So would you just agree with me, because, I

Page 19

mean, I have the same life experience that you do, is, sometimes it is difficult to tell whether or not somebody is 16 or 19 years old?

A. I agree.

Q. Yeah. Kind of seems like the older I get the harder it is to look at someone and say, Oh, no, that person's in college or that person -- is that your experience?

MS. SHEVLIN: Form.

THE WITNESS: Do I hear something in the background? I'm not sure if it's --

MR. ROBERTS: Someone is objecting. Someone is just objecting for the record.

MS. SHEVLIN: You may hear objections from time to time.

THE WITNESS: I'm only hearing a blip, and I can't quit make out what it is. I apologize.

MS. SHEVLIN: It's just me objecting to form. You can ignore me. It's just for the record.

THE WITNESS: No problem. No problem.

MR. CARSON: If we could, for just -- if we could, for just a second, I -- I objected to the form of a question a few minutes ago, and I wasn't sure, I didn't see the green border of my Zoom window light up, so, Madam Court Reporter, could

Page 20

you confirm that you can -- you can hear me object to the form previously?

THE COURT REPORTER: I did not hear anything from you previously, and the green light didn't show up on my end. So maybe if they pause a little bit, it will get it.

MR. CARSON: Yeah, Sergeant Tolbert, if you don't mind making sure you just give us one second between the end of Mr. Roberts' question and you starting your answer, and that will allow Ms. Shevlin and myself to object to the form, if we deem it appropriate. And you can still answer, if you can. All right?

THE WITNESS: Absolutely.

MR. CARSON: Thank you, sir.

BY MR. ROBERTS:

Q. So, I want to just kind of go through some -- some basic -- and I -- I'm not trying to -- I know you're a professional, and you do this for a living or you have done the ICAC investigation for a living, but I just want to just kind of confirm some things. I'm a lawyer, that's my job. Do you understand?

A. No problem.

Q. The private possession of adult pornography images is legal and protected by the Constitution of

Page 21

the United States. Do you agree with that statement?

A. Yes.

Q. And at the time of this investigation, that right was well-established, and you were aware of it?

A. Yes.

Q. You understand what probable cause means?

A. I do.

Q. What do you understand the term "probable cause" to mean?

A. The facts and circumstances that would lead one to believe that a circumstance probably occurred.

Q. Okay. And in terms of probable cause that a crime was committed, can you tell me what that means?

A. Facts and circumstances that would lead you to believe that circumstances or crimes probably occurred.

Q. And you understood at the time of this investigation that the Constitution of the United States required a finding of probable cause prior to issuing a search warrant in this case?

A. Correct.

Q. And you also understood that the Constitution of the United States required a finding of probable cause prior to effectuating an arrest?

A. Correct.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
*Eugene Tolbert on 12/17/2024*

Page 22

Q.  Those rights and the requirement of probable cause were long established, and you were aware of them at the time of this investigation?

A.  Correct.

Q.  Okay.  You are familiar with Florida Statute Section 827.071, Subsection 5, which is the possession of child sexual abuse material statute?  Are you familiar with that statute?

A.  I have read it before.  I couldn't quote it to you.

Q.  You have -- you have arrested people based on that statute before?

A.  I have been involved in investigations based on that statute before.

Q.  I'm just going to read the statute and see if that -- if it purports with your recollection.  Okay?

"It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction or other presentation which in whole or in part he or she knows to include any sexual conduct by a child."  Does that sound like the statute that you're familiar with?

A.  Yes.

MR. CARSON:  I'm going to object to form.

Page 23

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q.  Do you understand and did you understand at the time of this investigation that Florida law required Mr. Lawshe to know that the images in his possession contained images of a child?

A.  Yes.

Q.  So in order to believe that an individual has committed the crime of possession of child pornography in Florida, the officer would have to believe that the person knew that the image in their possession depicted a child, correct?

A.  Correct.

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q.  The opposite of that is true as well.  If the law enforcement officer had reason to believe that the suspect believed that the image depicted an adult, then there would not be probable cause to believe that the suspect had committed the crime of possession of child sexual abuse material?

MS. SHEVLIN:  Form.

MR. CARSON:  Object to form.

THE WITNESS:  I'm sorry, was that a question?

Page 24

I thought you were just making a statement.

BY MR. ROBERTS:

Q.  No, it's a question.

A.  I apologize.  I'm sorry, can you repeat it?

Q.  Yeah.  If -- and that usually signifies the question, "if."  If a law enforcement officer had reason to believe that the suspect believed the image depicted an adult, then there would not be probable cause to believe that the suspect had committed the crime of possession of child sexual abuse material?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  Generally speaking, yes.

BY MR. ROBERTS:

Q.  You would agree that it is important to understand the context in which an image is published to understand what the suspect may or may not have believed at the time that they possessed the image?

A.  I'm not quite sure what you mean by "context."

Q.  Do you not understand the word "context"?

A.  I do.  I just don't know what you're -- what you're referring to by context.  You mean like by the means, like be it the internet or -- I'm not quite following what you mean by that.

Page 25

Q.  So like a picture of a naked baby that a mom has taken of her own child in a bathtub, probably not possession of child sexual abuse material?

A.  I think it could be innocently possessed, but I -- I think it could be innocently possessed, but I think that could also be a criminal situation.  I think it really depends on what the circumstances are.

Q.  I mean, did -- you have two daughters.  I mean, I have kids.  I mean, sometimes my wife will take pictures, and my kids are naked in the pictures.  I'm not committing a crime of possession of child sexual abuse material, am I?

MS. SHEVLIN:  Form.

THE WITNESS:  So in -- in that context, to use your words, no.

BY MR. ROBERTS:

Q.  Okay.  So the -- but if someone else was trading or selling it on the dark web, that very well may be, that same image very well may constitute a crime of possession of child sexual abuse material, correct?

A.  Correct.  And that's kind of what I was getting at, is just because the image itself being innocent doesn't necessarily mean that it is innocent.  So the context is important in that scenario.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 26

Q. Right. You also agree that if an image such as the one that Mr. Lawshe was viewing was available on a public website with a disclaimer that the model was verified to be an adult, that would be an important context to consider before making a probable cause determination?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: Well, I -- I think generally, yes, but I don't know what website that image was posted to, so there is -- I just don't have that information listed here, so...

BY MR. ROBERTS:

Q. Okay. And I understand you were not intimately involved with the investigation of this image, correct?

A. Correct.

Q. Right. You, as we sit here today, don't recall having the information of what website it was published on?

A. I do believe there was a watermark on the photo for Metart, if memory serves me correctly. I don't want to get my wires crossed, but I don't know what website that that image was received from.

Q. Okay. Did you ever investigate -- did you

Page 27

personally ever go to that website to see the context and the disclaimers in which that image was published?

A. No.

Q. Did you go to any website where any of the images that Mr. Lawshe was charged with were published on the internet?

A. No.

Q. Are you aware today that -- that all three of the images were published on the public internet?

A. No, I'm not.

Q. Have you ever seen photographs of these two models with their IDs, pictures of holding their IDs?

A. I have not.

Q. You have not. Okay. All right. Are you aware of whether or not Detective Preston ever visited metart.com or any other website to investigate the context in which these images were published?

I didn't hear your answer. I'm sorry.

THE COURT REPORTER: I didn't either.

THE WITNESS: I almost wonder if we need to take just two minutes and let me swap this microphone, if you're having a really hard time. I'm leaning into the microphone, and if you still can't hear me, I don't know what else I can do. Can we just hit pause for like a minute, and I'll

Page 28

just --

MR. ROBERTS: Absolutely.

THE WITNESS: I'll pop out and go on my laptop.

MR. ROBERTS: Absolutely.

(Off record)

THE WITNESS: I'm not aware of that, no.

BY MR. ROBERTS:

Q. So you indicated that you went with Detective Dully to -- I'm sorry, Detective Preston to Dr. Dully's office, and you participated in that meeting. Other than that, what else, if anything, did you do in this investigation?

A. I reviewed a search warrant for the -- I think it was Synchronoss. Hang on a second. I've got the case file right here. Is Synchronoss correct?

Q. Yeah, that's right, Verizon --

A. Yeah.

Q. -- Synchronoss, or something like that.

A. Yeah. So I reviewed the search warrant for Synchronoss, and I participated in the ruse when Lee came into the sheriff's office and was interviewed.

Q. Did you -- did you reach out to Mr. Lawshe to get him to come in to the office?

A. I did, yes.

Page 29

Q. Did you know Mr. Lawshe?

A. Professionally because of a prior investigation, yes.

Q. Tell me about what you knew of Mr. Lawshe before this.

A. So back in 2013 I was working a homicide case, and Mr. Lawshe was working for FWC at the time, and he participated in a search out in the Flagler Estates area in the southwest corner of our county, and he actually located the remains of our homicide victim.

Q. Did you form any impressions about him as a law enforcement officer during that interaction?

A. No, not really. So I mean, we didn't know each other intimately, like we didn't hang out on the weekends, drink beer together or anything like that. I didn't know anything about him. That was really my only interaction with him.

Q. When did you first learn that this investigation that we're here talking about involved Mr. Lawshe?

A. When I opened the cyber tip.

Q. You knew that that cyber tip involved a law enforcement officer, local law enforcement officer at that moment?

A. I did. I recognized his name.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 30

Q.   Did you communicate that information to Detective Preston?

A.   I did.

Q.   So the entire time she investigated this case, she was aware that Mr. Lawshe was a law enforcement officer?

A.   Yes.

Q.   Okay.  So you participated in the interview. I understand that his supervisor at FWC had been informed about this investigation prior to him being brought in or the arrest.  First of all, do you know who informed his supervisor at FWC of this investigation?

A.   Captain Bill Werle.

Q.   And that's -- that's the St. Johns County Sheriff's officer?  And you said Werle; is that correct?

A.   Yeah.  It's W-E-R-L-E.  His first name is William.  He goes by Bill.

Q.   And how did Mr. Werle find out about this investigation?

A.   He's the captain of criminal investigations at the Sheriff's office.

Q.   I mean, does he know about every criminal investigation, or did someone bring this to him saying

Page 31

that this was a law enforcement officer?

A.   Both.  So he is the chain of command for criminal investigations.  So any large scale investigation or any sensitive investigation, like in this situation involving a law enforcement officer, he would be briefed on.

Q.   This was a -- you considered this a sensitive investigation?

A.   Yes.

Q.   Is the only reason that he was a law enforcement officer --

A.   I --

Q.   I'm just trying to say, are all -- are all investigations of CSAM sensitive, or is it just the fact that he was a law enforcement officer that made this particular investigation sensitive?

A.   No.  All investigations are sensitive, but this one, like, it adds a little bit more to it by the fact that he's a law enforcement officer.

Q.   Was this investigation treated any differently because Mr. Lawshe was a law enforcement officer?

A.   Other than who had access to the information being limited, no.

Q.   Nothing was done or not done in the

Page 32

investigation because he was a law enforcement officer?

A.   Well, I would say that the contact with his agency was done because he was a law enforcement officer, but I -- I wasn't party to that.  I just know it happened.

Q.   I understand that media was contacted upon his arrest.  Do you know how they were contacted?

A.   I'm not positive that the sheriff's office contacted the media.  If I remember correctly, and I could be mistaken because we're going back in time a little bit, I believe that media contacted us because someone had saw his name and recognized his name on the booking log, and then a release was made after that.

Q.   Were you involved with that at all?

A.   No.

Q.   Okay.  So you were part of the interview and were you the one that communicated to Captain Werle about this case involving a law enforcement officer?

A.   I communicated to my lieutenant, who is Jose Jimenez, and then the chain of command kind of goes from there.  I did have conversations with Captain Werle, but I'm not the person who told him about it.

Q.   Tell me about those conversations.  What did you guys talk about?

A.   They just wanted to be kept abreast of the

Page 33

investigation as it went forward.  And then when Lee came in during the ruse, we actually met in Bill's office.

Q.   Okay.  All right.  So other than assigning the tip, going with Detective Preston to Dr. Dully's office, participating in the interview, are there any other tasks that you performed on this investigation?

A.   I never said I participated in the interview. I'm not sure where you got that from, but I did not -- I did not --

Q.   I thought you said you were there.  Yeah, I'm sorry.

A.   No, I was involved in the ruse when he was --

Q.   Okay.

A.   -- taken into custody.  I didn't participate in the interview, no, sir.

Q.   My bad.  So you did not participate in the interview?

A.   No, sir.

Q.   All right.  Whose decision was it to make an arrest?

A.   I got to be honest with you, I don't know.

Q.   That's okay.  Would that usually be the lead detective's decision?

A.   It's generally a kind of a -- a combination

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 34

of the lead detective and the chain of command kind of supporting the decision. We were in a little bit of a transition during that timeframe, so we had two layers of chain of command. So that's why I don't know whose decision it was.

Q. As we sit here today, do you have an independent recollection of a conversation that you had with anyone regarding the decision to make an arrest of Mr. Lawshe?

A. I don't. I was just informed that it happened.

Q. Okay. All right. Who informed you?

A. I don't remember. I -- it was -- at that point, there were a lot of moving parts. I just -- I don't remember who actually told me that he was going to be arrested. It might have been Captain Werle. It might have been my lieutenant. I don't remember.

Q. At that time, it sounds like you were responsible for receiving and disseminating the NCMEC cyber reports. Did I understand that correctly?

A. Correct, yes.

Q. How many reports do you think you would get back first quarter of -- of 2023? And you can estimate by week or month, if you can.

A. It's kind of hard to estimate because some

Page 35

weeks were busier than others.

Q. Uh-huh.

A. So some weeks we would get upward of 50. Some weeks we would get two. So really it -- there was really no rhyme or reason to it. It's just kind of, you know, however we received them.

Q. And is there a way for you to estimate how many of those you -- we used the word culled, but did not assign because you felt like they weren't actionable just by looking at the image?

A. I tried to weed out as many as possible just to keep the detectives' case loads manageable. If I had to put an estimate on it, I would say probably somewhere around 50 percent. But, you know, there's wiggle room on both sides there, so...

Q. Was it a relatively common thing that you would get a NCMEC report and it would not be actionable?

A. Correct, yes.

Q. All right. Whether it was 60 or 40, I understand you can't testify to that?

A. Correct.

Q. Are you familiar with the NCMEC term "Unconfirmed child pornography"?

A. I am, yes.

Page 36

Q. What do you understand that term to mean?

A. Just -- so, to me it can be a couple of different things, but generally speaking, it hasn't been viewed independently by someone from the center, meaning the national center, or some other review process.

Q. So is it your understanding or your position, I guess, that if you received a NCMEC report of unconfirmed child pornography, that report in and of itself would not constitute probable cause that the image was child sexual abuse material?

A. I agree with that.

Q. Okay. That would require some level of investigation by either you or your subordinates?

A. That's correct.

Q. So I know that you have talked about assigning this to Detective Preston, and I know that you've talked about going to Dr. Dully's office with her. Are you aware of any steps that she took to investigate this image other than going to Dr. Dully?

A. Off the top of my head -- I can read a report but I know she went to Dr. Dully, and I know -- can you hear me okay?

Q. I can.

A. Okay. I know she went to Dr. Dully and I

Page 37

know that she did the search warrant for Synchronoss and got some data back there. I'm not sure if there's -- she might have did a cell cite search warrant. I'm vaguely remembering something about that. I'm trying to skim over the report right now.

Q. Other than what's contained in the report, are you aware of any steps that she took to complete her investigation into whether or not these images constituted child sexual abuse material?

A. No, I'm not aware of anything outside of what is documented in her report.

Q. Okay. Do you agree that any reasonable investigation of -- that a purported depiction of CSAM would include visiting the website where that image was published, if that information was available?

MR. CARSON: Object, form.

THE WITNESS: No, I don't --

MS. SHEVLIN: Join.

THE WITNESS: -- I don't agree with that.

BY MR. ROBERTS:

Q. You don't agree with that?

A. No, I don't.

Q. Okay. So do you agree that ICAC's purpose is to prevent the proliferation and spread of child sexual abuse material?

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 38

A.    I think that's one of their goals, yes.

Q.    I mean, is that St. Johns County, is that your goal, the sheriff's office, is to prevent the exploitation of children?

A.    Correct, yes.

Q.    All right.  So I mean, would you agree that an investigator should have taken reasonable steps to obtain the identity of someone that they believed was being sexually exploited?

A.    I do, yes.

Q.    Wouldn't that information potentially be found on the website where the image was published?

A.    Well, it's -- so the reason why I said not necessarily that I don't agree with that is, it's not -- it's not really a hard no.  It's more of a situation context type scenario.  Generally speaking, the -- the -- the download of the device when the search warrant is down on the device would give us clues as to the origin or the -- kind of the path that that image took.

Q.    Right.

A.    And that might lead to additional information as far as being able to investigate that, but if we can't identify where the image originated from, in some circumstances, then that might be something that would

Page 39

be prohibitive to pursue that, so...

Q.    Detective Greene has testified that he located, along with counsel for Mr. Lawshe, both of the models that are in question here within about 20 to 30 minutes based solely on the information that was contained in the images.  He found those images and models on the internet.  Do you have any reason to disagree with that?

MS. SHEVLIN:  Form.

THE WITNESS:  If that's what Detective Greene said, that's fine.  I'm not aware of that.

BY MR. ROBERTS:

Q.    Okay.  But if that's true, don't you believe that a reasonable investigation would include going to that website to investigate the context or potential identity of the victim?

MR. CARSON:  Object to form.

THE WITNESS:  Again, not in every scenario, so...

BY MR. ROBERTS:

Q.    But in this scenario where you had information that told you where they were being published, don't you think that that should be a reasonable part of the investigation?

A.    So I remember having a conversation with

Page 40

Detective Greene about this case and him making a reference -- he's been doing ICAC investigations for quite a bit longer than I have -- and him telling me that Metart that had the watermark on the image or one of the images, I'm not sure if it was on all of them or not, but I remember at least one of them having that watermark, that that website had had -- previously had issues with displaying images of underage females.  Now, beyond that, whether or not someone should have gone to Metart to investigate that, I don't know if that occurred.  I certainly don't think it would have been a bad idea, but, again, context-wise, you know, not in every scenario.

Q.    Okay.  And I appreciate your answer.  And I appreciate that you do not know exactly what was done, but my question to you is, do you agree that given the context that you know or have information that leads you to believe that it was published on particular websites, that it would be reasonable to go to those websites to investigate the publication or identity of the victims contained in those images?

MR. CARSON:  Object to form.

THE WITNESS:  I don't think it's unreasonable.  Again, like I said, it's situational based upon, you know --

Page 41

BY MR. ROBERTS:

Q.    Well, I mean, if your goal is to end or to stop the proliferation of online sexual abuse material, wouldn't the publisher of that website be committing a crime but publishing this image?

A.    Oh, agreeable.  But not all websites are housed within the borders of the United States.  We frequently in an ICAC investigation more often than not run into companies that are overseas where, you know, unfortunately, it's -- it kind of just comes to a dead end.  So again, like I said, I don't think it's unreasonable at all, but it might not be feasible in every scenario, so...

Q.    But you would have to go to the website to determine whether it was an offshore website or housed in the United States, wouldn't you?

A.    Not necessarily.  There may be a legal process that you could do to the company.  You know, there's a couple of different avenues that you can pursue, so...

Q.    But going to the internet would probably be the -- the website itself would probably be the first step in that investigation, wouldn't you agree?

A.    Well, I mean, you know, typically speaking, we don't want to go to, you know, an illicit website on

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 42

a, you know, county computer that's on a sheriff's office network that can be infected by mal-ware or something along those lines to kind of, you know, just willy-nilly go fishing around. So there are ways to do that. It might not be on our, you know, network computers. It might be on a -- on a -- on a different interface, but -- but, yes, that is one way to do it, is to go to the website, so...

Q. And do you have any information -- I can represent to you Metart's record custodian is a barred attorney in the State of California. Have you ever heard that?

A. No, I haven't heard that.

Q. Okay. Are you familiar -- and let me just ask this. Did Detective Greene do anything wrong by using a St. John's County Sheriff's Office computer to search these websites to find these models on the internet?

A. No, he has forensic machines that are on a protected network that are not on the Sheriff's Office network, so he has the ability to do that.

Q. And Detective Greene has access -- I mean, I'm sorry -- Detective Preston has access to ask Detective Greene for assistance in her investigation anytime she feels free to, correct?

Page 43

A. She does, yes.

Q. Right. So has St. John County Sheriff's office ever pursued or referred publication of child sexual abuse material to another law enforcement agency in another jurisdiction to prosecute the publisher of that image?

A. Well, you used the word "ever." I don't know. I'm not familiar with a scenario where that has happened. But I can't answer the "ever" part of your question.

Q. Do you know why not, why it hasn't happened under when you were the supervisor?

A. I don't know that the scenario has presented itself.

Q. Well, this scenario presented itself, right? I mean, there is a website that purports to own this image. And it's a ww.com. I mean, that's the scenario that we're talking about, right?

A. Again, I can't tell you. The only thing I can tell you is, I'm not familiar with that ever occurring.

Q. Okay.

A. Now, whether or not it has ever occurred, I don't know.

Q. All right. So getting your ICAC training,

Page 44

investigative experience, you are familiar with federal age verification laws?

A. Yes.

Q. That federal government has laws that publishers of pornography under certain circumstances are required to keep age-verification documents of the models; you're aware of that, correct?

A. Yes.

Q. All right. Have you ever utilized that statute to obtain identification or age confirming information from a website?

A. I have not.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q. Do you know --

MR. CARSON: Hold on a second. Madam Court Reporter, did you get my objection?

THE COURT REPORTER: Yes. Yes.

MR. CARSON: Thank you, ma'am. I'm sorry to interrupt. Go ahead.

MR. ROBERTS: That's okay.

BY MR. ROBERTS:

Q. Do you know how this case was ultimately disposed of?

A. I don't know the details. Again, like right

Page 45

as this case was coming to a culmination, I transferred out of ICAC and moved back to major crimes, so I don't know the details, the kind of behind the scenes, if you will. But I know the charges got dropped, so...

Q. You know the charges got dropped?

A. Correct.

Q. You don't know why the charges got dropped?

A. I don't know all the details.

Q. Do you know any of the details?

A. Not enough to say that it's reliable information, so...

Q. You made a comment about what you heard from Detective Greene regarding metart.com. Do you recall that testimony?

A. I do, yes.

Q. Do you have -- or at the time, right, when you got -- at the moment that you got the cyber tip, did you have any information or opinions about metart.com?

A. I never heard of it before this investigation.

Q. Okay. And I think I know the answer to this, but I'm just going to make sure. You never investigated metart.com as part of your work in this investigation?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 46

A. Correct.

Q. ICAC provides training to investigators, correct?

A. They do.

Q. One of the things that they are trained to do is to attempt to identify victims of child sexual abuse?

A. Yes.

Q. All right. I mean, to the extent that Detective Preston never attempted to identify these individuals, would you agree that that would be a violation of her duty as a law enforcement officer at St. John's County Sheriff's Office?

MR. CARSON: Object to form.

THE WITNESS: I think it's sloppy police work.

BY MR. ROBERTS:

Q. You're aware of federal age verification statutes. You've testified to that. Would you agree if that information was available to a detective such as Detective Preston, she should inquire with the records custodian of the website to see if they have age verification documentation of the models in question?

A. Well, again, you're kind of talking in

Page 47

absolute terms, and I would say it's situational. So when you say should she have, I don't know that she should have. Could she have, yes, she could have. So...

Q. Right. If she had the ability to be able to go to the website, and that website said, Hey, we -- we complied with federal age verification statutes, she could have asked for that documentation, correct?

A. She could have, yes.

Q. I mean, do you think it's sloppy police work to not do that, in this case?

A. So I can tell you that I'm not aware in the year and-a-half, just under two years that I was in ICAC, of us in -- I could just not be remembering a scenario, but I'm not aware of us ever pursuing that information in an investigation. So is it one of those things that you could do, yes, but when you say -- you know, when you use the word "should," well, we have quite a few cases that we've investigated successfully prosecuted, closed out, that that was never done in. So is it a necessity for an investigation, no, not necessarily.

Q. It's not necessary to obtain a conviction, but is it necessary to at least get all of the information that's available?

Page 48

A. Well, again, I think it's a circumstantial scenario, you know, based on the circumstances, the contact of the investigation. And like I said, I'm not familiar with a case where we have pursued that information in the past from a website.

Q. But you agree, if someone, as you say, was successfully prosecuted and convicted of possession of child pornography, and it turned out that that individual was an adult, that would be a travesty, a miscarriage of justice, correct?

A. Oh, I agree with that. Yes.

Q. It is not just your goal as a detective just to convict people. It's to seek justice, correct?

A. Correct.

Q. All right. You would agree that sometimes -- and I think we have already said that this -- it is difficult to look at an image and determined with any sort of certainty the age of the model depicted, correct?

A. The best you can probably get is an estimation, an age range, correct.

Q. The federal age verification laws, would you agree, are a powerful tool at your disposal in order to attempt to verify someone's age through government issued ID?

Page 49

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: I would agree, yes.

BY MR. ROBERTS:

Q. You would agree, correct?

A. Yes.

Q. All right. You are getting these cyber tip reports, and I think you would agree, that as a detective, it's your job prior to making any probable cause decisions to determine the credibility of that tip before taking any actionable steps?

A. Yes.

Q. In this cyber tip report, and I -- I don't -- and I know you looked at it probably multiple times, isn't it true that this cyber tip report describes the image as prepubescent?

A. I have it right here. I can verify that.

Q. Yeah, please do.

A. Can you point to me to where you're referring to?

Q. Yeah, and actually, you know, rather than making you do that, I can -- what I can do is, I can share my screen, and we can attach this as Exhibit 1.

(Plaintiff's Exhibit No. 1 was marked for Identification.)

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 50

THE WITNESS: If it's further information on uploaded files, I see where it says, Prepubescent minor is a -- Is that what you're referring to?

BY MR. ROBERTS:

Q.   Yeah.  You see where it says A-2?

A.   Yeah.

Q.   A-2.

A.   I just want to make sure that's what we were talking about, yeah.

Q.   Right.  And the A stands for prepubescent, correct?

A.   I'm assuming.

Q.   What does it say right under there?

A.   Yes.

MS. SHEVLIN:  I don't -- I don't want to interrupt you, but can you screen share anyway so we can --

MR. ROBERTS:  Sure.

MS. SHEVLIN:  -- make sure we know exactly what he's referring to?

MR. ROBERTS:  Absolutely.

MS. SHEVLIN:  Thank you.  And you're marking this as Exhibit 1, you said?

MR. ROBERTS:  Yes.

MS. SHEVLIN:  Okay.

Page 51

BY MR. ROBERTS:

Q.   Detective Tolbert, were you looking at this document that I just shared on the screen?

A.   Yes.

Q.   All right.  And you agree that when you received this tip, the tip to you was that the -- that the final contained one image of a prepubescent minor in a lascivious expedition -- exhibition.  I don't know why I can't say that word.  I'm sorry.

A.   Lascivious, yes, sir.

Q.   Lascivious exhibition.  That was what you were told?

A.   That's what the tip says, yes.

Q.   Right.  As we sit here today, though, do you recall that the image actually was of a pubescent individual?

A.   No, I don't.  I don't have the image in front of me, though.  There's two different cyber tips, but can we verify we're talking about the one in 9160?

Q.   Yeah, that was the one I was just showing you.

A.   Okay.  All right.

Q.   Would it -- would it -- would it be important if that was incorrect and this was actually a pubescent image, an image of a pubescent individual?

Page 52

A.   No, it's not important.  We don't rely on that information.

Q.   Well, do you attempt to verify the credibility of a tip, especially when it's been an unconfirmed tip?

A.   So I -- when I was reviewing tips, I didn't look at that information at all, that category.

Q.   Okay.

A.   That meant very little to me.  The thing that I wanted to look at was kind of like a -- you know, kind of firsthand scenario is the image itself.  And then the suspect information as far as assigning out tips.

Q.   Okay.

A.   In theory, if that was a -- and I'm not suggesting this never happens, but in theory, if that was a pubescent minor or adult pornography, we shouldn't have received a tip to begin with.  So in my experience, most, if not all of the tips that we received, I'm trying to think of a scenario where it would be different, I'll say that.  So does that make sense?

Q.   Yeah, I mean, some of them say pubescent.  I mean, it's A or B, right?

A.   Sure.

Page 53

Q.   Yeah, yeah.  But I think you said 50 percent or somewhere around 50 percent you call out as being either age-difficult or not actionable?

A.   The non-actionable could be as simple as it's very clear CSAM, but there is no information or follow-up on as far as pursuing a suspect.

Q.   But you also call out that some age-difficult images as well?

A.   You're correct, yes.

Q.   So you know that -- I mean, just because you get a cyber tip doesn't mean that it's actually CSAM?

A.   Correct.

Q.   And did you hear through the grapevine or any other way that one of the reasons or at least the defendant or Mr. Lawshe's attorney presented government-issue ID, photographs, something like that, to the State Attorney?

A.   So I remember having a conversation -- I never saw the documents about, I want to say it was passports, but I don't know the details as far as how that flushed out.

Q.   Let me ask you a question.  This is a hypothetical question.  If prior to making a decision to let's start with seek a search warrant, if you would have had an image of government-issued ID and

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 54

information that the model was 18 or older at the time of the photo shoot, would you have sought a search warrant, and would you have claimed to have had probable cause to search Mr. Lawshe's data?

