No. 26-10155-D

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

WILLIAM LEE LAWSHE,
*Plaintiff-Appellant,*

v.

MIKAYLA PRESTON,
and
KATHLEEN DULLY,
*Defendants-Appellees.*

---

Appeal from the United States District Court for
the Middle District of Florida, Jacksonville
Division

3:24-cv-00044-MMH-MCR

---

## APPENDIX VOLUME III

---

**LAW OFFICES OF NOONEY,
ROBERTS, HEWETT, AND
NOWICKI**

*/s/ Michael K. Roberts*
**Michael K. Roberts, Esquire**
Florida Bar No. 0077974
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
mroberts@nrhnlaw.com
*Counsel for Appellant*

# INDEX

## VOLUME 1

Docket Sheet

Complaint against All Defendants with Jury Demand...................................1

Motion to Dismiss for Failure to State a Claim by Katheen Dully .................10

Amended Complaint against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand filed by Willam Lee Lawshe....................................26

Answer and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston.....................................34

Second Amended Complaint against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand filed by William Lee Lawshe.............................40

Answer and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston.....................................43

Answer and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully.....................................54

Motion of Partial Summary Judgment Against Preston by William Lee Lawshe...66

Zoom Videotaped Deposition Transcript of Kathleen Dully M.D dated April 28, 2025.....................................66 – 1

Letter to Mikayla Preston from Kathleen Dully M.D dated February 22, 2023..66-2

Letter to Mikayla Preston from Kathleen Dully M.D dated April 5, 2023......66 – 3

## VOLUME 2

Docket Sheet

Letter to Mikayla Preston from Kathleen Dully M.D dated April 5, 2023......66 – 4

Expert Report of Dr. Scott Krugman.................................66 – 5

Continued Remote Video Deposition Transcript of Kathleen Dully M.D dated June 18, 2025.....................................66 – 6

Motion of Partial Summary Judgment Against Preston by William Lee Lawshe...67

Affidavit for Search Warrant dated February 28, 2023............................67 – 1

Cyber Tipline Report 153739160..............................................67 – 2

Remote Deposition Transcript of Eugine Tolbert dated December 17, 2024...67 – 3

Remote Deposition Transcript of Kevin Greene dated December 17, 2024......67-4

## VOLUME 3

Docket Sheet

Videotaped Deposition Transcript of Fallon McNulty dated June 12, 2025.......67-5

Video-Recorded Deposition Transcript of Mikayla Preston dated March 13, 2025
...................................................................67-6

Remote Deposition Transcript of Dennis Camden dated December 17, 2024....67-7

Affidavit of Jeffrey J. Douglas..................................................67-8

Letter to Mikayla Preston from Kathleen Dully M.D dated February 22, 2023..67-9

## VOLUME 4

Docket Sheet

Zoom Videotaped Deposition Transcript of Kathleen Dully MD dated April 28, 2025...............................................................67-10

Continued Remote Video Deposition Transcript of Kathleen Dully M.D dated June 18, 2025................................................................67-11

Deposition Transcript of Mikayla Preston dated November 21, 2023............67-12

Affidavit for Search Warrant dated April 12, 2023..........................67-13

St. Johns County Sheriffs Office Arrest Report.............................67-14

Felony Information Sheet...................................................67-15

Email Correspondence re Nolle Prosse dated December 22, 2023.............67-16

Response in Opposition re 66 Motion for Partial Summary Judgment filed by Kathleen Dully.................................................................................75

Response in Opposition re 67 Motion for Partial Summary Judgment filed by Mikayla Preston................................................................................78

Motion for Summary Judgment filed by Mikayla Preston...........................83

**VOLUME 5**

Docket Sheet

Motion for Summary Judgment filed by Kathleen Dully..............................85

Reply to Response to Motion re 67 Motion for Partial Summary Judgment filed by William Lee Lawshe.........................................................................90

Reply to Response to Motion re 66 Motion filed by William Lee Lawshe..........91

Response to Motion re 85 Motion for Summary Judgment filed by William Lee Lawshe................................................................................95

Response to Motion re 83 Motion for Summary Judgment filed by William Lee Lawshe................................................................................96

Report of Patrick Siewert..................................................... 96-1

Reply to Response to Motion re 85 Motion for Summary Judgment filed by Kathleen Dully.....................................................................100

Reply to Response to Motion re 83 Motion for Summary Judgment filed by Mikayla Preston....................................................................101

Opinion and Order re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary Judgment; denying as moot 71 Motion in Limine; granting 83 Motion for Summary Judgment; granting 85 Motion for Summary Judgment........................103

Judgment is entered in favor of Defendants and against Plaintiff.................104

APPEAL,CLOSED,MEDIATION,SL DOC,STAYED,TANGIBLE

# U.S. District Court
## Middle District of Florida (Jacksonville)
### CIVIL DOCKET FOR CASE #: 3:24-cv-00044-JAR-MCR

Lawshe v. Hardwick et al
Assigned to: Judge Jane A. Restani
Referred to: Magistrate Judge Monte C. Richardson
Case in other court: 11th Circuit, 26-10155-D
Cause: 42:1983 Civil Rights Act

Date Filed: 01/12/2024
Date Terminated: 12/19/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

## Plaintiff

**William Lee Lawshe**
*an individual*

represented by **Michael Keith Roberts , II**
Law Offices of Nooney & Roberts
1680 Emerson St
Jacksonville, FL 32207
904/398-1992
Fax: 904/858-9943
Email: mroberts@nooneyandroberts.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Scott Nooney , Jr.**
The Law Offices of Nooney & Roberts
1680 Emerson St.
Jacksonville, FL 32207
904-398-1992
Fax: 904-858-9943
Email: jnooney@nooneyandroberts.com
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Robert A. Hardwick**
*in his official capacity as Sheriff of St. Johns County*
*TERMINATED: 10/29/2024*

represented by **Michael P. Spellman**
Spellman Law, P.A.
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: michael@spellman.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
Spellman Law, P.A.
905 E. Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: cpetruzzelli@spellman.law
*ATTORNEY TO BE NOTICED*

Matthew Joseph Carson
Spellman Law, PA
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: mcarson@spellman.law
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mikayla Preston**
*in her induvial capacity as a Detective for*
*St. Johns County Sheriff's Office*

represented by **Michael P. Spellman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jami McFatter Kimbrell**
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: jami@kimbrellfirm.com
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**University of Florida Board of Trustees**
*TERMINATED: 03/28/2024*

represented by **Todd Anderson Wright**
Alexander DeGance Barnett, P.A.
1500 Riverside Avenue
Jacksonville, FL 32204
904-345-3284
Fax: 904-345-3294
Email: todd.wright@adblegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Dully**
*in her individual capacity as medical*
*director of the UF Child Protection Team*

represented by **Jami McFatter Kimbrell**
(See above for address)
*LEAD ATTORNEY*

**Robert B. Buchanan**
Banker Lopez Gassler P.A.
1900 SE 18th Street
Suite 300
Ocala, FL 34475-8237
352-629-4099
Fax: 352-629-3975
Email: aperry@bankerlopez.com

*TERMINATED: 05/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Shevlin**
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471
352-629-4099
Email: ashevlin@rbtrial.com
*ATTORNEY TO BE NOTICED*

**John Wilson**
Howell, Buchan and Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: johnwilson@jsh-pa.com
*ATTORNEY TO BE NOTICED*

<u>**Mediator**</u>

**Thomas H. Bateman, III**
*TERMINATED: 08/07/2025*

represented by **Thomas H. Bateman , III**
Messer Caparello, PA
2618 Centennial Place
Tallahassee, FL 32308
850/222-0720
Fax: 850/558-0674
Email: tbateman@lawfla.com
*TERMINATED: 08/07/2025*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2024 | 1 | STRICKEN per 23 Order; COMPLAINT against All Defendants with Jury Demand (Filing fee $405 receipt number AFLMDC-21652226) filed by William L Lawshe. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons Hardwick Summons, # 3 Proposed Summons Preston Summons, # 4 Proposed Summons UF BOT Summons, # 5 Proposed Summons Dully Summons)(Roberts, Michael) Modified on 4/2/2024 to edit docket text (JDR). (Entered: 01/12/2024) |
| 01/12/2024 | 2 | NEW CASE ASSIGNED to Judge Marcia Morales Howard and Magistrate Judge Monte C. Richardson. New case number: 3:24-cv-44-MMH-MCR. (JCG) (Entered: 01/12/2024) |
| 01/16/2024 | 3 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (JW) (Entered: 01/16/2024) |

| 01/16/2024 | 4 | SUMMONS issued as to Kathleen Dully, Robert Hardwick, Mikayla Preston, University of Florida Board of Trustees. (MCB) (Entered: 01/16/2024) |
|---|---|---|
| 02/08/2024 | 5 | NOTICE TO ALL COUNSEL of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who - unless the party changes the designation - remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (GL) (Entered: 02/08/2024) |
| 02/15/2024 | 6 | NOTICE of Lead Counsel Designation by Michael Keith Roberts, II on behalf of William Lee Lawshe. Lead Counsel: Michael K Roberts, Esq.. (Roberts, Michael) (Entered: 02/15/2024) |
| 02/19/2024 | 7 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 8 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 9 | NOTICE of Appearance by Robert B. Buchanan on behalf of Kathleen Dully (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/19/2024 | 10 | MOTION to Dismiss for Failure to State a Claim by Kathleen Dully. (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/20/2024 | 11 | **ORDER directing Defendant to file a supplement to her [Doc. 10] Motion to Dismiss Plaintiff's Complaint on or before February 27, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 2/20/2024. (JPA)** (Entered: 02/20/2024) |
| 02/20/2024 | 12 | MOTION to Dismiss Count VIII of Plaintiff's Complaint by University of Florida Board of Trustees. (Wright, Todd) (Entered: 02/20/2024) |
| 02/22/2024 | 13 | MOTION for Clerk's Default against Robert Hardwick, Mikayla Preston by William Lee Lawshe. (Nooney, Jeffrey) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/22/2024) |
| 02/27/2024 | 14 | Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 02/27/2024) |
| 02/27/2024 | 15 | NOTICE of Appearance by Michael P. Spellman on behalf of Robert Hardwick, Mikayla Preston (Spellman, Michael) (Entered: 02/27/2024) |
| 02/27/2024 | 16 | MOTION for Extension of Time to File Response/Reply as to 1 Complaint , MOTION to Set Aside Clerk Default *(Deny Entry)* by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Declaration of Trae Wylie)(Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/27/2024) |
| 02/28/2024 | 17 | NOTICE of supplemental authority re 16 MOTION for Extension of Time to File Response/Reply as to 1 Complaint MOTION to Set Aside Clerk Default *(Deny Entry)* RE: Local Rule 3.01(g) Conferral by Robert Hardwick, Mikayla Preston. (Spellman, Michael) (Entered: 02/28/2024) |
| 03/08/2024 | 18 | NOTICE of voluntary dismissal by William Lee Lawshe (Roberts, Michael) (Entered: 03/08/2024) |
| 03/08/2024 | 19 | RESPONSE in Opposition re 14 Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 03/08/2024) |
| 03/13/2024 | 20 | RESPONSE to 16 MOTION to Deny Entry of Default filed by William Lee Lawshe. (Roberts, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |

| | | |
|---|---|---|
| 03/13/2024 | 21 | NOTICE of Supplemental Authority to 16 MOTION to Deny Entry of Clerk's Default and for Extension of Time by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Savoia-McHugh v. Glass)(Spellman, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |
| 03/28/2024 | 22 | **ORDER dismissing, without prejudice, the claims raised against Defendant University of Florida Board of Trustees; terminating 12 Motion to Dismiss; and directing the Clerk of the Court to terminate this Defendant. Signed by Judge Marcia Morales Howard on 3/28/2024. (JW) (Entered: 03/28/2024)** |
| 04/02/2024 | 23 | **ORDER striking 1 Complaint filed by William Lee Lawshe. Plaintiff shall file a corrected complaint on or before April 22, 2024. Signed by Judge Marcia Morales Howard on 4/2/2024. (JPA) (Entered: 04/02/2024)** |
| 04/12/2024 | 24 | CASE MANAGEMENT REPORT. (Spellman, Michael) (Entered: 04/12/2024) |
| 04/15/2024 | 25 | CASE MANAGEMENT AND SCHEDULING ORDER AND REFERRAL TO MEDIATION: **Disclosure statements due by 4/26/2024. Discovery due by 6/20/2025. Dispositive motions due by 7/21/2025. Conduct mediation hearing by 8/15/2025. Final Pretrial Conference set for 12/15/2025 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 1/5/2026 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Signed by Judge Marcia Morales Howard on 4/15/2024.** (Attachments: # 1 Mediation Report Form, # 2 Court Docket)(JW) (Entered: 04/15/2024) |
| 04/16/2024 | 26 | AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) (Entered: 04/16/2024) |
| 04/19/2024 | 27 | **ORDER denying as moot 13 Plaintiff's Motion for Entry of Clerk's Default; denying as moot 14 Defendant Kathleen Dully's Motion to Dismiss; denying as moot 16 Motion to Deny Entry of Clerk's Default and for Extension of Time to Respond to Complaint. Signed by Judge Marcia Morales Howard on 4/19/2024. (JW) (Entered: 04/19/2024)** |
| 04/26/2024 | 28 | CORPORATE Disclosure Statement by Kathleen Dully. (Buchanan, Robert) (Entered: 04/26/2024) |
| 04/29/2024 | 29 | CORPORATE Disclosure Statement by Mikayla Preston. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 30 | CORPORATE Disclosure Statement by Robert Hardwick. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 31 | ***INCORRECT EVENT. COUNSEL TO REFILE AS "CORPORATE DISCLOSURE STATEMENT"***AMENDED document by Kathleen Dully. *Defendant Kathleen Dully's Amended Corporate Disclosure Statement.* (Buchanan, Robert) Modified on 4/30/2024 (LSS). (Entered: 04/29/2024) |
| 04/30/2024 | 32 | AMENDED Disclosure Statement Under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Kathleen Dully. (Buchanan, Robert) (Modified on 4/30/2024, to edit text) (BGR). (Entered: 04/30/2024) |
| 04/30/2024 | 33 | NOTICE of Appearance by Matthew Joseph Carson on behalf of Robert Hardwick, Mikayla Preston (Carson, Matthew) (Entered: 04/30/2024) |

| | | |
|---|---|---|
| 04/30/2024 | 34 | ANSWER and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston.(Carson, Matthew) (Entered: 04/30/2024) |
| 04/30/2024 | 35 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew). Added MOTION to Strike on 5/2/2024 (AM). (Entered: 04/30/2024) |
| 05/02/2024 | 36 | **ORDER directing Plaintiff to show cause why this case should not be dismissed for failure to prosecute or sanctions imposed due to his failure to comply with the Local Rules and this Court's Order. Show Cause Response due by 5/16/2024. Signed by Judge Marcia Morales Howard on 5/2/2024. (JW) (Entered: 05/02/2024)** |
| 05/02/2024 | 37 | CORPORATE Disclosure Statement by William Lee Lawshe. (Roberts, Michael) (Entered: 05/02/2024) |
| 05/02/2024 | 38 | RESPONSE TO ORDER TO SHOW CAUSE re 36 Order to show cause filed by William Lee Lawshe. (Roberts, Michael) Modified on 5/3/2024 to edit text (ELM). (Entered: 05/02/2024) |
| 05/03/2024 | 39 | **ENDORSED ORDER discharging 36 Order to Show Cause. Signed by Judge Marcia Morales Howard on 5/3/2024. (JW) (Entered: 05/03/2024)** |
| 05/20/2024 | 40 | SECOND AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/20/2024 | 41 | NOTICE of Filing 40 Second Amended Complaint by William Lee Lawshe (Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/23/2024 | 42 | **ORDER denying as moot 35 Defendant Sheriff Hardwick's Motion to Dismiss and Motion to Strike. Signed by Judge Marcia Morales Howard on 5/23/2024. (JW) (Entered: 05/23/2024)** |
| 06/03/2024 | 43 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston. (Attachments: # 1 Exhibit CybeTip Report, # 2 Exhibit Dully Opinion f6a487, # 3 Exhibit Dully Opinion 59 and 65, # 4 Exhibit Dully Opinion Screenshot Duckduckgo)(Carson, Matthew) (Entered: 06/03/2024) |
| 06/03/2024 | 44 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew) (Entered: 06/03/2024) |
| 06/19/2024 | 45 | MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint *or Alternatively, Motion for a More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 06/19/2024) |
| 06/24/2024 | 46 | RESPONSE to Motion re 44 MOTION to Dismiss for Failure to State a Claim filed by William Lee Lawshe. (Roberts, Michael) (Entered: 06/24/2024) |
| 07/12/2024 | 47 | RESPONSE to Motion re 45 MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint *or Alternatively, Motion for a More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 07/12/2024) |
| 08/16/2024 | 48 | NOTICE of Appearance by Christen Ann Petruzzelli on behalf of Robert A. Hardwick, Mikayla Preston (Petruzzelli, Christen) (Entered: 08/16/2024) |
| 08/16/2024 | 49 | MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Request for Production* by Mikayla Preston. (Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/16/2024) |
| 08/17/2024 | 50 | SUPPLEMENT re 49 MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Request for Production* by Mikayla Preston. (Spellman, Michael) |

| | | (Entered: 08/17/2024) |
|---|---|---|
| 08/19/2024 | 51 | **ENDORSED ORDER granting 49 Defendant Preston's Motion for Extension of Time to Respond to Plaintiff's First Request for Production. Defendant shall have until August 26, 2024, to respond to Plaintiff's First Request for Production. Signed by Magistrate Judge Monte C. Richardson on 8/19/2024. (JRC)** (Entered: 08/19/2024) |
| 10/03/2024 | 52 | **ORDER: To the extent that Plaintiff requests affirmative relief from the Court, 46 Plaintiff's Response to Defendant Hardwick's Motion to Dismiss is denied without prejudice. See Order for details. Signed by Judge Marcia Morales Howard on 10/3/2024. (JPA)** (Entered: 10/03/2024) |
| 10/29/2024 | 53 | **ORDER granting 44 Motion to Dismiss for Failure to State a Claim and denying 45 Motion to Dismiss. The Clerk of the Court is directed to terminate Defendant Robert Hardwick. Defendant Kathleen Dully shall respond to Plaintiff's Second Amended Complaint on or before November 13, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 10/29/2024. (JPA)** (Entered: 10/29/2024) |
| 11/13/2024 | 54 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully.(Buchanan, Robert) (Entered: 11/13/2024) |
| 02/01/2025 | 55 | MOTION to Compel Production of Documents by William Lee Lawshe. (Attachments: # 1 Exhibit Ex A - Plaintiff RTP, # 2 Exhibit Ex B - Def RTP response, # 3 Exhibit Ex C - Email Correspondence)(Roberts, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/01/2025) |
| 02/05/2025 | 56 | NOTICE of Withdrawal Motion to Compel Production of Documents by William Lee Lawshe. (Roberts, Michael) Modified on 2/6/2025 to edit text (ELA). (Entered: 02/05/2025) |
| 05/16/2025 | 57 | MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/16/2025) |
| 05/19/2025 | 58 | **ENDORSED ORDER denying without prejudice 57 Defendant Kathleen Dully's Motion for Substitution of Counsel because it fails to comply with Local Rule 3.01(g). Signed by Magistrate Judge Monte C. Richardson on 5/19/2025. (SBL)** (Entered: 05/19/2025) |
| 05/22/2025 | 59 | Amended MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/22/2025) |
| 05/27/2025 | 60 | **ENDORSED ORDER granting 59 Defendant Kathleen Dully's Amended Motion for Substitution of Counsel. Robert B. Buchanan, Esq. is relieved of any further responsibility as counsel for Defendant in this matter, but he shall comply with all applicable obligations on withdrawing counsel, including any applicable Bar rules. Jami Kimbrell, Esq. is substituted as counsel of record for Defendant. Signed by Magistrate Judge Monte C. Richardson on 5/27/2025. (SBL)** (Entered: 05/27/2025) |
| 05/27/2025 | 61 | NOTICE of Appearance by John Wilson on behalf of Kathleen Dully (Wilson, John) (Entered: 05/27/2025) |
| 06/06/2025 | 62 | Unopposed MOTION for Extension of Time to Complete Discovery by Kathleen Dully. (Wilson, John) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 6/9/2025 to edit the docket text (MLB). (Entered: 06/06/2025) |
| 06/09/2025 | 63 | **ORDER granting 62 Unopposed Motion for Extension of Deadlines to Complete Discovery and File Dispositive Motions. Discovery deadline is 8/4/2025. Dispositive and Daubert motions due 9/5/2025. Final pretrial conference continued to 1/20/2026, at 10:00 a.m. Jury trial set for trial term commencing on 2/2/2026, at 9:00 a.m. See** |

| | | |
|---|---|---|
| | | **Order for additional deadlines. Signed by Judge Marcia Morales Howard on 6/9/2025. (JW)** (Entered: 06/09/2025) |
| 06/09/2025 | | Set / Reset Scheduling Order Deadlines/Hearings per 63: Discovery due by 8/4/2025. Dispositive motions due by 9/5/2025. All other motions due by 12/29/2025. Final Pretrial Conference set for 1/20/2026 at 10:00 AM before Judge Marcia Morales Howard. Jury Trial set for 2/2/2026 at 09:00 AM before Judge Marcia Morales Howard. (EVK) (Entered: 06/10/2025) |
| 06/18/2025 | 64 | NOTICE of mediation conference/hearing to be held on 8/6/25 at 10AM before Thomas H. Bateman, III. (Carson, Matthew) (Entered: 06/18/2025) |
| 08/06/2025 | 65 | MEDIATION report Hearing held on 8-6-2025. Hearing outcome: Impasse.. (Bateman, Thomas) (Entered: 08/06/2025) |
| 08/12/2025 | 66 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/12/2025 | 67 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/13/2025 | 68 | **SUMMARY JUDGMENT NOTICE AND COURTESY COPIES. Signed by Deputy Clerk on 8/13/2025. (JW)** (Entered: 08/13/2025) |
| 08/29/2025 | 69 | Unopposed MOTION for Extension of Time to File Response/Reply as to 67 MOTION for Partial Summary Judgment , 66 MOTION for Partial Summary Judgment Set / Reset Scheduling Order Deadlines/Hearings *and Extension of Time to File Motions for Summary Judgment* by All Defendants. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/29/2025) |
| 09/03/2025 | 70 | **ENDORSED ORDER granting 69 Defendants' Joint Unopposed Motion for Extension of Time. Defendants shall respond to Plaintiff's Motions for Partial Summary Judgment on or before September 9, 2025. The deadline for Defendants to file dispositive motions is extended until September 12, 2025. The granting of this Motion shall not serve as a basis for seeking to extend any other deadlines in the Case Management and Scheduling Order. Signed by Magistrate Judge Monte C. Richardson on 9/3/2025. (SBL)** (Entered: 09/03/2025) |
| 09/05/2025 | 71 | MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) by Mikayla Preston. (Attachments: # 1 Exhibit 1 = Siewert CV, # 2 Exhibit 2 - Siewert Report) (Carson, Matthew) (Entered: 09/05/2025) |
| 09/08/2025 | 72 | Unopposed MOTION to file DOCUMENT under seal by Kathleen Dully, Mikayla Preston (Attachments: # 1 Proposed Sealed Item Redacted f6a487, # 2 Proposed Sealed Item Redacted 0065(1), # 3 Proposed Sealed Item Redacted 0059, # 4 Proposed Sealed Item Redacted DuckDuckGo, # 5 Proposed Sealed Item Redacted VVFQ_o, # 6 Appendix Unredacted File Names and Sizes)(Carson, Matthew).Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 09/08/2025) |
| 09/08/2025 | 73 | Consent MOTION to File Excess Pages in Response to Motion for Partial Summary Judgment by Kathleen Dully. (Kimbrell, Jami) Modified text on 9/9/2025 (MGB). (Entered: 09/08/2025) |

| 09/09/2025 | 74 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
|---|---|---|
| 09/09/2025 | 75 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
| 09/09/2025 | 76 | NOTICE by Kathleen Dully re 75 Response in Opposition to Motion *Filing Exhibits to* (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 Exhibit K, # 7 Exhibit L)(Kimbrell, Jami) Modified text on 9/10/2025 (ABM). (Entered: 09/09/2025) |
| 09/09/2025 | 77 | NOTICE by Mikayla Preston *documents in support of her response in opposition to Plaintiff's motion for partial summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty, # 3 Exhibit Deposition of Detective Mikayla Preston, # 4 Exhibit Deposition of Detective Kevin Greene, # 5 Exhibit Deposition of Sergeant Eugene Tolbert, # 6 Exhibit Deposition of Dr. Kathleen Dully I, # 7 Exhibit Deposition of Dr. Kathleen Dully II, # 8 Exhibit Affidavit of Kaitlyn M. Paine, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe)(Carson, Matthew) (Entered: 09/09/2025) |
| 09/09/2025 | 78 | RESPONSE in Opposition re 67 MOTION for Partial Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 09/09/2025) |
| 09/10/2025 | 79 | **ENDORSED ORDER granting 73 Defendant Kathleen Dully's Motion for Leave to Exceed the Page Limit and accepting as filed 75 Defendant Kathleen Dully's response to Plaintiff's Motion for Partial Summary Judgment. Signed by Judge Marcia Morales Howard on 9/10/2025. (JW) (Entered: 09/10/2025)** |
| 09/10/2025 | 80 | NOTICE by Kathleen Dully re 74 Response in Opposition to Motion *to Disregard* (Kimbrell, Jami) (Entered: 09/10/2025) |
| 09/11/2025 | 81 | **ORDER granting 72 Defendant's Unopposed Motion to Seal. See Order for details. Signed by Magistrate Judge Monte C. Richardson on 9/11/2025. (SBL) (Entered: 09/11/2025)** |
| 09/12/2025 | 82 | NOTICE by Mikayla Preston *of filing documents in support of her motion for final summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty (corporate representative for the National Center for Missing and Exploited Children) taken June 12, 2025 (excerpts), # 3 Exhibit Deposition of Detective Mikayla Preston taken March 13, 2025 (excerpts), # 4 Exhibit Deposition of Detective Kevin Greene taken December 17, 2024 (excerpts), # 5 Exhibit Deposition of Sergeant Eugene Tolbert taken December 17, 2024 (excerpts), # 6 Exhibit Deposition of Dr. Kathleen Dully taken April 28, 2025 (excerpts), # 7 Exhibit Deposition of Dr. Kathleen Dully taken June 18, 2025 (excerpts), # 8 Exhibit Affidavit of Kaitlyn M. Paine dated August 28, 2025, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe taken March 14, 2025 (excerpts))(Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 83 | MOTION for Summary Judgment by Mikayla Preston. (Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 84 | MOTION to File Excess Pages by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 85 | MOTION for Summary Judgment by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 86 | NOTICE of Filing Exhibits by Kathleen Dully re 85 MOTION for Summary Judgment. (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 |

Exhibit K, # 7 Exhibit L, # 8 Exhibit M)(Kimbrell, Jami) Modified docket text on 9/15/2025 (JOS). (Entered: 09/12/2025)

| | | |
|---|---|---|
| 09/16/2025 | 88 | **ENDORSED ORDER granting 84 Defendant Kathleen Dully's Motion for Leave to File an Over-Length Motion for Summary Judgment and accepting as filed 85 Defendant Kathleen Dully's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 9/16/2025. (JW)** (Entered: 09/16/2025) |
| 09/16/2025 | 90 | REPLY to Response to Motion re 67 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/16/2025 | 91 | REPLY to Response to Motion re 66 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/19/2025 | 92 | RESPONSE to Motion re 71 MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 09/19/2025) |
| 09/24/2025 | 93 | SEALED DOCUMENT re 81 Sealed Order on Motion to Seal by Mikayla Preston (Attachments: # 1 Exhibit Redacted f6a487, # 2 Exhibit Redacted 0065(1), # 3 Exhibit Redacted 0059, # 4 Exhibit Redacted DuckDuckGo, # 5 Exhibit Redacted VVFQ_o) (Carson, Matthew). (Entered: 09/24/2025) |
| 10/03/2025 | 94 | MOTION to File Excess Pages by William Lee Lawshe. (Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 95 | RESPONSE to Motion re 85 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 96 | RESPONSE to Motion re 83 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/06/2025 | 97 | **ENDORSED ORDER granting 94 Plaintiff's Unopposed Motion for an Extension of Page Limit and accepting as filed 96 Plaintiff's Response to Defendant Preston's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 10/6/2025. (JW)** (Entered: 10/06/2025) |
| 10/16/2025 | 98 | **ORDER REASSIGNING CASE to Senior Judge Jane A. Restani. Signed by Judge Marcia Morales Howard on 10/16/2025. (MHM)** (Entered: 10/16/2025) |
| 10/17/2025 | 99 | Case Reassigned to Judge Jane A. Restani. New case number: 3:24-cv-44-JAR-MCR. Judge Marcia Morales Howard no longer assigned to the case. (MDC) (Entered: 10/17/2025) |
| 10/17/2025 | 100 | REPLY to Response to Motion re 85 MOTION for Summary Judgment filed by Kathleen Dully. (Wilson, John) (Entered: 10/17/2025) |
| 10/17/2025 | 101 | REPLY to Response to Motion re 83 MOTION for Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 10/17/2025) |
| 11/17/2025 | 102 | Notice to counsel that pursuant to the summary judgment notice 68, the parties must submit courtesy copies of any motion, response, and authorized reply that exceeds twenty-five (25) pages (including exhibits or other supporting evidentiary materials) in length. Courtesy copies should be mailed by United States mail or other reliable service to Hon. Jane A. Restani, United States Court of International Trade, 1 Federal Plaza, Suite 694, New York, NY 10278-0001 (jkl) (Entered: 11/17/2025) |
| 12/18/2025 | 103 | **OPINION AND ORDER re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary** |

| | | |
|---|---|---|
| | | Judgment; denying as moot 71 Motion in Limine; granting 83 Motion for Summary Judgment; granting 85 Motion for Summary Judgment. The Clerk shall enter judgment in favor of Defendants Preston and Dully and against Plaintiff Lawshe, terminate any pending motions, and close the case. Signed by Judge Jane A. Restani on 12/18/2025. (SJW) (Modified on 12/18/2025)(SJW). (Entered: 12/18/2025) |
| 12/19/2025 | 104 | **JUDGMENT is entered in favor of Defendants and against Plaintiff. Signed by Deputy Clerk on 12/19/2025. (JTM) (Entered: 12/19/2025)** |
| 12/19/2025 | 105 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (JTM) (Entered: 12/19/2025) |
| 01/06/2026 | 106 | NOTICE of change of address by Christen Ann Petruzzelli (Petruzzelli, Christen) (Entered: 01/06/2026) |
| 01/06/2026 | 107 | MOTION for Extension of Time to File Motion for Entitlement to Costs by Mikayla Preston. (Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 01/06/2026) |
| 01/16/2026 | 108 | NOTICE OF APPEAL as to 103 Order on Motion for Partial Summary Judgment Order on Motion in Limine, Order on Motion for Summary Judgment, 104 Judgment by William Lee Lawshe. Filing fee $605, receipt number AFLMDC-24340578. ***Case Stayed. (Roberts, Michael) (Entered: 01/16/2026) |
| 01/16/2026 | 109 | TRANSMITTAL of initial appeal package to the U.S. Court of Appeals - 11th Circuit re 108 Notice of Appeal,. Filing fee paid. (JDR) (Entered: 01/16/2026) |
| 01/20/2026 | 110 | RESPONSE in Opposition re 107 MOTION for Extension of Time to File Motion for Entitlement to Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 01/20/2026) |
| 01/20/2026 | | ***11th Circuit Case Number: 26-10155-D for 108 Notice of Appeal, filed by William Lee Lawshe. (SJW) (Entered: 01/22/2026) |
| 01/30/2026 | 111 | **ENDORSED ORDER granting 107 Defendant Mikayla Preston's Motion for Extension of Time. The Court has considered Plaintiff's arguments but finds that good cause exists for the requested extension. Defendant shall file the subject Motion on or before February 5, 2026. Signed by Magistrate Judge Monte C. Richardson on 1/30/2026. (SBL) (Entered: 01/30/2026)** |
| 01/30/2026 | 112 | TRANSCRIPT information form filed by William Lee Lawshe re 108 Notice of Appeal USCA number: 26-10155-D. No transcript(s) requested. (Roberts, Michael) (Entered: 01/30/2026) |
| 02/05/2026 | 113 | MOTION for Taxation of Costs by Mikayla Preston. (Attachments: # 1 Affidavit of Matthew Carson, # 2 Exhibit Bill of Costs)(Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/05/2026) |
| 02/06/2026 | 114 | NOTICE by Mikayla Preston re 113 MOTION for Taxation of Costs *of Filing Supplement Pursuant to M.D. Fla. Loc. R. 3.01(g).* (Petruzzelli, Christen) (Entered: 02/06/2026) |
| 02/19/2026 | 115 | MEMORANDUM in opposition re 113 Motion for Taxation of Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 02/19/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/04/2026 09:26:31 | | | |
| **PACER Login:** | mroberts00779741 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:24-cv-00044-JAR-MCR |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

67-5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.   3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE,
an individual,

        Plaintiff,

vs.

MIKAYLA PRESTON, in her individual
capacity as a Detective for St. Johns
County Sheriff's Office; and KATHLEEN
DULLY, in her individual capacity as
medical director of the UF Child
Protection Team,

        Defendants.

_____/

VIDEOTAPED DEPOSITION OF FALLON MCNULTY

Taken on Behalf of the Plaintiff

DATE TAKEN:         June 12, 2025
TIME:           10:06 AM - 1:18 PM
PLACE:          Via Videoconference

Examination of the witness taken before:
Jodi J. Benjamin, Court Reporter
and Notary Public, State of Florida at Large.

Huseby Litigation
14 Suntree Place
Suite 101
Viera/Melbourne, FL  32940

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 2

APPEARANCES
(all appearances via videoconference)

APPEARANCE ON BEHALF OF THE PLAINTIFF

MICHAEL K. ROBERTS, ESQUIRE
Law Offices of Nooney, Roberts, Hewett & Nowicki
1680 Emerson Street
Jacksonville, FL 32207

APPEARANCE ON BEHALF OF FALLON MCNULTY

LOGAN M. RUTHERFORD, ESQUIRE
Bryan Cave Leighton Paisner, LLP
One Kansas City Place
1200 Main Street
Suite 3800
Kansas City, MO 64105

APPEARANCE ON BEHALF OF MIKAYLA PRESTON

MATTHEW J. CARSON, ESQUIRE
Sniffen & Spellman P.A.
123 North Monroe Street
Tallahassee, FL 32301

APPEARANCE ON BEHALF OF KATHLEEN DULLY

JAMI M. KIMBRELL
Howell, Buchan & Strong
2898 Mahan Drive
Suite 6
Tallahassee, FL 32308

ALSO PRESENT
MIKE STINGO, VIDEOGRAPHER
YIOTA SOURAS, ESQUIRE - IN-HOUSE COUNSEL FOR NCMEC
ALEXANDRA GROSSO
AUTUMN ZEPF

Page 3

INDEX OF PROCEEDINGS
DEPOSITION OF FALLON MCNULTY

|  | PAGE NO. |
|---|---|
| Direct Examination by Mr. Roberts | 5 |
| Cross Examination by Mr. Carson | 101 |
| Certificate of Oath | 117 |
| Certificate of Reporter | 118 |
| Errata | 119 |

INDEX OF EXHIBITS
PLAINTIFF'S EXHIBITS

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| A | CyberTipline Report 153739160 | (post-marked) |
| B | CyberTipline Report 137877849 | (post-marked) |
| C | Stanford Publication | (post-marked) |
| D | Agreement | (post-marked) |
| E | Audit Letter | (post-marked) |
| F | Synchronoss Document | (post-marked) |
| G | Motion | (post-marked) |

DEFENDANT'S EXHIBITS

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| *************** NONE *************** | | |

Page 4

(Whereupon, the following proceedings were had:)

VIDEOGRAPHER STINGO: We are on the record in the video deposition of Fallon McNulty, as corporate representative of National Center for Missing and Endangered Children, taken in the matter of William Lee Lawshe vs. Mikayla Preston and Kathleen Dully.

Today is June 12th, 2025, and the time is ten oh six a.m.

The court reporter is Jodi Benjamin, and the videographer is Michael Stingo. We are here with Huseby Global Litigation.

Will counsel please introduce themselves; after which, the court reporter will swear in the witness.

MR. ROBERTS: Michael Roberts for the plaintiff.

MR. RUTHERFORD: Logan Rutherford, I'm here on behalf of the witness.

MR. CARSON: Matt Carson with Sniffen and Spellman representing Detective Mikayla Preston.

MS. KIMBRELL: Jami Kimbrell with Howell, Buchan and Strong, representing defendant Dr. Dully.

Page 5

WHEREUPON:

FALLON MCNULTY,
a witness herein, having been duly sworn, testified upon her oath as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q   Good morning. My name is Michael Roberts, I didn't get a chance to introduce myself before we started.

But can you introduce yourself for the record?

A   Good morning. My name is Fallon McNulty.

Q   And, Ms. McNulty, I understand you've been designated as a corporate representative for the National Center for Missing and Exploited Children?

A   Yes, that is correct.

Q   All right. Can you tell me what your, what your, your job is at -- and for the court reporter's benefit, we will, we will be using some acronyms today.

But is, is the National Center for Missing and Exploited Children, is that sometimes referred to as NCMEC?

A   It is.

MR. ROBERTS: Okay. And so, Madame Court Reporter, when we say NCMEC, that's an acronym,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 6

N-C-M-E-C, and that's probably the way that I will refer to it, just for the record so you have that.

BY MR. ROBERTS:

Q   Okay.  So back to my question, Ms. McNulty. What is your, what's your current position with, with NCMEC?

A   I am the executive director of our CyberTipline.

Q   And how long have you been doing that?

A   In this current role, I was just recently promoted in April of this year.

Q   All right.  And what did you do before, before that?

A   Prior to this role I was the director of the CyberTipline.

Q   All right.  How long have you been involved with the work for NCMEC, specifically involving the, the CyberTipline?

A   I've been employed at the CyberTipline since 2016, so nearly a decade.

Q   And have you been, has your deposition ever been taken regarding your work for NCMEC?

A   I have not been deposed previously.

Q   Okay.  And so can you give me an idea of what your current role entails, in terms of like what's your

Page 7

job, what are your job duties?

A   As the executive director of the CyberTipline, I help to oversee the day-to-day operations of the CyberTipline.  So specifically how we receive reports, especially from electronic service providers, how we process those reports, and how we make them available to law enforcement.

Q   All right.  So I had sent a subpoena for a deposition today.

Did you have an opportunity to review that?

A   I did.

Q   And there, there is a, a schedule that's attached to that, that subpoena as Exhibit A, where we ask for certain documents to be produced.

Did you review that?

A   I did see a copy with the, the list of documents that were requested.

Q   Okay.  And, and I did receive documents that were responsive to, you know, to those requests.

My question is were you part of the effort to, to gather that, those documents?

A   I was.

Q   And have you reviewed the documents that were, that were produced?

A   Yes, I have had a chance to review them.

Page 8

Q   Okay.  So we're here today, I represent a man named William Lawshe, William Lee Lawshe, regarding some charges against him.  And there were NCMEC reports involved in, in that case.

Have you had an opportunity to review the original NCMEC reports that were sent to the Gainesville Police Department in this case?

A   I have had the opportunity to review the two CyberTipline reports, yes.

Q   All right.  Okay.  So one of the documents that we requested, or information that we requested, was historical information about the evaluation of the specific content that was included in the CyberTip reports.

Do you recall that, those requests?

A   Yes, I do.

MR. ROBERTS:  All right.  And so let me just, if we, if we can, what I'll do is just so we -- I'm going to share my screen, Madame Court Reporter, with what we will mark as exhibit, Plaintiff's Exhibit A.

BY MR. ROBERTS:

Q   I want to share the, can you see the shared screen there, Ms. McNulty?

A   I can.

Page 9

Q   All right.  And does this appear to be the CyberTip report that you reviewed?

And for the record it's 153739160.

A   From this first page, yes, it does.

Q   From the executive summary?

A   Yes.

Q   Okay.  I want to scroll down --

MS. KIMBRELL:  Hey, Michael.

MR. ROBERTS:  Yeah.

MS. KIMBRELL:  This is Jami Kimbrell.

While you're doing that, I know you had indicated yesterday you were going to send a link to the documents that you had received.

Did that get sent, if it did --

MR. ROBERTS:  I did.  I did send it, you know. I might have just sent it to John.

MS. KIMBRELL:  Okay.  Can you have Autumn send it to me now if that would, if that would --

MR. ROBERTS:  Sure.  Autumn, can you send that to her?

Yeah, she's doing it now.

MS. KIMBRELL:  Thank you.

MR. ROBERTS:  Sorry about that, Jami.

MS. KIMBRELL:  That's okay.

MR. ROBERTS:  I had been emailing with John

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 10

about the case, I'm sorry.

MS. KIMBRELL: Yeah.

BY MR. ROBERTS:

Q    Okay. So we asked you specific questions about hash values that were involved in this case. And it's hard to read, but did you attempt to locate this hash -- and I'll represent to you it begins with a B06.

Did you attempt to locate that hash in the NCMEC CSAM hash list?

A    We did.

Q    And were you able to find that hash in the NCMEC hash list?

A    Are you referring to the CSAM hash list that NCMEC makes available within industry members or within our just general CyberTipline database?

Q    Well, let me ask you this.

Were you able to find that hash in any list?

A    So that MD5 hash value is present within the CyberTipline, based on this report in question that was received by the CyberTipline. That MD5 hash value was not located in any hash-sharing list that is made available with parties outside of NCMEC.

Q    Okay. So can you -- okay. I want to, I want to back up here.

So where is that hash value located, where were you

Page 11

able to locate it?

A    This exact MD5 hash value is located within this particular CyberTipline report itself. That is the only instance in which we've seen this exact MD5 hash value.

Q    All right. So let's go back a second just for the record.

What is an MD5 hash value?

A    A hash value is a digital fingerprint essentially of a file, so any file could have one. In this instance, the MD5 hash value represents the uploaded image that was included within this report. An MD5 hash value is something that is going to be exact to a file. So it only is repetitive of that exact file or image.

Q    And so when you received this report from Synchronoss in this case, does NCMEC run the specific MD5 hash value against a hash list?

A    So we do, with any incoming report, any files that are received by the CyberTipline, we look to see if the file has ever been submitted previously by an industry member. We do that both with the exact MD5 hash value, as well as something called a PhotoDNA signature, which is another type of hashing algorithm. And that is to look for any visually similar, near

Page 12

identical versions of an image or a video that's been received by the CyberTipline.

Q    Okay. So what do you run that, what database or list do you run that, either the MD5 value or a PhotoDNA, do they call it a fingerprint?

A    Or a PhotoDNA signature.

Q    Or a, okay, yeah, or a signature.

What database or list do you run that against?

A    We run that internally against our own CyberTipline database.

Q    Internally -- say that again.

A    Against our own CyberTipline information.

Q    So what do you refer to that as, is that the NCMEC CSAM hash list?

A    It is not. So when I'm referring to the CyberTipline database, that is going to be any images or videos or other files that have been previously reported to the CyberTipline by an electronic service provider. So think of that as all of the files that have been previously reported to the CyberTipline. The NGO CSAM hash-sharing list that NCMEC creates is a much smaller list of hashes.

Q    Have you run this MD5 through the NCMEC NGO hash list?

A    We have compared that, yes.

Page 13

Q    And did you find the hash in that list?

A    We did not.

Q    So I understand that -- let's, let's just go back and take a step.

So what is the NCMEC NGO hash list?

A    The NCMEC NGO hash list is a hash-sharing platform that NCMEC hosts and makes available to participating industry members. NCMEC contributes hashes to that list of files that have undergone a multi-human review process and that NCMEC has classified as depicting apparent child sexual abuse material.

That list also contains hashes from, from other participating NGOs as well.

Q    Do you know the names of the other -- and by NGO, are you referring to non-governmental organizations?

A    Yes, I am.

Q    And who are the other NGOs that participate in NCMEC's NGO hash-sharing list?

A    Those include the Internet Watch Foundation, and the Canadian Center for Child Protection.

VIDEOGRAPHER STINCO: Excuse me, Counsel, it's your videographer.

Just a heads-up, for video purposes you might want to make the exhibits a little bit larger so

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 14

they're legible on, on the video.

Thank you.

MR. ROBERTS:  Thank you.

Thank you for that suggestion, is that better?

THE WITNESS:  (Unintelligible.)

VIDEOGRAPHER STINGO:  Yes, sir.

BY MR. ROBERTS:

Q    Okay.  All right.  So it seems that in regards to the MD hash, MD5 hash value that begins with B06, NCMEC, as we sit here today, has run that against its internal list of hashes that have been ever reported by an electronic service provider; is that correct?

A    Yes.

Q    And you've run it against the NCMEC NGO hash-sharing list that NCMEC contributes to, along with the International Watch Foundation and the Canadian CyberTipline?

A    Yes.

Q    And this specific hash that begins with B06 was not found in the, in the NCMEC NGO hash list?

A    That's correct.

Q    All right.  Was it found in the internal NCMEC hash list of all reported hash values?

A    This exact MD5 hash value was not.  But we also ran a comparison to see if any images with

Page 15

different hash values were through, again, that technology and PhotoDNA, and we have seen this image reported to the CyberTipline previously.

Q    Prior to January 25th, 2023?

A    Yes, that is correct.

Q    All right.  Is there any document that you could refer to, or NCMEC has possession of, that would tell me on what occasions, you know, previous to January 25, 2023, that this image had been reported?

A    There's not currently a document that has that information.

Q    Can you give me any sort of idea how many times prior to January 25, 2023, this particular image had been reported to NCMEC?

A    It had been seen in just over two hundred CyberTipline reports.

Q    And let me ask you another question.  Did you, did you do the PhotoDNA comparison?

A    Yes.

Q    With the, with the external list?

A    We did.  With the hash-sharing list?

Q    Right.

A    Yes, that is correct.

Q    With the hash -- and that did not return any, any results?

Page 16

A    No, this image as filed has not been represented on NCMEC's hash-sharing contributions.

Q    Or IWF or, or the Canadian CyberTipline?

A    So we're only able to query NCMEC's entries to the, to the external hash-sharing list that's shared with industry members.  We don't have visibility necessarily into the entries that other NGO participants make to the list.

Q    Okay.  But you did run the MD5 hash against the NCMEC NGO --

A    Yes.

Q    -- hash list?

A    We did run it against NCMEC's entries to the list.

Q    Okay.  But it's just NCMEC's entries, it's just NCMEC's contributions to the list?

A    Yes, that's correct.

Q    So you don't, is it, do you have any way of knowing whether or not this hash appears on IWF or the Canadian CyberTipline?

A    No, we would not be able to speak to the entries made by other participating NGOs.

Q    Okay.  And so prior to January 25th, 2023, NCMEC had been, or a CyberTip had contained this, this content, did I understand that correctly, a little more

Page 17

than two hundred times?

A    Yes, that is correct.

Q    Okay.  Can you, could you tell from your review of the records about whether or not the image had been viewed prior to January 25th, 2023, by NCMEC staff?

A    Yes, it had.

Q    And are there any records that reflect those reviews?

A    The prior CyberTipline reports would contain that information.

Q    Okay.  And so are you able to answer the question that I asked you, had this hash value beginning with B06, had that ever been included in a NCMEC CSAM hash list?

A    The MD5 hash value starting with B06 had not ever been included and it had never been seen by the CyberTipline before, nor had it been included in a hash-sharing list.

Q    But the content which this MD5 hash represents had been viewed by NCMEC previously?

A    Yes.

Q    All right.  Do you know how many, or approximately how many images, individual images are contained within the NCMEC CSAM list that it shares with the, with external electronic service providers?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 18

A    We have contributed more than ten million entries to the NCMEC entries to the NGO CSAM sharing list.

Q    Are those individual, individual images or are those MD5 hash values?

A    Those are going to be hash values.  So they are not necessarily unique, there is duplication within the list.

Q    Okay.  I thought I saw, and we're actually going to talk about it a little bit later, that NCMEC had employed a company named Concentrix to do an audit of its list.

Do, do you recall all that?

A    Yes, I do.

Q    That indicated that it was something around, over, between five hundred and six hundred thousand individual images.

Would that be -- or images or, you know, content files I guess I should say.

Is that, does that represent the complete content that NCMEC has contributed to the NGO hash-sharing list?

A    Yes, that was representative of the de-duplicated set of images and videos that are represented on NCMEC CSAM hash-sharing list.

Q    And so, and I can imagine like in a video or

Page 19

something, one particular file may generate multiple MD5 hash values; is that right?

A    Yes.

Q    Okay.  Do you have a sense of, you know, when we talk about the NCMEC NGO hash list that is shared with participating electronic service providers, do you have a sense of how many images or separate content files are contained within that list?

A    It's going to be close to that six hundred thousand number from the Concentrix audit.

Q    Well, and I'm sorry, probably a bad question.

I'm referring also to like the International Watch Foundation and the Canadian center, do you have a sense of like the combined amount of content?

A    So, not the de-duplicated content because NCMEC doesn't have necessarily that visibility into the images or videos that are being represented on the contributions made by the other NGOs.  But it is millions and millions of hashes that are being shared by those entities.

Q    So just so I understand, so in this case we're talking about Synchronoss or Verizon as an electronic service provider.

They have, if they choose to, they can have access to the, the full list of NCMEC NGO hash-sharing list,

Page 20

which would include NCMEC, IWF, and Canadian CyberTipline hash values?

A    Yes, that's correct.

Q    But NCMEC doesn't have that same access?

A    We do not access the, the entries from the other participants.

Q    Why is that, I'm just curious?

A    Really because we couldn't necessarily have access to the files in which those other entities are creating their, their hash lists from.  And also just with different data sharing agreements.

Q    Okay.  And I understand that there's a, that NCMEC, NCMEC takes seriously the inclusion of content into its CSAM hash-sharing list.

Is that, did I understand that correctly?

A    Yes.

Q    And you, you, I have seen it described a triple-vetting process.

Did I, did I read that somewhere?

A    Yes, that is correct.

Q    Can you, can you describe what, what that means?

A    Certainly.  So as files are being reviewed that have come into the CyberTipline, we have a separate process for the categorization of those files, including

Page 21

the inclusion of identifying which files would be suitable to be represented on NCMEC's hash-sharing contributions.

That includes a three-part human review in which initially a first-pass reviewer is going to be assessing the content of what is depicted within that file, and applying a content categorization.

It then goes to a second-review process, so a second individual is reviewing that content and seeing if they agree with that content categorization.

If at that point the content has gone through the two-part review process and both reviewers have agreed that it depicts apparent child sexual abuse material, it's going to go through a third-party review by another more senior member of our staff who is looking both to, one, ensure that they agree that the file should be classified as apparent CSAM, and also to review the file to see if it's suitable for hash-sharing.

Q    And so is, do, do you know whether or not at some point prior to January 25th, 2023, that the content which is the subject of the CyberTip report that we're looking at here in Exhibit A had gone through this triple-vetting process?

A    This file had been reviewed and had been previously categorized.  Because it is not represented

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 22

on our hash-sharing list, it would not have necessarily gone through the triple-vetting process, but it would have gone through the two-person process for the content categorization.

Q   And I, so I understand what you're saying, only, only, I guess, I guess it's, in theory, you could go through the three steps, and then the final step someone make the decision, the more senior, that it's not going to be included in the list; is that correct?

A   Yes, that's possible.

Q   All right.  So this content was previously categorized how?

A   This content was categorized and should be included within this report as well, if you look at Section C or Section D of the PDF, but was classified as unconfirmed child pornography.

Q   And what does that mean?

A   That unconfirmed designation -- yes, that's the designation there.  That indicates that when this file was being reviewed and categorized, it depicted either a sex act or lewd and/or lascivious exhibition, but that NCMEC was not able to confirm the age of the individual depicted.  So we're indicating that it could be CSAM, but it is unconfirmed.

Q   So tell me what, what is the standard for

Page 23

inclusion into the NCMEC hash-sharing list?

A   In order for a file to be included in the NCMEC hash-sharing list that is going to be shared externally, the file has to have been categorized as apparent child sexual abuse material by NCMEC.  That means that the file depicts either a sex act, or lewd and lascivious exhibition, and that it is clearly either a prepubescent child, or if it's a pubescent child, it's a child that NCMEC knows to have been identified by law enforcement as being an individual under the age of eighteen.

Q   So obviously prepubescent or has been identified by law enforcement as an individual under the age of eighteen?

A   Yes.

Q   Did I understand that correctly?

All right.  So I want to talk about the law enforcement confirmation.

How, how do you guys get that type of information in regards to content?

A   So NCMEC's Exploited Children Division has an additional program of work called Our Child Victim Identification Program, or CVIP.  Our Child Victim Identification Program receives information from law enforcement to indicate when a file has been identified

Page 24

as depicting an individual that is under the age of eighteen.  So NCMEC similarly holds that information as a national clearinghouse.

Q   And I, I think it's, it's true that NCMEC does not have a law enforcement or exploitation file regarding this content which is the subject of Exhibit A?

A   We do not to my knowledge.

Q   So the, the other potential reason for not inclusion is, is that it does not obviously predict -- it does not show an obviously prepubescent child.

Do I take it by that that -- well, first of all, let me ask you, the first-pass review and the second individual, do those individuals receive training regarding making these types of determinations that you, you've described?

A   They do.

Q   And who provides that training?

A   That's provided internally with our Exploited Children Division.

Q   Can you just describe what that training entails?

A   Certainly.  It is very on-the-job training.  But as an analyst is first working within the Exploited Children Division, they would be reviewing content that

Page 25

has been submitted either to our CyberTipline or to our Child Victim Identification Program.  And they would be sitting with a more senior team member, member of management, and being taught the content categorizations that we use for incoming files, which could be what the actual content itself depicts, so what do we classify as apparent CSAM, or versus unconfirmed child pornography, versus an unclothed child.  And can also entail different additional labeling that could be applied to files as well, so if a file depicts bondage or sadism, if a file depicts an infant.

Those individuals who are in training are going to be reviewing thousands of different types of files that are coming in.  And then they are going to be categorizing those files.  As they are categorizing those files in training, again, their trainer, a member of management, is going to be reviewing those classifications and providing feedback to them until they are, are certified within our team for content classification.

Q   And it sounds like the, the third review here is the most senior of reviewers before content is placed on a NCMEC CSAM external hash-sharing list?

A   Yes, that's correct.

Q   Is there any way to identify, you know, the

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 26

individual or probably individuals who categorized this content that is the subject of Exhibit A?

A    That information is not typically stored within our CyberTipline system. It could be possible looking back at different records, but I don't have that information today.

Q    So is, is there only one for this CP unconfirmed, you've given me a definition, is that the only definition of the unconfirmed categorization?

A    Yes, that, it depicts what could be CSAM, but our team is indicating the designation as unconfirmed, again, because they are unsure of the age of the individual who is being depicted.

Q    So, and now let me just, just hone in on that a second. It seems like a two-part, a two-part definition.

One is, is that the image depicts a sex act or something that could be characterized as pornography.

Is, is that a fair statement?

A    Correct.

Q    And then the second is a question of the age of the individual that's depicted in the sex act or pornography?

A    Yes.

Q    Would you agree though that the age of the

Page 27

individual depicted is the determining factor about whether or not something is child pornography or adult pornography?

A    That is a critical factor, yes.

Q    I saw some case out of Florida, it's Williamson, have you ever, are you familiar with that, that case in the, in Florida where it was a NCMEC employee that testified about the definition of unconfirmed?

A    I have heard of this case, yes.

Q    Yeah, and I just, I just want, and I don't want to belabor the point, but the determining factor of whether you guys confirm or do not confirm whether something is child pornography is in, in the context of like the age of, or the apparent, or your, your perception of the age of the individual?

MR. RUTHERFORD:  I'm going to object and just ask that that question be reasked. I think it was a little bit confusing the way --

MR. ROBERTS:  Probably, probably, probably.

MR. RUTHERFORD:  Thank you.

MR. ROBERTS:  Probably.

BY MR. ROBERTS:

Q    I don't know that I need to re-ask it. I think you, I think you have, I think you've made it

Page 28

clear that unconfirmed means that we have a sex act or pornography, but we are unsure of the age of the individual depicted in that content.

Is that a fair representation of what unconfirmed means?

A    Yes, unconfirmed would indicate we believe it could be child sexual abuse material, but ultimately we do not have that determination of age.

Q    I've heard the term age-difficult, is that a term that you guys use at all?

A    That is a term that is sometimes used, yes.

Q    I've heard it used in law enforcement as describing someone who simply, by looking at them, you cannot determine whether they are under the age of eighteen or over the age of eighteen.

Is that the way you use that term?

A    Yes, we use it similarly.

Q    Okay. Is that, is that, when getting down to, you know, when you talk about it's we cannot determine the age of the individual depicted, is another way to say that, that the individual is age-difficult?

A    It could be, yes.

Q    Okay. I asked about who, do you know when this image was, the image that is the subject of Exhibit A, categorized as unconfirmed CSAM?

Page 29

A    I don't know that information off the top of my head of when the categorization was applied. I can tell you that we have been seeing this file since about 2010.

Q    All right. Other than subjective -- the first pass, the second review, and the third review, are those, and I'm not trying to minimize what they're doing, but are those subjective opinions of NCMEC's staff regarding the age or content that is depicted?

A    Not necessarily. So, again, NCMEC does house information about children who have been identified by law enforcement, that certainly could pay a factor into imagery that's being represented on NCMEC's NGO CSAM hash-sharing list, as well as our content categorization.

Q    Does NCMEC ever engage in investigating whether or not content is, depicts, depicts a minor or, or not?

And let me give you an example of what I'm talking about. In this case, you know, an image was depicted on a website and, you know, an investigator contacted the website, hey, can we have the age verification information.

Does NCMEC ever do anything like that in terms of investigating content?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 30

A    NCMEC does not investigate any content or any information reported to the CyberTipline.

Q    In the, back up a little bit to the NGO, the NCMEC NGO hash-sharing list.

Do participating electronic service providers, do they have the ability to choose the, the specific hash list that they match against or they utilize?

A    They do.

Q    So let's just use Synchronoss because, you know, they're involved in this case.

They get access to the NGO hash-sharing list, they can choose to only utilize NCMEC's list?

A    Yes.

Q    All right.

A    Participating industry members are able to both query based on the entering member of a hash, and they are also, regardless of what hashes they are ingesting, able to see which entity contributed that hash to the hash-sharing list.

Q    And that was true back in let's say the calendar year 2022, 2023?

A    Yes.

Q    Is it an opt-in system?

So, so that I, if I, if I sign up for the NCMEC NGO hash list, I opt in to receiving NCMEC list, IWF list,

Page 31

or Canadian CyberTip list, or am I automatically enrolled in all?

A    It's really up to the industry member. They are accessing the hash list through an API, and then they are able to query the list based on the parameters that they are setting up. And they are able to then ingest those hashes that are returned based on the query parameters that they've utilized.

Q    I can go ahead and tell you that I'm not going to go through the API technical documents that you guys sent to me because I'm just not able to do that.

But in layman's terms, what is, what is an API?

A    It's a web service. So essentially it's, it sets up the ability for the company to access the data that NCMEC is holding and to pull that information down. NCMEC does not push any of the information out.

Q    So you say a query, is there an affirmative step that a service provider has to take in order to request a hash scan with, let's say NCMEC list, IWF list, or Canadian CyberTip list, is that, is that an affirmative input that has to be made when setting up the API?

A    So certainly the company has to search the hashes and then pull those down. In terms of anything that happens from there, that is, is totally on the

Page 32

company. So we don't do any comparisons, and we don't push any information. We simply make the hashes available for the companies to access and ingest.

Q    You make NCMEC's CSAM list available through the NGO platform; is that correct?

A    Yes.

Q    But, and, and I think NCMEC sets up the platform to which other NGOs can contribute; is that also correct?

A    Yes.

Q    But you're not, you're not making any representations or pushing any IWF content or the Canadian CyberTipline, you're not, you have nothing to do with what they are putting in, or how service providers interact with that?

A    Yes, that's correct.

Q    I saw something in some materials about some feedback that NCMEC can provide to service providers in terms of like a vote up or a vote down.

Does that sound familiar to you?

A    Yes, that is a feature within the hash-sharing list.

Q    Now is that, was that available in 2023?

A    I would need to refer to, I believe there's actually an email thread that references when that was

Page 33

first released. Off the top of my head, I can't recall if it was in 2023 or 2024.

Q    If you can, briefly describe to me what that is, that thumbs-up, thumbs-down kind of thing?

A    So the upvote/downvote feature is a feature that allows any participants of the hash-sharing list to essentially upvote an entry or downvote an entry based on their feedback regarding the particular hash entry.

Q    And can you be a little bit more specific in what you mean about the, the substance or content of the entry?

A    So the upvote and downvote would be utilized so that essentially other industry members could endorse hashes that had been shared, or they could downvote a hash to indicate that they have previously ingested the hash and for whatever reason didn't feel that it was one that other industry members should use, or perhaps they had some type of issue with it.

Q    Okay. Is it something that like if something is unconfirmed, would you give that a downvote, or a no vote, or an upvote, how would that work?

A    So NCMEC doesn't add any hashes to the NGO CSAM list that would have an unconfirmed designation. We also do not participate in the, the upvote/downvote.

And perhaps just to elaborate a little bit more on

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 34

that feature. Aside from the NGO CSAM sharing list, NCMEC has multiple other lists that we host as well, some of which we do not participate in, but we host the platform. And so this is a request that was made by industry participants to be able to provide feedback to one another about some of their different hashes that they might be sharing amongst one another.

Q    Is there any mechanism, you know, where -- and I'll, and I'll ask this as a hypothetical because I don't want anybody to have to, you know, accept something as true.

But, you know, hypothetically if, if it was proved that the model depicted in the content represented in Exhibit A was an adult at the time of the image, is there any mechanism to communicate with whoever has got this hash value on their list so that, that they can remove it from their list?

A    There is a, a mechanism both for providing the feedback as well as to retract hashes.

Q    But how in this case, right, so do you know the source of this hash?

A    This hash has never been contributed to a hash-sharing list by NCMEC.

Q    So you don't know what -- let me ask you this. Can you tell from this, this CyberTip report that

Page 35

Synchronoss discovered this image by a hash match?

A    I don't believe that there's anything within the report to indicate how Synchronoss became aware of the file.

Q    Okay. Let me just ask it different.

So you, you, as we sit here today, you don't know if Synchronoss used MD5 hash scanning technology to, to discover or pick out this image out of all the other images?

A    No, I, I don't know how Synchronoss became aware of this content.

Q    And if it was -- you don't know if this hash was contained in any hash list, whether that was an NGO hash list or some other hash list?

A    No, I wouldn't be able to speak to that.

Q    So in this particular case, would there be any way, you know, at the conclusion of the case if I said, hey, look, you know, here's the evidence that this model was an adult, there would be no way for you to sort of retrace the steps and figure out where the hash came from in order to correct it?

A    We would only have the visibility into NCMEC's entries and contributions.

Q    Correct. Okay. Not correct, but I understand, I'm sorry.

Page 36

Is there overlapping between the content or the hash values in the NCMEC list and the other NGO hash list within the NGO platform, the hash-sharing platform?

A    Again, I wouldn't necessarily be able to speak to that because we are not reviewing the entries that are added by the other NGOs.

Q    But in theory, and I know, in theory, just thinking through this, if, if a hash and content, the corresponding content was on an IWF hash list shared in the NGO platform, and that came through a CyberTip report to NCMEC, NCMEC would evaluate that, and if they felt it met the three-step, you know, verification process, that hash value and content would be placed on the NCMEC CSAM list; correct?

A    Yes, that's scenario is possible.

Q    So to that extent, I mean, in theory at least, there is an overlap of content between NCMEC CSAM list that they share with the NGO platform, and IWF or the Canadian CyberTipline's list that they share with the NGO platform?

A    There could be.

Q    So I'm going to stop sharing right now and I, I just want to, this is to just confirm a little bit about what we're talking about.

We're going to mark as -- well, before I do that, I

Page 37

apologize. I'm going to mark as Exhibit B, and I'll share this, we won't go through the same level of detail here.

Do you see this CyberTipline report?

A    Yes, I do.

Q    And this is Report 137877848.

Did I read that correctly?

A    Yes.

Q    Did you do the same research regarding the content and hash that is the subject of Exhibit B as you did with Exhibit A?

A    Yes, we did.

Q    All right. Had that content, was that content included in the NCMEC CSAM hash list that they share externally?

A    No, it was not.

Q    Had this hash or the PhotoDNA signature, this content, been reported to NCMEC prior to October of 2022?

A    The exact MD5 hash value had not been seen before, but there were previous versions of this file seen in the CyberTipline based on photo, PhotoDNA hash matching.

Q    Same question, about how many times prior to this had this content been the subject of another NCMEC

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 38

report?

A    This file had been seen in more than one hundred CyberTipline reports.

VIDEOGRAPHER STINGO:  Counsel, you might want to blow it up a little bit.

MR. ROBERTS:  Thank you again.

BY MR. ROBERTS:

Q    This is again, had this previously been categorized as unconfirmed?

A    Yes, it had previously.

Q    And same question, because of that prior review of this content, and the characterization of it as unconfirmed, it was not placed on the NCMEC hash-sharing list which is the external list?

A    Correct.  It was not.

Q    I, I have seen, there was a recent article, I've seen -- it must be a little bit odd having your deposition taken and knowing I've done a little bit of research on you.  I've seen you give a video presentation at a, a conference last summer talking about, you know, NCMEC and the process and all the good work that you do there.  I didn't know if you know there's a YouTube video of you online giving your, your presentation.

But do you keep up with industry literature

Page 39

regarding the detection, scanning, reporting of, of images of suspected CSAM?

MR. ROBERTS:  And before you answer that question, Madame Court Reporter, when I say CSAM, that is another acronym for child sexual abuse material.

BY MR. ROBERTS:

Q    Do you keep up with literature like that, Ms. McNulty?

A    To some extent.

Q    There is a, there's a group at Stanford University called Internet Observatory, the Cyber Policy Center at Stanford University.

Are you familiar with that --

A    Yes.

Q    -- that group?

They, they conducted it seems like a fairly comprehensive study that was published in April of 2024 where I think they interview NCMEC staff to, to compile that report.

Do you, are you familiar with that?

A    I am.

Q    Have you read that, that report?

A    I have.

Q    Okay.  And I know that you guys have done an

Page 40

audit using Concentrix of your -- and I, and I remember seeing in the video that I think you made the comment of something like, you know, I trust my people to do a good job, but like why should other people trust my people to do a good job.

Do you recall making a statement like that?

A    I, I do not.

Q    Okay.  I was going to say -- anyway, well, let me ask you this question.

Why did you guys do the audit of the NCMEC CSAM external hash-sharing list?

A    It's something that had not been done before, to our knowledge, by really any other entity either who shares hashes externally.  And we really wanted to highlight just how curated that list is.

And so we had engaged with Concentrix who ultimately ended up being the third party who performed the audit to see if they were in agreement of what is represented on NCMEC's hash-sharing list does indeed depict child sexual abuse material.  And the results of that audit was the ninety-nine point ninety-nine percent agreement.

Q    I'm actually, and a little bit later I've got it on my, I'm trying to stay with my, with my notes. I'm going to attach that as an exhibit so that we can

Page 41

talk a little bit about those results and your efforts to do that.

Why is it important -- or let me ask you this.

Is it important to have a curated list as you put it?

A    I mean, we certainly think it's important for individuals who are ingesting the list to be able to feel that they can remove that content from their platforms, so the child victims who are depicted in that imagery are not having their images and videos recirculated over and over and over again on the internet.

Q    I'm going to share what we'll mark as Exhibit C.  And I can represent to you this and you can see it, I'll blow it up before.  This is the Stanford Internet Observatory Cyber Policy Center report I think that we were referring to.

And I've highlighted a line here, it says one officer, and they're talking about law enforcement officer, told us that there are a lot, quote, of CyberTipline reports that are images of adults.

Do you recall reading this in this report?

A    It, it's been about a year since I've read the report, so not necessarily this particular quote; but in general this is familiar to me.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 42

Q    Have you, have you gotten that feedback from law enforcement or industry people that a lot of CyberTip reports are images of adults?

A    We receive very little feedback concerning CyberTipline reports. When we think about the tens of millions of reports that are made available to law enforcement each year, only a few hundred thousand reports ultimately come back to us with law enforcement feedback. But anecdotally we have heard feedback about the content that is sometimes included by electronic service providers within reports.

Q    And, and the feedback is that some of those electronic service providers are providing reports with adult images in it?

A    Could be regarding that, could be regarding imagery that is perhaps age-difficult, it could be regarding reports that are submitted by industry members that might just not have enough information for law enforcement to determine even what is occurring.

Q    And when you say it could be, you're describing the different types of feedback that you get, not, it's not hypothetical, you have gotten those types of feedback?

A    Yes, we, we do receive that anecdotal feedback.

Page 43

Q    And is that part of the motivating factor, in at least part, for auditing your, your list, and the three-step verification process that you guys go through?

A    In terms of the three-step verification process, we truly want our NGO CSAM contributions to be the best of the best. We deserve or we believe that these children and survivors deserve to not have their content being recirculated online, and for that revictimization to be happening over and over again.

The audit was seen as a way to also have a third party come in and similarly be able to say that the content depicted within that list are indeed CSAM.

Q    And I know you guys have a congressional mandate to be the, the clearinghouse for child sexual abuse material; correct?

A    We are authorized to, NCMEC is authorized to operate about sixteen different programs of work, including the CyberTipline.

Q    Is there any concern from NCMEC though regarding the rights of, privacy rights of individuals who may be falsely accused of possessing child pornography based on inaccurate or uncurated hash lists?

A    So NCMEC doesn't make any determination about the validity of information that's included within a

Page 44

report. Ultimately as a clearinghouse, we're serving two main functions.

One is we are constantly triaging the tens of thousands of reports that we're receiving each and every day to prioritize the risk to a child. So we are constantly looking to surface any reports where a child may be imminently in harm's way.

Secondly, we are looking to see and determine where that report resolves to based on the information that's contained within that report so it can be made available to the appropriate law enforcement agency for their independent review.

Q    You understand, or do you understand that if, if law enforcement is having to deal with images of adults, that that takes away from the time that they can focus on children?

A    It would really depend in what context. There are certainly reports that come into the CyberTipline which depict adults who are perhaps engaged in sexually abusing a child, adults who are engaged in online enticement or sextortion of a child. So we do receive information concerning adults.

Q    Have you ever gotten complaints from law enforcement, like something to the effect of, hey, you know, we're, we're drowning in the amount of CyberTip

Page 45

reports that we get, in the context of complaining about the accuracy of the reports?

A    We have heard feedback from law enforcement, I would say pretty universally that there is a very high volume of cases being referred related to online child sexual exploitation. The reports that NCMEC receives go out globally, so it would not just be here within the United States.

And certainly there are a lot of different laws, a lot of different things that law enforcement may find actionable in one area of the world that might not be true in another area of the world. So, essentially, as we're referring those reports out, we are allowing law enforcement to, to be performing that triage on their end, again, through that independent review as they receive a report.

Q    And I'm, I'm not, I'm not suggesting that there should be, but does NCMEC have any policies or procedures or practices that are designed to protect the privacy of the individuals who are described as suspects or targets in CyberTipline reports?

A    I'm not sure I understand that question.

Q    So CyberTipline reports, not always but, but generally can identify a, a suspect or a target who is in possession of alleged CSAM or child sexual abuse

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 46

material.

Do I understand that right?

A    Yes, the report could contain information about a user or an account --

Q    Right.

A    -- that's been reported.

Q    Right. My question is are there any policies or practices or procedures that are designed to protect the privacy of those individuals who are identified as possessing or, let's just say possessing child sexual abuse material?

A    Well, certainly CyberTipline reports can only be shared with law enforcement. So that information, as it's being received to the CyberTipline, whether it's a report that's being submitted by a member of the public or an electronic service provider, all of that is happening in a secure manner in our system.

And then the reports are made available to law enforcement via secure electronic connection. Law enforcement, who has direct connectivity with the CyberTipline, is then able to come into our system to retrieve those reports.

So there, there's no information sharing outside of that pipeline from the CyberTipline except to law enforcement.

Page 47

MR. ROBERTS: So we've been going about an hour, do people want to take a break or -- customarily, Ms. McNulty, we'll take a break every hour for comfort.

But I'm just, I just want to throw that out there, does anybody want to take five or anything like that?

MR. RUTHERFORD: I would, I would normally take a break right around now, but I guess I'm just, if you, if you have only thirty minutes left, then we wouldn't take one. But, but if you have --

MR. ROBERTS: I don't know how much longer, you know, I kind of make it up as I go along.

MR. RUTHERFORD: That's fine. Then let's, then let's take a break. That's fine.

MR. ROBERTS: Yeah, we'll take, take five-minute break, guys, okay.

MR. RUTHERFORD: Thank you.

MR. ROBERTS: All right. Thank you.

VIDEOGRAPHER STINGO: Off the record, eleven sixteen a.m.

(Whereupon, a break was had from 11:16 a.m. to 11:23 a.m.)

VIDEOGRAPHER STINGO: On the record, eleven twenty-three a.m.

Page 48

BY MR. ROBERTS:

Q    Okay. Thank you, Ms. McNulty, for the quick break there.

I just want to kind of follow up on some of the questions and we'll move on.

In regards to the source of a particular hash from the NGO hash list, does a service provider have ability to know the source of that hash?

A    They have the ability to see the entering member. So, for example, if a hash was contributed by NCMEC, they would be able to see that within the entry.

Q    Or in this case if, if hypothetically the hash was contained within the NGO list, it would have had someone, it would not have said NCMEC, it would have had IWF or the Canadian organization?

A    Yes, that's correct.

Q    Is there, and we'll talk about it briefly in a little bit, but I, I see email communications between Synchronoss and staff at NCMEC.

Does, is there the ability, is there an ability for a service provider to inquire about particular content's categorization or anything like that with NCMEC?

A    So certainly any member or any registrant who is accessing the hash list would be able to be in contact with our team at the CyberTipline for any

Page 49

questions that they had about a particular hash that NCMEC contributed, or about accessing the hash list itself.

Q    In, in this case, if, if, let's say there was, you know, I'm a service provider and I, I get an image and I don't know, you know, like it's, it's difficult, right, and I'm trying to figure out what to do.

In this circumstance, it's not on a NCMEC list but -- well, it is on the internal NCMEC list, could I as a service provider inquire about, you know, how has NCMEC categorized this image if it exists on that list?

A    That wouldn't be common, but certainly a company could reach out with, with questions.

Q    Sure.

A    Similarly, if a company had questions about any hash that they had ingested from the list that was added by a different member, so in this instance a different NGO, they could certainly reach out to NCMEC and we would be able to provide them with the appropriate contact information for that other entity that had added the hash.

Q    But essentially NCMEC is there to provide information if there's questions about content, if NCMEC has reviewed it and categorized it, it's certainly not something that you're prohibited from sharing with a,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 50

with a member?

A    Certainly if they have any questions about the hashes that we've added to the list.

Q    Or, and I, and specifically this question is content that you've reviewed and decided not to add to the list, you have a record of that content as well internally?

A    Not, not necessarily. I'm not sure I really understand the, the question.

Q    So you keep an internal, I thought I understood you keep an internal list of all of the content, whether it's MD5, I know MD5 is not content, but of the MD5 hashes or PhotoDNA that you receive in reports even though they are not included in the external NCMEC CSAM list; is that correct?

Did I understand that correctly?

A    Yes, any file that's been reported to the CyberTipline, we would have record of that file.

Q    And in that record, and do you search that list by either a PhotoDNA signature or the MD5 hash value?

A    Yes, we can.

Q    Okay. So if I was a member and I had a question about, you know, NCMEC's categorization of content, could you, could you access that list as well,

Page 51

not just the external list?

A    So if an, if I'm understanding your question correctly, if a, say an industry member had an MD5 hash value or some other hash value and they wanted to know if NCMEC had seen that reported to the CyberTipline before, we certainly could query the CyberTipline to see if it had. And, you know, of course we could share if we had previously categorized it, what NCMEC categorized it as. But ultimately it would really be up to that industry member to make any determination about what action they would be taking with that file.

Q    You don't give them any advice about what their reporting obligations are or what they should do, I would assume that you don't?

A    That's up to, to the industry member.

Q    Right. Right. NCMEC doesn't provide advice to them about what they should do?

A    Correct.

Q    Yeah, yeah, yeah, yeah, yeah.

Okay. So I just want to, we requested any and all agreements or memorandums of understanding, and I guess we're at Exhibit, is it D, I want to share what we'll mark as Exhibit D.

This is the, can you see the screen there?

A    Yes.

Page 52

Q    Okay. This was the only agreement that NCMEC produced in, in a request for both, you know, the agreements for Verizon and Synchronoss that were in effect at the time of these two reports.

Was this the only agreement that you were able to locate?

A    Yes, it is.

Q    And so Verizon does not have a current agreement with NCMEC.

Do I understand that correctly?

A    They do not.

Q    Have they ever to your knowledge?

A    Not to my knowledge.

Q    Now earlier you, you indicated and you did provide sample agreements of the other, I think there's three different hash lists that you got, or there's four in total but, there's four in total hash lists that you guys provide access to electronic service providers; is that correct?

A    Yes, it is.

Q    Can you just tell me what those four are?

A    Certainly. So this one which we're looking at right now is our non-profit CSAM hash-sharing list or our NGO CSAM list. That is the one that NCMEC contributes CSAM hashes to, as well as the other NGOs

Page 53

that we discussed.

Additionally, we host the NCMEC exploitative hash-sharing list. That contains entries contributed by NCMEC of sexually exploitative files that do not necessarily rise to the definition of child sexual abuse material, but depicts children either who are unclothed or in sexually exploitative, otherwise being explicit, we make that available to industry as well should they choose to remove that content from their platforms.

We also host a take-it-down hash-sharing list. That is a list that marries up with it, with our take-it-down service in which minors or survivors are able to submit hashes of images or videos depicting themselves from when they were under the age of eighteen. And then in turn we share those hashes with participating industry members. That list NCMEC does not have any visibility into those files necessarily because we are only receiving the hashes, not the images or the videos themselves.

And then finally we host an industry CSAM sharing list. And that is something where industry members are able to share hashes amongst one another; but, again, NCMEC does not contribute to, or review, or interact with that list in any way.

Q    So in response to the subpoena, or the

Page 54

schedule on the deposition subpoena, you guys produced one agreement with Synchronoss.

Do I take it that there were no other agreements regarding the other hash-sharing lists that NCMEC supports?

A   Yes, we do not have record of any other agreements with Synchronoss.

Q   Or Verizon?

A   Nor Verizon.

Q   And I think you were, this was kind of what you were just touching on, this is specifically the NGO hash-sharing list, this agreement; correct?

A   Yes.

Q   And under NCMEC responsibilities, it says NCMEC does not submit and is not responsible for information submitted to the non-profit database by participating non-profits.

Do I understand that correctly that what you're saying is NCMEC is responsible for the, the hash lists that it provides, but not for the stuff that other NGOs provide?

A   Yes.

Q   And in the agreement, the registrant, I guess in this case Synchronoss, they accept all information contained in the not, in the non-profit database,

Page 55

including but not limited to PhotoDNA signatures, hashes and categorizations as is without warranty of any kind, and assumes all risks and liability associated with using the information contained in the non-profit database.

Was this the agreement that was in force and effect in October of 2022 and January of 2023?

A   Yes, that paragraph would have been included in those years as well.

Q   And, and so NCMEC makes it clear at the time that registrants agree to use these lists, that the information is provided as is and that there are no warranties about the accuracy of the information contained in the NGO list?

A   Yes.

Q   I understand that NCMEC does what they believe are best efforts to ensure that their lists are accurate.

But do you have any visibility into the International Watch Foundation or Canadian CyberTip as to what their either definition or threshold for entry into their CyberTip hash lists are?

A   I'm not familiar with their internal practices.

Q   Okay.  And NCMEC makes no representations that

Page 56

the NGO list is triple-verified or accurate in any way other than the things that they have contributed.

Do I understand that correctly?

A   Yes, we don't make that assertion, observation anywhere within this agreement.

Q   I think I understood you say earlier that your, your audit with Concentrix -- and I'll, and I will attach, let me just attach it before I ask you.

I've attached what we'll mark as E, Plaintiff's Exhibit E.

Do you recognize this document?

A   I do.

Q   And what is this?

A   This is a letter from Concentrix to NCMEC with the results of Concentrix audit of NCMEC's hashes that are represented on our CSAM hash list.

Q   I think I heard you say, and I think it maybe is referenced in here, that to your knowledge this is the first industry, industry-wide, this is the first audit of a hash list?

A   I'm not aware of, of any others, or at least any others that have been spoken about publicly in this way.

Q   I think the, in the conclusion it was fifty-nine, they found fifty-nine exceptions out of five

Page 57

hundred and thirty-eight thousand and change.

And you guys removed those, it looks like as soon as practical, as soon as you were in a, notified of those, you removed those from the hash lists?

A   Yes.

Q   This audit did not cover the content in the NGO, the NGO hash-sharing list contributed by IWF or the Canadian organization?

A   No, this only concerned the NCMEC hashes.

Q   So going back to Exhibit A, I just want to kind of go through this document.  We've looked at the executive summary.

I want to talk about the incident time.  I've read in some of your training materials, warnings to law enforcement, that electronic service providers may be providing inaccurate incident times.

Does that sound familiar?

A   I wouldn't characterize it as inaccurate so much as that different industry members may utilize this field for different purposes.  We have an additional field which is incident date and time description in which the industry member can choose to clarify exactly what the incident time reflects.

But in this instance that information was not provided within this report.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 58

Q    So you don't really know what Synchronoss -- from, from this report, it's, you're unable to know what Synchronoss meant by the, the incident time?

A    Yes, we don't have that further clarification in this section of the report.

Q    Okay. And let me, let me just go back up because I think just, just for the record the, there's a time stamp on the report of 1/25/2023 at twenty-one eighteen twelve UTC.

Does, did I read that correctly?

A    Yes.

Q    And the incident time, is that the exact same time down to the second?

A    It looks to be, yes.

Q    How does NCMEC generate the received by NCMEC on, how do you generate that time?

A    Our system generates this time at the point in which the, the company submits the report to the CyberTipline.

Q    Are you confident that that is an accurate recording of the time that NCMEC received the report?

A    Yes, I am.

Q    So in this instance, would you agree with me that it appears that the incident time provided by Synchronoss is, is simply the time that they hit the

Page 59

button to send the report to Synchronoss -- I mean to NCMEC, I'm sorry?

A    Yes, it does appear to be reflective of the time they submitted the report to the CyberTipline.

Q    It doesn't appear to be reflective of the time of any conduct of the person that they've identified as either possessing, manufacturing, or distributing child pornography?

A    I wouldn't be able to speak to that based on the, the limited information that they included within this report.

Q    So the, under the uploaded file information, we have a file name, the MD5 number that we've spoken about. There's an indication that says, did reporting ESP view the entire contents of the uploaded file.

Do you see their answer?

A    Yes.

Q    What do you take that to mean?

A    That Synchronoss indicated that, yes, that the, that Synchronoss viewed the entire contents of the uploaded file included within this report.

Q    Does that include, does it have to be Synchronoss or could it be some other entity that they hire?

A    That information's not included within the

Page 60

report, and I'm not familiar with, with how Synchronoss operates or answers this question.

Q    Okay. It says were the, were entire contents of the uploaded file publicly available. It says no.

What does that mean to you?

A    To me that, I take that to mean that this file was not publicly available.

Q    And then there's an image categorization by the ESP A2.

What does A2 mean?

A    If you are to scroll down into Section B, we provide a definition.

So this is a industry categorization or classification that was created by industry and is used by industry. Synchronoss here indicated A2, which indicates that a, the file depicts a prepubescent minor engaged in lascivious exhibition.

Q    So NCMEC had previously viewed this content and made the determination that it did not depict someone who was obviously prepubescent; correct?

A    Correct. We indicated that the file was unconfirmed.

Q    This categorization of A2, that information is contained or potentially -- let me ask, start with it this way, potentially, is potentially included in the

Page 61

information on the NGO hash-sharing list.

Do I understand that correctly?

A    In this context, this information was provided by Synchronoss at the time of submitting the report.

Q    But my question is when you have a hash match in the NGO, if -- and this is hypothetically, right.

If you have a hash match in the NGO hash-sharing list, does that match, can it come with the categorization of the image as A1, A2, B1, B2?

A    There are a number of different categorizations that contributing members can include within the hashes that they are sharing, whether to the NGO list or other hash lists that NCMEC hosts.

Q    Let's just go back here to the, because I want to clarify this.

So this is our Exhibit, I think D, this is the, the contract with, or the agreement with Synchronoss.

And there's an Exhibit 1. And it says that participating non-profits are required to submit information to the non-profit database in the fields indicated below.

So when, do I understand when an NGO places a, a hash in their list that they're sharing externally, they are required to put their name, the PhotoDNA signature, the MD5 hash value, they have to identify that they're

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 62

using the industry-standard child pornography categorization, and they have to include their categorization of the image.

Do I understand that correctly?

A   That is how it's laid out here in this agreement which is a bit older and perhaps had some historical language. But there is not currently a requirement for that, that industry classification or categorization to be included with a hash-sharing entry.

Q   In 2018, when this agreement was signed, was that a requirement?

A   I don't recall that off, off --

Q   Okay.

A   -- the top of my head.

Q   In any event it -- let's just ask it this way.

It is possible that NGOs have included this categorization information in, within the NGO CSAM list?

A   Yes, it's possible.

Q   Especially historically possible, content maybe that's been in there for some time may more likely have that type of information?

A   It, it's really up to the, the entering member; but, yes, it's possible that, that they're utilizing the industry classification.

Q   Okay. Well, at the very least -- let me ask

Page 63

you this.

Is it still required that they, that they include their name with the submission of a hash to the list?

A   Yes, the, the member name is always going to be included, as well as then the, the fingerprints or hashes that they are including with the entry.

Q   And for every entry, do they include both the PhotoDNA and the MD5?

A   Not necessarily. So especially as time has gone on, we have seen different entities, different companies use a, a multitude of different hashing algorithms. So there are certainly entries within the list that don't necessarily have both an MD5 and a PhotoDNA signature. It could be some other type of hash fingerprint.

Q   One question that I had here, and this may be a little bit out of order.

But do you have some idea of the frequency in which NCMEC transmits reports of unconfirmed child pornography to law enforcement?

A   That would be on nearly a daily basis.

Q   So, and I know that NCMEC, CyberTip reports come from multiple sources; correct?

It's not all electronic service providers, they can come from other sources; right?

Page 64

A   Yes, we could receive reports from members of the public as well.

Q   Is it, I mean, can you venture a guess on like what the percentage is?

I would imagine it's, the vast majority is from the electronic service provider.

A   Yes, about ninety-nine percent of our reports come from industry.

Q   What I would like to do is your, is get your best estimate of the percentage of reports which result in unconfirmed, a report of unconfirmed child pornography.

A   I don't have a, a figure in mind for, for last year. It is a large portion of the reports that come into the CyberTipline. Especially as we have seen an increase in incidents concerning online enticement of children, of content that is being produced by victims and used themselves. We might not have that information at the onset of receiving a report to indicate or to know that that individual is under the age of eighteen.

Q   I mean, is it, can it, more or less than half of, of the reports that go to law enforcement are unconfirmed?

A   So actually a, a fairly small percentage of the reports that are being referred out by the

Page 65

CyberTipline are being reviewed and receiving that categorization. We have a fairly small team here, and we receive tens of millions of reports each and every year. So certainly the focus is reviewing content and information certainly where a child is at risk.

Q   Sure.

A   Content that's never been seen before, reports that are resolving here within the United States. But there are, is a multitude of reports that are being auto-referred, especially to international law enforcement, by our system where we wouldn't necessarily have that information to provide the breakdown of that content categorization.

Q   Is every service, is every report received by NCMEC from an electronic service provider at least run through the internal NCMEC system?

A   We do have a number of internalized alerts in which information is being checked across the CyberTipline application really to help us surface any incidents that are incoming in which a child may be at imminent risk. So that would include the system reviewing if that file had been seen before through that hash-matching technology. It could also include information about any kind of chat or text that's, that's included as well.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 66

Q   So, I mean, I guess back to my question, then we can back out of it.

Do you think that it's, it's more than half of the reports that are sent to law enforcement in the United States are child pornography unconfirmed?

A   I, again, and I don't have the, the exact numbers.

Q   Right.

A   I don't know that I would say more than half, because again unfortunately --

Q   Sure.

A   -- we see some of the same content depicted and recirculated over and over and over again of identified child victims, known survivors. And much of that content depicts the rape and sexual abuse of prepubescent children.

Q   But the consent that you're talking about would be confirmed. If you're talking about recirculation of, you know, things that are obviously, you know, prepubescent or recirculating of things, those would be confirmed reports of child pornography; wouldn't they?

A   Yes.

Q   So what I'm talking about is, so this image that's the subject of, you know, Exhibit A, has been

Page 67

recirculated over two hundred times. The, the content which is the subject of CyberTip from Exhibit B has been, you know, circulated over a hundred times. So just these two images are three hundred, you know, over three hundred CyberTip reports that are unconfirmed.

That's what I'm trying to get a sense of is how often are those types of reports getting pushed out to law enforcement in the United States?

MR. RUTHERFORD:  And, I'm sorry, I'm going to have to object. I, I really don't even know what the question was there.

MR. ROBERTS:  Yeah, I'll re-ask it.

BY MR. ROBERTS:

Q   So you receive reports like the one in Exhibit A everyday; correct?

Electronic service provider has got a hash match with some list and they're attaching an image and saying, hey, this is possession of child pornography.

You get that everyday; right?

A   We certainly receive reports everyday from electronic service providers that contain uploaded files.

Q   And those files, you have to I think by statute, you have to forward those CyberTip reports to the applicable law enforcement if you are able, if you

Page 68

have like, you know, enough information to identify the law enforcement, relevant law enforcement; correct?

A   We do make all CyberTipline reports available to law enforcement.

Q   Right. So what I'm trying to get at is how many of those, whether it's daily, monthly, yearly, are of uploaded files that have been reviewed by NCMEC and categorized as unconfirmed?

A   And that's where I don't have a number to provide off the top of my head.

Q   So you guys have a list, you maintain a list of all the content that has been reported on a CyberTip, through the CyberTipline; correct?

A   We maintain a record of every file that's been reported to the CyberTipline, yes.

Q   Can you query that database by the term unconfirmed?

A   Not in that manner; but, yes, we would be able to query our database to see how many files have been categorized as unconfirmed child pornography.

Q   And would that like print out some sort of like a log if you, if you, if you queried it and it would come up with like these are the, these are the, this is the content that we've categorized as unconfirmed?

Page 69

A   In theory, yes, we could try to do that.

Q   But if I asked you to do that, you could try to do that?

A   Yes.

Q   That's something you have the capability of doing.

Okay. So to go back to, I think it was Exhibit A.

What was, and so we talked about, do you recall the training material where you were, where we were talking about law enforcement, warning them about the incident time?

A   Are you referring to the, our PowerPoint presentation?

Q   Yeah, I think that's where I saw it.

Rather than like digging through it and pulling it up, can you tell me about that?

A   Yes, so as I stated earlier, so one of the things that we highlight here is that the incident time could represent different things to different industry members.

We also have a field available for incident time description in which a company can choose to clarify what this time reflects within their reports, but that was not included within this CyberTipline report.

Q   So Synchronoss had the ability to clarify what

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 70

they meant by an incident time in this case?

A   Yes.

Q   And they did not do that?

A   That information is not included.

Q   There's also just a general comment section where they can add context or commentary to a CyberTip report.

Do I understand that?

A   Yes.

Q   And did they do that in this case, in Exhibit A?

A   There is not any additional information that's included here. I believe I did see some texts that they had included above earlier in Section A. Yes, says company information.

Q   Okay. But not any context about the, the content that they're reporting?

A   Yeah, this is the extent of what they included within the report.

Q   So we already talked about this, the entire contents of the uploaded file publicly available, no. We talked about what you understood that to mean.

Is it, do sometimes people add like a website, like here's the website, here's the URL where this can be found?

Page 71

A   For the uploaded file information?

Q   Yes.

A   Yes, there is a field that's available where the company could choose to include additional information about where that file was first seen or other information about the reported incident.

Q   Where it was downloaded or uploaded from?

A   They could provide a URL.

Q   So when you guys are determining where to, because you get a report and then you disseminate it, correct, to law enforcement?

Do you guys ever report websites for publishing CSAM?

A   We do have a separate program within the CyberTipline. So any reports that we receive, whether from members of the public or electronic service providers, if those concern URLs that are reported to still be hosting CSAM, our team does access those URLs. And if we do find CSAM depicted on that platform, we send a notification to that service provider alerting them that CSAM is being hosted on the platform.

Q   So this particular image was, I can represent to you, published on a publicly dot com, you know, website for ten years, fifteen, ten years, at least ten years.

Page 72

If somebody would have reported that website in conjunction with one of these CyberTip reports, what action would NCMEC have taken?

A   It would depend on the, the context included within the report. If this report was submitted by Synchronoss and it also included the URL, because we have that location information from the phone number, we would still be referring this to law enforcement for their independent review.

Q   But would you have taken, how, what do you have, what has to happen for you to get it into that program where you, you would contact the website and say, hey, take this down or, you know, you got child pornography on your website?

A   So if we received a report that solely contained a URL, or perhaps contained some additional information indicating that possible CSAM was being hosted somewhere, and we didn't have any other information within that report in order to, to make it available to law enforcement, that is at the time the team would be accessing the URL and assessing what content was hosted there.

Q   And this is just perhaps an aside but, I mean, you've spoken today about, you know, the recirculation and victimization of children's images online. It seems

Page 73

that -- or let me ask another question.

Wouldn't you agree that efforts should be made, if images of children are being published on public websites, that efforts should be made to remove that?

A   Of course. If child sexual abuse material is being hosted online, that, that content should be removed.

Q   Have you guys ever given the industry feed, and when I say industry I mean electronic service provider, industry feedback on the importance of clarifying the incident time, you know, or providing accurate incident time information?

A   We frequently provide feedback to industry members about improving the quality of information provided within CyberTipline reports, including things like incident time, description, and that clarification.

Q   And has Synchronoss or Verizon been on the receiving end of some of that feedback?

A   Thinking back over the years, yes, they have certainly heard from the team about different areas for improvement within their reports.

Q   Including the incident time?

A   Off the top of my head I would not be able to speak to that field specifically.

Q   But that's something that you include in your,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 74

or have included in your, your training material and PowerPoints in the past?

A    Yes, that information is included in PowerPoints provided by NCMEC.

Q    To law enforcement?

A    Yes.

Q    We've talked about this section and the, the definitions.  I guess if there's any -- let me just, let me just go through this real quickly.

It seems that in the -- I'm going to share the Synchronoss agreement with you one more time because I think it has also information regarding the characterization.

NCMEC, this is the agreement -- first of all, does NCMEC draft this agreement for the non-profit sharing database access agreement, is this drafted by NCMEC?

A    Yes.

Q    Okay.  So NCMEC provided Synchronoss, or anyone else who is a member, this guideline.  It says, as a general guideline, prepubescent is appropriate when the subject of the image lacks breast/hip development, has no pubic/facial/underarm hair, testicles have not dropped away from the body, development of muscle tone and body curves has not occurred, and, if audio is available, the voice has not deepened.

Page 75

Is that the guidance that Synchronoss, I'm sorry, that NCMEC still provides to companies that sign up for access to the NGO list?

A    I would have to refer to one of our more recent agreements.

Q    Okay.  Is this definition or general guideline, is that language reflective of how NCMEC attempts to distinguish between content when they're evaluating is this obviously prepubescent or is it age-difficult?

A    This general guideline is in line with, with some of the training that the team would be receiving when doing content categorization.

Q    Okay.  In particular, in reference to this image which is the subject of Exhibit A, has NCMEC, when did NCMEC, when did you first become aware of this particular lawsuit and the allegations that were in this lawsuit regarding Mr. Lawshe and, and I guess the, the Verizon lawsuit as well?

A    I think I first became aware probably in July of last year.

Q    And what were the circumstances of that?

A    I heard about it at a conference in, out in San Francisco last July.

Q    Who, did someone give a presentation about

Page 76

that?

A    There was a, yes, a representative from Verizon who was speaking about the case.

Q    Who was that person?

A    Ethan Arenson.

Q    How do you spell Arenson, is it like A's or E's?

A    I believe it starts with an A.

Q    Okay.  Arenson.

And was there, was this like a, a formal presentation, like a little, you know, slide slow, or what was it?

A    I don't necessarily recall the specifics of the presentation, but it, it would have been, yes, speaking to a group of people at a conference track.

Q    And were you part of the group of people?

A    Yes, I was present in the audience.

Q    And did he have material, like a slide show?

A    I don't recall if he had a slide show or not.

Q    Okay.  What was the name of the conference?

A    TrustCon.

Q    You spoke at that.

A    I did.

Q    Okay.  That's the video that I saw of you was at TrustCon, yeah, your, your presentation.  You had a

Page 77

slide show.

A    I did.  I had several.

Q    Was he on that same stage talking about this case?

A    No, this would have been with a much smaller group of people.

Q    What did he say, what did he have to say?

A    I really don't recall the specifics of the presentation, but it, it would have centered around some different case law concerning industry matters and CyberTipline reporting.

Q    Anything more specific than that?

A    Not, not that I recall.

Q    Was it recorded?

A    No, I don't believe so.

Q    Was there other, did you know other people who were in attendance at that?

A    There would have been about a hundred or so people I believe in attendance.

Q    So was it, was it kind of like a, a legal primer on, on the issues of the case, or was it like substantive, like this is what we did or didn't do?

A    It was more in an overview of just the, the legal landscape currently as it related to industry reporting in the CyberTipline.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 78

Q    Not like factual representations about what they did or didn't do in this case?

A    No, more of an overview of multiple different cases that were ongoing.

Q    Is Ethan, is he a lawyer?

A    I believe so.

Q    Okay. So that was the first time you heard about it and we've discussed that.

Any other presentations or conversations within the industry or work that you had about this, this case?

A    Not externally. The next time I heard of the case would have been the spring, maybe in March of 2025, and that was internally here at NCMEC.

Q    Tell me about that.

MR. RUTHERFORD: I just want to object to the extent that this is asking for conversations that Fallon has had with lawyers, those would be off-limits in this deposition.

MR. ROBERTS: Oh, sure, yeah, obviously.

BY MR. ROBERTS:

Q    Is that what you're referring to, conversations with lawyers?

A    Yes, it would have been with NCMEC's internal counsel.

Q    And was that before or after we requested a

Page 79

deposition?

MR. RUTHERFORD: I'm going to, I'm going to instruct the witness not to answer. She would only know that from conversations she's had with counsel.

BY MR. ROBERTS:

Q    Okay. Well, let me, let me just ask it another way. I'll do this a different way.

I'm looking for something, I'm not just staring at you, I'm sorry.

All right. Here we go.

So I'll mark as Exhibit F -- well, I thought I was going to.

This was a document that was produced that was responsive to our subpoena, and it's almost an identical copy of the CyberTip report in this case. There's two of them. The difference is it's a PDF and it has a date that it was generated as March 6th, 2025. Which I can tell you is, is prior to my office reaching out to request any deposition or anything. It's right after the order was entered denying Verizon's motion to dismiss the lawsuit.

So let me ask you this.

Was there any non-lawyer reason why you guys printed out this PDF on March 6th, 2025?

Page 80

A    Not that I'm aware of.

Q    Were you part of the decision to pull this up and, and review it in March of, March 6th of 2025?

A    I, I don't recall who would have generated this PDF.

Q    Okay. The, the difference here, I guess substantively to, other than the PDF date, is that staff reviewed the following uploaded files at the time of the PDF report was generated.

So my question to you is did you review the files in March 6th, that timeframe, of this year?

A    I don't know if I reviewed the files on March 6th, but I had reviewed the file within this report.

Q    Okay. And the original NCMEC report, it indicated, and I don't want to make you just do it from memory, so we'll, what's Exhibit A, I'm showing you here, it says that NCMEC staff have not viewed the following uploaded files and have no information concerning the, the content of the uploaded files.

Do I understand by this, at the time, January 25th, 2023, when this report was received and transmitted, NCMEC staff did not view, physically view the content that was the subject of Exhibit A?

A    Yes, the, at that time the file within this

Page 81

report had not been viewed by NCMEC staff.

Q    Historically the file had been viewed by NCMEC staff though; correct?

A    Yes.

Q    And was that the basis of the unconfirmed categorization?

A    Yes, the file had been previously reviewed in other CyberTipline reports and had previously been categorized as unconfirmed.

Q    Same question as to the October '22, Exhibit B report.

Is that your understanding, it was not viewed at the time that the, that the tip was received and transmitted to law enforcement, but it had been historically viewed and categorized prior to October of 2022?

A    Do we have that?

Q    I can pull it up, yeah, sure, yeah, yeah. I don't, you never need to do this from memory.

Okay. Oh, shoot, I've shared the same thing, stop sharing.

All right. So this is the October 29th CyberTipline report. And, wait, this is, I can't remember if, is this the, I'm getting confused here.

A    Yeah, so --

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 82

Q    No, this is the original one.  So it is different.

So this is, the PDF was generated -- what does this mean, date PDF generated?

A    So that indicates the date that this copy of the PDF was generated.  And if we scroll down a bit, I believe at this time, as of 2023, it indicated that the files had been viewed by NCMEC staff.

Q    Yeah, I think that's right.  So they did view this, in October they viewed the file.

What, does that mean that it had been viewed at the time the report was made in October, or does it, does it mean that they reviewed it in February of '23?

A    So it means that information is, is accurate as of February 20th, 2023, at the time that the report was generated, this version of the PDF.

If you are to scroll up to the executive summary of this report.

Q    Sure.

A    I don't believe this one indicates it was a hash match.

See where it says incident type, apparent child pornography unconfirmed, I believe this is a report that the individual analyst, when processing the report, reviewed the files at the time of making that report

Page 83

available to law enforcement.

Q    So, but this file had been previously viewed and categorized as unconfirmed irrespective of whether or not it was looked at in October or by February?

A    As of the time that this PDF was generated in 2023, it indicates that, yes, the file had been categorized at a file level as CP, unconfirmed.  And then also at the time of processing, the analyst had applied at the overall report level that incident type of apparent child pornography, unconfirmed.

Q    Earlier you indicated that this content had been the subject of a report over a hundred times previous to October of 2022.

Did I understand that right?

A    It's been seen over a hundred times all time in --

Q    Oh, okay.  So you're not sure if that's before or after, but can you -- go ahead, sorry.

A    Yeah, I was just going to agree, yes.

Q    But can you tell me whether or not this had been categorized previously as, previous to October 29th, unconfirmed child pornography?

A    I believe it had been prior to 2022 categorized as unconfirmed.  There are several versions of this file that we have seen within the CyberTipline.

Page 84

And so when we were querying to see how many times it had been reported previously, we first started seeing it in 2017, or a version of it, submitted by other industry members.

In, in that particular version, the, the photo has been either photoshopped or digitally altered to depict a child's face superimposed over the body of the individual.

Q    Oh, so I, I was, I was, that's -- okay.

So you have looked at the content though that was attached to this file?

A    Yes, I have.

Q    It, it does not have a child's face?

A    It does not.

Q    And because, I mean, I'm not trying to be mean, I'm forty-seven years old.

The, the woman does not look to be remotely young, I mean, I -- do you agree that she does not appear to be a teen or a young adult at all?

A    The file itself is now categorized as appears adult within the CyberTipline system.

Q    Okay.

A    In reviewing the file, I could understand an analyst making the designation as unconfirmed, really the, the focus of the file itself being on the

Page 85

individual's anus and genitalia, and ultimately making that determination to leave it for law enforcement for their review.

Q    Are you, are you saying like lack of, lack of pubic hair, is that what you mean when you say the focus?

A    Yeah, certainly.  In terms of the, the file in this report, that individual's face, when the, the analyst is going through and doing a review not necessarily being the focus --

Q    Mm-hmm.

A    -- what they might be looking at.

Q    Mm-hmm.

A    And, again, keeping in mind is the analyst is processing the report, they are making that fairly snap determination about where that, that report resolves to and who it should be made available to, and then applying that top level incident type that was selected.

Q    When was this hash listed as appears adult?

A    I believe that that was first categorized in either late 2023 or early 2024.

Q    I'm just looking at something.

And, you know, just, it's just the way things go when you're viewing hundreds of documents and moving.

I, I will reshow I think what is Exhibit F.  This

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 86

is the, what I'll refer to as the March, when you guys reviewed it in March of this year, and you produced this report.

The executive summary of the CyberTip Report 137877848, that now reflects a categorization of adult?

A    Yes.

Q    And that's what you're referring to?

A    Yes.

Q    So can you just describe to me how -- and any time I ask a question, if I'm asking something that's too technical.

But how is it that the hash of the image with a sort of altered image gets confused with the hash of the adult image?

A    So not necessarily that it gets confused, but more so that when we were doing our query to see when the, the image was first seen, when it first began being reported to the CyberTipline, using some of that visually similar hash matching, we're also able to surface those files which depict the digitally altered image to include the child's face.

Q    So a hash of, a hash value, MD5 hash value represents a digital DNA or fingerprint of a particular photograph.

Do I understand that correctly?

Page 87

A    The MD5 hash value I would think of as the exact fingerprint, so it is the exact file itself.

Q    And so the hash that you received corresponds with the image which was attached to the October CyberTip report, Exhibit B.

And that represents a picture of an adult, or what you're fairly confident is an adult as we sit here today; correct?

A    Yes, it is categorized as apparent adult within our system.

Q    And so if this image is included in a, another NGO's hash list, it is, it is a hash and an image or content that is of an adult, it is not, it doesn't have any sort of relationship with the altered image other than -- that's a terrible question, just stop.

Your attorney is going to object and he should object. I'm trying to figure this out. So --

MR. RUTHERFORD: I was getting, I was getting ready.

MR. ROBERTS: Yeah, yeah. He was getting wound up. I could, I can't see him, but I can, I can feel it.

BY MR. ROBERTS:

Q    NCMEC would never include this hash and this image in their, their CSAM hash list, the external CSAM

Page 88

hash list; would they?

A    No, this file has not been represented on our hash-sharing list.

Q    And if, tell me, just explain to me how did you make that connection?

Did you do like a PhotoDNA and it, and that's how you kind of connected the two images?

A    Yes, doing a hash comparison, our team was able to surface both the images that are representative of the file that's included within the report that we're talking about today, as well as the modified version of the file that has been seen in other CyberTipline reports. We have seen both instances reported multiple times to the CyberTipline.

Q    Do you all include digitally altered images, as the one that you are describing where it's an adult body that has been altered to put a child's face on it, in your external NCMEC CSAM hash list?

A    That file, the altered version of this file, has also not been represented on NCMEC's hash sharing contributions.

Q    Do you have a policy though regarding inclusion of images like that, where you have an adult body that's been altered to put a child's face on it?

A    A policy, not necessarily.

Page 89

Think of, again, when we're doing this three-person review, and one of the things that we're thinking about is the suitability for something to be represented on a hash-sharing.

So we talked about doing the content categorization.

Also thinking about the suitability, that would include things that could create any kind of collisions or confusion when registrants are performing hash matching. And so whether something is photoshopped or digitally altered in this way, something that might be a grid image for example, a file that has very strong borders, so say if I were to take a screenshot here, and the majority of the, the file was just black borders around the actual image itself, those are the types of things that the reviewers are assessing to determine if something should or should not be represented on hash-sharing. Because we would like those, representations of those files to ensure that they're, again, going to be suitable for matching.

So in a long-winded way to say that, no, this file, similar files would not be added to NCMEC's hash-sharing list.

Q    Now the, you don't know what other, other people generating hash lists though, what their policies

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 90

and procedures are regarding an image like this; do you?

A    No, I wouldn't be able to speak to that.

Q    But, I mean, in theory, including the fully adult image could potentially, using PhotoDNA, could catch the altered image in, in an algorithm or a match.

Is that what I'm understanding?

A    Yes, in, in theory someone could.

Q    Have you heard of, there is a, what I've heard from industry, industry people, there's a, I don't know what the technical term is, but it's where like people will transmit child pornography, images of child sexual abuse, packaged with other, like, legal images.

Have you heard of this, it's almost like a bundling, have you heard of this being something that people do, criminals do?

A    You're asking if I've heard if criminals share CSAM along with other files to one another?

Q    Right. Like, like almost like hidden in other legal files.

A    Can you elaborate --

Q    Well, yeah, yeah, here's what I'm, here's what I'm getting at is that I've heard that sometimes there would be like a batch of files that include like a clearly abusive, you know, illegal image. But it's, it's, it's in this larger file that has other legal

Page 91

images.

And what I have heard is that sometimes those other images are hashed because they're associated with the illegal content, and that they are, that they are transmitted with that content by some, some criminals.

Does that make sense?

A    I'm following what you're saying, but I'm, I'm still not sure I understand.

Are these adult pornography images, some other type of file?

Q    Yeah, they may be -- and if you're not familiar with it, I'm not going to ask you to speculate about it.

So if it doesn't sound familiar, you can say like, no, it's just not in my wheelhouse. Like, I don't, I don't know what you're talking about.

It sounds like you're not really familiar with this kind of thing.

A    It's not a, a trend that we've seen with --

Q    Okay.

A    (Unintelligible.)

Q    Okay. Okay. All right. Have you communicated to any other members of the NGO hash-sharing list, or anyone else, specifically regarding this adult image being included or possibly

Page 92

included in a hash list?

A    No, NCMEC has no indication. It, it's not included within NCMEC's entries. We have not --

Q    But --

A    -- been in communication with anyone else.

Q    I mean, is there a concern, maybe this is something that you're not concerned with, but, I mean, is there a concern that is included in either the International Watch Foundation or the Canadian CyberTipline list?

A    We haven't received any indication from any hash-sharing members to indicate that it had.

Q    Do you have any sense of, I mean, where it's coming from?

I mean, you've seen this image before, this content before. Do you have any sense of where or what list, if there is a list, that it's being matched with?

A    No, we have no visibility into that. Industry uses a, a number of different mechanisms, whether that's hash-sharing, whether it's lists that they maintain, we, we have no idea why industry members are reporting that piece of content.

MR. ROBERTS: Okay. So I'm almost at the end here. I'm not saying that I've got like two or three more questions, I may have a couple

Page 93

questions.

But should we just take a quick break and then, you know, and then come back and then I'll, I'll kind of wrap it up?

MR. RUTHERFORD: Yeah, I think that's great with me.

MR. ROBERTS: Thanks.

MR. RUTHERFORD: Thanks.

MR. ROBERTS: And if anybody wanted to take a longer break, because I mean there may be other people that have questions, I'm okay with a longer break if somebody wants to, you know, grab a soda or some crackers or something like that, too, but.

MR. CARSON: I'm going to have just a few questions for the witness. I don't expect it will take more than fifteen minutes.

MR. ROBERTS: Sure.

MR. CARSON: I'll just throw that out there if it's helpful for the witness to figure out if you would like to take a longer break before we continue.

MR. RUTHERFORD: Fallon, what do you think, is ten minutes enough?

THE WITNESS: Yeah, ten minutes is perfect.

MR. ROBERTS: Perfect. Thank you so much,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 94

yeah.

MS. KIMBRELL: And, Madame Court Reporter, I'm going to be logging off, but I'm going to come back on on a different line, so I'll be on here but you may have to let me back in.

VIDEOGRAPHER STINGO: Counsels, I'll just get us off.

Off the record at twelve thirty-eight p.m.

(Whereupon, a break was had from 12:38 p.m. to 12:49 p.m.)

VIDEOGRAPHER STINGO: On the record at twelve forty-nine p.m.

BY MR. ROBERTS:

Q   Ms. McNulty, you all produced a lot of pages of emails between Synchronoss staff and NCMEC staff.

Did you have a chance to review those?

A   I did have a chance to look them over briefly.

Q   But I don't think you were actually involved in any of that back and forth?

A   In reviewing the majority of them, no, I don't believe I was in copy.

Q   Just because I don't think we need to go through all of them, but it seems like Synchronoss was inquiring because they had a problem with a reduction in the matches that they were getting against the NGO hash

Page 95

list.

A   My interpretation of the email is Synchronoss reached out because it seemed they were having some technical difficulty in querying the NGO CSAM list and were not seeing the number of results that they would have expected to see.

Q   Now the explanation that I saw from NCMEC was that they had been dropped from the IWF and Canadian organization's list in terms of access.

Did I read that correctly?

A   Yes, that the IWF and Canada had revoked access to their hashes.

Q   And is it, was it NCMEC's, was the, was the determination that that, that was what caused the, the reduction in the number of matches that Synchronoss was observing?

A   Yes, that would explain their reduction that they were seeing.

Q   They were still getting matches, and I think it was June of 2024 that the emails were, June to July of 2024, that they were going back.

Does that timeframe sound right from your review?

A   Yes, it does.

Q   Okay. They were still getting matches, it just wasn't to the volume that they expected.

Page 96

Is that, was that your interpretation of what they were telling you, or telling NCMEC?

A   Yes, the email, the gist of it was that they expected to see more hashes returned based on the query that they were doing against the hash-sharing list and that it was a reduced number.

Q   At that time though they still had access to the NCMEC list?

A   Yes.

Q   It was just that they had lost access to IWF and the Canadian list?

A   Yes.

Q   Is it your impression that there are a lot like more, or a, or a, or a, a broader scope of, of hashes in those two lists than, than in NCMEC's list?

A   Based on feedback that we've heard, there is quite a, a wide breadth of content that's represented on each list. And so while I'm sure there is some overlap, I don't believe it's at a, an extremely high volume.

Q   When you say a, a wider breadth, do you attribute that to some, at least in part to NCMEC's sort of stringent three-part verification process?

A   More so what comes to my mind is that both of those entities are hotlines within the UK or Canada respectively receiving different reports than what the

Page 97

CyberTipline is receiving here in the U.S. And so it certainly could be that. It could be just based on the, the reports that they're receiving in and what content they're reviewing and categorizing.

Q   So it could be that, a sort of curation issue is one, but it also could be just their definition of what gets on the, the list or not on the list is different than, than NCMEC's as well?

A   Or even just the reports or the work that they're doing within their own, as their own national hotlines.

Q   Okay. All right. Do you know whether or not they regain, do you know why they lost access to the IWF or Canadian --

A   I don't know the, the specifics. Generally, if an industry member loses access to one of the lists, it could be that they, their agreement with that other entity has expired. And so I believe the resolution was we provided them with contact information for both of those other entities so that they could be in direct contact with them.

Q   Do you know the outcome of, of those conversations?

A   I do not.

Q   Synchronoss agreed to the NCMEC NGO list

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 98

agreement.

Is it your understanding that they had separate agreements with International Watch Foundation and the Canadian group, or did that one agreement satisfy access to the entire platform?

A    So the one agreement provides access to the platform that each entity is able to allow or restrict access to their individual hash contributions.

But in terms of if Synchronoss previously had agreements with IWF or Canada, I, I don't know. I wouldn't have visibility into that.

Q    Okay. All right. I just want one last exhibit here. What are we on, G?

And this is, have you, have you looked at any of the pleadings in the case, the Lawshe vs. Verizon case?

A    No.

Q    I just want to just, one statement here, or two statements. I just want to get your feedback. Share this exhibit.

This is a motion, Verizon's motion for reconsideration of the order denying the Rule 12, Rule 12(b)(6) motions to dismiss.

And it, and I've highlighted here. It says the fact that the image was included in NCMEC's CSAM database.

Page 99

That's, that's an incorrect or, or false statement; correct?

This, this image was not included in NCMEC's CSAM database?

A    I'm not sure what NCMEC's CSAM database refers to, but this image was not represented on our hash-sharing list.

Q    Okay. And then there's a list here that, at best, Verizon reported an image mistakenly categorized as CSAM in the NCMEC database.

NCMEC did not categorize these images as CSAM or apparent CSAM in their database; did they?

A    The image represented in the first report was previously categorized as unconfirmed and is now categorized as adult within our system.

And the image within the second report is categorized as unconfirmed.

Q    But it's not in NCMEC's external hash-sharing database or list?

A    No, neither image has been represented on our hash-sharing list.

Q    So if Verizon meant the NGO list, then it was another list, not NCMEC's list, that this was contained on, that these images were, were contained in?

A    Yes, neither of the, the images, we don't have

Page 100

any indication that they have ever been added to the list by NCMEC.

Q    And, and so, so let me, let me just do this.

If Verizon or Synchronoss wanted to take the position that, hey, NCMEC indicated that these two images were apparent child pornography, that would be an incorrect statement, NCMEC has never externally described either of these images as apparent child pornography?

A    Yes, we have no record of ever having shared them externally on the hash-sharing list.

Q    Okay. And certainly, and we went over the contract, but just.

When Synchronoss signed up to be a member of the NGO hash list, it, it is clearly explained to them that the NGO list includes lists from other non-governmental organizations, not just NCMEC?

A    Yes.

MR. ROBERTS: Okay. All right. I don't have any other questions at this time.

Thank you, Ms. McNulty.

THE WITNESS: Thank you.

MR. CARSON: All right. Jami, you all right if I go next?

MS. KIMBRELL: Go ahead. I don't have

Page 101

anything right now.

MR. CARSON: Okay. Thank you.

CROSS EXAMINATION

BY MR. CARSON:

Q    Good afternoon, Ms. McNulty.

My name is Matt Carson. I'm with the law firm of Sniffen and Spellman in Tallahassee, Florida. We represent Detective Mikayla Preston in this action. She's a deputy with the St. Johns County Sheriff's Office, and she was the detective that, in large part, investigated the allegations that Mr. Lawshe possessed CSAM.

I appreciate your insight thus far. I have a couple of clarification questions that hopefully will help me understand your testimony.

Verizon or Synchronoss reported to NCMEC -- well, let me, let me specifically refer to Exhibit A, which was the second tip.

Synchronoss or Verizon reported to NCMEC that one of its subscribers had in his or her possession this photograph; is that accurate?

A    Yes.

Q    Okay. How did Verizon or Synchronoss know to report to NCMEC that this photograph was potentially problematic or otherwise of interest to NCMEC?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 102

A    I wouldn't be able to speak to that. Synchronoss would have to answer that question.

Q    So, and is it possible that they are just looking at their subscriber's photographs and looking for stuff that they think is problematic?

A    It certainly could be.  Industry members use a variety of different means to surface imagery to report to the CyberTipline.

Q    Okay.  If they were, in order to, to get an MD5 hash value for a photograph, what, what's the process?

A    In regards to how we expose the MD5 related to the CyberTipline?

Q    Yes, ma'am.

A    So that is with, built within our system.  So inherently as that report is being submitted and as the file is being uploaded to the CyberTipline report, our system reads the MD5 hash value associated with that file and puts it into that field within the reported PDF.

Q    So if I sent you a, a photograph of anything right now, could your organization create an MD5 hash value for that photograph?

A    If it was coming through the CyberTipline, yes, that MD5 hash value would be read and we would be

Page 103

able to provide that.

Q    Okay.  If I wanted to find out what an MD5 hash value of any given photograph would be, am I able to do that?

A    Yes, I believe you would be able to do that.

Q    Okay.  And how would I do that?

A    You would use a -- well, it depends on what system you're, you're operating.  But there are a variety of different, whether it's hash readers that are available online or whatnot.  Ours is built directly into our CyberTipline application.

Q    Thank you.

Is it your understanding that the ESPs are converting images of their subscriber's photographs, photographs stored on the cloud, et cetera, and converting them or otherwise obtaining the MD5 hash values for those photographs?

A    Could you clarify what you mean by converting?

Q    Sure.  So I understand you've got a, a, a database of just a massive amount of hash values; correct?

A    We have all of the, the hash information about all the files that have been reported to the CyberTipline.

Q    And if I have a subscriber, let's say I'm an

Page 104

ESP and I have a subscriber and he's got a hundred photographs and I don't want to look at the photographs, am I able to convert those photographs, and convert is probably not the right word, but am I able to somehow obtain the MD5 hash values associated with those photographs and then compare them to these hash lists that are available?

A    So we don't offer a, a comparison.  There's no, no tool that's provided within the CyberTipline for comparison.

What we do is publish the list of the, the hashes that we wish to contribute on the CSAM hash-sharing list.  The company is then able to ingest or download those hashes, maintain that list, and then certainly they would be able to do any matching on their end.

But the specifics of how they do that would be ultimately up to the industry member.

Q    Understand.  And I appreciate that, and that's exactly what I'm going for.  And I, I understand you can't speak specifically to Verizon or Synchronoss or any given industry member.

But, in general, how does an ESP after it, it ingests these, these, these hash values from the list, how does it compare those hash values to the photographs that it's storing on the cloud?

Page 105

A    So, again, this is going to vary depending on the company and how they might have things set up on their end.  So ultimately the company would be the best to speak to this.

But, in general, the company could either be ingesting the exact MD5 hash value and comparing that against content on their platform, they might be using a different hashing algorithm and doing other types of hash matching.  But that is something that they would have to build and operate on their end.

Q    Okay.  I guess my question really is what value is the, the database that you provide to the ESP that is trying to make sure that there is not problematic content being housed on its servers?

A    So the, the CSAM hashes that we provide within the hash-sharing list is really meant to be sharing that information back to industries so they can ensure that that content is not being circulated on their platforms, so that that CSAM is not being uploaded or shared and they are able to remove it very swiftly.

Q    And I guess I'll have to try to ask it a different way.

How?

A    So the how is ultimately going to be up to the company.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 106

Q    Okay. But presumably they, they are not looking at millions of pictures, they have somehow automated the process where pictures are converted to hash values and hash values are being able to be compared to known files or files that otherwise have hash values in one or more of the databases you've spoken about.

Is that accurate?

A    Again, I would say it really varies on the company and their business practices. There are certainly platforms that we hear from who are relying heavily on human content moderation, some who are using just known CSAM hash values for matching others who might be doing a combination of both of those things or using other tools.

Q    Okay. Looking at the CyberTipline report that is Exhibit A, which is the, the second report, or the second tip, excuse me.

The report that we've looked at, that PDF, does it contain any reference to how it was that Verizon or Synchronoss determined that the specific image was potentially problematic?

A    Are you asking if it contained any indication of how they became aware of it?

Q    Yes.

Page 107

A    No, that information was not included within the report.

Q    Okay. You've testified that the, the hash value that we see, I'm sorry, the MD5 hash begins with B06 for this particular tip, has never appeared in any of the hash lists that NCMEC maintains; is that accurate?

A    Yes, that's correct.

Q    So presumably when they are looking at this photograph, whether it be a hash value or otherwise -- well, let me rephrase that.

The MD5 hash value that is referenced on the CyberTipline report, that is what is generated when the photograph is uploaded to NCMEC; is that correct?

A    Yes.

Q    Okay. So it's possible that prior to Verizon or Synchronoss uploading the photo to NCMEC, they had no idea what the MD5 hash value for this photograph was; is that accurate?

A    I, I would not be able to speak to that.

Q    Right. You don't know one way or the other; correct?

A    I don't know what Synchronoss did on their end.

Q    Right. And the report doesn't indicate one

Page 108

way or the other?

A    It does not.

Q    Okay. You said that it had never been on any, any list that NCMEC has ever maintained, but you're able to run a comparison to look for the image itself that, and had found that it had been seen in over two hundred CyberTipline reports; is that correct?

A    Yes.

Q    Did you have or do you have MD5 hash values for those other images?

A    We do, yes.

Q    Okay. Are they different than the MD5 hash value for this specific image that is the subject of Exhibit A?

A    Yes, there are different MD5 hashes.

Q    But it's the same photograph, it's the same image; correct?

A    Correct.

Q    How does that happen?

A    How does, do different MD5 hashes get generated?

Q    Yeah, if I've got two images that by all accounts appear to be the exact same image, how can they have different MD5 hash values?

A    So, again, that MD5 hash value is going to be

Page 109

that exact fingerprint of a file.

So if I were to take a picture of our computer screen right here and I made an exact copy of that file, that would be the, the same file. If I were to edit it in any way, by one pixel, if I were to very slightly crop it, that second file would have a different MD5 hash value. But if I were to put them up side-by-side everyone on the call would not be able to see a difference, visually identical.

So we utilize different hash-matching technology to identify those visually similar images. And that is what we utilized to, to cross-reference and see if that had been seen previously by the CyberTipline.

Q    Are you able to know what happened to any of those other over two hundred CyberTipline reports that are related to this, the same image?

A    Could you elaborate what happened to them?

Q    Yeah, are you able to know were those CyberTipline reports made available to local law enforcement, do you know if anything happened as a result of those referrals or otherwise being made available to law enforcement, anything like that?

A    That is information that we would be able to access, yes.

Q    In your experience, do people that would

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 110

exchange or otherwise collect CSAM, do they ever purposefully attempt to modify the picture in an effort to avoid MD5 hash matching by you or other organizations?

A   Yes.

Q   Okay. And based on your prior testimony, that could be as simple as cropping a photograph; correct?

A   Correct.

Q   Or, or adding text in, in the corner in such a way that it is no longer the exact same image; correct?

A   Yes, editing it in any way would change the hash value.

Q   You testified earlier that this particular image was likely not triple-vetted when it was submitted in this case pursuant to this specific CyberTipline submission; is that correct?

A   The triple-verification, the tertiary review is for inclusion on the hash-sharing list, and this file was not categorized as apparent child sexual abuse material, so it is unlikely that it went for that third-pass review.

Q   Okay. And, but you testified that it had already been vetted with, when it was submitted, when the same image was submitted but in a slightly different format resulting in a different MD5 hash value; is that

Page 111

accurate?

A   Yes.

Q   And the, the document that you provided in response to the subpoena in advance of your deposition today, the PDF was created or generated on March 6th of 2025; correct?

A   This is still for the, the second report?

Q   The second report.

A   Yes, I believe so.

Q   Okay. March, March of this year; correct?

A   Yes.

Q   And it's still listed as, it's still categorized as CP, unconfirmed; correct?

A   Yes.

Q   Okay. At the top, and I can show it to you if it's helpful, at the top of the CyberTipline report, right underneath the number it says Priority Level E.

What does that mean?

A   If you wouldn't mind screen sharing the report.

Q   Yeah, no problem, no problem. Just one second.

A   Right underneath it will have the definition of what that priority level entails.

Q   Okay. Are you able to see my screen?

Page 112

A   Yes, thank you.

So Priority Level E, and right underneath that priority level indicates that it is a report that was submitted by a registered electronic service provider.

Q   Awesome. So, yeah, so what's underneath it is, is the definition. Understood.

That wasn't clear to me from the, from the outset, so I appreciate that.

All right. Well, I don't have any -- well, I have one other question.

If you, if NCMEC is, if NCMEC is reviewing a submission and determines upon viewing the document, the image, that it's not CSAM, it's not apparent CSAM, it's not unconfirmed CSAM but it's an adult, they will make the change to the categorization of the, the image, or at least the MD5 hash value associated with that tip; correct?

A   Yes, and we would indicate that within the report incident type as well.

MR. CARSON: Awesome. That's all the questions I have for you.

Thank you so much, Ms. McNulty, I appreciate it.

THE WITNESS: Thank you.

MS. KIMBRELL: And this is Jami Kimbrell. I

Page 113

have no additional questions.

Thank you.

MR. ROBERTS: I really appreciate you.

And, Ms. Souras, I really appreciate your cooperation. And you guys work very smoothly and courtesy, and I appreciate that, so.

I don't, that's -- you guys want to read or waive?

Oh, I don't, I doubt that your attorney has any questions. I don't know why, no dog in this fight.

MR. RUTHERFORD: No.

MR. ROBERTS: I mean --

MR. RUTHERFORD: No, no, I didn't have any. I didn't have any.

MR. ROBERTS: Yeah, yeah, yeah, yeah.

MR. RUTHERFORD: Yeah, Fallon, would you, would you like to read the transcript just to ensure that it's, that it's accurate?

THE WITNESS: Yes, please.

MR. RUTHERFORD: Okay. Yeah, we'll, we'll read and sign.

VIDEOGRAPHER STINGO: Okay. Counsels, before we go off, I just have to ask if you like to order video today?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025

Page 114

MR. ROBERTS: I don't --

MR. RUTHERFORD: (Unintelligible.)

MR. ROBERTS: I don't need a copy of the video, but I am going to order the transcript.

THE COURT REPORTER: Wait a minute. That was two of you at the same time, I didn't get it.

So, Mr. Roberts, what did you say?

MR. CARSON: No video, but I do need the transcript.

THE COURT REPORTER: Okay. How do you like it -- and do you want all this on the record, the video record or do you want to go off?

I meant the ordering of the transcript on video.

VIDEOGRAPHER STINGO: Because I need to know if everyone else would like video as well.

THE COURT REPORTER: I know the video part on the record.

VIDEOGRAPHER STINGO: Yep.

THE COURT REPORTER: So anybody want video?

MR. ROBERTS: I don't need video.

Thank you, sir.

MS. KIMBRELL: I don't need video.

Thank you.

MR. RUTHERFORD: NCMEC would also just like a

Page 115

VIDEOGRAPHER STINGO: Okay. I will get us off.

Going off the record, one eighteen p.m.

THE COURT REPORTER: Now we'll stay on the record for the ordering of the transcript.

Mr. Roberts, how did you want it, etran, PDF?

MR. ROBERTS: Yeah, the PDF is fine, you know, the condensed and standard.

THE COURT REPORTER: Okay. And let's just go in order.

Mr. Rutherford, do you want a copy?

MR. RUTHERFORD: Yes, and when you say just a PDF, would that be a PDF of the transcript and the there would be the exhibits at the end of the transcript when you say it that way?

THE COURT REPORTER: Yes, the PDF with the exhibits attached.

MR. RUTHERFORD: Yeah, that would be fine. That would be fine.

THE COURT REPORTER: And then, Mr. Carson, yes or no?

MR. CARSON: I'm good. I don't need anything. Thank you, ma'am.

THE COURT REPORTER: Okay. And, Ms. Kimbrell?

Page 116

MS. KIMBRELL: I don't need anything. Thank you.

THE COURT REPORTER: All right. Well, that's all I need. Have a great rest of a day.

MR. ROBERTS: All right. Thank you.

MS. KIMBRELL: Thank you.

MR. ROBERTS: Bye-bye.

(Whereupon, the deposition was concluded at 1:18 p.m.)

Page 117

CERTIFICATE OF OATH

STATE OF FLORIDA    )
COUNTY OF INDIAN RIVER  )

I, JODI J. BENJAMIN, Court Reporter, Notary Public, State of Florida, certify that FALLON MCNULTY appeared before me via videoconference on the 12th day of June, 2025, and was duly sworn.

_____
Jodi J. Benjamin,
Court Reporter,
Notary Public, State of Florida
My Commission No.  HH 346222
My Commission Expires:  May 1, 2027

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 118

CERTIFICATE OF REPORTER

STATE OF FLORIDA    )

COUNTY OF INDIAN RIVER  )

I, Jodi J. Benjamin, Court Reporter, do hereby certify that I was authorized to and did stenographically report the videoconference deposition of FALLON MCNULTY; and that the foregoing transcript, Pages 1 through 119, is a true and correct record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of June, 2025, at Sebastian, Indian River County, Florida.

_____
Jodi J. Benjamin, Court Reporter

Page 119

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
IN RE: Lawshe v. Preston, et al
CASE NO: 3:24-cv-00044-MMH-MCR
DEPOSITION OF: Fallon McNulty
TAKEN: June 12, 2025

Page No.    Line No.      Change          Reason

Under penalties of perjury, I declare I have read my deposition is this matter and that it is true and correct, subject to any changes in form or substance as reflected above.

Signature _____    Date _____

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Index: 1..accurate

---

### Exhibits

**EXHIBIT A - FM**
3:13 7:13 8:21 21:22 24:7 26:2 28:24,25 34:14 37:11 57:10 66:25 67:14,15 69:7 70:11 75:15 80:17, 24 101:17 106:17 108:14

**EXHIBIT B - FM**
3:13 37:1,10 67:2 81:10 87:5

**EXHIBIT C - FM**
3:14 41:13, 14

**EXHIBIT D - FM**
3:14 51:23

**EXHIBIT E - FM**
3:15 56:10

**EXHIBIT F - FM**
3:15 79:12 85:25

**EXHIBIT G - FM**
3:16

---

### 1

**1** 61:18

**1/25/2023** 58:8

**11:16** 47:22

**11:23** 47:23

**12** 98:21

**12(b)(6)** 98:22

**12:38** 94:9

**12:49** 94:10

**12th** 4:9

**137877848** 37:6 86:5

**153739160** 9:3

**1:18** 116:9

---

### 2

**2010** 29:4

**2016** 6:20

**2017** 84:3

**2018** 62:10

**2022** 30:21 37:19 55:7 81:16 83:13, 23

**2023** 15:4,9, 13 16:23 17:5 21:20 30:21 32:23 33:2 55:7 80:22 82:7, 15 83:6 85:21

**2024** 33:2

**39:18** 85:21 95:20,21

**2025** 4:9 78:12 79:18, 25 80:3 111:6

**20th** 82:15

**22** 81:10

**23** 82:13

**25** 15:9,13

**25th** 15:4 16:23 17:5 21:20 80:21

**29th** 81:22 83:22

---

### 6

**6th** 79:18,25 80:3,11,13 111:5

---

### A

**A's** 76:6

**a.m.** 4:10 47:21,22,23, 25

**A1** 61:9

**A2** 60:9,10, 15,23 61:9

**ability** 30:6 31:14 48:7, 9,20 69:25

**abuse** 13:11 21:13 23:5 28:7 39:5 40:20 43:16 45:25 46:11 53:5 66:15 73:5 90:12 110:19

**abusing** 44:20

**abusive** 90:24

**accept** 34:10 54:24

**access** 19:24 20:4,5,9 30:11 31:14 32:3 50:25 52:18 71:18 74:16 75:3 95:9,12 96:7,10 97:13,16 98:4,6,8 109:24

**accessing** 31:4 48:24 49:2 72:21

**account** 46:4

**accounts** 108:23

**accuracy** 45:2 55:13

**accurate** 55:18 56:1 58:20 73:12 82:14 101:21 106:8

107:7,19
111:1 113:19

**accused** 43:22

**acronym** 5:25
39:5

**acronyms** 5:19

**act** 22:21
23:6 26:17,
22 28:1

**action** 51:11
72:3 101:8

**actionable**
45:11

**actual** 25:6
89:15

**add** 33:22
50:5 70:6,23

**added** 36:6
49:17,21
50:3 89:22
100:1

**adding** 110:9

**additional**
23:22 25:9
57:20 70:12
71:4 72:16
113:1

**Additionally**
53:2

**adult** 27:2
34:14 35:19
42:14 84:19,
21 85:19

86:5,14
87:6,7,9,13
88:16,23
90:4 91:9,25
99:15 112:14

**adults** 41:21
42:3 44:15,
19,20,22

**advance** 111:4

**advice** 51:12,
16

**affirmative**
31:17,21

**afternoon**
101:5

**age** 22:22
23:10,14
24:1 26:12,
21,25 27:15,
16 28:2,8,
14,15,20
29:9,22
53:14 64:20

**age-difficult**
28:9,21
42:16 75:10

**agency** 44:11

**agree** 21:10,
16 26:25
55:11 58:23
73:2 83:19
84:18

**agreed** 21:12
97:25

**agreement**
40:18,22
52:1,5,9
54:2,12,23
55:6 56:5
61:17 62:6,
10 74:11,14,
15,16 97:17
98:1,4,6

**agreements**
20:11 51:21
52:3,15
54:3,7 75:5
98:3,10

**ahead** 31:9
83:18 100:25

**alerting** 71:20

**alerts** 65:17

**algorithm**
11:24 90:5
105:8

**algorithms**
63:12

**allegations**
75:17 101:11

**alleged** 45:25

**allowing** 45:13

**altered** 84:6
86:13,20
87:14 88:15,
17,19,24
89:11 90:5

**amount** 19:14
44:25 103:20

**analyst** 24:24
82:24 83:8
84:24 85:9,
14

**and/or** 22:21

**anecdotal**
42:24

**anecdotally**
42:9

**answers** 60:2

**anus** 85:1

**API** 31:4,10,
12,22

**apologize** 37:1

**apparent** 13:11
21:13,17
23:5 25:7
27:15 82:22
83:10 87:9
99:12 100:6,
8 110:19
112:13

**appeared** 107:5

**appears** 16:19
58:24 84:20
85:19

**applicable**
67:25

**application**
65:19 103:11

**applied** 25:9
29:2 83:9

**applying** 21:7

85:18

**approximately** 17:23

**April** 6:11 39:18

**area** 45:11,12

**areas** 73:20

**Arenson** 76:5, 6,9

**article** 38:16

**assertation** 56:4

**assessing** 21:5 72:21 89:16

**assume** 51:14

**assumes** 55:3

**attach** 40:25 56:8

**attached** 7:13 56:9 84:11 87:4 115:18

**attaching** 67:17

**attempt** 10:6,8 110:2

**attempts** 75:8

**attendance** 77:17,19

**attorney** 87:16 113:9

**attribute** 96:21

**audience** 76:17

**audio** 74:24

**audit** 18:11 19:10 40:1, 10,18,21 43:11 56:7, 15,20 57:6

**auditing** 43:2

**authorized** 43:17

**auto-referred** 65:10

**automated** 106:3

**automatically** 31:1

**Autumn** 9:17,19

**avoid** 110:3

**aware** 35:3,11 56:21 75:16, 20 80:1 106:24

**Awesome** 112:5, 20

_____
**B**
_____

**B06** 10:7 14:9,19 17:13,15 107:5

**B1** 61:9

**B2** 61:9

**back** 6:4 10:24 11:6 13:4 26:5 30:3,20 42:8 57:10 58:6 61:14 66:1,2 69:7 73:19 93:3 94:3,5, 19 95:21 105:17

**bad** 19:11

**based** 10:19 30:16 31:5,7 33:7 37:22 43:23 44:9 59:9 96:4,16 97:2 110:6

**basis** 63:21 81:5

**batch** 90:23

**began** 86:17

**beginning** 17:12

**begins** 10:7 14:9,19 107:4

**behalf** 4:20

**belabor** 27:12

**benefit** 5:19

**Benjamin** 4:11

**bit** 13:25 18:10 27:19 30:3 33:9,25 36:23 38:5,

17,18 40:23 41:1 48:18 62:6 63:17 82:6

**black** 89:14

**blow** 38:5 41:15

**body** 74:23,24 84:7 88:17, 24

**bondage** 25:10

**borders** 89:13, 14

**breadth** 96:17, 20

**break** 47:2,3, 9,15,17,22 48:3 93:2, 10,12,20 94:9

**breakdown** 65:12

**breast/hip** 74:21

**briefly** 33:3 48:17 94:17

**broader** 96:14

**Buchan** 4:24

**build** 105:10

**built** 102:15 103:10

**bundling** 90:14

**business**
106:10

**button** 59:1

**Bye-bye** 116:7

---

### C

**calendar** 30:21

**call** 12:5
109:8

**called** 11:23
23:22 39:12

**Canada** 95:11
96:24 98:10

**Canadian** 13:21
14:16 16:3,
20 19:13
20:1 31:1,20
32:13 36:19
48:15 55:20
57:8 92:9
95:8 96:11
97:14 98:4

**capability**
69:5

**Carson** 4:21
93:14,18
100:23
101:2,4,6
112:20 114:8
115:21,23

**case** 8:4,7
10:1,5 11:17
19:21 27:5,
7,10 29:20

30:10 34:20
35:16,17
48:12 49:4
54:24 70:1,
10 76:3
77:4,10,21
78:2,10,12
79:16 98:15
110:15

**cases** 45:5
78:4

**catch** 90:5

**categorization**
20:25 21:7,
10 22:4 26:9
29:2,15
48:22 50:24
60:8,13,23
61:9 62:2,3,
9,17 65:2,13
75:13 81:6
86:5 89:6
112:15

**categorizations**
25:4 55:2
61:11

**categorize**
99:11

**categorized**
21:25 22:12,
13,20 23:4
26:1 28:25
38:9 49:11,
24 51:8
68:8,20,24
81:9,15

83:3,7,21,24
84:20 85:20
87:9 99:9,
14,15,17
110:19
111:13

**categorizing**
25:15 97:4

**caused** 95:14

**center** 4:5
5:15,20
13:21 19:13
39:13 41:16

**centered** 77:9

**certified**
25:19

**cetera** 103:15

**chance** 5:9
7:25 94:16,
17

**change** 57:1
110:11
112:15

**characterization**
38:12 74:13

**characterize**
57:18

**characterized**
26:18

**charges** 8:3

**chat** 65:24

**checked** 65:18

**child** 13:11,
21 21:13
22:16 23:5,
8,9,22,23
24:11 25:2,
7,8 27:2,14
28:7 39:5
40:20 41:9
43:15,22
44:5,6,20,21
45:5,25
46:10 53:5
59:7 62:1
63:19 64:11
65:5,20
66:5,14,21
67:18 68:20
72:13 73:5
82:22 83:10,
22 90:11
100:6,8
110:19

**child's** 84:7,
13 86:21
88:17,24

**children** 4:6
5:15,21
23:21 24:20,
25 29:11
43:8 44:16
53:6 64:17
66:16 73:3

**children's**
72:25

**choose** 19:24
30:6,12 53:9
57:22 69:22

71:4

**circulated**
67:3 105:18

**circumstance**
49:8

**circumstances**
75:22

**clarification**
58:4 73:16
101:14

**clarify** 57:22
61:15 69:22,
25 103:18

**clarifying**
73:11

**classification**
25:20 60:14
62:8,24

**classifications**
25:18

**classified**
13:10 21:17
22:15

**classify** 25:6

**clear** 28:1
55:10 112:7

**clearinghouse**
24:3 43:15
44:1

**close** 19:9

**cloud** 103:15
104:25

**collect** 110:1

**collisions**
89:8

**combination**
106:14

**combined** 19:14

**comfort** 47:4

**comment** 40:2
70:5

**commentary**
70:6

**common** 49:12

**communicate**
34:15

**communicated**
91:23

**communication**
92:5

**communications**
48:18

**companies** 32:3
63:11 75:2

**company** 18:11
31:14,23
32:1 49:13,
15 58:18
69:22 70:15
71:4 104:13
105:2,3,5,25
106:10

**compare** 104:6,
24

**compared** 12:25
106:5

**comparing**
105:6

**comparison**
14:25 15:18
88:8 104:8,
10 108:5

**comparisons**
32:1

**compile** 39:19

**complaining**
45:1

**complaints**
44:23

**complete** 18:20

**comprehensive**
39:18

**computer** 109:2

**Concentrix**
18:11 19:10
40:1,16
56:7,14,15

**concern** 43:20
71:17 92:6,8

**concerned** 57:9
92:7

**concluded**
116:8

**conclusion**
35:17 56:24

**condensed**
115:9

**conduct** 59:6

**conducted**
39:17

**conference**
38:20 75:23
76:15,20

**confident**
58:20 87:7

**confirm** 22:22
27:13 36:23

**confirmation**
23:18

**confirmed**
66:18,21

**confused** 81:24
86:13,15

**confusing**
27:19

**confusion** 89:9

**congressional**
43:14

**conjunction**
72:2

**connected** 88:7

**connection**
46:19 88:5

**connectivity**
46:20

**consent** 66:17

**constantly**
44:3,6

**contact** 48:25

49:20 72:12
97:19,21

**contacted**
29:21

**contained**
16:24 17:24
19:8 35:13
44:10 48:13
54:25 55:4,
14 60:24
72:16 99:23,
24 106:23

**content** 8:13
16:25 17:19
18:18,20
19:7,14,15
20:13 21:6,
7,9,10,11,20
22:3,11,13
23:20 24:6,
25 25:4,6,
19,22 26:2
28:3 29:9,
14,17,25
30:1 32:12
33:10 34:13
35:11 36:1,
8,9,13,17
37:10,13,18,
25 38:12
41:8 42:10
43:9,13
49:23 50:5,
6,12,25 53:9
57:6 60:18
62:19 64:17
65:4,7,13

66:12,15
67:1 68:12,
24 70:17
72:22 73:6
75:8,13
80:20,23
83:11 84:10
87:13 89:5
91:4,5
92:15,22
96:17 97:3
105:7,14,18
106:12

**content's**
48:21

**contents**
59:15,20
60:3 70:21

**context** 27:14
44:17 45:1
61:3 70:6,16
72:4

**continue** 93:21

**contract** 61:17
100:13

**contribute**
32:8 53:23
104:12

**contributed**
18:1,21
30:18 34:22
48:10 49:2
53:3 56:2
57:7

**contributes**

13:8 14:15
52:25

**contributing**
61:11

**contributions**
16:2,16
19:18 21:3
35:23 43:6
88:21 98:8

**conversations**
78:9,16,22
79:4 97:23

**convert** 104:3

**converted**
106:3

**converting**
103:14,16,18

**cooperation**
113:5

**copy** 7:16
79:16 82:5
94:21 109:3
114:3 115:12

**corner** 110:9

**corporate** 4:5
5:14

**correct** 5:16
14:12,21
15:5,23
16:17 17:2
20:3,20 22:9
25:24 26:20
32:5,9,16
35:21,24

36:14 38:15
43:16 48:16
50:15 51:18
52:19 54:12
60:20,21
63:23 67:15
68:2,13
71:11 81:3
87:8 99:2
103:21
107:8,14,22
108:7,17,18
110:7,8,10,
16 111:6,10,
13 112:17

**correctly**
16:25 20:15
23:16 37:7
50:16 51:3
52:10 54:18
56:3 58:10
61:2 62:4
86:25 95:10

**corresponds**
87:3

**counsel** 4:14
13:22 38:4
78:24 79:5

**Counsels** 94:6
113:23

**County** 101:9

**couple** 92:25
101:14

**court** 4:11,15
5:18,24 8:19
39:4 94:2

114:5,10,17, 20 115:5,10, 17,21,25 116:3

**courtesy** 113:6

**cover** 57:6

**CP** 26:7 83:7 111:13

**crackers** 93:13

**create** 89:8 102:22

**created** 60:14 111:5

**creates** 12:21

**creating** 20:10

**criminals** 90:15,16 91:5

**critical** 27:4

**crop** 109:6

**cropping** 110:7

**CROSS** 101:3

**cross-reference** 109:12

**CSAM** 10:9,13 12:14,20 17:13,24 18:2,24 20:14 21:17 22:24 25:7, 23 26:10 28:25 29:13 32:4 33:23

34:1 36:14, 17 37:14 39:2,4 40:10 43:6,13 45:25 50:15 52:23,24,25 53:20 56:16 62:17 71:13, 18,19,21 72:17 87:25 88:18 90:17 95:4 98:24 99:3,5,10, 11,12 101:12 104:12 105:15,19 106:13 110:1 112:13,14

**curated** 40:15 41:4

**curation** 97:5

**curious** 20:7

**current** 6:5, 10,25 52:8

**curves** 74:24

**customarily** 47:3

**CVIP** 23:23

**Cyber** 39:12 41:16

**Cybertip** 8:13 9:2 16:24 21:21 31:1, 20 34:25 36:10 42:3

44:25 55:20, 22 63:22 67:2,5,24 68:12 70:6 72:2 79:16 86:4 87:5

**Cybertipline** 6:8,15,18,19 7:2,4 8:9 10:15,19,20 11:3,20 12:2,10,12, 16,18,20 14:17 15:3, 16 16:3,20 17:9,17 20:2,24 25:1 26:4 30:2 32:13 37:4, 22 38:3 41:21 42:5 43:19 44:18 45:21,23 46:12,14,21, 24 48:25 50:18 51:5,6 58:19 59:4 64:15 65:1, 19 68:3,13, 15 69:24 71:15 73:15 77:11,25 81:8,23 83:25 84:21 86:18 88:12, 14 92:10 97:1 102:8, 13,17,24

103:11,24 104:9 106:16 107:13 108:7 109:13,15,19 110:15 111:16

**Cybertipline's** 36:19

---

D

---

**daily** 63:21 68:6

**data** 20:11 31:14

**database** 10:15 12:3,8,10,16 54:16,25 55:5 61:20 68:16,19 74:16 98:25 99:4,5,10, 12,19 103:20 105:12

**databases** 106:6

**date** 57:21 79:17 80:7 82:4,5

**day** 44:5 116:4

**day-to-day** 7:3

**de-duplicated** 18:23 19:15

**deal** 44:14

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                    Index: decade..documents

decade   6:20

decided   50:5

decision   22:8
  80:2

deepened   74:25

defendant   4:24

definition
  26:8,9,16
  27:8 53:5
  55:21 60:12
  75:6 97:6
  111:23 112:6

definitions
  74:8

denying   79:21
  98:21

Department   8:7

depend   44:17
  72:4

depending
  105:1

depends   103:7

depict   40:20
  44:19 60:19
  84:6 86:20

depicted   21:6
  22:20,23
  26:13,22
  27:1 28:3,20
  29:9,20
  34:13 41:9
  43:13 66:12
  71:19

depicting
  13:11 24:1
  53:13

depicts   21:13
  23:6 25:6,
  10,11 26:10,
  17 29:17
  53:6 60:16
  66:15

deposed   6:23

deposition   4:4
  6:21 7:9
  38:18 54:1
  78:18 79:1,
  20 111:4
  116:8

deputy   101:9

describe   20:21
  24:21 33:3
  86:9

describing
  28:13 42:21
  88:16

description
  57:21 69:22
  73:16

deserve   43:7,8

designated
  5:14

designation
  22:18,19
  26:11 33:23
  84:24

designed   45:19

46:8

detail   37:2

detection   39:1

detective   4:22
  101:8,10

determination
  28:8 43:24
  51:10 60:19
  85:2,16
  95:14

determinations
  24:15

determine
  28:14,19
  42:19 44:8
  89:16

determined
  106:21

determines
  112:12

determining
  27:1,12 71:9

development
  74:21,23

difference
  79:17 80:6
  109:9

difficult   49:6

difficulty
  95:4

digging   69:15

digital   11:9
  86:23

digitally   84:6
  86:20 88:15
  89:11

direct   5:6
  46:20 97:20

directer   6:7
  7:2

directly
  103:10

director   6:14

discover   35:8

discovered
  35:1

discussed   53:1
  78:8

dismiss   79:22
  98:22

disseminate
  71:10

distinguish
  75:8

distributing
  59:7

Division   23:21
  24:20,25

DNA   86:23

document   15:6,
  10 56:11
  57:11 79:14
  111:3 112:12

documents
  7:14,17,18,
  21,23 8:10

Case 3:24-cv-00044-JAR-MCR    Document 67-5    Filed 08/12/25    Page 40 of 62 PageID 847
WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                    Index: dog..entry

9:13 31:10 85:24

dog 113:10

dot 71:23

doubt 113:9

download 104:13

downloaded 71:7

downvote 33:7, 12,14,20

draft 74:15

drafted 74:16

dropped 74:23 95:8

drowning 44:25

Dully 4:8,25

duly 5:3

duplication 18:7

duties 7:1

**E**

E's 76:7

earlier 52:14 56:6 69:17 70:14 83:11 110:13

early 85:21

edit 109:4

editing 110:11

effect 44:24 52:4 55:6

effort 7:20 110:2

efforts 41:1 55:17 73:2,4

eighteen 23:11,14 24:2 28:15 53:15 58:9 64:20 115:4

elaborate 33:25 90:20 109:17

electronic 7:5 12:18 14:12 17:25 19:6, 22 30:5 42:10,13 46:16,19 52:18 57:15 63:24 64:6 65:15 67:16, 21 71:16 73:9 112:4

eleven 47:20, 24

email 32:25 48:18 95:2 96:3

emailing 9:25

emails 94:15 95:20

employed 6:19 18:11

employee 27:8

end 45:15 73:18 92:23 104:15 105:3,10 107:24 115:15

Endangered 4:6

ended 40:17

endorse 33:13

enforcement 7:7 23:10, 13,18,25 24:5 28:12 29:12 41:19 42:2,7,8,19 44:11,14,24 45:3,10,14 46:13,19,20, 25 57:15 63:20 64:22 65:11 66:4 67:8,25 68:2,4 69:10 71:11 72:8, 20 74:5 81:14 83:1 85:2 109:20, 22

engage 29:16

engaged 40:16 44:19,20 60:17

enrolled 31:2

ensure 21:16 55:17 89:19 105:17 113:19

entail 25:8

entails 6:25 24:22 111:24

entered 79:21

entering 30:16 48:9 62:22

enticement 44:21 64:16

entire 59:15, 20 60:3 70:20 98:5

entities 19:20 20:9 63:10 96:24 97:20

entity 30:18 40:13 49:20 59:23 97:18 98:7

entries 16:4, 7,13,15,22 18:2 20:5 35:23 36:5 53:3 63:12 92:3

entry 33:7,8, 11 48:11 55:21 62:9 63:6,7

**ESP** 59:15 60:9 104:1, 22 105:12

**ESPS** 103:13

**essentially** 11:10 31:13 33:7,13 45:12 49:22

**estimate** 64:10

**Ethan** 76:5 78:5

**etran** 115:7

**evaluate** 36:11

**evaluating** 75:9

**evaluation** 8:12

**event** 62:15

**everyday** 67:15,19,20

**evidence** 35:18

**exact** 11:2,4, 13,14,22 14:24 37:20 58:12 66:6 87:2 105:6 108:23 109:1,3 110:10

**EXAMINATION** 5:6 101:3

**exceptions** 56:25

**exchange** 110:1

**excuse** 13:22 106:18

**executive** 6:7 7:2 9:5 57:12 82:17 86:4

**exhibit** 7:13 8:20,21 21:22 24:7 26:2 28:24 34:14 37:1, 10,11 40:25 41:13 51:22, 23 56:10 57:10 61:16, 18 66:25 67:2,14 69:7 70:11 75:15 79:12 80:17, 24 81:10 85:25 87:5 98:13,19 101:17 106:17 108:14

**exhibition** 22:21 23:7 60:17

**exhibits** 13:25 115:15,18

**exists** 49:11

**expect** 93:15

**expected** 95:6, 25 96:4

**experience** 109:25

**expired** 97:18

**explain** 88:4 95:17

**explained** 100:15

**explanation** 95:7

**explicit** 53:7

**exploitation** 24:5 45:6

**exploitative** 53:2,4,7

**Exploited** 5:15,21 23:21 24:19, 24

**expose** 102:12

**extent** 36:16 39:10 70:18 78:16

**external** 15:20 16:5 17:25 25:23 38:14 40:11 50:15 51:1 87:25 88:18 99:18

**externally** 23:4 37:15 40:14 61:23 78:11 100:7, 11

**extremely** 96:19

---

**F**

---

**face** 84:7,13 85:8 86:21 88:17,24

**fact** 98:24

**factor** 27:1,4, 12 29:12 43:1

**factual** 78:1

**fair** 26:19 28:4

**fairly** 39:17 64:24 65:2 85:15 87:7

**Fallon** 4:4 5:2,12 78:17 93:22 113:17

**false** 99:1

**falsely** 43:22

**familiar** 27:6 32:20 39:14, 21 41:25 55:23 57:17 60:1 91:12, 14,17

**feature** 32:21 33:5 34:1

**February** 82:13,15 83:4

feed   73:8

feedback   25:18
  32:18 33:8
  34:5,19
  42:1,4,9,12,
  21,23,25
  45:3 73:10,
  13,18 96:16
  98:18

feel   33:16
  41:8 87:22

felt   36:12

field   57:20,
  21 69:21
  71:3 73:24
  102:19

fields   61:20

fifteen   71:24
  93:16

fifty-nine
  56:25

fight   113:11

figure   35:20
  49:7 64:13
  87:17 93:19

file   11:10,
  14,21 19:1
  21:6,16,17,
  24 22:20
  23:2,4,6,25
  24:5 25:10,
  11 29:3 35:4
  37:21 38:2
  50:17,18

51:11 59:12,
  13,15,21
  60:4,6,16,21
  65:22 68:14
  70:21 71:1,5
  80:13,25
  81:2,7 82:10
  83:2,6,7,25
  84:11,20,23,
  25 85:7 87:2
  88:2,10,12,
  19 89:12,14,
  21 90:25
  91:10
  102:17,19
  109:1,3,4,6
  110:18

filed   16:1

files   11:19
  12:17,19
  13:9 18:19
  19:8 20:9,
  23,25 21:1
  25:5,10,13,
  15,16 53:4,
  17 67:22,23
  68:7,19
  80:8,10,12,
  19,20 82:8,
  25 86:20
  89:19,22
  90:17,19,23
  103:23 106:5

final   22:7

finally   53:20

find   10:11,17

13:1 45:10
  71:19 103:2

fine   47:14,15
  115:8,19,20

fingerprint
  11:9 12:5
  63:15 86:23
  87:2 109:1

fingerprints
  63:5

firm   101:6

first-pass
  21:5 24:13

five-minute
  47:17

Florida   27:5,7
  101:7

focus   44:16
  65:4 84:25
  85:6,10

follow   48:4

force   55:6

formal   76:10

format   110:25

forty-nine
  94:12

forty-seven
  84:16

forward   67:24

found   14:20,
  22 56:25
  70:25 108:6

Foundation
  13:20 14:16
  19:13 55:20
  92:9 98:3

Francisco
  75:24

frequency
  63:18

frequently
  73:13

full   19:25

fully   90:3

functions   44:2

― G ―

Gainesville
  8:6

gather   7:21

general   10:15
  41:25 70:5
  74:20 75:6,
  11 104:22
  105:5

generally
  45:24 97:15

generate   19:1
  58:15,16

generated
  79:18 80:4,9
  82:3,4,6,16
  83:5 107:13
  108:21 111:5

generates

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                    Index: generating..hashes

58:17

**generating**
89:25

**genitalia**  85:1

**gist**  96:3

**give**  6:24
15:12 29:19
33:20 38:19
51:12 75:25

**giving**  38:23

**Global**  4:13

**globally**  45:7

**good**  5:8,12
38:21 40:3,5
101:5 115:23

**grab**  93:12

**great**  93:5
116:4

**grid**  89:12

**group**  39:11,
16 76:15,16
77:6 98:4

**guess**  18:19
22:6 47:9
51:21 54:23
64:3 66:1
74:8 75:18
80:6 105:11,
21

**guidance**  75:1

**guideline**
74:19,20
75:7,11

**guys**  23:19
27:13 28:10
31:10 39:25
40:10 43:3,
14 47:17
52:18 54:1
57:2 68:11
71:9,12 73:8
79:24 86:1
113:5,7

**H**

**hair**  74:22
85:5

**half**  64:21
66:3,9

**happen**  72:11
108:19

**happened**
109:14,17,20

**happening**
43:10 46:17

**hard**  10:6

**harm's**  44:7

**hash**  10:5,7,
8,9,11,12,
13,17,18,20,
25 11:2,4,8,
9,11,13,18,
23 12:14,24
13:1,5,6
14:9,19,20,
23,24 15:1,
24 16:9,12,
19 17:12,14,

15,19 18:5,6
19:2,5 20:2,
10 30:6,16,
19,25 31:4,
19 33:8,15,
16 34:16,21,
22 35:1,7,
12,13,14,20
36:2,8,9,13
37:10,14,17,
20,22 43:23
48:6,7,8,10,
12,24 49:1,
2,16,21
50:20 51:3,4
52:16,17
54:19 55:22
56:16,20
57:4 61:5,7,
13,23,25
63:3,14
67:16 82:21
85:19 86:12,
13,19,22
87:1,3,12,
24,25 88:1,
8,18,20
89:9,25 92:1
94:25 98:8
100:15
102:10,18,
22,25 103:3,
9,16,20,22
104:5,6,23,
24 105:6
106:4,6,13
107:3,4,6,
10,12,18

108:9,12,24,
25 109:7
110:3,12,25
112:16

**hash-matching**
65:23 109:10

**hash-sharing**
10:21 12:21
13:6,19
14:15 15:21
16:2,5 17:18
18:21,24
19:25 20:14
21:2,18 22:1
23:1,3 25:23
29:14 30:4,
11,19 32:21
33:6 34:23
36:3 38:14
40:11,19
52:23 53:3,
10 54:4,12
57:7 61:1,7
62:9 88:3
89:4,18,22
91:24 92:12,
20 96:5
99:7,18,21
100:11
104:12
105:16
110:18

**hashed**  91:3

**hashes**  12:22
13:9,12
14:11 19:19
30:17 31:7,

24 32:2 33:14,22 34:6,19 40:14 50:3,13 52:25 53:13,15,18,22 55:1 56:15 57:9 61:12 63:6 95:12 96:4,15 104:11,14 105:15 108:15,20

**hashing** 11:24 63:11 105:8

**hatch** 105:9

**head** 29:2 33:1 62:14 68:10 73:23

**heads-up** 13:24

**hear** 106:11

**heard** 27:10 28:9,12 42:9 45:3 56:17 73:20 75:23 78:7,11 90:8,13,14,16,22 91:2 96:16

**heavily** 106:12

**helpful** 93:19 111:16

**hey** 9:8 29:22 35:18 44:24 67:18 72:13

100:5

**hidden** 90:18

**high** 45:4 96:19

**highlight** 40:15 69:18

**highlighted** 41:18 98:23

**hire** 59:24

**historical** 8:12 62:7

**historically** 62:19 81:2,15

**hit** 58:25

**holding** 31:15

**holds** 24:2

**hone** 26:14

**host** 34:2,3 53:2,10,20

**hosted** 71:21 72:18,22 73:6

**hosting** 71:18

**hosts** 13:7 61:13

**hotlines** 96:24 97:11

**hour** 47:2,4

**house** 29:10

**housed** 105:14

**Howell** 4:23

**human** 21:4 106:12

**hundred** 15:15 17:1 18:16 19:9 38:3 42:7 57:1 67:1,3,4,5 77:18 83:12,15 104:1 108:6 109:15

**hundreds** 85:24

**Huseby** 4:13

**hypothetical** 34:9 42:22

**hypothetically** 34:12 48:12 61:6

---

**I**

---

**idea** 6:24 15:12 63:18 92:21 107:18

**identical** 12:1 79:15 109:9

**Identification** 23:23,24 25:2

**identified** 23:9,13,25 29:11 46:9 59:6 66:14

**identify** 25:25 45:24 61:25

68:1 109:11

**identifying** 21:1

**illegal** 90:24 91:4

**image** 11:12,15 12:1 15:2,9,13 16:1 17:4 26:17 28:24 29:20 34:14 35:1,8 49:5,11 60:8 61:9 62:3 66:24 67:17 71:22 74:21 75:15 86:12,13,14,17,21 87:4,11,12,14,25 89:12,15 90:1,4,5,24 91:25 92:15 98:24 99:3,6,9,13,16,20 106:21 108:5,13,17,23 109:16 110:10,14,24 112:13,15

**imagery** 29:13 41:10 42:16 102:7

**images** 12:16 14:25 17:23 18:4,17,18,23 19:7,17

35:9 39:2 41:10,21 42:3,14 44:14 53:13, 18 67:4 72:25 73:3 88:7,9,15,23 90:11,12 91:1,3,9 99:11,24,25 100:6,8 103:14 108:10,22 109:11

**imagine** 18:25 64:5

**imminent** 65:21

**imminently** 44:7

**importance** 73:10

**important** 41:3,4,6

**impression** 96:13

**improvement** 73:21

**improving** 73:14

**inaccurate** 43:23 57:16, 18

**incident** 57:13,16,21,

23 58:3,12, 24 69:10,18, 21 70:1 71:6 73:11,12,16, 22 82:22 83:9 85:18 112:19

**incidents** 64:16 65:20

**include** 13:20 20:1 59:22 61:11 62:2 63:2,7 65:21,23 71:4 73:25 86:21 87:24 88:15 89:8 90:23

**included** 8:13 11:12 17:13, 16,17 22:9, 14 23:2 37:14 42:10 43:25 50:14 55:8 59:10, 21,25 60:25 62:9,16 63:5 65:25 69:24 70:4,13,14, 18 72:4,6 74:1,3 87:11 88:10 91:25 92:1,3,8 98:24 99:3 107:1

**includes** 21:4 100:16

**including** 20:25 43:19 55:1 63:6 73:15,22 90:3

**inclusion** 20:13 21:1 23:1 24:10 88:23 110:18

**incoming** 11:19 25:5 65:20

**incorrect** 99:1 100:7

**increase** 64:16

**independent** 44:12 45:15 72:9

**indicating** 22:23 26:11 72:17

**indication** 59:14 92:2, 11 100:1 106:23

**individual** 17:23 18:4, 17 21:9 22:23 23:10, 13 24:1,14 26:1,13,22 27:1,16 28:3,20,21 64:20 82:24 84:8 98:8

**individual's**

85:1,8

**individuals** 24:14 25:12 26:1 41:7 43:21 45:20 46:9

**industries** 105:17

**industry** 10:14 11:22 13:8 16:6 30:15 31:3 33:13, 17 34:5 38:25 42:2, 17 51:3,10, 15 53:8,16, 20,21 56:19 57:19,22 60:13,14,15 62:8,24 64:8 69:19 73:8, 9,10,13 77:10,24 78:10 84:3 90:9 92:18, 21 97:16 102:6 104:17,21

**industry- standard** 62:1

**industry-wide** 56:19

**infant** 25:11

**information** 8:11,12 12:12 15:11

17:10 23:19, 24 24:2 26:3,6 29:1, 11,23 30:2 31:15,16 32:2 42:18 43:25 44:9, 22 46:3,13, 23 49:20,23 54:16,24 55:4,12,13 57:24 59:10, 12 60:23 61:1,3,20 62:17,21 64:18 65:5, 12,18,24 68:1 70:4, 12,15 71:1, 5,6 72:7,17, 19 73:12,14 74:3,12 80:19 82:14 97:19 103:22 105:17 107:1 109:23

**information's** 59:25

**ingest** 31:7 32:3 104:13

**ingested** 33:15 49:16

**ingesting** 30:18 41:7 105:6

**ingests** 104:23

**inherently** 102:16

**initially** 21:5

**input** 31:21

**inquire** 48:21 49:10

**inquiring** 94:24

**insight** 101:13

**instance** 11:4, 11 49:17 57:24 58:23

**instances** 88:13

**instruct** 79:3

**interact** 32:15 53:23

**interest** 101:25

**internal** 14:11,22 49:9 50:10, 11 55:23 65:16 78:23

**internalized** 65:17

**internally** 12:9,11 24:19 50:7 78:13

**international** 14:16 19:12 55:20 65:10

92:9 98:3

**internet** 13:20 39:12 41:12, 15

**interpretation** 95:2 96:1

**interview** 39:19

**introduce** 4:14 5:9,11

**investigate** 30:1

**investigated** 101:11

**investigating** 29:16,25

**investigator** 29:21

**involved** 6:16 8:4 10:5 30:10 94:18

**involving** 6:17

**irrespective** 83:3

**issue** 33:18 97:5

**issues** 77:21

**IWF** 16:3,19 20:1 30:25 31:19 32:12 36:9,18 48:15 57:7 95:8,11

96:10 97:13 98:10

_____

**J**
_____

**Jami** 4:23 9:10,23 100:23 112:25

**January** 15:4, 9,13 16:23 17:5 21:20 55:7 80:21

**job** 5:18 7:1 40:4,5

**Jodi** 4:11

**John** 9:16,25

**Johns** 101:9

**July** 75:20,24 95:20

**June** 4:9 95:20

_____

**K**
_____

**Kathleen** 4:8

**keeping** 85:14

**Kimbrell** 4:23 9:8,10,17, 22,24 10:2 94:2 100:25 112:25 114:23 115:25 116:1,6

**kind**  33:4 47:13 48:4 54:10 55:2 57:11 65:24 77:20 88:7 89:8 91:18 93:4

**knowing**  16:19 38:18

**knowledge**  24:8 40:13 52:12, 13 56:18

---

**L**

---

**labeling**  25:9

**lack**  85:4

**lacks**  74:21

**laid**  62:5

**landscape**  77:24

**language**  62:7 75:7

**large**  64:14 101:10

**larger**  13:25 90:25

**lascivious**  22:21 23:7 60:17

**late**  85:21

**law**  7:7 23:9, 13,17,24 24:5 28:12

29:12 41:19 42:2,6,8,18 44:11,14,23 45:3,10,13 46:13,18,19, 24 57:14 63:20 64:22 65:10 66:4 67:8,25 68:2,4 69:10 71:11 72:8, 20 74:5 77:10 81:14 83:1 85:2 101:6 109:19,22

**laws**  45:9

**Lawshe**  4:7 8:2 75:18 98:15 101:11

**lawsuit**  75:17, 18,19 79:22

**lawyer**  78:5

**lawyers**  78:17, 22

**layman's**  31:12

**leave**  85:2

**Lee**  4:7 8:2

**left**  47:10

**legal**  77:20, 24 90:12,19, 25

**legible**  14:1

**letter**  56:14

**level**  37:2 83:7,9 85:18 111:17,24 112:2,3

**lewd**  22:21 23:6

**liability**  55:3

**limited**  55:1 59:10

**link**  9:12

**list**  7:16 10:9,12,13, 17,21 11:18 12:4,8,14, 21,22,24 13:1,5,6,9, 12,19 14:11, 15,20,23 15:20,21 16:5,8,12, 14,16 17:14, 18,24 18:3, 8,12,21,24 19:5,8,25 20:14 22:1,9 23:1,3 25:23 29:14 30:4, 7,11,12,19, 25 31:1,4,5, 19,20 32:4, 22 33:6,23 34:1,16,17, 23 35:13,14 36:2,3,9,14, 17,19 37:14

38:14 40:11, 15,19 41:4,7 43:2,13 48:7,13,24 49:2,8,9,11, 16 50:3,6, 11,15,20,25 51:1 52:23, 24 53:3,10, 11,16,21,24 54:12 55:14 56:1,16,20 57:7 61:1,8, 13,23 62:17 63:3,13 67:17 68:11 75:3 87:12, 25 88:1,3,18 89:23 91:24 92:1,10,16, 17 95:1,4,9 96:5,8,11, 15,18 97:7, 25 99:7,8, 19,21,22,23 100:2,11,15, 16 104:11, 13,14,23 105:16 108:4 110:18

**listed**  85:19 111:12

**lists**  20:10 34:2 43:23 52:16,17 54:4,19 55:11,17,22

57:4 61:13 89:25 92:20 96:15 97:16 100:16 104:6 107:6

**literature** 38:25 39:8

**Litigation** 4:13

**local** 109:19

**locate** 10:6,8 11:1 52:6

**located** 10:21, 25 11:2

**location** 72:7

**log** 68:22

**Logan** 4:19

**logging** 94:3

**long** 6:9,16

**long-winded** 89:21

**longer** 47:12 93:10,11,20 110:10

**looked** 57:11 83:4 84:10 98:14 106:19

**loses** 97:16

**lost** 96:10 97:13

**lot** 41:20 42:2 45:9,10

94:14 96:13

---

**M**

---

**Madame** 5:24 8:19 39:4 94:2

**made** 10:21 16:22 19:18 27:25 31:21 34:4 40:2 42:6 44:10 46:18 60:19 73:2,4 82:12 85:17 109:3, 19,21

**main** 44:2

**maintain** 68:11,14 92:20 104:14

**maintained** 108:4

**maintains** 107:6

**majority** 64:5 89:14 94:20

**make** 7:6 13:25 16:8 22:8 32:2,4 43:24 47:13 51:10 53:8 56:4 68:3 72:19 80:16 88:5 91:6 105:13 112:14

**makes** 10:14 13:7 55:10, 25

**making** 24:15 32:11 40:6 82:25 84:24 85:1,15

**man** 8:1

**management** 25:4,17

**mandate** 43:15

**manner** 46:17 68:18

**manufacturing** 59:7

**March** 78:12 79:18,25 80:3,11,13 86:1,2 111:5,10

**mark** 8:20 36:25 37:1 41:13 51:23 56:9 79:12

**marries** 53:11

**massive** 103:20

**match** 30:7 35:1 61:5,7, 8 67:16 82:21 90:5

**matched** 92:17

**matches** 94:25 95:15,19,24

**matching** 37:23 86:19 89:10, 20 104:15 105:9 106:13 110:3

**material** 13:11 21:13 23:5 28:7 39:6 40:20 43:16 46:1,11 53:6 69:9 73:5 74:1 76:18 110:20

**materials** 32:17 57:14

**Matt** 4:21 101:6

**matter** 4:7

**matters** 77:10

**Mcnulty** 4:4 5:2,12,13 6:4 8:24 39:9 47:3 48:2 94:14 100:21 101:5 112:22

**MD** 14:9

**MD5** 10:18,20 11:2,4,8,11, 13,18,22 12:4,23 14:9,24 16:9 17:15,19 18:5 19:1 35:7 37:20

50:12,13,20
51:3 59:13
61:25 63:8,
13 86:22
87:1 102:10,
12,18,22,25
103:2,16
104:5 105:6
107:4,12,18
108:9,12,15,
20,24,25
109:6 110:3,
25 112:16

**means** 20:22
23:6 28:1,5
82:14 102:7

**meant** 58:3
70:1 99:22
105:16
114:13

**mechanism**
34:8,15,18

**mechanisms**
92:19

**member** 11:22
21:15 25:3,
16 30:16
31:3 46:15
48:10,23
49:17 50:1,
23 51:3,10,
15 57:22
62:23 63:4
74:19 97:16
100:14
104:17,21

**members** 10:14
13:8 16:6
30:15 33:13,
17 42:17
53:16,21
57:19 61:11
64:1 69:20
71:16 73:14
84:4 91:23
92:12,21
102:6

**memorandums**
51:21

**memory** 80:17
81:19

**met** 36:12

**Michael** 4:12,
17 5:8 9:8

**Mikayla** 4:7,22
101:8

**million** 18:1

**millions** 19:19
42:6 65:3
106:2

**mind** 64:13
85:14 96:23
111:19

**minimize** 29:7

**minor** 29:17
60:16

**minors** 53:12

**minute** 114:5

**minutes** 47:10

93:16,23,24

**Missing** 4:6
5:15,20

**mistakenly**
99:9

**Mm-hmm** 85:11,
13

**model** 34:13
35:18

**moderation**
106:12

**modified** 88:11

**modify** 110:2

**monthly** 68:6

**morning** 5:8,12

**motion** 79:21
98:20

**motions** 98:22

**motivating**
43:1

**move** 48:5

**moving** 85:24

**multi-human**
13:10

**multiple** 19:1
34:2 63:23
78:3 88:13

**multitude**
63:11 65:9

**muscle** 74:23

---

**N**

---

**N-C-M-E-C** 6:1

**named** 8:2
18:11

**names** 13:14

**national** 4:5
5:15,20 24:3
97:10

**NCMEC** 5:22,25
6:6,17,22
8:3,6 10:8,
12,14,22
11:17 12:14,
21,23 13:5,
6,7,8,10
14:10,14,15,
20,22 15:7,
14 16:10,24
17:5,13,20,
24 18:2,10,
21,24 19:5,
16,25 20:1,
4,13 22:22
23:1,3,5,9
24:2,4 25:23
27:7 29:10,
16,24 30:1,
4,24,25
31:15,16,19
32:7,18
33:22 34:2,
23 36:2,11,
14,17 37:14,
18,25 38:13,
21 39:19

Case 3:24-cv-00044-JAR-MCR    Document 67-5    Filed 08/12/25    Page 50 of 62 PageID
857
WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                    Index: Ncmec's..office

40:10 43:17,
20,24 45:6,
18 48:11,14,
19,22 49:2,
8,9,11,18,
22,23 50:15
51:5,8,16
52:1,9,24
53:2,4,16,23
54:4,14,15,
19 55:10,16,
25 56:14
57:9 58:15,
21 59:2
60:18 61:13
63:19,22
65:15,16
68:7 72:3
74:4,14,15,
16,18 75:2,
7,15,16
78:13 80:15,
18,23 81:1,2
82:8 87:24
88:18 92:2
94:15 95:7
96:2,8 97:25
99:10,11
100:2,5,7,17
101:16,19,
24,25 107:6,
14,17 108:4
112:11
114:25

**NCMEC's**  13:19
16:2,4,13,
15,16 21:2
23:21 29:8,

13 30:12
32:4 35:22
40:19 50:24
56:15 78:23
88:20 89:22
92:3 95:13
96:15,21
97:8 98:24
99:3,5,18,23

**necessarily**
16:7 18:7
19:16 20:8
22:1 29:10
36:4 41:24
50:8 53:5,17
63:9,13
65:11 76:13
85:10 86:15
88:25

**NGO**  12:20,23
13:5,6,15,19
14:14,20
16:7,10
18:2,21
19:5,25
29:13 30:3,
4,11,24 32:5
33:22 34:1
35:13 36:2,
3,10,18,20
43:6 48:7,13
49:18 52:24
54:11 55:14
56:1 57:7
61:1,6,7,13,
22 62:17
75:3 91:23

94:25 95:4
97:25 99:22
100:15,16

**NGO's**  87:12

**NGOS**  13:13,18
16:22 19:18
32:8 36:6
52:25 54:20
62:16

**ninety-nine**
40:21 64:7

**non-governmental**
13:15 100:16

**non-lawyer**
79:24

**non-profit**
52:23 54:16,
25 55:4
61:20 74:15

**non-profits**
54:17 61:19

**notes**  40:24

**notification**
71:20

**notified**  57:3

**number**  19:10
59:13 61:10
65:17 68:9
72:7 92:19
95:5,15 96:6
111:17

**numbers**  66:7

O

**oath**  5:4

**object**  27:17
67:10 78:15
87:16,17

**obligations**
51:13

**observation**
56:5

**Observatory**
39:12 41:16

**observing**
95:16

**obtain**  104:5

**obtaining**
103:16

**occasions**  15:8

**occurred**  74:24

**occurring**
42:19

**October**  37:18
55:7 81:10,
15,22 82:10,
12 83:4,13,
22 87:4

**odd**  38:17

**off-limits**
78:18

**offer**  104:8

**office**  79:19
101:10

officer 41:19, 20

older 62:6

on-the-job 24:23

ongoing 78:4

online 38:23 43:9 44:20 45:5 64:16 72:25 73:6 103:10

onset 64:19

operate 43:18 105:10

operates 60:2

operating 103:8

operations 7:3

opinions 29:8

opportunity 7:10 8:5,8

opt 30:25

opt-in 30:23

order 23:2 31:18 35:21 63:17 72:19 79:21 98:21 102:9 113:24 114:4 115:11

ordering 114:13 115:6

organization

48:15 57:8 102:22

organization's 95:9

organizations 13:16 100:17 110:4

original 8:5 80:15 82:1

outcome 97:22

outset 112:7

overlap 36:17 96:18

overlapping 36:1

oversee 7:3

overview 77:23 78:3

——————————

P

——————————

p.m. 94:8,9, 10,12 115:4 116:9

packaged 90:12

pages 94:14

paragraph 55:8

parameters 31:5,8

part 7:20 43:1,2 76:16 80:2 96:21 101:10

114:17

participants 16:7 20:6 33:6 34:5

participate 13:18 33:24 34:3

participating 13:8,13 16:22 19:6 30:5,15 53:16 54:17 61:19

parties 10:22

party 40:17 43:12

pass 29:6

past 74:2

pay 29:12

PDF 22:15 79:17,25 80:5,7,9 82:3,4,6,16 83:5 102:20 106:19 111:5 115:7,8,14, 17

people 40:3,4 42:2 47:2 70:23 76:15, 16 77:6,16, 19 89:25 90:9,10,15 93:11 109:25

percent 40:21 64:7

percentage 64:4,10,24

perception 27:16

perfect 93:24, 25

performed 40:17

performing 45:14 89:9

person 59:6 76:4

phone 72:7

photo 37:22 84:5 107:17

Photodna 11:23 12:5,6 15:2, 18 37:17,22 50:13,20 55:1 61:24 63:8,14 88:6 90:4

photograph 86:24 101:21,24 102:10,21,23 103:3 107:10,14,18 108:16 110:7

photographs 102:4 103:14,15,17

104:2,3,6,24

**photoshopped**
84:6 89:10

**physically**
80:23

**pick** 35:8

**picture** 87:6
109:2 110:2

**pictures**
106:2,3

**piece** 92:22

**pipeline** 46:24

**pixel** 109:5

**places** 61:22

**plaintiff** 4:18

**Plaintiff's**
8:20 56:9

**platform** 13:7
32:5,8 34:4
36:3,10,18,
20 71:19,21
98:5,7 105:7

**platforms** 41:9
53:9 105:18
106:11

**pleadings**
98:15

**point** 21:11,
20 27:12
40:21 58:17

**Police** 8:6

**policies** 45:18

46:7 89:25

**policy** 39:12
41:16 88:22,
25

**pornography**
22:16 25:7
26:18,23
27:2,3,14
28:2 43:23
59:8 62:1
63:19 64:12
66:5,21
67:18 68:20
72:14 82:23
83:10,22
90:11 91:9
100:6,9

**portion** 64:14

**position** 6:5
100:5

**possessed**
101:11

**possessing**
43:22 46:10
59:7

**possession**
15:7 45:25
67:18 101:20

**possibly** 91:25

**potential** 24:9

**potentially**
60:24,25
90:4 101:24
106:22

**Powerpoint**
69:12

**Powerpoints**
74:2,4

**practical** 57:3

**practices**
45:19 46:8
55:24 106:10

**predict** 24:10

**prepubescent**
23:8,12
24:11 60:16,
20 66:16,20
74:20 75:9

**present** 10:18
76:17

**presentation**
38:20,24
69:13 75:25
76:11,14,25
77:9

**presentations**
78:9

**Preston** 4:7,22
101:8

**pretty** 45:4

**previous** 15:8
37:21 83:13,
21

**previously**
6:23 11:21
12:17,20
15:3 17:20
21:25 22:11

33:15 38:8,
10 51:8
60:18 81:7,8
83:2,21 84:2
98:9 99:14
109:13

**primer** 77:21

**print** 68:21

**printed** 79:25

**prior** 6:14
15:4,13
16:23 17:5,9
21:20 37:18,
24 38:11
79:19 81:15
83:23 107:16
110:6

**prioritize**
44:5

**priority**
111:17,24
112:2,3

**privacy** 43:21
45:20 46:9

**problem** 94:24
111:21

**problematic**
101:25 102:5
105:14
106:22

**procedures**
45:19 46:8
90:1

**proceedings**

Case 3:24-cv-00044-JAR-MCR    Document 67-5    Filed 08/12/25    Page 53 of 62 PageID
860
WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                Index: process..quote

4:1

**process** 7:6
13:10 20:18,
25 21:8,12,
23 22:2,3
36:13 38:21
43:3,6 96:22
102:11 106:3

**processing**
82:24 83:8
85:15

**produced** 7:14,
24 52:2 54:1
64:17 79:14
86:2 94:14

**program** 23:22,
23,24 25:2
71:14 72:12

**programs** 43:18

**prohibited**
49:25

**promoted** 6:11

**protect** 45:19
46:8

**Protection**
13:21

**proved** 34:12

**provide** 32:18
34:5 49:19,
22 51:16
52:15,18
54:21 60:12
65:12 68:10
71:8 73:13

103:1
105:12,15

**provided** 24:19
55:12 57:25
58:24 61:3
73:15 74:4,
18 97:19
104:9 111:3

**provider** 12:18
14:12 19:23
31:18 46:16
48:7,21
49:5,10 64:6
65:15 67:16
71:20 73:10
112:4

**providers** 7:5
17:25 19:6
30:5 32:15,
18 42:11,13
52:18 57:15
63:24 67:21
71:17

**providing**
25:18 34:18
42:13 57:16
73:11

**pubescent** 23:8

**pubic** 85:5

**pubic/facial/**
**underarm** 74:22

**public** 46:15
64:2 71:16
73:3

**publicly** 56:22

60:4,7 70:21
71:23

**publish** 104:11

**published**
39:18 71:23
73:3

**publishing**
71:12

**pull** 31:15,24
80:2 81:18

**pulling** 69:15

**purposefully**
110:2

**purposes** 13:24
57:20

**pursuant**
110:15

**push** 31:16
32:2

**pushed** 67:7

**pushing** 32:12

**put** 41:4
61:24 88:17,
24 109:7

**puts** 102:19

**putting** 32:14

─────────────
**Q**
─────────────

**quality** 73:14

**queried** 68:22

**query** 16:4

30:16 31:5,
7,17 51:6
68:16,19
86:16 96:4

**querying** 84:1
95:4

**question** 6:4
7:20 10:19
15:17 17:12
19:11 26:21
27:18 37:24
38:11 39:4
40:9 45:22
46:7 50:4,9,
24 51:2 60:2
61:5 63:16
66:1 67:11
73:1 80:10
81:10 86:10
87:15 102:2
105:11
112:10

**questions** 10:4
48:5 49:1,
13,15,23
50:2 92:25
93:1,11,15
100:20
101:14
112:21
113:1,10

**quick** 48:2
93:2

**quickly** 74:9

**quote** 41:20,
24

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**                    Index: ran..remove

---

### R

ran   14:25

rape   66:15

re-ask   27:24 67:12

reach   49:13, 18

reached   95:3

reaching   79:19

read   10:6 20:19 37:7 39:23 41:23 57:13 58:10 95:10 102:25 113:7,18,22

readers   103:9

reading   41:22

reads   102:18

ready   87:19

real   74:9

reasked   27:18

reason   24:9 33:16 79:24

recall   8:15 18:13 33:1 40:6 41:22 62:12 69:8 76:13,19 77:8,13 80:4

receive   7:4,18 24:14 42:4,

24 44:21 45:16 50:13 64:1 65:3 67:14,20 71:15

received   9:13 10:20 11:16, 20 12:2 46:14 58:15, 21 65:14 72:15 80:22 81:13 87:3 92:11

receives   23:24 45:6

receiving   30:25 44:4 53:18 64:19 65:1 73:18 75:12 96:25 97:1,3

recent   38:16 75:5

recently   6:10

recirculated   41:11 43:9 66:13 67:1

recirculating   66:20

recirculation   66:19 72:24

recognize   56:11

reconsideration

98:21

record   4:3 5:11 6:2 9:3 11:7 47:20, 24 50:6,18, 19 54:6 58:7 68:14 94:8, 11 100:10 114:11,12,18 115:4,6

recorded   77:14

recording   58:21

records   17:4,7 26:5

reduced   96:6

reduction   94:24 95:15, 17

refer   6:2 12:13 15:7 32:24 75:4 86:1 101:17

reference   75:14 106:20

referenced   56:18 107:12

references   32:25

referrals   109:21

referred   5:21 45:5 64:25

referring   10:13 12:15 13:15 19:12 41:17 45:13 69:12 72:8 78:21 86:7

refers   99:5

reflect   17:7

reflective   59:3,5 75:7

reflects   57:23 69:23 86:5

regain   97:13

registered   112:4

registrant   48:23 54:23

registrants   55:11 89:9

related   45:5 77:24 102:12 109:16

relationship   87:14

released   33:1

relevant   68:2

relying   106:11

remember   40:1 81:24

remotely   84:17

remove   34:17 41:8 53:9

73:4 105:20

**removed** 57:2,4 73:7

**repetitive** 11:14

**rephrase** 107:11

**report** 9:2 10:19 11:3, 12,16,19 21:21 22:14 34:25 35:3 36:11 37:4,6 38:1 39:20, 23 41:16,22, 24 44:1,9,10 45:16 46:3, 15 57:25 58:2,5,8,18, 21 59:1,4, 11,21 60:1 61:4 64:11, 19 65:14 69:24 70:7, 19 71:10,12 72:5,15,19 79:16 80:9, 14,15,22 81:1,11,23 82:12,15,18, 23,24,25 83:9,12 85:8,15,16 86:3,4 87:5 88:10 99:13, 16 101:24 102:7,16,17

106:16,17,19 107:2,13,25 111:7,8,16, 20 112:3,19

**reported** 12:17,20 14:11,23 15:3,9,14 30:2 37:18 46:6 50:17 51:5 68:12, 15 71:6,17 72:1 84:2 86:18 88:13 99:9 101:16, 19 102:19 103:23

**reporter** 4:11, 15 5:25 8:19 39:4 94:2 114:5,10,17, 20 115:5,10, 17,21,25 116:3

**reporter's** 5:18

**reporting** 39:1 51:13 59:14 70:17 77:11, 25 92:21

**reports** 7:4,6 8:3,6,9,14 15:16 17:9 38:3 41:21 42:3,5,6,8, 11,13,17

44:4,6,18 45:1,2,6,13, 21,23 46:12, 18,22 50:14 52:4 63:19, 22 64:1,7, 10,14,22,25 65:3,7,9 66:4,21 67:5,7,14, 20,24 68:3 69:23 71:15 72:2 73:15, 21 81:8 88:13 96:25 97:3,9 108:7 109:15,19

**represent** 8:1 10:7 18:20 41:14 69:19 71:22 101:8

**representation** 28:4

**representations** 32:12 55:25 78:1 89:19

**representative** 4:5 5:14 18:22 76:2 88:9

**represented** 16:2 18:24 19:17 21:2, 25 29:13 34:13 40:19 56:16 88:2,

20 89:3,17 96:17 99:6, 13,20

**representing** 4:22,24

**represents** 11:11 17:19 86:23 87:6

**request** 31:19 34:4 52:2 79:20

**requested** 7:17 8:11 51:20 78:25

**requests** 7:19 8:15

**required** 61:19,24 63:2

**requirement** 62:8,11

**research** 37:9 38:19

**reshow** 85:25

**resolution** 97:18

**resolves** 44:9 85:16

**resolving** 65:8

**response** 53:25 111:4

**responsibilities** 54:14

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                  Index: responsible..sense

responsible
  54:15,19

responsive
  7:19 79:15

rest  116:4

restrict  98:7

result  64:10
  109:21

resulting
  110:25

results  15:25
  40:20 41:1
  56:15 95:5

retrace  35:20

retract  34:19

retrieve  46:22

return  15:24

returned  31:7
  96:4

revictimization
  43:10

review  7:10,
  15,25 8:5,8
  13:10 17:4
  21:4,12,14,
  17 24:13
  25:21 29:6
  38:12 44:12
  45:15 53:23
  72:9 80:3,10
  85:3,9 89:2
  94:16 95:22
  110:17,21

reviewed  7:23
  9:2 20:23
  21:24 22:20
  49:24 50:5
  65:1 68:7
  80:8,12,13
  81:7 82:13,
  25 86:2

reviewer  21:5

reviewers
  21:12 25:22
  89:16

reviewing  21:9
  24:25 25:13,
  17 36:5
  65:4,22
  84:23 94:20
  97:4 112:11

reviews  17:8

revoked  95:11

rights  43:21

rise  53:5

risk  44:5
  65:5,21

risks  55:3

Roberts  4:17
  5:7,8,24 6:3
  8:17,22 9:9,
  15,19,23,25
  10:3 14:3,7
  27:20,22,23
  38:6,7 39:3,
  7 47:1,12,
  16,19 48:1

67:12,13
78:19,20
79:6 87:20,
23 92:23
93:7,9,17,25
94:13 100:19
113:3,13,16
114:1,3,7,21
115:7,8
116:5,7

role  6:10,14,
  25

Rule  98:21

run  11:17
  12:3,4,8,9,
  23 14:10,14
  16:9,13
  65:15 108:5

Rutherford
  4:19 27:17,
  21 47:8,14,
  18 67:9
  78:15 79:2
  87:18 93:5,
  8,22 113:12,
  14,17,21
  114:2,25
  115:12,13,19

————————————
         S
————————————

sadism  25:10

sample  52:15

San  75:24

satisfy  98:4

scan  31:19

scanning  35:7
  39:1

scenario  36:15

schedule  7:12
  54:1

scope  96:14

screen  8:19,24
  51:24 109:3
  111:19,25

screenshot
  89:13

scroll  9:7
  60:11 82:6,
  17

search  31:23
  50:19

second-review
  21:8

section  22:15
  58:5 60:11
  70:5,14 74:7

secure  46:17,
  19

selected  85:18

send  9:12,15,
  17,19 59:1
  71:20

senior  21:15
  22:8 25:3,22

sense  19:4,7,
  13 67:6 91:6
  92:13,16

Case 3:24-cv-00044-JAR-MCR    Document 67-5    Filed 08/12/25    Page 57 of 62 PageID
864
WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025          Index: separate..speaking

separate   19:7
  20:24 71:14
  98:2

servers   105:14

service   7:5
  12:18 14:12
  17:25 19:6,
  23 30:5
  31:13,18
  32:14,18
  42:11,13
  46:16 48:7,
  21 49:5,10
  52:18 53:12
  57:15 63:24
  64:6 65:14,
  15 67:16,21
  71:16,20
  73:9 112:4

serving   44:1

set   18:23
  105:2

sets   31:14
  32:7

setting   31:6,
  21

sex   22:21
  23:6 26:17,
  22 28:1

sextortion
  44:21

sexual   13:11
  21:13 23:5
  28:7 39:5
  40:20 43:15

45:6,25
46:10 53:5
66:15 73:5
90:11 110:19

sexually   44:19
  53:4,7

share   8:19,23
  36:18,19
  37:2,14
  41:13 51:7,
  22 53:15,22
  74:10 90:16
  98:19

shared   8:23
  16:5 19:5,19
  23:3 33:14
  36:9 46:13
  81:20 100:10
  105:19

shares   17:24
  40:14

sharing   18:2
  20:11 34:1,7
  36:22 46:23
  49:25 53:20
  61:12,23
  74:15 81:21
  88:20 105:16
  111:19

Sheriff's
  101:9

shoot   81:20

show   24:11
  76:18,19
  77:1 111:15

showing   80:17

side-by-side
  109:7

sign   30:24
  75:2 113:22

signature
  11:24 12:6,7
  37:17 50:20
  61:24 63:14

signatures
  55:1

signed   62:10
  100:14

similar   11:25
  86:19 89:22
  109:11

similarly   24:2
  28:17 43:12
  49:15

simple   110:7

simply   28:13
  32:2 58:25

sir   14:6
  114:22

sit   14:10
  35:6 87:7

sitting   25:3

sixteen   43:18
  47:21

slide   76:11,
  18,19 77:1

slightly   109:5
  110:24

slow   76:11

small   64:24
  65:2

smaller   12:21
  77:5

smoothly   113:5

snap   85:15

Sniffen   4:21
  101:7

soda   93:12

solely   72:15

sort   15:12
  35:19 68:21
  86:13 87:14
  96:21 97:5

sound   32:20
  57:17 91:14
  95:22

sounds   25:21
  91:17

Souras   113:4

source   34:21
  48:6,8

sources   63:23,
  25

speak   16:21
  35:15 36:4
  59:9 73:24
  90:2 102:1
  104:20 105:4
  107:20

speaking   76:3,
  15

specific  8:13
  10:4 11:17
  14:19 30:6
  33:9 77:12
  106:21
  108:13
  110:15

specifically
  6:17 7:4
  50:4 54:11
  73:24 91:24
  101:17
  104:20

specifics
  76:13 77:8
  97:15 104:16

speculate
  91:12

spell  76:6

Spellman  4:22
  101:7

spoke  76:22

spoken  56:22
  59:13 72:24
  106:7

spring  78:12

St  101:9

staff  17:5
  21:15 29:9
  39:19 48:19
  80:7,18,23
  81:1,3 82:8
  94:15

stage  77:3

stamp  58:8

standard  22:25
  115:9

Stanford
  39:11,13
  41:15

staring  79:9

start  60:24

started  5:10
  84:2

starting  17:15

starts  76:8

stated  69:17

statement
  26:19 40:6
  98:17 99:1
  100:7

statements
  98:18

States  45:8
  65:8 66:5
  67:8

statute  67:24

stay  40:24
  115:5

step  13:4
  22:7 31:18

steps  22:7
  35:20

Stingo  4:3,12
  13:22 14:6
  38:4 47:20,

24  94:6,11
  113:23
  114:15,19
  115:2

stop  36:22
  81:20 87:15

stored  26:3
  103:15

storing  104:25

stringent
  96:22

strong  4:24
  89:12

study  39:18

stuff  54:20
  102:5

subject  21:21
  24:6 26:2
  28:24 37:10,
  25 66:25
  67:2 74:21
  75:15 80:24
  83:12 108:13

subjective
  29:5,8

submission
  63:3 110:16
  112:12

submit  53:13
  54:15 61:19

submits  58:18

submitted
  11:21 25:1

42:17 46:15
  54:16 59:4
  72:5 84:3
  102:16
  110:14,23,24
  112:4

submitting
  61:4

subpoena  7:8,
  13 53:25
  54:1 79:15
  111:4

subscriber
  103:25 104:1

subscriber's
  102:4 103:14

subscribers
  101:20

substance
  33:10

substantive
  77:22

substantively
  80:7

suggesting
  45:17

suggestion
  14:4

suitability
  89:3,7

suitable  21:2,
  18 89:20

summary  9:5

57:12 82:17 86:4

**summer** 38:20

**superimposed** 84:7

**supports** 54:5

**surface** 44:6 65:19 86:20 88:9 102:7

**survivors** 43:8 53:12 66:14

**suspect** 45:24

**suspected** 39:2

**suspects** 45:20

**swear** 4:15

**swiftly** 105:20

**sworn** 5:3

Synchronoss 11:17 19:22 30:9 35:1,3, 7,10 48:19 52:3 54:2,7, 24 58:1,3,25 59:1,19,20, 23 60:1,15 61:4,17 69:25 72:6 73:17 74:11, 18 75:1 94:15,23 95:2,15 97:25 98:9 100:4,14 101:16,19,23

102:2 104:20 106:21 107:17,23

**system** 26:4 30:23 46:17, 21 58:17 65:11,16,21 84:21 87:10 99:15 102:15,18 103:8

---

**T**

---

**take-it-down** 53:10,12

**takes** 20:13 44:15

**taking** 51:11

**talk** 18:10 19:5 23:17 28:19 41:1 48:17 57:13

**talked** 69:8 70:20,22 74:7 89:5

**talking** 19:22 29:19 36:24 38:20 41:19 66:17,18,24 69:9 77:3 88:11 91:16

**Tallahassee** 101:7

**target** 45:24

**targets** 45:21

**taught** 25:4

**team** 25:3,19 26:11 48:25 65:2 71:18 72:21 73:20 75:12 88:8

**technical** 31:10 86:11 90:10 95:4

**technology** 15:2 35:7 65:23 109:10

**teen** 84:19

**telling** 96:2

**ten** 4:9 18:1 71:24 93:23, 24

**tens** 42:5 44:3 65:3

**term** 28:9,10, 11,16 68:16 90:10

**terms** 6:25 29:24 31:12, 24 32:19 43:5 85:7 95:9 98:9

**terrible** 87:15

**tertiary** 110:17

**testicles** 74:22

**testified** 5:3 27:8 107:3 110:13,22

**testimony** 101:15 110:6

**text** 65:24 110:9

**texts** 70:13

**theory** 22:6 36:7,16 69:1 90:3,7

**thing** 33:4 81:20 91:18

**things** 45:10 56:2 66:19, 20 69:18,19 73:15 85:23 89:2,8,16 105:2 106:14

**thinking** 36:8 73:19 89:2,7

**third-party** 21:14

**third-pass** 110:21

**thirty** 47:10

**thirty-eight** 57:1 94:8

**thought** 18:9 50:10 79:12

**thousand** 18:16 19:10 42:7 57:1

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: thousands..unable

thousands
  25:13 44:4

thread   32:25

three-part
  21:4 96:22

three-person
  89:1

three-step
  36:12 43:3,5

threshold
  55:21

throw   47:5
  93:18

thumbs-down
  33:4

thumbs-up   33:4

time   4:9
  34:14 44:15
  52:4 55:10
  57:13,21,23
  58:3,8,12,
  13,16,17,21,
  24,25 59:4,5
  61:4 62:20
  63:9 69:11,
  18,21,23
  70:1 72:20
  73:11,12,16,
  22 74:11
  78:7,11
  80:8,21,25
  81:13 82:7,
  12,15,25
  83:5,8,15
  86:10 96:7

100:20 114:6

timeframe
  80:11 95:22

times   15:13
  17:1 37:24
  57:16 67:1,3
  83:12,15
  84:1 88:14

tip   81:13
  101:18
  106:18 107:5
  112:16

today   4:9
  5:19 7:9 8:1
  14:10 26:6
  35:6 72:24
  87:8 88:11
  111:5 113:25

told   41:20

tone   74:23

tool   104:9

tools   106:15

top   29:1 33:1
  62:14 68:10
  73:23 85:18
  111:15,16

total   52:17

totally   31:25

touching   54:11

track   76:15

trainer   25:16

training
  24:14,18,21,

23 25:12,16
  57:14 69:9
  74:1 75:12

transcript
  113:18
  114:4,9,13
  115:1,6,14,
  16

transmit   90:11

transmits
  63:19

transmitted
  80:22 81:14
  91:5

trend   91:19

triage   45:14

triaging   44:3

triple-
verification
  110:17

triple-verified
  56:1

triple-vetted
  110:14

triple-vetting
  20:18 21:23
  22:2

true   24:4
  30:20 34:11
  45:12

trust   40:3,4

Trustcon
  76:21,25

turn   53:15

twelve   58:9
  94:8,11

twenty-one
  58:8

twenty-three
  47:25

two-part   21:12
  26:15

two-person
  22:3

type   11:24
  23:19 33:18
  62:21 63:14
  82:22 83:9
  85:18 91:9
  112:19

types   24:15
  25:13 42:21,
  22 67:7
  89:15 105:8

typically   26:3

**U**

U.S.   97:1

UK   96:24

ultimately
  28:7 40:17
  42:8 44:1
  51:9 85:1
  104:17
  105:3,24

unable   58:2

unclothed   25:8
  53:6

unconfirmed
  22:16,18,24
  25:7 26:8,9,
  11 27:9
  28:1,4,6,25
  33:20,23
  38:9,13
  60:22 63:19
  64:11,23
  66:5 67:5
  68:8,17,20,
  25 81:5,9
  82:23 83:3,
  7,10,22,24
  84:24 99:14,
  17 111:13
  112:14

uncurated
  43:23

undergone   13:9

underneath
  111:17,23
  112:2,5

understand
  5:13 13:3
  16:25 19:21
  20:12,15
  22:5 23:16
  35:25 44:13
  45:22 46:2
  50:9,16
  52:10 54:18
  55:16 56:3
  61:2,22 62:4

70:8 80:21
83:14 84:23
86:25 91:8
101:15
103:19
104:18,19

understanding
  51:2,21
  81:12 90:6
  98:2 103:13

understood
  50:11 56:6
  70:22 112:6

Unintelligible
  14:5 91:21
  114:2

unique   18:7

United   45:8
  65:8 66:4
  67:8

universally
  45:4

University
  39:12,13

unsure   26:12
  28:2

uploaded   11:12
  59:12,15,21
  60:4 67:21
  68:7 70:21
  71:1,7 80:8,
  19,20 102:17
  105:19
  107:14

uploading
  107:17

upvote   33:7,
  12,21

upvote/downvote
  33:5,24

URL   70:24
  71:8 72:6,
  16,21

URLS   71:17,18

user   46:4

UTC   58:9

utilize   30:7,
  12 57:19
  109:10

utilized   31:8
  33:12 109:12

utilizing
  62:24

---

**V**

validity   43:25

values   10:5
  14:23 15:1
  18:5,6 19:2
  20:2 36:2
  103:17,20
  104:5,23,24
  106:4,6,13
  108:9,24

varies   106:9

variety   102:7
  103:9

vary   105:1

vast   64:5

venture   64:3

verification
  29:22 36:12
  43:3,5 96:22

Verizon   19:22
  52:3,8 54:8,
  9 73:17
  75:19 76:3
  98:15 99:9,
  22 100:4
  101:16,19,23
  104:20
  106:20
  107:16

Verizon's
  79:21 98:20

version   82:16
  84:3,5
  88:11,19

versions   12:1
  37:21 83:24

versus   25:7,8

vetted   110:23

Victim   23:22,
  23 25:2

victimization
  72:25

victims   41:9
  64:17 66:14

video   4:4
  12:1 13:24

14:1 18:25
38:19,23
40:2 76:24
113:25
114:4,8,12,
14,16,17,20,
21,23

videos 12:17
18:23 19:17
41:10 53:13,
19

view 59:15
80:23 82:9

viewed 17:5,20
59:20 60:18
80:18 81:1,
2,12,15
82:8,10,11
83:2

viewing 85:24
112:12

visibility
16:6 19:16
35:22 53:17
55:19 92:18
98:11

visually 11:25
86:19 109:9,
11

voice 74:25

volume 45:5
95:25 96:19

vote 32:19
33:21

—— — — — — ——
                W
————————

wait 81:23
114:5

waive 113:8

wanted 40:14
51:4 93:9
100:4 103:2

warning 69:10

warnings 57:14

warranties
55:13

warranty 55:2

Watch 13:20
14:16 19:12
55:20 92:9
98:3

web 31:13

website 29:21,
22 70:23,24
71:24 72:1,
12,14

websites 71:12
73:4

whatnot 103:10

wheelhouse
91:15

wide 96:17

wider 96:20

William 4:7
8:2

Williamson
27:6

woman 84:17

word 104:4

work 6:17,22
23:22 33:21
38:22 43:18
78:10 97:9
113:5

working 24:24

world 45:11,
12

wound 87:21

wrap 93:4

————————
                Y
————————

year 6:11
30:21 41:23
42:7 64:14
65:4 75:21
80:11 86:2
111:10

yearly 68:6

years 55:9
71:24,25
73:19 84:16

yesterday 9:12

young 84:17,
19

Youtube 38:23

67-6

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE, an individual,

Plaintiff,

CASE NO.:
3:24-cv-44-MMH-MCR

vs.

MIKAYLA PRESTON, in her individual capacity as a detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

Defendants.

_____

VIDEO-RECORDED DEPOSITION OF

**MIKAYLA PRESTON**

Taken on behalf of Plaintiff

DATE TAKEN:    Thursday, March 13, 2025

TIME:    1:01 p.m. - 6:38 p.m.

PLACE:    St. Augustine Court Reporters
1260 North Ponce De Leon Boulevard
Suite E
St. Augustine, Florida 32084

Examination of the witness taken before:

Nicole Medlock
Registered Professional Reporter and FPR-C

---

## A P P E A R A N C E S

MICHAEL KEITH ROBERTS, II, Esquire

Nooney, Roberts, Hewett, & Nowicki
1680 Emerson Street
Jacksonville, Florida 32207-6104
904-398-1992
mroberts@nrhnlaw.com

appearing on behalf of Plaintiff.

MATTHEW JOSEPH CARSON, Esquire
CHRISTEN ANN PETRUZZELLI, Esquire (via Zoom)

Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
850-205-1996
mcarson@sniffenlaw.com
cpetruzzelli@sniffenlaw.com

appearing on behalf of Defendant Mikayla Preston.

AMY R. SHEVLIN, Esquire (via Zoom)

Buchanan & Buchanan, P.A.
1900 SE 18th Avenue, Suite 300
Ocala, Florida 34471-8237
352-629-4099
ashevlin@rbtrial.com

appearing on behalf of Defendant Kathleen Dully.

ALSO PRESENT:

ANDREW CUSIMANO, Videographer
AUTUMN ZEPF, Paralegal for Plaintiff

---

## I N D E X

| Witness | Page |
|---|---|
| MIKAYLA PRESTON | |
| Direct Examination By Mr. Roberts | 5 |
| Cross Examination By Ms. Shevlin | 263 |
| Redirect Examination By Mr. Roberts | 287 |
| Certificate of Oath | 308 |
| Certificate of Reporter | 309 |
| Errata Sheet | 310 |

### PLAINTIFF'S EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | Cyber tip line report | 14 |
| 2 | Affidavit for search warrant | 38 |
| 3 | Deposition of Mikayla Preston on November 21, 2023 | 43 |
| 4 | met-art.com Google search results | 45 |
| 5 | 2018 Florida Statute 817.071 | 85 |
| 6 | Letters to Mikayla Preston from Kathleen Dully, M.D. | 107 |
| 7 | Photograph | 161 |
| 8 | Photographs | 223 |
| 9 | Photograph | 241 |

### DEFENDANTS' EXHIBITS

(None marked.)

---

THE VIDEOGRAPHER: This begins Media Unit Number 1 to the video-recorded deposition of Mikayla Preston in the matter of William Lee Lawshe versus Mikayla Preston, et al., being heard before the United States District Court, Middle District of Florida, Jacksonville Division, Case Number 3:24-cv-00044-MMH-MCR. This deposition is being held at 1260 North Ponce De Leon Boulevard, Suite E, in St. Augustine, Florida. Today's date is March 13th, 2025, and the time is 1:01 p.m.

My name is Andrew Cusimano, and I am the videographer.

The court reporter is Nicole Medlock.

Counsel, will you please introduce yourselves, your affiliations, and the witness will then be sworn in.

MR. ROBERTS: Michael Roberts. I represent the plaintiff, Mr. Lawshe.

MR. CARSON: Matthew Carson, representing Detective Mikayla Preston.

MS. SHEVLIN: Amy Shevlin, representing Dr. Dully.

MIKAYLA PRESTON, having been produced and first duly sworn as a witness on behalf of Plaintiff, and after responding "Yes, ma'am" to the oath, testified as follows:

THE VIDEOGRAPHER: Before we start, I forgot to ask you --

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q    All right. Good afternoon. Can you just state your name for the record, please?

A    Yes, Mikayla Preston.

Q    And, Ms. Preston, we're here today to take your deposition. I introduced myself earlier. As you know, I represent a gentleman named William Lawshe in a case that he's brought against you and another individual.

Are you currently employed?

A    Yes, sir, I am.

Q    And what's your current employment?

A    I'm an ICAC detective -- excuse me -- ICAC detective. I don't know (unintelligible).

Q    With St. Johns County?

A    Yes, sir.

Q    All right. And how long have you been an ICAC detective?

A    Since 2022, if I'm not mistaken, yeah.

Q    Now, for the court reporter, let's say what ICAC -- can you -- that's an acronym, I understand. What is that an acronym for?

A    Yes. It's for Internet crimes against children.

Q    And you've been deposed in this case before, not in this case but in the case of Mr. Lawshe, the State versus Mr. Lawshe; correct?

A    Yes, sir.

Q    And have you had an opportunity to review that deposition?

A    Yes, sir.

Q    All right. I'm not going to go through the rules of a deposition because I know you've had your deposition taken multiple times. But from time to time, I may remind you if we start, you know, talking over one another or something like that. Okay?

A    Yes, sir.

Q    All right. Now, we sit here today. It's March 13th, 2025. What day did you effectuate this arrest on Mr. Lawshe?

A    I do not recall the specific date.

Q    Okay. April of 2023 sound correct?

A    Yes. It does sound around that time.

Q    All right. So as we sit here today, have you had an opportunity to review some of the documents in this case?

A    Yes, sir.

Q    Can you tell me what you've reviewed in preparation for today's deposition?

A    So I reviewed the images, the NCMEC images --

Q    Uh-huh.

A    -- and then the images that were charged.

Q    Anything else?

A    Also my report.

Q    When you say your report, can you be a little bit more specific?

A    Yes, sir. It was my initial -- what we call a narrative.

Q    All right. Did you review any other documents?

A    Not that I recall.

Q    All right. I know that you -- you completed and executed several affidavits in this case for search warrants. Did you review any of that in preparation for today?

A    The only search warrant would have been the one I provided my attorney, which would have been the Synchronoss.

Q    Okay. That was the first search warrant that you sought in this matter?

A    Yes, sir.

Q    Okay. Now, do you understand that the charges against Mr. Lawshe were dropped?

A    Yes, sir, I do.

Q    Okay. As we sit here in today in March of 2025, do you agree that the models that were the subject of this case were, in fact, adults at the time these photographs were taken?

A    Do I agree --

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    From time to time, somebody may object. You still have to answer the question but --

A    Okay. Do I agree that they were adults?

Q    Yes.

A    In my opinion, no, I don't.

Q    Okay. So as we sit here today, you believe that the models depicted in the charged images -- there were three charged images; correct?

A    Yes, sir.

Q    -- were minors at the time that these photographs were taken?

9

A In my personal opinion? Is that --

Q Well, I'm asking just your opinion, I mean --

A Yes. In my --

Q -- what your belief it is.

A Yes. In my personal opinion, I do believe that they are minors.

Q Okay. And are you under -- do you know why the charges were dropped against Mr. Lawshe?

A The specific reason, no, sir.

Q Were you given any reason?

A Not that I recall.

Q All right.

MR. CARSON: Can we take a real quick break? Is that all right?

MR. ROBERTS: Sure.

MR. CARSON: We don't have to go off the record. Can we just admit my partner?

MR. ROBERTS: Oh, great. Yeah.

MR. CARSON: Sorry about that. Thank you.

(Ms. Petruzzelli enters the deposition.)

MR. ROBERTS: Are we back -- still on the record. Okay.

BY MR. ROBERTS:

Q So we're going to get into that a little bit, but I wanted -- that kind of helps me on the road of how

10

we're going to address all of this. Okay?

So what's the last investigative thing that you did on this case?

A Sorry if it takes me a while to think back, just because it was, like, two years ago.

Q So it's been two years since you've done anything on the case?

A Yes, sir. Because that was in 2023, and we're now in 2025. So it was about two years ago.

Offhand, I do not remember, and I don't want to guess on anything.

Q Well, let's just -- I don't want you to guess either.

Have you done anything since the charges were dropped in December of 2023?

A Not that I recall.

Q Okay. At the time that -- and we're going to get into this in more detail -- the charges were dropped, were you shown photographs of the -- the subject models with photographic ID?

A You're talking about, like --

MS. SHEVLIN: Form.

THE WITNESS: -- the passport?

BY MR. ROBERTS:

Q With passports, yes.

11

A Yes. I was shown a redacted version.

Q Right.

And what was your reaction to seeing those?

A I didn't really have a reaction just because I didn't have a lot of information to go off of.

Q Did you ask for any other information?

A Ask who?

Q I'm just asking, did you ask anybody for more information?

A I do not remember. And you're saying it was December of 2023?

Q Yeah.

A Yeah. I don't recall. I don't remember.

Q Safe to say that you did not take any other investigative action after seeing those photographs with --

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q -- with the -- when I say photographs, you understand I'm talking about the photographs --

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q -- with the passports in them?

A That I don't recall.

Q You don't recall doing anything?

12

A No, sir.

Q Okay. When the charges were dropped, did you close your investigative file?

A Yes, sir.

Q Did you disagree with the decision to drop the charges?

A I wouldn't say that I disagreed.

Q Did you agree that the charges should be dropped?

A To be honest, I didn't really have a concrete opinion on it.

Q At that time, did you believe that there was probable cause to continue to charge Mr. Lawshe with a crime of possession of child sexual abuse material?

A And at what time are you referring to, at --

Q The time the charges were dropped.

A Do I believe that we had probable cause?

Q At the time the charges were dropped.

A I believe that we had probable cause to charge for what we charged him for, if that makes sense. I hope I'm not rewording it.

Q It's okay.

A Okay.

Q But you're not answering the question. So the question is at the time the charges were dropped, do you

believe that probable cause still existed?

A   Yes, sir, I do.

Q   At that time?

A   Yes, sir, I do.

Q   With images of the models holding passports, you believed that there was still probable cause to believe that there was possession of child pornography?

A   Yes, sir, I do.

Q   Okay.  Do you feel strongly about that?

A   Yes, sir, I do.

Q   Okay.  We're going to pick back up there in a minute.

A   Okay.

Q   So what began your investigation into this case?

A   We received a NCMEC cyber tip.

Q   Okay.  What is a NCMEC cyber tip?  Explain what NCMEC stands for.

A   Sorry for using the acronym.  It's the National Center for Missing & Exploited Children.

Q   I'm going to show you what we'll mark as Plaintiff's Exhibit 1 and a copy for your counsel.

MR. ROBERTS:  And I -- Amy, I did not print out a copy for you.

THE WITNESS:  Thank you.

MS. SHEVLIN:  Can you tell me what document we're looking at?  Because I've got a bunch of stuff in front of me.

MR. ROBERTS:  Yeah.  It's the cyber tip line report, Number 1537.

MS. SHEVLIN:  Got it.  Thank you.

MR. ROBERTS:  Yep.  Okay.  All right.

(Plaintiff's Exhibit 1 was marked for identification.)

BY MR. ROBERTS:

Q   Okay.  What have -- what have I shown you?

A   You've shown me a NCMEC cyber tip.

Q   And is this the cyber tip that began your investigation?

A   Yes, sir.

Q   Okay.  And does this report indicate -- tell me, as a detective, what did this report tell you?

A   So this report told us who the ESP, which is just an electronic service provider, was that reported the CSAM as well as some suspect identifiers, which would have been the phone number and then the file that was reported.

Q   Okay.  And do you -- do you get -- you say the file.  Is that a photograph?

A   Yes, sir.

Q   And did you --

A   In this case.

Q   And did you receive and review that photograph?

A   Yes, sir.

Q   I see that the incident type is described as child pornography on Page 2 of the cyber tip line report?

A   Yes, sir.

Q   And there's an incident time.  What is that?

A   That is the date and time that the ESP documented as when the crime would have occurred.

Q   Okay.  What's important about the incident date and time for you?

A   It gives us, I guess in laymen's terms, kind of like a starting point of when we think that the crime would have occurred.

Q   So you see the incident date and time as the date that he uploaded the file or when the crime occurred.

A   Yes, sir.  That's what it goes off.

Q   And so when you went to seek for a subpoena, I think you asked for seven days before and after that date.

A   If I'm not mistaken.

Q   We'll get to it in a minute.

But you would have used that date as the date to communicate with Synchronoss in this case about getting documents and photographs; correct?

A   If I don't -- I don't recall the specific date that I put in my search warrant.

Q   We'll get to that in a minute.  But that's what you understand that to mean is, like, that's the date that he downloaded the image?  That's the date that the crime occurred?

A   Yes, sir.

Q   Okay.  All right.  Do you review the entire NCMEC report as part of your investigation?

A   And you're referring to, like, all the pages in it?

Q   All the pages in it.

A   Yes, sir.

Q   Okay.  Let's continue down on Page 2.  There's a file name.

A   Okay.

Q   I see a couple of things.  MD5, what is MD5?

A   So in laymen's terms, the MD5 is just pretty much, like, the photo ID of a photograph or, like, a video.

Q   We refer -- sometimes I hear hash matching and

17

Q stuff like that. Is --

A Yeah, like, the hash value of it.

Q Okay. Did the service provider communicate to you how they identified this image, this -- this suspected image?

A No, sir.

Q All right. Was it by hash match?

A That I don't know because I didn't communicate with them.

Q Does it have in the report as to whether or not it was a hash match or not? And I'm not trying to trick you. I -- but I think it indicates that it was a hash match.

A But you're saying a hash match for what, like --

Q For the image.

A So you're -- I guess I'm confused by your question.

Q Okay.

A I'm sorry.

Q Do you have any information -- did the service provider communicate to you in this report how they identified this particular image as potential or suspected child pornography?

A No, sir, not that I recall.

18

Q Okay. I see image categorization by ESP, A2. Was does that mean?

A So that's based off the electronic service provider, how they would classify an image.

Q And what does that mean, A2?

A So if you flip to -- I guess this would be Page 3 -- it will say -- it's kind of halfway down Page 3. And it's -- A is for prepubescent minor. And then A1 is sex act. A2 is just the lascivious exhibition. Sorry.

Q Okay. All right.

MS. SHEVLIN: I don't mean to interrupt. But a Christie Petruzzelli just signed on. I just want to make sure that that person is supposed to be in this deposition.

MR. CARSON: She is. That's -- that's my law partner, Amy.

MS. SHEVLIN: Okay. I just wanted to make sure. Someone popped up, and I didn't recognize the name. All right. Go ahead. Sorry.

BY MR. ROBERTS:

Q All right. So at the outset of the investigation, I think you said that you identified -- in any investigations, not this investigation, when you begin an investigation, do you -- you identify

19

Q potential -- a target of the investigation?

A I'm sorry. What?

Q A suspect or a target of the investigation if a crime occurred?

A So -- but what is your question, I guess? I'm sorry.

Q Is that something that you do?

A Yes, sir.

Q That's part of your investigation, is to identify --

A Yes, sir.

Q -- a suspect?

A Yes, sir.

Q All right. And did you do that in this case?

A Yes, sir.

Q Okay. What did your initial investigation reveal as potential suspect or suspects?

A It was based off of the phone number.

Q Okay. All right. And in your initial investigation, did you identify that as William Lee Lawshe?

A Yes, sir.

Q How did you do that?

A We -- if I'm not -- excuse me. We sent off legal compliance to the suspect identifier, which in

20

Q this case was a phone number. And that came back.

Q Have you reviewed the deposition of any of your colleagues in this case?

A No, sir.

Q Detective Tolbert, Detective Greene?

A No, sir.

Q Detective Camden?

A No, sir, not that I recall.

Q Okay. If Detective Tolbert told you that -- when he gave you this cyber tip, he also told you that the suspect was Lee Lawshe and a Florida Fish and Wildlife officer, would that ring a bell?

A Yes, sir.

Q Okay. So you knew the suspect. You were given the suspect before you even got the cyber tip?

A So no, sir. I didn't personally know him. I had never heard of him before.

Q No. But --

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q But Detective Tolbert gave you the information at the time of giving you the tip?

A He stated that that's who he believed the suspect was, but I still had to send off for that compliance --

**21**

Q Okay.

A -- to confirm it.

Q Okay. What other suspects or targets of your investigation did -- did you identify?

A Just that, just William Lawshe, sir.

Q So the image that -- that you described has a website across the -- the image; correct?

A Yes, sir.

Q What was the name of the website?

A The MetArt.

Q met-art --

A I believe it's just --

Q -- .com?

A met-art.com. Sorry.

Q Okay. You did not identify them as a potential suspect?

A At that time, no, sir.

Q Have you ever identified them as a target of your investigation?

A No, sir.

Q So it's March 13th, 2025. You believe that met-art.com currently has child pornography on their website, and you have not done anything about it?

MR. CARSON: Object to form.

You can answer, if you can. You can answer.

**22**

Yes, ma'am.

THE WITNESS: Have I done anything further in the investigation? No, sir, due to it being closed.

BY MR. ROBERTS:

Q Why don't you open an investigation into this publisher of child pornography?

MR. CARSON: Object to form.

THE WITNESS: Am I --

MR. CARSON: Yeah, yeah. Unless I -- unless I tell you don't answer --

THE WITNESS: Okay. Sorry.

MR. CARSON: -- you'll be allowed to answer. No worries. No worries.

THE WITNESS: Well, I wouldn't personally have the resources. I would have to forward that to another government agency, whether it be, like, FBI or HSI.

BY MR. ROBERTS:

Q Okay. Or -- or the state where the company that owns this website is located?

A Yes. But that would still have to be forwarded to, like, the FBI or HSI --

Q But you have --

A -- as, like, a connection.

**23**

Q But you have not done that?

A No, sir.

Q Why not?

A I do not have an answer.

Q Do you care about the proliferation of child sexual abuse material?

A Yes, sir, I do.

Q And you say you don't have an answer. But that's your job; right?

A Yes, sir.

Q Any explanation as to why you're not doing your job?

A I am still doing my job but --

Q But you're allowing a website to disseminate -- continuing to disseminate -- disseminate an image that you, as we sit here today, believe is child sexual exploitation material. Why?

MR. CARSON: Object to -- object to form.

THE WITNESS: I don't have --

BY MR. ROBERTS:

Q It doesn't make any sense to you, the question?

A I didn't say that it didn't make any sense. I just don't have an answer.

Q Well, explain to me. Why don't you have an

**24**

answer?

A If I had an answer, I would be --

Q Do you really --

A -- able to explain it.

Q Do you really believe that these are minors?

A Yes, sir, I do.

Q So there's a child victim out there. Have you made any attempt to identify who that is?

A We have attempted, but I have been unsuccessful.

Q You have a copy of her passport, both of them.

A I have a redacted form.

Q And you also have a name of the record custodian who has a presumably non-redacted copy of that?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q Correct?

MR. CARSON: Object to form.

THE WITNESS: Well, I can't say correct because I can't assume that he would have an un-redacted.

BY MR. ROBERTS:

Q But you're an investigator. It's your job to find out if he has an un-redacted copy; right?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q   Correct?

A   Yes, if I'm able to.

Q   Well, Mr. Pierce -- you know Mr. Pierce, Crawford Pierce, the attorney?

A   Yes.

Q   You -- you know that he simply e-mailed the records custodian of met-art.com and that records custodian, who is a licensed attorney in California, responded to his e-mail. You know that; correct?

A   Yes, sir.

Q   You know that's how Mr. Crawford Pierce got the images of the passports; correct?

A   Yes, sir.

Q   There's nothing preventing you as we sit here today from contacting the records custodian, is there?

A   No, sir.

Q   But you haven't done that?

A   No, sir.

Q   But you believe that he's a criminal; correct?

A   Believe who is a criminal?

Q   That anyone who has any sort of publishing interest or ownership interest in met-art.com is a criminal in your mind; correct?

MR. CARSON: Object to form.

THE WITNESS: Yeah. That's a very broad statement that I --

BY MR. ROBERTS:

Q   There is --

A   -- don't feel comfortable.

Q   Okay. Well, let's back up a little bit. Are you aware that publishing images child -- of child sexual abuse online is a crime?

A   Yes, sir.

Q   And you currently here believe that met-art.com is publishing child sexual abuse material; correct?

MR. CARSON: Object to form.

THE WITNESS: Do I believe that MetArt is currently publishing CSAM --

BY MR. ROBERTS:

Q   Yes.

A   -- which is -- sorry -- child porn --

Q   Yes.

A   -- if I use the term CSAM.

Q   Yeah.

A   I don't know if I know how to answer that actually.

Q   Well, why don't you know how to answer that?

A   And sorry if it takes me a minute to think --

Q   It's okay.

A   -- just because --

Q   It's okay.

A   -- I'm processing your question. So I do apologize if I take a while.

I don't know.

Q   Do you have any reason to believe that they've taken images of this model down from their website?

MR. CARSON: Object to form.

THE WITNESS: That I do not know.

BY MR. ROBERTS:

Q   Do you have any idea how long this image has been on the website?

MR. CARSON: Object to form.

THE WITNESS: That I do not know.

BY MR. ROBERTS:

Q   So let's just go through this. Do you have any idea why this specific image was flagged?

A   Unfortunately, I don't work for Synchronoss, so I don't know.

Q   What does the characterization, from NCMEC, unconfirmed child pornography mean?

A   So for NCMEC, unconfirmed means that they have not had a confirmed -- like, this is, like, a reported child victim, I guess in laymen's terms.

Q   They through their review or information that they have cannot confirm that the person in the image is a minor?

A   No. Based off the unconfirmed, it just means that the person has not been identified as a minor, which is why it's unconfirmed.

Q   So that -- when you say that person, you're talking about the model depicted in the subject photograph?

A   The female, yes.

Q   Right.

So you understand unconfirmed means that NCMEC has not been able to confirm that this model was a minor; correct?

A   No. It's not that she's not a minor. It's that they cannot confirm that this is an identified, like, in a sense, child victim.

Q   So you believe -- I'm sorry. I didn't mean to cut you off.

A   You're good.

Q   You believe that NCMEC has tried to identify who this model is?

A   No. I cannot say that because I don't know.

Q   Where are you getting NCMEC's definition of

unconfirmed from?

A **So it all -- it should be in here, but I don't want to speak out of turn. So --**

Q I can represent to you I do not see any definition of the term unconfirmed in there, but you can sit and look if you want.

A **No, sir. I don't see it.**

Q Okay. Do you actually know what NCMEC means by unconfirmed?

A **Yes, sir. Because they have spoken to it -- about it in our training.**

Q So when you received this photograph and you looked at the photograph, you immediately identified met-art.com as having some association with this image?

A **Did I immediately identify it? No, sir.**

Q Tell me, how did met-art.com appear on the image?

A **Like, where is it listed on the image?**

Q Yeah.

A **It should be at the bottom right-hand -- the photograph.**

Q You describe it as watermark.

A **Yes.**

Q What do you mean by the word watermark?

A **Just, like, a -- I guess a text that's pretty**

**much inputted in the photograph.**

Q Right.

So that, like, other people can't reproduce it without that being on there?

MR. CARSON: Object to form.

THE WITNESS: That's sometimes one of the functions of watermarks, not always.

BY MR. ROBERTS:

Q What are some of the other functions? Other than copyright, what are -- what are some of the other functions of a -- of a watermark?

A **One function could be for further contact, like if somebody wants to input their own information for another person, let's say, to reach out to them further, if that's not too confusing.**

Q Yeah. I don't understand that. Yeah.

A **Sorry. So, like, another function of a watermark could be where -- let's say I could input your e-mail address on the photo so somebody could use that as a form of contact for you.**

Q In relation to the subject matter of the image?

A **It could be that, or it could be a multitude of things.**

Q What -- what other kinds of things?

A **One could be, like, payment. It could be pretty much anything.**

Q At what point did you connect this image and the source of this image as met-art.com?

A **After further reviewing it.**

Q But before you did anything else, just while you were looking at the image.

A **What do you mean, before I did anything else?**

Q Did you make that determination upon your initial evaluation of the image, that this -- most likely, this image was related to met-art.com?

A **No. That wasn't my initial.**

Q Okay. What I'm asking is when. After your initial, when did you come to that conclusion?

A **Ooh, that was -- I would say probably after sending off the legal compliance.**

Q When you say legal compliance, are you talking about a subpoena, the -- the subpoena?

A **And the search warrants.**

Q And the search warrants.

So you, in your mind, did not make any connection between met-art.com and this image prior to getting the return on the subpoena?

A **No. I did. It was during that time. Sorry. I don't want to misstate.**

Q Okay. So I -- that's what I'm asking. Like --

A **Yes, sir.**

Q -- was it before you sought the subpoena?

A **I don't recall if it was before or after.**

Q What made you connect this particular image with the website met-art.com?

A **Just looking at the watermark.**

Q Okay. But you saw that initially when you first looked at it. You saw the watermark when you first looked at the photograph; correct?

A **I don't recall if I noticed it right off --**

Q Okay.

A **-- immediately.**

Q Okay. But it was nothing other than the watermark that led you to believe that that website had some sort of connection with this image.

A **Oh, you're saying -- let me make sure I'm answering this correctly. Are you saying that the watermark is the connection to -- that I had with the website?**

Q Yeah.

A **Yes.**

Q There was no other research or investigation that you did that revealed some other fact that led you

to believe that this photograph was connected with met-art.com?

A    Not that I recall.

Q    Okay. Now, you -- at this time in -- you received this tip, it looks like, in February of 2023. How long had you been an -- an ICAC investigator at that time?

A    For about a couple months.

Q    All right. You were aware at the time that not all cyber tips contained child pornography?

A    Yes, sir.

Q    And that regularly, you would get a NCMEC cyber tip report, and someone would look at that image and determine that that was not a minor in that image?

A    It wouldn't be regularly, but it can occur.

Q    Can you quantify for me how -- how often that occurred?

A    Honestly, I couldn't.

Q    Occurs today. How often does it occur today?

A    Like, you're talking 2025?

Q    Yeah. Like, currently, how often does it happen that you get a cyber tip and you look at it and you go, hmm, I just don't know?

A    Honestly, this year, we haven't had a lot. There haven't been actual CSAM and child pornography starting.

Q    And to be fair, you think this is CSAM, these images. You think these images are CSAM?

A    Yes, sir.

Q    Okay. So you wouldn't categorize these images, these -- this one image, anyway, that was the cyber tip report image with the met-art.com. You would not characterize that as a false report of child pornography?

A    No, sir, I wouldn't.

Q    But there was another cyber tip that -- that was associated with this. It was a prior cyber tip; correct?

A    Yes, sir.

Q    And you looked at that image, and you did determine that that appeared to be an adult?

A    Yes, sir.

Q    Okay. So from an investigative standpoint, you would agree with me that as an investigator, you -- you do have to exercise caution when getting a NCMEC report to make some determination that this is actually child pornography and not a mistaken report?

A    Yes, sir.

Q    All right.

You immediately -- or I -- let me say, between the time that you looked at the image that was the subject of the cyber tip report that we're talking about and the time that you applied for the search warrant, you determined that the characterization of the image as A2 was incorrect; correct?

A    I'm just referring back to the A2. The prepubescent minor?

Q    Yes.

A    Yes. Because she looked like she hit puberty. So yes.

Q    Right. So that was a false statement in the NCMEC report; correct?

MR. CARSON: Object to form.

THE WITNESS: Based off their categorization.

BY MR. ROBERTS:

Q    It was a false statement to categorize this model as prepubescent; correct?

A    That -- I don't want to say it's a false statement because we don't go based off of that. We go based off of our own.

Q    I understand what you're saying. But what I am saying is this report -- the information in this report, not your opinion but the characterization in this report as A2 was incorrect according to your assessment?

A    In my opinion, yes.

Q    And your opinion is based on the presence of pubic hair?

A    Not solely the presence of pubic hair.

Q    There were other factors that led you to believe that this was a -- a pubertal --

A    I know what --

Q    -- female; correct?

A    Yes, sir.

Q    All right. And so the characterization of prepubescent was incorrect in your opinion?

A    In my opinion, yes, sir.

Q    Yeah. Okay.

Now, prior to seeking a search warrant, you determined that the likely source of this image was met-art.com; correct?

MR. CARSON: Object to form.

THE WITNESS: I'm sorry. Can you repeat the question?

BY MR. ROBERTS:

Q    You made a determination, an investigative determination that the likely source of this image, the subject image, was met-art.com?

A    No, sir. I can't say that.

Q    How would you characterize that?

37

A   You're asking me based off the photo that I think the likely source was MetArt?

Q   Yeah. You did not think that the likely source was MetArt.

A   Oh, I'm sorry. That I did not think that it was the likely source. Okay. Sorry. I got confused.

Q   All right. Let's start over. I asked you the question, between the time that you initially viewed the image and when you applied for the search warrant, you had determined that the likely source of the image was met-art.com.

A   No.

Q   So the converse is at the time you applied for a search warrant, you did not believe that the likely source of the image was met-art.com.

A   It's not that I did not believe. It's just I don't know what -- the likely source of that CSAM image because it could be from anywhere.

Q   So at the time you applied for the search warrant, it was your -- what you believed was that this image could be from anywhere?

A   Yes, sir.

Q   Okay.

Now, earlier, you said that you did make some connection between the image and met-art.com. What

38

connection did you -- did you place on that? What did you understand that connection -- or what did you believe that connection was?

A   It was just solely based off of the watermark.

Q   But, I mean, did you, as an investigator, think that there was a connection between MetArt and this -- this image?

A   No, sir.

Q   You didn't think that?

A   (Shakes head.)

Q   Okay. We're going to come back to this, but I'm just going to just skip forward a little bit. I'm going to give you what we'll mark as Exhibit 2, just because we're on this thought.

MR. ROBERTS: Exhibit 2 is the affidavit for the search warrant to Synchronoss and -- Amy.

(Plaintiff's Exhibit 2 was marked for identification.)

BY MR. ROBERTS:

Q   So I just want you to take a second. Flip over to -- first of all, can you identify this?

A   Yes, sir.

Q   All right. What is it?

A   It's the search warrant.

Q   Right. Okay.

39

So you just testified that you did not believe that there was a connection between the image and met-art.com; correct?

A   Yes, sir.

Q   Why did you swear under oath to a court that there was a connection between this image and met-art.com?

A   Because like --

MR. CARSON: Object to form.

You can answer if you can.

THE WITNESS: Like I stated, based off the watermark.

BY MR. ROBERTS:

Q   Well, you just testified unequivocally that you did not believe that the likely source of this image was met-art.com; correct?

A   Yes. Sorry.

Q   Okay. You understand when you fill out an affidavit and present that to a court, you have to be truthful?

A   Yes, sir.

Q   You understand it's a third-degree felony to make false statements to a court?

A   Yes, sir.

Q   And false statements include statements that

40

you don't believe to be true; correct?

A   Yes. Yes, sir.

Q   Now you've just testified that you did not believe that this image came from met-art.com; correct?

A   No. I said that it can come from a likely source, but I don't know the actual source for MetArt. It could be from anywhere.

Q   No. I asked you, did you believe that met-art.com was the likely source of the image, and you testified no. Do you recall that?

A   Yes. But I should say that I don't know. I'm sorry for misspeaking, but it's I don't know.

Q   But you agree that you gave a statement to a court under oath that would lead the court to believe that it was the likely source of the image; correct?

MR. CARSON: Object to form.

THE WITNESS: I would have to review what --

BY MR. ROBERTS:

Q   Let me read it. To note, there is a watermark of www.met-art.com on the offending image. This site has a known history of displaying CSAM images of teenage girls and CSAM content from this site has been encountered by other ICAC investigators in past investigations.

Correct?

**41**

A   Yes.

Q   Well, if it didn't come from that website and has no connection to that website, why would you tell the judge about a history of CSAM on that website?

A   Because when describing the photo, I'm describing what is listed on the photo. Just like I have a description for the photograph, like, hey, it depicts a female at X, Y, and Z, I'm also going to notate the watermark on the photo.

Q   You're not actually notating the watermark, though. You're -- you're telling the court much more than there's just a watermark on there, aren't you?

MR. CARSON:  Object to form.

THE WITNESS:  But I --

BY MR. ROBERTS:

Q   You say this --

A   -- did note there is a watermark.

Q   Yeah.  This site has a known history of displaying CSAM images of teenage girls; correct?

A   Yes, sir.

Q   But you didn't believe that this image came from met-art.com.

A   I don't know where it came from.

Q   Okay.  But you've reviewed your deposition; right?

**42**

A   Yes, sir.

Q   Okay.  I think your testimony -- your prior testimony is that you Googled met-art.com?

A   No, sir.  So I did an open source search of MetArt, but I also consulted with other ICAC investigators.

Q   What's open source?  What do you mean?

A   It's not using, like, the Google search engine, but it's just pretty much what we call, like, open source and phrase -- you're just researching, I guess, in simple terms, not really using law important -- law enforcement -- excuse me -- databases. But you're utilizing stuff to, I guess, search whatever term, if that makes sense.  I feel like that was kind of confusing, the way I described it.

Q   Well, it's confusing because under oath in your prior deposition, you said you Googled it.

A   I don't recall using Google, but I could have.

Q   Well, if you testified back in 2023, November of 2023, that you Googled met-art.com, you think that would be the most accurate answer?

A   It could potentially.  I just don't recall.

Q   You don't recall what you did, or you don't recall your testimony?

A   No.  I don't recall what actual, I guess,

**43**

database I utilized to query MetArt.

Q   I'm going to hand you a deposition.

A   Okay.

Q   This will be Exhibit 3.

(Plaintiff's Exhibit 3 was marked for identification.)

MR. ROBERTS:  Got a copy for you.

MS. SHEVLIN:  What's the date on the depo, Michael?

MR. ROBERTS:  November 21st, 2023.

MS. SHEVLIN:  Thank you.

And are you marking this as an exhibit, or are you just refreshing her recollection?

MR. ROBERTS:  No.  It's Exhibit 3.

MS. SHEVLIN:  Gotcha.

BY MR. ROBERTS:

Q   So just -- if you will, just turn to Page 30.

A   30?  Okay.  I'm there.

Q   Yeah.

A   Yes.

Q   And I'll just read your answer on Line 10.  It says:  I actually searched it on Google.  And it was showing -- because he's heard it before in the past. Obviously -- excuse me -- MetArt -- I don't know why I keep saying MetaArt.  But MetArt using underage females

**44**

in the past on their sites.  And I've been -- and I've seen different links on Google.  Obviously, you can't -- can't believe everything you see on Google stating that underage females were used on the site, but I couldn't obviously locate that specific image on met-art.com or MetArt.

Did I read that close enough?

A   Yes, sir.

Q   Okay.  So fair to say -- I mean, is it your testimony that you did Google?

A   I don't recall using Google, but if I stated that I used Google back in 2023, then I could have used Google.

Q   And I'm assuming if you Googled, you would, like, Google met-art.com, child porn, something like that?

A   I would have just probably done MetArt.  I wouldn't type in child porn on Google just because of the job I do.

Q   Uh-huh.  Okay.  Well, I've done that.  I'm going to -- I'm going to -- I'm going to mark something as --

A   Okay.

Q   -- Plaintiff's Exhibit 4.

45

(Plaintiff's Exhibit 4 was marked for identification.)

BY MR. ROBERTS:

Q    I've actually Googled it.  And I'm going to represent to you there are no such links on Google talking about met-art.com publishing child pornography.  The only thing that actually comes up are our case and a -- and a -- like, an intellectual property case.  Did you actually --

MR. CARSON:  Hold on.  So Exhibit 4 to Detective Preston's deposition --

MR. ROBERTS:  Yeah.

MR. CARSON:  -- is a printout of what you purport to be your Google search?

MR. ROBERTS:  That's correct.

MS. SHEVLIN:  Were we provided with this ahead of time?

MR. ROBERTS:  I just did it.

MS. SHEVLIN:  Did you Google (unintelligible)?

MR. ROBERTS:  Here.  I can -- we can Google it right now.  I've got my computer.

BY MR. ROBERTS:

Q    Are you sure there's a link on Google that says met-art.com?

MR. CARSON:  Hold on.  Hold on.  We're still

46

talking about this exhibit that's been dropped on our lap for the first time.  So --

MR. ROBERTS:  Okay.  Well, we won't attach it.  If you have a problem with it, we won't attach it.

MR. CARSON:  No.  We're going to attach it.

MR. ROBERTS:  Okay.

MR. CARSON:  Because -- because here's the problem.  Yours shows three hits.  Mine shows considerably more than that.

MR. ROBERTS:  Uh-huh.

MR. CARSON:  So --

MR. ROBERTS:  Probably different search terms.

MR. CARSON:  No.  met-art.com, in parens, child pornography case.

MR. ROBERTS:  Okay.

MR. CARSON:  Oh, I'm sorry.  That's what shows up at the top, but in the header, it's child pornography case, accused criminal.

So okay.  We're going to attach this as Exhibit 4 to --

MR. ROBERTS:  Yeah.

MR. CARSON:  -- Detective Preston's deposition.

MR. ROBERTS:  Yeah.

47

BY MR. ROBERTS:

Q    Detective, are you sure that there was a link on Google that described this website as a source of child pornography?

A    **Yes, sir.**

Q    You're sure, under oath?

A    **Yes, sir, under oath.**

Q    I've got my laptop right here.  Do you want to use my laptop?

A    **For?**

Q    Finding it.

MR. CARSON:  I'm going to advise my client not to engage in this exercise of searching on Google right now.  That's highly irregular.  It's highly inappropriate to put her on the spot and say, while you're being video-recorded and while the court reporter's taking down everything you say, perform this little stunt for us.  I'm going to advise her not to do it.

MR. ROBERTS:  Okay.  Stunt.

MR. CARSON:  And I'll say -- let me just say this too, Michael:  I've given you a fair amount of leeway, but it's -- it's taken a decidedly unsavory turn.  There's no reason to treat Detective Preston with this level of disrespect.  I'm going to ask

48

you respectfully to rein it in.

MR. ROBERTS:  Could you articulate how I've been disrespectful?

MR. CARSON:  If -- if you don't understand how you've been disrespectful, then I'm not sure I can explain it to you in a way that you'll understand.  But there's a way to speak to her without calling her professionalism into question, without calling her intelligence into question, without calling her competence into question.  There's a way to try this case and to litigate this case without making it personal, and I was hoping we could get there.

MR. ROBERTS:  I -- I appreciate that.  I'm going to move to strike your commentary but --

MR. CARSON:  Well, it's a deposition transcript.  It doesn't need to be stricken.  I just wanted you to know --

MR. ROBERTS:  So --

MR. CARSON:  -- I'm getting close to the point where it's starting to seem like you're badgering, harassing the witness.

MR. ROBERTS:  Well, it's hard for me to respond, Matt, because you haven't objected to any questions, so I don't know which questions you find to be badgering or offensive.  I think that I'm

asking fair questions. Based on the evidence, I'm showing her exhibits and asking why she has or has not done anything.

So please object to my questions, and I will respond to the objection. But I can't, in hindsight, change a question because you find it to be offensive. Frankly, I believe you don't like the answers, and you don't like the questions. But that's all commentary, and we don't need to be doing that.

BY MR. ROBERTS:

Q   So you agree that you put this statement under oath in the search warrant to Synchronoss; correct?

A   Yes, sir.

Q   And you understand that you have to make truthful statements to the court?

A   Yes, sir.

Q   All right. And your testimony today is that your Google search did reveal some -- was it an article?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q   What was it?

A   I don't recall a specific -- what it pulled up, but it was in reference to MetArt having CSAM.

Q   Okay. Was it a news article?

A   Like I said, I don't recall specifically what it was.

Q   Can you give me any description of what it was?

A   I don't recall. That was over two years ago, unfortunately.

Q   Is there any way that I could use different search terms or any way to identify what you're talking about?

A   If I remembered the specific search terms, then I would be happy to disclose. I just don't recall.

Q   So I read your testimony in your deposition, and you said, quote: You can't believe everything you read on Google.

Is that correct?

A   Yes, sir.

Q   Do you believe that?

A   Yes. That's with everything.

Q   But a court should be able to believe what you tell them; correct?

A   Yes, sir.

Q   So you didn't actually believe -- or you knew that you really couldn't believe what you saw on Google on the search results; correct?

A   I was using it. So you're saying -- okay.

Hold on. I'm sorry. I'm confused. Are you saying that I can't believe what I saw on Google?

Q   You testified that you can't believe everything you see on Google.

A   Yes.

Q   Correct?

And so when you read that on Google, you knew that it may or may not be a credible thing that you saw?

A   Yes.

Q   And what I'm asking you is why would you swear under oath that it was credible?

A   Based off the other investigators and their dealings with MetArt. I guess that's the right term, not really dealings but I guess prior cases that they've had and stuff like that.

Q   What investigator told you that they had a prior case with MetArt?

A   I believe it was Corporal Greene.

Q   We've taken Corporal Greene's deposition. He's testified that he's never had a case with MetArt.

A   Well, he told me differently, unfortunately.

Q   He told you that he had investigated a case involving an image from met-art.com?

A   Yes, when we originally had this case.

Q   You haven't reviewed his testimony?

A   No, sir.

Q   So if he testified to me that he had heard of met-art.com through some -- he could not remember where or if it was credible or not credible but that was his only relation to met-art.com, that would have been a false statement that he made to me?

A   I can't say that.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q   That's not what he told you?

A   I can't say what he stated to you was a false statement, and I can't say that what he stated to me was a false statement. I'm just going solely based off what he told me.

Q   Okay. So what he told you was there was a known history of displaying CSAM images on teenage -- of teenage girls on met-art.com?

A   Yes, sir.

Q   Do you know what the source of his information was?

A   No, sir, I do not.

Q   And then you Googled it. And your testimony today is that you found some unknown source that you cannot identify that confirmed or had some information that met-art.com was connected with CSAM?

53

A    Yes, sir.

Q    And on that basis, you felt comfortable swearing under oath that this site has a known history of displaying CSAM images?

A    Yes, sir.

Q    Can you describe to me what you feel like your obligation to -- let me ask it a different way. Strike that.

Do you believe that you have an obligation to present reliable information to a court?

A    Yes, sir.

Q    And do you believe that these Google searches that you reference, is that a reliable source?

A    I believe that it can be.

Q    Was it in this case?

A    I don't really know the answer to that, if it was in this case. I don't really know how to answer.

Q    So are you saying that the only source -- did you use it as a source to make this statement to the court?

A    You're talking about the Google search?

Q    Yeah.

A    Is that what is put in my search warrant? Because I'm pretty positive my search warrant states based off obviously the other detectives and their

54

history with it.

Q    You said: This site has a known history of displaying CSAM images of teenage girls.

A    Yes, and has been encountered by other ICAC investigators in past investigations.

Q    And the only investigator that you can identify is Detective Greene?

A    Yes, sir.

Q    And you don't know if what he was telling you was reliable or not?

A    That I don't know because it was before I was even in law enforcement, if I'm not mistaken.

Q    Did he know that you put this statement in your affidavit?

A    I don't recall. I don't know if we've ever discussed that.

Q    Tell me about this conversation with Detective Greene. I mean, how did this come about?

A    When I was asking him about MetArt and if he's ever heard of it and anything he knows about it.

Q    Why were you asking him about MetArt?

A    Because I had never heard of it.

Q    Did you believe there was a connection between this image and met-art.com?

A    That -- like I stated before, I don't know.

55

Q    Okay. How would you find that out?

A    How would I find what out?

Q    How would you find out if there was a connection between this image and met-art.com? As an investigator, just what are some of the ways you could have done that?

A    Oh, I'm sorry. I was confused about where your question was going.

You can try to search the site. That's probably the -- the main way that I would think.

Q    Did you do that?

A    No, sir.

Q    Have you ever been to met-art.com?

A    No, sir.

Q    Why -- why did you not go to the website?

A    At that point in my investigation, I was focused on confirming that obviously this is a child and speaking with Dr. Dully.

Q    Detective Greene, in his deposition, described the models as being age-difficult. Would you agree or disagree with that?

A    I would disagree.

Q    Okay. Do sometimes you guys disagree about what age-difficult is and what underage is?

A    Yes, sir.

56

Q    Was this a case of where there was a disagreement?

A    Yes, if I'm not mistaken.

Q    So there was a disagreement?

A    Honestly, I cannot remember. I don't want to say yes because clearly, I don't remember. So I'm sorry for saying not mistaken but honestly don't remember.

Q    If someone did characterize all of these images containing age-difficult individuals, that would be a reasonable position for that person to take?

A    What are you -- like, what is your question? If you're saying if they -- both of these images, if they did it as age-difficult?

Q    Well, let's just start with the image that we're currently talking about.

A    Okay.

Q    It's easy to get off track. But the image that was attached to the NCMEC report, you understand the image I'm talking about.

A    Yes, sir.

Q    All right. Could a reasonable person look at that model and believe that that was age-difficult?

A    That would be an opinion that I can't speak on because I can only speak on my personal opinion.

Q    Okay. But your recollection may be that other

57

people looked at this image and thought that person -- it could be an age-difficult image?

A   In my office, not that I can recall.

Q   Okay. When you say not in your office, are you talking, like, Detective Greene?

A   I'm talking about, like, my office, like, the ICAC investigators.

Q   Okay.

A   Yes.

Q   Detective Greene's not an ICAC investigator?

A   No, sir.

Q   He's a former ICAC investigator?

A   Yes, sir.

Q   You're not saying that he did not disagree about whether or not it was obviously a child or an age-difficult image?

A   I don't recall what his opinion of it was.

Q   Okay. Well, and let's just talk about age-difficult because that's a term of art in your industry; correct?

A   It's a term that people can use, but it's not a category, I guess --

Q   Right.

A   -- of an image, if that makes sense.

Q   What does age-difficult mean to you?

58

A   For me personally, it just means that a person could easily be underage, or they could be, like, 18, 19, that range.

Q   So is it fair to say that all 18- or 19-year-olds could fairly be categorized as age-difficult?

A   No. Because everybody's body is different.

Q   No. But, I mean, like, there's no such thing as an 18-year-old that's not age-difficult?

A   I'm confused by your question.

Q   Well, and maybe this is a little basic.

A   Okay.

Q   But you could be 17 -- right? -- and 11 months old. And if there was a nude image of me, it was -- that would be child sexual abuse material; correct?

A   You're 17, so you're under the age of 18, yes.

Q   Right.

That person doesn't look any different when they turn 18 and they're 18 and a month old; right?

A   That I can't speak on because everybody's body develops differently.

Q   Yeah. But when you -- I mean, there's a joke. Like, when you go to sleep on the night before your bed -- your birthday and you wake up, you know, you don't look different -- right? -- from one day to the

59

next.

A   Like I said, I can't speak on it because everybody is different. Like, every case is different, so I can't say, yeah, that's going to be the same across the board.

Q   You -- you're not comfortable saying that any 18-year-old that you look at, someone might think that they look like a 17-year-old?

A   Every person is different so --

Q   Well, I certainly appreciate that, that everybody is different, I mean. But I -- I guess what I'm saying is if someone is 18, you think -- do you have the ability to look at some people who are 18 and go, definitely, they're 18 and not 17?

A   No. Because everybody is different.

Q   So you can't do that; right? You don't have the ability to do that, do you?

A   No.

Q   Right.

So I guess what I'm saying -- that's what my point is is, like, every 18-year-old is age-difficult because you really can't look at somebody and tell if they're 17 or 19. You really can't just look at somebody and tell that, can you?

A   I wouldn't say that every person is

60

age-difficult because like I said, everybody is different.

Q   Okay.

A   So trying to classify just because a person is 18 is age-difficult, that doesn't seem correct.

Q   But like most 18-year-olds, if you looked at them, you'd be like, they could be age-difficult; right?

A   No.

Q   Most 18-year-olds?

A   I can't say that.

Q   Okay. But, I mean, you do this for a living, though; right?

A   (Nods head.)

Q   Fair to say you're not an expert in determining who is under 18 or who is over 18?

A   No. I'm not a doctor.

Q   You're not. Well, we'll get into that.

But, I mean, you don't have any ICAC training or any specialized training in, like, what is -- what does an 18-year-old look like versus what does a 17-year-old look like?

A   No. Because every person is different.

Q   Every person is different; right?

A   Yes.

Q   Every human individual is different, and every

**61**

observer has a different set of perspectives; correct?

A   Yes.

Q   Right.

And you don't have the ability to know what other people perceive as looking young or not young, do you?

A   No, I do not.

Q   Okay. Now, this image that we are discussing, which was the cyber tip image, this was a professionally produced photograph; correct?

A   That I do not know if it was professionally produced.

Q   Did it appear to be professionally produced?

A   It appeared to be of higher -- higher quality. Like, it didn't seem like a phone took it.

Q   Right, yeah. It looked like a photo shoot, like, a part of a photo shoot; is that correct?

A   That I don't know.

Q   It was in a studio setting?

A   That -- I honestly don't know where that photo was taken.

Q   Okay.

A   So I can't say that it was in a studio.

Q   All right. But it wasn't, like, a cell phone picture?

**62**

A   It didn't appear to be a cell phone to me.

Q   It had a website on it, like, listed on it as a watermark?

A   Uh-huh.

Q   All right. It was a female; correct?

A   Yes.

Q   All right. There was nothing -- no -- no props or other sort of nonverbal descriptions of the image that would have signalled that this is a minor?

A   What do you mean?

Q   So -- and I've read your testimony. Sometimes, like, there will be, like, pictures in the bathroom or, like, child's underwear in a child's bedroom. Are you familiar with images like that?

A   Uh-huh.

Q   Yes?

A   We do have -- we have some images -- excuse me -- like that.

Q   Yeah. Or it's, like, you know, seventh grade, after class or something like that that would indicate or tell the viewer that this is a minor. You -- so you know what I'm saying?

A   Yes.

Q   There was nothing like that in the image?

A   Not that I recall.

**63**

Q   Okay. I've characterized it as like a centerfold-type image. Do you know what a centerfold is?

A   No.

Q   Have you ever looked at, like, a Playboy or --

A   No.

Q   -- Penthouse?

A   Sorry. No.

Q   Have you ever looked at pornography?

A   What do you mean, just, like, in a magazine?

Q   Magazine, on your phone?

A   I've never viewed pornography on my cellular phone.

Q   Okay. I mean, it's not -- I'm not -- like, have you ever seen the Pornhub statistics on, like, how many adult Americans look at pornography?

A   No, I have not.

Q   It's, like, way over half.

A   I know Florida --

Q   It's, like, the majority --

A   -- they said is off the --

Q   It's, like, the majority of people.

A   But no. I --

Q   So I'm not trying to be mean or ugly. Like, I just --

**64**

A   No. I know.

Q   What I'm trying to do is, like, get a sense of, like, how much do you know about the world of pornography? It sounds like not a lot.

A   I don't view, like I said, like, magazine, if that's what you're talking -- like, Playboy. Like, I haven't bought Playboy magazines. That's what I'm referring to.

Q   Do you have, like, a brother?

A   Yes. But --

Q   Did he ever have a Playboy or anything?

A   That I don't know.

Q   Okay. All right.

A   I didn't go in his room.

Q   So you don't really -- so you don't really know what I mean when I say centerfold?

A   No.

Q   So, like, a centerfold in a Playboy, when it would come every month or so, like, it would just have, like, a spread. It would just be, like, still photographs of, like, a model pose. And it might be partial nudity. It might be full nudity. But it was, like, a still photograph that was, like, taken by a photographer, and it's just, like, on the page. That's what a centerfold is.

**65**

A    Okay.

Q    All right. Does this appear to be, like, a centerfold-type picture?

A    It appeared to be just, like, a regular photo taken.

Q    Right. And it was partial nudity?

A    Yes.

Q    Okay. I want to -- I do want to -- I mean, I'm not -- and I'm seriously not -- I mean, I'm not trying to pry into your personal life. I -- if -- do you really not know that much about the world of, like, what is on pornographic websites?

A    No. What I'm saying is I don't know about Playboy. Like, you're saying, have I ever viewed Playboy --

Q    Yeah.

A    -- if I had a Playboy -- like, I don't. So I can't speak on Playboy. I can't speak on, you know, searching through Pornhub.

Q    Okay. I mean, but, like -- that's what I'm trying to get a sense of is, like, do you understand, like, the way Pornhub is set up or, like, how -- how pornography is portrayed in the world?

A    Yes. I understand that. What I'm saying is I personally don't go on those sites.

**66**

Q    Sure.

MR. CARSON: And -- and if I could, maybe --

MR. ROBERTS: Yeah.

MR. CARSON: -- maybe that's where we draw the line. Instead of asking Detective Preston whether she or any members of her family have looked at this stuff, maybe speak more generally to her understanding of how it operates.

BY MR. ROBERTS:

Q    Well, I mean, I -- I -- you only look at pornographic images at work that have been the subject of, like, a NCMEC report or some other -- right?

A    Yes.

Q    So your -- your view through work is very myopic, like, short-sided, on images that might be characterized by somebody as child pornography; correct?

A    Yes.

Q    So, I mean, you're not really an expert on, like, what pornography looks like in general, legal pornography?

A    Legal pornography, yes, I am.

Q    Okay. How do you get that expertise?

A    Because obviously basing it off of, yes, we view child pornography, and we have to go to these sites. But sometimes there can be, within those sites,

**67**

illegal pornography, which would be child pornography.

Q    Now, you just said you have to go to those sites.

A    I'm sorry. Not have to go to those sites, but we do sometimes go to those sites.

Q    Why didn't you go to this site in this case?

A    I don't know.

Q    No -- no explanation?

A    No.

Q    I mean, do you wish that you would have?

A    I think at that point in my investigation, I was focused on the victim in the photograph, not going to the site.

Q    You had reason to believe that this image was published on a public website, though; correct?

A    Yes.

Q    Yes. And you've been to those websites?

A    Some of them.

Q    Do you know that most public websites make disclosures and disclaimers about the age of the models?

A    Yes, sir.

Q    So you're aware that virtually all of the pornography that is published on a public website, the website is at least telling the public that these images

**68**

contain images of adults?

A    That the website is telling them that these should be adults? Yes.

Q    Yeah. So when you got this tip, you knew that Mr. Lawshe, when he viewed this image, most likely was being told that this was an adult?

A    That I can't speak on because I don't know where he viewed it.

Q    It was easy enough for you find out where he viewed it, though; right?

A    No, sir.

Q    Did you attempt to find out where he viewed it?

A    That would be a digital forensic examiner because they're the ones, like, going through the search terms and all of that, not me.

Q    So you don't -- you don't -- you don't ever go to the websites?

A    I don't say that I don't ever go, but I have in the past.

Q    So you had the ability to go the website in this case?

A    Yes, sir.

Q    Yeah. You could have verified that this model was a model on -- on the website very easily?

A   Yes, sir.

Q   Okay. Do you agree if you would have done that, you would have known for sure that the model was being portrayed as a verified adult?

A   No, sir.

Q   Why do you say that?

A   Because I can't go based off just what the site is telling me on their public forum. Like, hey, this should be an adult, that that is confirmed an adult.

Q   I'm not asking that question. My question is about what Mr. Lawshe would have been told about this model when he viewed it. Do you understand the perspective that I'm talking about now?

A   Yes.

Q   So here's the question. If you would have gone to the website, you would have been able to confirm that Mr. Lawshe was being told by the website that this model was a verified adult?

MR. CARSON: Object to form.

THE WITNESS: No, I wouldn't have been able to because I don't know if that's how he got the photograph. So I can't speak on saying, yes, that is a verified minor, and that's what he saw before he viewed the photograph because I don't know how he viewed it.

BY MR. ROBERTS:

Q   But do -- did you have reason to believe that he viewed it on the Internet?

A   No. I can't speak on how he -- because I didn't have his device. I wasn't there with him.

Q   Now, you're a -- you're an expert in investigating Internet crimes against children; correct?

A   Yes, sir.

Q   You didn't look at this image and take from this image reasonable suspicion that he got this image off of the Internet?

MR. CARSON: Object to form.

THE WITNESS: That would be me speculating, and I cannot speculate that he got it from that site, that he went on to that site and pulled that image.

BY MR. ROBERTS:

Q   Did you determine -- seek to determine where he got it from?

A   That I do not recall.

Q   You don't recall whether or not you -- you made an attempt to do that?

A   I don't recall. I don't remember.

Q   Okay. So you agree that -- that there's at least a probability that he got it from a website connected with met-art.com?

A   That he could have. He could have not. I can't speak on how he did it.

Q   Right. But, I mean, there was evidence on the photograph of a website; right?

A   Uh-huh. Yes, sir.

Q   And so the only evidence was that this was connected to met-art.com; right?

A   What do you mean?

Q   That the image was connected with met-art.com. That was the only evidence that you had.

A   You're talking about the watermark is the only evidence --

Q   That you had of where it might have come from.

A   It's a possibility, where it could have come from, yes, based off that watermark.

Q   But such that you -- you included it in your -- in your search warrant; correct?

A   Yes, sir.

Q   All right. So did you -- do you believe, as we sit here today, that that website portrayed the model as a verified adult?

A   That I do not know.

Q   Does that concern you?

A   What do you mean?

Q   You've testified that you believe this is a minor; correct?

A   Yes, uh-huh.

Q   Does it concern you as a law enforcement officer that there's a website that is publishing images telling the public that they're adults but they're really not adults?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q   Does that concern you as a law enforcement officer?

MR. CARSON: Object to form.

THE WITNESS: I don't know how to answer that.

BY MR. ROBERTS:

Q   Would that be a crime?

A   You're talking about if they are illegally posting minors?

Q   And calling them adults.

A   Yes. That could --

Q   That would be a crime?

A   Yes. It could be a crime.

Q   What has to happen in St. Johns County in order for you to take that and investigate it?

A   What do you -- what do you mean, for --

Q    Do you have the freedom to investigate crimes as you see fit?

A    I don't understand your question. Like, can I pick and choose? Is that what you're --

Q    Well, do you have to get permission? If -- if we leave here today and you say, you know what; he's right, you know; this is a child on this website and they're most likely telling people that it's an adult, we should do something about that. I mean, how would you make that happen?

A    I would contact one of our federal agencies, whether it be the FBI or, like, HSI.

Q    Okay. But you haven't done that?

A    No, sir.

Q    All right. You don't have a reason why?

A    No, sir.

Q    All right. So the sole basis of you believing that this was a minor was just your personal opinion about this model looked young?

MR. CARSON:  Object to form.

THE WITNESS:  No, sir.

BY MR. ROBERTS:

Q    What was the basis of your opinion when you looked at this image to determine that this was a minor or not?

A    Based off my personal experience and obviously me being a female, that, and then also going the extra step and getting it certified by Dr. Dully.

Q    What do you mean by that?

A    By which part?

Q    You -- let -- let's just go to -- if I can direct your --

A    Yeah.

Q    -- attention to your -- your deposition. And I'm just going to have you read your testimony on Page 38.

A    Okay. Just one second. Sorry.

MR. ROBERTS:  And, Matt, I'm not trying to be rude. I'm having her read her testimony from a deposition. It is awkward. But I did not make this to be awkward.

BY MR. ROBERTS:

Q    I'd like you to read Line 14 --

A    14?

Q    Yep, on 38. Can you -- can you read your answer?

A    Yes. Yes, sir. And obviously, the main difference with me is, which is also super weird to say, if you were to get me naked and I was to be photographed naked, you would be able to tell. Okay. Even though

the face looks young, her body is way more mature than a child, which is what we go based off -- excuse me -- go based off. We don't go based off the edited photos, if it's just their -- of their face edited. We go based off of the totality and their body.

Q    What do you mean by that?

A    That statement was in reference to a previous question for me using certain photos, like, edited photos of my face.

Q    It was about determining who looks to be a minor and who is not a minor; correct?

A    Uh-huh.

Q    Because you -- you have posed in sting operations as a -- as a minor; correct?

A    Yes, sir.

Q    As a 13-year-old?

A    Yes.

Q    And pictures of your face unedited?

A    No. They're edited because I don't look 13.

Q    How are they edited?

A    They're edited through an app that we utilize.

Q    I mean, I can tell you I've seen a picture. It looks just like you.

A    Like I said, (unintelligible), but I do not look like --

Q    You put a hat on. You slick your hair back. You wear a sweatshirt.

A    No.

Q    You -- you never had a hat on?

A    Not --

Q    Luring people in to tell them you're 13?

A    No. We edit our face. But with, like, hats and stuff, if I'm not mistaken, it's hard for it to pick up, like, your facial features to edit it.

Q    Okay. All right. I'm not trying to give you a compliment.

A    No.

Q    But, I mean --

A    I'm like --

Q    -- your -- your image, you -- you're portraying yourself as a 13-year-old.

A    Yes.

Q    Okay. And we'll get into the editing here in a minute. But I think what you were trying to -- to articulate in your testimony was that it's not just the way someone's face looks as how you determine whether or not someone's a minor or not.

A    Yes.

Q    And my question to you is what are you talking about there? And I'm not trying to make you feel

awkward or weird. But I'm just trying to say, like, what do you mean?

A    The totality of it, like, saying that. Because I guess in laymen's terms, with my edited photos, it's just my face. I am fully clothed. So obviously, when we get a CSAM image, we're not getting an image of a fully clothed person, and we're not just looking at a face, which could easily be edited to appear younger. We're looking at the totality of everything in that photograph.

Q    So you acknowledge that the photograph in this -- in this case, it -- the face could have been edited in some way?

A    That I don't know.

Q    But it could have been?

A    It could, yes.

Q    And -- and you know that images are easily digitally altered?

A    Yes.

Q    And even with genital or pubic region, I mean, hair is one of the most easy things to remove from a -- from a digital image, isn't it?

A    It could be, yes.

Q    I mean, that happens all the time in -- in the world.

A    But it could be. I can't speak for it because I don't know.

Q    Okay. But, like --

A    But it could.

Q    Yeah. You -- you understand that's a fairly easy thing to do?

A    Yes.

Q    All right. Do you know whether or not this image was altered in any way?

A    No, sir, I don't.

Q    Okay. Did you do anything to try to determine whether it had been altered or not?

A    Like, anything like what, like, I guess?

Q    Talk to the forensic guys about it.

A    They reviewed the image, but they didn't tell me that it appeared altered from my recollection.

Q    Did you ask them that question?

A    I don't recall verbatim if that was one of my questions.

Q    Okay. But as we sit here today, you don't know whether it was altered or not?

A    No, sir, I do not.

Q    And that's not just for the face, but that's also for the appearance of pubic hair.

A    Yes. That's for everything. I don't know.

Q    Right. So, I mean, I -- and I'm not trying to be crude. But what was it about this image that you looked at, and you're like, no, that's definitely someone who's under 18?

A    The totality of it, everything involved in that photograph, the entire person, like, from top to bottom.

Q    You have to be a little bit more specific than that.

A    So face, her body, everything down to --

Q    So she's squatting. So you don't see her breasts. Knees to chest.

A    Yes.

Q    Correct?

A    Uh-huh.

Q    So you can't see her breasts. I think maybe she's partially clothed?

A    If I remember -- I'd have to refer back to the image.

Q    Okay. So really, all you can see is her face and, I think, her genitals?

A    Yes.

Q    All right. Not -- this is not -- let me -- what about her genitals looked under 18?

A    So I'm not a doctor. So I can't --

Q    Right.

A    -- you know, speak like, hey, it was this part of her genitals that looked young.

Q    You did not have an opinion that her genitals look anything different than anyone else's genitals?

A    What do you mean?

Q    I'm asking you, did you look at this image and go, oh, no, there's definitely something young-looking about her genitals?

A    Yes.

Q    What is it?

A    That I don't remember specifically, just because I'm not a doctor, so I don't know specific doctor terms.

Q    I mean, can you use layperson's terms?

A    Personally, everything but -- about her vaginal region. And I know that's not super specific for you, but that's just my opinion of it based off looking at that photo.

Q    I mean, do you have any sort of expertise to -- to make that opinion?

A    No. Because I'm not a doctor.

Q    Okay. So let me -- let me just ask you this: I mean, what in your opinion does your evidentiary --

81

like, your opinion, what weight does that have for a court?

A    That I do not know.

Q    I mean, is your opinion better or worse than anyone else sitting in this room?

A    That I can't speak on, I guess.

Q    You don't know?

A    Yeah. I don't know.

Q    I don't have any training in determining if someone is 18 or 16 or 19 or -- do you have specific training on that?

A    On determining the specific age, no, sir, I do not.

Q    Okay. So I don't -- there's nothing special about your opinion that this model looked below the age of 18?

A    I wouldn't call my opinion special.

Q    There -- there's no weight -- there's no extra weight that we should give that opinion because you're a detective?

A    That I don't know.

    MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    Okay. All right. Well, you don't know. And I guess what that means is as we sit here today, you do

82

not see your own opinion as being expert in any way?

A    What do you mean?

    MS. SHEVLIN: Form.

    THE WITNESS: In a body, in classifying a specific age? No. Because I'm not an expert in that. So no, I cannot say --

BY MR. ROBERTS:

Q    Okay.

A    -- my opinion --

Q    Okay.

A    -- in reference to that.

    MR. ROBERTS: All right. Do you guys want to take a break? We've been going, like, an hour.

    MR. CARSON: I was just going to ask.

    MR. ROBERTS: Yeah, yeah, yeah. That's fine. Yeah, perfect.

    MS. SHEVLIN: Yeah, sounds great.

    MR. ROBERTS: Yeah.

    THE VIDEOGRAPHER: This is the end of Media Unit Number 1. We are going off the record at 2:22 p.m.

    (Recess from 2:22 p.m. to 2:32 p.m.)

    THE VIDEOGRAPHER: This is the beginning of Media Unit Number 2. We are back on the record at 2:32 p.m.

83

BY MR. ROBERTS:

Q    Okay. So just going over some notes, kind of pick up where we are, your -- your testimony is that you've never been to met-art.com?

A    Yes, sir.

Q    Even after sort of the revelations from Mr. Pierce in the criminal case, you never went back and checked on anything?

A    No, sir.

Q    All right. I want to just -- you to pull to Page 37 on your -- your deposition. And Mr. Pierce asked a question. Aside from any of -- this is Line 6. Aside from any of those conclusions about sexual maturity, is there anything about the image in particular that says this is definitely a minor? I mean, is it in a child's bedroom? Does --

    Then you say: So no.

    Question: Look like a selfie in a bathroom by a teen?

    Can you read your answer at Line 13?

A    Especially on MetArt because it's that overseas. They're all posed. And it's done, I'm assuming, by a professional photographer. So they're usually in, like, staged studios, which is what it appeared to be.

84

Q    Okay. So especially on MetArt, how -- where did you get this information about what models are usually like on met-art.com?

A    That was from Detective Greene.

Q    So Detective Greene told you that he had been on met-art.com?

A    Yes, sir.

Q    And told you that these were professional photographers?

A    Yes, sir.

Q    Told you they were in staged studios?

A    Yes, sir.

Q    All right. You never verified that information?

A    Not that I can recall.

Q    All right. Is it true that -- and I think I may have asked this. But is it true, as an investigator of Internet crimes against children, that most public websites describe the models as adults and verified adults?

A    What do you mean? I'm sorry.

Q    Most public pornographic websites describe the models on those websites as adults?

A    Yes, sir.

Q    Okay. All right. I think I already went

through that. Now that reminds me.

A    Okay.

Q    All right. What was the -- what was the charge that you -- actually, let's -- let's continue. Do you have your -- your search -- your affidavit for the search report there?

A    You're talking about which one?

Q    Search warrant. This is the search warrant and affidavit for Synchronoss.

A    Yes. I think we're at the same one, the (unintelligible). This one?

Q    Yes. That's correct, yes.

A    Okay.

Q    And so in this -- in this affidavit, you cite a -- a statute, 827.015. What is that statute?

A    So this one is 827 -- you mean .071? You said .1.

Q    .071(5).

A    Yes, sir, the possession of child sexual abuse imagery.

Q    Okay. And I've got a copy of that. We can just attach it for the record.

(Plaintiff's Exhibit 5 was marked for identification.)

BY MR. ROBERTS:

Q    You're familiar with that statute?

A    Yes, sir.

Q    All right. And --

A    Thank you.

Q    -- (5), can you read (5)(a), the first sentence?

MR. CARSON: Can you give me -- can you give me just one second?

MR. ROBERTS: Yeah.

MR. CARSON: I'm going to object to form.

You can answer.

THE WITNESS: And you said just the first sentence?

BY MR. ROBERTS:

Q    Yes.

A    It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction, or other presentation which in whole or in part he or she knows includes any sexual conduct by a child.

Q    And is that the statute that you are referencing in your affidavit for a search warrant?

A    Yes, sir.

Q    All right. And you requested, from Verizon -- I see that here. We're looking at the search warrant exhibit, which I think is Exhibit 2.

A    Yes. It should be because your NCMEC tip was 1.

Q    Yeah.

And we talked about this earlier. I'm just confirming that -- the dates that you sought for the subpoena, 1/22/23 through 1/28/23. Did I read that correctly?

A    Yes, sir.

Q    And were those dates based on three days before the incident date and three days after the incident date?

A    Yes, sir.

Q    So including the incident date, that would be seven days total?

A    If my math is correct, yes.

Q    I think it is. I think that's at least what you put in your --

A    Yes.

Q    -- in your search warrant.

You go through your background. And you say that you have over five years of law -- law enforcement experience and that your affiant is currently assigned to the special victims unit.

How long had you been assigned to the special victims unit at the time of this affidavit?

A    So it's technically just ICAC, but we were under special victims, if that makes sense.

Q    Okay. How long had you been ICAC?

A    Just a couple months.

Q    All right. Had you been the lead detective on cases prior to this one?

A    Yes, sir.

Q    All right. Can you estimate how many?

A    Oh. I don't know an exact number -- sorry -- just because that was back from 2023 and '22. I can't -- I do not remember an exact number.

Q    Fair to say that you were pretty new?

A    Yes, sir.

Q    All right. Had you completed all of your training by that time?

A    No, sir.

Q    All right. Had you started your training at that time?

A    Yes, sir.

Q    Can you tell me how -- how far along you were in your training?

A    Just being a couple months in, it was pretty

**89**

much right at the beginning stages.

Q Okay.

A Yes, sir.

Q All right. I want to go to the facts which establish probable cause, that section.

A Okay.

Q All right. And you reference the -- the cyber tip in the same number that we've previously marked as Exhibit 1; correct?

A Yes, sir.

Q All right. You quote, looks like word for word, from portions of that cyber tip, file name through the image categorization by ESP. Is that a sort of copy and paste from the NCMEC report?

A Yes, sir.

Q All right. Now, at the time you did this affidavit, you knew that A2 was incorrect?

A That it was their description. And so what I'm copying and pasting is the ESP's description and their information. So what I put was just the information provided by the ESP.

Q But you knew that the model was not prepubescent?

A In my opinion. But in their opinion, she was.

Q Let's talk just a little about what you

**90**

understand to be pubescent or prepubescent. We're obviously talking about puberty; correct?

A Yes, sir.

Q What is your definition of prepubescent versus pubescent?

A I guess the easiest way to describe it is obviously, the prepubescent is you haven't hit puberty, so you have usually no kind of development to you.

Q Pubic hair?

A Not just pubic hair.

Q But pubic hair is one of those things?

A It can be, yes, one of those things, yes, sir.

Q The presence of pubic hair would alert you that someone has begun to experience puberty?

A Yes, sir.

Q Okay. And this model had pubic hair?

A Yes, sir.

Q Did you make any -- any opinions about the appearance of her pubic hair in relation to her age?

A That I don't recall. I would have to refer back to this to see if I did, but I don't recall.

Q Refer back to what?

A If it was in the description.

Q Okay. Yeah.

A Yeah. I just don't recall.

**91**

Q We'll go through this.

A Okay.

Q So we can -- yeah.

It says you have viewed the image attached to the cyber tip. And then additionally, on February 22nd, 2023, your affiant consulted with Dr. K. Dully of the First Coast Child Protection Team --

A Yes, sir.

Q -- who also reviewed the offending image.

Did I read that sentence correctly?

A Who also reviewed the -- yes, sir.

Q Yeah.

You actually did not express -- and you can take a minute if you would like -- your opinion in this affidavit that this was a minor or an adult.

A No. So usually, we put what the image depicts. But in this one, I did not put my opinion of what the image depicts. I just put Dr. Dully's statement.

Q When the -- and unfortunately -- right? -- I mean, unfortunately, sometimes you see images of what is obviously a child; correct?

A Yes, sir.

Q And when it is obviously a child, you don't consult with Dr. Dully usually, do you?

**92**

A That would be correct.

Q And so --

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q -- in those cases where it's obviously a child, you would express your opinion in the affidavit that this is obviously a child of, you know, a certain, I guess, age range?

A We describe the --

MS. SHEVLIN: Form.

THE WITNESS: Sorry.

BY MR. ROBERTS:

Q Yeah.

A We describe the photograph and what it depicts and I say, like, for example, it appears to depict CSAM, which is just the child sexual abuse material.

Q And in those cases, it's just obvious?

A Yes, sir.

Q Right?

A Uh-huh.

Q You'll agree that this case, it was not just obvious that this was a minor?

A In my opinion, it was.

Q But you didn't treat it like other cases where it is obvious, and you would have not consulted with

93

Dr. Dully; correct?

A    Yes.

Q    All right.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    So it is a little different than those circumstances where it's obviously a child.  You treated it differently anyway.

A    Yes.  In my opinion, yes.

Q    Right.

Do you agree that some people could have looked at this model and said, oh, she's 18?

A    That could be.

Q    Some people could say that; right?

A    Yeah.

Q    Detective Greene could come to that conclusion?

A    Yes.

Q    You -- you wouldn't testify under oath that Dr. Greene -- I mean that Detective Greene is wrong in his opinion that this person could have been 18 years old?

A    No.

Q    All right.

All right.  Let's -- this is a good point for

94

us to -- to kind of break out of this.

A    Okay.

Q    And I'm going to show you what we'll mark as --

MR. ROBERTS:  Where are we?  4, 5?

MR. CARSON:  6.

MR. ROBERTS:  6?  Okay.

BY MR. ROBERTS:

Q    I'm going to mark, as Exhibit 6 -- and what I'll do is I'll -- I'll make this a composite of three different things.

A    Okay.

Q    But we're just going to talk about one right now.

A    All right.

Q    This is the three --

MR. ROBERTS:  Here you go, Matt.

BY MR. ROBERTS:

Q    This is the report from Detective -- I mean -- sorry -- Dr. Dully.

A    Yes.

Q    There's three separate reports.  I just want to talk about -- let's start with the February 22nd report.

A    Okay.

95

Q    How many times prior to this had you met with Dr. Dully in the two months that you had been working?

A    Personally, this was my first time.

Q    This was your first time.  Okay.

How is it that you came to know about Dr. Dully?

A    So I was referred to her by Sergeant Tolbert.

Q    Okay.  And what did Sergeant Tolbert say?

A    That she had previously reviewed other ICAC detectives', like, images and that I would have to go to her.

Q    Now, you had had other -- let's just -- Detective -- I'm sorry.  Sergeant?

A    Tolbert.

Q    Tolbert.  And I've called him Detective.  I guess it's Detective Sergeant?

A    Yes.

Q    Yeah.  Sounds like a British crime show.

So Sergeant Tolbert, this was the first time that he had referred you to Dr. Dully; correct?

A    Yes, sir.

Q    But this was not the first investigation that you had worked on where there was an allegation of possession of child pornography?

A    Yes, sir.  That would be correct.

96

Q    You had done other investigations?

A    Yes, sir.

Q    And those other investigations included obvious child pornography that you did not need to go to a doctor; correct?

A    Yes, sir, correct.

Q    All right.  And so was -- tell me about that conversation.  Did Dr. -- why did it come up that Dr. Dully should or could be involved in this case?

A    So with this one, I reviewed it.

MS. SHEVLIN:  Form.

THE WITNESS:  I -- oh, sorry.  The background is making me -- I viewed it as being CSAM.  I don't remember for certain who it was.  I know it wasn't Sergeant Tolbert because he also reviewed the image before he assigned it to me, and he also viewed it as CSAM.  But I believe that there was somebody else in the office who thought that it could be age-difficult.  So that's when we decided, just to make sure we covered our bases, to have it verified.

BY MR. ROBERTS:

Q    And when you say age-difficult, what you mean is this could -- somebody believed that it could potentially be an adult?

A    Yes, uh-huh.

Q    All right. So -- and this is in some of the other testimony, that when there's a disagreement about the -- whether the model is an adult or a minor that the kind of policy of the department is to go to a Child Protection Team doctor. In this case, it was Dr. Dully?

MR. ROBERTS: Object to form.

THE WITNESS: I wouldn't say it's in policy.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q    It wasn't in policy.

So sometimes you would, and sometimes you wouldn't?

A    This is the first case, so I can only speak on this that I've had.

Q    You've -- you've done subsequent cases; correct?

A    Uh-huh.

Q    Where you've gone to Dr. Dully?

A    Not that I recall. Yeah.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q    Okay. So this is --

MS. SHEVLIN: Excuse me. Form.

MR. ROBERTS: I'm sorry. Yep.

---

BY MR. ROBERTS:

Q    This is the only case that you have consulted with Dr. Dully on?

A    Yes, sir.

Q    Okay. Other cases, you've chosen not to pursue because you thought this person could very well be an adult?

A    No. It was just other cases have not either been CSAM, or they have been CSAM.

Q    Right. So I guess there was a second part to my --

A    Oh, sorry.

Q    Sometimes when you don't go to Dr. Dully, it's because you've looked at the image, and you've said this is not CSAM or it's age-difficult -- correct? -- sometimes. Sometimes you don't go to her because it's obvious --

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    -- that it's a child?

MR. CARSON: Object to form.

THE WITNESS: No.

BY MR. ROBERTS:

Q    Okay. Yeah.

So -- so have you taken every cyber tip that

---

you've gotten since this and ultimately, that led to charges?

A    If I haven't, like, investigated -- or excuse me. I guess I should say every cyber tip that I've had post this, you're referring to?

Q    Let me just back up because I think we're ships passing in the night. Earlier in the deposition, you testified that you have looked at other images that you, yourself, determined were not CSAM.

A    Yes.

Q    Another way of saying that is you looked at an image, and it was age-difficult to the point where you just did not think it was a valid case to pursue.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q    Is that true?

A    No, not necessarily. Because --

Q    So -- okay. So explain that to me. Would you pursue age-difficult cases?

A    No. If I feel like it is age-difficult, then I would not pursue it.

Q    Okay.

A    Yes.

Q    And if you felt that it was age-difficult, you wouldn't go to Dr. Dully?

---

A    No. I -- depending on the circumstances. If it was one that I felt, hey, this is a child and I had somebody like in this case that had a difference of opinion, just to cover our bases, I would go to Dr. Dully.

Q    But in those cases, you -- you thought that it was a child?

A    Yes, like in this case.

Q    Right.

What I'm saying is in cases where you felt like that it was not a child; right? So image -- a tip comes in. You look at it. You go, I don't think that's a child. You would not take that to Dr. Dully.

MS. SHEVLIN: Form.

THE WITNESS: It's hard for me to say because I haven't had a case where I've been on the border, where it's like, ooh, could this be a child; could this not be a child? Like, I've had cases where it's clear, like, that is not a child or cases that don't even have CSAM at all.

BY MR. ROBERTS:

Q    Okay. Okay. All right. So what is -- you've never had an opportunity to go to Dr. Dully since this incident?

A    Yes.

101

Q    Okay. All right. So do you know -- I think you said it was Sergeant Tolbert that suggested that you go see Dr. Dully?

A    Yes.

Q    And your recollection is that because there was some disagreement about whether or not this was a child or an adult?

A    I believe it was a disagreement --

MS. SHEVLIN: Form.

THE WITNESS: -- on somebody thinking it could be potentially age-difficult and then us thinking, like, no, this is for sure a child.

BY MR. ROBERTS:

Q    Okay. So there was some disagreement about how to interpret the photograph?

A    Yes.

Q    All right. What was explained to you by anyone at St. Johns County, Dr. Dully's qualifications to determine whether some -- a model was an adult or a child?

A    What do you mean? Like, her qualifications? Like?

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    However you take that qualifications. I mean,

102

did -- let me ask it this way: Did Detective -- or Sergeant Tolbert tell you that she was qualified to tell you or to render an opinion about whether or not a particular model was an adult or a minor?

A    Oh, like, why we should be going to her at all?

Q    Right.

A    Is that what you're referring to?

Q    Right.

A    I don't recall the specific conversation. I believe -- honestly, I don't remember verbatim, and I don't want to guess. So I just don't recall the specific conversation we had about, like, I guess her background in medical.

Q    So you don't recall, before you first met her, what her -- being told what her specific qualifications were?

A    No, sir, I don't.

Q    Okay. When you met with Detective -- with Dr. Dully, did she tell you what her qualifications were?

A    Honestly, I don't recall because it was so long ago.

Q    All right. What makes you think that Dr. Dully has a scientific ability to determine whether

103

an image of a model on the Internet is or is not an adult?

MS. SHEVLIN: Form.

THE WITNESS: I don't know how to answer that, like, because I don't want to speak for Dr. Dully but to, like, say that, hey, she has a scientific, you know, I guess, method.

BY MR. ROBERTS:

Q    Do you know if she has a scientific method?

A    And by scientific method, like, what are you referring to?

Q    A reproducible method of accurately estimating the chronological age of a particular model in a particular digital photograph.

MR. CARSON: Object to form.

You can answer.

THE WITNESS: I don't recall specifically what she did.

MS. SHEVLIN: Join.

THE WITNESS: But I don't want to say, you know, accurately or inaccurately because obviously, that's a difference of opinion.

BY MR. ROBERTS:

Q    Well, as we sit here today, do you believe Dr. Dully has the ability to estimate within some degree

104

of scientific reliability the age of an individual by looking at a digital photograph?

A    Yes.

Q    Okay.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    What is that based on?

A    The specific? I don't know what it's based on, but that's why we went to her.

Q    Why do you believe she has the ability to simply look at a digital photograph and estimate the age of that person?

MS. SHEVLIN: Form.

THE WITNESS: This would be just me going based off my personal opinion --

BY MR. ROBERTS:

Q    Uh-huh.

A    -- which I don't know.

Q    Uh-huh.

Well, I mean, tell me. You have a personal opinion that -- that -- that doctors have a scientifically reliable way of looking at someone and telling their age.

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

**105**

THE WITNESS: You're saying scientifically? That's the thing. I don't know, I guess, how to answer it based off, like, that term being used.

BY MR. ROBERTS:

Q So --

A I don't want to misspeak.

Q -- you -- you were the -- ultimately responsible for this investigation; correct?

A Yes, sir.

Q And you understand that when you apply for a search warrant, you have the obligation of only presenting reliable information to the court; correct?

A Yes, sir.

Q All right. So we've talked about, you know, whether or not it was reliable that this website actually has a history of -- of child pornography. We've talked about that; correct?

A Yes, sir.

Q All right. What I'm asking you is how did you satisfy yourself, being in charge of the investigation, that Dr. Dully's opinion about the age was reliable such that you could present it to a court?

MS. SHEVLIN: Form.

MR. CARSON: I'll join.

You can answer.

**106**

THE WITNESS: And I'm sorry. I'm thinking back to obviously when I went to her office, just because I don't recall specifically what she used to determine the age. But her being a doctor in the medical field working with children, I think that also played into why I felt comfortable utilizing her.

BY MR. ROBERTS:

Q So you met with her twice?

A Yes, for this case.

Q Okay. The first time you met with her on February 22nd, did -- did she tell you that she could -- yeah, I can accurately, reliably estimate the age of the individual in this digital photograph?

A I don't remember verbatim what she said.

Q Do you remember getting that sense from her, that she was going to give you reliable information about the age?

A Yes.

Q Okay.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q All right. Now, prior to showing her the image, you told her that this image came from a cyber tip; correct?

**107**

A I don't recall what I stated exactly.

Q Well, if you will, just look at the Exhibit 6.

(Plaintiff's Exhibit 6 was marked for identification.)

BY MR. ROBERTS:

Q And I -- February --

A This one?

Q Yeah, yeah, February 22nd.

A Okay.

Q This is a letter that Dr. Dully wrote to you; correct?

A Yes, uh-huh.

Q All right. And she writes that she -- single color photograph displayed on law enforcement laptop. And she has the file number --

A Uh-huh.

Q -- provided to me by yourself following a cyber tip from NCMEC.

Correct?

A Yes.

Q She would have had no way to know whether or not this was a cyber tip image without you telling her, would she?

A No.

Q All right. So fair to say you -- you probably

**108**

told her that this was a NCMEC cyber tip report?

A Yes.

Q Did you tell her that it was unconfirmed?

A I don't think I remember what, verbatim, we talked about.

Q In your deposition with Mr. Pierce, you talk about understanding what confirmation bias is.

A Uh-huh, yes.

Q And what is confirmation bias to you?

A To me, in laymen's terms, it's -- like, I'll use for an example if I tell you, hey, the guy across the street just stole something from McDonald's and he's wearing a blue baseball cap and you see a guy matching that description, you're already going to have bias. Like, okay, he's a thief, based off what I just told you.

Q Do you believe that there's a risk, applying that same thing, when you told Dr. Dully at the time that she reviewed it that NCMEC, the National Center for Missing & Exploited Children, had already flagged this in a cyber tip? Do you think that that created the potential for confirmation bias?

A No. Because I can't speak for Dr. Dully and say, like, yeah, she had confirmation bias.

Q But that's exactly the scenario you just

109

described about someone robbing something; correct?

A   Uh-huh.

Q   Correct?

A   Yeah.

Q   Yeah.
You told her -- you gave her information that there was already a suspicion that this was a child at the time or prior to her opinion being formed; correct?

A   No. I don't recall specifically what I stated or if, hey, this is a child; can you confirm. So I don't recall what was said.

Q   But -- but clearly, you did tell her that it was from a cyber tip?

A   Yeah, from the National Center for Missing & Exploited Children.

Q   Did she -- did she act like she knew what that was?

A   I don't recall if she did or didn't.

Q   Okay.

A   Sorry.

Q   Do you agree that there might have been a different outcome if you would have told Dr. Dully that this was an 18-year-old?

A   No. Because I can't speak for her, if she would have changed her opinion on it.

110

Q   Okay. But when you brought the image to her, you realized or you at least acknowledged the possibility that someone had represented this individual as an adult?

MR. CARSON: Object to form.

THE WITNESS: What do you mean, that somebody represented her as an adult?

BY MR. ROBERTS:

Q   This -- the image that's the subject of the NCMEC report, cyber tip report.

A   Yeah.

Q   The website that it was on most likely represented this as an adult?

MR. CARSON: Object to form.

THE WITNESS: But like I stated, I can't say that that came specifically from that website.

BY MR. ROBERTS:

Q   But you knew that it came from the Internet; right?

MR. CARSON: Object to form.

THE WITNESS: That I can't say.

BY MR. ROBERTS:

Q   Well, where else would it have come from?

A   I don't know.

Q   Well, you're a detective, Internet crimes

111

against children. I mean, what are the possible sources that this digital photograph with a website stamped on it -- what are the other potential sources that this came from?

A   There could be a multitude of different sources that it could come from.

Q   Like what?

A   Like, honestly, anywhere.

Q   Could it have come from the moon? I mean, that's silly. But you're saying anywhere. I mean, like --

A   Yeah.

Q   -- don't you agree that, like -- I mean, you've heard it's like -- it walks like a duck, talks like a duck. I mean, doesn't this appear to be an image from the Internet?

A   Yes. It appears to be one that's a digital image, if that's what you're referring to, yes.

Q   Right. It appears to be a pornographic picture from the Internet; right?

MR. CARSON: Object to form.

THE WITNESS: It appears to me to be a digital image. That's what I see.

BY MR. ROBERTS:

Q   Right.

112

A   I don't automatically constitute it as, okay, this person got it off an Internet-based site.

Q   Even though --

A   (Unintelligible).

Q   Even though it has, like, the website on the image?

A   Yes. But that does not mean that it came from the website is only what I'm saying.

Q   Okay. Where else would this image -- how else -- and you're an expert -- right? -- in crimes -- Internet crime against children. Where else would a digital, what we've said, professionally produced photograph --

A   Like I said, I don't know -- I can't say for certain that it's professionally produced, so I don't want to say, yes, this was professionally produced.

Q   It appears -- you said it appears to be taken by a photographer.

A   Yes.

Q   Right?

A   Uh-huh.

Q   Where else would someone, on their phone, get a picture like that?

MR. CARSON: Object to form.

THE WITNESS: Honestly, anywhere. Like, our

phones can do so much.

BY MR. ROBERTS:

Q    They can't get things, though, that are not from the Internet.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Can they?

A    What I'm saying is that I agree that it's a digital photograph, but to say that it came from a specific site solely based off a watermark, I can't say that.

Q    And I'm not saying a specific site.  I'm just saying the Internet, like, a -- a website.

A    Yes.  Like, any website, yes, it can come from any website.  It can come from any type of social media site.  It could come from a -- a text message.  It can come from anywhere.  That's all I'm saying, yes.

Q    Okay.  You made no effort to determine where it came from?

A    I don't recall.

Q    Okay.  So you -- you meet with Dr. Dully.  Tell me about that meeting.

A    So I met at her office in Jacksonville.  And I brought in my agency laptop, showed her the image, and then that's when she reviewed it.

Q    Did she make any comments when she reviewed it?

A    I don't recall specifically what she said.

Q    How long did you guys meet this first time, February 22nd?

A    Yeah.  I don't know because I just wasn't keeping track of time.  So --

Q    I mean, do you -- do you think you did have a meeting with her, or was it just -- you just showed her the image and left?

A    No.  I had a meeting with her.

Q    Exchanged words, like, had a conversation of some sort?

A    That I don't remember specifically.  Like, if -- our conversation, like, what we stated, you know, or talked about, I honestly can't recall.

Q    Do you remember if she gave you her opinion while you were there?

MS. SHEVLIN:  Form.

THE WITNESS:  I don't recall, no.

BY MR. ROBERTS:

Q    Did she make reference to any book or handbook or anything like that?

A    Not that I recall.  I can't remember.

Q    What did she do?  Did she just look at the photograph?

A    No.  I remember her reviewing the photograph, but the specifics, just because it's honestly been so long, I don't remember.

Q    So you really don't remember anything about the meeting other than you brought a laptop.  She looked at the laptop, and then you left?

A    Yeah.

Q    Anybody else there with you?

A    No.  It was in her office.  I do remember that, yeah.  It was just me and her in her office.

Q    Sergeant Tolbert didn't go with you?

A    No, sir.

Q    Okay.  You can't tell me anything else about that meeting?

A    Not that I remember.  And I'm sorry.  It's just been so long.

Q    You get the report on February 22nd.  Is that the same day that you -- you met with her, or did you meet with her before that?

A    The date on this report would have been the date I met with her.

Q    How do you remember that?

A    Because I remember getting a printed-out copy of it, of the report.

Q    While you were still at the office?

A    Yes.

Q    Okay.  So sounds like you're there.  She forms all of her opinions while you're there, and she prints out a letter for you.

A    Yes, sir.

Q    Is that correct?

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    All right.  Did you read this?

A    Yes, sir.

Q    All right.  What is SMR?

A    Offhand, I don't remember specifically what the acronym stands for.

Q    Do you know what it means?  You don't know what the acronym stands for.  Do you know what it is?

A    Offhand, I'm -- I can't recall.

Q    Do you think you knew at the time and you've forgotten, or, like, maybe you never knew?

A    No.  I would assume at the time, she would have explained to me what SMR stood for and what it is.

Q    Do you know what SMR 4 -- what that means?

A    No, sir, not offhand.

Q    Okay.  The last sentence of the main paragraph, it says:  She does not appear to be shaved,

117

as her anterior pubic hair is still present.

What does that mean to you?

A   **What do you mean?  Like --**

Q   She says:  She does not appear to be shaved, as her anterior pubic hair is still present.

What do you take that sentence to mean?

A   **Like, what do I think Dr. Dully meant by it?**

Q   Yeah.  Or what did you take it to mean?

A   **That she doesn't, like, shave, like, her pubic region.**

Q   Because she has anterior -- still has anterior pubic hair.  Does that make sense to you, that sentence, the way it's written?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q   It's okay if it does.  I'm just -- to me, if you said, I still have hair -- right? -- it almost denotes that I have shaved some.  But I'm just trying to understand if I'm misunderstanding it.  It says:  She does not appear to be shaved, as her anterior pubic hair is still present.

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

118

BY MR. ROBERTS:

Q   Do you know what she meant by that?

A   **Not the way you're breaking it down.  It has me confused.  I'm not even going to lie to you.**

Q   Right.  It is a little confusing -- right? -- the way it's written.

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  Not the way it's written.  I guess the way, like, you broke it down, like, you explain, like, I guess I get confused, kind of --

BY MR. ROBERTS:

Q   All right.

A   **-- confused me in the process.**

Q   Okay.  I'm not trying to confuse you.  I'm trying --

A   **(Unintelligible).**

Q   -- to understand what it means.

A   **It's just the way, like, you, I guess, kind of explained it as you were breaking it down kind of made me --**

Q   Right.

A   **-- like, what?**

Q   Right.

A   **So sorry.**

119

Q   Right.

Do you -- do you believe that Dr. Dully is an expert in what grooming techniques are available for women?

A   **That I don't know.**

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q   You have no idea; right?

A   **No.**

Q   You -- you know --

A   **I don't know how I would know.**

Q   Yeah.

You -- you know that there are lots of different grooming methods.

A   **Uh-huh.**

Q   Right?

A   **Yes.**

Q   Shaving's just one of them?

A   **Yes.**

Q   You know that -- waxing?

A   **Uh-huh.**

Q   You've heard of that?

A   **Yes.**

Q   There -- there are chemicals; right?  Nair?

A   **Oh, yeah.**

120

Q   People used to use things like that, you know.

A   **Yes, yeah.**

Q   And there's electrolysis.  You've heard of that?  Like, use electro -- like, laser hair removal?

A   **Yes, laser, uh-huh.**

Q   Right.

And you would agree with me that each -- those all have maybe different appearances afterwards.  Like, electrolysis may appear differently after you've done that than shaving?

A   **I mean, I think it could appear differently.**

Q   Right.  I mean, sometimes you can get, like, a razor burn or, like, a rash from shaving; right?

A   **Yes, uh-huh.**

Q   You can have a different type of skin irritation, I think, from, like, waxing?

A   **Yes.**

Q   But they might appear differently; is that right?

A   **Yes, on the person.  Yeah.**

Q   Okay.  Yeah.

So you don't know whether or not Dr. Dully is an expert on determining whether a digital photograph accurately depicts whether someone has been shaved or not shaved?

A    No. Because I don't know her experience --

Q    Right.

A    -- in that aspect of grooming. I don't think that was --

Q    Right.

A    -- ever discussed.

Q    Right.

A    Yeah.

Q    And that's not something traditionally -- I mean, you're a detective, but you're also a female in the world. Like, you don't go to a doctor to be groomed?

A    No.

Q    Right. I mean, you don't expect even a pediatrics to be an expert in, like, being able to look at a -- a digital photograph and say, is that person groomed or not?

A    That I couldn't speak on.

Q    Yeah.

You -- you acknowledge that, like, a lot of young women do groom their pubic regions?

A    Uh-huh, yes.

Q    Yes?

I mean, you, like -- I know you have very limited experience on pornographic websites. But, I mean, is it your understanding that, like, a lot of the women on pornographic websites do not have any pubic hair?

MR. CARSON: Object to form.

THE WITNESS: No.

MS. SHEVLIN: Join.

THE WITNESS: So that is completely different just because some men or let's say women, depending on what you're looking at, may be into people who have pubic hair. So it just depends.

BY MR. ROBERTS:

Q    That's right. I mean, like, it's actually just called a fetish; right?

A    Yes, exactly.

Q    You're -- you're --

A    So it all depends.

Q    Right. So it's, like, a fetish if you're not groomed.

A    Yes.

Q    Right?

A    It could be, yes.

Q    It could be; right? Yeah, yeah, yeah. This is weird stuff to talk about, but, I mean, this is your job; right?

A    Yes.

Q    Right? I mean -- okay.

So -- but you -- you're aware that, like, a lot of women choose to groom themselves so that they don't have any pubic hair?

MR. CARSON: Object to form.

THE WITNESS: Some women can.

BY MR. ROBERTS:

Q    Some of them can.

And that's not an indication to you as a detective that they are under the age of 18, is it?

A    Just them being groomed? Is that what you're saying?

Q    Right. Just the lack of pubic hair, that's not a reason for you to say, oh, no, that's -- that person's under the age of 18?

MS. SHEVLIN: Form.

THE WITNESS: I don't think that would be the only determination, if that's what you're -- like, if that's the question that you're asking. Is that the only determination that I would use?

BY MR. ROBERTS:

Q    What I'm --

A    Sorry.

Q    What I'm saying is the fact that a model does not have visibly apparent pubic hair does not by itself tell you whether or not they are an adult or a minor.

A    No. I don't think that would be the only thing that I would go based off.

Q    Right. I mean, that -- that would be dangerous; right? Because there's lot of adults that don't have any visible pubic hair on a digital photograph; correct?

A    There could be, yeah.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    Yeah. All right.

So did you get a sense from Dr. Dully that, like, the appearance of the pubic hair was a -- was a contributing factor or a major factor in her opinion about the age?

A    No, sir.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    Did she -- did she tell you why she came to the opinion that she came to?

A    I can't remember verbatim what she stated specifically about how she formulated her opinion.

Q    Okay. All right. So did -- did you -- at the time, February 22nd, did you consider Dr. Dully to be an expert in determining age?

**125**

MS. SHEVLIN: Form.

THE WITNESS: Yes, sir.

BY MR. ROBERTS:

Q  You did?

A  Uh-huh.

Q  You believed that she had more qualifications than you to determine who's -- what the age of an individual is on a digital photograph?

A  Yes, sir.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q  And was it true that, I mean, that expertise -- did you get the understanding that that expertise was sort of the reason why, when there was disagreement, that you guys would kind of go and defer to Dr. Dully?

A  What do you mean?

MS. SHEVLIN: Form.

THE WITNESS: Like, her, I guess, opinion was kind of like our -- I guess are you saying, like, the reason that pushed us further into continuing with the case?

BY MR. ROBERTS:

Q  Yes.

A  Yes, uh-huh.

**126**

Q  You guys might have disagreed, but you've said that you're not really an expert on determining if someone is an adult or a minor; correct?

A  Yes, sir.

Q  But if this doctor, who has specialized knowledge, can say whether it was an adult or a minor, then -- then you would rely on that?

A  Yes, sir.

Q  Okay.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q  And that's what you did in this case?

A  Yes, sir.

Q  All right. Now, are you aware that at some point, Detective Greene met with a guy named Aaron Weiss and Crawford Pierce down at St. Johns County Sheriff's Office about this case?

A  The name Aaron doesn't sound familiar, but obviously, Crawford Pierce does.

Q  Yeah.

Do you recall -- and I don't know that you -- you may have been present or not. It was in October/November time frame of 2023, where Detective Greene was asked to search and locate this image and -- and the other images on the Internet. Do -- are you

**127**

familiar with that meeting?

A  No, sir. I don't think I was there.

Q  Did he tell you that he was able to locate these images on the Internet?

A  That who?

Q  Detective Greene. Did Detective Greene tell you that he was able to locate both of the models that are involved in this case on the Internet on multiple websites?

A  Not that I recall.

Q  You don't recall him telling you that?

A  No, sir.

Q  Okay.

A  That would have been during their meeting, you said?

Q  Yeah. And I don't know if you were there or not. You don't recall being in that meeting?

A  No, sir.

Q  All right. At some point later, you did learn, though, that these models had been located on a website?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q  Let me ask you a question.

A  Okay.

**128**

Q  You saw the photographs with them holding their passports?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q  Correct?

A  Yes.

Q  You were shown those. Who showed those to you?

A  I believe it was Pierce, but I can't be for certain. So I don't know offhand.

Q  Okay. Was it maybe Kaitlyn Payne, the assistant state attorney?

A  I don't recall her ever showing me.

Q  Okay.

A  No.

Q  Do you think you got them in an e-mail or --

A  If I viewed them, I believe it was Crawford Pierce who showed me them. But I don't remember how specifically I viewed them, but I think he provided them.

Q  Okay. All right. So -- and I'm going to have to circle back around when we talk about the other images but --

A  Okay.

Q  All right. So you get this letter from

129

Dr. Dully, and then you go back to -- what do you do after you get this opinion from Dr. Dully?

A    Sorry. I'm thinking back to -- after I got this opinion, I should have went back to the office, and I can't remember verbatim the next step in it. I don't want to misspeak.

Q    Well, I've got this search warrant. February 28th is the date that it looks to be signed, February 28th, 2023. That's what's been previously marked as Exhibit 2.

A    The Verizon?

Q    Yeah. Do you think that would have been the next thing you did in your investigation?

A    Yes, sir.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    After getting Dr. Dully's letter, did you do anything else in your investigation between obtaining this letter from Dr. Dully and seeking the search warrant?

MS. SHEVLIN: Form.

THE WITNESS: Other than probably waiting on the search warrant to return from Synchronoss.

BY MR. ROBERTS:

Q    Well, no, no. I believe that you got

130

Dr. Dully's opinion before you sought the search warrant.

A    Yeah. But I'm saying, like, after I got Dr. Dully's, it would have been on waiting on the Synchronoss return.

Q    But you -- you didn't send the subpoena until after you did the -- got the warrant; correct?

A    The subpoena to -- you're talking about Synchronoss?

Q    Yeah.

A    I don't recall sending a subpoena to Synchronoss.

Q    I mean -- I'm sorry -- to Verizon. I'm just trying to get the time line.

A    Yes, sir.

Q    You -- you get Dr. Dully's report.

A    Uh-huh.

Q    And then is the next thing you do is you fill out and create the affidavit for a search warrant that's dated --

A    On the 28th.

Q    On the 28th. That's the next thing you did?

A    Yes, sir.

Q    You didn't do any investigation between Dully's report and the affidavit?

131

A    Not that I recall.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    Okay. That's okay. I don't --

A    Yeah.

Q    -- have any record that you did. I'm just trying to verify that I'm not missing anything.

A    No. Sorry. I'm just -- that's why my face kind of scrunched up. I was thinking back to it.

Q    Sure.

All right. And so you -- in this affidavit, you quote directly from Dr. Dully's letter; correct?

A    Yes, sir.

Q    And so you -- we've already asked you questions about the reliability of Dr. Dully's opinion. But at that point, did you believe that Dr. Dully was a reliable source of information in estimating the age?

A    Yes, sir.

Q    Okay. All right. So is there anything other than Dr. Dully's report and the NCMEC tip that you submitted to the court -- well, strike that.

It looks like you submitted the information from the NCMEC report. You submitted your -- your statement that met-art.com was a known -- has a known history of displaying CSAM. And then the third thing

132

that you did was you quoted for Dr. Dully. Is there anything else that you submitted to the court to establish probable cause at the time that you applied for this search warrant on February 28th, 2023?

MR. CARSON: Object to form.

THE WITNESS: I don't recall.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q    Was there anything else in the -- in -- I mean, I'm asking what you submitted to the court. Did you submit anything to the court other than those three pieces of -- or the information that's contained in this subpoena?

MR. CARSON: Object to form.

THE WITNESS: That I don't recall. I don't remember if there was anything else.

BY MR. ROBERTS:

Q    You don't remember if you submitted anything other than the affidavit for the search warrant?

A    Yes, I don't remember.

Q    Did you submit the image?

A    The NCMEC image?

Q    Yes.

A    We don't, like, submit images into, like, a court forum.

Q   Okay. But did you -- did you -- that's what I'm asking you.

A   Yes.

Q   Did you do any -- did you submit anything other than the affidavit for the search warrant in support of probable cause to seek the search warrant?

A   Not that I recall, anything other than this.

Q   Okay.

A   I just know that we don't submit, obviously, NCMEC images.

Q   Well, you could show the -- I mean, do you -- do you believe that it would be improper for you to show a judge the image?

A   So all of our, like -- excuse me. All of our search warrant stuff is electronic-based. So I wouldn't be able to submit that electronically, that image.

Q   You don't have the ability to go to chambers to a judge to obtain a search warrant in person?

A   I mean, we can go in person. It's just the judges prefer to do it electronically based.

Q   Okay. But you have the ability to bring your laptop there --

A   Yes.

Q   -- if you wanted to show the image?

A   Yes.

Q   All right.

And did -- did you get a return on -- on this -- was the -- was the search warrant issued?

A   Yes, sir.

Q   Okay. And was there -- was it served, and was there a response?

A   Yes, sir.

Q   Okay. What happened next?

A   We received the Synchronoss download.

Q   Okay. And what did that download contain?

A   It contained numerous files linked to that phone number.

Q   All right. And you got all the customer subscriber information?

A   I don't recall if they provided the customer subscriber information. Usually, they have you reach out to Verizon.

Q   Okay. I'm just looking down the list --

A   Yes, sir.

Q   -- of things that you requested for it.

A   Uh-huh.

Q   You requested device purchase information?

A   Yes. Sorry. Let me go back to that page.

Q   E-mail address -- yeah. E-mail addresses associated with the account.

A   The call detail records?

Q   Call detail records.

Cell site information, what's the importance of that?

A   That will -- usually with cell site, if you request it fast enough, you should be able to kind of pinpoint, you know, where the phone was utilized during a specific time.

Q   And why is that important?

A   Because that can tell you, like, hey, were they in our county, or, hey, was it somewhere else, or, you know, like, where were they at specifically. But usually, you have to do that fast, fast.

Q   Specifically at the time of the incident?

A   Yes.

Q   Okay. All right.

All right. And so you got the -- the download. What happened next?

A   Then the next step is just to go through the download, review it, and see what all is contained in it.

Q   And what -- what was contained in it from your perspective?

A   That's when we located three other CSAM images, and then -- excuse me -- there was numerous other kind of files that contained other pornographic images as well.

Q   Those were adult pornographic images?

A   To be honest, I do not know their specific age.

Q   That's true of any -- any -- any pornographic image; right?

A   Uh-huh.

Q   Correct, just for the court reporter?

A   Oh, sorry. Yes.

Q   Yes.

A   Sorry. I forget that. I was -- uh-huh.

Q   So you found how many images that you thought were child pornography?

A   Total of three.

Q   Okay. Total of three?

A   Yes.

Q   Was that unusual?

A   No.

Q   You write in your affidavit that often people hoard. Is that true?

A   Yes.

Q   Was -- did you find any evidence of hoarding?

A   I can't recall specifically because there was a lot of files, like, a lot.

137

Q   Uh-huh.

A   **But as it pertains to, like, the CSAM, I can't recall if there was, like, hoarding of images.**

Q   Right.

You say in the affidavit that normally, people in possession of child pornography will try to hide or secret them away.

A   **Uh-huh.**

Q   Is that a yes?

A   **Oh, yes.  Sorry.  I need to stop doing that. I'm sorry.**

Q   There was no evidence that Mr. Lawshe was hiding or secreting away these -- these images; correct?

A   **I don't recall offhand because I do know he was married, but I don't recall if he had them in, like, different folders specifically.**

Q   But he -- but he didn't have them segregated from the other pornographic images on his phone?

A   **That I don't recall.**

Q   So you said there were three total images on his phone of child pornography?

A   **No, three total that we, like, charged for.**

Q   Were there other images of child pornography?

A   **That I don't recall.  No.**

Q   Okay.  So was one of those images the NCMEC

138

report image?

A   **That we charged, one of the images, no, sir.**

Q   Did you guys find that image on his phone?

A   **I do not believe we located that image.**

Q   I think you located an image of the same model, though?

A   **Yes, sir.**

Q   All right.  Actually, at least two images of the same model?

A   **Yes.**

Q   All right.  So I asked you earlier if this appeared to be part of a photo shoot.  Do you recall that?  Did the NCMEC image appear to be part of a photo shoot?

A   **Sorry.  I'm just thinking back to the other two images, just trying to make sure that they were of the same model.  I know one, for sure, was of the same model, but two, I'm not certain.  I would have to review that image.**

Q   And we have these images.

A   **Yes.**

Q   We're probably going to get to those a little bit later.

A   **Uh-huh.**

Q   But my question to you is there was a

139

different picture of the same model that was in the NCMEC image; correct?

A   **Of the same female, yes.**

Q   Same female?

A   **Uh-huh.**

Q   So I asked you if it was a photo shoot.  I mean, when you got that other image back, it confirmed that this was part of a photo shoot; correct?

A   **No.  Because I don't know if it was a part of a photo shoot.**

Q   It didn't appear to be part of the same photo shoot?

A   **Not based off my personal opinion.**

Q   Did it -- did it have website information on that image?

A   **I don't recall.  I would have to look at it again.**

Q   Okay.  Detective Greene has testified that he located the models on all of the images based on the information that was contained within the images themselves.  Do you have any reason to disagree with that?

A   **That I don't know just because I wasn't there when we located them, so I can't speak on it.**

Q   No.  But I'm not asking you --

140

A   **Yeah.**

Q   -- if that was a true statement or not.  What I'm asking you is he has testified --

A   **Uh-huh.**

Q   -- okay? -- that he was able to locate the two models in question using solely the information on the images themselves.  My question to you is do you have any reason to believe that that testimony is not accurate?

A   **No.  I don't think I have any reason to believe that.  Yeah.**

Q   You take -- you take Detective Greene for his word?

A   **Yes, uh-huh.**

Q   All right.  All right.  So he also testified that he located these models on websites within 20 to 30 minutes.  Do you have any reason to disagree with that testimony?

A   **No, sir.**

Q   All right.  He said when he located these models on the Internet that they were all portrayed as verified adults.  Do you have any reason to disagree with that?

A   **That?  No, based off what he's saying.**

Q   Okay.  And that wouldn't be unusual --

right? -- I mean, on a public website for a model to be described as a verified adult. Like, that's the way it is; right?

MR. CARSON: Object to form.

THE WITNESS: It should be.

BY MR. CARSON:

Q    Should be; correct? Right?

A    Yes.

Q    You're familiar with the federal age verification laws?

A    Not super familiar but --

Q    But you're an investigator with, you know, Internet crimes against children; correct?

A    Yes.

Q    You know that there are federal laws which require publishers to -- and producers to maintain age documentation; correct?

A    Yes.

Q    And you know that websites are supposed to have a records custodian to maintain that information?

A    Yes.

Q    All right. And so you know that prior to you making the decision to arrest, you had all of the information that you needed to locate these models on a public website; correct?

MR. CARSON: Object -- object to form.

THE WITNESS: Did I have all of the information needed? I wouldn't say that I did.

BY MR. ROBERTS:

Q    Well, Detective Greene had all of the information that he needed to do it; correct?

MR. CARSON: Object to form.

THE WITNESS: That I don't know.

BY MR. ROBERTS:

Q    Well, I mean, he did.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q    You're not -- you're not disagreeing. You're not saying that Detective Greene is lying, are you?

A    No, no.

Q    Okay. What other information would you need to locate these models on a website that you didn't have prior to making the decision to arrest Mr. Lawshe?

A    So when we made the decision to arrest him, obviously based off the probable cause, we had the information that was available to us. After -- well, I'm assuming it was months. Don't quote me on that. I don't -- I'm assuming it was. So months later, that's when we were presented with, like, the passport, redacted form and stuff like that.

Q    But prior to making the arrest, you had all of the information necessary to go to the websites and locate these models; correct?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q    I understand you didn't do that, but you had information to do that if you chose to do that?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q    Correct?

A    I don't think that I could have said for certain, like, yes, that specific image that I have on my NCMEC tip was the exact same image that was on the site.

Q    Do you believe that you had all the necessary information prior to arresting Mr. Lawshe in order to locate these models on the Internet?

MR. CARSON: Object to form.

THE WITNESS: No. I wouldn't say that I had all the --

BY MR. ROBERTS:

Q    What did you not have?

MR. CARSON: Object to form.

THE WITNESS: What I just stated.

BY MR. ROBERTS:

Q    Well, I mean, Detective Greene -- and I think the images are going to speak for themselves. All of the images had a website on them, listed on them in some way.

A    I don't recall all the images having a website listed on them.

Q    Okay. Some of the images had websites on them; correct?

A    Yes.

Q    You -- you had the names of these -- and I think it was multiple websites; correct?

A    That I do not recall, if it was multiple.

Q    Okay. You -- so you at least had met-art.com?

A    Yes.

Q    Right?

A    Uh-huh.

Q    So you -- you agree that you had all the information you needed to go to met-art.com; correct?

A    Could I have went to MetArt? Yes.

Q    You had all the information that you needed prior to making the arrest to go to met-art.com; correct? That's something that you do in the past; right?

A    What do you mean, do in the past?

145

Q You have been to websites to follow up and investigate NCMEC tips.

A Yes, previously.

Q Yes. You've done that before; right?

A Uh-huh, yes.

Q So you knew that you had the ability.

A Yes.

Q And you knew you had all of the information to go to met-art.com; correct?

A To go to -- yes.

Q Prior to arresting Mr. Lawshe; correct?

A Yes.

Q And you've never been to met-art.com. But if that website identified a records custodian, you could have e-mailed that records custodian to request information about these images; correct?

A Yes, uh-huh.

Q All right. Do you have any reason to believe that you as a law enforcement officer, if you would have e-mailed the record custodian, that he would not have responded to you?

A That I can't speak on because it would be hypothetical, so I don't know.

Q You -- you know that he responded to Mr. Pierce.

146

A Another attorney, yes.

Q Another attorney.

A Yeah.

Q Right?

You knew that you had the ability, even if you had to go the state attorney or somebody, you could get the information --

A Yes.

Q -- from the website; right?

A I could have attempted, yes.

Q Right.

So you had all of the information that you needed to actually get the passport information and photo session information from met-art.com prior to making the arrest of Mr. Lawshe, didn't you?

MR. CARSON: Object to form.

THE WITNESS: No. I still would say no.

BY MR. ROBERTS:

Q What -- what were you lacking?

A Because what was provided to me, like I stated, which was well after the fact, was just redacted forms.

Q Well, no. But I'm just saying, you could -- you had everything you needed to get the images of the redacted passports prior to making the arrest of

147

Mr. Lawshe; correct?

MR. CARSON: Object to form.

THE WITNESS: Yes. But I guess I'm just confused by your question because the redacted form wouldn't prove.

BY MR. ROBERTS:

Q That's not my question. I'm not -- I'll -- I will ask you -- and I promise I will ask you what you would have maybe hypothetically done with that information.

A Okay.

Q But what I am asking you is you had all of the information that you needed readily available in order to reach out to met-art.com's record custodian to request age verification information; correct?

A Yes, to request it.

Q And you had that information prior to making the arrest of Mr. Lawshe?

A I had MetArt. That's all I had, was the watermark, yes.

Q And -- and you -- that's all you needed to go to that website and request, from the record custodian, age verification information; correct?

A I would need to know that that photograph was housed on that server.

148

Q And wouldn't -- as an investigator -- right? -- a way to find that out would be to e-mail that image to them.

A No, sir. I wouldn't feel comfortable e-mailing something that I viewed as child pornography because now I'm transmitting child pornography via my agency e-mail.

Q So you believe it would have been illegal for you to transmit that image in your investigation?

A Yes.

Q Okay.

A Very much so.

Q So when you -- you could have gone on the website; right?

A Uh-huh.

Q You could have located. You could identify the model by name; correct?

A (Nods head.)

Q And then requested all the age verification by the name of the model; right?

MR. CARSON: Object to form.

THE WITNESS: By her name, possibly. I can't say for certain if that's how they would locate them. I don't know how they do that.

BY MR. ROBERTS:

Q   You don't know because you didn't do it.

A   **Yes.**

Q   All right. Okay. So let's talk about what you would have done differently had you gotten the information from the records custodian. Do you recall seeing an e-mail from the records custodian, attaching the documents?

A   **I recall getting an e-mail from Crawford Pierce.**

Q   Right.

A   **And I don't know if he reached out to that person.**

Q   Do you --

A   **But I remember seeing --**

Q   Do you remember seeing several attachments, and some of them were photographs of the -- of the passports?

A   **Yes, sir.**

Q   There's also an affidavit from the records custodian. Do you recall seeing that?

A   **There may have been. I -- I don't know offhand.**

Q   Okay.

A   **Yeah. But I do remember the passport.**

Q   Okay. Had you gotten that information, would it have affected the way you handled the investigation?

A   **No. Because I still felt that we had probable cause to do the arrest. I would have attempted to see if they could provide the un-redacted, just so we could verify, just because with redacted, there's no way for me as a law enforcement officer to verify what they're providing me.**

Q   So you -- but you wouldn't have just arrested Mr. Lawshe if you were in possession of an e-mail from a records custodian or an affidavit from a record custodian along with passport images which purported to prove that the models were adults? You wouldn't have just arrested Mr. Lawshe after receiving that, would you?

MR. CARSON: Object to form.

THE WITNESS: There would have been no way to prove that what they gave me was authentic and valid based off of what they provided you guys.

BY MR. ROBERTS:

Q   You're law enforcement. You could have gotten a subpoena. You could have done lots of things to get un-redacted copies; correct?

MR. CARSON: Object to form.

THE WITNESS: That with it being entirely

another state, I don't know if me as a St. Johns County law enforcement officer would have been able to force them to provide those records. So that I can't speak on.

BY MR. ROBERTS:

Q   And you don't know because you didn't try.

A   **Exactly.**

Q   All right. You wouldn't have arrested Mr. Lawshe if, in fact, the girls were 18 or 19, would you?

MR. CARSON: Object to form.

THE WITNESS: If they were adults, then we wouldn't have viewed it as CSAM. Then no.

BY MR. ROBERTS:

Q   It's kind of a ridiculous question; right?

A   **Yeah, if they were adults.**

Q   Do you see how it might be -- sound, like, outrageous that if a records custodian, a licensed attorney, in the state of California swore an affidavit and provided images of passports to -- that proved that these models were 18 that that wouldn't be enough to satisfy law enforcement that Mr. Lawshe was not in knowing possession of child pornography?

MR. CARSON: Object to form.

THE WITNESS: Do -- are you saying that do I think that the redacted versions of that is enough? Is that your question?

BY MR. ROBERTS:

Q   Well, don't you think that that creates a serious doubt as to whether or not these models are, in fact, minors?

MR. CARSON: Object to form.

THE WITNESS: No.

BY MR. ROBERTS:

Q   A sworn affidavit from an attorney licensed in California, that doesn't create any doubt in your mind that these are actually adults?

MR. CARSON: Object to form.

THE WITNESS: Honestly --

BY MR. ROBERTS:

Q   What would? What would? What would constitute reasonable evidence to you that these models were adults?

MR. CARSON: Object to form.

THE WITNESS: What would constitute evidence to me?

BY MR. ROBERTS:

Q   Right.

A   **Is if they provided the un-redacted version, something that would allow us as law enforcement**

153

officers or even any other agency to verify the records that they have.

Q   Well, let's say that they were actual real records and nobody tampered with the -- I mean, is that -- is that your theory right now, that the records custodian has manipulated or somebody has manipulated these passport documents?

MR. CARSON:  Object to form.

THE WITNESS:  I would hope that they wouldn't.

BY MR. ROBERTS:

Q   Well, if they didn't, then these -- then these models are -- are adults.

MR. CARSON:  Object to form.

THE WITNESS:  But like I said, I can't say that based off what I was given.

BY MR. ROBERTS:

Q   So the only way, in your mind, that Mr. Lawshe could not have been arrested is if somebody proved to you beyond a shadow of a doubt that these models were adults?

MR. CARSON:  Object to form.

THE WITNESS:  No, sir.  I'm not saying that's the only way that he wouldn't have been arrested.

BY MR. ROBERTS:

Q   But it's not enough to have passport IDs along

154

with the dates of the photo shoots from the records custodian.  That's not enough?

MR. CARSON:  Object to form.

THE WITNESS:  I'm saying that that didn't change probable cause that I was going off of.

BY MR. ROBERTS:

Q   You said that would not -- you still would have arrested him?

A   I'm saying what I had during that time that he was arrested was enough probable cause for me to initiate the arrest.

Q   What I'm asking, though, is a different question, is if you would have had the passports, the affidavit, and the e-mail from the record custodian, you still would have arrested him?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know.  Like, I can't say because it obviously would have changed the entirety of the investigation, so I can't speak on just one aspect of the investigation.

BY MR. ROBERTS:

Q   Every one of your colleagues that have been deposed have said, absolutely, no, we would not have arrested him, if we'd had these images of the passports.  Are you disagreeing with them?

155

MR. CARSON:  Object to form.

THE WITNESS:  I'm saying that that's their opinion.  But what I'm saying is I'm going to take everything in an investigation and look at it completely.  So I'm not going to go based off one piece of evidence and formulate an opinion.

BY MR. ROBERTS:

Q   But -- but you -- but you didn't do -- you didn't investigate these models' identity at all, did you?

MR. CARSON:  Object to form.

THE WITNESS:  You're talking about during the investigation?

BY MR. ROBERTS:

Q   During the investigation, you made no attempt to identify these, who you believe are child victims?

A   Uh-huh.

Q   Isn't it the stated goal of ICAC, is to protect and prevent the sexual abuse of minors?

A   Yes, sir.

Q   I mean, that's the --

A   That's one of the goals.

Q   But that's the number one priority -- right? -- for you is to, like, protect children.

A   Yes.

156

Q   And yet you took no effort to protect these children.  Why?

A   My effort was during my investigation because you're in an investigation is when obviously we work and do pretty much everything.

Q   But -- but you didn't make any effort to protect these models, did you?

A   Because at that point in my investigation, I had not gotten there.

Q   And -- and you still haven't gotten there.  It's March of 2025; correct?

A   Yes, it is March.

Q   All right.  So you find three other images -- or three total images of what you believe was child pornography on Mr. Lawshe's phone on the return from -- from Synchronoss; correct?

A   Yes, sir.

Q   How did you choose those images?

A   What do you mean, like, choose them?

Q   How did you pick them out of all of these photographs?  How did you choose these three?

A   Based off reviewing them.  I don't really know, like, what your question is.  Like --

Q   I mean, they just looked young to you?

A   No.  It was more than just looking young.

157

Looking young doesn't constitute CSAM.

Q    But, I mean, what about these -- because you're the one that chose the images; correct?

A    Yes, sir.

Q    You picked these three images out of a lot of different images.

A    Yes.

Q    Why did you pick these three images?

A    For the totality of the image.  So obviously, reviewing the entire image in its -- excuse me -- the image in its entirety.  That's how I formulated my opinion that it was CSAM.

Q    And when you say in the entirety, what do you mean?

A    Like, everything in the image, including the female.

Q    Like, breasts, face?

A    Everything, yep.

Q    Genitals?

A    Everything, yep.

Q    Okay.  Explain to me why the third image only has genitals.  And it's got no face.  It's got no breasts.  Why did you choose that image?

A    That is the -- you're talking about the Big Heart, right, that film?

158

Q    Right, yeah.  You charged that image; correct?

A    Yes.

Q    The only thing depicted in that image is a vagina.

A    Uh-huh.

Q    What made you drawn to this particular vagina?

MR. CARSON:  Object to form.

MR. ROBERTS:  What's the -- what's the objection?

MR. CARSON:  Did you ask what drew you to this vagina?

BY MR. ROBERTS:

Q    Well, it's a picture of a vagina, isn't it?  Am I mischaracterizing it?

A    It's the way in which, I guess, you worded the question because it's --

MR. ROBERTS:  I mean, it's a picture of a vagina, and I'm asking her what drew her to this particular vagina.

THE WITNESS:  I wouldn't say anything drew me to that specific vagina the way you worded it.  But that image does depict what I view to be CSAM.

BY MR. ROBERTS:

Q    I mean, it's not funny; right?  I mean, this ruined my client's life, and I want to know what

159

specifically about this image of this vagina led you to believe that the owner of the vagina was a minor.

A    And like I'm telling you, the image in its entirety, including that zoomed-in image of her vagina, is what made me believe that it was CSAM.

Q    What about the vagina made you believe that it was CSAM?

A    I don't know specific medical terminology if that's what you're looking for to describe it.  But I can only describe it the best way that I can.

Q    Describe it the best way you can.

A    That's what I'm saying.  The vagina in and of itself is what made me believe that it was CSAM.

Q    But you can't point to anything in particular about it that made you believe that it was a minor?

A    Not that I recall.  I can't specify a specific terminology if that's what you're saying.

Q    You took that image to Dr. Dully, did you not?

A    Uh-huh.

Q    And what did she have to say about it?

A    Do you want me to read it?

Q    Yeah, please.

A    Okay.  The second image is imprinted with script saying Big Heart and the file name, screenshot -- and then it has a list of numbers -- _duckduckgo.jpg.

160

This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly.  She appears to have no pubic hair development.  She does not appear to be shaved.  This developmental appearance is also less than or greater than 9 to 13.5 years of age.

Q    So the only anatomical description is -- is that she says she appears to have no public hair development.  Do you agree with that?

A    Do I agree that that's what she wrote?  Yes.  But --

Q    Okay.

A    -- her opinion, I can't speak for her opinion.

Q    Right.

And she does not appear to be shaved; correct?

A    That's what is written, yes.

Q    So, I mean, other than that, the only thing that Dr. Dully highlights in this to suggest that she's less than 9 to 13 years old is that she appears to have no public hair development?

A    That I don't know.  I just know that that's what is written in here.

Q    So I think -- and we'll mark this as Exhibit 7.  This is the -- this is the model, I think, in question.

161

MR. CARSON: Object to form.

MS. SHEVLIN: Michael, what's being marked as Exhibit 7?

MR. ROBERTS: It's the picture of the model.

MS. SHEVLIN: With the passport, with the Latvian passport?

MR. ROBERTS: With the Latvian passport.

MS. SHEVLIN: Thank you.

(Plaintiff's Exhibit 7 was marked for identification.)

BY MR. ROBERTS:

Q Now, you never actually saw the face or breasts of this model; correct?

A **Nope.**

Q You just saw the -- is there a better word to use, genitals? I guess we can use genitals.

A **That's fine.**

Q I'm sorry if vagina is -- is offensive. I'm not trying to be.

Would you look at that person and say that they're less than 9 to 13 years old?

MR. CARSON: Object to form.

THE WITNESS: Just based off this photo, I wouldn't be able to give an age.

162

BY MR. ROBERTS:

Q Right.

A **All I can see is just a face.**

Q She doesn't look nine, though; right?

A **I can't give a specific age just because I don't have much to go off of.**

Q I'm not asking for a specific age, I guess. I'm just saying, like --

A **Does she look less than 9?**

Q Does she look less than 9 to 13 and a half years old to you?

MS. SHEVLIN: Form.

MR. CARSON: Join.

THE WITNESS: I don't know.

BY MR. ROBERTS:

Q You don't know. Okay.

Why didn't -- why didn't you -- I mean, you didn't try to find another image that -- I guess you felt comfortable charging someone with possession of child pornography based on an image that only showed, like, belly button to genitals?

A **Yes, sir.**

Q This is a weird question. But does that seem fair to you?

MR. CARSON: Object to form.

163

THE WITNESS: Fair in what?

BY MR. ROBERTS:

Q Like, if -- if Mr. Lawshe wasn't able to locate these images on the Internet, like, he would have never been able to, like, show the face of that individual. Like, does it seem like you're hiding the ball at all by -- by charging an image that's clearly on a website -- right? -- but you choose an image that doesn't show any breasts and doesn't show a face?

MR. CARSON: Object to form.

THE WITNESS: I don't understand, like, your question. You're saying that it's not fair that we choose an image based off the focal point of the image?

BY MR. ROBERTS:

Q Yeah. Like, how would you ever defend yourself? How would Mr. Lawshe ever defend himself? It's just a picture of genitals, and there's no context to it. How could he ever prove that that was an adult?

A **I'm not --**

MR. CARSON: Object to form.

THE WITNESS: I'm not him, so I can't say how he would defend his reasoning for that image.

BY MR. ROBERTS:

Q It makes it a lot harder, though -- right? --

164

if you don't include breasts or -- or a face -- right? -- to defend it?

A **I wouldn't say that it would make it harder or easier to defend.**

Q Do you think it's a reasonable position that the -- that the model depicted in Photograph 7 is less than 9 to 13 years old?

MR. CARSON: Object to form.

THE WITNESS: That I don't know --

MS. SHEVLIN: Join.

THE WITNESS: -- because all I can go off is based off of face. Like, that's the thing. You want me to say --

BY MR. ROBERTS:

Q So you can't say that?

A **That I don't know, based solely off her face.**

MR. CARSON: We've been going about another hour and a half.

MR. ROBERTS: Let me just ask this question. Then we'll take a break.

MR. CARSON: Thanks.

BY MR. ROBERTS:

Q If you can't say that, then how can you sit here and say that you believe that she's a minor?

MR. CARSON: Object to form.

THE WITNESS: Because I wasn't looking at her face in the --

BY MR. ROBERTS:

Q No, no, no. No, no, no, no, no, no, Detective. I asked you when you sat down. I said you've seen the pictures --

A Yes.

Q -- of them holding their passports.

A Uh-huh.

Q And you said you still, after seeing the picture in the passport, believe that they are minors. Do you recall that testimony?

MR. CARSON: Object to form.

THE WITNESS: Yes.

BY MR. ROBERTS:

Q And now you've just testified that you have no -- you can't look at that and tell at all what age she is; correct?

A **Because your question was to, I think, that she is less than 9 years of age or 9 to 13. What I'm saying is I can't say for certain if she's between that specific age range that you gave me.**

Q But you can say --

A **So I don't want to misspeak.**

Q But you can say that she is, in your opinion, less than 18 years old?

A **I'm saying that she could be.**

Q She could be?

A **Yes, sir.**

Q She could also be 20; right?

A **Yes.**

Q Is that the real reason that you -- you haven't sought out these alleged victims of -- of child pornography because you really don't know that they're minors?

MR. CARSON: Object to form.

THE WITNESS: No. That's not the reason that I wouldn't do my job.

BY MR. ROBERTS:

Q You don't know why you haven't sought them out?

A **Why I haven't sought out?**

Q I mean, this individual right here, you -- you said earlier that you believed that she was a minor.

A **Yes.**

Q Do you still -- okay. Now, a lot's happened in this testimony right now. Do you still believe, after what we've just been through, that she is a minor?

MR. CARSON: Object to form.

THE WITNESS: That she could have been a minor at the time the photos were taken, yes. I don't know, obviously, her age now.

BY MR. ROBERTS:

Q She also could have been an adult at the time the pictures were taken; correct?

MR. CARSON: Object to form.

THE WITNESS: That she could have been. I don't know.

MS. SHEVLIN: Form.

THE WITNESS: Just like she could have been a minor. She could have been -- I don't know.

BY MR. ROBERTS:

Q But the only evidence is that they were an adult; correct?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q Currently, the only evidence -- actually, there's -- there's a passport and there's a statement from the records custodian. That is the only evidence of what their actual age is; correct?

MR. CARSON: Object to form.

THE WITNESS: I don't know based off that redacted passport what her age is.

BY MR. ROBERTS:

Q Okay. But as we sit here today, isn't it true that the reason you're not pursuing these cases is because you believe that both of these models very well may have been adults at the time the photographs were taken?

MR. CARSON: Object to form.

THE WITNESS: No.

BY MR. ROBERTS:

Q They could have been adults.

MR. CARSON: Object to form.

THE WITNESS: In my opinion, no.

BY MR. ROBERTS:

Q They could not have been adults?

A **In my opinion, I don't think that they are adults.**

Q You do not believe that this person could have been an adult on the day that this picture was taken.

MR. CARSON: Object to form.

THE WITNESS: That I don't know.

MR. ROBERTS: Okay. We'll take a break.

THE VIDEOGRAPHER: We are going off the record at 3:56 p.m.

(Recess from 3:56 p.m. to 4:06 p.m.)

THE VIDEOGRAPHER: This is the beginning of Media Unit Number 3. We are back on the record at 4:06 p.m.

BY MR. ROBERTS:

Q Okay. I want to circle back to -- now that we've talked about all three images, I want to circle back to the -- the idea that there was some disagreement between -- or at least a question in the St. Johns County office by -- I think you maybe recalled Detective Greene questioning whether or not this was clearly a minor or age-difficult?

A **I don't recall, like, who specifically.**

Q But someone. Someone questioned that this may be age-difficult or -- or an adult is another way to say that?

A **Just age-difficult but yes.**

Q Right. But age-difficult means that it might be an adult?

A **It could be, yes.**

Q Right.

So I want to go back to the exhibit, and I've done a terrible job of writing them down. But the statute, Florida Statute 27.071 [sic]?

A **Yes. This?**

Q Correct. And part of that --

MS. SHEVLIN: Michael, I'm sorry. What exhibit number was this?

MR. CARSON: I have it as 5, but --

MR. ROBERTS: I think that's right.

MR. CARSON: I'm not sure.

MR. ROBERTS: I think that's right.

MS. SHEVLIN: Thank you.

BY MR. ROBERTS:

Q This is the Florida statute that we've referenced.

So you're familiar with the idea that crimes have elements?

A **Yes, sir.**

Q And there are, would you agree with me, two requirements in this statute that, one, the possession of the image must be knowing?

A **Uh-huh.**

Q Do you agree with that?

A **Yes, sir.**

Q And that the -- the individual who has possession of it must know that it includes sexual conduct by a child?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q Well, let's just read it because I'm just -- you know, let's just do this.

MR. CARSON: Object to form.

MR. ROBERTS: For me reading the statute?

MR. CARSON: Yeah. You can. Go ahead.

MR. ROBERTS: Okay.

BY MR. ROBERTS:

Q You -- you -- this is the statute that you -- you charged Mr. -- that you sought the search warrant for; correct?

A **Yes.**

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q You cited this statute?

A **The 827.071(5)?**

Q Yes.

A **Yes.**

Q And so you -- you were familiar with the statute at the time that you sought the search warrant?

A **Yes, sir.**

Q And you didn't put a statute in there without knowing what it was?

A **Yes, sir.**

Q Right?

And so at the time, you were familiar with what was required to prove that someone was in possession of child sexual abuse material?

A **Yes, sir.**

Q All right. And I'll just read it real quick.

It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction, or other presentation which in whole or part he or she knows to include any sexual conduct by a child.

Did I read that correctly?

A **Yes.**

Q All right. What evidence did you have that Mr. Lawshe knew that this was a minor?

A **So that would be just based off of my opinion, just like you're saying based off somebody else's opinion, they can view that as age-difficult.**

Q So -- okay. You've already testified that it was your opinion that it looked to be a minor; correct?

A **Yes, uh-huh.**

Q You didn't know what age, but it looked to be a minor to you?

A **Yes, sir.**

Q But you agree that someone else in the sheriff's department expressed concern that it might look like an adult; correct?

MR. CARSON: Object to form.

THE WITNESS: Age-difficult but yes.

BY MR. ROBERTS:

Q Age-difficult but that means that it may be an adult; correct?

MR. CARSON: Object to form.

THE WITNESS: And it may be a child. So age-difficult, like we said, it's -- it could be a child, or it could potentially be an adult. That's why it's age-difficult. We don't know what age range it is.

BY MR. ROBERTS:

Q Correct.

So what evidence did you have that made you believe that Mr. Lawshe did not think that this was an adult?

A So he could have gone off the same opinion as me, that that looked like a child.

Q Right. But we've already said that, like, you know, everybody's different, a point that you made earlier; correct?

A Uh-huh, yes.

Q And that's not only physically, but we also made the point that people's perception of age and aging other people is different; correct?

A Yes.

Q All right. What I'm saying is what evidence did you have that led you to believe that Mr. Lawshe thought that this was a minor?

A So I can't speak on his opinion because I'm not him. So I can't say that yes, he for sure thought that that was an adult or he for sure thought that that was something else. Like, I can't speak on somebody else's opinion because I'm not them.

Q Right.

A So I don't want to speculate.

Q But at the time, you knew that it was at least a possibility that he had obtained this off of a website?

A That? I don't know where he obtained it.

Q You have to acknowledge that it was possible that he got this off of a website.

A He could have gotten it off of anywhere. So that -- I can't say, like, yes, he got it off that site or yes, he could have -- he could have gotten it off anywhere. Yes, I will agree to that.

Q But he could have gotten that off met-art.com?

A Could have.

Q Right.

And -- and if he had, he would have been told that this was an adult; correct?

A That I can't say because I don't know if

that's what pops up when you first go on that site. I can't speak on that.

Q But if you'd have gone to the site -- I mean, Detective Greene -- we went through this -- has been to the site in this investigation. And he's testified that it -- it does disclaim that the models are verified adults. Do you have any reason to disagree with that?

MR. CARSON: Object to form.

THE WITNESS: What I'm saying is I don't know if that's same across the board. I can't say what Mr. Lawshe saw when he went to that site, just like I can't say what Detective Greene -- I can only speak on what I know.

BY MR. ROBERTS:

Q But if Mr. Lawshe got that image from that website, do you agree that it would be very difficult for you to establish that he knew that this was a minor?

A That I don't know because when I review a case, it doesn't tell me where a person is getting an image from.

Q Well, you have the ability to do that; right? You have the forensic guy that can help you understand where each image is coming from; correct?

A That's not --

MR. CARSON: Object to form.

THE WITNESS: That's not always the case.

BY MR. ROBERTS:

Q It's the case in this -- in Mr. Lawshe's case, though.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q Correct?

A That I do not recall.

Q I mean, you -- you had the availability -- Detective Greene testified to ability to access search terms, websites. He could see the websites that he went to.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q Do you have any reason to disagree that Detective Greene had the ability to see what websites Mr. Lawshe went to?

MR. CARSON: Object to form.

THE WITNESS: What I'm saying is just because you see what site somebody visited -- visits doesn't mean that that's the site that the image came off of or that's how they got it. That's all I'm saying. So I don't know how he got it.

BY MR. ROBERTS:

Q That's correct. But -- but what I'm saying to

you, what I'm asking you is -- and let's just frame it as a hypothetical. All right? If Mr. Lawshe viewed this on a website and was told that it was a verified adult, wouldn't you agree that it would be very difficult for you to show or believe that he thought that it was a minor?

A    That I don't know because I can't speak on a hypothetical what if because there are so many other variables that can be hypothetically brought into it. So I can't answer that. Like, I don't know.

Q    Was there any evidence that you -- you had of what he believed about this image?

A    What do you mean?

Q    Like, so you agree, like, in order for him to be guilty of this crime, he would have to have no -- he would have to know that the person is a minor?

MR. CARSON:  Object to form.

THE WITNESS:  Like, knowingly and intentionally possessing it.  Like, that person in his mind is a minor.

BY MR. ROBERTS:

Q    That's your understanding?

A    That's -- yes.

Q    And so the only basis, if I'm understanding you correctly, is your personal belief that this was a minor. That's the only reason that you have to think that he might have thought that it was a minor?

A    No, sir.

Q    What's the other basis?

A    I'm going based off the totality of it. Obviously, my viewpoint and viewing as CSAM, having a doctor certify that as CSAM, having multiple other people in the office have the same viewpoint that yes, this is CSAM. Obviously, it is opinions.

Q    Okay. So that's a great point. You don't -- you had no idea -- I mean, you don't believe -- or did you believe at the time that Mr. Lawshe was an expert in aging individuals?

MR. CARSON:  Object to form.

THE WITNESS:  I don't know anything about him, so I couldn't tell you.

BY MR. ROBERTS:

Q    Well, you know that he was a Florida Fish and Wildlife officer; correct?

A    That was learned after I started this investigation.  I didn't know prior to this investigation who he was or what his job class was.

Q    But at the beginning of the investigation, you were told that he was a Florida Fish and Wildlife officer.

A    I don't remember verbatim if they told me where exactly he worked.

Q    Okay.  I think it's -- if it's included in your -- your papers, will you agree that you knew that he was a --

A    During the course of the investigation, yes.

Q    You learned that he was a --

A    Yes, of course.

Q    Right.  Prior to his arrest, you knew that.

A    Yes, uh-huh.

Q    All right.  I'm trying to understand how -- and this is a little bit of a hard concept, but I -- I'm trying to articulate it.  If you have a specific illness, would you ever -- you'd go to a doctor to diagnose that illness; right?

A    Are --

Q    It's just a general question.

A    Okay.  Like, are you saying if I had, like, let's say, cancer, I would go to a cancer doctor?

Q    You'd go to a cancer doctor; right?

A    Yes.

Q    And that cancer doctor could give you a diagnosis of what your problem was; right?  Correct?

A    Yes.

Q    Because he's an expert on cancer; right?

A    Yes.

Q    But you wouldn't go to somebody who is not a cancer doctor to diagnose your cancer, would you?

A    I can't say I -- I wouldn't.  That probably -- if I'm sick, I would go to a doctor.

Q    A doctor; right?

A    Yeah.

Q    But not a -- but not someone who's not a doctor?

A    Not a doctor, yes.

Q    Right?

A    Not someone who's not a doctor, yes.

Q    Right.

Here's what I'm getting at, is if it takes a doctor to determine the age of someone, how can you expect just an ordinary guy to be able to know what their age is?

A    So I guess the easiest way to answer that is it didn't take a doctor for me to be like, hey, this person looks like a child, appears to be a child. But I did refer to a doctor as just an extra step to further and kind of beef up the investigation, so to speak, so there couldn't be, like, hey, did you take your extra steps that you could have done, especially if there is something that you're questioning.

Q    And so -- but officer -- officer or officers in your department took the -- the opposite approach and said, ah, I don't know. This could be age-difficult. It could be an adult. Right?

MR. CARSON: Object to form.

THE WITNESS: That, what they specifically stated I can't say because I don't know verbatim.

BY MR. ROBERTS:

Q    But -- but you remember something -- right? -- that they disagreed with the assessment that this was clearly a child?

A    I do recall one person, yes, disagreeing, but I just don't remember who specifically it was.

Q    Right.

And there's probably, like -- we're only talking about, like, four people that would have been involved in this?

A    No. Because I -- oh, gosh. I don't know at the time because there was some movement in the office of people going to different divisions, so I don't remember offhand, like, how many people were still in the unit.

Q    So if -- whoever this person was that disagreed, if they were in possession of that, they -- they would not have been in knowing possession of child pornography, would they?

A    What are you talking -- like, what are you referring --

Q    This officer that -- your colleague who looked at this and said, ah, this -- this is -- this could be age-difficult or an adult, however they characterize it, if they possessed this particular image, it would not be a crime; right?

A    That I can't say.

Q    Well, they don't believe that it's a minor, do they?

A    Yes. But if somebody else was to -- let's say, had that investigation and investigated that officer and they felt the same way that I felt, it would be a crime.

Q    So you -- you're -- you're the determiner of what's a crime and not a crime?

A    No. But I'm saying that they could have felt, hey, I have probable cause for this specific crime.

Q    But -- but this is what I'm struggling with, is you've acknowledged you've got no expertise as anybody else in this room, yet you get to determine what is and is not CSAM and what is or is not potentially a crime. And that doesn't seem right to me. But is that what you're saying; that's what it is?

MR. CARSON: Object to form.

THE WITNESS: That's not what I'm saying. I'm not saming -- excuse me -- saying that I'm the judge and executioner of what is a crime. What I'm saying is that I felt that this depicted a child, and I had that probable cause. I had it reviewed by another doctor. I had it reviewed by a state attorney, and that is why we proceeded with the investigation. But I'm not saying that I am the end all/be all, no, sir.

BY MR. ROBERTS:

Q    Do you think that you conducted a reasonable investigation prior to arresting my client?

A    Yes, sir, I do.

Q    And why -- explain to me why that investigation did not include going to the website met-art.com.

A    Because at that point in my investigation, when I am trying to obtain probable cause for an arrest, going to MetArt was not during that point in my investigation.

Q    You knew that med-art.com potentially had exculpatory information.

MR. CARSON: Object to form.

THE WITNESS: No, I did not.

BY MR. ROBERTS:

Q    You didn't know that websites like met-art.com purport to have age verification documentation?

A    I did not know that that image would be on MetArt, so I can't say for certain that yes, that image would be on MetArt or that's where he got that image, is what I'm saying.

Q    But the only reason you don't know that is because you didn't conduct an investigation.

A    I did conduct. Sorry.

Q    I think your answer was you did conduct an investigation?

A    Yes, sir.

Q    No. But your -- and forgive me, but your argument is -- is, I think, circular. You're saying you didn't investigate because there was no connection between the image and the website.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q    And then you're saying what is -- I'm sorry. So you're -- why didn't you investigate the website? Why didn't you go to the website?

A    Because I'm saying at that point in time when I was establishing my probable cause, at that point in time in my investigation, the website in, I guess,

185

itself was not at the forefront of my investigation. My investigation was establishing probable cause. That image alone, based off the watermark, doesn't mean that that's where the suspect could have gotten it from, is all I'm saying.

Q   But you would only know that unless you, like, went to the website or did an investigation into the website and a little bit deeper into where the image came from; right?

MR. CARSON:  Object to form.

THE WITNESS:  But what I'm saying is even if -- going to that website doesn't automatically mean that that image is going to be on it or that is the same image that he viewed that I am viewing.

BY MR. ROBERTS:

Q   But you wouldn't know unless you -- unless you went; right?

A   Yes.  But what I'm saying is --

Q   Right.

A   -- it's not a determining factor.

Q   Do you see how that's circular, though?  Like, you're saying I didn't know because I didn't go, but I didn't go because I didn't know.

A   No.  That's not what I'm trying to say.

Q   So sometimes you've said in your

186

investigations, you do go to websites like this; right?

A   Yes, sir.

Q   What's the difference in those cases and this case?

A   Nothing that I can recall.

Q   Do you think it's reasonable to go to the websites in those cases?

A   I wouldn't say that it's unreasonable, and I wouldn't say that it's reasonable.

Q   But you can't articulate for me why you would go to a website in one investigation but not in another.

A   Have a specific reason?  Not that I can recall.

Q   You -- you've said several times now that your -- that you were building probable cause.  Did I understand you correctly?

A   No.  What I mean is in the course of my investigation, establishing, obviously, probable cause during that investigation.

Q   Is that your goal, is to establish probable cause?

A   No.  It's to investigate the crime in its entirety.

Q   That did not happen in this case, though, did it?  You did not investigate the crime in its entirety

187

in this case, did you?

A   I feel like I investigated the crime.

Q   You -- you didn't investigate the known potential source of the image, did you?

A   No.

Q   You didn't contact the website that you had reason to believe was publishing this image, did you?

A   No.  Because at the time, there was nothing telling me that, hey, this website for a fact published this image.

Q   And the only way you know you would have known that, though, would be to investigate it, which you didn't do, did you?

A   No, sir.

Q   The victims in this case, you made no attempt to locate or identify the victims in this case, did you?

A   I don't recall offhand.  I would have to go back.

Q   Okay.  So you said you did a complete investigation, but you didn't do a complete investigation into the circumstances of these images on this NCMEC report, did you?

MR. CARSON:  Object to form.

THE WITNESS:  I felt as though I did.

188

BY MR. ROBERTS:

Q   But, I mean, as we sit here today, there are major gaps in your investigation, aren't there?

MR. CARSON:  Object to form.

THE WITNESS:  I don't think so, but it's solely my opinion.

BY MR. ROBERTS:

Q   Do you think -- do you think that Mr. Lawshe deserved to be arrested like this and for these things to happen to him?

A   I felt that I had probable cause to arrest him, yes, sir.

Q   But now, knowing everything that you had, now that we've done the investigation -- Mr. -- Mr. Pierce did the investigation and contacted the website.  With all of that information, you don't have any regrets about effectuating this arrest on Mr. Lawshe?

MR. CARSON:  Object to form.

THE WITNESS:  I think based off what I had and the probable cause that I still had probable cause to arrest him.

BY MR. ROBERTS:

Q   That's not my question.

A   What is your question?

Q   My question is just, like, as a human being,

knowing what you know now, you don't regret ruining this guy's life?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q You -- you understand that this ruined his career in law enforcement. You understand that; right?

A Like I said, I don't personally know him, and I did not personally follow up with him afterwards. So I don't know what occurred. So I can't speak on something that I don't know.

Q FWC was actually in the room next to him when you were interrogating him; correct?

A That -- if I'm in a different room, I don't know who's in the room next to me. So --

Q No one told you that his supervisors had been called and brought down to the station at the time that you were interrogating him? No one told you that?

A That I don't recall. That would have been a command staff level. I'm not command staff.

Q Okay. Well, I'm representing to you that he was fired. Okay? And I'm representing to you that this has been a catastrophic thing that's happened in his life. Knowing what you know now, you don't -- you don't feel any regret about -- about what's happened?

MR. CARSON: Object to form.

THE WITNESS: I don't know what answer you're looking for.

BY MR. ROBERTS:

Q You can say no.

A Like --

Q You can say no, I don't have any regrets about this.

A Well, what I'm -- my answer is do I think I had probable cause? Do I still feel, knowing everything that I know now that I had probable cause to do the arrest, yes. And that's my answer.

Q And nothing here has told you, man, I -- I kind of wish I went to that website?

A (Shakes head.)

Q Nothing?

MR. CARSON: Object to form.

THE WITNESS: (Shakes head.)

BY MR. ROBERTS:

Q Nothing that you've learned has told you, I should have -- I should have reached out to this record custodian?

A Do I think that things could have been different? That is with every investigation that I have. You -- hindsight is 20/20. When I look back at investigations, like, hey, I could have done this

differently or, hey, I could have done X, Y, and Z. That's with every investigation. That's the only way you learn.

Q You were still learning when you were doing this investigation?

A Yes, sir.

Q Did, at any point, you feel like -- I mean, this is the only time that you've ever used Dr. Dully; correct?

A Yes, sir, uh-huh.

Q I mean, at any point in time, did you feel like maybe -- maybe someone else with more experience should have handled this investigation?

A That --

MS. SHEVLIN: Form.

THE WITNESS: -- I don't know, solely because I can't speak for my sergeant because he was the one that assigns out the investigations and picks who they go to. So that would have to have been a question for him. I just can't speak for him.

BY MR. ROBERTS:

Q He personally knew Mr. Lawshe. Did you know that?

A That I don't know, just because he's been in law enforcement way longer than I have.

Q Right.

So tell me, when did you make the decision to arrest Mr. Lawshe?

A This was after everything was reviewed by both my sergeant, lieutenant, and then the state attorney.

Q Okay. If Dr. Dully would have told you that she could not help you, would you have pursued charges against Mr. Lawshe?

A The case --

MS. SHEVLIN: Form.

THE WITNESS: -- wouldn't have stopped there.

BY MR. ROBERTS:

Q So in a way, I guess your position is Dr. Dully -- really, her -- her opinion was the deciding factor in whether or not to proceed to -- pursue the charges or not pursue the charges?

MR. CARSON: Object to form.

MS. SHEVLIN: Form.

THE WITNESS: I can't say that.

MS. SHEVLIN: Mischaracterization of prior testimony.

BY MR. ROBERTS:

Q Okay. Well, let's just say -- I guess then, if I'm mischaracterizing it, just to confirm, if Dr. Dully, on February 22nd, would have told you, look,

I just can't help you for whatever reason, you would not have sought a search warrant in this matter?

A    That I can't say because --

MS. SHEVLIN:  Form.

THE WITNESS:  -- it would have been reviewed by my sergeant.  So I would have went back to the office, informed my sergeant of everything that occurred, and then it would have been his deciding factor.

BY MR. ROBERTS:

Q    If, on April 5th, you had gone to Dr. Dully and she would have said, I can't help you, would you have made the decision to arrest?

A    It would have been the same answer.  I would have gone back to my sergeant.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    So when you said earlier that the investigation which would have ended, that wasn't true.

A    I'm saying that I would have went back to my sergeant, and he would have been the deciding factor.  So I'm sorry.  I misspoke on that.

Q    Right.

MR. CARSON:  If -- if I could, I think you misheard what she said.

MR. ROBERTS:  Oh.

MR. CARSON:  Yeah.

BY MR. ROBERTS:

Q    I thought you said -- and it's on video, but I thought you said, like, then this investigation would have ended.

A    I don't recall, but if I did say that, then I misspoke.  I would have went back to the office and spoke with my sergeant.

MR. CARSON:  I don't -- I don't mean to interrupt your questioning.

MR. ROBERTS:  No, no, no.  That's what I heard.

MR. CARSON:  I think she said it would not have ended.

MR. ROBERTS:  Oh.

MS. SHEVLIN:  That's why I said mischaracterization (unintelligible).

BY MR. ROBERTS:

Q    So -- so Kathleen Dully, if -- if she would have said, I can't help, you -- you -- you don't think the investigation would have ended?

A    Yes.  I would have still went back to my sergeant.  I would have reviewed everything again with him in its entirety, including Dr. Dully's statement

that she would have provided.

Q    Uh-huh.

A    And then we would have decided how to proceed forward.

Q    You can't say one or the other whether or not you would have proceeded or not proceeded?

A    No, sir, I cannot.

Q    All right.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    On the -- If you would have gone to the website, if you had the photograph of the passport and the information from the record custodian, can you say as we sit here today whether or not you would have proceeded in the investigation or not?

A    No.  Because there is more variables that would have been in play with all of that.

Q    It definitely would have changed your -- the -- the analysis in what to do with the case?

A    I don't know if it would have changed what to do with the case.

Q    It might have led to more investigations?

A    Yes.

Q    All right.  But do you agree that if prior to making the arrest, you were presented with the passport photographs and the information from the website that you would have, at least, to have paused on a decision to make an arrest at that point?

A    I can't say for certain because it all depends on when we got that information, and there would be a lot of factors that would have been in play.  So I can't say if it would have been paused or if it would have been the exact same.

Q    Or if it would have been completely different?

A    Yeah, or completely different.

Q    And so I think this is a really good point.  And I'm glad we're kind of going through this.  Sometimes it seems pointless.

If you would have had this information from the website that Detective Greene got and Mr. Pierce got, the passports, statement from the records custodian and you had that in your investigative file prior to making the decision to effectuate arrest, I think I understand what you would have done is you would have taken that to your supervisors?

A    Yes.  Everything goes through my supervisors.  So they see every part of that investigation because they have to approve the reports.

Q    So, I mean, really -- I mean, I've asked this question of Detective Tolbert.  He was your supervisor

**197**

Q at the time; correct?

A Yes, sir.

Q I mean, he said unequivocally, if I had these passport photographs and this information, I would not have arrested him. You've got no way -- you didn't have the power to disagree with him at that time, did you?

MR. CARSON: Object to form.

THE WITNESS: That wasn't there. So --

BY MR. ROBERTS:

Q Right. I mean, that didn't happen. I get that. No. But I'm just saying, like, if you would have brought the passport information and the record custodian information, you would have brought that to your supervisor; correct?

A Yes, as with all this other information.

Q As with all the other information?

A Uh-huh.

Q And you would have allowed them to make the call?

A It would have been a group discussion. I don't know if it would have been just one person because I can't say, yeah, one person is solely making the call. It would have been something that we would have talked about with him, the attorneys, everybody involved in the investigation.

**198**

Q Who -- who was responsible for making the decision to effectuate the arrest in this case?

A That was something, like I said, that it was a group discussion, where it passed multiple points. It passed not only the sergeant, the lieutenant as well as the state attorney. It wasn't solely just one person.

Q You were involved in that decision?

A Yes, because it passed multiple points.

Q And was Sergeant Tolbert part of that decision?

A Yes, sir.

Q Who was the -- who was the person in St. Johns County Sheriff's Office that was responsible for that decision?

A I don't understand your question because --

Q Where does the buck stop for that decision in ICAC at the time that this arrest was made?

A I guess I'm a little confused. And please correct me if I'm not going down the right path.

Q Don't want you to.

A But what I'm saying is it's not just one person. Like, it doesn't just stop at one buck. Like, it's multiple different people, including the state attorney, that it has to go through before we even get to that point. So I can't just say, yeah, it's one

**199**

person because it's not, if that makes sense.

Q But it wasn't you? Was it you that made the decision to make this arrest?

A What I'm saying is it's multiple people. I agreed, if that's what you're saying, with the arrest as well as everybody else that was reviewing it, if that answers your question. I don't know.

Q Okay. Did you make a recommendation to your supervisors? How did you present that to your supervisors?

A By doing the probable cause. So I --

Q So you did your probable cause affidavit for the search warrant.

A Yes, uh-huh.

Q You stated there was probable cause, and then you asked them to sort of sign off on that?

A So they review it, yes. But we also do have to have somebody sign off on it. But they review it as well as the state attorney is reviewing the investigation and obviously Dr. Dully's statements, everything in its entirety.

Q Okay. So really, if there were this information that we're talking about, the passports and the website record custodian, Detective Tolbert's opinion or testimony about that would be relevant on

**200**

what ultimately happened with the case?

MR. CARSON: Object to form.

THE WITNESS: I don't understand the question.

BY MR. ROBERTS:

Q If -- if Detective -- if -- if Sergeant Tolbert told you, we're not proceeding with this case; we're not effectuating an arrest on Mr. Lawshe, that would be the end of the story?

A No. I can't say that because it would still go to multiple people. Like, we would all --

Q Who?

A -- review it.

Q Who?

A The people I just listed, me, the state attorney, my sergeant. In that case, when we brought it in, it was the lieutenant.

Q Who's the lieutenant?

A Because it switched. I cannot remember if it was -- oh. I would have to refer back to that time because we -- we now have our third lieutenant. So we've had different lieutenants during that time, so I would have to refer back to who was working during that time.

Q Okay. But you were responsible for presenting the information to your superior and the state attorney?

201

A   Yes.

Q   Not every case that you have do you present to the state attorney, do you?

A   If it's one that we're going to try to do a physical arrest day of, yes.

Q   But if you make the decision that we're not going to arrest, you don't -- do you have to get the state attorney's involvement in that?

A   They do.  Especially if we're going to be eventually forwarding charges, they're going to involved in it.

Q   I'm sorry.  I'm asking actually a different question.

A   Okay.  Sorry.

Q   If you make the decision that you're not going to -- there was another image that was the subject of the NCMEC report in this.  You're familiar?

A   Yes, uh-huh.

Q   You looked at it, and you discarded it.  You said, no, this is not CSAM; correct?

A   Uh-huh, yes.

Q   Was that your decision?

A   Yes.

Q   Did you run that by Sergeant Tolbert?

A   Yes.  He reviewed the image as well.

202

Q   And he agreed with you?

A   Yes.

Q   Did you run it by a state attorney?

A   I don't recall.  I can't remember if we did or didn't.

Q   Okay.  All right.

All right.  So I just want to encapsulate --

A   Okay.

Q   -- what -- what we've got here.  You've got the NCMEC report from Detective Tolbert; correct?

A   Yes, sir.

Q   At the time that he gave it to you, you do not recall whether or not he identified Mr. Lawshe as the subject of the investigation or not?

A   I don't recall offhand.

Q   Okay.  But by the time that you applied for a search warrant, you did understand that Mr. Lawshe was a law enforcement officer with FWC?

A   Yes.

Q   All right.  After viewing the image and reviewing the NCMEC report, you spoke with other detectives in the unit about their opinions about what this NCMEC -- initial NCMEC image showed?

A   Yes.

MR. CARSON:  Object to form.

203

BY MR. ROBERTS:

Q   And there was agreement between some people that it -- that it depicted a -- a child -- and there was some dissent from someone -- and you cannot remember that person's name -- that it may not be a child and it may be age-difficult?

A   Yes, if I'm recalling correctly.

Q   After that, the decision was made, and you were introduced to Dr. Dully by Sergeant Tolbert?

A   Yes, sir.

Q   You took the image, on February 22nd, to Dr. Dully?

A   Yes.

Q   You've already described the meeting that you've had with her.  You went back to the office, and sometime between then and February 28th, you executed an affidavit in support of a search warrant; correct?

A   Yes, sir.

Q   All right.  Search warrant was issued; correct?

A   Yes, sir.

Q   That was served on Verizon?

A   Synchronoss.

Q   Synchronoss?

A   Yes, sir.

204

Q   And they returned the data that you requested.

A   Yes, sir.

Q   You downloaded that data with Detective Greene, his assistance?

A   I don't recall.  He may have assisted.  I just don't recall for certain if he did or didn't.

Q   Okay.  You reviewed some of the pornographic images on the phone once the download was complete?

A   Yes.

Q   You chose three images that were not -- one of the -- those three images were not the original NCMEC tip report; correct?

A   That is correct.

Q   You -- you -- you made the determination that these appeared to be minors, in your opinion?

A   Yes, after reviewing them with Dr. Dully.

Q   Well, you made that determination, and then you took them to Dr. Dully.

A   Yes, sir.

Q   Right?

A   Uh-huh, yes.

Q   Now, there are images in Dr. Dully's report, and I'm glad we're talking about this.  Let's go to the second report.

A   Okay.

205

Q    It appears that some of the images that you had her review were not ultimately charged. There's more than three images reviewed in these two -- in these reports.

A    Which one?

Q    So we've got the -- the February 22nd; correct? That image was never charged; right?

A    No, sir.

Q    Right?

So there's an April 5th, which it deals with -- it sounds like you brought her additional images of the same female child. This is what this is saying, from the NCMEC report.

A    And it's the one entitled D26?

Q    I previously examined a single color photograph on a laptop entitled, yes, D26; right?

A    Yeah. That was the NCMEC image, yes, sir.

Q    Right?

A    Uh-huh, yes.

Q    Today -- so -- so basically, she -- she goes over her original opinion in the February 22nd.

A    Yes.

Q    Right?

A    Yes, sir.

Q    And then there's a -- a paragraph. It says:

206

Today, you've shown me two additional images of the same female child. And they confirm my previous determination that she is at most SMR 3 or 4 and, therefore, again, less than 12 to 15 years of age.

Correct?

A    Yes, sir.

Q    You don't know what SMR 3 or 4 means?

A    Not that I can recall, no, sir.

Q    All right. You don't know that SMR 4 could be actually an adult?

A    Not that I can recall. I don't know.

Q    Have you -- have you ever Googled that?

A    Not that I can recall. I don't know.

Q    Have you ever looked into any just, like, online literature about the controversial nature of sexual maturity rating?

A    No, sir, not that I can recall.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    Okay. Those two images at the bottom of this letter dealing with the original NCMEC and the two additional images, those two images were charged. Do I understand that?

A    Yes.

Q    All right. On the second April 5th letter --

207

and there's really no way to delineate them other than this -- this deals with the Big Heart?

A    Yes.

Q    Right?

A    Uh-huh.

Q    The Big Heart is the only image here that was charged?

A    Yes, sir.

Q    That was the third image; correct?

A    Uh-huh.

Q    Why didn't you charge on the -- the image on the first paragraph, the YCBLVVFQ_0.jpg?

MS. SHEVLIN: Form.

THE WITNESS: I don't recall offhand why that one wasn't charged.

BY MR. ROBERTS:

Q    Was it because this model had adult breasts and --

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    -- because she did not have pubic hair? Dr. Dully said she was SMR 1, which is prepubescent.

A    That wouldn't be a reason not to charge.

Q    Have you ever met a child that has adult breasts and no pubic hair development?

208

A    That I can't recall off -- I can't remember each child that I've met.

Q    But, I mean, like, does it seem really weird to you that, like, a prepubescent child would have, like, adult breasts?

MS. SHEVLIN: Form.

THE WITNESS: No. That doesn't seem weird.

BY MR. CARSON:

Q    Doesn't seem weird to you at all?

A    No, sir.

Q    No pubic hair development because I'm pre -- prepuberty, but I have fully developed breasts. That doesn't seem odd to you?

A    Because I don't know if I'm --

MS. SHEVLIN: Form, asked and answered.

THE WITNESS: -- like you stated earlier, looking at a child who's shaved or not. So I don't -- I can't say that just because I don't personally see it with my naked eye.

BY MR. CARSON:

Q    Oh, no, no, no, no. Excuse me. I'm not saying shaved. I'm just saying this -- this child was not shaved.

A    Yes. But what I'm saying is I can't --

Q    Appears -- appears to be not -- not shaved;

209

right? So have you -- have you -- does that not -- does that strike you as normal or -- or odd that a 9- to 13-year-old child who is prepubescent and developed no pubic hair would have adult breasts?

A    **No, that does not seem odd to me as a female.**

MS. SHEVLIN: Form, asked and answered.

BY MR. ROBERTS:

Q    Okay. If it doesn't sound weird to you, it's fine. That's okay.

All right. Okay. But in any event, you did not charge him with possession of this?

A    **I can't recall specifically why that one didn't get charged.**

Q    But it wasn't because it made no sense?

A    **No. We don't not charge --**

MS. SHEVLIN: Form.

THE WITNESS: -- just because they have breast development. That's not a reason not to charge.

BY MR. ROBERTS:

Q    Not breast development. It's Grade 4, Grade 5. Grade 5 is -- is -- that's an adult?

MR. CARSON: Form.

BY MR. ROBERTS:

Q    That's as high as it gets?

MS. SHEVLIN: Join, form.

210

THE WITNESS: What I'm saying is I don't know what that terminology means, so that's not a reason for me not to charge for an image.

BY MR. ROBERTS:

Q    So -- but it's your lack of understanding in what these terms mean that would lead you to, I mean, make a filing decision?

MR. CARSON: Object to form.

THE WITNESS: No, sir.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q    How do you rely on these opinions if you don't have really any understanding of what they mean?

MR. CARSON: Object to form.

THE WITNESS: What I'm saying is I'm relying on a doctor --

MS. SHEVLIN: Join.

THE WITNESS: -- who has to attest to that.

BY MR. ROBERTS:

Q    So you're just --

A    **I am not a doctor.**

Q    You're just trusting that -- that Dr. Dully is providing you with medical opinions within a reasonable degree of medical probability?

MR. CARSON: Form.

211

MS. SHEVLIN: Form.

THE WITNESS: Am I trusting her that she is accurately describing these females? I would say yes, if that's --

BY MR. ROBERTS:

Q    Why? Why do you trust her?

A    **Why do I trust her? Based off her experience.**

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q    Okay. Do you know what her experience is?

A    **I can't recall verbatim what her experience is offhand.**

Q    Okay. All right. So what -- and I'm just going to ask you. What would these images -- and the images are what they are, and we're going to look at them just here in a second.

A    **Okay.**

Q    What evidence would satisfy you that they are an adult?

MR. CARSON: Object to form.

THE WITNESS: What do you mean?

BY MR. ROBERTS:

Q    What evidence would satisfy you that the models depicted in these images --

A    **Uh-huh.**

212

Q    -- are, in fact, adults? You say today that you don't believe that they are; correct?

MR. CARSON: Object to form.

THE WITNESS: Yes.

BY MR. ROBERTS:

Q    What evidence would satisfy you that they are, in fact, or were, in fact, adults at the time that the photographs were taken?

MR. CARSON: Object to form.

THE WITNESS: I think that's a hypothetical question. I can't provide a hypothetical answer and say, like, yeah, that's for sure my reasoning because it would be hypothetically. So I can't --

BY MR. ROBERTS:

Q    Well, it's your -- it was part of your job, at least, to determine whether they were adults or minors; right?

MR. CARSON: Object to form.

THE WITNESS: Not -- I don't -- I guess the way you're describing it, that would be hard for me to be, like, yeah, my job is to sit here and judge this person's age, like, because it's not my job. Because I can't determine, like, hey, that's for sure somebody that's 18 or 19.

BY MR. ROBERTS:

Q    You -- you've testified that you, currently, as we sit here with everything that you know, still believe that these are -- these two models were minors at the time the images were taken.

A    Yes, sir.

Q    My question to you is you've -- you've seen passport -- government-issued IDs and an affidavit from a record custodian.  That has not satisfied you that they were adults at the time of the -- of the photo shoot; correct?

A    I would say no, that it has not satisfied me.

Q    So what would?

A    Like I said, I can't speak on a hypothetical because you're saying I've seen passports, government-issued.  I don't know that they're government-issued.  All I've seen is a redacted copy.  I don't know.  So I can't speak on something that --

Q    What's -- what's redacted?

A    All of their personal information.

Q    Like, their name but not their birthday?

A    And the rest of the personal information.

Q    As we sit here today --

A    Yes.

Q    -- you believe someone has manipulated or faked the IDs?

A    No, that's not what I'm saying.

Q    Well, enlighten me.  Is there a difference between you -- you don't believe the date -- the birth dates on the IDs but it's not fabricated?

A    No.  What I'm saying is I cannot formulate a concrete opinion based off the limited information that I have from that photograph.  That is what I'm saying.

Q    Which is you have the models' birthday, and you -- and you have the date of the photographs; correct?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    What more information would you need?

MR. CARSON:  Object to form.

THE WITNESS:  What I'm saying is I do not feel comfortable formulating an opinion based off the limited information that I had been provided.

BY MR. ROBERTS:

Q    And I'm just -- it's limited in -- in the name because I think there's some privacy laws that protect adults and -- and, you know, their choices that they make about, you know, what they do for a living.  But, I mean, you're a detective; right?  That's your job --

A    Uh-huh.

Q    -- is to determine and investigate what facts are and are not; right?

A    Yes.

Q    But you can't sit here today and tell me what -- what would satisfy you that these are or were adults at the time?

A    Because it's a hypothetical question, and I can't give you a hypothetical answer.

Q    Well, it's not a hypothetical question.  I mean, my client was arrested and lost his career because you did not verify their age.  And I'm asking you, what would have verified their age for you?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    It's not a hypothetical.

A    And what I'm saying is the limited information that I was provided I can't go based off of.

Q    Would you request a physical copy of their passport?  Would a physical copy of their passport satisfy you?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know.

BY MR. ROBERTS:

Q    Would a birth certificate?  Would that satisfy you?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know because that would have been another variable added to the investigation that I would have reviewed.

BY MR. ROBERTS:

Q    How do you ever come to any sort of conclusions?  I mean, you literally -- I mean, you were a beat cop; right?  You worked as a patrol officer?

A    Yes, uh-huh.

Q    You just would pull people over and refuse to believe their age on their ID?  Did you do that?

A    Did I pull people over and refuse to believe their age?

Q    They produced an ID and maybe -- maybe -- did you ever stop anyone for underage drinking?

A    Probably in the past, yes.

Q    And did they produce a -- a driver's license?

A    I've had people produce fictitious driver's license.

Q    Okay.  Have you -- and real ones?

A    And real ones.

Q    And when they produced, did you believe the information on -- on the ID, or were you satisfied that that ID, like, accurately described their birthday?

A    That I can't speak on because that is a

217

completely different circumstance. You're talking about a driver's license, and then you're talking about a passport. And completely different. So I can't say that yes, during that incident, as a road patrol officer, doing, let's say, a traffic stop --

Q    Right.

A    -- that that sufficed. And this, doing an investigation that is occurring over the -- like, it's completely different. So I can't speak on that.

Q    What's -- what's completely different as a law enforcement officer about verifying someone's age with a passport or a driver's license?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    What's different?

A    I just explained that. It is completely different when I'm having something in hand, running it, doing X, Y, and Z or --

Q    Okay.

A    -- whatever the case may be.

Q    All right. So --

A    It is a different circumstance --

Q    So --

A    -- as being on patrol.

MR. CARSON:  Don't interrupt her. Let her

218

finish.

BY MR. ROBERTS:

Q    So if you had a physical copy or if you had, like, an un-redacted copy, you could do all of the things that you do with any other ID?

MR. CARSON:  Object to form.

THE WITNESS:  No.

BY MR. ROBERTS:

Q    You don't have access to Interpol/FBI resources?

A    I work for a local agency, so no, I do not.

Q    You do not believe that your ICAC membership gives you access to greater law enforcement resources than just St. Johns County?

A    I did not say that. What I'm saying is I personally do not have access to Interpol and everything else that you just listed.

Q    But you -- you do. You could call the FBI. You could call another law enforcement agency and say, hey, I've got these passports; I need to verify that they're real. You can do that; right?

MR. CARSON:  Object to form.

THE WITNESS:  I could attempt to do that.

BY MR. ROBERTS:

Q    And if you did that, would that satisfy you

219

that these were adults at the time that the images were taken?

A    Like I said, I do not know.

Q    Okay. Let's -- let's -- did you bring some documents with you today?

A    Yes. There's thumb drives and the redacted images.

Q    And so for the record, I believe, based on government-issued ID and the affidavit of an attorney licensed in the state of California, that these images were taken of adults at the time that the image was taken. That's based on all of the information and belief that I have.

You believe that you're holding child sexual abuse material; correct?

A    Which is why it's redacted, yes.

Q    Okay. So I've made my statement on the record. I believe this is legal based on all of the information. Okay? Thank you.

So is this the NCMEC image?

A    Yes.

Q    Who -- wait. I didn't ask for redacted images.

A    The un-redacted are on this thumb drive.

Q    Okay. Okay. All right. Okay.

220

A    I just don't feel comfortable printing out un-redacted --

Q    Okay.

A    -- due to me feeling that they are CSAM.

Q    You think this is an adult?

A    Yes.

Q    All right. So no reason to -- to do that, redact anything, like --

A    I just redacted it because I don't know if you want to see --

Q    Okay. You don't think that this -- you've testified that this is not a photo shoot; correct?

A    I said that I cannot confirm that is a photo shoot or not.

Q    She's wearing the same clothes.

A    Yes, she's wearing the same clothes.

Q    Same earrings?

A    Uh-huh.

Q    Background's the same. Curtains are the same.

A    Yes.

Q    Correct?

A    But that doesn't constitute that it is a photo shoot.

Q    What do you mean by photo shoot?

A    You said that this is a photo shoot. Just

221

that alone in my opinion doesn't mean that it's automatically a photo shoot.

Q   What -- what do you think a photo shoot is?

A   It could be a multitude of things to different people. What I'm saying, just because somebody's in the same outfit does not mean it is automatically a photo shoot.

Q   This top image is the image you charged him with?

A   Uh-huh.

MR. CARSON: Object to form.

THE WITNESS: Yes, sir.

BY MR. ROBERTS:

Q   Let's write these down because we'll obviously have to attach these as exhibits but --

MR. CARSON: For what it's worth, you can ask the witness, but I think there's identifying marks on the back.

THE WITNESS: Yes. You might not be able -- because my handwriting is really bad, but I tried to put the file name on it.

BY MR. ROBERTS:

Q   Sorry. I can't read that.

A   Yeah. It's -- it might be bad.

MS. SHEVLIN: Is this the jump drive that --

222

there was one going to be delivered to our office and one that was going to be delivered to Michael's office?

MR. CARSON: No. Amy, this is Matt Carson. There's -- there's -- you're going to get a -- you're going to get a full hard drive of the investigative file that we provided to plaintiff's counsel. I also have a thumb drive that has these photographs, both redacted and un-redacted, that we will get to you --

MS. SHEVLIN: Okay.

MR. CARSON: -- as soon as we can. And maybe you and I can just touch base offline --

MS. SHEVLIN: Okay.

MR. CARSON: -- and figure out the best way to do that.

MS. SHEVLIN: Sure. Thank you. Appreciate it.

BY MR. ROBERTS:

Q   So I've just -- just put, like, A through F here.

A   Okay.

Q   Okay?

A   Okay.

Q   So this is E.

223

A   Yes.

Q   Okay. There's three images on that; correct?

A   Yes, sir.

Q   And you -- you charged him with the top image?

A   Yes, sir.

Q   All right. Now, we'll attach this as -- it's a composite exhibit -- 8?

MS. ZEPF: I have, like, six pages of that.

MR. ROBERTS: Yeah. It's --

MS. SHEVLIN: That sounds right.

MR. ROBERTS: It's 8. It's 8, I think. All right. So this --

MS. SHEVLIN: Is it -- is it a composite of all the images, Michael?

MR. ROBERTS: Yeah. So the exhibit will have, like, a bunch of pictures on it. Like -- yeah. So 8 has A through F.

MS. SHEVLIN: It's a composite of all the images.

MR. ROBERTS: That's correct. It's A through F, so it will be 8A through F. Okay?

MS. SHEVLIN: Gotcha.

(Plaintiff's Exhibit 8 was marked for identification.)

224

BY MR. ROBERTS:

Q   All right. So the top -- right?

A   Uh-huh.

Q   So this photograph identifies the model by name, Sanija?

A   That I don't know because I don't know if it's referring to obviously her, her, or another one.

Q   That's not true. It says Big Heart right next to it, and you identified -- you -- you understood that Sanija was part of the Big Heart.

A   No. What I understood was that it listed Big Heart, but I don't know if that's the model obviously presented as what they listed. I don't know if that's Sanija.

Q   Well, who do you think Sanija is?

A   That I don't know.

Q   I mean, take a guess.

A   Like I stated, I don't know.

Q   You can't make an educated guess about -- it says AmourAngels Sanija/Big Heart, and then there's a picture that says Big Heart on it. You don't know -- you had no idea who Sanija is?

A   What I'm saying is I can't say for certain that this person listed is what they view as Sanija. No, I do not.

Q    But you can say for certain that it's a minor?

A    Yes.

Q    But you can't say that that's Sanija?

A    Because I don't know who Sanija is.

Q    Well, one way would be to go to the website and search Sanija; right?

A    If that populates.

Q    Yeah.

You didn't do that?

A    No, sir.

Q    All right.  Detective Greene did that?

A    That I don't know.

Q    Okay.  This AmourAngels Karry chic, you don't think she's a minor, do you?

A    That, I would have to review the image, like, full on just because I can't tell based off this small snippet of it.

Q    Who do you think Karry is?

A    That I don't know.

Q    You don't know.  Okay.

A    No.

Q    All right.

All right.  Now, this AmourAngels here, this appears to be the cover of a print magazine.  Do you see that?

A    Yes.  I'm looking.

Q    Does it appear to be a cover of a print magazine?

A    I don't know if it's a magazine just because it's only one image.

Q    Down here, we have AmourAngels, heaven of sensuality.  That looks like the top of a -- of a magazine or a header, banner, I guess, maybe for a website.  What do you interpret that to be?

A    That, honestly, it could be anything because it's a watermark so --

Q    So how would you, like, figure out what that is?  If you wanted to figure out, like, what an AmourAngels is, like, what would you do?

A    I could try to do, like, an open source query on it.

Q    Okay.  Like, a Google search?

A    I don't know if I would do Google just because I don't know if I feel comfortable doing Google, but I could try to find another way to search it.

Q    I mean, you say you're not comfortable, but, I mean, you have to be comfortable searching pornography, and you are an ICAC investigator; right?

A    Yes.  But it's not just adult pornography.  If I think this is child pornography, I don't want to just

go on Google and type it in.

Q    But the statute explicitly excludes your possession of child pornography from the definition of criminal possession, doesn't it?

A    That, I would have to review the statute in its entirety.

Q    You know that -- I mean, you have the ability to take that laptop with these images, and sometimes you do have images of -- of actual child pornography; correct?

A    On what?

Q    Your computer.

A    No.

Q    Or some digital format?  You have possession of the images that you get through these various tips; correct?

A    We have it housed in a database, which is the IDS database.

Q    And you -- in this case, you put it on your laptop?

A    On a thumb drive.

Q    Right.  So, I mean, you were in possession of these images as you took them to Dr. Dully; right?

A    Yes.

Q    You did not think that you were committing a

crime, did you?

A    No.

Q    I mean, you understand that you have the ability to research these things.  You have to have that ability, or you couldn't research them; right?

A    Yes.

Q    So are you testifying that you hesitate to go on the Internet to research whether or not these images are actual CSAM or -- or they're adults?

A    No.  I wouldn't say hesitate.  I'd just be more cautious on what platform and what I'm utilizing to research this.  I just don't want to blindly go searching for something and it pop up with more CSAM, or it could potentially pop up with a virus.  You just -- you never know.

Q    Why would you want to avoid more CSAM popping up?

A    I wouldn't say it as in, like, me avoiding more CSAM.  It's me being cautious in what I'm doing.

Q    Aren't you looking for CSAM?  I mean, if you did this and you found this treasure trove of child pornography on a website, wouldn't you be like, oh, my God, we've got to call the FBI; we've got to get -- we've got to shut this website down?  Right?

A    So I wouldn't say that I'm looking for CSAM

**Page 229**

because that would make me, like, a suspect. I don't go out intentionally searching for CSAM, if that makes sense.

Q   It doesn't make sense. You're an investigator. Your job is to investigate the proliferation of child sexual abuse material; correct?

A   **That is one part of our job, yes.**

Q   And if you -- If you knew that AmourAngels not only had Sanija but other minors on it -- right? -- don't you feel compelled as a -- as a law enforcement officer to go and protect these victims of child sexual abuse and get their images taken down off the Internet?

A   **Yes.**

Q   But you didn't do that in this case?

A   **Did I go searching for that site? No, sir, I didn't.**

Q   Right.
But if you wanted to know what AmourAngels was or what Sanija was, you could just Google or whatever open source you're talking about. You could use the Internet to discover what that was.

A   **I could have attempted, yes, to see if that populates.**

Q   Most -- yeah. Most likely, you could have just written out that line, September 27th, 2019. You

**Page 230**

could probably have just gotten the exact match; right? Big Heart, AmourAngels Sanija, September 27th, 2019?

A   **I don't know if it would have been the exact match.**

Q   But, I mean, there's a good chance that it would be; right?

A   **That --**

MR. CARSON: Object to form.

THE WITNESS: -- I can't say.

BY MR. ROBERTS:

Q   Okay. The only way you would know is if you actually did the investigation; right?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q   The only way that you'd know is if you actually tried to discover it?

A   **If I went searching for that site.**

Q   Or this model, the name?

A   **Yes.**

Q   Right?
Okay.
Now, I don't see -- I mean, forgive me, but I don't see the watermark. You have to open it up, and it says met-art.com down there?

A   **No. So when you look at the image, you'll be**

**Page 231**

able to see it. It's just the way this prints out, it only does, unfortunately, that small snippet. I don't --

Q   Okay.

A   **-- know why it doesn't try to take up the entire page but --**

Q   So on the image, it's -- it's across the whole page?

A   **No, sir.**

Q   Okay. How is it?

A   **It's just like that, down at the bottom.**

Q   Well, why does it not -- why are you saying it's different on the printout than in real life?

A   **No. What I'm saying is you see how you have the white?**

THE WITNESS: Sorry.

MR. CARSON: Go ahead.

BY MR. ROBERTS:

Q   But you're saying that -- all right. You're shaking your head. I think she's trying to describe when you print it out, it prints out differently than what it looks on the thumb drive.

A   **I'm just saying that it's not, like, a zoomed-in version. When you print it out, it's only printing out that big.**

**Page 232**

Q   Right.

A   **So you see how you still have white around the paper?**

Q   Sure.

MS. ZEPF: Would it be helpful to plug in the thumb drive?

MR. ROBERTS: Well, no.

BY MR. ROBERTS:

Q   It's just -- what you're saying is it's more visible when you open it up on the thumb drive?

A   **If you were to open it up, it would be, like, this full page. The picture would be from top to bottom --**

Q   Okay.

A   **-- rather than just this small.**

Q   I mean, my eyes are getting bad in my old age, but I can't read anything there. But you could read that that was met-art.com?

A   **When I looked at -- yeah. I didn't print it out. So yes, when you look at the digital.**

Q   When you look at the digital image, it's -- it's clearly present that it says met-art.com?

A   **Yes, sir.**

Q   That was my question; right?

A   **Yes, sir.**

233

Q   And it's not that way when you print it out. It's not so obvious?

A   I don't know why it's not. Yeah.

Q   Right.

A   I don't know why it didn't print out the full --

Q   Right, right.

So did you ever have any suspicion that Mr. Lawshe took these photographs?

A   That I can't say. Yeah. I don't know if that ever crossed my mind.

Q   Okay. You never believed that there was an actual child that he was exploiting? Like -- like --

A   That I don't know.

Q   You know what I'm saying? But you didn't feel like there was a child in eminent harm that he was currently abusing?

A   Oh, like, in his home or something like that?

Q   Like, in his home or, like, a neighbor or something like that.

A   No. I don't think so.

Q   Right.

Because all of these images seem to be digital images obtained from, I mean, most likely, the Internet; right? I mean, they have websites on them.

234

A   Yes. They all appear to be digital images.

Q   Right. And they -- and they all have a website, like, literally written on the image?

A   Not all of them, I don't think. So --

Q   So this one does. I don't know. I -- it's so hard for me to see. This one is the same --

A   That one I don't think.

Q   This is the same model, I think.

A   Yes.

Q   Yeah. These do. These all have; right? So -- so let me just go through.

A   Okay.

Q   I think you're saying A does not have?

A   Yes. I didn't see a watermark or anything listed on that photo.

Q   On A.

When you saw this image, did you recognize that it was the same image -- from the same model as in the NCMEC?

A   They appear to look the same.

Q   When you -- when you first picked it out, you said, like, oh, that looks like the same model as on the NCMEC image?

A   I don't know if that's the first thing I thought, but she does appear to be the same female.

235

Q   And it appears to be a different photo shoot than the NCMEC image?

A   A different photograph, yes. I don't know if it's a photo shoot, so I can't say a different photo shoot. But a different photograph, yes.

Q   Her hairstyle is different.

A   Yes, uh-huh.

Q   She is in a different room.

A   I --

Q   So there's red walls in this, wooden floor. So in B, we've got a wooden floor; correct?

A   Uh-huh.

Q   B is the NCMEC image; correct?

A   Yes.

Q   All right.

A   Yes, sir.

Q   And what I've got listed as A, that's a tile floor; correct?

A   It appears to be tile.

Q   All right. And there -- there's some sort of, like, white columns in the background. Can you see that, like --

A   It almost looked like a window to me, but it could be columns.

Q   Maybe.

236

A   I don't know.

Q   It looks completely different in the background and the curtains --

A   Yes, different background.

Q   -- in this room; right?

A   Uh-huh.

Q   So fair to say -- I mean, you're an investigator -- probably taken at different times?

A   That I don't know, if it would be taken at different times.

Q   I mean, her makeup's different; correct?

A   Yes. But I'm saying I don't know if it's taken the same day and just -- you know, they switch out. I don't know.

Q   Right.

A   So I can't say.

Q   But, I mean, even if it's later, I mean, like, she's changed her hair; correct?

A   Yes. Different hairstyle, yes, sir.

Q   Different hairstyle. Different jewelry.

A   Oh, yes, sir.

Q   Different makeup.

A   I don't know if they're wearing makeup but yes.

Q   Okay. All right. So did -- I mean, I'm not

237

trying to be -- but, like, do you ever try to make deductions from the evidence, like, deduce?

A    In what aspect?

Q    Like, that -- that this model, which is the subject of the -- the cyber tip, has been in multiple photo shoots.

A    But like I said, I don't know if it's photo shoots.

Q    Well, is she --

A    Are they in multiple photographs?  Yes.

Q    Yeah.  And there's three photographs where she's wearing the same outfit, same makeup in the same room; right?

A    Yes.  Yes, sir.

Q    Right?

A    Sorry.  Yes.

Q    B, C, and D; correct?

A    Uh-huh.

Q    And so, I mean, I don't know what you mean by photo shoot.  But this is -- it appears that she's posing; correct?

A    Yes.

Q    Right?

A    Uh-huh.

Q    It appears that there's a photographer taking

238

the picture?  They're not selfies?

A    I mean, she's not using --

Q    So there's a photographer in the room?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Right?

A    That -- I don't know if it's one in the room because I'm not there.

Q    But you're a detective.  Like, that's what I'm talking about, like, a deduction.  Like, you're deducing that someone is taking this photograph.

MR. CARSON:  Object to form.

THE WITNESS:  But what I'm saying is I can't speak on that because I'm not there.  So I can't say, yes, somebody's taking the photograph or, hey, is that a still video.  Like, I don't know because I'm not there.

BY MR. ROBERTS:

Q    Oh.  You mean, like, another person could be taking a video?

A    What I'm saying is I don't know.  There could be a multitude of things going on.

Q    Okay.  Does this have all the appearances of a photo shoot?

A    Honestly, I can't really say for certain.

239

Q    Have you ever -- has anyone ever taken your picture, like, professionally, like a headshot or --

A    Not offhand.

Q    -- school pictures?

A    School photos.

Q    Yeah.  They take, like, three or four pictures, and maybe you, like, do something differently; right?

A    Uh-huh, uh-huh.

Q    Would you consider that a photo shoot?  Maybe, maybe not?

I mean, we don't need to belabor the point.  This -- this was a session where multiple photographs were taken presumably -- and maybe you're not comfortable presuming but presumably by a photographer in different poses?

A    That -- yeah.  I just --

Q    Correct?

A    I just don't know if it was a photographer or not.

Q    You're not comfortable presuming that there was a photographer involved?

A    No, sir, I'm not.

Q    Okay.  All right.  So I understand your position that -- I -- I guess what you're -- what you're

240

saying is is whoever presented these passports and the affidavit from the records custodian is somehow attempting to fool the ultimate consumer of this content?

A    No, sir.

MR. CARSON:  Object to form.

THE WITNESS:  That's not what I'm saying.

BY MR. ROBERTS:

Q    So -- and I'm not playing word games with you.  Okay?

A    Yes, sir.

Q    You have seen pictures of the model depicted in Picture A.

A    Yes.

Q    You have seen a picture of her holding a passport; correct?

A    Yes, uh-huh.

Q    All right.  And there were representations made about the date of the photo shoot.  Do you know that?

A    What do you mean?

Q    So the record custodian says her birth date is X, as -- as shown on the passport.

A    Okay.

Q    And the photo shoot was on this date.  So you

241

can do the math. She was an adult at the time of the photo shoot. You're aware that that evidence exists?

MR. CARSON: Object to form.

THE WITNESS: That I cannot recall because I do not recall.

BY MR. ROBERTS:

Q   Okay. All right. If it did say that, would you accept that they're -- they were 18 at the time of the photo -- photographs?

A   Like I stated previously, there's more variables that would still be into play. Given if they provided, let's say, that documentation, I would still go about my case the same, and I would present all of this information to obviously the state attorney --

Q   Right.

A   -- to my sergeant.

Q   So actually -- and I don't know -- we'll mark this as 9.

(Plaintiff's Exhibit 9 was marked for identification.)

BY MR. ROBERTS:

Q   What I think is -- of course, it's not what I think.

Do you remember seeing this photograph?

A   Yes.

242

Q   Okay. Why -- and I want you to make a deduction. You're an -- you're an investigator.

A   Uh-huh.

Q   Why does she have two passports?

A   That I don't know. Because it appears to be from another country, so I don't know if that's how that country does it. I don't know.

Q   Have you -- you've run into people with fake IDs?

A   Fake driver's license, yes.

Q   Fake -- fake ID; right?

A   Uh-huh.

Q   Okay. Do they usually present two fake IDs to you at the same time?

A   I can't recall.

Q   That ever happening, can you?

A   That I don't know. It could have happened.

Q   Right.

A   I just can't recall --

Q   Right.

A   -- because that was years ago.

Q   If I -- don't you agree, like, if -- if she was trying to deceive, this model was trying to deceive someone about her age, using manipulated passports, there would be no reason for her to show two passports?

243

MR. CARSON: Object to form.

THE WITNESS: That I don't know because I don't know how that country operates or if that's the norm. So I don't know. I can't speak on that.

BY MR. ROBERTS:

Q   Did you notice that in the two -- did you ever look at the passport photographs?

A   Yes.

Q   Does she look appreciably younger to you in one of the passport photos?

A   In both of them, she looks pretty young.

Q   No, no, no. Does she look younger in one of the passport photos than she does in the other passport photo?

A   Based off this, it's kind of hard to tell because it's in the black and white, so I -- I don't know.

Q   You can't -- you can't look at these and say, oh, she looks younger in one of the pictures than she does in the other picture?

MR. CARSON: Object to form.

THE WITNESS: Based off that photograph, no. Because they're -- it's in black and white, and it's kind of hard to see.

244

BY MR. ROBERTS:

Q   You -- you saw a digital copy of this photograph originally; right?

A   Yes, yes.

Q   Okay. Did you take the chance to look at the photographs at that point in time?

A   Yes. I do believe so.

Q   Do you recall looking at the images of the passports?

A   Yes.

Q   Did you see anything untoward about them?

A   Not that I recall.

Q   Anything on the passports that led you to believe that they had been faked?

A   That I don't know because I don't know how that country's passports are supposed to look.

Q   Okay. All right. And did you ever -- this was the only image that you ever saw on -- on Exhibit 8E, the top -- the Big Heart. This was the only image of this particular model that you ever saw?

A   That I don't recall.

Q   There's a QR code on that image as well. Do you see that?

A   Yes, I see it.

Q   Do you know what a -- a QR code is?

245

A   Yes.

Q   What is a QR code?

A   How to describe it in laymen's terms, it's -- I guess the easiest way is you can scan it, let's say, on your phone or on an iPad, and it will usually take you to another link.

Q   Did you ever try to use that QR code --

A   No.

Q   -- to see what link it took you to?

A   No, sir.

Q   Do you believe or do you have -- do you think that there's a possibility that if you use that QR code, it might take you to something that's related to that image?

A   That I do not know.

Q   Do you think if I asked you to guess, like, would you say that it could?

A   That I don't know because it would be a hypothetical answer.

Q   You -- you would have to actually do that investigation to know what that went to.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q   You'd have to scan it to know what it went to; right?

246

A   You mean scan that QR code --

Q   Scan that QR code.

A   -- to know for certain?

Q   Yeah.

A   Yes, sir.

Q   All right.  Did you attempt to scan that QR code?

A   I just said no.

Q   Okay.

MR. ROBERTS:  Let's just take five, and I think we're -- I think we're done.  But let's take five minutes.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  We are going off the record art 5:23 p.m.

(Recess from 5:23 p.m. to 5:32 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 5:32 p.m.

BY MR. ROBERTS:

Q   I'm going to show you Exhibit 8, Subsection E, and just take a look at that again.

A   Yes, sir.

Q   All right.  And the top image here is the one that was charged; correct?

A   Yes, sir.

247

Q   Now, this appears to be a screenshot from his phone?

A   I don't know if it's from his phone, but it does appear to be a screenshot.

Q   Right.

And are you comfortable acknowledging that this is most likely from the Internet?

A   This?

Q   These images were obtained most likely from the Internet?

A   That I don't know.

Q   So we've got a screenshot.  What other way do you think that a person could get an image like this on their phone, like, this particular array of images, if it wasn't a screenshot of, like, a website or something on the internet, social media, some Internet platform?

A   Because it could have been a screenshot sent from somebody else to them, so I don't know obviously where specifically this screenshot image came from.

Q   Fair enough.

Someone could have sent him a screenshot; correct?

A   Could have sent, yes, this image.

Q   But whoever -- whoever took the screenshot most likely got the images off of the Internet; right?

248

A   That I don't know.  I could speculate and say.

Q   Yeah.  Speculate for me.

A   Possibly but I don't know.

Q   How would you find out?

A   Based off this image?

Q   Right.  How would you find out?

A   With it being a screenshot, I would probably refer to one of our digital guys because they work in this realm a lot more than I do.

Q   You -- you wouldn't just go to an open source and just, like, Google that to see if it popped up on the Internet?

A   I don't know offhand.

Q   Okay.  All right.  Okay.  So there was a rumor that -- that Detective Tolbert repeated in his deposition that there was some evidence that Mr. Lawshe had scrubbed his phone.  Did you ever hear anything like that?

A   That I don't recall.

Q   He didn't recall who told him either.

A   Yeah.  I don't --

Q   Do you recall hearing something like that?

A   Honestly, I don't recall that information.

Q   Did you tell Sergeant Tolbert something like that?

249

A    That I do not recall, saying that he scrubbed his phone.

Q    Do you have any -- is there -- was there ever any suspicion that he scrubbed his phone of -- of illicit images?

A    That I do not know.

Q    But you're -- you're the investigator. You're the detective in charge of this case; correct?

A    Yes, sir.

Q    And you don't know? Who would I ask? Who would I ask to know if there was a suspicion that he had scrubbed illegal images off of his phone?

MR. CARSON: Object to form.

THE WITNESS: I don't know specifically who stated that, so I don't know who you would ask to be able --

BY MR. ROBERTS:

Q    I'm asking you as the lead investigator in this case, did you ever have any concern that my client had deleted or scrubbed any files or images off of his phone?

A    What I'm saying is I don't know, and I don't recall hearing that. So I can't speak on it.

Q    I'm not asking --

A    Yes.

250

Q    I'm going to ask the question until you answer it. Okay? Did you have any concerns or information that Mr. Lawshe scrubbed his phone or deleted any images from his phone that were illegal?

A    And what I'm saying is I don't recall hearing that or having information that that occurred, so I don't know.

Q    Okay. So you say you don't know. I'm asking if you had a concern. Okay? I'm not asking if you heard somebody else. So the answer is I either had a concern or I didn't have a concern. I mean, I guess you might say that I don't remember if I had a concern or not.

But my question is did you ever have a concern that he scrubbed or deleted any illegal images off of his phone or any electronic device?

A    Like I'm saying, I cannot recall that occurring or having that thought. Like, I can't remember. So I don't want to speak on something that I don't remember.

Q    So I guess your answer is you don't remember if there was any evidence that he had scrubbed illegal images off of his phone or not?

A    My answer is I don't recall that occurring, so I don't know.

251

Q    So you just don't remember if that was something you were concerned with or not?

A    What I'm saying is I don't recall, so I can't tell you if that's something that I was concerned with or something that I wasn't because I do not recall.

Q    Okay. All right. And you were the lead detective in charge?

A    Yes, sir.

Q    All right.

We -- you did seek another search warrant for his home; correct?

A    Yes, sir.

Q    And you obtained two additional devices from his home?

A    I don't recall. I would have to review what was taken because I wasn't on scene when that occurred.

Q    Well, let me ask you this: Did -- all of the three images that he was charged with were from his personal cell phone device?

A    I don't recall. I would have to look back at the Cellebrite extraction.

Q    Okay. Why did you not charge -- there's -- one, two, three -- four images of -- let's call her the model from the NCMEC.

A    Yes, uh-huh.

252

Q    Why did you not charge her [sic] with all of the images?

A    You're talking about all of the ones that we have on this table?

Q    No, all of the images of the model that was the subject of the NCMEC report.

A    Because, like, for instance, this image, I would have to go back to the Cellebrite report. But if it was not on the device at the time that he physically had it, we wouldn't have charged for it.

Q    Why not?

A    Because he wouldn't have been physically in possession of that image.

Q    But Synchronoss had told you that he had downloaded it.

A    That, I don't know if they stated downloaded, but at some point in time, that image was viewed.

Q    Okay. So there's three images. Let's take out B.

A    Okay.

Q    Okay? Because you're saying that you don't believe that was on the -- the download. There's three images, A, D, and C. You did not charge for those images, all of those images. Which images did you charge and why not the other?

A   I would have to look back at the image names to be able to determine which ones were charged --

Q   Okay.

A   -- on it.

Q   Well, why would you have not charged all three?

A   All three of these?

Q   Correct.

A   This image, I do not believe that was one of the ones that was charged, but I would have to refer back. But I don't recall why it wasn't.

Q   You don't recall?

A   Why this image was not charged, no.

Q   And -- but this top image in E was charged; correct?

A   Yes, sir, uh-huh.

Q   Can you tell me why that image was charged?

A   Because like I said, I viewed it as CSAM, and we also got that confirmed by Dr. Dully.

Q   Yeah. But so -- so are these.

A   Uh-huh.

Q   And you didn't charge those.

MR. CARSON: Object to form.

THE WITNESS: I would have to review, but -- and I don't want to misspeak. But I would have to look back at the PC to see if these images were charged.

BY MR. ROBERTS:

Q   Well, there were only three images charged.

A   Yes.

Q   And -- and we're looking at a total of what, five, six images?

A   Yes.

Q   We know one, you just determined it was an adult.

A   Uh-huh.

Q   Right?

One wasn't on his phone.

MR. CARSON: Object to form.

THE WITNESS: That I don't know.

BY MR. ROBERTS:

Q   You don't know, but it wasn't charged.

A   No, it was not charged.

Q   You're not -- you're not sure why it wasn't charged?

A   No. I'm saying I know that one was not charged. I do not remember why this one was not charged. But three images within this were charged, is what I'm saying.

Q   You didn't charge A?

A   I do not recall. I would have to look back at the image name, the file name, on the PC.

Q   Isn't that the file name right there?

A   Yes. But what I'm saying is I would have to refer back to my PC that lists the file names that were charged.

Q   On your arrest and booking report or on the charging document?

A   It should be on both.

Q   I mean, is there a reason -- can you -- whether you -- you charged that or not, is there a reason why you wouldn't have?

A   I think there's some confusion because within these images are the charged image. So that's where I'm kind of confused by your question. Because I included the NCMEC image -- the two NCMEC images, the three images that were charged and then another image. So you're saying that I didn't charge on these images, but included within this pile are the charges. So that's why I was --

Q   That's correct, yeah. No, no. And I --

A   That's why I'm a little confused by what you're saying. Because you're saying that I didn't charge on these images, but what I'm saying is included in these images are the three that's charged. So something would have had to have been charged.

Q   Yeah. And I guess you just don't know why you charged two but not three of those images of the NCMEC model?

A   What I'm saying is I don't recall why this one was not charged. Yes, I don't recall.

Q   You're saying that the YCBLDV was not charged?

A   What I'm saying is that potentially, but I would have to review that to see.

Q   But I'm not really asking you which were charged and not. I'm asking you why all three of these images were not charged. Why did you just choose two and not three?

A   I'm very confused by what you're asking.

Q   Okay. There are three pictures of this model.

A   Yes.

Q   Okay?

A   Yes.

Q   A, D, and C.

A   Uh-huh.

Q   Okay? And it doesn't really matter which one was charged or not charged; right? But only two of these images were charged; correct?

A   Yes, if these were the images that were charged.

257

Q    Well, I've asked you to bring all of the images; right?

A    Yes. But what I'm saying is I would have to review the file name because I've looked at these images so much that I don't know what file name is associated with each image. That's all I'm saying, is I would have to review the file name attached to that PC.

Q    You're just not understanding my question. Okay? I'm not asking which --

A    Probably.

Q    -- which images were charged on. Okay? I'm not asking that question.

A    Yes.

Q    But there are more images than there are charges.

A    Yes. I get that.

Q    You understand.

A    Yes.

Q    One of these of the NCMEC model was not charged because you don't think you could find that on the phone.

A    Yes.

Q    Right?
     So that leaves us with three images of the same model that was in the NCMEC picture; right?

258

A    Yes.

Q    And then you have a second model that we've already talked about; right?

A    Uh-huh.

Q    That's four images of what you consider to be CSAM on his phone. I'm just asking why you would only charge three of those images and not all four of those images.

A    Yes. But that's why I stated I don't recall why one of the images was not charged. I would have to go back and review it. I -- maybe that was not heard.

Q    Okay. You think if I showed you which image it was that you would remember?

A    Why it was not charged? No, just by seeing it. Because I'm looking at them now. Like, I still -- even with looking at them, I can't recall why a specific image --

Q    So it doesn't really matter if you know which images were charged or not. You're not going to remember why a specific image was not charged?

A    Yes. That's what I'm saying. I thought you were saying why were these not charged, and that's why I was like, no, I'm pretty positive these were. But --

Q    No. I'm just -- for some unknown -- for some unknown reason, you just decided not to charge

259

Mr. Lawshe with possession of one of these images?

A    That, I don't know the reason.

Q    You just don't know the reason. That's why I said unknown reason.

A    Yes.

Q    Right. Okay.

A    Sorry. I got confused with the way you asked it.

Q    That's okay.
     All right. I think those are for the court.
     You were in no way part of the decision to drop the charges?

A    No, sir. That was the State Attorney's Office.

Q    And I just -- I just want to make sure. Your testimony today is that other detectives in -- in your department, that you ran these images by them after your initial review and they weighed in on whether they thought that it was CSAM or not?

A    What images are you referring to?

Q    The charged images.

A    Yes, sir.

Q    You -- after you looked at them, you took them to Detective Greene?

A    I don't remember verbatim who I took them to,

260

just because it was two years ago. So I can't recall who specifically viewed them.

Q    In your deposition, you testified that for sure, you ran it by Detective Greene.

A    So maybe he viewed it. I just don't recall.

Q    Detective Camden?

A    I don't recall if he was back from maternity leave at that point.

Q    Tolbert?

A    Sergeant Tolbert would have reviewed them.

Q    After your initial investigation?

A    What do you mean, like, after the initial --

Q    Like, after -- after you got the NCMEC to -- after you did your search warrants, he would have reviewed them --

A    Oh, yes.

Q    -- and been part of the decision that these are, in fact, CSAM images?

A    Yes, sir, uh-huh.

Q    Right?
     Other than Greene and Tolbert, who -- who would have been your colleagues that you ran these by?

A    I don't recall who was in the office during that time.

Q    So you don't -- you don't know of anybody

261

else?

A    Offhand, I don't recall who else.

Q    Who were the other detectives at that time in -- in ICAC?

A    It was in 2023. So we had, I believe, Detective Jimenero (phonetic), but I don't know if he would have been -- I don't know --

Q    Okay.

A    -- if they would have been in the office at that time.

Q    Camden, maybe, maybe not?

A    That I just -- I can't recall specific, who.

Q    Okay. All right. So you don't know -- you don't have a specific recollection of who you ran this by?

A    No, sir.

Q    Detective Greene has testified that he did not have any part in saying whether these were CSAM or not CSAM. Do you disagree with that testimony?

A    What I'm saying is that if I stated back in that original depo that he viewed him, then he would have viewed them. Now, if he doesn't recall it, he doesn't recall it.

Q    Okay. All right. Have you ever reached out to the FBI?

262

A    In reference to?

Q    ICAC issue.

A    Like, what exactly?

Q    In any investigation that you've done as an ICAC or SVU, have you ever reached out to the FBI for help?

A    Possibly. I can't recall.

Q    Okay. So you can't recall?

A    Uh-uh, not that I can recall, possibly.

Q    You don't have, like, a -- and I'm not being silly. But, like, you don't have, like, memory issues, do you?

A    No.

Q    I mean, you've been an investigator since 2023, early 2023. That's, like, two years, and you don't recall in that time ever having talked to an FBI agent? You just don't have that recollection?

A    No, sir. With the amount of cases that we get and the amount that goes on in that office, I can't recall specific events.

Q    Okay.

MR. ROBERTS: All right. I don't have any other questions. Thank you.

MS. SHEVLIN: Matt, I've got some questions. I'm assuming you want me to go first?

263

MR. CARSON: Yeah.

MS. SHEVLIN: I do have follow-up.

MR. CARSON: Yeah. Go for it.

MS. SHEVLIN: Okay.

CROSS EXAMINATION

BY MS. SHEVLIN:

Q    Detective Preston, my name is Amy Shevlin. I represent Dr. Dully in this case. There's a little bit of a delay. I suspect sometimes the audio goes down --

A    Okay.

Q    -- and then it pops back up. So if you have any issues hearing me, please do let me know.

A    Yes, ma'am.

Q    And I'll let you know if I have issues hearing your answer. Okay?

A    Okay.

Q    So I -- I have a couple questions for you mostly based on the testimony that (unintelligible) for Mr. Roberts. So you testified several times that you believe -- as we sit here today, you believe that the images in question show minors and not adults; correct?

A    Yes, ma'am.

Q    Okay. Would it be fair to say that you formulated that opinion upon viewing those images?

A    Yes, ma'am.

264

Q    Okay. And you viewed those images prior to taking them to Dr. Dully; is that correct?

A    Yes, ma'am.

Q    All right. Can you tell me -- you may have said it already in your testimony, and I apologize if I'm rehashing. But can you tell me how you know Dr. Dully?

A    So I don't -- she was referred to me by my sergeant, Sergeant Tolbert.

Q    Okay.

A    So this --

Q    And that was in the context of the underlying case with Mr. Lawshe; correct?

A    Yes, ma'am. This was my first time meeting her, like, during this investigation.

Q    Okay. Okay. And I believe you also stated you have not worked with her since this case with Mr. Lawshe. Am I remembering that correctly?

A    Yes, ma'am, that's correct.

Q    Okay. What is your understanding of Dr. Dully's employer as we sit here today?

A    I don't remember offhand. I know that she works in Jacksonville in -- possibly at the Child Protection Team. I just don't remember the specifics offhand.

265

Q   Sure.

Do you remember her job or her title?

A   No, ma'am, not offhand.  No, I don't.

Q   Dr. Dully is not a -- she's not an employee of St. Johns; is that correct?

A   Yes, that is correct.

Q   Okay.  And when I say St. Johns, I am using shorthand.  I'm referring to your employer.  Do you understand that?

A   Yes, ma'am, the sheriff's office.  Yes, ma'am.

Q   Okay.  Thank you.  Yes, yes.

So how many times total did you meet with Dr. Dully regarding this case?

A   I believe it should have only been twice.

Sorry.

Sorry.

Q   Ms. Preston, I'm sorry.  You cut out.

A   Oh, yeah.  Sorry.  The Internet connection is saying it was unstable.

Q   Yeah.

A   I believe it should only have been twice.

Q   Twice?

A   Yes, ma'am.

Q   Okay.  And I believe you said that you met with Dr. Dully alone.  Do you remember anyone

266

accompanying you to either of the meetings that you had with her?

A   Not that I recall, no, ma'am.

Q   All right.  How did you come to meet with Dr. Dully, meaning who coordinated the meeting?

A   Sergeant Tolbert gave me her contact information, and then I reached out to her.

Q   And I believe the dates that you're meeting with her, I think you said February 20th and the 22nd.  Am I remembering that correctly?

A   It should have been February 22nd and April.

Q   Okay.  February 22nd.  And then was that April 5th?

A   Yes, ma'am.

Q   Okay.  All right.  And that would have been 2023?

A   Yes, ma'am.

Q   All right.  And the -- the -- let's talk about the first meeting on February 22nd.

A   Okay.

Q   Did you show Dr. Dully any of the images in question on that date, on the 22nd of February?

A   It would have been the one NCMEC photograph.

Q   Okay.  And that -- the NCMEC photograph is the first one that came in with the cyber tip?

267

A   No.  So it would have been the second one.  So it was the only one that we worked off because there was two photos.

Q   Okay.

A   Yeah.

Q   Okay.  Do you recollect how many photos you showed her in that first meeting on February 22nd?

A   It should have been only one.

Q   Just the one.  All right.

A   Yes, ma'am.

Q   How were the -- how was the photo presented to her?

A   On my agency-issued laptop.  I had a thumb drive, and I just plugged in the thumb drive and then opened up the image.

Q   That was your employer-issued laptop, you said?

A   Yes, ma'am.

Q   All right.  And when you showed her the images on your laptop, I am assuming when your meeting was over, you took that laptop.  You took that image.  She was not provided a copy.  Am I correct in that assumption?

A   That would be correct, yes, ma'am.

Q   All right.  Did you at any point on

268

February 22nd tell Dr. Dully the identity of the suspect?

A   No, ma'am.

Q   Okay.  Did you at any point reveal Mr. Lawshe's career or job or position as a law enforcement officer with -- during your meeting with Dr. Dully?

A   No, ma'am.  Because it's an active investigation.

Q   Would it be fair to say that Dr. Dully had absolutely no idea who the subject or the suspect of your investigation was?

A   That would be correct.

Q   Was Dr. Dully paid to review any of these images or render any of these opinions?

A   Not by my knowledge, not by us.

Q   Okay.  All right.  So St. Johns, through you, requested that Dr. Dully review these images; correct?

A   Yes, ma'am.

Q   Okay.  And who requested that Dr. Dully author the letters that we have?  We've got one from February 22nd.  There's one from April 5th, and then there's a second one from April 5th.  Who requested that she author those?

A   You mean, like, write her opinion on it?

269

Q   Yes, ma'am.

A   I don't know if anybody requested it. I think she just wrote it herself, but I can't recall.

Q   You cut out again. It's freezing. I'm so sorry.

A   No. You're good.
I'm sorry. I don't think anybody specifically requested she, like, write an opinion on it, if that answers your question. I think she just wrote it on her own.

Q   Would it be part of St. Johns' expectation that if they're showing these images to Dr. Dully that she would render a written opinion?

A   That I don't know, just because this was my first time using her. But I do believe she has written these in the past.

Q   You don't have a specific recollection of you specifically asking her for anything in writing regarding these images?

A   No, ma'am. Not from me, no.

Q   Okay. Do you know if anyone else from St. Johns asked her to author these?

A   No, not from my knowledge.

Q   Do you know -- I know you said you've only worked with her the one time.

270

A   Yes, ma'am.

Q   But do you know that if it is her normal practice or course of business to author a report when she is shown images from law enforcement?

A   That I don't know, just because this is my only time working with her, so I don't know if it's --

Q   Sure.
You never provided a copy of the images showing the two models holding their passports to Dr. Dully; is that correct?

A   Yes, that is correct.

Q   Okay. And Dr. Dully was never provided with the affidavit from -- I think it's Mr. Douglas, who's the attorney in California, who states that these girls are, in fact, over 18 in his opinion?

A   No. She was never provided that.

Q   Okay.
MR. ROBERTS: I'll object to that question.
BY MS. SHEVLIN:

Q   Is it fair to say that all of the information that Dr. Dully had regarding these images came either from you or from St. Johns in some fashion?

A   Yes, ma'am.

Q   Do you believe that Dr. Dully acted in good faith in reviewing these records?

271

A   Yes, ma'am.

Q   Do you believe that Dr. Dully acted in good faith when she authored the February 22nd and the two April 5th, 2023, letters regarding these images?

A   Yes, ma'am, I do.

Q   After -- well, let me jump a little bit further ahead.
Okay. So on April 5th, you met with her a second time; correct?

A   Yes, ma'am.

Q   All right. And it looks like her -- on her April 5th letter, there's the first paragraph, which is a copy from the paragraph on February 22nd, 2023?

A   Yes, uh-huh.

Q   Okay. And then there's a second paragraph that says that she was shown two additional images of the same female that was in the first image that she looked at, and you testified that was the second NCMEC cyber tip that came in?

A   Are you saying that these two images were the second NCMEC cyber tip?

Q   No. The -- you -- you just told me earlier that the first image that you showed to Dr. Dully was the second NCMEC cyber tip that came in. The first one you did not show her; correct?

272

A   Yes, that is correct.

Q   Okay. And then in addition to that first one, which she had already seen on April 5th, you showed her two additional images depicting the same female --

A   Oh.

Q   -- that was in the second cyber tip that you showed her on February 22nd; correct?

A   Yes, ma'am. I'm sorry. I misunderstood. Yes.

Q   Okay. Okay. That's okay. I just want to make sure.
And then also, on February 5th, it looks like she was also shown another -- excuse me -- two additional images. The first image is a -- let me see. It was -- the image is -- it looks like YCBLVVFQ_0.jpg is the file name.

A   Yes.

Q   Is that correct?

A   Yes, ma'am.

Q   Okay. And then the second image was the image that Mr. Roberts was asking you about earlier that says Big Heart on the bottom?

A   Yes.

Q   Okay. I'm going to -- I'm notoriously bad at screen sharing, so bear with me a moment.

273

A Okay.

MR. ROBERTS: Is it an exhibit you think we have?

MS. SHEVLIN: It is. I'm sure you do have it. I mean, you do. She's looking at them right now. It's just the three letters. I have the composite in front of me.

MR. ROBERTS: It's just where your computer is is, like, kind of hard for her to see. But that's my only --

MS. SHEVLIN: Okay. All right. Hang on a second. Like I said, I'm not good at this.

You know what? I'm going to come back to this because this screen share does not appear to want to work right now.

BY MS. SHEVLIN:

Q All right. We're going to come back to those letters. I have a couple additional questions for you, but --

A Okay.

Q -- we'll come back to that.

After your -- your second meeting with Dr. Dully on April 5th of 2023, did you ever have any (unintelligible) you met with her?

A You said did I have any -- you broke up.

274

Q After -- after April 5th of 2023, did you have any other meetings with Dr. Dully?

A Not that I recall, no, ma'am.

Q Did you have any phone calls with her after April 5th of 2023?

A Not that I recall, no.

Q Did -- did you have any correspondence with her, either e-mail or letters through the mail, text message, anything like that regarding this case?

A Not that I recall.

Q Okay. You said multiple times in your testimony that there were -- there was a variety of factors that led to the decision to bring charges against Mr. Lawshe. Can you very briefly just describe what those multiple factors were that led you to believe that charges should be brought against him?

A Yes, ma'am. So obviously, based off the image, me viewing it as CSAM, Dr. Dully's statement, and then the entirety of the digital download that we did, that's why we felt as though we had probable cause for the arrest.

Q Would it be fair to say, based on what you've just told me, that you did not base your decision to bring charges against Mr. Lawshe exclusively on Dr. Dully's opinion?

275

A That would be correct.

Q Now, Mr. -- excuse me. I think I'm going to call him by the wrong -- by the wrong title. I think it is Sergeant Tolbert, but please correctly -- correct me if I'm wrong.

A No. You've got it right, Sergeant Tolbert.

Q It is sergeant?

A Yes, ma'am.

Q Okay. Wonderful.

So Sergeant Tolbert was previously deposed in this case. And in his deposition, he stated that if we, meaning St. Johns, didn't feel like it was CSAM, we wouldn't have taken it to Dr. Dully to begin with, meaning there was already an opinion that the images were depicting minors before they were brought to Dr. Dully.

Do you agree with that statement?

A Yes, ma'am, I do.

Q Okay. Do you also agree with my statement that Dr. Dully never would have seen any of these images if St. Johns hadn't already determined that they depicted minors?

A That, I don't know how she would have been able to see them without us showing them to her.

Q Okay. Did Dr. Dully apply for a search

276

warrant in this case?

A No, ma'am, not from my knowledge.

Q Did Dr. Dully testify at any hearings in this case?

A Not from my knowledge, no, ma'am.

Q Do you recall what you told Dr. Dully about the images when she was viewing them?

A I don't recall our conversation at all.

Q You testified that you do not believe that the models depicted in the images are age-difficult. Do you remember that testimony?

A Yes, ma'am, I do.

Q Okay. So you believed at the time of your investigation that these images were obviously of minors?

A Yes, ma'am.

Q Okay. And you still believe that today?

A Yes, ma'am, I do.

Q You discussed a little bit earlier with Mr. Roberts your prior deposition testimony that was in November of 2023. You remember discussing that today?

A Yes, ma'am, I do.

Q Okay. On Page 22 of your deposition, you testified -- prior to taking the photos to Dr. Dully on the time line, you testified: So that, I did know that

04/04/2025 06:26:56 PM

277

it was child pornography. I felt that she, referring to the model, was definitely under the age of 18.

As we sit here today, do you stand by that testimony? It's on Lines 21 and 23.

A  Thank you. Sorry. I was trying to look for it.

Q  That's okay.

A  Yes, ma'am, I still stand by that.

Q  Okay. And on the next page, on Page 23, we've got Lines 1 through 5. And you answered in the affirmative to a question that you concluded that the image was a minor prior to speaking to Dr. Dully; is that true?

A  You broke up. You said --

Q  Did I break up?

A  Yes, ma'am.

Q  Okay. All right. Page 23, Lines 1 through 5 of your deposition from November 23 --

A  Yes, ma'am.

Q  -- you answered in the -- in the affirmative to a question regarding that you -- you concluded that the image was a minor prior to speaking to Dr. Dully.

A  Yes, ma'am.

Q  And then on Page 29 of your deposition -- let me get there. I believe -- it's between Lines 5 and 20.

278

I know that's a lot. But I'll break it down. From Lines 5 to 10, you testified: Nine times out of ten, you would always have another detective with you to confirm this is CSAM, just to get a second opinion on any image, especially if we're going to move forward with it.

And then at Lines 16 and 17, you stated that Kevin Greene reviewed the images. Detective Scoggins reviewed the images. And just a couple minutes ago, you also testified that Detective Tolbert also reviewed the images. Are all of those people -- excuse me.

Were all of these people, at the time, employees of St. Johns?

A  Yes, ma'am. They were and are. Sorry.

Q  Okay. I know you stated earlier in your testimony that you did not visit met-art.com. So I will represent to you that met-art.com refers to their model as teens and girls. Is that something you were aware of?

A  I know Kevin Greene stated something along those lines, but I don't remember verbatim what he stated.

Q  Okay. And would it surprise you to learn there are suggested search terms on met-art.com, which include Roy's teen amateurs, teenage beauties, teen from

279

Argentina, Asian dream teen, nude hairy teens, petite teens naked, teens in lingerie, teen nipples, teen boobs, teen boobs teen, teens wearing thongs, teens up skirt? Would any of that surprise you based on what you've seen?

A  Based on what I've seen just in investigations, like, for ICAC?

Q  Based on -- excuse me. Thank you for clarifying. Based on the images that you reviewed in relation to Mr. Lawshe.

A  No, that wouldn't surprise me.

Q  Okay. Now, Mr. Roberts had asked you earlier if you were of the opinion that someone had potentially altered the identification or the passports of the models in question to make it appear that they were 18. Do you remember that testimony?

A  Yes, ma'am, I do.

Q  Or that line of questions?

A  Yes, ma'am.

Q  Okay. And you -- you saw the images of the two models. There's one -- I believe her name is Melina (phonetic) D., and she's the one holding the two Ukrainian passports?

A  Yes, uh-huh.

Q  Okay. And those images -- on the image with

280

Melina D. with the two passports, the passports on there are, in fact, redacted; correct?

A  Yes. Based off what I could see, yes.

Q  Okay. So IDs can be manipulated or altered, especially in a photo; correct?

A  Yes, ma'am, in a photograph especially.

Q  And, in fact, we do have an altered photograph on this one because the information that is contained on the passports have -- has been redacted; correct?

A  As in them altering it to redact it, yes, ma'am.

Q  Yes, ma'am.

And same questions with the other model. I cannot recall her name right now, but she's one with darker hair.

A  Yes.

Q  She's holding a Latvian passport?

A  Uh-huh, yes, ma'am.

Q  And the passport that she is holding has also been redacted; correct?

A  Yes, ma'am, it has.

Q  Okay. So, again, that image has been altered in that it has been redacted so that we can't actually see the information on that passport?

A  Yes, ma'am.

Q    Seeing the image -- or images, I should say, of these girls holding these passports that purport to show their age do not give you any indication of how old they were at the time that these photos were taken; correct?

A    You're saying -- I'm sorry.  Because you broke up.  Just based off them holding the photographs?

Q    You froze again.

A    Yes.  Sorry.

I was saying you're saying just based off the photographs?

Q    There would -- there would be no way of knowing --

A    Sorry.

Q    Yes.  Let me ask it again just so it's clear because you broke up, and I broke up on your end.

You would have no way of knowing how old these girls were at the time these images were taken just by looking at a picture of them holding their passports?

A    No, ma'am, I wouldn't.

Q    Okay.

Okay.  I am going to attempt to screen share again.

A    Okay.

Q    I am going to be looking -- and you have

everything in front of you I'm going to screen share, just so we're on the same page.  Going to have a few things highlighted.

A    Okay.

Q    But I'm going to refer to the February 22nd, 2023, letter from Dr. Dully and then the two letters that are authored on April 5th, 2023.

A    Okay.

Q    And I understand that my screen is a bit far from you.

A    Yes.  I have them in front of me.

Q    (Unintelligible) digital image.  Okay.

All right.  So on the first letter dated February 22nd, 2023.  So I've got some things here highlighted.  I don't know if you can see those.  But I'll just call your attention to the line so you can look at them with me.

A    Okay.

Q    And the first -- well, the first letter is only one paragraph.  The fourth line down in the paragraph states:  This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet.

A    Yes, ma'am.  I see that.

Q    Would you agree with me that that's what

says?

A    Yes, ma'am.  That does say that.

Q    Okay.  And then two lines under that, it says: This female child appears younger than 18 years of age.

Would you agree with that assessment, that that is what this letter states?

A    Yes, ma'am.

Q    And then on the last line, it says:  She does not appear to be shaved.

Would you agree with me that that's what that says?

A    Yes, ma'am.  That's what it states.

Q    Okay.  I'm going to move to the April 5th, the first April 5th, 2020 -- excuse me -- 2023, letter.  And we've already established that first paragraph is the same as the February 22nd letter?

A    Yes.

Q    Starting on the second line of the second paragraph, she's describing the image or two images and says:  The model in that image is depicted to be, at most, SMR 3 or 4 and, therefore, between the ages of 12 and 15.

Would you agree with me that that's what that letter says?

A    I'm sorry.  What line was that?  I lost --

Q    Second paragraph.

A    Oh, okay.

Q    It starts on the second line and continues on to the third line.

A    Okay.

Q    Would you agree with me that that's what that letter says?

A    Yes, ma'am.

Q    Okay.  And then on the second April 5th letter --

A    Yes, ma'am.  I'm here.

THE WITNESS:  I don't know if she froze.

BY MS. SHEVLIN:

Q    I'm not sure if you answered because you broke up.  I'm sorry.

A    No.  I think you froze.  I couldn't hear -- this is freezing.

MR. ROBERTS:  We didn't hear the question.

MS. SHEVLIN:  I think there's a delay, yeah.

All right.

BY MS. SHEVLIN:

Q    On the first paragraph on the third line down, it states:  The model (unintelligible) visible and could be SMR 4 to 5.

Would you agree with me that that is

285

accurately stated in this letter; I'm -- I'm accurately stating what this letter says?

A    You froze. But did you state her breasts are partially visible and could be SMR? Is that --

Q    And could be SMR 4 or 5.

A    Yes, ma'am. That's what it states on this one, yes.

Q    Okay. And then the next line down says: Developmental appearance is 9 to 13 and a half years of age.

A    Yes, ma'am.

Q    Is that accurate? Am I reading that accurately?

A    Yes, ma'am.

Q    Okay. In the second paragraph, second line from the bottom, it says: The model appears to have no pubic hair development. She does not appear to be shaved. Developmental appearance is 9 to 13 and a half years of age.

Am I reading that accurately?

A    Yes, ma'am, you are.

Q    Okay. So earlier in your testimony, I believe you used the word certified, that Dr. Dully's certified that these images were of minors. Having just looked at these letters, she says: Appears, depicts between these

286

ages.

I don't see anything in here that certifies anything. Do you?

A    Not using the term certified, yes, ma'am. She does not specify that it's certified that this is what it is. So yes, I would agree.

Q    Now, there was also some earlier testimony that Mr. Roberts was asking you about why not all of the images depicting the same model had been charged, and you couldn't remember the specific reason.

A    Yes, ma'am.

Q    So would it be fair to say that the ultimate decision on which images to charge, regardless of what Dr. Dully reviewed or rendered an opinion on, ultimately, that decision was St. Johns? Correct?

A    Yes, ma'am.

Q    Okay. And St. Johns was the one that made the decision to bring the chargers forward against Mr. Lawshe; is that correct?

A    Yes, ma'am.

MS. SHEVLIN: Okay. I believe that's all I have for you. There's probably going to be some follow-up, so I'll turn it over to everybody else. But I appreciate your time, ma'am. Thank you.

THE WITNESS: Yes, ma'am.

287

MR. CARSON: Do you have any more, Michael?

MR. ROBERTS: I do.

MR. CARSON: Go ahead.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q    So I want to show you, in Exhibit 8, A and C.

A    Okay.

Q    We previously looked at these photographs. Can you read the file number of A? Well, first of all, you agree that these are the same models?

A    They appear to be the same.

Q    Right?

A    They appear to be, yes.

Q    And I think you said you actually -- when you -- when you picked out A, you recognized that as the NCMEC image model?

A    As appearing to be, yes.

Q    Right?

Okay. So can you read the file number of that?

A    It should be YCBLVVFQ_ -- either an O or a 0.

Q    Okay. Now, I want you to go to April 5th, the one that deals with -- it repeats the findings from February 22nd.

A    Where it repeats, you said, the find -- this

288

one?

Q    Yeah. The one where it repeats it.

A    Okay.

Q    And then you show her the additional images?

A    Okay.

Q    You got me?

A    Yes. I think I'm on -- on this page.

Q    I wish there was, like, a number. We could probably call it something but --

A    This one?

Q    Yes.

A    Okay.

Q    It's the one that begins I previously examined.

A    Yes. Yes, sir. I'm there, yes.

Q    Okay. Now, this is describing -- and I think her name is Melania D., so let's just call her Melania D. Okay?

A    Okay.

Q    All right. This is describing the original NCMEC image of Melanie D., correct, in the first paragraph?

A    Yes, sir.

Q    All right. In the second paragraph, you show her two additional images of that model; correct?

289

A Yes.

Q And I think you have -- that's one of the additional -- one of the additional files; correct?

A The 0059?

Q 05 -- 0059. That's 8C; correct?

A Yes, uh-huh.

Q Okay. Both of these are Melania D.; correct?

A I don't know if they are both. They appear to be the same, but I don't know if it's confirmed if they are the same person.

Q That was your impression?

A That it appears to be the same person, yes, sir.

Q Right.
And so she estimated that this model was an SMM -- SMR 4 -- correct? -- originally and then SMR 3 or 4 at most, therefore, 12 to 15 years of age?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q Is that what she --

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q Is that what it says in this document that we're looking at?

MR. CARSON: Object to form.

290

THE WITNESS: By saying --

MS. SHEVLIN: Join.

THE WITNESS: -- therefore, again, less than equal to 12 to 15. That's what it says in this document.

BY MR. ROBERTS:

Q So in this -- in this document that begins I previously examined a single color photograph, Dr. Dully is communicating to you. This letter's directed to you; correct?

A Yes, sir.

Q That Melania D. -- and I understand you didn't know her name at the time. But Melania D. is an SMR 4, maybe a 3, 12 to 15 years of age; correct?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: You said an SMR 4 or what was the other one?

BY MR. ROBERTS:

Q 3 or 4. I'm just reading her opinion.

A Yes.

Q And I'm trying to get -- when you got this, like, you tried to understand what she was telling you; correct?

A Uh-huh.

291

Q Yes?

A Yes. Sorry.

Q And it says this model, who we now know is Melania D. -- and I'm just reading the last sentence; right?

A Okay. Yes, yes.

Q Right?

A Yes, sir.

Q And it says: She would have achieved this developmental genital appearance of SMR 4 at 12 to 15 years of age.
Did I read that correctly?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q Did I read that correctly?

MS. SHEVLIN: Join.

THE WITNESS: You read it as it states it on here.

BY MR. ROBERTS:

Q Right.
And then it says: Today, you showed me two additional images of the same female child, and these confirm my previous determination that she's depicted to be, at most, SMR 3 or 4 and, therefore, again -- I think it says less than 12 to 15 years of age; correct?

292

A Yes, sir.

Q All right. So Melania D., according to this, is an SMR 3 or 4, 12 to 15 years old; correct?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q Is that what you took from this?

A Based off this model? Yes, based off these photographs of this model.

Q Right.
So you went and you also showed her -- I want you to go to the next.

A Uh-huh.

Q Okay. Read that first paragraph for me.

A The entire paragraph?

Q Yeah, the entire paragraph.

A Today, you have provided to me two images for review displayed on a law enforcement laptop. The first is YCBLVVFQ_ -- I'm assuming it's either a O or O -- .jpg and depicts a female child with no pubic hair development. She does not appear to be shaved. Her breasts are partially visible and could be SMR 4 to 5. However, her genitals are plainly visible with her thighs spread widely apart and showing she's SMR 1 -- I'm assuming that's going to be 1 -- with respect to

293

pubic hair. **This developmental appearance is less than or equal to 9 to 13.5 years of age.**

Q   Okay. So you read this at the time before you sought the -- or the search warrant; correct? Or the -- you made the arrest. You read this; right?

A   **Yes, uh-huh.**

MS. SHEVLIN: Form.

THE WITNESS: I said yes. Sorry. I didn't know if you didn't hear me.

BY MR. ROBERTS:

Q   That's Melania D.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q   Correct?

A   **That I -- like I said, I cannot confirm that it's her.**

MS. SHEVLIN: Form, assumes facts not in evidence.

BY MR. ROBERTS:

Q   You testified earlier that you believe that that was Melania D.

MR. CARSON: Object to form.

THE WITNESS: That it appears to be her.

MS. SHEVLIN: Join.

THE WITNESS: But I can't confirm that this is

294

her.

BY MR. ROBERTS:

Q   Uh-huh. Right. Now you can't confirm that. Do you see the problem?

A   **No. Because I stated --**

MS. SHEVLIN: Form.

THE WITNESS: -- to begin with, I can't confirm that this is her.

BY MR. ROBERTS:

Q   Yeah.

A   **It appears to be her.**

Q   See, it says no pubic hair development, doesn't it, in that first paragraph?

A   **No pubic hair development.**

Q   Right.

But -- but the other images of Melania D. shows that she clearly has pubic hair.

MR. CARSON: Object to form.

THE WITNESS: Yes.

MS. SHEVLIN: Join.

THE WITNESS: But how do I know when this photo was taken? So I can't confirm that it's her, just like I can't confirm that these photos were taken a month apart, the same day. I can't confirm.

295

BY MR. ROBERTS:

Q   Okay. Did you recognize that indiscrepancy -- or that discrepancy when you first read these reports?

MR. CARSON: Object to form.

THE WITNESS: What discrepancy?

MS. SHEVLIN: Form, assumes facts not in evidence, lack of predicate.

BY MR. ROBERTS:

Q   That she had a different sexual maturity rating as to Melania D. in the April 5th that begins today, you provided me with two images. Then she did, in the April 5th report -- I previously -- that begins I previously examined. Did you -- did you recognize that discrepancy?

MR. CARSON: Object to form.

THE WITNESS: I don't --

MS. SHEVLIN: Same objections.

THE WITNESS: -- understand where the discrepancy -- because she's not saying that this is the same female. So that's what I'm saying. I felt as though this appears to be the same, but Dr. Dully is not saying that this is the same exact female. So I can't say that that's a discrepancy because --

296

BY MR. ROBERTS:

Q   Okay.

A   **-- she didn't say that.**

Q   But at the time --

A   **Just my opinion.**

Q   But at the time you read this, it was your opinion that it was the same female?

A   **That it appears to be the same female. I don't -- like I said, I don't know when this photograph was taken.**

Q   Okay. And I -- and I appreciate that you don't. But when you saw these images and read this report, did -- did you realize that what Ms. -- that what Dr. Dully was saying, that this was a prepubertal Melania D.?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q   Did you make that connection in your mind?

MS. SHEVLIN: Join.

THE WITNESS: No. Because she never said --

MR. ROBERTS: Same objection.

THE WITNESS: -- that this was the same female.

BY MR. ROBERTS:

Q   I know she didn't.

297

A   Yeah. So I can't make that connection that this is the same female. I can say, hey, this appears to be, but I don't know because I don't know when these photographs were taken. And I also can't confirm that this is the same female. I'm just going based off this side and it said it appears to be the same person.

Q   Right.
And I know that she didn't tell you it was the same. But at the time you read this report, it was your understanding, your belief that it was the same person?

A   No. I said that it appears to be the same person, but I do not know that it is the same person. So I can't say, yes, this is the same person. It appears to be.

Q   So it appears to be, but you didn't believe it?

A   What?

Q   You're making a distinction between it appeared to be --

A   Yes.

Q   -- and you believed it to be. Is that what you're doing?

A   No. What I'm saying is that this appears to be the same person.

Q   Right.

298

A   But I'm not saying for a fact this is the same person. That's like if you have somebody that looks like you but it is not you, I'm not going to say, hey, that was, you know, attorney Roberts. I could say, hey, he appeared to be or he looked similar to that person, but I'm not going to say for a fact that that is that person.

Q   Okay. All right. So do you -- as we sit here today, do you think that that's the same model?

A   Like I previously stated, it appears to be, but I can't say for certain if it is or isn't.

Q   If it was, would it be, like, a problem to you that in this April 5th report, there is this discrepancy in the age description by Dr. Dully?

MR. CARSON: Object to form.

THE WITNESS: No, sir.

MS. SHEVLIN: Form, assumes facts not in evidence, mischaracterizes her prior testimony, and lack of predicate.

BY MR. ROBERTS:

Q   So in -- in the Exhibit C, 8C, you agree that Dr. Dully rendered an opinion that gave an age range of 12 to 15?

A   Yes. Based off this photo, yes, sir.

Q   Correct?

299

A   Uh-huh.

Q   And then based on this photograph, which was 8A, she said less than 9 to 13 years old.

A   Yes, based off that photograph.

Q   Okay. And you think that -- this is your testimony -- it appears that this is the same model.

A   Uh-huh.

Q   And is it your testimony that --

A   Yes. Sorry. I said uh-huh.

Q   Yes.
On the right-hand side, this appears to be a less than 19 -- 9- to 13-year-old version of Melania D., and on the left, this appears to be a 12- to 15-year-old version of Melania D.?

MR. CARSON: Object to form.

MS. SHEVLIN: Form.

THE WITNESS: Like I said, I don't know if this is the same person, so I can't say that that's a younger version of her because I do not know if that is her. And I do not want to say for a fact this is a younger version of her because I don't know who it is.

BY MR. ROBERTS:

Q   Does it appear to be a -- a younger version of her?

300

A   I don't know if it would be --

MS. SHEVLIN: Asked and answered.

THE WITNESS: -- a younger version of her.

BY MR. ROBERTS:

Q   You said it appears to be the same model.

A   Yes.

Q   I'm asking you, does it appear to be a younger version of the model depicted in 8C?

MR. CARSON: Object to form.

THE WITNESS: And what I'm saying is --

MS. SHEVLIN: Join.

THE WITNESS: -- I can't say that because that's a hypothetical. I don't know if it appears to be a younger version of her.

BY MR. ROBERTS:

Q   I'm -- I'm not playing semantics with you, Detective. You testified that they appear to be the same person.

A   Yes, sir.

Q   All right. I'm not asking you if you verified through DNA or physical passport or fingerprints. I'm not asking you that. I'm asking you, having testified under oath that these appear to be the same model --

A   Uh-huh.

Q   -- does the model depicted in 8A appear to be

04/04/2025 06:26:56 PM

301

a younger version of the model depicted in 8C?

A   Like I said --

MS. SHEVLIN: Asked and answered, form.

THE WITNESS: -- I can't say because I don't know if this is a younger version of her. Like, I can't give you an answer that I don't have, unfortunately. Like, I don't know how to reword it.

BY MR. ROBERTS:

Q   Well, I mean, this case is entirely based -- not entirely based. I don't want to be hyperbolic. It is based, in a large part, on your determination of how old people look; correct?

A   Uh-huh.

Q   Is your testimony that although these models appear to be the same, you cannot look at them and say one is younger than the other one?

MR. CARSON: Object to form.

THE WITNESS: Like I said, I'm not a doctor.

MS. SHEVLIN: Join.

THE WITNESS: So I can't sit there and say, yes, she looks like she's 9 and she looks like she's 15 because I'm not certified to speak on that.

302

BY MR. ROBERTS:

Q   But just as a human being, as a person that walks around in the world -- and you're not a doctor, but you make determinations in your job: This person's a minor; this person's not a minor. I'm asking you, does the model, which you think appears to be Melania D., depicted in 8A, does she appear to be a younger version of the model, Melania D., that is depicted in 8C?

MR. CARSON: Object to form.

THE WITNESS: And like I stated --

MS. SHEVLIN: Join, asked and answered several times.

THE WITNESS: Like, I don't know how to restate that any further than I already have. Every person is different, so I can't say that this person looks younger than that nine range. I cannot say that.

BY MR. ROBERTS:

Q   But you can say with a -- that it's obviously less than 18?

A   Yes.

Q   But you can't tell whether or not this is a model that's less than 9 to 13 and this is 12 to 15?

A   Because I can't say a specific age. No, I

303

will not attest to that.

Q   I'm just asking your opinion. That doesn't seem to be younger than this one?

A   Like I said, I don't know.

Q   When you got this report, did you realize that she was talking about Melania D. or who appeared to be Melania D.?

MR. CARSON: Object to form.

THE WITNESS: What do you mean?

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q   Did you realize that the file that she was describing was what you believed to be Melania D.?

A   You're saying the file that I gave her --

Q   Yeah.

A   -- that I said appears to be --

Q   Melania D.?

A   -- the same female?

Q   Yes.

When you read this report, did you look at it and say, oh, she's talking about the other picture of Melania D.?

MR. CARSON: Object to form.

THE WITNESS: I'm very confused by this question. What do you mean? I'm just very

304

confused by the question.

BY MR. ROBERTS:

Q   Is that the reason you didn't charge this image was because this didn't make any sense?

A   No. That is not the reason. That's not a reason to not charge for an image.

Q   Did it make sense to you that Dr. Dully had aged the model in 8C to be a Grade 3 or 4 and the model in 8A a Grade 1?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q   Did that make sense to you?

MS. SHEVLIN: Form. Form, beyond the scope.

THE WITNESS: She's looking at two totally different photographs, like you said, two totally different photographs, two totally different backgrounds. I can't speak for her opinion on why she did that, but obviously, it is not the same photograph.

BY MR. ROBERTS:

Q   But it doesn't appear to be the same model at approximately the same age?

MR. CARSON: Object to form.

THE WITNESS: I can't speak for Dr. Dully.

305

BY MR. ROBERTS:

Q    I'm asking you.

MS. SHEVLIN:  Asked and answered, form.

BY MR. ROBERTS:

Q    I'm asking you.

A    Like I said, to me, it appears to be the same person at the same time.  I can't say that.

Q    But at -- around the same age; right?

MR. CARSON:  Object to form.

THE WITNESS:  That I can't say.

BY MR. ROBERTS:

Q    You can't say?

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    You have no opinion on whether or not these appear to be roughly the same age?

A    No.  Because I do not know when the photograph was taken.

Q    I'm not asking you when the photograph was taken.  I'm asking you -- you make determinations on how old people are by looking at them all the time without knowing when the photograph was taken; correct?

MR. CARSON:  Object to form.

THE WITNESS:  I'm sorry.  What was your question?

306

BY MR. ROBERTS:

Q    You make determinations on how old, if someone's an adult or a minor, all the time without knowing when the photograph was taken.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

A    I make the determination that they are under the age of 18.  A specific age, I cannot determine that.

Q    And what I'm asking you is do you have the ability -- and you can say no, I guess -- to look at these two images and say -- I'll just ask you the question, rather, this way:  Do these models not appear to be the same model at approximately the same age?

A    Like I said, I --

MS. SHEVLIN:  Form, asked and answered.

THE WITNESS -- cannot say that.

BY MR. ROBERTS:

Q    You have no opinion as we sit here today?

A    I cannot say that these appear to be at the same age or around about the same age.  I can't say that because I don't know.

Q    Do -- do they appear to be different ages to you?

A    I don't know because I don't know who this is.

307

I don't know if this is Melania.  I don't know if this is also Melania.  I don't know.  So I can't sit there and tell you, like, yeah, they appear to be two years apart.  I, unfortunately, cannot say that.

Q    You can't say that they appear to be roughly the same age?

MS. SHEVLIN:  Asked and answered.

THE WITNESS:  No.

MR. ROBERTS:  Okay.  All right.  No further questions.

MR. CARSON:  Amy, you good?

MS. SHEVLIN:  I am good.  Thank you.

MR. CARSON:  All right.  I have no questions.  She'll read if it's ordered, through me.

THE VIDEOGRAPHER:  This concludes the videotaped deposition of Mikayla Preston on March 13th, 2025.  We are going off the record at 6:37 p.m.

(Witness excused.)

(Deposition concluded at 6:38 p.m.)

- - -

308

CERTIFICATE OF OATH

STATE OF FLORIDA    )
COUNTY OF ST. JOHNS )

I, Nicole Medlock, Registered Professional Reporter, Notary Public, State of Florida, certify that **MIKAYLA PRESTON** personally appeared before me on March 13, 2025, and was sworn.

Signed this 4th day of April, 2025.

/s/ Nicole Medlock
Nicole Medlock, RPR and FPR-C
Notary Public, State of Florida
My Commission No. HH 285922
Expires:  July 24, 2026

Personally known _____
OR Produced Identification ___X___
Type of Identification Produced Driver's License

CERTIFICATE

309

STATE OF FLORIDA   )
COUNTY OF ST. JOHNS )

I, Nicole Medlock, Registered Professional Reporter, certify that I was authorized and did stenographically report the deposition of **MIKAYLA PRESTON**; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Signed this 4th day of April, 2025.

/s/ Nicole Medlock
Nicole Medlock, RPR and FPR-C

310

ERRATA SHEET

WILLIAM LEE LAWSHE, an Individual,
   v.
MIKAYLA PRESTON, in her individual capacity as a detective for St. Johns County Sheriff's Office, and
KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team
Case No.: 3:24-cv-44-MMH-MCR
Depo taken: 03/13/2025

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES BELOW

PAGE   LINE   CHANGE        REASON

"Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true."

Date        MIKAYLA PRESTON

**'22** [1] - 88:13

**/**

**/s** [2] - 308:12, 309:18

**0**

**0** [1] - 287:21
**0059** [2] - 289:4, 289:5
**03/13/2025** [1] - 310:5
**05** [1] - 289:5
**071** [1] - 85:16
**071(5)** [1] - 85:18

**1**

**1** [14] - 3:13, 4:2, 13:22, 14:8, 82:20, 85:17, 87:5, 89:9, 207:22, 277:10, 277:17, 292:24, 292:25, 304:9
**1/22/23** [1] - 87:9
**1/28/23** [1] - 87:9
**10** [2] - 43:21, 278:2
**107** [1] - 3:18
**11** [1] - 58:13
**12** [11] - 206:4, 283:21, 289:17, 290:4, 290:14, 291:10, 291:25, 292:3, 298:23, 299:13, 302:24
**123** [1] - 2:11
**1260** [2] - 1:19, 4:8
**13** [14] - 1:16, 75:19, 76:6, 83:20, 160:19, 161:21, 162:10, 164:7, 165:20, 285:9, 285:18, 299:3, 302:24, 308:8
**13-year-old** [4] - 75:16, 76:16, 209:3, 299:12
**13.5** [2] - 160:6, 293:2
**13th** [4] - 4:10, 6:22, 21:21, 307:17
**14** [3] - 3:13, 74:18, 74:19
**15** [11] - 206:4, 283:22, 289:17, 290:4, 290:14, 291:10, 291:25, 292:3, 298:23, 301:23, 302:24
**15-year-old** [1] - 299:13
**1537** [1] - 14:5
**16** [2] - 81:10, 278:7

**161** [1] - 3:20
**1680** [1] - 2:4
**17** [5] - 58:13, 58:16, 59:14, 59:23, 278:7
**17-year-old** [2] - 59:8, 60:21
**18** [30] - 58:2, 58:4, 58:16, 58:19, 59:12, 59:13, 59:14, 60:5, 60:15, 79:5, 79:25, 81:10, 81:16, 93:12, 93:21, 123:10, 123:15, 151:9, 151:21, 166:1, 212:24, 241:8, 270:15, 277:2, 279:15, 283:4, 302:21, 306:9
**18-year-old** [5] - 58:9, 59:7, 59:21, 60:20, 109:23
**18-year-olds** [2] - 60:6, 60:9
**18th** [1] - 2:17
**19** [6] - 58:3, 59:23, 81:10, 151:9, 212:24, 299:12
**19-year-olds** [1] - 58:5
**1900** [1] - 2:17
**1:01** [2] - 1:17, 4:10

**2**

**2** [9] - 3:14, 15:7, 16:18, 38:13, 38:15, 38:17, 82:24, 87:3, 129:10
**20** [3] - 140:16, 166:5, 277:25
**20/20** [1] - 190:24
**2018** [1] - 3:17
**2019** [2] - 229:25, 230:2
**2020** [1] - 283:14
**2022** [1] - 6:2
**2023** [29] - 3:15, 6:25, 10:8, 10:15, 11:11, 33:5, 42:19, 42:20, 43:10, 44:12, 88:13, 91:6, 126:23, 129:9, 132:4, 261:5, 262:15, 266:16, 271:4, 271:13, 273:23, 274:1, 274:5, 276:21, 282:6, 282:7, 282:14, 283:14
**2025** [12] - 1:16, 4:10, 6:22, 8:9, 10:9, 21:21, 33:20, 156:11, 307:17,

308:8, 308:9, 309:15
**2026** [1] - 308:14
**20th** [1] - 266:9
**21** [2] - 3:15, 277:4
**21st** [1] - 43:10
**22** [1] - 276:23
**223** [1] - 3:21
**22nd** [26] - 91:5, 94:23, 106:12, 107:8, 114:5, 115:18, 124:24, 192:25, 203:11, 205:6, 205:21, 266:9, 266:11, 266:12, 266:19, 266:22, 267:7, 268:1, 268:22, 271:3, 271:13, 272:7, 282:5, 282:14, 283:16, 287:24
**23** [4] - 277:4, 277:9, 277:17, 277:18
**24** [1] - 308:14
**241** [1] - 3:22
**263** [1] - 3:5
**27.071** [1] - 169:20
**27th** [2] - 229:25, 230:2
**285922** [1] - 308:14
**287** [1] - 3:6
**28th** [6] - 129:8, 129:9, 130:21, 130:22, 132:4, 203:16
**29** [1] - 277:24
**2:22** [2] - 82:21, 82:22
**2:32** [2] - 82:22, 82:25

**3**

**3** [16] - 3:15, 18:7, 18:8, 43:4, 43:5, 43:14, 168:24, 206:3, 206:7, 283:21, 289:16, 290:14, 290:20, 291:24, 292:3, 304:8
**30** [3] - 43:17, 43:18, 140:17
**300** [1] - 2:17
**308** [1] - 3:7
**309** [1] - 3:8
**310** [1] - 3:9
**32084** [1] - 1:20
**32207-6104** [1] - 2:5
**32301-1509** [1] - 2:11
**34471-8237** [1] - 2:18
**352-629-4099** [1] - 2:18
**37** [1] - 83:11

**38** [3] - 3:14, 74:11, 74:20
**3:24-cv-00044-MMH-MCR** [1] - 4:7
**3:24-cv-44-MMH-MCR** [2] - 1:5, 310:5
**3:56** [2] - 168:21, 168:22

**4**

**4** [24] - 3:16, 44:24, 45:1, 45:10, 46:20, 94:5, 116:22, 206:3, 206:7, 206:9, 209:20, 283:21, 284:24, 285:5, 289:16, 289:17, 290:13, 290:17, 290:20, 291:10, 291:24, 292:3, 292:22, 304:8
**43** [1] - 3:15
**45** [1] - 3:16
**4:06** [2] - 168:22, 168:25
**4th** [2] - 308:9, 309:15

**5**

**5** [15] - 3:4, 3:17, 85:23, 86:6, 94:5, 169:25, 209:21, 277:10, 277:17, 277:25, 278:2, 284:24, 285:5, 292:22
**5)(a** [1] - 86:6
**5:23** [2] - 246:15, 246:16
**5:32** [2] - 246:16, 246:18
**5th** [22] - 193:11, 205:10, 206:25, 266:13, 268:22, 268:23, 271:4, 271:8, 271:12, 272:3, 272:12, 273:23, 274:1, 274:5, 282:7, 283:13, 283:14, 284:9, 287:22, 295:10, 295:12, 298:13

**6**

**6** [7] - 3:18, 83:12, 94:6, 94:7, 94:9, 107:2, 107:3
**6:37** [1] - 307:18
**6:38** [2] - 1:17, 307:20

**7**

**7** [5] - 3:20, 160:24, 161:3, 161:9, 164:6

**8**

**8** [8] - 3:21, 223:7, 223:11, 223:17, 223:23, 246:20, 287:6
**817.071** [1] - 3:17
**827** [1] - 85:16
**827.015** [1] - 85:15
**827.071(5** [1] - 171:11
**85** [1] - 3:17
**850-205-1996** [1] - 2:12
**8A** [5] - 223:21, 299:3, 300:25, 302:7, 304:9
**8C** [6] - 289:5, 298:21, 300:8, 301:1, 302:9, 304:8
**8E** [1] - 244:19

**9**

**9** [19] - 3:22, 160:6, 160:19, 161:21, 162:9, 162:10, 164:7, 165:20, 209:2, 241:18, 241:19, 285:9, 285:18, 293:2, 299:3, 299:12, 301:22, 302:24
**904-398-1992** [1] - 2:5

**A**

**A1** [1] - 18:9
**A2** [7] - 18:1, 18:5, 18:9, 35:5, 35:6, 35:24, 89:17
**Aaron** [2] - 126:15, 126:18
**ability** [18] - 59:13, 59:17, 61:4, 68:21, 102:25, 103:25, 104:10, 133:17, 133:21, 145:6, 146:5, 175:21, 176:10, 176:16, 227:7, 228:4, 228:5, 306:11
**able** [23] - 24:4, 25:4, 28:14, 50:19, 69:17, 69:21, 74:25, 121:15, 127:3, 127:7, 133:16, 135:6, 140:5, 151:2, 161:24, 163:3,

163:5, 180:16, 221:19, 231:1, 249:16, 253:2, 275:24

**absolutely** [2] - 154:23, 268:11

**abuse** [12] - 12:14, 23:6, 26:9, 26:12, 58:15, 85:19, 92:16, 155:19, 171:23, 219:15, 229:6, 229:12

**abusing** [1] - 233:17

**accept** [1] - 241:8

**access** [4] - 176:10, 218:9, 218:13, 218:16

**accompanying** [1] - 266:1

**according** [2] - 35:24, 292:2

**account** [1] - 134:25

**accurate** [3] - 42:21, 140:9, 285:12

**accurately** [10] - 103:12, 103:21, 106:13, 120:24, 211:3, 216:24, 285:1, 285:13, 285:20

**accused** [1] - 46:18

**achieved** [1] - 291:9

**acknowledge** [3] - 77:11, 121:20, 174:14

**acknowledged** [2] - 110:2, 182:21

**acknowledging** [1] - 247:6

**acronym** [5] - 6:4, 6:5, 13:19, 116:14, 116:16

**act** [2] - 18:9, 109:16

**acted** [2] - 270:24, 271:2

**action** [3] - 11:15, 309:13, 309:14

**active** [1] - 268:8

**actual** [8] - 33:25, 40:6, 42:25, 153:3, 167:20, 227:9, 228:9, 233:13

**added** [1] - 216:3

**addition** [1] - 272:2

**additional** [13] - 205:11, 206:1, 206:22, 251:13, 271:16, 272:4, 272:14, 273:18, 288:4, 288:25,

289:3, 291:22

**additionally** [1] - 91:5

**address** [3] - 10:1, 30:19, 134:24

**addresses** [1] - 134:24

**admit** [1] - 9:17

**adult** [52] - 34:16, 63:16, 68:6, 69:4, 69:9, 69:10, 69:19, 71:23, 73:8, 91:15, 96:25, 97:4, 98:7, 101:7, 101:19, 102:4, 103:2, 110:4, 110:7, 110:13, 124:1, 126:3, 126:6, 136:3, 141:2, 163:19, 167:4, 167:14, 168:16, 169:11, 169:15, 172:22, 173:3, 173:7, 173:14, 174:5, 174:24, 177:4, 181:4, 182:6, 206:10, 207:17, 207:24, 208:5, 209:4, 209:21, 211:19, 220:5, 226:24, 241:1, 254:10, 306:3

**adults** [34] - 8:10, 8:17, 68:1, 68:3, 72:7, 72:8, 72:19, 84:19, 84:20, 84:23, 124:5, 140:22, 150:13, 151:12, 151:16, 152:12, 152:18, 153:12, 153:20, 168:3, 168:8, 168:12, 168:14, 175:7, 212:1, 212:7, 212:16, 213:10, 214:22, 215:6, 219:1, 219:11, 228:9, 263:21

**advise** [2] - 47:12, 47:18

**affected** [1] - 150:2

**affiant** [2] - 87:25, 91:6

**Affidavit** [1] - 3:14

**affidavit** [29] - 38:15, 39:19, 54:14, 85:5, 85:9, 85:14, 86:24, 88:3, 89:17, 91:15, 92:6, 130:19, 130:25, 131:11, 132:19, 133:5, 136:20, 137:5,

149:20, 150:11, 151:19, 152:10, 154:14, 199:12, 203:17, 213:8, 219:9, 240:2, 270:13

**affidavits** [1] - 7:21

**affiliations** [1] - 4:15

**afternoon** [1] - 5:10

**afterwards** [2] - 120:8, 189:8

**age** [110] - 55:20, 55:24, 56:9, 56:13, 56:22, 57:2, 57:16, 57:19, 57:25, 58:6, 58:9, 58:16, 59:21, 60:1, 60:5, 60:7, 67:21, 81:12, 81:15, 82:5, 90:19, 92:8, 96:19, 96:23, 98:15, 99:12, 99:19, 99:20, 99:24, 101:11, 103:13, 104:1, 104:11, 104:23, 105:21, 106:4, 106:13, 106:18, 123:10, 123:15, 124:15, 124:25, 125:7, 131:17, 136:5, 141:9, 141:16, 147:15, 147:23, 148:19, 160:6, 161:24, 162:5, 162:7, 165:17, 165:20, 165:22, 167:2, 167:20, 167:23, 169:8, 169:11, 169:13, 169:14, 172:13, 172:17, 172:24, 173:2, 173:6, 173:8, 173:22, 180:15, 180:17, 181:3, 182:6, 184:3, 203:6, 206:4, 212:22, 215:11, 215:12, 216:11, 216:13, 217:11, 232:16, 242:24, 276:10, 277:2, 281:3, 283:4, 285:10, 285:19, 289:17, 290:14, 291:11, 291:25, 293:2, 298:14, 298:22, 302:25, 304:22, 305:8, 305:16, 306:9, 306:14, 306:21, 307:6

**age-difficult** [36] -

55:20, 55:24, 56:9, 56:13, 56:22, 57:2, 57:16, 57:19, 57:25, 58:6, 58:9, 59:21, 60:1, 60:5, 60:7, 96:19, 96:23, 98:15, 99:12, 99:19, 99:20, 99:24, 101:11, 169:8, 169:11, 169:13, 169:14, 172:13, 172:24, 173:2, 173:6, 173:8, 181:3, 182:6, 203:6, 276:10

**aged** [1] - 304:8

**agencies** [1] - 73:11

**agency** [7] - 22:17, 113:24, 148:7, 153:1, 218:11, 218:19, 267:13

**agency-issued** [1] - 267:13

**agent** [1] - 262:17

**ages** [3] - 283:21, 286:1, 306:23

**aging** [2] - 173:22, 178:13

**ago** [7] - 10:5, 10:9, 50:5, 102:23, 242:21, 260:1, 278:9

**agree** [40] - 8:9, 8:12, 8:17, 12:8, 34:19, 40:13, 49:12, 55:20, 69:2, 70:25, 92:21, 93:11, 109:21, 111:13, 113:8, 120:7, 144:18, 160:9, 160:10, 170:11, 170:15, 172:20, 174:19, 175:16, 177:4, 177:14, 179:4, 195:24, 242:22, 275:17, 275:19, 282:25, 283:5, 283:10, 283:23, 284:6, 284:25, 286:6, 287:10, 298:21

**agreed** [2] - 199:5, 202:1

**agreement** [1] - 203:2

**ahead** [6] - 18:20, 45:16, 171:1, 231:17, 271:7, 287:3

**al** [1] - 4:4

**alert** [1] - 90:13

**all/be** [1] - 183:10

**allegation** [1] - 95:23

**alleged** [1] - 166:8

**allow** [1] - 152:25

**allowed** [2] - 22:13, 197:18

**allowing** [1] - 23:14

**almost** [2] - 117:18, 235:23

**alone** [3] - 185:3, 221:1, 265:25

**ALSO** [1] - 2:22

**altered** [9] - 77:18, 78:9, 78:12, 78:16, 78:21, 279:14, 280:4, 280:7, 280:22

**altering** [1] - 280:10

**amateurs** [1] - 278:25

**Americans** [1] - 63:16

**amount** [3] - 47:22, 262:18, 262:19

**AmourAngels** [8] - 224:20, 225:13, 225:23, 226:6, 226:14, 229:8, 229:18, 230:2

**AMY** [1] - 2:16

**Amy** [7] - 4:21, 13:23, 18:17, 38:16, 222:4, 263:7, 307:11

**analysis** [1] - 195:19

**anatomical** [1] - 160:7

**ANDREW** [1] - 2:23

**Andrew** [1] - 4:11

**ANN** [1] - 2:9

**answer** [41] - 8:16, 21:25, 22:11, 22:13, 23:4, 23:8, 23:24, 24:1, 24:2, 26:23, 26:25, 39:10, 42:21, 43:21, 53:16, 53:17, 72:14, 74:21, 83:20, 86:12, 103:4, 103:16, 105:3, 105:25, 177:10, 180:18, 184:11, 190:1, 190:8, 190:11, 193:14, 212:11, 215:8, 245:19, 250:1, 250:10, 250:21, 250:24, 263:15, 301:6

**answered** [11] - 208:15, 209:6, 277:10, 277:20, 284:14, 300:2, 301:3, 302:12, 305:3, 306:16, 307:7

**answering** [2] - 12:24, 32:19

**answers** [3] - 49:8, 199:7, 269:9

anterior [5] - 117:1, 117:5, 117:11, 117:21
anyway [2] - 34:6, 93:8
apart [3] - 292:24, 294:24, 307:4
apologize [2] - 27:6, 264:5
app [1] - 75:21
apparent [1] - 123:25
appear [43] - 29:16, 61:13, 62:1, 65:2, 77:9, 111:15, 116:25, 117:4, 117:21, 120:9, 120:11, 120:18, 138:13, 139:11, 160:4, 160:15, 226:2, 234:1, 234:20, 234:25, 247:4, 273:14, 279:15, 283:9, 285:17, 287:11, 287:13, 289:8, 292:21, 299:24, 300:7, 300:17, 300:23, 300:25, 301:16, 302:7, 304:21, 305:16, 306:13, 306:20, 306:23, 307:3, 307:5
appearance [8] - 78:24, 90:19, 124:13, 160:5, 285:9, 285:18, 291:10, 293:1
appearances [2] - 120:8, 238:23
appeared [11] - 34:16, 61:14, 65:4, 78:16, 83:25, 138:12, 204:15, 297:19, 298:5, 303:6, 308:7
appearing [4] - 2:7, 2:14, 2:20, 287:17
applied [6] - 35:3, 37:9, 37:13, 37:19, 132:3, 202:16
apply [2] - 105:10, 275:25
applying [1] - 108:17
appreciably [1] - 243:9
appreciate [5] - 48:13, 59:10, 222:17, 286:24, 296:11
approach [1] - 181:2
approve [1] - 196:23
April [25] - 6:25,

193:11, 205:10, 206:25, 266:11, 266:13, 268:22, 268:23, 271:4, 271:8, 271:12, 272:3, 273:23, 274:1, 274:5, 282:7, 283:13, 283:14, 284:9, 287:22, 295:10, 295:12, 298:13, 308:9, 309:15
area [1] - 160:3
Argentina [1] - 279:1
argument [1] - 184:15
array [1] - 247:14
arrest [32] - 6:23, 141:23, 142:18, 142:19, 143:1, 144:22, 146:15, 146:25, 147:18, 150:4, 154:11, 179:9, 183:19, 188:11, 188:17, 188:21, 190:11, 192:3, 193:13, 195:25, 196:3, 196:18, 198:2, 198:17, 199:3, 199:5, 200:7, 201:5, 201:7, 255:7, 274:21, 293:5
arrested [12] - 150:9, 150:14, 151:8, 153:18, 153:23, 154:8, 154:10, 154:15, 154:24, 188:9, 197:5, 215:10
arresting [3] - 143:16, 145:11, 183:13
art [3] - 21:11, 57:19, 246:15
art.com [64] - 3:16, 21:14, 21:22, 25:9, 25:24, 26:12, 29:14, 29:16, 31:4, 31:11, 31:22, 32:7, 33:2, 34:7, 36:16, 36:23, 37:11, 37:15, 37:25, 39:3, 39:7, 39:16, 40:4, 40:9, 40:20, 41:22, 42:3, 42:20, 44:5, 44:15, 45:6, 45:24, 46:13, 51:23, 52:3, 52:5, 52:17, 52:25, 54:24, 55:4, 55:13, 71:2, 71:9, 71:11, 83:4, 84:3, 84:6, 131:24, 144:14, 144:19,

144:22, 145:9, 145:13, 146:14, 174:20, 183:17, 183:22, 184:2, 230:24, 232:18, 232:22, 278:16, 278:17, 278:24
art.com's [1] - 147:14
article [2] - 49:19, 49:25
articulate [4] - 48:2, 76:20, 179:13, 186:10
ashevlin@rbtrial. com [1] - 2:19
Asian [1] - 279:1
aside [2] - 83:12, 83:13
aspect [3] - 121:3, 154:20, 237:3
assessment [3] - 35:25, 181:10, 283:5
assigned [3] - 87:25, 88:2, 96:16
assigns [1] - 191:18
assistance [1] - 204:4
assistant [1] - 128:12
assisted [1] - 204:5
associated [3] - 34:12, 134:25, 257:5
association [1] - 29:14
assume [2] - 24:21, 116:20
assumes [3] - 293:17, 295:6, 298:17
assuming [8] - 44:14, 83:23, 142:22, 142:23, 262:25, 267:20, 292:19, 292:25
assumption [1] - 267:23
attach [7] - 46:3, 46:4, 46:5, 46:19, 85:22, 221:15, 223:6
attached [3] - 56:18, 91:4, 257:7
attaching [1] - 149:7
attachments [1] - 149:16
attempt [8] - 24:8, 68:12, 70:23, 155:15, 187:15, 218:23, 246:6, 281:22
attempted [4] - 24:9, 146:10, 150:4, 229:22
attempting [1] - 240:3

attention [2] - 74:9, 282:16
attest [2] - 210:18, 303:1
attorney [24] - 7:25, 25:6, 25:10, 128:12, 146:1, 146:2, 146:6, 151:19, 152:10, 183:8, 192:5, 198:6, 198:24, 199:19, 200:15, 200:25, 201:3, 202:3, 219:9, 241:14, 270:14, 298:4, 309:11, 309:13
Attorney's [1] - 259:13
attorney's [1] - 201:8
attorneys [1] - 197:24
audio [1] - 263:9
Augustine [3] - 1:18, 1:20, 4:9
authentic [1] - 150:18
author [4] - 268:20, 268:24, 269:22, 270:3
authored [2] - 271:3, 282:7
authorized [1] - 309:5
automatically [4] - 112:1, 185:12, 221:2, 221:6
AUTUMN [1] - 2:24
availability [1] - 176:9
available [3] - 119:3, 142:21, 147:13
Avenue [1] - 2:17
avoid [1] - 228:16
avoiding [1] - 228:18
aware [7] - 26:8, 33:9, 67:23, 123:2, 126:14, 241:2, 278:18
awkward [3] - 74:15, 74:16, 77:1

**B**

background [6] - 87:23, 96:12, 102:14, 235:21, 236:3, 236:4
background's [1] - 220:19
backgrounds [1] - 304:17
bad [4] - 221:20, 221:24, 232:16, 272:24
badgering [2] - 48:20, 48:25

ball [1] - 163:7
banner [1] - 226:8
base [2] - 222:13, 274:23
baseball [1] - 108:13
based [82] - 18:3, 19:18, 28:5, 35:14, 35:19, 35:20, 36:2, 37:1, 38:4, 39:11, 49:1, 51:12, 52:13, 53:25, 69:7, 71:17, 74:1, 75:2, 75:3, 75:4, 80:19, 87:12, 104:7, 104:8, 104:15, 105:3, 108:15, 112:2, 113:10, 124:3, 133:15, 133:20, 139:13, 139:19, 140:24, 142:20, 150:19, 153:15, 155:5, 156:22, 161:23, 162:20, 163:13, 164:12, 164:16, 167:22, 172:11, 172:12, 178:5, 185:3, 188:19, 211:7, 214:7, 214:17, 215:17, 219:8, 219:12, 219:18, 225:16, 243:15, 243:22, 248:5, 263:18, 274:17, 274:22, 279:4, 279:6, 279:8, 279:9, 280:3, 281:7, 281:10, 292:8, 297:5, 298:24, 299:2, 299:4, 301:10, 301:11, 301:12
bases [2] - 96:20, 100:4
basic [1] - 58:11
basing [1] - 66:23
basis [5] - 53:2, 73:17, 73:23, 177:24, 178:4
bathroom [2] - 62:13, 83:18
bear [1] - 272:25
beat [1] - 216:8
beauties [1] - 278:25
bed [1] - 58:24
bedroom [2] - 62:14, 83:16
beef [1] - 180:22
began [2] - 13:14, 14:13
begin [3] - 18:25,

275:13, 294:7
beginning [4] - 82:23, 89:1, 168:23, 178:23
begins [5] - 4:1, 288:13, 290:7, 295:10, 295:12
begun [1] - 90:14
behalf [5] - 1:15, 2:7, 2:14, 2:20, 5:3
belabor [1] - 239:12
belief [4] - 9:4, 177:25, 219:13, 297:10
bell [1] - 20:12
belly [1] - 162:21
below [1] - 81:15
BELOW [1] - 310:6
best [3] - 159:10, 159:11, 222:15
better [2] - 81:4, 161:15
between [21] - 31:22, 34:25, 37:8, 37:25, 38:6, 39:2, 39:6, 54:23, 55:4, 129:18, 130:24, 165:21, 169:5, 184:17, 203:2, 203:16, 214:4, 277:25, 283:21, 285:25, 297:18
beyond [2] - 153:19, 304:13
bias [5] - 108:7, 108:9, 108:14, 108:22, 108:24
big [1] - 231:25
Big [11] - 157:24, 159:24, 207:2, 207:6, 224:8, 224:10, 224:11, 224:21, 230:2, 244:19, 272:22
birth [3] - 214:4, 215:24, 240:22
birthday [4] - 58:24, 213:21, 214:9, 216:24
bit [12] - 7:14, 9:24, 26:7, 38:12, 79:9, 138:23, 179:12, 185:8, 263:8, 271:6, 276:19, 282:9
black [3] - 160:1, 243:16, 243:23
blindly [1] - 228:12
blue [1] - 108:13
board [2] - 59:5, 175:10
body [6] - 58:7, 58:20, 75:1, 75:5, 79:11,

82:4
boobs [2] - 279:3
book [1] - 114:22
booking [1] - 255:7
border [1] - 100:16
bottom [7] - 29:20, 79:8, 206:20, 231:11, 232:13, 272:22, 285:16
bought [1] - 64:7
Boulevard [2] - 1:19, 4:8
break [7] - 9:13, 82:13, 94:1, 164:20, 168:19, 277:15, 278:1
breaking [2] - 118:3, 118:20
breast [2] - 209:17, 209:20
breasts [14] - 79:13, 79:17, 157:17, 157:23, 161:13, 163:9, 164:1, 207:17, 207:25, 208:5, 208:12, 209:4, 285:3, 292:22
briefly [1] - 274:14
bring [6] - 133:21, 219:4, 257:1, 274:13, 274:24, 286:18
British [1] - 95:18
broad [1] - 26:2
broke [7] - 118:10, 273:25, 277:14, 281:6, 281:16, 284:14
brother [1] - 64:9
brought [12] - 5:16, 110:1, 113:24, 115:6, 177:9, 189:16, 197:12, 197:13, 200:15, 205:11, 274:16, 275:15
Buchanan [2] - 2:17
buck [2] - 198:16, 198:22
building [1] - 186:15
bunch [2] - 14:2, 223:16
burn [1] - 120:13
business [1] - 270:3
button [1] - 162:21
BY [263] - 5:9, 8:14, 9:23, 10:24, 11:18, 11:22, 14:10, 18:21, 20:20, 22:5, 22:19, 23:20, 24:17, 24:23,

25:2, 26:4, 26:17, 27:12, 27:17, 30:8, 35:15, 36:20, 38:19, 39:13, 40:18, 41:15, 43:16, 45:3, 45:22, 47:1, 49:11, 49:21, 52:9, 66:9, 70:2, 70:18, 72:10, 72:15, 73:22, 74:17, 81:23, 82:7, 83:1, 86:1, 86:15, 92:4, 92:12, 93:5, 94:8, 94:18, 96:22, 97:10, 97:22, 98:1, 98:19, 98:23, 99:15, 100:21, 101:13, 101:24, 103:8, 103:23, 104:6, 104:16, 105:4, 106:8, 106:22, 107:5, 110:8, 110:17, 110:22, 111:24, 113:2, 113:6, 114:21, 116:9, 117:16, 118:1, 118:12, 119:7, 122:11, 123:7, 123:21, 124:10, 124:18, 125:3, 125:11, 125:23, 126:11, 127:23, 128:4, 129:16, 129:24, 131:3, 132:8, 132:17, 141:6, 142:4, 142:9, 142:12, 143:5, 143:9, 143:21, 144:1, 146:18, 147:6, 149:1, 150:20, 151:5, 151:14, 152:3, 152:9, 152:15, 152:22, 153:10, 153:16, 153:24, 154:6, 154:21, 155:7, 155:14, 158:12, 158:23, 161:11, 162:1, 162:15, 163:2, 163:15, 163:24, 164:14, 164:22, 165:3, 165:15, 166:14, 167:3, 167:12, 167:16, 167:24, 168:7, 168:11, 169:1, 170:5, 170:21, 171:3, 171:9, 173:1, 173:10, 175:14, 176:2, 176:6, 176:14, 176:24,

177:21, 178:17, 181:8, 183:11, 184:1, 184:19, 185:15, 188:1, 188:7, 188:22, 189:4, 190:3, 190:18, 191:21, 192:12, 192:22, 193:10, 193:17, 194:3, 194:19, 195:10, 197:9, 200:4, 203:1, 206:19, 207:16, 207:20, 208:8, 208:20, 209:7, 209:19, 209:23, 210:4, 210:11, 210:19, 211:5, 211:9, 211:22, 212:5, 212:14, 213:1, 214:13, 214:19, 215:14, 215:23, 216:5, 217:14, 218:2, 218:8, 218:24, 221:13, 221:22, 222:19, 224:1, 230:10, 230:14, 231:18, 232:8, 238:5, 238:18, 240:8, 241:6, 241:21, 243:5, 244:1, 245:23, 246:19, 249:17, 254:3, 254:16, 263:6, 270:19, 273:16, 284:13, 284:21, 287:5, 289:19, 289:22, 290:6, 290:19, 291:14, 291:19, 292:6, 293:10, 293:13, 293:19, 294:2, 294:9, 295:1, 295:8, 296:1, 296:17, 296:24, 298:20, 299:23, 300:4, 300:15, 301:9, 302:1, 302:19, 303:11, 304:2, 304:11, 304:20, 305:1, 305:4, 305:11, 305:14, 306:1, 306:6, 306:18

**C**

California [5] - 25:10, 151:19, 152:11, 219:10, 270:14

Camden [3] - 20:7, 260:6, 261:11
cancer [7] - 179:19, 179:20, 179:22, 179:25, 180:3
cannot [22] - 28:3, 28:17, 28:24, 52:24, 56:5, 70:15, 82:6, 195:7, 200:18, 203:4, 214:6, 220:13, 241:4, 250:17, 280:14, 293:15, 301:16, 302:18, 306:9, 306:17, 306:20, 307:4
cap [1] - 108:13
capacity [4] - 1:7, 1:9, 310:3, 310:4
care [1] - 23:5
career [3] - 189:6, 215:10, 268:5
Carson [2] - 4:19, 222:4
CARSON [219] - 2:9, 4:19, 9:13, 9:16, 9:19, 11:17, 18:16, 21:24, 22:8, 22:10, 22:13, 23:18, 24:16, 24:19, 25:1, 26:1, 26:14, 27:10, 27:15, 30:5, 35:13, 36:17, 39:9, 40:16, 41:13, 45:10, 45:13, 45:25, 46:5, 46:7, 46:11, 46:13, 46:16, 46:22, 47:12, 47:21, 48:4, 48:15, 48:19, 49:20, 52:8, 66:2, 66:4, 69:20, 70:13, 72:9, 72:13, 73:20, 82:14, 86:8, 86:11, 94:6, 98:21, 99:14, 103:15, 104:24, 105:24, 110:5, 110:14, 110:20, 111:21, 112:24, 113:5, 117:14, 117:23, 118:7, 122:4, 123:5, 127:22, 128:3, 132:5, 132:14, 141:4, 141:6, 142:1, 142:7, 142:11, 143:4, 143:8, 143:18, 143:23, 146:16, 147:2, 148:21, 150:16, 150:24, 151:11, 151:24, 152:7,

152:13, 152:19, 153:8, 153:13, 153:21, 154:3, 154:16, 155:1, 155:11, 158:7, 158:10, 161:1, 161:22, 162:13, 162:25, 163:10, 163:21, 164:8, 164:17, 164:21, 164:25, 165:13, 166:11, 166:24, 167:6, 167:15, 167:21, 168:5, 168:9, 168:17, 169:25, 170:2, 170:20, 170:24, 171:1, 171:8, 172:23, 173:4, 175:8, 175:25, 176:5, 176:13, 176:18, 177:17, 178:14, 181:5, 183:1, 183:24, 184:18, 185:10, 187:23, 188:4, 188:18, 189:3, 189:25, 190:16, 192:17, 193:24, 194:2, 194:10, 194:14, 197:7, 200:2, 202:25, 208:8, 208:20, 209:22, 210:8, 210:14, 210:25, 211:20, 212:3, 212:9, 212:18, 214:12, 214:15, 215:13, 215:21, 216:1, 217:13, 217:25, 218:6, 218:22, 221:11, 221:16, 222:4, 222:12, 222:15, 230:8, 230:13, 231:17, 238:4, 238:12, 240:6, 241:3, 243:1, 243:21, 245:22, 249:13, 253:23, 254:14, 263:1, 263:3, 287:1, 287:3, 289:18, 289:25, 290:15, 291:13, 292:4, 293:12, 293:22, 294:18, 295:4, 295:15, 296:16, 298:15, 299:15, 300:9, 301:18, 302:10, 303:8, 303:23,

304:10, 304:23, 305:9, 305:23, 306:5, 307:11, 307:13
CASE [1] - 1:4
case [79] - 5:16, 6:8, 6:9, 7:4, 7:21, 8:10, 10:3, 10:7, 13:15, 15:2, 16:3, 19:14, 20:1, 20:3, 45:7, 45:8, 46:14, 46:18, 48:11, 51:17, 51:20, 51:22, 51:24, 53:15, 53:17, 56:1, 59:3, 67:6, 68:22, 77:12, 83:7, 92:21, 96:9, 97:6, 97:14, 98:2, 99:13, 100:3, 100:8, 100:16, 106:10, 125:22, 126:12, 126:17, 127:8, 175:19, 176:1, 176:3, 186:4, 186:24, 187:1, 187:15, 187:16, 192:9, 195:19, 195:21, 198:2, 200:1, 200:6, 200:15, 201:2, 217:20, 227:19, 229:14, 241:13, 249:8, 249:19, 263:8, 264:13, 264:17, 265:13, 274:9, 275:11, 276:1, 276:4, 301:10
Case [2] - 4:6, 310:5
cases [17] - 51:14, 88:9, 92:5, 92:17, 92:24, 97:16, 98:5, 98:8, 99:19, 100:6, 100:10, 100:18, 100:19, 168:1, 186:3, 186:7, 262:18
catastrophic [1] - 189:22
categorization [3] - 18:1, 35:14, 89:13
categorize [2] - 34:5, 35:16
categorized [1] - 58:5
category [1] - 57:22
caution [1] - 34:20
cautious [2] - 228:11, 228:19
cell [5] - 61:24, 62:1, 135:3, 135:5, 251:19
Cellebrite [2] - 251:21, 252:8
cellular [1] - 63:12

Center [3] - 13:20, 108:19, 109:14
centerfold [6] - 63:2, 64:16, 64:18, 64:25, 65:3
centerfold-type [2] - 63:2, 65:3
certain [17] - 75:8, 92:7, 96:14, 112:15, 128:10, 138:18, 143:12, 148:23, 165:21, 184:5, 196:4, 204:6, 224:23, 225:1, 238:25, 246:3, 298:11
certainly [1] - 59:10
certificate [1] - 215:24
CERTIFICATE [1] - 308:1
Certificate [2] - 3:7, 3:8
certified [6] - 74:3, 285:23, 286:4, 286:5, 301:23
certifies [1] - 286:2
certify [4] - 178:7, 308:6, 309:5, 309:10
chambers [1] - 133:17
chance [2] - 230:5, 244:5
CHANGE [1] - 310:7
change [2] - 49:6, 154:5
changed [5] - 109:25, 154:18, 195:18, 195:20, 236:18
CHANGES [1] - 310:6
characterization [4] - 27:22, 35:4, 35:23, 36:10
characterize [4] - 34:8, 36:25, 56:8, 182:6
characterized [2] - 63:1, 66:16
charge [25] - 12:13, 12:19, 85:4, 105:20, 207:11, 207:23, 209:11, 209:15, 209:18, 210:3, 249:8, 251:7, 251:22, 252:1, 252:23, 252:25, 253:22, 254:25, 255:18, 255:24, 258:7, 258:25, 286:13, 304:3, 304:6
charged [57] - 7:10, 8:21, 8:22, 12:20,

137:22, 138:2, 158:1, 171:5, 205:2, 205:7, 206:22, 207:7, 207:15, 209:13, 221:8, 223:4, 246:24, 251:18, 252:10, 253:2, 253:5, 253:10, 253:13, 253:14, 253:17, 254:2, 254:4, 254:17, 254:18, 254:20, 254:22, 254:23, 255:6, 255:11, 255:14, 255:17, 255:25, 256:1, 256:3, 256:6, 256:7, 256:11, 256:12, 256:22, 256:23, 256:25, 257:11, 257:20, 258:10, 258:14, 258:19, 258:20, 258:22, 259:21, 286:9
chargers [1] - 286:18
charges [21] - 8:5, 9:8, 10:14, 10:18, 12:2, 12:6, 12:8, 12:16, 12:18, 12:25, 99:2, 192:7, 192:16, 201:10, 255:19, 257:15, 259:12, 274:13, 274:16, 274:24
charging [3] - 162:19, 163:7, 255:8
checked [1] - 83:8
chemicals [1] - 119:24
chest [1] - 79:13
chic [1] - 225:13
child [105] - 12:14, 13:7, 15:7, 17:24, 21:22, 22:7, 23:5, 23:17, 24:7, 26:8, 26:12, 26:19, 27:23, 28:1, 28:18, 33:10, 33:25, 34:8, 34:22, 44:15, 44:18, 45:6, 46:14, 46:17, 47:4, 55:17, 57:15, 58:15, 66:16, 66:24, 67:1, 73:7, 75:2, 85:19, 86:22, 91:22, 91:24, 92:6, 92:7, 92:16, 93:7, 95:24, 96:4, 98:20, 100:2, 100:7, 100:11, 100:13, 100:17, 100:18, 100:19, 101:7,

101:12, 101:20, 105:16, 109:7, 109:10, 136:14, 137:6, 137:21, 137:23, 148:5, 148:6, 151:23, 155:16, 156:14, 160:1, 162:20, 166:8, 170:19, 171:23, 172:6, 173:5, 173:7, 173:16, 180:20, 181:11, 181:25, 183:5, 203:3, 203:5, 205:12, 206:2, 207:24, 208:2, 208:4, 208:17, 208:22, 209:3, 219:14, 226:25, 227:3, 227:9, 228:21, 229:6, 229:11, 233:13, 233:16, 277:1, 282:22, 283:4, 291:22, 292:20
Child [5] - 1:10, 91:7, 97:5, 264:23, 310:4
child's [3] - 62:13, 83:16
children [9] - 6:7, 70:8, 84:18, 106:5, 111:1, 112:11, 141:13, 155:24, 156:2
Children [3] - 13:20, 108:20, 109:15
choices [1] - 214:22
choose [9] - 73:4, 123:3, 156:18, 156:19, 156:21, 157:23, 163:8, 163:13, 256:12
chose [3] - 143:7, 157:3, 204:10
chosen [1] - 98:5
CHRISTEN [1] - 2:9
Christie [1] - 18:13
chronological [1] - 103:13
circle [3] - 128:22, 169:2, 169:3
circular [2] - 184:15, 185:21
circumstance [2] - 217:1, 217:22
circumstances [3] - 93:7, 100:1, 187:21
cite [1] - 85:14
cited [1] - 171:10
clarifying [1] - 279:9

class [2] - 62:20, 178:22
classify [2] - 18:4, 60:4
classifying [1] - 82:4
clear [2] - 100:19, 281:15
clearly [8] - 56:6, 109:12, 160:3, 163:7, 169:7, 181:11, 232:22, 294:17
client [4] - 47:12, 183:13, 215:10, 249:19
client's [1] - 158:25
close [3] - 12:3, 44:7, 48:19
closed [1] - 22:4
clothed [3] - 77:5, 77:7, 79:18
clothes [2] - 220:15, 220:16
Coast [1] - 91:7
code [8] - 244:22, 244:25, 245:2, 245:7, 245:12, 246:1, 246:2, 246:7
colleague [1] - 182:4
colleagues [3] - 20:3, 154:22, 260:22
color [3] - 107:14, 205:15, 290:8
columns [2] - 235:21, 235:24
com [1] - 21:13
comfortable [14] - 26:6, 53:2, 59:6, 106:6, 148:4, 162:19, 214:17, 220:1, 226:19, 226:21, 226:22, 239:15, 239:21, 247:6
coming [1] - 175:23
command [2] - 189:19
commentary [2] - 48:14, 49:9
comments [1] - 114:1
Commission [1] - 308:14
committing [1] - 227:25
communicate [4] - 16:3, 17:3, 17:8, 17:22
communicating [1] - 290:9
company [1] - 22:20
compelled [1] -

229:10
competence [1] - 48:10
complete [4] - 187:19, 187:20, 204:8, 309:8
completed [2] - 7:20, 88:17
completely [10] - 122:7, 155:5, 196:9, 196:10, 217:1, 217:3, 217:9, 217:10, 217:16, 236:2
compliance [4] - 19:25, 20:25, 31:16, 31:17
compliment [1] - 76:11
composite [5] - 94:10, 223:7, 223:13, 223:18, 273:6
computer [5] - 45:21, 86:20, 172:4, 227:12, 273:8
concept [1] - 179:12
concern [10] - 71:25, 72:5, 72:11, 172:21, 249:19, 250:9, 250:11, 250:12, 250:14
concerned [2] - 251:2, 251:4
concerns [1] - 250:2
concluded [3] - 277:11, 277:21, 307:20
concludes [1] - 307:15
conclusion [2] - 31:14, 93:17
conclusions [2] - 83:13, 216:7
concrete [2] - 12:10, 214:7
conduct [6] - 86:22, 170:19, 172:5, 184:9, 184:10, 184:11
conducted [1] - 183:12
confirm [19] - 21:2, 28:3, 28:14, 28:17, 69:17, 109:10, 192:24, 206:2, 220:13, 278:4, 291:23, 293:15, 293:25, 294:3, 294:8, 294:22, 294:23, 294:25, 297:4

confirmation [4] - 108:7, 108:9, 108:22, 108:24
confirmed [6] - 27:25, 52:24, 69:9, 139:7, 253:19, 289:9
confirming [2] - 55:17, 87:8
confuse [1] - 118:15
confused [16] - 17:17, 37:6, 51:1, 55:7, 58:10, 118:4, 118:11, 118:14, 147:4, 198:18, 255:15, 255:22, 256:14, 259:7, 303:24, 304:1
confusing [4] - 30:15, 42:15, 42:16, 118:5
confusion [1] - 255:13
connect [2] - 31:3, 32:6
connected [6] - 33:1, 52:25, 71:2, 71:9, 71:11, 309:13
connection [18] - 22:25, 31:22, 32:17, 32:20, 37:25, 38:1, 38:2, 38:3, 38:6, 39:2, 39:6, 41:3, 54:23, 55:4, 184:16, 265:18, 296:18, 297:1
consider [3] - 124:24, 239:10, 258:5
considerably [1] - 46:9
constitute [5] - 112:1, 152:17, 152:20, 157:1, 220:22
consult [1] - 91:25
consulted [4] - 42:5, 91:6, 92:25, 98:2
consumer [1] - 240:3
contact [5] - 30:12, 30:20, 73:11, 187:6, 266:6
contacted [1] - 188:15
contacting [1] - 25:17
contain [2] - 68:1, 134:10
contained [8] - 33:10, 132:12, 134:11, 135:20, 135:22, 136:1, 139:20, 280:8
containing [1] - 56:9
content [2] - 40:22, 240:4
context [2] - 163:18, 264:12

continue [3] - 12:13, 16:18, 85:4
continues [1] - 284:3
continuing [2] - 23:15, 125:21
contributing [1] - 124:14
control [2] - 86:18, 172:2
controversial [1] - 206:15
conversation [7] - 54:17, 96:8, 102:10, 102:13, 114:12, 114:15, 276:8
converse [1] - 37:13
coordinated [1] - 266:5
cop [1] - 216:8
copies [1] - 150:23
copy [18] - 13:22, 13:24, 24:11, 24:14, 24:25, 43:7, 85:21, 89:13, 115:24, 213:17, 215:18, 215:19, 218:3, 218:4, 244:2, 267:22, 270:8, 271:13
copying [1] - 89:19
copyright [1] - 30:10
Corporal [2] - 51:18, 51:19
correct [209] - 6:10, 6:25, 8:22, 16:4, 21:7, 24:18, 24:20, 25:3, 25:11, 25:14, 25:21, 25:25, 26:13, 28:15, 32:11, 34:13, 35:5, 35:12, 35:17, 36:8, 36:16, 39:3, 39:16, 40:1, 40:4, 40:15, 40:25, 41:19, 45:15, 49:13, 50:15, 50:20, 50:24, 51:6, 57:20, 58:15, 60:5, 61:1, 61:10, 61:17, 62:5, 66:16, 67:15, 70:8, 71:19, 72:3, 75:11, 75:14, 79:15, 85:12, 87:18, 89:9, 90:2, 91:22, 92:1, 93:1, 95:20, 95:25, 96:5, 96:6, 97:17, 98:15, 105:8, 105:12, 105:17, 106:25, 107:11, 107:19, 109:1, 109:3, 109:8, 116:7, 124:7, 126:3, 128:5,

130:7, 131:12, 136:9, 137:13, 139:2, 139:8, 141:7, 141:13, 141:17, 141:25, 142:6, 143:3, 143:10, 144:9, 144:12, 144:19, 144:23, 145:9, 145:11, 145:16, 147:1, 147:15, 147:23, 148:17, 150:23, 156:11, 156:16, 157:3, 158:1, 160:15, 161:13, 165:18, 167:5, 167:14, 167:20, 169:22, 171:6, 172:15, 172:22, 173:3, 173:11, 173:19, 173:23, 174:24, 175:23, 176:7, 176:25, 178:19, 179:23, 189:12, 191:9, 197:1, 197:14, 198:19, 201:20, 202:10, 203:17, 203:20, 204:12, 204:13, 205:7, 206:5, 207:9, 212:2, 213:11, 214:11, 219:15, 220:12, 220:21, 223:2, 223:20, 227:10, 227:16, 229:6, 235:11, 235:13, 235:18, 236:11, 236:18, 237:17, 237:21, 239:18, 240:16, 246:24, 247:22, 249:8, 251:11, 253:8, 253:15, 255:21, 256:23, 263:21, 264:2, 264:13, 264:19, 265:5, 265:6, 267:22, 267:24, 268:13, 268:18, 270:10, 270:11, 271:9, 271:25, 272:1, 272:7, 272:18, 275:1, 275:4, 280:2, 280:5, 280:9, 280:20, 281:5, 286:15, 286:19, 288:21, 288:25, 289:3, 289:5, 289:7, 289:16, 290:10, 290:14, 290:24,

291:25, 292:3,
293:4, 293:14,
298:25, 301:13,
305:22, 306:7
**correctly** [12] - 32:19,
87:10, 91:10, 172:7,
177:25, 186:16,
203:7, 264:18,
266:10, 275:4,
291:12, 291:15
**correspondence** [1] -
274:7
**counsel** [4] - 13:22,
222:8, 309:11,
309:13
**Counsel** [1] - 4:14
**country** [3] - 242:6,
242:7, 243:3
**country's** [1] - 244:16
**county** [1] - 136:11
**County** [10] - 1:8,
5:23, 72:23, 101:18,
126:16, 151:2,
169:6, 198:13,
218:14, 310:3
**COUNTY** [2] - 308:4,
309:3
**couple** [7] - 16:21,
33:8, 88:7, 88:25,
263:17, 273:18,
278:9
**course** [5] - 179:6,
179:8, 186:17,
241:22, 270:3
**court** [23] - 4:13, 6:3,
39:5, 39:19, 39:23,
40:14, 41:11, 47:16,
49:16, 50:19, 53:10,
53:20, 81:2, 105:12,
105:22, 131:21,
132:2, 132:10,
132:11, 132:25,
136:9, 259:10
**COURT** [1] - 1:1
**Court** [2] - 1:18, 4:5
**cover** [3] - 100:4,
225:24, 226:2
**covered** [1] - 96:20
**cpetruzzelli @
sniffenlaw.com** [1] -
2:13
**Crawford** [6] - 25:6,
25:13, 126:16,
126:19, 128:17,
149:9
**create** [2] - 130:19,
152:11
**created** [1] - 108:21
**creates** [1] - 152:4
**credible** [4] - 51:8,

51:11, 52:4
**crime** [24] - 12:14,
15:12, 15:16, 15:19,
16:10, 19:4, 26:9,
72:16, 72:21, 72:22,
95:18, 112:11,
177:15, 182:8,
182:15, 182:17,
182:19, 182:24,
183:4, 186:22,
186:25, 187:2, 228:1
**crimes** [8] - 6:6, 70:8,
73:1, 84:18, 110:25,
112:10, 141:13,
170:8
**criminal** [6] - 25:21,
25:22, 25:25, 46:18,
83:7, 227:4
**CROSS** [1] - 263:5
**Cross** [1] - 3:5
**crossed** [1] - 233:11
**crude** [1] - 79:3
**CSAM** [57] - 14:20,
26:16, 26:21, 33:25,
34:2, 34:3, 37:17,
40:21, 40:22, 41:4,
41:19, 49:24, 52:16,
52:25, 53:4, 54:3,
77:6, 92:15, 96:13,
96:17, 98:9, 98:15,
99:9, 100:20,
131:25, 135:24,
137:2, 151:13,
157:1, 157:12,
158:22, 159:5,
159:7, 159:13,
178:6, 178:7, 178:9,
182:23, 201:20,
220:4, 228:9,
228:13, 228:16,
228:19, 228:20,
228:25, 229:2,
253:18, 258:6,
259:19, 260:18,
261:18, 261:19,
274:18, 275:12,
278:4
**current** [1] - 5:20
**curtains** [2] - 220:19,
236:3
**CUSIMANO** [1] - 2:23
**Cusimano** [1] - 4:11
**custodian** [28] - 24:14,
25:9, 25:10, 25:17,
141:20, 145:14,
145:15, 145:20,
147:14, 147:22,
149:6, 149:7,
149:21, 150:11,
150:12, 151:18,

153:6, 154:2,
154:14, 167:19,
190:21, 195:13,
196:16, 197:13,
199:24, 213:9,
240:2, 240:22
**customer** [2] - 134:13,
134:15
**cut** [3] - 28:20, 265:17,
269:4
**cyber** [34] - 13:16,
13:17, 14:4, 14:12,
14:13, 15:7, 20:10,
20:15, 33:10, 33:13,
33:22, 34:7, 34:11,
34:12, 35:2, 61:9,
89:7, 89:12, 91:5,
98:25, 99:4, 106:24,
107:18, 107:22,
108:1, 108:21,
109:13, 110:10,
237:5, 266:25,
271:19, 271:21,
271:24, 272:6
**Cyber** [1] - 3:13

# D

**D26** [2] - 205:14,
205:16
**dangerous** [1] - 124:5
**darker** [1] - 280:15
**data** [4] - 86:20, 172:3,
204:1, 204:3
**database** [3] - 43:1,
227:17, 227:18
**databases** [1] - 42:12
**DATE** [1] - 1:16
**Date** [1] - 310:25
**date** [25] - 4:9, 6:24,
15:11, 15:14, 15:18,
15:19, 15:24, 16:2,
16:5, 16:9, 43:8,
87:13, 87:14, 87:16,
115:21, 115:22,
129:8, 214:4,
214:10, 240:19,
240:22, 240:25,
266:22
**dated** [2] - 130:20,
282:13
**dates** [5] - 87:8, 87:12,
154:1, 214:5, 266:8
**days** [4] - 15:23,
87:12, 87:13, 87:17
**De** [2] - 1:19, 4:8
**dealing** [1] - 206:21
**dealings** [2] - 51:13,
51:14
**deals** [3] - 205:10,
207:2, 287:23

**deceive** [2] - 242:23
**December** [2] - 10:15,
11:11
**decided** [3] - 96:19,
195:3, 258:25
**decidedly** [1] - 47:23
**deciding** [3] - 192:14,
193:8, 193:21
**decision** [26] - 12:5,
141:23, 142:18,
142:19, 192:2,
193:13, 196:2,
196:18, 198:2,
198:7, 198:10,
198:14, 198:16,
199:3, 201:6,
201:15, 201:22,
203:8, 210:7,
259:11, 260:17,
274:13, 274:23,
286:13, 286:15,
286:18
**declare** [1] - 310:23
**deduce** [1] - 237:2
**deducing** [1] - 238:10
**deduction** [2] -
238:10, 242:2
**deductions** [1] - 237:2
**deeper** [1] - 185:8
**defend** [5] - 163:16,
163:17, 163:23,
164:2, 164:4
**Defendant** [2] - 2:14,
2:20
**Defendants** [1] - 1:11
**DEFENDANTS'** [1] -
3:24
**defer** [1] - 125:15
**definitely** [6] - 59:14,
79:4, 80:9, 83:15,
195:18, 277:2
**definition** [4] - 28:25,
29:5, 90:4, 227:3
**degree** [3] - 39:22,
103:25, 210:24
**delay** [2] - 263:9,
284:19
**deleted** [3] - 249:20,
250:3, 250:15
**delineate** [1] - 207:1
**delivered** [2] - 222:1,
222:2
**denotes** [1] - 117:19
**department** [4] - 97:5,
172:21, 181:2,
259:17
**depict** [2] - 92:15,
158:22
**depicted** [17] - 8:21,
28:9, 158:3, 164:6,

183:5, 203:3,
211:24, 240:12,
275:22, 276:10,
283:20, 291:23,
300:8, 300:25,
301:1, 302:7, 302:9
**depicting** [3] - 272:4,
275:15, 286:9
**depiction** [2] - 86:20,
172:4
**depicts** [8] - 41:8,
91:17, 91:18, 92:14,
120:24, 282:21,
285:25, 292:20
**Depo** [1] - 310:5
**depo** [2] - 43:8,
261:21
**deposed** [3] - 6:8,
154:23, 275:10
**Deposition** [1] - 3:15
**deposition** [34] - 4:2,
4:7, 5:14, 6:13, 6:16,
6:17, 7:7, 9:20,
18:15, 20:2, 41:24,
42:17, 43:2, 45:11,
46:23, 48:15, 50:12,
51:19, 55:19, 74:9,
74:15, 83:11, 99:7,
108:6, 248:16,
260:3, 275:11,
276:20, 276:23,
277:18, 277:24,
307:16, 307:20,
309:6
**DEPOSITION** [1] -
1:13
**describe** [13] - 29:22,
53:6, 84:19, 84:22,
90:6, 92:9, 92:14,
159:9, 159:10,
159:11, 231:20,
245:3, 274:14
**described** [9] - 15:6,
21:6, 42:15, 47:3,
55:19, 109:1, 141:2,
203:14, 216:24
**describing** [8] - 41:5,
41:6, 211:3, 212:20,
283:19, 288:16,
288:20, 303:13
**Description** [1] - 3:12
**description** [8] - 41:7,
50:3, 89:18, 89:19,
90:23, 108:14,
160:7, 298:14
**descriptions** [1] - 62:8
**deserved** [1] - 188:9
**detail** [3] - 10:18,
135:1, 135:2
**Detective** [58] - 4:20,

20:5, 20:7, 20:9, 20:21, 45:11, 46:22, 47:2, 47:24, 54:7, 54:17, 55:19, 57:5, 57:10, 66:5, 84:4, 84:5, 93:16, 93:20, 94:19, 95:13, 95:15, 95:16, 102:1, 102:19, 126:15, 126:23, 127:6, 139:18, 140:12, 142:5, 142:14, 144:2, 165:5, 169:6, 175:4, 175:12, 176:10, 176:16, 196:15, 196:25, 199:24, 200:5, 202:10, 204:3, 225:11, 248:15, 259:24, 260:4, 260:6, 261:6, 261:17, 263:7, 278:8, 278:10, 300:17

detective [16] - 1:8, 5:21, 5:22, 6:1, 14:17, 81:20, 88:8, 110:25, 121:10, 123:10, 214:24, 238:9, 249:8, 251:7, 278:3, 310:3

detectives [4] - 53:25, 202:22, 259:16, 261:3

detectives' [1] - 95:10

determination [12] - 31:9, 34:21, 36:21, 36:22, 123:18, 123:20, 204:14, 204:17, 206:3, 291:23, 301:12, 306:8

determinations [3] - 302:4, 305:20, 306:2

determine [19] - 33:14, 34:16, 70:19, 73:24, 76:21, 78:11, 101:19, 102:25, 106:4, 113:18, 125:7, 180:15, 182:22, 212:16, 212:23, 215:1, 253:2, 306:9

determined [6] - 35:4, 36:15, 37:10, 99:9, 254:9, 275:21

determiner [1] - 182:16

determining [6] - 60:15, 75:10, 81:9,

81:12, 120:23, 124:25, 126:2, 185:20

developed [2] - 208:12, 209:3

development [12] - 90:8, 160:4, 160:9, 160:20, 207:25, 208:11, 209:18, 209:20, 285:17, 292:21, 294:12, 294:14

developmental [5] - 160:5, 285:9, 285:18, 291:10, 293:1

develops [1] - 58:21

device [5] - 70:6, 134:22, 250:16, 251:19, 252:9

devices [1] - 251:13

diagnose [2] - 179:15, 180:3

diagnosis [1] - 179:23

difference [5] - 74:23, 100:3, 103:22, 186:3, 214:3

different [71] - 44:2, 46:12, 50:7, 53:7, 58:7, 58:18, 58:25, 59:3, 59:9, 59:11, 59:15, 60:2, 60:22, 60:23, 60:25, 61:1, 80:6, 93:6, 94:11, 109:22, 111:5, 119:14, 120:8, 120:15, 122:7, 137:16, 139:1, 154:12, 157:6, 173:18, 173:23, 181:20, 189:13, 190:23, 196:9, 196:10, 198:23, 200:21, 201:12, 217:1, 217:3, 217:9, 217:10, 217:15, 217:17, 217:22, 221:4, 231:13, 235:1, 235:3, 235:4, 235:5, 235:6, 235:8, 236:2, 236:4, 236:8, 236:10, 236:11, 236:19, 236:20, 236:22, 239:16, 295:9, 302:16, 304:15, 304:16, 306:23

differently [10] - 51:21, 58:21, 93:8, 120:9, 120:11,

120:18, 149:5, 191:1, 231:21, 239:7

difficult [38] - 55:20, 55:24, 56:9, 56:13, 56:22, 57:2, 57:16, 57:19, 57:25, 58:6, 58:9, 59:21, 60:1, 60:5, 60:7, 96:19, 96:23, 98:15, 99:12, 99:19, 99:20, 99:24, 101:11, 169:8, 169:11, 169:13, 169:14, 172:13, 172:24, 173:2, 173:6, 173:8, 175:16, 177:5, 181:3, 182:6, 203:6, 276:10

digital [24] - 68:14, 77:22, 103:14, 104:2, 104:11, 106:14, 111:2, 111:17, 111:22, 112:12, 113:9, 120:23, 121:16, 124:6, 125:8, 227:14, 232:20, 232:21, 233:23, 234:1, 244:2, 248:8, 274:19, 282:12

digitally [1] - 77:18

DIRECT [1] - 5:8

direct [1] - 74:7

Direct [1] - 3:4

directed [1] - 290:9

directly [1] - 131:12

director [2] - 1:9, 310:4

disagree [12] - 12:5, 55:21, 55:22, 55:23, 57:14, 139:21, 140:17, 140:22, 175:7, 176:15, 197:6, 261:19

disagreed [4] - 12:7, 126:1, 181:10, 181:24

disagreeing [3] - 142:13, 154:25, 181:12

disagreement [8] - 56:2, 56:4, 97:3, 101:6, 101:8, 101:14, 125:15, 169:4

discarded [1] - 201:19

disclaim [1] - 175:6

disclaimers [1] - 67:21

disclose [1] - 50:11

disclosures [1] - 67:21

discover [2] - 229:21, 230:16

discrepancy [6] - 295:3, 295:5, 295:14, 295:19, 295:23, 298:13

discussed [3] - 54:16, 121:6, 276:19

discussing [2] - 61:8, 276:21

discussion [2] - 197:20, 198:4

displayed [2] - 107:14, 292:18

displaying [6] - 40:21, 41:19, 52:16, 53:4, 54:3, 131:25

disrespect [1] - 47:25

disrespectful [2] - 48:3, 48:5

disseminate [3] - 23:15

dissent [1] - 203:4

distinction [1] - 297:18

DISTRICT [2] - 1:1, 1:1

District [2] - 4:5

DIVISION [1] - 1:2

Division [1] - 4:6

divisions [1] - 181:20

DNA [1] - 300:21

DO [1] - 310:6

doctor [29] - 60:16, 80:1, 80:14, 80:15, 80:23, 96:5, 97:6, 106:4, 121:11, 126:5, 178:7, 179:14, 179:19, 179:20, 179:22, 180:3, 180:5, 180:6, 180:9, 180:10, 180:12, 180:15, 180:19, 180:21, 183:7, 210:16, 210:21, 301:19, 302:3

doctors [1] - 104:21

document [6] - 14:1, 255:8, 289:23, 290:5, 290:7, 310:23

documentation [3] - 141:17, 184:3, 241:12

documented [1] - 15:12

documents [6] - 7:3, 7:18, 16:4, 149:8, 153:7, 219:5

done [28] - 10:6, 10:14, 21:23, 22:2, 23:1, 25:19, 44:17, 44:20, 49:3, 55:6, 69:2, 73:13, 83:22, 96:1, 97:16, 120:9, 145:4, 147:9, 149:5, 150:22, 169:19, 180:24, 188:14, 190:25, 191:1, 196:19, 246:11, 262:4

doubt [3] - 152:5, 152:11, 153:19

Douglas [1] - 270:13

down [26] - 16:18, 18:7, 27:9, 47:17, 79:11, 118:3, 118:10, 118:20, 126:16, 134:18, 160:2, 165:5, 169:19, 189:16, 198:19, 221:14, 226:6, 228:24, 229:12, 230:24, 231:11, 263:9, 278:1, 282:20, 284:22, 285:8

download [7] - 134:9, 134:10, 135:18, 135:20, 204:8, 252:22, 274:19

downloaded [4] - 16:9, 204:3, 252:15, 252:16

Dr [115] - 4:22, 55:18, 74:3, 91:6, 91:18, 91:25, 93:1, 93:20, 94:20, 95:2, 95:6, 95:20, 96:8, 96:9, 97:6, 97:19, 98:3, 98:13, 99:25, 100:5, 100:13, 100:23, 101:3, 101:18, 102:20, 102:25, 103:5, 103:25, 105:21, 107:10, 108:18, 108:23, 109:22, 113:21, 117:7, 119:2, 120:22, 124:12, 124:24, 125:16, 129:1, 129:2, 129:17, 129:19, 130:1, 130:4, 130:16, 131:12, 131:15, 131:16, 131:20, 132:1, 159:18, 160:18, 191:8, 192:6,

| | | | | |
|---|---|---|---|---|
| 192:14, 192:25, 193:11, 194:25, 199:20, 203:9, 203:12, 204:16, 204:18, 204:22, 207:22, 210:22, 227:23, 253:19, 263:8, 264:2, 264:7, 264:21, 265:4, 265:13, 265:25, 266:5, 266:21, 268:1, 268:7, 268:10, 268:14, 268:18, 268:20, 269:12, 270:10, 270:12, 270:21, 270:24, 271:2, 271:23, 273:23, 274:2, 274:18, 274:25, 275:13, 275:16, 275:20, 275:25, 276:3, 276:6, 276:24, 277:12, 277:22, 282:6, 285:23, 286:14, 290:8, 295:22, 296:14, 298:14, 298:22, 304:7, 304:24<br>**draw** [1] – 66:4<br>**drawn** [1] – 158:6<br>**dream** [1] – 279:1<br>**drew** [3] – 158:10, 158:18, 158:20<br>**drinking** [1] – 216:15<br>**drive** [10] – 219:24, 221:25, 222:6, 222:8, 227:21, 231:22, 232:6, 232:10, 267:14<br>**Driver's** [1] – 308:22<br>**driver's** [5] – 216:17, 216:18, 217:2, 217:12, 242:10<br>**drives** [1] – 219:6<br>**drop** [2] – 12:5, 259:12<br>**dropped** [10] – 8:6, 9:8, 10:15, 10:19, 12:2, 12:9, 12:16, 12:18, 12:25, 46:1<br>**duck** [2] – 111:14, 111:15<br>**duckduckgo .jpg** [1] – 159:25<br>**due** [2] – 22:3, 220:4<br>**Dully** [99] – 2:20, 3:19, 4:22, 55:18, 74:3, 91:6, 91:25, 93:1, 94:20, 95:2, 95:6, 95:20, 96:9, 97:6, | 97:19, 98:3, 98:13, 99:25, 100:5, 100:13, 100:23, 101:3, 102:20, 102:25, 103:5, 103:25, 107:10, 108:18, 108:23, 109:22, 113:21, 117:7, 119:2, 120:22, 124:12, 124:24, 125:16, 129:1, 129:2, 129:19, 131:16, 132:1, 159:18, 160:18, 191:8, 192:6, 192:14, 192:25, 193:11, 194:20, 203:9, 203:12, 204:16, 204:18, 207:22, 210:22, 227:23, 253:19, 263:8, 264:2, 264:7, 265:4, 265:13, 265:25, 266:5, 266:21, 268:1, 268:7, 268:10, 268:14, 268:18, 268:20, 269:12, 270:10, 270:12, 270:21, 270:24, 271:2, 271:23, 273:23, 274:2, 275:13, 275:16, 275:20, 275:25, 276:3, 276:6, 276:24, 277:12, 277:22, 282:6, 286:14, 290:8, 295:22, 296:14, 298:14, 298:22, 304:7, 304:24<br>**DULLY** [2] – 1:9, 310:4<br>**Dully's** [18] – 91:18, 101:18, 105:21, 129:17, 130:1, 130:4, 130:16, 130:25, 131:12, 131:15, 131:20, 194:25, 199:20, 204:22, 264:21, 274:18, 274:25, 285:23<br>**duly** [1] – 5:2<br>**during** [16] – 31:24, 127:14, 135:7, 154:9, 155:12, 155:15, 156:3, 179:6, 183:20, 186:19, 200:21, 200:22, 217:4, | 260:23, 264:15, 268:6<br><br>**E**<br><br>**e-mail** [12] – 25:11, 30:19, 128:16, 134:24, 148:2, 148:7, 149:7, 149:9, 150:10, 154:14, 274:8<br>**e-mailed** [3] – 25:8, 145:15, 145:20<br>**e-mailing** [1] – 148:5<br>**early** [1] – 262:15<br>**earrings** [2] – 220:17, 282:22<br>**easier** [1] – 164:4<br>**easiest** [3] – 90:6, 180:18, 245:4<br>**easily** [4] – 58:2, 68:25, 77:8, 77:17<br>**easy** [4] – 56:17, 68:9, 77:21, 78:6<br>**edit** [2] – 76:7, 76.9<br>**edited** [9] – 75:3, 75:4, 75:8, 75:19, 75:20, 75:21, 77:4, 77:8, 77:13<br>**editing** [1] – 76:18<br>**educated** [1] – 224:19<br>**effectuate** [3] – 6:22, 196:18, 198:2<br>**effectuating** [2] – 188:17, 200:7<br>**effort** [4] – 113:18, 156:1, 156:3, 156:6<br>**either** [9] – 10:13, 98:8, 248:20, 250:10, 266:1, 270:21, 274:8, 287:21, 292:19<br>**electro** [1] – 120:4<br>**electrolysis** [2] – 120:3, 120:9<br>**electronic** [4] – 14:19, 18:3, 133:15, 250:16<br>**electronic-based** [1] – 133:15<br>**electronically** [2] – 133:16, 133:20<br>**elements** [1] – 170:9<br>**Emerson** [1] – 2:4<br>**eminent** [1] – 233:16<br>**employed** [1] – 5:18<br>**employee** [3] – 265:4, 309:11, 309:12<br>**employees** [1] – 278:13<br>**employer** [3] – 264:21, | 265:8, 267:16<br>**employer-issued** [1] – 267:16<br>**employment** [1] – 5:20<br>**encapsulate** [1] – 202:7<br>**encountered** [2] – 40:23, 54:4<br>**end** [4] – 82:19, 183:10, 200:8, 281:16<br>**ended** [4] – 193:19, 194:6, 194:15, 194:22<br>**enforcement** [22] – 42:12, 54:12, 72:5, 72:11, 87:24, 107:14, 145:19, 150:7, 150:21, 151:2, 151:22, 152:25, 189:6, 191:25, 202:18, 217:11, 218:13, 218:19, 229:10, 268:6, 270:4, 292:18<br>**engage** [1] – 47:13<br>**engine** [1] – 42:9<br>**enlighten** [1] – 214:3<br>**ENTER** [1] – 310:6<br>**enters** [1] – 9:20<br>**entire** [6] – 16:12, 79:7, 157:10, 231:6, 292:15, 292:16<br>**entirely** [3] – 150:25, 301:10, 301:11<br>**entirety** [10] – 154:19, 157:11, 157:13, 159:4, 186:23, 186:25, 194:25, 199:21, 227:6, 274:19<br>**entitled** [2] – 205:14, 205:16<br>**equal** [2] – 290:4, 293:2<br>**Errata** [1] – 3:9<br>**ESP** [5] – 14:18, 15:11, 18:1, 89:13, 89:21<br>**ESP's** [1] – 89:19<br>**especially** [7] – 83:21, 84:1, 180:24, 201:9, 278:5, 280:5, 280:6<br>**Esquire** [4] – 2:3, 2:9, 2:9, 2:16<br>**establish** [4] – 89:5, 132:3, 175:17, 186:20<br>**established** [1] – 283:15<br>**establishing** [3] – | 184:24, 185:2, 186:18<br>**estimate** [4] – 88:11, 103:25, 104:11, 106:13<br>**estimated** [1] – 289:15<br>**estimating** [2] – 103:12, 131:17<br>**et** [1] – 4:4<br>**evaluation** [1] – 31:10<br>**event** [1] – 209:10<br>**events** [1] – 262:20<br>**eventually** [1] – 201:10<br>**evidence** [27] – 49:1, 71:5, 71:8, 71:12, 71:14, 136:23, 137:12, 152:17, 152:20, 155:6, 167:13, 167:17, 167:19, 172:9, 173:12, 173:25, 177:11, 211:18, 211:23, 212:6, 237:2, 241:2, 248:16, 250:22, 293:18, 295:7, 298:18<br>**evidentiary** [1] – 80:25<br>**exact** [7] – 88:12, 88:14, 143:13, 196:8, 230:1, 230:3, 295:22<br>**exactly** [6] – 107:1, 108:25, 122:14, 151:7, 179:2, 262:3<br>**EXAMINATION** [3] – 5:8, 263:5, 287:4<br>**Examination** [4] – 1:23, 3:4, 3:5, 3:6<br>**examined** [4] – 205:15, 288:14, 290:8, 295:13<br>**examiner** [1] – 68:14<br>**example** [2] – 92:15, 108:11<br>**exchanged** [1] – 114:12<br>**excludes** [1] – 227:2<br>**exclusively** [1] – 274:24<br>**exculpatory** [1] – 183:23<br>**excuse** [18] – 5:21, 19:24, 42:12, 43:24, 62:17, 75:2, 97:24, 99:3, 133:14, 135:25, 157:10, 183:3, 208:21, 272:13, 275:2, 278:11, 279:8, |

283:14
excused [1] - 307:19
executed [2] - 7:21, 203:16
executioner [1] - 183:4
exercise [2] - 34:20, 47:13
Exhibit [28] - 13:22, 14:8, 38:13, 38:15, 38:17, 43:4, 43:5, 43:14, 44:24, 45:1, 45:10, 46:20, 85:23, 87:3, 89:9, 94:9, 107:2, 107:3, 129:10, 160:24, 161:3, 161:9, 223:23, 241:19, 244:19, 246:20, 287:6, 298:21
exhibit [8] - 43:12, 46:1, 87:3, 169:18, 169:24, 223:7, 223:15, 273:2
exhibition [3] - 18:10, 86:19, 172:3
exhibits [2] - 49:2, 221:15
EXHIBITS [2] - 3:11, 3:24
existed [1] - 13:1
exists [1] - 241:2
expect [2] - 121:14, 180:16
expectation [1] - 269:11
experience [9] - 74:1, 87:25, 90:14, 121:1, 121:25, 191:12, 211:7, 211:10, 211:11
expert [13] - 60:14, 66:18, 70:7, 82:1, 82:5, 112:10, 119:3, 120:23, 121:15, 124:25, 126:2, 178:12, 179:25
expertise [5] - 66:22, 80:21, 125:13, 125:14, 182:21
Expires [1] - 308:14
explain [8] - 13:17, 23:25, 24:4, 48:6, 99:18, 118:11, 157:21, 183:15
explained [4] - 101:17, 116:21, 118:20, 217:16
explanation [2] - 23:11, 67:8

explicitly [1] - 227:2
exploitation [1] - 23:17
Exploited [3] - 13:20, 108:20, 109:15
exploiting [1] - 233:13
exposing [1] - 160:3
express [2] - 91:13, 92:6
expressed [1] - 172:21
extra [4] - 74:2, 81:18, 180:21, 180:23
extraction [1] - 251:21
eye [1] - 208:19
eyes [1] - 232:16

**F**

fabricated [1] - 214:5
face [23] - 75:1, 75:4, 75:9, 75:18, 76:7, 76:21, 77:5, 77:8, 77:12, 78:23, 79:11, 79:21, 131:8, 157:17, 157:22, 161:12, 162:3, 163:5, 163:9, 164:1, 164:12, 164:16, 165:2
facial [1] - 76:9
fact [17] - 8:10, 32:25, 123:24, 146:21, 151:9, 152:6, 187:9, 212:1, 212:7, 260:18, 270:15, 280:2, 280:7, 298:1, 298:6, 299:20
factor [6] - 124:14, 185:20, 192:15, 193:9, 193:21
factors [4] - 36:5, 196:6, 274:13, 274:15
facts [6] - 89:4, 215:1, 293:17, 295:6, 298:17, 310:23
fair [18] - 34:2, 44:9, 47:22, 49:1, 58:4, 60:14, 88:15, 107:25, 162:24, 163:1, 163:12, 236:7, 247:20, 263:23, 268:10, 270:20, 274:22, 286:12
fairly [2] - 58:5, 78:5
faith [2] - 270:25, 271:3
fake [5] - 242:8, 242:10, 242:11,

242:13
faked [2] - 214:1, 244:14
false [9] - 34:8, 35:11, 35:16, 35:18, 39:23, 39:25, 52:6, 52:11, 52:13
familiar [10] - 62:14, 86:2, 126:18, 127:1, 141:9, 141:11, 170:8, 171:14, 171:21, 201:17
family [1] - 66:6
far [2] - 88:23, 282:9
fashion [1] - 270:22
fast [3] - 135:6, 135:13
FBI [8] - 22:17, 22:23, 73:12, 218:18, 228:23, 261:25, 262:5, 262:16
features [1] - 76:9
February [33] - 33:5, 91:5, 94:23, 106:12, 107:6, 107:8, 114:5, 115:18, 124:24, 129:8, 129:9, 132:4, 192:25, 203:11, 203:16, 205:6, 205:21, 266:9, 266:11, 266:12, 266:19, 266:22, 267:7, 268:1, 268:22, 271:3, 271:13, 272:7, 272:12, 282:5, 282:14, 283:16, 287:24
federal [3] - 73:11, 141:9, 141:15
feet [1] - 282:23
felony [1] - 39:22
felt [16] - 53:2, 99:24, 100:2, 100:10, 106:6, 150:3, 162:19, 182:14, 182:18, 183:5, 187:24, 188:11, 274:20, 277:1, 295:21
female [28] - 28:11, 36:8, 41:8, 62:5, 74:2, 121:10, 139:3, 139:4, 157:16, 160:1, 205:12, 206:2, 209:5, 234:25, 271:17, 272:4, 282:22, 283:4, 291:22, 292:20, 295:20, 295:23, 296:7,

296:8, 296:23, 297:2, 297:5, 303:18
females [3] - 43:25, 44:4, 211:3
fetish [2] - 122:13, 122:17
few [1] - 282:2
fictitious [1] - 216:18
field [1] - 106:5
figure [3] - 222:15, 226:12, 226:13
file [22] - 12:3, 14:21, 14:24, 15:19, 16:19, 89:12, 107:15, 159:24, 196:17, 221:21, 222:7, 255:2, 255:3, 255:5, 257:4, 257:5, 257:7, 272:16, 287:9, 287:19, 303:12, 303:14
files [5] - 134:11, 136:1, 136:25, 249:20, 289:3
filing [1] - 210:7
fill [2] - 39:18, 130:18
film [1] - 157:25
financially [1] - 309:14
findings [1] - 287:23
fine [3] - 82:15, 161:17, 209:9
fingerprints [1] - 300:21
finish [1] - 218:1
fired [1] - 189:21
First [1] - 91:7
first [44] - 5:2, 8:2, 32:10, 32:11, 38:21, 46:2, 86:6, 86:13, 95:3, 95:4, 95:19, 95:22, 97:14, 102:15, 106:11, 114:4, 175:1, 207:12, 234:21, 234:24, 262:25, 264:14, 266:19, 266:25, 267:7, 269:15, 271:12, 271:17, 271:23, 271:24, 272:2, 272:14, 282:13, 282:19, 283:14, 283:15, 284:22, 287:9, 288:21, 292:14, 292:18, 294:13, 295:3
Fish [3] - 20:11, 178:18, 178:24
fit [1] - 73:2
five [4] - 87:24,

246:10, 246:12, 254:7
flagged [2] - 27:19, 108:20
flip [2] - 18:6, 38:20
floor [3] - 235:10, 235:11, 235:18
FLORIDA [3] - 1:1, 308:3, 309:2
Florida [15] - 1:20, 2:5, 2:11, 2:18, 3:17, 4:6, 4:9, 20:11, 63:19, 169:20, 170:6, 178:18, 178:24, 308:6, 308:13
focal [1] - 163:13
focused [2] - 55:17, 67:12
folders [1] - 137:16
follow [4] - 145:1, 189:8, 263:2, 286:23
follow-up [2] - 263:2, 286:23
following [1] - 107:17
follows [1] - 5:4
fool [1] - 240:3
force [1] - 151:3
forefront [1] - 185:1
foregoing [1] - 310:23
forensic [3] - 68:14, 78:14, 175:22
forget [1] - 136:12
forgive [2] - 184:14, 230:22
forgot [1] - 5:5
forgotten [1] - 116:19
form [232] - 8:13, 10:22, 11:17, 20:19, 21:24, 22:8, 23:18, 24:12, 24:16, 24:19, 25:1, 26:1, 26:14, 27:10, 27:15, 30:5, 30:20, 35:13, 36:17, 39:9, 40:16, 41:13, 49:20, 52:8, 69:20, 70:13, 72:9, 72:13, 73:20, 81:22, 82:3, 86:11, 92:3, 92:10, 93:4, 96:11, 97:7, 97:24, 98:18, 98:21, 99:14, 100:14, 101:9, 101:23, 103:3, 103:15, 104:5, 104:13, 104:24, 105:23, 106:21, 110:5, 110:14, 110:20, 111:21, 112:24, 113:5, 114:19,

116:8, 117:14, 117:15, 117:23, 118:7, 119:6, 122:4, 123:5, 123:16, 124:9, 124:17, 125:1, 125:10, 125:18, 126:10, 127:22, 128:3, 129:15, 129:21, 131:2, 132:5, 132:14, 141:4, 142:1, 142:7, 142:11, 142:25, 143:4, 143:8, 143:18, 143:23, 146:16, 147:2, 147:4, 148:21, 150:16, 150:24, 151:11, 151:24, 152:7, 152:13, 152:19, 153:8, 153:13, 153:21, 154:3, 154:16, 155:1, 155:11, 158:7, 161:1, 161:22, 162:12, 162:25, 163:10, 163:21, 164:8, 164:25, 165:13, 166:11, 166:24, 167:6, 167:9, 167:15, 167:21, 168:5, 168:9, 168:17, 170:20, 170:24, 171:8, 172:23, 173:4, 175:8, 175:25, 176:5, 176:13, 176:18, 177:17, 178:14, 181:5, 183:1, 183:24, 184:18, 185:10, 187:23, 188:4, 188:18, 189:3, 189:25, 190:16, 191:15, 192:10, 192:17, 192:18, 193:4, 193:16, 195:9, 197:7, 200:2, 202:25, 206:18, 207:13, 207:19, 208:6, 208:15, 209:6, 209:16, 209:22, 209:25, 210:8, 210:14, 210:25, 211:1, 211:8, 211:20, 212:3, 212:9, 212:18, 214:12, 214:15, 215:13, 215:21, 216:1,

217:13, 218:6, 218:22, 221:11, 230:8, 230:13, 238:4, 238:12, 240:6, 241:3, 243:1, 243:21, 245:22, 249:13, 253:23, 254:14, 289:18, 289:25, 290:15, 291:13, 292:4, 293:7, 293:12, 293:17, 293:22, 294:6, 294:18, 295:4, 295:6, 295:15, 296:16, 298:15, 298:17, 299:15, 299:16, 300:9, 301:3, 301:18, 302:10, 303:8, 303:23, 304:10, 304:13, 304:23, 305:3, 305:9, 305:23, 306:5, 306:16
**format** [1] - 227:14
**formed** [1] - 109:8
**former** [1] - 57:12
**forms** [2] - 116:3, 146:22
**formulate** [2] - 155:6, 214:6
**formulated** [3] - 124:22, 157:11, 263:24
**formulating** [1] - 214:17
**forum** [2] - 69:8, 132:25
**forward** [5] - 22:16, 38:12, 195:4, 278:5, 286:18
**forwarded** [1] - 22:23
**forwarding** [1] - 201:10
**four** [5] - 181:16, 239:6, 251:23, 258:5, 258:7
**fourth** [1] - 282:20
**FPR** [3] - 1:24, 308:13, 309:18
**FPR-C** [3] - 1:24, 308:13, 309:18
**frame** [2] - 126:23, 177:1
**frankly** [1] - 49:7
**freedom** [1] - 73:1
**freezing** [2] - 269:4, 284:17
**front** [4] - 14:3, 273:7, 282:1, 282:11

**froze** [4] - 281:8, 284:12, 284:16, 285:3
**full** [5] - 64:22, 222:6, 225:16, 232:12, 233:6
**fully** [3] - 77:5, 77:7, 208:12
**function** [2] - 30:12, 30:17
**functions** [3] - 30:7, 30:9, 30:11
**funny** [1] - 158:24
**FWC** [2] - 189:11, 202:18

## G

**games** [1] - 240:9
**gaps** [1] - 188:3
**general** [2] - 66:19, 179:17
**generally** [1] - 66:7
**genital** [3] - 77:20, 160:3, 291:10
**genitals** [13] - 79:22, 79:25, 80:4, 80:5, 80:6, 80:10, 157:19, 157:22, 161:16, 162:21, 163:18, 292:23
**gentleman** [1] - 5:15
**girls** [9] - 40:22, 41:19, 52:17, 54:3, 151:9, 270:14, 278:18, 281:2, 281:18
**given** [5] - 9:10, 20:15, 47:22, 153:15, 241:11
**glad** [2] - 196:12, 204:23
**goal** [2] - 155:18, 186:20
**goals** [1] - 155:22
**God** [1] - 228:23
**Google** [33] - 3:16, 42:8, 42:18, 43:22, 44:2, 44:3, 44:10, 44:11, 44:12, 44:13, 44:15, 44:18, 45:5, 45:14, 45:19, 45:20, 45:23, 47:3, 47:13, 49:19, 50:14, 50:23, 51:2, 51:4, 51:7, 53:12, 53:21, 226:17, 226:18, 226:19, 227:1, 229:19, 248:11
**Googled** [7] - 42:3, 42:17, 42:20, 44:14,

45:4, 52:22, 206:12
**gosh** [1] - 181:18
**gotcha** [2] - 43:15, 223:22
**government** [5] - 22:17, 213:8, 213:16, 213:17, 219:9
**government -issued** [4] - 213:8, 213:16, 213:17, 219:9
**grade** [1] - 62:19
**Grade** [5] - 209:20, 209:21, 304:8, 304:9
**great** [3] - 9:18, 82:17, 178:10
**greater** [2] - 160:6, 218:13
**Greene** [34] - 20:5, 51:18, 54:7, 54:18, 55:19, 57:5, 84:4, 84:5, 93:16, 93:20, 126:15, 126:24, 127:6, 139:18, 140:12, 142:5, 142:14, 144:2, 169:7, 175:4, 175:12, 176:10, 176:16, 196:15, 204:4, 225:11, 259:24, 260:4, 260:21, 261:17, 278:8, 278:20
**Greene's** [2] - 51:19, 57:10
**groom** [2] - 121:21, 123:3
**groomed** [4] - 121:12, 121:17, 122:18, 123:11
**grooming** [3] - 119:3, 119:14, 121:3
**group** [2] - 197:20, 198:4
**guess** [55] - 10:11, 10:12, 15:15, 17:17, 18:6, 19:5, 28:1, 29:25, 42:11, 42:13, 42:25, 51:13, 51:14, 57:22, 59:11, 59:20, 77:4, 78:13, 81:6, 81:25, 90:6, 92:8, 95:16, 98:10, 99:4, 102:12, 102:13, 103:7, 105:2, 118:10, 118:11, 118:19, 125:19, 125:20, 147:3, 158:15, 161:16, 162:7, 162:18,

180:18, 184:25, 192:13, 192:23, 198:18, 212:19, 224:17, 224:19, 226:8, 239:25, 245:4, 245:16, 250:11, 250:21, 256:2, 306:11
**guilty** [1] - 177:15
**guy** [5] - 108:11, 108:13, 126:15, 175:22, 180:16
**guys** [9] - 55:23, 78:14, 82:12, 114:4, 125:15, 126:1, 138:3, 150:19, 248:8

## H

**hair** [39] - 36:3, 36:4, 76:1, 77:21, 78:24, 90:9, 90:10, 90:11, 90:13, 90:16, 90:19, 117:1, 117:5, 117:12, 117:18, 117:21, 120:4, 122:3, 122:10, 123:4, 123:13, 123:25, 124:6, 124:13, 160:4, 160:8, 160:20, 207:21, 207:25, 208:11, 209:4, 236:18, 280:15, 285:17, 292:20, 293:1, 294:12, 294:14, 294:17
**hairstyle** [3] - 235:6, 236:19, 236:20
**hairy** [1] - 279:1
**half** [5] - 63:18, 162:10, 164:18, 285:9, 285:18
**halfway** [1] - 18:7
**hand** [4] - 29:20, 43:2, 217:17, 299:11
**handbook** [1] - 114:22
**handled** [2] - 150:2, 191:13
**handwriting** [1] - 221:20
**hang** [1] - 273:11
**happy** [1] - 50:11
**harassing** [1] - 48:21
**hard** [10] - 48:22, 76:8, 100:15, 179:12, 212:20, 222:6, 234:6, 243:15, 243:24, 273:9
**harder** [2] - 163:25, 164:3

harm [1] - 233:16
hash [6] - 16:25, 17:2, 17:7, 17:11, 17:13, 17:14
hat [2] - 76:1, 76:4
hats [1] - 76:7
head [6] - 38:10, 60:13, 148:18, 190:14, 190:17, 231:20
header [2] - 46:17, 226:8
headshot [1] - 239:2
hear [5] - 16:25, 248:17, 284:16, 284:18, 293:9
heard [12] - 4:4, 20:17, 43:23, 52:2, 54:20, 54:22, 111:14, 119:22, 120:3, 194:13, 250:10, 258:11
hearing [5] - 248:22, 249:23, 250:5, 263:12, 263:14
hearings [1] - 276:3
Heart [12] - 157:25, 159:24, 207:2, 207:6, 224:8, 224:10, 224:12, 224:20, 224:21, 230:2, 244:19, 272:22
heaven [1] - 226:6
held [1] - 4:8
help [6] - 175:22, 192:7, 193:1, 193:12, 194:21, 262:6
helpful [1] - 232:5
helps [1] - 9:25
herself [1] - 269:3
hesitate [2] - 228:7, 228:10
Hewett [1] - 2:4
HH [1] - 308:14
hide [1] - 137:6
hiding [2] - 137:13, 163:6
high [1] - 209:24
higher [2] - 61:14
highlighted [2] - 282:3, 282:15
highlights [1] - 160:18
highly [2] - 47:14
himself [1] - 163:17
hindsight [2] - 49:6, 190:24
history [9] - 40:21, 41:4, 41:18, 52:16,

53:3, 54:1, 54:2, 105:16, 131:25
hit [2] - 35:9, 90:7
hits [1] - 46:8
hmm [1] - 33:23
hoard [1] - 136:21
hoarding [2] - 136:23, 137:3
hold [4] - 45:10, 45:25, 51:1
holding [12] - 13:5, 128:1, 165:8, 219:14, 240:15, 270:9, 279:22, 280:17, 280:19, 281:2, 281:7, 281:19
home [4] - 233:18, 233:19, 251:11, 251:14
honest [2] - 12:10, 136:4
honestly [15] - 33:18, 33:24, 56:5, 56:7, 61:20, 102:11, 102:22, 111:8, 112:25, 114:16, 115:3, 152:14, 226:10, 238:25, 248:23
hope [2] - 12:21, 153:9
hoping [1] - 48:12
hour [2] - 82:13, 164:18
housed [2] - 147:25, 227:17
HSI [3] - 22:18, 22:23, 73:12
human [3] - 60:25, 188:25, 302:2
hyperbolic [1] - 301:11
hypothetical [12] - 145:23, 177:2, 177:8, 212:10, 212:11, 213:14, 215:7, 215:8, 215:9, 215:15, 245:19, 300:13
hypothetically [3] - 147:9, 177:9, 212:13

**I**

ICAC [23] - 5:21, 5:25, 6:4, 33:6, 40:23, 42:5, 54:4, 57:7, 57:10, 57:12, 60:18, 88:4, 88:6, 95:9, 155:18, 198:17, 218:12, 226:23,

261:4, 262:2, 262:5, 279:7
ID [9] - 10:20, 16:23, 216:11, 216:14, 216:23, 216:24, 218:5, 219:9, 242:11
idea [8] - 27:13, 27:19, 119:8, 169:4, 170:8, 178:11, 224:22, 268:11
Identification [2] - 308:21, 308:22
identification [10] - 14:9, 38:18, 43:6, 45:2, 85:24, 107:4, 161:10, 223:24, 241:20, 279:14
identified [10] - 17:4, 17:23, 18:23, 21:18, 28:6, 28:17, 29:13, 145:14, 202:13, 224:9
identifier [1] - 19:25
identifiers [1] - 14:20
identifies [1] - 224:4
identify [15] - 18:25, 19:10, 19:20, 21:4, 21:15, 24:8, 28:22, 29:15, 38:21, 50:8, 52:24, 54:7, 148:16, 155:16, 187:16
identifying [1] - 221:17
identity [2] - 155:9, 268:1
IDS [1] - 227:18
IDs [7] - 153:25, 213:8, 214:1, 214:5, 242:9, 242:13, 280:4
II [1] - 2:3
illegal [6] - 67:1, 148:8, 249:12, 250:4, 250:15, 250:22
illegally [1] - 72:17
illicit [1] - 249:5
illness [2] - 179:14, 179:15
image [244] - 16:9, 17:4, 17:5, 17:16, 17:23, 18:1, 18:4, 21:6, 21:7, 23:16, 27:13, 27:19, 28:3, 29:14, 29:17, 29:18, 30:22, 31:3, 31:4, 31:7, 31:10, 31:11, 31:22, 32:6, 32:17, 33:13, 33:14, 34:6, 34:7, 34:15, 35:1, 35:4, 36:15, 36:22,

36:23, 37:9, 37:10, 37:15, 37:17, 37:21, 37:25, 38:7, 39:2, 39:6, 39:15, 40:4, 40:9, 40:15, 40:20, 41:21, 44:5, 51:23, 54:24, 55:4, 56:14, 56:17, 56:19, 57:1, 57:2, 57:16, 57:24, 58:14, 61:8, 61:9, 62:9, 62:24, 63:2, 67:14, 68:5, 70:10, 70:11, 70:17, 71:11, 73:24, 76:15, 77:6, 77:7, 77:22, 78:9, 78:15, 79:3, 79:20, 80:8, 83:14, 86:19, 89:13, 91:4, 91:9, 91:16, 91:18, 96:15, 98:14, 99:12, 100:11, 103:1, 106:24, 107:22, 110:1, 110:9, 111:15, 111:18, 111:23, 112:6, 112:9, 113:24, 114:10, 126:24, 132:21, 132:22, 133:13, 133:16, 133:24, 136:7, 138:1, 138:3, 138:4, 138:5, 138:13, 138:19, 139:2, 139:7, 139:15, 143:12, 143:13, 148:3, 148:9, 157:9, 157:10, 157:11, 157:15, 157:21, 157:23, 158:1, 158:3, 158:22, 159:1, 159:3, 159:4, 159:18, 159:23, 160:1, 162:18, 162:20, 163:7, 163:8, 163:13, 163:14, 163:23, 170:13, 172:3, 175:15, 175:20, 175:23, 176:21, 177:12, 182:7, 184:4, 184:5, 184:6, 184:17, 185:3, 185:8, 185:13, 185:14, 187:4, 187:7, 187:10, 201:16, 201:25, 202:20, 202:23, 203:11, 205:7, 205:17, 207:6, 207:9, 207:11, 210:3, 219:11,

219:20, 221:8, 223:4, 225:15, 226:5, 230:25, 231:7, 232:21, 234:3, 234:17, 234:18, 234:23, 235:2, 235:13, 244:18, 244:20, 244:22, 245:14, 246:23, 247:13, 247:19, 247:23, 248:5, 252:7, 252:13, 252:17, 253:1, 253:9, 253:13, 253:14, 253:17, 255:2, 255:14, 255:16, 255:17, 257:6, 258:12, 258:17, 258:20, 267:15, 267:21, 271:17, 271:23, 272:14, 272:15, 272:20, 274:18, 277:12, 277:22, 278:5, 279:25, 280:22, 281:1, 282:12, 282:21, 283:19, 283:20, 287:16, 288:21, 304:4, 304:6
imagery [1] - 85:20
images [192] - 7:8, 7:10, 8:21, 8:22, 13:5, 25:14, 26:8, 27:9, 34:3, 34:6, 40:21, 41:19, 52:16, 53:4, 54:3, 56:9, 56:12, 62:14, 62:17, 66:11, 66:15, 67:25, 68:1, 72:6, 77:17, 91:21, 95:10, 99:8, 126:25, 127:4, 128:23, 132:24, 133:10, 135:25, 136:2, 136:3, 136:13, 137:3, 137:13, 137:18, 137:20, 137:23, 137:25, 138:2, 138:8, 138:16, 138:20, 139:19, 139:20, 140:7, 144:3, 144:4, 144:6, 144:8, 145:16, 146:24, 150:12, 151:20, 154:24, 156:13, 156:14, 156:18, 157:3, 157:5, 157:6, 157:8, 163:4, 169:3, 187:21, 204:8,

204:10, 204:11, 204:22, 205:1, 205:3, 205:11, 206:1, 206:20, 206:22, 211:14, 211:15, 211:24, 213:5, 219:1, 219:7, 219:10, 219:23, 223:2, 223:14, 223:19, 227:8, 227:9, 227:15, 227:23, 228:8, 229:12, 233:23, 233:24, 234:1, 244:8, 247:9, 247:14, 247:25, 249:5, 249:12, 249:20, 250:3, 250:15, 250:23, 251:18, 251:23, 252:2, 252:5, 252:18, 252:23, 252:24, 254:1, 254:4, 254:7, 254:23, 255:14, 255:16, 255:17, 255:18, 255:24, 255:25, 256:3, 256:12, 256:23, 256:24, 257:2, 257:4, 257:11, 257:14, 257:24, 258:5, 258:7, 258:8, 258:10, 258:19, 259:1, 259:17, 259:20, 259:21, 260:18, 263:21, 263:24, 264:1, 266:21, 267:19, 268:15, 268:18, 269:12, 269:19, 270:4, 270:8, 270:21, 271:4, 271:16, 271:20, 272:4, 272:14, 275:14, 275:20, 276:7, 276:10, 276:14, 278:8, 278:9, 278:11, 279:9, 279:20, 279:25, 281:1, 281:18, 283:19, 285:24, 286:9, 286:13, 288:4, 288:25, 291:22, 292:17, 294:16, 295:11, 296:12, 306:12
**immediately** [4] - 29:13, 29:15, 32:14, 34:25

**importance** [1] - 135:3
**important** [3] - 15:13, 42:12, 135:9
**impression** [1] - 289:11
**imprinted** [1] - 159:23
**improper** [1] - 133:12
**inaccurately** [1] - 103:21
**inappropriate** [1] - 47:15
**incident** [10] - 15:6, 15:10, 15:13, 15:18, 87:13, 87:14, 87:16, 100:24, 135:14, 217:4
**include** [5] - 39:25, 164:1, 172:5, 183:16, 278:25
**included** [6] - 71:18, 96:3, 179:3, 255:15, 255:19, 255:24
**includes** [2] - 86:21, 170:18
**including** [5] - 87:16, 157:15, 159:4, 194:25, 198:23
**incorrect** [4] - 35:5, 35:24, 36:11, 89:17
**indicate** [2] - 14:16, 62:20
**indicates** [1] - 17:12
**indication** [2] - 123:9, 281:3
**indiscrepancy** [1] - 295:2
**individual** [15] - 1:4, 1:7, 1:9, 5:17, 60:25, 104:1, 106:14, 110:3, 125:8, 163:6, 166:18, 170:17, 310:2, 310:3, 310:4
**individuals** [2] - 56:9, 178:13
**industry** [1] - 57:20
**information** [82] - 11:5, 11:6, 11:9, 17:21, 20:21, 28:2, 30:13, 35:22, 52:19, 52:24, 53:10, 84:2, 84:14, 89:20, 89:21, 105:12, 106:17, 109:6, 131:17, 131:22, 132:12, 134:14, 134:16, 134:22, 135:3, 139:14, 139:20, 140:6, 141:20, 141:24, 142:3, 142:6, 142:16,

142:21, 143:2, 143:7, 143:16, 144:19, 144:21, 145:8, 145:16, 146:7, 146:12, 146:13, 146:14, 147:10, 147:13, 147:15, 147:17, 147:23, 149:6, 150:1, 183:23, 188:16, 195:13, 196:1, 196:5, 196:14, 197:4, 197:12, 197:13, 197:15, 197:16, 199:23, 200:25, 213:20, 213:22, 214:7, 214:14, 214:18, 215:16, 216:23, 219:12, 219:19, 241:14, 248:23, 250:2, 250:6, 266:7, 270:20, 280:8, 280:24
**informed** [1] - 193:7
**initial** [10] - 7:15, 19:16, 19:19, 31:10, 31:12, 31:14, 202:23, 259:18, 260:11, 260:12
**initiate** [1] - 154:11
**input** [2] - 30:13, 30:18
**inputted** [1] - 30:1
**instance** [1] - 252:7
**instead** [1] - 66:5
**intellectual** [1] - 45:8
**intelligence** [1] - 48:9
**intentionally** [4] - 86:18, 172:2, 177:19, 229:2
**interest** [2] - 25:24
**interested** [1] - 309:14
**Internet** [31] - 6:6, 70:4, 70:8, 70:12, 84:18, 103:1, 110:18, 110:25, 111:16, 111:20, 112:2, 112:11, 113:4, 113:13, 126:25, 127:4, 127:8, 140:21, 141:13, 143:17, 163:4, 228:8, 229:12, 229:21, 233:24, 247:7, 247:10, 247:16, 247:25, 248:12, 265:18

**internet** [1] - 247:16
**Internet-based** [1] - 112:2
**Interpol** [1] - 218:16
**Interpol/FBI** [1] - 218:9
**interpret** [2] - 101:15, 226:9
**interrogating** [2] - 189:12, 189:17
**interrupt** [3] - 18:12, 194:11, 217:25
**introduce** [1] - 4:14
**introduced** [2] - 5:14, 203:9
**investigate** [12] - 72:24, 73:1, 145:2, 155:9, 184:16, 184:21, 186:22, 186:25, 187:3, 187:12, 215:1, 229:5
**investigated** [4] - 51:22, 99:3, 182:13, 187:2
**investigating** [1] - 70:8
**investigation** [82] - 13:14, 14:14, 16:13, 18:23, 18:24, 18:25, 19:1, 19:3, 19:9, 19:16, 19:20, 21:4, 21:19, 22:3, 22:6, 32:24, 55:16, 67:11, 95:22, 105:8, 105:20, 129:13, 129:18, 130:24, 148:9, 150:2, 154:19, 154:20, 155:4, 155:13, 155:15, 156:3, 156:4, 156:8, 175:5, 178:21, 178:22, 178:23, 179:6, 180:22, 182:13, 183:9, 183:13, 183:16, 183:18, 183:21, 184:9, 184:12, 184:25, 185:1, 185:2, 185:7, 186:11, 186:18, 186:19, 187:20, 187:21, 188:3, 188:14, 188:15, 190:23, 191:2, 191:5, 191:13, 193:19, 194:5, 194:22, 195:15, 196:22, 197:25, 199:20, 202:14, 216:4, 217:8,

230:12, 245:21, 260:11, 262:4, 264:15, 268:9, 268:12, 276:14
**investigations** [10] - 18:24, 40:24, 54:5, 96:1, 96:3, 186:1, 190:25, 191:18, 195:22, 279:7
**investigative** [7] - 10:2, 11:15, 12:3, 34:18, 36:21, 196:17, 222:7
**investigator** [19] - 24:24, 33:6, 34:19, 38:5, 51:16, 54:6, 55:5, 57:10, 57:12, 84:17, 141:12, 148:1, 226:23, 229:5, 236:8, 242:2, 249:7, 249:18, 262:14
**investigators** [5] - 40:23, 42:6, 51:12, 54:5, 57:7
**involved** [8] - 79:6, 96:9, 127:8, 181:17, 197:24, 198:7, 201:10, 239:22
**involvement** [1] - 201:8
**involving** [1] - 51:23
**iPad** [1] - 245:5
**irregular** [1] - 47:14
**irritation** [1] - 120:16
**issue** [1] - 262:2
**issued** [8] - 134:3, 203:19, 213:8, 213:16, 213:17, 219:9, 267:13, 267:16
**issues** [3] - 262:11, 263:12, 263:14
**itself** [3] - 123:25, 159:13, 185:1

### J

**Jacksonville** [4] - 2:5, 4:6, 113:23, 264:23
**JACKSONVILLE** [1] - 1:2
**jewelry** [1] - 236:20
**Jimenero** [1] - 261:6
**job** [18] - 23:9, 23:12, 23:13, 24:24, 44:19, 122:24, 166:13, 169:19, 178:22, 212:15, 212:21, 212:22, 214:24, 229:5, 229:7, 265:2,

268:5, 302:4
**JOHNS** [2] - 308:4, 309:3
**Johns** [20] - 1:8, 5:23, 72:23, 101:18, 126:16, 151:1, 169:5, 198:12, 218:14, 265:5, 265:7, 268:17, 269:22, 270:22, 275:12, 275:21, 278:13, 286:15, 286:17, 310:3
**Johns'** [1] - 269:11
**join** [26] - 11:21, 97:9, 97:21, 103:19, 104:25, 105:24, 117:24, 118:8, 122:6, 132:7, 162:13, 164:10, 209:25, 210:10, 210:17, 289:21, 290:2, 290:16, 291:16, 292:5, 293:24, 294:20, 296:19, 300:11, 301:20, 302:12, 303:10, 305:13
**joke** [1] - 58:22
**JOSEPH** [1] - 2:9
**jpg** [1] - 292:20
**judge** [5] - 41:4, 133:13, 133:18, 183:4, 212:21
**judges** [1] - 133:20
**July** [1] - 308:14
**jump** [2] - 221:25, 271:6

### K

**Kaitlyn** [1] - 128:11
**Karry** [2] - 225:13, 225:18
**KATHLEEN** [2] - 1:8, 310:4
**Kathleen** [3] - 2:20, 3:19, 194:20
**keep** [1] - 43:25
**keeping** [1] - 114:7
**KEITH** [1] - 2:3
**Kevin** [2] - 278:8, 278:20
**kind** [24] - 9:25, 15:15, 18:7, 42:14, 83:2, 90:8, 94:1, 97:5, 118:11, 118:19, 118:20, 125:15, 125:20, 131:9, 135:6, 136:1, 151:15, 180:22,

190:13, 196.12, 243:15, 243:24, 255:15, 273:9
**kinds** [1] - 30:25
**knees** [1] - 79:13
**knowing** [12] - 151:23, 170:13, 171:18, 181:25, 188:13, 189:1, 189:23, 190:9, 281:13, 281:17, 305:22, 306:4
**knowingly** [3] - 86:17, 172:1, 177:18
**knowledge** [5] - 126:6, 268:16, 269:23, 276:2, 276:5
**known** [11] - 40:21, 41:18, 52:16, 53:3, 54:2, 69:3, 131:24, 187:3, 187:11, 308:21
**knows** [3] - 54:20, 86:21, 172:5

### L

**lace** [1] - 282:23
**lack** [4] - 123:13, 210:5, 295:7, 298:19
**lacking** [1] - 146:19
**lap** [1] - 46:2
**laptop** [15] - 47:8, 47:9, 107:14, 113:24, 115:6, 115:7, 133:22, 205:16, 227:8, 227:20, 267:13, 267:16, 267:20, 267:21, 292:18
**large** [1] - 301:12
**lascivious** [1] - 18:9
**laser** [2] - 120:4, 120:5
**last** [4] - 10:2, 116:24, 283:8, 291:4
**Latvian** [3] - 161:6, 161:7, 280:17
**law** [25] - 18:16, 42:11, 42:12, 54:12, 72:5, 72:11, 87:24, 107:14, 145:19, 150:7, 150:21, 151:2, 151:22, 152:25, 189:6, 191:25, 202:18, 217:10, 218:13, 218:19, 229:10, 268:5, 270:4, 292:18
**laws** [3] - 141:10, 141:15, 214:21
**Lawshe** [55] - 4:3,

4:18, 5:15, 6:9, 6:10, 6:23, 8:6, 9:8, 12:13, 19:21, 20:11, 21:5, 68:5, 69:12, 69:18, 137:12, 142:18, 143:16, 145:11, 146:15, 147:1, 147:18, 150:10, 150:14, 151:9, 151:22, 153:17, 163:3, 163:17, 172:10, 173:13, 174:1, 175:11, 175:15, 176:17, 177:2, 178:12, 188:8, 188:17, 191:22, 192:3, 192:8, 200:7, 202:13, 202:17, 233:9, 248:16, 250:3, 259:1, 264:13, 264:18, 274:14, 274:24, 279:10, 286:19
**LAWSHE** [2] - 1:3, 310:2
**Lawshe's** [3] - 156:15, 176:3, 268:5
**laymen's** [6] - 15:15, 16:22, 28:1, 77:4, 108:10, 245:3
**layperson's** [1] - 80:16
**lead** [5] - 40:14, 88:8, 210:6, 249:18, 251:6
**learn** [3] - 127:20, 191:3, 278:23
**learned** [3] - 178:20, 179:7, 190:19
**learning** [1] - 191:4
**least** [10] - 67:25, 71:1, 87:19, 110:2, 138:8, 144:14, 169:5, 174:10, 196:2, 212:16
**leave** [2] - 73:6, 260:8
**leaves** [1] - 257:24
**led** [10] - 32:16, 32:25, 36:5, 99:1, 159:1, 174:1, 195:22, 244:13, 274:13, 274:15
**LEE** [2] - 1:3, 310:2
**Lee** [3] - 4:3, 19:20, 20:11
**leeway** [1] - 47:23
**left** [3] - 114:10, 115:7, 299:13
**legal** [6] - 19:25, 31:16, 31:17, 66:19,

66:21, 219:18
**Leon** [2] - 1:19, 4:8
**less** [16] - 160:5, 160:19, 161:21, 162:9, 162:10, 164:6, 165:20, 166:1, 206:4, 290:3, 291:25, 293:1, 299:3, 299:12, 302:21, 302:24
**letter** [20] - 107:10, 116:5, 128:25, 129:17, 129:19, 131:12, 206:21, 206:25, 271:12, 282:6, 282:13, 282:19, 283:6, 283:14, 283:16, 283:24, 284:7, 284:10, 285:1, 285:2
**letter's** [1] - 290:9
**Letters** [1] - 3:18
**letters** [7] - 268:21, 271:4, 273:6, 273:18, 274:8, 282:6, 285:25
**level** [2] - 47:25, 189:19
**license** [5] - 216:17, 216:19, 217:2, 217:12, 242:10
**License** [1] - 308:22
**licensed** [4] - 25:10, 151:18, 152:10, 219:10
**lie** [1] - 118:4
**lieutenant** [6] - 192:5, 198:5, 200:16, 200:17, 200:20
**lieutenants** [1] - 200:21
**life** [5] - 65:10, 158:25, 189:2, 189:23, 231:13
**likely** [21] - 31:11, 36:15, 36:22, 37:2, 37:3, 37:6, 37:10, 37:14, 37:17, 39:15, 40:5, 40:9, 40:15, 68:5, 73:8, 110:12, 229:24, 233:24, 247:7, 247:9, 247:25
**limited** [5] - 121:25, 214:7, 214:18, 214:20, 215:16
**Line** [4] - 43:21, 74:18, 83:12, 83:20
**line** [18] - 3:13, 14:4, 15:7, 66:5, 130:14, 229:25, 276:25,

279:18, 282:16, 282:20, 283:8, 283:18, 283:25, 284:3, 284:4, 284:22, 285:8, 285:15
**LINE** [1] - 310:7
**Lines** [6] - 277:4, 277:10, 277:17, 277:25, 278:2, 278:7
**lines** [2] - 278:21, 283:3
**lingerie** [1] - 279:2
**link** [4] - 45:23, 47:2, 245:6, 245:9
**linked** [1] - 134:11
**links** [2] - 44:2, 45:5
**list** [2] - 134:18, 159:25
**listed** [12] - 29:18, 41:6, 62:2, 144:4, 144:7, 200:14, 218:17, 224:11, 224:13, 224:24, 234:15, 235:17
**lists** [1] - 255:5
**literally** [2] - 216:7, 234:3
**literature** [1] - 206:15
**litigate** [1] - 48:11
**living** [2] - 60:11, 214:23
**local** [1] - 218:11
**locate** [12] - 44:5, 126:24, 127:3, 127:7, 140:5, 141:24, 142:17, 143:3, 143:17, 148:23, 163:4, 187:16
**located** [10] - 22:21, 127:20, 135:24, 138:4, 138:5, 139:19, 139:24, 140:16, 140:20, 148:16
**look** [58] - 29:6, 33:13, 33:22, 56:21, 58:18, 58:25, 59:7, 59:8, 59:13, 59:22, 59:23, 60:20, 60:21, 63:16, 66:10, 70:10, 75:19, 75:25, 80:6, 80:8, 83:18, 100:12, 104:11, 107:2, 114:25, 121:15, 139:16, 155:4, 161:20, 162:4, 162:9, 162:10, 165:17, 172:22,

| | **M** | makeup's [1] - 236:11 | 67:10, 71:5, 71:10, | 275:12, 275:14 |
|---|---|---|---|---|
| 190:24, 192:25, 211:15, 230:25, 232:20, 232:21, 234:20, 243:7, 243:9, 243:12, 243:18, 244:5, 244:16, 246:21, 251:20, 253:1, 254:1, 255:1, 277:5, 282:17, 301:13, 301:16, 303:20, 306:11 | M.D [1] - 3:19 ma'am [70] - 5:4, 22:1, 263:13, 263:22, 263:25, 264:3, 264:14, 264:19, 265:3, 265:10, 265:23, 266:3, 266:14, 266:17, 267:10, 267:18, 267:24, 268:3, 268:8, 268:19, | man [1] - 190:12 manipulated [5] - 153:6, 213:25, 242:24, 280:4 March [9] - 1:16, 4:10, 6:22, 8:8, 21:21, 156:11, 156:12, 307:17, 308:8 mark [7] - 13:21, 38:13, 44:21, 94:3, 94:9, 160:23, 241:17 marked [13] - 3:25, | 72:1, 72:25, 73:9, 74:4, 75:6, 75:22, 76:13, 77:2, 77:20, 77:24, 79:2, 80:7, 80:16, 80:21, 80:25, 81:4, 82:2, 83:16, 84:21, 85:16, 91:21, 93:20, 94:19, 96:23, 101:21, 101:25, 104:20, 110:6, 111:1, 111:9, | means [13] - 27:24, 28:5, 28:13, 29:8, 58:1, 81:25, 116:15, 116:22, 118:18, 169:14, 173:2, 206:7, 210:2 meant [2] - 117:7, 118:2 med [1] - 183:22 med-art.com [1] - 183:22 |

*(continued full index — columns merged in reading order below)*

190:24, 192:25, 211:15, 230:25, 232:20, 232:21, 234:20, 243:7, 243:9, 243:12, 243:18, 244:5, 244:16, 246:21, 251:20, 253:1, 254:1, 255:1, 277:5, 282:17, 301:13, 301:16, 303:20, 306:11

**looked** [38] - 29:13, 32:10, 32:11, 34:15, 35:1, 35:9, 57:1, 60:6, 61:16, 63:5, 63:9, 66:6, 73:19, 73:24, 79:3, 79:25, 80:4, 81:15, 93:12, 98:14, 99:8, 99:11, 115:6, 156:24, 172:15, 172:17, 173:16, 182:4, 201:19, 206:14, 232:19, 235:23, 257:4, 259:23, 271:18, 285:24, 287:8, 298:5

**looking** [32] - 14:2, 31:7, 32:8, 61:5, 77:8, 77:9, 80:9, 80:20, 87:2, 104:2, 104:22, 122:9, 134:18, 156:25, 157:1, 159:9, 165:1, 190:2, 208:17, 226:1, 228:20, 228:25, 244:8, 254:6, 258:15, 258:16, 273:5, 281:19, 281:25, 289:24, 304:14, 305:21

**looks** [23] - 33:5, 66:19, 75:1, 75:10, 75:23, 76:21, 89:11, 129:8, 131:22, 180:20, 226:7, 231:22, 234:22, 236:2, 243:11, 243:19, 271:11, 272:12, 272:15, 298:2, 301:22, 302:17

**lost** [2] - 215:10, 283:25

**lot's** [1] - 166:21

**luring** [1] - 76:6

**lying** [1] - 142:14

**M**

**M.D** [1] - 3:19

**ma'am** [70] - 5:4, 22:1, 263:13, 263:22, 263:25, 264:3, 264:14, 264:19, 265:3, 265:10, 265:23, 266:3, 266:14, 266:17, 267:10, 267:18, 267:24, 268:3, 268:8, 268:19, 269:1, 269:20, 270:1, 270:23, 271:1, 271:5, 271:10, 272:8, 272:19, 274:3, 274:17, 275:8, 275:18, 276:2, 276:5, 276:12, 276:16, 276:18, 276:22, 277:8, 277:16, 277:19, 277:23, 278:14, 279:17, 279:19, 280:6, 280:11, 280:12, 280:18, 280:21, 280:25, 281:20, 282:24, 283:2, 283:7, 283:12, 284:8, 284:11, 285:6, 285:11, 285:14, 285:21, 286:4, 286:11, 286:16, 286:20, 286:24, 286:25

**magazine** [7] - 63:10, 63:11, 64:5, 225:24, 226:3, 226:4, 226:8

**magazines** [1] - 64:7

**mail** [13] - 25:11, 30:19, 128:16, 134:24, 148:2, 148:7, 149:7, 149:9, 150:10, 154:14, 274:8

**mailed** [3] - 25:8, 145:15, 145:20

**mailing** [1] - 148:5

**main** [3] - 55:10, 74:22, 116:24

**maintain** [2] - 141:16, 141:20

**major** [2] - 124:14, 188:3

**majority** [2] - 63:20, 63:22

**makeup** [3] - 236:22, 236:23, 237:12

**makeup's** [1] - 236:11

**man** [1] - 190:12

**manipulated** [5] - 153:6, 213:25, 242:24, 280:4

**March** [9] - 1:16, 4:10, 6:22, 8:8, 21:21, 156:11, 156:12, 307:17, 308:8

**mark** [7] - 13:21, 38:13, 44:21, 94:3, 94:9, 160:23, 241:17

**marked** [13] - 3:25, 14:8, 38:17, 43:5, 45:1, 85:23, 89:8, 107:3, 129:10, 161:2, 161:9, 223:23, 241:19

**marking** [1] - 43:12

**marks** [1] - 221:17

**married** [1] - 137:15

**match** [6] - 17:7, 17:11, 17:13, 17:14, 230:1, 230:4

**matching** [2] - 16:25, 108:13

**material** [9] - 12:14, 23:6, 23:17, 26:12, 58:15, 92:16, 171:23, 219:15, 229:6

**maternity** [1] - 260:7

**math** [2] - 87:18, 241:1

**Matt** [5] - 48:23, 74:13, 94:17, 222:4, 262:24

**matter** [6] - 4:3, 8:3, 30:21, 193:2, 256:21, 258:18

**MATTHEW** [1] - 2:9

**Matthew** [1] - 4:19

**mature** [1] - 75:1

**maturity** [3] - 83:14, 206:16, 295:9

**mcarson@ sniffenlaw.com** [1] - 2:12

**McDonald's** [1] - 108:12

**MD5** [3] - 16:21, 16:22

**mean** [165] - 9:2, 16:8, 18:2, 18:5, 18:12, 27:23, 28:19, 29:24, 31:8, 38:5, 42:7, 44:9, 54:18, 57:25, 58:8, 58:22, 59:11, 60:11, 60:18, 62:10, 63:10, 63:14, 63:24, 64:16, 65:8, 65:9, 65:20, 66:10, 66:18, 67:10, 71:5, 71:10, 72:1, 72:25, 73:9, 74:4, 75:6, 75:22, 76:13, 77:2, 77:20, 77:24, 79:2, 80:7, 80:16, 80:21, 80:25, 81:4, 82:2, 83:16, 84:21, 85:16, 91:21, 93:20, 94:19, 96:23, 101:21, 101:25, 104:20, 110:6, 111:1, 111:9, 111:10, 111:13, 111:15, 112:7, 114:8, 117:2, 117:3, 117:6, 117:8, 120:11, 120:12, 121:10, 121:14, 121:24, 122:1, 122:12, 122:23, 123:1, 124:4, 125:12, 125:17, 130:13, 132:10, 133:11, 133:19, 139:7, 141:1, 142:10, 144:2, 144:25, 153:4, 155:21, 156:19, 156:24, 157:2, 157:14, 158:17, 158:24, 160:17, 162:17, 166:18, 175:3, 176:9, 176:21, 177:13, 178:11, 185:3, 185:13, 186:17, 188:2, 191:7, 191:11, 194:10, 196:24, 197:3, 197:10, 208:3, 210:6, 210:13, 211:21, 214:24, 215:10, 216:7, 220:24, 221:1, 221:6, 224:17, 226:21, 226:22, 227:7, 227:22, 228:3, 228:20, 230:5, 230:22, 232:16, 233:24, 233:25, 236:7, 236:11, 236:17, 236:25, 237:19, 238:2, 238:19, 239:12, 240:21, 246:1, 250:11, 255:10, 260:12, 262:14, 268:25, 273:5, 301:10, 303:9, 303:25

**meaning** [3] - 266:5, 275:12, 275:14

**means** [13] - 27:24, 28:5, 28:13, 29:8, 58:1, 81:25, 116:15, 116:22, 118:18, 169:14, 173:2, 206:7, 210:2

**meant** [2] - 117:7, 118:2

**med** [1] - 183:22

**med-art.com** [1] - 183:22

**media** [2] - 113:15, 247:16

**Media** [4] - 4:1, 82:19, 82:24, 168:24

**medical** [7] - 1:9, 102:14, 106:5, 159:8, 210:23, 210:24, 310:4

**Medlock** [8] - 1:24, 4:13, 308:5, 308:12, 308:13, 309:4, 309:18, 309:18

**meet** [5] - 113:21, 114:4, 115:20, 265:12, 266:4

**meeting** [17] - 113:22, 114:9, 114:11, 115:6, 115:15, 127:1, 127:14, 127:17, 203:14, 264:14, 266:5, 266:8, 266:19, 267:7, 267:20, 268:6, 273:22

**meetings** [2] - 266:1, 274:2

**Melania** [23] - 288:17, 288:18, 289:7, 290:12, 290:13, 291:4, 292:2, 293:11, 293:21, 294:16, 295:10, 296:15, 299:12, 299:14, 302:7, 302:8, 303:6, 303:7, 303:13, 303:17, 303:22, 307:1, 307:2

**Melanie** [1] - 288:21

**Melina** [2] - 279:22, 280:1

**members** [1] - 66:6

**membership** [1] - 218:12

**memory** [1] - 262:11

**men** [1] - 122:8

**message** [2] - 113:16, 274:9

**met** [78] - 3:16, 21:11,

| | | | | |
|---|---|---|---|---|
| 21:14, 21:22, 25:9, 25:24, 26:12, 29:14, 29:16, 31:4, 31:11, 31:22, 32:7, 33:2, 34:7, 36:16, 36:23, 37:11, 37:15, 37:25, 39:3, 39:7, 39:16, 40:4, 40:9, 41:22, 42:3, 42:20, 44:5, 44:15, 45:6, 45:24, 46:13, 51:23, 52:3, 52:5, 52:17, 52:25, 54:24, 55:4, 55:13, 71:2, 71:9, 71:11, 83:4, 84:3, 84:6, 95:1, 102:15, 102:19, 106:9, 106:11, 113:23, 115:19, 115:22, 126:15, 131:24, 144:14, 144:19, 144:22, 145:9, 145:13, 146:14, 147:14, 174:20, 183:17, 184:2, 207:24, 208:2, 230:24, 232:18, 232:22, 265:24, 271:8, 273:24, 278:16, 278:17, 278:24<br>**met-art** [1] - 21:11<br>**met-art.com** [62] - 3:16, 21:14, 21:22, 25:9, 25:24, 26:12, 29:14, 29:16, 31:4, 31:11, 31:22, 32:7, 33:2, 34:7, 36:16, 36:23, 37:11, 37:15, 37:25, 39:3, 39:7, 39:16, 40:4, 40:9, 41:22, 42:3, 42:20, 44:5, 44:15, 45:6, 45:24, 46:13, 51:23, 52:3, 52:5, 52:17, 52:25, 54:24, 55:4, 55:13, 71:2, 71:9, 71:11, 83:4, 84:3, 84:6, 131:24, 144:14, 144:19, 144:22, 145:9, 145:13, 146:14, 174:20, 183:17, 184:2, 230:24, 232:18, 232:22, 278:16, 278:17, 278:24<br>**met-art.com's** [1] - 147:14<br>**MetaArt** [1] - 43:25 | **MetArt** [25] - 21:10, 26:15, 37:2, 37:4, 38:6, 40:6, 42:5, 43:1, 43:24, 43:25, 44:6, 44:17, 49:24, 51:13, 51:17, 51:20, 54:19, 54:21, 83:21, 84:1, 144:20, 147:19, 183:20, 184:5, 184:6<br>**method** [4] - 103:7, 103:9, 103:10, 103:12<br>**methods** [1] - 119:14<br>**MICHAEL** [1] - 2:3<br>**Michael** [7] - 4:17, 43:9, 47:22, 161:2, 169:23, 223:14, 287:1<br>**Michael's** [1] - 222:2<br>**Middle** [1] - 4:5<br>**MIDDLE** [1] - 1:1<br>**might** [17] - 59:7, 64:21, 64:22, 66:15, 71:15, 109:21, 120:18, 126:1, 151:17, 169:14, 172:21, 178:2, 195:22, 221:19, 221:24, 245:13, 250:12<br>**Mikayla** [8] - 2:14, 3:15, 3:18, 4:3, 4:4, 4:20, 5:12, 307:16<br>**MIKAYLA** [8] - 1:7, 1:14, 3:3, 5:1, 308:7, 309:6, 310:3, 310:25<br>**mind** [7] - 25:25, 31:21, 152:11, 153:17, 177:20, 233:11, 296:18<br>**mine** [1] - 46:8<br>**minor** [51] - 18:8, 28:4, 28:6, 28:15, 28:16, 33:14, 35:7, 62:9, 62:21, 69:24, 72:3, 73:18, 73:24, 75:11, 75:14, 76:22, 83:15, 91:15, 92:22, 97:4, 102:4, 124:1, 126:3, 126:6, 159:2, 159:15, 164:24, 166:19, 166:23, 166:25, 167:11, 169:8, 172:10, 172:15, 172:18, 174:2, 175:17, 177:6, 177:16, 177:20, 178:1, 178:2, 182:10, | 225:1, 225:14, 277:12, 277:22, 302:5, 306:3<br>**minors** [17] - 8:24, 9:6, 24:5, 72:18, 152:6, 155:19, 165:11, 166:10, 204:15, 212:16, 213:4, 229:9, 263:21, 275:15, 275:22, 276:15, 285:24<br>**minute** [6] - 13:12, 16:1, 16:7, 27:1, 76:19, 91:14<br>**minutes** [3] - 140:17, 246:12, 278:9<br>**mischaracterization** [2] - 192:20, 194:18<br>**mischaracterizes** [1] - 298:18<br>**mischaracterizing** [2] - 158:14, 192:24<br>**misheard** [1] - 193:25<br>**missing** [1] - 131:7<br>**Missing** [3] - 13:20, 108:20, 109:14<br>**misspeak** [4] - 105:6, 129:6, 165:24, 253:25<br>**misspeaking** [1] - 40:12<br>**misspoke** [2] - 193:22, 194:8<br>**misstate** [1] - 31:25<br>**mistaken** [7] - 6:2, 15:25, 34:22, 54:12, 56:3, 56:7, 76:8<br>**misunderstanding** [1] - 117:20<br>**misunderstood** [1] - 272:8<br>**model** [81] - 27:9, 28:9, 28:14, 28:23, 35:17, 56:22, 64:21, 68:24, 68:25, 69:3, 69:13, 69:19, 71:22, 73:19, 81:15, 89:22, 90:16, 93:12, 97:4, 101:19, 102:4, 103:1, 103:13, 123:24, 138:6, 138:9, 138:17, 138:18, 139:1, 141:1, 148:17, 148:20, 160:24, 161:4, 161:13, 164:6, 207:17, 224:4, 224:12, 230:18, 234:8, 234:18, 234:22, | 237:4, 240:12, 242:23, 244:20, 251:24, 252:5, 256:4, 256:15, 257:19, 257:25, 258:2, 277:2, 278:17, 280:13, 283:20, 284:23, 285:16, 286:9, 287:16, 288:25, 289:15, 291:3, 292:8, 292:9, 298:9, 299:6, 300:5, 300:8, 300:23, 300:25, 301:1, 302:6, 302:8, 302:24, 304:8, 304:21, 306:14<br>**models** [37] - 8:9, 8:21, 10:20, 13:5, 55:20, 67:21, 84:2, 84:19, 84:23, 127:7, 127:20, 139:19, 140:6, 140:16, 140:21, 141:24, 142:17, 143:3, 143:17, 150:13, 151:21, 152:5, 152:17, 153:12, 153:19, 156:7, 168:2, 175:6, 211:24, 213:4, 270:9, 276:10, 279:15, 279:21, 287:10, 301:15, 306:13<br>**models'** [2] - 155:9, 214:9<br>**moment** [1] - 272:25<br>**Monroe** [1] - 2:11<br>**month** [3] - 58:19, 64:19, 294:24<br>**months** [7] - 33:8, 58:13, 88:7, 88:25, 95:2, 142:22, 142:23<br>**moon** [1] - 111:9<br>**most** [21] - 31:10, 42:21, 60:6, 60:9, 67:20, 68:5, 73:8, 77:21, 84:18, 84:22, 110:12, 206:3, 229:24, 233:24, 247:7, 247:9, 247:25, 283:21, 289:17, 291:24<br>**mostly** [1] - 263:18<br>**motion** [2] - 86:19, 172:2<br>**move** [3] - 48:14, 278:5, 283:13<br>**movement** [1] - | 181:19<br>**MR** [538] - 4:17, 4:19, 5:9, 8:14, 9:13, 9:15, 9:16, 9:18, 9:19, 9:21, 9:23, 10:24, 11:17, 11:18, 11:22, 13:23, 14:4, 14:7, 14:10, 18:16, 18:21, 20:20, 21:24, 22:5, 22:8, 22:10, 22:13, 22:19, 23:18, 23:20, 24:16, 24:17, 24:19, 24:23, 25:1, 25:2, 26:1, 26:4, 26:14, 26:17, 27:10, 27:12, 27:15, 27:17, 30:5, 30:8, 35:13, 35:15, 36:17, 36:20, 38:15, 38:19, 39:9, 39:13, 40:16, 40:18, 41:13, 41:15, 43:7, 43:10, 43:14, 43:16, 45:3, 45:10, 45:12, 45:13, 45:15, 45:18, 45:20, 45:22, 45:25, 46:3, 46:5, 46:6, 46:7, 46:10, 46:11, 46:12, 46:13, 46:15, 46:16, 46:21, 46:22, 46:24, 47:1, 47:12, 47:20, 47:21, 48:2, 48:4, 48:13, 48:15, 48:18, 48:19, 48:22, 49:11, 49:20, 49:21, 52:8, 52:9, 66:2, 66:3, 66:4, 66:9, 69:20, 70:2, 70:13, 70:18, 72:9, 72:10, 72:13, 72:15, 73:20, 73:22, 74:13, 74:17, 81:23, 82:7, 82:12, 82:14, 82:15, 82:18, 83:1, 86:1, 86:8, 86:10, 86:11, 86:15, 92:4, 92:12, 93:5, 94:5, 94:6, 94:7, 94:8, 94:17, 94:18, 96:22, 97:7, 97:10, 97:22, 97:25, 98:1, 98:19, 98:21, 98:23, 99:14, 99:15, 100:21, 101:13, 101:24, 103:8, 103:15, 103:23, 104:6, 104:16, 104:24, 105:4, 105:24, 106:8, 106:22, 107:5, 110:5, 110:8, 110:14, 110:17, 110:20, 110:22, 111:21, 111:24, |

112:24, 113:2, 113:5, 113:6, 114:21, 116:9, 117:14, 117:16, 117:23, 118:1, 118:7, 118:12, 119:7, 122:4, 122:11, 123:5, 123:7, 123:21, 124:10, 124:18, 125:3, 125:11, 125:23, 126:11, 127:22, 127:23, 128:3, 128:4, 129:16, 129:24, 131:3, 132:5, 132:8, 132:14, 132:17, 141:4, 141:6, 142:1, 142:4, 142:7, 142:9, 142:11, 142:12, 143:4, 143:5, 143:8, 143:9, 143:18, 143:21, 143:23, 144:1, 146:16, 146:18, 147:2, 147:6, 148:21, 149:1, 150:16, 150:20, 150:24, 151:5, 151:11, 151:14, 151:24, 152:3, 152:7, 152:9, 152:13, 152:15, 152:19, 152:22, 153:8, 153:10, 153:13, 153:16, 153:21, 153:24, 154:3, 154:6, 154:16, 154:21, 155:1, 155:7, 155:11, 155:14, 158:7, 158:8, 158:10, 158:12, 158:17, 158:23, 161:1, 161:4, 161:7, 161:11, 161:22, 162:1, 162:13, 162:15, 162:25, 163:2, 163:10, 163:15, 163:21, 163:24, 164:8, 164:14, 164:17, 164:19, 164:21, 164:22, 164:25, 165:3, 165:13, 165:15, 166:11, 166:14, 166:24, 167:3, 167:6, 167:12, 167:15, 167:16, 167:21, 167:24, 168:5, 168:7, 168:9,

168:11, 168:17, 168:19, 169:1, 169:25, 170:1, 170:2, 170:3, 170:5, 170:20, 170:21, 170:24, 170:25, 171:1, 171:2, 171:3, 171:8, 171:9, 172:23, 173:1, 173:4, 173:10, 175:8, 175:14, 175:25, 176:2, 176:5, 176:6, 176:13, 176:14, 176:18, 176:24, 177:17, 177:21, 178:14, 178:17, 181:5, 181:8, 183:1, 183:11, 183:24, 184:1, 184:18, 184:19, 185:10, 185:15, 187:23, 188:1, 188:4, 188:7, 188:18, 188:22, 189:3, 189:4, 189:25, 190:3, 190:16, 190:18, 191:21, 192:12, 192:17, 192:22, 193:10, 193:17, 193:24, 194:1, 194:2, 194:3, 194:10, 194:12, 194:14, 194:16, 194:19, 195:10, 197:7, 197:9, 200:2, 200:4, 202:25, 203:1, 206:19, 207:16, 207:20, 208:8, 208:20, 209:7, 209:19, 209:22, 209:23, 210:4, 210:8, 210:11, 210:14, 210:19, 210:25, 211:5, 211:9, 211:20, 211:22, 212:3, 212:5, 212:9, 212:14, 212:18, 213:1, 214:12, 214:13, 214:15, 214:19, 215:13, 215:14, 215:21, 215:23, 216:1, 216:5, 217:13, 217:14, 217:25, 218:2, 218:6, 218:8, 218:22, 218:24, 221:11, 221:13, 221:16, 221:22, 222:4, 222:12,

222:15, 222:19, 223:9, 223:11, 223:15, 223:20, 224:1, 230:8, 230:10, 230:13, 230:14, 231:17, 231:18, 232:7, 232:8, 238:4, 238:5, 238:12, 238:18, 240:6, 240:8, 241:3, 241:6, 241:21, 243:1, 243:5, 243:21, 244:1, 245:22, 245:23, 246:10, 246:19, 249:13, 249:17, 253:23, 254:3, 254:14, 254:16, 262:22, 263:1, 263:3, 270:18, 273:2, 273:8, 284:18, 287:1, 287:2, 287:3, 287:5, 289:18, 289:19, 289:22, 289:25, 290:6, 290:15, 290:19, 291:13, 291:14, 291:19, 292:4, 292:6, 293:10, 293:12, 293:13, 293:19, 293:22, 294:2, 294:9, 294:18, 295:1, 295:4, 295:8, 295:15, 296:1, 296:16, 296:17, 296:21, 296:24, 298:15, 298:20, 299:15, 299:23, 300:4, 300:9, 300:15, 301:9, 301:18, 302:1, 302:10, 302:19, 303:8, 303:11, 303:23, 304:2, 304:10, 304:11, 304:20, 304:23, 305:1, 305:4, 305:9, 305:11, 305:14, 305:23, 306:1, 306:5, 306:6, 306:18, 307:9, 307:11, 307:13
**mroberts@nrhnlaw. com** [1] - 2:6
**MS** [130] - 4:21, 8:13, 10:22, 11:21, 14:1, 14:6, 18:12, 18:18, 20:19, 43:8, 43:11, 43:15, 45:16, 45:19, 81:22, 82:3, 82:17,

92:3, 92:10, 93:4, 96:11, 97:9, 97:21, 97:24, 98:18, 100:14, 101:9, 101:23, 103:3, 103:19, 104:5, 104:13, 104:25, 105:23, 106:21, 114:19, 116:8, 117:15, 117:24, 118:8, 119:6, 122:6, 123:16, 124:9, 124:17, 125:1, 125:10, 125:18, 126:10, 129:15, 129:21, 131:2, 132:7, 161:2, 161:5, 161:8, 162:12, 164:10, 167:9, 169:23, 170:4, 191:15, 192:10, 192:18, 192:20, 193:4, 193:16, 194:17, 195:9, 206:18, 207:13, 207:19, 208:6, 208:15, 209:6, 209:16, 209:25, 210:10, 210:17, 211:1, 211:8, 221:25, 222:11, 222:14, 222:17, 223:8, 223:10, 223:13, 223:18, 223:22, 232:5, 262:24, 263:2, 263:4, 263:6, 270:19, 273:4, 273:11, 273:16, 284:13, 284:19, 284:21, 286:21, 289:21, 290:2, 290:16, 291:16, 292:5, 293:7, 293:17, 293:24, 294:6, 294:20, 295:6, 295:17, 296:19, 298:17, 299:16, 300:2, 300:11, 301:3, 301:20, 302:12, 303:10, 304:13, 305:3, 305:13, 306:16, 307:7, 307:12
**multiple** [15] - 6:17, 127:8, 144:12, 144:13, 178:7, 198:4, 198:8, 198:23, 199:4, 200:10, 237:5,

237:10, 239:13, 274:11, 274:15
**multitude** [4] - 30:23, 111:5, 221:4, 238:22
**must** [2] - 170:13, 170:18
**myopic** [1] - 66:15

---

## N

**Nair** [1] - 119:24
**naked** [5] - 74:24, 74:25, 208:19, 279:2, 282:22
**name** [30] - 4:11, 5:11, 16:19, 18:20, 21:9, 24:13, 89:12, 126:18, 148:17, 148:20, 148:22, 159:24, 203:5, 213:21, 214:20, 221:21, 224:5, 230:18, 255:2, 255:3, 257:4, 257:5, 257:7, 263:7, 272:16, 279:21, 280:14, 288:17, 290:13
**named** [2] - 5:15, 126:15
**names** [3] - 144:11, 253:1, 255:5
**narrative** [1] - 7:16
**National** [3] - 13:20, 108:19, 109:14
**nature** [1] - 206:15
**NCMEC** [61] - 7:8, 13:16, 13:17, 13:18, 14:12, 16:13, 27:22, 27:24, 28:13, 28:22, 29:8, 33:12, 34:20, 35:12, 56:18, 66:12, 87:4, 89:14, 107:18, 108:1, 108:19, 110:10, 131:20, 131:23, 132:22, 133:10, 137:25, 138:13, 139:2, 143:13, 145:2, 187:22, 201:17, 202:10, 202:21, 202:23, 204:11, 205:13, 205:17, 206:21, 219:20, 234:19, 234:23, 235:2, 235:13, 251:24, 252:6, 255:16, 256:3, 257:19, 257:25, 260:13, 266:23, 266:24, 271:18,

271:21, 271:24,
287:16, 288:21
**NCMEC's** [1] - 28:25
**necessarily** [1] - 99:17
**necessary** [2] - 143:2,
143:15
**need** [9] - 48:16, 49:9,
96:4, 137:10,
142:16, 147:24,
214:14, 218:20,
239:12
**needed** [9] - 141:24,
142:3, 142:6,
144:19, 144:21,
146:13, 146:24,
147:13, 147:21
**neighbor** [1] - 233:19
**never** [21] - 20:17,
51:20, 54:22, 63:12,
76:4, 83:4, 83:7,
84:13, 100:23,
116:19, 145:13,
161:12, 163:5,
205:7, 228:15,
233:12, 270:8,
270:12, 270:16,
275:20, 296:20
**new** [1] - 88:15
**news** [1] - 49:25
**next** [14] - 59:1, 129:5,
129:13, 130:18,
130:22, 134:8,
135:18, 135:19,
189:11, 189:14,
224:8, 277:9, 285:8,
292:12
**Nicole** [8] - 1:24, 4:13,
308:5, 308:12,
308:13, 309:4,
309:18, 309:18
**night** [2] - 58:23, 99:7
**nine** [3] - 162:4, 278:2,
302:17
**nipples** [1] - 279:2
**NO** [1] - 1:4
**nobody** [1] - 153:4
**non** [1] - 24:14
**non-redacted** [1] -
24:14
**none** [1] - 3:25
**nonverbal** [1] - 62:8
**Nooney** [1] - 2:4
**norm** [1] - 243:4
**normal** [2] - 209:2,
270:2
**normally** [1] - 137:5
**North** [3] - 1:19, 2:11,
4:8
**NOT** [1] - 310:6
**Notary** [2] - 308:6,

308:13
**notate** [1] - 41:9
**notating** [1] - 41:10
**note** [2] - 40:19, 41:17
**notes** [2] - 83:2, 309:9
**nothing** [10] - 25:16,
32:15, 62:7, 62:24,
81:14, 186:5, 187:8,
190:12, 190:15,
190:19
**notice** [1] - 243:6
**noticed** [1] - 32:12
**notoriously** [1] -
272:24
**November** [5] - 3:15,
42:19, 43:10,
276:21, 277:18
**Nowicki** [1] - 2:4
**nude** [2] - 58:14,
279:1
**nudity** [3] - 64:22,
65:6
**number** [13] - 14:21,
19:18, 20:1, 88:12,
88:14, 89:8, 107:15,
134:12, 155:23,
169:24, 287:9,
287:19, 288:8
**Number** [7] - 3:12,
4:2, 4:7, 14:5, 82:20,
82:24, 168:24
**numbers** [1] - 159:25
**numerous** [2] -
134:11, 135:25

---

**O**

---

**oath** [11] - 5:4, 39:5,
40:14, 42:16, 47:6,
47:7, 49:13, 51:11,
53:3, 93:19, 300:23
**OATH** [1] - 308:1
**Oath** ...................
[1] - 3:7
**object** [169] - 8:15,
11:17, 21:24, 22:8,
23:18, 24:16, 24:19,
25:1, 26:1, 26:14,
27:10, 27:15, 30:5,
35:13, 36:17, 39:9,
40:16, 41:13, 49:4,
49:20, 52:8, 69:20,
70:13, 72:9, 72:13,
73:20, 86:11, 97:7,
98:21, 99:14,
103:15, 104:24,
110:5, 110:14,
110:20, 111:21,
112:24, 113:5,
117:14, 117:23,
118:7, 122:4, 123:5,

127:22, 128:3,
132:5, 132:14,
141:4, 142:1, 142:7,
142:11, 143:4,
143:8, 143:18,
143:23, 146:16,
147:2, 148:21,
150:16, 150:24,
151:11, 151:24,
152:7, 152:13,
152:19, 153:8,
153:13, 153:21,
154:3, 154:16,
155:1, 155:11,
158:7, 161:1,
161:22, 162:25,
163:10, 163:21,
164:8, 164:25,
165:13, 166:11,
166:24, 167:6,
167:15, 167:21,
168:5, 168:9,
168:17, 170:20,
170:24, 171:8,
172:23, 173:4,
175:8, 175:25,
176:5, 176:13,
176:18, 177:17,
178:14, 181:5,
183:1, 183:24,
184:18, 185:10,
187:23, 188:4,
188:18, 189:3,
189:25, 190:16,
192:17, 197:7,
200:2, 202:25,
210:8, 210:14,
211:20, 212:3,
212:9, 212:18,
214:12, 214:15,
215:13, 215:21,
216:1, 217:13,
218:6, 218:22,
221:11, 230:8,
230:13, 238:4,
238:12, 240:6,
241:3, 243:1,
243:21, 245:22,
249:13, 253:23,
254:14, 270:18,
289:18, 289:25,
290:15, 291:13,
292:4, 293:12,
293:22, 294:18,
295:4, 295:15,
296:16, 298:15,
299:15, 300:9,
301:18, 302:10,
303:8, 303:23,
304:10, 304:23,
305:9, 305:23, 306:5

**objected** [1] - 48:23
**objection** [3] - 49:5,
158:9, 296:21
**objections** [1] -
295:17
**obligation** [3] - 53:7,
53:9, 105:11
**observer** [1] - 61:1
**obtain** [2] - 133:18,
183:19
**obtained** [5] - 174:11,
174:13, 233:24,
247:9, 251:13
**obtaining** [1] - 129:18
**obvious** [6] - 92:17,
92:22, 92:25, 96:4,
98:17, 233:2
**obviously** [39] - 43:24,
44:2, 44:5, 53:25,
55:17, 57:15, 66:23,
74:1, 74:22, 77:6,
90:2, 90:7, 91:22,
91:24, 92:5, 92:7,
93:7, 103:21, 106:2,
126:19, 133:9,
142:20, 154:18,
156:4, 157:9, 167:2,
178:6, 178:9,
186:18, 199:20,
221:14, 224:7,
224:12, 241:14,
247:18, 274:17,
276:14, 302:20,
304:18
**Ocala** [1] - 2:18
**occur** [2] - 33:15,
33:19
**occurred** [10] - 15:12,
15:17, 15:20, 16:10,
19:4, 33:17, 189:9,
193:8, 250:6, 251:16
**occurring** [3] - 217:8,
250:18, 250:24
**occurs** [1] - 33:19
**October/November**
[1] - 126:23
**odd** [3] - 208:13,
209:2, 209:5
**OF** [7] - 1:1, 1:13,
308:1, 308:3, 308:4,
309:2, 309:3
**offending** [2] - 40:20,
91:9
**offensive** [3] - 48:25,
49:7, 161:18
**offhand** [16] - 10:10,
116:13, 116:17,
116:23, 128:10,
137:14, 149:23,
181:21, 187:17,

202:15, 207:14,
211:12, 239:3,
248:13, 261:2,
264:22, 264:25,
265:3
**office** [22] - 57:3, 57:4,
57:6, 96:18, 106:2,
113:23, 115:10,
115:11, 116:1,
129:4, 169:6, 178:8,
181:19, 193:7,
194:8, 203:15,
222:1, 222:3,
260:23, 261:9,
262:19, 265:10
**Office** [5] - 1:8,
126:17, 198:13,
259:14, 310:3
**officer** [18] - 20:12,
72:6, 72:12, 145:19,
150:7, 151:2,
178:19, 178:25,
181:1, 182:4,
182:14, 202:18,
216:8, 217:5,
217:11, 229:11,
268:6
**officers** [2] - 153:1,
181:1
**offline** [1] - 222:13
**often** [4] - 33:16,
33:19, 33:21, 136:20
**old** [16] - 58:14, 58:19,
93:22, 160:19,
161:21, 162:11,
164:7, 166:1,
232:16, 281:3,
281:17, 292:3,
299:3, 301:13,
305:21, 306:2
**ON** [1] - 310:6
**once** [1] - 204:8
**one** [110] - 6:18, 7:25,
30:6, 30:12, 31:1,
34:6, 58:25, 73:11,
74:12, 77:21, 78:18,
85:7, 85:10, 85:11,
85:16, 86:9, 88:9,
90:11, 90:12, 91:17,
94:13, 96:10, 100:2,
107:7, 111:17,
119:18, 137:25,
138:2, 138:17,
154:20, 154:22,
155:5, 155:22,
155:23, 157:3,
170:12, 181:12,
186:11, 189:15,
189:17, 191:18,
195:5, 197:21,

197:22, 198:6, 198:21, 198:22, 198:25, 201:4, 204:10, 205:5, 205:14, 207:15, 209:12, 222:1, 222:2, 224:7, 225:5, 226:5, 229:7, 234:5, 234:6, 234:7, 238:7, 243:10, 243:12, 243:19, 246:23, 248:8, 251:23, 253:9, 254:9, 254:13, 254:21, 254:22, 256:5, 256:21, 257:19, 258:10, 259:1, 266:23, 266:25, 267:1, 267:2, 267:8, 267:9, 268:21, 268:22, 268:23, 269:25, 271:24, 272:2, 279:21, 279:22, 280:8, 280:14, 282:20, 285:7, 286:17, 287:23, 288:1, 288:2, 288:10, 288:13, 289:2, 289:3, 290:18, 301:17, 303:3

**ones** [6] - 68:15, 216:20, 216:21, 252:3, 253:2, 253:10

**online** [2] - 26:9, 206:15

**ooh** [2] - 31:15, 100:17

**open** [10] - 22:6, 42:4, 42:7, 42:10, 226:15, 229:20, 230:23, 232:10, 232:11, 248:10

**opened** [1] - 267:15

**operates** [2] - 66:8, 243:3

**operations** [1] - 75:14

**opinion** [92] - 8:19, 9:1, 9:2, 9:5, 12:11, 35:23, 36:1, 36:2, 36:11, 36:12, 56:23, 56:24, 57:17, 73:18, 73:23, 80:5, 80:19, 80:22, 80:25, 81:1, 81:4, 81:15, 81:17, 81:19, 82:1, 82:9, 89:24, 91:14, 91:17, 92:6, 92:23, 93:9, 93:21, 100:4, 102:3, 103:22, 104:15,

104:21, 105:21, 109:8, 109:25, 114:17, 124:14, 124:20, 124:22, 125:19, 129:2, 129:4, 130:1, 131:15, 139:13, 155:3, 155:6, 157:12, 160:13, 165:25, 168:10, 168:13, 172:11, 172:13, 172:15, 173:15, 174:3, 174:7, 188:6, 192:14, 199:25, 204:15, 205:21, 214:7, 214:17, 221:1, 263:24, 268:25, 269:8, 269:13, 270:15, 274:25, 275:14, 278:4, 279:13, 286:14, 290:20, 296:5, 296:7, 298:22, 303:2, 304:17, 305:15, 306:19

**opinions** [7] - 90:18, 116:4, 178:9, 202:22, 210:12, 210:23, 268:15

**opportunity** [3] - 6:12, 7:3, 100:23

**opposite** [1] - 181:2

**order** [4] - 72:24, 143:16, 147:13, 177:14

**ordered** [1] - 307:14

**ordinary** [1] - 180:16

**original** [5] - 204:11, 205:21, 206:21, 261:21, 288:20

**originally** [3] - 51:24, 244:3, 289:16

**outcome** [1] - 109:22

**outfit** [2] - 221:6, 237:12

**outrageous** [1] - 151:18

**outset** [1] - 18:22

**overseas** [1] - 83:22

**own** [4] - 30:13, 35:20, 82:1, 269:10

**owner** [1] - 159:2

**ownership** [1] - 25:24

**owns** [1] - 22:21

**P**

**P.A** [2] - 2:10, 2:17
**p.m** [17] - 1:17, 4:10,

82:21, 82:22, 82:25, 168:21, 168:22, 168:25, 246:15, 246:16, 246:18, 307:18, 307:20

**page** [8] - 64:24, 134:23, 231:6, 231:8, 232:12, 277:9, 282:2, 288:7

**PAGE** [1] - 310:7

**Page** [13] - 3:2, 3:12, 15:7, 16:18, 18:7, 18:8, 43:17, 74:11, 83:11, 276:23, 277:9, 277:17, 277:24

**pages** [3] - 16:14, 16:16, 223:8

**paid** [1] - 268:14

**paper** [1] - 232:3

**papers** [1] - 179:4

**paragraph** [19] - 116:25, 205:25, 207:12, 271:12, 271:13, 271:15, 282:20, 282:21, 283:15, 283:19, 284:1, 284:22, 285:15, 288:22, 288:24, 292:14, 292:15, 292:16, 294:13

**Paralegal** [1] - 2:24

**parens** [1] - 46:13

**part** [24] - 16:13, 19:9, 61:17, 74:5, 80:3, 86:21, 98:10, 138:12, 138:13, 139:8, 139:9, 139:11, 169:22, 172:5, 196:22, 198:9, 212:15, 224:10, 229:7, 259:11, 260:17, 261:18, 269:11, 301:12

**parted** [2] - 160:2

**partial** [2] - 64:22, 65:6

**partially** [3] - 79:18, 285:4, 292:22

**particular** [12] - 17:23, 32:6, 83:15, 102:4, 103:13, 103:14, 158:6, 158:19, 159:14, 182:7, 244:20, 247:14

**parties** [1] - 309:11

**parties'** [1] - 309:12

**partner** [2] - 9:17,

18:17

**passed** [3] - 198:4, 198:5, 198:8

**passing** [1] - 99:7

**passport** [33] - 10:23, 24:11, 142:24, 146:13, 149:25, 150:12, 153:7, 153:25, 161:5, 161:6, 161:7, 165:11, 167:18, 167:23, 195:12, 195:25, 197:4, 197:12, 213:8, 215:19, 217:3, 217:12, 240:16, 240:23, 243:7, 243:10, 243:13, 280:17, 280:19, 280:24, 300:21

**passports** [30] - 10:25, 11:23, 13:5, 25:14, 128:2, 146:25, 149:18, 151:20, 154:13, 154:24, 165:8, 196:16, 199:23, 213:15, 218:20, 240:1, 242:4, 242:24, 242:25, 244:9, 244:13, 244:16, 270:9, 279:14, 279:23, 280:1, 280:9, 281:2, 281:19

**past** [9] - 40:23, 43:23, 44:1, 54:5, 68:20, 144:23, 144:25, 216:16, 269:16

**paste** [1] - 89:14

**pasting** [1] - 89:19

**path** [1] - 198:19

**patrol** [3] - 216:8, 217:4, 217:24

**paused** [2] - 196:2, 196:7

**payment** [1] - 31:1

**Payne** [1] - 128:11

**PC** [4] - 254:1, 255:2, 255:5, 257:7

**pediatrics** [1] - 121:15

**penalties** [1] - 310:23

**Penthouse** [1] - 63:7

**people** [33] - 30:3, 57:1, 57:21, 59:13, 61:5, 63:22, 73:8, 76:6, 93:11, 93:14, 120:1, 122:9, 136:20, 137:5, 173:23, 178:8,

181:16, 181:20, 181:21, 198:23, 199:4, 200:10, 200:14, 203:2, 216:10, 216:12, 216:18, 221:5, 242:8, 278:11, 278:12, 301:13, 305:21

**people's** [1] - 173:22

**perceive** [1] - 61:5

**perception** [1] - 173:22

**perfect** [1] - 82:16

**perform** [1] - 47:17

**perjury** [1] - 310:23

**permission** [1] - 73:5

**person** [62] - 18:14, 28:3, 28:6, 28:8, 30:14, 56:10, 56:21, 57:1, 58:1, 58:18, 59:9, 59:25, 60:4, 60:22, 60:23, 77:7, 79:7, 86:17, 93:21, 98:6, 104:12, 112:2, 120:20, 121:16, 133:18, 133:19, 149:13, 161:20, 168:15, 172:1, 175:19, 177:16, 177:19, 180:20, 181:12, 181:23, 197:21, 197:22, 198:6, 198:12, 198:22, 199:1, 224:24, 238:19, 247:13, 289:10, 289:12, 297:6, 297:10, 297:12, 297:13, 297:24, 298:2, 298:5, 298:7, 299:18, 300:18, 302:2, 302:16, 302:17, 305:7

**person's** [5] - 123:15, 203:5, 212:22, 302:4, 302:5

**personal** [14] - 9:1, 9:5, 48:12, 56:24, 65:10, 73:18, 74:1, 104:15, 104:20, 139:13, 177:25, 213:20, 213:22, 251:19

**personally** [13] - 20:16, 22:15, 58:1, 65:25, 80:17, 95:3, 189:7, 189:8, 191:22, 208:19, 218:16, 308:7,

308:21
perspective [2] - 69:14, 135:23
perspectives [1] - 61:1
pertains [1] - 137:2
petite [1] - 279:1
PETRUZZELLI [1] - 2:9
Petruzzelli [2] - 9:20, 18:13
phone [34] - 14:21, 19:18, 20:1, 61:15, 61:24, 62:1, 63:11, 63:13, 112:22, 134:12, 135:7, 137:18, 137:21, 138:3, 156:15, 204:8, 245:5, 247:2, 247:3, 247:14, 248:17, 249:2, 249:4, 249:12, 249:21, 250:3, 250:4, 250:16, 250:23, 251:19, 254:13, 257:21, 258:6, 274:4
phones [1] - 113:1
phonetic [2] - 261:6, 279:22
photo [47] - 16:23, 30:19, 37:1, 41:5, 41:6, 41:9, 61:16, 61:17, 61:20, 65:4, 80:20, 138:12, 138:13, 139:6, 139:8, 139:10, 139:11, 146:14, 154:1, 161:23, 213:10, 220:12, 220:13, 220:22, 220:24, 220:25, 221:2, 221:3, 221:6, 234:15, 235:1, 235:4, 237:6, 237:7, 237:20, 238:24, 239:10, 240:19, 240:25, 241:2, 241:9, 243:14, 267:11, 280:5, 294:22, 298:24
photograph [63] - 14:24, 15:4, 16:23, 28:10, 29:12, 29:13, 29:21, 30:1, 32:11, 33:1, 41:7, 61:10, 64:23, 67:12, 69:23, 69:25, 71:6, 77:10, 77:11, 79:7, 86:18, 92:14, 101:15,

103:14, 104:2, 104:11, 106:14, 107:14, 111:2, 112:13, 113:9, 115:1, 115:2, 120:23, 121:16, 124:7, 125:8, 147:24, 172:2, 195:12, 205:16, 214:8, 224:4, 235:3, 235:5, 238:11, 238:15, 241:24, 243:22, 244:3, 266:23, 266:24, 280:6, 280:7, 290:8, 296:9, 299:2, 299:4, 304:19, 305:17, 305:19, 305:22, 306:4
Photograph [3] - 3:20, 3:22, 164:6
photographed [1] - 74:24
photographer [8] - 64:24, 83:23, 112:18, 237:25, 238:3, 239:15, 239:19, 239:22
photographers [1] - 84:9
photographic [1] - 10:20
Photographs [1] - 3:21
photographs [31] - 8:11, 8:25, 10:19, 11:15, 11:19, 11:20, 16:4, 64:21, 128:1, 149:17, 156:21, 168:3, 196:1, 197:4, 212:8, 214:10, 222:9, 233:9, 237:10, 237:11, 239:13, 241:9, 243:7, 244:6, 281:7, 281:11, 287:8, 292:9, 297:4, 304:15, 304:16
photos [13] - 75:3, 75:8, 75:9, 77:5, 167:1, 239:5, 243:10, 243:13, 267:3, 267:6, 276:24, 281:4, 294:23
phrase [1] - 42:10
physical [5] - 201:5, 215:18, 215:19, 218:3, 300:21
physically [3] -

173:21, 252:9, 252:12
pick [6] - 13:11, 73:4, 76:8, 83:3, 156:20, 157:8
picked [3] - 157:5, 234:21, 287:15
picks [1] - 191:18
Picture [1] - 240:13
picture [23] - 61:25, 65:3, 75:22, 86:19, 111:20, 112:23, 139:1, 158:13, 158:17, 161:4, 163:18, 165:11, 168:16, 172:3, 224:21, 232:12, 238:1, 239:2, 240:15, 243:20, 257:25, 281:19, 303:21
pictures [10] - 62:12, 75:18, 165:6, 167:5, 223:16, 239:4, 239:7, 240:12, 243:19, 256:15
piece [1] - 155:6
pieces [1] - 132:12
Pierce [15] - 25:5, 25:6, 25:13, 83:7, 83:11, 108:6, 126:16, 126:19, 128:9, 128:18, 145:25, 149:10, 188:14, 196:15
pile [1] - 255:19
pink [1] - 282:22
pinpoint [1] - 135:7
PLACE [1] - 1:18
place [1] - 38:1
plainly [1] - 292:23
plaintiff [2] - 1:5, 4:18
Plaintiff [4] - 1:15, 2:7, 2:24, 5:3
Plaintiff's [11] - 13:22, 14:8, 38:17, 43:5, 44:24, 45:1, 85:23, 107:3, 161:9, 223:23, 241:19
PLAINTIFF'S [1] - 3:11
plaintiff's [1] - 222:7
platform [2] - 228:11, 247:16
play [3] - 195:17, 196:6, 241:11
Playboy [9] - 63:5, 64:6, 64:7, 64:11, 64:18, 65:14, 65:15, 65:17, 65:18

played [1] - 106:6
playing [2] - 240:9, 300:16
plug [1] - 232:5
plugged [1] - 267:14
point [32] - 15:16, 31:3, 48:19, 55:16, 59:21, 67:11, 93:25, 99:12, 126:15, 127:19, 131:16, 156:8, 159:14, 163:13, 173:18, 173:22, 178:10, 183:18, 183:20, 184:23, 184:24, 191:7, 191:11, 196:3, 196:11, 198:25, 239:12, 244:6, 252:17, 260:8, 267:25, 268:4
pointless [1] - 196:13
points [2] - 198:4, 198:8
policy [3] - 97:5, 97:8, 97:11
Ponce [2] - 1:19, 4:8
pop [2] - 228:13, 228:14
popped [2] - 18:19, 248:11
popping [1] - 228:16
pops [2] - 175:1, 263:11
populates [2] - 225:7, 229:23
porn [3] - 26:19, 44:15, 44:18
Pornhub [3] - 63:15, 65:19, 65:22
pornographic [11] - 65:12, 66:11, 84:22, 111:19, 121:25, 122:2, 136:1, 136:3, 136:6, 137:18, 204:7
pornography [48] - 13:7, 15:7, 17:24, 21:22, 22:7, 27:23, 33:10, 33:25, 34:9, 34:22, 45:6, 46:14, 46:18, 47:4, 63:9, 63:12, 63:16, 64:4, 65:23, 66:16, 66:19, 66:20, 66:21, 66:24, 67:1, 67:24, 95:24, 96:4, 105:16, 136:14, 137:6, 137:21, 137:23, 148:5, 148:6, 151:23, 156:15, 162:20, 166:9,

182:1, 226:22, 226:24, 226:25, 227:3, 227:9, 228:22, 277:1
portions [1] - 89:12
portrayed [4] - 65:23, 69:4, 71:22, 140:21
portraying [1] - 76:16
pose [1] - 64:21
posed [2] - 75:13, 83:22
poses [1] - 239:16
posing [1] - 237:21
position [5] - 56:10, 164:5, 192:13, 239:25, 268:5
positive [2] - 53:24, 258:23
possess [2] - 86:18, 172:1
possessed [1] - 182:7
possessing [1] - 177:19
possession [20] - 12:14, 13:7, 85:19, 95:24, 137:6, 150:10, 151:23, 162:19, 170:12, 170:18, 171:23, 181:24, 181:25, 209:11, 227:3, 227:4, 227:14, 227:22, 252:13, 259:1
possibility [4] - 71:16, 110:3, 174:11, 245:12
possible [2] - 111:1, 174:14
possibly [5] - 148:22, 248:3, 262:7, 262:9, 264:23
post [1] - 99:5
posting [1] - 72:18
potential [7] - 17:23, 19:1, 19:17, 21:16, 108:22, 111:3, 187:4
potentially [9] - 42:22, 96:25, 101:11, 173:7, 182:23, 183:22, 228:14, 256:8, 279:13
power [1] - 197:6
practice [1] - 270:3
pre [1] - 208:11
predicate [2] - 295:7, 298:19
prefer [1] - 133:20
preparation [2] - 7:7, 7:22

prepubertal [1] - 296:14
prepuberty [1] - 208:12
prepubescent [11] - 18:8, 35:7, 35:17, 36:11, 89:23, 90:1, 90:4, 90:7, 207:22, 208:4, 209:3
presence [3] - 36:2, 36:4, 90:13
PRESENT [1] - 2:22
present [12] - 39:19, 53:10, 105:22, 117:1, 117:5, 117:22, 126:22, 199:9, 201:2, 232:22, 241:13, 242:13
presentation [2] - 86:20, 172:4
presented [5] - 142:24, 195:25, 224:13, 240:1, 267:11
presenting [2] - 105:12, 200:24
PRESTON [8] - 1:7, 1:14, 3:3, 5:1, 308:7, 309:7, 310:3, 310:25
Preston [13] - 2:14, 3:15, 3:18, 4:3, 4:4, 4:20, 5:12, 5:13, 47:24, 66:5, 263:7, 265:17, 307:16
Preston's [2] - 45:11, 46:22
presumably [3] - 24:14, 239:14, 239:15
presuming [2] - 239:15, 239:21
pretty [10] - 16:22, 29:25, 31:2, 42:9, 53:24, 88:15, 88:25, 156:5, 243:11, 258:23
prevent [1] - 155:19
preventing [1] - 25:16
previous [3] - 75:7, 206:2, 291:23
previously [13] - 89:8, 95:9, 129:9, 145:3, 205:15, 241:10, 275:10, 287:8, 288:13, 290:8, 295:12, 295:13, 298:10
print [8] - 13:23, 225:24, 226:2,

231:21, 231:24, 232:19, 233:1, 233:5
printed [1] - 115:24
printed-out [1] - 115:24
printing [2] - 220:1, 231:25
printout [2] - 45:13, 231:13
prints [3] - 116:4, 231:1, 231:21
priority [1] - 155:23
privacy [1] - 214:21
probability [2] - 71:1, 210:24
probable [29] - 12:13, 12:17, 12:19, 13:1, 13:6, 89:5, 132:3, 133:6, 142:20, 150:3, 154:5, 154:10, 182:19, 183:6, 183:19, 184:24, 185:2, 186:15, 186:18, 186:20, 188:11, 188:20, 190:9, 190:10, 199:11, 199:12, 199:15, 274:20
problem [5] - 46:4, 46:8, 179:23, 294:4, 298:12
proceed [2] - 192:15, 195:3
proceeded [4] - 183:8, 195:6, 195:15
proceeding [1] - 200:6
process [1] - 118:14
processing [1] - 27:5
produce [2] - 216:17, 216:18
Produced [2] - 308:21, 308:22
produced [9] - 5:2, 61:10, 61:12, 61:13, 112:12, 112:15, 112:16, 216:14, 216:22
producers [1] - 141:16
professional [2] - 83:23, 84:8
Professional [3] - 1:24, 308:5, 309:4
professionalism [1] - 48:8
professionally [7] - 61:9, 61:11, 61:13, 112:12, 112:15, 112:16, 239:2
proliferation [2] -

23:5, 229:6
promise [1] - 147:8
property [1] - 45:8
props [1] - 62:8
protect [6] - 155:19, 155:24, 156:1, 156:7, 214:21, 229:11
Protection [5] - 1:10, 91:7, 97:6, 264:24, 310:4
prove [5] - 147:5, 150:13, 150:18, 163:19, 171:22
proved [2] - 151:20, 153:18
provide [3] - 150:5, 151:3, 212:11
provided [21] - 7:25, 45:16, 89:21, 107:17, 128:19, 134:15, 146:20, 150:19, 151:20, 152:24, 195:1, 214:18, 215:17, 222:7, 241:12, 267:22, 270:8, 270:12, 270:16, 292:17, 295:11
provider [4] - 14:19, 17:3, 17:22, 18:4
providing [2] - 150:8, 210:23
pry [1] - 65:10
pubertal [2] - 36:6, 282:22
puberty [4] - 35:9, 90:2, 90:7, 90:14
pubescent [2] - 90:1, 90:5
pubic [34] - 36:3, 36:4, 77:20, 78:24, 90:9, 90:10, 90:11, 90:13, 90:16, 90:19, 117:1, 117:5, 117:9, 117:12, 117:21, 121:21, 122:2, 122:10, 123:4, 123:13, 123:25, 124:6, 124:13, 160:4, 207:21, 207:25, 208:11, 209:4, 285:17, 292:20, 293:1, 294:12, 294:14, 294:17
public [12] - 67:15, 67:20, 67:24, 67:25, 69:8, 72:7, 84:18, 84:22, 141:1,

141:25, 160:8, 160:20
Public [2] - 308:6, 308:13
published [3] - 67:15, 67:24, 187:9
publisher [1] - 22:7
publishers [1] - 141:16
publishing [7] - 25:23, 26:8, 26:12, 26:16, 45:6, 72:6, 187:7
pull [3] - 83:10, 216:10, 216:12
pulled [2] - 49:23, 70:16
purchase [1] - 134:22
purport [3] - 45:14, 184:3, 281:2
purported [1] - 150:12
pursue [6] - 98:6, 99:13, 99:19, 99:21, 192:15, 192:16
pursued [1] - 192:7
pursuing [1] - 168:1
pushed [1] - 125:21
put [15] - 16:6, 47:15, 49:12, 53:23, 54:13, 76:1, 87:20, 89:20, 91:16, 91:17, 91:18, 171:17, 221:21, 222:20, 227:19

### Q

QR [8] - 244:22, 244:25, 245:2, 245:7, 245:12, 246:1, 246:2, 246:6
qualifications [6] - 101:18, 101:21, 101:25, 102:16, 102:20, 125:6
qualified [1] - 102:2
quality [1] - 61:14
quantify [1] - 33:16
query [2] - 43:1, 226:15
questioned [1] - 169:10
questioning [3] - 169:7, 180:25, 194:11
questions [15] - 48:24, 49:1, 49:4, 49:8, 78:19, 131:15, 262:23, 262:24, 263:17, 273:18, 279:18, 280:13, 307:10, 307:13

quick [2] - 9:13, 171:25
quote [4] - 50:13, 89:11, 131:12, 142:22
quoted [1] - 132:1

### R

ran [4] - 259:17, 260:4, 260:22, 261:14
range [6] - 58:3, 92:8, 165:22, 173:9, 298:22, 302:17
rash [1] - 120:13
rather [2] - 232:15, 306:13
rating [2] - 206:16, 295:10
razor [1] - 120:13
reach [3] - 30:14, 134:16, 147:14
reached [5] - 149:12, 190:20, 261:24, 262:5, 266:7
reaction [2] - 11:3, 11:4
read [38] - 40:19, 43:21, 44:7, 50:12, 50:14, 51:7, 62:11, 74:10, 74:14, 74:18, 74:20, 83:20, 86:6, 87:9, 91:10, 116:10, 159:21, 170:22, 171:25, 172:7, 221:23, 232:17, 287:9, 287:19, 291:12, 291:15, 291:17, 292:14, 293:3, 293:5, 295:3, 296:6, 296:12, 297:9, 303:20, 307:14, 310:23
readily [1] - 147:13
reading [5] - 170:25, 285:12, 285:20, 290:20, 291:4
real [8] - 9:13, 153:3, 166:7, 171:25, 216:20, 216:21, 218:21, 231:13
realize [3] - 296:13, 303:5, 303:12
realized [1] - 110:2
really [33] - 11:4, 12:10, 24:3, 24:5, 42:11, 50:23, 51:14, 53:16, 53:17, 59:22, 59:23, 64:15, 65:11, 66:18, 72:8, 79:21,

| | | | | |
|---|---|---|---|---|
| 115:5, 126:2, 156:22, 166:9, 192:14, 196:11, 196:24, 199:22, 207:1, 208:3, 210:13, 221:20, 238:25, 256:10, 256:21, 258:18<br>**realm** [1] - 248:9<br>**REASON** [1] - 310:7<br>**reason** [41] - 9:9, 9:10, 27:8, 47:24, 67:14, 70:3, 73:15, 123:14, 125:14, 125:21, 139:21, 140:8, 140:10, 140:17, 140:22, 145:18, 166:7, 166:12, 168:1, 175:7, 176:15, 178:1, 184:8, 186:12, 187:7, 193:1, 207:23, 209:18, 210:2, 220:7, 242:25, 255:10, 255:12, 258:25, 259:2, 259:3, 259:4, 286:10, 304:3, 304:5, 304:6<br>**reasonable** [9] - 56:10, 56:21, 70:11, 152:17, 164:5, 183:12, 186:6, 186:9, 210:23<br>**reasoning** [2] - 163:23, 212:12<br>**recalled** [1] - 169:6<br>**recalling** [1] - 203:7<br>**receive** [1] - 15:3<br>**received** [4] - 13:16, 29:12, 33:5, 134:9<br>**receiving** [1] - 150:14<br>**recess** [3] - 82:22, 168:22, 246:16<br>**recognize** [4] - 18:19, 234:17, 295:2, 295:13<br>**recognized** [1] - 287:15<br>**recollect** [1] - 267:6<br>**recollection** [7] - 43:13, 56:25, 78:16, 101:5, 261:14, 262:17, 269:17<br>**recommendation** [1] - 199:8<br>**record** [27] - 5:11, 9:17, 9:22, 24:13, 82:20, 82:24, 85:22, 131:6, 145:20, | 147:14, 147:22, 150:11, 154:14, 168:20, 168:24, 190:20, 195:13, 197:12, 199:24, 213:9, 219:8, 219:18, 240:22, 246:14, 246:17, 307:17, 309:8<br>**recorded** [2] - 4:2, 47:16<br>**RECORDED** [1] - 1:13<br>**records** [22] - 25:9, 25:17, 135:1, 135:2, 141:20, 145:14, 145:15, 149:6, 149:7, 149:20, 150:11, 151:3, 151:18, 153:1, 153:4, 153:5, 154:1, 167:19, 196:16, 240:2, 270:25<br>**red** [1] - 235:10<br>**redact** [2] - 220:8, 280:10<br>**redacted** [30] - 11:1, 24:12, 24:14, 24:22, 24:25, 142:25, 146:21, 146:25, 147:4, 150:5, 150:6, 150:23, 152:1, 152:24, 167:23, 213:17, 213:19, 218:4, 219:6, 219:16, 219:22, 219:24, 220:2, 220:9, 222:9, 280:2, 280:9, 280:20, 280:23<br>**REDIRECT** [1] - 287:4<br>**Redirect** [1] - 3:6<br>**refer** [11] - 16:25, 79:19, 90:20, 90:22, 180:21, 200:19, 200:22, 248:8, 253:10, 255:5, 282:5<br>**reference** [7] - 49:24, 53:13, 75:7, 82:11, 89:7, 114:22, 262:1<br>**referenced** [1] - 170:7<br>**referencing** [1] - 86:24<br>**referred** [3] - 95:7, 95:20, 264:8<br>**referring** [13] - 12:15, 16:14, 35:6, 64:8, 99:5, 102:8, 103:11, 111:18, 182:3, 224:7, 259:20, 265:8, 277:1<br>**refers** [1] - 278:17 | **refreshing** [1] - 43:13<br>**refuse** [2] - 216:10, 216:12<br>**regarding** [6] - 265:13, 269:19, 270:21, 271:4, 274:9, 277:21<br>**regardless** [1] - 286:13<br>**region** [3] - 77:20, 80:18, 117:10<br>**regions** [1] - 121:21<br>**Registered** [3] - 1:24, 308:5, 309:4<br>**regret** [2] - 189:1, 189:24<br>**regrets** [2] - 188:16, 190:6<br>**regular** [1] - 65:4<br>**regularly** [2] - 33:12, 33:15<br>**rehashing** [1] - 264:6<br>**rein** [1] - 48:1<br>**related** [2] - 31:11, 245:13<br>**relation** [4] - 30:21, 52:5, 90:19, 279:10<br>**relative** [2] - 309:10, 309:12<br>**relevant** [1] - 199:25<br>**reliability** [2] - 104:1, 131:15<br>**reliable** [9] - 53:10, 53:13, 54:10, 104:22, 105:12, 105:15, 105:21, 106:17, 131:17<br>**reliably** [1] - 106:13<br>**rely** [2] - 126:7, 210:12<br>**relying** [1] - 210:15<br>**remember** [63] - 10:10, 11:10, 11:13, 52:3, 56:5, 56:6, 56:7, 70:24, 79:19, 80:13, 88:14, 96:14, 102:11, 106:15, 106:16, 108:4, 114:14, 114:17, 114:24, 115:2, 115:4, 115:5, 115:10, 115:16, 115:23, 115:24, 116:13, 124:21, 128:18, 129:5, 132:16, 132:18, 132:20, 149:15, 149:16, 149:25, 179:1, 181:9, 181:13, 181:21, 200:18, 202:4, | 203:4, 208:1, 241:24, 250:12, 250:19, 250:20, 250:21, 251:1, 254:22, 258:13, 258:20, 259:25, 264:22, 264:24, 265:2, 265:25, 276:11, 276:21, 278:21, 279:16, 286:10<br>**remembered** [1] - 50:10<br>**remembering** [2] - 264:18, 266:10<br>**remind** [1] - 6:18<br>**reminds** [1] - 85:1<br>**removal** [1] - 120:4<br>**remove** [1] - 77:21<br>**render** [3] - 102:3, 268:15, 269:13<br>**rendered** [2] - 286:14, 298:22<br>**repeat** [1] - 36:18<br>**repeated** [1] - 248:15<br>**repeats** [3] - 287:23, 287:25, 288:2<br>**report** [57] - 3:13, 7:12, 7:13, 14:5, 14:16, 14:17, 14:18, 15:8, 16:13, 17:10, 17:22, 33:13, 34:7, 34:8, 34:21, 34:22, 35:2, 35:12, 35:22, 35:23, 35:24, 56:18, 66:12, 85:6, 89:14, 94:19, 94:24, 108:1, 110:10, 115:18, 115:21, 115:25, 130:16, 130:25, 131:20, 131:23, 138:1, 187:22, 201:17, 202:10, 202:21, 204:12, 204:22, 204:24, 205:13, 252:6, 252:8, 255:7, 270:3, 295:12, 296:13, 297:9, 298:13, 303:5, 303:20, 309:6<br>**reported** [3] - 14:19, 14:22, 27:25<br>**Reporter** [3] - 1:24, 308:6, 309:5<br>**reporter** [3] - 4:13, 6:3, 136:9<br>**reporter's** [1] - 47:17<br>**Reporter** ............<br>.. [1] - 3:8<br>**Reporters** [1] - 1:18 | **reports** [4] - 94:22, 196:23, 205:4, 295:3<br>**represent** [6] - 4:17, 5:15, 29:4, 45:5, 263:8, 278:17<br>**representation** [2] - 86:19, 172:3<br>**representations** [1] - 240:18<br>**represented** [3] - 110:3, 110:7, 110:13<br>**representing** [4] - 4:19, 4:21, 189:20, 189:21<br>**reproduce** [1] - 30:3<br>**reproducible** [1] - 103:12<br>**request** [6] - 135:6, 145:15, 147:15, 147:16, 147:22, 215:18<br>**requested** [11] - 87:1, 134:20, 134:22, 148:19, 204:1, 268:18, 268:20, 268:23, 269:2, 269:8, 309:7<br>**require** [1] - 141:16<br>**required** [1] - 171:22<br>**requirements** [1] - 170:12<br>**research** [5] - 32:24, 228:4, 228:5, 228:8, 228:12<br>**researching** [1] - 42:10<br>**resources** [3] - 22:16, 218:10, 218:13<br>**respect** [1] - 292:25<br>**respectfully** [1] - 48:1<br>**respond** [2] - 48:23, 49:5<br>**responded** [3] - 25:11, 145:21, 145:24<br>**responding** [1] - 5:3<br>**response** [1] - 134:6<br>**responsible** [4] - 105:8, 198:1, 198:13, 200:24<br>**rest** [1] - 213:22<br>**restate** [1] - 302:15<br>**results** [2] - 3:16, 50:24<br>**return** [5] - 31:23, 129:23, 130:5, 134:2, 156:15<br>**returned** [1] - 204:1<br>**reveal** [3] - 19:17, 49:19, 268:4<br>**revealed** [1] - 32:25 |

revelations [1] - 83:6
review [28] - 6:12, 7:3, 7:17, 7:22, 15:3, 16:12, 28:2, 40:17, 135:20, 138:18, 175:18, 199:17, 199:18, 200:12, 205:2, 225:15, 227:5, 251:15, 253:24, 256:9, 257:4, 257:7, 258:11, 259:18, 268:14, 268:18, 292:18, 309:7
reviewed [30] - 7:6, 7:8, 20:2, 41:24, 51:25, 78:15, 91:9, 91:11, 95:9, 96:10, 96:15, 108:19, 113:25, 114:1, 183:6, 183:7, 192:4, 193:5, 194:24, 201:25, 204:7, 205:3, 216:4, 260:10, 260:15, 278:8, 278:9, 278:10, 279:9, 286:14
reviewing [9] - 31:5, 115:2, 156:22, 157:10, 199:6, 199:19, 202:21, 204:16, 270:25
reword [1] - 301:7
rewording [1] - 12:21
ridiculous [1] - 151:15
right-hand [2] - 29:20, 299:11
ring [1] - 20:12
risk [1] - 108:17
road [2] - 9:25, 217:4
robbing [1] - 109:1
ROBERTS [321] - 2:3, 4:17, 5:9, 8:14, 9:15, 9:18, 9:21, 9:23, 10:24, 11:18, 11:22, 13:23, 14:4, 14:7, 14:10, 18:21, 20:20, 22:5, 22:19, 23:20, 24:17, 24:23, 25:2, 26:4, 26:17, 27:12, 27:17, 30:8, 35:15, 36:20, 38:15, 38:19, 39:13, 40:18, 41:15, 43:7, 43:10, 43:14, 43:16, 45:3, 45:12, 45:15, 45:18, 45:20, 45:22, 46:3, 46:6, 46:10, 46:12, 46:15, 46:21, 46:24, 47:1,

47:20, 48:2, 48:13, 48:18, 48:22, 49:11, 49:21, 52:9, 66:3, 66:9, 70:2, 70:18, 72:10, 72:15, 73:22, 74:13, 74:17, 81:23, 82:7, 82:12, 82:15, 82:18, 83:1, 86:1, 86:10, 86:15, 92:4, 92:12, 93:5, 94:5, 94:7, 94:8, 94:17, 94:18, 96:22, 97:7, 97:10, 97:22, 97:25, 98:1, 98:19, 98:23, 99:15, 100:21, 101:13, 101:24, 103:8, 103:23, 104:6, 104:16, 105:4, 106:8, 106:22, 107:5, 110:8, 110:17, 110:22, 111:24, 113:2, 113:6, 114:21, 116:9, 117:16, 118:1, 118:12, 119:7, 122:11, 123:7, 123:21, 124:10, 124:18, 125:3, 125:11, 125:23, 126:11, 127:23, 128:4, 129:16, 129:24, 131:3, 132:8, 132:17, 142:4, 142:9, 142:12, 143:5, 143:9, 143:21, 144:1, 146:18, 147:6, 149:1, 150:20, 151:5, 151:14, 152:3, 152:9, 152:15, 152:22, 153:10, 153:16, 153:24, 154:6, 154:21, 155:7, 155:14, 158:8, 158:12, 158:17, 158:23, 161:4, 161:7, 161:11, 162:1, 162:15, 163:2, 163:15, 163:24, 164:14, 164:19, 164:22, 165:3, 165:15, 166:14, 167:3, 167:12, 167:16, 167:24, 168:7, 168:11, 168:19, 169:1, 170:1, 170:3, 170:5, 170:21, 170:25,

171:2, 171:3, 171:9, 173:1, 173:10, 175:14, 176:2, 176:6, 176:14, 176:24, 177:21, 178:17, 181:8, 183:11, 184:1, 184:19, 185:15, 188:1, 188:7, 188:22, 189:4, 190:3, 190:18, 191:21, 192:12, 192:22, 193:10, 193:17, 194:1, 194:3, 194:12, 194:16, 194:19, 195:10, 197:9, 200:4, 203:1, 206:19, 207:16, 207:20, 209:7, 209:19, 209:23, 210:4, 210:11, 210:19, 211:5, 211:9, 211:22, 212:5, 212:14, 213:1, 214:13, 214:19, 215:14, 215:23, 216:5, 217:14, 218:2, 218:8, 218:24, 221:13, 221:22, 222:19, 223:9, 223:11, 223:15, 223:20, 224:1, 230:10, 230:14, 231:18, 232:7, 232:8, 238:5, 238:18, 240:8, 241:6, 241:21, 243:5, 244:1, 245:23, 246:10, 246:19, 249:17, 254:3, 254:16, 262:22, 270:18, 273:2, 273:8, 284:18, 287:2, 287:5, 289:19, 289:22, 290:6, 290:19, 291:14, 291:19, 292:6, 293:10, 293:13, 293:19, 294:2, 294:9, 295:1, 295:8, 296:1, 296:17, 296:21, 296:24, 298:20, 299:23, 300:4, 300:15, 301:9, 302:1, 302:19, 303:11, 304:2, 304:11, 304:20, 305:1,

305:4, 305:11, 305:14, 306:1, 306:6, 306:18, 307:9
Roberts [8] - 2:4, 4:17, 263:19, 272:21, 276:20, 279:12, 286:8, 298:4
Roberts .......... [1] - 3:6
Roberts ........... [1] - 3:4
room [11] - 64:14, 81:5, 182:22, 189:11, 189:13, 189:14, 235:8, 236:5, 237:13, 238:3, 238:7
roughly [2] - 305:16, 307:5
Roy's [1] - 278:25
RPR [2] - 308:13, 309:18
rude [1] - 74:14
ruined [2] - 158:25, 189:5
ruining [1] - 189:1
rules [1] - 6:16
rumor [1] - 248:14
run [3] - 201:24, 202:3, 242:8
running [1] - 217:17

**S**

safe [1] - 11:14
saming [1] - 183:3
Sanija [12] - 224:5, 224:10, 224:14, 224:15, 224:22, 224:24, 225:3, 225:4, 225:6, 229:9, 229:19, 230:2
Sanija/Big [1] - 224:20
sat [1] - 165:5
satisfied [3] - 213:9, 213:12, 216:23
satisfy [9] - 105:20, 151:22, 211:18, 211:23, 212:6, 215:5, 215:20, 215:24, 218:25
saw [16] - 32:9, 32:10, 50:23, 51:2, 51:8, 69:24, 128:1, 161:12, 161:15, 175:11, 234:17, 244:2, 244:18, 244:20, 279:20, 296:12
scan [5] - 245:4,

245:24, 246:1, 246:2, 246:6
scenario [1] - 108:25
scene [1] - 251:16
school [2] - 239:4, 239:5
scientific [5] - 102:25, 103:6, 103:9, 103:10, 104:1
scientifically [2] - 104:22, 105:1
Scoggins [1] - 278:8
scope [1] - 304:13
screen [5] - 272:25, 273:14, 281:22, 282:1, 282:9
screenshot [10] - 159:24, 247:1, 247:4, 247:12, 247:15, 247:17, 247:19, 247:21, 247:24, 248:7
script [1] - 159:24
scrubbed [8] - 248:17, 249:1, 249:4, 249:12, 249:20, 250:3, 250:15, 250:22
scrunched [1] - 131:9
SE [1] - 2:17
search [68] - 3:14, 3:16, 7:21, 7:24, 8:2, 16:6, 31:19, 31:20, 35:3, 36:14, 37:9, 37:14, 37:19, 38:16, 38:24, 42:4, 42:8, 42:13, 45:14, 46:12, 49:13, 49:19, 50:8, 50:10, 50:24, 53:21, 53:23, 53:24, 55:9, 68:15, 71:19, 85:5, 85:6, 85:8, 86:24, 87:2, 87:22, 105:11, 126:24, 129:7, 129:19, 129:23, 130:1, 130:19, 132:4, 132:19, 133:5, 133:6, 133:15, 133:18, 134:3, 171:5, 171:15, 176:10, 193:2, 199:13, 202:17, 203:17, 203:19, 225:6, 226:17, 226:20, 251:10, 260:14, 275:25, 278:24, 293:4
searched [1] - 43:22
searches [1] - 53:12

**searching** [7] - 47:13, 65:19, 226:22, 228:13, 229:2, 229:15, 230:17
**second** [29] - 38:20, 74:12, 86:9, 98:10, 159:23, 204:24, 206:25, 211:16, 258:2, 267:1, 268:23, 271:9, 271:15, 271:18, 271:21, 271:24, 272:6, 272:20, 273:12, 273:22, 278:4, 283:18, 284:1, 284:3, 284:9, 285:15, 288:24
**secret** [1] - 137:7
**secreting** [1] - 137:13
**section** [1] - 89:5
**see** [58] - 15:6, 15:18, 16:21, 18:1, 29:4, 29:7, 44:3, 51:4, 73:2, 79:12, 79:17, 79:21, 82:1, 87:2, 90:21, 91:21, 101:3, 108:13, 111:23, 135:20, 150:4, 151:17, 162:3, 176:11, 176:16, 176:20, 185:21, 196:22, 208:19, 220:10, 225:24, 229:22, 230:22, 230:23, 231:1, 231:14, 232:2, 234:6, 234:14, 235:21, 243:24, 244:11, 244:23, 244:24, 245:9, 248:11, 254:1, 256:9, 272:14, 273:9, 275:24, 280:3, 280:24, 282:15, 282:24, 286:2, 294:4, 294:12
**seeing** [10] - 11:3, 11:15, 149:7, 149:15, 149:16, 149:21, 165:10, 241:24, 258:14, 281:1
**seek** [4] - 15:22, 70:19, 133:6, 251:10
**seeking** [2] - 36:14, 129:19
**seem** [13] - 48:20, 60:5, 61:15, 162:23, 163:6, 182:24, 208:3, 208:7, 208:9,

208:13, 209:5, 233:23, 303:3
**segregated** [1] - 137:17
**selfie** [1] - 83:18
**selfies** [1] - 238:1
**semantics** [1] - 300:16
**send** [2] - 20:24, 130:6
**sending** [2] - 31:16, 130:11
**sense** [19] - 12:20, 23:21, 23:23, 28:18, 42:14, 57:24, 64:2, 65:21, 88:5, 106:16, 117:12, 124:12, 199:1, 209:14, 229:3, 229:4, 304:4, 304:7, 304:12
**sensuality** [1] - 226:7
**sent** [4] - 19:24, 247:17, 247:21, 247:23
**sentence** [7] - 86:7, 86:14, 91:10, 116:24, 117:6, 117:12, 291:4
**separate** [1] - 94:22
**September** [2] - 229:25, 230:2
**Sergeant** [19] - 95:7, 95:8, 95:16, 95:19, 96:15, 101:2, 102:2, 115:12, 198:9, 200:5, 201:24, 203:9, 248:24, 260:10, 264:9, 266:6, 275:4, 275:6, 275:10
**sergeant** [14] - 95:13, 191:17, 192:5, 193:6, 193:7, 193:15, 193:21, 194:9, 194:24, 198:5, 200:15, 241:16, 264:9, 275:7
**serious** [1] - 152:5
**seriously** [1] - 65:9
**served** [2] - 134:5, 203:22
**server** [1] - 147:25
**service** [4] - 14:19, 17:3, 17:21, 18:3
**session** [2] - 146:14, 239:13
**set** [2] - 61:1, 65:22
**setting** [1] - 61:19
**seven** [2] - 15:23, 87:17
**seventh** [1] - 62:19
**several** [5] - 7:21,

149:16, 186:14, 263:19, 302:12
**sex** [1] - 18:9
**sexual** [19] - 12:14, 23:6, 23:17, 26:9, 26:12, 58:15, 83:13, 85:19, 86:21, 92:16, 155:19, 170:18, 171:23, 172:5, 206:16, 219:14, 229:6, 229:11, 295:9
**shadow** [1] - 153:19
**shakes** [3] - 38:10, 190:14, 190:17
**shaking** [1] - 231:20
**share** [3] - 273:14, 281:22, 282:1
**sharing** [1] - 272:25
**shave** [1] - 117:9
**shaved** [15] - 116:25, 117:4, 117:19, 117:21, 120:24, 120:25, 160:5, 160:15, 208:17, 208:22, 208:23, 208:25, 283:9, 285:18, 292:21
**shaving** [2] - 120:10, 120:13
**shaving's** [1] - 119:18
**Sheet**.........................
........ [1] - 3:9
**Sheriff's** [4] - 1:8, 126:16, 198:13, 310:3
**sheriff's** [2] - 172:21, 265:10
**SHEVLIN** [129] - 2:16, 4:21, 8:13, 10:22, 11:21, 14:1, 14:6, 18:12, 18:18, 20:19, 43:8, 43:11, 43:15, 45:16, 45:19, 81:22, 82:3, 82:17, 92:3, 92:10, 93:4, 96:11, 97:9, 97:21, 97:24, 98:18, 100:14, 101:9, 101:23, 103:3, 103:19, 104:5, 104:13, 104:25, 105:23, 106:21, 114:19, 116:8, 117:15, 117:24, 118:8, 119:6, 122:6, 123:16, 124:9, 124:17, 125:1, 125:10, 125:18, 126:10, 129:15, 129:21, 131:2,

132:7, 161:2, 161:5, 161:8, 162:12, 164:10, 167:9, 169:23, 170:4, 191:15, 192:10, 192:18, 192:20, 193:4, 193:16, 194:17, 195:9, 206:18, 207:13, 207:19, 208:6, 208:15, 209:6, 209:16, 209:25, 210:10, 210:17, 211:1, 211:8, 221:25, 222:11, 222:14, 222:17, 223:10, 223:13, 223:18, 223:22, 262:24, 263:2, 263:4, 263:6, 270:19, 273:4, 273:11, 273:16, 284:13, 284:19, 284:21, 286:21, 289:21, 290:2, 290:16, 291:16, 292:5, 293:7, 293:17, 293:24, 294:6, 294:20, 295:6, 295:17, 296:19, 298:17, 299:16, 300:2, 300:11, 301:3, 301:20, 302:12, 303:10, 304:13, 305:3, 305:13, 306:16, 307:7, 307:12
**Shevlin** [2] - 4:21, 263:7
**Shevlin** ............. [1] - 3:5
**ships** [1] - 99:7
**shoot** [26] - 61:16, 61:17, 138:12, 138:14, 139:6, 139:8, 139:10, 139:12, 213:11, 220:12, 220:14, 220:23, 220:24, 220:25, 221:2, 221:3, 221:7, 235:1, 235:4, 235:5, 237:20, 238:24, 239:10, 240:19, 240:25, 241:2
**shoots** [3] - 154:1, 237:6, 237:8
**short** [1] - 66:15
**short-sided** [1] -

66:15
**shorthand** [1] - 265:8
**show** [21] - 13:21, 86:19, 94:3, 95:18, 133:11, 133:12, 133:24, 163:5, 163:9, 172:3, 177:5, 242:25, 246:20, 263:21, 266:21, 271:25, 281:3, 287:6, 288:4, 288:24
**showed** [14] - 113:24, 114:9, 128:7, 128:18, 162:20, 202:23, 258:12, 267:7, 267:19, 271:23, 272:3, 272:7, 291:21, 292:11
**showing** [8] - 43:23, 49:2, 106:23, 128:13, 269:12, 270:9, 275:24, 292:24
**shown** [10] - 10:19, 11:1, 14:11, 14:12, 128:7, 206:1, 240:23, 270:4, 271:16, 272:13
**shows** [5] - 46:8, 46:16, 160:1, 294:17
**shut** [1] - 228:24
**sic** [2] - 169:20, 252:1
**sick** [1] - 180:5
**side** [2] - 297:6, 299:11
**sided** [1] - 66:15
**sign** [2] - 199:16, 199:18
**signalled** [1] - 62:9
**Signed** [2] - 308:9, 309:15
**signed** [2] - 18:13, 129:8
**silly** [2] - 111:10, 262:11
**similar** [1] - 298:5
**simple** [1] - 42:11
**simply** [2] - 25:8, 104:11
**single** [3] - 107:13, 205:15, 290:8
**sit** [26] - 6:21, 7:2, 8:8, 8:20, 23:16, 25:16, 29:6, 71:22, 78:20, 81:25, 103:24, 164:23, 167:25, 188:2, 195:14, 212:21, 213:3, 213:23, 215:4,

263:20, 264:21, 277:3, 298:8, 301:21, 306:19, 307:2
site [28] - 40:20, 40:22, 41:18, 44:4, 53:3, 54:2, 55:9, 67:6, 67:13, 69:8, 70:16, 112:2, 113:10, 113:12, 113:16, 135:3, 135:5, 143:14, 174:17, 175:1, 175:3, 175:5, 175:11, 176:20, 176:21, 229:15, 230:17
sites [7] - 44:1, 65:25, 66:25, 67:3, 67:4, 67:5
sitting [1] - 81:5
six [2] - 223:8, 254:7
skin [1] - 120:15
skip [1] - 38:12
skirt [1] - 279:4
sleep [1] - 58:23
slick [1] - 76:1
small [3] - 225:16, 231:2, 232:15
SMM [1] - 289:16
SMR [20] - 116:12, 116:21, 116:22, 206:3, 206:7, 206:9, 207:22, 283:21, 284:24, 285:4, 285:5, 289:16, 290:13, 290:17, 291:10, 291:24, 292:3, 292:22, 292:24
Sniffen [1] - 2:10
snippet [2] - 225:17, 231:2
social [2] - 113:15, 247:16
socks [1] - 282:23
sole [1] - 73:17
solely [10] - 36:4, 38:4, 52:13, 113:10, 140:6, 164:16, 188:6, 191:16, 197:22, 198:6
someone [29] - 18:19, 33:13, 56:8, 59:7, 59:12, 79:4, 81:10, 90:14, 104:22, 109:1, 110:3, 112:22, 120:24, 126:3, 162:19, 169:10, 171:22,

172:20, 180:8, 180:12, 180:15, 191:12, 203:4, 213:25, 238:11, 242:24, 247:21, 279:13
sometime [1] - 203:16
sometimes [17] - 16:25, 30:6, 55:23, 62:12, 66:25, 67:5, 91:21, 97:12, 98:13, 98:16, 120:12, 185:25, 196:13, 227:8, 263:9
somewhere [1] - 135:11
soon [1] - 222:12
sorry [78] - 9:19, 10:4, 13:19, 17:20, 18:10, 18:20, 19:2, 19:6, 21:14, 22:12, 26:19, 27:1, 28:19, 30:17, 31:24, 36:18, 37:5, 37:6, 39:17, 40:12, 46:16, 51:1, 55:7, 56:6, 63:8, 67:4, 74:12, 84:21, 88:12, 92:11, 94:20, 95:13, 96:12, 97:25, 98:12, 106:1, 109:20, 115:16, 118:25, 123:23, 129:3, 130:13, 131:8, 134:23, 136:10, 136:12, 137:10, 137:11, 138:15, 161:18, 169:23, 184:10, 184:20, 193:22, 201:12, 201:14, 221:23, 231:16, 237:16, 259:7, 265:15, 265:16, 265:17, 265:18, 269:5, 269:7, 272:8, 277:5, 278:14, 281:6, 281:9, 281:14, 283:25, 284:15, 291:2, 293:8, 299:9, 305:24
sort [11] - 25:23, 32:17, 62:8, 80:21, 83:6, 89:13, 114:13, 125:14, 199:16, 216:6, 235:20
sought [11] - 8:3, 32:4, 87:8, 130:1, 166:8, 166:15, 166:17, 171:5, 171:15, 193:2, 293:4

sound [5] - 6:25, 7:1, 126:18, 151:17, 209:8
sounds [6] - 64:4, 82:17, 95:18, 116:3, 205:11, 223:10
source [28] - 31:4, 36:15, 36:22, 37:2, 37:4, 37:6, 37:10, 37:15, 37:17, 39:15, 40:6, 40:9, 40:15, 42:4, 42:7, 42:10, 47:3, 52:19, 52:23, 53:13, 53:18, 53:19, 131:17, 187:4, 226:15, 229:20, 248:10
sources [3] - 111:1, 111:3, 111:6
speaking [3] - 55:18, 277:12, 277:22
special [5] - 81:14, 81:17, 88:1, 88:2, 88:5
specialized [2] - 60:19, 126:5
specific [41] - 6:24, 7:14, 9:9, 16:5, 27:19, 44:5, 49:23, 50:10, 79:9, 80:14, 80:18, 81:10, 81:12, 82:5, 102:10, 102:13, 102:16, 104:8, 113:10, 113:12, 135:8, 136:4, 143:12, 158:21, 159:8, 159:16, 162:5, 162:7, 165:22, 179:13, 182:19, 186:12, 258:16, 258:20, 261:12, 261:14, 262:20, 269:17, 286:10, 302:25, 306:9
specifically [25] - 50:1, 80:13, 103:17, 106:3, 109:9, 110:16, 114:3, 114:14, 116:13, 124:22, 128:19, 135:12, 135:14, 136:24, 137:16, 159:1, 169:9, 181:6, 181:13, 209:12, 247:19, 249:14, 260:2, 269:7, 269:18
specifics [2] - 115:3, 264:24
specify [2] - 159:16,

286:5
speculate [4] - 70:15, 174:9, 248:1, 248:2
speculating [1] - 70:14
Spellman [1] - 2:10
spoken [1] - 29:10
spot [1] - 47:15
spread [2] - 64:20, 292:24
squatting [1] - 79:12
ST [2] - 308:4, 309:3
St [24] - 1:8, 1:18, 1:20, 4:9, 5:23, 72:23, 101:18, 126:16, 151:1, 169:5, 198:12, 218:14, 265:5, 265:7, 268:17, 269:11, 269:22, 270:22, 275:12, 275:21, 278:13, 286:15, 286:17, 310:3
staff [2] - 189:19
staged [2] - 83:24, 84:11
stages [1] - 89:1
stamped [1] - 111:2
stand [2] - 277:3, 277:8
standpoint [1] - 34:18
stands [3] - 13:18, 116:14, 116:16
start [5] - 5:5, 6:18, 37:7, 56:14, 94:23
started [2] - 88:20, 178:20
starting [4] - 15:16, 34:1, 48:20, 283:18
starts [1] - 284:3
state [19] - 5:11, 22:20, 128:12, 146:6, 151:1, 151:19, 183:7, 192:5, 198:6, 198:23, 199:19, 200:14, 200:25, 201:3, 201:8, 202:3, 219:10, 241:14, 285:3
STATE [2] - 308:3, 309:2
State [4] - 6:10, 259:13, 308:6, 308:13
statement [22] - 26:3, 35:11, 35:16, 35:19, 40:13, 49:12, 52:6, 52:12, 52:13, 53:19,

54:13, 75:7, 91:19, 131:24, 140:2, 167:18, 194:25, 196:16, 219:17, 274:18, 275:17, 275:19
statements [5] - 39:23, 39:25, 49:16, 199:20
States [1] - 4:5
STATES [1] - 1:1
states [8] - 53:24, 270:14, 282:21, 283:6, 283:12, 284:23, 285:6, 291:17
stating [2] - 44:3, 285:2
station [1] - 189:16
statistics [1] - 63:15
Statute [2] - 3:17, 169:20
statute [14] - 85:15, 86:2, 86:23, 169:20, 170:6, 170:12, 170:25, 171:4, 171:10, 171:15, 171:17, 227:2, 227:5
stenographic [1] - 309:9
stenographically [1] - 309:6
step [4] - 74:3, 129:5, 135:19, 180:21
steps [1] - 180:24
still [38] - 8:16, 9:21, 13:1, 13:6, 20:24, 22:22, 23:13, 45:25, 64:20, 64:23, 116:1, 117:1, 117:5, 117:11, 117:18, 117:22, 146:17, 150:3, 154:7, 154:15, 156:10, 165:10, 165:21, 166:22, 181:21, 188:20, 190:9, 191:4, 194:23, 200:9, 213:3, 232:2, 238:16, 241:11, 241:12, 258:15, 276:17, 277:8
sting [1] - 75:13
stole [1] - 108:12
stood [1] - 116:21
stop [5] - 137:10, 198:16, 198:22, 216:15, 217:5
stopped [1] - 192:11
story [1] - 200:8

**Street** [2] - 2:4, 2:11
**street** [1] - 108:12
**stricken** [1] - 48:16
**strike** [4] - 48:14, 53:7, 131:21, 209:2
**strongly** [1] - 13:9
**struggling** [1] - 182:20
**studio** [2] - 61:19, 61:23
**studios** [2] - 83:24, 84:11
**stuff** [9] - 14:3, 17:1, 42:13, 51:15, 66:7, 76:8, 122:23, 133:15, 142:25
**stunt** [2] - 47:18, 47:20
**subject** [13] - 8:9, 10:20, 28:9, 30:21, 35:2, 36:23, 66:11, 110:9, 201:16, 202:14, 237:5, 252:6, 268:11
**submit** [6] - 132:11, 132:21, 132:24, 133:4, 133:9, 133:16
**submitted** [6] - 131:21, 131:22, 131:23, 132:2, 132:10, 132:18
**subpoena** [11] - 15:22, 31:18, 31:23, 32:4, 87:9, 130:6, 130:8, 130:11, 132:13, 150:22
**subscriber** [2] - 134:14, 134:16
**Subsection** [1] - 246:20
**subsequent** [1] - 97:16
**sufficed** [1] - 217:7
**suggest** [1] - 160:18
**suggested** [2] - 101:2, 278:24
**Suite** [3] - 1:19, 2:17, 4:9
**super** [3] - 74:23, 80:18, 141:11
**superior** [1] - 200:25
**supervisor** [2] - 196:25, 197:14
**supervisors** [5] - 189:15, 196:20, 196:21, 199:9, 199:10
**support** [2] - 133:6, 203:17
**supposed** [3] - 18:14,

141:19, 244:16
**surprise** [3] - 278:23, 279:4, 279:11
**suspect** [15] - 14:20, 19:3, 19:12, 19:17, 19:25, 20:11, 20:14, 20:15, 20:24, 21:16, 185:4, 229:1, 263:9, 268:2, 268:11
**suspected** [2] - 17:5, 17:24
**suspects** [2] - 19:17, 21:3
**suspicion** [5] - 70:11, 109:7, 233:8, 249:4, 249:11
**SVU** [1] - 262:5
**swear** [2] - 39:5, 51:10
**swearing** [1] - 53:3
**sweatshirt** [1] - 76:2
**switch** [1] - 236:13
**switched** [1] - 200:18
**swore** [1] - 151:19
**sworn** [4] - 4:16, 5:2, 152:10, 308:8
**Synchronoss** [15] - 8:1, 16:3, 27:20, 38:16, 49:13, 85:9, 129:23, 130:5, 130:9, 130:12, 134:9, 156:16, 203:23, 203:24, 252:14

**T**

**table** [1] - 252:4
**TAKEN** [1] - 1:16
**talks** [1] - 111:14
**Tallahassee** [1] - 2:11
**tampered** [1] - 153:4
**target** [3] - 19:1, 19:3, 21:18
**targets** [1] - 21:3
**Team** [5] - 1:10, 91:7, 97:6, 264:24, 310:4
**technically** [1] - 86:4
**techniques** [1] - 119:3
**teen** [8] - 83:19, 278:25, 279:1, 279:2, 279:3
**teenage** [6] - 40:21, 41:19, 52:16, 52:17, 54:3, 278:25
**teens** [6] - 278:18, 279:1, 279:2, 279:3
**ten** [1] - 278:2
**term** [8] - 26:21, 29:5, 42:14, 51:13, 57:19, 57:21, 105:3, 286:4

**terminology** [3] - 159:8, 159:17, 210:2
**terms** [16] - 15:15, 16:22, 28:1, 42:11, 46:12, 50:8, 50:10, 68:16, 77:4, 80:15, 80:16, 108:10, 176:11, 210:6, 245:3, 278:24
**terrible** [1] - 169:19
**testified** [32] - 5:4, 39:1, 39:14, 40:3, 40:10, 42:19, 51:3, 51:20, 52:2, 72:2, 99:8, 139:18, 140:3, 140:15, 165:16, 172:14, 175:5, 176:10, 213:2, 220:12, 260:3, 261:17, 263:19, 271:18, 276:9, 276:24, 276:25, 278:2, 278:10, 293:20, 300:17, 300:22
**testify** [2] - 93:19, 276:3
**testifying** [1] - 228:7
**testimony** [36] - 42:2, 42:3, 42:24, 44:10, 49:18, 50:12, 51:25, 52:22, 62:11, 74:10, 74:14, 76:20, 83:3, 97:3, 140:8, 140:18, 165:12, 166:22, 192:21, 199:25, 259:16, 261:19, 263:18, 264:5, 274:12, 276:11, 276:20, 277:4, 278:16, 279:16, 285:22, 286:7, 298:18, 299:6, 299:8, 301:15
**text** [3] - 29:25, 113:16, 274:8
**THE** [190] - 4:1, 5:5, 5:7, 10:23, 13:25, 22:2, 22:9, 22:12, 22:15, 23:19, 24:20, 26:2, 26:15, 27:11, 27:16, 30:6, 35:14, 36:18, 39:11, 40:17, 41:14, 69:21, 70:14, 72:14, 73:21, 82:4, 82:19, 82:23, 86:13, 92:11, 96:12, 97:8, 98:22, 100:15, 101:10, 103:4, 103:17, 103:20,

104:14, 105:1, 106:1, 110:6, 110:15, 110:21, 111:22, 112:25, 114:20, 118:9, 122:5, 122:7, 123:6, 123:17, 125:2, 125:19, 129:22, 132:6, 132:15, 141:5, 142:2, 142:8, 143:19, 143:24, 146:17, 147:3, 148:22, 150:17, 150:25, 151:12, 151:25, 152:8, 152:14, 152:20, 153:9, 153:14, 153:22, 154:4, 154:17, 155:2, 155:12, 158:20, 161:23, 162:14, 163:1, 163:11, 163:22, 164:9, 164:11, 165:1, 165:14, 166:12, 166:25, 167:7, 167:10, 167:22, 168:6, 168:10, 168:18, 168:20, 168:23, 172:24, 173:5, 175:9, 176:1, 176:19, 177:18, 178:15, 181:6, 183:2, 183:25, 185:11, 187:24, 188:5, 188:19, 190:1, 190:17, 191:16, 192:11, 192:19, 193:5, 197:8, 200:3, 207:14, 208:7, 208:16, 209:17, 210:1, 210:9, 210:15, 210:18, 211:2, 211:21, 212:4, 212:10, 212:19, 214:16, 215:22, 216:2, 218:7, 218:23, 221:12, 221:19, 230:9, 231:16, 238:13, 240:7, 241:4, 243:2, 243:22, 246:13, 246:14, 246:17, 249:14, 253:24, 254:15, 284:12, 286:25, 290:1, 290:3, 290:17, 291:17, 293:8, 293:23, 293:25,

294:7, 294:19, 294:21, 295:5, 295:16, 295:18, 296:20, 296:22, 298:16, 299:17, 300:3, 300:10, 300:12, 301:4, 301:19, 301:21, 302:11, 302:14, 303:9, 303:24, 304:14, 304:24, 305:10, 305:24, 306:17, 307:8, 307:15
**themselves** [4] - 123:3, 139:21, 140:7, 144:3
**theory** [1] - 153:5
**therefore** [5] - 206:4, 283:21, 289:17, 290:3, 291:24
**they've** [2] - 27:8, 51:14
**thief** [1] - 108:15
**thighs** [2] - 160:2, 292:24
**thinking** [6] - 101:10, 101:11, 106:1, 129:3, 131:9, 138:15
**third** [7] - 39:22, 131:25, 157:21, 200:20, 207:9, 284:4, 284:22
**third-degree** [1] - 39:22
**thongs** [1] - 279:3
**three** [42] - 8:22, 46:8, 87:12, 87:13, 94:10, 94:16, 94:22, 132:11, 135:24, 136:15, 136:16, 137:20, 137:22, 156:13, 156:14, 156:21, 157:5, 157:8, 169:3, 204:10, 204:11, 205:3, 223:2, 237:11, 239:6, 251:18, 251:23, 252:18, 252:22, 253:6, 253:7, 254:4, 254:23, 255:16, 255:25, 256:3, 256:11, 256:13, 256:15, 257:24, 258:7, 273:6
**thumb** [9] - 219:6, 219:24, 222:8, 227:21, 231:22, 232:6, 232:10,

267:13, 267:14
**Thursday** [1] - 1:16
**tile** [2] - 235:17,
235:19
**TIME** [1] - 1:17
**tip** [42] - 3:13, 13:16,
13:17, 14:4, 14:12,
14:13, 15:7, 20:10,
20:15, 20:22, 33:5,
33:13, 33:22, 34:7,
34:11, 34:12, 35:2,
61:9, 68:4, 87:4,
89:8, 89:12, 91:5,
98:25, 99:4, 100:11,
106:25, 107:18,
107:22, 108:1,
108:21, 109:13,
110:10, 131:20,
143:13, 204:12,
237:5, 266:25,
271:19, 271:21,
271:24, 272:6
**tips** [3] - 33:10, 145:2,
227:15
**title** [2] - 265:2, 275:3
**today** [37] - 5:13, 6:21,
7:2, 7:23, 8:8, 8:20,
23:16, 25:17, 33:19,
49:18, 52:23, 71:22,
73:6, 78:20, 81:25,
103:24, 167:25,
188:2, 195:14,
205:20, 206:1,
212:1, 213:23,
215:4, 219:5,
259:16, 263:20,
264:21, 276:17,
276:21, 277:3,
291:21, 292:17,
295:11, 298:9,
306:19
**today's** [2] - 4:9, 7:7
**Tolbert** [29] - 20:5,
20:9, 20:21, 95:7,
95:8, 95:14, 95:15,
95:19, 96:15, 101:2,
102:2, 115:12,
196:25, 198:9,
200:6, 201:24,
202:10, 203:9,
248:15, 248:24,
260:9, 260:10,
260:21, 264:9,
266:6, 275:4, 275:6,
275:10, 278:10
**Tolbert's** [1] - 199:24
**took** [15] - 61:15,
156:1, 159:18,
181:2, 203:11,
204:18, 227:23,

233:9, 245:9,
247:24, 259:23,
259:25, 267:21,
292:7
**top** [11] - 46:17, 79:7,
160:1, 221:8, 223:4,
224:2, 226:7,
232:12, 244:19,
246:23, 253:14
**total** [8] - 87:17,
136:15, 136:16,
137:20, 137:22,
156:14, 254:6,
265:12
**totality** [6] - 75:5,
77:3, 77:9, 79:6,
157:9, 178:5
**totally** [3] - 304:14,
304:15, 304:16
**touch** [1] - 222:13
**track** [2] - 56:17, 114:7
**traditionally** [1] -
121:9
**traffic** [1] - 217:5
**training** [8] - 29:11,
60:18, 60:19, 81:9,
81:11, 88:18, 88:20,
88:24
**transcript** [3] - 48:16,
309:7, 309:8
**TRANSCRIPT** [1] -
310:6
**transmit** [1] - 148:9
**transmitting** [1] -
148:6
**treasure** [1] - 228:21
**treat** [2] - 47:24, 92:24
**treated** [1] - 93:7
**trick** [1] - 17:12
**tried** [4] - 28:22,
221:20, 230:16,
290:23
**trove** [1] - 228:21
**true** [14] - 40:1, 84:16,
84:17, 99:16,
125:12, 136:6,
136:21, 140:2,
167:25, 193:19,
224:8, 277:13,
309:8, 310:24
**trust** [2] - 211:6, 211:7
**trusting** [2] - 210:22,
211:2
**truthful** [2] - 39:20,
49:16
**try** [12] - 48:10, 55:9,
78:11, 137:6, 151:6,
162:18, 201:4,
226:15, 226:20,
231:5, 237:1, 245:7,

**trying** [29] - 17:11,
60:4, 63:24, 64:2,
65:10, 65:21, 74:13,
76:10, 76:19, 76:25,
77:1, 79:2, 117:19,
118:15, 118:16,
130:14, 131:7,
138:16, 161:19,
179:11, 179:13,
183:19, 185:24,
231:20, 237:1,
242:23, 277:5,
290:22
**turn** [5] - 29:3, 43:17,
47:24, 58:19, 286:23
**twice** [4] - 106:9,
265:14, 265:21,
265:22
**two** [50] - 10:5, 10:6,
10:9, 50:5, 95:2,
138:8, 138:16,
138:18, 140:5,
170:11, 205:3,
206:1, 206:20,
206:21, 206:22,
213:4, 242:4,
242:13, 242:25,
243:6, 251:13,
251:23, 255:16,
256:3, 256:12,
256:22, 260:1,
262:15, 267:3,
270:9, 271:3,
271:16, 271:20,
272:4, 272:13,
279:21, 279:22,
280:1, 282:6, 283:3,
283:19, 288:25,
291:21, 292:17,
295:11, 304:14,
304:15, 304:16,
306:12, 307:3
**Type** [1] - 308:22
**type** [7] - 15:6, 44:18,
63:2, 65:3, 113:15,
120:15, 227:1

## U

**UF** [2] - 1:10, 310:4
**ugly** [1] - 63:24
**Ukrainian** [1] - 279:23
**ultimate** [2] - 240:3,
286:12
**ultimately** [5] - 99:1,
105:7, 200:1, 205:2,
286:15
**un-redacted** [9] -
24:22, 24:25, 150:5,
150:23, 152:24,
218:4, 219:24,

220:2, 222:9
**unconfirmed** [9] -
27:23, 27:24, 28:5,
28:7, 28:13, 29:1,
29:5, 29:9, 108:3
**under** [21] - 9:7, 39:5,
40:14, 42:16, 47:6,
47:7, 49:12, 51:11,
53:3, 58:16, 60:15,
79:5, 79:25, 88:5,
93:19, 123:10,
123:15, 277:2,
283:3, 300:23, 306:8
**Under** [1] - 310:23
**underage** [5] - 43:25,
44:4, 55:24, 58:2,
216:15
**underlying** [1] -
264:12
**understood** [2] -
224:9, 224:11
**underwear** [2] - 62:13,
160:2
**unedited** [1] - 75:18
**unequivocally** [2] -
39:14, 197:3
**unfortunately** [8] -
27:20, 50:6, 51:21,
91:20, 91:21, 231:2,
301:7, 307:4
**unintelligible** [6] -
45:19, 75:24,
263:18, 273:24,
282:12, 284:23
**unintelligible )** [5] -
5:22, 85:11, 112:4,
118:17, 194:18
**unit** [4] - 88:1, 88:3,
181:22, 202:22
**Unit** [4] - 4:1, 82:20,
82:24, 168:24
**UNITED** [1] - 1:1
**United** [1] - 4:5
**unknown** [4] - 52:23,
258:24, 258:25,
259:4
**unlawful** [2] - 86:17,
172:1
**unless** [5] - 22:10,
185:6, 185:16
**unreasonable** [1] -
186:8
**unsavory** [1] - 47:23
**unstable** [1] - 265:19
**unsuccessful** [1] -
24:10
**untoward** [1] - 244:11
**unusual** [2] - 136:18,
140:25
**up** [37] - 13:11, 18:19,

26:7, 45:7, 46:17,
49:24, 58:24, 65:22,
76:9, 83:3, 96:8,
99:6, 131:9, 145:1,
175:1, 180:22,
189:8, 228:13,
228:14, 228:17,
230:23, 231:5,
232:10, 232:11,
248:11, 263:2,
263:11, 267:15,
273:25, 277:14,
277:15, 279:3,
281:7, 281:16,
284:15, 286:23
**uploaded** [1] - 15:19
**utilize** [1] - 75:21
**utilized** [2] - 43:1,
135:7
**utilizing** [3] - 42:13,
106:7, 228:11

## V

**vagina** [13] - 158:4,
158:6, 158:11,
158:13, 158:18,
158:19, 158:21,
159:1, 159:2, 159:4,
159:6, 159:12,
161:18
**vaginal** [1] - 80:18
**valid** [2] - 99:13,
150:19
**value** [1] - 17:2
**variable** [1] - 216:3
**variables** [3] - 177:9,
195:16, 241:11
**variety** [1] - 274:12
**various** [1] - 227:15
**verbatim** [11] - 78:18,
102:11, 106:15,
108:4, 124:21,
129:5, 179:1, 181:7,
211:11, 259:25,
278:21
**verification** [5] -
141:10, 147:15,
147:23, 148:19,
184:3
**verified** [14] - 68:24,
69:4, 69:19, 69:24,
71:23, 84:13, 84:19,
96:21, 140:22,
141:2, 175:6, 177:3,
215:12, 300:20
**verify** [6] - 131:7,
150:6, 150:7, 153:1,
215:11, 218:20
**verifying** [1] - 217:11
**Verizon** [5] - 87:1,

129:11, 130:13, 134:17, 203:22
**version** [14] - 11:1, 152:24, 231:24, 299:12, 299:14, 299:19, 299:21, 299:24, 300:3, 300:8, 300:14, 301:1, 301:5, 302:8
**versions** [1] - 152:1
**versus** [4] - 4:4, 6:10, 60:20, 90:4
**via** [3] - 2:9, 2:16, 148:6
**victim** [4] - 24:7, 28:1, 28:18, 67:12
**victims** [8] - 88:1, 88:3, 88:5, 155:16, 166:8, 187:15, 187:16, 229:11
**video** [6] - 4:2, 16:24, 47:16, 194:4, 238:16, 238:20
**VIDEO** [1] - 1:13
**video-recorded** [2] - 4:2, 47:16
**VIDEO-RECORDED** [1] - 1:13
**Videographer** [1] - 2:23
**VIDEOGRAPHER** [9] - 4:1, 5:5, 82:19, 82:23, 168:20, 168:23, 246:14, 246:17, 307:15
**videographer** [1] - 4:12
**videotaped** [1] - 307:16
**view** [8] - 64:5, 66:14, 66:24, 86:18, 158:22, 172:2, 172:13, 224:24
**viewed** [27] - 37:8, 63:12, 65:14, 68:5, 68:8, 68:10, 68:12, 69:13, 69:25, 70:1, 70:4, 91:4, 96:13, 96:16, 128:17, 128:19, 148:5, 151:13, 177:2, 185:14, 252:17, 253:18, 260:2, 260:5, 261:21, 261:22, 264:1
**viewer** [1] - 62:21
**viewing** [6] - 178:6, 185:14, 202:20, 263:24, 274:18, 276:7

**viewpoint** [2] - 178:6, 178:8
**virtually** [1] - 67:23
**virus** [1] - 228:14
**visible** [6] - 124:6, 232:10, 284:23, 285:4, 292:22, 292:23
**visibly** [1] - 123:25
**visit** [1] - 278:16
**visited** [1] - 176:20
**visits** [1] - 176:20
**vs** [1] - 1:6

## W

**wait** [1] - 219:22
**waiting** [2] - 129:22, 130:4
**wake** [1] - 58:24
**walks** [2] - 111:14, 302:3
**walls** [1] - 235:10
**wants** [1] - 30:13
**warrant** [44] - 3:14, 7:24, 8:2, 16:6, 35:3, 36:14, 37:9, 37:14, 37:20, 38:16, 38:24, 49:13, 53:23, 53:24, 71:19, 85:8, 86:24, 87:2, 87:22, 105:11, 129:7, 129:20, 129:23, 130:2, 130:7, 130:19, 132:4, 132:19, 133:5, 133:6, 133:15, 133:18, 134:3, 171:5, 171:15, 193:2, 199:13, 202:17, 203:17, 203:19, 251:10, 276:1, 293:4
**warrants** [4] - 7:22, 31:19, 31:20, 260:14
**watermark** [24] - 29:22, 29:24, 30:11, 30:18, 32:8, 32:10, 32:16, 32:20, 38:4, 39:12, 40:19, 41:9, 41:10, 41:12, 41:17, 62:3, 71:13, 71:17, 113:10, 147:20, 185:3, 226:11, 230:23, 234:14
**watermarks** [1] - 30:7
**waxing** [2] - 119:20, 120:16
**ways** [1] - 55:5
**wear** [1] - 76:2
**wearing** [7] - 108:13,

220:15, 220:16, 236:23, 237:12, 279:3, 282:22
**website** [77] - 21:7, 21:9, 21:23, 22:21, 23:14, 27:9, 27:14, 32:7, 32:16, 32:21, 41:2, 41:3, 41:4, 47:3, 55:15, 62:2, 67:15, 67:24, 67:25, 68:2, 68:21, 68:25, 69:17, 69:18, 71:1, 71:6, 71:22, 72:6, 73:7, 105:15, 110:12, 110:16, 111:2, 112:5, 112:8, 113:13, 113:14, 113:15, 127:21, 139:14, 141:1, 141:25, 142:17, 144:4, 144:6, 145:14, 146:9, 147:22, 148:14, 163:8, 174:12, 174:15, 175:16, 177:3, 183:16, 184:17, 184:21, 184:22, 184:25, 185:7, 185:8, 185:12, 186:11, 187:6, 187:9, 188:15, 190:13, 195:12, 196:1, 196:15, 199:24, 225:5, 226:9, 228:22, 228:24, 234:3, 247:15
**websites** [23] - 65:12, 67:18, 67:20, 68:18, 84:19, 84:22, 84:23, 121:25, 122:2, 127:9, 140:16, 141:19, 143:2, 144:8, 144:12, 145:1, 176:11, 176:16, 184:2, 186:1, 186:7, 233:25
**weighed** [1] - 259:18
**weight** [3] - 81:1, 81:18, 81:19
**weird** [8] - 74:23, 77:1, 122:23, 162:23, 208:3, 208:7, 208:9, 209:8
**Weiss** [1] - 126:15
**white** [6] - 231:15, 232:2, 235:21, 243:16, 243:23, 282:23
**whole** [3] - 86:21,

172:4, 231:7
**widely** [1] - 292:24
**Wildlife** [3] - 20:12, 178:19, 178:24
**WILLIAM** [2] - 1:3, 310:2
**William** [4] - 4:3, 5:15, 19:20, 21:5
**window** [1] - 235:23
**wish** [3] - 67:10, 190:13, 288:8
**Witness** [1] - 3:2
**WITNESS** [181] - 5:7, 10:23, 13:25, 22:2, 22:9, 22:12, 22:15, 23:19, 24:20, 26:2, 26:15, 27:11, 27:16, 30:6, 35:14, 36:18, 39:11, 40:17, 41:14, 69:21, 70:14, 72:14, 73:21, 82:4, 86:13, 92:11, 96:12, 97:8, 98:22, 100:15, 101:10, 103:4, 103:17, 103:20, 104:14, 105:1, 106:1, 110:6, 110:15, 110:21, 111:22, 112:25, 114:20, 118:9, 122:5, 122:7, 123:6, 123:17, 125:2, 125:19, 129:22, 132:6, 132:15, 141:5, 142:2, 142:8, 143:19, 143:24, 146:17, 147:3, 148:22, 150:17, 150:25, 151:12, 151:25, 152:8, 152:14, 152:20, 153:9, 153:14, 153:22, 154:4, 154:17, 155:2, 155:12, 158:20, 161:23, 162:14, 163:1, 163:11, 163:22, 164:9, 164:11, 165:1, 165:14, 166:12, 166:25, 167:7, 167:10, 167:22, 168:6, 168:10, 168:18, 172:24, 173:5, 175:9, 176:1, 176:19, 177:18, 178:15, 181:6, 183:2, 183:25, 185:11, 187:24, 188:5, 188:19,

190:1, 190:17, 191:16, 192:11, 192:19, 193:5, 197:8, 200:3, 207:14, 208:7, 208:16, 209:17, 210:1, 210:9, 210:15, 210:18, 211:2, 211:21, 212:4, 212:10, 212:19, 214:16, 215:22, 216:2, 218:7, 218:23, 221:12, 221:19, 230:9, 231:16, 238:13, 240:7, 241:4, 243:2, 243:22, 246:13, 249:14, 253:24, 254:15, 284:12, 286:25, 290:1, 290:3, 290:17, 291:17, 293:8, 293:23, 293:25, 294:7, 294:19, 294:21, 295:5, 295:16, 295:18, 296:20, 296:22, 298:16, 299:17, 300:3, 300:10, 300:12, 301:4, 301:19, 301:21, 302:11, 302:14, 303:9, 303:24, 304:14, 304:24, 305:10, 305:24, 306:17, 307:8
**witness** [6] - 1:23, 4:15, 5:2, 48:21, 221:17, 307:19
**women** [6] - 119:4, 121:21, 122:2, 122:8, 123:3, 123:6
**wonderful** [1] - 275:9
**wooden** [2] - 235:10, 235:11
**word** [7] - 29:24, 89:11, 89:12, 140:13, 161:15, 240:9, 285:23
**worded** [2] - 158:15, 158:21
**words** [1] - 114:12
**works** [1] - 264:23
**world** [8] - 64:3, 65:11, 65:23, 77:25, 121:11, 302:3
**worries** [2] - 22:14
**worse** [1] - 81:4
**worth** [1] - 221:16

| | |
|---|---|
| **WRITE** [1] - 310:6<br>**write** [4] - 136:20,<br>  221:14, 268:25,<br>  269:8<br>**writes** [1] - 107:13<br>**writing** [2] - 169:19,<br>  269:18<br>**written** [9] - 117:13,<br>  118:6, 118:9,<br>  160:16, 160:22,<br>  229:25, 234:3,<br>  269:13, 269:15<br>**wrote** [4] - 107:10,<br>  160:10, 269:3, 269:9<br>**www.met** [1] - 40:20<br>**www.met-art.com** [1]<br>  - 40:20 | **Z**<br>**ZEPF** [3] - 2:24, 223:8,<br>  232:5<br>**Zoom** [2] - 2:9, 2:16<br>**zoomed** [2] - 159:4,<br>  231:24<br>**zoomed-in** [2] - 159:4,<br>  231:24 |

**Y**

**YCBLDV** [1] - 256:7
**YCBLVVFQ** [2] -
  287:21, 292:19
**YCBLVVFQ_0.jpg** [2]
  - 207:12, 272:15
**year** [1] - 33:24
**years** [28] - 10:5, 10:6,
  10:9, 50:5, 87:24,
  93:21, 160:6,
  160:19, 161:21,
  162:11, 164:7,
  165:20, 166:1,
  206:4, 242:21,
  260:1, 262:15,
  283:4, 285:9,
  285:19, 289:17,
  290:14, 291:11,
  291:25, 292:3,
  293:2, 299:3, 307:3
**young** [11] - 61:5,
  73:19, 75:1, 80:4,
  80:9, 121:21,
  156:24, 156:25,
  157:1, 243:11
**young-looking** [1] -
  80:9
**younger** [17] - 77:9,
  243:9, 243:12,
  243:19, 283:4,
  299:19, 299:21,
  299:24, 300:3,
  300:7, 300:14,
  301:1, 301:5,
  301:17, 302:8,
  302:17, 303:3
**yourself** [5] - 76:16,
  99:9, 105:20,
  107:17, 163:17
**yourselves** [1] - 4:14

67-7

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Dennis Camden on 12/17/2024

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

Case 3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE, an individual,

      Plaintiff,

-vs-

ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

      Defendants.

_____/

REMOTE DEPOSITION OF DENNIS CAMDEN

Taken on Behalf of the Plaintiff

DATE TAKEN:  Tuesday, December 17, 2024
TIME:       3:04 p.m. - 3:55 p.m.
PLACE:      Remotely via Zoom

Deposition of the witness taken before:

Maureen Hall, RPR, FPR

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Dennis Camden on 12/17/2024**

Page 2

APPEARANCES:

Counsel for Plaintiff:

MICHAEL K. ROBERTS, ESQUIRE
LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI
1680 Emerson Street
Jacksonville, Florida 32207
mroberts@nrhnlaw.com

Counsel for Defendants, Robert Hardwick and Mikayla Preston:

MATTHEW JOSEPH CARSON, ESQUIRE
SNIFFEN & SPELLMAN, P.A.
123 Monroe Street
Tallahassee, Florida 32301-1509
mcarson@sniffenlaw.com

Counsel for Defendant, Kathleen Dully:

AMY K. SHEVLIN, ESQUIRE
BUCHANAN & BUCHANAN, P.A.
1900 Southeast 18th Avenue, Suite 300
Ocala, Florida 34471-8237
ashevlin@rbtrial.com

Page 3

I N D E X

REMOTE ZOOM DEPOSITION OF DENNIS CAMDEN

DIRECT EXAMINATION BY MR. ROBERTS:                    4

Page 4

PROCEEDINGS

Whereupon,

DENNIS CAMDEN, called as a witness by the Plaintiff, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.  Can you state your name for the record.

A.  Dennis Camden.

Q.  And what do you do for a living?

A.  I am a detective with the St. Johns County Sheriff's Office.

Q.  How long have you been a detective there?

A.  I've been a detective maybe four years.

Q.  And what did you do before that?

A.  Prior to becoming a -- well, I'm currently the corporal in the ICAC unit, which is internet crimes against children.  Prior to becoming the corporal of the ICAC Unit, I was a detective in the ICAC unit, and then prior to that, I worked patrol.

Q.  So how long have you been in the ICAC unit?

A.  Almost four years, I believe, three or four years.

Q.  Can you just tell me a little bit about the

Page 5

training and what goes into being an ICAC detective?

A.  So we are governed through an ICAC Task Force, North Florida ICAC Task Force.  Our headquarters are out of Gainesville, Florida.  We have -- is it quarterly training through them?  We go through training through any type of digital forensic's company, if you're able to do it, anything to another ICAC task force, anything, but it -- it's a lot.

Q.  Is there some sort of certification that you achieve prior to becoming an ICAC detective?

A.  No, sir, not that I know of.

Q.  So is it -- and I just want to understand. Is it that you get sort of transferred to the ICAC team at St. John's County Sheriff's Office, and you become an ICAC detective, and then from there you begin your quarterly or periodic training after that?

A.  Yes, sir.

Q.  Okay.  So I'm here to ask you some questions about the investigation of Mr. William Lawshe.  Do you recall any of that case?

A.  I took no part in the investigation of that case, but I am aware of what you're talking about.

Q.  Okay.  Do you know Detective Preston?

A.  Yes, sir.

Q.  Is she an ICAC detective in your department?

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Dennis Camden on 12/17/2024

Page 6

A.    Yes, sir.

Q.    Is she your subordinate now?

A.    Now, yes.

Q.    At the time of this investigation, were you guys colleagues?

A.    Yes.

Q.    And peers on the chain of command?

A.    Yes, sir.

Q.    So she would not have reported to you, and you would not have reported to her?

A.    Correct.

Q.    Did she ever ask you to help her to investigate Mr. Lawshe's case?

A.    No, sir. I took no part in this investigation. I was not housed out of this office. I was part of the federal task force housed out of Jacksonville, Florida.

Q.    I had your name as being like at least disclosed as maybe going to the house or doing something like that in the search?

A.    I did do that. I got a phonecall that asked me to sit on a house. I conducted a sweep, and that was it.

Q.    Okay. Did you ever view the images, any of the images related to Mr. Lawshe's case?

Page 7

A.    No, sir.

Q.    Did you ever form any opinions about whether or not there was probable cause to arrest Mr. Lawshe?

A.    No, sir.

Q.    Same question, I guess, is, did you ever form any opinion about whether or not there was probable cause to seek a search warrant in Mr. Lawshe's case?

A.    No, sir.

Q.    Have you ever had an opportunity to discuss this investigation -- understand that you are not a part of it -- with anyone else?

A.    No, sir, I did nothing involved in the investigation.

Q.    Did you ultimately hear that Mr. Lawshe's case was dropped by the Assistant State Attorney?

A.    I understand that there were complications involved in the -- or complications of the case, yes, sir.

Q.    Do you have any information as to why, what you call complications, why the case was dropped?

A.    No, sir, not -- I had nothing. It had nothing to do with me.

Q.    Okay. Do you know anything about a website called metart.com?

A.    Yes, sir.

Page 8

Q.    What do you know about that?

A.    I know -- I couldn't give you dates. Through an open source, you can see that Metart used to be involved in CSAM. They had a photographer that was taking CSAM photographs. The website got under investigation. The photographer got arrested, and the site was down for a while.

Q.    All right. Where did you find this information?

A.    Google.

Q.    When did you Google this information?

A.    Metart has images that come and go through multiple investigations. I looked into it when I learned about -- after all this happened.

So Metart has been involved in multiple investigations through CSAM. I Googled it after all this came about.

Q.    So at the time that decision for probable cause was made, you did not know anything about metart.com?

A.    No.

Q.    Did you investigate Metart because of Mr. Lawshe's case?

A.    I didn't investigate Metart. I did a Google search.

Page 9

Q.    Okay. I mean -- but I mean, did you do the Google search because you heard that it was involved with Mr. Lawshe's case?

A.    Yes.

Q.    Tell me about that. How did you come to learn that it was involved with Mr. Lawshe's case?

A.    I just explained it. I heard Metart was involved, so I Googled it.

Q.    Yeah. But I'm asking how did you hear that Metart was involved?

A.    I don't know. It's been a while ago. I -- the name came up.

Q.    Was anyone with you when you were Googling metart.com?

A.    Not that I know of, no, sir.

Q.    Was it Detective Preston that told you about metart.com?

A.    I couldn't tell you. I don't know.

Q.    Do you -- you said it was -- I think you said open source platform. Is that what you said?

A.    Open source platform. Meaning, you type in information and get things for it.

Q.    Right. Do you recall the source of the information that you're referring to?

A.    No, sir. It was just a random Google search.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Dennis Camden on 12/17/2024**

Page 10

Q. Well, I -- I'm familiar with Google. Google is --

A. I just don't remember the link I clicked on for it. I just started reading stuff.

Q. All right. Okay. It wasn't Google that told you, though. Like there was some source that had this, right?

A. Yes. That's how Google works, yes, sir.

Q. Right. You just don't have any recollection of what the source was?

A. No.

Q. Do you have any -- do you know if it's a credible source?

A. I don't think I was that far into it because this wasn't my investigation.

Q. Right. I just -- but -- well --

A. No, I couldn't --

Q. I understand.

A. I would assume, based off what I looked up and what led to the stuff with Russia, I can't say if it's credible or not.

Q. What stuff with Russia are you talking about?

A. I believe it was Russia where the photographer got arrested.

Q. Okay.

Page 11

A. I didn't pay any attention to it. I just did a Google search.

Q. All right. Hold on one second.

A. Sure.

Q. Did you communicate any of this information that you gleaned from the Google search to Detective Preston?

A. Yes, sir. I told her what I had found.

Q. And did you tell her something like what you have told me?

A. I did, yes, sir.

Q. Okay. And did you tell her the source of that information or do you recall?

A. No, sir.

Q. All right. No, you don't recall or --

A. I don't recall. I don't know if I told her or not. It was a quick conversation, like, Hey this is what I Googled. This is what I found.

Q. Okay. So based on this Google search, not knowing the source, not knowing the credibility, would you be willing to swear under oath that Metart was involved with a criminal investigation for CSAM?

A. Would I swear in -- would I be willing to swear under oath that Metart was involved in a criminal investigation?

Page 12

Q. Regarding CSAM.

A. I did swear under oath what I read, yes, sir.

Q. No, that's not the question that I'm asking you. The question that I'm asking you is could you swear under oath that Metart is a known source of CSAM?

A. Yes, sir, I think I could, yeah.

Q. Based on an article that you can't tell me where it came from?

A. No, not based off that, no.

Q. What would it be based off --
I don't understand your answer. Can you explain it?

A. I'm not able to swear under oath based off a random article, so, no, I can't do that, no, sir.

Q. Just so we can clear it up, I think we were talking over each other.
So you would not be willing to go under oath and swear that Metart had been the subject of a CSAM investigation or shutdown, anything like that?

A. So I would be willing to go under oath and state that, yes. I would not be willing to go under oath simply based off an article, no. Metart has been involved in multiple -- it has a history of being involved in CSAM cases.

Q. Okay. So your information is based on more

Page 13

than your Google search?

A. Yes, sir. Yeah.

Q. Earlier you just said that you had Googled it, and that's where you got the information from.

A. Oh, yes, it was that -- those -- I don't know where it was, what country it was, that the photographer was involved in it, yes, sir.

Q. Do you know that metart.com was involved with it?

A. No, sir. No.

Q. Okay. I mean, I'm not trying to play with you.

A. I don't even know if I'm explaining it correctly, because I am trying to --

Q. Yeah, I'm just going to tell you, I have an e-mail from the records custodian, it's a licensed attorney in California, and says that they have never been criminally prosecuted for CSAM. Do you have any reason to disagree with that?

A. No, sir. No. Thank you. No.

Q. Yeah.

A. Right.

Q. And you wouldn't go under oath and tell a judge that you knew that they displayed CSAM?

A. No. Okay. I understand what you're saying,

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Dennis Camden on 12/17/2024**

Page 14

but no.

Q.   Right.

A.   Okay.  I was going to get to that.

Q.   Yeah.  So are there other investigations where you have -- strike that, because I think we went through that.  I think we've muddled through that.

Do you know if Detective Preston did any other research into metart.com other than what you told me?

A.   I don't know.

Q.   I assume that you have investigated allegations of possession of child pornography?

A.   Yes, sir.

Q.   And in investigating those, you are aware that there are federal age verification statutes that require publishers to maintain records by the age of their models, are you not?

You are aware of the federal statute, and I think it's 18 U.S.C. 2257, federal age verification law?

A.   No, sir, I'm not aware of that specific statute.

Q.   Have you ever been to a pornographic website that has a disclaimer that the models have been verified and it has the federal statute?

Page 15

A.   I think I know what you're talking about, yes, sir.

Q.   You've been personally to websites where they have that?

A.   Yes, sir.  I believe so.

Q.   And you understand that that is at least purporting that they have a records custodian who is maintaining records on the images that they are publishing?

A.   Yes, sir.

Q.   Have you ever utilized that statutory mechanism to seek age verification from one of these websites?

MR. CARSON:  Object to form.

You can answer, if you can, sir.

MS. SHEVLIN:  Join.

THE WITNESS:  I haven't used a federal statute to do any investigation that I know of, no, sir.

BY MR. ROBERTS:

Q.   Have you ever e-mailed a records custodian for them to provide you with age verification information of a model?

A.   I haven't, no, sir.

Q.   You're aware that you have the ability to do

Page 16

that, as a detective, though, correct?

A.   Yes, sir.

Q.   Do you agree that an investigator or detective who is investigating the potential for child sexual abuse material should attempt to identify the alleged victim if it's possible?

A.   If they know of it, it's possible, but...

Q.   All right.  And so if they know where the image is published, would you agree that going to that location of where the image is published may help them identify who that alleged minor is?

A.   Based off of what you're saying, if they knew of it, yes, sir.

Q.   If they knew where it was published, a detective such as yourself could, if you were trying to identify this model, a place to start would be to go to the website and see if there was any identifying information of that model on the website, correct?

A.   Yes, sir.

Q.   Also, you understand that not only is it a crime to knowingly possess an image -- a pornographic image of a minor, it's also a crime to publish such an image on the internet, right?

A.   Yes, sir.

Q.   And so it also would be part of your job as a

Page 17

detective to go to that website to see if you could identify that criminal who is potentially publishing child sexual abuse material?

A.   Yes, sir.

Q.   So if a detective has information in their possession of the location or potential location of publication, would you agree that a reasonable investigation of that image and that potential victim would include going to the website to determine whether or not the potential victim could be identified or whether or not there was other crimes occurring?

MR. CARSON:  Object to form.

You can answer if you can, sir.

THE WITNESS:  Okay.  Can you restate the question?  I'm sorry.

MR. ROBERTS:  Maybe Madam Court Reporter can read it back.  I'm terrible at re-asking the same thing.

(Thereupon, the requested portion of the record was read back.)

THE WITNESS:  Yes, sir.

THE COURT REPORTER:  Did you say no, sir, or yes, sir?  Sorry.

THE WITNESS:  Yes.  Sorry.  Yeah.

THE COURT REPORTER:  Yes, sir.  Okay.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Dennis Camden on 12/17/2024**

Page 18

BY MR. ROBERTS:

Q. Okay. Investigating allegations of possession of child pornography, you do, through your work, spend time observing adult pornography; is that correct?

A. Yes.

Q. And through your work, you have become familiar with what is usual and customary on legal public pornography websites?

A. Correct.

Q. There's no other question in your mind that the private possession of adult pornographic material is legal and protected by the First Amendment of the Constitution of the United States?

A. Yeah, if it's --

Q. Yeah.

THE COURT REPORTER: I'm sorry, you said, If it's, and you glitched out on my end. If it?

THE WITNESS: Yes. If it's adults, yes.

THE COURT REPORTER: Thank you.

BY MR. ROBERTS:

Q. You also understand that possession of child sexual abuse material is only illegal if the individual possessing it knows that the image depicts the child?

MR. CARSON: Object to form.

Page 19

THE WITNESS: You -- so you're -- are you questioning if they had the intent of knowing that they have CSAM?

BY MR. ROBERTS:

Q. Yes, that to -- Ma'am Court Reporter can read the question back, but, yes, they know -- they have to know that they are in possession of images that they know are of a child?

A. That's correct.

Q. It is not a crime in the State of Florida for someone to possess an image which they think is an adult, but it turns out it is a 17 year old, for example?

MR. CARSON: Object to form.

THE WITNESS: I wouldn't say it's a crime, but you have probable cause to do an investigation, yes.

BY MR. ROBERTS:

Q. You believe there would be probable cause for an investigation if you knew or had reason to know that the individual possessing it believed that it was an adult?

MR. CARSON: Object to form.

THE WITNESS: If the image is still of a child, it's of a child. You have -- you have

Page 20

probable cause to conduct an investigation.

BY MR. ROBERTS:

Q. Okay. But would you have a probable cause to arrest an individual if your investigation revealed that he most likely believed that it was an adult?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: So you conducted an investigation on supposed CSAM?

BY MR. ROBERTS:

Q. Right.

A. The suspect is stating he didn't know he was -- it was CSAM?

Q. No. All of the evidence suggests that the image -- well, let me just -- let me just ask it in a little bit different way. Okay? I understand. All right.

So, hypothetically you have an image published on metart.com. Follow me?

A. Yes.

Q. A suspect goes to metart.com, sees an individual who is advertised, or there's a disclaimer that they are an adult. You have no evidence that he has sought out child pornography. The website says that the model was an adult. The website says that it

Page 21

is following federal age verification laws to ensure that the model is an adult. That's all of the evidence that you have. Do you believe that there is probable cause that that individual is in knowing possession of child pornography?

MR. CARSON: Object to form.

THE WITNESS: Knowing possession if he received -- if from that website directly, I don't -- based off of what you're saying, no.

BY MR. ROBERTS:

Q. Right. You -- in other words, people can't be tricked into committing the crime of possession of child sexual material, right?

MR. CARSON: Object to form.

MS. SHEVLIN: Form.

THE WITNESS: It's hard to come across websites that have CSAM just openly.

BY MR. ROBERTS:

Q. Sure.

A. But you said unknowingly be in possession of it in this area that you're provided with.

Q. And I -- and I appreciate you saying that. That's the point I want to make.

It is extremely rare that there would be actual child sexual abuse material published on the

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Dennis Camden on 12/17/2024

Page 22

public web and described as pornographic images of a child. That's extremely rare?

A. Unfortunately, it's there, and you can get to it through Google. And it's not rare to unknowingly be in possession of it. It happens, specifically the scenario that you're speaking of. Like if you thought it was legal and you download it, you have it.

Q. That's a pretty common situation?

A. Yes.

Q. All right. Now, but -- but what I'm getting at is, how often have you come across on the internet on a public website Pornhub, metart.com, whatever, YouPorn.com, whatever, pick a website, how often in your investigation or any other experience, come across an image that that website described the model as under the age of 18?

MR. CARSON: Object to the form.

THE WITNESS: Not that I know of.

BY MR. ROBERTS:

Q. Right. That would be extremely rare, almost unheard of, that a public website would tell its viewer that it is viewing a minor, correct?

A. Correct.

Q. Right. So you would agree that the fact that an image is found on a public website is evidence that

Page 23

most likely it is being portrayed as an adult, even if it turned out that that person is 17?

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q. Correct?

A. I'm trying to understand the way you said it.

Q. Right. So what I'm saying is, any image that you look at, right, the fact that you find it on a public website makes it more likely than not that that model is being portrayed as an adult to the person who found it on that website?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: The way you're saying it, yes, sir.

BY MR. ROBERTS:

Q. Yes. And so I understand that sometimes the information is not correct on those websites, and there may be -- and I think this is what you're describing -- times where people have unknowingly viewed a child sexual abuse material on a public website, thinking that it was an adult. Is that -- that's the situation you were describing, correct?

A. Yes, sir.

Q. All right. Lack of pubic hair does not mean

Page 24

that a model is a minor, does it?

A. Lack of pubic --

MS. SHEVLIN: Form.

MR. CARSON: Join.

BY MR. ROBERTS:

Q. So let me just run through this, right? In your job you -- you have to view adult pornographic sites on a regular basis, correct?

A. Yes, sir.

Q. And you are aware that even in your opinion, there are adult models on those websites who have taken measures, grooming measures, to remove their pubic hair, correct?

A. Yes.

Q. And that's a widespread practice in the porn industry, right?

A. Yes.

Q. It's actually a widespread practice in like the real world, to your knowledge, right?

A. Yes, sir.

Q. Yes, sir?

A. Yes, sir.

Q. Right. I mean, people groom themselves when it comes to pubic hair, right?

A. Yes.

Page 25

Q. Right. And in your experience, do individuals take steps to make that grooming seem less obvious, like not have razer burn or redness or rashes or things like that?

MS. SHEVLIN: Form.

MR. CARSON: Join.

BY MR. ROBERTS:

Q. You can say you don't know.

A. It -- when somebody says something, it kind of -- my speaker gets weird.

Q. Right. So they were objecting.

But I'm just asking you, is it in your experience, do people take measures, when they do groom themselves, to make that esthetically appear as though they're not shaving or waxing or using chemicals or things like that?

MS. SHEVLIN: Form.

MR. CARSON: Join.

THE WITNESS: I don't know the specifics of what you're saying. I just know it is common to groom yourself.

BY MR. ROBERTS:

Q. Right. And do you agree --

A. The grooming is a common practice, but the details he's speaking of, I don't know how far -- if

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Dennis Camden on 12/17/2024**

Page 26

that would go that far.

Q. Okay. Would you agree, in your investigations, research, or interactions with adult pornography, is sometimes it's difficult to tell whether someone has waxed, or shaved; it just looks like they don't have any hair?

A. Yes, I have come across cases of possible -- you don't know if it's prepubescent or if it's just an adult that's groomed.

Q. Right. And it's hard to tell from a digital image sometimes?

A. Sometimes it is different.

Q. And you're aware that digital images can be altered, and they can be touched-up --

A. Yes, sir.

Q. -- right?

And that happens not just in pornography, but in like wedding pictures, family pictures, people -- photographers now edit almost every photograph that they take, don't they?

A. Yes, sir.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q. And as an investigator, you know that, right? You know that like the physical appearance of pubic

Page 27

hair is difficult to determine from simply looking at a digital image?

A. Yes.

Q. As an investigator, right now I'm just talking like as a detective, you know that it can be difficult looking at a digital image to tell whether or not that person has groomed or whether they just don't have any pubic hair?

A. Correct. Yes, sir.

Q. Now, you know who Dr. Kathleen Dully is, don't you?

A. I know of her. I've never worked with her.

Q. You've never had an opportunity -- have you ever used some other Child Protection Team doctor to render some opinions or estimations of age of potential CSAM?

A. I have never been in a position where I had to use CPT for a case.

Q. Why is that?

A. I just haven't been in a position where I need to use them.

Q. I mean, is it because you -- when you make a decision to prosecute a case, it's obvious child pornography?

A. Okay. Yes, sir.

Page 28

Q. I understand that from -- I talked to Detective Greene earlier, I talked to Detective Tolbert, that in the industry, people sometimes describe images that is age-difficult. Have you ever heard that terminology?

A. Yes, sir.

Q. Would you agree that that means that by simply looking at the individual, it can be difficult to determine whether that person is 18, 19 or 16 or 17?

A. Yes, sir.

Q. That's how you would understand age-difficult. It's just difficult to tell her age?

A. Yes, sir.

Q. So are you testifying you never found a probable cause or decided to take action in a case where you look at an image and thought that it was age-difficult?

A. I can't say that off the top of my head. I just know I've never used CPT.

Q. Okay. Let me ask you -- I mean, you're the supervisor of ICAC currently, right?

A. Yes.

Q. Is it your understanding that best practice, the best practices that you wish to be in place, that prior to the decision for probable cause on any

Page 29

suspected image of CSAM, there be either obvious child pornography or some other evidence that this individual is a minor?

A. Yes, there would need to be evidence.

Q. And you never felt in any of the cases that you personally investigated, that you needed to go to an expert to determine what the age of that person was?

A. No, sir, I don't believe so. I don't believe I did.

Q. All right. I mean, is that because like in your opinion, like if it's close, and someone could reasonably believe that this is an adult, that there should not be a probable cause finding?

A. I just don't think I've ever had a case presented that I felt that I had to use CPT.

Q. I understand that testimony. I'm just understanding -- I'm trying to understand why. You've certainly looked at age-difficult images over the course of your several years now in the ICAC division, correct?

A. Yes.

Q. All right. Is part of your job getting the NCMEC reports and disseminating them to your subordinates?

A. Now it is, yes, sir.

Page 30

Q. So, I mean, you see all the NCMEC reports, right?

A. Not all of them, but yes, sir.

Q. And many of those have what's been referred to as unconfirmed child pornography?

A. Yes, sir. Yes, sir.

Q. You know that NCMEC categorizes some images as unconfirmed?

A. Yes.

Q. Okay. What does that mean to you?

A. The photograph or video, the analyst or whoever through NCMEC cannot possibly identify that is of a child.

Q. Right. I know it may not always be because the image is age-difficult, but it could be that the image is age-difficult, and that's why they can't confirm that it is a child.

MR. CARSON: Object to form.

THE WITNESS: It's one of the reasons.

BY MR. ROBERTS:

Q. Right. So you've seen age-difficult images in your time as a detective and now as a supervisor at St. Johns County Sheriff's Office, correct?

A. Yes, sir.

Q. And have you charged someone with possession

Page 31

of child pornography in a case where you found it to be difficult to determine the age of the model?

A. Based off -- no, not that I -- no. No, sir.

Q. And that's what I'm getting at. From your personal practice, if you look at an image, and it's difficult to determine whether this person is 18 or -- is an adult or a minor, you personally, in your professional capacity, make the decision to find no probable cause and do not seek a search warrant or do not arrest that individual?

MR. CARSON: Object to form.

THE WITNESS: I've never had a case solely that it was -- all I had was age-difficult images. So I think for the most part, that's the reason I never had to use CPT for an investigation.

BY MR. ROBERTS:

Q. So you never had a case like Mr. Lawshe's case, where there was just images that came in, and they were published on a website, public website, and it's a model that could be 18. She could be 17. She could be 19. You've never had that scenario?

A. I've never seen the photographs --

MR. CARSON: Object to form.

THE WITNESS: I've never seen the photographs involved in Mr. Lawshe's case.

Page 32

BY MR. ROBERTS:

Q. Well, I'm describing to you, they're -- they're -- they're centerfold type pictures, partial nudity, published on a website. You've never had anything like that, where you looked at an image, it's from a website, and it could be an adult, or it could not be an adult, you've never had anything like that?

MR. CARSON: Object to form.

THE WITNESS: Solely just that and not a hundred percent confirmed, no.

BY MR. ROBERTS:

Q. Okay. So that would be unusual, that scenario would be an unusual scenario in your experience as an ICAC investigator?

MR. CARSON: Object to form.

THE WITNESS: Me personally, I just never experienced it.

BY MR. ROBERTS:

Q. Yeah. I mean, you're -- but you're the supervisor now, right?

A. Yes.

Q. When you say you have other things, like what are the other things that you have in the NCMEC report other than the image?

A. Meaning?

Page 33

Q. You're saying that you never had just like an age-difficult image to review without something else, right?

A. Well, there's always -- unfortunately, you can tell they're babies. You can tell they're toddlers.

Q. Those are not age-difficult, right? Those are just obvious child pornography?

A. That's what I'm saying. I've never had just a case of age-difficult. That's the only --

Q. Oh, okay. All right. What if you did just get an image that was age-difficult and there was a website on it, what would you do with that?

A. I would conduct an investigation.

Q. You would do what?

A. Conduct an investigation.

Q. Okay. And what would that investigation include?

A. I'd try to confirm if it was a pre-pubescent or pubescent, if it was a child or an adult.

Q. Would you go to the website and see the context of which it was published?

A. If I had access to the website or if I had added information, I would -- yeah, in the beginning, yes.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Dennis Camden on 12/17/2024

Page 34

Q. Sure. So like if there was a watermark that said metart.com on the picture, you would go to metart.com to see if you can locate that picture?

A. I wouldn't say I would follow watermarks because there's a lot of people initially placing watermarks on CSAM. I don't know if he personally followed the watermarks website.

Q. Detective Greene, do you know who he is?

A. Yes. Yes.

Q. His testimony is that all three images had website information on the images that allowed him and Mr. Pierce, the attorney for Mr. Lawshe, to find and identify these models, within about 20 minutes, on the public web. If you had that kind of access to information, would you do it?

A. Yes, sir.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q. Okay. Have we discussed anything about Mr. -- and I know you said you didn't have anything to do with Mr. Lawshe's case, other than, it sounds like Ms. Preston asked you about Metart, or she brought up metart.com, and you Googled that?

A. Yes, sir.

Q. And then you communicated that to her. Other

Page 35

than that, did you do anything else in this investigation?

A. I wasn't even part of the investigation. That was well after everything. I just wanted to know what the website was.

Q. Was that after the arrest was made?

A. I couldn't tell you a timeline. I don't know. I've not -- I wasn't here in this office, so it would have just had to be coming and going. So I'm not going to know --

Q. You're sure -- I mean, you're sure that Detective Preston brought up metart.com to you at some point in relation to Mr. Lawshe's case?

A. I can't say a hundred percent it was her. I just heard it being brought up.

Q. Okay. I thought you testified that you had told her about what you saw in --

A. Yeah, I did tell her what I -- what I Googled, yes.

Q. Okay.

A. But he brought it up. I -- I -- it could be her. It could have just been brought up. I have no idea.

Q. I mean, have you looked at the affidavit in this case, the affidavit for probable cause for the

Page 36

search or the arrest?

A. No.

Q. Would it surprise you to know that something similar to what you testified to today is actually part of that affidavit?

A. Something I have testified today is part of that affidavit?

Q. I'm just going to pull it up so you have it. Right here in the middle, this is the affidavit for the Synchronoss subpoena. It says, To note, there's a watermark of www.metart.com on the offending image. This site has a known history of displaying CSAM images of teenage girls, and CSAM content from this site has been encountered by other IPAC investigators in past investigations.

My question is, you didn't know that that information was in the affidavit?

A. No, I had no part in this at all, no.

Q. Okay. When you were being asked or you made that comment to Ms. Preston, you did not think -- and I'm not saying she did -- but you did not intend that the information that she was going to be -- you were giving to her would be used in an affidavit to support probable cause, did you?

A. No, this ---

Page 37

Q. MR. CARSON: Form.

THE WITNESS: -- was nowhere close to that timeframe. This was as you -- So what was that PC for, because I was not involved or knew anything about anything involving search warrant, arrest, or anything.

BY MR. ROBERTS:

Q. Doesn't it -- I asked you if you know when she had the conversation about metart.com, and I recall you saying you're not sure when that happened.

A. Oh, I learned about all this after all this was over with.

Q. So your testimony now is, is that you gave her this information long after the arrest happened?

A. Yes, sir. That's always been -- that's always been my testimony.

Q. Well, I asked you if it happened at or before, and you said you don't remember what the time-frame was.

A. I'm referring to like after all this was over, I have no clue when I told her about it.

Q. Okay. So your testimony is there's no way that she's referring to you in this affidavit?

A. Oh, yes, sir, a hundred percent. There's no way.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Dennis Camden on 12/17/2024

Page 38

Q. So if she were to testify that, Oh, Dennis Camden, he's the ICAC investigator that told me this, you would say that's not true?

A. Yes, sir. That's a hundred percent.

Q. That would not be true, right? It wouldn't be true?

So she was not referring to you when she said other ICAC investigators have been involved with Metart?

A. Correct.

Q. All right. At that time, how many ICAC investigators were there in the office?

A. Two.

Q. Two?

A. Two. A serg and then a digital forensics. They're required to be there.

Q. Yeah. Yeah. So if you didn't tell her, if Detective Tolbert didn't tell her and Detective Greene didn't tell her this information about Metart, were there any other ICAC investigators in the department that could have told her about this Metart?

MR. CARSON: Object to form.

THE WITNESS: I have no idea.

BY MR. ROBERTS:

Q. Okay. Have you ever been involved in any

Page 39

investigations where Detective Preston was modeled as a 15 year old?

A. Yes.

Q. You have been part of those?

A. I have been there when she used undercover photos, yes.

Q. Were you part of like the taking of the pictures?

A. No.

Q. Who helped her take those pictures?

A. I don't know.

Q. Okay. Were you involved in the investigations where those photographs were used?

A. I've been a case agent on a chat. I don't know. It's possible.

Q. Okay. You are aware that those -- those photographs have successfully convinced a suspect that Ms. Preston was actually 15 years old?

A. Yes, I've seen that.

Q. Yeah. And at the time, how old was she?

A. Oh, I have no idea. She might be 30. I hope I got that right.

Q. You're safe. I think she's 30.

A. Okay. Okay.

Q. I think she's 30.

Page 40

A. Don't let her know I said that. I don't know.

Q. No, I mean, I think you're right on, so it's not offensive. And just as an aside note, I mean, it's kind of amazing, don't you think, that she can pass for a 15 year old?

A. The way that they're age regressed, I could pass as a 14 year old.

Q. What do you mean as "age regressed"? What do you mean?

A. I can just upload my photo and make it look like a child with the press of a button.

Q. Is that what they did with Ms. Preston's photographs?

A. I don't know specifically how she does hers. I'm speaking on mine.

Q. Have you posed as a 14 year old before?

A. I have, yes, sir.

Q. So you're aware that technology makes it very easy to make people younger than they appear on a digital image?

A. Yes, sir.

Q. Yeah. Do you guys have any way of like running these NCMEC images through some sort of program that can tell if they've been altered in any way?

Page 41

A. Not that I know of.

Q. Okay. But are you concerned that innocent people might be arrested for possession of child pornography in St. Johns County?

MR. CARSON: Object to form.

THE WITNESS: I'm concerned if any innocent person would be arrested.

BY MR. ROBERTS:

Q. And --

A. But it's what you know at the time of the arrest.

Q. Well, it's what you know at the time of the arrest or what is knowable at the time of the arrest, correct?

MR. CARSON: Object to form.

THE WITNESS: No, I would -- I would say it's what you knew at the time of the arrest, acting in good faith.

BY MR. ROBERTS:

Q. You don't think that officers just have the right to ignore easily assessable information that's relevant to the case, do you?

A. No.

Q. Right. You agree that you are required as an officer of the law to conduct a reasonable

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Dennis Camden on 12/17/2024

Page 42

investigation prior to making a determination of probable cause?

MR. CARSON: Object to form.

THE WITNESS: Yes.

BY MR. ROBERTS:

Q. And in a case where you know the image is published on a public website, that reasonable investigation would include at the very least visiting that website and attempting to obtain the context in which that image was published?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: It's what you know at the time, not after -- like right now we know about it afterwards. At the time I don't know what information was known. But if you're -- the watermark, the website, like going to the website, is that what you're asking?

BY MR. ROBERTS:

Q. Yeah, a reasonable investigation would include visiting the website where potentially the image is published.

MR. CARSON: Object to form.

THE WITNESS: Yes.

Page 43

BY MR. ROBERTS:

Q. And it may lead to a dead end, right? It may not be published on there, right, or -- or it could be lots of different things, but that's what an investigation is, right, is trying to uncover what is available and what's not available, right?

MR. CARSON: Object to form.

THE WITNESS: Right.

MR. ROBERTS: Okay. I don't have any other questions. I appreciate your time, and I'm sorry it's under these circumstances that -- that we met, but, you know, it is what it is.

THE WITNESS: I'm sorry that my Zoom was so bad, so I apologize. Thank you for not getting more frustrated at me.

MS. SHEVLIN: I don't believe I have any questions either, sir. Thank you.

THE WITNESS: All right. Thank you.

MR. CARSON: All right. Detective Camden, my name is Matt Carson. I represent Detective Preston in this action. I don't have any questions for you either. In the event this transcript is ordered, he can read through me.

Yeah, we'll order. We'll order it.

THE COURT REPORTER: Okay. Matthew the same

Page 44

and Amy?

MR. CARSON: Same order, yes, ma'am. Thank you.

MS. SHEVLIN: Same order.

THE COURT REPORTER: Okay.

MS. SHEVLIN: Thank you.

(Thereupon, the remote deposition was concluded at 3:55 p.m. and the signature and formalities were not waived.)

Page 45

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, the undersigned authority, certify that the aforementioned witness Kevin Greene, personally appeared before me via remote teleconference and was duly sworn on Tuesday, December 17, 2024.

Dated this 27th day of December, 2024

_maureen Ubelaoke Hall_

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida
My Commission Expires: 3/17/25
My Commission No.: HH065896
Identification presented by Deponent: License

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Dennis Camden on 12/17/2024**

**Page 46**

C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, MAUREEN HALL, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition; and that the transcript is a true record of the testimony given by the witness.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in this action.

Dated this 27th day of December, 2024.

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida

**Page 47**

DENNIS CAMDEN
C/O MATTHEW JOSEPH CARSON, ESQUIRE
SNIFFEN & SPELLMAN, P.A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
mcarson@sniffenlaw.com

IN RE: WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA PRESTON AND KATHLEEN DULLY,
CASE NO.: 3:24-cv-00044-MMH-MCR
Dear Mr. Carson,
The deposition of Dennis Camden, taken in the above-styled cause on December 17, 2024 is now ready for signature of the witness. Please contact our office to make arrangements for the witness to sign the same; or, if you wish to waive the signature of the deposition, please so advise.
If this deposition has not been signed by January 27th, 2025, or the signature thereto waived, we shall consider such delay a refusal to sign under Rule 1.310(e) of the Florida Rules of Civil Procedure.
If you have any reason which you would like for me to place on the deposition as to the witness' failure to sign the same, please advise.
Very truly yours,
HUSEBY COURT REPORTING, COURT REPORTER

By: _____
Maureen Hall, RPR, FPR
Dated: December 27, 2024
cc: Counsel of Record

**Page 48**

E R R A T A  S H E E T

IN RE: WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA PRESTON AND KATHLEEN DULLY

DEPO OF: DENNIS CAMDEN

DATE TAKEN: 12/17/24

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

Page No.____Line No.____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Please forward the original signed errata sheet to this office so that copies may be distributed to all parties.

DATE:_____

SIGNATURE OF DEPONENT:_____

## 1

14  40:8,17

15  39:2,18 40:6

16  28:9

17  19:12 23:2 28:9

18  14:19 22:16 28:9 31:6,20

19  28:9 31:21

## 2

20  34:13

2257  14:19

## 3

30  39:21,23, 25

3:55  44:8

## A

ability  15:25

abuse  16:5 17:3 18:23 21:25 23:21

access  33:23 34:14

achieve  5:10

acting  41:17

action  28:15 43:21

actual  21:25

added  33:24

adult  18:4,12 19:12,22 20:5,23,25 21:2 23:1, 10,22 24:7, 11 26:3,9 29:12 31:7 32:6,7 33:20

adults  18:19

advertised  20:22

affidavit  35:24,25 36:5,7,9,17, 23 37:23

age  14:15,16, 19 15:12,22 21:1 22:16 27:15 28:12 29:7 31:2 40:7,9

age-difficult  28:4,12,17 29:18 30:15, 16,21 31:13 33:2,7,10,12

agent  39:14

agree  16:3,9 17:7 22:24 25:23 26:2

28:7 41:24

allegations  14:12 18:2

alleged  16:6, 11

allowed  34:11

altered  26:14 40:25

amazing  40:5

Amendment  18:13

Amy  44:1

analyst  30:11

apologize  43:14

appearance  26:25

area  21:21

arrest  7:3 20:4 31:10 35:6 36:1 37:5,14 41:11,13,17

arrested  8:6 10:24 41:3,7

article  12:7, 14,22

assessable  41:21

Assistant  7:15

assume  10:19 14:11

attempt  16:5

attempting  42:9

attention  11:1

attorney  7:15 13:17 34:12

aware  5:22 14:14,18,21 15:25 24:10 26:13 39:16 40:19

## B

babies  33:5

back  17:17,20 19:6

bad  43:14

based  10:19 11:19 12:7, 9,10,13,22, 25 16:12 21:9 31:3

basis  24:8

be'17  31:20

begin  5:15

beginning  33:24

believed  19:21 20:5

bit  4:25 20:16

brought  34:22

35:12,15,21, 22

**burn** 25:3

**button** 40:12

___

**C**

___

**California** 13:17

**call** 7:20

**called** 4:3 7:24

**Camden** 4:3,10 38:2 43:19

**capacity** 31:8

**Carson** 15:14 17:12 18:25 19:14,23 20:6 21:6,14 22:17 23:3, 12 24:4 25:6,18 30:18 31:11, 23 32:8,15 34:17 37:1 38:22 41:5, 15 42:3,11, 23 43:7,19, 20 44:2

**case** 5:20,22 6:13,25 7:7, 15,17,20 8:23 9:3,6 27:18,23 28:15 29:14

31:1,12,17, 18,25 33:10 34:21 35:13, 25 39:14 41:22 42:6

**cases** 12:24 26:7 29:5

**categorizes** 30:7

**centerfold** 32:3

**certification** 5:9

**chain** 6:7

**charged** 30:25

**chat** 39:14

**chemicals** 25:15

**child** 14:12 16:4 17:3 18:3,22,24 19:8,25 20:24 21:5, 13,25 22:2 23:20 27:14, 23 29:1 30:5,13,17 31:1 33:8,20 40:12 41:3

**children** 4:19

**circumstances** 43:11

**clear** 12:15

**clicked** 10:3

**close** 29:11 37:2

**clue** 37:21

**colleagues** 6:5

**command** 6:7

**comment** 36:20

**committing** 21:12

**common** 22:8 25:20,24

**communicate** 11:5

**communicated** 34:25

**company** 5:7

**complications** 7:16,17,20

**concerned** 41:2,6

**concluded** 44:8

**conduct** 20:1 33:14,16 41:25

**conducted** 6:22 20:8

**confirm** 30:17 33:19

**confirmed** 32:10

**Constitution** 18:14

**content** 36:13

**context** 33:22 42:9

**conversation** 11:17 37:9

**convinced** 39:17

**corporal** 4:18, 19

**correct** 6:11 16:1,18 18:5,10 19:9 22:22,23 23:5,18,23 24:8,13 27:9 29:20 30:23 38:10 41:14

**correctly** 13:14

**country** 13:6

**County** 4:12 5:14 30:23 41:4

**Court** 17:16, 22,25 18:17, 20 19:5 43:25 44:5

**CPT** 27:18 28:19 29:15 31:15

**credibility** 11:20

**credible** 10:13,21

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Dennis Camden on 12/17/2024                    Index: crime..fact

crime 16:21, 22 19:10,15 21:12

crimes 4:18 17:11

criminal 11:22,24 17:2

criminally 13:18

CSAM 8:4,5,16 11:22 12:1, 5,18,24 13:18,24 19:3 20:9,13 21:17 27:16 29:1 34:6 36:12,13

custodian 13:16 15:7, 21

customary 18:8

**D**

dates 8:2

dead 43:2

decided 28:15

decision 8:18 27:23 28:25 31:8

Dennis 4:3,10 38:1

department

5:25 38:20

depicts 18:24

deposition 44:7

describe 28:4

describing 23:19,23 32:2

details 25:25

detective 4:12,14,15, 20 5:1,10, 15,23,25 9:16 11:7 14:7 16:1,4, 15 17:1,5 27:5 28:2 30:22 34:8 35:12 38:18 39:1 43:19, 21

determination 42:1

determine 17:9 27:1 28:9 29:7 31:2,6

difficult 26:4 27:1,6 28:8, 12 31:2,6

digital 5:6 26:10,13 27:2,6 38:15 40:21

DIRECT 4:7

directly 21:8

disagree 13:19

disclaimer 14:24 20:22

disclosed 6:19

discuss 7:9

discussed 34:19

displayed 13:24

displaying 36:12

disseminating 29:23

division 29:19

doctor 27:14

download 22:7

dropped 7:15, 20

Dully 27:10

duly 4:4

**E**

e-mail 13:16

e-mailed 15:21

earlier 13:3 28:2

easily 41:21

easy 40:20

edit 26:19

encountered 36:14

end 18:18 43:2

ensure 21:1

esthetically 25:14

estimations 27:15

event 43:22

evidence 20:14,23 21:2 22:25 29:2,4

EXAMINATION 4:7

experience 22:14 25:1, 13 32:14

experienced 32:17

expert 29:7

explain 12:12

explained 9:7

explaining 13:13

extremely 21:24 22:2, 20

**F**

fact 22:24

23:8

faith   41:18

familiar   10:1 18:8

family   26:18

federal   6:16 14:15,18,19, 25 15:17 21:1

felt   29:5,15

find   8:8 23:8 31:8 34:12

finding   29:13

Florida   5:3,4 6:17 19:10

follow   20:19 34:4

force   5:3,8 6:16

forensic's   5:6

forensics 38:15

form   7:2,5 15:14 17:12 18:25 19:14, 23 20:6 21:6,14,15 22:17 23:3, 12 24:3 25:5,17 26:22 30:18 31:11,23 32:8,15

34:17 37:1 38:22 41:5, 15 42:3,11, 23 43:7

formalities 44:9

found   11:8,18 22:25 23:11 28:14 31:1

frustrated 43:15

---

**G**

Gainesville 5:4

gave   37:13

girls   36:13

give   8:2

giving   36:23

gleaned   11:6

glitched   18:18

good   41:18

Google   8:10, 11,24 9:2,25 10:1,5,8 11:2,6,19 13:1 22:4

Googled   8:16 9:8 11:18 13:3 34:23 35:19

Googling   9:13

governed   5:2

Greene   28:2 34:8 38:18

groom   24:23 25:13,21

groomed   26:9 27:7

grooming   24:12 25:2,24

guess   7:5

guys   6:5 40:23

---

**H**

hair   23:25 24:13,24 26:6 27:1,8

happened   8:14 37:10,14,17

hard   21:16 26:10

head   28:18

headquarters 5:3

hear   7:14 9:9

heard   9:2,7 28:5 35:15

helped   39:10

Hey   11:17

history   12:23 36:12

Hold   11:3

hope   39:21

house   6:19,22

housed   6:15,16

hundred   32:10 35:14 37:24 38:4

hypothetically 20:18

---

**I**

ICAC   4:18,20, 22 5:1,2,3, 8,10,13,15, 25 28:21 29:19 32:14 38:2,8,11,20

idea   35:23 38:23 39:21

identified 17:10

identify   16:5, 11,16 17:2 30:12 34:13

identifying 16:17

ignore   41:21

illegal   18:23

image   16:9, 10,21,22,23 17:8 18:24 19:11,24 20:15,18

22:15,25 23:7 26:11 27:2,6 28:16 29:1 30:15, 16 31:5 32:5,24 33:2,12 36:11 40:21 42:6,10,22

images   6:24,25 8:12 15:8 19:7 22:1 26:13 28:4 29:18 30:7, 21 31:13,18 34:10,11 36:12 40:24

include   17:9 33:18 42:8, 21

individual 18:23 19:21 20:4,22 21:4 28:8 29:2 31:10

individuals 25:2

industry   24:16 28:3

information 7:19 8:9,11 9:22,24 11:5,13 12:25 13:4 15:23 16:18 17:5 23:18

33:24 34:11, 15 36:17,22 37:14 38:19 41:21 42:16

initially   34:5

innocent   41:2, 6

intend   36:21

intent   19:2

interactions 26:3

internet   4:18 16:23 22:11

investigate 6:13 8:22,24

investigated 14:11 29:6

investigating 14:14 16:4 18:2

investigation 5:19,21 6:4, 15 7:10,13 8:6 10:15 11:22,25 12:19 15:18 17:8 19:17, 20 20:1,4,9 22:14 31:15 33:14,16,17 35:2,3 42:1, 8,20 43:5

investigations 8:13,16 14:4

26:3 36:15 39:1,13

investigator 16:3 26:24 27:4 32:14 38:2

investigators 36:14 38:8, 12,20

involved   7:12, 17 8:4,15 9:2,6,8,10 11:22,24 12:23,24 13:7,8 31:25 37:4 38:8,25 39:12

involving   37:5

IPAC   36:14

---

**J**

---

Jacksonville 6:17

job   16:25 24:7 29:22

John's   5:14

Johns   4:12 30:23 41:4

Join   15:16 20:7 23:13 24:4 25:6,18 42:12

judge   13:24

---

**K**

---

Kathleen   27:10

kind   25:9 34:14 40:5

knew   13:24 16:12,14 19:20 37:4 41:17

knowable   41:13

knowing   11:20 19:2 21:4,7

knowingly 16:21

knowledge 24:19

---

**L**

---

Lack   23:25 24:2

law   14:20 41:25

laws   21:1

Lawshe   5:19 7:3 34:12

Lawshe's   6:13, 25 7:7,14 8:23 9:3,6 31:17,25 34:21 35:13

lead   43:2

learn   9:6

learned 8:14 37:11

led 10:20

legal 18:8,13 22:7

licensed 13:16

link 10:3

living 4:11

locate 34:3

location 16:10 17:6

long 4:14,22 37:14

looked 8:13 10:19 29:18 32:5 35:24

lot 5:8 34:5

lots 43:4

**M**

Madam 17:16

made 8:19 35:6 36:19

maintain 14:16

maintaining 15:8

make 21:23 25:2,14 27:22 31:8 40:11,20

makes 23:9

40:19

making 42:1

material 16:5 17:3 18:12,23 21:13,25 23:21

Matt 43:20

Matthew 43:25

Meaning 9:21 32:25

means 28:7

measures 24:12 25:13

mechanism 15:12

met 43:12

Metart 8:3,12,15,22,24 9:7,10 11:21,24 12:5,18,22 34:22 38:9,19,21

metart.com 7:24 8:20 9:14,17 13:8 14:8 20:21 22:12 34:2,3,23 35:12 37:9

metart.com. 20:19

middle 36:9

mind 18:11

mine 40:16

minor 16:11,22 22:22 24:1 29:3 31:7

minutes 34:13

model 15:23 16:16,18 20:25 21:2 22:15 23:10 24:1 31:2,20

modeled 39:1

models 14:17,24 24:11 34:13

muddled 14:6

multiple 8:13,15 12:23

**N**

NCMEC 29:23 30:1,7,12 32:23 40:24

needed 29:6

North 5:3

note 36:10 40:4

nudity 32:4

**O**

oath 11:21,24

12:2,5,13,17,20,22 13:23

Object 15:14 17:12 18:25 19:14,23 20:6 21:6,14 22:17 23:3,12 30:18 31:11,23 32:8,15 34:17 38:22 41:5,15 42:3,11,23 43:7

objecting 25:11

observing 18:4

obtain 42:9

obvious 25:3 27:23 29:1 33:8

occurring 17:11

offending 36:11

offensive 40:4

office 4:13 5:14 6:15 30:23 35:8 38:12

officer 41:25

officers 41:20

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Dennis Camden on 12/17/2024                    Index: open..Preston

open  8:3 9:20,21

openly  21:17

opinion  7:6 24:10 29:11

opinions  7:2 27:15

opportunity  7:9 27:13

order  43:24 44:2,4

ordered  43:23

**P**

p.m.  44:8

part  5:21 6:14,16 7:11 16:25 29:22 31:14 35:3 36:4,6,18 39:4,7

partial  32:3

pass  40:5,8

past  36:14

patrol  4:21

pay  11:1

PC  37:3

peers  6:7

people  21:11 23:20 24:23 25:13 26:18 28:3 34:5

40:20 41:3

percent  32:10 35:14 37:24 38:4

periodic  5:16

person  23:2,10 27:7 28:9 29:7 31:6 41:7

personal  31:5

personally  15:3 29:6 31:7 32:16 34:6

phonecall  6:21

photo  40:11

photograph  26:19 30:11

photographer  8:4,6 10:24 13:7

photographers  26:19

photographs  8:5 31:22,24 39:13,17 40:14

photos  39:6

physical  26:25

pick  22:13

picture  34:2,3

pictures  26:18

32:3 39:8,10

Pierce  34:12

place  16:16 28:24

placing  34:5

Plaintiff  4:4

platform  9:20, 21

play  13:11

point  21:23 35:13

porn  24:15

Pornhub  22:12

pornographic  14:23 16:21 18:12 22:1 24:7

pornography  14:12 18:3, 4,9 20:24 21:5 26:4,17 27:24 29:2 30:5 31:1 33:8 41:4

portion  17:19

portrayed  23:1,10

posed  40:17

position  27:17,20

possess  16:21 19:11

possessing  18:24 19:21

possession  14:12 17:6 18:3,12,22 19:7 21:4,7, 12,20 22:5 30:25 41:3

possibly  30:12

potential  16:4 17:6,8,10 27:15

potentially  17:2 42:21

practice  24:15,18 25:24 28:23 31:5

practices  28:24

pre-pubescent  33:19

prepubescent  26:8

presented  29:15

press  40:12

Preston  5:23 9:16 11:7 14:7 34:22 35:12 36:20 39:1,18 43:21

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Dennis Camden on 12/17/2024                    Index: Preston's..represent

Preston's 40:13

pretty 22:8

prior 4:17, 19,21 5:10 28:25 42:1

private 18:12

probable 7:3,6 8:18 19:16, 19 20:1,3 21:3 28:15, 25 29:13 31:9 35:25 36:24 42:2

PROCEEDINGS 4:1

professional 31:8

program 40:24

prosecute 27:23

prosecuted 13:18

protected 18:13

Protection 27:14

provide 15:22

provided 21:21

pubescent 33:20

pubic 23:25 24:2,12,24

26:25 27:8

public 18:9 22:1,12,21, 25 23:9,21 31:19 34:14 42:7

publication 17:7

publish 16:22

published 16:9,10,14 20:19 21:25 31:19 32:4 33:22 42:7, 10,22 43:3

publishers 14:16

publishing 15:9 17:2

pull 36:8

purporting 15:7

—— Q ——

quarterly 5:5, 16

question 7:5 12:3,4 17:15 18:11 19:6 36:16

questioning 19:2

questions 5:18

43:10,17,22

quick 11:17

—— R ——

random 9:25 12:14

rare 21:24 22:2,4,20

rashes 25:3

razer 25:3

re-asking 17:17

read 12:2 17:17,20 19:5 43:23

reading 10:4

real 24:19

reason 13:19 19:20 31:14

reasonable 17:7 41:25 42:7,20

reasons 30:19

recall 5:20 9:23 11:13, 15,16 37:9

received 21:8

recollection 10:9

record 4:9 17:20

records 13:16 14:16 15:7, 8,21

redness 25:3

referred 30:4

referring 9:24 37:20,23 38:7

regressed 40:7,9

regular 24:8

related 6:25

relation 35:13

relevant 41:22

remember 10:3 37:18

remote 44:7

remove 24:12

render 27:15

report 32:23

reported 6:9, 10

Reporter 17:16,22,25 18:17,20 19:5 43:25 44:5

reports 29:23 30:1

represent 43:20

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Dennis Camden on 12/17/2024**

Index: requested..stuff

requested 17:19

require 14:16

required 38:16 41:24

research 14:8 26:3

restate 17:14

revealed 20:4

review 33:2

ROBERTS 4:8 15:20 17:16 18:1,21 19:4,18 20:2,10 21:10,18 22:19 23:4, 16 24:5 25:7,22 26:23 30:20 31:16 32:1, 11,18 34:18 37:7 38:24 41:8,19 42:5,19 43:1,9

run 24:6

running 40:24

Russia 10:20, 22,23

_____

S
_____

safe 39:23

scenario 22:6 31:21 32:13

search 6:20 7:7 8:25 9:2,25 11:2, 6,19 13:1 31:9 36:1 37:5

seek 7:7 15:12 31:9

sees 20:21

serg 38:15

sexual 16:5 17:3 18:23 21:13,25 23:21

shaved 26:5

shaving 25:15

Sheriff's 4:13 5:14 30:23

SHEVLIN 15:16 20:7 21:15 23:13 24:3 25:5,17 26:22 42:12 43:16 44:4,6

shutdown 12:19

signature 44:8

similar 36:4

simply 12:22 27:1 28:8

sir 5:11,17, 24 6:1,8,14

7:1,4,8,12, 18,21,25 9:15,25 10:8 11:8,11,14 12:2,6,14 13:2,7,10,20 14:13,21 15:2,5,10, 15,19,24 16:2,13,19, 24 17:4,13, 21,22,23,25 23:15,24 24:9,20,21, 22 26:15,21 27:9,25 28:6,10,13 29:8,25 30:3,6,24 31:3 34:16, 24 37:15,24 38:4 40:18, 22 43:17

sit 6:22

site 8:7 36:12,13

sites 24:8

situation 22:8 23:22

solely 31:12 32:9

sort 5:9,13 40:24

sought 20:24

sounds 34:21

source 8:3 9:20,21,23 10:6,10,13 11:12,20 12:5

speaker 25:10

speaking 22:6 25:25 40:16

specific 14:21

specifically 22:5 40:15

specifics 25:19

spend 18:4

St 4:12 5:14 30:23 41:4

start 16:16

started 10:4

state 4:9 7:15 12:21 19:10

States 18:14

stating 20:12

statute 14:18, 22,25 15:18

statutes 14:15

statutory 15:11

steps 25:2

strike 14:5

stuff 10:4, 20,22

subject   12:18

subordinate
  6:2

subordinates
  29:24

subpoena   36:10

successfully
  39:17

suggests   20:14

supervisor
  28:21 30:22
  32:20

support   36:23

supposed   20:9

surprise   36:3

suspect   20:12,
  21 39:17

suspected   29:1

swear   11:21,
  23,24 12:2,
  5,13,18

sweep   6:22

sworn   4:4

Synchronoss
  36:10

**T**

taking   8:5
  39:7

talked   28:1,2

talking   5:22

10:22 12:16
15:1 27:5

task   5:2,3,8
  6:16

team   5:13
  27:14

technology
  40:19

teenage   36:13

terminology
  28:5

terrible   17:17

testified   4:4
  35:16 36:4,6

testify   38:1

testifying
  28:14

testimony
  29:16 34:10
  37:13,16,22

thing   17:18

things   9:22
  25:4,16
  32:22,23
  43:4

thinking   23:21

thought   22:6
  28:16 35:16

time   6:4 8:18
  18:4 30:22
  38:11 39:20
  41:10,12,13,
  17 42:13,15

43:10

time-frame
  37:19

timeframe   37:3

timeline   35:7

times   23:20

today   36:4,6

toddlers   33:6

Tolbert   28:3
  38:18

told   9:16
  10:5 11:8,
  10,16 14:8
  35:17 37:21
  38:2,21

top   28:18

touched-up
  26:14

training   5:1,
  5,6,16

transcript
  43:23

transferred
  5:13

tricked   21:12

true   38:3,5,6

turned   23:2

turns   19:12

type   5:6 9:21
  32:3

**U**

U.S.C.   14:19

ultimately
  7:14

unconfirmed
  30:5,8

uncover   43:5

undercover
  39:5

understand
  5:12 7:10,16
  10:18 12:11
  13:25 15:6
  16:20 18:22
  20:16 23:6,
  17 28:1,11
  29:16,17

understanding
  28:23 29:17

unheard   22:21

unit   4:18,20,
  22

United   18:14

unknowingly
  21:20 22:4
  23:20

unusual   32:12,
  13

upload   40:11

usual   18:8

utilized   15:11

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Dennis Camden on 12/17/2024                    Index: verification..Zoom

## V

verification
 14:15,19
 15:12,22
 21:1

verified  14:25

victim  16:6
 17:8,10

video  30:11

view  6:24
 24:7

viewed  23:20

viewer  22:21

viewing  22:22

visiting  42:8,
 21

## W

waived  44:9

wanted  35:4

warrant  7:7
 31:9 37:5

watermark  34:1
 36:11 42:17

watermarks
 34:4,6,7

waxed  26:5

waxing  25:15

web  22:1
 34:14

website  7:23
 8:5 14:23
 16:17,18
 17:1,9
 20:24,25
 21:8 22:12,
 13,15,21,25
 23:9,11,21
 31:19 32:4,6
 33:13,21,23
 34:7,11 35:5
 42:7,9,17,21

websites  15:3,
 13 18:9
 21:17 23:18
 24:11

wedding  26:18

weird  25:10

widespread
 24:15,18

William  5:19

words  21:11

work  18:4,7

worked  4:21
 27:12

works  10:8

world  24:19

www.metart.com
 36:11

## Y

year  19:12
 39:2 40:6,8,
 17

years  4:15,
 23,24 29:19
 39:18

younger  40:20

Youporn.com
 22:13

## Z

Zoom  43:13

67-8

State of California            )
                               )      ss
County of Los Angeles          )

## AFFIDAVIT

I, JEFFREY J. DOUGLAS, being first sworn upon oath, state as follows:

### Background and Qualifications:

1.      I am a practicing criminal defense attorney who emphasizes the First Amendment and related matters in my practice. I am admitted to practice in all California State and Federal Courts. I am a member of California Attorneys for Criminal Justice, the California Public Defenders Association, and the National Association of Criminal Defense Lawyers.

2.      I am Chair of the Board of Directors of the Free Speech Coalition, the trade association of the adult entertainment industry, and I was formerly both Executive Director and Legal Counsel of that organization. I am the former National Chair and President of the First Amendment Lawyers Association. I founded and operated Know Censorship, Inc., the Free Speech Coalition's database for tracking obscenity prosecutions throughout the United States.

3.      I have represented and advised all segments of the adult entertainment industry since 1982, addressing issues arising from creation, manufacture, and distribution, through direct consumer sales of adult-oriented expressive materials. In particular, I represent some of the largest manufacturers, distributors, and retailers of sexually explicit materials. I represent hundreds of websites specializing in X-rated products and services, as well as "mainstream" clients such as Virgin Megastores, and other retailers selling adult products. I was involved in the defense in all three of the Federal sting operations against the adult entertainment industry, representing defendants in "Postporn" (1987), and "Operation Woodworm" (1990), and as a law student assisted in the representation of some MiPorn defendants (1981). Furthermore, I represented the first website prosecuted in the U.S. for distributing obscenity, and have successfully defended clients wrongfully accused of distributing child pornography and obscenity, as well as clients charged with obscene live conduct. I played a critical role in halting prosecutions for "lewd conduct" of adult film productions. I succeeded in having five prosecutions dismissed, and the Los Angeles City Attorney has now stopped the practice. I have also defended two Federal obscenity prosecutions in the early 2000s.

4.      In order to meet the demands of my practice, and in my capacity as Chair of the Board of Directors of the Free Speech Coalition, as well as through my regular attendance and participation in the First Amendment Lawyers Association, I maintain close monitoring of current prosecutions of obscenity and child pornography cases nationally.

5.      I have qualified and testified as an expert witness in California state courts, and have qualified and testified as an expert witness in several Federal cases, including *United States v. Katz*, Case No. Cr. 96-20027-0001, a child pornography prosecution in the Federal District of Louisiana, *Nitke v. Ashcroft*, Case No. 01 Civ. 11476, a challenge to the obscenity provisions of the Communications Decency Act before a three judge panel of the Southern District of New York, as well as in *Free Speech Coalition v. Gonzalez*, Case No. 05-CV-1126-WDM, a challenge to 18 U.S.C. § 2257 in the United States District Court in Colorado. Finally, I was an expert witness in *Free Speech Coalition, et al., v. Attorney General of the United States*, Case No. 2-09-cv-04607-MMB, a case challenging many elements of 18

1

U.S.C. § 2257, resulting in the gutting if the statute by the Third Circuit. In addition, I regularly testify before the California legislature, and on invitation, have testified before the United States Congress. I am an editor of *Porn 101*, a published (Prometheus Press) compendium of academic papers given at the World Pornography Conference in 1998, and I served along with several university professors as one the primary organizers of that Conference. I have authored numerous published magazine articles.

6.      I am among the small group of lawyers expert in the area of compliance with 18 U.S.C. § 2257, the so-called Federal Labeling Law. I was a creator of the industry standard compliance form for 18 U.S.C. § 2257. I have spoken at every national and regional forum on compliance and have done scores of individual consultations on the topic. Most major manufacturers use my compliance forms and training materials. I have testified as an expert witness in a Federal prosecution in Louisiana regarding use of 18 U.S.C. § 2257 documentation.

7.      I represent and am the record-keeper for MET-Art.com, a premiere adult website. I have been an attorney for Met-Art since 2002. That website features art photography of nude women. There is no sexual activity other than genital exposure; that is, there is no genital stimulation of any kind. Met-Art possesses proof of age of all posted models that exceeds industry standards. No image exists on the website of a person under the age of 18 years old.

8.      I have been approached by law enforcement concerning Met-Art imagery, and proof of age of particular models, many times. MET-Art has established an excellent reputation for cooperating with law enforcement. As far as I know, no image from MET-Art has been successfully convicted of being CSAM (Child sexual abuse material).

9.      I was asked by C. Crawford Pierce, counsel for William Lawshe, to confirm that the models appearing under the names of Kacey Lane and Milena D. were, in fact, 18 years old or older at the time of the photography. I provided proof of age of the models in question on December 19, 2023 (see Exhibit 1.) Exhibit 2 to this affidavit contains the photographic records that the models were of age, as well as my supporting affidavit. Those records were kept and maintained consistent with policies, procedures and statutory compliance in the regular course of business. Both were over 18 years old at the time of photography. I believe that the documentation I provided were substantial factors in the dismissing of criminal charges.

10. Cases arising from Milena D. images have been dismissed in England, Iowa, Holland and France. In 2013, I was asked by a Florida-based FBI Agent (Terri Botterbusch) to provide proof of identity (not age) to assure parents of a missing girl that Milena D. was not their missing child. Agent Botterbusch expressed appreciation for the cooperation and spoke highly of the reputation of Met-art for its responsible practices.

11.      I have reviewed two affidavits in support of search warrants by Detective Mikayla Preston, St. Johns County Sheriff Office. In each affidavit she states the following:
"To note [sic], there is a watermark of www.met-art.com on the offending image. This site has a known history of displaying CSAM [child sexual abuse material] images of teenage girls and CSAM content from this site has been encountered other ICAC investigators in past investigations."

12.      This is a false statement and may indeed be a deliberate lie. There is no CSAM on the site. No law enforcement agency in St. Johns County has ever sought proof of age of any model from Met-art.com. Had any agent done so, I would have provided such proof.

13.      Distributing CSAM carries a mandatory minimum fifteen years' imprisonment under Federal law. Met-art.com is one of the most visited adult websites in the world. If any state or Federal

2

authorities suspected that Met-art.com was displaying CSAM material, Met-art.com would have been subject to an investigation and prosecution. That has not occurred and cannot because all models depicted are of age at the time of the photography.

I declare under penalty of perjury that the foregoing statements are true and correct, except for that portion based upon belief and as to that portion, I believe it to be true and correct.

_____
Jeffrey J. Douglas

Sworn and subscribed to before me
this _____ day of May, 2025.


_____
Notary Public

See Attached Form For Notary
Walter H. Barnes IV , Notary Public
Dated -
May 8, 2025

3

**CALIFORNIA JURAT**

GOVERNMENT CODE § 8202

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of ___Los Angeles___

Subscribed and sworn to (or affirmed) before me on

this **8th** day of ___May___, 20 **25**, by
   Date          Month        Year

(1) ___Jeffrey J. Douglas___

(and (2) _____ ).
           Name(s) of Signer(s)

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

**WALTER H. BARNES IV**
Notary Public - California
Los Angeles County
Commission # 2496568
My Comm. Expires Aug 4, 2028

Place Notary Seal and/or Stamp Above

Signature _____
          Signature of Notary Public

--- OPTIONAL ---

Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

Description of Attached Document

Title or Type of Document: **Affidavit**

Document Date: _____

Number of Pages: **3**

Signer(s) Other Than Named Above: _____

©2019 National Notary Association

**EXHIBIT 1**

 Gmail

Jeffrey Douglas <jjdxxx1@gmail.com>

## MET-Art

**Jeffrey Douglas** <jjdxxx1@gmail.com>    Tue, Dec 19, 2023 at 10:08 AM
To: "C. Crawford Pierce, IV" <crawfordpiercelaw@gmail.com>, "Mike Roberts (Cell)" <mroberts@nrhnlaw.com>

I attach the redacted photo ID of "Kacey Lane." She was born on April 28, 2001. The earliest images of her were recorded on October 10 - 13, 2019. Those images were published on November 18, 2019. So she was 18 years, four months and twelve (?) days old at the time of the photography (if my arithmetic is correct).

As to Milena D., she has been the subject of many inquiries. Cases arising from her images were dismissed in England, Iowa, Holland and France. It was she who the FBI Agent (Terri Botterbusch) requested assistance regarding her origins to assure parents of a missing girl in 2013. I attach her holding two passports and an affidavit I provided to an English solicitor resulting in the dismissal of a British prosecution for possession of a sexually explicit image of an underage model. I have asked when "Top Model" film shoot occurred, but the affidavit below indicates that the earliest shoot happened when she was 18 years and seven months old.

Let me know if I can be of further assistance. Specifically, I can sign any and all relevant declarations.

Best wishes and happy holidays!

    JJD          He/Him/His
Jeffrey J. Douglas, A Professional Corporation    **Please note address change.**
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

**3 attachments**



**7420 Kacey Lane passport.jpg**
941K



**Milena-D-holding-2-passports.jpg**
1273K

5/8/2025, 10:00 AM

1 of 2

## Witness Statement

*(CJ Act 1967, s.9 MC Act 1980, s.4 MC Rules 1981, r.70)*

| | |
|---|---|
| Statement of: | Jeffrey J.Douglas |
| Age: | 58 |
| Date of Birth: | 23 July 1956 |
| Occupation: | Attorney at law |
| Address: | 1717 4th St 3rd Floor
Santa Monica  California 90401-3319 |

*This statement (consisting of 1 page each signed by me) is true to the best of my knowledge and belief and I make it knowing that, if it is tendered in evidence, I shall be liable to prosecution if I have wilfully stated anything that I know to be false or do not believe to be true*

I am an attorney licensed to practice law in the State of California and all Federal Courts therein. I am the custodian of records for the website MET-Art.com. All statements contained within this Declaration are true to my personal knowledge or based upon information and belief.

It is the absolute requirement of MET-Art.com and all related entities that for any form of publication or possession of images, the models must be eighteen years of age at the time of photography, and proof of that age must be provided when the images are acquired by MET-Art.com.

This policy is not just based upon the ethical standards of the operators of MET-Art.com. The penalties for creation or importation of images of underage persons are so severe under United States law (fifteen years mandatory minimum imprisonment) that no commercial benefit could ever justify the risk.

I have reviewed copies of the identification and related documents of a model known as "Milena D." She was born in June 1991. The earliest photography of her was recorded in February 2010. She was eighteen years (and seven months) old at the time of the photography.

Signed: *[signature]* Jeffrey J.Douglas    Dated: 12 February 2015

**EXHIBIT 2**





## Witness Statement
(CJ Act 1967, s.9 MC Act 1980, S.A MC Rules 1981, r.70)

| | |
|---|---|
| Statement of: | Jeffrey J.Douglas |
| Age: | 58 |
| Date of Birth: | 23 July 1956 |
| Occupation: | Attorney at law |
| Address: | 1717 4th St 3rd Floor |
| | Santa Monica, California 90401-3319 |

*This statement (consisting of 1 page each signed by me) is true to the best of my knowledge and belief and I make it knowing that, if it is tendered in evidence, I shall be liable to prosecution if I have wilfully stated anything that I know to be false or do not believe to be true.*

I am an attorney licensed to practice law in the State of California and all Federal Courts therein. I am the custodian of records for the website MET-Art.com. All statements contained within this Declaration are true to my personal knowledge or based upon information and belief.

It is the absolute requirement of MET-Art.com and all related entities that for any form of publication or possession of images, the models must be eighteen years of age at the time of photography, and proof of that age must be provided when the images are acquired by MET-Art.com.

This policy is not just based upon the ethical standards of the operators of MET-Art.com. The penalties for creation or importation of images of underage persons are so severe under United States law (fifteen years mandatory minimum imprisonment) that no commercial benefit could ever justify the risk.

I have reviewed copies of the identification and related documents of a model known as "Milena D." She was born in June 1991. The earliest photography of her was recorded in February 2010. She was eighteen years (and seven months) old at the time of the photography.

Signed: *[signature]*     Dated: 12 February 2015

Jeffrey J Douglas     Page 1 of 1

Ref:

## AFFIDAVIT

1. I am over the age of 18, of sound mind and body, and make this affidavit of my own free will and of my own personal knowledge of the facts contained herein.

2. I am a licensed attorney and have been a member of the Florida Bar since 2009.

3. I represented William Lee Lawshe in criminal case No. 2023-CF-00516 filed in St. Johns Couty, FL.

4. During the investigation, I was one of the few individuals given access to the relevant images involved in the case.

5. Upon review of the images, I immediately believed them to depict adults.

6. All of the content was professionally produced and still photographs of partially nude females. These photographs could be described as "centerfold" or "pin-up" type photographs.

7. None of the models were portrayed as, pretending to be, or described as minors.

8. All of the images were clearly downloaded or screenshot from public ".com" websites.

9. Within a very short period of time, I was able to locate the models on multiple public websites.

10. A simple Google search will return all of the images and models involved in this case.

11. Both of the models can be found on *metart.com.*

12. The models are described as "verified adults" and the website claims compliance with federal age verification or labeling law: §18 USC 2257.

13. *Metart.com* publishes the name and contact information of their records custodian.

14. The records custodian of *metart.com*, Mr. Jeffery Douglas, is a licensed attorney in the State of California.

15. After verifying his active license to practice law on the California State Bar's website, I contacted the records custodian, Mr. Jeffrey Douglas, and obtained the age verification information contained in "Exhibit A" within days.

16. The models identified by Mr. Douglas are the models depicted in the relevant images and images charged in the above-referenced criminal case. (See Exhibit A)

17. Based on information and belief, the models were adults at the time of the relevant photography.

C. Crawford Pierce, IV, Esq.

STATE OF FLORIDA

COUNTY OF Duval

The foregoing instrument was subscribed and sworn to personally before me this ___ day of May, 2025.

Notary Public

AUTUMN ZEPF
Notary Public - State of Florida
Commission # HH 341767
My Comm. Expires Apr 11, 2027
Bonded through National Notary Assn.

Printed Name or Official Stamp: _____

# EXHIBIT A

 Outlook

## Re: MET-Art

**From** Jeffrey Douglas <jjdxxx1@gmail.com>

**Date** Tue 12/19/2023 1:08 PM

**To** C. Crawford Plerce, IV <crawfordpiercelaw@gmail.com>; Mike Roberts (Cell) <mroberts@nrhnlaw.com>

📎 3 attachments (3 MB)

7420 JJD Milena signed dec Atkinson .pdf; 7420 Kacey Lane passport.jpg; Milena-D-holding-2-passports.jpg;

I attach the redacted photo ID of "Kacey Lane." She was born on April 28, 2001. The earliest images of her were recorded on October 10 - 13, 2019. Those images were published on November 18, 2019. So she was 18 years, four months and twelve (?) days old at the time of the photography (if my arithmetic is correct).

As to Milena D., she has been the subject of many inquiries. Cases arising from her images were dismissed in England, Iowa, Holland and France. It was she who the FBI Agent (Terri Botterbusch) requested assistance regarding her origins to assure parents of a missing girl in 2013. I attach her holding two passports and an affidavit I provided to an English solicitor resulting in the dismissal of a British prosecution for possession of a sexually explicit image of an underage model. I have asked when "Top Model" film shoot occurred, but the affidavit below indicates that the earliest shoot happened when she was 18 years and seven months old.

Let me know if I can be of further assistance. Specifically, I can sign any and all relevant declarations.

Best wishes and happy holidays!

JJD    He/Him/His

Jeffrey J. Douglas, A Professional Corporation    **Please note address change.**
401 Wilshire Boulevard, Fl 12
Santa Monica, CA  90401-1456

310.804.4971 mobile
310.576.3411
310.576-3408 fx

jjdxxx1@gmail.com

"The law, in its majestic equality, forbids equally the rich, as well as the poor, to sleep under bridges, to beg in the streets and to steal bread."

From The Red Lily by Anatole France (Jacques Thibault)

On Mon, Dec 18, 2023 at 8:33 PM C. Crawford Plerce, IV <crawfordpiercelaw@gmail.com> wrote:

Mr. Douglas,

I just located the 2nd model on Met Art's website that they charged my client with possessing photos of, and this appears to be the same set of photos.

Please see what you can locate for me on this model: Milena D in 'Top Star' (129 photos) - MetArt

I am certain these photos and model are from the very same shoot.

Thank you so very much!

Crawford Pierce, IV, Esq.
The Law Office of C. Crawford Pierce, IV
2807 N. Tenth Street, Suite 12
St. Augustine, FL 32084
(904) 468-3575
wwww.CrawfordPierceLaw.com
CrawfordPierceLaw@Gmail.com



**From:** Jeffrey Douglas
**Sent:** Monday, December 18, 2023 3:15 PM
**To:** crawfordpiercelaw@gmail.com
**Subject:** MET-Art

Dear Crawford,

It was both pleasant and disturbing speaking with you today. Rest assured of my commitment to assisting your client in this miscarriage of justice. Hard to believe Florida would pursue such a thing....

I have requested the ID information on "Kacy Lane" be sent to me to pass onto you. I hope that the holidays do not slow anything down on MET-Art's end.

Below please find my contact information.

Mobile is the best telephone.

JJD          He/Him/His

Jeffrey J. Douglas, A Professional Corporation
401 Wilshire Boulevard, Fl 12
Santa Monica, CA  90401-1456

**310.804.4971 mobile**
310.576.3411
310.576-3408 fx

jjdxxx1@gmail.com

"The law, in its majestic equality, forbids equally the rich, as well as the poor, to sleep under bridges, to beg in the streets and to steal bread."

From The Red Lily by Anatole France (Jacques Thibault)

67-9



College of Medicine – *Jacksonville*
Department of Pediatrics
First Coast Child Protection Team
Fax: (904) 633-0301

4100 Building, 4539 Beach Boulevard
Jacksonville, FL 32207
Tel: (904) 633-0300

February 22, 2023

Detective Mikayla Preston
Internet Crimes Against Children
Saint Johns County Sheriff's Office
4015 Lewis Speedway
St. Augustine, FL  32084

Dear Detective Preston:

I have examined a single color photograph displayed on a law enforcement laptop
entitled  d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173
13cf489728f19896c5f79e9d4c63b80f6a487  provided to me by yourself following a cybertip
from NCMEC.  This image depicts what appears to be a naked pubertal female child wearing
pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest
position with her lower legs and ankles parted to expose her genitalia for the camera.  This
female child appears younger than 18 years of age.  She would have achieved this developmental
genital appearance of SMR IV at 12-15 years of age.  She does not appear to be shaved as her
anterior pubic hair is still present.

Please contact me if I can provide further assistance.

Sincerely,

Kathleen Dully, M.D.
Child Abuse Pediatrician
Sex Assault Forensic Examiner
Medical Director, First Coast
Child Protection Team

SJCSO-Lawshe 000058



College of Medicine – *Jacksonville*
Department of Pediatrics
First Coast Child Protection Team
Fax: (904) 633-0301

4100 Building, 4539 Beach Boulevard
Jacksonville, FL 32207
Tel: (904) 633-0300

April 5, 2023

Detective Mikayla Preston
Internet Crimes Against Children
Saint Johns County Sheriff's Office
4015 Lewis Speedway
St. Augustine, FL  32084

Dear Detective Preston:

I previously examined a single color photograph displayed on a law enforcement laptop
entitled  d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173
13cf489728f19896c5f79e9d4c63b80f6a487 provided to me by yourself following a cybertip
from NCMEC.  This image depicts what appears to be a naked pubertal female child wearing
pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest
position with her lower legs and ankles parted to expose her genitalia for the camera.  This
female child appears younger than 18 years of age.  She would have achieved this developmental
genital appearance of SMR IV at 12-15 years of age.  She does not appear to be shaved as her
anterior pubic hair is still present.

Today you have shown me two additional images of the same female child and these
confirm my previous determination that she is depicted to be at most SMR III or IV and
therefore again ≤ 12-15 years of age.  The filenames for these photos are 0059 and 0065(1).

Please contact me if I can provide further assistance.

Sincerely,

Kathleen Dully, M.D.
Child Abuse Pediatrician
Sex Assault Forensic Examiner
Medical Director, First Coast
Child Protection Team

SJCSO-Lawshe 000059



College of Medicine — *Jacksonville*
Department of Pediatrics
First Coast Child Protection Team
Fax: (904) 633-0301

4100 Building, 4539 Beach Boulevard
Jacksonville, FL 32207
Tel: (904) 633-0300

April 5, 2023

Detective Mikayla Preston
Internet Crimes Against Children
Saint Johns County Sheriff's Office
4015 Lewis Speedway
St. Augustine, FL  32084

Dear Detective Preston:

Today you have provided to me two images for review displayed on a law enforcement laptop. The first is ycbLVVFQ_o.jpg and depicts a female child with no pubic hair development. She does not appear to be shaved. Her breasts are partially visible and could be SMR IV-V, however her genitals are plainly visible with her thighs splayed widely-apart and showing she is SMR I with-respect-to-pubic hair. This developmental appearance is ≤ 9-13.5 years of age.

The second image is imprinted with white script saying "Big Heart" and the filename Screenshot_20230122_174408_DuckDuckGo.jpg. This image shows a female child with her black top parted and underwear down around her parted thighs exposing her genital area clearly. She appears to have no pubic hair development. She does not appear to be shaved. This developmental appearance is also ≤ 9-13.5 years of age.

Please contact me if I can provide further assistance.

Sincerely,

Kathleen Dully, M.D.
Child Abuse Pediatrician
Sex Assault Forensic Examiner
Medical Director, First Coast
Child Protection Team

SJCSO-Lawshe 000060

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on March 4, 2026.

*/s/ Michael K. Roberts*
**MICHAEL K. ROBERTS**