A. No.

Q. Same question. If you had images of the models in question with a government issued ID and an affidavit stating their age or information from a records custodian stating their age at the time of the photographs, would you have supported an affidavit, or would you have supported the decision for probable cause to make an arrest of Mr. Lawshe?

A. No.

Q. Do you have any reason to believe in this case that those documents were not easily assessable to Detective Preston?

A. I mean, in hindsight, so...

Q. In hindsight. I mean, look, we're talking about things that happened in the past.

A. Sure.

Q. That information was readily available to Detective Preston at the time she made the decision or at the time the arrest was made?

A. In hindsight, correct.

Q. Correct. One of the images that Mr. Lawshe

Page 55

was charged with -- first of all, did you ever see all of the images -- there were three images that we were charged with. Did you see all three of those?

A. No.

Q. Okay. Did you only see the numbering NCMEC tip image?

A. Correct.

Q. Okay. It's my understanding he actually wasn't charged with that. Do you have any knowledge about that?

A. I do not.

Q. Okay. Well, I can relate to you that one of the images only showed the vantage point of bellybutton to genital area, vaginal area of the model, there was no face, no breast, it was just that cross-section. Is that -- is that ordinarily the type of image that would be picked out to charge someone with possession of CSAM?

A. If that image alone was the only image you had, probably not.

Q. Okay. So if that was the only image of that model, would you agree that that should not have been charged in this case against Mr. Lawshe?

MR. CARSON: Object to form.

THE WITNESS: It's kind of difficult to say

Page 56

without having the advantage of seeing the image, you know.

BY MR. ROBERTS:

Q. But it at least raises a question in your mind about the charge of a -- of a picture that doesn't show the face or breast of the model?

A. I mean, it certainly makes it more challenging. So I don't know the circumstances in which that decision was made, so I don't know if there's more information available that I'm not aware of.

Q. Okay.

A. Like I said, based on not having seen the image, I couldn't really say one way or another.

Q. Okay. Doctor Dully, do you know Dr. Dully?

A. I mean, we don't hang out on the weekends, but I have met her probably a half a dozen times or so when I was in iTech.

Q. And was it all under similar circumstances where you were investigating possession of child pornography?

A. Yes, correct.

Q. I heard that sort of the office policy or custom was that if an image was age-difficult and there was a disagreement about the age of the individual,

Page 57

that the procedure was to take it to Dr. Dully and let her be the tiebreaker. Is that true?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: I don't know that that's a fair characterization of it.

BY MR. ROBERTS:

Q. Just tell me what -- what circumstances would Dr. Dully be brought in on a case?

A. Sure. So if it's one of those things where you're just looking for, I guess, an extra layer of confirmation, you know, I think we all can kind of look at something and say, Oh, that appears to be this to me, but maybe I want a second opinion. You know, there's plenty of things in life that you can refer to in that, so in those scenarios, we would reach out to Dr. Dully or someone from CPT. I only ever dealt with Dr. Dully, but I'm sure CPT has someone else that you could also, you know, speak to, so...

Q. Did you ever review her reports in this case?

A. So she didn't do a report. She did like a memo. I'm not familiar with an actual report, but it was like a kind of a letter memo kind of deal. I'm not sure if you're calling that a report.

Q. Yeah, I -- I -- I don't -- yeah, yeah -- no,

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 58

all I have are three separate, I guess you could call them even a letter. It's all on letterhead, with her opinions in them.

A. Correct, yes, I am -- I guess it's semantics. I guess you could call it a report. I wouldn't refer to it as a report, but I remember looking at them. I don't remember them in any great detail at this point. I might have copies of them. I printed everything out from this case and kind of held onto it. I do have copies of them.

Q. So I just want to ask you a couple of questions. Are you generally familiar with the sexual maturity rating that it goes from 1 to 5?

A. I don't know the details behind that. I've had very little exposure to it as far as the medical side of it.

Q. Okay.

A. I mean, I -- I -- I put a great deal of weight in the fact that a medical professional is telling us their opinion on something, so I don't know the signs behind that, so...

Q. Okay. Well, I just want to look right here. I mean, other than -- let me just ask you this. Other than the fact that she has a medical license, do you have any reason to trust Dr. Dully?

Page 59

MS. SHEVLIN: Form.

MR. CARSON: Join.

BY MR. ROBERTS:

Q. I mean, is there something -- do you understand what I'm saying? I mean, is she just a resource, and you say you don't hang out with her. I mean, you just implicitly -- you trust her, that she's telling you the truth?

MR. CARSON: Form.

THE WITNESS: Well, I trust the process in that she has consulted on cases before. She works for the child protective team with the University of Florida. You know, she obviously is a medical professional, would obviously be able to give her expert opinion in situations, where we as lay people can't, and I trust that a court would give her latitude with that, and from my understanding, has in the past. So I'm not aware of any issues, you know, with any -- any kind of -- you know, for me to doubt that process or for me to doubt her reliability.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. ROBERTS:

Q. Right. Okay. So I just want to show you,

Page 60

this is a letter from April 5th, 2023. I'm sharing it from the screen, and we'll make all three of her letters Exhibit 2. It's a composite exhibit to this deposition, okay? Can you see it?

A. I can. And I'm looking at it in my case file as well.

Q. Right. So I'm showing you the first paragraph. Today you've provided me with two images for review displayed on a law enforcement laptop. The first is -- and then there's a file number and depicts a female child with no pubic hair development. She does not appear to be shaved. Her breasts are partially visible and could be SMR 4 to 5; however, her genitals are plainly visible, with her thighs displayed widely apart and showing she is an SMR 1 with respect to pubic hair. This developmental appearance is nine to 13 years -- 13 and-a-half -- less than nine to 13 years of age. Did I read that correctly?

A. Yes, you did.

Q. And you were there for this meeting?

A. No, I wasn't, not for the April one. I was there in February. There's a letter dated February. That's the one that I -- that was the initial meeting when we met with Dr. Dully.

Q. Thank you for that clarification. I

Page 61

appreciate it.

So you were not there --

A. I apologize for the misunderstanding.

Q. No, no, it's my fault. I knew that there were two meetings, or I should have known there was two meetings. So you know that this was a digital image, correct?

A. I do. Well, I mean, I'm assuming it was. My -- on the April one, the one from February that I can speak to personally was a digital image.

Q. Right. So you understand -- and I'm sure you're not a doctor, but you understand what Dr. Dully was saying is that it does not appear -- there is no pubic hair development on the model, you understand what that means, right?

A. Yes.

Q. Okay. I'm sure in your -- your experience as an investigator, you see a lot of images of pornography, adult pornography, age-difficult pornography, you see a lot of that, don't you, or you did back when you were doing the ICAC investigations?

A. Yes, correct.

Q. You agree that it is common for adult models to have groomed themselves so that there is no appearance of a pubic hair?

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

**Page 62**

A. I vote yes, but okay. Yeah.

Q. Okay, yeah.

You're familiar with that; you know that, right?

A. Yes.

Q. And as a -- I mean, as an investigator of pornographic images, that would be something that you really have to be familiar with, correct?

A. Yes.

Q. So you, as an ICAC trained investigator and a major crimes investigator, you understand that apart from grooming, images can be digitally altered or touched up to improve the esthetics of that -- of that image, correct?

A. Correct.

Q. You have no belief that Dr. Dully is an expert in determining if an image has been touched up or digitally altered, do you?

MS. SHEVLIN: Form.

THE WITNESS: No, but there's not a requirement in the Florida Statute for that delineation to be made. For instance, if the image is intentionally altered for the purposes of trying to put a particular person's face on a particular body, and that still represents a

**Page 63**

child, it doesn't matter that that image has been altered. It still depicts child sexual abuse material, so I mean, the --

BY MR. ROBERTS:

Q. But it is relevant -- you agree it is relevant given her opinion about whether or not this model is grooming or altering the photograph to have no pubic hair, or if she has not developed pubic hair because she's prepubescent, you agreed that that's like the heart of the matter from an investigative standpoint, correct?

MS. SHEVLIN: Form.

MR. CARSON: Join.

THE WITNESS: I mean, I don't know that that is solely what she relies on. I have to assume that she takes other factors into consideration.

BY MR. ROBERTS:

Q. Did she put any other factors in her letter?

A. No, I've read the letter, and --

Q. No. Do you know -- do you know what --

MS. SHEVLIN: The witness is still trying to answer the question.

THE WITNESS: I said, I've read the letter, and you just read it out loud, is what I said.

**Page 64**

BY MR. ROBERTS:

Q. Do you know -- do you understand that an SMR 4 to 5, a 5 is an adult breast; are you aware of that?

A. No, I don't think I've ever known that before, no.

Q. Do you think that an ICAC investigator prosecuting crimes, investigating crimes of child pornography, should know the basics of the SMR rating?

A. I do think there's some value in understanding that language, yes.

Q. Would it give you concern to know that this model had potentially adult breasts, but because she did not have pubic hair, according to Dr. Dully, she was less than nine to 13 and-a-half years old. Does that give you concern as an investigator?

MS. SHEVLIN: Form.

THE WITNESS: Well, to kind of correct what counsel said, I don't think it says less than nine. I think it's a range between nine and 13 and-a-half.

BY MR. ROBERTS:

Q. Does your copy have that -- that angle that -- that -- with a line under it?

A. Yeah, yeah, so it's greater than or --

Q. That's less than or equal to. Yeah.

**Page 65**

A. It does, yes. Yes. Greater than or equal to.

Q. Well, I think it's -- the way I interpret that is her appearance is less than or equal to nine to 13 and-a-half years old?

A. Oh, I'm sorry. You're correct. Yes, I stand corrected. Yes.

Q. Okay. Does that give you concern as an investigator, that this model has what may be interpreted as adult breasts, but this doctor, because of the lack of appearance of pubic hair, is saying that she is prepubescent, does that give you concern, as an investigator?

A. As we sit here --

MS. SHEVLIN: Object to form.

MR. CARSON: I join.

MS. SHEVLIN: I objected to form, and I --

MR. CARSON: I joined.

MS. SHEVLIN: Yes, counsel joined.

THE WITNESS: So it's certainly a conversation I would want to have with her, to try to get that hashed out. I came across my --

(Plaintiff's Exhibit No. 3 was marked for identification.)

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 66

BY MR. ROBERTS:

Q.   I'm going to share -- I'm going to share the photograph of the ID.  I don't think you've seen this before.  We'll mark this as Exhibit 3.

In any world or interpretation, would you interpret the model that's depicted in Exhibit 3 as being less than nine to 13 years old?

A.   No.

Q.   Would you look at this model and say that it is entirely possible that she is 18 or older?

A.   I do believe it's a possible -- it's possible she's 18 or older.

Q.   Okay.

MS. SHEVLIN:   Are you attaching that as an exhibit, Michael?

MR. ROBERTS:  Exhibit 3.

BY MR. ROBERTS:

Q.   During this deposition, Detective Greene testifies that he wished that the investigators had spent a little bit more time on this case prior to making a decision for arrest.  Would you agree with that comment?

A.   I do agree with that comment.

MR. CARSON:  Object to form.

Page 67

BY MR. ROBERTS:

Q.   You do agree with that comment?

A.   I don't know what just happened, but I just got a lot of feedback.  Can you say that again?

Q.   Did you agree with that comment?

A.   I do agree with that comment, yes.

Q.   Okay.  One of the things that you -- I want to understand -- one of the things in taking more time is Detective Preston could have gone to the website and requested the age documentation information, correct?

A.   Yes, she could have.

Q.   And had she done that, at least in your opinion, there would not have been probable cause to believe that these two images constituted probable cause for an arrest for possession of child sexual abuse material?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  Correct.

BY MR. ROBERTS:

Q.   You agree with that statement?

A.   Yes, correct.

Q.   I want to use -- you understand the implications of an allegation like this against Mr. Lawshe, don't you?

Page 68

A.   Of course.

Q.   He was -- you understood that he was like a decorated law enforcement officer?

A.   I know he's a law enforcement officer.  I don't know, you know, what his background is, so...

Q.   Okay.  All right.  You knew the moment that you saw this cyber tip, that if he was charged or arrested with this crime, it would end his law enforcement career?

A.   Yes.

Q.   You knew that it would devastate his reputation in the community?

A.   Yes.

Q.   You know that the allegation alone, whether or not he was guilty or not, would be enough to irreparably damage his reputation?

A.   Yes.

Q.   I mean, I can tell you, I mean, I don't know if you care, but Mr. Lawshe, I mean, this has -- this has changed his life.  Do you have any reason to believe that it hasn't?

A.   No, I don't have a reason to believe it hasn't, no.

Q.   I mean, do you think that St. John's County owes him an apology or something for what it's done to

Page 69

him?

MR. CARSON:  Object to the form.

THE WITNESS:  No, I do not.

BY MR. ROBERTS:

Q.   You just think -- what do you think in that regard?  This is the way it should happen, it should have happened to him?

A.   No.  I think that the case happened the way it happened.  I think that there are aspects of the case that give me a great deal of concern as far as I wasn't involved in the investigation in the aftermath, but it was my understanding that there was some evidence that his phone had been wiped.

Q.   Yeah.  Who said that?  Who said that?

A.   Who told me that?

Q.   Yeah, who told you that?

A.   I don't know who told me that.

Q.   And you didn't remember who told you that?

A.   I don't know who told me that.

Q.   Because it's a defamatory statement that somebody is perpetuating in law enforcement or at the State Attorney's Office.  Are you aware of any evidence that he wiped his phone?

A.   Do I?  No, that's just -- that's just something that I was told.  I just don't remember

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 70

specifically who told me that, so...

Q. Did they say they had evidence of that, or was it just an allegation?

A. I -- I got to be honest with you, I don't remember the details of it.

Q. But this individual was publishing this statement to whoever would listen?

A. Well, I mean, I was told it, so --

Q. And was it told you -- did you interpret it as meaning, well, he really is a pedophile; we just couldn't prove it? Is that the way you took it?

A. So like I said, it causes some concerns as far as like, you know, there's that kind of wonderance as far as what did we miss, so to speak.

Q. Yeah. Makes you think maybe he was guilty, doesn't it?

A. Well, I don't know. So, I mean --

Q. That's a very damaging statement --

A. Yes.

Q. -- and it makes you think -- makes you think --

It's a very damaging statement, isn't it?

A. Well, I guess in the grand scheme of things I don't know enough about the case, the aftermath of the case, to even know if that was true or not. I just

Page 71

know that that's what I was told. I don't remember the circumstances in which I was told that.

Q. Do you know Kevin Greene?

A. I do know Kevin Greene.

Q. Is he a competent forensic investigator?

A. Based on my interaction with him, yeah, he's worked plenty of cases for me in the past.

Q. Have you reviewed his report?

A. I have not.

Q. If somebody had wiped a device, don't you think that would be something that would be included in his forensic report?

A. I have to assume, but I don't know if it's there or not. So I'm assuming --

Q. You're not --

A. I'm sorry.

Q. You're not telling anybody that Mr. Lawshe has wiped a phone or anything like that, are you?

A. I'm sorry. Repeat that.

Q. You're not telling people that Mr. Lawshe has wiped a phone or destroyed evidence, are you?

A. No, beyond the conversation that I've had with you guys about the deposition, I haven't talked about this case since it happened.

Q. But you haven't repeated that comment that

Page 72

you were told, Oh, he -- there's evidence that he wiped a device, you haven't repeated that to anybody?

A. No. I don't remember telling anybody that.

Q. Has there been any sort of after action report or investigation into Detective Preston's conduct in this investigation?

A. I don't know the answer to that.

Q. Is she still a special victims unit investigator?

A. ICAC, yes.

Q. ICAC. Okay.

Let me just go through my notes. I think I'm done, but just give me one second. Okay?

A. Sure. Sure. No problem.

MR. ROBERTS: Thanks, Detective. I don't have any other questions. I appreciate your time.

THE WITNESS: All right.

CROSS-EXAMINATION

BY MS. SHEVLIN:

Q. I have a couple of questions for you, sir. My name is Amy. I represent Dr. Dully in this case, and I have a couple of follow-up questions for you based on your prior testimony.

I want to make sure I understood you. I believe you said you were at only one of the meetings

Page 73

that took place with Dr. Dully. Did I hear you correctly?

A. Yeah, the first one is the one I remember going to.

Q. Okay. And when was that?

A. Her letter is dated February 22nd. I have to assume that's reliable. I know she would generally type the letter right there and give it to us before we would leave in the past. I just don't remember if she did that in this particular case.

Q. Okay. But safe to say it was a meeting that took place in February of 2023?

A. Correct.

Q. Okay. At that meeting, the February 2023 meeting, how many images were presented to Dr. Dully?

A. I believe one.

Q. And how were they presented to her or shown to her?

A. On a laptop.

Q. And whose laptop was that?

A. Detective Preston.

Q. And who physically showed her the image on the laptop? Was that you or Detective Preston?

A. Detective Preston.

Q. Do you remember what that image looks like?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 74

A.   Vaguely.

Q.   Can you describe it for me?

A.   If I remember correctly, it's a little girl, kind of seated with her legs spread.  I think that's the one where she's wearing white socks or like little lacy socks, is the only thing that she has on.

Q.   And can you see the -- you said "little girl," but can you see the little girl's face in the image?

A.   Yes, yes, you could.

Q.   And when Dr. Dully was shown this image, was she given a copy, or was she shown the image on the computer, and then the computer left with you and Detective Preston, and Dr. Dully does not have access to that?

A.   No, she doesn't have access to it.  We -- we -- it was only on the computer, and we took the computer with us.

Q.   Okay.  At the time of this meeting, was Dr. Dully informed of the identity of Mr. Lawshe?

A.   I don't remember.

Q.   Would it be typical that Dr. Dully be informed of who the subject of investigation is?

A.   No.

Q.   More likely than not she was not informed

Page 75

regarding the name or identity of the subject of the investigation, meaning Mr. Lawshe?

A.   Yeah, she wouldn't really have a reason to know that, so...

Q.   Would she have been informed of Mr. Lawshe's status as a law enforcement officer during this meeting?

A.   No, again, she really wouldn't have a reason to know that.

Q.   And Dr. Dully was not paid for this service, correct?

A.   No, she's part of the CPT, so they offer this service to law enforcement.

Q.   And can you define "CPT" for the record?

A.   Child protection team at the University of Florida.  They have an office in Jacksonville, and they handle abuse cases.  They have doctors that are forensically trained to provide law enforcement support for abuse investigations.

Q.   And you testified earlier you had some prior interactions with Dr. Dully.  I think you said you've met her approximately six times.  Am I remembering that testimony correctly?

A.   Five or six, yes.  I don't remember the exact number.  But that's a fair estimate.

Page 76

Q.   And on those five or six occasions that you had previously met Dr. Dully, were they all within the context of investigations regarding probable CSAM?

A.   Yes.

Q.   Give me one moment.  I'm just looking through my notes here.

I misunderstood your testimony earlier.  I want to ask you again to make sure the record is clear, prior to the investigation regarding Mr. Lawshe, were you familiar with the website metart.com?

A.   No.

Q.   Okay.  Do you know what the MET in Metart stands for?

A.   I do not.

Q.   If I told you it stood for most erotic teens, would that surprise you, based on the content that you saw?

A.   No, there's often, like in ICAC investigations, there's often hidden meanings in different terms.

Q.   And were you aware that metart.com refers to their models as teens and girls?

A.   I'm not aware of that, no.

Q.   Would it surprise you?

A.   No, it doesn't surprise me.

Page 77

Q.   Now, I know you said you stated you never saw the passports that Mr. Roberts had referred to earlier on his questioning of you.  Do you know what country those passports were issued from?

A.   I don't.

Q.   Do you know if they were issued in the United States?

A.   I don't.

Q.   If those passports -- passports were not issued in the United States, would that cause you some concern regarding verification of the ages of the models?

A.   I don't know that them being issued in the United States or outside the United States really matters.  Any ID can really be manipulated, so I guess to answer your question is -- I guess the simple answer is yes.

Q.   The purported ages of the models using the passports for identification that was issued for them would not prove to you that the images in question were taken at a time that the models were 18 or older; is that correct?

A.   That's correct.

Q.   I want to refer you back to Exhibit 2, which was the April 5th, 2023 report of Dr. Dully.  I know

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 78

you said you were not present at that meeting, but we did discuss that.

And Michael, just for ease of use, could you throw Exhibit 2 back up there, the April 5th report.

Much appreciated. Okay.

In the letter that we're looking at, the same one that you discussed with Mr. Roberts earlier, there are descriptions of the images that Dr. Dully reviewed, correct?

A. If you are referring to paragraph 2, the second image is imprinted with the word "script" saying "big heart." Is that what you're referring to?

Q. Correct.

A. Yes, correct.

Q. Okay. And it also -- it describes the images in terms of it shows, you know, a female child with a black top, underwear down. It describes what she's seeing in the images, correct?

A. Correct.

Q. Okay. And you just noted that there is an indication that there is white script on the image, saying, "big heart," correct?

A. Correct.

Q. And it also indicates what the file names are for these two images, correct?

Page 79

A. Correct.

Q. Okay. Nowhere in this letter does it indicate that there is any type of watermark on any of these images, correct?

A. Not on this one.

Q. Okay. And nowhere in this letter does it indicate that there's any other text on these images other than what she's noted with the quote/unquote, big heart in the second image, correct?

A. That is correct.

Q. And Dr. Dully was not asked to provide an opinion as to whether any of these images appeared altered, correct?

A. That's correct.

Q. And Dr. Dully was not asked to provide an opinion regarding the potential grooming habits of any of these models, correct?

A. That's correct.

Q. Now, Mr. Roberts asked you about the sexual maturity rating scale, the SMR, and he made a representation to you that Stage 5 was an adult. Do you remember that earlier in your testimony?

A. I do.

Q. Okay. Now, Stage 5, which is fully developed, does not necessarily mean that a fully

Page 80

developed sexually mature person is in fact over the age of 18, correct?

A. I'm not familiar with the SMR scale, like I told Mr. Roberts, so I took for granted what he said was true. I don't -- I don't know the answer to that.

Q. Okay. Let me ask it a different way. In your experience with these investigations, would it be possible for an image of a breast to appear to be fully developed and that breast belonged to a person who is still under the age of 18? So, for example, a 16 or 17 year old may have a fully developed looking breast?

A. Yes.

MS. SHEVLIN: Michael, could you put Exhibit 3 back up, please. It was the image of the model holding the passport.

BY MS. SHEVLIN:

Q. Thank you. Mr. Roberts asked you earlier while were you looking at this picture if you could believe that she was 18 or older, and you answered in the affirmative. Do you remember that?

A. Yes.

Q. Looking at this image, could you also believe that she was under the age of 18?

A. I think she could be.

Q. I'm looking through my notes here.

Page 81

A. Not that it matters, but where is that passport from?

Q. My understanding is it is from the Ukraine. Have you seen this before?

A. No, I've never seen it before, and I didn't recognize the wording.

MR. ROBERTS: It's actually Lat --

MS. SHEVLIN: It says Latvia. Excuse me. It says Latvia.

Have you seen a Latvian passport before?

THE WITNESS: I have not. I'm not worldly traveled, so...

BY MS. SHEVLIN:

Q. And in fact, this passport in this image is redacted in several spots, correct?

A. Yes, that's correct.

Q. And we're looking at this image again, and I think you answered me already, but the passport in question in this image is redacted in several places, correct?

A. Correct.

Q. Okay. So we do see some alteration in this photograph, which is apparent, correct?

A. Correct.

Q. Okay.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

**Page 82**

MS. SHEVLIN: Michael, you can take it down. Thank you.

I believe that is all I have for you, sir. I appreciate your time. Some of the other counsels may have questions for you.

MR. ROBERTS: I just have a little bit of redirect on that, but...

MR. CARSON: Go ahead.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q. Detective Tolbert, you understand that probable cause for possession of child pornography cannot be based on the mere possibility that the model is underage, correct?

A. Correct.

Q. Unless the evidence satisfies a reasonable person that a crime has likely occurred, correct?

A. Correct.

Q. When I asked you about the way that model looked, I asked you if that model, if a reasonable person can believe that that model was 18 and you testified yes, that had nothing to do with her passport, did it?

A. No, it was just visually looking at the photo that was displayed on the screen.

**Page 83**

Q. Well, actually, you understand that it's not Mr. Lawshe's burden to prove his innocence to St. Johns County for the State of Florida, correct? It's the state's burden to prove that he committed a crime?

MR. CARSON: Object to form.

THE WITNESS: Yes.

MR. ROBERTS: Okay. No further questions.

MR. CARSON: Sergeant Tolbert, I'm Matt Carson. I'm an attorney representing Detective Preston in this action. I have no questions for you today. Mr. Roberts, are you ordering?

MR. ROBERTS: I will order.

MR. CARSON: Yeah, he'll read through me.

THE COURT REPORTER: And do you want a copy?

MS. SHEVLIN: Yes.

MR. CARSON: Same order. Thank you.

(Thereupon, the deposition was concluded at 2:47 p.m. and the signature and formalities were not waived.)

**Page 84**

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF JACKSONVILLE

I, the undersigned authority, certify that the aforementioned witness Eugine Tolbert, personally appeared before me via remote teleconference and was duly sworn on Tuesday, December 17, 2024.

Dated this 27th day of December, 2024

_Maureen Uebelacker Hall_

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida
My Commission Expires: 3/17/25
My Commission No.: HH065896
Identification presented by Deponent: License

**Page 85**

C E R T I F I C A T E

STATE OF FLORIDA
COUNTY OF JACKSONVILLE

I, MAUREEN HALL, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition; and that the transcript is a true record of the testimony given by the witness.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in this action.

Dated this 27th day of December, 2024.

_Maureen Uebelacker Hall_

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 86

EUGINE TOLBERT
C/O MATTHEW JOSEPH CARSON, ESQUIRE
SNIFFEN & SPELLMAN, P A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
mcarson@sniffenlaw.com


          IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK,
MIKAYLA PRESTON AND KATHLEEN DULLY,
     CASE NO.:  3:24-cv-00044-MMH-MCR
Dear Mr. Carson,
     The deposition of Eugine Tolbert, taken in
the above-styled cause on December 17, 2024 is now ready
for signature of the witness.  Please contact our office
to make arrangements for the witness to sign the same;
or, if you wish to waive the signature of the deposition,
please so advise.
     If this deposition has not been signed by January
27th, 2025, or the signature thereto waived, we shall
consider such delay a refusal to sign under Rule 1.310(e)
of the Florida Rules of Civil Procedure.
     If you have any reason which you would like for me
to place on the deposition as to the witness' failure to
sign the same, please advise.
          Very truly yours,
          HUSEBY COURT REPORTING, COURT REPORTER

          By:_____
               Maureen Hall, RPR, FPR
Dated:  December 27, 2024
cc:  Counsel of Record

Page 87

          E R R A T A  S H E E T

IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA
PRESTON AND KATHLEEN DULLY


DEPO OF:  EUGINE TOLBERT

DATE TAKEN:  12/17/24

     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

     Page No._____Line No._____Change to:_____

     _____

     Reason for change:_____

     Page No._____Line No._____Change to:_____

     _____

     Reason for change:_____

     Page No._____Line No._____Change to:_____

     _____

     Reason for change:_____

     Page No._____Line No._____Change to:_____

     _____

     Reason for change:_____


     Please forward the original signed errata sheet to
this office so that copies may be distributed to all
parties.

     DATE:_____

     SIGNATURE OF DEPONENT:_____

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Index: 1..age

**1**

**1** 49:23,24 50:23 58:13 60:15

**13** 60:17,18 64:14,19 65:5 66:7

**16** 13:24 14:4 19:3 80:10

**17** 12:21,25 13:12,24 14:4 80:10

**18** 12:21 13:1,13,24 17:15,20 18:1,9,10, 11,14,16 54:1 66:10, 12 77:21 80:2,10,19, 23 82:21

**19** 13:24 19:3

**2**

**2** 59:22 60:3 77:24 78:4, 10

**20** 39:4

**2001** 6:12

**2009** 6:12,14

**2013** 29:6

**2018** 6:18

**2020** 6:20

**2023** 5:12 8:10 34:23 60:1 73:12, 14 77:25

**21** 6:7,21

**22nd** 73:6

**23** 6:7

**2:47** 83:19

**3**

**3** 65:23 66:4, 6,16 80:14

**30** 39:4

**4**

**4** 60:13 64:3

**40** 35:20

**48** 14:1

**5**

**5** 22:6 58:13 60:13 64:3 79:21,24

**50** 35:3,14 53:1,2

**5th** 60:1 77:25 78:4

**6**

**60** 35:20

**8**

**827.071** 22:6

**9**

**9160** 51:19

**A**

**A-2** 50:5,7

**ability** 42:21 47:5

**abreast** 32:25

**absolute** 18:6 47:1

**absolutely** 17:21 18:12 20:14 28:2,5 50:21

**absolutes** 18:3

**abuse** 11:20 22:7 23:22 24:10 25:3, 12,20 36:11 37:9,25 41:3 43:4 46:7 63:2 67:16 75:17,19

**accept** 18:8,10

**accepted** 18:15

**access** 31:23 42:22,23 74:14,16

**action** 72:4 83:10

**actionable** 9:4,5 11:15 15:20,22 35:10,18 49:11 53:3

**actual** 57:22

**additional** 6:19 38:22

**adds** 31:18

**adult** 14:11 20:24 23:19 24:8 26:4 48:9 52:17 61:19,23 64:3,12 65:10 79:21

**advantage** 56:1

**affidavit** 54:8,10

**affirmative** 80:20

**aftermath** 69:11 70:24

**afternoon** 4:9

**age** 14:7,12, 23 15:10,15 44:2,10 46:18,23 47:7 48:18, 21,22,24 54:8,9 56:25 60:18 67:10

Case 3:24-cv-00044-JAR-MCR    Document 67-3    Filed 08/12/25    Page 25 of 45 PageID
741
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024                    Index: age-difficult..back

80:2,10,23

**age-difficult**
9:20 10:5,9,
18,19,23,25
11:5,7 53:3,
7 56:24
61:19

**age-verification**
44:6

**agency** 7:6
32:3 43:4

**ages** 77:11,18

**agree** 10:16
18:25 19:4
21:1 24:15
26:1 36:12
37:12,19,21,
23 38:6,14
40:16 41:23
46:11,19
48:6,11,15,
23 49:3,5,8
51:5 55:22
61:23 63:5
66:21,23
67:2,5,6,21

**agreeable** 41:6

**agreed** 15:23
63:9

**ahead** 10:2
44:20 82:8

**allegation**
67:24 68:14
70:3

**allegations**
4:24

**alteration**
81:22

**altered** 62:12,
18,23 63:2
79:13

**altering** 63:7

**Amy** 72:21

**and-a-half**
6:17 47:13
60:17 64:14,
20 65:5

**angle** 64:22

**answering** 10:2
16:25

**anytime** 42:25

**apologize** 8:21
19:17 24:4
61:3

**apology** 68:25

**apparent** 81:23

**appearance**
60:16 61:25
65:4,11

**appeared** 15:23
79:12

**appears** 57:13

**appreciated**
78:5

**approach** 9:17

**approximate**

14:12

**approximately**
75:22

**April** 60:1,21
61:9 77:25
78:4

**area** 29:9
55:14

**arrest** 21:24
30:11 32:7
33:21 34:8
54:12,23
66:21 67:15

**arrested** 22:11
34:16 68:8

**aspects** 69:9

**assessable**
54:15

**assessment**
15:12

**assign** 10:5,6
35:9

**assigned** 5:8
7:7,12,13,20
10:24 16:18

**assigning** 8:15
9:13 33:4
36:17 52:12

**assistance**
42:24

**assume** 63:15
71:13 73:7

**assuming** 50:12

61:8 71:14

**attach** 49:23

**attaching**
66:14

**attempt** 46:6
48:24 52:3

**attempted**
46:10

**attended** 14:3

**attorney** 42:11
53:15,17
83:9

**Attorney's**
69:22

**avenues** 41:19

**aware** 21:4
22:2 27:8,15
28:7 30:5
36:19 37:7,
10 39:11
44:7 46:18
47:12,15
56:10 59:18
64:3 69:22
76:21,23

---

**B**

**baby** 25:1

**back** 5:11,21,
25 6:20,23
29:6 32:10
34:23 37:2
45:2 61:21
77:24 78:4

80:14

**background** 15:7 19:11 68:5

**bad** 9:9 33:17 40:12

**barred** 42:10

**barrel** 7:21

**based** 9:16 11:8 14:12 22:11,13 39:5 40:25 48:2 56:13 71:6 72:23 76:16 82:13

**basic** 20:18

**basics** 64:8

**bat** 15:20

**bathtub** 25:2

**beer** 29:15

**begin** 15:17 52:18

**beginning** 5:12

**belief** 62:16

**believed** 16:17 17:3,13,15, 20 23:19 24:7,18 38:8

**bellybutton** 55:13

**belonged** 80:9

**big** 78:12,22

79:8

**Bill** 30:14,19

**Bill's** 33:2

**bit** 20:6 31:18 32:11 34:2 40:3 66:20 82:6

**black** 78:17

**blip** 19:16

**body** 13:9 62:25

**booking** 32:13

**border** 19:24

**borders** 41:7

**breast** 13:9 55:15 56:6 64:3 80:8,9, 11

**breasts** 60:12 64:12 65:10

**briefed** 31:6

**bring** 30:25

**brought** 30:11 57:9

**buds** 13:9

**burden** 83:2,4

**busier** 35:1

---
**C**
---

**California** 42:11

**call** 4:11,12 8:16,21 9:18 53:2,7 58:1, 5

**called** 4:3,14 9:20

**calling** 57:24

**captain** 30:14, 22 32:17,21 34:16

**care** 12:7 68:19

**career** 68:9

**Carson** 19:21 20:7,15 22:25 23:14, 24 24:11 26:7 37:16 39:17 40:22 44:13,16,19 46:14 49:1 55:24 57:3 59:2,9 63:13 65:16,18 66:24 67:17 69:2 82:8 83:5,8,9,14, 17

**case** 4:21 5:13,14 7:2, 10,11,20 10:3,22 11:1 13:18 15:12, 18 16:9 21:20 28:16 29:7 30:5

32:18 35:12 40:1 44:23 45:1 47:11 48:4 54:15 55:23 57:9, 20 58:9 60:5 66:20 69:8, 10 70:24,25 71:24 72:21 73:10

**cases** 47:19 59:11 71:7 75:17

**category** 9:21, 22 52:7

**cell** 37:3

**center** 36:4,5

**Centers** 8:3

**certainty** 48:18

**chain** 31:2 32:20 34:1,4

**challenging** 56:8

**changed** 6:16 68:20

**characterization** 57:6

**charge** 55:17 56:5

**charged** 27:5 55:1,3,9,23 68:7

charges  45:4,
  5,7

child  4:24
  11:17,20
  13:2 15:24
  16:5 17:4,9,
  11,13 22:7,
  22 23:6,9,
  12,21 24:10
  25:2,3,11,20
  35:24 36:9,
  11 37:9,24
  43:3 46:6
  48:8 56:20
  59:12 60:11
  63:1,2 64:7
  67:15 75:15
  78:16 82:12

children  5:20
  8:4 38:4

circumstance
  21:11

circumstances
  21:10,14,15
  25:7 38:25
  44:5 48:2
  56:8,19 57:8
  71:2

circumstantial
  48:1

cite  37:3

claimed  54:3

clarification
  60:25

class  14:2

classes  14:22

clear  53:5
  76:8

client  4:21

closed  15:21
  47:20

clues  38:19

college  19:7

combination
  33:25

command  31:2
  32:20 34:1,4

comment  45:12
  66:22,23
  67:2,5,6
  71:25

committed
  21:13 23:9,
  21 24:9 83:4

committing
  25:11 41:4

common  9:16
  35:16 61:23

communicate
  11:18 30:1

communicated
  11:19 32:17,
  19

community
  68:12

companies  41:9

company  41:18

competent  71:5

complete  37:7

complied  47:7

composite  60:3

computer  22:20
  42:1,16
  74:13,17,18

computers  42:6

concern  64:11,
  15 65:8,12
  69:10 77:11

concerns  70:12

concluded
  83:18

conduct  22:22
  72:6

confirm  20:1,
  21

confirmation
  57:12

confirming
  44:10

consideration
  63:16

considered
  31:7

constitute
  25:19 36:10

constituted
  11:20 37:9
  67:14

Constitution

20:25 21:18,
  22

consulted
  59:11

contact  32:2
  48:3

contacted
  32:6,7,9,11

contained  23:6
  37:6 39:6
  40:21 51:7

content  76:16

context  24:16,
  20,21,23
  25:14,25
  26:5 27:1,17
  38:16 39:15
  40:17 76:3

context-wise
  40:12

control  22:18

conversation
  10:12 34:7
  39:25 53:18
  65:21 71:22

conversations
  32:21,23

convict  48:13

convicted  48:7

conviction
  47:23

copies  58:8,10

**copy** 17:19 64:22 74:12 83:15

**corner** 29:9

**correct** 6:8,11 7:14,15,25 12:14 16:3, 4,6,7 18:1, 22 21:21,25 22:4 23:12, 13 25:21,22 26:16,17 28:16 30:17 34:21 35:19, 22 36:15 38:5 42:25 44:7 45:6 46:1,3 47:8 48:10,13,14, 19,21 49:5 50:11 53:9, 12 54:24,25 55:7 56:22 58:4 61:7,22 62:8,14,15 63:11 64:17 65:6 67:10, 19,22 73:13 75:11 77:22, 23 78:9,13, 14,18,19,22, 23,25 79:1, 4,9,10,13, 14,17,18 80:2 81:15, 16,20,21,23, 24 82:14,15,

17,18 83:3

**corrected** 65:7

**correctly** 26:22 32:9 34:20 60:18 73:2 74:3 75:23

**counsel** 39:3 64:18 65:19

**counsels** 82:4

**country** 77:3

**county** 5:9 7:17 29:9 30:15 38:2 42:1,16 43:2 46:13 68:24 83:3

**couple** 36:2 41:19 58:11 72:20,22

**court** 19:25 20:3 27:19 44:16,18 59:16 83:15

**CPT** 13:15,18 15:6 57:17, 18 75:12,14

**credibility** 49:10 52:4

**crime** 21:13 23:9,21 24:10 25:11, 20 41:5 68:8 82:17 83:4

**crimes** 5:9,20, 21 6:10,16, 24 21:15 45:2 62:11 64:7

**criminal** 25:6 30:22,24 31:3

**CROSS-EXAMINATION** 72:18

**cross-section** 55:15

**crossed** 26:23

**CSAM** 10:10 11:2 13:17 15:17 31:14 37:13 53:5, 11 55:18 76:3

**cull** 8:14,18, 20,22

**culled** 35:8

**culmination** 45:1

**custodian** 42:10 46:22 54:9

**custody** 33:15

**custom** 56:24

**cyber** 7:5,24 8:9,11,14 29:21,22 34:20 45:17

49:7,13,15 51:18 53:11 68:7

---

**D**

**damage** 68:16

**damaging** 70:18,22

**dark** 25:18

**data** 22:20 37:2 54:4

**dated** 60:22 73:6

**daughters** 11:10 12:18 13:25 25:8

**dead** 41:10

**deal** 12:7 57:23 58:18 69:10

**dealing** 7:23

**dealt** 57:17

**decent** 10:7

**decision** 33:20,24 34:2,5,8 53:23 54:11, 22 56:9 66:21

**decisions** 49:10

**decorated** 68:3

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: deem..disposed

deem  10:25
20:12

deemed  10:5,7
15:19

deeper  15:5

defamatory
69:20

defendant
53:15

define  75:14

definition
11:7

deliberate
10:11

delineated
10:13

delineation
62:22

depends  25:7

depicted
23:11,19
24:8 48:18
66:6

depiction
22:20 37:13

depicts  60:10
63:2

deposition
4:17,18 8:2
60:4 66:18
71:23 83:18

deputy  6:12

describe  7:1
74:2

describes
49:15 78:15,
17

description
9:23

descriptions
78:8

destroyed
71:21

detail  15:4
58:7

detailed  12:16

details  44:25
45:3,8,9
53:20 58:14
70:5

detective  4:9,
10,11,15
6:17 7:12,
14,16,20
8:3,11 9:19
11:4,13,18
12:2,12
16:18 27:15
28:9,10 30:2
33:5 34:1
36:17 39:2,
10 40:1
42:15,22,23,
24 45:13
46:10,20,21
48:12 49:9
51:2 54:16,

22 66:18
67:9 72:5,15
73:21,23,24
74:14 82:11
83:10

detective's
33:24

detectives  7:7
8:15 9:1

detectives'
35:12

determination
13:25 26:6

determine
41:15 49:10

determined
48:17

determining
12:19 62:17

devastate
68:11

developed
13:11 63:8
79:25 80:1,
9,11

development
13:7,8 60:11
61:14

developmental
60:16

device  38:17,
18 71:10
72:2

difference
12:20

differently
13:7 31:21

difficult
12:25 19:2
48:17 55:25

dig  15:5

digital  61:6,
10

digitally
62:12,18

dinner  4:12

DIRECT  4:7

disagree  10:9
11:6 39:8

disagreement
10:13,14
56:25

disclaimer
26:3

disclaimers
27:2

discuss  78:2

discussed  78:7

displayed
12:19 60:9,
14 82:25

displaying
40:8

disposal  48:23

disposed  44:24

**disseminating**
  34:19

**distinguish**
  13:23

**doctor**  12:4
  56:15  61:12
  65:10

**doctors**  75:17

**document**  51:3

**documentation**
  46:23  47:8
  67:10

**documented**
  37:11

**documents**  44:6
  53:19  54:15

**doubt**  59:20

**download**  38:17

**dozen**  56:17

**drawing**  14:14

**drink**  29:15

**dropped**  45:4,
  5,7

**drowning**  9:1

**duck**  9:17,18
  15:1,2

**Dully**  11:17
  12:3,13
  15:6,7,17,
  21,23 16:3,
  6,10,14,15,
  21 17:10

28:10 36:20,
22,25 56:15
57:1,9,17,18
58:25 60:24
61:12 62:16
64:13 72:21
73:1,15
74:11,14,20,
22 75:10,21
76:2 77:25
78:8 79:11,
15

**Dully's**  18:9
  28:10 33:5
  36:18

**duly**  4:4
  15:14

**duty**  46:12

---

### E

**earlier**  75:20
  76:7  77:2
  78:7  79:22
  80:17

**early**  17:13

**earth**  14:1,8

**ease**  78:3

**easily**  54:15

**easy**  6:12

**educated**  14:22

**effectuating**
  21:24

**end**  20:5,9

41:2,11 68:8

**enforcement**
  14:16 18:3
  23:18 24:6
  29:12,23
  30:6 31:1,5,
  11,15,19,21
  32:1,3,18
  43:4 46:12
  60:9 68:3,4,
  9 69:21
  75:6,13,18

**entire**  30:4

**equal**  64:25
  65:1,4

**erotic**  76:15

**established**
  22:2

**Estates**  29:9

**esthetics**
  62:13

**estimate**  15:10
  34:23,25
  35:7,13
  75:25

**estimating**
  14:6,23

**estimation**
  48:21

**EUGINE**  4:3

**evaluate**  9:11

**evidence**
  69:13,22

70:2 71:21
72:1 82:16

**exact**  75:24

**EXAMINATION**
  4:7 82:9

**Excuse**  81:8

**exhibit**  49:23,
  24 50:23
  59:22 60:3
  65:23 66:4,
  6,15,16
  77:24 78:4
  80:14

**exhibition**
  22:19 51:8,
  11

**expedition**
  51:8

**experience**
  11:9 14:16,
  17,21 19:1,8
  44:1 52:19
  61:17 80:7

**experienced**
  14:14

**experiencing**
  13:21

**expert**  59:15
  62:17

**expertise**
  17:17

**explain**  15:3

**exploitation**

38:4

**exploited** 8:4 38:9

**exposure** 58:15

**extent** 9:3 46:9

**extra** 57:11

---

### F

**face** 16:16 55:15 56:6 62:24 74:8

**facetious** 15:2

**fact** 12:17 15:13 31:15, 19 58:19,24 80:1 81:14

**factors** 63:16, 18

**facts** 21:10, 14

**fair** 16:13 57:5 75:25

**familiar** 4:22 9:21 22:5,8, 23 35:23 42:14 43:8, 20 44:1 48:4 57:22 58:12 62:3,8 76:10 80:3

**fault** 61:4

**feasible** 41:12

**February** 60:22 61:9 73:6, 12,14

**federal** 44:1,4 46:18 47:7 48:22

**feedback** 67:4

**feel** 15:16

**feels** 42:25

**felt** 11:1,15, 19 13:15,16 15:22 16:12 35:9

**female** 60:11 78:16

**females** 13:8 40:8

**file** 28:16 60:5,10 78:24

**files** 50:2

**final** 51:7

**find** 30:20 42:17

**finding** 21:19, 23

**fine** 39:11

**firsthand** 52:11

**fishing** 42:4

**Flagler** 29:8

**Florida** 7:6

22:5 23:4,10 59:13 62:21 75:16 83:3

**flushed** 53:21

**follow-up** 7:8 8:12,24 53:6 72:22

**force** 7:7

**forensic** 42:19 71:5,12

**forensically** 75:18

**form** 18:17,23 19:9,18,23 20:2,11 22:25 23:14, 23,24 24:11 25:13 26:7 29:11 37:16 39:9,17 40:22 44:13 46:14 49:1 55:24 57:3 59:1,9 62:19 63:12 64:16 65:15,17 66:24 67:17 69:2 83:5

**formalities** 83:19

**forward** 15:24 33:1

**found** 38:12 39:6

**free** 42:25

**frequently** 41:8

**front** 51:17

**fully** 79:24, 25 80:8,11

**FWC** 29:7 30:9,12

---

### G

**game** 12:10

**general** 7:8

**generally** 13:7,8,10 14:9,11,15 18:21 24:13 26:9 33:25 36:3 38:16 58:12 73:7

**genital** 55:14

**genitals** 60:14

**get all** 47:24

**girl** 74:3,8

**girl's** 74:8

**girls** 76:22

**give** 6:3 15:10 17:6, 17 20:8 38:18 59:14, 16 64:11,15 65:8,12 69:10 72:13

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024          Index: goal..identification

73:8 76:5

goal  38:3 41:2 48:12

goals  38:1

Good  4:9

government 44:4 48:24 54:7

government-issue 53:16

government-issued  53:25

grand  70:23

grandmother 8:18

granted  80:4

grapevine 53:13

great  9:8,10 58:7,18 69:10

greater  64:24 65:1

green  19:24 20:4

Greene  8:2,3 9:19 11:4 39:2,10 40:1 42:15,22,24 45:13 66:18 71:3,4

Greene's  11:13

groomed  61:24

grooming  62:12 63:7 79:16

ground  4:19

guess  17:23 36:8 57:11 58:1,4,5 70:23 77:15,16

guessing  6:6

guilty  68:15 70:15

guy  4:22 9:9

guys  11:6 32:24 71:23

H

habits  79:16

hair  13:9,11 60:11,16 61:14,25 63:8 64:13 65:11

half  56:17

hand  12:8

handle  75:17

hang  28:15 29:14 56:16 59:6

happen  69:6

happened  32:5 34:11 43:9,

11 54:19 67:3 69:7,8,9 71:24

hard  27:22 34:25 38:15

harder  19:6

hash  12:25

hashed  65:22

he'll  83:14

head  36:21

hear  4:25 19:10,14 20:1,3 27:18,24 36:23 53:13 73:1

heard  42:12,13 45:12,20 56:23

hearing  19:16

heart  63:10 78:12,22 79:9

heavily  14:17

held  58:9

Hey  18:14 47:6

hidden  76:19

hindsight 54:17,18,24

hit  27:25

hits  13:6

Hold  44:16

holding  12:8 27:12 80:15

homicide  6:17 29:6,10

honest  33:22 70:4

housed  41:7,15

hypothetical 53:23

I

ICAC  5:20,23 6:4,7,22 7:4,6,16 20:20 40:2 41:8 43:25 45:2 46:2 47:14 61:21 62:10 64:6 72:10,11 76:18

ICAC's  37:23

ID  17:19,20 18:13 48:25 53:16,25 54:7 66:3 77:15

idea  40:12

identifiable 9:6

identification 44:10 49:25 59:23 65:24

77:19

**identify** 38:24
46:6,10

**identity** 13:2
38:8 39:16
40:20 74:20
75:1

**IDS** 27:12

**ignore** 19:19

**illicit** 41:25

**image** 9:12
10:6 11:20
15:14 16:18,
21 22:20
23:11,19
24:7,16,18
25:19,23
26:1,10,16,
24 27:2
35:10 36:11,
20 37:14
38:12,20,24
40:4 41:5
43:6,17
48:17 49:16
51:7,15,17,
25 52:11
53:25 55:6,
16,19,21
56:1,14,24
61:6,10
62:14,17,23
63:1 73:22,
25 74:9,11,
12 78:11,21
79:9 80:8,

14,22 81:14,
17,19

**images** 10:4,
19,22 11:4
12:3,25 16:3
20:25 23:5,6
27:5,9,17
37:8 39:6
40:5,8,21
53:8 54:6,25
55:2,13 60:8
61:18 62:7,
12 67:14
73:15 77:20
78:8,15,18,
25 79:4,7,12

**imaging** 17:24

**implications**
67:24

**implicitly**
59:7

**important**
24:15 25:25
26:4 51:23
52:1

**impressions**
29:11

**imprinted**
78:11

**improve** 62:13

**include** 22:21
37:14 39:14

**included** 71:11

**incorrect**

51:24

**independent**
34:7

**independently**
36:4

**indication**
78:21

**individual**
12:19 23:8
48:9 51:16,
25 56:25
70:6

**individuals**
46:11

**infected** 42:2

**information**
8:24 13:2
26:12,19
30:1 31:23
37:15 38:11,
22 39:5,22
40:17 42:9
44:11 45:11,
18 46:20
47:16,25
48:5 50:1
52:2,7,12
53:5 54:1,8,
21 56:10
67:10

**informed**
30:10,12
34:10,12
74:20,23,25
75:5

**initial** 10:24
15:12 60:23

**innocence** 83:2

**innocent** 25:24

**innocently**
25:4,5

**inquire** 46:21

**inquired** 11:2

**instance** 10:1
62:22

**intentionally**
22:18 62:23

**interaction**
14:13 29:12,
17 71:6

**interactions**
75:21

**interface** 42:7

**internet** 5:20
24:24 27:6,9
39:7 41:21
42:18

**interpret** 65:3
66:6 70:9

**interpretation**
66:5

**interpreted**
65:10

**interrupt**
44:20 50:16

**interview** 30:8
32:16 33:6,

Case 3:24-cv-00044-JAR-MCR    Document 67-3    Filed 08/12/25    Page 34 of 45 PageID 750
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024    Index: interviewed..language

8,16,18

**interviewed**
28:22

**intimately**
26:15 29:14

**introduced**
4:15

**investigate**
10:18 11:23
26:25 27:16
36:20 38:23
39:15 40:10,
20

**investigated**
30:4 45:24
47:19

**investigating**
7:11 56:20
64:7

**investigation**
4:23 7:2,8,9
8:12,24
12:1,23
15:24 20:20
21:3,18 22:3
23:4 26:15
28:13 29:3,
19 30:10,13,
21,25 31:4,
8,16,20 32:1
33:1,7 36:14
37:8,13
39:14,24
41:8,23
42:24 45:21,

25 47:16,21
48:3 69:11
72:5,6 74:23
75:2 76:9

**investigations**
6:14 22:13
30:22 31:3,
14,17 40:2
61:21 75:19
76:3,19 80:7

**investigative**
44:1 63:10

**investigator**
7:11 8:11
38:7 61:18
62:6,10,11
64:6,15
65:9,13 71:5
72:9

**investigators**
10:8 46:2
66:19

**involved** 10:22
13:3 22:13
26:15 29:19,
22 32:14
33:13 69:11

**involvement**
7:2

**involving** 31:5
32:18

**irreparably**
68:16

**issued** 48:25
54:7 77:4,6,

10,13,19

**issues** 40:8
59:18

**issuing** 21:20

**itech** 56:18

---

**J**

**Jacksonville**
75:16

**Jimenez** 32:20

**job** 5:6,11
20:22 49:9

**John** 43:2

**John's** 42:16
46:13 68:24

**Johns** 5:9
7:17 30:15
38:2 83:2

**join** 23:1,15
24:12 26:8
37:18 49:2
57:4 59:2
63:13 65:16
67:18

**joined** 65:18,
19

**Jose** 32:19

**jurisdiction**
43:5

**justice** 48:10,
13

---

**K**

**Kevin** 71:3,4

**kids** 25:9,10

**kind** 4:19 6:3
9:16 11:9
12:6,7,8,9,
10,24,25
13:1 15:11
18:2 19:5
20:17,21
25:22 32:20
33:25 34:1,
25 35:5
38:19 41:10
42:3 45:3
46:25 52:10,
11 55:25
57:12,23
58:9 59:19
64:17 70:13
74:4

**knew** 23:11
29:4,22 61:4
68:6,11

**knowingly**
22:17

**knowledge** 14:6
55:9

---

**L**

**lack** 65:11

**lacy** 74:6

**language** 64:10

**laptop** 28:4 60:9 73:19, 20,23

**large** 31:3

**lascivious** 51:8,10,11

**Lat** 81:7

**late** 4:12

**latitude** 59:17

**Latvia** 81:8,9

**Latvian** 81:10

**law** 14:16 18:3 23:4,18 24:6 29:12, 22,23 30:5 31:1,5,10, 15,19,21 32:1,3,18 43:4 46:12 60:9 68:3,4, 8 69:21 75:6,13,18

**laws** 44:2,4 48:22

**Lawshe** 4:22,23 10:4 23:5 26:2 27:5 28:23 29:1, 4,7,20 30:5 31:21 34:9 39:3 54:12, 25 55:23 67:25 68:19 71:17,20

74:20 75:2 76:9

**Lawshe's** 7:2, 11 10:3,22 11:1,5 15:18 53:15 54:4 75:5 83:2

**lawyer** 14:19 20:22

**lay** 59:15

**layer** 57:11

**layers** 34:3

**layperson** 14:10

**lead** 7:10 21:10,14 33:23 34:1 38:22

**leads** 12:23 40:17

**leaning** 27:23

**learn** 29:18

**learned** 18:3

**leave** 73:9

**Lee** 4:22 28:21 33:1

**left** 74:13

**legal** 20:25 41:17

**legs** 74:4

**lesson** 18:3

**letter** 57:23 58:2 60:1,22 63:18,19,23 73:6,8 78:6 79:2,6

**letterhead** 58:2

**letters** 60:3

**level** 9:2 36:13

**license** 58:24

**lieutenant** 32:19 34:17

**life** 14:17,20 19:1 57:15 68:20

**lifetime** 14:14

**light** 19:25 20:4

**limited** 31:24

**lines** 42:3

**listed** 26:12

**listen** 70:7

**literature** 15:9

**living** 14:7 20:19,20

**loads** 35:12

**local** 29:23

**locate** 9:7

**located** 29:10 39:3

**log** 32:13

**long** 5:22 6:2 22:2

**longer** 40:3

**looked** 49:14 82:20

**lot** 34:14 61:18,20 67:4

**loud** 63:24

### M

**machines** 42:19

**Madam** 19:25 44:16

**made** 31:15 32:13 45:12 54:22,23 56:9 62:22 79:20

**major** 5:9,21 6:10,16,24 45:2 62:11

**make** 13:24 19:17 33:20 34:8 45:23 50:8,19 52:21 54:12 60:2 72:24 76:8

**makes** 6:12 9:5 56:7 70:15,20

making   20:8 24:1 26:5 40:1 49:9,22 53:23 66:21

mal-ware   42:2

manageable   35:12

manipulated   77:15

mark   66:4

marked   49:24 59:22 65:23

marking   50:22

material   11:21 22:7 23:22 24:10 25:3, 12,20 36:11 37:9,25 41:3 43:4 63:3 67:16

Matt   83:8

matter   63:1,10

matters   77:15 81:1

mature   80:1

maturity   58:13 79:20

meaning   36:5 70:10 75:2

meanings   76:19

means   11:7 21:6,13 24:24 61:15

meant   52:9

media   32:6,9, 11

medical   15:7 58:15,19,24 59:13

meeting   12:13 28:11 60:20, 23 73:11,14, 15 74:19 75:7 78:1

meetings   61:5, 6 72:25

memo   57:22,23

memory   26:22

mere   82:13

met   33:2 56:17 60:24 75:22 76:2, 12

Metart   26:22 40:4,10 76:12

Metart's   42:10

metart.com   27:16 45:19, 24 76:10,21

metart.com.   45:13

Michael   4:16 66:15 78:3 80:13 82:1

microphone

27:22,23

mind   20:8 56:5

minor   9:12 16:10,12,15, 18 50:3 51:7 52:17

minute   12:16 27:25

minutes   19:23 27:21 39:5

miscarriage   48:10

Missing   8:4

mistaken   32:10

misunderstanding   61:3

misunderstood   76:7

model   17:24 18:9,10 26:3 48:18 54:1 55:14,22 56:6 61:14 63:7 64:12 65:9 66:6,9 80:15 82:13, 19,20,21

model's   15:15

models   27:12 39:4,7 42:17 44:7 46:23 54:7 61:23 76:22 77:12,

18,21 79:17

mom   25:1

moment   29:24 45:17 68:6 76:5

month   34:24

motion   22:19

mouth   13:20

moved   45:2

moving   34:14

multiple   49:14

_____

**N**
_____

naked   25:1,10

named   4:22

names   78:24

national   8:3 36:5

NCMEC   8:6 34:19 35:17, 23 36:8 55:5

necessarily   25:24 38:14 41:17 47:22 79:25

necessity   47:21

network   42:2, 5,20,21

non-actionable   53:4

**North**   7:6

**noted**   78:20
   79:8

**notes**   72:12
   76:6 80:25

**number**   60:10
   75:25

**numbering**   55:5

---

**O**

---

**object**   20:1,11
   22:25 23:14,
   24 24:11
   26:7 37:16
   39:17 40:22
   44:13 46:14
   49:1 55:24
   57:3 65:15
   66:24 67:17
   69:2 83:5

**objected**   19:22
   65:17

**objecting**
   19:12,13,18

**objection**
   44:17

**objections**
   19:14

**obtain**   38:8
   44:10 47:23

**occasions**   76:1

**occurred**
   21:11,16

**40:11** 43:23
   82:17

**occurring**
   43:21

**offer**   75:12

**office**   5:10
   7:17 10:9
   28:11,22,24
   30:23 32:8
   33:3,6 36:18
   38:3 42:2,
   16,20 43:3
   46:13 56:23
   69:22 75:16

**officer**   23:10,
   18 24:6
   29:12,23
   30:6,16
   31:1,5,11,
   15,19,22
   32:1,4,18
   46:12 68:3,4
   75:6

**offshore**   41:15

**older**   19:5
   54:1 66:10,
   12 77:21
   80:19

**online**   41:3

**opened**   29:21

**opinion**   11:2,
   4,16 13:17
   16:22,23
   17:18 18:9
   57:14 58:20

**59:15** 63:6
   67:13 79:12,
   16

**opinions**   45:18
   58:3

**opposed**   12:7

**opposite**   23:17

**order**   23:8
   48:23 83:13,
   17

**ordering**   83:12

**ordinarily**
   55:16

**origin**   38:19

**original**   13:22

**originated**
   38:24

**overseas**   41:9

**owes**   68:25

---

**P**

---

**p.m.**   83:19

**paid**   75:10

**paragraph**   60:8
   78:10

**part**   11:25
   22:21 32:16
   39:24 43:9
   45:24 75:12

**partially**
   60:13

**participate**
   33:15,17

**participated**
   28:11,21
   29:8 30:8
   33:8

**participating**
   33:6

**parts**   34:14

**party**   32:4

**passport**   80:15
   81:2,10,14,
   18 82:23

**passports**
   53:20 77:2,
   4,9,19

**past**   12:24
   48:5 54:19
   59:18 71:7
   73:9

**path**   38:19

**patrol**   6:12,
   20,21

**pause**   20:5
   27:25

**pedophile**
   70:10

**people**   11:6
   22:11 48:13
   59:16 71:20

**percent**   35:14
   53:1,2

**performed**   33:7

perpetuating
69:21

person   14:4,11
18:1 19:7
22:17 23:11
32:22 80:1,9
82:17,21

person's  19:7
62:24

personal  11:9
14:17

personally
27:1 61:10

phone  11:5
69:13,23
71:18,21

photo  26:22
54:2 82:24

photograph
12:20 18:13,
15 22:18
63:7 66:3
81:23

photographs
27:11 53:16
54:10

physically
73:22

picked  55:17

picture  22:19
25:1 56:5
80:18

pictures  25:10
27:12

place  73:1,12

places  81:19

plainly  60:14

Plaintiff  4:4

plaintiff's
49:24 59:22
65:23

plenty  57:15
71:7

point  5:19
11:10,11,13,
14 12:23
34:14 49:19
55:13 58:7

police  46:15
47:10

policy  56:23

pop  28:3

pornographic
62:7

pornography
4:24 20:24
23:9 35:24
36:9 44:5
48:8 52:17
56:21 61:19,
20 64:8
82:12

position  36:7

positive  32:8

possess  22:18

possessed
24:18 25:4,5

possession
4:24 20:24
22:6 23:6,9,
11,21 24:10
25:3,11,20
48:7 55:17
56:20 67:15
82:12

possibility
82:13

posted  26:11

potential
39:15 79:16

potentially
38:11 64:12

powerful  48:23

practice  13:10

prepubescent
49:16 50:2,
10 51:7 63:9
65:12

present  78:1

presentation
22:20

presented  12:3
13:17 43:13,
15 53:15
73:15,17

Preston  7:14,
20 11:18
12:3,12
16:19 27:15
28:10 30:2
33:5 36:17

42:23 46:10,
21 54:16,22
67:9 73:21,
23,24 74:14
83:10

Preston's  72:5

prevent  37:24
38:3

previously
20:2,4 40:7
76:2

printed  58:8

prior  6:6,9,
11 8:14
21:19,24
29:2 30:10
49:9 53:23
66:20 72:23
75:20 76:9

private  20:24

probable  21:6,
8,12,19,23
22:1 23:20
24:8 26:5
36:10 49:9
54:4,11
67:13,14
76:3 82:12

problem  19:20
20:23 72:14

procedure  4:20
57:1

PROCEEDINGS
4:1

process 7:23
36:6 41:18
59:10,20

produced 18:13

professional
20:19 58:19
59:14

Professionally
29:2

prohibitive
39:1

proliferation
37:24 41:3

promoted 6:18

prosecute 43:5

prosecuted
47:20 48:7

prosecuting
64:7

prosecution
4:23

protected
20:25 42:20

protection
11:17 75:15

protective
59:12

prove 70:11
77:20 83:2,4

provide 75:18
79:11,15

provided 60:8

puberty 12:24
13:4,6,21

pubescent
51:15,24,25
52:17,23

pubic 13:11
60:11,16
61:14,25
63:8 64:13
65:11

public 14:10
26:3 27:9

publication
40:20 43:3

published
24:16 26:20
27:2,5,9,17
37:15 38:12
39:23 40:18

publisher 41:4
43:5

publishers
44:5

publishing
41:5 70:6

purported
37:13 77:18

purports 22:16
43:16

purpose 37:23

purposes 62:23

pursue 39:1
41:20

pursued 43:3
48:4

pursuing 47:15
53:6

put 13:19
35:13 58:18
62:24 63:18
80:13

**Q**

quality 17:24

quarter 8:10
34:23

question 10:3
13:22 14:25
15:3,14
16:12 17:9
19:23 20:9
23:25 24:3,6
39:4 40:16
43:10 46:24
53:22,23
54:6,7 56:4
63:22 77:16,
20 81:19

questioning
77:3

questions
12:16 58:12
72:16,20,22
82:5 83:7,11

quit 19:17

quote 22:9

quote/unquote

79:8

**R**

raises 56:4

range 48:21
64:19

rating 58:13
64:8 79:20

reach 28:23
57:16

reached 15:6

read 22:9,15
36:21 60:18
63:19,23,24
83:14

readily 54:21

reason 7:19
11:3 23:18
24:7 31:10
35:5 38:13
39:7 54:14
58:25 68:20,
22 75:3,8

reasonable
37:12 38:7
39:14,24
40:19 82:16,
20

reasons 53:14

recall 10:21
26:19 45:13
51:15

received 7:5

10:3,6 11:1 16:17 26:24 35:6 36:8 51:6 52:18, 20

**receiving** 34:19

**recognize** 81:6

**recognized** 29:25 32:12

**recollection** 22:16 34:7

**record** 4:16 19:13,19 28:6 42:10 75:14 76:8

**records** 46:22 54:9

**redacted** 81:15,19

**redirect** 82:7, 9

**refer** 8:10 15:9 57:15 58:5 77:24

**reference** 11:11,12,13, 15 40:2

**references** 15:9

**referred** 6:15 43:3 77:2

**referring** 5:13

8:5 9:24 24:23 49:19 50:3,20 78:10,12

**refers** 76:21

**regard** 14:23 69:6

**relate** 55:12

**release** 32:13

**relevant** 63:5, 6

**reliability** 59:21

**reliable** 45:10 73:7

**relies** 63:15

**rely** 52:1

**remains** 29:10

**remember** 10:12,15 32:9 34:13, 15,17 39:25 40:6 53:18 58:6,7 69:18,25 70:5 71:1 72:3 73:3,9, 25 74:3,21 75:24 79:22 80:20

**remembering** 37:4 47:14 75:22

**repeat** 24:4 71:19

**repeated** 71:25 72:2

**report** 35:17 36:8,9,21 37:5,6,11 49:13,15 57:21,22,24 58:5,6 71:8, 12 72:5 77:25 78:4

**Reporter** 19:25 20:3 27:19 44:17,18 83:15

**reports** 34:20, 22 49:8 57:20

**represent** 42:10 72:21

**representation** 22:19 79:21

**representing** 83:9

**represents** 62:25

**reputation** 68:12,16

**requested** 67:10

**require** 36:13

**required** 21:19,23

23:5 44:6

**requirement** 22:1 62:21

**resource** 59:6

**respect** 60:15

**responsible** 34:19

**retired** 6:25

**review** 36:5 57:20 60:9

**reviewed** 7:5 16:12,17 28:14,20 71:8 78:8

**reviewing** 11:12 52:6

**rhyme** 35:5

**rights** 22:1

**robbery/homicide** 6:15

**Roberts** 4:8,17 18:20,24 19:12 20:16 23:2,16 24:2,14 25:16 26:13 28:2,5,8 37:20 39:12, 20 41:1 44:14,21,22 46:17 49:4 50:4,18,21, 24 51:1 56:3 57:7 59:3,24

63:4,17
64:1,21
66:1,16,17
67:1,20 69:4
72:15 77:2
78:7 79:19
80:4,17 81:7
82:6,10
83:7,11,13

**Roberts'** 20:9

**room** 35:15

**rotated** 6:20

**rules** 4:20

**run** 41:9

**ruse** 28:21
33:2,13

---

**S**

**safe** 73:11

**satisfies** 82:16

**scale** 31:3
79:20 80:3

**scenario** 13:3
15:6 17:7
18:6 25:25
38:16 39:18,
21 40:13
41:13 43:8,
13,15,17
47:15 48:2
52:11,20

**scenarios** 57:16

**scenes** 45:3

**scheme** 70:23

**screen** 49:23
50:16 51:3
60:2 82:25

**script** 78:11,
21

**search** 21:20
28:14,20
29:8 37:1,3
38:18 42:17
53:24 54:2,4

**seated** 74:4

**Section** 22:6

**seek** 11:16
48:13 53:24

**selling** 25:18

**semantics** 58:4

**seminar** 14:3

**sense** 9:16
52:22

**sensitive** 31:4,7,14,
16,17

**separate** 10:4
58:1

**sergeant** 4:10,
11 6:18,24
20:7 83:8

**sergeants** 5:8

**serves** 26:22

**service** 75:10,

13

**sexual** 11:20
22:7,22
23:22 24:10
25:3,11,20
36:11 37:9,
24 41:3 43:4
46:6 58:12
63:2 67:15
79:19

**sexually** 38:9
80:1

**share** 49:23
50:16 66:2

**shared** 51:3

**sharing** 60:1

**shaved** 60:12

**sheriff's** 5:10
7:17 28:22
30:16,23
32:8 38:3
42:1,16,20
43:2 46:13

**Shevlin** 18:17,
23 19:9,14,
18 20:11
23:1,15,23
24:12 25:13
26:8 37:18
39:9 49:2
50:15,19,22,
25 57:4 59:1
62:19 63:12,
21 64:16
65:15,17,19

66:14 67:18
72:19 80:13,
16 81:8,13
82:1 83:16

**shoot** 54:2

**show** 20:5
22:19 56:6
59:25

**showed** 55:13
73:22

**showing** 51:20
60:7,15

**shown** 73:17
74:11,12

**shows** 78:16

**side** 58:16

**sides** 35:15

**signature** 83:19

**signifies** 24:5

**signs** 58:21

**similar** 56:19

**simple** 53:4
77:16

**sir** 5:3 20:15
33:16,19
51:10 72:20
82:3

**sit** 5:6 26:18
34:6 51:14
65:14

**situation** 25:6

31:5 38:16

**situational**
40:25 47:1

**situations**
59:15

**skim** 37:5

**skin** 12:10

**sloppy** 46:15
47:10

**SMR** 60:13,15
64:2,8 79:20
80:3

**society** 14:13

**socks** 74:5,6

**solely** 39:5
63:15

**someone's**
14:7,23
48:24

**sort** 48:18
56:23 72:4

**sought** 54:2

**sound** 22:22

**sounds** 6:9
34:18

**source** 18:18

**southwest** 29:9

**speak** 11:14
12:8 57:19
61:10 70:14

**speaking** 14:9
18:21 24:13

36:3 38:16
41:24

**special** 72:8

**specialized**
14:5,21 15:8

**specific** 13:1

**specifically**
70:1

**spent** 66:20

**spots** 81:15

**spread** 37:24
74:4

**St** 5:9 7:17
30:15 38:2
42:16 43:2
46:13 68:24
83:2

**Stage** 79:21,
24

**stand** 65:6

**standpoint**
63:11

**stands** 50:10
76:13

**start** 9:10
53:24

**starting** 20:10

**State** 42:11
53:17 69:22
83:3

**state's** 83:4

**stated** 77:1

**statement** 21:1
24:1 67:21
69:20 70:7,
18,22

**States** 21:1,
19,23 41:7,
16 77:7,10,
14

**stating** 54:8,9

**status** 75:6

**statute** 22:5,
7,8,12,14,
15,23 44:10
62:21

**statutes** 46:19
47:7

**step** 41:23

**steps** 36:19
37:7 38:7
49:11

**stood** 76:15

**stop** 41:3

**stuff** 4:20

**subject** 74:23
75:1

**submit** 18:6

**subordinates**
36:14

**Subsection**
22:6

**successfully**
47:19 48:7

**suggesting**
52:16

**supervise** 5:9

**supervised**
6:19

**supervision**
7:8

**supervisor**
5:19,23 6:4,
7,22,24 7:4
9:2 30:9,12
43:12

**support** 75:18

**supported**
54:10,11

**supporting**
34:2

**suppose** 10:13

**surprise**
76:16,24,25

**suspect** 9:6
23:19,21
24:7,9,17
52:12 53:6

**swap** 27:21

**sworn** 4:4

**Synchronoss**
28:15,16,19,
21 37:1

---
T
---

**tagged** 12:11

takes 63:16

taking 49:11 67:8

talk 32:24

talked 8:3 36:16,18 71:23

talking 7:24 8:9 9:19 29:19 43:18 46:25 50:9 51:19 54:18

task 7:7

tasks 33:7

team 11:17 15:7 59:12 75:15

teen 17:13

teens 76:15, 22

telling 40:3 58:20 59:8 71:17,20 72:3

ten 6:17

tend 9:3

term 9:25 21:8 35:23 36:1

termed 14:15

terms 21:12 47:1 76:20 78:16

testified 4:4 39:2 46:19 75:20 82:22

testifies 66:19

testify 35:21

testimony 45:14 72:23 75:23 76:7 79:22

text 79:7

theory 52:15, 16

thighs 60:14

thing 4:13 35:16 43:19 52:9 74:6

things 8:19 11:12 13:9 14:13,15 15:8 20:21 36:3 46:5 47:17 54:19 57:10,15 67:7,8 70:23

thought 8:20 24:1 33:11

throw 78:4

tiebreaker 57:2

time 5:25 6:10 9:12 10:12,15 11:19 18:14

19:15 21:3, 17 22:3 23:4 24:18 27:22 29:7 30:4 32:10 34:18 45:16 54:1, 9,22,23 66:20 67:8 72:16 74:19 77:21 82:4

timeframe 6:3, 7 8:9 34:3

times 49:14 56:17 75:22

tip 8:9,11 9:5,9 10:24 11:1,15,19 15:19,21,22 16:13,17 29:21,22 33:5 45:17 49:7,11,13, 15 51:6,13 52:4,5,18 53:11 55:6 68:7

tips 7:5,7,24 8:14,23 9:2, 4,8,13 10:4 15:19 51:18 52:6,13,19

title 5:6

today 4:17 5:7 26:18 27:8 34:6 51:14 60:8

83:11

Tolbert 4:3 20:7 51:2 82:11 83:8

told 17:14 32:22 34:15 39:22 51:12 69:15,16,17, 18,19,25 70:1,8,9 71:1,2 72:1 76:15 80:4

tool 48:23

top 36:21 78:17

touched 62:13, 17

trading 25:18

trained 46:5 62:10 75:18

training 12:18 13:22,23,24 14:5,16,22 15:8 43:25 46:2

transferred 45:1

transition 5:18 34:3

transitioned 6:21,23

transitioning 5:19,21

traveled   81:12

travesty   48:9

treated   31:20

triage   9:3

true   23:17
   39:13 49:15
   57:2 70:25
   80:5

trust   58:25
   59:7,10,16

truth   59:8

turn   7:21

turned   48:8

type   17:23
   38:16 55:16
   73:8 79:3

typical   74:22

typically
   41:24

**U**

Uh-huh   8:25
   35:2

Ukraine   81:3

ultimately
   44:23

unconfirmed
   35:24 36:9
   52:5

underage   40:8
   82:14

understand
   4:18 7:13,23
   8:5 9:23,25
   13:21 16:2,8
   20:22 21:6,8
   23:3 24:16,
   17,21 26:14
   30:9 32:6
   34:20 35:21
   36:1 59:5
   61:11,12,14
   62:11 64:2
   67:8,23
   82:11 83:1

understanding
   14:6 36:7
   55:8 59:17
   64:10 69:12
   81:3

understood
   21:17,22
   68:2 72:24

underwear
   78:17

unit   5:9,20,
   21,23 6:4,
   10,19 7:16
   72:8

United   21:1,
   18,23 41:7,
   16 77:6,10,
   14

University
   59:12 75:15

unlawful   22:17

unreasonable
   40:24 41:12

uploaded   50:2

upward   35:3

utilized   44:9

**V**

vaginal   55:14

vaguely   37:4
   74:1

vantage   55:13

verification
   44:2 46:18,
   23 47:7
   48:22 77:11

verified   26:4

verify   48:24
   49:17 51:19
   52:3

Verizon   28:17

versus   14:4

victim   29:10
   39:16

victims   40:21
   46:6 72:8

view   22:18

viewed   36:4

viewing   26:2

violation
   46:12

visible   60:13,

14

visited   27:15

visiting   37:14

visually   82:24

vote   62:1

**W**

W-E-R-L-E
   30:18

waived   83:20

walks   9:17

wanted   32:25
   52:10

warrant   21:20
   28:14,20
   37:1,4 38:18
   53:24 54:3

watermark
   26:21 40:4,7
   79:3

ways   42:4

wearing   74:5

web   25:18

website   26:3,
   10,19,24
   27:1,4,16
   37:14 38:12
   39:15 40:7
   41:4,14,15,
   22,25 42:8
   43:16 44:11
   46:22 47:6

48:5 67:9 76:10

**websites** 40:19,20 41:6 42:17

**weed** 35:11

**weeds** 13:12

**week** 34:24

**weekends** 29:15 56:16

**weeks** 35:1,3, 4

**weighs** 14:17

**weight** 58:19

**well-established** 21:4

**Werle** 30:14, 16,20 32:17, 22 34:16

**white** 74:5 78:21

**widely** 60:15

**wife** 25:9

**wiggle** 35:15

**William** 4:22 30:19

**willy-nilly** 42:4

**window** 19:25

**wiped** 69:13, 23 71:10,18, 21 72:1

**wires** 26:23

**wished** 66:19

**wonderance** 70:13

**word** 24:21 35:8 43:7 47:18 51:9 78:11

**wording** 81:6

**words** 13:14, 19 25:15

**work** 45:24 46:16 47:10

**worked** 12:9 71:7

**working** 29:6,7

**works** 59:11

**world** 66:5

**worldly** 81:11

**worst** 4:13

**wrong** 42:15

**ww.com.** 43:17

---

**Y**

**y'all's** 13:10

**year** 6:21 13:1,13 17:12,15 47:13 80:11

**years** 6:5,6, 17,19,23

12:21 14:1 18:1 19:3 47:13 60:17, 18 64:14 65:5 66:7

---

**Z**

**Zoom** 19:24

67-4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case 3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE, an individual,

     Plaintiff,

-vs-

ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

     Defendants.

_____/

REMOTE DEPOSITION OF KEVIN GREENE

Taken on Behalf of the Plaintiff

DATE TAKEN:  Tuesday, December 17, 2024
TIME:        10:02 a.m. - 12:12 p.m.
PLACE:       Remotely via Zoom

Deposition of the witness taken before:

Maureen Hall, RPR, FPR

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 2

APPEARANCES:
Counsel for Plaintiff:

MICHAEL K. ROBERTS, ESQUIRE
LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI
1680 Emerson Street
Jacksonville, Florida 32207
mroberts@nrhnlaw.com

Counsel for Defendants, Robert Hardwick and Mikayla Preston:

MATTHEW JOSEPH CARSON, ESQUIRE
SNIFFEN & SPELLMAN, P.A.
123 Monroe Street
Tallahassee, Florida 32301-1509
mcarson@sniffenlaw.com

Counsel for Defendant, Kathleen Dully:

AMY K. SHEVLIN, ESQUIRE
BUCHANAN & BUCHANAN, P.A.
1900 Southeast 18th Avenue, Suite 300
Ocala, Florida 34471-8237
ashevlin@rbtrial.com

Page 3

I N D E X

REMOTE ZOOM DEPOSITION OF KEVIN GREENE

DIRECT EXAMINATION BY MR. ROBERTS:          4

CROSS EXAMINATION BY MS. SHEVLIN:          80

REDIRECT EXAMINATION BY MR. ROBERTS:       87

E X H I B I T S

Plaintiff's Ex. No. 1   Statute              39

Plaintiff's Ex. No. 2   CyberTipline Report  62

Page 4

PROCEEDINGS

Whereupon,

KEVIN GREENE, called as a witness by the Plaintiff, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.  Can you state your name for the record.

A.  Kevin Greene.

Q.  And I understand you're employed with St. Johns County Sheriff's Office?

A.  Yes.

Q.  And you're a corporal or detective corporal at --

A.  Yes.

Q.  Yeah.  What's your -- your job title today as we sit here?

A.  I'm a digital forensics detective.  I'm kind of like assistant supervisor of the digital forensics lab.

Q.  How many people are in that lab?

A.  Currently there are four of us.  And we have a lieutenant who oversees us.

Q.  And how long have you been doing that for

Page 5

St. Johns County?

A.  Full-time just -- well, almost five years.  Next month it will be five years.

Q.  I understand before that you were -- did you work for -- were you an ICAC detective?

A.  From 2015, like late 2015 until I think mid-2017.  It's internet crimes against children, I-C-A-C.

Q.  And I was just going to ask you, what -- what is that?

A.  It's investigating like online enticement of children.

Q.  Okay.  Well, as -- I think we're here today about an investigation that involved the alleged possession of child pornography.  Would that be under the -- the purview of -- of ICAC investigators?

A.  Yes.

Q.  And in your -- in the past, while you were an ICAC investigator or detective, was that with St. Johns County Sheriff's Office?

A.  Yes.

Q.  Sometimes I see the -- a special victims unit or SVU; did you work in that department?

A.  Yes.  I went from ICAC to special victims.

Q.  Okay.

Page 6

A. And at the time that I was in ICAC, ICAC was part of special victims unit.

Q. And when you say part of ICAC, is that a certification or a membership? What is that?

A. It's not really a certification; it's more of a specialty.

Q. Do they provide training?

A. Yeah, they do. There's a task force at the state and national level that will give you -- or a part of that task force is really more of like a funding. The Federal Government or agencies out there will provide funding for training for special -- or, I guess, specialized training for law enforcement agents that do that kind of work.

Q. All right. Now I understand that you were involved in the investigation of Mr. Lawshe's case; is that correct?

A. Yes, sir.

Q. And you performed your forensics function in that investigation; is that -- do I understand that correct?

A. Yes.

Q. And that you generated a report as a result of your work; is that correct?

A. Yes.

Page 7

Q. All right. I know that you've had your deposition taken before. Did you review anything in preparation for today's deposition?

A. Yes.

Q. What did you review?

A. That report and the cellphones. Downloads, the forensics reports that -- that I did.

Q. So did you look at the actual cellphones, or did you just look at the reports that you did?

A. The reports that I did.

Q. Okay. How many reports did you do?

A. Well, actually, I only reviewed one of the reports. The -- his -- he had two phones. He had his work phone and his personal phone. The work phone had nothing of evidentiary value, so there was no point in really reviewing that.

Q. Did you review anything else?

A. I think I scanned through the -- the Verizon download, just to kind of confirm something that I read in my report.

Q. So when you say "The Verizon download," are you referring to the -- the NCMEC cyber tip report?

MR. ROBERTS: And Madam Court Reporter, that's National Center for Missing & Exploited Children.

Page 8

BY MR. ROBERTS:

Q. Before we get into that, what is National Center for Missing & Exploited Children, Mr. Greene -- or Detective Green?

A. It is -- it's a clearinghouse for -- the way we are referring to it, it's a clearinghouse for information on -- on -- I'm trying to think of the easiest way to explain it. They share with us information related to children that are being exploited, whether it's over the internet or in person and being exploited over the internet or in person with information that they get online, whether it's through electronic service providers such as Google or, you know, Comcast or whoever. They'll get information via cyber tips. They share that with law enforcement, and that gets passed down through whatever chain and eventually comes to us and we investigate those.

They also get information via hotlines and that cyber tip from people, and that gets also passed down to us to be investigated. And that goes to the ICAC unit, and they do their investigations that way.

Q. Sometimes that's referred to as NCMEC; do I understand that correctly?

A. Yes.

MR. ROBERTS: And that acronym, for the court

Page 9

reporter, is N-C-M-E-C.

BY MR. ROBERTS:

Q. Is that correct, Detective Greene?

A. Yes.

Q. All right. And so if I say "NCMEC," you will know that I'm referring to the National Center for Missing & Exploited Children?

A. Yes.

Q. Now, you -- where we were going, I kind of got on a tangent there, you -- you reviewed a -- you called it a Verizon report or something like that. Were you referring to the NCMEC cyber tip that St. Johns County received regarding Mr. Lawshe?

A. Yes. I reviewed that, yes.

Q. Okay. All right. And we'll talk about that in a little bit about anything else that you reviewed in preparation for today's deposition.

A. I also reviewed the -- the Verizon download, the search warrant return.

Q. And when you say you reviewed it, are you talking about a document that you reviewed?

A. No, the -- the return that Detective Preston requested from Verizon after she got the NCMEC tip.

Q. What I'm asking, though, is, are you referring to a document, or did you look at all -- did

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

**Page 10**

you review all of the images that were -- were provided in that subpoena return?

A. I didn't look at all the images, but the images were present, yes.

Q. Did you -- did you look at any images in preparation for today's deposition?

A. Yes.

Q. Okay. Do you believe that you have in your possession the three images that Mr. Lawshe was charged with in this case?

A. Yes.

Q. Okay. And did you review those three images today?

A. Yes.

Q. All right.

A. Well, not today, but yes.

Q. But in preparation for today?

A. Yes, in preparation, yes.

Q. Anything else that you reviewed?

A. No.

Q. Did you have time to speak with your lawyer and have any questions answered that you may have about this process today?

A. Not really.

Q. Okay. Okay. So let me ask you this. When

**Page 11**

you came into this investigation, did you know Mr. Lawshe or who he was?

You have to say yes or no for the court reporter.

A. No, no. I did. There's a printer going on in the background. I'm sorry.

Q. It's okay. And you know -- you know, you have done this before, I'm not trying to be a jerk about it, I just --

A. Right, right.

Q. The court reporter has to write something down. When did you first realize -- when did you first learn that he was a law enforcement officer?

A. It -- it had to be a while after everything was going on. I don't honestly know how long the case was being investigated for.

Q. Uh-huh.

A. It was probably several hours after, I guess, he was maybe brought in for an interview. I don't know.

Q. Okay.

A. Our office is across the hall from the ICAC office, but they don't really -- I mean, they don't discuss everything with us until they need assistance with a download of a phone, so...

**Page 12**

Q. Sure. So let me just start by asking -- I mean, you know, you've reviewed, it seems like, quite a bit of material, but have you reviewed everything that you want to review before today's deposition?

A. I believe so, yeah.

Q. Okay. And I know your deposition was taken in this case previously, in the criminal case. Do you recall that?

A. I don't recall it, no. I -- believe me, I have -- I have -- I do a lot of cases, so it's very possible. I just don't remember it.

Q. Do you remember Crawford Pierce, that name Crawford Pierce?

A. Yes, I do, but whether it was from this case or others, I -- I know -- I know him. I just don't remember if it was for this case or not.

Q. You're not saying that you weren't deposed. You just don't have a recollection?

A. Right, I don't remember it, yeah.

Q. All right. So let me just ask you this. I mean, as we get started, is there anything after reviewing the documents that you would like to say to me or Mr. Lawshe?

A. No, no, I don't.

Q. Is there anything, in looking back at the

**Page 13**

investigation, that you wish or think should have happened differently from St. Johns County's perspective?

MR. CARSON: Object to form.

You can answer, if you can, Corporal Greene.

MS. SHEVLIN: Join.

THE WITNESS: Say that again. Sorry.

MR. CARSON: Are you asking me what I said, sir?

THE WITNESS: Yeah. Yeah, yeah.

MR. CARSON: Yeah, from time to time, myself or Ms. Shevlin may object to the form of the question. That's just so that the record notes that we -- we have an objection to the form, but you still answer the question, if you can.

THE WITNESS: Okay. And so can you repeat the question?

BY MR. ROBERTS:

Q. Sure.

A. The original question.

Q. Right.

MR. ROBERTS: And I will -- Matt, I will understand that you will object to the question. I'll just try to ask -- I don't have it verbatim, but I'll try to ask it again.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 14

BY MR. ROBERTS:

Q. Having reviewed the documents that you reviewed, is there anything that you wish or believe that St. Johns County Sheriff's Office should have done differently in the investigation of the allegations against Mr. Lawshe?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: I mean, I think they should have taken more time. Honestly, I think they have probably rushed a little bit and, you know, taken more time and -- and gone through things a little longer.

BY MR. ROBERTS:

Q. Okay. I appreciate that. Well, can you be a little bit more specific about what you wish they would have taken more time with?

A. Not really. It just -- you know, I know in a lot of cases, especially when it comes to dealing with -- with certain individuals that you worry about, especially, you know, people that are known to have firearms, you worry about issues of -- of safety and how things are going to turn out. So it becomes an officer safety issue, how things are going to come together getting -- getting somebody to a place where

Page 15

you can conduct an interview safely becomes an issue. And things tend to maybe get rushed as opposed to slowing the process down, which you have that opportunity with other potential suspects, if you want to call it that. And I kind of wish things would have slowed down. But, you know, in this case, that had nothing to do with, you know, me or my unit. We had no idea what was going on with any of this.

Q. Right.

A. Hindsight's 20/20 with all things.

Q. Right. So, yeah, I -- I appreciate that. But just to be clear, you're -- you are saying that there's a known concern of -- that Mr. Lawshe may have shot himself, killed himself, had he learned about --

A. No, no --

Q. Let me just ask a different question. You kind of answered that, I think, but you -- you said that with an officer who owns a gun, there may be sort of a desire to rush because of safety. Whose safety are you talking about?

A. His safety, our safety, anybody's. And it's not necessarily a law enforcement officer. It could be anybody who is known to have firearms. You know, it would be the same thing as if we were going against, you know, a known gangster who is -- to drive around

Page 16

with firearms, we're going to be a little extra careful or on a drug warrant --

Q. Right.

A. -- you know, if we're sending a SWAT team to go in to do, you know, something. And then in this case, especially when it comes to, you know, evidence that's easy to -- to get rid of, you know, it's -- in a lot of cases, easy just to throw in a toilet and, you know, you don't even need to flush it, it's -- you know, you get a phone wet and it's gone.

Q. So -- so you -- you -- you believe or you wish that they would have slowed this investigation down and taken a little bit more time before making the decision to arrest Mr. Lawshe?

A. I mean, in my opinion, yeah.

Q. Yeah. And that's all I'm here to do, is to get your opinion, your facts and -- and you made a comment, I want to kind of go to that, which is, you -- you downloaded -- let's just talk about the Samsung phone. Would that be okay?

A. Yeah.

Q. And the reason I like to do that is because he had a work phone, I believe it was an Apple device; is that correct?

A. Yes.

Page 17

Q. I think you just testified to this, and I want to make sure. There was no nude or pornographic images on that phone?

A. Correct.

Q. So the -- and you actually had possession of a work laptop; did I understand that correctly?

A. Yes.

Q. And you didn't find any, you know, content of interest or anything relevant to possession of pornography or child pornography on that device?

A. Correct.

Q. Right. So let's talk about the Samsung device. You -- you had the device in your possession at the time that you were asked to do a forensic download. Do I understand that correctly?

A. Well, we knew that we were going to have to do it. They didn't have it when he came in for the interview. Initially, I was asked to go with them to his house to pick it up to identify it.

Q. Okay.

A. So I went with -- I don't remember everybody that was there. It wasn't a whole lot of people. There was several of us, though, I think three or four. We went to Mr. Lawshe's house, located the phone, identified it by the IMEI number on the back. I took a

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 18

few pictures of it. I think somebody was there -- I don't remember who it was, somebody was there with a camera, took some pictures of the house to show that we didn't damage anything. I took the phone with me and went back to the lab and started my process with it.

Q. Now, prior to bringing Mr. Lawshe in, you just referred to, it was your understanding that St. Johns County already had the subpoena return from -- from Verizon or Synchronoss at that point?

A. Yes. Yes.

Q. And so they knew what was in his cloud on that Samsung device from the return of the subpoena. Do I understand that correctly?

A. Yes. And I don't remember a hundred percent, I -- I believe so. I don't -- I don't recall exactly the timeline of events.

Q. Right.

A. But generally that would be how it would work. You would get the subpoena or the -- the tip from NCMEC. You would do your -- your legal process, which in this case would be the Synchronoss, whether it's a subpoena or a search warrant, requesting all the information, then you would review it. And I -- I think in this case Detective Preston had problems getting the downloads, and she asked me to help her get

Page 19

the search warrant return from Synchronoss. And because they, at the time, were running off of small laptops, she was having a lot of trouble with it, and I think our computers are way, way more advanced. I think I downloaded it for her and gave it to her. I didn't review it or anything. I just gave it to her.

Q. And let me --

A. They probably would have gone from there.

Q. Yeah, so -- and let me just kind of make a sort of -- make sure I understand one thing is, your involvement in this case was the forensic download --

A. Yes.

Q. -- of the phone and perhaps you helped her download the subpoena return; is that correct?

A. Yes.

Q. You never reviewed any images to make, inform an opinion prior to the arrest about whether or not an image constituted probable cause for possession of child sexual abuse material?

A. No.

Q. You were strictly just sort of the tech facilitator of getting any images to Detective Preston for her to do the investigation; is that correct?

A. Yes.

Q. You were not responsible for making any

Page 20

probable cause determinations about any of the images, whether charged or not charged, in this case?

A. No.

Q. And no one on your team was; is that correct?

A. Correct.

Q. All right. You have done that before, though, when you were an ICAC and SVU detective or investigator, you -- it was at one point in the past your job to make probable cause determinations about what is or does not constitute probable cause for possession of -- of child pornography?

A. Yes.

Q. All right. You indicated that Detective Preston, you -- you have a recollection that she may have asked you to help download the subpoena return. Did I understand that correctly?

A. The search warrant, yes.

Q. The search warrant subpoena return. Okay. Did she ever ask you specifically to look at the images, the charged images, for you to confirm that you -- in your opinion, they were depictions of a minor?

A. Not that I recall, no.

Q. As a forensic investigator or detective with St. Johns County, do you have the ability to look at an

Page 21

image and determine whether or not it has been edited or altered digitally?

A. Sometimes. It -- it depends on the way it's been done and the -- the type of tool that was used. There are some -- some ways that we can -- or some tools that we can use that will let us know if something has been altered. And a lot of the forensic tools we use are becoming way more advanced in that field that are looking for artificial intelligence manipulation in -- in images and videos, but there are ways to kind of tinker with an image and play with like the lighting in different filters and you can see the manipulations in it, but it's -- it's kind of hit or miss. You know, if somebody is really good at the job, then it's -- it's hard to tell.

Q. You are an expert, though, in -- in tinkering with it and trying to tell whether an image has been digitally altered?

A. I wouldn't say an expert, no, but I have a little experience with it, yeah.

Q. Is there anybody else at St. Johns County who has more experience than you or more knowledge than you in trying to determine whether or not an image has been digitally altered in some way?

A. I don't know, maybe. Not that I know of, but

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 22

maybe.

Q. In your forensics --

A. Maybe one of my coworkers, maybe.

Q. Yeah.

A. But...

Q. Let me ask you a question. Did Detective Preston or anybody else at St. Johns County Sheriff's Office ask you to review any images related to Mr. Lawshe's case to determine whether or not they had been digitally altered or not?

A. Not that I can recall.

Q. If you did something like that, would you have generated a report of your work?

A. I don't think so. I mean, it would -- it would depend on -- no, I -- I don't think so, because it would depend on what I did it for and if it had a result in the case. You know what I mean? If it was just like, Hey, do you think somebody has done something with this, and I looked at it and nobody did anything with it, then, not really. But if I looked at it, and I said, Wow, yeah, this has been really tinkered with or somebody has done something with this and that affected the investigation, then absolutely I would.

Q. You have no recollection today of Detective

Page 23

Preston or another detective coming to you with those images related to Mr. Lawshe's case and asking you to evaluate them as to whether or not they had been digitally altered or not?

A. Not that I remember, no.

Q. Do you have a way of determining whether or not an image is artificial intelligence generated?

A. Other than some of the forensic tools, they sometimes will show us that stuff, but not really.

Q. A similar answer to the digitally altered question?

A. Yes.

Q. Okay. Do you recall anyone coming to ask you whether or not any of the images related to Mr. Lawshe's case were the product of AI generation?

A. No.

Q. So we're going through kind of your involvement in the case. I think -- was it fair to say the first time -- let me ask. When was the first time that you were made aware of this investigation?

A. I think it was around the time that Mr. Lawshe was brought in to the interview room. Either -- it was either -- I think it was after he was brought into the interview room.

Q. And that would have been the time where you

Page 24

were asked to help assist with the Synchronoss download, or had that happened before he was brought in?

A. Well, it -- well, no, the Synchronoss download, I might -- I mean, I guess that would have been a couple days before. I probably just didn't even realize it was the same case.

Q. Fair enough.

A. Yeah.

Q. You were just asked the technical, Hey, can you help with this?

A. Right. And that happens a lot. And not -- not just from ICAC. That happens from every unit all over the place.

Q. Where they're dealing -- where they're dealing with a large amount of information or data that's being downloaded or dealt with?

A. Yes. I'm kind of like the investigations IT person.

Q. Okay.

A. So a lot of people come to me for a lot of different things, and I just end up going to help them out.

Q. Yeah. So you were made aware when they brought him in. And I think you already testified you

Page 25

were asked to -- to go to the home, Mr. Lawshe's home. Did I understand that correctly?

A. Yes, sir.

Q. You, along with several other officers, not a lot, but a few other officers, went to his home. You recall going to his home?

A. Yes.

Q. At the time that you went to his home, did you understand that this investigation was about the allegation of possession of child pornography?

A. Yes.

Q. All right. I think you testified that you located the device in the home, took some pictures. Did you bring back -- that back to your office?

A. Yes.

Q. And did you download, or did you do everything that you were asked to do with all three devices?

A. Yes.

Q. Talking about the Samsung device, you were able to image or download that phone successfully?

A. Yes.

Q. And I think you ran the data through several programs that you guys have to detect images of nudity or -- or pornography or things like that?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 26

A. Right.

Q. Right. I have had a chance to look at your report. It says that a download revealed several items of interest. I think that's the way you phrased it in your report. Did I recall that correctly?

A. Files of interest is usually how I write it.

Q. "Files of interest." And by that, you -- you -- do I understand correctly, you simply meant that these files may contain pornographic or nude images of individuals?

A. Correct.

Q. You did not make any determination that these files contained minors during your -- your work as a forensic download specialist?

A. Correct. It's -- unless it's overly obvious, as in it's a -- you know, like a toddler or something like that, and still, it's -- it's not my job to make that determination. I'm am not charging anybody. Unless I find a crime of some other type that's not related to the case with ICAC investigations, I'm sending it to the ICAC detectives to let them do their job. So I just note that I saw something that seemed like it should be of interest, and I send it to the detective to let them...

Q. But I'm just trying to clarify. When you say

Page 27

"of interest," it's just because there is a picture of a -- of a nude individual or -- or potentially pornographic image. You're not making a value judgment upon the age of the person depicted in those images?

A. In this case, I think there were a lot of what we would categorize as age-difficult, but, yes, for the most part, it was a lot of nudity.

Q. Okay.

A. Yes.

Q. And you didn't see anything that you, in your experience, would categorize as -- as obvious, I think you used the term obvious child pornography?

A. Correct, I did not.

Q. You also made a notation, I think I under -- or I saw it somewhere, there were no file-sharing apps, things like BitTorrent. I'm not even sure what that is. What is BitTorrent?

A. BitTorrent is -- it's a type of peer-to-peer sharing. Do you remember like Napster back in the 90s?

Q. I do.

A. It's similar to that, where people will share -- like say if I want to share a movie, I can --

Q. Right.

A. -- upload it into a BitTorrent file and then put it onto a platform where 20 different people can

Page 28

share from, you know, multiple files, and then they share with a hundred different people. And it's just a quicker way to share files.

Q. You didn't find anything like that on -- on any of the devices that you imaged of Mr. Lawshe's, correct?

A. No, sir.

Q. I have heard the term "dark web." Is it -- 8chan or 4chan or things like that, is that different than file sharing or...

A. Yeah, that's more of a forum-based service.

Q. Did you -- did you find any evidence like that -- that -- that -- I don't even know, some sort of a platform device or something on any of these devices that would have shown that there was -- he had been accessing things from these sort of dark web places?

A. I -- not really dark web. I did see some like forum-based websites. I wouldn't categorize them necessarily as illegal. They were definitely related to pornographic like sharing --

Q. Sure.

A. -- and stuff like that, but I wouldn't say not illegal. It's -- per se, you know.

Q. You saw, I think, a lot of information that -- you're just saying a public website that deals

Page 29

in pornography. That's what you're talking about, right?

A. But it was like a forum-based, you know, people can get on there and just talk to each other. Not like a -- like a chat site where -- you know, where you would get on like Yahoo Messenger or something like that, but it's -- when you say "4chan," 4chan is really a forum similar to Reddit where you post something and people respond back and forth to what the original post is. And that's -- if I remember correctly, 4chan or 8chan is like that, and you can post pictures, you can post videos in response to an original post, and there was at least one thing that was similar to that. But I think it was more along the lines of somebody posts something and people would send nudes to that post or nude pictures to that post. And I -- not that I really dug a lot into it, but I think that's what that website was for. But it was -- as far as I can tell, it wasn't anything really illegal about it. I didn't dig a whole lot into it because --

Q. Okay.

A. -- it didn't seem --

Q. All right.

A. -- nefarious.

Q. You were not involved at all in the decision

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 30

to bring Mr. Lawshe in or effectuate arrest on him, were you?

A. No.

Q. All right. After you imaged the phone -- the devices and you turned over that data to Detective Preston, what was the next involvement that you had with this case?

A. I don't think there was really much more involvement. I know there was a search of his car, and I stood by in case they needed me to identify anything, but I didn't really search. And I was only there for a couple minutes, and I tried to -- I tried to image his computer, which didn't work out well. His work computer.

Q. Okay. But I --

A. I -- like not really a whole lot of anything.

Q. Okay. I have -- I have a record that you met twice about this case separately. And I'm not trying to -- I know you meet with a lot of people a lot of times, right, so I know you're not intentionally trying to, you know, whatever, but I understand that you met with an Aaron Weiss. Do you know who Aaron Weiss is?

A. Yes. Yeah.

Q. Okay. And then -- and then I think maybe he has a colleague named Santiago. I'm not sure what his

Page 31

last name is or if that is his last name. Do you know Mr. Santiago?

A. Yes.

Q. All right. And then I -- I understand that you met a second time with Mr. Weiss, and this time Mr. Pierce was present, and I believe some St. Johns County and the Assistant State Attorney were present for that second meeting.

A. Yeah, yeah, yeah.

Q. Do you recall that?

A. Uh-huh.

Q. Okay. I want to go to the second meeting, if I could. And I believe that happened in late October 2023. Do you have any reason to disagree with the timeframe of that?

A. No.

Q. Okay. Do you recall who was present for that meeting?

A. I think it was just -- I don't remember Aaron being there, but maybe he was. I remember Mr. Pierce, and if it's the meeting I'm thinking of, it would be Kaitlyan Payne and the State Attorney and Crawford Pierce and, yes, Aaron Weiss was there, and me, yes, and I don't -- well, no, I think it was just us four.

Q. You think the -- that Detective Preston was

Page 32

there?

A. I don't think so.

Q. Okay.

A. I don't remember, but I don't think so. I do remember that, yeah.

Q. Okay.

A. I didn't know that was the involvement you were you talking about. I thought you meant like as far as in -- like --

Q. You meet with people almost every day, probably, about your forensic downloads, correct?

A. Yeah.

Q. Okay. So, you know, most people remember their deposition taken, but, you know, it happens so often with you, you don't recall that, and I understand totally.

A. Absolutely.

Q. Don't apologize.
What do you recall about that second meeting?

A. We were reviewing the images that Mr. Lawshe was charged with, and Mr. Pierce was asking -- or him and Ms. Payne were arguing over the content, and there was a watermark on the bottom of the images, and Mr. Pierce wanted to go to the websites, and so we went to the websites, and on one of the images in

Page 33

particular, there's a -- you only see a portion of the female's body, which just shows from like the bottom of her hips to the top of her thighs, and we were able to find the image and then find her entire body in that image, and, I mean, you can see her whole body from that as opposed to just her vagina.

Q. Is it unusual in your experience for an image like that, that just shows like hips to vagina, to be charged as possession of an image of a minor, a pornographic image of a minor?

A. I wouldn't say unusual.

Q. Well, let me ask you this. How long did it take for you to -- I understand that you were asked to actually drive the computer in this, so you were like typing in the websites and all that kind of stuff. Is that your recollection?

A. Yes.

Q. And I also have information that all of the images had information on them related to a website; is that correct?

A. Yes. Well -- oh, those three images, yes.

Q. Those three images that he was charged with all had some type of reference to a website on them, correct?

A. Yes.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 34

Q. How long did it take you to locate that image on the website, the image that you're talking about, with the hips to the vaginal area?

A. I don't remember. Twenty minutes, maybe, 30 minutes.

Q. Okay. I understand that you guys actually went to multiple websites that day?

A. I wouldn't think multiple, maybe two. Two, three. Yeah.

Q. Two or three websites. And you were able to locate both of the models on those websites?

A. Correct.

Q. Just for the record, so we understand, there were three images that Mr. Lawshe was charged with, correct?

A. Yes.

Q. There were two images of one model and one image of another model; is that right?

A. Correct.

Q. All right. Both of the websites or the websites that you went to represented that the models in question were adults, correct?

A. Correct.

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

Page 35

MR. ROBERTS: I want to make sure that the court reporter got that answer. You said "correct." Those websites did represent that the models were adults; is that correct?

THE WITNESS: Yeah, they represented every model on their websites were adults.

BY MR. ROBERTS:

Q. Okay. They -- these websites also contain a disclaimer that the websites were complying with federal age verification laws; is that correct?

A. If I remember correctly, yes.

Q. Now, Mr. Pierce actually asked you to print out that disclaimer, did he not?

A. I don't remember.

Q. Do you remember the Assistant State Attorney instructing you not to print it out?

A. I don't remember that either, no.

Q. Okay. You said they were arguing. Do you recall that that might have been one of the things they were arguing about?

A. It's possible. They argued a lot that day.

Q. Okay. When you saw the full image of the model who is the subject of the picture of just bellybutton to her vagina --

A. Uh-huh.

Page 36

Q. -- you recall the image that I'm talking about?

A. Yes.

Q. And you recall seeing the image of her, of her face. Yes?

A. I don't remember what her face looks like, but I do remember -- I remember what you're talking about, yes.

Q. You actually just reviewed these images just within the last couple of days?

A. Not the one of her whole face, yes.

Q. Right. Were there any images that were charged that showed her face?

A. I don't remember what she looked like. Oh, you mean of the charged one? No.

Q. Okay. So Mr. Lawshe was charged with possession of child pornography on three images, correct?

A. Correct.

Q. Two of them didn't show the face of the model; is that correct?

A. Two of them showed the face of --

Q. The one model?

A. -- of the one model.

Q. Okay. Okay. All right.

Page 37

A. And one didn't show. One just had -- well, one had the one clip, or it had three different females in it, and I guess the section that was actually being charged was the one that just showed the girl's vagina, and there was the two other girls in the picture, I believe.

Q. Yeah, the two other girls appear to be adults or at least arguably adults?

A. I believe so. I'm not sure about it. Yeah.

Q. All right. Now, you are a -- you at least were an IPAC investigator, correct?

A. Uh-huh, yes.

Q. You are familiar with the statute that -- the crime that Mr. Lawshe was charged with?

A. Yes. It's been a long time since I've read it, but yes.

Q. In Section 827.071, Subsection 5, Possession of child sexual abuse material, I'm going to ask you a couple of questions about it, and I'm not -- you can say you don't remember or you don't know, like I'm not trying to trick you here.

But you were trained in investigating cases of possession of child pornography, correct?

A. Yes. A long time ago, yes.

Q. Right. You understand because of your

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 38

training that the law requires -- in order to be guilty of this crime -- knowing possession of the -- of the image; is that correct?

A.  Knowingly being in possession?

Q.  Yes.

A.  I would believe so, if that's in the statute, yes.

Q.  And look, why don't I just -- I'm not trying to -- let me -- rather than fumbling around with this, I'm just going to share, and I can -- we can make this an exhibit, I guess.  It's the Florida Statute on -- okay.  This is Subsection 5 of 827.01, sexual performance by a child.  Did I read that correctly?

A.  Uh-huh.

Q.  And then Subsection 5-A, I'm just going to read it so you don't have to squint and look at your computer.  It says, "It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation image, data, computer depiction or other presentation which in whole or in part he or she knows to include any sexual conduct by a child."  Did I read that correctly?

A.  Yes.

(Plaintiff's Exhibit No. 1 was marked for

Page 39

Identification.)

BY MR. ROBERTS:

Q.  Does that refresh your recollection from your training about what the law is regarding possession of child pornography?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q.  Does it refresh your recollection?

A.  Yes.

Q.  All right.  So you would agree in order for there -- in order for a person to have committed this crime, they would have to know that the models were minors.  Is that your understanding, from your training?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  Yeah and no.  I would think if -- if you're looking for -- if you're looking for young teens, then I don't know.  It just -- it -- at some point you're going to end up down a rabbit hole, and you're going to get hurt.  And it's just -- it's bad.  Technically knowingly in possession, yes.  But it's just as bad.

Page 40

BY MR. ROBERTS:

Q.  You agree that it's legal to possess pornographic images of an adult in the United States?

A.  Yes.

Q.  And you -- you understand that that means anyone 18 years or older, correct?

A.  Right.

Q.  You understand that in order to be a minor, the individual has to be below 18, correct?

A.  Yes.

Q.  Now, you said it's bad.  Are you saying like it's morally wrong to look at an 18 or a 19 year old; is that what you mean?

A.  No, no, no, no, no, no.  I'm just saying that if he's -- I don't know.  I just -- I think -- he's digging himself further.  And I'm just saying, theoretically, I'm not saying your client, I'm just saying a person that keeps doing this kind of stuff is going to end up getting themself in a -- in a -- a hole, in a -- you know, I've seen it time and time again, that people just keep digging themself into a hole, and they just go down in this pit, and they end up in bad spots with this stuff, so I don't know, I'm --

Q.  Do you think it's a bad spot to be on a

Page 41

public website that has a disclaimer that all of the models are verified under federal law to be adults?  Do you think that's a bad spot?

A.  No.  No.  No.  It's -- it's legal to be on a legal website.

Q.  So do you believe that the information which you saw that represented the models that Mr. Lawshe was charged with was readily available to any investigator who chose to investigate that?

A.  It could have been, yes.  Those websites can sometimes be very sketchy or can be very --

Q.  Sure.

A.  It's a lot of times probably why people are nervous about going to them, especially if they end with like dot RU or dot TO or something like that, you know, those are -- people worry about getting viruses and stuff like that, and that's...

Q.  All of these websites ended with a dot com, correct?

A.  As far as I recall, yes.  But -- or at least those two, yes.

Q.  As an ICAT trained investigator, are you familiar, at least nominally, with federal age verification requirements?

A.  Honestly, no.  I wasn't, no.  But I

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 42

understand it. I understand that.

Q. Right. Right. And as an ICAT investigator, you certainly have access to understand what those laws are and what that means, correct?

A. Yes.

Q. The websites that you viewed with Mr. Pierce and the Assistant State Attorney, they actually cited the federal statute, didn't they?

A. I don't recall. But I'm sure they did, yeah.

Q. Okay. All right. So were you aware that that law requires their website to have a records custodian?

A. No, that wasn't --

Q. All right. Well, let me ask you this. That type of -- of work that you did there with Mr. Crawford and the Assistant State Attorney, is that the type of thing when you said when we began is that you wish they would have taken a little bit more time with this investigation, is that the kind of thing that you wish would have happened before Mr. Lawshe was arrested?

A. Yeah. Yeah, among other things, you know. But yes. Yeah.

Q. What other things?

A. I mean, nothing specific.

Q. Okay.

Page 43

A. Just, you know, yeah.

Q. So viewing those websites that you did with Mr. Pierce and the Assistant State Attorney, in your opinion -- and I understand it was not your investigation -- but in your opinion, raised serious doubts about what probable cause existed that Mr. Lawshe had committed a crime in this matter, correct?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: Not -- well, so there's more to the development of probable cause than just the image itself when you're dealing with the issue of an age-difficult image, so you come across an image of what you believe to be a potential, like an older teenage, in this case, female, or a -- an older male, you know, with pubic hair, you know, chest tissue or whatever, pectoral muscles, you still -- you know, you're looking at a face that still looks like a child or something like that, or in this case you're seeing a female is starting to develop breasts or pubic hair or hip development, but in the face you still look like a child, they have -- the investigators are supposed to take it to a doctor, and in this case they

Page 44

didn't, and the doctor agreed that it looked like a child, and that was enough to develop probable cause, so, you know, technically probable cause was there.

MR. ROBERTS: We're going to get back to that in a second.

THE WITNESS: Okay.

BY MR. ROBERTS:

Q. But let me ask you this. Had you had that information that the -- the websites were telling -- well, let me ask you this. Do you agree that -- let's say hypothetically one of these models was 17 years old. Okay? Do you understand my hypothetical? Let's just say -- we know they weren't, but let's just say they were 17.

MS. SHEVLIN: Objection. Not established.

MR. CARSON: Join.

BY MR. ROBERTS:

Q. We'll establish it in a second. Have you seen the images of the models with their passports? Have you seen that?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. You've seen this. Okay.

Page 45

Let's just hypothetical that they were 17. If the evidence was, as an investigator, that Mr. Lawshe had reason to believe that they were 18, that's not a crime to possess those images under Florida law, is it?

A. No.

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q. Your answer was no?

A. No.

Q. Right. So really, whether an expert physician comes to an expert opinion about the age of an individual doesn't really bear on Mr. Lawshe if he committed a crime or not, does it?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q. Does it?

A. I don't know what you want me to say here.

Q. It doesn't, does it?

A. I --

Q. Yes or no?

MS. SHEVLIN: Form.

THE WITNESS: Okay. Okay.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 46

BY MR. ROBERTS:

Q. Okay. All right. If you would have been the investigator in charge and you had seen the full images in the context of the website, with the representations made on the website, you would not have charged Mr. Lawshe with possession of child pornography, would you?

A. I can't say. I might have made different decisions. I -- I don't know.

Q. Okay.

A. I mean, it wasn't my investigation. I don't want to second-guess somebody else one way or another.

Q. Do you believe that any reasonable investigation of these images should include visiting the websites that are referenced on the images themselves?

A. If possible. I would -- I would like to -- if -- if -- if circumstances -- if the circumstances allow, yes. I think we should be able to.

Q. And in this case, the circumstances did allow?

A. I don't know the entire circumstances. You know, I wasn't -- I wasn't here for it, for the beginning of that. I don't know what happened at the beginning of what was going on.

Page 47

Q. Well --

A. It wasn't included in the part.

Q. When you were in a room with nothing but the images themselves, you were able to locate both of these models on --

A. Correct.

Q. -- looking on the internet, correct?

A. Correct. I mean, from before I became involved. I don't know what happened up to the time.

Q. Correct. But you do know that Detective Preston had the three images that you were looking at, at the end of October, 2023. You know that she had possession of those images prior to making the decision to arrest Mr. Lawshe, correct?

A. Yes.

Q. So with those images and with those images alone, she had the ability to easily access those models on the internet, correct?

A. Well, I don't know that she knew that she could, though. Honestly it's --

Q. Okay. You don't know --

A. Up to that point. Up to that point they did not have the same internet access that we do in the lab. We had just moved the forensic lab across the hall. It opened up on -- I think within a couple of

Page 48

months -- across from their hall. We have an undercover internet line in our lab. They have one now. They didn't have it at that time, I don't think.

Q. She could have walked across the hallway and asked you to help her, correct?

A. She could have, but I don't think she knew that. Now, I'm not making excuses for her. She could have been able to do that. But I'm just saying there's a possibility that she didn't know that.

Q. Well, she came and asked you to help download the images from the subpoena return, correct?

A. Yeah. I'm just saying. Yeah.

Q. She's testified actually that she regularly would go to you for help --

A. She did.

Q. -- for difficult matters, correct?

A. Yes.

Q. Detective Preston regularly came to you for technical internet data assistance prior to making the decision to arrest Mr. Lawshe, correct?

A. Yes.

Q. But she did not come to you asking you to help her access these websites that were available through looking at the images in Mr. Lawshe's case, did she?

Page 49

A. No, she didn't.

Q. So after this -- after this meeting where you viewed these -- you identified these models on -- on the internet, did you have any further conversations with anyone about this case?

And let me say this. Up until the point -- let me just ask it -- that's a bad question because I know you have, right? We're sitting here talking about it now.

Did you ever go to Detective Preston and express concerns about the investigation and the evidence in this case, given your meeting -- I think it was October 29th, 2023 -- with Mr. Pierce and the Assistant State Attorney?

A. I don't remember. I probably told her about finding that full picture on the internet, but I don't remember.

Q. Okay.

A. When did you say the -- the meeting with Crawford Pierce was? Was it October?

Q. I think it was like October 29th, I think is what I have.

A. Of last year?

Q. Of 2023. Not last -- so, I mean, is that last year? Yeah, I guess it's 2024. The years run

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 50

together now.

A. I know. Believe me, a lot has happened since then, so...

Q. If you don't remember, that's okay.

A. Yeah, I don't. I don't remember.

Q. But fair to say you did have concerns about the evidence against Mr. Lawshe at that point?

A. Well, just the simple fact that we found that, I probably told her about that, I would just guess. I just don't remember any of it.

Q. Right. So at some point you actually saw the images with the models, the two models with pictures of their -- of their passports?

A. Yes.

Q. Tell me, how did that happen? How did that come to pass?

A. Whenever I -- I guess Mr. Pierce contacted after that meeting, I think he contacted whatever company it was, metart.com., and they sent him the pictures, and either he sent them to the State Attorney in -- I think he sent them to the State Attorney, and either she sent them to Detective Preston and me, or somehow they got to me. And they showed them to me, so...

Q. Do you remember the context? I mean, did you

Page 51

have a conversation with somebody about them or...

A. I don't know. I don't remember.

Q. The --

A. The picture doesn't -- it doesn't -- like, when you first look at it, it doesn't look like the girl in the photos because she doesn't have makeup on. But, you know, once you look at her, you can tell it's definitely the same girl. It's just...

Q. Both of the models, I just want to confirm, you saw an I.D. and photographs of the two models that were depicted in the images that Mr. Lawshe was charged with, correct?

A. I have seen both of the photo ID's. Like I said, I don't remember what the other one's face looks like, so I, you know, couldn't tell you. I just -- the -- the one girl who has the Ukrainian passport, there's the two photos or the two images that have her face, so I can compare to her. But the other one, I -- I don't have the original picture of her face.

Q. Because -- because her face wasn't charged?

A. Right. Correct.
And we didn't screenshot the -- the website for her face, that I remember.

Q. So let me ask you, do you know anything about metart.com?

Page 52

A. A little bit, not much.

Q. What do you know? Let me ask you this. Before I ask you this, I want to ask a better question. When did you know prior to Mr. Lawshe's case?

A. I had read -- I know -- I mean, I know what you're getting at. I had read somewhere back when I was doing ICAC investigations that they used 17 year old models from the Ukraine back years ago.

Q. What was the source of that?

A. Something when I was doing investigations when I was -- I read it on the internet somewhere.

Q. You read it on the internet somewhere?

A. I can't remember. I mean, I don't have it in a book or anything.

Q. No, but, I mean, like, was it a -- a Google review or...

A. I don't recall. That was almost ten years ago, you know.

Q. So you have no idea if that was a credible accusation?

A. I don't recall. It could have been at the time. I just -- I mean, I don't have it.

Q. It could have been credible, but it also could have not been credible, correct?

A. I mean, it very well -- I mean --

Page 53

Q. I mean --

A. It was -- it was from 2015 or 2016. I don't -- I don't have -- it's something I remembered from when I was in ICAC.

Q. Okay. All right. Actually not what I was going to, but I appreciate it. I was going to go there.
Have you ever visited -- have you ever -- have you ever Googled metart.com in response to this case?

A. Yes. This morning. Yeah.

Q. Okay. Okay. Okay. Did you and Ms. -- did you and Detective Preston Google metart.com together at any point in time?

A. Not that I recall.

Q. Did you tell her that metart.com was publishing illegal content?

A. I don't think so.

Q. All right.

A. Did I? Did she say I did? Because I don't remember telling her that I did.

Q. Okay. You made a comment about -- well, I'm going to go through something else first. You said you reviewed the NCMEC report?

A. Yes.

Page 54

Q.   Would you agree with me that there are factual discrepancies or false statements contained within that NCMEC property?

A.   In what regard?  I don't -- I don't remember the entire NCMEC report.

Q.   Sure.  So you recall -- you have reviewed the image that was the subject of the NCMEC report, correct?

A.   Yes.

Q.   All right.  Let me just -- are you familiar that a NCMEC report categorizes the content contained within the -- the image, the subject image?

A.   How so?

Q.   A-1, A-2, B-1, B-2.

A.   Yeah, I -- I know that they do that but...

Q.   Okay.  Let me -- do you recall what that means?

A.   Not really, no.

Q.   Okay.  I'm showing you the NCMEC report, and it's dated January 25th, 2023; is that correct?

A.   Yes, sir.

Q.   You reviewed this report within the last several days or some time in preparation for today's deposition?

A.   Very quickly.

Page 55

Q.   Okay.  So the number right here under further information on uploaded files, I'll just read it.  In each category it says, "A-2," and then it has a "1."  Do you see that?

A.   Yes.

Q.   Did I read that correctly?

A.   Yes.

Q.   Right.  A stands for prepubescent minor, correct?

A.   Yes.

Q.   All right.  2 is lascivious exhibition,-- that's a hard word to say -- correct?

A.   Yes.

Q.   All right.  The model in the image was not prepubescent, correct?

A.   This is the one where the -- the girl is facing away from the camera.

Q.   Knee -- chest to knees, there's pubic hair present?

A.   Yes.  Yeah.

Q.   She's not prepubescent, correct?

A.   Correct.  Right.

Q.   And it also says that this image was not available to the public.  That was not correct either, was it?

Page 56

A.   And I think what it's saying as far as not available to the public, it's not available to the public from him.  Like, it's -- it's coming from his -- his cloud system.  Like, he's not making it publicly available.  And I don't know.  You'd have to get with NCMEC about that.  I'm not positive.  I don't --

Q.   Well --

A.   I don't read their reports on a constant basis.  It's just on a -- like a need-to-know like as far as the only -- realistically, the only reason I review their reports is so when we have an investigation or we're doing downloads from an ICAC case is so I know what images or videos I'm looking for.  It helps us to kind of narrow the scope of our investigation to help them to get stuff done a little quicker.

Q.   Well, when you were an ICAC investigator, you regularly looked at them, correct?

A.   Yeah.  But again, that was eight, nine years ago.

Q.   Okay.  You made a comment, and I think it's a term of art, it's called "age-difficult."  What does that mean?

A.   It means it's a -- where it's beginning to -- or it's where a person, a human being, is developing

Page 57

physically because of puberty it's hard to tell an approximate age.  It's obvious they're no longer a -- a small child or an infant or a toddler because of puberty developing where they are getting pubic hair.  In females it's breast development, hip dysplasia.  In males it's pubic hair, pectoral muscles, testicles are starting to drop, stuff like that.  So for us, it -- it -- it's a -- it's a level of categorization where it's -- we call it age-difficult.  It's kind of a -- for -- for categorization purposes as far as child sexual abuse material, we have, you know, absolute CSAM, then age-difficult or child erotica and then nonchargeable and then there's a few other categorizations but...

Q.   And we've used the word "CSAM."  Let's tell the court reporter what CSAM is.

A.   CSAM is child sexual abuse material.

Q.   All right.  Age-difficult kind of means what it sounds like.  It's difficult to tell how old this individual is?

A.   Correct.

Q.   And are you familiar with a NCMEC categorization of unconfirmed child pornography?

A.   Yes.

Q.   And isn't it the case that this report from

Page 58

NCMEC was a report of unconfirmed child pornography?

A.    I believe that's what they would consider it, that it's -- I think what they're saying, and you'd have to check with them again, is that somebody is reporting this, and in this case it would be -- I believe it would be Synchronoss is reporting to NCMEC that they think that this is child pornography. NCMEC is reporting it to us is unconfirmed because the hash values on the picture do not match something that is known to them as child pornography. NCMEC doesn't make that determination. They only report what they have known in their data base as confirmed child pornography because of the hash values.

Q.    You understand, though, that when you get a -- a NCMEC report of unconfirmed child pornography, NCMEC is not communicating to St. Johns County Sheriff's Office or any ICAC investigator that they have confirmed that this is child pornography?

A.    They -- they will confirm that it is child pornography, if they have the hash values to confirm that it is. They'll -- well, they won't confirm that it's child porn. They'll say these -- these are known, you need to confirm with us that these are known images or known videos.

Q.    And in this case, they were not able to

Page 59

confirm that it was child pornography?

A.    Correct. Correct.

Q.    And so you understand that by getting this NCMEC report that is unconfirmed, St. Johns County Sheriff's Office has to do some investigation to determine whether it is child pornography or not child pornography. They cannot just rely on this NCMEC report?

A.    Correct.

Q.    Also, I mean, as you pointed out, I mean, would you consider the fact that the report says that this a prepubescent individual and that's just not true, is that -- does that affect -- as an investigator, would that affect your -- your viewing or the credibility of this tip?

A.    Well, I mean, again, I'm not the investigator on this, so, you know, I -- it would but...

Q.    Right. If you were the investigator -- if you were the investigator, it would raise a question about the credibility of the tip, in your mind?

A.    Yeah. Yes. Correct.

Q.    Okay. And I have no idea. This is an open-ended question. How many NCMEC reports -- and let's just use the timeframe of, you know, first quarter of 2023, how many NCMEC reports, cyber tip

Page 60

reports, does St. Johns County Sheriff's Office receive, however you would like to estimate it, daily, weekly, monthly? Can you estimate?

A.    I -- I don't know off the top of my head, but just as a guesstimation, when I was doing it in 2015 to 2017, we got about, I think, seven a month, and now they're getting easily like a hundred a month. If not, maybe a little less, maybe a little more. I -- I know that they had, I think, 300 in the first three months or something like that. It's -- it's crazy considering there's only a handful of people in there, so they have a lot.

Q.    How many of those images are just not chargeable, it's just -- it's just not child pornography that they're getting in these cyber tips?

A.    I don't know. We -- I don't -- I don't -- I just can't answer. I don't know. Yeah.

Q.    But are you aware it happens on a fairly regular basis that a NCMEC report will contain an image that does not constitute a chargeable possession of child pornography material?

MS. SHEVLIN:  Form.

THE WITNESS:  I can't answer. I don't know. I don't -- I don't look at cyber tips unless they are specifically related to a case.

Page 61

BY MR. ROBERTS:

Q.    Back when you were doing it, were there times where you got a NCMEC report and you're like you looked at it and go, No, this is not something that we can charge?

A.    I think so. I -- yeah. Well, you know, we only got them, like I said, like seven -- maybe seven a month.

Q.    Okay.

A.    So...

Q.    All right.

A.    And most of them were like weird guys from up north was chatting with a kid from here or something like that. They weren't really so much image-related.

Q.    I think we talked about, you know, the need, and you thought, Well, we should go to a website, if that's available. I want to ask you a question, though. I mean, if -- if you have an image, and let's just say hypothetically the detective believes that it's a minor being depicted and published, would you agree that the detective should make every effort possible to identify the -- the model or the individual being depicted in that image?

A.    Uh-huh, I do.

Q.    Yes?

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 62

A.   Yes, I do.

Q.   I mean, the point of ICAC investigations is to protect children from sexual exploitation, correct?

A.   Yes.

MR. ROBERTS:  You know, we've been going for an hour.  Does anybody need a break?

MS. SHEVLIN:  A bathroom break sounds great, actually.

MR. ROBERTS:  I'll get some coffee.  I appreciate everybody's time.  Thank you.

MS. SHEVLIN:  All right.  See you all in five.

(Off record)

MR. ROBERTS:  If we go back on the record, I was talking to the court reporter -- I will, just because I think maybe it was ambiguous, just make the NCMEC report Exhibit 2.  I think Exhibit 1 was the statute 82.071.  So am I right, there have been only two things that I have shared?

MR. CARSON:  Can you e-mail those to the court reporter?

MR. ROBERTS:  She put her e-mail in the chat, so yeah, yeah, yeah.

(Plaintiff's Exhibit No. 2 was marked for Identification.)

Page 63

BY MR. ROBERTS:

Q.   All right.  So Mr. Greene, I always do this.  We just had a break.  Did you discuss this case with anyone during the break?

A.   No.  And I apologize, somebody put a lock on this door and didn't give anybody the keys.

Q.   Okay.  All right.

A.   Gave us a nice office to do this stuff in and...

Q.   I always say too, it's not inappropriate that you did talk to someone.  It's not against the rules.  It's just I -- you know, we want to know.  So -- but you didn't.  So...

MR. ROBERTS:  So Madam Court Reporter, I think the last, were we asking like -- did I ask something about it would be -- an officer should make best efforts to try to identify any minor depicted in a -- can you just ask the last question, Madam Court Reporter, because I think I already got an answer to that one.

THE COURT REPORTER:  Sure.

(Thereupon, the requested portion of the record was read.)

MR. ROBERTS:  Okay.  Very good.

Page 64

BY MR. ROBERTS:

Q.   All right.  You were able to view the models in question with their ID's, correct?

A.   Yes.

Q.   Are you satisfied, as we sit here today, that at the time of these photo shoots that the models were at least over the age of 18?

A.   No.

Q.   All right.  What evidence makes you think that they were not?

A.   If I can see the -- the meta data from the images, the original images, I would be satisfied.

Q.   Let me ask you this.  Does it at least raise a question in your mind that needs to be investigated before anyone got arrested for possession of these images?

A.   Yes.

MR. CARSON:  Object to the form.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q.   Did anybody ask you to do any analysis on the photographs depicting the -- the ID's?

A.   No.

Q.   Just so I know, you're -- you're not taking the position that these models are under the age of 18,

Page 65

are you?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  I'm not taking any position on anything.

BY MR. ROBERTS:

Q.   Let me ask you this.  Could a -- in your opinion, as an investigator, and you have looked at these images and, you know, could a reasonable person believe that these models were 18 at the time they were depicted in these photographs?

A.   Yes.  And a reasonable person could also believe that they are under 18.

Q.   And isn't that why the federal government has given investigators the tools to use the federal age -- age verification statute?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  The federal age verification statute?

BY MR. ROBERTS:

Q.   The statute that was disclaimed and -- and posted on the websites that you viewed with these images.

MR. CARSON:  Object to form.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 66

MS. SHEVLIN: Join.

THE WITNESS: Sure.

BY MR. ROBERTS:

Q. Yeah, I mean, look, I think -- and look, I'm just saying, like, it can be -- and I'm not talking about specifically about Mr. Lawshe, okay, but you agree it sometimes can be very difficult to tell the difference between a 17 year old and a 19 year old? You would agree with that, correct?

A. Yeah, absolutely.

Q. Right. And so if there was some law that required publishers to keep and maintain age, you know, IDs, that would be very helpful to law enforcement to make those calls, correct?

A. Yes.

MR. CARSON: Object to the form.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q. And in your understanding metart.com did keep, at least what they purport to be, government issued ID's of the models in question, correct?

A. From -- from what I have seen, which is only this, the two pictures that I saw, yes.

Q. Did you ever -- were you provided the affidavit from the record custodian?

Page 67

A. Not that I recall.

Q. Okay. But at least that -- I mean, you agree that that is a tool that would help an investigator to make that difficult decision, right?

A. Yes.

Q. And that way, you don't -- you don't have to make this sort of like difficult choice, correct?

A. Correct.

Q. You made a reference earlier in your -- your testimony like if you're searching for -- and I can't remember the terms you used, I think you said like young teens. You don't have any evidence of any search terms that Mr. Lawshe was using on any of his devices, do you?

A. As far as stuff like that?

Q. Yeah.

A. Correct, no.

Q. So when you said, "If you search for really young teens," that was just a hypothetical that you were using?

A. Right.

Q. You're not saying that Mr. Lawshe was searching for, quote, young teens?

A. There -- there was some -- I think some search history for like pornographic sites but nothing

Page 68

that would lead us to believe that there was any search history for anything illegal, correct.

Q. Right. On the images in question, there was nothing that stated that the individuals were minors, was there?

A. On the three images, no.

Q. They weren't pretending to be minors?

MR. CARSON: Form.

BY MR. ROBERTS:

Q. You did not interpret them as pretending to be minors?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: No.

BY MR. ROBERTS:

Q. You know what I mean, though, when I say like people pretending to be minors?

A. Yes.

Q. Detective Preston sometimes pretends to be a minor, doesn't she?

A. In -- in her job, yes.

Q. You're aware, I think, in 2022, 2023, she's about 28, 29 years old?

A. I believe so, something like that. She was parts of investigations where she was putting

Page 69

photographs of herself out and claiming to be 15 as part of a -- a UC or an undercover operation but, yeah, I believe so.

Q. So I mean, you know, as you are aware that St. Johns County as a -- as a unit has attempted and believes that they can credibly pass off a 28, 29 year old as a 15 year old on the internet?

A. It's -- it's part of, you know, being an ICAC investigator.

Q. Right. But these models weren't doing anything like that, right? Like, they were saying, Hey, I'm 15, or I just got out of my seventh grade class or something like that, were they?

A. Not that I can tell --

MR. CARSON: Form.

THE WITNESS: -- with the two pictures, no.

BY MR. ROBERTS:

Q. Right. Would you agree with me that the fact that a 28 or 29 year old female can success -- let me ask you this. Has she successfully baited and fooled somebody into believing that she was 15?

A. I wouldn't use the terms "baited" and "fooled," no.

Q. Has she -- has St. Johns County convinced another person, an individual that images of Detective

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 70

Preston were images of a 15 year old?

MR. CARSON: Object form.

THE WITNESS: Yeah, I'm not going to answer that. That's...

BY MR. ROBERTS:

Q. Well, let me ask you this. Have you -- has St. Johns County Sheriff's Office arrested somebody for attempting to meet up with Detective Preston who had pretended to be a 15 year old?

A. I -- I don't honestly know. I --

Q. Okay. That's okay.

A. -- don't keep track -- yeah, I don't have...

Q. You can say "I don't know" at any time. You can say I don't know. That's fair enough.

You would agree that photographs are highly manipulatable especially terms of like the age of the individual depicted?

A. How so?

Q. Well, a 29 year old could be made to look like a 15 year old?

A. What -- what does this have to do with -- with what I did in this case? Because you're asking me a whole bunch of stuff that's hypothetical that has nothing to do with anything I did in this investigation. And it's been going on for at least

Page 71

like 45 minutes now.

I did nothing with any kind of manipulation. I'm sure it's possible, but I don't know anything about it.

Q. Anytime you don't know the answer to a question, you can say "I don't know."

A. I don't know.

Q. You understand why Mr. Lawshe is suing Detective Preston, though, correct?

A. I do, yes. Yeah.

Q. You understand that this -- this arrest ruined his career?

A. I absolutely do.

Q. And ruined his personal reputation?

A. I do.

Q. Do you know who in St. Johns County Sheriff's Office called the media after they made the arrest?

A. No.

Q. Do you understand that it was somebody from St. Johns County Sheriff's Office that called the media?

A. No. I -- I didn't even know the media got called, honestly.

Q. You never saw any news, TV, articles about this case?

Page 72

A. No.

Q. Who called his supervisor at FWC before the arrest?

A. I don't know.

Q. Are you aware that FWC was called and notified of this investigation prior to the arrest?

A. Well, I know that there was a supervisor that was here because when I went into the office, into the ICAC office, to -- they were talking to me about going to the house to pick up the phone. I think it was his supervisor was in there, so -- and that was the only kind of contact I had with anybody with FWC or with fish and wildlife.

Q. We talked about Dr. Dully for a moment, you referenced her. Have you -- did you, while you were an ICAC investigator, use Dr. Dully in the investigation of possession of child pornography cases?

A. No, sir.

Q. What is your understanding of her expertise?

A. I -- I don't -- I believe, a pediatrician. I don't know.

Q. You made a comment earlier, this is the reason I'm asking, that if somebody was age-difficult and people disagreed, that the policy was to call Dr. Dully. Did I understand that correctly?

Page 73

A. Yes. Well, a -- a doctor.

Q. A doctor.

Do you believe -- go ahead.

A. I never -- I never had to do that when I was an investigator, but that would be the step to have to go to.

Q. Why not?

A. I was lucky.

Q. I mean, are you saying that all of the images you charged were obviously child pornography?

A. Correct. Obviously young children.

Q. You never made the decision to file charges on an age-difficult person?

A. Correct.

Q. All right. And again, I'm -- I'm -- I'm just -- I don't know what you know, right, and so like sometimes there are things that -- you know, if you don't know the answer to the question, you can say "I don't know." Do you believe that Dr. Dully has the ability to tell the chronological age of an individual by looking at a digital picture?

MS. SHEVLIN: Form.

THE WITNESS: I don't know.

BY MR. ROBERTS:

Q. Unfortunately, I guess, you have had to look

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 74

at a lot of pornographic images over your career; is that correct?

A.  Yes.

Q.  And many of those are legal images of pornography?

A.  Yes.

Q.  Correct?

A.  Yes.

Q.  You are aware that female models, adult female models do practice on a regular basis grooming of some type of their pubic hair?

A.  Yes.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q.  You're aware that there are multiple types of grooming?

A.  Yes.

Q.  And you are aware that digital images can be touched up to improve the esthetic appearance of things like skin and hair?

A.  Yes.

Q.  It happens on like a regular basis in our society that -- that photographs are touched up, correct?

A.  Yeah.

Page 75

Q.  All right.  When you were an ICAC investigator, did you ever take solely the absence of pubic hair as evidence that a model was prepubescent?

MS. SHEVLIN:  Form.

THE WITNESS:  Not that I recall, no.

BY MR. ROBERTS:

Q.  Okay.  Would you agree with me that just because a female model does not have pubic hair does not mean that she is prepubescent?

A.  No.  Say that question again.

Q.  Yeah.  You would agree that not all -- I'm going to ask it a better way, I think a better way.  Not all models who do not have visible signs of pubic hair are prepubescent?

A.  Right.

Q.  I talked to you a little bit earlier about as a forensics specialist your ability to tell whether an image has been touched up or altered in any way.  Do you recall that question?

A.  Yes.

Q.  Sometimes it's difficult for even you to tell whether or not an image has been altered in some way, for example, to remove evidence of pubic hair?

A.  Correct.

Q.  Did you ever look at Dr. Dully's reports in

Page 76

this case?

A.  No.

Q.  Do you have any idea what they are based on?

A.  Not really.  I'm guessing the Tanner scale, I think is what it's called.

Q.  Sexual maturity rating, Tanner scale, that -- that sort thing.  Are you familiar with that Tanner scale?

A.  Not -- not really.  I had another case recently where I had to meet with a pediatrician, similar to this, not this case but something kind of similar to this, and I took some pictures to a pediatrician, and she explained it just a little, little tiny bit to me, but, yeah.

Q.  Was it Dr. Dully that you took it to?

A.  No.

Q.  Was a member -- sorry.

A.  No.  It was a doctor in Gainesville.  I don't -- I don't remember her name.  But...

Q.  Was it a doctor who is a member of the Florida -- UF Child Protection Team?

A.  I don't know.

Q.  Okay.

A.  She was referred to by a -- a State Attorney in Putnam County.

Page 77

Q.  Were -- in that case, were you investigating possession of child pornography?

A.  Yes.  Yes.

Q.  Why were you investigating possession of child pornography?

A.  A completely different kind of case.  It was one of our people.  It wasn't me investigating.  It was one of our detectives who was in the ICAC unit who is no longer in the ICAC unit.  I was doing the digital forensics on it, and I had dealt with this State Attorney on another case that I worked or did the digital forensics on for a different county and was helping her on this other case and was taking some stuff to her and just, you know, kill two birds with one stone, so I figured I would take this stuff over and let her take it to the doctor, so...

Q.  And this doctor kind of gave you a little bit of insight into Tanner staging?

A.  Correct.  Correct.

Q.  Did that doctor explain to you that Tanner staging is not designed to estimate chronological age?

A.  No.  No.

Q.  Did she tell you that that test was actually designed to measure an individual's development through the stages of puberty?

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 78

A.   No.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q.   But you're not a doctor, so you don't really know what --

A.   Right.

Q.   -- the Tanner stages are?  Okay.

A.   Right.

Q.   I'm just trying to get what she would have told you.

A.   Right.

Q.   Did that doctor tell you that she could estimate the chronological age of an individual from looking at a photograph?

A.   No.

Q.   Okay.  Did she explain that there were limitations to chronological age estimation using the Tanner scale?

A.   No.

Q.   We're almost getting through this.

You talked earlier -- I'm just kind of going to skip around -- a little bit about grants and funding related to ICAC.

A.   Okay.

Q.   Do you recall that?

Page 79

A.   About funding, yes.

Q.   Yeah.  Does St. Johns County Sheriff's Office receive funding based on the number of arrests for child pornography, child sexual exploitation?

A.   No, not that I know of, no.

Q.   Do they write grants to organizations to receive funding for investigations and arrests of child sexual exploitation?

A.   Based on the amount of arrests?  No.

We might -- we might write -- and this is way above my paygrade, but we might write grants for funding to assist for equipment to -- I know we do for digital forensics and things like that, but it's not based on the amount of arrests, or it would be like, you know, wanting to get more equipment, so we would write more tickets and, you know, have a quota or something like that.  We don't -- we don't do any kind of quota work.

Q.   Is there a certain prestige that comes from within the law enforcement community from arresting another law enforcement officer?

A.   No.  We -- at least for me personally, I think it's disgraceful.  I don't like doing it.

Q.   Do you treat law enforcement differently than you would treat anybody else?

Page 80

A.   No.  No.  And that's -- you have to be very particular about that.  You can't treat somebody differently, because if you do, if you treat them better or you treat them worse, you get looked down upon by the members of the community.

Q.   All right.  Just give me -- just give me one second.  I'm going to take a quick break, and that may be all I have.  I'm just going to look at my notes.

(Recess taken)

MR. ROBERTS:  Thank you, Detective Greene.  I don't have any other questions.

THE WITNESS:  All right.

MR. ROBERTS:  This lady and gentleman, these other attorneys, may have some other questions, I don't know.

THE WITNESS:  Okay.

MS. SHEVLIN:  I have a couple of questions for you, Detective.  Thank you.

THE WITNESS:  Uh-huh.

MS. SHEVLIN:  Let me just go through my notes here.

CROSS-EXAMINATION

BY MS. SHEVLIN:

Q.   Prior to the investigation involving Mr. Lawshe, were you familiar with the website

Page 81

metart.com?

A.   I have heard of it, and I think -- I can't say I have ever had an investigation on it, but I'm familiar with it, yes.

Q.   Okay.  And when you say you're familiar with it, what did you know about it prior to the investigation involving Mr. Lawshe?

A.   I'm sure I had seen pictures from it.  I couldn't tell you from where.  I -- probably from whether it was from ICAC downloads or working in ICAC or from digital forensics, I have seen pictures or videos or something from it, but I -- I at least knew the name from one place or another.  I can't recall.

Q.   And do you know what the -- the M-E-T, the met part, stands for?

A.   No, ma'am.

Q.   Were you familiar with the term "most erotic teens" in relation to metart.com?

A.   No.

Q.   Okay.  Are you familiar with the fact that metart refers to its models as teens and girls?

A.   No.  No, I wasn't.  No.

Q.   Would that surprise you?

A.   No.  Actually, I did see that this morning when I was Googling.  I just didn't put two and two

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 82

together.

Q. You were asked earlier by Mr. Roberts about an image that was -- it sounded like it was bellybutton to thighs, and it showed vagina of the individual on the -- in the photo. Was that photo that we're talking about cropped, or was that the full image was from bellybutton to thighs?

A. It was a screenshot from a web page, and it was -- there's a word for that type of image, but it -- I can't remember the word. It was kind of cropped in between two other images. It would be like if -- if you were looking at a website, and it was just a -- like a very large thumbnail in between two other images. It was basically wanting you to click on it to see the full image.

Q. Okay.

A. So I think if you'd have clicked on that, then you were on the website, it would go to the -- the full image. And I can't remember the -- the name of the -- the photo, but it was like screenshot, a bunch of numbers, dot DuckDuckGo, or something like that.

Q. Mr. Roberts also asked about a disclaimer that was on metart.com, essentially saying all of our models are -- are 18, and we do age verification. You would have no way of knowing whether or not that

Page 83

statement was accurate and true, correct?

A. Correct.

Q. Okay. And in fact, there is false information published across the internet every day, all the time, correct?

A. Correct.

Q. He also asked you about whether or not you had seen the models' passports or IDs. And I was not clear. Did each -- there were two models, correct?

A. Correct.

Q. Did you view an image -- an image of a passport for each of those models?

A. I -- I only remember -- I -- I have some type of image of ID. I don't recall the one where you only see the girl's vagina. I don't recall if it's her passport or an ID for the one girl. But the other one where you have the -- the two pictures where you can see, you know, who the girl is, her, definitely have an ID and passport for her, because I always go back and look to verify. I just don't remember off the top my head. I know there's some form of ID for the other girl, too. I just -- but I also don't remember what her face looked like from when we went on the internet.

Q. And the identification and the passports that you viewed, what country were those from?

Page 84

A. The Ukraine.

Q. Both of them?

A. The only one I remember, yeah, yeah. I don't remember the other one.

Q. Are you familiar with passports or government issued IDs from the Ukraine?

A. No.

Q. Have you seen government issued IDs or passports from Ukraine before?

A. No.

Q. Regardless of the age identification on the passports and the IDs which are purported to belong to these models, you would have no way of verifying when the photographs in question were taken, correct?

A. No.

Q. Okay. So the fact that the passports and the identifications which purport to belong to these girls show that they were over the age of 18 does not necessarily equate to those images being taken when those girls were over 18, correct?

A. Correct.

Q. I'm just looking through my notes. Thank you for your patience.

Mr. Roberts had asked you a question about your -- I think it was phrased that you never made the

Page 85

decision to file charges on an age-difficult person. Do you remember that question?

A. Correct.

Q. I want to clarify, because you said you -- you got lucky and -- and the images that you brought charges forth on were obvious child pornography images.

A. Uh-huh.

Q. So in relation to that question, were you saying that you never had occasion to bring charges forth on an age-difficult person, or were you saying you did see age-difficult people, and you made a decision not to bring charges forward?

A. I think that I didn't have the occasion.

Q. Okay.

A. I don't recall having to make that decision. And I know I never had to go to a doctor for any kind of verification or anything like that. I know there were occasions when I had females that were age-difficult, but they were known victims or I was able to -- they were identified victims, something like that. And that's a whole different ballgame, so that's not something that we would be dealing with like this.

Q. There was also some brief discussion of the Tanner scale. Are you familiar with the Tanner scale being a commonly used or accepted practice among

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024

Page 86

doctors who opine on age ranges of -- of people in photographs such as the ones we are talking about today?

A.   That's about the limit of my knowledge of it, is that it's commonly used.

Q.   Okay.  And in fact, the -- the doctor that you were just talking about that you consulted with recently, she discussed the Tanner scale with you within that context, correct?

A.   Right.  I -- I was really trying to see if there was a way to get some kind of -- if there was some type of training that might be available to law enforcement for these kinds of situations and what -- what do y'all do?  And, Oh, we used a Tanner scale. Oh, okay, maybe I'll look into something like this later on that might be beneficial to people that do ICAC cases, but that just wasn't the time or place so, yeah.

Q.   And is it your understanding that the Tanner scale does in fact use indicators such as breast development and pubic hair to establish possible age range for children or teenagers?

A.   I believe so.  I'm not a hundred percent sure, but I -- I think that's where everything I was taught coming into ICAC and -- and later learned is

Page 87

where that came from.

Q.   Have you ever had occasion to speak with Dr. Dully regarding either this case or any other similar case?

A.   No, no.  I have never met or talked to Dr. Dully.

MS. SHEVLIN:  Okay.  I believe that's all I have for you.  I very much appreciate your time. Thank you.

THE WITNESS:  You're welcome.

MR. ROBERTS:  Matt, do you have any questions.

MR. CARSON:  Give me one second.

MR. ROBERTS:  I've got a couple follow-up. Do you want me to ask those before you go or...

MR. CARSON:  You're doing redirect based on what Ms. Shevlin asked?

MR. ROBERTS:  Yeah.

MR. CARSON:  Go ahead.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q.   So Mr. Greene, you were asked by Ms. Shevlin about your knowledge of the Metart website before your involvement in the Lawshe case.  Do you recall that?

A.   Uh-huh.

Page 88

Q.   I think I recall you, I think you testified earlier, you don't recall the source or exactly what was said about Metart, correct?

A.   Right.  Right.

Q.   Okay.  My question to you is, based on your knowledge, would you be comfortable stating under oath that metart.com has a known history of displaying child sexual abuse material?

A.   No.  I wouldn't -- I wouldn't say that it's child sexual abuse material, no.  Because even -- yeah, no, I wouldn't.  No.

Q.   Okay.  You were asked about did you have any way of knowing -- Ms. Shevlin was asking you questions about the -- the disclaimers on the websites that you viewed that the models were 18 or older and that there was age verification.  Do you recall those questions?

A.   Yes.

Q.   I think she asked was there any way that you could verify if that was true or not.  Do you recall that question?

A.   Uh-huh.  Yes.

Q.   Well, isn't it -- isn't it true that you -- you could have -- not you, I'm just saying an investigator could have investigated those claims by e-mailing the records custodian of the website,

Page 89

correct?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

THE WITNESS:  Sure, you could e-mail them.

BY MR. ROBERTS:

Q.   And in fact, you understand that's what happened in this case, that Mr. Lawshe's investigative team e-mailed the record custodian, and they returned the photo ID's, correct?

A.   Correct.

Q.   And I -- you're not aware of any affidavit where the dates of the photographs, the records custodian said what dates the photographs were taken, you just don't know that because it wasn't provided to you?

A.   Right.  I never saw any of that.

Q.   But had you been provided that, you would have been able to compare the -- the date of birth to the date of the photo shoot, correct?

A.   Correct.

MR. ROBERTS:  No further questions.

MR. CARSON:  Ms. Shevlin, are you good?

MR. SHEVLIN:  I'm good.  Thank you.

MR. CARSON:  Corporal Greene, my name is Matt Carson.  I represent Detective Preston in this

**Page 90**

action.  I don't have any questions for you.

Mr. Roberts, is it all right if I suggest that he'll read, and he can go through me?

MR. ROBERTS:  Absolutely.

MR. CARSON:  All right.

MR. ROBERTS:  And honestly, Matt, I mean, I -- I kind of assume you represented him anyway because he's an employee of St. Johns, so I -- you know --

MR. CARSON:  Yeah, we're -- we're in this -- we're in this weird spot where I'm -- I'm still considering the Sheriff's Office employees to be my client inasmuch as --

MR. ROBERTS:  Yeah.

MR. CARSON:  -- as of very recently, the sheriff's office was a defendant.  So, yeah, he'll read and that can go through me.

MR. ROBERTS:  Perfect.  Yeah, no objection to that.  Yeah.

THE COURT REPORTER:  Mr. Roberts, do you want to order the O and 1 and then Mr. Carson and Ms. Shevlin want a copy?

MR. ROBERTS:  Yes, I -- I will order.

MR. CARSON:  I will take a copy, ma'am.  I need the simplest possible PDF that you can send

**Page 91**

me, please.  And thank you.

THE COURT REPORTER:  Okay.

MR. ROBERTS:  Although it is nice, Matt, to get the kind that you can word search.  You know, sometimes I get these PDFs, and it won't do the control F, find, then I'm like...

MR. CARSON:  Yeah, what I hate --

THE COURT REPORTER:  Do you want this on or off?  I'll just go off now.

MR. CARSON:  Yeah, we can go off.

THE COURT REPORTER:  Would you like a copy, Ms. Shevlin?

MS. SHEVLIN:  Yeah, I'll take a copy.  Thank you.  Just PDF.

(Off record)

(Thereupon, the remote deposition was concluded at 12:12 and the signature and formalities were not waived.)

**Page 92**

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, the undersigned authority, certify that the aforementioned witness Kevin Greene, personally appeared before me via remote teleconference and was duly sworn on Tuesday, December 17, 2024.

Dated this 27th day of December, 2024

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida
My Commission Expires:  3/17/25
My Commission No.:  HH065896
Identification presented by Deponent: License

**Page 93**

C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, MAUREEN HALL, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition; and that the transcript is a true record of the testimony given by the witness.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in this action.

Dated this 27th day of December, 2024.

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida

Page 94

KEVIN GREENE
C/O MATTHEW JOSEPH CARSON, ESQUIRE
SNIFFEN & SPELLMAN, P.A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
mcarson@sniffenlaw.com

        IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK,
MIKAYLA PRESTON AND KATHLEEN DULLY,
        CASE NO.:  3:24-cv-00044-MMH-MCR
Dear Mr. Carson,
    The deposition of Kevin Greene, taken in
the above-styled cause on December 17, 2024 is now ready
for signature of the witness.  Please contact our office
to make arrangements for the witness to sign the same;
or, if you wish to waive the signature of the deposition,
please so advise.
    If this deposition has not been signed by January
27th, 2025, or the signature thereto waived, we shall
consider such delay a refusal to sign under Rule 1.310(e)
of the Florida Rules of Civil Procedure.
    If you have any reason which you would like for me
to place on the deposition as to the witness' failure to
sign the same, please advise.
        Very truly yours,
        HUSEBY COURT REPORTING, COURT REPORTER

        By: _____
            Maureen Hall, RPR, FPR
Dated:  December 27, 2024
cc:  Counsel of Record

Page 95

            E R R A T A   S H E E T
IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA
PRESTON AND KATHLEEN DULLY

DEPO OF:  KEVIN GREENE
DATE TAKEN:  12/17/24
    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
    Page No._____Line No._____Change to:_____
    _____
    Reason for change:_____
    Page No._____Line No._____Change to:_____
    _____
    Reason for change:_____
    Page No._____Line No._____Change to:_____
    _____
    Reason for change:_____
    Page No._____Line No._____Change to:_____
    _____
    Reason for change:_____

    Please forward the original signed errata sheet to
this office so that copies may be distributed to all
parties.
    DATE:_____
    SIGNATURE OF DEPONENT:_____

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
*Kevin Greene on 12/17/2024*                    Index: 1..agree

---

**1**

**1** 38:25 55:3 62:17 90:21

**12:12** 91:17

**15** 69:1,7,12, 21 70:1,9,20

**17** 44:12,15 45:1 52:7 66:8

**18** 40:6,9,12 45:3 64:7,25 65:10,13 82:24 84:18, 20 88:15

**19** 40:12 66:8

---

**2**

**2** 55:11 62:17,24

**20** 27:25

**20/20** 15:10

**2015** 5:6 53:2 60:5

**2016** 53:2

**2017** 60:6

**2022** 68:22

**2023** 31:14 47:12 49:13, 24 54:20 59:25 68:22

**2024** 49:25

---

**25th** 54:20

**28** 68:23 69:6,19

**29** 68:23 69:6,19 70:19

**29th** 49:13,21

---

**3**

**30** 34:5

**300** 60:9

---

**4**

**45** 71:1

**4chan** 28:9 29:7,10

---

**5**

**5** 37:17 38:12

**5-A** 38:15

---

**8**

**82.071** 62:18

**827.01** 38:12

**827.071** 37:17

**8chan** 28:9 29:11

---

**9**

**90s** 27:19

---

**A**

**A-1** 54:14

**A-2** 54:14 55:3

**Aaron** 30:22 31:19,23

**ability** 20:25 47:17 73:20 75:17

**absence** 75:2

**absolute** 57:11

**absolutely** 22:23 32:17 66:10 71:13 90:4

**abuse** 19:19 37:18 57:11, 17 88:8,10

**accepted** 85:25

**access** 42:3 47:17,23 48:23

**accessing** 28:16

**accurate** 83:1

**accusation** 52:20

**acronym** 8:25

**action** 90:1

**actual** 7:8

---

**adult** 40:3 74:9

**adults** 34:22 35:4,6 37:7, 8 41:2

**advanced** 19:4 21:8

**affect** 59:13, 14

**affected** 22:23

**affidavit** 66:25 89:11

**age** 27:4 35:10 41:23 45:13 57:2 64:7,25 65:15,16,19 66:12 70:16 73:20 77:21 78:13,17 82:24 84:11, 18 86:1,21 88:16

**age-difficult** 27:6 43:14 56:22 57:9, 12,18 72:23 73:13 85:1, 10,11,19

**agencies** 6:11

**agents** 6:13

**agree** 39:11 40:2 44:11 54:1 61:21

66:7,9 67:2 69:18 70:15 75:7,11

**agreed** 44:1

**ahead** 73:3 87:19

**AI** 23:15

**allegation** 25:10

**allegations** 14:5

**alleged** 5:14

**altered** 21:2, 7,18,24 22:10 23:4, 10 75:18,22

**ambiguous** 62:16

**amount** 24:16 79:9,14

**analysis** 64:21

**anybody's** 15:21

**Anytime** 71:5

**apologize** 32:18 63:5

**appearance** 74:19

**Apple** 16:23

**approximate** 57:2

**apps** 27:15

**area** 34:3

**arguably** 37:8

**argued** 35:21

**arguing** 32:22 35:18,20

**arrest** 16:14 19:17 30:1 47:14 48:20 71:11,17 72:3,6

**arrested** 42:20 64:15 70:7

**arresting** 79:20

**arrests** 79:3, 7,9,14

**art** 56:22

**articles** 71:24

**artificial** 21:9 23:7

**assist** 24:1 79:12

**assistance** 11:24 48:19

**assistant** 4:20 31:7 35:15 42:7,16 43:3 49:14

**assume** 90:7

**attempted** 69:5

**attempting** 70:8

**Attorney** 31:7, 22 35:15 42:7,16 43:3 49:14 50:20, 21 76:24 77:11

**attorneys** 80:14

**aware** 23:20 24:24 42:10 60:18 68:22 69:4 72:5 74:9,15,18 89:11

---

**B**

---

**B-1** 54:14

**B-2** 54:14

**back** 12:25 17:25 18:5 25:14 27:19 29:9 44:5 52:6,8 61:2 62:14 83:19

**background** 11:6

**bad** 39:23,24 40:11,23,25 41:3 49:7

**baited** 69:20, 22

**ballgame** 85:21

**base** 58:12

**based** 76:3 79:3,9,14 87:16 88:5

**basically** 82:14

**basis** 56:9 60:19 74:10, 22

**bathroom** 62:7

**bear** 45:14

**began** 42:17

**beginning** 46:24,25 56:24

**believes** 61:19 69:6

**believing** 69:21

**bellybutton** 35:24 82:3,7

**belong** 84:12, 17

**beneficial** 86:16

**birds** 77:14

**birth** 89:18

**bit** 9:16 12:3 14:11,16 16:13 42:18 52:1 75:16 76:14 77:17 78:22

**Bittorrent** 27:16,17,18, 24

**body** 33:2,4,5

**book** 52:14

**bottom** 32:23 33:2

**break** 62:6,7 63:3,4 80:7

**breast** 57:5 86:20

**breasts** 43:22

**bring** 25:14 30:1 85:9,12

**bringing** 18:6

**brought** 11:19 23:22,24 24:2,25 85:5

**bunch** 70:23 82:20

**C**

**call** 15:5 57:9 72:24

**called** 4:3 9:11 56:22 71:17,20,23 72:2,5 76:5

**calls** 66:14

**camera** 18:3 55:17

**car** 30:9

**career** 71:12 74:1

**careful** 16:1

**Carson** 13:4,8, 11 14:7 34:24 39:6, 16 43:9 44:17 45:7, 16 62:20 64:18 65:2, 17,25 66:16 68:8,12 69:15 70:2 87:13,16,19 89:3,22,24, 25 90:5,10, 15,21,24 91:7,10

**case** 6:16 10:10 11:15 12:7,14,16 15:6 16:6 18:21,24 19:11 20:2 22:9,17 23:2,15,18 24:7 26:20 27:5 30:7, 10,18 43:16, 21,25 46:20 48:24 49:5, 12 52:4 53:10 56:13 57:25 58:5, 25 60:25 63:3 70:22 71:25 76:1,

9,11 77:1,6, 11,13 87:3, 4,24 89:7

**cases** 12:10 14:19 16:8 37:22 72:17 86:17

**categorization** 57:8,10,23

**categorizations** 57:14

**categorize** 27:6,11 28:18

**categorizes** 54:11

**category** 55:3

**cellphones** 7:6,8

**Center** 7:24 8:3 9:6

**certification** 6:4,5

**chain** 8:16

**chance** 26:2

**charge** 46:3 61:5

**chargeable** 60:14,20

**charged** 10:9 20:2,20 32:21 33:9, 22 34:14

36:13,15,16 37:4,14 41:8 46:5 51:11, 20 73:10

**charges** 73:12 85:1,6,9,12

**charging** 26:18

**chat** 29:5 62:22

**chatting** 61:13

**check** 58:4

**chest** 43:18 55:18

**child** 5:15 17:10 19:19 20:11 25:10 27:12 36:17 37:18,23 38:13,22 39:5 43:20, 24 44:2 46:6 57:3,10,12, 17,23 58:1, 7,10,12,15, 18,19,22 59:1,6 60:14,21 72:17 73:10 76:21 77:2,5 79:4,7 85:6 88:7,10

**children** 5:7, 12 7:25 8:3, 9 9:7 62:3 73:11 86:22

**choice**  67:7

**chose**  41:9

**chronological**  73:20 77:21 78:13,17

**circumstances**  46:18,20,22

**cited**  42:7

**claiming**  69:1

**claims**  88:24

**clarify**  26:25 85:4

**class**  69:13

**clear**  15:12 83:9

**clearinghouse**  8:5,6

**click**  82:14

**clicked**  82:17

**client**  40:17 90:13

**clip**  37:2

**cloud**  18:11 56:4

**coffee**  62:9

**colleague**  30:25

**Comcast**  8:14

**comfortable**  88:6

**comment**  16:18

53:22 56:21 72:22

**committed**  39:12 43:7 45:15

**commonly**  85:25 86:5

**communicating**  58:16

**community**  79:20 80:5

**company**  50:19

**compare**  51:18 89:18

**completely**  77:6

**complying**  35:9

**computer**  30:13,14 33:14 38:17, 20

**computers**  19:4

**concern**  15:13

**concerns**  49:11 50:6

**concluded**  91:17

**conduct**  15:1 38:22

**confirm**  7:19 20:20 51:9 58:19,20,21, 23 59:1

**confirmed**  58:12,18

**constant**  56:8

**constitute**  20:10 60:20

**constituted**  19:18

**consulted**  86:7

**contact**  72:12

**contacted**  50:17,18

**contained**  26:13 54:2, 11

**content**  17:8 32:22 53:17 54:11

**context**  46:4 50:25 86:9

**control**  38:18 91:6

**conversation**  51:1

**conversations**  49:4

**convinced**  69:24

**copy**  90:22,24 91:11,13

**corporal**  4:14 13:5 89:24

**correct**  6:17,

21,24 9:3 16:24 17:4, 11 19:14,23 20:4,5 26:11,15 27:13 28:6 32:11 33:20, 24 34:12,15, 19,22,23 35:3,4,10 36:18,19,21 37:11,23 38:3 40:6,9 41:19 42:4 43:8 47:6,7, 8,10,14,18 48:5,11,16, 20 51:12,21 52:24 54:8, 20 55:9,12, 15,21,22,24 56:18 57:21 59:2,9,21 62:3 64:3 66:9,14,21 67:7,8,17 68:2 71:9 73:11,14 74:2,7,24 75:24 77:19 83:1,2,5,6, 9,10 84:14, 20,21 85:3 86:9 88:3 89:1,9,10, 19,20

**correctly**  8:23 17:6,15

Case 3:24-cv-00044-JAR-MCR    Document 67-4    Filed 08/12/25    Page 30 of 46 PageID
791
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024                    Index: country..detectives

18:13 20:16 25:2 26:5,8 29:10 35:11 38:13,23 55:6 72:25

**country** 83:25

**county** 4:12 5:1,20 9:13 14:4 18:8 20:25 21:21 22:7 31:7 58:16 59:4 60:1 69:5,24 70:7 71:16, 20 76:25 77:12 79:2

**County's** 13:2

**couple** 24:6 30:12 36:10 37:19 47:25 80:17 87:14

**court** 7:23 8:25 11:3,11 35:2 57:16 62:15,21 63:14,19,21 90:20 91:2, 8,11

**coworkers** 22:3

**Crawford** 12:12,13 31:22 42:15 49:20

**crazy** 60:10

**credibility**

59:15,20

**credible** 52:19,23,24

**credibly** 69:6

**crime** 26:19 37:14 38:2 39:13 43:7 45:4,15

**crimes** 5:7

**criminal** 12:7

**cropped** 82:6, 10

**CROSS-EXAMINATION** 80:22

**CSAM** 57:12, 15,16,17

**custodian** 42:12 66:25 88:25 89:8, 13

**cyber** 7:22 8:15,19 9:12 59:25 60:15, 24

— D —

**daily** 60:2

**damage** 18:4

**dark** 28:8,16, 17

**data** 24:16 25:23 30:5

38:20 48:19 58:12 64:11

**date** 89:18,19

**dated** 54:20

**dates** 89:12, 13

**day** 32:10 34:7 35:21 83:4

**days** 24:6 36:10 54:23

**dealing** 14:19 24:15,16 43:13 85:22

**deals** 28:25

**dealt** 24:17 77:10

**decision** 16:14 29:25 47:14 48:20 67:4 73:12 85:1, 12,15

**decisions** 46:9

**defendant** 90:16

**department** 5:23

**depend** 22:15, 16

**depends** 21:3

**depicted** 27:4 51:11 61:20, 23 63:18

65:11 70:17

**depicting** 64:22

**depiction** 38:20

**depictions** 20:21

**deposed** 12:17

**deposition** 7:2,3 9:17 10:6 12:4,6 32:14 54:24 91:16

**designed** 77:21,24

**desire** 15:19

**detect** 25:24

**detective** 4:14,19 5:5, 19 8:4 9:3, 22 18:24 19:22 20:7, 13,24 22:6, 25 23:1 26:24 30:5 31:25 47:11 48:18 49:10 50:22 53:13 61:19,21 68:19 69:25 70:8 71:9 80:10,18 89:25

**detectives**

26:21 77:8

**determination**
26:12,18
58:11

**determinations**
20:1,9

**determine**
21:1,23 22:9
59:6

**determining**
23:6

**develop** 43:22
44:2

**developing**
56:25 57:4

**development**
43:12,23
57:5 77:24
86:21

**device** 16:23
17:10,13
18:12 25:13,
20 28:14

**devices** 25:18
28:5,14 30:5
67:13

**difference**
66:8

**differently**
13:2 14:5
79:24 80:3

**difficult**
48:16 57:19
66:7 67:4,7

75:21

**dig** 29:19

**digging** 40:16,
21

**digital** 4:19,
20 73:21
74:18 77:9,
12 79:13
81:11

**digitally**
21:2,18,24
22:10 23:4,
10

**DIRECT** 4:7

**disagree** 31:14

**disagreed**
72:24

**disclaimed**
65:22

**disclaimer**
35:9,13 41:1
82:22

**disclaimers**
88:14

**discrepancies**
54:2

**discuss** 11:24
63:3

**discussed** 86:8

**discussion**
85:23

**disgraceful**
79:23

**displaying**
88:7

**doctor** 43:25
44:1 73:1,2
76:18,20
77:16,17,20
78:4,12
85:16 86:6

**doctors** 86:1

**document** 9:21,
25

**documents**
12:22 14:2

**door** 63:6

**dot** 41:15,18
82:21

**doubts** 43:6

**download** 7:19,
21 9:18
11:25 17:15
19:11,14
20:15 24:2,5
25:16,21
26:3,14
48:10

**downloaded**
16:19 19:5
24:17

**downloads** 7:6
18:25 32:11
56:12 81:10

**drive** 15:25
33:14

**drop** 57:7

**drug** 16:2

**Duckduckgo**
82:21

**dug** 29:17

**Dully** 72:14,
16,25 73:19
76:15 87:3,6

**Dully's** 75:25

**duly** 4:4

**dysplasia** 57:5

---

**E**

**e-mail** 62:20,
22 89:4

**e-mailed** 89:8

**e-mailing**
88:25

**earlier** 67:9
72:22 75:16
78:21 82:2
88:2

**easiest** 8:8

**easily** 47:17
60:7

**easy** 16:7,8

**edited** 21:1

**effectuate**
30:1

**effort** 61:21

**efforts** 63:17

electronic 8:13

employed 4:11

employee 90:8

employees 90:12

end 24:22 39:21 40:19, 22 41:14 47:12

ended 41:18

enforcement 6:13 8:15 11:13 15:22 66:13 79:20, 21,24 86:13

enticement 5:11

entire 33:4 46:22 54:5

equate 84:19

equipment 79:12,15

erotic 81:17

erotica 57:12

essentially 82:23

establish 44:19 86:21

established 44:16

esthetic 74:19

estimate 60:2, 3 77:21 78:13

estimation 78:17

evaluate 23:3

events 18:16

eventually 8:17

everybody's 62:10

evidence 16:6 28:12 45:2 49:12 50:7 64:9 67:12 75:3,23

evidentiary 7:15

EXAMINATION 4:7 87:20

excuses 48:7

exhibit 38:11, 25 62:17,24

exhibition 38:19

exhibition,-- 55:11

existed 43:6

experience 21:20,22 27:11 33:7

expert 21:16, 19 45:12,13

expertise 72:19

explain 8:8 77:20 78:16

explained 76:13

exploitation 62:3 79:4,8

exploited 7:24 8:3,10,11 9:7

express 49:11

extra 16:1

---

**F**

face 36:5,6, 11,13,20,22 43:19,23 51:14,18,19, 20,23 83:23

facilitator 19:22

facing 55:17

fact 50:8 59:11 69:18 81:20 83:3 84:16 86:6, 20 89:6

facts 16:17

factual 54:2

fair 23:18 24:8 50:6 70:14

fairly 60:18

false 54:2 83:3

familiar 37:13 41:23 54:10 57:22 76:7 80:25 81:4, 5,17,20 84:5 85:24

federal 6:11 35:10 41:2, 23 42:8 65:14,15,19

female 43:16, 21 69:19 74:9,10 75:8

female's 33:2

females 37:2 57:5 85:18

field 21:9

figured 77:15

file 27:24 28:10 73:12 85:1

file-sharing 27:15

files 26:6,7, 9,13 28:1,3 55:2

filters 21:12

find 17:8 26:19 28:4, 12 33:4 91:6

finding  49:16

firearms  14:22
  15:23  16:1

fish  72:13

Florida  38:11
  45:5  76:21

flush  16:9

follow-up
  87:14

fooled  69:20,
  23

force  6:8,10

forensic  17:14
  19:11  20:24
  21:7  23:8
  26:14  32:11
  47:24

forensics
  4:19,20  6:19
  7:7  22:2
  75:17  77:10,
  12  79:13
  81:11

form  13:4,12,
  14  14:7
  34:24  39:6,
  16  43:9
  45:7,16,23
  60:22  64:18
  65:2,17,25
  66:16  68:8,
  12  69:15
  70:2  73:22
  74:13  75:4

78:2  83:21
89:2

formalities
  91:17

forum  29:8

forum-based
  28:11,18
  29:3

forward  85:12

found  50:8

full  35:22
  46:3  49:16
  82:6,15,19

Full-time  5:2

fumbling  38:9

function  6:19

funding  6:11,
  12  78:22
  79:1,3,7,12

FWC  72:2,5,12

---

G

Gainesville
  76:18

gangster  15:25

gave  19:5,6
  63:8  77:17

generally
  18:18

generated  6:23
  22:13  23:7

generation
  23:15

gentleman
  80:13

girl  51:6,8,
  16  55:16
  83:16,18,22

girl's  37:4
  83:15

girls  37:5,7
  81:21  84:17,
  20

give  6:9  63:6
  80:6  87:13

good  21:14
  63:24  89:22,
  23

Google  8:13
  52:15  53:13

Googled  53:9

Googling  81:25

government
  6:11  65:14
  66:20  84:5,8

grade  69:12

grants  78:22
  79:6,11

great  62:7

Green  8:4

Greene  4:3,10
  8:3  9:3  13:5
  63:2  80:10
  87:22  89:24

generation
  23:15

grooming
  74:10,16

guess  6:13
  11:18  24:5
  37:3  38:11
  49:25  50:10,
  17  73:25

guessing  76:4

guesstimation
  60:5

guilty  38:1

gun  15:18

guys  25:24
  34:6  61:12

---

H

hair  43:17,22
  55:18  57:4,6
  74:11,20
  75:3,8,14,23
  86:21

hall  11:22
  47:25  48:1

hallway  48:4

handful  60:11

happen  50:15

happened  13:2
  24:2  31:13
  42:20  46:24
  47:9  50:2
  89:7

hard  21:15
  55:12  57:1

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                    Index: hash..images

**hash** 58:8,13, 20

**hate** 91:7

**he'll** 90:3,16

**head** 60:4 83:21

**heard** 28:8 81:2

**helped** 19:13

**helpful** 66:13

**helping** 77:13

**helps** 56:14

**Hey** 22:18 24:10 69:12

**highly** 70:15

**Hindsight's** 15:10

**hip** 43:22 57:5

**hips** 33:3,8 34:3

**history** 67:25 68:2 88:7

**hit** 21:13

**hole** 39:22 40:20,22

**home** 25:1,5, 6,8,13

**honestly** 11:15 14:10 41:25 47:20 70:10 71:23 90:6

**hotlines** 8:18

**hour** 62:6

**hours** 11:18

**house** 17:19, 24 18:3 72:10

**human** 56:25

**hundred** 18:14 28:2 60:7 86:23

**hurt** 39:22

**hypothetical** 44:13 45:1 67:19 70:23

**hypothetically** 44:12 61:19

---

I

---

**I-C-A-C** 5:8

**I.D.** 51:10

**ICAC** 5:5,16, 19,24 6:1,3 8:21 11:22 20:7 24:13 26:20,21 52:7 53:4 56:12,17 58:17 62:2 69:8 72:9,16 75:1 77:8,9 78:23 81:10 86:17,25

**ICAT** 41:22

42:2

**ID** 83:14,16, 19,21

**ID's** 51:13 64:3,22 66:21 89:9

**idea** 15:8 52:19 59:22 76:3

**identification** 39:1 62:25 83:24 84:11

**identifications** 84:17

**identified** 17:25 49:3 85:20

**identify** 17:19 30:10 61:22 63:17

**IDS** 66:13 83:8 84:6,8, 12

**illegal** 28:19, 23 29:19 53:17 68:2

**image** 19:18 21:1,11,17, 23 23:7 25:21 27:3 30:12 33:4, 5,7,9,10 34:1,2,18 35:22 36:1,4

38:3,20 43:13,14,15 54:7,12 55:14,23 60:19 61:18, 23 75:18,22 82:3,6,9,15, 19 83:11,14

**image-related** 61:14

**imaged** 28:5 30:4

**images** 10:1,3, 4,5,9,12 17:3 19:16, 22 20:1,20 21:10 22:8 23:2,14 25:24 26:9 27:4 32:20, 23,25 33:19, 21,22 34:14, 17 36:9,12, 17 40:3 44:20 45:4 46:3,14,15 47:4,11,13, 16 48:11,24 50:12 51:11, 17 56:13 58:23 60:13 64:12,16 65:9,24 68:3,6 69:25 70:1 73:9 74:1,4,18 82:11,14

84:19 85:5,6

**IMEI** 17:25

**improve** 74:19

**inappropriate** 63:10

**include** 38:22 46:14

**included** 47:2

**indicators** 86:20

**individual** 27:2 40:9 45:14 57:20 59:12 61:22 69:25 70:17 73:20 78:13 82:4

**individual's** 77:24

**individuals** 14:20 26:10 68:4

**infant** 57:3

**inform** 19:16

**information** 8:7,9,12,14, 18 18:23 24:16 28:24 33:18,19 41:6 44:10 55:2 83:4

**Initially** 17:18

**insight** 77:18

**instructing** 35:16

**intelligence** 21:9 23:7

**intentionally** 30:20 38:18

**interest** 17:9 26:4,6,7,23 27:1

**internet** 5:7 8:10,11 47:7,18,23 48:2,19 49:4,16 52:11,12 69:7 83:4,23

**interpret** 68:10

**interview** 11:19 15:1 17:18 23:22, 24

**investigate** 8:17 41:9

**investigated** 8:20 11:16 64:14 88:24

**investigating** 5:11 37:22 77:1,4,7

**investigation** 5:14 6:16,20 11:1 13:1

14:5 16:12 19:23 22:23 23:20 25:9 42:19 43:5 46:11,14 49:11 56:12, 15 59:5 70:25 72:6, 16 80:24 81:3,7

**investigations** 8:21 24:18 26:20 52:7, 10 62:2 68:25 79:7

**investigative** 89:7

**investigator** 5:19 20:8,24 37:11 41:8, 22 42:2 45:2 46:3 56:17 58:17 59:14, 16,18,19 65:8 67:3 69:9 72:16 73:5 75:2 88:24

**investigators** 5:16 43:24 65:15

**involved** 5:14 6:16 29:25 47:9

**involvement** 19:11 23:18

30:6,9 32:7 87:24

**involving** 80:24 81:7

**IPAC** 37:11

**issue** 14:24 15:1 43:13

**issued** 66:21 84:6,8

**issues** 14:22

**items** 26:3

---

**J**

**January** 54:20

**jerk** 11:8

**job** 4:17 20:9 21:14 26:17, 22 68:21

**Johns** 4:12 5:1,19 9:13 13:2 14:4 18:8 20:25 21:21 22:7 31:6 58:16 59:4 60:1 69:5,24 70:7 71:16,20 79:2 90:8

**Join** 13:6 14:8 34:25 39:7,17 43:10 44:17 45:8 64:19 65:3,18

Case 3:24-cv-00044-JAR-MCR    Document 67-4    Filed 08/12/25    Page 36 of 46 PageID 797
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024                Index: judgment..Madam

66:1,17 68:13 89:3

**judgment** 27:3

---

**K**

**Kaitlyan** 31:22

**Kevin** 4:3,10

**keys** 63:6

**kid** 61:13

**kill** 77:14

**killed** 15:14

**kind** 4:19 6:14 7:19 9:9 15:5,17 16:18 19:9 21:11,13 23:17 24:18 33:15 40:18 42:19 56:14 57:9,18 71:2 72:12 76:11 77:6,17 78:21 79:17 82:10 85:16 86:11 90:7 91:4

**kinds** 86:13

**Knee** 55:18

**knees** 55:18

**knew** 17:16 18:11 47:19 48:6 81:12

**knowing** 38:2

82:25 88:13

**knowingly** 38:4,18 39:23

**knowledge** 21:22 86:4 87:23 88:6

---

**L**

**lab** 4:21,22 18:5 47:24 48:2

**lady** 80:13

**laptop** 17:6

**laptops** 19:3

**large** 24:16 82:13

**lascivious** 55:11

**late** 5:6 31:13

**law** 6:13 8:15 11:13 15:22 38:1 39:4 41:2 42:11 45:5 66:11, 13 79:20,21, 24 86:12

**laws** 35:10 42:3

**Lawshe** 9:13 10:9 11:2 12:23 14:6

15:13 16:14 18:6 23:22 30:1 32:20 34:14 36:16 37:14 41:7 42:20 43:7 45:3,14 46:6 47:14 48:20 50:7 51:11 66:6 67:13, 22 71:8 80:25 81:7 87:24

**Lawshe's** 6:16 17:24 22:9 23:2,15 25:1 28:5 48:24 52:4 89:7

**lawyer** 10:21

**lead** 68:1

**learn** 11:13

**learned** 15:14 86:25

**legal** 18:20 40:2 41:4,5 74:4

**level** 6:9 57:8

**lieutenant** 4:24

**lighting** 21:12

**limit** 86:4

**limitations** 78:17

**lines** 29:14

**locate** 34:1,11 47:4

**located** 17:24 25:13

**lock** 63:5

**long** 4:25 11:15 33:12 34:1 37:15, 24

**longer** 14:13 57:2 77:9

**looked** 22:19, 20 36:14 44:1 56:18 61:3 65:8 80:4 83:23

**lot** 12:10 14:19 16:8 17:22 19:3 21:7 24:12, 21 25:5 27:5,7 28:24 29:17,20 30:16,19 35:21 41:13 50:2 60:12 74:1

**lucky** 73:8 85:5

---

**M**

**M-E-T** 81:14

**Madam** 7:23

63:14,19

**made** 16:17 23:20 24:24 27:14 46:5,8 53:22 56:21 67:9 70:19 71:17 72:22 73:12 84:25 85:11

**maintain** 66:12

**make** 17:2 19:9,10,16 20:9 26:12, 17 35:1 38:10 58:10 61:21 62:16 63:17 66:14 67:4,7 85:15

**makes** 64:9

**makeup** 51:6

**making** 16:13 19:25 27:3 47:13 48:7, 19 56:4

**male** 43:17

**males** 57:6

**manipulatable** 70:16

**manipulation** 21:10 71:2

**manipulations** 21:13

**marked** 38:25 62:24

**match** 58:9

**material** 12:3 19:19 37:18 57:11,17 60:21 88:8, 10

**Matt** 13:22 87:11 89:24 90:6 91:3

**matter** 43:7

**matters** 48:16

**maturity** 76:6

**means** 40:5 42:4 54:17 56:24 57:18

**meant** 26:8 32:8

**measure** 77:24

**media** 71:17, 21,22

**meet** 30:19 32:10 70:8 76:10

**meeting** 31:8, 12,18,21 32:19 49:2, 12,19 50:18

**member** 76:17, 20

**members** 80:5

**membership** 6:4

**Messenger** 29:6

**met** 30:17,21 31:5 81:15 87:5

**meta** 64:11

**metart** 81:21 87:23 88:3

**metart.com** 51:25 53:9, 13,16 66:19 81:1,18 82:23 88:7

**metart.com.** 50:19

**mid-2017** 5:7

**mind** 59:20 64:14

**minor** 20:22 33:9,10 40:8 55:8 61:20 63:17 68:20

**minors** 26:13 39:14 68:4, 7,11,17

**minutes** 30:12 34:4,5 71:1

**Missing** 7:24 8:3 9:7

**model** 34:17, 18 35:6,23 36:21,23,24 55:14 61:22 75:3,8

**models** 34:11, 21 35:4

39:13 41:2,7 44:12,20 47:5,18 49:3 50:12 51:9, 10 52:8 64:2,6,25 65:10 66:21 69:10 74:9, 10 75:13 81:21 82:24 83:9,12 84:13 88:15

**models'** 83:8

**moment** 72:14

**month** 5:3 60:6,7 61:8

**monthly** 60:3

**months** 48:1 60:9

**morally** 40:12

**morning** 53:11 81:24

**motion** 38:19

**moved** 47:24

**movie** 27:22

**multiple** 28:1 34:7,8 74:15

**muscles** 43:18 57:6

---

**N**

**N-C-M-E-C** 9:1

named   30:25

Napster   27:19

narrow   56:14

national   6:9
  7:24 8:2 9:6

NCMEC   7:22
  8:22 9:5,12,
  23 18:20
  53:24 54:3,
  5,7,11,19
  56:6 57:22
  58:1,6,7,10,
  15,16 59:4,
  7,23,25
  60:19 61:3
  62:17

necessarily
  15:22 28:19
  84:19

need-to-know
  56:9

needed   30:10

nefarious
  29:24

nervous   41:14

news   71:24

nice   63:8
  91:3

nominally
  41:23

nonchargeable
  57:13

north   61:13

notation   27:14

note   26:22

notes   13:13
  80:8,20
  84:22

notified   72:6

nude   17:2
  26:9 27:2
  29:16

nudes   29:15

nudity   25:24
  27:7

number   17:25
  55:1 79:3

numbers   82:21

────────────
O
────────────

oath   88:6

object   13:4,
  12,23 14:7
  34:24 39:6,
  16 43:9
  45:7,16
  64:18 65:2,
  17,25 66:16
  68:12 70:2

objection
  13:14 44:16
  90:18

obvious   26:15
  27:11,12
  57:2 85:6

occasion   85:9,

13 87:2

occasions
  85:18

October   31:13
  47:12 49:13,
  20,21

office   4:12
  5:20 11:22,
  23 14:4 22:8
  25:14 58:17
  59:5 60:1
  63:8 70:7
  71:17,20
  72:8,9 79:2
  90:12,16

officer   11:13
  14:24 15:18,
  22 63:16
  79:21

officers   25:4,
  5

older   40:6
  43:16,17
  88:15

one's   51:14

online   5:11
  8:12

open-ended
  59:23

opened   47:25

operation   69:2

opine   86:1

opinion   16:15,

17 19:17
  20:21 43:4,5
  45:13 65:8

opportunity
  15:4

opposed   15:2
  33:6

order   38:1
  39:11,12
  40:8 90:21,
  23

organizations
  79:6

original   13:20
  29:9,12
  51:19 64:12

overly   26:15

oversees   4:24

owns   15:18

────────────
P
────────────

part   6:2,3,10
  27:7 38:21
  47:2 69:2,8
  81:15

parts   68:25

pass   50:16
  69:6

passed   8:16,19

passport   51:16
  83:12,16,19

passports

44:20 50:13 83:8,24 84:5,9,12,16

**past** 5:18 20:8

**patience** 84:23

**paygrade** 79:11

**Payne** 31:22 32:22

**PDF** 90:25 91:14

**PDFS** 91:5

**pectoral** 43:18 57:6

**pediatrician** 72:20 76:10, 13

**peer-to-peer** 27:18

**people** 4:22 8:19 14:21 17:22 24:21 27:21,25 28:2 29:4,9, 15 30:19 32:10,13 40:21 41:13, 16 60:11 68:17 72:24 77:7 85:11 86:1,16

**percent** 18:14 86:23

**Perfect** 90:18

**performance** 38:13

**performed** 6:19

**person** 8:10,11 24:19 27:4 38:17 39:12 40:18 56:25 65:9,12 69:25 73:13 85:1,10

**personal** 7:14 71:14

**personally** 79:22

**perspective** 13:3

**phone** 7:14 11:25 16:10, 20,23 17:3, 24 18:4 19:13 25:21 30:4 72:10

**phones** 7:13

**photo** 51:13 64:6 82:5,20 89:9,19

**photograph** 38:19 78:14

**photographs** 51:10 64:22 65:11 69:1 70:15 74:23 84:14 86:2

89:12,13

**photos** 51:6,17

**phrased** 26:4 84:25

**physically** 57:1

**physician** 45:13

**pick** 17:19 72:10

**picture** 27:1 35:23 37:5 38:19 49:16 51:4,19 58:9 73:21

**pictures** 18:1, 3 25:13 29:11,16 50:12,20 66:23 69:16 76:12 81:8, 11 83:17

**Pierce** 12:12, 13 31:6,20, 23 32:21,24 35:12 42:6 43:3 49:13, 20 50:17

**pit** 40:22

**place** 14:25 24:14 81:13 86:17

**places** 28:16

**Plaintiff** 4:4

**plaintiff's** 38:25 62:24

**platform** 27:25 28:14

**play** 21:11

**point** 7:15 18:9 20:8 39:21 47:22 49:6 50:7,11 53:14 62:2

**pointed** 59:10

**policy** 72:24

**porn** 58:22

**pornographic** 17:2 26:9 27:3 28:20 33:10 40:3 67:25 74:1

**pornography** 5:15 17:10 20:11 25:10, 25 27:12 29:1 36:17 37:23 39:5 46:6 57:23 58:1,7,10, 12,15,18,20 59:1,6,7 60:15,21 72:17 73:10 74:5 77:2,5 79:4 85:6

**portion** 33:1

63:22

**position** 64:25 65:4

**positive** 56:6

**possess** 38:18 40:2 45:4

**possession** 5:15 10:9 17:5,9,13 19:18 20:11 25:10 33:9 36:17 37:17, 23 38:2,4 39:4,24 46:6 47:13 60:20 64:15 72:17 77:2,4

**possibility** 48:9

**post** 29:8,9, 11,12,15,16

**posted** 65:23

**posts** 29:14

**potential** 15:4 43:15

**potentially** 27:2

**practice** 74:10 85:25

**preparation** 7:3 9:17 10:6,17,18 54:23

**prepubescent** 55:8,15,21 59:12 75:3, 9,14

**present** 10:4 31:6,7,17 55:19

**presentation** 38:21

**prestige** 79:19

**Preston** 9:22 18:24 19:22 20:14 22:7 23:1 30:6 31:25 47:11 48:18 49:10 50:22 53:13 68:19 70:1,8 71:9 89:25

**pretended** 70:9

**pretending** 68:7,10,17

**pretends** 68:19

**previously** 12:7

**print** 35:12, 16

**printer** 11:5

**prior** 18:6 19:17 47:13 48:19 52:4 72:6 80:24 81:6

**probable** 19:18 20:1,9,10 43:6,12 44:2,3

**problems** 18:24

**PROCEEDINGS** 4:1

**process** 10:23 15:3 18:5,20

**product** 23:15

**programs** 25:24

**property** 54:3

**protect** 62:3

**Protection** 76:21

**provide** 6:7,12

**provided** 10:1 66:24 89:14, 17

**providers** 8:13

**puberty** 57:1,4 77:25

**pubic** 43:17, 22 55:18 57:4,6 74:11 75:3,8,13,23 86:21

**public** 28:25 41:1 55:24 56:2,3

**publicly** 56:4

**published**

61:20 83:4

**publishers** 66:12

**publishing** 53:17

**purport** 66:20 84:17

**purported** 84:12

**purposes** 57:10

**purview** 5:16

**put** 27:25 62:22 63:5 81:25

**Putnam** 76:25

**putting** 68:25

---
**Q**
---

**quarter** 59:25

**question** 13:13,15,17, 20,23 15:16 22:6 23:11 34:22 49:7 52:3 59:19, 23 61:17 63:19 64:3, 14 66:21 68:3 71:6 73:18 75:10, 19 84:14,24 85:2,8 88:5, 20

**questions**
  10:22 37:19
  80:11,14,17
  87:12 88:13,
  16 89:21
  90:1

**quick**  80:7

**quicker**  28:3
  56:16

**quickly**  54:25

**quota**  79:16,
  18

**quote**  67:23

---

### R

**rabbit**  39:22

**raise**  59:19
  64:13

**raised**  43:5

**ran**  25:23

**range**  86:22

**ranges**  86:1

**rating**  76:6

**read**  7:19
  37:15 38:13,
  16,22 52:5,
  6,11,12
  55:2,6 56:8
  63:23 90:3,
  17

**readily**  41:8

**realistically**

56:10

**realize**  11:12
  24:7

**reason**  16:22
  31:14 45:3
  56:10 72:23

**reasonable**
  46:13 65:9,
  12

**recall**  12:8,9
  18:15 20:23
  22:11 23:13
  25:6 26:5
  31:10,17
  32:15,19
  35:19 36:1,4
  41:20 42:9
  52:17,21
  53:15 54:6,
  16 67:1
  75:5,19
  78:25 81:13
  83:14,15
  85:15 87:24
  88:1,2,16,19

**receive**  60:2
  79:3,7

**received**  9:13

**recently**  76:10
  86:8 90:15

**recess**  80:9

**recollection**
  12:18 20:14
  22:25 33:16
  39:3,9

**record**  4:9
  13:13 30:17
  34:13 62:13,
  14 63:23
  66:25 89:8
  91:15

**records**  42:11
  88:25 89:12

**Reddit**  29:8

**redirect**
  87:16,20

**reference**
  33:23 67:9

**referenced**
  46:15 72:15

**referred**  8:22
  18:7 76:24

**referring**  7:22
  8:6 9:6,12,
  25

**refers**  81:21

**refresh**  39:3,9

**regard**  54:4

**regular**  60:19
  74:10,22

**regularly**
  48:13,18
  56:18

**related**  8:9
  22:8 23:2,14
  26:20 28:19
  33:19 60:25
  78:23

**relation**  81:18
  85:8

**relevant**  17:9

**rely**  59:7

**remember**
  12:11,12,16,
  19 17:21
  18:2,14 23:5
  27:19 29:10
  31:19,20
  32:4,5,13
  34:4 35:11,
  14,15,17
  36:6,7,14
  37:20 49:15,
  17 50:4,5,
  10,25 51:2,
  14,23 52:13
  53:21 54:4
  67:11 76:19
  82:10,19
  83:13,20,22
  84:3,4 85:2

**remembered**
  53:3

**remote**  91:16

**remove**  75:23

**repeat**  13:16

**report**  6:23
  7:6,20,22
  9:11 22:13
  26:3,5 53:24
  54:5,7,11,
  19,22 57:25
  58:1,11,15

59:4,8,11
60:19 61:3
62:17

**reporter** 7:23
9:1 11:4,11
35:2 57:16
62:15,21
63:14,19,21
90:20 91:2,
8,11

**reporting**
58:5,6,8

**reports** 7:7,9,
10,11,13
56:8,11
59:23,25
60:1 75:25

**represent** 35:3
89:25

**representation**
38:20

**representations**
46:4

**represented**
34:21 35:5
41:7 90:7

**reputation**
71:14

**requested** 9:23
63:22

**requesting**
18:22

**required** 66:12

**requirements**
41:24

**requires** 38:1
42:11

**respond** 29:9

**response** 29:12
53:9

**responsible**
19:25

**result** 6:23
22:17

**return** 9:19,22
10:2 18:8,12
19:1,14
20:15,18
48:11

**returned** 89:8

**revealed** 26:3

**review** 7:2,5,
17 10:1,12
12:4 18:23
19:6 22:8
52:16 56:11

**reviewed** 7:12
9:10,14,16,
18,20,21
10:19 12:2,3
14:2,3 19:16
36:9 53:24
54:6,22

**reviewing** 7:16
12:22 32:20

**rid** 16:7

**Roberts** 4:8
7:23 8:1,25
9:2 13:18,22
14:1,14
35:1,7 39:2,
8 40:1 44:5,
8,18 45:9,17
46:1 61:1
62:5,9,14,22
63:1,14,24
64:1,20
65:6,21
66:3,18
68:9,15
69:17 70:5
73:24 74:14
75:6 78:3
80:10,13
82:2,22
84:24 87:11,
14,18,21
89:5,21
90:2,4,6,14,
18,20,23
91:3

**room** 23:22,24
47:3

**RU** 41:15

**ruined** 71:12,
14

**rules** 63:11

**run** 49:25

**running** 19:2

**rush** 15:19

**rushed** 14:11

15:2

_____

S

_____

**safely** 15:1

**safety** 14:22,
24 15:19,21

**Samsung** 16:19
17:12 18:12
25:20

**Santiago** 30:25
31:2

**satisfied**
64:5,12

**scale** 76:4,6,
8 78:18
85:24 86:8,
14,20

**scanned** 7:18

**scope** 56:14

**screenshot**
51:22 82:8,
20

**search** 9:19
18:22 19:1
20:17,18
30:9,11
67:12,18,25
68:1 91:4

**searching**
67:10,23

**second-guess**
46:12

**section** 37:3,

17

send 26:23 29:15 90:25

sending 16:4 26:21

separately 30:18

service 8:13 28:11

seventh 69:12

sexual 19:19 37:18 38:12, 22 57:11,17 62:3 76:6 79:4,8 88:8, 10

share 8:8,15 27:22 28:1, 2,3 38:10

shared 62:19

sharing 27:19 28:10,20

sheriff's 4:12 5:20 14:4 22:7 58:17 59:5 60:1 70:7 71:16, 20 79:2 90:12,16

Shevlin 13:6, 12 14:8 34:25 39:7, 17 43:10 44:16 45:8,

23 60:22 62:7,11 64:19 65:3, 18 66:1,17 68:13 73:22 74:13 75:4 78:2 80:17, 20,23 87:7, 17,22 88:13 89:2,22,23 90:22 91:12, 13

shoot 89:19

shoots 64:6

shot 15:14

show 18:3 23:9 36:20 37:1 38:19 84:18

showed 36:13, 22 37:4 50:23 82:4

showing 54:19

shown 28:15

shows 33:2,8

signature 91:17

signs 75:13

similar 23:10 27:21 29:8, 13 76:11,12 87:4

simple 50:8

simplest 90:25

simply 26:8

sir 6:18 13:9 25:3 28:7 54:21 72:18

sit 4:18 64:5

site 29:5

sites 67:25

sitting 49:8

situations 86:13

sketchy 41:11

skin 74:20

skip 78:22

slowed 15:6 16:12

slowing 15:3

small 19:2 57:3

society 74:23

solely 75:2

sort 15:18 19:10,21 28:13,16 67:7 76:7

sounded 82:3

sounds 57:19 62:7

source 52:9 88:2

speak 10:21

simplest 90:25 87:2

special 5:22, 24 6:2,12

specialist 26:14 75:17

specialized 6:13

specialty 6:6

specific 14:16 42:24

specifically 20:19 60:25 66:6

spot 40:25 41:3 90:11

spots 40:23

squint 38:16

St 4:12 5:1, 19 9:13 13:2 14:4 18:8 20:25 21:21 22:7 31:6 58:16 59:4 60:1 69:5,24 70:7 71:16, 20 79:2 90:8

stages 77:25 78:7

staging 77:18, 21

stands 55:8 81:15

start 12:1

started 12:21 18:5

starting 43:21 57:7

state 4:9 6:9 31:7,22 35:15 42:7, 16 43:3 49:14 50:20, 21 76:24 77:10

stated 68:4

statement 83:1

statements 54:2

States 40:3

stating 88:6

statute 37:13 38:6,11 42:8 62:18 65:16, 20,22

step 73:5

stone 77:15

stood 30:10

strictly 19:21

stuff 23:9 28:22 33:15 40:18,23 41:17 56:15 57:7 63:8 67:15 70:23 77:14,15

subject 35:23

54:7,12

subpoena 10:2 18:8,12,19, 22 19:14 20:15,18 48:11

Subsection 37:17 38:12, 15

success 69:19

successfully 25:21 69:20

suggest 90:2

suing 71:8

supervisor 4:20 72:2,7, 11

supposed 43:24

surprise 81:23

suspects 15:4

SVU 5:23 20:7

SWAT 16:4

sworn 4:4

Synchronoss 18:9,21 19:1 24:1,4 58:6

system 56:4

---

**T**

---

taking 64:24 65:4 77:13

talk 9:15 16:19 17:12 29:4 63:11

talked 61:15 72:14 75:16 78:21 87:5

talking 9:21 15:20 25:20 29:1 32:8 34:2 36:1,7 49:8 62:15 66:5 72:9 82:5 86:2,7

tangent 9:10

Tanner 76:4,6, 7 77:18,20 78:7,18 85:24 86:8, 14,19

task 6:8,10

taught 86:25

team 16:4 20:4 76:21 89:8

tech 19:21

technical 24:10 48:19

technically 39:23 44:3

teenage 43:16

teenagers 86:22

teens 39:20

67:12,19,23 81:18,21

telling 44:10 53:21

ten 52:17

tend 15:2

term 27:12 28:8 56:22 81:17

terms 67:11, 13 69:22 70:16

test 77:23

testicles 57:6

testified 4:4 17:1 24:25 25:12 48:13 88:1

testimony 67:10

themself 40:19,21

theoretically 40:17

thighs 33:3 82:4,7

thing 15:24 19:10 29:13 42:17,19 76:7

things 14:12, 23,24 15:2, 5,10 24:22

25:25 27:16 28:9,16 35:19 42:21, 23 62:19 73:17 74:19 79:13

thinking 31:21

thought 32:8 61:16

throw 16:8

thumbnail 82:13

tickets 79:16

time 6:1 10:21 13:11 14:10,12,17 16:13 17:14 19:2 23:19, 21,25 25:8 31:5 37:15, 24 40:20 42:18 47:9 48:3 52:22 53:14 54:23 62:10 64:6 65:10 70:13 83:5 86:17 87:8

timeframe 31:15 59:24

timeline 18:16

times 30:20 41:13 61:2

tinker 21:11

tinkered 22:22

tinkering 21:16

tiny 76:14

tip 7:22 8:19 9:12,23 18:19 59:15, 20,25

tips 8:15 60:15,24

tissue 43:18

title 4:17

today 4:17 5:13 10:13, 16,17,23 22:25 64:5 86:3

today's 7:3 9:17 10:6 12:4 54:23

toddler 26:16 57:3

toilet 16:8

told 49:15 50:9 78:10

tool 21:4 67:3

tools 21:6,8 23:8 65:15

top 33:3 60:4 83:20

totally 32:16

touched 74:19, 23 75:18

track 70:12

trained 37:22 41:22

training 6:7, 12,13 38:1 39:4,15 86:12

treat 79:24, 25 80:2,3,4

trick 37:21

trouble 19:3

true 59:13 83:1 88:19, 22

turn 14:23

turned 30:5

TV 71:24

Twenty 34:4

type 21:4 26:19 27:18 33:23 42:15, 16 74:11 82:9 83:13 86:12

types 74:15

typing 33:15

—————————
        U
—————————

UC 69:2

UF 76:21

Uh-huh 11:17 31:11 35:25 37:12 38:14 44:22 61:24 80:19 85:7 87:25 88:21

Ukraine 52:8 84:1,6,9

Ukrainian 51:16

unconfirmed 57:23 58:1, 8,15 59:4

undercover 48:2 69:2

understand 4:11 5:4 6:15,20 8:23 13:23 17:6, 15 18:13 19:10 20:16 25:2,9 26:8 30:21 31:4 32:15 33:13 34:6,13 37:25 40:5,8 42:1,3 43:4 44:13 58:14 59:3 71:8, 11,19 72:25 89:6

understanding 18:7 39:14 66:19 72:19

Case 3:24-cv-00044-JAR-MCR    Document 67-4    Filed 08/12/25    Page 46 of 46 PageID 807
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024                                      Index: unit..young

86:19

**unit** 5:22 6:2 8:21 15:7 24:13 69:5 77:8,9

**United** 40:3

**unlawful** 38:17

**unusual** 33:7, 11

**upload** 27:24

**uploaded** 55:2

---

### V

**vagina** 33:6,8 35:24 37:4 82:4 83:15

**vaginal** 34:3

**values** 58:9, 13,20

**verbatim** 13:24

**verification** 35:10 41:24 65:16,19 82:24 85:17 88:16

**verified** 41:2

**verify** 83:20 88:19

**verifying** 84:13

**Verizon** 7:18, 21 9:11,18,

23 18:9

**victims** 5:22, 24 6:2 85:19,20

**videos** 21:10 29:12 56:13 58:24 81:12

**view** 38:18 64:2 83:11

**viewed** 42:6 49:3 65:23 83:25 88:15

**viewing** 43:2 59:14

**viruses** 41:16

**visible** 75:13

**visited** 53:8

**visiting** 46:14

---

### W

**waived** 91:18

**walked** 48:4

**wanted** 32:24

**wanting** 79:15 82:14

**warrant** 9:19 16:2 18:22 19:1 20:17, 18

**watermark** 32:23

**ways** 21:5,11

**web** 28:8,16, 17 82:8

**website** 28:25 29:17 33:19, 23 34:2 41:1,5 42:11 46:4,5 51:22 61:16 80:25 82:12,18 87:23 88:25

**websites** 28:18 32:24,25 33:15 34:7, 10,11,20,21 35:3,6,8,9 41:10,18 42:6 43:2 44:10 46:15 48:23 65:23 88:14

**weekly** 60:3

**weird** 61:12 90:11

**Weiss** 30:22 31:5,23

**wet** 16:10

**wildlife** 72:13

**word** 55:12 57:15 82:9, 10 91:4

**work** 5:5,23 6:14,24 7:14 16:23 17:6

18:19 22:13 26:13 30:13 42:15 79:18

**worked** 77:11

**working** 81:10

**worry** 14:20, 22 41:16

**worse** 80:4

**Wow** 22:21

**write** 11:11 26:6 79:6, 10,11,16

**wrong** 40:12

---

### Y

**y'all** 86:14

**Yahoo** 29:6

**year** 40:12 49:23,25 52:7 66:8 69:6,7,19 70:1,9,19,20

**years** 5:2,3 40:6 44:12 49:25 52:8, 17 56:19 68:23

**young** 39:20 67:12,19,23 73:11

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on March 4, 2026.

/s/ Michael K. Roberts
**MICHAEL K. ROBERTS**