No. 26-10155-D

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

WILLIAM LEE LAWSHE,
*Plaintiff-Appellant,*

v.

MIKAYLA PRESTON,
and
KATHLEEN DULLY,
*Defendants-Appellees.*

Appeal from the United States District Court for
the Middle District of Florida, Jacksonville
Division

3:24-cv-00044-MMH-MCR

## APPENDIX VOLUME IV

**LAW OFFICES OF NOONEY,
ROBERTS, HEWETT, AND
NOWICKI**

*/s/ Michael K. Roberts*
**Michael K. Roberts, Esquire**
Florida Bar No. 0077974
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
mroberts@nrhnlaw.com
*Counsel for Appellant*

# INDEX

## VOLUME 1

Docket Sheet

Complaint against All Defendants with Jury Demand...................................1

Motion to Dismiss for Failure to State a Claim by Katheen Dully ..................10

Amended Complaint against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand filed by Willam Lee Lawshe................................... ...26

Answer and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston.................................................................34

Second Amended Complaint against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand filed by William Lee Lawshe............................40

Answer and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston.................................................................43

Answer and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully.................................................................54

Motion of Partial Summary Judgment Against Preston by William Lee Lawshe...66

Zoom Videotaped Deposition Transcript of Kathleen Dully M.D dated April 28, 2025.................................................................66 – 1

Letter to Mikayla Preston from Kathleen Dully M.D dated February 22, 2023..66-2

Letter to Mikayla Preston from Kathleen Dully M.D dated April 5, 2023......66 – 3

## VOLUME 2

Docket Sheet

Letter to Mikayla Preston from Kathleen Dully M.D dated April 5, 2023......66 – 4

Expert Report of Dr. Scott Krugman.................................66 – 5

Continued Remote Video Deposition Transcript of Kathleen Dully M.D dated June 18, 2025.................................................................66 – 6

Motion of Partial Summary Judgment Against Preston by William Lee Lawshe...67

Affidavit for Search Warrant dated February 28, 2023...........................67 – 1

Cyber Tipline Report 153739160.................................................67 – 2

Remote Deposition Transcript of Eugine Tolbert dated December 17, 2024...67 – 3

Remote Deposition Transcript of Kevin Greene dated December 17, 2024......67-4

## VOLUME 3

Docket Sheet

Videotaped Deposition Transcript of Fallon McNulty dated June 12, 2025.......67-5

Video-Recorded Deposition Transcript of Mikayla Preston dated March 13, 2025
................................................................................67-6

Remote Deposition Transcript of Dennis Camden dated December 17, 2024....67-7

Affidavit of Jeffrey J. Douglas................................................67-8

Letter to Mikayla Preston from Kathleen Dully M.D dated February 22, 2023..67-9

## VOLUME 4

Docket Sheet

Zoom Videotaped Deposition Transcript of Kathleen Dully MD dated April 28, 2025..............................................................67-10

Continued Remote Video Deposition Transcript of Kathleen Dully M.D dated June 18, 2025..............................................................67-11

Deposition Transcript of Mikayla Preston dated November 21, 2023...........67-12

Affidavit for Search Warrant dated April 12, 2023.........................67-13

St. Johns County Sheriffs Office Arrest Report............................67-14

Felony Information Sheet..................................................67-15

Email Correspondence re Nolle Prosse dated December 22, 2023.............67-16

Response in Opposition re 66 Motion for Partial Summary Judgment filed by Kathleen Dully.................................................................................75

Response in Opposition re 67 Motion for Partial Summary Judgment filed by Mikayla Preston....................................................................................78

Motion for Summary Judgment filed by Mikayla Preston.........................83

**VOLUME 5**

Docket Sheet

Motion for Summary Judgment filed by Kathleen Dully............................85

Reply to Response to Motion re 67 Motion for Partial Summary Judgment filed by William Lee Lawshe...............................................................90

Reply to Response to Motion re 66 Motion filed by William Lee Lawshe.........91

Response to Motion re 85 Motion for Summary Judgment filed by William Lee Lawshe...............................................................................95

Response to Motion re 83 Motion for Summary Judgment filed by William Lee Lawshe...............................................................................96

Report of Patrick Siewert...................................................... 96-1

Reply to Response to Motion re 85 Motion for Summary Judgment filed by Kathleen Dully.............................................................................100

Reply to Response to Motion re 83 Motion for Summary Judgment filed by Mikayla Preston............................................................................101

Opinion and Order re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary Judgment; denying as moot 71 Motion in Limine; granting 83 Motion for Summary Judgment; granting 85 Motion for Summary Judgment...............103

Judgment is entered in favor of Defendants and against Plaintiff.................104

APPEAL,CLOSED,MEDIATION,SL DOC,STAYED,TANGIBLE

# U.S. District Court
## Middle District of Florida (Jacksonville)
### CIVIL DOCKET FOR CASE #: 3:24-cv-00044-JAR-MCR

Lawshe v. Hardwick et al
Assigned to: Judge Jane A. Restani
Referred to: Magistrate Judge Monte C. Richardson
Case in other court: 11th Circuit, 26-10155-D
Cause: 42:1983 Civil Rights Act

Date Filed: 01/12/2024
Date Terminated: 12/19/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

### Plaintiff

**William Lee Lawshe**
*an individual*

represented by **Michael Keith Roberts , II**
Law Offices of Nooney & Roberts
1680 Emerson St
Jacksonville, FL 32207
904/398-1992
Fax: 904/858-9943
Email: mroberts@nooneyandroberts.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Scott Nooney , Jr.**
The Law Offices of Nooney & Roberts
1680 Emerson St.
Jacksonville, FL 32207
904-398-1992
Fax: 904-858-9943
Email: jnooney@nooneyandroberts.com
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Robert A. Hardwick**
*in his official capacity as Sheriff of St. Johns
County*
*TERMINATED: 10/29/2024*

represented by **Michael P. Spellman**
Spellman Law, P.A.
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: michael@spellman.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
Spellman Law, P.A.
905 E. Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: cpetruzzelli@spellman.law
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Carson**
Spellman Law, PA
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: mcarson@spellman.law
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mikayla Preston**
*in her induvial capacity as a Detective for
St. Johns County Sheriff's Office*

represented by **Michael P. Spellman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jami McFatter Kimbrell**
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: jami@kimbrellfirm.com
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**University of Florida Board of Trustees**
*TERMINATED: 03/28/2024*

represented by **Todd Anderson Wright**
Alexander DeGance Barnett, P.A.
1500 Riverside Avenue
Jacksonville, FL 32204
904-345-3284
Fax: 904-345-3294
Email: todd.wright@adblegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Dully**
*in her individual capacity as medical
director of the UF Child Protection Team*

represented by **Jami McFatter Kimbrell**
(See above for address)
*LEAD ATTORNEY*

**Robert B. Buchanan**
Banker Lopez Gassler P.A.
1900 SE 18th Street
Suite 300
Ocala, FL 34475-8237
352-629-4099
Fax: 352-629-3975
Email: aperry@bankerlopez.com

*TERMINATED: 05/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Shevlin**
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471
352-629-4099
Email: ashevlin@rbtrial.com
*ATTORNEY TO BE NOTICED*

**John Wilson**
Howell, Buchan and Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: johnwilson@jsh-pa.com
*ATTORNEY TO BE NOTICED*

**Mediator**

**Thomas H. Bateman, III**
*TERMINATED: 08/07/2025*

represented by **Thomas H. Bateman , III**
Messer Caparello, PA
2618 Centennial Place
Tallahassee, FL 32308
850/222-0720
Fax: 850/558-0674
Email: tbateman@lawfla.com
*TERMINATED: 08/07/2025*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2024 | 1 | STRICKEN per 23 Order; COMPLAINT against All Defendants with Jury Demand (Filing fee $405 receipt number AFLMDC-21652226) filed by William L Lawshe. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons Hardwick Summons, # 3 Proposed Summons Preston Summons, # 4 Proposed Summons UF BOT Summons, # 5 Proposed Summons Dully Summons)(Roberts, Michael) Modified on 4/2/2024 to edit docket text (JDR). (Entered: 01/12/2024) |
| 01/12/2024 | 2 | NEW CASE ASSIGNED to Judge Marcia Morales Howard and Magistrate Judge Monte C. Richardson. New case number: 3:24-cv-44-MMH-MCR. (JCG) (Entered: 01/12/2024) |
| 01/16/2024 | 3 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (JW) (Entered: 01/16/2024) |

| 01/16/2024 | 4 | SUMMONS issued as to Kathleen Dully, Robert Hardwick, Mikayla Preston, University of Florida Board of Trustees. (MCB) (Entered: 01/16/2024) |
|---|---|---|
| 02/08/2024 | 5 | NOTICE TO ALL COUNSEL of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who - unless the party changes the designation - remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (GL) (Entered: 02/08/2024) |
| 02/15/2024 | 6 | NOTICE of Lead Counsel Designation by Michael Keith Roberts, II on behalf of William Lee Lawshe. Lead Counsel: Michael K Roberts, Esq.. (Roberts, Michael) (Entered: 02/15/2024) |
| 02/19/2024 | 7 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 8 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 9 | NOTICE of Appearance by Robert B. Buchanan on behalf of Kathleen Dully (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/19/2024 | 10 | MOTION to Dismiss for Failure to State a Claim by Kathleen Dully. (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/20/2024 | 11 | **ORDER directing Defendant to file a supplement to her [Doc. 10] Motion to Dismiss Plaintiff's Complaint on or before February 27, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 2/20/2024. (JPA)** (Entered: 02/20/2024) |
| 02/20/2024 | 12 | MOTION to Dismiss Count VIII of Plaintiff's Complaint by University of Florida Board of Trustees. (Wright, Todd) (Entered: 02/20/2024) |
| 02/22/2024 | 13 | MOTION for Clerk's Default against Robert Hardwick, Mikayla Preston by William Lee Lawshe. (Nooney, Jeffrey) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/22/2024) |
| 02/27/2024 | 14 | Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 02/27/2024) |
| 02/27/2024 | 15 | NOTICE of Appearance by Michael P. Spellman on behalf of Robert Hardwick, Mikayla Preston (Spellman, Michael) (Entered: 02/27/2024) |
| 02/27/2024 | 16 | MOTION for Extension of Time to File Response/Reply as to 1 Complaint , MOTION to Set Aside Clerk Default *(Deny Entry)* by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Declaration of Trae Wylie)(Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/27/2024) |
| 02/28/2024 | 17 | NOTICE of supplemental authority re 16 MOTION for Extension of Time to File Response/Reply as to 1 Complaint MOTION to Set Aside Clerk Default *(Deny Entry)* RE: Local Rule 3.01(g) Conferral by Robert Hardwick, Mikayla Preston. (Spellman, Michael) (Entered: 02/28/2024) |
| 03/08/2024 | 18 | NOTICE of voluntary dismissal by William Lee Lawshe (Roberts, Michael) (Entered: 03/08/2024) |
| 03/08/2024 | 19 | RESPONSE in Opposition re 14 Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 03/08/2024) |
| 03/13/2024 | 20 | RESPONSE to 16 MOTION to Deny Entry of Default filed by William Lee Lawshe. (Roberts, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |

| 03/13/2024 | 21 | NOTICE of Supplemental Authority to 16 MOTION to Deny Entry of Clerk's Default and for Extension of Time by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Savoia-McHugh v. Glass)(Spellman, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |
|---|---|---|
| 03/28/2024 | 22 | **ORDER dismissing, without prejudice, the claims raised against Defendant University of Florida Board of Trustees; terminating 12 Motion to Dismiss; and directing the Clerk of the Court to terminate this Defendant. Signed by Judge Marcia Morales Howard on 3/28/2024. (JW)** (Entered: 03/28/2024) |
| 04/02/2024 | 23 | **ORDER striking 1 Complaint filed by William Lee Lawshe. Plaintiff shall file a corrected complaint on or before April 22, 2024. Signed by Judge Marcia Morales Howard on 4/2/2024. (JPA)** (Entered: 04/02/2024) |
| 04/12/2024 | 24 | CASE MANAGEMENT REPORT. (Spellman, Michael) (Entered: 04/12/2024) |
| 04/15/2024 | 25 | **CASE MANAGEMENT AND SCHEDULING ORDER AND REFERRAL TO MEDIATION: Disclosure statements due by 4/26/2024. Discovery due by 6/20/2025. Dispositive motions due by 7/21/2025. Conduct mediation hearing by 8/15/2025. Final Pretrial Conference set for 12/15/2025 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 1/5/2026 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Signed by Judge Marcia Morales Howard on 4/15/2024. (Attachments: # 1 Mediation Report Form, # 2 Court Docket)(JW)** (Entered: 04/15/2024) |
| 04/16/2024 | 26 | AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) (Entered: 04/16/2024) |
| 04/19/2024 | 27 | **ORDER denying as moot 13 Plaintiff's Motion for Entry of Clerk's Default; denying as moot 14 Defendant Kathleen Dully's Motion to Dismiss; denying as moot 16 Motion to Deny Entry of Clerk's Default and for Extension of Time to Respond to Complaint. Signed by Judge Marcia Morales Howard on 4/19/2024. (JW)** (Entered: 04/19/2024) |
| 04/26/2024 | 28 | CORPORATE Disclosure Statement by Kathleen Dully. (Buchanan, Robert) (Entered: 04/26/2024) |
| 04/29/2024 | 29 | CORPORATE Disclosure Statement by Mikayla Preston. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 30 | CORPORATE Disclosure Statement by Robert Hardwick. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 31 | ***INCORRECT EVENT. COUNSEL TO REFILE AS "CORPORATE DISCLOSURE STATEMENT"***AMENDED document by Kathleen Dully. *Defendant Kathleen Dully's Amended Corporate Disclosure Statement.* (Buchanan, Robert) Modified on 4/30/2024 (LSS). (Entered: 04/29/2024) |
| 04/30/2024 | 32 | AMENDED Disclosure Statement Under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Kathleen Dully. (Buchanan, Robert) (Modified on 4/30/2024, to edit text) (BGR). (Entered: 04/30/2024) |
| 04/30/2024 | 33 | NOTICE of Appearance by Matthew Joseph Carson on behalf of Robert Hardwick, Mikayla Preston (Carson, Matthew) (Entered: 04/30/2024) |

| | | |
|---|---|---|
| 04/30/2024 | 34 | ANSWER and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston.(Carson, Matthew) (Entered: 04/30/2024) |
| 04/30/2024 | 35 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew). Added MOTION to Strike on 5/2/2024 (AM). (Entered: 04/30/2024) |
| 05/02/2024 | 36 | **ORDER directing Plaintiff to show cause why this case should not be dismissed for failure to prosecute or sanctions imposed due to his failure to comply with the Local Rules and this Court's Order. Show Cause Response due by 5/16/2024. Signed by Judge Marcia Morales Howard on 5/2/2024. (JW)** (Entered: 05/02/2024) |
| 05/02/2024 | 37 | CORPORATE Disclosure Statement by William Lee Lawshe. (Roberts, Michael) (Entered: 05/02/2024) |
| 05/02/2024 | 38 | RESPONSE TO ORDER TO SHOW CAUSE re 36 Order to show cause filed by William Lee Lawshe. (Roberts, Michael) Modified on 5/3/2024 to edit text (ELM). (Entered: 05/02/2024) |
| 05/03/2024 | 39 | **ENDORSED ORDER discharging 36 Order to Show Cause. Signed by Judge Marcia Morales Howard on 5/3/2024. (JW)** (Entered: 05/03/2024) |
| 05/20/2024 | 40 | SECOND AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/20/2024 | 41 | NOTICE of Filing 40 Second Amended Complaint by William Lee Lawshe (Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/23/2024 | 42 | **ORDER denying as moot 35 Defendant Sheriff Hardwick's Motion to Dismiss and Motion to Strike. Signed by Judge Marcia Morales Howard on 5/23/2024. (JW)** (Entered: 05/23/2024) |
| 06/03/2024 | 43 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston. (Attachments: # 1 Exhibit CybeTip Report, # 2 Exhibit Dully Opinion f6a487, # 3 Exhibit Dully Opinion 59 and 65, # 4 Exhibit Dully Opinion Screenshot Duckduckgo)(Carson, Matthew) (Entered: 06/03/2024) |
| 06/03/2024 | 44 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew) (Entered: 06/03/2024) |
| 06/19/2024 | 45 | MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint or Alternatively, Motion for a More Definite Statement by Kathleen Dully. (Buchanan, Robert) (Entered: 06/19/2024) |
| 06/24/2024 | 46 | RESPONSE to Motion re 44 MOTION to Dismiss for Failure to State a Claim filed by William Lee Lawshe. (Roberts, Michael) (Entered: 06/24/2024) |
| 07/12/2024 | 47 | RESPONSE to Motion re 45 MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint or Alternatively, Motion for a More Definite Statement filed by William Lee Lawshe. (Roberts, Michael) (Entered: 07/12/2024) |
| 08/16/2024 | 48 | NOTICE of Appearance by Christen Ann Petruzzelli on behalf of Robert A. Hardwick, Mikayla Preston (Petruzzelli, Christen) (Entered: 08/16/2024) |
| 08/16/2024 | 49 | MOTION for Extension of Time to File Response/Reply to Plaintiff's First Request for Production by Mikayla Preston. (Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/16/2024) |
| 08/17/2024 | 50 | SUPPLEMENT re 49 MOTION for Extension of Time to File Response/Reply to Plaintiff's First Request for Production by Mikayla Preston. (Spellman, Michael) |

| | | |
|---|---|---|
| | | (Entered: 08/17/2024) |
| 08/19/2024 | 51 | ENDORSED ORDER granting 49 Defendant Preston's Motion for Extension of Time to Respond to Plaintiff's First Request for Production. Defendant shall have until August 26, 2024, to respond to Plaintiff's First Request for Production. Signed by Magistrate Judge Monte C. Richardson on 8/19/2024. (JRC) (Entered: 08/19/2024) |
| 10/03/2024 | 52 | ORDER: To the extent that Plaintiff requests affirmative relief from the Court, 46 Plaintiff's Response to Defendant Hardwick's Motion to Dismiss is denied without prejudice. See Order for details. Signed by Judge Marcia Morales Howard on 10/3/2024. (JPA) (Entered: 10/03/2024) |
| 10/29/2024 | 53 | ORDER granting 44 Motion to Dismiss for Failure to State a Claim and denying 45 Motion to Dismiss. The Clerk of the Court is directed to terminate Defendant Robert Hardwick. Defendant Kathleen Dully shall respond to Plaintiff's Second Amended Complaint on or before November 13, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 10/29/2024. (JPA) (Entered: 10/29/2024) |
| 11/13/2024 | 54 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully.(Buchanan, Robert) (Entered: 11/13/2024) |
| 02/01/2025 | 55 | MOTION to Compel Production of Documents by William Lee Lawshe. (Attachments: # 1 Exhibit Ex A - Plaintiff RTP, # 2 Exhibit Ex B - Def RTP response, # 3 Exhibit Ex C - Email Correspondence)(Roberts, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/01/2025) |
| 02/05/2025 | 56 | NOTICE of Withdrawal Motion to Compel Production of Documents by William Lee Lawshe. (Roberts, Michael) Modified on 2/6/2025 to edit text (ELA). (Entered: 02/05/2025) |
| 05/16/2025 | 57 | MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/16/2025) |
| 05/19/2025 | 58 | ENDORSED ORDER denying without prejudice 57 Defendant Kathleen Dully's Motion for Substitution of Counsel because it fails to comply with Local Rule 3.01(g). Signed by Magistrate Judge Monte C. Richardson on 5/19/2025. (SBL) (Entered: 05/19/2025) |
| 05/22/2025 | 59 | Amended MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/22/2025) |
| 05/27/2025 | 60 | ENDORSED ORDER granting 59 Defendant Kathleen Dully's Amended Motion for Substitution of Counsel. Robert B. Buchanan, Esq. is relieved of any further responsibility as counsel for Defendant in this matter, but he shall comply with all applicable obligations on withdrawing counsel, including any applicable Bar rules. Jami Kimbrell, Esq. is substituted as counsel of record for Defendant. Signed by Magistrate Judge Monte C. Richardson on 5/27/2025. (SBL) (Entered: 05/27/2025) |
| 05/27/2025 | 61 | NOTICE of Appearance by John Wilson on behalf of Kathleen Dully (Wilson, John) (Entered: 05/27/2025) |
| 06/06/2025 | 62 | Unopposed MOTION for Extension of Time to Complete Discovery by Kathleen Dully. (Wilson, John) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 6/9/2025 to edit the docket text (MLB). (Entered: 06/06/2025) |
| 06/09/2025 | 63 | ORDER granting 62 Unopposed Motion for Extension of Deadlines to Complete Discovery and File Dispositive Motions. Discovery deadline is 8/4/2025. Dispositive and Daubert motions due 9/5/2025. Final pretrial conference continued to 1/20/2026, at 10:00 a.m. Jury trial set for trial term commencing on 2/2/2026, at 9:00 a.m. See |

| | | |
|---|---|---|
| | | Order for additional deadlines. **Signed by Judge Marcia Morales Howard on 6/9/2025.** (JW) (Entered: 06/09/2025) |
| 06/09/2025 | | Set / Reset Scheduling Order Deadlines/Hearings per 63: Discovery due by 8/4/2025. Dispositive motions due by 9/5/2025. All other motions due by 12/29/2025. Final Pretrial Conference set for 1/20/2026 at 10:00 AM before Judge Marcia Morales Howard. Jury Trial set for 2/2/2026 at 09:00 AM before Judge Marcia Morales Howard. (EVK) (Entered: 06/10/2025) |
| 06/18/2025 | 64 | NOTICE of mediation conference/hearing to be held on 8/6/25 at 10AM before Thomas H. Bateman, III. (Carson, Matthew) (Entered: 06/18/2025) |
| 08/06/2025 | 65 | MEDIATION report Hearing held on 8-6-2025. Hearing outcome: Impasse.. (Bateman, Thomas) (Entered: 08/06/2025) |
| 08/12/2025 | 66 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/12/2025 | 67 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/13/2025 | 68 | **SUMMARY JUDGMENT NOTICE AND COURTESY COPIES. Signed by Deputy Clerk on 8/13/2025.** (JW) (Entered: 08/13/2025) |
| 08/29/2025 | 69 | Unopposed MOTION for Extension of Time to File Response/Reply as to 67 MOTION for Partial Summary Judgment , 66 MOTION for Partial Summary Judgment Set / Reset Scheduling Order Deadlines/Hearings *and Extension of Time to File Motions for Summary Judgment* by All Defendants. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/29/2025) |
| 09/03/2025 | 70 | **ENDORSED ORDER granting 69 Defendants' Joint Unopposed Motion for Extension of Time. Defendants shall respond to Plaintiff's Motions for Partial Summary Judgment on or before September 9, 2025. The deadline for Defendants to file dispositive motions is extended until September 12, 2025. The granting of this Motion shall not serve as a basis for seeking to extend any other deadlines in the Case Management and Scheduling Order. Signed by Magistrate Judge Monte C. Richardson on 9/3/2025.** (SBL) (Entered: 09/03/2025) |
| 09/05/2025 | 71 | MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) by Mikayla Preston. (Attachments: # 1 Exhibit 1 = Siewert CV, # 2 Exhibit 2 - Siewert Report) (Carson, Matthew) (Entered: 09/05/2025) |
| 09/08/2025 | 72 | Unopposed MOTION to file DOCUMENT under seal by Kathleen Dully, Mikayla Preston (Attachments: # 1 Proposed Sealed Item Redacted f6a487, # 2 Proposed Sealed Item Redacted 0065(1), # 3 Proposed Sealed Item Redacted 0059, # 4 Proposed Sealed Item Redacted DuckDuckGo, # 5 Proposed Sealed Item Redacted VVFQ_o, # 6 Appendix Unredacted File Names and Sizes)(Carson, Matthew).Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 09/08/2025) |
| 09/08/2025 | 73 | Consent MOTION to File Excess Pages in Response to Motion for Partial Summary Judgment by Kathleen Dully. (Kimbrell, Jami) Modified text on 9/9/2025 (MGB). (Entered: 09/08/2025) |

| 09/09/2025 | 74 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
|---|---|---|
| 09/09/2025 | 75 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
| 09/09/2025 | 76 | NOTICE by Kathleen Dully re 75 Response in Opposition to Motion *Filing Exhibits to* (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 Exhibit K, # 7 Exhibit L)(Kimbrell, Jami) Modified text on 9/10/2025 (ABM). (Entered: 09/09/2025) |
| 09/09/2025 | 77 | NOTICE by Mikayla Preston *documents in support of her response in opposition to Plaintiff's motion for partial summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty, # 3 Exhibit Deposition of Detective Mikayla Preston, # 4 Exhibit Deposition of Detective Kevin Greene, # 5 Exhibit Deposition of Sergeant Eugene Tolbert, # 6 Exhibit Deposition of Dr. Kathleen Dully I, # 7 Exhibit Deposition of Dr. Kathleen Dully II, # 8 Exhibit Affidavit of Kaitlyn M. Paine, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe)(Carson, Matthew) (Entered: 09/09/2025) |
| 09/09/2025 | 78 | RESPONSE in Opposition re 67 MOTION for Partial Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 09/09/2025) |
| 09/10/2025 | 79 | **ENDORSED ORDER granting 73 Defendant Kathleen Dully's Motion for Leave to Exceed the Page Limit and accepting as filed 75 Defendant Kathleen Dully's response to Plaintiff's Motion for Partial Summary Judgment. Signed by Judge Marcia Morales Howard on 9/10/2025. (JW) (Entered: 09/10/2025)** |
| 09/10/2025 | 80 | NOTICE by Kathleen Dully re 74 Response in Opposition to Motion *to Disregard* (Kimbrell, Jami) (Entered: 09/10/2025) |
| 09/11/2025 | 81 | **ORDER granting 72 Defendant's Unopposed Motion to Seal. See Order for details. Signed by Magistrate Judge Monte C. Richardson on 9/11/2025. (SBL) (Entered: 09/11/2025)** |
| 09/12/2025 | 82 | NOTICE by Mikayla Preston *of filing documents in support of her motion for final summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty (corporate representative for the National Center for Missing and Exploited Children) taken June 12, 2025 (excerpts), # 3 Exhibit Deposition of Detective Mikayla Preston taken March 13, 2025 (excerpts), # 4 Exhibit Deposition of Detective Kevin Greene taken December 17, 2024 (excerpts), # 5 Exhibit Deposition of Sergeant Eugene Tolbert taken December 17, 2024 (excerpts), # 6 Exhibit Deposition of Dr. Kathleen Dully taken April 28, 2025 (excerpts), # 7 Exhibit Deposition of Dr. Kathleen Dully taken June 18, 2025 (excerpts), # 8 Exhibit Affidavit of Kaitlyn M. Paine dated August 28, 2025, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe taken March 14, 2025 (excerpts))(Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 83 | MOTION for Summary Judgment by Mikayla Preston. (Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 84 | MOTION to File Excess Pages by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 85 | MOTION for Summary Judgment by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 86 | NOTICE of Filing Exhibits by Kathleen Dully re 85 MOTION for Summary Judgment. (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 |

| | | |
|---|---|---|
| | | Exhibit K, # 7 Exhibit L, # 8 Exhibit M)(Kimbrell, Jami) Modified docket text on 9/15/2025 (JOS). (Entered: 09/12/2025) |
| 09/16/2025 | 88 | **ENDORSED ORDER granting 84 Defendant Kathleen Dully's Motion for Leave to File an Over-Length Motion for Summary Judgment and accepting as filed 85 Defendant Kathleen Dully's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 9/16/2025. (JW) (Entered: 09/16/2025)** |
| 09/16/2025 | 90 | REPLY to Response to Motion re 67 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/16/2025 | 91 | REPLY to Response to Motion re 66 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/19/2025 | 92 | RESPONSE to Motion re 71 MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 09/19/2025) |
| 09/24/2025 | 93 | SEALED DOCUMENT re 81 Sealed Order on Motion to Seal by Mikayla Preston (Attachments: # 1 Exhibit Redacted f6a487, # 2 Exhibit Redacted 0065(1), # 3 Exhibit Redacted 0059, # 4 Exhibit Redacted DuckDuckGo, # 5 Exhibit Redacted VVFQ_o) (Carson, Matthew). (Entered: 09/24/2025) |
| 10/03/2025 | 94 | MOTION to File Excess Pages by William Lee Lawshe. (Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 95 | RESPONSE to Motion re 85 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 96 | RESPONSE to Motion re 83 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/06/2025 | 97 | **ENDORSED ORDER granting 94 Plaintiff's Unopposed Motion for an Extension of Page Limit and accepting as filed 96 Plaintiff's Response to Defendant Preston's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 10/6/2025. (JW) (Entered: 10/06/2025)** |
| 10/16/2025 | 98 | **ORDER REASSIGNING CASE to Senior Judge Jane A. Restani. Signed by Judge Marcia Morales Howard on 10/16/2025. (MHM) (Entered: 10/16/2025)** |
| 10/17/2025 | 99 | Case Reassigned to Judge Jane A. Restani. New case number: 3:24-cv-44-JAR-MCR. Judge Marcia Morales Howard no longer assigned to the case. (MDC) (Entered: 10/17/2025) |
| 10/17/2025 | 100 | REPLY to Response to Motion re 85 MOTION for Summary Judgment filed by Kathleen Dully. (Wilson, John) (Entered: 10/17/2025) |
| 10/17/2025 | 101 | REPLY to Response to Motion re 83 MOTION for Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 10/17/2025) |
| 11/17/2025 | 102 | Notice to counsel that pursuant to the summary judgment notice 68, the parties must submit courtesy copies of any motion, response, and authorized reply that exceeds twenty-five (25) pages (including exhibits or other supporting evidentiary materials) in length. Courtesy copies should be mailed by United States mail or other reliable service to Hon. Jane A. Restani, United States Court of International Trade, 1 Federal Plaza, Suite 694, New York, NY 10278-0001 (jkl) (Entered: 11/17/2025) |
| 12/18/2025 | 103 | **OPINION AND ORDER re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary** |

| | | |
|---|---|---|
| | | Judgment; denying as moot 71 Motion in Limine; granting 83 Motion for Summary Judgment; granting 85 Motion for Summary Judgment. The Clerk shall enter judgment in favor of Defendants Preston and Dully and against Plaintiff Lawshe, terminate any pending motions, and close the case. Signed by Judge Jane A. Restani on 12/18/2025. (SJW) (Modified on 12/18/2025)(SJW). (Entered: 12/18/2025) |
| 12/19/2025 | 104 | **JUDGMENT is entered in favor of Defendants and against Plaintiff. Signed by Deputy Clerk on 12/19/2025. (JTM) (Entered: 12/19/2025)** |
| 12/19/2025 | 105 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (JTM) (Entered: 12/19/2025) |
| 01/06/2026 | 106 | NOTICE of change of address by Christen Ann Petruzzelli (Petruzzelli, Christen) (Entered: 01/06/2026) |
| 01/06/2026 | 107 | MOTION for Extension of Time to File Motion for Entitlement to Costs by Mikayla Preston. (Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 01/06/2026) |
| 01/16/2026 | 108 | NOTICE OF APPEAL as to 103 Order on Motion for Partial Summary Judgment Order on Motion in Limine, Order on Motion for Summary Judgment, 104 Judgment by William Lee Lawshe. Filing fee $605, receipt number AFLMDC-24340578. ***Case Stayed. (Roberts, Michael) (Entered: 01/16/2026) |
| 01/16/2026 | 109 | TRANSMITTAL of initial appeal package to the U.S. Court of Appeals - 11th Circuit re 108 Notice of Appeal,. Filing fee paid. (JDR) (Entered: 01/16/2026) |
| 01/20/2026 | 110 | RESPONSE in Opposition re 107 MOTION for Extension of Time to File Motion for Entitlement to Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 01/20/2026) |
| 01/20/2026 | | ***11th Circuit Case Number: 26-10155-D for 108 Notice of Appeal, filed by William Lee Lawshe. (SJW) (Entered: 01/22/2026) |
| 01/30/2026 | 111 | **ENDORSED ORDER granting 107 Defendant Mikayla Preston's Motion for Extension of Time. The Court has considered Plaintiff's arguments but finds that good cause exists for the requested extension. Defendant shall file the subject Motion on or before February 5, 2026. Signed by Magistrate Judge Monte C. Richardson on 1/30/2026. (SBL) (Entered: 01/30/2026)** |
| 01/30/2026 | 112 | TRANSCRIPT information form filed by William Lee Lawshe re 108 Notice of Appeal USCA number: 26-10155-D. No transcript(s) requested. (Roberts, Michael) (Entered: 01/30/2026) |
| 02/05/2026 | 113 | MOTION for Taxation of Costs by Mikayla Preston. (Attachments: # 1 Affidavit of Matthew Carson, # 2 Exhibit Bill of Costs)(Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/05/2026) |
| 02/06/2026 | 114 | NOTICE by Mikayla Preston re 113 MOTION for Taxation of Costs *of Filing Supplement Pursuant to M.D. Fla. Loc. R. 3.01(g)*. (Petruzzelli, Christen) (Entered: 02/06/2026) |
| 02/19/2026 | 115 | MEMORANDUM in opposition re 113 Motion for Taxation of Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 02/19/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/04/2026 09:26:31 | | | |
| **PACER Login:** | mroberts00779741 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:24-cv-00044-JAR-MCR |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

67-10

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.:  3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE,
an individual,

        Plaintiff,

vs.

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's office
and KATHLEEN DULLY, in her
individual capacity as
medical director of the UF
Child Protection Team,

        Defendants.
                          /

ZOOM VIDEOTAPED DEPOSITION OF:  KATHLEEN DULLY,
                                M.D.

DATE:           April 28, 2025

TIME:           10:00 a.m. - 12:26 p.m.

LOCATION:       Via Zoom

REPORTED BY:  LISA K. PENKACIK, RMR

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

**Page 2**

APPEARANCES:

MICHAEL K. ROBERTS, ESQUIRE
Law Offices of Nooney, Roberts
Hewett and Nowicki
1680 Emerson Street
Jacksonville, Fl 32207
mroberts@nrhnlaw.com
   On behalf of the Plaintiff.

AMY SHEVLIN, ESQUIRE
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471-8237
ashevlin@rbtrial.com
   On behalf of the Defendant Kathleen Dully, M.D.

MATTHEW CARSON, ESQUIRE
Sniffen & Spellman, P.A.
123 N Monroe Street
Tallahassee, FL 32301-1509
mcarson@sniffenlaw.com

   On behalf of Defendant Mikayla Preston.

ALSO PRESENT:  Danny Holguin, videographer
               Shayne A. Thomas, Esquire
               (University of Florida)
               Autumn Zepf, paralegal

**Page 3**

I N D E X

TESTIMONY OF:  KATHLEEN DULLY, M.D.

DIRECT EXAMINATION by Mr. Roberts . . . . . . . 4

CERTIFICATE OF OATH . . . . . . . . . . . . . . 87
CERTIFICATE OF REPORTER . . . . . . . . . . . . 88
ERRATA SHEET. . . . . . . . . . . . . . . . . . 89
PLAINTIFF'S EXHIBITS:
  1 (Articles). . . . . . . . . . . . . . . . . 85
  2 (Dr. Krugman's report). . . . . . . . . . . 85
  3 (Demonstrative image) . . . . . . . . . . . 85
  4 (Dr. Dully's letters) . . . . . . . . . . . 85

S T I P U L A T I O N S

   It is hereby stipulated and agreed by and between counsel for the respective parties and the deponent that the reading and signing of the deposition be reserved.

**Page 4**

PROCEEDINGS

THE VIDEOGRAPHER: Good morning, this is the beginning of media one in the deposition of Dr. Kathleen Dully in the matter of William Lee Lawshe versus Mikayla Preston, case number 3:24-cv-00044-MMH. Today's date is April 28, 2025 and the time is 10:01 a.m. My name is Danny Holguin. I am the videographer. The court reporter is Lisa Penkacik. We are here with Huseby Global Litigation.

Counsel please introduce yourselves after which the court reporter will swear in the witness. Thank you.

MR. ROBERTS: Michael Roberts for the plaintiff, Mr. Lawshe.

MS. SHEVLIN: Amy Shevlin on behalf of Dr. Dully.

MR. CARSON: Matt Carson representing Detective Preston.

KATHLEEN DULLY, M.D., having been first duly sworn by the reporter, thereupon testified upon her oath as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

**Page 5**

Q. Okay. Dr. Dully, I introduced myself a little bit earlier, my name is Michael Roberts, I'm here to ask some questions today. I assume -- you've had your deposition taken before?

A. Yes, but never as a defendant, but, yes.

Q. Okay. You've had it taken as an expert witness?

A. Yes.

Q. Well, a deposition is a deposition, same ground rules apply, you're under oath, and I'll be asking you questions. At any time if you don't understand a question that I've asked you, please let me know and I'll try to rephrase it. I don't have a script that I'm going from, so it's probable that I will ask a bad question, so don't hesitate to question me if you don't understand. Also, there is a court reporter who is trying to take down everything that we say, question and answer, so we'll just try to be mindful of the job that she's trying to do and not speak over one another; sometimes that's difficult for me and sometimes it's difficult for witnesses. So we'll do the best we can. But the last thing that I'll say is, a lot of times we'll speak colloquially, we'll say uh-huh or uh-huh or they'll be a nod of the head, I'll ask for a verbal

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 6

response, if I catch it, just because the court reporter will not be able to describe un-huh, uh-huh, I'll know what you mean by a nod of the head, but she can't write that down so...

A.  Thanks.

Q.  With that, can you just state your full name for the record?

A.  Kathleen Mary Dully, D-u-l-l-y.

Q.  And where are you currently employed?

A.  The University of Florida College of Medicine in Jacksonville.

Q.  And I understand you work for the Child Protection Team?

A.  Yes, I'm the medical director of the Child Protection Team for the University of Florida.

Q.  And what does that mean; what is a medical director of the Child Protection Team?

A.  I supervise the medical care that we deliver on a case by case basis and solve problems and help hire people, essentially.

Q.  And just for those who may not know, what is the Child Protection Team?

A.  The Child Protection Team is the body of experts that consults for DCF usually and sometimes law enforcement as well on suspected or advertised

Page 7

child maltreatment cases. And offers them determinations on the likelihood of abuse or that it is not abuse. We cover the eight counties -- this Child Protection Team covers the eight northeast counties of Florida.

Q.  What is -- well, what is your training and background?

A.  So in 1981 I graduated from Cornell University College of Arts and Sciences, in Ithaca, New York with a Bachelor of Arts and I graduated with distinction in all subjects and Cum Laude.  In 1986, I graduated from the F. Edward Hebert, H-e-b-e-r-t School of Medicine in Bethesda, Maryland, which is Fed Med or the military medical school.

And from there I went to pediatric internship followed by residency training at Naval Hospital Oakland, California from 1986 through 1989. In 1989, I was transferred to my first duty station as a pediatrician, and that was here at Naval Air Station Jacksonville, Florida where I served for two years.  I was assigned to be the Chair of the Child Abuse Case Review Committee here at this military region Navy Marine Corps while I was there.

At the time the only training that was available was in the conference format, so although I

Page 8

had seen and cared for children of possible child maltreatment before, I had only learned about it as a resident and on the job training is what that is and by reading and studying the cases in the medical literature.

Then in 1990 the Navy sent me to my first child abuse conference in January in San Diego, California, which was the child maltreatment conference that is offered by what is called now Navy Children's Hospital in San Diego and the American Academy of Pediatrics and the American Professional Society of Abusive Children.  The conference format for many years was all that was available in terms of getting additional medical training and consultation and so I continued to pursue that all the time every year, and then in 1980 -- sorry, during Desert Shield.  1991, the Navy moved me to Naval Medical Center San Diego.

In San Diego they made me in charge because I had the training, child abuse case review, subcommittees for physical abuse, sexual abuse and something they called the multi-problem family unit. And those I was the Chair, but actually functioned as the medical consultant to a team of people doing case reviews for military commanders.

Page 9

In 1993, there was some ability to propose to the military that specialized fellowships could be developed, and were slowly becoming available, and in 1994 the Navy sent me to the Chadwick Center for Children & Families, which was Rady Children's Hospital for a year of fellowship.  And there I was able to see cases under supervision of people who had been working in the field for 30 and more years, and do the medical assessments on suspected child maltreatment cases, as well as that which is not.  So that was a specialized opportunity.

When I finished that in 1994, the Navy moved me to the Naval Hospital Camp Pendleton, California, and there I was again the medical consultant for the child abuse case review committee for Marine Corps Commanders and then I was also the domestic violence consultant for their domestic violence case review committees.

In all of this time I had served as faculty and am a teacher for medical residents and positions in training at all levels in child maltreatment, be it radiology or orthopedics, or OB/GYN or pediatrics, of course, and emergency medicine.

And after 1994 when I finished the fellowship, my additional training went back to

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 10

conferences and continuing medical education and then I was able -- though I had passed the general pediatric specialty boards in 1989, the first child abuse specialty board became available in 2009 and I was grandmothered into the field with about 200 others, and I was able to sit for and pass that EXAMINATION in 2009 to be a board certified specialist in child abuse pediatrics.

Q. Very good. Thank you for that.

So currently at the Child Protection Team, do you -- do you see -- do you have patients; do you form a patient -- a doctor/patient relationship with the people that you examine?

A. On a case by case basis, yes.

Q. And tell me, what do you mean by that?

A. So I am consultant. I don't become the child's pediatrician, but I consult for DCF and law enforcement and the hospitals and so I have a time of a doctor/patient relationship, but the relationship goes back to the primary care pediatrician.

Q. In the time that you consult, do you -- do you agree that you have to practice within the standard of applicable care, medical care?

A. Yes.

MS. SHEVLIN: Form.

Page 11

Q. And so this child abuse board certification, is that a medical/legal certification?

MS. SHEVLIN: Form.

A. It's a medical from -- administered by the American Board of Pediatrics.

Q. Is there a legal component to it?

MS. SHEVLIN: Form.

A. No.

Q. Okay. All right. Is part of that curriculum designed to help you interface with law enforcement or DCF?

MS. SHEVLIN: Form.

A. Not in any direct way, no. Of course you have to be able to do that.

Q. Do you understand that the child abuse -- that the purpose of the child abuse certification is to aid DCF and law enforcement in investigations?

MS. SHEVLIN: Form.

A. That is not the purpose, that is one of the practice points, I would say yes, but it is to take care of kids and try to stop whatever is going on, if, in fact, something is going on.

Q. Okay. Well, what do you mean by "trying to stop something that's going on"?

A. If there is child maltreatment going on,

Page 12

sometimes it can be stopped and then the child can have a more normal life.

Q. Do doctors stop that?

MS. SHEVLIN: Form, speculation.

Q. Well, let me ask you a better way.

As a doctor, are you trained in your -- in your child abuse specialty, are you trained to stop child abuse in a home setting?

MS. SHEVLIN: Form.

You can answer, Dr. Dully. I'm laying a record. Unless I tell you not to answer a question, just go ahead and answer to the best of your ability if you understand the question, I'm just making some objections for the record.

A. I was missing those completely. I'm sorry, I didn't understand.

MS. SHEVLIN: That's okay. I just objected to form. If you understood the question and you can answer, you can go ahead and answer.

A. I have no ability to stop it, but by helping to assess the evidence that is present that may contribute to stopping it.

Q. Okay. So who -- who stops it? As a medical doctor, what are you talking about?

MS. SHEVLIN: Form.

Page 13

A. The community, which involves responsible investigators and agencies.

Q. So is it not a fair statement to say that the child abuse board -- like that training exist to provide expertise to determine what is and what is not child abuse?

MS. SHEVLIN: Form.

A. There is various levels of certainty, but at one end of the spectrum, it may not be child abuse and at the other end of the spectrum, it may only be child abuse.

Q. Right. But to treat the condition or the injury, you were qualified to treat injuries or illnesses as a pediatrician without the child abuse specialty; do I understand that correctly?

MS. SHEVLIN: Form.

A. I think I do, as a general pediatrician, I take care of kids.

Q. Right. So the only -- what I'm trying to get at, the child abuse specialty is really solely aimed at the distinction or you making a distinction between what may or may not constitute abuse, correct?

MS. SHEVLIN: Form, mischaracterization of her prior testimony.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 14

A. There are things that look like child abuse that are not and I'm consulted in those and there are things where we can't say for sure, and there are things that are child abuse and not something else. And that is part of the determination and diagnostic process.

Q. And that, grappling with those decisions, that is the job of a child abuse specialist, correct?

MS. SHEVLIN: Form.

A. That is what we do in the medical case, yes.

Q. And that's what I'm getting at, right. I understand that you're a pediatrician, but the board certification specifically regarding child abuse, that is what gives you the purported expertise of making a determination or an opinion about whether something is or is not child abuse; is that a fair characterization of what that specialty is?

MS. SHEVLIN: Form.

A. The board certification is a board certification and I passed it because of a lot of other things, and so there's training, experience, literature and the years that go by and the things that children and parents have taught me. So it doesn't distill down to an exam or a -- a yes or no

Page 15

determination.

Q. And I am sorry if you took that question as being like what the test entails. What I'm trying to understand, and I'll just ask you the question.

What does it mean to be a child abuse -- do you consider you to be an expert on child abuse medicine?

MS. SHEVLIN: Form.

A. -- abuse pediatrics.

Q. What does that mean?

A. That is what the board -- American Board of Pediatrics decided to call it, and it is a specialty where we can see the children and put the time in, and whatever else is required to help determine how correct that concern may be or not.

Q. And when you say concern, you're talking about abuse?

A. Yes.

Q. Concern for abuse, correct?

A. So people report things and then I am in a position if there are medical concerns to bring those to bear on what they reported to help decide if they could be right or not right or we cannot say for sure.

Q. And so how long have you been with the

Page 16

University of Florida?

A. 10 and a half years now.

Q. And other than the Navy is the University of Florida the only other employer that you had in your career?

A. No. I also did the same work as a child abuse pediatrician and sex assault examiner for the Rady Children's Hospital before I came here. There I was not medical director, and there, technically, I worked for their specialty group, not necessary -- not for the center -- not for the hospital. Although those are the patients that I saw.

Q. Do you -- and I'm going to use the term "moonlight"; do you know what that means?

A. Yes.

Q. Have you moonlighted anywhere else as a pediatrician or anything like that?

MS. SHEVLIN: Form.

A. When I was active duty military, my work for Rady Children's, Chadwick Center for Children & Families as a child abuse pediatrician and sex assault examiner, that was considered moonlighting through 2006 and I retired upon my return from Iraq. The moonlighting after that, I did not do or need to do because I was able to work continuously in my

Page 17

specialty.

Q. So how many physicians currently work for your department that you're a medical director of?

A. In the division, there are three of us and all three of us participate on the team.

Q. And are you responsible for setting policies and procedures?

MS. SHEVLIN: Form.

A. I contribute to them. I make recommendations about them, I may be the person who writes and signs them, but these other two pediatricians are also board certified child abuse pediatricians with many years experience and I consult with them before putting things in writing in general.

Q. Okay. So we're here today about a case that you consulted on -- do you understand that correctly; did you consult on the case against Mr. Lawshe?

MS. SHEVLIN: Form.

A. I did not know that person's name at the time. I consulted for a detective at the St. Johns Sheriff's office.

Q. Subsequently have you learned that Mr. Lawshe was the subject of that investigation?

Page 18

A.    Yes.

Q.    I have three letters; one is dated February 22nd; one is April 5th and the other is April 5th; do you have access to those as we sit here today?

A.    I do not have the February 22 letter.  I can't find it.

Q.    I'll share it with you when we get to that.

I want to ask you just to start off, some general -- some general questions.

So what is sexual maturity rating?

A.    Sexual maturity rating is a way of stating how close to puberty or in the middle of puberty or completed puberty may be progressing.

Q.    I've also seen it referred to as Tanner staging; is Tanner staging and SMR or sexual maturity, is that the same thing; are those two terms synonymous?

MS. SHEVLIN:  Form.

A.    In the 1980s and 1990s early, it was called Tanner staging.  In about 1998 it changed because there had been so many other studies both before and after Tanner and Marshall and it was changed to sexual maturity rating.  As the years go by, there's more data than just Dr. Tanner's data.

Q.    All right.  And so when did you first

Page 19

learn -- when you first learned about it, it was called Tanner staging?

MS. SHEVLIN:  Form.

A.    Well, it didn't have a formal name and I actually don't remember what the other pediatricians were calling it in fellowship.

Q.    Okay.  And do you know what the -- the test was designed to do?

MS. SHEVLIN:  Form.

A.    In the clinical setting?

Q.    In the clinical setting, yes.

A.    Yes.

Q.    First of all, was it designed as a clinical test?

MS. SHEVLIN:  Form, speculation.

A.    It was -- sexual maturity rating was designed to be able to monitor progress through puberty or a completion thereof or delay thereof, as well as early puberty.

Q.    So a pediatrician would be able to assess whether or not there were any delays or abnormal start to puberty in their patients; that was sort of the reason -- that was the function of Tanner staging or sexual maturity rating as you understand it?

MS. SHEVLIN:  Form, prior

Page 20

mischaracterization of prior testimony.

A.    For most pediatricians that is its function.

Q.    Okay.  And what do you mean by that "for most pediatricians that's its function"?

A.    Well, even newborns aren't Tanner two or SMR two, so it is normal to have some variability in the development of puberty.  Sometimes it's actually the sign of a tumor, so we want to have some idea of what's normal, so that we can identify deviations from normal.  For instance, a three year old who already has Tanner three or SMR three breast buds, plus pubic hair, that would not be normal.  So we use it on the very little kids as well as those who are approaching puberty and in reference to the concerns from the parents or the child, sometimes a teen-age child is worried that they're not normal.

Q.    But that is not the way in which you employ sexual maturity rating in this case, is it?

A.    In this case, the opportunity to assess the patient never occurred.

Q.    But you did use the sexual maturity rating in forming your opinions in this case?

A.    Yes.

Q.    All right, okay.  So let me -- let's just

Page 21

go back.

How long have you been using sexual maturity rating to -- let me ask you this.  Looking for predicate for this.

Do you use sexual maturity rating to chronologically estimate the age of individuals in digital pornographic photographs?

MS. SHEVLIN:  Form.

A.    It is not to estimate the age, it's to estimate the appearance of the age, yes.

Q.    What does that mean?

A.    The appearance of the age is not the same thing as knowing the chronological age.

Q.    What's the difference?

A.    One is in terms of years of age and has documents to go with it.  And the other is based on appearance and in this case, in photographs.

Q.    So I'm struggling with that distinction.  So you -- so you're -- you're not attempting to state or estimate how old the individual depicted in the photograph is, you are trying to estimate how old they appear to be?

A.    Yes.

Q.    So any type of -- you're aware that photographs can be digitally edited?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 22

MS. SHEVLIN:  Form.

A.   Yes.

Q.   You're aware that models can remove pubic hair through multiple different modalities, correct?

MS. SHEVLIN:  Form.

A.   Yes.

Q.   Any digital altering of a photograph would render your opinion say -- would not make it a reliable opinion, correct?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

A.   That's not true, it will be a reliable opinion about the appearance of the image.

Q.   But it would not be a reliable opinion about the actual age of the individual that is depicted?

A.   It may not be.

Q.   And that's true as well as grooming.  If somebody had been groomed, it may not be -- it may be an -- you may be given an accurate depiction or opinion about the appearance, but if there were grooming that was undetectable to you, it would not be an accurate opinion or reliable opinion about the actual age of the individual?

MS. SHEVLIN:  Form.

Page 23

A.   The chronological age is a different question.  This is just the appearance of the image.

Q.   Okay.  So from a scientific -- you understand that -- let me just ask you.

Would you agree with me that that is a -- a limitation on what your opinion could be accurately understood to be?

A.   Yes.

MS. SHEVLIN:  Form.

Q.   Can you describe that limitation for me?

A.   It is not an opinion about chronological age, it is an opinion about the apparent appearance of the image and what its age may be.  It's not the same thing.

Q.   How long have you interacted with law enforcement -- let me ask you this question.

How long do you think you have been using SMR in this way, to look at a pornographic image and estimate the appearance of chronological age?

MS. SHEVLIN:  Form.

A.   Since shortly after 1994.

Q.   And is that sort of like the burst of the internet or like widely used internet, what was 1994?

MS. SHEVLIN:  Form.

A.   It was just my fellowship.

Page 24

Q.   Okay.  What was special about that fellowship that that's what made you start doing that?

MS. SHEVLIN:  Form.

A.   Law enforcement was bringing cases for evaluation to Rady Children's and my colleague pediatricians were also doing these evaluations.  I had not been aware of it before 1994.

Q.   And when is the last time you did an evaluation like this?

A.   2024.  Maybe Nassau County Sheriff.  I know I did at least one for them in 2024.

Q.   You don't think you've done any this year?

A.   I have not.

Q.   Has there been any change in your practice or policies since 2023 in regards to evaluation of these types of images?

MS. SHEVLIN:  Wait, Dr. Dully, hang on a second.  Michael, we're getting into subsequent remedial measures, there's case law on this.  I'm not going to let her answer this question.

MR. ROBERTS:  You can't direct her not to answer questions, whether it's relevant or not is not a reason for you to instruct her not to answer.

Page 25

MS. SHEVLIN:  It's not relevant.  It's subsequent remedial measures.  There's case law on it.

MR. ROBERTS:  That's not -- that's not the law.  And you cannot -- and you can't -- you can, but there's two reasons why you can instruct the witness not to answer and they both deal with privilege.

MS. SHEVLIN:  You're asking her for subsequent remedial measures.

MR. ROBERTS:  And that is perfectly discoverable.  That is perfectly discoverable.

MS. SHEVLIN:  If you want to provide me case law on your position, I'm happy to look at it.

MR. ROBERTS:  Are you instructing her -- are you instructing her not to answer that question?

MS. SHEVLIN:  At this time I'm instructing her not to answer that question.  If there is case law, tell me that I'm wrong, I'm happy to look at it.

MR. ROBERTS:  I haven't briefed the issue, I've only done this for 21 years but --

Q.   Have you -- have you read my -- or Mr.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 26

Lawshe's expert report in this case?

A. I saw it on Friday, yes.

Q. Okay. What was your impression of that?

MS. SHEVLIN: Form.

A. I don't agree with it.

Q. Have you read the article The Difficult Issue of Age Assessment on pedo-pornographic material?

A. Not to my knowledge, no.

Q. The last time you attempted to do any research on the reliability of applying sexual maturity rating to online pornographic images?

MS. SHEVLIN: Form.

A. I was reviewing what I already have last night.

Q. What is it that you already have?

A. I have the original Tanner and Marshall articles from 1959 and '70, the Noshney (ph) publication that came a decade or so later. It's sort of an update on sexual maturity ratings. The Herman and Giddens work that came about 10 years after that in the 1990s on sexual maturity in American girls. I do have some other population evaluation articles such as from Switzerland or from Hong Kong or Asia, but those don't really apply in

Page 27

this case to my knowledge, and I did not review them much at all. And what else? I did look at an American Academy of Pediatrics publication that summarizes all of the pubertal stage photographs from, I think it's from 1996 and then also the -- was there anything else good? There is another article that I reviewed. Let me see. I don't know if I have -- well, and of course, the standard textbook that I use which is the 15th Edition of Nelson's textbook of pediatrics.

Q. So those sound like journals that are pediatric journals about Tanners staging or sexual maturity rating in the clinical setting?

A. They -- they are and also a -- a publication, I think it's a desktop publication from the military from the Armed Forces Center for Child Protection in 1998, I think it was. I looked at it, that was -- I was actually asked to help get these images taken care of by the Armed Forces Center for Child Protection about that time when I was active duty.

Q. And just so -- anyway, clinical setting by clinical setting, I mean and I want to make sure we're on the same page, a pediatrician who is treating a patient in the clinical or office setting;

Page 28

is that -- is that a fair way to use clinical?

A. Yes. Except that all the work was done from photographs -- where most of the work was done from photographs as a study modality. So it is a clinical tool, and if you ever get access to the child, then you can use it that way. But sometimes in child abuse pediatrics, you do or do not have access to the child; you do have access to the images and are consulted to estimate the appearance of their sexual maturity based on photographs.

Q. Okay. So I want to share the screen here. This is an article that we disclosed to you a month ago, a couple months ago. Can you see this on your screen?

A. Okay. Yeah, that's a lot of fine print.

Q. Let me -- Forensic Science International; have you heard of that journal?

A. Well, it's not a medical journal, but I have heard of it.

Q. I just want to go down here to the conclusion. I'm going to read some of these -- well, let me just read this. We'll start with this. Much pornographic, pedo-pornographic material depicts women who seem sexually mature and who may be late teenagers or women over the 18 years of age. Our

Page 29

study, in fact, proves that it is nearly impossible to say that adults who look like sub adults are indeed adults, which obviously may apply to all those sub adults who seem sexually mature. Did I read that correctly?

A. You read it out loud, yes.

Q. And it says, forensic and medical experts should avoid using such unscientific behavior which may have drastic consequences in a Court of law; did I read that correctly?

A. Yes.

Q. Now, you're unfamiliar with this, but I'd ask you to get familiar with it. This study shows that pediatricians who attempt to age pornographic images of women are wrong between 95 and 73 percent of the time when they do that; does that surprise you?

A. Well, they're against it, so it doesn't surprise me. I think that's what they wanted to find.

Q. This study was funded by the E.U. Project to help develop ways of detecting child ponography online; why do you see that this is what they wanted?

MS. SHEVLIN: Form, she has not had an opportunity to read the entire article.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 30

MR. ROBERTS: Stop, stop, I don't want a speaking objection. She said this article was published by people who wanted to find that.

Q.    Dr. Dully, why do you think the people who wrote this article wanted to find that?

MS. SHEVLIN: Form.

A.    Because their conclusion and their tables say that in what you have shown me. It needs to be read critically with a jaundiced eye because it appears on the surface that that is their aim. It's also a legal journal, not a medical journal. It would be read with a jaundiced eye.

Q.    So you're discounting an article that you've never seen or read?

MS. SHEVLIN: Form.

A.    I am discounting a journal that is not a medical journal and I would read it critically if you give me the chance.

Q.    Well, you had a chance and you haven't done it, have you?

MS. SHEVLIN: Form.

A.    I haven't seen this before.

Q.    Well, you -- you -- you had access to the article last week.

MS. SHEVLIN: Form.

Page 31

A.    I have never seen this before.

Q.    Because you chose not to look at it.

MS. SHEVLIN: Form, mischaracterization of her prior testimony.

A.    I have never seen this before.

Q.    Why have you not seen it before?

A.    It was not provided to me. I have never seen it before.

Q.    It was in the expert's report that you said you read last week?

A.    It's certainly not in there.

Q.    Okay. I'm going to share what we'll mark as Exhibit 2. That will be Exhibit 1.

This is the report of Scott Krugman; does this look familiar to you?

A.    Yes.

Q.    See three here, The Difficult Issue of Age Assessment on Pedo Pornographic Material?

A.    It is a reference, yes.

Q.    You agree it was -- the name of the article, the journal and the citation was provided in his report?

MS. SHEVLIN: Form, mischaracterization of her prior testimony.

A.    The citation is there.

Page 32

Q.    So why -- why didn't you look at it?

MS. SHEVLIN: Form.

A.    Because I know it's a difficult assessment. I know that it's difficult.

Q.    Why do you say that it's difficult?

A.    Because it is an appearance, it is not a chronicle age. Chronological age, sorry, not enough syllables.

Q.    So let me ask you this. So if I was a person who had to make a legal determination about whether or not someone was, in fact, or -- let me re-ask the question. If I was someone who was being asked to make a factual determination about whether or not a model depicted in a pornographic image on the internet was a minor; in fact, a minor, would your opinion about the appearance be a reliable opinion for me to base that decision on?

MS. SHEVLIN: Form.

A.    No, that's what the investigation is for.

Q.    That seems like a major limitation in your opinion about age; would you agree with that?

MS. SHEVLIN: Form.

Q.    I'm sorry, almost all of your answers are being interrupted by Amy's objection. Was that a yes?

Page 33

A.    It was a correct.

MS. SHEVLIN: Give us just like one second so I can make an objection and then we won't talk over other.

A.    Sorry, sorry.

Q.    And maybe I'm -- do you tell law enforcement officers about the limitations in your opinions before you give them to them?

MS. SHEVLIN: Form.

A.    Yes.

Q.    It happened again. It happened again. So you said yes to that question, correct?

A.    Yes.

Q.    Can you tell me what you explain to law enforcement officers when you give them your opinion?

A.    That this is the appearance of the person in the image, and that is, if I can see the image; sometimes the images are too blurry or just not good enough to even see. So they know quality of the image and they know that it is only an image and that the appearance depicts something that is based on sexual maturity rating that may or may not prove to be a minor. They don't bring the little kids, they bring these borderline kids to be looked at or images and they investigate after that. Because I can only

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 34

give them appearance.

Q.   So you're aware that a lot -- I mean, do you have any impression of how much or how many images that are published on the internet have been digitally altered in some way?

MS. SHEVLIN:   Form.

A.   I'm sure it's an astrological number.  I don't know the number.

Q.   As we sit here, I mean, you're -- I mean, you believe -- let me just -- you think that most images have some sort of digital altering on them for aesthetic purposes?

MS. SHEVLIN:   Form, mischaracterization of prior testimony.

A.   No.  A lot of images have -- may have alterations and a lot of images may not have alterations, I don't know what those numbers might be.

Q.   And that is a fair answer.  If you don't know the answer, just say I don't know.

But whether or not there were alterations would have a significant impact on the accuracy or the reliability of your opinion as to the actual age of the model?

MS. SHEVLIN:   Form, speculation.

Page 35

A.   What I see on the image does not necessarily give an indication of the actual chronological age that may be discovered during investigations.

Q.   So what is -- what do you see -- what is the value -- I mean, your -- your job is to consult with law enforcement in these cases, correct?

A.   Yes.

Q.   What do you see the value of your opinions being?

MS. SHEVLIN:   Form.

A.   There are times when it leads to a real child or a trafficked child and it may be local; it may not have any bearing at all because it may turn out to be modified images that were made to look like an adolescent.  So I don't know what direction it will go after I tell them, yes, they have an appearance of an adolescent going through puberty and that is its only value.

Q.   So, okay.  I'm going to put a pin in that statement.  I want to go to actually sexual maturity rating.  In terms -- and let's just have this and just talk about females.  All of the images you reviewed in this case were females, correct?

A.   Yes.

Page 36

Q.   So and let's just start with a genital or vaginal appearance in females.  Can you describe what the grades of sexual maturity -- first of all, what are the grades of sexual maturity rating?

A.   I, II, III, IV, V and for pubic hair there may be a VI.

Q.   Okay.  So can you just give me the pubic hair -- first of all, in the genital region is there any other factor other than pubic hair development in sexual maturity rating?

A.   There is another factor but we usually can't see it and that is the appearance of the hymen itself.

Q.   And that's an internal anatomical body part?

A.   It's a little bit internal; it's not -- it's still considered external, but it's not readily visible.

Q.   Did that have any bearing on your opinions in this case, the hymen?

A.   No, I could not see that structure.

Q.   So, the only, I guess anatomical appearance would be the appearance of pubic hair in terms of genital development?

A.   Generally speaking, yes.  I don't have the

Page 37

images, so I haven't seen them in two years, so...

Q.   Well, we'll talk about that because, Amy, I thought that's what we were doing, is you were going to give her the images.

MS. SHEVLIN:   I meant to talk to you about that on Friday.  When we take a break, I'll call you.

MR. ROBERTS:   Okay.  All right.

Q.   So, grade- -- what's grade I?  I'm sorry, we're just talking about genitals or pubertal hair --

A.   For the female child, that's the little girl, so she will have fully developed labia majora if she's a term infant and that appearance will continue until she becomes -- developed some pubic hair.  So once she starts developing some pubic hair that is not vellus hair, different from the hair on her abdomen, she could be called SMR II.

Q.   Okay.  And grade -- what is grade III?

A.   Grade III is a little bit more pubic hair on the labia and also where the labia come together up front that will no longer be clearly or plainly visible because there is pubic hair at the top of that, the labia majora where they come together, the interior commissure, and part of the mons pubis is covered with pubic hair that is not the same as

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 38

vellus hairs on the abdomen.

Q. And grade IV.

A. Grade IV fills out the entire triangle shape of the labia majora, the anterior commissure and the mons pubis over to, but not involving where the thighs join at the pelvis.

Q. What do you mean by triangle?

A. That is the shape when the legs are together of the hair bearing parts over the mons pubis in front of the anterior commissure and on either side it's wider and between the legs, it will come to appointment so it may look like an inverted triangle.

Q. And grade IV?

A. Grade IV will involve the inner thighs as well. And also hair will be thicker or more abundant.

Q. So, I mean, human beings are all different; the thickness is a very subjective evaluation, I would imagine?

MS. SHEVLIN: Form.

A. Is that a clinical question or --

Q. Yeah, it is. Between making the distinction between IV and V, I mean, how -- what is the thickness of a V versus the thickness of a IV?

Page 39

A. I would look at the inner thighs to tell the difference. And most -- most of the children are shaved, so we don't get to assess thickness, there isn't anything to see, there are whiskers there.

Q. Because most -- most people at that age do groom themselves at least at the thigh level?

MS. SHEVLIN: Form, speculation.

Q. Well, I think that was just your testimony, wasn't it?

A. No, that wasn't my testimony, but --

Q. What did you say? I'm sorry, can you just say it again, you don't get to see at the thigh, you said something about shaving?

A. There are whiskers. We cannot judge the thickness of the pubic hair, we can only look at the location of the hair bearing parts by looking for the whiskers, the obvious shaving.

Q. So, really, the difference between four and five is whether or not you see over the inguinal notch, that crease between our thighs and the pubic level, the pubic area?

A. Practically speaking, it is the inner thighs.

Q. Yep, okay. And if there were waxing or grooming such that you couldn't see whiskers or

Page 40

something, but it was obviously being groomed, you would not be able to distinguish between IV and V?

A. So I can see whiskers on the inner thighs, that distinguishes V from IV.

Q. But if you can't, because of the method of grooming or the digital altering, you would not be able to tell the difference between a IV and a V?

MS. SHEVLIN: Form.

A. I'm talking about an actual patient. You're talking about images?

Q. Oh, is there a difference?

MS. SHEVLIN: Form.

A. An actual patient, I can see the difference because I can see the hair follicles.

Q. So what's the difference when you're evaluating an image?

A. There isn't as much fine focus or close view to necessarily be able to see and blond individuals may be less obvious as well.

Q. So it's much more difficult or it's more difficult for you to make the distinction between a IV and a V on -- on a digital image?

MS. SHEVLIN: Form.

A. On any image, yes.

Q. Okay, okay. All right.

Page 41

So this triangle of pubic hair, what -- what's the significance of that? Why do you say a triangle?

A. Because I'm trying to be descriptive.

Q. No, but I mean, is that the way that pubic hair grows in on females is in a triangle -- is that the way it's supposed to grow in?

A. At a certain maturity, it will look like a triangle. Early on it does not look like a triangle.

Q. But at the IV to V stage, an ungroomed female model should have a triangle shape to her pubic hair?

MS. SHEVLIN: Form.

A. Roughly, except for what's out on the inner thigh they're going more posterior. Some people have it going up to their belly button as well, that's called a six.

Q. Okay. Pubic hair that goes up to your belly button would be a VI? Grade VI; is that correct?

A. In a straight line up the midline lafay (ph), there can be a VI, and it may go posterior around the anus, too.

Q. How long can people appear to be -- well, before I ask that question. Give me the same rundown

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 42

with breasts. Grades IV through V in breasts, just describe what those are.

A. Grade IV, just grade IV and V?

Q. No, I'm sorry, grade I through V. I'm sorry if I asked that question wrong.

A. Okay. So most newborns are II, maybe III in their sexual maturity rating, they've been exposed to estrogen in utero. Even the male infant has breast buds, so the newborn is, by definition, a sexual maturity rating of II and sometimes III. As the estrogen effect from being a fetus goes down in their bloodstream in little girls that takes two to four years. The breast buds become small and flat and no longer palpable. So there will be a flat little pale nipple and if they're cold, they may have a papilla protruding in the middle. As the -- that is an SMR I, which is sometime after birth until estrogen effects starts being produced by their own body. The breast buds will then redevelop and when it's confined to just under the nipple and its areola, then that is an SMR II.

When there is a little bit more enlargement of a mound outside the area of the pink areola, then that's a III. When the breast tissue is beginning to meet at the sternum and the midline, then it is a IV

Page 43

when looking at it an anterior/posterior way, so we're looking directly at the person's chest. If we look from the side, you -- or have a side view, you can see that a IV has two mounds; one mound for the breast tissue and a separate mound on top of it for the nipple for areola and papilla. So IV, sexual maturity rating is two mounds instead of one. V has become a single globular shape, and so it has a papilla at the top of the nipple, but there is one mound that is under the pink of the areola and the breast tissue all the way to the chest wall.

Q. Okay. So how long in chronological age can a female present as a grade IV on clinical exam?

MS. SHEVLIN: Form.

A. About 20 percent of women who are not pregnant revert to a IV. And will be that way through parts of their adulthood.

Q. So a female being a grade IV is not inconsistent with them being over the age of 18?

A. Correct.

MS. SHEVLIN: Form.

Q. And when you meet with detectives, do you give them some explanation of what the -- the sexual maturity rating is; do you give them like a little primer course if you've never met them before?

Page 44

MR. STEWART: Form.

A. In general, I don't -- I'm not the first pediatrician that they have met with, but I will ask them if they have any questions and show them what I use, my reference.

Q. You show them a reference book or something like that?

A. The pediatric, Nelson's Textbook of Pediatrics, yes.

Q. Okay. Actually, and I'm just going to show you this. It's just -- and you can tell me if it's helpful or not helpful. I guess that means it's a demonstrative aid, it just has -- it's like a textbook, I don't know if it's from your textbook or not, and you can tell me if it's not helpful. Do you see this?

A. I can see it.

Q. Is that a visual depiction of what you just testified to, that image there? What's that?

A. Yes, they are trying to depict that here.

Q. And I understand it's like -- it's a drawing, it's probably just a pen drawing, but this -- this is kind of -- I see a triangle at IV and I see a larger triangle at V; is this generally what you were testifying to earlier?

Page 45

A. Yes, roughly.

MS. SHEVLIN: Are you making that as an exhibit?

MR. ROBERTS: We can mark that as 3. 1 was the article. 2 was the expert report and 3 was that demonstrative image.

Q. I want to go back to Exhibit 2, which is Dr. Krugman's report and you said you disagreed with the report, but I just want to maybe dial in on that.

For example, I just want to go to the -- the letter E here, Dr. Dully. It's well-known and documented that adult females can exhibit and appear to be SMR IV; you would agree with Dr. Krugman on that point?

A. Yes.

Q. Do you know Dr. Krugman?

A. I know Dick Krugman, I don't think I know Scott Krugman.

Q. Okay. In this he says that you're a member of a list serves that he's a member of and this issue about the concerns and limitations of using SMR in CSAM investigations has been raised in that -- in that e-mail list serve; is that true?

A. It's been discussed off and on for at least a decade, yes.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 46

Q.   I mean, has anyone suggested on there that it is not scientific to be applying SMR ratings to the pornographic images on the internet to determine chronological age?

MS. SHEVLIN:  Form.

A.   I don't remember anybody saying that it was unscientific, but we all agree that there are limitations to stating what the appearance may be versus what the age of the patient may actually be.

Q.   Let me ask a question in a different way, because we may be just ships passing in the nights here.

Do you agree that it is not scientifically reliable to use SMR ratings to determine the actual chronological age of a model depicted in a pornographic image on the internet?

MS. SHEVLIN:  Form.

A.   Yes.

Q.   Yes.  Sorry.

So you agree that that's not scientific to say the actual age of the model?

A.   I agree.

Q.   What you are saying is, is that you can apply SMR and say what it appears to be, irrespective of the possibility of grooming or digital

Page 47

manipulation?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

Q.   I didn't even -- I don't even know I know what your answer is there, so can you restate your answer?

A.   I said correct.

Q.   Correct, okay.

Do you think that you communicate that idea to law enforcement when they come to you?

A.   Yes.

Q.   So when Detective Preston came to you with these images and she left, you would have told her that you cannot give her any reliable information about the actual age of this individual depicted in this image?

A.   Yes.

Q.   All right.  So, in some ways, I think maybe you agree with Dr. Krugman if he is talking about actual age; is that fair enough -- is that a fair statement?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

Q.   Do you understand my question, Dr. Dully?

A.   I'm -- I'm not sure how your question is

Page 48

different from all the others.  I guess I'm not sure.  I must be missing the nuance.

Q.   Well, you said originally that you disagreed with his opinions; do you remember that testimony?

A.   I disagreed with his opinion about my opinion.

Q.   If he thought that your opinion was stating the actual age of the individual, rather than just the appearance, would that be an explanation for the disagreement between Dr. Krugman and yourself?

MS. SHEVLIN:  Form, speculation.

A.   Yes.

Q.   Okay.  So did you understand that your opinions were going to be used in a probable cause affidavit to seek a search warrant?

MS. SHEVLIN:  Form.

A.   No.

Q.   What did you think that they were going to be used for?

A.   That there were probably other files to be looked at or other circumstances and there would be some determination on whether they would move forward or not.

Q.   Do you think -- I'm sorry, I didn't mean to

Page 49

cut you off.  Were you finished?  I'm sorry.

A.   I think I was finished.

Q.   Okay.  Sometimes on Zoom it's a little hard to know when people are finished or not, but...

Would you be comfortable with your opinions being used in a probable cause affidavit without the caveat --

MS. SHEVLIN:  Form.

Q.   -- that you've just given us here about the limitations of your opinion?

A.   I don't think my comfort matters.  I'm just making a statement about the appearance.  And then there's decisions on whether to move forward with that or not.  Sometimes they do and sometimes they don't, and I don't know that one image is going very far ever; I don't know that.

Q.   Well, no, that's not my -- so it's, you know, as a child abuse expert that your opinion sometimes have serious legal consequences, correct?

A.   Yes.

MS. SHEVLIN:  Form.

Q.   Parents lose their children sometimes because of your opinions.

A.   Yes.

Q.   In this case someone went to jail, in part,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 50

because of your opinion; were you aware of that?

MR. STEWART: Form.

A. I was informed after it was published in a newspaper. A colleague informed me that that had been in the newspaper, but I did not know that.

Q. Did you suspect that your opinions might be used in front of a judge?

MS. SHEVLIN: Form.

A. Sometimes they go before a judge, sometimes they go before a jury; that's not my determination.

Q. But that's not my question.

My question was, when you gave this -- when you wrote these letters, did you expect that the law enforcement officer, Detective Preston, was -- was going to quote them in a probable cause affidavit for a judge?

A. I know that she was going to investigate further, but I did not know what the next step might be.

Q. All right. So I'm going to just pull up and share the -- you don't have the February 22nd report; did I understand that correctly?

A. I did not.

Q. So -- and we'll mark this as Plaintiff's Exhibit 4. And it will be a composite exhibit

Page 51

because I have them in a PDF that has all three of your letters. I'll represent to you that this letter is almost verbatim copy and pasted from your -- in your April 5th, so the words are going to probably look very similar, but just take a second and look at it. Just tell me when you're done.

A. Okay.

Q. So my first question is, why did you not include in your letter any commentary on the limitations of your opinion in regards to the actual age of the model or the ima- -- the person depicted in the photograph?

A. I think the limitations are obvious, and I say what appears to be. And that is the appearance, the developmental genital appearance and she does not appear to be shaved; the whole thing is about appearance. I think that's pretty apparent.

Q. Well, you told -- you've already testified that you would have told Detective Preston explicitly that I am not talking about the actual age of the individual, I'm only talking about the appearance?

A. I'm only talking about the appearance that's --

Q. And you would have communicated that to Detective Preston?

Page 52

A. And it's in writing, yes.

Q. And when you say it's in writing, you're talking about your use of the word "appears," you use the word appears over and over again?

A. Yes.

Q. Okay. So I understand you don't have the images in front of you and we're going to take a break here in just a minute and I can talk to Amy about that, but I just want -- I want to go through this real quick, okay.

You, in this depict -- you describe the image that you're looking at, correct?

A. Yes.

Q. And can you describe for the record -- do you -- first of all, do you remember meeting for the first time Detective Preston?

A. I remember that I met her, yes.

Q. Do you remember -- you had that meeting in general, maybe not word for word, but in general do you remember that meeting?

A. Only vaguely.

Q. So she showed you an image on her laptop is what's related in this letter. Can you describe what that image looked like?

A. I can only read to you what I typed.

Page 53

Q. Please do.

A. The image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet. She is on a wood floor in a knees to chest position with her lower legs and ankles parted to expose her genitalia for the camera.

Q. So she was in a knees to chest position; is that correct?

A. Yes.

Q. Now, you were of the opinion -- Oh, I'm sorry, I didn't mean to stop sharing there, I'm sorry.

Your opinion was that she appeared to be SMR IV; is that correct?

A. Just of her genitals, yes.

Q. Because you -- you couldn't evaluate her breasts?

A. I don't think I was able to see them or I would have put them in there.

Q. Well, knees to chest, in theory, she would be covering her breasts with her knees or her legs, correct?

MR. KASS: Form.

A. That sounds right.

Q. Yeah.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 54

You put that she would have achieved this developmental genital appearance of SMR IV at 12 to 15 years of age. Why didn't you put that she could -- but she could be 18 or 19 or 20 with an SMR IV?

MS. SHEVLIN: Form.

A. Well, that would depend on the modifications and grooming, as you're calling it, that she would undertake, and I'm not assessing grooming, I'm assessing appearance of the photograph, which is what pornography is all about.

Q. Well, you testified earlier and you agreed with Dr. Krugman that women can present as SMR IV for their entire life?

A. For their breast development, yes.

Q. And genital pubic hair?

A. That depends on shaving and heritage or depilatories or waxing or other things.

Q. You say that she (sic) did not assess her grooming, but you did in the next sentence assess the grooming?

A. She did not appear to be shaved; that, again, is an appearance.

Q. How -- what scientific basis do you have to make that determination?

MS. SHEVLIN: Form.

Page 55

A. I don't see any hair there and so she does not appear, you know, to be shaved. I mean, there is or there isn't hair, right, why say that there is anterior pubic hair present.

Q. But that's just a lay opinion, right, that's not a scientific opinion, you're just saying I don't see any hair?

A. No, I think you mischaracterize it big time, clinically.

Q. Tell me, I asked the question and you didn't answer it.

What is the scientific basis for your opinion that she does not appear to be shaved, medical, scientific basis for your opinion?

A. The hair is still there.

Q. I don't understand, you said the hair is still hair?

A. Shaving removes hair, but the hair is still there; it's present or absent in the image.

Q. Is that a medical opinion?

A. That's a clinical medical assessment what the image looks like.

Q. What about waxing or electrolysis or chemical hair removal?

MS. SHEVLIN: Form, speculation.

Page 56

A. What about it? The hair --

Q. Do those leave visible signs of hair?

MS. SHEVLIN: Same objections.

Q. Well, hold on. You're saying as a medical expert, you can determine whether someone is groomed or not groomed, correct?

MS. SHEVLIN: Form, mischaracterization of her prior testimony.

A. I know what shaving looks like because I see it all the time and it has been that way since the 90's so --

Q. Yeah, and I'm asking about go waxing or electrolysis; you're familiar that there are other types of grooming other than shaving, correct?

A. There are, yes.

Q. And they leave a different -- they look different; the results is different than shaving, correct?

MS. SHEVLIN: Objection, speculation.

A. They're designed to be the same or they can be designed to be different.

Q. Right.

So, how can you look at a pornographic image and determine whether or not they have been waxed or electrolysis hair removal, some other form

Page 57

of hair removal?

A. I'm not assessing the hair removal, I am saying the pubic hair is present.

Q. But if she is groomed that would destroy any validity to your SMR rating as -- as regards to pubic hair, correct?

MS. SHEVLIN: Form.

A. The hair is still present. It can be assessed for its appearance.

Q. We're going to follow back up with that. But before we take a break, I'm going to ask you this quick and I'm going to go back to this image.

Okay. This is the general image and we talked were the triangle. Dr. Dully, you've described this model in the February 22nd, 2023 as sitting towards the camera, knees to chest, correct?

A. Yes.

Q. It would have been impossible for you to determine whether this model had a triangle or not based on the way that she was sitting, correct?

A. I do not know; I do not know what the image looks like.

Q. You've described the image as knees to chest, sitting on the floor, that would obscure the inguinal notch or the inner thigh from your view,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 58

correct?

MS. SHEVLIN: Form.

A. No, that depends on the image.

Q. Well, if the image, because I've seen it, if the image obscured the inguinal notch, it would be impossible for you to determine whether or not the model had a triangle or the hair crossed the inguinal notch to the thigh, correct?

MS. SHEVLIN: Form.

A. Well, there is not -- there is no inguinal notch, I don't know what you're talking about, and I can see -- I state that I can see, but I don't have the image, you have an advantage over me, you're not seeing it, correctly.

Q. Okay. The thigh -- you testified -- tell me what was the difference between, again, IV and V?

A. Can I see the image?

Q. I am not actually comfortable because the image is still on a Nick Nick database because no one is doing their job, and I'm afraid that if we transmit it, we're all going to get investigated for child pornography even though it's an adult, so I'm just going to ask you questions right now based on the hypothetical and I will show you the image, but can you, once again, tell me what is the difference

Page 59

between a IV and a grade V pubic hair?

A. The presence of hair or the shaved area of hair on the inner thighs, on either side of the fully developed roughly triangle shape of hair.

Q. So if you could not see the inner thigh, you could not distinguish -- it would be impossible for you to even say what appears to be a grade IV versus a grade V?

MS. SHEVLIN: Form.

A. I cannot see the image. I can't comment one way or the other.

Q. You have to answer my questions unless you don't understand them.

A. I can't see the image. You're asking me --

Q. I'm asking you a hypothetical question, Dr. Dully.

A. Okay. A hypothetical, not about this case, about something else, okay, try that.

Q. Hypothetically, if the image did not show the inner thigh or the inner section of the inner thigh and the pubic region, you could not distinguish between a grade IV and a grade V in terms of sexual maturity rating appearance?

MS. SHEVLIN: Form.

A. I would need to see the image, but I would

Page 60

consider that as facts, yes.

Q. Evaluating whether or not pubic hair has crossed the line onto the thigh is the distinguishing factor between a grade IV and grade V, pubic hair distribution for sexual maturity rating, correct?

A. It is the most helpful distinction, yes.

Q. Okay. All right. Why don't we take a break, we've been going for an hour and a half.

Amy, do you want to call me?

MS. SHEVLIN: Yeah, I'll you on your cell.

THE VIDEOGRAPHER: Going off the record the time is 11:29 a.m.

(Whereupon a break was taken.)

THE VIDEOGRAPHER: We're on the record, the time is 11:47 a.m.

Q. Okay. So we had an off record discussion and through no fault of Dr. Dully, there's just a logistical issue with Miss Shevlin's office and the photographs did not get sent to her. So we are going to ask a few more questions, but then continue the deposition to a later time in which she will have access to those photographs and we will reschedule it, Matt raised the concern about him asking questions and that certainly will be accommodated when we reschedule the deposition. He also has the

Page 61

ability to reset a deposition as well. Is that a fair summary, Matt and Amy?

MS. SHEVLIN: I think that's a fair summary.

MR. CARSON: Agreed.

MS. SHEVLIN: And I do also want to add just one thing. The questions that you'll be asking her are largely going to be hypothetical if we're talking about the images from this point forward and then when we have an opportunity for her to look at the images, they'll be specific to those images, correct?

MR. ROBERTS: Some of them may be hypothetical. I don't intend to go through every image in a hypothetical way, but I am going to ask about some general principles, you know, that maybe we don't even need the images for, but yeah, some may be hypothetical, but I don't intend to go through everything like that.

Q. All right, Dr. Dully, I want to ask you -- and this is not a hypothetical, when you were making these assessments at the request of law enforcement, do you use any other set of scientific principles or methods in rendering the opinion on the appearance of the model, other than sexual maturity rating?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 62

A.    Yes, sometimes I do.  It depends on the image.  So sometimes I --

Q.    What would those be?

A.    So sometimes I can see the teeth, and I can tell if they're baby teeth or mixed dentition, which is adult teeth in some stage of eruption, sometimes with missing teeth as well.  And then sometimes if they're very young, I can look at it by proportion, if they're very young, images of the very young, I can look at body proportion which is head size to body size.  And most of the size or height is not visible in most images; sometimes they're standing next to an adult and I can look at approximate height, but most of these images are not that, and so occasionally, you know, there's more information or appearance information on the images and sometimes, there is not.

Q.    If you relied on any other data such as proportion, height, teeth, would that be information that would be included in your report?

A.    Yes.

Q.    So if it's not included in your report, I can take from that that you did not consider other data in forming that opinion?

A.    Not other image data.  Sometimes I look at

Page 63

the bio main or something that's printed on it, or for sexual content, but that's often not helpful either.  It's just all letters and numbers and asterisks, that doesn't help.

Q.    Yeah, I understand.  If -- if there was something, though, you would put that in your report?

A.    I would.

Q.    All right.  So I think when we left off, there was this hypothetical and I don't -- and I apologize, and I'm going to ask this hypothetical again, and I use inguinal notch, but I think it's inguinal -- what is it that --

MS. SHEVLIN:  Form.

A.    I don't know.

Q.    It's -- I'm sorry, do you know the anatomical term that I'm talking about?

MR. CARSON:  Groove.

Q.    Inguinal groove?

A.    Yeah, I don't know what you're referring to.

Q.    It's just an anatomy term.  It's the -- it's the -- it's the line between the abdominal wall and your hip, that groove, that crease.

A.    Oh, that would be -- you could call that an inguinal fold.

Page 64

Q.    Inguinal fold, yeah, I've seen notch, I've seen fold, I've seen groove, I've seen -- but that's the line that you're talking about in the distinction of -- between IV and V, correct?

A.    No, that is very anterior.  I'm talking about medial thighs, which is the inner surface of the upper thighs.

Q.    But if a picture did not -- if an image did not depict the upper thigh or the abdominal wall where it meets the thigh, it would be impossible for you to distinguish between a grade IV and a grade V pubic hair presentation, correct?

MS. SHEVLIN:  Form.

A.    No, that's not the location.  The location isn't abdominal wall and it's not in the inguinal fold.  It is between where the thighs come together in the middle, so it's anterior and medial, the inner thigh.

Q.    Okay.  So if you cannot see in a digital image, the interior thigh, it would be impossible for you to distinguish between a grade IV and a grade V?

MS. SHEVLIN:  Form.

A.    No, it's the anterior, a-n-t-e-r-i-o-r and medial thigh, m-e-d-i-a-l, which is where the legs come together between the upper thighs and on the

Page 65

front of the medial surface of the thighs.

Q.    If you cannot see that area, it would be impossible for you to distinguish between a grade IV or a grade V presentation, correct?

MS. SHEVLIN:  Form.

A.    Probably, but grade IV and grade V are also a subjective determination of quantity amount of pubic hair.

Q.    You would not be able to, scientifically, with any degree of reliability distinguish between a grade IV and grade V if you had not seen the area that you have just described?

MS. SHEVLIN:  Form.

A.    At a hundred percent level of certainty, probably not.

Q.    No, you can't ever say with 100 degree -- 100, you know, that's not -- that's not what I'm talking about.  And I want to -- I'm going to spend as much time on this as we need to.  What I'm going to do, is I'm going to pull back up our demonstrative aid.

Mr. Videographer, do you have this demonstrative aid?

THE VIDEOGRAPHER:  Yes, sir, if I see it?

MR. ROBERTS:  Yeah, can you do like a split

Page 66

screen, the ability to do a split screen with the witness in this?

THE VIDEOGRAPHER: I see it now. She's on the -- do you guys see it? She's on the side right now.

MR. ROBERTS: That's fine, yeah, that's fine.

THE VIDEOGRAPHER: Okay.

Q. So we have a -- can you see cursor, Dr. Dully?

A. Yes.

Q. So on grade IV, grade V; is my cursor, the area where my cursor on both the IV and the V, is that the area that you're talking about?

A. Yes. Also between the thighs.

Q. Also between the thighs.

A. To each other.

Q. If you cannot see this area that I am running my cursor on, you cannot do a SMR rating to distinguish between a IV and a V on a pornographic image off the internet, can you?

MS. SHEVLIN: Form.

A. There can be a difference in quality, as you can see, and then also there's medial thighs which you can't see on these diagrams, so if I can

Page 67

see better than just this, maybe.

Q. At what point would you say to -- first of all, have you ever told a law enforcement officer, you know, there's just not enough here for me to reliably give you an opinion about the sexual maturity rating.

A. Yes.

Q. And what would be the criteria for that?

A. Sometimes the image is too pixilated or blurry or the clothes are covering the vital structures.

Q. What are the vital structures?

A. The breast area from more than one view, and the pubic area as well.

Q. Okay. So if the breast area is obscured and the pubic area is obscured, those are circumstances in which you believe you have communicated to a law enforcement officer that this just isn't enough for me to reliably opine on the sexual maturity rating as it appears in the photograph?

MS. SHEVLIN: Form.

A. Correct. Maybe I can see the teeth, maybe it's an image that belongs to a bigger file that shows more information, but based on that one image

Page 68

alone, I can't do the sexual maturity rating.

Q. So you do have -- first of all, do you recall, I think you met with Detective Preston twice; is that what your rec- -- records indicate?

A. Yes.

Q. February 22nd and April 5th. Do you have any calendars or anything in your possession that document those meetings?

A. I have a date and a time on my Outlook calendar.

Q. Have you gone back and checked that Outlook calendar and -- and found an April 5th and a February 22nd?

A. I did not remember the February visit, so when I went back, I did find the February visit on my calendar.

Q. Have you met with her any other times other than April 5th or April (sic) 22nd?

A. Not met with her. I may have seen her in the hallway, potentially, but, no, I didn't share any cases with her to my knowledge.

Q. Okay. Did you check for that?

A. No.

Q. So you just don't recall having any other cases that you consulted with her about?

Page 69

A. I don't know that they were with her; sometimes it's a team. I have seen other St. John's County cases at the hospital --

Q. Right.

A. -- but I don't remember her being a prominent figure in any of the others.

Q. Okay. So do you recall -- so you don't recall her -- meeting her in February with a single image as we sit here today?

A. I do not.

Q. Do you recall meeting her in April with multiple images?

A. Yes, because we scheduled that. And she had images, more than one, yes.

Q. And we've talked a little bit about that meeting. Do you recall the discussions that you had with her during that meeting?

A. In any vivid way, no.

Q. You testified earlier that you would have counseled her on the limitations of your opinions regarding appearance versus actual age; is that correct?

A. In a simple way, yes, that's all I would have said.

Q. In any way you wouldn't be misleading

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 70

anybody in what your opinions are, correct?

MS. SHEVLIN: Form.

MR. CARSON: Join.

A. Correct, the investigation needs to occur.

Q. What do you mean by that, the investigation need to occur?

A. I have no access to actual -- any additional information at all about the case, the person depicted, other computer's images, I don't have any of that information, so if there is an investigation that's occurring, that I am not part of.

Q. Do you mean that, in part, that your opinions are not enough to establish the actual age of the individuals depicted from a medical standpoint?

A. Right.

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

Q. So, it's okay. I got your answer that time.

MR. CARSON: If you don't mind, I didn't hear her. I think I might have spoken over the witness.

Q. I think you gave me another "correct"?

Page 71

A. I think I did, yes.

MR. CARSON: I apologize, Doctor.

A. I'm sorry, I'm sorry.

Q. I'll re-ask it.

You have not -- in these -- in these three reports that I have that you produced in this case, you have not rendered a reliable medical opinion on the actual age of the individuals depicted in this -- in these images, correct?

A. Correct.

Q. So let me ask you this and these are kind of hypothetical questions, but they are about the images, so does that mean when you're presented an image and, for example, the model appears, for whatever reason, to have no pubic hair, that in regards to sexual maturity rating is going to be -- that that is a sexual maturity rating of one?

A. Probably, but I'll look to see if I can see the other areas, too, and countenance of the person.

Q. Right. But I mean, you're not, if you're not -- if you can't look at the breast and you don't have a picture of her face or anything like that and you just see a genital area and there's no pubic hair that is visible to you, that's a sexual maturity rating of what?

Page 72

A. That would be the appearance -- if the person is blonde, I will explain that I might not be able to see blonde pubic hair even if it's there, so I don't know the image, so I don't know if it was a blonde or not.

Q. Well, I guess for whatever reason, right, I'm just asking, brunette red head or whatever, if you look at an image and you do not see any pubic hair, that would result in a sexual maturity rating of one in terms of appearance?

A. Yes.

Q. And do you make any effort to determine whether or not the image has been manipulated, touched up, edited in any way?

A. No, I have no expertise in that.

Q. Talk about shaving, do you have any expertise in the appearance of electrolysis, hair removal?

A. Not to my knowledge, no.

Q. Do you have any expertise in what an individual who has received electrolysis looks like when you take a picture of them -- of their pubic hair?

A. No.

Q. Same question with waxing; do you -- are --

Page 73

do you have any expertise in determining whether or not from looking at a picture someone has been waxed?

A. If there's folliculitis where the hairs are starting to grow back, maybe, otherwise, no.

Q. Because your understanding is waxing pulls the hair follicles out of the skin in that process, correct?

A. Yes. And there would be a period of time where the follicles look healed over.

Q. And that would be the appearance of no growth of pubic hair?

A. Yes.

Q. Is there a reason why you only say in -- in these opio- -- in these letters that the model or she does not appear to be shaved rather than waxed?

A. No, I just used shaved as the customary term.

Q. So by shaved, you mean grooming of any type?

MS. SHEVLIN: Form.

A. The after care is still present, not shaved in a general sense, not absent.

Q. Hold on, I'm not understanding you. Let's not even look at the first letter, let's just look at April 5th, okay? You've got an April 5th. I can

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 74

pull it up.

MS. SHEVLIN: Could you pull it up, I want to make sure it's the correct one for all of us to pull up at the same time.

MR. ROBERTS: There's two April 5ths.

Q. So I'm going to share your report again. I'm going to scroll down to the second -- so, I just want to go over here on the second paragraph, can you see this, the second image is imprinted with white script. That's the way it begins. You say she does not appeared to be shaved. What do you mean by that statement?

A. That there's no shaving bumps or folliculitis that we might see, and I don't see -- you can see that I say she appears to have no pubic hair development.

Q. So I guess what I'm saying, what I'm getting at is what if she was waxed?

MS. SHEVLIN: Form, speculation.

A. I could have said she does not appear to be waxed, I would be saying the same thing.

Q. Bill, but -- do you get bumps from waxing?

MS. SHEVLIN: Form, speculation.

A. You can.

Q. But I think we just established that there

Page 75

is a period after waxing where it appears that you have no pubic hair growth, correct?

A. It may appear you have no hair growth wherever was waxed, I don't know how long that lasted.

Q. So how could you rule out in giving your opinion here that she hadn't been waxed?

MS. SHEVLIN: Form.

A. I'm not making any statement about waxing at all.

Q. And that's my question, why not? Why not?

A. Because the presence of pubic hair is the presence of pubic hair; what cosmetic procedure is not part of the question.

Q. She doesn't have any presence of pubic hair, so isn't it part of the question, why does she not have pubic hair; your answer is that she's prepubescent, there are other explanations, correct?

MS. SHEVLIN: Form.

A. Correct, she has appearance of prepubescent or -- yes.

Q. Or she has the appearance of one is who is just been waxed?

MS. SHEVLIN: Form, speculation.

A. I can't see the image, but hypothetically,

Page 76

that is one explanation.

Q. Why is that explanation less likely than your given explanation that she's prepubescent?

MS. SHEVLIN: Form.

A. Which explanation?

Q. That she's just been waxed?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. I was a military doctor and all the young women are shaved, they're not waxed. Waxing and electrolysis and laser hair treatments are expensive, and so in general, they're shaved. So for me as a military physician, shaved is a general term.

Q. Whatever happens in the military happens in the military. I'm not asking about the military; you've been a U.F. physician for 10 years, correct?

A. And a military physician since 1982.

Q. And you had no reason to believe that this model was in the military, correct?

MS. SHEVLIN: Form, speculation.

A. Correct, but my customary vocabulary is definitely effected,

Q. No, and I'm not talking semantics, Dr. Dully, and I -- I apologize if you think I am talking semantics, I am not. You just testified that one

Page 77

possible explanation for her not having the appearance of hair, is that she was waxed?

A. Okay.

Q. That's correct, right?

A. Or shaved or something else, yes.

Q. Or electrolysis, correct?

A. Maybe.

Q. Now, my question to you is, you offered the opinion that the reason why she does not have pubic hair is because she is less than nine to 13 years old, correct?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. Based on the appearance.

Q. But the appearance is also consistent with someone who's been waxed, correct?

MS. SHEVLIN: Same objections.

A. Correct, but I'm not seeing the image, so hypothetically, it could be.

Q. Right, so here's my question. What makes it more likely that your opinion, that it is her pubertal development that explains her lack of pubic hair, rather than waxing or electrolysis?

MS. SHEVLIN: Form.

A. The investigation will verify or refute. I

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 78

have no ability to do that.

Q. Well, I'm just asking you from a medical perspective, okay. You get an image, right, from the internet, you knew this was an image from the internet, correct?

A. No, I know it was a Nick Nick tip based on what I was told, I don't actually know.

Q. Actually, and you may not know this, this was not a Nick Nick tip, this picture, you describe it, it had a file name, it's a screen shot and then there is Duck Duck Go dot -- did you not know that that was a screen shot from the internet?

MS. SHEVLIN: Form.

A. No, I didn't know where it came from.

Q. Well, you'll look at it when you look at the image, you'll agree it is from the internet; it has the website.

MS. SHEVLIN: Form.

Q. Well, let's not get into that, we'll ask that later.

You're being asked a medical opinion by the detective, correct?

MS. SHEVLIN: Form.

A. Yes.

Q. Now, you know, as a medical doctor that

Page 79

there can be multiple explanations for a model in an image not having the appearance of pubic hair, correct?

A. There can be, yes.

Q. Right.

One of those is that the image has just been digitally altered to remove evidence of pubic hair, correct?

A. Yes.

MS. SHEVLIN: Form.

Q. One of those would be waxing or electrolysis or some form of hair removal that did not leave any visible evidence of hair, correct?

MS. SHEVLIN: Form.

A. Yes.

Q. All right. One of the explanations would be that the model has not reached a certain level of puberty, correct?

A. Yes.

Q. So as a medical doctor, this would be what we call kind of a differential diagnosis, correct? You got -- you got three different things that could explain what you are observing; is that a fair characterization?

MS. SHEVLIN: Form.

Page 80

A. Potentially, yes.

Q. What makes you think that pubertal development would be more likely than digitally altering the image or some sort form of hair removal that you couldn't see on the picture?

MS. SHEVLIN: Speculation.

A. I am not saying how likely or unlikely it is, I'm only saying what the appearance is.

Q. So when you're entering these opinions, you're not saying with any degree of reliability that they're correct?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. It's not chronological age, their appearance.

Q. Well, why didn't you -- I guess my question here is and I don't think you need to look at the image for this, you acknowledge that waxing can produce the same effect of no visual evidence of pubic hair; why would you as a doctor say that she is an SMR I rather than she just had a really good wax job?

MS. SHEVLIN: Form, speculation.

A. Again, I need to see the patient, which is the image.

Page 81

Q. Okay. Well, we'll certainly do that when we get the images and I guess we can answer those questions then.

In this same -- and this perhaps highlights what we've been going around today more than anything else. In the first paragraph here you review another image, and this is -- let's just call it by its file name: YCBLVVFQ underscore O.JPG. This is an image that you evaluated and I'm just going to read your opinion. Her breasts are partially visible and could be SMR IV to V. However, her genitals -- genitals are plainly visible and her thighs spread widely apart and showing she is SMR I with respect to pubic hair. Then you say this developmental appearance is less than nine to 13 years of age.

So my first question is, what developmental appearance is less than nine to 13 and a half years of age with this model?

MS. SHEVLIN: Form.

A. Absence of hair bearing parts.

Q. Okay. But what about her breasts?

A. Well, I did not have a good view of her breasts, so that was the best that I could do was IV to V.

Q. Yeah, but what's the developmental

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 82

appearance of a V breast; what's the age ra- -- age range of that?

A. Post pubertal or beyond.

Q. Greater than 18 years old, correct?

A. Well, no, not necessarily, because part of the sexual maturity rating is looking for disorders that involve estrogen exposure at any age, and the five can -- breast development sometimes starts first and finishes first and so you can have a V during puberty, so it's good to be able to see both areas if possible.

Q. What kind of disorder would that be called, someone who has an SMR rating of V breasts, but no pubertal hair development?

A. Well, it can be normal, and it can be normal based on the limitations of the photographs, and there are cases of precocious thelarche it's called where breast development happens without actual pubertal development.

Q. Your testimony here today is that it is normal for a female to have grade IV to V breasts, but no pubic -- pubertal hair development in a clinical setting?

A. It is possible, yes.

Q. And if that is possible, you would look at

Page 83

it and say -- you would run some diagnostic tests to try to explain why that was happening, correct?

A. No, not necessarily. It depends on the whole picture.

Q. How many pictures have you seen -- have you ever treated that had grade V breasts, but no pubertal development; is that someone that you've treated before?

MS. SHEVLIN: Form.

A. Yes. I have seen one in the military and she had a sexual development disorder.

Q. Okay. So something that was not normal?

A. It turned out that it was not normal, but when we started, that was not necessarily so.

Q. How old was she when you stopped treating her?

A. 17.

Q. So at 17 she had no pubertal hair development?

A. That was why I was seeing her, yes.

Q. Did she have pubertal development when she was 18?

A. I didn't see her past 17, I don't know.

Q. So it's possible for someone to present with an SMR IV -- IV or V breast, no pubertal hair

Page 84

development and be 18 years-old?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. Well, it's -- it's possible; it would depend on the underlying causes.

Q. You would have to be in a clinical setting to diagnose and figure that out, right?

MS. SHEVLIN: Form.

A. Yeah.

Q. Why did you -- why in this one, though, would you have -- would you have relied on the pubic hair SMR rating, but not the breast development SMR rating?

A. Because I can see the pubic hair development.

Q. But there was enough for you to say SMR IV to V?

A. I erred on the old side since I could not really see, so the breast development was potentially that mature.

MR. ROBERTS: Give me one second, okay. I think it's probably a good point to just continue the deposition, go through the photographs and all that stuff, I'm sure there will be a lot more questions. Does that sound good to everybody?

Page 85

MS. SHEVLIN: Fine with me.

THE VIDEOGRAPHER: Sorry, Mr. Roberts, no video orders right now?

MR. ROBERTS: Yeah, no video orders. I will actually order a copy of the transcript.

MS. SHEVLIN: We'll take a copy as well, just E-Tran.

THE COURT REPORTER: Mr. Carson, do you need a copy?

MR. CARSON: I'm good for now.

THE COURT REPORTER: Read or waive?

MR. ROBERTS: You know, I don't even know if we're continuing it, if it's an official transcript. It's up to you, Doctor, you can read it if you want.

MS. SHEVLIN: I'm going to have her read, but given the circumstances, we'll make sure it gets to her as soon as possible as soon as we get it.

THE VIDEOGRAPHER: The video recorded deposition of Dr. Kathleen Duffy, going off the record, the time is 12:26 p.m. Thank you.

(Plaintiff's Exhibit Nos. 1 through 4 were marked by the reporter subsequent to the deposition.)

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

**Page 86**

(Whereupon the deposition terminated at 12:26 p.m.)

**Page 88**

CERTIFICATE OF REPORTER

STATE OF FLORIDA   )

COUNTY OF ORANGE   )

I, LISA K. PENKACIK, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of KATHLEEN DULLY, M.D.; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I, further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

Dated this 10th day of May, 2025.

LISA K. PENKACIK, RMR

**Page 87**

CERTIFICATE OF OATH

STATE OF FLORIDA   )
COUNTY OF ORANGE   )

I, the undersigned authority, certify that KATHLEEN DULLY, M.D. personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 10th day of May 2025.

LISA K. PENKACIK, RMR
Notary Public - State Of Florida
My Commission expires 9/7/2026
Commission No.:   HH 289853

**Page 89**

ERRATA SHEET

PAGE:    LINE:    CORRECTION:    REASON:

_____
DATE

KATHLEEN DULLY, M.D.

**Exhibits**

**Plt Exhibit 1**
3:8 31:13

**Plt Exhibit 2**
3:8 31:13
45:7

**Plt Exhibit 3**
3:9

**Plt Exhibit 4**
3:9 50:25

**1**

1  31:13 45:4
85:23

10  16:2 26:21
76:16

100  65:16,17

10:01  4:7

11:29  60:12

11:47  60:15

12  54:2

12:26  85:22
86:2

13  77:10
81:15,17

15  54:3

15th  27:9

17  83:17,18,
23

18  28:25

43:19 54:4
82:4 83:22
84:1

19  54:4

1959  26:18

1980  8:16

1980s  18:19

1981  7:8

1982  76:17

1986  7:11,17

1989  7:17,18
10:3

1990  8:6

1990s  18:19
26:22

1991  8:17

1993  9:1

1994  9:4,12,
24 23:21,23
24:8

1996  27:5

1998  18:20
27:17

**2**

2  31:13 45:5,
7

20  43:15 54:4

200  10:5

2006  16:23

2009  10:4,7

2023  24:16
57:15

2024  24:11,12

2025  4:7

21  25:24

22  18:5

22nd  18:3
50:21 57:15
68:6,13,18

28  4:6

**3**

3  45:4,5

30  9:8

3:24-cv-00044-
mmh  4:6

**4**

4  50:25 85:23

**5**

5th  18:3 51:4
68:6,12,18
73:25

5ths  74:5

**7**

70  26:18

73  29:15

**9**

90's  56:11

95  29:15

**A**

a-n-t-e-r-i-o-r
64:23

a.m.  4:7
60:12,15

abdomen  37:17
38:1

abdominal
63:22 64:9,
15

ability  9:1
12:13,20
61:1 66:1
78:1

abnormal  19:21

Absence  81:20

absent  55:19
73:22

abundant  38:17

abuse  7:2,3,
22 8:7,20,21
9:15 10:4,8
11:1,15,16
12:7,8 13:4,
6,9,11,14,
20,22 14:1,
4,8,14,17
15:5,6,9,17,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025                    Index: Abusive..appearance

19 16:7,21 17:12 28:7 49:18

**Abusive** 8:12

**Academy** 8:11 27:3

**access** 18:4 28:5,8 30:23 60:22 70:7

**accommodated** 60:24

**accuracy** 34:22

**accurate** 22:20,23

**accurately** 23:6

**achieved** 54:1

**acknowledge** 80:18

**active** 16:19 27:20

**actual** 22:15, 24 34:23 35:2 40:9,13 46:14,21 47:15,20 48:9 51:10, 20 69:21 70:7,14 71:8 82:19

**add** 61:6

**additional** 8:14 9:25

70:8

**administered** 11:4

**adolescent** 35:16,18

**adult** 45:12 58:22 62:6, 13

**adulthood** 43:17

**adults** 29:2,3, 4

**advantage** 58:13

**advertised** 6:25

**aesthetic** 34:12

**affidavit** 48:16 49:6 50:15

**afraid** 58:20

**age** 21:6,9, 10,12,13,15 22:15,24 23:1,12,13, 19 26:7 28:25 29:14 31:17 32:7, 21 34:23 35:3 39:5 43:12,19 46:4,9,15,21 47:15,20

48:9 51:11, 20 54:3 69:21 70:14 71:8 80:14 81:15,18 82:1,7

**agencies** 13:2

**agree** 10:22 23:5 26:5 31:20 32:21 45:13 46:7, 13,20,22 47:19 78:16

**agreed** 54:11 61:5

**ahead** 12:12, 19

**aid** 11:17 44:13 65:21, 23

**aim** 30:10

**aimed** 13:21

**Air** 7:19

**alterations** 34:16,17,21

**altered** 34:5 79:7

**altering** 22:7 34:11 40:6 80:4

**American** 8:10, 11 11:5 15:11 26:23 27:3

**amount** 65:7

**Amy** 4:16 37:2 52:8 60:9 61:2

**Amy's** 32:24

**anatomical** 36:14,22 63:16

**anatomy** 63:21

**ankles** 53:6

**answers** 32:23

**anterior** 38:4, 10 55:4 64:5,17,23

**anterior/ posterior** 43:1

**anus** 41:23

**apologize** 63:10 71:2 76:24

**apparent** 23:12 51:17

**appearance** 21:10,12,17 22:13,21 23:2,12,19 28:9 32:6,16 33:16,21 34:1 35:18 36:2,12,22, 23 37:13 46:8 48:10 49:12 51:14, 15,17,21,22

54:2,9,22 57:9 59:23 61:24 62:16 69:21 72:1, 10,17 73:10 75:20,22 77:2,14,15 79:2 80:8,15 81:14,17 82:1

appeared  53:13 74:11

appears  30:10 46:24 51:14 52:3,4 53:2 59:7 67:20 71:14 74:15 75:1

applicable 10:23

apply  5:10 26:25 29:3 46:24

applying  26:11 46:2

appointment 38:12

approaching 20:15

approximate 62:13

April  4:6 18:3 51:4 68:6,12,18 69:11 73:25

74:5

area  39:21 42:23 59:2 65:2,11 66:13,14,18 67:13,14,15, 16 71:23

areas  71:19 82:10

areola  42:21, 23 43:6,10

Armed  27:16, 19

article  26:6 27:6 28:12 29:25 30:2, 5,13,24 31:21 45:5

articles 26:18,24

Arts  7:9,10

Asia  26:25

assault  16:7, 22

assess  12:21 19:20 20:20 39:3 54:18, 19

assessed  57:9

assessing 54:8,9 57:2

assessment 26:7 31:18

32:3 55:21

assessments 9:9 61:22

assigned  7:21

assume  5:3

asterisks  63:4

astrological 34:7

attempt  29:14

attempted 26:10

attempting 21:19

avoid  29:8

aware  21:24 22:3 24:8 34:2 50:1

──────────
B
──────────

baby  62:5

Bachelor  7:10

back  9:25 10:20 21:1 45:7 57:10, 12 65:20 68:11,15 73:4

background  7:7

bad  5:15

base  32:17

based  21:16

28:10 33:21 57:20 58:23 67:25 77:14 78:6 82:16

basis  6:19 10:14 54:23 55:12,14

bear  15:22

bearing  35:14 36:19 38:9 39:16 81:20

beginning  4:3 42:24

begins  74:10

behalf  4:16

behavior  29:8

beings  38:18

belly  41:16, 19

belongs  67:24

Bethesda  7:13

big  55:8

bigger  67:24

Bill  74:22

bio  63:1

birth  42:17

bit  5:2 36:16 37:19 42:22 69:15

blond  40:18

blonde  72:2,3,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025                    Index: bloodstream..child

5

bloodstream
  42:12

blurry  33:18
  67:10

board  10:4,7
  11:1,5 13:4
  14:13,20
  15:11 17:12

boards  10:3

body  6:23
  36:14 42:19
  62:10,11

book  44:6

borderline
  33:24

break  37:6
  52:8 57:11
  60:8,13

breast  20:12
  42:9,13,19,
  24 43:5,11
  54:14 67:13,
  15 71:21
  82:1,8,18
  83:25 84:12,
  19

breasts  42:1
  53:17,21
  81:10,21,23
  82:13,21
  83:6

briefed  25:23

bring  15:21
  33:23,24

bringing  24:5

brunette  72:7

buds  20:12
  42:9,13,19

bumps  74:13,
  22

burst  23:22

button  41:16,
  19

─────────────
        C
─────────────

calendar
  68:10,12,16

calendars  68:7

California
  7:17 8:8
  9:14

call  15:12
  37:6 60:9
  63:24 79:21
  81:7

called  8:9,22
  18:19 19:2
  37:17 41:17
  82:12,18

calling  19:6
  54:7

camera  53:6
  57:16

Camp  9:13

care  6:18
  10:20,23
  11:21 13:18
  27:19 73:21

cared  8:1

career  16:5

Carson  4:18
  22:11 47:3
  61:5 63:17
  70:3,18,22
  71:2 85:8,10

case  4:5 6:19
  7:22 8:20,24
  9:15,18
  10:14 14:10
  17:16,18
  20:19,20,23
  21:17 24:20
  25:2,14,21
  26:1 27:1
  35:24 36:20
  49:25 59:17
  70:8 71:6

cases  7:1 8:4
  9:7,10 24:5
  35:7 68:21,
  25 69:3
  82:17

catch  6:1

caveat  49:7

cell  60:10

center  8:18
  9:4 16:11,20
  27:16,19

certainty  13:8
  65:14

certification
  11:2,16
  14:14,20,21

certified  10:7
  17:12

Chadwick  9:4
  16:20

Chair  7:21
  8:23

chance  30:18,
  19

change  24:15

changed  18:20,
  22

characterization
  14:18 79:24

charge  8:19

check  68:22

checked  68:11

chemical  55:24

chest  43:2,11
  53:5,7,20
  57:16,24

child  6:12,
  14,17,22,23
  7:1,4,21
  8:1,7,8,20
  9:9,15,21
  10:3,8,10
  11:1,15,16,
  25 12:1,7,8

13:4,6,9,11, 14,20 14:1, 4,8,14,17 15:5,6 16:6, 21 17:12 20:16,17 27:16,20 28:6,7,8 29:22 35:13 37:11 49:18 53:3 58:22

**child's** 10:17

**children** 8:1, 12 9:5 14:24 15:13 16:20 39:2 49:22

**Children's** 8:10 9:5 16:8,20 24:6

**chose** 31:2

**chronicle** 32:7

**chronological** 21:13 23:1, 11,19 32:7 35:3 43:12 46:4,15 80:14

**chronologically** 21:6

**circumstances** 48:22 67:17 85:17

**citation** 31:21,25

**clinical** 19:10,11,13 27:13,22,23, 25 28:1,5 38:22 43:13 55:21 82:23 84:6

**clinically** 55:9

**close** 18:12 40:17

**clothes** 67:10

**cold** 42:15

**colleague** 24:6 50:4

**College** 6:10 7:9

**colloquially** 5:24

**comfort** 49:11

**comfortable** 49:5 58:18

**commanders** 8:25 9:16

**comment** 59:10

**commentary** 51:9

**commissure** 37:24 38:4, 10

**committee** 7:22 9:15

**committees** 9:18

**communicate** 47:9

**communicated** 51:24 67:18

**community** 13:1

**completed** 18:13

**completely** 12:15

**completion** 19:18

**component** 11:6

**composite** 50:25

**computer's** 70:9

**concern** 15:15, 16,19 60:23

**concerns** 15:21 20:15 45:21

**conclusion** 28:21 30:7

**condition** 13:12

**conference** 7:25 8:7,9, 12

**conferences** 10:1

**confined** 42:20

**consequences** 29:9 49:19

**considered** 16:22 36:17

**consistent** 77:15

**constitute** 13:22

**consult** 10:17, 21 17:14,18 35:6

**consultant** 8:24 9:15,17 10:16

**consultation** 8:14

**consulted** 14:2 17:17,22 28:9 68:25

**consults** 6:24

**content** 63:2

**continue** 37:14 60:20 84:22

**continued** 8:15

**continuing** 10:1 85:13

**continuously** 16:25

**contribute** 12:22 17:9

**copy** 51:3 85:5,6,9

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Index: Cornell..Desert

Cornell  7:8

Corps  7:23  9:16

correct  13:23 14:8 15:15, 19 22:4,9 33:1,12 35:7,24 41:20 43:20 47:7,8 49:19 52:12 53:8, 14,22 56:6, 14,18 57:6, 16,20 58:1,8 60:5 61:12 64:4,12 65:4 67:23 69:22 70:1,4,25 71:9,10 73:7 74:3 75:2, 18,20 76:16, 19,21 77:4, 6,11,16,18 78:5,22 79:3,8,13, 18,21 80:11 82:4 83:2

correctly  13:15 17:18 29:5,10 50:22 58:14

cosmetic  75:13

Counsel  4:11

counseled  69:20

countenance  71:19

counties  7:3,5

County  24:11  69:3

couple  28:13

court  4:8,12 5:17 6:1 29:9 85:8,11

cover  7:3

covered  37:25

covering  53:21 67:10

covers  7:4

crease  39:20 63:23

criteria  67:8

critically  30:9,17

crossed  58:7 60:3

CSAM  45:22

Cum  7:11

curriculum  11:10

cursor  66:9, 12,13,19

customary  73:16 76:21

cut  49:1

## D

D-U-L-L-Y  6:8

Danny  4:7

data  18:24 62:18,24,25

database  58:19

date  4:6 68:9

dated  18:2

DCF  6:24 10:17 11:11, 17

deal  25:7

decade  26:19 45:25

decide  15:22

decided  15:12

decision  32:17

decisions  14:7 49:13

defendant  5:5

definition  42:9

degree  65:10, 16 80:10

delay  19:18

delays  19:21

deliver  6:19

demonstrative  44:13 45:6 65:20,23

dentition  62:5

department  17:3

depend  54:6 84:5

depends  54:16 58:3 62:1 83:3

depict  44:20 52:11 64:9

depicted  21:20 22:16 32:14 46:15 47:15 51:11 70:9, 15 71:8

depiction  22:20 44:18

depicts  28:23 33:21 53:2

depilatories  54:17

deposition  4:3 5:4,9 60:21, 25 61:1 84:23 85:21, 25 86:1

describe  6:2 23:10 36:2 42:2 52:11, 14,23 78:9

descriptive  41:4

Desert  8:16

**designed** 11:10 19:8,13,17 56:20,21

**desktop** 27:15

**destroy** 57:4

**detecting** 29:22

**detective** 4:19 17:22 47:12 50:14 51:19, 25 52:16 68:3 78:22

**detectives** 43:22

**determination** 14:5,16 15:1 32:10,13 48:23 50:10 54:24 65:7

**determinations** 7:2

**determine** 13:5 15:14 46:3, 14 56:5,24 57:19 58:6 72:12

**determining** 73:1

**develop** 29:22

**developed** 9:3 37:12,14 59:4

**developing** 37:15

**development** 20:8 36:9,24 54:14 74:16 77:22 80:3 82:8,14,18, 19,22 83:7, 11,19,21 84:1,12,15, 19

**developmental** 51:15 54:2 81:14,16,25

**deviations** 20:10

**diagnose** 84:7

**diagnosis** 79:21

**diagnostic** 14:5 83:1

**diagrams** 66:25

**dial** 45:9

**Dick** 45:17

**Diego** 8:7,10, 18,19

**difference** 21:14 39:2, 18 40:7,11, 13,15 58:16, 25 66:23

**differential** 79:21

**difficult** 5:21 26:6 31:17 32:3,4,5

40:20,21

**digital** 21:7 22:7 34:11 40:6,22 46:25 64:19

**digitally** 21:25 34:5 79:7 80:3

**direct** 4:24 11:13 24:22

**direction** 35:16

**directly** 43:2

**director** 6:14, 17 16:9 17:3

**disagreed** 45:8 48:4,6

**disagreement** 48:11

**disclosed** 28:12

**discounting** 30:13,16

**discoverable** 25:12

**discovered** 35:3

**discussed** 45:24

**discussion** 60:16

**discussions** 69:16

**disorder** 82:12 83:11

**disorders** 82:6

**distill** 14:25

**distinction** 7:11 13:21 21:18 38:24 40:21 60:6 64:3

**distinguish** 40:2 59:6,21 64:11,21 65:3,10 66:20

**distinguishes** 40:4

**distinguishing** 60:3

**distribution** 60:5

**division** 17:4

**doctor** 12:6,24 71:2 76:9 78:25 79:20 80:20 85:14

**doctor/patient** 10:12,19

**doctors** 12:3

**document** 68:8

**documented** 45:12

**documents** 21:16

domestic   9:17

dot   78:11

drastic   29:9

drawing   44:22

Duck   78:11

Duffy   85:21

Dully   4:4,17,
  20 5:1 6:8
  12:10 24:18
  30:4 45:11
  47:24 57:14
  59:16 60:17
  61:20 66:10
  76:24

duly   4:21

duty   7:18
  16:19 27:21

_____
          **E**
_____

e-mail   45:23

E-TRAN   85:7

E.U.   29:21

earlier   5:2
  44:25 54:11
  69:19

early   18:19
  19:19 41:9

earrings   53:3

edited   21:25
  72:14

Edition   27:9

education   10:1

Edward   7:12

effect   42:11
  80:19

effected   76:22

effects   42:18

effort   72:12

electrolysis
  55:23 56:13,
  25 72:17,21
  76:11 77:6,
  23 79:12

emergency   9:23

employ   20:18

employed   6:9

employer   16:4

end   13:9,10

enforcement
  6:25 10:18
  11:11,17
  23:16 24:5
  33:7,15 35:7
  47:10 50:14
  61:22 67:3,
  18

enlargement
  42:22

entails   15:3

entering   80:9

entire   29:25
  38:3 54:13

erred   84:18

eruption   62:6

essentially
  6:20

establish
  70:14

established
  74:25

estimate   21:6,
  9,10,20,21
  23:19 28:9

estrogen   42:8,
  11,18 82:7

evaluate   53:16

evaluated   81:9

evaluating
  40:16 60:2

evaluation
  24:6,10,16
  26:24 38:19

evaluations
  24:7

evidence   12:21
  79:7,13
  80:19

exam   14:25
  43:13

EXAMINATION
  4:24 10:7

examine   10:13

examiner   16:7,
  22

exhibit   31:13

45:3,7,12
  50:25 85:23

exist   13:4

expect   50:13

expensive
  76:11

experience
  14:22 17:13

expert   5:6
  15:6 26:1
  45:5 49:18
  56:5

expert's   31:9

expertise   13:5
  14:15 72:15,
  17,20 73:1

experts   6:24
  29:7

explain   33:14
  72:2 79:23
  83:2

explains   77:22

explanation
  43:23 48:10
  76:1,2,3,5
  77:1

explanations
  75:18 79:1,
  16

explicitly
  51:19

expose   53:6

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Index: exposed..Friday

exposed 42:7

exposure 82:7

external 36:17

eye 30:9,12

---

**F**

face 71:22

fact 11:22 29:1 32:11, 15

factor 36:9,11 60:4

facts 60:1

factual 32:13

faculty 9:19

fair 13:3 14:17 28:1 34:19 47:20 61:2,3 79:23

familiar 29:13 31:15 56:13

Families 9:5 16:21

family 8:22

fault 60:17

February 18:2, 5 50:21 57:15 68:6, 13,14,15 69:8

Fed 7:14

feet 53:4

fellowship 9:6,25 19:6 23:25 24:2

fellowships 9:2

female 37:11 41:11 43:13, 18 53:3 82:21

females 35:23, 24 36:2 41:6 45:12

fetus 42:11

field 9:8 10:5

figure 69:6 84:7

file 67:24 78:10 81:7

files 48:21

fills 38:3

find 18:6 29:20 30:3,5 68:15

fine 28:15 40:17 66:6,7 85:1

finished 9:12, 24 49:1,2,4

finishes 82:9

flat 42:13,14

floor 53:4 57:24

Florida 6:10, 15 7:5,20 16:1,4

focus 40:17

fold 63:25 64:1,2,16

follicles 40:14 73:6,9

folliculitis 73:3 74:14

follow 57:10

Forces 27:16, 19

forensic 28:16 29:7

form 10:12,25 11:3,7,12,18 12:4,9,18,25 13:7,16,24 14:9,19 15:8 16:18 17:8, 20 18:18 19:3,9,15,25 21:8 22:1,5, 10,25 23:9, 20,24 24:4 26:4,13 29:24 30:6, 15,21,25 31:3,23 32:2,18,22 33:9 34:6, 13,25 35:11

38:21 39:7 40:8,12,23 41:13 43:14, 21 44:1 46:5,17 47:2,22 48:12,17 49:8,21 50:2,8 53:23 54:5,25 55:25 56:7, 25 57:7 58:2,9 59:9, 24 63:13 64:13,22 65:5,13 66:22 67:22 70:2,18 73:20 74:19, 23 75:8,19, 24 76:4,7,20 77:12,24 78:13,18,23 79:10,12,14, 25 80:4,12, 23 81:19 83:9 84:2,8

formal 19:4

format 7:25 8:12

forming 20:23 62:24

forward 48:23 49:13 61:10

found 68:12

Friday 26:2

37:6

**front** 37:21 38:10 50:7 52:7 65:1

**full** 6:6

**fully** 37:12 59:3

**function** 19:23 20:3,5

**functioned** 8:23

**funded** 29:21

___

**G**

___

**gave** 50:12 70:25

**general** 10:2 13:17 17:15 18:9 44:2 52:19 57:13 61:16 73:22 76:12,13

**generally** 36:25 44:24

**genital** 36:1, 8,24 51:15 54:2,15 71:23

**genitalia** 53:6

**genitals** 37:10 53:15 81:11

**Giddens** 26:21

**girl** 37:12

**girls** 26:23 42:12

**give** 30:18 33:2,8,15 34:1 35:2 36:7 37:4 41:25 43:23, 24 47:14 67:5 84:21

**giving** 75:6

**Global** 4:10

**globular** 43:8

**good** 4:2 10:9 27:6 33:18 80:21 81:22 82:10 84:22, 25 85:10

**grade** 37:9, 18,19 38:2, 3,14,15 41:19 42:3,4 43:13,18 59:1,7,8,22 60:4 64:11, 21 65:3,4,6, 11 66:12 82:21 83:6

**grade-** 37:9

**grades** 36:3,4 42:1

**graduated** 7:8, 10,12

**grandmothered**

10:5

**grappling** 14:7

**Greater** 82:4

**groom** 39:6

**groomed** 22:19 40:1 56:5,6 57:4

**grooming** 22:18,22 39:25 40:6 46:25 54:7, 9,19,20 56:14 73:18

**groove** 63:17, 18,23 64:2

**ground** 5:10

**group** 16:10

**grow** 41:7 73:4

**grows** 41:6

**growth** 73:11 75:2,3

**guess** 36:22 44:12 48:1 72:6 74:17 80:16 81:2

**guys** 66:4

___

**H**

___

**H-E-B-E-R-T** 7:12

**hair** 20:13

22:4 36:5,8, 9,23 37:10, 15,16,19,22, 25 38:9,16 39:15,16 40:14 41:1, 6,12,18 54:15 55:1, 3,4,7,15,16, 17,18,24 56:1,2,25 57:1,2,3,6,8 58:7 59:1,2, 3,4 60:2,4 64:12 65:8 71:15,23 72:3,9,17,23 73:6,11 74:16 75:2, 3,12,13,16, 17 76:11 77:2,10,23 79:2,8,12,13 80:4,20 81:14,20 82:14,22 83:18,25 84:12,14

**hairs** 38:1 73:3

**half** 16:2 60:8 81:17

**hallway** 68:20

**hang** 24:18

**happened** 33:11

**happening** 83:2

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**                    Index: happy..informed

| | | | |
|---|---|---|---|
| happy 25:14, 21 | hospitals 10:18 | 32:14 33:17, 20 35:1 | imagine 38:20 |
| hard 49:3 | hour 60:8 | 40:16,22,24 44:19 45:6 | impact 34:22 |
| head 5:25 6:3 62:10 72:7 | human 38:18 | 46:16 47:16 49:15 52:12, | impossible 29:1 57:18 58:6 59:6 64:10,20 65:3 |
| healed 73:9 | hundred 65:14 | 22,24 53:2 55:19,22 | |
| hear 70:23 | Huseby 4:10 | 56:24 57:12, 13,21,23 | |
| heard 28:17, 19 | hymen 36:12, 20 | 58:3,4,5,13, 17,19,24 | impression 26:3 34:3 |
| Hebert 7:12 | hypothetical 58:24 59:15, | 59:10,14,19, 25 61:15 | imprinted 74:9 |
| height 62:11, 14,19 | 17 61:8,14, 15,18,21 | 62:2,25 64:8,20 | include 51:9 |
| helpful 44:12, 15 60:6 63:2 | 63:9,10 71:12 | 66:21 67:9, 24,25 69:9 | included 62:20,22 |
| helping 12:21 | hypothetically 59:19 75:25 | 71:14 72:4, 8,13 74:9 | inconsistent 43:19 |
| heritage 54:16 | 77:19 | 75:25 77:18 78:3,4,16 | indication 35:2 |
| Herman 26:21 | ——————— I ——————— | 79:2,6 80:4, 18,25 81:7,8 | individual 21:20 22:15, 24 47:15 48:9 51:21 72:21 |
| hesitate 5:15 | | | |
| highlights 81:4 | idea 20:9 47:9 | images 24:17 26:12 27:19 | |
| hip 63:23 | identify 20:10 | 28:8 29:15 33:18,24 | individuals 21:6 40:19 70:15 71:8 |
| hire 6:20 | II 36:5 37:17 42:6,10,21 | 34:4,11,15, 16 35:15,23 | |
| hold 56:4 73:23 | III 36:5 37:18,19 | 37:1,4 40:10 46:3 47:13 | infant 37:13 42:8 |
| Holguin 4:8 | 42:6,10,24 | 52:7 61:9, 11,12,17 | |
| home 12:8 | illnesses 13:14 | 62:9,12,14, 16 69:12,14 | information 47:14 62:15, 16,19 67:25 70:8,10 |
| Hong 26:25 | ima- 51:11 | 70:9 71:9,13 81:2 | |
| hospital 7:17 8:10 9:6,13 16:8,11 69:3 | image 22:13 23:2,13,18 | | informed 50:3, 4 |

inguinal 39:19 57:25 58:5, 7,10 63:11, 12,18,25 64:1,15

injuries 13:13

injury 13:13

instance 20:11

instruct 24:24 25:6

instructing 25:16,17,19

intend 61:14, 19

interacted 23:15

interface 11:10

interior 37:24 64:20

internal 36:14,16

international 28:16

internet 23:23 32:15 34:4 46:3,16 66:21 78:4, 5,12,16

internship 7:16

interrupted 32:24

introduce 4:11

introduced 5:1

inverted 38:12

investigate 33:25 50:17

investigated 58:21

investigation 17:25 32:19 70:4,5,11 77:25

investigations 11:17 35:4 45:22

investigators 13:2

involve 38:15 82:7

involves 13:1

involving 38:5

Iraq 16:23

irrespective 46:24

issue 25:23 26:7 31:17 45:20 60:18

Ithaca 7:9

IV 36:5 38:2, 3,14,15,24, 25 40:2,4,7, 22 41:10 42:1,3,25 43:4,6,13,

16,18 44:23 45:13 53:14 54:2,4,12 58:16 59:1, 7,22 60:4 64:4,11,21 65:3,6,11 66:12,13,20 81:11,23 82:21 83:25 84:16

**J**

Jacksonville 6:11 7:20

jail 49:25

January 8:7

jaundiced 30:9,12

job 5:19 8:3 14:8 35:6 58:20 80:22

John's 69:2

Johns 17:22

join 22:11 38:6 47:3 70:3,19

journal 28:17, 18 30:11,16, 17 31:21

journals 27:11,12

judge 39:14 50:7,9,16

jury 50:10

**K**

KASS 53:23

Kathleen 4:4, 20 6:8 85:21

kids 11:21 13:18 20:14 33:23,24

kind 44:23 71:11 79:21 82:12

knees 53:5,7, 20,21 57:16, 23

knew 78:4

knowing 21:13

knowledge 26:9 27:1 68:21 72:19

Kong 26:25

Krugman 31:14 45:13,16,17, 18 47:19 48:11 54:12

Krugman's 45:8

**L**

labia 37:12, 20,23 38:4

lace 53:4

lack 77:22

lafay   41:21

laptop   52:22

largely   61:8

larger   44:24

laser   76:11

lasted   75:5

late   28:24

Laude   7:11

law   6:25
  10:17 11:10,
  17 23:15
  24:5,20
  25:2,5,14,21
  29:9 33:6,14
  35:7 47:10
  50:13 61:22
  67:3,18

Lawshe   4:5,15
  17:19,25

Lawshe's   26:1

lay   55:5

laying   12:10

leads   35:12

learn   19:1

learned   8:2
  17:24 19:1

leave   56:2,16
  79:13

Lee   4:4

left   47:13
  63:8

legal   11:6
  30:11 32:10
  49:19

legs   38:8,11
  53:5,21
  64:24

letter   18:5
  45:11 51:2,9
  52:23 73:24

letters   18:2
  50:13 51:2
  63:3 73:14

level   39:6,21
  65:14 79:17

levels   9:21
  13:8

life   12:2
  54:13

likelihood   7:2

limitation
  23:6,10
  32:20

limitations
  33:7 45:21
  46:8 49:10
  51:10,13
  69:20 82:16

Lisa   4:9

list   45:20,23

literature   8:5
  14:23

Litigation
  4:10

local   35:13

location   39:16
  64:14

logistical
  60:18

long   15:25
  21:2 23:15,
  17 41:24
  43:12 75:4

longer   37:21
  42:14

looked   27:17
  33:24 48:22
  52:24

lose   49:22

lot   5:23
  14:21 28:15
  34:2,15,16
  84:24

loud   29:6

lower   53:5

M

m-e-d-i-a-l
  64:24

M.D.   4:20

made   8:19
  24:2 35:15

main   63:1

major   32:20

majora   37:12,
  23 38:4

make   17:9
  22:8 27:23
  32:10,13
  33:3 40:21
  54:24 72:12
  74:3 85:17

makes   77:20
  80:2

making   12:14
  13:21 14:16
  38:23 45:2
  49:12 61:21
  75:9

male   42:8

maltreatment
  7:1 8:2,8
  9:10,21
  11:25

manipulated
  72:13

manipulation
  47:1

Marine   7:23
  9:16

mark   31:12
  45:4 50:24

marked   85:24

Marshall   18:22
  26:17

Mary   6:8

Maryland   7:13

material   26:8
  28:23 31:18

Matt 4:18 60:23 61:2

matter 4:4

matters 49:11

mature 28:24 29:4 84:20

maturity 18:10,11,16, 23 19:16,24 20:19,22 21:3,5 26:12,20,22 27:13 28:10 33:22 35:21 36:3,4,10 41:8 42:7,10 43:7,24 59:23 60:5 61:25 67:6, 20 68:1 71:16,17,24 72:9 82:6

means 16:14 44:12

meant 37:5

measures 24:20 25:2,10

Med 7:14

media 4:3

medial 64:6, 17,24 65:1 66:24

medical 6:14, 16,18 7:14

8:4,14,17,24 9:9,14,20 10:1,23 11:4 12:24 14:10 15:21 16:9 17:3 28:18 29:7 30:11, 17 55:14,20, 21 56:4 70:15 71:7 78:2,21,25 79:20

medical/legal 11:2

medicine 6:11 7:13 9:23 15:7

meet 42:25 43:22

meeting 52:15, 18,20 69:8, 11,16,17

meetings 68:8

meets 64:10

member 45:19, 20

met 43:25 44:3 52:17 68:3,17,19

method 40:5

methods 61:24

Michael 4:14 5:2 24:19

middle 18:12 42:16 64:17

midline 41:21 42:25

Mikayla 4:5

military 7:14, 22 8:25 9:2 16:19 27:16 76:9,13,14, 15,17,19 83:10

mind 70:22

mindful 5:19

minor 32:15 33:23

minute 52:8

mischaracterizat ion 13:24 20:1 31:3,23 34:13 47:22 56:7 76:7 77:12 80:12 84:2

mischaracterize 55:8

misleading 69:25

missing 12:15 48:2 62:7

mixed 62:5

modalities 22:4

modality 28:4

model 32:14 34:24 41:11 46:15,21 51:11 57:15, 19 58:7 61:25 71:14 73:14 76:19 79:1,17 81:18

models 22:3

modifications 54:7

modified 35:15

monitor 19:17

mons 37:24 38:5,9

month 28:12

months 28:13

moonlight 16:14

moonlighted 16:16

moonlighting 16:22,24

morning 4:2

mound 42:23 43:4,5,10

mounds 43:4,7

move 48:23 49:13

moved 8:17 9:13

multi-problem 8:22

multiple 22:4 69:12 79:1

**N**

naked 53:3

Nassau 24:11

Naval 7:16,19 8:17 9:13

Navy 7:23 8:6,9,17 9:4,12 16:3

necessarily 35:2 40:18 82:5 83:3,14

Nelson's 27:9 44:8

newborn 42:9

newborns 20:6 42:6

newspaper 50:4,5

Nick 58:19 78:6,9

night 26:15

nights 46:11

nipple 42:15, 20 43:6,9

nod 5:25 6:3

normal 12:2 20:7,10,11,

13,17 82:15, 16,21 83:12, 13

northeast 7:4

Nos 85:23

Noshney 26:18

notch 39:20 57:25 58:5, 8,11 63:11 64:1

nuance 48:2

number 4:5 34:7,8

numbers 34:17 63:3

**O**

O.JPG. 81:8

Oakland 7:17

oath 4:22 5:10

OB/GYN 9:22

Object 70:18

objected 12:17

objection 30:2 32:24 33:3 56:19

objections 12:14 56:3 77:17

obscure 57:24

obscured 58:5 67:15,16

observing 79:23

obvious 39:17 40:19 51:13

occasionally 62:15

occur 70:4,6

occurred 20:21

occurring 70:11

offered 8:9 77:8

offers 7:1

office 17:23 27:25 60:18

officer 50:14 67:3,18

officers 33:7, 15

official 85:13

online 26:12 29:23

opine 67:19

opinion 14:16 22:8,9,13, 14,21,23 23:6,11,12 32:16,17,21 33:15 34:23 48:6,7,8 49:10,18

50:1 51:10 53:10,13 55:5,6,13, 14,20 61:24 62:24 67:5 71:7 75:7 77:9,21 78:21 81:10

opinions 20:23 33:8 35:9 36:19 48:4, 15 49:5,23 50:6 69:20 70:1,14 80:9

opio- 73:14

opportunity 9:11 20:20 29:25 61:10

order 85:5

orders 85:3,4

original 26:17

originally 48:3

orthopedics 9:22

Outlook 68:9, 11

**P**

p.m. 85:22 86:2

pale 42:15

palpable 42:14

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

papilla  42:16 43:6,9

paragraph  74:8 81:6

parents  14:24 20:16 49:22

part  11:9 14:5 36:15 37:24 49:25 70:11,13 75:14,16 82:5

parted  53:6

partially  81:10

participate  17:5

parts  38:9 39:16 43:17 81:20

pass  10:6

passed  10:2 14:21

passing  46:11

past  83:23

pasted  51:3

patient  10:12 20:21 27:25 40:9,13 46:9 80:24

patients  10:11 16:12 19:22

PDF  51:1

pediatric  7:15 10:3 27:12 44:8

pediatrician  7:19 10:17, 20 13:14,17 14:13 16:7, 17,21 19:20 27:24 44:3

pediatricians  17:12,13 19:5 20:2,5 24:7 29:14

pediatrics  8:11 9:22 10:8 11:5 15:9,12 27:3,10 28:7 44:9

Pedo  31:18

pedo- pornographic  26:7 28:23

pelvis  38:6

pen  44:22

Pendleton  9:13

Penkacik  4:9

people  6:20 8:24 9:7 10:13 15:20 30:3,4 39:5 41:15,24 49:4

percent  29:15 43:15 65:14

perfectly  25:11,12

period  73:8 75:1

person  17:10 32:10 33:16 51:11 70:9 71:19 72:2

person's  17:21 43:2

perspective  78:3

ph  26:18 41:22

photograph  21:21 22:7 51:12 54:9 67:21

photographs  21:7,17,25 27:4 28:3,4, 10 60:19,22 82:16 84:23

physical  8:21

physician  76:13,16,17

physicians  17:2

picture  64:8 71:22 72:22 73:2 78:9 80:5 83:4

pictures  83:5

pin  35:20

pink  42:23 43:10 53:3

pixilated  67:9

plainly  37:21 81:12

plaintiff  4:15

plaintiff's  50:24 85:23

point  45:14 61:9 67:2 84:22

points  11:20

policies  17:7 24:16

ponography  29:22

population  26:23

pornographic  21:7 23:18 26:12 28:23 29:14 31:18 32:14 46:3, 16 56:23 66:20

pornography  54:10 58:22

position  15:21 25:14 53:5,7

positions  9:20

possession 68:7

possibility 46:25

Post 82:3

posterior 41:15,22

potentially 68:20 80:1 84:19

Practically 39:22

practice 10:22 11:20 24:15

precocious 82:17

predicate 21:4

pregnant 43:16

prepubescent 75:18,20 76:3

presence 59:2 75:12,13,15

present 12:21 43:13 54:12 55:4,19 57:3,8 73:21 83:24

presentation 64:12 65:4

presented 71:13

Preston 4:5,19 47:12 50:14 51:19,25 52:16 68:3

pretty 51:17

primary 10:20

primer 43:25

principles 61:16,23

print 28:15

printed 63:1

prior 13:25 19:25 20:1 31:4,24 34:14 47:23 56:8 76:8 77:13 80:13 84:3

privilege 25:8

probable 5:14 48:15 49:6 50:15

problems 6:19

procedure 75:13

procedures 17:7

process 14:6 73:6

produce 80:19

produced 42:18 71:6

Professional 8:11

progress 19:17

progressing 18:13

Project 29:21

prominent 69:6

proportion 62:8,10,19

propose 9:1

Protection 6:13,15,17, 22,23 7:4 10:10 27:17, 20

protruding 42:16

prove 33:22

proves 29:1

provide 13:5 25:13

provided 31:7, 21

pubertal 27:4 37:10 53:3 77:22 80:2 82:3,14,19, 22 83:7,18, 21,25

puberty 18:12, 13 19:18,19, 22 20:8,15 35:18 79:18

82:10

pubic 20:13 22:3 36:5,7, 9,23 37:14, 15,19,22,25 39:15,20,21 41:1,5,12,18 54:15 55:4 57:3,6 59:1, 21 60:2,4 64:12 65:8 67:14,16 71:15,23 72:3,8,22 73:11 74:15 75:2,12,13, 15,17 77:9, 22 79:2,7 80:20 81:13 82:22 84:11, 14

pubis 37:24 38:5,10

publication 26:19 27:3, 15

published 30:3 34:4 50:3

pull 50:20 65:20 74:1, 2,4

pulls 73:5

purported 14:15

purpose 11:16,

19

purposes   34:12

pursue   8:15

put   15:13
   35:20 53:19
   54:1,3 63:6

putting   17:14

_____

**Q**

qualified
   13:13

quality   33:19
   66:23

quantity   65:7

question   5:12,
   15,16,18
   12:12,13,18
   15:2,4 23:2,
   16 24:21
   25:18,20
   32:12 33:12
   38:22 41:25
   42:5 46:10
   47:24,25
   50:11,12
   51:8 55:10
   59:15 72:25
   75:11,14,16
   77:8,20
   80:16 81:16

questions   5:3,
   11 18:9
   24:23 44:4
   58:23 59:12

60:20,24
61:7 71:12
81:3 84:25

quick   52:10
   57:12

quote   50:15

_____

**R**

ra-   82:1

radiology   9:22

Rady   9:5
   16:8,20 24:6

raised   45:22
   60:23

range   82:2

rating   18:10,
   11,23 19:16,
   24 20:19,22
   21:3,5 26:12
   27:13 33:22
   35:22 36:4,
   10 42:7,10
   43:7,24 57:5
   59:23 60:5
   61:25 66:19
   67:6,20 68:1
   71:16,17,25
   72:9 82:6,13
   84:12,13

ratings   26:20
   46:2,14

re-ask   32:12
   71:4

reached   79:17

read   25:25
   26:6 28:21,
   22 29:4,6,
   10,25 30:9,
   12,14,17
   31:10 52:25
   81:9 85:11,
   14,16

readily   36:17

reading   8:4

real   35:12
   52:10

reason   19:23
   24:24 71:15
   72:6 73:13
   76:18 77:9

reasons   25:6

rec-   68:4

recall   68:3,24
   69:7,8,11,16

received   72:21

recommendations
   17:10

record   6:7
   12:11,14
   52:14 60:11,
   14,16 85:22

recorded   85:20

records   68:4

red   72:7

redevelop
   42:19

reference
   20:15 31:19
   44:5,6

referred   18:14

referring
   63:19

refute   77:25

region   7:23
   36:8 59:21

related   52:23

relationship
   10:12,19

relevant   24:23
   25:1

reliability
   26:11 34:23
   65:10 80:10

reliable   22:9,
   12,14,23
   32:16 46:14
   47:14 71:7

reliably   67:5,
   19

relied   62:18
   84:11

remedial   24:20
   25:2,10

remember   19:5
   46:6 48:4
   52:15,17,18,
   20 68:14
   69:5

removal   55:24

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

56:25 57:1,2 72:18 79:12 80:4

remove 22:3 79:7

removes 55:18

render 22:8

rendered 71:7

rendering 61:24

rephrase 5:13

report 15:20 26:1 31:9, 14,22 45:5, 8,9 50:22 62:20,22 63:6 74:6

reported 15:22

reporter 4:9, 12,21 5:17 6:2 85:8,11, 24

reports 71:6

represent 51:2

representing 4:18

request 61:22

required 15:14

reschedule 60:22,25

research 26:11

reset 61:1

residency 7:16

resident 8:3

residents 9:20

respect 81:13

response 6:1

responsible 13:1 17:6

restate 47:5

result 72:9

results 56:17

retired 16:23

return 16:23

revert 43:16

review 7:22 8:20 9:15,18 27:1 81:6

reviewed 27:7 35:24

reviewing 26:14

reviews 8:25

Roberts 4:14, 25 5:2 24:22 25:4,11,16, 23 30:1 37:8 45:4 61:13 65:25 66:6 74:5 84:21 85:2,4,12

roughly 41:14 45:1 59:4

rule 75:6

rules 5:10

run 83:1

rundown 41:25

running 66:19

_____

**S**

_____

San 8:7,10, 18,19

scheduled 69:13

school 7:13,14

Science 28:16

Sciences 7:9

scientific 23:3 46:2,20 54:23 55:6, 12,14 61:23

scientifically 46:13 65:9

Scott 31:14 45:18

screen 28:11, 14 66:1 78:10,12

script 5:14 74:10

scroll 74:7

search 48:16

section 59:20

seek 48:16

semantics 76:23,25

sense 73:22

sentence 54:19

separate 43:5

serve 45:23

served 7:20 9:19

serves 45:20

set 61:23

setting 12:8 17:6 19:10, 11 27:13,22, 23,25 82:23 84:6

sex 16:7,21

sexual 8:21 18:10,11,15, 23 19:16,24 20:19,22 21:2,5 26:11,20,22 27:12 28:10 33:22 35:21 36:3,4,10 42:7,10 43:6,23 59:22 60:5 61:25 63:2 67:5,20 68:1 71:16,17,24 72:9 82:6 83:11

sexually 28:24

29:4

**shape** 38:4,8 41:11 43:8 59:4

**share** 18:7 28:11 31:12 50:21 68:20 74:6

**sharing** 53:11

**shaved** 39:3 51:16 54:21 55:2,13 59:2 73:15,16,18, 21 74:11 76:10,12,13 77:5

**shaving** 39:13, 17 54:16 55:18 56:9, 14,17 72:16 74:13

**Sheriff** 24:11

**Sheriff's** 17:23

**Shevlin** 4:16 10:25 11:3, 7,12,18 12:4,9,17,25 13:7,16,24 14:9,19 15:8 16:18 17:8, 20 18:18 19:3,9,15,25 21:8 22:1,5, 10,25 23:9,

20,24 24:4, 18 25:1,9, 13,19 26:4, 13 29:24 30:6,15,21, 25 31:3,23 32:2,18,22 33:2,9 34:6, 13,25 35:11 37:5 38:21 39:7 40:8, 12,23 41:13 43:14,21 45:2 46:5,17 47:2,22 48:12,17 49:8,21 50:8 54:5,25 55:25 56:3, 7,19 57:7 58:2,9 59:9, 24 60:10 61:3,6 63:13 64:13,22 65:5,13 66:22 67:22 70:2,19 73:20 74:2, 19,23 75:8, 19,24 76:4, 7,20 77:12, 17,24 78:13, 18,23 79:10, 14,25 80:6, 12,23 81:19 83:9 84:2,8, 85:1,6,16

**Shevlin's** 60:18

**Shield** 8:17

**ships** 46:11

**shortly** 23:21

**shot** 78:10,12

**show** 44:4,6, 10 58:24 59:19

**showed** 52:22

**showing** 81:13

**shown** 30:8

**shows** 29:13 67:25

**sic** 54:18 68:18

**side** 38:11 43:3 59:3 66:4 84:18

**sign** 20:9

**significance** 41:2

**significant** 34:22

**signs** 17:11 56:2

**similar** 51:5

**simple** 69:23

**single** 43:8 69:8

**sir** 65:24

**sit** 10:6 18:4 34:9 69:9

**sitting** 57:16, 20,24

**size** 62:10,11

**skin** 73:6

**slowly** 9:3

**small** 42:13

**SMR** 18:15 20:7,12 23:18 37:17 42:17,21 45:13,21 46:2,14,24 53:14 54:2, 4,12 57:5 66:19 80:21 81:11,13 82:13 83:25 84:12,16

**Society** 8:12

**socks** 53:4

**solely** 13:20

**solve** 6:19

**sort** 19:22 23:22 26:20 34:11 80:4

**sound** 27:11 84:25

**sounds** 53:24

**speak** 5:20,24

**speaking** 30:2 36:25 39:22

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**
Index: special..talking

special 24:1
27:12

specialist
10:8 14:8

specialized
9:2,11

specialty
10:3,4 12:7
13:15,20
14:18 15:12
16:10 17:1

specific 61:11

specifically
14:14

spectrum 13:9,
10

speculation
12:4 19:15
34:25 39:7
48:12 55:25
56:19 74:19,
23 75:24
76:20 80:6,
23

spend 65:18

split 65:25
66:1

spoken 70:23

spread 81:12

St 17:22 69:2

stage 27:4
41:10 62:6

staging 18:15,
20 19:2,23

standard 10:23
27:8

standing 62:12

standpoint
70:16

start 18:8
19:22 24:2
28:22 36:1

started 83:14

starting 73:4

starts 37:15
42:18 82:8

state 6:6
21:19 58:12

statement 13:3
35:21 47:21
49:12 74:12
75:9

stating 18:11
46:8 48:8

station 7:18,
20

step 50:18

sternum 42:25

STEWART 44:1
50:2

stop 11:21,24
12:3,7,20
30:1 53:11

stopped 12:1
83:15

stopping 12:22

stops 12:23

straight 41:21

structure
36:21

structures
67:11,12

struggling
21:18

studies 18:21

study 28:4
29:1,13,21

studying 8:4

stuff 84:24

subcommittees
8:21

subject 17:25

subjective
38:19 65:7

subjects 7:11

subsequent
24:19 25:2,
10 85:24

Subsequently
17:24

suggested 46:1

summarizes
27:4

summary 61:2,4

supervise 6:18

supervision

9:7

supposed 41:7

surface 30:10
64:6 65:1

surprise
29:16,19

suspect 50:6

suspected 6:25
9:9

swear 4:12

Switzerland
26:24

sworn 4:21

syllables 32:8

synonymous
18:17

_____

T

_____

tables 30:7

takes 42:12

talk 33:4
35:23 37:2,5
52:8 72:16

talked 57:14
69:15

talking 12:24
15:16 37:10
40:9,10
47:19 51:20,
21,22 52:3
58:11 61:9
63:16 64:3,5

65:18 66:14 76:23,24

**Tanner** 18:14, 15,20,22 19:2,23 20:6,12 26:17

**Tanner's** 18:24

**Tanners** 27:12

**taught** 14:24

**teacher** 9:20

**team** 6:13,15, 17,22,23 7:4 8:24 10:10 17:5 69:2

**technically** 16:9

**teen-age** 20:16

**teenagers** 28:25

**teeth** 62:4,5, 6,7,19 67:23

**term** 16:13 37:13 63:16, 21 73:17 76:13

**terminated** 86:1

**terms** 8:13 18:16 21:15 35:22 36:23 59:22 72:10

**test** 15:3

19:7,14

**testified** 4:22 44:19 51:18 54:11 58:15 69:19 76:25

**testifying** 44:25

**testimony** 13:25 20:1 31:4,24 34:14 39:8, 10 47:23 48:5 56:8 76:8 77:13 80:13 82:20 84:3

**tests** 83:1

**textbook** 27:8, 9 44:8,14

**thelarche** 82:17

**theory** 53:20

**thereof** 19:18

**thicker** 38:16

**thickness** 38:19,25 39:3,15

**thigh** 39:6,12 41:15 57:25 58:8,15 59:5,20,21 60:3 64:9, 10,18,20,24

**thighs** 38:6,15 39:1,20,23 40:3 59:3 64:6,7,16,25 65:1 66:15, 16,24 81:12

**thing** 5:23 18:16 21:13 23:14 51:16 61:7 74:21

**things** 14:1,3, 4,22,23 15:20 17:14 54:17 79:22

**thought** 37:3 48:8

**time** 4:7 5:11 7:24 8:15 9:19 10:18, 21 15:13 17:22 24:9 25:19 26:10 27:20 29:16 52:16 55:9 56:10 60:12, 15,21 65:19 68:9 70:21 73:8 74:4 85:22

**times** 5:23 35:12 68:17

**tip** 78:6,9

**tissue** 42:24 43:5,11

**today** 5:3

17:16 18:4 69:9 81:5 82:20

**Today's** 4:6

**told** 47:13 51:18,19 67:3 78:7

**tool** 28:5

**top** 37:22 43:5,9

**touched** 72:14

**trafficked** 35:13

**trained** 12:6,7

**training** 7:6, 16,24 8:3, 14,20 9:21, 25 13:4 14:22

**transcript** 85:5,14

**transferred** 7:18

**transmit** 58:21

**treat** 13:12, 13

**treated** 83:6,8

**treating** 27:25 83:15

**treatments** 76:11

**triangle** 38:3,

7,13 41:1,3, 6,9,11 44:23,24 57:14,19 58:7 59:4

**true** 22:12,18 45:23

**tumor** 20:9

**turn** 35:14

**turned** 83:13

**type** 21:24 73:19

**typed** 52:25

**types** 24:17 56:14

## U

**U.F.** 76:16

**uh-huh** 5:24 6:2

**un-huh** 6:2

**underlying** 84:5

**underscore** 81:8

**understand** 5:12,16 6:12 11:15 12:13, 16 13:15 14:13 15:4 17:17 19:24 23:4 44:21 47:24 48:14

50:22 52:6 55:16 59:13 63:5

**understanding** 73:5,23

**understood** 12:18 23:7

**undertake** 54:8

**undetectable** 22:22

**unfamiliar** 29:12

**ungroomed** 41:10

**unit** 8:22

**University** 6:10,15 7:9 16:1,3

**unscientific** 29:8 46:7

**update** 26:20

**upper** 64:7,9, 25

**utero** 42:8

## V

**vaginal** 36:2

**vaguely** 52:21

**validity** 57:5

**variability** 20:7

**vellus** 37:16 38:1

**verbal** 5:25

**verbatim** 51:3

**verify** 77:25

**versus** 4:5 38:25 46:9 59:8 69:21

**VI** 36:6 41:19,22

**video** 85:3,4, 20

**view** 40:18 43:3 57:25 67:13 81:22

**violence** 9:17, 18

**visible** 36:18 37:22 56:2 62:12 71:24 79:13 81:10, 12

**visit** 68:14, 15

**visual** 44:18 80:19

**vital** 67:10, 12

**vivid** 69:18

**vocabulary** 76:21

## W

**Wait** 24:18

**waive** 85:11

**wall** 43:11 63:22 64:9, 15

**wanted** 29:19, 23 30:3,5

**warrant** 48:16

**wax** 80:21

**waxed** 56:25 73:2,15 74:18,21 75:4,7,23 76:6,10 77:2,16

**waxing** 39:24 54:17 55:23 56:12 72:25 73:5 74:22 75:1,9 76:10 77:23 79:11 80:18

**ways** 29:22 47:18

**wearing** 53:3

**website** 78:17

**week** 30:24 31:10

**well-known** 45:11

**whiskers** 39:4,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**                    Index: white..Zoom

14,17,25
40:3

white   53:4
  74:9

widely   23:23
  81:12

wider   38:11

William   4:4

witnesses   5:22

women   28:24,
  25 29:15
  43:15 54:12
  76:10

wood   53:4

word   52:3,4,
  19

words   51:4

work   6:12
  16:6,19,25
  17:2 26:21
  28:2,3

worked   16:10

working   9:8

worried   20:17

write   6:4

writes   17:11

writing   17:14
  52:1,2

wrong   25:21
  29:15 42:5

wrote   30:5
  50:13

---
### Y
---

YCBLVVFQ   81:8

year   8:16 9:6
  20:11 24:13

years   7:21
  8:13 9:8
  14:23 16:2
  17:13 18:23
  21:15 25:24
  26:21 28:25
  37:1 42:13
  54:3 76:16
  77:10 81:15,
  17 82:4

years-old   84:1

York   7:10

young   62:8,9
  76:9

---
### Z
---

Zoom   49:3

67-11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

  Plaintiff,

vs.                 CASE NO.:  3:24-cv-00044-MMH-MCP

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's Office, and
KATHLEEN DULLY, in her individual
capacity as medical director of the
UF Child Protection Team,

  Defendant.

_____

CONTINUED
REMOTE VIDEO
DEPOSITION OF:    KATHLEEN M. DULLY, M.D.


DATE:          June 18th, 2025


TIME:          3:05 p.m. - 5:10 p.m.


PLACE:        Videoconference


STENOGRAPHICALLY
REPORTED BY:    Deborah J. Guest, RPR
              Shorthand Reporter



            (1 - 89)

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 2

APPEARANCES:

(All parties appearing via Zoom.)

MICHAEL K. ROBERTS, II, ESQUIRE
OF: Nooney, Roberts, Hewett & Nowicki
1680 Emerson Street
Jacksonville, FL 32207-6104
Office: 904-398-1992
Cell: 904-398-1992
E-mail: mroberts@nrhnlaw.com
Appearing on behalf of the Plaintiff,
William Lee Lawshe

MATTHEW J. CARSON, ESQUIRE
OF: Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, FL 32301-1509
Office: 850-205-1996
E-mail: mcarson@sniffenlaw.com

Appearing on behalf of the Defendant,
Mikayla Preston
-and-
JOHN A. WILSON, ESQUIRE
OF: Howell, Buchan & Strong
2098 Mahan Drive
Suite 6
Tallahassee, FL 32308-5462
Office: 850-877-7776
E-mail: johnwilson@jsh-pa.com
Appearing on behalf of the Defendant,
Kathleen M. Dully, M.D.

ALSO PRESENT: Cameron Hodges, Videographer

Page 3

INDEX
TESTIMONY OF KATHLEEN M. DULLY, M.D.

                                        PAGE
Review of previously marked exhibits - no
video.................................... 4
Direct Examination by Mr. Roberts......... 7
Cross-Examination by Mr. Carson........... 78
Cross-Examination by Mr. Wilson........... 84
Redirect Examination by Mr. Roberts....... 85
Certificate of Oath....................... 88
Certificate of Reporter................... 89

INDEX OF EXHIBITS
                                        PAGE
(DR. DULLY'S FIRST DEPOSITION)
(Previously marked - attached to first deposition)
No. 3 (a demonstrative diagram of the
pubertal stages)......................... 37

No. 4 (composite exhibit of three letters
written by Dr. Dully in this case)........ 18,50,69
(DETECTIVE PRESTON'S DEPOSITION)
(Previously marked - not attached)

8-A (image YCBLVVFQ)..................... 69

8-B (image 806FE687)..................... 23

8-C (0059).............................. 15,25

8-D (0065(1))........................... 25

8-E (20230122_174408DuckDuckGo.jpg)...... 53

STIPULATIONS
It is hereby stipulated and agreed by and among the counsel for the respective parties and the Defendant that the reading and signing of the Zoom video deposition transcript be waived.

Page 4

PROCEEDINGS
* * * *

MR. WILSON: Counsel, will you be sharing exhibits today?

MR. ROBERTS: Maybe.

MR. WILSON: Maybe.

MR. ROBERTS: I don't know that there will be any other ones, but I'll simply refer to the images either by their file name or -- and we can go on the record -- but they were attached in letter form to Detective Preston's deposition as lettered exhibits, and so we can refer to them in both ways. But we'll make sure that we're on the same page before we begin discussing the exhibit. Fair enough?

MR. WILSON: Yes. Can we go through the exhibits for clarity that were attached to the first deposition?

MR. ROBERTS: Yes. Exhibit 1 was a journal article, Exhibit 2 was the affidavit of the Plaintiff's expert, Dr. Krugman, Exhibit 3 was a demonstrative diagram of the pubertal stages, and Exhibit 4 was the -- it's a composite exhibit of three letters written by Dr. Dully all in this case.

Page 5

MR. WILSON: And you are prepared to show those on the screen as they come up, if necessary?

MR. ROBERTS: Yes. I mean, I am not going to plow the same field. We're not going to -- you know, I may ask her a question about one or two, and it may become relevant.

But as this is a continuation of the prior deposition, you know, I will assume that these exhibits are going to be attached as exhibits to this deposition as well.

THE VIDEOGRAPHER: Counselor, is this a continuation?

MR. ROBERTS: It is a continuation, yes.

THE VIDEOGRAPHER: All right, perfect. Are there any other housekeeping matters?

MR. WILSON: I believe Mr. Carson called in and dropped off of the call. I do not know what has happened to Mr. Carson.

MR. CARSON: I'm still here.

MR. WILSON: Okay, thank you.

MR. CARSON: I am trying not to clog the gallery. I will probably just stay hidden until or unless I need to say anything.

MR. ROBERTS: All right, thank you.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 6

THE VIDEOGRAPHER: All right, then. Counsel, are we ready to begin?

MR. ROBERTS: Yes.

(Discussion off the record.)

THE VIDEOGRAPHER: Good afternoon. We're now on the record at 3:10 p.m. this June 18th, 2025. This begins the continued deposition of Dr. Kathleen Dully, taken in the matter of William Lee Lawshe versus Mikayla Preston, et al. This deposition is being conducted remotely via Zoom.

My name is Cameron Hodges. I am the videographer. The court reporter is Deborah Guest. We represent Huseby Global Litigation.

Will counsel please introduce themselves, after which will the court reporter please swear in the witness. Thank you.

MR. ROBERTS: Michael Roberts for Mr. Lawshe, the Plaintiff.

MR. WILSON: John Wilson for Dr. Dully.

MR. CARSON: Matt Carson for Detective Mikayla Preston.

COURT REPORTER: Doctor, would you raise your right hand, please.

Do you solemnly swear the testimony you're

Page 7

about to give in this cause today will be the truth, the whole truth, and nothing but the truth?

THE DEFENDANT: I do.

COURT REPORTER: Thank you.

KATHLEEN DULLY, M.D., having been duly sworn to tell the truth, testified as follows:

DIRECT EXAMINATION

BY MR. ROBERTS:

Q    All right. Doctor, it is good to see you again. Where are you currently located?

A    In this particular room?

Q    What building?

A    This is the Forensic Pediatrics Office, sort of that administrative office which is one building over from the clinic building.

Q    And when you say "clinic building," what are you referring to?

A    Well, there's two buildings for this division. And one has the clinic where we actually see children and have our offices and exam rooms and equipment and medication, and then this is an administrative building with a xerox machine and this very nice Zoom/conference room.

Q    And when you say -- and I just made this a

Page 8

little more obvious, but this is the Child Protection Team. When you say "division," you are talking about the Child Protection Team?

A    No, this is not the Child Protection Team office. This is the Division of Forensic Pediatrics for the University of Florida, and the Child Protection Team is part of the division and major activity.

Q    What does forensics mean?

A    Open to debate.

Q    So that is what -- if you say, "I am a forensic PD -- pediatrician," that means it's up for debate, pediatrics?

A    That we specialize in the debates of pediatrics, yes. In this case, I think that applies.

Q    Okay. Sometimes I have heard -- maybe it's colloquially, but forensics as being a subspecialty of either medicine or engineering, some science which attempts to examine or offer opinions on legal questions.

Is that -- are you not familiar with that use of the word forensics?

A    No. I use it as part of pediatrics.

Q    Okay.

A    I don't engage in those other activities.

Page 9

Q    You don't practice -- you don't offer opinions in legal proceedings?

A    I do if I am subpoenaed.

Q    Okay. But isn't that like part of your job, to offer opinions in legal proceedings on behalf of the State of Florida?

A    That is part of my job as a pediatrician, and the American Board of Pediatrics does not like to use the term forensics. That's why they call it child abuse pediatrics.

Q    And, in fact, the statute that establishes the Child Protection Team directs that the Child Protection Team will investigate and support law enforcement activities in regards to child abuse allegations, doesn't it?

A    I don't know the statute by heart. It probably says that or something about like that. It does establish the Child Protection Teams throughout Florida.

Q    Okay, all right. So have you -- this is a continuation of our prior deposition.

Since that time, have you spoken with any representatives of Detective Preston?

A    No.

Q    Have you spoken with Detective Preston?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 10

A    No.

Q    Have you spoken with anyone other than your attorney about the facts or circumstances arising out of this case?

A    No, but the attorneys did change.  So I have spoken to two attorneys, the previous and then also Mr. Wilson.

Q    Has anyone from Verizon or Synchronoss Corporations reached out to you about this case?

A    No.

Q    Have you made any statements or conducted any -- or have been part of any interviews regarding the facts and circumstances of this case since we last met?

A    No.

Q    All right.  So have you had an opportunity to review your deposition transcript prior to today's continuation of that deposition?

A    I went through it one time today.

Q    Okay, all right.  So we ended the last deposition because you did not have the photographs or the digital images which were the subject of your reports in this case.  Did I understand that correctly?

A    Yes.  And I had not seen them in two years

Page 11

and could not recollect.

Q    Sure.  And today, do you have them?

A    I have them, yes.

Q    And have you had a chance to review them prior to us getting on the record here today?

A    Yes.

Q    Okay.  So let's -- I am just going to -- we left off in your deposition talking about opinions in general -- your opinions in general, and let's pick up today with your -- your interactions with -- just to set the scene, I guess, so to speak, with -- your interactions with Detective Preston and reviewing these particular photographs because you have them now, and that's really what I intend to go through today.

So at some point, you received an e-mail from Detective Preston introducing herself.  Do I understand that correctly?

A    At some point, she was introduced to me at CPT, but I don't remember the specifics.

Q    Do -- have you reviewed any e-mails she sent to you attempting to set up a meeting regarding this particular case?

A    She did send one e-mail between the two dates -- I don't know the date -- asking for another

Page 12

appointment.

Q    So you had one meeting with her on February 22nd, 2023; is that correct?

A    Yes.

Q    And in that meeting, you examined a single colored photograph that she showed you on a law enforcement laptop; is that correct?

A    Yes.

Q    That file name -- I am not going to read the entire file name, but it begins with D263B; is that correct?

A    Yes.

Q    All right.  You met with her again on April 5th, 2023; is that correct?

A    Yes.

Q    And you reviewed additional photographs, which we'll get into in a second.

So I believe you testified in your original deposition you do have some recollection of meeting with Detective Preston; correct?

A    Yes.

Q    All right.  And when you met with her, you explained to her that you could not offer her scientific reliable opinions regarding the actual age of the models depicted in these images, correct?

Page 13

A    Yes.

Q    You told her that you could only offer her an opinion about what the sexual maturity rating of the appearance of the image was, correct?

A    Yes.

Q    And I think we went through this in your prior deposition.  For example, if you were shown a photograph that just showed belly button to thighs and it showed genitals, if there was no pubic hair development, your opinion would be that that is a sexual maturity rating of a woman, correct?

A    In general, yes.

Q    You do not consider the possibility of digital altering of the photograph to make it appear as though there is no pubic hair?

A    That is not my expertise.

Q    And you do not consider that possibility in rendering your opinions?

A    That is always a possibility.  However, I am commenting on appearance, not knowing anything more about the photograph.

Q    And you made that clear to Detective Preston in your meeting on February 22nd?

A    I think that's obvious.  That's what the investigation is for, which is not something that I

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 14

do.

Q    Whether you think it is obvious or not, your testimony is that you made that clear to Detective Preston in your meeting?

A    Well, it's in writing that it's appearance, and I said it's appearance.

Q    Your prior testimony even today was that you explained to her that you could not give her a scientifically reliable opinion about the actual age of the model depicted, correct?

A    Well, those are your words. That's not my words. I never used the word scientific. It is not -- it's a medical question, and those are your words, not mine. And it has been two years, and I don't remember my exact words.

Q    I am not -- I am not asking you your exact words. I am asking if you related to her -- in whatever words you chose but related to her in what you consider to be a clear manner that you could not offer her a medical opinion about the actual age of the individual depicted in these images, correct?

A    Yes.

Q    All right. One second.
I would like for you to pull up on the laptop the file 0059, and just tell me when you have

Page 15

that image up for you to view.

A    And which letter is that?

(Exhibit 8-C, previously marked in Detective Preston's deposition, was identified for the record.)

BY MR. ROBERTS:

Q    If you can just pull the image up, and then I'll ask questions and direct you. While you are pulling it up, I am going to, for the record, identify this.
The redacted image was attached to Detective Preston's deposition as Exhibit C. Do you have this pulled up in front of you, 0059?

A    That is what the label says, yes.

Q    Okay. This depicts a female model with it looks like a pink lace lingerie -- wearing like a pink lace lingerie. Do you see that?

A    Yes.

Q    A red background?

A    I would call that orange, but yes.

Q    Okay. Maybe we got a different color tone on our screen.
All right. And the model appears to even have her eyes closed or be looking down towards the floor?

A    Yes.

Page 16

Q    All right. This model clearly has utilized some form of grooming of her pubic hair, correct?

A    She may have and so -- you know, maybe, yeah.

Q    It appears -- now, you are a medical doctor and you -- we talked a lot about this in your -- in your prior -- in your original testimony in the beginning of this case.
The appearance of pubic hair is the -- I guess the leading determining factor in the sexual maturity rating as it pertains to female individuals, correct?

A    Yes.

Q    All right. And we went through diagrams about what Grade I, Grade II, Grade III, Grade IV, Grade V pubic hair development looks like, did we not?

A    Yes.

Q    This appearance of pubic hair does not match any of the diagrams that -- or the depictions on the diagrams that we saw, does it?

A    Not very well. It is in the midline and anterior which is how it develops.

Q    Right. But this clearly -- this model has clearly either shaven or waxed or groomed in some way

Page 17

her pubic hair, correct?

A    I don't know if that is clearly, but I think that is a possibility, yes.

Q    Well, your medical opinions are based on the appearance of pubic hair in this case, correct?

A    Yes. To a large degree, yes.

Q    Would you say that by looking at this you cannot determine whether or not this model has utilized some sort of grooming, shaving, waxing, some sort of hair removal process?

A    No. I am saying that she may have --

Q    Okay.

A    -- but I don't know for sure. Usually I ask the child.

Q    Okay. You can't ask the child, though, when you are reviewing images pulled off of the internet, can you?

A    Correct. That's what the investigation is for.

Q    Right. Your opinions were part of the investigation, though, correct?

A    I think I am assuming that they must be because here we are.

Q    Right?

A    But, no, I never know what role my

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 18

statements play.

Q    Well, what did you surmise when a detective, a law enforcement detective, asked you to render some opinions about some images, some pornographic images?  Did you not -- did you not surmise that they were contacting you as part of their investigation?

MR. WILSON:  Object to form, but go ahead.

A    They were contacting me, asking for an opinion.  What they do next, I don't know.  And I don't know that they ever used these until now.

Q    Well --

A    You are telling me so.

Q    And I am sorry for cutting you off.  But you know that the detectives -- you knew that the detective was investigating a potential crime, correct?

A    Yes.  By the 5th of April, I surmised that because she came back with more.

Q    Right.  And you knew that she was coming to you as part of that investigation, did you not?

A    It would be likely.

Q    Yes.

A    I did not pin her down.

(Plaintiff's Exhibit No. 4, previously marked, was

Page 19

identified for the record.)

BY MR. ROBERTS:

Q    Okay.  I am going to share my screen which is Plaintiff's Exhibit 4.

I'm trying to move that.  I don't know what that is on there.  I don't know what this blue line is, I apologize, but do you see this?

A    Yes.

Q    Okay.  I am going to show you what is marked February 22nd.  That is the date that you have.  We looked at this letter, okay?

April 5th, do you see this letter?

A    Yes.

Q    Do you agree that the first paragraph is largely a copy and paste from the February 22nd, 2023 letter?

A    Oh.  It would appear that that is true, yeah.

Q    Can you read the second paragraph of your letter --

A    April --

Q    -- from April 5th, 2023?

A    "Today you have shown me two additional images" --

Is that what you are referring to?

Page 20

Q    Yes.

A    -- "of the same female child, and these confirm my previous determination that she is depicted to be at most sexual maturity of maybe III or IV and, therefore, again less than 12 to 15 years of age."

Q    There is one more sentence.

A    Oh.  "The file names for these photos are 0059 and 0065(1)."

Q    Now, the last sentence of the first paragraph says, "She does not appear to be shaved as her anterior pubic hair is still present."

But on April 5th, 2023, when you saw the 0059 image, you knew that this model had been shaved, waxed, or removed her pubic hair in some way, correct?

A    No.

MR. WILSON:  Object to form.

A    No.

Q    You just testified that the 0059 -- that she very well may have used some form of hair removal process.  Did I understand that correctly?

A    You misstate my testimony.

Q    Please restate it --

A    It was --

Page 21

Q    -- for me.  Please restate it.

A    It was possible, and that's what the investigation is for.

Q    Well, you are the expert on pubic hair development, correct?

A    Yes, but not depilatories, waxes, lasers, and you brought up electrolysis, as I recall.

Q    Or chemical hair removal or just digital alterations of images or all the things that I brought up.  But you made the affirmative statement on April 5th, 2023 that this model does not appear to be shaved, correct?

A    I said that on February 22, and I did not change it on April 5.

Q    That was an untrue statement, though, correct?

A    Not correct.

Q    So is it your testimony that the model depicted in 0059 does not appear to be shaved?

A    Is 0059 the same image as the D2635841644B390?  You know, I don't know if that is actually the same image or not.

Q    It's not the same image.  It's an image taken from the exact same photo shoot.

A    I don't know that.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 22

Q    Well, why don't you look -- why don't you open up the files for -- I'll give you the file number.  Why don't you just open up the file that starts in D263B, open that up for me, and also open up 0065.  And tell me when they are open.

A    Is this supposed to be --

COURT REPORTER:  Ma'am, I can't hear.

THE DEFENDANT:  I don't know what I am looking at.  I am sorry, I am trying to figure out what I am looking at.  This is a different file.  I don't know what is what.  I don't know what is what.

BY MR. ROBERTS:

Q    So let me read the file name for you, okay?  It's B06F --

A    To what?  A file name to what?  There is more than one file.  B06F, that is what that one says here.

Q    Knees-to-chest.  So the image that you are looking for is a female model with knees-to-chest.

A    That is not the file name that I looked it up as according to my statements in 2023.

MR. WILSON:  Yes.  Mr. Roberts, if I may interject for a moment, the file names that we have as evidence in this case for Exhibit 8-B of

Page 23

Detective Preston's interview and the one that is referenced in the first paragraph of the February 22nd letter, they are a different file name than is shown on Dr. Dully's letters here.  But the description matches, and it is the image marked for identification purposes in other testimony in this case.

MR. ROBERTS:  Thank you, John.  I appreciate that.

(Exhibits 8-B and 8-D, previously marked in Detective Preston's deposition, were identified for the record.)

BY MR. ROBERTS:

Q    Let's look at the image that you are describing rather than the file name, okay?

Can you -- can you open the file where it shows the model sitting on a wooden floor in a knees-to-chest position with her lower legs and ankles parted to expose her genital for the camera.  I have that -- and it may have been miswritten in the report, but I have that as B06FE687.

A    That is what is on this photo that says Exhibit 8-B.

Q    Okay.  Do you agree that that photograph showing the female in the knees-to-chest position was

Page 24

taken at the same photo shoot, the same time as the other two images --

A    I --

Q    -- that you reference in that letter, 0059?

A    I have no idea.

Q    Can you explain why -- can you explain that, why you have no idea?

A    I wasn't at the photo shoot.  I have no idea.

Q    Well, does she appear to be wearing the same clothes?

A    What is --

Q    Well, first of all -- sorry, strike that.  Strike that.

Is it the same model?

A    What is the second picture that you are referring to?

Q    Okay, all right.

MR. WILSON:  I will go ahead and interject again.

MR. ROBERTS:  Okay.

MR. WILSON:  We have on the screen on this laptop Exhibit 8-B, which we were previously discussing, and Exhibit 8-D, which is also marked in Dr. Dully's reports as image 0065(1).  Those

Page 25

are the two images that are currently on the laptop screen.

BY MR. ROBERTS:

Q    Okay.  So 0065(1), gotcha, 0059, that is the image that we were originally talking about today, let's just talk about those two images first, okay?

Do you agree that those two images were taken at the same photo shoot around the same time?

MR. WILSON:  Let -- let me pull up those two images.

(Exhibits 8-C and 8-D, previously marked in Detective Preston's deposition, were identified for the record.)

MR. WILSON:  All right, and now we have on the laptop screen Exhibit 8-C 0059 and Exhibit 8-D 0065(1), both displayed side by side.

MR. ROBERTS:  Okay.

BY MR. ROBERTS:

Q    Having a look at those, do they appear to be taken from the same photo shoot?

A    It is all the same accoutrements, so they could be.  But, otherwise, I don't actually know.

Q    It's the same model --

A    Probably.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 26

Q    -- correct?

Well, you say -- I think you say it is the same model in your letter of -- let's see.

A    Detective Preston told me that.

Q    April 5th, 2023, you indicate that you show me two -- pardon me, "Today you show me two additional images of the same female child." Did I read that correctly?

A    Yes.

Q    Okay. So it is the same female model that is depicted in the original image which you described as sitting on a wooden floor in a knees-to-chest position, correct?

A    She told me they were the same child, and I did not know any way to validate that. So I accepted it. I do think it looks like the same child, but I am not the investigating person, so...

Q    Okay. She's wearing the same earrings, correct?

A    Oh, I didn't notice the earrings. Sorry.

Q    Yes? Wearing the same earrings?

A    No, I don't know what the earrings are. Maybe you better go back to another screen.

Q    Oh, I am sorry.

MR. ROBERTS: Can you pull this back up?

Page 27

MR. WILSON: They are up.

THE DEFENDANT: No, he's talking back now about the one I saw in February.

MR. WILSON: Oh, okay.

MR. ROBERTS: I'm talking about -- let's pull all three up, okay, the image from February with the knees-to-chest and then the two subsequent images that you viewed April 5th, which are 0059 and 0065(1). And just tell me when you have them up.

THE DEFENDANT: Thank you.

MR. WILSON: You're very welcome. I am working on it.

THE DEFENDANT: It's going to be very small.

MR. WILSON: All right. I have got all three up, side by side, on the laptop screen.

MR. ROBERTS: Okay.

BY MR. ROBERTS:

Q    So, Dr. Dully, you weren't able to tell me whether or not these appeared to be from the same photo shoot taken at approximately the same time, so I am going to ask you: Is the model wearing the same earrings in all three photographs?

A    It looks like the same earrings, yes.

Page 28

Q    Is her hairstyle the same in all three photographs?

A    Well, with partial views, I -- I think they could be, but I can't really see her whole hairstyle in the first photo.

Q    Wearing the same clothes?

A    No, I don't see the same clothes. I see her knees and her legs and her bare arms.

Q    Do you see some pink lace on the floor?

A    There is something on the floor. I can't see what it is.

Q    Does it appear to be consistent with pink lace --

A    It could --

Q    -- lingerie?

A    Yeah, it could be. Yes.

Q    The same pink lingerie that she's wearing in 0059 and 0065(1)?

A    It could be, yes.

Q    Yeah. The wall color in the background is the same on all three images?

A    Yes.

Q    The drapes are the same in all three images?

A    They look like it, yes.

Page 29

Q    The house plants in the image all appear to be the same house plants?

A    The ones that I can see, yes.

Q    So all indicia seem to be that these were taken at the same location at approximately the same time?

A    No, I don't know that.

Q    Okay, all right.

A    This is a costume.

COURT REPORTER: I'm sorry, ma'am. Could you repeat that, please?

THE DEFENDANT: This is a costume.

BY MR. ROBERTS:

Q    What does that mean?

A    Something that you can put on every time it's time to put it on.

Q    Sure. All clothes are costumes in that way, though, right?

A    No.

Q    I mean, you can put on the dress that you are wearing any time that you want, right?

THE DEFENDANT: Do I have to answer that?

MR. WILSON: Yes.

MR. ROBERTS: Yes, you do.

A    Yes.

Page 30

Q    Okay.  So to the extent that these appear to be -- and I guess I'll just have to ask it in a hypothetical way:  These appear to be part of the same photo shoot.  The model depicted does appear to have, as you put it, shaved her pubic hair, correct?

A    No, not in all three images.  I don't know that it's the same photo shoot.  I think it's likely it's not the same photo shoot, and it is not necessarily something that happened all at one time.  And you are putting words in my mouth, and I --

Q    Ms. Dully -- Dr. Dully, you realize you are under oath today, correct?

A    Yes, I am under oath --

Q    And you swore to tell the truth?

A    -- and you are telling me what I said, and that's not what I said.

Q    Okay.  And you are sworn to tell the truth.  What makes you believe in the original image, knees-to-chest, that her pubic hair grooming is any different than it is in 0059?

A    Because it is different, it is not the same view, and she looks younger to me.

Q    She looks younger to you?  What do you mean by that?

A    She has an immature face, she has large

Page 31

eyes, she has a prominent forehead, she has her labia very well exposed, and she only has a little tiny bit of anterior pubic hair, which is exactly what early pubic hair in puberty looks like.  She still looks young to me.

Q    Why --

A    She's not old- --

Q    Why didn't you include any of that in your letter?

A    No one asked.  You didn't ask.  I did not change my opinion.  It's there in the letter.

Q    So let's just break it down.
On 0059, you agree that there is a -- as you put it, a possibility that she is groomed, correct?

A    Which one is 0059?

Q    That's the one where you can see what I think in common parlance is referred to as a landing strip of pubic hair.

A    Okay, that's the middle image here?

Q    Right.  Do you agree that there is at least a possibility that that is -- that she has shaved or used some sort of grooming?

A    Yes, I said that.  Yes.

Q    Yeah.  Generally, pubic hair doesn't grow

Page 32

in that way, like in a straight line, a straight line up towards your belly button, does it?

A    Not as uniformly, no.

Q    No.  So -- just so we understand and it's clear for the record, if a model has groomed, you cannot offer any opinions about the sexual maturity rating of that model as it pertains to the development of pubic hair, correct?

MR. WILSON:  Object to form.  But go ahead.

A    It is an appearance, and it was not just one photograph.

Q    Well, according to you, on the day that 0059 was taken -- because you, I think, testified earlier that it is likely that these were taken on different days, correct?

A    I think it's likely that the knees exposure is younger but not necessarily the same time.

Q    So like developmentally younger, like her facial features are different, things like that?

A    Yes.

Q    So we're talking years younger in your opinion?

A    No, not necessarily.  Puberty is all happening in a year or two.

Q    Okay.  So I just want to make sure:  Under

Page 33

oath, your testimony is it's your opinion right now that the knees-to-chest was taken how much earlier than 0059 and 0065(1)?

A    It appears to be earlier.  I cannot say how many days or weeks or months.

Q    And so when I read your letter of February -- of April 5th where you write that these two additional photographs confirm your prior opinion, that would be incorrect then, correct?

A    No.  She is older and she was younger, and that's consistent.

Q    But your prior opinion was that she was Grade IV in the -- in the February 22nd letter, correct, a sexual maturity rating IV?

A    That is what it says.

Q    You actually say in your letter that from the second two images, 0059, 0065(1) -- you say III to IV in those images.  So you actually in your letter place her as being younger in the 0059 and the 0065 [sic] than in the knees-to-chest version of the image, correct?

A    Can you say that again?  I didn't follow it.

Q    Yeah.  So on the original image, the February letter that you wrote, you placed the sexual

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 34

maturity rating at Grade IV, correct?

A    That is what I typed.

Q    Now, you've testified today that you believe that the model was younger, developmentally younger --

A    Yes.

Q    -- in the knees-to-chest picture that was subject of the February 22nd letter, correct?

A    Yes, she appears younger.

Q    But in your letter, you actually put -- of April 5th, you actually state that it confirms your opinion that she's a Grade III or IV by looking at the 0059 and the 0065(1) images, correct?

A    Yes.

Q    So you actually have those as being developmentally younger than the original picture, of the knees-to-chest picture?

A    Well, I did not change my statement in terms of her age. But based on those photographs, I didn't type the exact same thing, no.

Q    What is the appearance of the model -- sexual maturity rating -- what is the appearance of her genitals in terms of sexual maturity rating in the 0059?

A    Okay, which one is the 0059?

Page 35

Q    That's the one with the straight line of pubic hair --

A    Okay, sorry.

Q    -- anterior, I think, to her genitals.

A    She has midline pubic hair development and anterior, like a low maturity that could be a III. That is a distribution that we do see.

I do agree that there is a uniformity that suggests that she could also be altered in one of the ways you already suggested.

Q    And if she has altered her pubic hair, you could not offer any appearance -- any opinion even of her appearance, could you?

A    It's her appearance, and a III and a IV is possible. And I am told it's the same child, and I've already said she's a IV. And now this view, she could also be a III. But I don't think it fits perfectly, no.

Q    That is not my question.

A    She --

Q    Ma'am, that is not my question.

A    What is your question?

Q    In your -- the original part of your deposition, we went through, I thought, in quite a bit of detail regarding the difference between III,

Page 36

IV, and V, the appearance of pubic hair development. And you made it very clear in your deposition that the distinction between a IV and a V or a III and a IV was the distribution of the pubic hair, correct?

A    Yes.

Q    All right. If the pubic hair has been removed so that you cannot see the biological -- the natural distribution of pubic hair, how could you possibly offer an opinion about a sexual maturity rating based on the pubic hair distribution?

A    Because it's based on appearance.

Q    Right. But the appearance here is that she has been shaved.

A    That is your opinion. I think it's possible --

Q    Well, you've acknowledged -- you've acknowledged that that is a -- that that is a possibility here that is consistent with grooming, that this image is consistent with grooming.

And my question to you is: If you saw that she had been groomed, why would you not tell Detective Preston, "Hey, I can't help you here; she's being groomed; I don't know what her pubic hair distribution is"?

MR. WILSON:    Object to form.

Page 37

A    I still have the first image.

Q    Let's talk about the first image. Before we do that, I want to share what was originally an exhibit. It was Exhibit 3 -- Exhibit 3 to your -- to this deposition.

(Plaintiff's Exhibit No. 3, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q    Now, you previously testified that this diagram roughly -- and it is a pen and ink drawing -- displays the development through the stages of pubic hair and breast development, correct?

A    It's close, yes.

Q    All right. And we talked in detail that the development of -- and this is what you said, was a triangle or an inverted triangle in the area above the genitals was the determining or one of the determining factors in assessing whether or not someone was a sexual maturity rating of a III, IV, or a V, correct?

A    If you only have an anterior view, that is what you see. And you see it on your diagram on III, IV, and V.

Q    Right. So I want you to go back now to the knees-to-chest image, the original image that

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 38

Detective Preston brought to you on February 22nd.

MR. ROBERTS: Tell me when that's up. I know it takes some time.

MR. WILSON: It's up. All three images are still open.

MR. ROBERTS: Okay, they're still up.

BY MR. ROBERTS:

Q    Isn't it true, ma'am, that in the knees-to-chest position, you cannot see the anatomical area of the body which is displayed in these diagrams?

A    In your limited diagram, it does not show the same view.

Q    It does not show the area above the genitals, does it?

A    You mean the photograph?

Q    I mean the photograph, yes.

A    It does not. It's not showing the same view at all.

Q    It is impossible for you to tell whether or not that is a III, IV, or V distribution of pubic hair based on the positioning of that model in that photograph, correct?

A    No, not true.

Q    Can you see how the pubic hair is

Page 39

distributed in the inverse triangle that you've described earlier in your testimony?

A    It is not the same view, no.

Q    So you can't?

A    Not with your limited diagram, no.

Q    Is there another diagram that you would refer me to?

A    There are lots of them.

Q    And are there any diagrams that would show females in a knee-to-chest positioning?

A    There certainly are, and there are other positions as well.

Q    Tell me about those. Can you tell me the names of those diagrams? Where can I find them?

A    There are some.

Q    I can't -- I can't see them. What -- can you just tell me the name of the book you are referring to?

A    "Assessment of Sexual Maturity Stages In Girls," American Academy of Pediatrics.

Q    And in that book, does it have diagrams of where doctors are assessing a sexual maturity rating of girls from images where they are on their knees-to-chest, in a knees-to-chest position?

A    It has similar exposures. But, no, they're

Page 40

certainly not in that position.

Q    Okay. Why is that?

A    Because this is not pornography. That is.

Q    Right. The entire test that you are talking about was never intended to use it as you are using it, correct?

A    That is not necessarily true.

Q    Well, the book you just referred to me is a clinical -- clinical treatise, correct?

A    It has diagrams and photographs and answers your question.

Q    But you are not answering my question, Dr. Dully, which is: The book that you are referring to is designed to help clinicians assess the sexual maturity rating of their patients in a clinical setting, does it not?

A    Including me, yes.

Q    And it's also designed to -- really what it's designed to do is to ensure that young people are appropriately developing through the stages of puberty and to help diagnose any sort of disorders that they may have in that regard?

A    In clinical medicine, that is how I use it.

Q    That is, in fact, what the test was designed to do, correct?

Page 41

A    That was what Dr. Tanner did in the 1950s. It certainly has another purpose now as well.

Q    But that other purpose is not to provide reliable opinions on the actual age of models depicted in pornographic images, is it?

A    Only appearance.

Q    Right. And -- and appearance -- there's really no value to your opinion regarding appearance, is there?

A    I am not sure -- I am not doing the investigation. I provide the consultation because I am required to and requested to.

Q    But I am not -- I'm going to ask you the question again.

There really is no value to your opinion regarding the appearance of a sexual maturity rating in a pornographic image, is there?

MR. WILSON: Object to form.

A    I don't --

Q    It's a yes or no. Is there value or is there not value?

A    There is value. In my opinion, there is value.

Q    Okay. You can't tell me if these pictures appear to be from the same day, can you?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 42

A    I cannot.

Q    You can't really tell me -- you don't actually believe they are from the same photo shoot?

A    I do not.

Q    You think that in between some of these photographs, this model groomed her pubic hair; is that right?

A    I think that she matured, and she may have groomed. I cannot rule that out because I would normally ask the patient.

Q    And is there any evidence, like actual evidence, for that testimony that you have today?

A    Well, from many hours of it, I would say, yes.

Q    Tell me -- tell me: What is the evidence that -- between the original knees-to-chest photograph and 0059 that this model groomed her pubic hair?

A    I don't know that she groomed her pubic hair. I think you are testifying she did, but I don't know that. I --

Q    Okay. And I guess that is my point, right? That if you can't even tell if somebody has groomed or not groomed, what is the value of your testimony?

A    Ask law enforcement. They ask for these

Page 43

all the time.

Q    I am asking you. You -- you hold yourself out as an expert to law enforcement in sexual maturity rating, correct?

A    Yes.

Q    And you can't even tell me, as we sit here today with hindsight, whether or not this model in 0059 has groomed her pubic hair; you can't tell me that, can you?

A    No.

Q    So what -- if you can't even say that, how can you in good faith offer any -- any opinions about the sexual maturity rating of these models?

MR. WILSON: Object to form. And your tone is getting awfully accusatory for a deposition.

MR. ROBERTS: All right. Well, hold on. For the record, it is accusatory.

THE DEFENDANT: Yes, I would agree.

BY MR. ROBERTS:

Q    I am telling you, it is accusatory. You cannot tell me whether or not this woman has groomed, can you?

A    That is what the investigation is for. Asked and answered.

Q    I am not asking about the investigation,

Page 44

Dr. Dully. I am asking you.

A    Not what I do. That is not what I do, and I have never offered myself as an expert in pubic hair grooming.

Q    Ma'am, I am going to ask you to go back to your letters in this case. You say, "She does not appear to be shaved."

A    She does not --

Q    You offered that opinion?

A    -- appear to be shaved. Yes, she does not --

Q    And there's no basis for that opinion; is there?

COURT REPORTER: Sir, I didn't get your question. This is the court reporter.

BY MR. ROBERTS:

Q    You offered the opinion to Detective Preston that this model was not shaved; isn't that true?

A    That's my opinion. It is still true.

Q    But today you can't tell me whether or not she was shaved or not?

A    I cannot. That is what the investigation is for.

Q    Do you understand that most people

Page 45

generally understand that to be a false statement?

If you told the detective something and now you say, "I don't know if it is true or not," that would be a false statement, wouldn't it be?

A    No. It is a statement for investigation.

Q    Do you endeavor to give truthful statements to an investigation?

A    Of course.

Q    Why would you say that this model does not appear to be shaved if you cannot tell whether or not she was shaved?

A    We're talking about two different images. So the first image, she does not appear to be shaved. The second image, she could be groomed. I can't say for sure, and the investigation should clear that up.

Q    How would an investigation clear up whether or not she was shaved on the day of this image?

A    When they find her, they can ask her, if they find her.

Q    Why did you not include in your report when you were talking and describing 0059 that this image may represent that it appears she may have groomed or shaved, as you put it?

A    I find it is also possible that she is a III. I did not know which it was, but it is based on

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 46

appearance.

Q   But the appearance -- in every other image, you talk about whether or not they appear to be shaved or not shaved.

I am asking you:  In regards to 0059, why did you not include in your report that it may be that this model has shaved?

A   I don't know.  I don't see that as my expertise.  I think that that needed more investigation.  And that was clearly what was, you know, probably underway because she was back for a second time.

Q   Is it true that you only include a notation on shaving when you say that they do not appear to be shaved?

A   No.  I do that on every medical assessment.

Q   Well, then, why didn't -- I am going to ask you again.  If you do that on every medical assessment, and 0059 you have acknowledged may be shaved, why did you not -- why did you not note that?

A   The comment I make is if they appear to be shaved and usually the answer is yes.

And in this case, I didn't think I could know that statement and the investigation needs to proceed.  In photograph number one, she does not

Page 47

appear to be shaved.

Q   But you don't -- let me ask you this.  If you look at 0059 and the original image, knees-to-chest --

A   The knees-to-chest one, the first one -- yes.  Go ahead.

Q   -- and 0059 that has the very regular, vertical strip of pubic hair, okay, those two presentations of pubic hair are perfectly consistent, correct?

A   No.  They are consistent with a change in age and a change in habits, potentially, but they are not, you know, the same thing twice, no.

Q   The original knees-to-chest image does not show the area of pubic hair that is depicted in 0059, does it?

A   Ah, let me see here.  It's not exactly the same, but the views are -- I would say the second photo is a little more exposed than your diagrams, and then the first photo is a completely different view.

Q   It is a completely different view, and that view hides the area that is exposed in 0059, correct?

A   Partially.

Q   Yeah.  To the extent that you can't tell

Page 48

what her pubic hair looks like above the area that is exposed, can you?

A   Above what area?

Q   There is an area of exposed pubic hair in the original knees-to-chest image, correct?

A   I --

Q   You can see pubic hair exposed in that image, can you not?

A   At the very top of her labial opening, yes.

Q   Above that area of exposed pubic hair, you cannot see that area because of her body positioning, correct?

A   Up towards her belly button and her lower abdomen, I cannot see those areas.

Q   And so it may be that her pubic hair is exactly the same in Image 1, where she has got the knees to the chest, as it is in 0059; there is no way for you to know because you just can't see that area, can you?

MR. WILSON:  Object to form.

A   I disagree.

Q   Okay.  You said earlier that Detective Preston told you that this was the same model.  Do you recall that testimony?

A   Yes.

Page 49

Q   Were you not able to surmise from your review of these images that it was the same model?

A   I suspected they were the same, and she said yes.

Q   Do you agree?  Is there any question in your mind that they are the same model?

A   Well, they appear to be the same model.  That's all I have.  But investigators would know better.

Q   When you say "investigators," ma'am, you are a forensic investigator in this case, are you not?

A   I am not.

Q   You didn't offer forensic opinions in this case to Detective Preston?

A   A forensic medical opinion.

Q   Did you offer a forensic medical opinion to Detective Preston in this case?

A   Yes.  On her request, yes.

Q   So you are part of the investigation; you agree with that?

A   It would appear that I am.

Q   Did you not know that at the time?  Did you not realize that at the time?

A   I knew that there was some likelihood, yes.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 50

Q    Okay.

A    I did not know what was happening next.

Q    Now, you say -- you have talked about -- and we talked about this in appearance. And you have testified, I think to be fair, that in your opinion it was obvious that you were not offering any opinions about the actual age of the models in question from the way you wrote your reports. Did I understand that correctly?

A    I think I am pretty clear that it is appearance.

(Plaintiff's Exhibit No. 4, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q    Okay. I want to share again Exhibit 5 -- I mean, I am sorry, Exhibit 4 from the original deposition, and let me go to the February 22nd. I am going to read a line. You say, "This female child appears younger than the age of 18."

Is that what you mean when you say "appears," that makes it obvious that you are just talking about appearance, not her actual age?

A    Yes.

Q    Okay. April 5th, and I am moving down to the third letter in our exhibit, in the second

Page 51

paragraph you wrote, "This image shows a female child with her black top parted and her underwear down around her parted thighs, exposing her genital area clearly."

You didn't use the word appear in that sentence. Why not?

A    I don't know why not. Maybe I did or maybe I didn't. What does it say? It is very easy to see. She has -- she's prepubertal.

Q    You say, "This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly," but you don't say anything about appearances or appear in that.

A    "She appears to have no pubic hair development in" --

Q    Right. But did you call her a female child? Do you see if I read that sentence how a person might interpret that as you saying that this person is a child, an actual child?

A    Well, I hope so, yes, but I don't know that.

Q    Wait, wait, wait, wait. You hope that someone would interpret this as you -- as you offering the opinion that this was actually a child,

Page 52

like her actual age was under the age of 18?

A    Her age is indeterminant. But she is well under the age of 18, and that is her appearance.

Q    So are you offering an opinion now on this image that the actual age of the model -- not just the appearance, but the actual age of the model is under the age of 18?

A    No. Her appearance is under the age of 18 very clearly.

Q    Because she doesn't have pubic hair?

A    We'll need to pull up the image because you are missing the basics.

Q    I am missing what?

A    The basics.

Q    I am missing the basics? Like, what are the basis?

A    I am pulling up the image so I can review them with you. Would you like to pull yours up? I'm not -- what is this one? Is this the DuckDuckGo one?

Q    Correct. This is the one with no face, no breasts, only a magazine cover with belly button to knees. Tell me: What am I leaving out?

MR. WILSON:    Before she answers, I am pulling up on the laptop screenshot 20230122_174408DuckDuckGo.jpg which was listed in

Page 53

Detective Preston's deposition as 8-E. And it is focused on the top image that has been colloquially referred to in this case at the Bay Heart image.

MR. ROBERTS:    Thank you, John.

(Exhibit 8-E, previously marked in Detective Preston's deposition, was identified for the record.)

BY MR. ROBERTS:

Q    So you said that I was leaving stuff out. What am I leaving out?

A    This child has no pubic hair. It is a very clear view. She has the labial majora that meet right in the middle. She does not have labial minora development as an older child or teen would have. And you can also see her hand. And she is a child by looking at this.

This is an appearance. This is what they look like on the exam table.

Q    You keep saying this is a child. But you are not actually testifying that in chronological age, this person is under the age of 18, are you?

A    I am not giving a chronological age. I am telling you what she looks like.

Q    Right. And so when you say "what she looks like," you are talking about a frontal view of the

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 54

genitals where she is vertically standing I think on her knees, correct?

A    Yes.  It's not just frontal.  You can see her labial majora and the cleft between them and her buttocks behind those a little bit, just the medial portion, because her legs are parted.

Q    I want you to Zoom in on that image for me.

MR. WILSON:  On?

BY MR. ROBERTS:

Q    When you Zoom in, I want you -- I want you to see how far you can Zoom in before it becomes pixilated.

A    On this particular -- yeah.

Q    You testified earlier in your deposition that if the quality of the photograph isn't good enough, you wouldn't be able to see things like a razor burn or stuff like that.

I am going to ask your opinion:  Is quality of this photograph good enough for you to see whether or not there's evidence of grooming, shaving, waxing, those kinds of things?

A    Yes.

Q    It is good enough?

A    Yes.

Q    Okay.  And so was that a misstatement when

Page 55

you said, "This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly?  Did you mean to say, "This is what appears to be a female child"?

A    This appears to be a female child, and I specified that.  She has no pubic hair development.  None.

Q    And you say here again, "She does not appear to be shaved"?

A    She does not.

Q    And what is that based on?

A    She is immature.  She does not need to shave.

Q    Has anyone related -- you know that this is an adult, right?

MR. WILSON:  Form.

A    No, I don't know that.  You are saying so.

Q    Well, not just me.

A    I don't know that.

Q    Okay.  You are saying, though, that this child doesn't need to shave; that's your -- that's your medical opinion today?

A    My medical opinion is she is so immature, she does not need to shave and she does not appear

Page 56

shaved.  She has all the immature anatomy appearance of a child who has not entered puberty.

Q    And you can tell all of that by this photograph?

A    Yes.

Q    And if I showed you a passport and the date of this picture, you would still say that she is prepubescent?

A    Well, I would not know when this picture was taken versus the passport picture taken that --

Q    No, I just said -- I just told that to you.  I said if I -- if I showed you the passport and the date that this photograph was taken -- it's actually on the image that you are looking at.

But if I showed you that, you would disagree and you would say, "No, no, she's not an adult"?

A    I would -- I would not presume that those are the same two people.

Q    That is not my question.  You would say, "I don't care what her passport says, I don't care what the date of the photograph is, this is not an adult"?

A    This does not appear to be an adult, and I do not know if there is a passport linked to it or not or if it's a valid passport.  I don't know.

Page 57

Q    Do you know whether or not she waxed?

A    She does not need to wax.

Q    Do you know if this image has been digitally altered?

A    It doesn't appear so, but there are other experts to look at that.

Q    When you say, "it doesn't appear so," what is that based on?

A    How it looks.

Q    Do you have any expertise in that?

A    In how it looks?  Yes.

Q    In what a digitally altered photograph looks like?

A    I do not have the expertise to find out if that's occurred or not.

Q    Why would you be willing to offer an opinion about it appearing not to be digitally altered, then?

A    Because it doesn't appear to be digitally altered.

Q    What do you mean --

A    But there are other experts that can look at that.  It doesn't --

Q    But I am asking you.  You have said it.  What is your basis for saying that?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 58

A    This is what little girls look like. No alteration required or involved.

Q    So I'm very -- you're looking at me in this way and I will be honest with you, I am confused by your testimony, because now you seem to be very emphatically offering an opinion about the actual age of this person and not the appearance.

A    Well, that's your opinion, but that's not what I have said. She appears to be a child, and she appears to be a child for the reasons that I have stated. And I have no burden to provide computer-based testimony or expertise in that area.

This is the beginning of looking at images. This is not necessarily -- sorry, the conclusion that would be reached if a good investigation occurred. I am not involved in that. I don't know how that went.

Q    So you -- you indicate in this letter, you say, "She appears to have no pubic hair development." Why do you put that she does not appear to be shaved?

A    Because she does not.

Q    No, but today you have testified that she doesn't need to shave.

A    She does not appear to need to shave. Her skin is perfectly smooth.

Q    Why didn't you put that in your report?

Page 59

A    Because that is more information for testimony. I don't put all the transcript [sic] that I might say in the future in one letter.

Q    So these letters don't include the basis -- all of the bases for your opinions?

A    No. It is not possible.

Q    Okay. So "she does not appear to be shaved," that was just -- you just wrote that -- even though you didn't think that she needed to shave, you say "she does not appear to be shaved." Because to me that sounds like you are saying, "Hey, she might shave but it appears like she hasn't shaved."

MR. WILSON: Object to form if that -- if there was a question there.

THE DEFENDANT: I think asked and answered would be good.

MR. ROBERTS: I think you are not an attorney.

THE DEFENDANT: I think you are right.

BY MR. ROBERTS:

Q    "She does not appear to be shaved" -- "she does not appear to be shaved," why did you write that?

A    Because she does not appear to be shaved.

Q    Does she appear to be waxed?

Page 60

A    No. She has perfectly smooth skin. There are no signs of a pubic hair that would still be there. There's no folliculitis. She does not have the signs of somebody who is doing things that they don't even need to do. She is a -- looks like a child.

Q    We talked a little bit earlier in your deposition the last time we were here about your opinions regarding the model who had the Grade IV to V breasts, but you had her at sexual maturity I. Do you recall that testimony?

A    Yes.

Q    What do you recall about it? You are shaking your head for a reason, I guess. What do you recall about it?

A    I said she could have mature breasts but I could not see them well, so I did not assess them for her maturity rating. So I can see in that statement that she could be mature which would be, you know, a IV or V.

Q    You said you did not assess her breasts for a sexual maturity rating.

A    Correct. You cannot see it, which is what my statement says, as I recall.

Q    Well, you do --

Page 61

A    That's what I said in the last deposition as well.

Q    You do say that she could be a sexual maturity rating of a IV or V.

A    Right. I just said that.

Q    I mean, it seems like that is an assessment.

A    That she could be a IV or a V?

Q    Correct.

A    No, it is a concession. It is not an assessment. It is a concession.

Q    What do you mean by concession?

A    I am conceding that I cannot exactly assess her breast development because I cannot see that well, so she could be mature. I cannot see that well. And if she was mature, she could be a IV or a V.

Q    Is that in the same way you couldn't really see the pubica -- pubert- -- pubic hair development in the knees-to-chest image?

A    No.

Q    Do you agree that you couldn't really see the area of pubic hair development in the knees-to-chest photograph?

A    I do not agree.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

Page 62

Q    You think you could see the lower abdomen above the genitals where the thighs meet the lower stomach; you think you could see that in that image?

A    We talked about that, no, and that is not the only thing to look at.

Q    Right.  But it is difficult to see that area, correct --

A    That area --

Q    -- in that image?

A    Yes.

Q    In that image?

A    In that image, that area is not well seen or seen at all, but the rest of the genitals are very well-exposed.

Q    Well, why didn't you give the same concession on that knees-to-chest image that you were talking about with the breasts?

A    Because the genitals are well-exposed, and I can see them and so can you.

Q    But the only opinion that you offer is to pubic hair development.

A    Right.

Q    And you cannot see the area where your pubic hair develops clearly in the knees-to-chest photograph, can you?

Page 63

A    Wrong.

Q    Well, I guess the image speaks for itself. I guess people can just make their own opinion about what it shows.

A    No.

Q    But your testimony is is that it does not show the area where pubic hair begins to develop in children?

A    Yes.

Q    Because your earlier testimony was that it begins in an inverse triangle above the genitals. That was your earlier testimony.

A    That is what you wanted from your diagram which is very limited.  I am trying to help you with your diagram.

Q    Actually --

A    That is not the only exposure, and her knee-chest is not that exposure.

Q    I am going to share with you your deposition transcript.  This is page 37 going into 38.  I am asking you to describe the grades of sexual maturity rating.  On page 37, I ask about III.  And on 38, I ask about Grade IV.  Can you read your answer for the jury, please?

A    I will read my answer, but there is no

Page 64

jury.  Where am I starting?

Q    Ma'am, this very well may be played in front of a jury.  I hope you understand that.

But it is -- the question is:  At line 2 and Grade IV, can you read your answer at 3?

A    What is Grade IV?  Line 2, Grade IV.

Q    Line 3.

MR. WILSON:  Can you give us the page, please?

MR. ROBERTS:  38.

THE DEFENDANT:  Oh, 38.  Line 2 and Grade IV.  Grade IV, that was it on the end.  Okay, Grade IV --

BY MR. ROBERTS:

Q    Page 38, line 3, can you read your answer when I ask you to describe Grade IV?

A    "Grade IV fills out the entire triangle shape of the labial majora, the anterior commissure, and the mons pubis over to, but not involving, where the thighs join the pelvis."

Q    You could not see -- that's your answer, correct; that's not my -- my words?

A    That is my answering you on asking me what the stage is.  That is not about one of the photographs.

Page 65

Q    And then on -- keep that -- keep that there because I ask you:  "What do you mean by triangle?" Can you answer that?

A    Is that a question?

Q    Can you read your answer?  Can you read your answer?

A    "That is the shape when the legs are together of the hair-bearing parts over the mons pubis in front of the anterior commissure.  And on either side, it's wider.  In between the legs, it will come to" -- it's supposed to say -- "a point so that it may look like an inverted triangle."

Q    So I asked you to describe the difference between -- or what a Grade IV was.  You told me about an inverted triangle, correct?

A    From your diagram, yes.

Q    Actually, if you go back and look, I don't think I had shown the diagram at that point.

A    I don't know.

Q    Okay.  Are you answering this question on page 38 based on what my diagram was or were you just answering just what Grade IV is?

A    Well, we need to go back and read, then, because I don't --

Q    Take as much time as you'd like.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 66

THE DEFENDANT: Lower. I am getting paged. Let's see.

A    You were asking me for a basic description, so I was giving you a description by each grade.

Q    And you identified the triangle and distribution of the pubic hair within that triangle, inverted triangle, as the definition for Grade III, Grade IV, and Grade V, correct?

A    Well, that is how we teach the basics, yes.

Q    You cannot see the development of a triangle in the model depicted in the knees-to-chest image, can you?

A    No.

Q    And in the 0059, there is no triangle on that model, is there?

A    No.

Q    And that would indicate the possibility that she has groomed, correct?

A    There is a possibility that she groomed.

Q    And if the model had groomed, you would not be able to use what you described earlier in your testimony as the definition of Grade IV and Grade V? You would not be able to use that to sexual maturity -- to do a sexual maturity rating of her pubic hair, would you?

Page 67

A    I can't use your oversimplified, basic description that you asked me for as the sole source of information for a completely different exposure.

So the first image of the knee-chest is a different exposure and it is a good one, and she does not appear to have mature pubic hair there. It is not in the basic diagram that you have.

The subsequent photograph does not look like it is the same moment in time or the same photo shoot, and there is a possibility that she is groomed.

Also, there are children who can be a sexual maturity rating II to III, or III, and it is on either side of the cleft like this. I think it would be part of the investigation. Or had she been brought to me, I could have asked her and take it from there. I don't think that is different than anything I have tried to keep explaining.

Q    So on the date you reviewed these -- let me just ask you a hypothetical question, okay, because I guess we're just not going to agree.

If these images were taken during the same photo shoot at approximately the same time and location, would the fact or the possibility that this model had groomed alter your ultimate opinions that

Page 68

you offered to Detective Preston?

A    I don't know if I had seen them all. I don't think so because I do think this child in the knee-chest looks younger, and I don't think so. But, of course, that is not what happened.

Q    Well, on April 5th, you did have all three images in front of you, correct?

A    Not at the same time, but it would appear I had several. I am sorry, there are so many file names I don't know.

Q    So you are saying at the time of April 5th when you wrote the letter regarding 0059 and zero, zero, six, paragraph one [sic], you formed the opinion that these images were taken at different times?

A    Yes.

Q    And it was your opinion back then that she possibly had groomed between the first knees-to-chest image and then the 059 image?

A    No. She had aged and developed more pubic hair and could have groomed.

Q    But you formed that opinion on April 5th, 2023?

A    Yes.

Q    You just didn't include it in your -- in

Page 69

your letter?

A    Well, it is included because it doesn't change my original determination on the first photo. But I didn't go on for pages about it, no.

Q    Well, I am not asking if you went on for pages. But you didn't say something like, "These pictures appear to be taken at different times, at different ages, of the same model"?

A    I did not say that.

Q    But that was, in fact, your opinion back then?

A    Yes.

(Plaintiff's Exhibit No. 4, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q    Okay. I am going to share again Exhibit 4, and I am going to go to the first paragraph this time.

This is the YCBLVVFQ. Can you pull this image up?

(Exhibit 8-A, previously marked in Detective Preston's deposition, was identified for the record.)

MR. WILSON: I am pulling up on the laptop what was marked in Detective Preston's deposition as Exhibit 8-A, YCBLVVFQ, it looks like,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 70

underscore O.

MR. ROBERTS:  Thank you, John.

BY MR. ROBERTS:

Q    Have you had a chance to look at that, Doctor?

A    I see it, yes.

Q    Do you recognize this model as the same model which is the subject of the knees-to-chest and 0059 and 0065(1)?

A    I think she is the same model.  She looks older to me, but I think she is the same model based on appearance.

Q    And the appearance to you is that this is an older version of the model, correct?

A    Yes.

Q    All right.  Despite that, when in the knees-to-chest 0059 you have this model, we'll call her Melania D, as a Grade III or IV sexual maturity rating, now, even though you think that she appears older, you have the same model as a sexual maturity rating of I, prepubescent.

Can you please explain that?

A    That is based on the view of her pubic hair being completely absent.

Q    Right.  But you just testified under oath

Page 71

that looking at her, she appears to be older than when she was depicted in 0059, correct?

A    I think so, yes.  That is my opinion.

Q    This isn't Benjamin Button, though, is it? I mean, she gets older over time; her puberty gets more developed over time, correct, not less developed?  Do I understand that correctly?

A    Yes.  That would be the normal sequence, yes.

Q    Yeah.  Can you please explain how an older version of Melania D has a lower sexual maturity rating, a prepubescent maturity rating?

A    Well, if she is the same child, then she would be altered.

Q    Is it your testimony that this is an altered image?

A    It could be.  I don't know that it is the same child.  I am assuming that --

Q    I -- sorry, sorry.  I didn't mean to cut you off.  Go ahead.

A    I don't know that it is the same child.  I am assuming that it is possible that she is the same child.

Q    So when you say "altered," what do you mean?

Page 72

A    That her pubic hair is missing if she is the same child because it would appear she had it before.

Q    Well, in this letter, you specifically say she -- in regards to this image, that she does not appear to be shaved.  Was that a lie?

A    Which letter are you talking about?

Q    April 5th --

A    Oh --

Q    -- YCBL.  You told the detective that she does not appear to be shaved.  Today you are testifying that she must be altered in some way.  I am asking:  Was that a false statement that you gave Detective Preston?

A    No, I didn't know it was the same child, if it is.

Q    You just testified, Doctor, that you believe that this is the same child but older.  Is that not your opinion?

A    I testified that this could be the same child in my opinion, but I don't know.

Q    So you don't know if this model has been shaved or waxed or the image has been digitally altered at all, do you?

A    No, I don't.

Page 73

Q    And yet you told Detective Preston that it did not appear that she had been shaved, right?

A    It does not appear that she was shaved.  It does not appear, no.

Q    But now your testimony is that it does appear that she may be shaved.

A    No, your testimony is.  She is -- if she is the same child and the child had pubic hair before, then we would know that she could be altered one way or the other, or grooming or computer manipulation. But she does not appear to be shaved in this image.

I -- I don't know if she is the same child. I do think that's possible that it could be her sister or some other child of a same heritage.  But the investigation should clear that up.

Q    So you had all of these images on the same day, April 5th, correct?

A    Eventually, there were more images, yes.

Q    On April 5th, you had both 0059 and the YCBLVVFQ, correct?

A    Yes.

Q    And at that time, you thought that they might be the same person, correct?

A    I did not know this was the same person but I thought that they could be.  The -- this is not the

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 74

same outfit, the same earrings, the same hair, the same background. None of that is there. This looks pretty different. I don't know if it is the same child or not at a different age in her time of growing up, and it looks pretty clearly like a different photo shoot. If --

Q    Okay. You already testified -- I am sorry. I am sorry.

Yeah, it is clearly a different photo shoot. I agree with you, yes. But I think you testified that you thought that this was an older version possibly of the Melania D that was described in 0059, correct?

A    I am conceding that that is possible.

Q    Right. And so on the day that you wrote this letter, April 5th, you knew -- you knew about this possibility that this was the same model and that she had shaved between the first photo shoot and then this photo shoot, correct? You knew that at the time that you wrote this letter?

A    No, I did not know that. I am still not sure of that. I --

Q    I am not asking you -- sorry, ma'am. I am not asking if you are sure. I said you knew about the possibility that this was the same model that was

Page 75

older; you knew that was a possibility on April 5th when you looked at all of these images, correct?

A    I don't remember assessing that, no.

Q    Well, as we assess it today, do you have any concerns about your affirmative statement to Detective Preston that she does not appear to be shaved?

A    No. I mean, I would concede for a jury that this could have turned out to be the same child at a different age. It's in the separate letter along with the other Bay Heart, and it is not one of the two that she told me was the same female child. And I don't remembering thinking that it was, and it is not the same photo shoot.

Q    Right. Today you've testified that you think maybe it's the same model but she is older, correct?

A    Yeah. And now that I see them in this sequence, it could be the same child. But I said I did not know that.

Q    Well, you had all of these photographs on April 5th in front of you with Detective Preston, correct?

A    And she said the other two were the same child.

Page 76

Q    Right. What I am trying to understand, as we sit here today, is how is it possible that you have given the opinion that an older version of Melania D has a lower or more immature sexual maturity rating?

A    I have conceded that she could be the same person, but I did not know that and I do not know that. If she is the same person, then her pubertal development continued and that would be consistent with -- I'm introducing another term -- her using some sort of alteration, technique, or the computer being done for her.

This was not represented to me as the same person, and I don't know that it is. I am conceding that it could be, but I did not know that and I don't know that now.

Q    While we're conceding things, will you concede that the first three images -- the knees-to-chest, 0059, and 0065(1) -- could be all from the same photo shoot?

A    The child with the knee-chest position looks younger to me. It does not look like the same moment in time to me.

Q    Would you concede that it could be, though?

A    I don't think it looks that way. It is a

Page 77

costume in a set, and the child looks different.

Q    Let me ask the converse. Your entire opinion that you offered to Detective Preston is predicated on the opinion that these photographs were taken at different times, substantially different times?

A    I don't know what "substantially different times" means. I've already said I don't know how many weeks or months might have gone by.

Q    But your entire opinion to Detective Preston is predicated on your opinion that the knees-to-chest photo was taken weeks, months, some time prior to 059 and 0065(1)?

A    That's how it appears to me, yes.

Q    Okay. And when did you develop that opinion that they are different times -- that they were different times? When did you develop that opinion?

A    I don't think I've changed it.

Q    That was your opinion on February -- on April 5th?

A    My assessment on April 5th did not change what I said on February 22.

MR. ROBERTS: Okay. We have been going for a little while. Let me take a break. Everybody

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 78

take a comfort break. We may not have that much longer. Thank you.

THE VIDEOGRAPHER: We're off the record at 4:48 p.m.

(Recess from 4:48 p.m. to 4:55 p.m.)

THE VIDEOGRAPHER: This begins media unit 2. We're back on the record at 4:55 p.m.

MR. ROBERTS: Okay. Dr. Dully, I do not have any other questions. I will turn it over to Mr. Carson.

THE DEFENDANT: Thank you.

CROSS-EXAMINATION

BY MR. CARSON:

Q    Hi, Dr. Dully.

A    Hello. Good afternoon.

Q    Yeah, good afternoon. My name is Matt Carson. We have met one other time I think at your deposition. My law firm represents Detective Preston who has also been sued in this litigation.

I have just a few questions for you just to get on the record kind of what your overall experience is in helping law enforcement as a member of the Child Protective Team.

I think you testified about this a little bit at your first deposition, but there have been

Page 79

other instances where you have had the opportunity to assist law enforcement, correct?

A    Yes.

Q    And would some of those have been when you have been shown pictures, images, videos, and asked to opine on the appearance of the age of the individual in the photograph image or video, correct?

A    Yes.

Q    And those -- have those been mostly close calls? Meaning, does law enforcement come to you when there is -- and, unfortunately, this is, I imagine, part of the work that you do as well as my client -- instances where it is a six-year-old or an eight-year-old or somebody who is, you know, clearly very, very young?

A    That has happened. It used to happen in the past. But now I think most law enforcement agencies are not bringing us the easy ones. They are bringing us the in between children where they might decide to use a medical opinion; they might not.

Q    And is it your understanding that that was a major -- I am sorry, there is background noise.

Is that your understanding, that that is what Detective Preston was asking you to help with?

A    Yes.

Page 80

Q    We talked a little bit about an investigation maybe resulting in the location of the individual in the photograph, correct?

A    Possibly --

Q    Possibly.

A    -- yes.

Q    In your experience, if you know, how often is the individual that is in these photos and these images local or, otherwise, able to be identified and located?

A    I see the patients and am told about the images that have been found but don't see those. But if they have a patient, they will bring me the patient and handle the images on their own.

However, I don't know a number of how many cyber tips go out there and how each law enforcement functions and what the different state laws and UCMJ may be saying now, so I follow law enforcement's leads since they know their local policies and procedures and laws.

Q    Do you understand that at least some of the time that you work with law enforcement in providing an opinion about the age of an individual and an image, that the individual will never be located?

A    I believe that that is probably true very

Page 81

often but I don't know a number.

Q    Does it follow, then, that you understand that a lot of times the investigation is into potential charges for possession of child pornography?

A    That can happen. That is really not my interest. It is in finding the local victims which is the reason that I participate.

Q    Did Detective Preston ever tell you what she was investigating with respect to any of the photographs she showed you?

A    All I knew is this was a National Center For Missing and Exploited Children cyber tip, and that this law enforcement agency had been chosen because there might be proximity. I mean, that is all I knew.

Q    And proximity to what, ma'am, or to who?

A    That maybe this ZIP Code or this area of Florida or that that particular office might have a role to play. I don't know if that's the victim or the possessor or what, but it -- for some reason, the National Center would have picked St. John's Sheriff, and I assume there's a logical reason.

Q    You assist other law enforcement agencies in your general geographic area, correct?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 82

A    Yes.

Q    Like the Jacksonville Sheriff's Office, Nassau Sheriff's Office, that sort of thing?

A    Yes.

Q    Okay.  Same --

A    Clay.

Q    Clay, right.  Same type of work, different law enforcement agencies with a different jurisdiction?

A    Yes.

Q    You understand that when these agencies come to you and ask you to provide your opinion on the appearance of an individual in these images, that they are going to use that opinion, at least in part, in their decision-making moving forward; is that correct?

A    Yes.

Q    For example, if they are going to decide whether or not they are going to seek a search warrant, they might use your opinion in that decision; is that correct?

A    Yes.

Q    In getting the search warrant, they might tell the Judge, "We have shown this image to Dr. Dully, she has these qualifications, and it was

Page 83

her opinion that the individual appeared to be of X or Y age."

Do you understand that that happens from time to time?

A    Yes.

Q    You understand that if you would have looked at any of these pictures and said to Detective Preston that the individual -- let me -- let me start my question all over again.

If law enforcement comes to you and you give an opinion that you believe the individual in an image appears to be 18 years or older, that that would impact the course of the investigation?

A    Yes.

Q    Have you ever been deposed in any other case involving your opinions as it relates to the appearance of individuals in an image?

A    I have testified to them.  The military doesn't do depositions.  They do Article 32s.  And California doesn't do depositions.  I did three in 20 years there.

So, no, I was probably never deposed in these cases, but I was testifying in a handful of them.

Q    And in those cases, were any of those of

Page 84

situations where the individual in the image was not found?

I can ask that in a different way.  Were these possession of child pornography cases?

A    To my knowledge, yes.

Q    Okay.  To your knowledge, was anybody -- law enforcement, anyone else -- ever able to locate the individuals in these photographs?

A    Not to my knowledge, no.

MR. CARSON:  Dr. Dully, that is all the questions I have for you.  Thank you very much.

THE DEFENDANT:  Thank you.

MR. WILSON:  All right.  This is John Wilson for Dr. Dully.  I just have a couple questions for you.

CROSS-EXAMINATION

BY MR. WILSON:

Q    The first is:  Do you know the Plaintiff in this case, William Lee Lawshe?

A    No.

Q    After April 5th when you provided your letters to the detective on this case, did you have any further involvement in the case at all?

A    No.

Q    When was the next time you heard about the

Page 85

case after you authored your April 5th letters?

A    In the Spring of 2024, I was told there had been an article in the newspaper about this particular case, and that's all I knew.

Q    So you didn't participate in a search warrant?

A    No.

Q    And you didn't participate in or were consulted beyond your letters in any sort of decision to make an arrest or file a charge?

A    Not at all.

MR. WILSON:  Thank you.  That is all the questions I have.

MR. ROBERTS:  I just have one -- kind of a follow-up with maybe one or two questions.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q    But, Dr. Dully, if you were told in this case after rendering your opinions that the models in question had been located and identified and that a licensed attorney in California who was a records custodian had produced age verification information, the dates of the photographs that established that the models were 18 at the time of the images, would you have testified in that case consistent with your

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 86

opinions that you wrote in these three letters?

MR. WILSON: Object to form. But go ahead.

MR. CARSON: Join.

A    I would testify about my work, yes. But I would concede that I am not the end of the case at all and not part of the investigation determinations.

MR. ROBERTS: Okay, thank you. I don't have any other questions.

So we'll order a transcript. And do you guys want to read or waive, Mr. Wilson?

MR. WILSON: Do you know what that question is?

THE DEFENDANT: Oh, I always waive.

MR. WILSON: Okay. We'll waive.

THE VIDEOGRAPHER: Any other transcript orders or video orders, Counsel?

MR. WILSON: Yes. One for John Wilson, Dr. Dully's transcript.

THE VIDEOGRAPHER: We are off the record at 5:06 p.m. This concludes the deposition.

COURT REPORTER: Mr. Wilson, are you ordering a copy, then, of the transcript?

MR. WILSON: Yes.

COURT REPORTER: Mr. Carson, do you need a copy?

Page 87

MR. CARSON: No, ma'am.

(Continued video Zoom deposition concluded at 5:10 p.m.)

* * *

Page 88

CERTIFICATE OF OATH

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH  )

I, Deborah J. Guest, RPR, Notary Public, State of Florida, do hereby certify that the witness, KATHLEEN M. DULLY, M.D., remotely appeared before me on June 18th, 2025, and was duly sworn and showed her work identification.

Signed the 25th day of June, 2025.

*Deborah J. Guest*

Deborah J. Guest
Notary Public, State of Florida
Commission Number: HH 280696
Expires: August 6th, 2026

Page 89

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH  )

I, Deborah J. Guest, RPR, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the continued remote video deposition of KATHLEEN M. DULLY, M.D., that a review of the transcript was not requested; and that the foregoing transcript, pages 4 through 87, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this the 25th day of June, 2025.

*Deborah J. Guest*

Deborah J. Guest, RPR
Shorthand Reporter

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**                    Index: 0..actual

**0**

0   70:1

0059   14:25
15:12 20:9,
14,20 21:19,
20 24:4
25:4,16 27:9
28:18 30:20
31:13,16
32:13 33:3,
17,19 34:13,
24,25 42:17
43:8 45:21
46:5,19
47:3,7,15,23
48:17 66:14
68:12 70:9,
17 71:2
73:19 74:13
76:19

0065   22:5
33:20

0065(1)   20:9
24:25 25:4,
17 27:9
28:18 33:3,
17 34:13
70:9 76:19
77:13

059   68:19
77:13

**1**

1   4:19 48:16

12   20:5

15   20:5

18   50:19
52:1,3,7,8
53:21 83:12
85:24

18th   6:6

1950s   41:1

**2**

2   4:20 64:4,
6,11 78:7

20   83:21

2023   12:3,14
19:15,22
20:13 21:11
22:22 26:5
68:23

20230122_
174408duckduckgo
.jpg   52:25

2024   85:2

2025   6:7

22   21:13
77:23

22nd   12:3
13:23 19:10,
15 23:3
33:13 34:8
38:1 50:17

**3**

3   4:21 37:4,6

64:5,7,15

32s   83:19

37   63:20,22

38   63:21,23
64:10,11,15
65:21

3:10   6:6

**4**

4   4:23 18:25
19:4 50:12,
16 69:13,16

4:48   78:4,5

4:55   78:5,7

**5**

5   21:14 50:15

5:06   86:20

5:10   87:3

5th   12:14
18:18 19:12,
22 20:13
21:11 26:5
27:8 33:7
34:11 50:24
68:6,11,22
72:8 73:17,
19 74:16
75:1,22
77:21,22
84:21 85:1

**8**

8-A   69:21,25

8-B   22:25
23:10,23
24:23

8-C   15:3
25:12,16

8-D   23:10
24:24 25:12,
17

8-E   53:1,6

**A**

abdomen   48:14
62:1

absent   70:24

abuse   9:10,14

Academy   39:20

accepted   26:15

accoutrements
25:22

accusatory
43:15,17,20

acknowledged
36:16,17
46:19

activities
8:25 9:14

activity   8:8

actual   12:24
14:9,20 41:4

42:11 50:7,
22 51:20
52:1,5,6
58:6

**additional**
12:16 19:23
26:7 33:8

**administrative**
7:15,23

**adult** 55:16
56:17,22,23

**affidavit** 4:20

**affirmative**
21:10 75:5

**afternoon** 6:5
78:15,16

**age** 12:24
14:9,20 20:6
34:19 41:4
47:12 50:7,
19,22 52:1,
2,3,5,6,7,8
53:21,22
58:6 74:4
75:10 79:6
80:23 83:2
85:22

**aged** 68:20

**agencies** 79:18
81:24 82:8,
11

**agency** 81:14

**ages** 69:8

**agree** 19:14
23:24 25:8
31:13,21
35:8 43:18
49:5,21
61:22,25
67:21 74:10

**ahead** 18:8
24:19 32:9
47:6 71:20
86:2

**allegations**
9:15

**alter** 67:25

**alteration**
58:2 76:11

**alterations**
21:9

**altered** 35:9,
11 57:4,12,
18,20 71:14,
16,24 72:12,
24 73:9

**altering** 13:14

**American** 9:8
39:20

**anatomical**
38:10

**anatomy** 56:1

**ankles** 23:19

**answering**
40:12 64:23
65:20,22

**answers** 40:10
52:23

**anterior** 16:23
20:12 31:3
35:4,6 37:21
64:18 65:9

**apologize** 19:7

**appearance**
13:4,20
14:5,6 16:9,
19 17:5
32:10 34:21,
22 35:12,13,
14 36:1,11,
12 41:6,7,8,
16 46:1,2
50:4,11,22
52:3,6,8
53:17 56:1
58:7 70:12,
13 79:6
82:13 83:17

**appearances**
51:14

**appeared** 27:21
83:1

**appearing**
57:17

**appears** 15:22
16:5 33:4
34:9 45:22
50:19,21
51:15 55:4,6
58:9,10,18
59:12 70:19
71:1 77:14

83:12

**applies** 8:15

**appointment**
12:1

**appropriately**
40:20

**approximately**
27:22 29:5
67:23

**April** 12:14
18:18 19:12,
21,22 20:13
21:11,14
26:5 27:8
33:7 34:11
50:24 68:6,
11,22 72:8
73:17,19
74:16 75:1,
22 77:21,22
84:21 85:1

**area** 37:16
38:10,14
47:15,23
48:1,3,4,10,
11,18 51:3,
12 55:3
58:12 61:23
62:7,8,12,23
63:7 81:18,
25

**areas** 48:14

**arising** 10:3

**arms** 28:8

Case 3:24-cv-00044-JAR-MCR   Document 67-11   Filed 08/12/25   Page 26 of 43 PageID
1093
WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025                    Index: arrest..Carson

arrest 85:10

article 4:20
  83:19 85:3

assess 40:14
  60:17,21
  61:13 75:4

assessing
  37:18 39:22
  75:3

assessment
  39:19 46:16,
  19 61:7,11
  77:22

assist 79:2
  81:24

assume 5:9
  81:23

assuming 17:22
  71:18,22

attached 4:10,
  17 5:10
  15:10

attempting
  11:22

attempts 8:19

attorney 10:3
  59:18 85:21

attorneys
  10:5,6

authored 85:1

**B**

B06f 22:15,17

B06fe687 23:21

back 18:19
  26:23,25
  27:2 37:24
  44:5 46:11
  65:17,23
  68:17 69:10
  78:7

background
  15:18 28:20
  74:2 79:22

bare 28:8

based 17:4
  34:19 36:10,
  11 38:22
  45:25 55:12
  57:8 65:21
  70:11,23

bases 59:5

basic 66:3
  67:1,7

basics 52:12,
  14,15 66:9

basis 44:12
  52:16 57:25
  59:4

Bay 53:3
  75:11

begin 4:14
  6:2

beginning 16:8
  58:13

begins 6:7
  12:10 63:7,
  11 78:6

behalf 9:5

belly 13:8
  32:2 48:13
  52:21

Benjamin 71:4

biological
  36:7

bit 31:2
  35:25 54:5
  60:7 78:25
  80:1

black 51:2,11
  55:2

blue 19:6

Board 9:8

body 38:10
  48:11

book 39:17,21
  40:8,13

break 31:12
  77:25 78:1

breast 37:12
  61:14

breasts 52:21
  60:10,16,21
  62:17

bring 80:13

beginning 16:8
  58:13

bringing
  79:18,19

brought 21:7,
  10 38:1
  67:16

building 7:13,
  16,17,23

buildings 7:19

burden 58:11

burn 54:17

buttocks 54:5

button 13:8
  32:2 48:13
  52:21 71:4

**C**

California
  83:20 85:21

call 5:18 9:9
  15:19 51:17
  70:17

called 5:17

calls 79:10

camera 23:19

Cameron 6:12

care 56:21

Carson 5:17,
  19,20,22
  6:21 78:10,
  13,17 84:10
  86:3,24 87:1

case  4:25
  8:15  10:4,9,
  13,23  11:23
  16:8  17:5
  22:25  23:7
  44:6  46:23
  49:11,15,18
  53:3  83:16
  84:19,22,23
  85:1,4,19,25
  86:5

cases  83:23,
  25  84:4

Center  81:12,
  22

chance  11:4
  70:4

change  10:5
  21:14  31:11
  34:18  47:11,
  12  69:3
  77:22

changed  77:19

charge  85:10

charges  81:4

chemical  21:8

chest  48:17

child  8:1,3,
  4,6  9:10,12,
  14,18  17:14,
  15  20:2
  26:7,14,16
  35:15  50:18
  51:1,10,18,

20,25  53:11,
  14,15,19
  55:1,5,6,22
  56:2  58:9,10
  60:6  68:3
  71:13,18,21,
  23  72:2,15,
  18,21  73:8,
  12,14  74:4
  75:9,12,19,
  25  76:21
  77:1  78:23
  81:4  84:4

children  7:21
  63:8  67:12
  79:19  81:13

chose  14:18

chosen  81:14

chronological
  53:20,22

circumstances
  10:3,13

clarity  4:17

Clay  82:6,7

clear  13:22
  14:3,19  32:5
  36:2  45:15,
  16  50:10
  53:12  73:15

cleft  54:4
  67:14

client  79:13

clinic  7:16,
  17,20

clinical  40:9,
  15,23

clinicians
  40:14

clog  5:22

close  37:13
  79:9

closed  15:23

clothes  24:11
  28:6,7  29:17

Code  81:18

colloquially
  8:17  53:3

color  15:20
  28:20

colored  12:6

comfort  78:1

comment  46:21

commenting
  13:20

commissure
  64:18  65:9

common  31:18

completely
  47:20,22
  67:3  70:24

composite  4:23

computer  73:10
  76:11

computer-based
  58:12

concede  75:8
  76:18,24
  86:5

conceded  76:6

conceding
  61:13  74:14
  76:14,17

concerns  75:5

concession
  61:10,11,12
  62:16

concluded  87:2

concludes
  86:20

conclusion
  58:14

conducted  6:10
  10:11

confirm  20:3
  33:8

confirms  34:11

confused  58:4

consistent
  28:12  33:11
  36:18,19
  47:9,11  76:9
  85:25

consultation
  41:11

consulted  85:9

contacting
  18:6,9

continuation
  5:8,13,14
  9:21 10:18

continued  6:7
  76:9 87:2

converse  77:2

copy  19:15
  86:22,25

Corporations
  10:9

correct  12:3,
  7,11,14,20,
  25 13:4,11
  14:10,21
  16:2,12
  17:1,5,18,21
  18:17 20:16
  21:5,12,16,
  17 26:1,13,
  19 30:5,12
  31:15 32:8,
  15 33:9,14,
  21 34:1,8,13
  36:4 37:12,
  20 38:23
  40:6,9,25
  43:4 47:10,
  23 48:5,12
  52:20 54:2
  60:23 61:9
  62:7 64:22
  65:15 66:8,
  18 68:7
  70:14 71:2,6
  73:17,20,23
  74:13,19

  75:2,17,23
  79:2,7 80:3
  81:25 82:16,
  21

correctly
  10:24 11:18
  20:22 26:8
  50:9 71:7

costume  29:9,
  12 77:1

costumes  29:17

counsel  4:3
  6:2,15 86:16

Counselor  5:12

couple  84:14

court  6:13,
  16,23 7:4
  22:7 29:10
  44:14,15
  86:21,24

cover  52:21

CPT  11:20

crime  18:16

CROSS-
EXAMINATION
  78:12 84:16

custodian
  85:22

cut  71:19

cutting  18:14

cyber  80:16
  81:13

                    D

D2635841644b390
  21:21

D263b  12:10
  22:4

date  11:25
  19:10 56:6,
  13,22 67:19

dates  11:25
  85:23

day  32:12
  41:25 45:17
  73:17 74:15

days  32:15
  33:5

debate  8:10,13

debates  8:14

Deborah  6:13

decide  79:20
  82:18

decision  82:21
  85:9

decision-making
  82:15

DEFENDANT  7:3
  22:8 27:2,
  11,14 29:12,
  22 43:18
  59:15,19
  64:11 66:1
  78:11 84:12
  86:13

definition
  66:7,22

degree  17:6

demonstrative
  4:22

depicted  12:25
  14:10,21
  20:4 21:19
  26:11 30:4
  41:5 47:15
  66:11 71:2

depictions
  16:20

depicts  15:14

depilatories
  21:6

deposed  83:15,
  22

deposition
  4:11,18 5:9,
  11 6:7,10
  9:21 10:17,
  18,21 11:8
  12:19 13:7
  15:4,11
  23:11 25:13
  35:24 36:2
  37:5 43:15
  50:17 53:1,7
  54:14 60:8
  61:1 63:20
  69:22,24
  78:18,25
  86:20 87:2

depositions

83:19,20

describe  63:21 64:16 65:13

describing 23:15 45:21

description 23:5 66:3,4 67:2

designed 40:14,18,19, 25

detail  35:25 37:14

detective  4:11 6:21 9:23,25 11:12,17 12:20 13:22 14:4 15:3,11 18:3,16 23:1,10 25:12 26:4 36:22 38:1 44:17 45:2 48:23 49:15, 18 53:1,6 68:1 69:21, 24 72:10,14 73:1 75:6,22 77:3,10 78:18 79:24 81:9 83:7 84:22

detectives 18:15

determination

20:3 69:3

determinations 86:6

determine  17:8

determining 16:10 37:17, 18

develop  63:7 77:15,17

developed 68:20 71:6,7

developing 40:20

development 13:10 16:16 21:5 32:8 35:5 36:1 37:11,12,15 51:16 53:14 55:7 58:18 61:14,19,23 62:21 66:10 76:9

developmentally 32:18 34:4, 16

develops  16:23 62:24

diagnose  40:21

diagram  4:22 37:10,22 38:12 39:5,6 63:13,15 65:16,18,21

67:7

diagrams 16:14,20,21 38:11 39:9, 14,21 40:10 47:19

difference 35:25 65:13

difficult  62:6

digital  10:22 13:14 21:8

digitally 57:4,12,17, 19 72:23

direct  7:8 15:7

directs  9:12

disagree  48:21 56:16

discussing 4:14 24:24

discussion  6:4

disorders 40:21

displayed 25:17 38:10

displays  37:11

distinction 36:3

distributed 39:1

distribution

35:7 36:4,8, 10,24 38:21 66:6

division  7:20 8:2,5,7

doctor  6:23 7:10 16:5 70:5 72:17

doctors  39:22

drapes  28:23

drawing  37:10

dress  29:20

dropped  5:18

Duckduckgo 52:19

Dully  4:24 6:8,20 7:5 27:20 30:11 40:13 44:1 78:8,14 82:25 84:10, 14 85:18

Dully's  23:4 24:25 86:18

duly  7:6

E

e-mail  11:16, 24

e-mails  11:21

earlier  32:14 33:2,4 39:2

48:22 54:14 60:7 63:10, 12 66:21

early 31:3

earrings 26:18,20,21, 22 27:24,25 74:1

easy 51:8 79:18

eight-year-old 79:14

electrolysis 21:7

emphatically 58:6

end 64:12 86:5

endeavor 45:6

ended 10:20

enforcement 9:14 12:7 18:3 42:25 43:3 78:22 79:2,10,17 80:16,22 81:14,24 82:8 83:10 84:7

enforcement's 80:18

engage 8:25

engineering

8:18

ensure 40:19

entered 56:2

entire 12:10 40:4 64:17 77:2,10

equipment 7:22

establish 9:18

established 85:23

establishes 9:11

et al 6:9

Eventually 73:18

evidence 22:25 42:11,12,15 54:20

exact 14:15, 16 21:24 34:20

exam 7:21 53:18

EXAMINATION 7:8 85:16

examine 8:19

examined 12:5

exhibit 4:14, 19,20,21,23 15:3,11 18:25 19:4 22:25 23:23

24:23,24 25:16,17 37:4,6 50:12,15,16, 25 53:6 69:13,16,21, 25

exhibits 4:4, 12,17 5:10 23:10 25:12

experience 78:22 80:7

expert 4:21 21:4 43:3 44:3

expertise 13:16 46:9 57:10,14 58:12

experts 57:6, 22

explain 24:6 70:22 71:10

explained 12:23 14:8

explaining 67:18

Exploited 81:13

expose 23:19

exposed 31:2 47:19,23 48:2,4,7,10

exposing 51:3, 12 55:3

exposure 32:16 63:17,18 67:3,5

exposures 39:25

extent 30:1 47:25

eyes 15:23 31:1

---

**F**

face 30:25 52:20

facial 32:19

fact 9:11 40:24 67:24 69:10

factor 16:10

factors 37:18

facts 10:3,13

fair 4:15 50:5

faith 43:12

false 45:1,4 72:13

familiar 8:21

features 32:19

February 12:3 13:23 19:10, 15 21:13

23:3 27:3,6 33:7,13,25 34:8 38:1 50:17 77:20,23

**female** 15:14 16:11 20:2 22:20 23:25 26:7,10 50:18 51:1,10,17 55:1,4,6 75:12

**females** 39:10

**field** 5:5

**figure** 22:9

**file** 4:9 12:9,10 14:25 20:8 22:2,3,11,14,16,17,21,24 23:3,15,16 68:9 85:10

**files** 22:2

**fills** 64:17

**find** 39:14 45:18,19,24 57:14

**finding** 81:7

**firm** 78:18

**fits** 35:17

**floor** 15:24 23:17 26:12 28:9,10

**Florida** 8:6 9:6,19 81:19

**focused** 53:2

**folliculitis** 60:3

**follow** 33:22 80:18 81:2

**follow-up** 85:15

**forehead** 31:1

**forensic** 7:14 8:5,12 49:11,14,16,17

**forensics** 8:9,17,22 9:9

**form** 4:11 16:2 18:8 20:18,21 32:9 36:25 41:18 43:14 48:20 55:17 59:13 86:2

**formed** 68:13,22

**forward** 82:15

**found** 80:12 84:2

**front** 15:12 64:3 65:9 68:7 75:22

**frontal** 53:25 54:3

**functions** 80:17

**future** 59:3

───────────────

G

───────────────

**gallery** 5:23

**gave** 72:13

**general** 11:9 13:12 81:25

**generally** 31:25 45:1

**genital** 23:19 51:3,12 55:3

**genitals** 13:9 34:23 35:4 37:17 38:15 54:1 62:2,13,18 63:11

**geographic** 81:25

**girls** 39:20,23 58:1

**give** 7:1 14:8 22:2 45:6 62:15 64:8 83:11

**giving** 53:22 66:4

**Global** 6:14

**good** 6:5 7:10 43:12 54:15,19,23 58:15 59:16 67:5

78:15,16

**gotcha** 25:4

**grade** 16:15,16 33:13 34:1,12 60:9 63:23 64:5,6,11,12,13,16,17 65:14,22 66:4,7,8,22 70:18

**grades** 63:21

**groomed** 16:25 31:14 32:5 36:21,23 42:6,9,17,19,23,24 43:8,21 45:14,22 66:18,19,20 67:11,25 68:18,21

**grooming** 16:2 17:9 30:19 31:23 36:18,19 44:4 54:20 73:10

**grow** 31:25

**growing** 74:5

**guess** 11:11 16:10 30:2 42:22 60:14 63:2,3 67:21

**Guest** 6:14

**guys** 86:10

**H**

habits   47:12

hair   13:9,15
  16:2,9,16,19
  17:1,5,10
  20:12,15,21
  21:4,8 30:5,
  19 31:3,4,
  19,25 32:8
  35:2,5,11
  36:1,4,6,8,
  10,23 37:12
  38:22,25
  42:6,18,20
  43:8 44:4
  47:8,9,15
  48:1,4,7,10,
  15 51:15
  52:10 53:11
  55:7 58:18
  60:2 61:19,
  23 62:21,24
  63:7 66:6,25
  67:6 68:21
  70:23 72:1
  73:8 74:1

hair-bearing
  65:8

hairstyle
  28:1,4

hand   6:24
  53:15

handful   83:23

handle   80:14

happen   79:16
  81:6

happened   5:19
  30:9 68:5
  79:16

happening
  32:24 50:2

head   60:14

hear   22:7

heard   8:16
  84:25

heart   9:16
  53:4 75:11

helping   78:22

heritage   73:14

Hey   36:22
  59:11

hidden   5:23

hides   47:23

hindsight   43:7

Hodges   6:12

hold   43:2,16

honest   58:4

hope   51:21,23
  64:3

hours   42:13

house   29:1,2

housekeeping
  5:16

Huseby   6:14

hypothetical
  30:3 67:20

**I**

idea   24:5,7,9

identification
  23:6

identified
  15:4 19:1
  23:11 25:13
  37:7 50:13
  53:7 66:5
  69:14,22
  80:9 85:20

identify   15:9

II   16:15
  67:13

III   16:15
  20:4 33:17
  34:12 35:6,
  14,17,25
  36:3 37:19,
  22 38:21
  45:25 63:22
  66:7 67:13
  70:18

image   13:4
  15:1,6,10
  20:14 21:20,
  22,23 22:19
  23:5,14
  24:25 25:5
  26:11 27:6
  29:1 30:18
  31:20 33:21,

24 36:19
37:1,2,25
41:17 45:13,
14,17,21
46:2 47:3,14
48:5,8,16
51:1,10
52:5,11,17
53:2,4 54:7
55:1 56:14
57:3 61:20
62:3,9,11,
12,16 63:2
66:12 67:4
68:19 69:20
71:16 72:5,
23 73:11
79:7 80:24
82:24 83:12,
17 84:1

images   4:9
  10:22 12:25
  14:21 17:16
  18:4,5 19:24
  21:9 24:2
  25:1,6,8,11
  26:7 27:8
  28:21,24
  30:6 33:17,
  18 34:13
  38:4 39:23
  41:5 45:12
  49:2 58:13
  67:22 68:7,
  14 73:16,18
  75:2 76:18
  79:5 80:9,
  12,14 82:13

Case 3:24-cv-00044-JAR-MCR    Document 67-11    Filed 08/12/25    Page 33 of 43 PageID
1100
WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025    Index: imagine..knees-to-chest

85:24

imagine   79:12

immature   30:25
  55:13,24
  56:1  76:4

impact   83:13

impossible
  38:20

include   31:8
  45:20  46:6,
  13  59:4
  68:25

included   69:2

Including
  40:17

incorrect   33:9

indeterminant
  52:2

indicia   29:4

individual
  14:21  79:7
  80:3,8,23,24
  82:13  83:1,
  8,11  84:1

individuals
  16:11  83:17
  84:8

information
  59:1  67:3
  85:22

ink   37:10

instances
  79:1,13

intend   11:14

intended   40:5

interactions
  11:10,12

interest   81:7

interject
  22:24  24:19

internet   17:17

interpret
  51:19,24

interview   23:1

interviews
  10:12

introduce   6:15

introduced
  11:19

introducing
  11:17  76:10

inverse   39:1
  63:11

inverted   37:16
  65:12,15
  66:7

investigate
  9:13

investigating
  18:16  26:17
  81:10

investigation
  13:25  17:18,
  21  18:7,21
  21:3  41:11

43:23,25
44:23  45:5,
7,15,16
46:10,24
49:20  58:15
67:15  73:15
80:2  81:3
83:13  86:6

investigator
  49:11

investigators
  49:8,10

involved   58:2,
  16

involvement
  84:23

involving
  64:19  83:16

IV   16:15  20:5
  33:13,14,18
  34:1,12
  35:14,16
  36:1,3,4
  37:19,23
  38:21  60:9,
  20  61:4,8,16
  63:23  64:5,
  6,12,13,16,
  17  65:14,22
  66:8,22
  70:18

_____
        J
_____

Jacksonville
  82:2

job   9:5,7

John   6:20
  23:8  53:5
  70:2  84:13
  86:17

John's   81:22

join   64:20
  86:3

journal   4:19

Judge   82:24

June   6:6

jurisdiction
  82:9

jury   63:24
  64:1,3  75:8

_____
        K
_____

Kathleen   6:8
  7:5

kind   78:21
  85:14

kinds   54:21

knee-chest
  63:18  67:4
  68:4  76:21

knee-to-chest
  39:10

knees   28:8
  32:16  48:17
  52:22  54:2

knees-to-chest
  22:19,20

23:18,25 26:12 27:7 30:19 33:2, 20 34:7,17 37:25 38:9 39:24 42:16 47:4,5,14 48:5 61:20, 24 62:16,24 66:11 68:18 70:8,17 76:19 77:12

**knew** 18:15,20 20:14 49:25 74:16,19,24 75:1 81:12, 16 85:4

**knowing** 13:20

**knowledge** 84:5,6,9

**Krugman** 4:21

---

## L

**label** 15:13

**labia** 31:1

**labial** 48:9 53:12,13 54:4 64:18

**lace** 15:15,16 28:9,13

**landing** 31:18

**laptop** 12:7 14:25 24:23 25:2,16

27:17 52:24 69:23

**large** 17:6 30:25

**largely** 19:15

**lasers** 21:6

**law** 9:13 12:6 18:3 42:25 43:3 78:18, 22 79:2,10, 17 80:16,18, 22 81:14,24 82:8 83:10 84:7

**laws** 80:17,20

**Lawshe** 6:9,19 84:19

**leading** 16:10

**leads** 80:19

**leaving** 52:22 53:9,10

**Lee** 6:9 84:19

**left** 11:8

**legal** 8:19 9:2,5

**legs** 23:18 28:8 54:6 65:7,10

**letter** 4:11 15:2 19:11, 12,16,20 23:3 24:4 26:3 31:9,11

33:6,13,16, 19,25 34:8, 10 50:25 58:17 59:3 68:12 69:1 72:4,7 74:16,20 75:10

**lettered** 4:12

**letters** 4:24 23:4 44:6 59:4 84:22 85:1,9 86:1

**licensed** 85:21

**lie** 72:6

**likelihood** 49:25

**limited** 38:12 39:5 63:14

**lingerie** 15:15,16 28:15,17

**linked** 56:24

**listed** 52:25

**litigation** 6:14 78:19

**local** 80:9,19 81:7

**locate** 84:7

**located** 7:11 80:10,24 85:20

**location** 29:5

67:24 80:2

**logical** 81:23

**longer** 78:2

**looked** 19:11 22:21 75:2 83:7

**lot** 16:6 81:3

**lots** 39:8

**low** 35:6

**lower** 23:18 48:13 62:1,2 66:1 71:11 76:4

---

## M

**M.D.** 7:5

**machine** 7:23

**made** 7:25 10:11 13:22 14:3 21:10 36:2

**magazine** 52:21

**major** 8:7 79:22

**majora** 53:12 54:4 64:18

**make** 4:13 13:14 32:25 46:21 63:3 85:10

**makes** 30:18 50:21

manipulation 73:10

manner 14:19

marked 15:3 18:25 19:10 23:6,10 24:24 25:12 37:6 50:12 53:6 69:13, 21,24

match 16:20

matches 23:5

Matt 6:21 78:16

matter 6:8

matters 5:16

mature 60:16, 19 61:15,16 67:6

matured 42:8

maturity 13:3, 11 16:11 20:4 32:6 33:14 34:1, 22,23 35:6 36:9 37:19 39:19,22 40:15 41:16 43:4,13 60:10,18,22 61:4 63:22 66:24 67:13 70:18,20 71:11,12

76:5

Meaning 79:10

means 8:12 77:8

media 78:6

medial 54:5

medical 14:13, 20 16:5 17:4 46:16,18 49:16,17 55:23,24 79:20

medication 7:22

medicine 8:18 40:23

meet 53:12 62:2

meeting 11:22 12:2,5,19 13:23 14:4

Melania 70:18 71:11 74:12 76:4

member 78:22

met 10:14 12:13,22 78:17

Michael 6:18

middle 31:20 53:13

midline 16:22 35:5

Mikayla 6:9,22

military 83:18

mind 49:6

mine 14:14

minora 53:13

missing 52:12, 13,15 72:1 81:13

misstate 20:23

misstatement 54:25

miswritten 23:20

model 14:10 15:14,22 16:1,24 17:8 20:14 21:11, 18 22:20 23:17 24:15 25:24 26:3, 10 27:23 30:4 32:5,7 34:4,21 38:22 42:6, 17 43:7 44:18 45:9 46:7 48:24 49:2,6,7 52:5,6 60:9 66:11,15,20 67:25 69:8 70:7,8,10, 11,14,17,20 72:22 74:17, 25 75:16

models 12:25 41:4 43:13 50:7 85:19, 24

moment 22:24 67:9 76:23

mons 64:19 65:8

months 33:5 77:9,12

mouth 30:10

move 19:5

moving 50:24 82:15

---

**N**

names 20:8 22:24 39:14 68:10

Nassau 82:3

National 81:12,22

natural 36:8

necessarily 30:9 32:17, 23 40:7 58:14

needed 46:9 59:9

newspaper 85:3

nice 7:24

noise 79:22

normal   71:8

notation   46:13

note   46:20

notice   26:20

number   22:3
46:25  80:15
81:1

**O**

oath   30:12,13
33:1  70:25

Object   18:8
20:18  32:9
36:25  41:18
43:14  48:20
59:13  86:2

obvious   8:1
13:24  14:2
50:6,21

occurred   57:15
58:15

offer   8:19
9:1,5  12:23
13:2  14:20
32:6  35:12
36:9  43:12
49:14,17
57:16  62:20

offered   44:3,
9,17  68:1
77:3

offering   50:6
51:25  52:4
58:6

office   7:14,15
8:5  81:19
82:2,3

offices   7:21

old-   31:7

older   33:10
53:14  70:11,
14,20  71:1,
5,10  72:18
74:11  75:1,
16  76:3
83:12

open   8:10
22:2,3,4,5
23:16  38:5

opening   48:9

opine   79:6

opinion   13:3,
10  14:9,20
18:10  31:11
32:22  33:1,
9,12  34:12
35:12  36:9,
14  41:8,15,
22  44:9,12,
17,20  49:16,
17  50:5
51:25  52:4
54:18  55:23,
24  57:17
58:6,8  62:20
63:3  68:14,
17,22  69:10
71:3  72:19,
21  76:3

77:3,4,10,
11,16,18,20
79:20  80:23
82:12,14,20
83:1,11

opinions   8:19
9:2,5  11:8,9
12:24  13:18
17:4,20  18:4
32:6  41:4
43:12  49:14
50:7  59:5
60:9  67:25
83:16  85:19
86:1

opportunity
10:16  79:1

orange   15:19

order   86:9

ordering   86:22

orders   86:16

original   12:18
16:7  26:11
30:18  33:24
34:16  35:23
37:25  42:16
47:3,14  48:5
50:16  69:3

originally
25:5  37:3

outfit   74:1

oversimplified
67:1

**P**

p.m.   6:6
78:4,5,7
86:20  87:3

paged   66:1

pages   69:4,6

paragraph
19:14,19
20:11  23:2
51:1  68:13
69:17

pardon   26:6

parlance   31:18

part   8:7,23
9:4,7  10:12
17:20  18:6,
21  30:3
35:23  49:20
67:15  79:12
82:14  86:6

parted   23:19
51:2,3,11,12
54:6  55:2

partial   28:3

Partially
47:24

participate
81:8  85:5,8

parts   65:8

passport   56:6,
10,12,21,24,
25

past  79:17

paste  19:15

patient  42:10
  80:13,14

patients  40:15
  80:11

PD  8:12

pediatrician
  8:12 9:7

pediatrics
  7:14 8:5,13,
  15,23 9:8,10
  39:20

pelvis  64:20

pen  37:10

people  40:19
  44:25 56:19
  63:3

perfect  5:15

perfectly
  35:18 47:9
  58:24 60:1

person  26:17
  51:19,20
  53:21 58:7
  73:23,24
  76:7,8,14

pertains  16:11
  32:7

photo  21:24
  23:22 24:1,8
  25:9,21
  27:22 28:5

30:4,7,8
42:3 47:19,
20 67:9,23
69:3 74:6,9,
18,19 75:14
76:20 77:12

photograph
  12:6 13:8,
  14,21 23:24
  32:11 38:16,
  17,23 42:17
  46:25 54:15,
  19 56:4,13,
  22 57:12
  61:24 62:25
  67:8 79:7
  80:3

photographs
  10:21 11:13
  12:16 27:24
  28:2 33:8
  34:19 40:10
  42:6 64:25
  75:21 77:4
  81:11 84:8
  85:23

photos  20:8
  80:8

pick  11:9

picked  81:22

picture  24:16
  34:7,16,17
  56:7,9,10

pictures  41:24
  69:7 79:5
  83:7

pin  18:24

pink  15:15,16
  28:9,12,17

pixilated
  54:12

place  33:19

Plaintiff  6:19
  84:18

plaintiff's
  4:21 18:25
  19:4 37:6
  50:12 69:13

plants  29:1,2

play  18:1
  81:20

played  64:2

plow  5:5

point  11:16,
  19 42:22
  65:11,18

policies  80:19

pornographic
  18:5 41:5,17

pornography
  40:3 81:5
  84:4

portion  54:6

position
  23:18,25
  26:13 38:9
  39:24 40:1
  76:21

positioning
  38:22 39:10
  48:11

positions
  39:12

possession
  81:4 84:4

possessor
  81:21

possibility
  13:13,17,19
  17:3 31:14,
  22 36:18
  66:17,19
  67:10,24
  74:17,25
  75:1

possibly  36:9
  68:18 74:12
  80:4,5

potential
  18:16 81:4

potentially
  47:12

practice  9:1

predicated
  77:4,11

prepared  5:1

prepubertal
  51:9

prepubescent
  56:8 70:21
  71:12

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Index: present..rating

present  20:12

presentations
  47:9

Preston  6:9,22
  9:23,25
  11:12,17
  12:20 13:23
  14:4 26:4
  36:22 38:1
  44:18 48:23
  49:15,18
  68:1 72:14
  73:1 75:6,22
  77:3,11
  78:18 79:24
  81:9 83:8

Preston's  4:11
  15:4,11
  23:1,11
  25:13 53:1,7
  69:22,24

presume  56:18

pretty  50:10
  74:3,5

previous  10:6
  20:3

previously
  15:3 18:25
  23:10 24:23
  25:12 37:6,9
  50:12 53:6
  69:13,21

prior  5:8
  9:21 10:17
  11:5 13:7

14:7 16:7
33:8,12
77:13

procedures
  80:20

proceed  46:25

proceedings
  9:2,5

process  17:10
  20:22

produced  85:22

prominent  31:1

Protection
  8:1,3,4,7
  9:12,13,18

Protective
  78:23

provide  41:3,
  11 58:11
  82:12

provided  84:21

providing
  80:22

proximity
  81:15,17

pubert-  61:19

pubertal  4:22
  76:8

puberty  31:4
  32:23 40:21
  56:2 71:5

pubic  13:9,15

16:2,9,16,19
17:1,5
20:12,15
21:4 30:5,19
31:3,4,19,25
32:8 35:2,5,
11 36:1,4,6,
8,10,23
37:11 38:21,
25 42:6,17,
19 43:8 44:3
47:8,9,15
48:1,4,7,10,
15 51:15
52:10 53:11
55:7 58:18
60:2 61:19,
23 62:21,24
63:7 66:6,25
67:6 68:20
70:23 72:1
73:8

pubica  61:19

pubis  64:19
  65:9

pull  14:24
  15:6 25:10
  26:25 27:6
  52:11,18
  69:19

pulled  15:12
  17:16

pulling  15:8
  52:17,24
  69:23

purpose  41:2,3

purposes  23:6

put  29:15,16,
  20 30:5
  31:14 34:10
  45:23 58:19,
  25 59:2

putting  30:10

_____

Q

_____

qualifications
  82:25

quality  54:15,
  18

question  5:6
  14:13 35:19,
  21,22 36:20
  40:11,12
  41:14 44:15
  49:5 50:8
  56:20 59:14
  64:4 65:4,20
  67:20 83:9
  85:20 86:11

questions  8:20
  15:7 78:9,20
  84:11,15
  85:13,15
  86:8

_____

R

_____

raise  6:23

rating  13:3,11
  16:11 32:7
  33:14 34:1,

22,23  36:10
37:19  39:22
40:15  41:16
43:4,13
60:18,22
61:4  63:22
66:24  67:13
70:19,21
71:12  76:5

**razor**  54:17

**reached**  10:9
58:15

**read**  12:9
19:19  22:14
26:8  33:6
50:18  51:18
63:23,25
64:5,15
65:5,23
86:10

**ready**  6:2

**realize**  30:11
49:24

**reason**  60:14
81:8,21,23

**reasons**  58:10

**recall**  21:7
48:24  60:11,
13,15,24

**received**  11:16

**recess**  78:5

**recognize**  70:7

**recollect**  11:1

**recollection**
12:19

**record**  4:10
6:4,6  11:5
15:4,8  19:1
23:12  25:14
32:5  37:7
43:17  50:13
53:7  69:14,
22  78:3,7,21
86:19

**records**  85:21

**red**  15:18

**redacted**  15:10

**REDIRECT**  85:16

**refer**  4:8,12
39:7

**reference**  24:4

**referenced**
23:2

**referred**  31:18
40:8  53:3

**referring**  7:18
19:25  24:17
39:18  40:13

**regard**  40:22

**regular**  47:7

**related**  14:17,
18  55:15

**relates**  83:16

**relevant**  5:7

**reliable**  12:24

14:9  41:4

**remember**  11:20
14:15  75:3

**remembering**
75:13

**remotely**  6:10

**removal**  17:10
20:21  21:8

**removed**  20:15
36:7

**render**  18:4

**rendering**
13:18  85:19

**repeat**  29:11

**report**  23:21
45:20  46:6
58:25

**reporter**  6:13,
16,23  7:4
22:7  29:10
44:14,15
86:21,24

**reports**  10:23
24:25  50:8

**represent**  6:14
45:22

**representatives**
9:23

**represented**
76:13

**represents**
78:18

**request**  49:19

**requested**
41:12

**required**  41:12
58:2

**respect**  81:10

**rest**  62:13

**restate**  20:24
21:1

**resulting**  80:2

**review**  10:17
11:4  49:2
52:17

**reviewed**  11:21
12:16  67:19

**reviewing**
11:12  17:16

**Roberts**  4:5,7,
19  5:4,14,25
6:3,18  7:9
15:5  19:2
22:13,23
23:8,13
24:21  25:3,
18,19  26:25
27:5,18,19
29:13,24
37:8  38:2,6,
7  43:16,19
44:16  50:14
53:5,8  54:9
59:17,20
64:10,14
69:15  70:2,3

77:24  78:8
85:14,17
86:7

role  17:25
81:20

room  7:12,24

rooms  7:21

roughly  37:10

rule  42:9

_____

S

scene  11:11

science  8:18

scientific
12:24  14:12

scientifically
14:9

screen  5:2
15:21  19:3
24:22  25:2,
16  26:23
27:17

screenshot
52:24

search  82:19,
23  85:5

seek  82:19

send  11:24

sentence  20:7,
10  51:6,18

separate  75:10

sequence  71:8
75:19

set  11:11,22
77:1

setting  40:16

sexual  13:3,11
16:10  20:4
32:6  33:14,
25  34:22,23
36:9  37:19
39:19,22
40:14  41:16
43:3,13
60:10,22
61:3  63:21
66:23,24
67:13  70:18,
20  71:11
76:4

shaking  60:14

shape  64:18
65:7

share  19:3
37:3  50:15
63:19  69:16

sharing  4:3

shave  55:14,
22,25  58:22,
23  59:9,12

shaved  20:11,
14  21:12,19
30:5  31:22
36:13  44:7,
10,18,22
45:10,11,13,

17,23  46:4,
7,15,20,22
47:1  55:10
56:1  58:19
59:8,10,12,
21,22,24
72:6,11,23
73:2,3,6,11
74:18  75:7

shaven  16:25

shaving  17:9
46:14  54:20

Sheriff  81:22

Sheriff's
82:2,3

shoot  21:24
24:1,8  25:9,
21  27:22
30:4,7,8
42:3  67:10,
23  74:6,10,
18,19  75:14
76:20

show  5:1  19:9
26:5,6
38:12,14
39:9  47:15
63:7

showed  12:6
13:8,9  56:6,
12,15  81:11

showing  23:25
38:18

shown  13:7
19:23  23:4

65:18  79:5
82:24

shows  23:17
51:1,10  55:1
63:4

sic  33:20
59:2  68:13

side  25:17
27:17  65:10
67:14

signs  60:2,4

similar  39:25

simply  4:8

single  12:5

Sir  44:14

sister  73:14

sit  43:6  76:2

sitting  23:17
26:12

situations
84:1

six-year-old
79:13

skin  58:24
60:1

small  27:15

smooth  58:24
60:1

sole  67:2

solemnly  6:25

sort  7:15

17:9,10 31:23 40:21 76:11 82:3 85:9

sounds 59:11

source 67:2

speak 11:11

speaks 63:2

specialize 8:14

specifically 72:4

specifics 11:20

spoken 9:22,25 10:2,6

Spring 85:2

St 81:22

stage 64:24

stages 4:22 37:11 39:19 40:20

standing 54:1

start 83:8

starting 64:1

starts 22:4

state 9:6 34:11 80:17

stated 58:11

statement 21:10,15

34:18 45:1, 4,5 46:24 60:18,24 72:13 75:5

statements 10:11 18:1 22:22 45:6

statute 9:11, 16

stay 5:23

stomach 62:3

straight 32:1 35:1

strike 24:13, 14

strip 31:19 47:8

stuff 53:9 54:17

subject 10:22 34:8 70:8

subpoenaed 9:3

subsequent 27:8 67:8

subspecialty 8:17

substantially 77:5,7

sued 78:19

suggested 35:10

suggests 35:9

support 9:13

supposed 22:6 65:11

surmise 18:2,6 49:1

surmised 18:18

suspected 49:3

swear 6:16,25

swore 30:14

sworn 7:6 30:17

Synchronoss 10:8

---

**T**

table 53:18

takes 38:3

talk 25:6 37:2 46:3

talked 16:6 37:14 50:3,4 60:7 62:4 80:1

talking 8:2 11:8 25:5 27:2,5 32:21 40:5 45:12, 21 50:22 53:25 62:17 72:7

Tanner 41:1

teach 66:9

Team 8:2,3,4, 7 9:12,13 78:23

Teams 9:18

technique 76:11

teen 53:14

telling 18:13 30:15 43:20 53:23

term 9:9 76:10

terms 34:19, 23

test 40:4,24

testified 7:6 12:18 20:20 32:13 34:3 37:9 50:5 54:14 58:21 70:25 72:17, 20 74:7,11 75:15 78:24 83:18 85:25

testify 86:4

testifying 42:20 53:20 72:12 83:23

testimony 6:25 14:3,7 16:7 20:23 21:18 23:7 33:1 39:2 42:12, 24 48:24

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025                    Index: thighs..victims

58:5,12 59:2
60:11 63:6,
10,12 66:22
71:15 73:5,7

**thighs** 13:8
51:3,12 55:3
62:2 64:20

**thing** 34:20
47:13 62:5
82:3

**things** 21:9
32:19 54:16,
21 60:4
76:17

**thinking** 75:13

**thought** 35:24
73:22,25
74:11

**time** 9:22
10:19 24:1
25:9 27:22
29:6,15,16,
21 30:9
32:17 38:3
43:1 46:12
49:23,24
60:8 65:25
67:9,23
68:8,11
69:18 71:5,6
73:22 74:4,
20 76:23
77:13 78:17
80:22 83:4
84:25 85:24

**times** 68:15
69:7 77:5,6,
8,16,17 81:3

**tiny** 31:2

**tip** 81:13

**tips** 80:16

**today** 4:4 7:1
10:19 11:2,
5,10,15 14:7
19:23 25:6
26:6 30:12
34:3 42:12
43:7 44:21
55:23 58:21
72:11 75:4,
15 76:2

**today's** 10:17

**told** 13:2
26:4,14
35:15 45:2
48:23 56:11
65:14 72:10
73:1 75:12
80:11 85:2,
18

**tone** 15:20
43:14

**top** 48:9
51:2,11 53:2
55:2

**transcript**
10:17 59:2
63:20 86:9,
15,18,22

**treatise** 40:9

**triangle** 37:16
39:1 63:11
64:17 65:2,
12,15 66:5,
6,7,11,14

**true** 19:17
38:8,24 40:7
44:19,20
45:3 46:13
80:25

**truth** 7:1,2,6
30:14,17

**truthful** 45:6

**turn** 78:9

**turned** 75:9

**type** 34:20
82:7

**typed** 34:2

_____

**U**
_____

**UCMJ** 80:17

**ultimate** 67:25

**underscore**
70:1

**understand**
10:23 11:18
20:22 32:4
44:25 45:1
50:9 64:3
71:7 76:1
80:21 81:2
82:11 83:3,6

**understanding**
79:21,23

**underway** 46:11

**underwear**
51:2,11 55:2

**uniformity**
35:8

**uniformly** 32:3

**unit** 78:6

**University** 8:6

**untrue** 21:15

**utilized** 16:1
17:9

_____

**V**
_____

**valid** 56:25

**validate** 26:15

**verification**
85:22

**Verizon** 10:8

**version** 33:20
70:14 71:11
74:12 76:3

**versus** 6:9
56:10

**vertical** 47:8

**vertically**
54:1

**victim** 81:20

**victims** 81:7

**video**  79:7 86:16 87:2

**videos**  79:5

**view**  15:1 30:22 35:16 37:21 38:13, 19 39:3 47:21,22,23 53:12,25 70:23

**viewed**  27:8

**views**  28:3 47:18

---

**W**

---

**wait**  51:23

**waive**  86:10, 13,14

**wall**  28:20

**wanted**  63:13

**warrant**  82:20, 23 85:6

**wax**  57:2

**waxed**  16:25 20:15 57:1 59:25 72:23

**waxes**  21:6

**waxing**  17:9 54:20

**ways**  4:13 35:10

**wearing**  15:15

24:10 26:18, 21 27:23 28:6,17 29:21

**weeks**  33:5 77:9,12

**well-exposed**  62:14,18

**wider**  65:10

**William**  6:9 84:19

**Wilson**  4:3,6, 16 5:1,17,21 6:20 10:7 18:8 20:18 22:23 24:19, 22 25:10,15 27:1,4,12,16 29:23 32:9 36:25 38:4 41:18 43:14 48:20 52:23 54:8 55:17 59:13 64:8 69:23 84:13, 14,17 85:12 86:2,10,11, 14,17,21,23

**woman**  13:11 43:21

**wooden**  23:17 26:12

**word**  8:22 14:12 51:5

**words**  14:11,

12,14,15,17, 18 30:10 64:22

**work**  79:12 80:22 82:7 86:4

**working**  27:13

**write**  33:7 59:22

**writing**  14:5

**written**  4:24

**Wrong**  63:1

**wrote**  33:25 50:8 51:1 59:8 68:12 74:15,20 86:1

---

**X**

---

**xerox**  7:23

---

**Y**

---

**YCBL**  72:10

**YCBLVVFQ**  69:19,25 73:20

**year**  32:24

**years**  10:25 14:14 20:5 32:21 83:12, 21

**young**  31:5

40:19 79:15

**younger**  30:22, 23 32:17,18, 21 33:10,19 34:4,5,9,16 50:19 68:4 76:22

---

**Z**

---

**ZIP**  81:18

**Zoom**  6:11 54:7,10,11 87:2

**Zoom/conference**  7:24


67-12

IN THE CIRCUIT COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR ST. JOHNS COUNTY, FLORIDA.

CASE NO.: 2023-CF-000516

STATE OF FLORIDA

vs.

WILLIAM LEE LAWSHE,

    Defendant.

_____/

DEPOSITION OF MIKAYLA PRESTON

(Via Zoom)

DATE TAKEN:    November 21, 2023

TIME:    10:28 a.m. until 11:30 a.m.

PLACE:    Via Zoom Videoconference

This cause came on to be heard at the time and place aforesaid, when and where the following proceedings were **stenographically reported** by:

Suzette M. Kowalski, RPR
Coastal Court Reporters, LLC
St. Augustine/Jacksonville, Florida
(904) 824-3521

---

**APPEARANCES**

KAITLYN PAYNE, ESQUIRE
(Appearing Via Zoom)
State Attorney's Office
Richard O. Watson Judicial Center
4010 Lewis Speedway, Suite 2022
St. Augustine, Florida 32084
appearing on behalf of the State.

C. CRAWFORD PIERCE, IV, ESQUIRE
(Appearing via Zoom)
The Law Office of Crawford Pierce, IV, P.A.
2807 North Tenth Street
Suite 12
St. Augustine, Florida 32084
appearing on behalf of the Defendant.

---

**I N D E X**

WITNESS:

MIKAYLA PRESTON

Direct Examination by Mr. Crawford    4

CERTIFICATE OF OATH    52
REPORTER'S CERTIFICATE    53
ERRATA SHEET    54

**N O   E X H I B I T S**

---

MIKAYLA PRESTON, having been first duly sworn, was examined and testified as follows:

THE WITNESS: Yes, ma'am.

DIRECT EXAMINATION

BY MR. PIERCE:

Q Good morning. Please state your name for the record.

A Mikayla Preston.

Q All right. And give me a little bit of your background and employment history.

A I started in law enforcement officer in 2017 with St. Augustine Beach Police Department, then I transitioned to the sheriff's office in 2020, and I came to investigations in 2022, if I'm not mistaken, I believe.

Q Okay. So it sounds like you were under Sheriff Hardwick over at SA Beach Police Department?

A Yes, sir. Yes, sir.

Q Okay. And I guess he brought you on with St. Johns County once he was elected?

A No, sir. I actually was hired on under Shore.

Q Oh, you did? Oh, okay.

A Yes, sir.

Q I got my dates got mixed up?

A   It was right before he got elected. Literally like a couple months before.

Q   Oh, okay. I was thinking 2020.

A   Yes, sir.

Q   And you said you joined this division last year?

A   Yes, I believe it was July of 2022.

Q   Okay. Now, I'm only going to ask you about your educational background because I think we have some similarities, but state that for me.

A   Well, I went to Florida State University, if that's what you --

Q   Go 'Noles.

A   Exactly. Go 'Noles.

Q   I think we were actually in the same department. Not at the same time or anything. But you got your degree in criminology?

A   Yes, sir. Yep.

Q   Okay. Did you stick with a bachelor's or did you go beyond that?

A   No, I just stuck with the bachelor's. And I actually came down after my bachelor's and started the police academy.

Q   Okay.

A   Yeah.

Q   All right. Yeah, I was in the master's program over there, so -- at that the same college of criminology?

A   That's what my best friend did, and I was like, I'm done paying student loans.

Q   Yeah. Yeah, I was debating between PhD and going to law school, which obviously I chose law school. And I've thought about going back many times for a PhD, but just haven't.

Do you have any background in IT or computer science, anything like that?

A   No.

Q   Okay. That looks like an adamant --

A   Probably need to, but no.

Q   Okay. Any medical training or any background in medicine?

A   No, sir.

Q   Okay. Give me your background specific to ICAC investigations. I know they send you guys to a lot of training.

A   Yes, sir. So I'm a part of the North Florida ICAC Task Force. With that, we also do different trainings that are part of that -- what we call North Florida ICAC for short.

Q   And how many hours have you put in thus far since -- I guess you would have started last year, correct?

A   Yep. If I had to estimate, because I don't know the exact amount of hours, I'd probably say, honestly, close to over 50 hours.

Q   Okay. Did they send you initially to some particular, like, education course or something like that?

A   So -- no, the only initial one that we did was what we call just kind of chat-based, with learning how to follow the ICAC standards with chatting with people who were trying to come and meet minors for sex --

Q   Online solicitation stuff?

A   Yes, sir.

Q   Okay.

A   That was the initial class.

Q   Specific to this type of investigation that we're dealing with in this case, what sort of training did you have through ICAC?

A   I'm trying to think of the actual name of it, which I cannot.

Q   Do you recall where you took it?

A   Well, it's through the North Florida ICAC. They have online site. I forgot the name of it. It's the school, and it starts with an F, and I cannot think of it right now.

Q   Okay.

A   But usually those are just online that what we do.

Q   Okay. Do you know how many of those you've attended --

A   At least five --

Q   -- specific to child pornography?

A   At least five or six, I want to say, if I'm not mistaken.

Q   Okay. All right.

A   It's Fox Valley. That's the name of it.

Q   Fox Valley?

A   Yes, sir, Fox Valley. I'm sorry.

Q   That's okay. Now, I've got a report from you -- give me one second, let me just pull it up so I can describe it to you. I've got a report from you that looks like it's 12 pages in length. And let me see how you titled it, just so I make sure we're talking about the same thing. It's titled, FIBRS Incident Report. What does FIBRS stand for, by the way?

A   Do you know what's listed in it? Because I do not know what you're referring to.

Q   No, it's just right above St. Johns County Sheriff's Office. I've been seeing these a lot lately

on the incident report, I just wasn't sure what the acronym meant. So this is a 12-page report, and then I think I've got an arrest report from you that -- let's see -- that is about four pages in length.

Do you recall preparing any other reports in connection with this investigation?

A   It should only be the initial and then that arrest report, which would be titled under the probable cause.

Q   Okay. Now, you prepared affidavits supporting search warrant, but did you actually prepare the search warrants, or was that done by Detective Tolbert?

A   No. So if -- the search warrant you're talking about -- which one? Because there was multiple search warrants that were prepared.

Q   Correct. I think you did the affidavits for each, though. So I've got one for the Verizon account, an affidavit to that search warrant, then I have an affidavit for search of Mr. Lawshe's home. What other affidavits do you recall?

A   The only one I know is the Synchronoss one, because we sent off for --

Q   Okay.

A   That's the one I'm referring to.

Q   Yes, ma'am. That's the one I just described

as the Verizon.

A   Verizon, okay.

Q   Okay. So aside from those two affidavits that we just referenced, the four-page arrest report and 12-page incident report, any other reports that you prepared in connection with the investigation?

A   No, sir, not from my knowledge.

Q   Okay. And have you had an opportunity to review those reports?

A   For which ones, the search warrants or my actual narrative and the probable cause?

Q   All of them.

A   So I wrote them, so I reviewed them, but I haven't recently reviewed them.

Q   Okay. I guess that's really my question. What did you review in preparation for the deposition?

A   So I reviewed the probable cause.

Q   Okay.

A   And then I went over my actual narrative as well, and a portion of Dr. Dully's statement as well.

Q   Okay. And let me ask you about that. I know eventually we'll get to it, but did she prepare any sort of, like, report for you? I know you had quoted from statements --

A   Yes, sir.

-- that she had made in your report.

A   Yes, sir. So she actually wrote out -- I guess you could say it probably was like a paragraph --

Q   Okay.

A   -- and she put it on her own actual letterhead. So yeah, she created her own personal report in reference to those images.

Q   Okay.

MR. PIERCE:   And just off the record real quick.

(Off-the-record discussion.)

BY MR. PIERCE:

Q   Okay. So tell me about when you initially received this tip from NCMEC. I think is how we pronounce that acronym.

A   Yes, sir. Yes, sir. That's right.

Q   Okay.

A   So we received the tip from NCMEC, it was provided by Synchronoss, and it provided a phone number, which was attached to the tip, and then also the image that was reported by Synchronoss.

Q   Okay. It looks like you originally got some identification information along with just the phone number. Did you have anything else identifying who the phone number belonged to or anything like that?

A   So we were able to look up the phone number and saw that it was linked to Mr. William Lawshe.

Q   Okay. So you had that information ahead of seeking the search warrant, correct?

A   Yes, sir.

Q   You had at least the individual's name?

A   Ahead of the search warrant, yes, sir.

Q   Okay. Can you describe for me the image that you reviewed in the original CyberTip?

A   So there were two images.

Q   Okay.

A   One image was of a younger girl. She was clothed with like some white, lace stockings, and she posed in a manner where her -- obviously, sexual organs were exposed. The other image was an image of a female. She was, like, on a bed and she was strapped in and she had something strapped across her mouth, and she was also completely naked. That is one that we viewed was age difficult, so we did not --

Q   What was strapped to her mouth, as you recall?

A   It almost looked like one of -- I guess almost like a sexual -- like a choking device in a sense. Like, it had like the ball like -- and it was strapped across her face.

Q   A ball gag?

A    Yes.

Q    You heard that term?

A    Yes.

Q    I'm no expert. I think Ms. Payne may have mentioned it.

A    But that was one of the other images. So it was two different CyberTips.

Q    Okay.

A    But all listed attached to that phone number, because that was the only thing listed on the actual CyberTip itself was just that 904 phone number. And then the one image was the female that was strapped to the bed and the other image was of the little girl.

Q    Now how do you guys receive -- do they actually just send the image over with a report, or do they send a report saying, Hey, this is a description of the image, and then you have to request it? How does that work?

A    So, like, the way you described it. So they send over a PDF form of the report, and it just lists like file name, MD5, who reported it, like the actual ESP company.

Q    Okay.

A    And then within the actual NCMEC database, they have -- underneath that PDF form, they'll have either like a MP4 or an actual image file, which will be that CSAM image, and you have to actually click on it, and then obviously accept that you want to view it, and then it pops up.

Q    Now, the one that you just described a moment ago with the device in the lady's mouth, is that -- that's the one that came through with a date of October 29th, 2022; is that accurate?

A    That I would have to refer back to. I don't remember the exact date.

Q    Okay. So I have one CyberTip report, I'm just looking at them right now that I got with discovery. One of them says, Received by NCMEC on January 25th, 2023. That's the one that's referenced in your report. And then the other one you described, you said, was sort of age indeterminate. So my assumption is that's the October 29th, 2022.

A    Let me look back. But that possibly is.

Q    So my question is: You guys get the second image reported on January 25th of this year. Did the prior CyberTip come in before that and had already been reviewed, or did it come in with the second tip?

A    So it all depends. So it just depends on when the ESP provider actually submitted the image and the report to NCMEC. So sometimes we can say, Hey, the incident was, let's say, June of 2021, but it's not forwarded to us until a month, two months later, or vice versa, if the second image was reported to NCMEC earlier and got to us later. It just all depends on when the ESP actually sends over that information to NCMEC and when NCMEC forwards it to us.

Q    Okay. So if at the top of this CyberTip report it says, Received by NCMEC on October 29th, 2022, that would be the date you guys actually received it from NCMEC?

A    That would be the date that it was reported to NCMEC. So our dates, it's whenever it's actually sent to us and is signed to us. So sometimes it could be sent after it's reported to NCMEC to our actual agency, because it will get forwarded to, like, the North Florida ICAC, and Chris King, which is over it, he would have to go through, okay, and say, Hey, this comes back to St. Johns County or this comes back to Duval County, and then it would get transferred over to us.

Q    Okay. And I'll just stop just for a moment for Suzette's purposes.

(Off-the-record discussion.)

BY MR. PIERCE:

Q    If this says it's received by NCMEC on October 29th, do you know, as we sit here today, whether or not that image would have been reviewed prior to the one that was received in January of this year?

A    No, I would have to pull it up and see if it was reviewed prior or at the same time.

Q    Do you have access to that stuff, just so you could tell me?

A    Yeah, uh-huh. Yes. I'll just have to login. One second.

Q    While you're looking, let me ask you: On both of these tips, it says, Content categorization CP unconfirmed. Do you ever get these tips come in where they actually say "confirmed"?

A    Yes, sir.

Q    Okay.

A    And that's usually confirmed either by the ESP --

Q    Okay.

A    -- or it could be confirmed by somebody in NCMEC.

Q    Okay. Now, ESP we know is, like, Electronic Service Provider?

A    Service Provider, yes, sir.

Q    Okay. In your report, you also reference, EXIF. What is that?

A    You said EX- -- oh, that's the EXIF data.

Q  Okay.

A  Which is on the actual photograph.

Q  Okay.  Do you know what that stands for, EXIF?

A  The actual word?  No, I just know it's the actual EXIF data.  Like every photograph or every image is going to have some type of data that makes it specific to that photograph, and that's literally what the EXIF is.

Q  The metadata basically?

A  The actual name for the acronym, I don't know.

Q  But it's like metadata?

A  In a sense, yes, sir, because all of it is specific to that actual image.

Q  Okay.

A  Okay.  And then do you remember which tip number it was that you were saying for the January one?

Q  Like, the actual tip line report number?

A  Yes, sir, the actual -- because there's two of them.  There's one that ends in 160, and then there's one that ends in 848.

Q  So the 848, if you look right underneath that, it says, Received by NCMEC on 10/29/2022.  But there doesn't seem to be any sort of like intervening reports or anything between October of last year and January of this year when the second CyberTip comes in.  That's

what I'm curious about, is whether or not someone had actually reviewed it before the second tip comes in, or they're both being reviewed at the same time.

A  So it appears that they were both being reviewed at the same time, because it shows the incident date of October 9, 2022, but then it shows that the date made available was December 5th of 2022.

Q  Oh, okay.

A  Yes, on the actual NCMEC site, it's showing that, Reporting Method, Synchronoss; Report Number, which will be that 137877848; and then it shows the date made available, December 5th, 2022; Incident Date, October 9th, 2022; and then Incident Type, Child Pornography.

Q  So would that be a situation where the tip comes in, but if somebody wanted to review it, they wouldn't even be able to see it until December?

A  Until, yes, it gets forwarded to NCMEC itself.

Q  Okay.

A  And until, I guess, it gets forwarded to that specific agency.

Q  Okay.  Can you tell based on that whether or not anyone reviewed it between that date it was accessible and December, before the second tip comes in in January?

A  Let me look at the case details.  Hold on one second.  Let me go back.

Q  Do you guys review every tip that comes in, or is there any sort of policy where it's like, well, we get so much of these, we're only going to review it if it's -- you know, we get two reports, or something like that?

A  No, every tip gets -- no, every tip gets reviewed, both by the sergeant and/or the corporal.

Q  Okay.

A  They go through the tips and then will assign them out to us.

Q  I got you.  I guess you're still looking for the answer to that one question.  But is there any way to tell whether or not anybody had reviewed it?

A  From what I can see, it doesn't show you who opens it or when they open it, it just shows you that it was open.

Q  Okay.

A  But it doesn't show me like -- you know, like a date stamp of when it was opened, because both tips obviously were opened, I just can't see when or by who.

Q  Do you guys -- on the law enforcement end, do you have like a login where you have to note, Okay, so Detective Makayla Preston with St. Johns County

Sheriff's Office reviewed this image?  Is there anything like that on there?

A  On the NCMEC site, no, sir.  It just shows you the list of people who are allowed to view it.  And then, like, if I wanted to leave, let's say, case notes, it would show my name if I attached case notes to it, or if I uploaded any type of information to the actual tip itself.  I'm looking at the -- because it's all done through that portal.

Q  Okay.  I got you.  All right.  So when the CyberTip comes down -- I wanted to refer back to that EXIF that we talked about a second ago.

So at the top of page 5 of your report is where it says, Did reporting ESP view the EXIF of uploaded file.  The answer was no.

If they had reviewed that, what would it have told them?

A  If they had reviewed the file?

Q  If they had reviewed -- well, I think the file itself was reviewed, because it says, Did reporting ESP view entire contents of uploaded file?  It says, Yes.  But then it asks, Did reporting ESP view the EXIF --

A  The EXIF data?

Q  Yes, ma'am.  And it says no.  What would they have discovered if they had reviewed that?  What would

it have told them?

A    What would it have told NCMEC? That I don't know.

Q    Okay. Is there a way for you to review metadata of the image once you receive it?

A    So once we receive it, obviously, it's going -- that metadata, it's going to be saved the way we save it to our computer. So it's different from how they, let's say, would save it to their phone. So like if he saved it to his phone, the metadata can change slightly, but it won't really change that MD5 hash, because that's the actual kind of tag that's stuck with that photograph.

Q    Okay. Now, you described the one -- the prior tip from October as age difficult or age indeterminate, and that was -- what's that?

A    No, I was just confirming that that was the right CyberTip number, but yes.

Q    Oh, okay. So you reviewed that on February 20th, and then you consulted with Dr. -- I pronounce it Dully, but it sounded like you pronounced it a different way.

A    And I could totally be wrong.

Q    Oh, okay. I just thought maybe you picked it up from your conversations with her.

A    No, I could totally be wrong.

Q    Okay. I'm just going to say Dully then.

Would it be fair to say that between February 20th and February 22nd, when you consulted with Dr. Dully, you had not confirmed at that point the age or anything like that of the individual in the image?

A    For the one that was actually confirmed to be CSAM, or are you talking about with the woman that was like with the gag?

Q    Well, it didn't sound like she -- did you even have Dr. --

(Simultaneous talking.)

A    No. So I never sent that one, because we just kind of X'd that one out. That one just --

Q    Okay.

A    Yeah.

Q    Okay. So at least at that point with the image that you asked her to review, you had not confirmed for yourself what you were looking at was indeed child pornography, correct?

A    So that I did know, that it was child pornography. I felt that she was definitely under the age 18. A specific age I didn't have, because obviously it would just be an approximate for me because I'm not a doctor.

Q    Okay. Now, you said you confirmed that the image was a minor, but would it be more accurate to say you concluded that it was a minor versus you confirmed it was a minor?

A    Prior to speaking to Dr. Dully, yes.

Q    Okay. Is there any sort of reports that Dr. Dully provided you where she confirms that this is a minor?

Because at least what you quoted in the report, she says that it was a pubertal female, which -- you understand what the definition that is, that means sexually mature and developed, has gone through puberty --

A    Yes, sir.

Q    -- at that point? And what she's quoted as saying is this female child appears younger than 18 years of age. But where does she confirm that the individual is under the age of 18?

A    The line below where she said that she would have received -- excuse me -- achieved -- sorry -- that developmental pubertal appearance between the ages of 12 to 15 years of age.

Q    Right. But she's saying that she's pubertal, meaning that she would have already achieved that at that age range, from 12 to 15, correct?

A    Yes, between the ages of 12 to 15, based off what Dr. Dully was saying, she has seen, obviously, children who appear to look similar to that child in that photograph.

Q    Okay. But as far as you know, she was never able to confirm the identity of this individual in any sort of way, correct?

A    No, we were able -- excuse me -- we were never able to know if the child was -- who the child was, but we were able to confirm that it was an actual child.

Q    Okay.

A    We just don't know who that child is.

Q    Now, do you -- do you always consult with Dr. Dully before making a decision on these cases?

A    We like to consult with her quite often. Do I do it for every case? No, sir.

Q    Okay. Do you know how many of these cases you've been assigned as the lead on?

A    Oh, Lord. Probably -- oh, gosh. Now, over 60 or 70. I'm trying to think of my caseload right now.

Q    Okay.

A    I definitely think well -- I know for sure well over 60.

Q    Okay.

A    Since I've been here.

Q    Do you know what -- approximately what percentage of those cases you would assign to consulting with Dr. Dully about the age determination?

A    Definitely say less than half of those.

Q    Okay.

A    Yeah, definitely less than half.

Q    Okay.  And the purpose in consulting with Dr. Dully is to try to determine age, correct?

A    To try to determine specific age, yes, if we can.

Q    Okay.  But she doesn't give you any sort of specificity, she gives you a range of each of these ages, correct?

A    Yes, between that 12 to 15 age.

Q    Okay.  Now, she applies what is known as a Tanner standard or schedule to these images.  Do you have any understanding of the Tanner system and how that operates?

A    Only what she briefly told me before she actually looked at the image.

Q    Okay.  Like if I were to ask you what is the appearance of SMR3 in the breast region, would you be able to describe that or define it --

A    No, not unless I had her little book.  No, no, no.

Q    I got you.  What is your understanding of her use of the term "pubertal"?

A    Just meaning that they have actually hit that puberty age where they will start showing, obviously, like, hair in the vaginal and anal regions and stuff like that, or they'll show breast development in certain areas.

Q    Okay.  When she's reviewing the images -- I assume you have to sit there with her while she's reviewing it?

A    Yes, sir.

Q    Okay.  And how long do you think that you met with Dr. Dully when she reviewed these images?  Looks like you met with her twice, so let me clarify that.

A    It was -- from start to finish, the first time, because I couldn't get the image to upload, it took a while.

Q    Okay.

A    And that one was about -- I want to say I was there for probably an hour, but most of the time it was spent trying to actually get that image to pull up on the computer.

Q    Okay.

A    But with her reviewing it, an estimate, I don't really know.

Q    Okay.  Now, does she reach her conclusions while you're sitting there reviewing the images with her, or does she send you a report later?

A    No, so she reaches her conclusions before I even leave.

Q    Okay.  Have you had any occasions that you recall since you've been in this division in the last year where you've been meeting with Dr. Dully and she said, No, that's not a minor?

A    Well, she's never really told me, Hey, that's not a minor, she's told me that this appears very age difficult before on a couple of images that we have shown her.

Q    Okay.  Okay.  Are you familiar with confirmation bias and how that works within law enforcement sometimes?

A    Yes, sir.

Q    Okay.  What's your understanding of confirmation bias and how that operates?

A    I would probably say -- like, an example, and obviously correct me if I'm wrong, but how I view it is if I send you an image and say, like, Hey, I believe this to be a child, can you confirm or deny it?  And then you were to review it and be like, Yep, I'm going to confirm that it is a child because you, as a law enforcement officer, are telling me that is a child.

Q    Yeah, that's sort of the same -- is there anything that you do in your practice to rule out the possibility of confirmation bias and that it's possibly occurring in those settings?

A    Yeah, so like with Dr. Dully, for instance, when I go over, I just literally tell her, Hey, obviously this is an image that we need reviewed.  I don't tell her, like, if I think that that's a child or not, just obviously review the image and tell me what you would think --

Q    Okay.

A    -- this image depicts.

Q    Were you able to confirm that the image you were looking at was not AI generated and was an actual individual?

A    Was an actual human?

Q    Uh-huh.

A    Yes, sir.  Because we've had cases where it is AI generated, and like you can even see the hairs on their skin, but we're able to have -- like, our digital forensics, Kevin, if I ever think like, hey, this even has an instance where it could be, he'll come over and he'll either confirm, and be like, yeah, this is definitely AI, don't look through it; or, obviously,

this is an actual human.

Q    But if you didn't have any questions about the image yourself, then you wouldn't have called Detective Greene over to analyze it, correct?

A    So no -- so I always -- probably, honestly, nine times out of ten, always have another detective with me confirm, like, this is CSAM, just to get a second --

Q    Okay.

A    -- opinion on any image, especially if we are going to move forward with it.

Q    Do you recall if it you used any other detectives in this particular investigation for confirmation?

A    Yes, sir.

Q    Which ones?

A    For sure Kevin Greene, obviously, reviewed the image. And I believe that I had Detective Scoggins, if I'm not mistaken, because he, during this time, used to sit adjacent to me, like kind of catty-corner.

Q    Okay. Do you know whether or not Dr. Dully is able to differentiate between AI imaging and an actual individual?

A    That I don't know, because we never discussed that with her.

Q    Okay. That would have been my follow-up, did

you ever have that conversation with her?

A    No, sir, I haven't.

Q    Did you yourself attempt to locate any of these images, particularly the first one that you had her review, that had the watermark of Met, hyphen, Art? Did you attempt to go to that website to see if you could find other images that were related to that one, or that particular individual?

A    So no. So Detective Greene, he actually researched the Meta-Art [sic], and I actually searched it on Google and it was showing -- because he's heard before -- in the past, obviously -- excuse me, Met-Art -- I don't know why I keep saying Meta-Art, but Met-Art -- using underage females in the past on their sites. And I've seen different links on Google -- obviously can't believe everything you see on Google -- stating that underage females were used on the site, but I couldn't, obviously, locate that specific image on Met-Art.

Q    Okay. Yeah, and your report states that Met-Art has a known history of displaying teenage girls and CSAM. And you'd also said that that site had been encountered by other ICAC investigators. But do you have any specific experience with that website yourself?

A    No, sir, I do not.

Q    And I notice you said that they have a history of displaying teenage girls and CSAM. Would you agree there's a difference between a teenage girl and CSAM?

A    No, sir, because they're all under the age of 18, so it would all be considered child pornography -- excuse me -- child sexual abuse.

(Simultaneous talking.)

Q    What about 18 and 19?

A    Huh?

Q    What about 18 and 19?

A    That, they're an adult.

Q    Those are still teenage girls, though.

A    But they're an adult. They're over that age of 18. I'm referring --

Q    Right.

A    -- to anybody under the age of 18, anybody that is not legally an adult.

Q    Okay. It just sounded like you were differentiating between teenage girls and CSAM in your report, because you said that Met-Art has a history of showing teenage girls and CSAM. But you're saying they're one and the same?

A    I'm saying that they have a history of showing CSAM, yes, which it would be one and the same.

Q    Okay.

A    So it was probably a grammatical error on my part.

Q    Okay. But you never went to that site to see how they had that particular image categorized or anything like that, right?

A    No, because I could never locate that particular image.

Q    Okay. All right. So at that point is when -- after you consulted with Dr. Dully the first time, that's when you sought the search warrant for Mr. Lawshe's computer devices and home, is that correct, or just the computer devices?

A    No, just the actual search warrant for that entire --

Q    Cell service?

A    -- Synchronoss account.

Q    Okay. So it's like a cloud account or something like that?

A    Yes, sir. Just because Synchronoss is separate from Verizon, in a sense, that everything has to be served to them rather than Verizon. Even though the phone company is Verizon, it has to be served to Synchronoss.

Q    Okay. And had you confirmed at that point what the source of that image was prior to seeking the

search warrant, meaning what website it came from, anything of that nature?

A    No, sir.

Q    Okay. Now, on -- let me see. I think it's on page 7 of your report. Let me just pull it up real quick.

Now, when you get the return from Verizon, you said that -- this is on March 8th, and I'm on page 7 of 12 of your incident report. It says, I received compliance from Synchronoss in reference to the aforementioned search warrant. It should be noted throughout March, while attempting to review all of the data provided by Synchronoss, I ran into numerous technical difficulties, including the initial downloads of the files provided to our agency's approved computer.

Can you describe for me what the difficulties were there?

A    Yes. So our internet. So with Synchronoss, because it has such a big file, you have to have it downloaded continuously. But with our actual computers, we have to use a specific computer to view the CSAM. We can't use like the laptop that I'm on currently because it's connected to our agency network, and they don't want CSAM downloaded to the actual network. Well, it kept crashing on the other computer because the internet

kept shutting out. So every time we would get like to 70 percent downloaded, it would completely just crash out, and you have to restart the download. And then it would come with an encrypted file where you had to, obviously, decrypt that with another password. And once you got the initial file downloaded, the decryption would stop working where it wouldn't be able to fully have that connection to the internet last for the entirety of the file to download --

Q    Okay.

A    So it was a lot to do with the internet.

Q    So when you're reviewing -- still on page 7 of your report. And it says, April 4th, I reviewed numerous photographs and video files and observed images that appeared to be CSAM.

Is that you reviewing the cell phone imaging and extraction done by Detective Greene?

A    No, sir, that is just the Synchronoss return that Synchronoss provided me.

Q    Just the Synchronoss?

A    Yes, sir.

Q    Okay. Your report says that you reviewed photographs and video files and observed images that appeared to be CSAM. Why is it you were unable to confirm just by viewing those images whether or not it

was CSAM?

A    Because some of those were age difficult, where like I told you how I would always have another detective review any type of file with me, we would have some that would be like, uh, that could be a little age difficult, where some were like, uh, no, that could be obviously a teen. And any of those images that were torn in between, where one person would be like, no, that could be age difficult, one person be like, yeah, I believe that is a teenager, we would have Dr. Dully review. And she also stated that those images that were also on the Synchronoss download would be age difficult.

Q    Okay. Why was it these three images in particular were selected?

A    Because those were the ones that we had all felt were CSAM --

Q    Okay.

A    -- that would not be age difficult in nature, where it could be cusp of being that 18, like you said, or 19 range.

Q    And one of the individuals is in two of the photographs, was one of the ones that Dr. Dully had already looked at, correct? I mean the same individual, not necessarily same photograph, correct?

A    Yes, sir.

Q    Why was it that you felt the need to show her the same individual again in a separate setting?

A    It wasn't --

Q    I mean, she'd already determined at that point right --

A    Yes, sir.

Q    -- that she believed it to be CSAM?

A    It's just that we wanted her, so we could be the same across the board, knowing that, hey, she reviewed this image, and if that is going to be an image that we're charging, we also want her to have reviewed all of the images that would have been charged, so it could just be straight across the board. Where it wouldn't be one image is reviewed by Dr. Dully, but then the other image isn't.

Q    Okay. Other than the conclusions that Dr. Dully reached upon reviewing that image, is there anything else remarkable about -- and I guess I'm referring more or less to the two images that were the same individual she had already looked at? It's like the -- I want to say there's like some pink lace or something like that in the description.

A    Yes, sir.

Q    Is there anything other than what Dr. Dully concluded about that individual's sexual maturity

tating, is there anything in particular that you could point to in those photos that would be indicative of it being a minor, like the setting, anything like that?

A   Other than like her actual body and her face and everything that would look like a minor.

Q   Right. Aside from any of those conclusions about sexual maturity, is there anything about the image in particular that says this is definitely a minor, I mean, is it a child's bedroom? Does --

A   So no --

Q   -- it look like a selfie in a bathroom by a teen?

A   Especially on Met-Art, because it's that overseas, they're all posed, and it's done, I'm assuming, by a professional photographer. So they're usually in, like, staged studios, which is what it appeared to be.

Q   Let me ask you this: In any of your other investigations, like the traveling to meet a minor or the online solicitation, have you ever used your own photo to try to solicit or lure in someone who's soliciting a minor online?

A   Yes, sir, but I, obviously, like, edit the photo.

Q   Okay. But you're not a minor, you would agree, right?

A   Yes, sir.

Q   Okay. How old are you as you sit here, if you don't mind me asking? You are under oath?

A   I'm 29.

Q   Okay. And I guess the reason I ask that is I've had -- I've had some of your photos used in other cases, I recognized you immediately when you came on -- yeah, sorry about that. I recognize you from those cases, but I just thought I would ask that. I mean, you have used your own photo and said that should clearly be a minor, anybody looking at that, but you yourself are 29?

A   Yes, sir. And, obviously the main difference with me is -- which is also super weird to say -- if you were to get me naked and I was to be photographed naked, you would be able to tell, okay, even though the face looks young, her body is way more mature than a child, which is what we go based off. We don't go based off the edited photo if it's just of their face edited, we go based off the totality and their body.

Q   And I guess that brings me to an interesting point. So, like, you know how in the traveling to meet a minor cases, in order to make yourself look more like a teenager, sometimes you'll hold up like a small pair of like kid's underwear or something like that, right, or you'll be in a setting of like a kid's bedroom or something like that.

A   And a lot of times if we're holding up, let's say, a pencil or a backpack or underwear, it's because that suspect has requested us to do so.

Q   Right, right, right. I understand that aspect of it. But I guess that's more or less what my original question was sort of getting to was, is there anything in those photographs that is indicative of this is definitely a minor. Because, you know, unfortunately we have a problem with, you know, teenage girls will take selfies and that sort of thing --

A   Yeah.

Q   -- of themselves in bedrooms or bathrooms. And when I looked at those images, they looked more like it was like a model setting or something like that, where someone's being posed and they're taking -- somebody's taking a picture of them.

A   Yes.

Q   Right.

A   So that one, to me, appeared like it was posed in a studio, but we have had plenty of CSAM where it literally is a toddler, but they're also posed a similar studio setting --

Q   I got you.

A   -- taken by a professional photographer.

Q   Okay. I asked you about the two images that are clearly of the same individual. I want to ask you about the one that you had Dr. Dully analyze where you can only see from the belly button to the knees, okay.

A   Yes, sir.

Q   I believe it's listed as the third image in the report. But you would agree with me that Dr. Dully's findings were that that child -- or the individual in the image could have been no older than nine to thirteen, I think, was her estimate, correct?

A   And that's the one that has the big heart, correct?

Q   Correct.

A   Yes, okay, I'm reading that.

Q   And she had a name just below the image. I want to say, if I'm not mistaken, it was Sanija. It's not in your report, but when I viewed it, it was S-a-n-i-)-a.

A   So I never reviewed any image that has that name on it. The one that I saw, it was -- the file name was the DuckDuckGo. I'm assuming that's the same file?

Q   That was a screenshot. Yes, ma'am.

A   Okay.

Q   And so there's three images --

(Simultaneous talking.)

A   Yes, and that one was at the top --

Q   -- two are half images and then there's a full image in the center.

A   Yes, sir.

Q   Okay.  Did you have any questions about that full image that you saw in the center, like as far as age determination or anything like that?  That's the one with the girl -- I know you've had to look at probably a lot of this stuff, unfortunately, but it's a girl, and she's on the hood of the car.  She's got a white top on and no bottoms.

A   And it was like -- and it's a red car?

Q   I remember it being red.  I think so.

A   Okay.  I just want to make sure --

Q   And she had like spiky hair.

A   Yes.

Q   Okay.  Was there any question in your mind about whether or not that was adult or a minor?

A   Whether she was a child or not?  I don't remember if I told them that I thought that that may be age difficult.  I don't remember if that -- because I remember them focusing -- excuse me, not them -- but focusing only on that top image.  Because it looked almost like a collage, because it was like three images, if I'm not mistaken.  And the girl next to the red car, she should have been in the middle, and it should have been an image underneath that.  And then the image up top that -- that was the one that they were confirming as CSAM, Dr. Dully.

Q   Okay.  Did you ever -- well, just let me establish first -- the top image where you can only see the bottom half of the individual, is it your understanding that Dr. Dully aged that individual no greater than nine to thirteen, correct?

A   Yes, sir.

Q   Okay.  Did you ever go to any of the website addresses on that screenshot and do any searches for Sanija, or that name?

A   No, sir, I did not.

Q   Okay.  So would it be fair to say you've never seen the full image of that --

A   No, sir.  Yes, that would be fair to say, I have not seen the full image.

Q   Okay.  Let me ask you just some general questions about your interpretation of the Cellebrite extraction of the cell phones and the images that were charged in this case that were found on Synchronoss.  Is there any way or have you seen anything in that extraction report that allowed you to conclude whether or not the image was ever opened or accessed by Mr. Lawshe?

A   That would --

Q   Any of the three images.

A   That would have to be a digital question, because I do not know if I would be able to see on, like, my little standard -- because we obviously just get a copy, shall I say, of that Cellebrite report to be able to open it and view it.  So I don't know if it was opened by him, closed, if it was cached -- deleted, sorry.

Q   Okay.  So you don't know if it was stored in like a temporary internet cache folder or something like that?

A   No, sir, I do not know.

Q   Okay.  Do you have any sort of training and experience thus far in doing the imaging of computer devices or the Cellebrite --

A   No.

Q   -- extraction?

A   No.  No.

Q   All right.

A   Not at all.

Q   All right.  So some of these questions I'm about to ask you.  I'm already going to know the answer to, but I just need to establish it on the record.

A   Yes, sir.

Q   There's no way to know at this point, at least from your perspective -- I've talked to Detective Greene -- but from your perspective, where those images were actually downloaded from and when they were downloaded?

A   From my knowledge, no, I do not know when.

Q   Okay.  Do you even know where within the Synchronoss account they were being stored, or how they got there?

A   So with Synchronoss, when you view the image, it gives you -- like those subfolders, like, I can re-pull up how it showed to me.  Like, the first folder, it was entitled the VZ Mobile.  And then within that folder, it was the MySamsung, which I'm assuming is just the name of the phone.

Q   Right.

A   And then it showed the list of the actual images under the file name.  That's how it shows from Synchronoss whenever we get it, it's just all of those subfolders, and then we click it, and from one subfolder, you get to the next one, and that's pretty much how I log of -- how they have it.  But, obviously,

I won't be able to tell if it was like in a hidden folder on a phone or anything like that, unless it's entitled that.

Q   But you don't know -- you don't know what in the phone settings was designating items to save to those folders, correct?

A   No, sir. No, I don't.

Q   And you don't know who would have applied those settings, whether or not that was intentional or it was just set up by the manufacturer?

A   That I couldn't tell you. I don't even have an Android, so I don't know how they work.

Q   Do you have any way of knowing whether or not these images were just stored on a clipboard or something like that on the computer, meaning copied and then never pasted?

A   Oh, no, because it's showing that it was all stored on the phone.

Q   Well, in Synchronoss; which is like a cloud account, so it's not actually on the phone, correct, you'd agree with that?

A   That it's just cloud-based, it's uploaded from the phone to their cloud.

Q   Right. Yeah. So there's nothing you could tell us about the location of the files that tells us

whether or not they were ever even accessed or intentionally downloaded by Mr. Lawshe?

A   Well, they would have to be downloaded.

Q   Intentionally, actively by the --

A   Oh, you mean like -- that I honestly would not know. I don't know how you unintentionally download.

Q   Well, I'll give you an example real quick. So I got a new iPhone a couple of months ago, and I've been having a problem and I haven't been able to fix it yet, where if somebody sends me a picture or something like that to a text message, it's been saving to my shared photos account. Like, I don't even like save the photo or anything, but if I go into my photos, it will be like, oh, this is a photo that got saved because so-and-so sent it to you. So you don't know what in the settings of this phone was causing it to save items in a certain location, correct?

A   Nope.

Q   Okay. And when you attempted to speak with Mr. Lawshe, he invoked his right to counsel at that point --

A   Yes, sir, he did. Yes, sir.

Q   And that was video and audio recorded?

A   Yes, sir, it was.

Q   Okay. All right. That's one thing I don't

think I've received yet.

Was it recorded in like an interrogation room setting with one of those video cameras or is it BODYCAM recording?

A   No, sir, it was in one of our actual interview rooms over here at the main sheriff's office, yes, sir.

Q   Okay. Do you guys --

A   I believe that was before we got body cameras, if I'm not mistaken.

Q   That's what I was about to ask you. Do you guys get equipped with --

A   Yes, we now have body cameras. So we use body cameras any time we serve a search warrant, our interview will be on the body camera because we're doing it there at the actual house.

Q   Okay.

A   But I don't think we had body cameras back in April. At least it wasn't assigned to us.

Q   When y'all were doing the search warrant?

A   Huh?

Q   When y'all were doing the search warrant --

A   If we --

Q   -- you wouldn't have had body cameras?

A   Yeah, but I don't think they were assigned to us back in April.

Q   Okay. Give me one second, make sure I don't have additional questions for you.

Before I get there, though, is there anything that I have failed to ask you this morning that you feel like is important in this investigation, or anything that you did that we didn't cover?

A   Not that I can think of off the top of my head.

Q   Okay. When you're doing affidavit for search warrant, do you ever copy and paste from other cases or other affidavits that you prepared in the past, or do you work from scratch?

A   Oh, no, so I use a template, and it will have like my little background that shows like -- where it says like I've been in law enforcement for five years, that just so obviously I don't have to retype that. That gets very redundant.

Q   Okay. But you would never template the, like, location of the search or anything like that, right, because that has to be very specific in these --

A   Yes, sir. And with those, we have to write, like, the directions. And we usually put like -- kind of starting point, like, from this area, this is how you would get, like, to the location.

Q   Let me ask you this: Is there any properties

that you guys searched in connection with this investigation at 834 South Black Cherry Drive?

A    No, sir. So with that one, you're talking about the header?

Q    It's in the foot of the affidavit.

A    Because there's one -- oh, I'm sorry, not in the header, because the case number should be in the header. So with that one, I kept having problems when I would go to have the judge sign it, it would never change over from -- the actual address. So I would type it in, and when I go to save it, it would somehow re-save it to something that it was from months ago. Because that Black Cherry was, honestly, I think, in the beginning of 2022. But I kept having problems. And I would see it, but I couldn't get it to actually delete every time I would go save it.

Q    May just want to black that out. That's pretty important.

A    It would re-add it. But it was weird, because I would take it off the judge's copy, and it would stay on there. But then on one copy, it would show that it was gone, it would show the correct -- so it was weird. It would be like -- on the judge's part, it would say the 834 South Black Cherry Drive, or 838, but then on my actual affidavit copy, it would show the correct

address. So I don't really know why.

Q    But the case number, I guess, is not changing when that's happening, right? Because it looks like the case number's consistent?

A    Yes, the header is fine, it's just that footer. And I would even go to try to change, like, the actual page numbers, too, and those would get all messed up.

Q    Okay. Is it always the Black Cherry Drive address, because it seemed like you recognized that immediately when I said it?

A    Yes. And that's what I would go to change, and I would have like my sergeant review it, and it would still say -- no matter how many times I would re-save it, save it, re-save it -- yeah. I don't know.

Q    Those poor people at Black Cherry Drive, they're just going to keep getting searched.

A    Thankfully they have moved out of that house. They are no longer there.

Q    I assume they were moved out by force of law.

A    No, they -- it took them a couple of months, it took them a couple months, but they finally left.

Q    Detective Preston, I think I've asked you just about everything this morning. I know I asked you a second ago, but anything else you did in this

investigation that we didn't cover? Anything that you anticipate testifying to in court in this case that we didn't cover?

A    No, I think that was pretty much everything.

Q    Okay. Any level of expertise that we did not cover that you anticipating testifying to?

A    I know I will not be testifying to digitally.

Q    Okay. I got you.

MR. PIERCE: All right. Thank you, ma'am. It was very nice to meet you.

THE WITNESS: Thank you. Yes, sir.

MR. PIERCE: Ms. Payne, did you have any follow-up?

MS. PAYNE: I was going to ask her if she wants to read or waive.

THE WITNESS: Read, please.

(Witness excused.)

CERTIFICATE OF OATH

STATE OF FLORIDA     )
COUNTY OF ST. JOHNS  )

I, the undersigned authority, certify that MIKAYLA PRESTON personally appeared before me via Zoom and was duly sworn.

WITNESS my hand and official seal this 24th day of February, 2024.

SUZETTE M. KOWALSKI, RPR
Notary Public-State of Florida
Commission No. HH254838
Expires: 6/21/2026

Personally known _____.
OR Produced Identification  XX
Type of Identification Produced AGENCY ID

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA        )

COUNTY OF ST. JOHNS )

I, SUZETTE M. KOWALSKI, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of MIKAYLA PRESTON, that a review of the transcript WAS REQUESTED, and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 24th day of February, 2024.

_____
SUZETTE M. KOWALSKI, RPR

---

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

IN RE: THE STATE OF FLORIDA
              vs.
        WILLIAM LEE LAWSHE

CASE NO.:       2023-CF-000516
WITNESS:        MIKAYLA PRESTON
DATE TAKEN:     November 21, 2023

PAGE NO.   LINE NO.     CHANGE          REASON

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

_____         _____
DATE                  MIKAYLA PRESTON

(SK)

**MR. PIERCE: [3]** 11/9 51/951/12
**MS. PAYNE: [1]** 51/14
**THE WITNESS: [3]** 4/4 51/1151/16

**'**

**'Noles [2]** 5/135/14

**0**

**000516 [2]** 1/354/5

**1**

**10/29/2022 [1]** 17/22
**10:28 [1]** 1/15
**11:30 [1]** 1/15
**12 [7]** 2/88/1823/21 23/2524/125/1433/9
**12-page [2]** 9/210/5
**137877848 [1]** 18/11
**15 [4]** 23/2223/2524/1 25/14
**160 [1]** 17/19
**18 [9]** 22/2323/1623/18 31/531/831/1031/14 31/1635/19
**19 [3]** 31/831/1035/20

**2**

**2017 [1]** 4/12
**2020 [2]** 4/145/3
**2021 [1]** 15/1
**2022 [12]** 2/44/155/7 14/814/1715/817/2218/6 18/718/1218/1349/14
**2023 [3]** 1/1414/1454/6
**2023-CF-000516 [2]** 1/354/5
**2024 [2]** 52/1153/19
**2026 [1]** 52/16
**20th [2]** 21/2022/4
**21 [2]** 1/1454/6
**22nd [1]** 22/4
**24th [2]** 52/1053/19
**25th [2]** 14/1314/20
**2807 [1]** 2/8
**29 [2]** 38/538/13
**29th [4]** 14/814/1715/8 15/25

**3**

**32084 [2]** 2/52/9
**3525 [1]** 1/22

**4010 [1]** 2/4
**4th [1]** 34/13

1125

**5**

**50 [1]** 7/5
**52 [1]** 3/6
**53 [1]** 3/6
**54 [1]** 3/7
**5th [2]** 18/718/12

**6**

**6/21/2026 [1]** 52/16
**60 [2]** 24/1924/23

**7**

**70 [1]** 24/20
**70 percent [1]** 34/2

**8**

**824-3525 [1]** 1/22
**834 [2]** 49/249/24
**838 [1]** 49/24
**848 [2]** 17/2017/21
**8th [1]** 33/8

**9**

**904 [2]** 1/2213/11
**9th [1]** 18/13

**A**

**a.m [2]** 1/151/15
**able [16]** 12/118/1724/6 24/824/924/1025/23 28/1428/2129/2134/7 38/1743/743/1045/146/9
**about [30]**
**above [1]** 8/24
**abuse [1]** 31/6
**academy [1]** 5/23
**accept [1]** 14/3
**access [1]** 16/5
**accessed [2]** 43/246/1
**accessible [1]** 18/24
**account [6]** 9/1732/16 32/1744/1145/2046/12
**accurate [2]** 14/823/2
**achieved [2]** 23/20 23/24
**acronym [3]** 9/211/15 17/10
**across [4]** 12/1712/24 36/936/13
**action [2]** 53/1653/17

**actively [1]** 46/4
**actual [34]**
**actually [22]** 4/225/15 5/229/1111/213/1514/2 14/2415/515/915/12 16/1218/222/725/2026/3 26/2130/930/1044/7 45/2049/15
**adamant [1]** 6/13
**add [1]** 49/19
**additional [1]** 48/2
**address [3]** 49/1050/1 50/10
**addresses [1]** 42/14
**adjacent [1]** 29/19
**adult [4]** 31/1131/13 31/1741/20
**affidavit [5]** 9/189/19 48/949/549/25
**affidavits [5]** 9/109/16 9/2010/348/11
**aforementioned [1]** 33/11
**aforesaid [1]** 1/19
**after [3]** 5/2215/1432/9
**again [1]** 36/2
**age [27]** 12/1914/16 21/1521/1522/522/23 22/2323/1723/1823/22 23/2525/325/825/925/14 26/427/1131/431/13 31/1635/235/535/935/12 35/1841/941/23
**aged [1]** 42/10
**agency [4]** 15/1418/21 33/2352/21
**agency's [1]** 33/15
**ages [3]** 23/2124/1 25/13
**ago [5]** 14/620/1246/8 49/1250/25
**agree [4]** 31/238/140/9 45/21
**ahead [2]** 12/312/7
**AI [4]** 28/1528/2028/25 29/21
**all [25]** 4/106/18/11 10/1213/914/2315/4 17/1220/820/1031/431/5 32/833/1235/1536/12 37/1443/2343/2443/25 44/2245/1746/2550/7 51/9

**allowed [2]** 20/443/1
**almost [3]** 12/2112/21 42/1
**along [1]** 11/23
**already [6]** 14/2123/24 35/2336/436/2044/1
**also [10]** 6/2211/20 12/1816/2330/2235/11 35/1236/1138/1539/24
**always [5]** 24/1329/5 29/635/350/9
**am [3]** 53/1353/1553/17
**amount [1]** 7/4
**anal [1]** 26/5
**analyze [2]** 29/440/5
**Android [1]** 45/12
**another [3]** 29/634/5 35/3
**answer [3]** 19/1420/15 44/1
**anticipate [1]** 51/2
**anticipating [1]** 51/6
**any [40]**
**anybody [4]** 19/1531/16 31/1638/12
**anyone [1]** 18/23
**anything [25]** 5/166/11 11/2411/2517/2420/1 22/628/332/533/236/18 36/2437/137/337/739/9 41/942/2545/246/1348/3 48/548/1950/2551/1
**appear [1]** 24/3
**appearance [2]** 23/21 25/22
**appeared [5]** 34/15 34/2437/1739/2252/7
**appearing [4]** 2/32/5 2/72/9
**appears [3]** 18/423/16 27/11
**applied [1]** 45/8
**applies [1]** 25/15
**approved [1]** 33/15
**approximate [1]** 22/24
**approximately [1]** 25/1
**April [3]** 34/1347/18 47/25
**April 4th [1]** 34/13
**are [14]** 6/238/320/4 22/827/1428/129/931/12 38/338/438/1240/441/4 50/19

## A

area [1] 48/23
areas [1] 26/7
arrest [3] 9/39/810/4
Art [9] 30/530/1030/13 30/1330/1430/1930/21 31/2037/13
as [18] 4/310/110/19 10/2012/2015/2521/15 23/1524/524/524/18 25/1527/2538/340/841/8 41/842/6
aside [2] 10/337/6
ask [14] 5/810/2116/9 25/2137/1838/638/10 40/442/2144/147/1048/4 48/2551/14
asked [4] 22/1840/3 50/2350/24
asking [1] 38/4
asks [1] 20/22
aspect [1] 39/7
assign [2] 19/1125/2
assigned [3] 24/18 47/1847/24
assume [2] 26/950/20
assuming [3] 37/15 40/2344/17
assumption [1] 14/16
at [42]
attached [3] 11/2013/9 20/6
attempt [2] 30/330/6
attempted [1] 46/19
attempting [1] 33/12
attended [1] 8/6
attorney [1] 53/16
Attorney's [1] 2/3
audio [1] 46/23
Augustine [4] 1/222/5 2/94/13
Augustine/Jacksonville [1] 1/22
authority [1] 52/6
authorized [1] 53/7
available [2] 18/718/12

## B

bachelor's [3] 5/195/21 5/22
back [9] 6/814/914/18 15/1715/1819/220/11 47/1747/25

background [6] 4/11 5/96/106/156/1848/16
backpack [1] 39/5
ball [2] 12/2312/25
based [7] 7/1018/22 24/138/1938/1938/21 45/22
basically [1] 17/9
bathroom [1] 37/11
bathrooms [1] 39/15
be [66]
Beach [2] 4/134/18
because [51]
bed [2] 12/1613/13
bedroom [2] 37/939/2
bedrooms [1] 39/15
been [18] 4/28/2514/21 16/124/1824/2527/727/8 29/2530/2236/1240/11 42/342/446/846/946/11 48/15
before [13] 5/15/214/21 18/218/2424/1425/19 27/427/1230/1247/848/3 52/7
beginning [1] 49/14
behalf [2] 2/52/9
being [7] 18/318/435/19 37/339/1841/1544/11
believe [8] 4/165/7 27/2229/1730/1635/10 40/847/8
believed [1] 36/7
belly [1] 40/6
belonged [1] 11/25
below [2] 23/1940/17
best [1] 6/4
between [11] 6/617/24 18/2322/323/2124/1 25/1429/2131/331/19 35/8
beyond [1] 5/20
bias [3] 27/1527/1928/4
big [2] 33/1940/13
bit [1] 4/10
black [6] 49/249/13 49/1749/2450/950/16
board [2] 36/936/13
body [9] 37/438/18 38/2147/847/1247/12 47/1447/1747/23
BODYCAM [1] 47/3
book [1] 25/24

both [5] 16/918/318/4 19/919/21
bottom [1] 42/9
bottoms [1] 41/13
breast [2] 25/2226/6
briefly [1] 25/19
brings [1] 38/22
brought [1] 4/20
but [68]
button [1] 40/6

## C

cache [1] 43/14
cached [1] 43/11
call [2] 6/237/10
called [1] 29/3
came [6] 1/184/145/22 14/733/138/8
camera [1] 47/14
cameras [6] 47/347/8 47/1247/1347/1747/23
can [14] 8/1712/814/25 18/2219/1621/1025/10 27/2328/2033/1640/6 42/844/1448/7
can't [3] 19/2230/16 33/22
cannot [2] 7/217/25
car [3] 41/1241/1442/2
case [12] 1/37/1819/1 20/520/624/1642/2449/7 50/250/451/254/5
caseload [1] 24/20
cases [8] 24/1424/17 25/228/1938/838/10 38/2448/10
categorization [1] 16/10
categorized [1] 32/4
catty [1] 29/19
catty-corner [1] 29/19
cause [4] 1/189/910/11 10/17
causing [1] 46/16
cell [3] 32/1534/1642/23
Cellebrite [3] 42/22 43/943/19
center [3] 2/441/541/8
certain [2] 26/646/17
CERTIFICATE [4] 3/6 3/651/1853/1
certify [3] 52/653/7 53/13
CF [2] 1/354/5

change [6] 21/1021/11 49/1050/650/1254/7
changes [2] 54/254/21
changing [1] 50/2
charged [2] 36/1242/24
charging [1] 36/11
chat [1] 7/10
chat-based [1] 7/10
chatting [1] 7/11
Cherry [5] 49/249/13 49/2450/950/16
child [19] 8/818/13 22/2022/2123/1624/3 24/924/924/1024/12 27/2327/2528/128/931/5 31/638/1840/1041/21
child's [1] 37/9
children [1] 24/3
choking [1] 12/22
chose [1] 6/7
Chris [1] 15/16
CIRCUIT [2] 1/11/1
clarify [1] 26/14
class [1] 7/16
clearly [2] 38/1140/4
click [2] 14/244/23
clipboard [1] 45/14
close [1] 7/5
closed [1] 43/11
clothed [1] 12/13
cloud [4] 32/1745/19 45/2245/23
cloud-based [1] 45/22
Coastal [1] 1/21
collage [1] 42/1
college [1] 6/2
come [6] 7/1214/21 14/2216/1128/2334/4
comes [8] 15/1715/18 17/2518/218/1618/24 19/320/11
Commission [1] 52/15
company [2] 13/22 32/22
complete [1] 53/10
completely [2] 12/18 34/2
compliance [1] 33/10
computer [10] 6/10 21/826/2232/1132/12 33/1533/2133/2543/18 45/15
computers [1] 33/20

**C**

conclude [1] 43/1
concluded [2] 23/3 36/25
conclusions [4] 27/1 27/436/1637/6
confirm [9] 23/1724/6 24/1027/2327/2528/14 28/2429/734/25
confirmation [4] 27/15 27/1928/429/13
confirmed [9] 16/12 16/1516/1822/522/7 22/1923/123/332/24
confirming [2] 21/17 42/5
confirms [1] 23/7
connected [2] 33/23 53/16
connection [4] 9/610/6 34/849/1
considered [1] 31/5
consistent [1] 50/4
consult [2] 24/1324/15
consulted [3] 21/20 22/432/9
consulting [2] 25/225/7
Content [1] 16/10
contents [1] 20/21
continuously [1] 33/20
conversation [1] 30/1
conversations [1] 21/25
copied [1] 45/15
copy [5] 43/948/10 49/2049/2149/25
corner [1] 29/19
corporal [1] 19/9
correct [23] 7/29/16 12/422/2023/2524/725/8 25/1327/2129/432/11 35/2335/2440/1240/14 40/1542/1145/645/20 46/1749/2249/2554/20
could [18] 11/315/13 16/616/1821/2322/1 28/2330/732/635/535/6 35/935/1936/836/1337/1 40/1145/24
couldn't [4] 26/1630/18 45/1149/15
counsel [3] 46/2053/14 53/16

COUNTY [8] 1/24/21 8/2415/1815/1819/257 52/453/4
couple [5] 5/227/1246/8 50/2150/22
course [1] 7/7
court [3] 1/11/2151/2
cover [4] 48/651/151/3 51/6
CP [1] 16/10
crash [1] 34/2
crashing [1] 33/25
CRAWFORD [3] 2/62/7 3/4
created [1] 11/6
criminology [2] 5/176/3
CSAM [18] 14/222/8 29/730/2231/231/331/19 31/2131/2433/2133/24 34/1534/2435/135/16 36/739/2342/6
curious [1] 18/1
currently [1] 33/22
cusp [1] 35/19
CyberTip [8] 12/913/11 14/1114/2115/717/25 20/1121/18
CyberTips [1] 13/7

**D**

data [5] 16/2517/517/6 20/2333/13
database [1] 13/24
date [13] 1/1414/7 14/1015/915/1118/618/6 18/1118/1218/2319/21 54/654/23
DATED [1] 53/19
dates [2] 4/2515/12
day [2] 52/1153/19
dealing [1] 7/18
debating [1] 6/6
December [4] 18/7 18/1218/1718/24
December 5th [2] 18/7 18/12
decision [1] 24/14
declare [1] 54/20
decrypt [1] 34/5
decryption [1] 34/6
Defendant [2] 1/82/9
define [1] 25/23
definitely [7] 22/22 24/2225/425/628/2537/8

39/11
definition [1] 23/11
degree [1] 5/17
delete [1] 49/15
deleted [1] 43/11
deny [1] 27/23
department [3] 4/13 4/185/16
depends [3] 14/2314/23 15/4
depicts [1] 28/13
deposition [5] 1/11 10/1653/153/854/20
describe [4] 8/1712/8 25/2333/16
described [5] 9/25 13/1914/514/1521/14
description [2] 13/16 36/22
designating [1] 45/5
details [1] 19/1
detective [10] 9/12 19/2529/329/629/1730/9 34/1735/444/550/23
detectives [1] 29/12
determination [2] 25/3 41/9
determine [2] 25/825/9
determined [1] 36/4
developed [1] 23/12
development [1] 26/6
developmental [1] 23/21
device [2] 12/2214/6
devices [3] 32/1132/12 43/19
did [33]
didn't [6] 22/1022/23 29/248/651/151/3
difference [2] 31/3 38/14
different [5] 6/2213/7 21/821/2230/15
differentiate [1] 29/21
differentiating [1] 31/19
difficult [9] 12/1921/15 27/1235/235/635/935/12 35/1841/23
difficulties [2] 33/14 33/16
digital [2] 28/2143/6
digitally [1] 51/7

Direct [2] 3/44/5
directions [1] 48/22
discovered [1] 20/25
discovery [1] 14/12
discussed [1] 29/23
discussion [2] 11/11 15/22
displaying [2] 30/21 31/2
division [2] 5/527/7
do [48]
doctor [1] 22/25
does [6] 8/2113/17 23/1727/127/337/9
doesn't [4] 17/2319/16 19/2025/11
doing [5] 43/1847/14 47/1947/2148/9
don't [33]
done [5] 6/59/1220/8 34/1737/14
down [2] 5/2220/11
download [4] 34/334/9 35/1246/6
downloaded [8] 33/20 33/2434/234/644/744/8 46/246/3
downloads [1] 33/14
Dr [3] 21/2022/1136/24
Dr. [21] 10/2022/523/5 23/724/224/1425/325/8 26/1327/828/629/2032/9 35/1035/2236/1436/17 40/540/1042/642/10
Dr. Dully [19] 22/523/5 23/724/224/1425/325/8 26/1327/828/629/2032/9 35/1035/2236/1436/17 40/542/642/10
Dr. Dully's [2] 10/20 40/10
Drive [4] 49/249/2450/9 50/16
DuckDuckGo [1] 40/23
Dully [22] 21/2122/2 22/523/523/724/224/14 25/325/826/1327/828/6 29/2032/935/1035/22 36/1436/1736/2440/5 42/642/10
Dully's [2] 10/2040/10
duly [2] 4/252/8
during [1] 29/18

Duval [1] 15/18

**E**

each [2] 9/1725/12
earlier [1] 15/3
edit [1] 37/23
edited [2] 38/2038/20
education [1] 7/7
educational [1] 5/9
either [3] 14/116/15 28/24
elected [2] 4/215/1
Electronic [1] 16/20
else [3] 11/2436/18 50/25
employee [2] 53/14 53/15
employment [1] 4/11
encountered [1] 30/23
encrypted [1] 34/4
end [1] 19/23
ends [2] 17/1917/20
enforcement [5] 4/12 19/2327/1628/148/15
ENTER [1] 54/2
entered [1] 54/21
entire [2] 20/2132/14
entirety [1] 34/9
entitled [2] 44/1645/3
equipped [1] 47/11
ERRATA [2] 3/753/25
error [1] 32/1
ESP [8] 13/2214/2415/5 16/1616/2020/1420/20 20/22
especially [2] 29/9 37/13
ESQUIRE [2] 2/22/6
establish [2] 42/844/2
estimate [3] 7/326/24 40/12
even [12] 18/1722/10 27/528/2028/2232/21 38/1744/1045/1146/1 46/1250/6
eventually [1] 10/22
ever [9] 16/1128/2230/1 37/2042/742/1343/246/1 48/10
every [8] 17/517/519/3 19/819/824/1634/149/16
everything [5] 30/16

EX [1] 16/25
exact [2] 7/414/10
Exactly [1] 5/14
Examination [2] 3/44/5
examined [1] 4/2
example [2] 27/2046/7
excuse [5] 23/2024/8 30/1231/641/24
excused [1] 51/17
EXIF [9] 16/2416/25 17/317/517/820/1220/14 20/2220/23
experience [2] 30/24 43/18
expert [1] 13/4
expertise [1] 51/5
Expires [1] 52/16
exposed [1] 12/15
extraction [4] 34/17 42/2343/143/21

**F**

face [4] 12/2437/438/17 38/20
failed [1] 48/4
fair [3] 22/342/1742/19
familiar [1] 27/14
far [4] 7/124/541/8 43/18
far since [1] 7/1
February [5] 21/2022/4 22/452/1153/19
February 20th [2] 21/2022/4
February 22nd [1] 22/4
feel [1] 48/4
felt [3] 22/2235/1636/1
female [4] 12/1513/12 23/1023/16
females [2] 30/1430/17
FIBRS [2] 8/208/21
file [14] 13/2114/120/15 20/1820/1920/2133/19 34/434/634/935/440/22 40/2344/21
files [4] 33/1534/14 34/2345/25
finally [1] 50/22
financially [1] 53/17
find [1] 30/7
findings [1] 40/10
fine [1] 50/5
finish [1] 26/15

first [6] 4/226/1530/4 32/942/844/15
five [3] 8/78/948/15
fix [1] 46/9
FLORIDA [14] 1/21/5 1/222/52/95/116/216/24 7/2315/1652/352/1553/3 54/3
focusing [2] 41/2441/25
folder [4] 43/1444/15 44/1745/2
folders [1] 45/6
follow [3] 7/1129/25 51/13
follow-up [2] 29/25 51/13
following [1] 1/19
follows [1] 4/3
foot [1] 49/5
footer [1] 50/6
force [2] 6/2250/20
forensics [1] 28/22
forgot [1] 7/24
form [3] 13/2013/25 54/21
forward [1] 29/10
forwarded [4] 15/2 15/1518/1818/20
forwards [1] 15/6
found [1] 42/24
four [2] 9/410/4
four-page [1] 10/4
Fox [3] 8/128/138/14
friend [1] 6/4
full [4] 41/441/842/18 42/20
fully [1] 34/7
further [1] 53/13

**G**

gag [2] 12/2522/9
general [1] 42/21
generated [2] 28/15 28/20
get [21] 10/2214/19 15/1515/1916/1119/5 19/626/1626/2129/733/7 34/138/1643/944/22 44/2447/1148/348/24 49/1550/7
gets [5] 18/1818/2019/8 19/848/17
getting [2] 39/950/17
girl [6] 12/1213/1331/3

girls [6] 30/2131/231/12 31/1931/2139/12
give [6] 4/106/188/16 25/1146/748/1
gives [2] 25/1244/14
go [18] 5/135/145/20 15/1719/219/1128/730/6 38/1938/1938/2142/13 46/1349/949/1149/16 50/650/12
going [14] 5/86/76/8 17/619/521/721/722/2 27/2429/1036/1044/1 50/1751/14
gone [2] 23/1249/22
Good [1] 4/7
Google [3] 30/1130/15 30/16
gosh [1] 24/19
got [22] 4/254/255/1 5/178/158/179/39/17 11/2214/1215/419/13 20/1026/134/640/141/12 44/1246/846/1447/851/8
grammatical [1] 32/1
greater [1] 42/11
Greene [5] 29/429/16 30/934/1744/6
guess [12] 4/207/1 10/1511/312/2118/20 19/1336/1838/638/22 39/850/2
guys [9] 6/1913/14 14/1915/919/319/2347/7 47/1149/1

**H**

had [39]
hair [2] 26/541/17
hairs [1] 28/20
half [4] 25/425/641/4 42/9
hand [1] 52/10
happening [1] 50/3
Hardwick [1] 4/18
has [12] 23/1224/2 28/2330/2131/2032/20 32/2233/1939/640/13 40/2148/20
hash [1] 21/11
have [85]
have Dr [1] 22/11
haven't [4] 6/910/14

## H

haven't... [2] 30/246/9
having [4] 4/246/949/8 49/14
he [9] 4/204/215/115/16 21/1029/1830/946/20 46/22
he'll [2] 28/2328/24
he's [1] 30/11
head [1] 48/8
header [4] 49/449/7 49/850/5
heard [3] 1/1813/2 30/11
heart [1] 40/13
her [31]
here [6] 15/2524/2538/3 47/654/254/21
hereby [1] 53/7
hey [8] 13/1614/25 15/1727/1027/2228/7 28/2236/9
HH254838 [1] 52/15
hidden [1] 45/1
him [1] 43/11
hired [1] 4/22
his [2] 21/1046/20
history [5] 4/1130/21 31/131/2031/23
hit [1] 26/3
hold [2] 19/138/25
holding [1] 39/4
home [2] 9/1932/11
honestly [4] 7/529/5 46/549/13
hood [1] 41/12
hour [1] 26/20
hours [3] 6/257/47/5
house [2] 47/1550/18
how [27] 6/257/108/5 8/1811/1413/1413/17 21/824/1725/1726/12 27/1527/1927/2132/4 35/338/338/2344/11 44/1544/2144/2544/25 45/1246/648/2350/14
huh [4] 16/728/1831/9 47/20
human [2] 28/1729/1
hyphen [1] 30/5

## I

I'd [1] 7/4

I'll [3] 15/2016/746/7
I'm [34]
I've [15] 6/88/158/17 8/259/39/1724/2530/15 38/738/744/546/847/1 48/1550/23
ICAC [8] 6/196/226/24 7/117/197/2315/1630/23
ID [1] 52/21
identification [3] 11/23 52/2052/21
identifying [1] 11/24
identity [1] 24/6
if [51]
image [57]
images [28]
imaging [3] 29/2134/16 43/18
immediately [2] 38/8 50/11
important [2] 48/5 49/18
in [116]
incident [8] 8/209/1 10/515/118/518/1218/13 33/9
including [1] 33/14
indeed [1] 22/20
indeterminate [2] 14/1621/15
indicative [2] 37/2 39/10
individual [13] 22/6 23/1824/628/1629/22 30/835/2336/236/2040/4 40/1142/942/10
individual's [2] 12/6 36/25
individuals [1] 35/21
information [4] 11/23 12/315/520/7
initial [5] 7/97/169/7 33/1434/6
initially [2] 7/611/13
instance [2] 28/628/23
intentional [1] 45/9
intentionally [2] 46/2 46/4
interested [1] 53/17
interesting [1] 38/22
internet [5] 33/1833/25 34/834/1143/14
interpretation [1]

42/22
interrogation [1] 47/2
intervening [1] 17/23
interview [2] 47/547/14
into [2] 33/1346/13
investigation [7] 7/17 9/610/629/1248/549/2 51/1
investigations [3] 4/15 6/1937/19
investigators [1] 30/23
invoked [1] 46/20
iPhone [1] 46/8
is [89]
isn't [1] 36/15
it [235]
it's [43]
items [2] 45/546/16
itself [4] 13/1118/18 20/820/20
IV [2] 2/62/7

## J

Jacksonville [1] 1/22
January [6] 14/1314/20 16/217/1617/2418/25
January 25th [2] 14/13 14/20
JOHNS [7] 1/24/218/24 15/1819/2552/453/4
joined [1] 5/5
judge [1] 49/9
judge's [2] 49/2049/23
JUDICIAL [2] 1/12/4
July [1] 5/7
June [1] 15/1
just [67]

## K

KAITLYN [1] 2/2
keep [2] 30/1350/17
kept [4] 33/2534/149/8 49/14
Kevin [2] 28/2229/16
kid's [2] 39/139/2
kind [5] 7/1021/1222/14 29/1948/22
King [1] 15/16
knees [1] 40/6
know [50]
knowing [2] 36/945/13
knowledge [2] 10/7 44/9
known [3] 25/1530/21

52/19
Kowalski [4] 1/2152/14 53/653/22

## L

lace [2] 12/1336/21
lady's [1] 14/6
laptop [1] 33/22
last [5] 5/57/117/2427/7 34/8
lately [1] 8/25
later [3] 15/215/427/3
law [9] 2/74/126/76/7 19/2327/1527/2548/15 50/20
LAWSHE [6] 1/712/2 43/346/246/2054/4
Lawshe's [2] 9/1932/11
lead [1] 24/18
learning [1] 7/10
least [7] 8/78/912/6 22/1723/944/447/18
leave [2] 20/527/5
LEE [2] 1/754/4
left [1] 50/22
legally [1] 31/17
length [2] 8/189/4
less [4] 25/425/636/19 39/8
let [14] 8/168/1810/21 14/1816/919/119/226/14 33/433/537/1842/742/21 48/25
let's [5] 9/315/120/5 21/939/4
letterhead [1] 11/6
level [1] 51/5
Lewis [1] 2/4
like [129]
line [3] 17/1723/1954/7
linked [1] 12/2
links [1] 30/15
list [2] 20/444/20
listed [4] 8/2213/913/10 40/8
lists [1] 13/20
literally [4] 5/117/728/7 39/24
little [6] 4/1013/13 25/2435/543/848/14
LLC [1] 1/21
loans [1] 6/5
locate [3] 30/330/18 32/6

location [4] 45/2546/17 48/1948/24
log [1] 44/25
login [2] 16/719/24
long [1] 26/12
longer [1] 50/19
look [10] 12/114/18 17/2119/124/328/2537/5 37/1138/2441/10
looked [7] 12/2125/20 35/2336/2039/1639/16 41/25
looking [7] 14/1216/9 19/1320/822/1928/15 38/12
looks [6] 6/138/1811/22 26/1338/1850/3
Lord [1] 24/19
lot [5] 6/198/2534/11 39/441/11
lure [1] 37/21

**M**

ma'am [5] 4/49/25 20/2440/2451/9
made [3] 11/118/718/12
main [2] 38/1447/6
Makayla [1] 19/25
make [4] 8/1938/24 41/1648/1
makes [1] 17/6
making [1] 24/14
manner [1] 12/14
manufacturer [1] 45/10
many [5] 6/86/258/5 24/1750/14
March [2] 33/833/12
March 8th [1] 33/8
master's [1] 6/1
matter [1] 50/14
mature [2] 23/1238/18
maturity [2] 36/2537/7
may [3] 13/441/2249/17
maybe [1] 21/24
MD5 [2] 13/2121/11
me [49]
mean [5] 35/2336/437/9 38/1046/5
meaning [4] 23/2426/3 33/145/15
means [1] 23/11

meant [1] 9/2
medical [1] 6/15
medicine [1] 6/16
meet [4] 7/1237/19 38/2351/10
meeting [1] 27/8
mentioned [1] 13/5
message [1] 46/11
messed [1] 50/7
met [9] 26/1226/1430/5 30/1330/1430/1930/21 31/2037/13
Met-Art [6] 30/1330/14 30/1930/2131/2037/13
Meta [2] 30/1030/13
Meta-Art [2] 30/10 30/13
metadata [5] 17/917/11 21/521/721/10
Method [1] 18/10
middle [1] 42/3
MIKAYLA [8] 1/113/3 3/194/952/753/854/5 54/23
mind [2] 38/441/19
minor [16] 23/223/3 23/423/827/927/1137/3 37/537/837/1937/22 37/2538/1238/2439/11 41/20
minors [1] 7/12
mistaken [6] 4/158/10 29/1840/1842/247/9
mixed [1] 4/25
Mobile [1] 44/16
model [1] 39/17
moment [2] 14/515/20
month [1] 15/2
months [6] 5/215/246/8 49/1250/2150/22
more [6] 23/236/19 38/1838/2439/839/16
morning [3] 4/748/4 50/24
most [1] 26/20
mouth [3] 12/1712/20 14/6
move [1] 29/10
moved [2] 50/1850/20
MP4 [1] 14/1
Mr [1] 3/4
Mr. [6] 9/1912/232/11 43/346/246/20

Mr. Lawshe [3] 43/3 46/246/20
Mr. Lawshe's [2] 9/19 32/11
Mr. William [1] 12/2
Ms [1] 51/12
Ms. [1] 13/4
Ms. Payne [1] 13/4
much [3] 19/544/2551/4
multiple [1] 9/14
my [25] 4/255/226/4 10/710/1010/1510/19 14/1614/1920/624/20 29/2532/139/843/844/9 46/1146/1348/748/14 49/2450/1352/1053/11 54/20
MySamsung [1] 44/17

**N**

naked [3] 12/1838/16 38/16
name [14] 4/77/207/24 8/1212/613/2117/1020/6 40/1740/2240/2242/15 44/1844/21
narrative [2] 10/11 10/19
nature [2] 33/235/18
NCMEC [19] 11/1411/18 13/2414/1314/2515/3 15/515/615/815/1015/12 15/1415/2416/1917/22 18/918/1820/321/2
necessarily [1] 35/24
need [4] 6/1428/836/1 44/2
network [2] 33/2333/24
never [12] 22/1324/5 24/827/1029/2332/332/6 40/2142/1745/1648/18 49/9
new [1] 46/8
next [2] 42/244/24
nice [1] 51/10
nine [3] 29/640/1242/11
no [66]
Nope [1] 46/18
nor [2] 53/1453/17
North [5] 2/86/216/23 7/2315/15
not [53]
Notary [1] 52/15
note [1] 19/24

noted [1] 33/11
notes [3] 20/520/653/11
nothing [1] 45/24
notice [1] 31/1
November [2] 1/1454/6
now [18] 5/88/18/15 9/1013/1414/514/12 16/2021/1423/124/13 24/1924/2025/1527/1 33/433/747/12
number [12] 11/19 11/2411/2512/113/9 13/1117/1617/1718/10 21/1849/750/2
number's [1] 50/4
numbers [1] 50/7
numerous [2] 33/13 34/14

**O**

oath [3] 3/638/452/1
observed [2] 34/14 34/23
obviously [23] 6/7 12/1414/319/2221/6 22/2324/226/427/2128/8 28/1028/2529/1630/12 30/1630/1834/535/7 37/2338/1443/844/25 48/16
occasions [1] 27/6
occurring [1] 28/5
October [8] 14/814/17 15/815/2517/2418/6 18/1321/15
October 29th [4] 14/8 14/1715/815/25
October 9 [1] 18/6
October 9th [1] 18/13
off [10] 9/2211/911/11 15/2224/138/1938/19 38/2148/749/20
office [6] 2/32/74/14 8/2520/147/6
officer [2] 4/1228/1
official [1] 52/10
often [1] 24/15
oh [14] 4/234/235/3 16/2518/821/1921/24 24/1924/1945/1746/5 46/1448/1349/6
okay [126]
old [1] 38/3
older [1] 40/11

on [68]
once [4] 4/2121/521/6 34/5
one [58]
ones [4] 10/1029/15 35/1535/22
online [5] 7/137/248/3 37/2037/22
only [10] 5/87/99/79/21 13/1019/525/1940/6 41/2542/8
open [3] 19/1719/18 43/10
opened [4] 19/2119/22 43/243/11
opens [1] 19/17
operates [2] 25/18 27/19
opinion [1] 29/9
opportunity [1] 10/8
or [92]
order [1] 38/24
organs [1] 12/14
original [2] 12/939/8
originally [1] 11/22
other [19] 9/59/1910/5 12/1513/613/1314/15 29/1130/730/2333/25 36/1536/1636/2437/4 37/1838/748/1048/11
our [10] 15/1215/14 21/828/2133/1533/18 33/2033/2347/547/13
out [10] 11/219/12 22/1428/329/634/134/3 49/1750/1850/20
over [17] 4/186/27/5 10/1913/1513/2015/5 15/1615/1924/1924/23 28/728/2329/431/1347/6 49/10
overseas [1] 37/14
own [4] 11/511/637/20 38/11

## P

P.A [1] 2/7
page [9] 9/210/410/5 20/1333/533/834/1250/7 54/7
pages [2] 8/189/4
pair [1] 38/25

paragraph [1] 1/3
part [4] 6/216/2132/2 49/23
particular [8] 7/729/12 30/832/432/735/1437/1 37/8
particularly [1] 30/4
parties [1] 53/14
parties' [1] 53/15
password [1] 34/5
past [3] 30/1230/14 48/11
paste [1] 48/10
pasted [1] 45/16
paying [1] 6/5
PAYNE [3] 2/213/4 51/12
PDF [2] 13/2013/25
penalties [1] 54/20
pencil [1] 39/5
people [3] 7/1120/4 50/16
percent [1] 34/2
percentage [1] 25/2
perjury [1] 54/20
person [2] 35/835/9
personal [1] 11/6
personally [2] 52/7 52/19
perspective [2] 44/5 44/6
PhD [2] 6/66/8
phone [17] 11/1911/23 11/2512/113/913/1121/9 21/1032/2234/1644/18 45/245/545/1845/20 45/2346/16
phones [1] 42/23
photo [6] 37/2137/24 38/1138/2046/1246/14
photograph [6] 17/2 17/517/721/1324/435/24
photographed [1] 38/16
photographer [2] 37/1540/2
photographs [4] 34/14 34/2335/2239/10
photos [4] 37/238/7 46/1246/13
picked [1] 21/24
picture [2] 39/1946/10
PIERCE [2] 2/62/7

pink [1] 36/21
place [2] 1/161/19
please [2] 4/751/16
plenty [1] 39/23
point [11] 22/522/17 23/1532/832/2436/437/2 38/2344/446/2148/23
police [3] 4/134/185/23
policy [1] 19/4
poor [1] 50/16
pops [1] 14/4
pornography [5] 8/8 18/1422/2022/2231/5
portal [1] 20/9
portion [1] 10/20
posed [5] 12/1437/14 39/1839/2239/24
possibility [1] 28/4
possibly [2] 14/1828/4
practice [1] 28/3
preparation [1] 10/16
prepare [2] 9/1110/22
prepared [4] 9/109/15 10/648/11
preparing [1] 9/5
PRESTON [10] 1/113/3 4/14/919/2550/2352/7 53/954/554/23
pretty [3] 44/2449/18 51/4
prior [6] 14/2116/116/4 21/1423/532/25
probable [3] 9/810/11 10/17
probably [9] 6/147/4 11/324/1926/2027/20 29/532/141/10
problem [2] 39/1246/9
problems [2] 49/849/14
proceedings [1] 1/20
Produced [2] 52/20 52/21
professional [3] 37/15 40/253/6
program [1] 6/2
pronounce [2] 11/15 21/21
pronounced [1] 21/21
properties [1] 48/25
provided [6] 11/19 11/1923/733/1333/15 34/19
provider [3] 14/2416/21

pubertal [4] 23/1023/21 23/2326/2
puberty [2] 23/1326/4
Public [1] 52/15
Public-State [1] 52/15
pull [5] 8/1616/326/21 33/544/15
purpose [1] 25/7
purposes [1] 15/21
put [3] 6/2511/548/22
put like [1] 48/22

## Q

question [6] 10/15 14/1919/1439/941/19 43/6
questions [5] 29/241/7 42/2243/2548/2
quick [3] 11/1033/646/7
quite [1] 24/15
quoted [3] 10/2323/9 23/15

## R

ran [1] 33/13
range [3] 23/2525/12 35/20
rather [1] 32/21
rating [1] 37/1
re [6] 44/1549/1249/19 50/1550/1554/3
re-add [1] 49/19
re-pull [1] 44/15
re-save [3] 49/1250/15 50/15
reach [1] 27/1
reached [1] 36/17
reaches [1] 27/4
read [3] 51/1551/16 54/20
reading [1] 40/16
real [3] 11/933/546/7
really [5] 10/1521/11 26/2527/1050/1
reason [2] 38/654/7
recall [6] 7/229/59/20 12/2027/729/11
receive [3] 13/1421/5 21/6
received [11] 11/14 11/1814/1315/815/9 15/2416/217/2223/20 33/947/1

## R

recently [1] 10/14
recognize [1] 38/9
recognized [2] 38/8
50/10
record [6] 4/811/911/11
15/2244/253/10
recorded [2] 46/2347/2
recording [1] 47/4
red [3] 41/1441/1542/2
redundant [1] 48/17
refer [2] 14/920/11
reference [3] 11/716/23
33/10
referenced [2] 10/4
14/14
referring [4] 8/239/24
31/1436/19
region [1] 25/22
regions [1] 26/5
Registered [1] 53/6
related [1] 30/7
relative [2] 53/1353/15
remarkable [1] 36/18
remember [6] 14/10
17/1541/1541/2241/23
41/24
report [36]
reported [7] 1/2011/21
13/2114/2015/315/11
15/14
Reporter [1] 53/7
REPORTER'S [2] 3/6
52/24
Reporters [1] 1/21
reporting [4] 18/10
20/1420/2020/22
reports [6] 9/510/510/9
17/2319/623/6
request [1] 13/17
requested [2] 39/653/9
researched [1] 30/10
researched the [1]
30/10
restart [1] 34/3
return [2] 33/734/18
retype [1] 48/16
review [15] 10/910/16
18/1619/319/521/422/18
27/2428/1030/533/12
35/435/1150/1353/9
reviewed [29]
reviewing [7] 26/8

26/1026/2427/234/12
34/1636/17
Richard [1] 2/4
right [33]
room [1] 47/2
rooms [1] 47/6
RPR [3] 1/2152/1453/22
rule [1] 28/3

## S

S-a-n-i-j-a [1] 40/20
SA [1] 4/18
said [13] 5/514/1516/25
23/123/1927/930/2231/1
31/2033/835/1938/11
50/11
same [17] 5/155/166/2
8/2016/418/318/528/2
31/2231/2435/2335/24
36/236/936/2040/440/23
Sanija [2] 40/1842/15
save [11] 21/821/945/5
46/1246/1649/1149/12
49/1650/1550/1550/15
saved [3] 21/721/10
46/14
saving [1] 46/11
saw [3] 12/240/2241/8
say [25] 7/48/911/3
14/2515/115/1716/12
20/521/922/222/323/2
25/426/1927/2027/22
36/2138/1539/540/18
42/1742/1943/949/23
50/14
say it [1] 11/3
saying [8] 13/1617/16
23/1623/2324/230/13
31/2131/23
says [15] 14/1315/8
15/2416/1017/2220/14
20/2020/2120/2423/10
33/934/1334/2237/8
48/15
schedule [1] 25/16
school [3] 6/76/77/25
science [1] 6/11
Scoggins [1] 29/17
scratch [1] 48/12
screenshot [2] 40/24
42/14
seal [1] 52/10
search [18] 9/119/11
9/139/159/189/1910/10

12/112/732/1032/1333/1
33/1147/1347/1947/21
48/948/19
searched [3] 30/1049/1
50/17
searches [1] 42/14
second [13] 8/1614/19
14/2215/316/817/2518/2
18/2419/220/1229/748/1
50/25
see [15] 8/189/416/3
18/1719/1619/2228/20
30/630/1632/333/440/6
42/843/749/15
seeing [1] 8/25
seeking [2] 12/432/25
seem [1] 17/23
seemed [1] 50/10
seen [5] 24/230/15
42/1842/2042/25
selected [1] 35/14
selfie [1] 37/11
selfies [1] 39/13
send [7] 6/197/613/15
13/1613/2027/327/22
sends [2] 15/546/10
sense [3] 12/2217/12
32/20
sent [5] 9/2215/1215/14
22/1346/15
separate [2] 32/2036/2
sergeant [2] 19/950/13
serve [1] 47/13
served [2] 32/2132/22
service [3] 16/2116/22
32/15
set [1] 45/10
setting [6] 36/237/3
39/239/1739/2547/3
settings [4] 28/545/5
45/946/16
SEVENTH [1] 1/1
sex [1] 7/12
sexual [5] 12/1412/22
31/636/2537/7
sexually [1] 23/12
shall [1] 43/9
shared [1] 46/11
she [40]
she'd [1] 36/4
she's [9] 23/1523/23
23/2326/826/927/10
27/1141/1241/12

SHEET [2] 3/754/1
Sheriff [1] 4/18
sheriff's [4] 4/148/25
20/147/6
Shore [1] 4/22
short [1] 6/24
should [6] 9/733/11
38/1142/342/349/7
show [8] 19/1619/20
20/626/636/149/2149/22
49/25
showed [2] 44/1544/20
showing [6] 18/926/4
30/1131/2131/2345/17
shown [1] 27/13
shows [7] 18/518/6
18/1119/1720/344/21
48/14
shutting [1] 34/1
sic [1] 30/10
sign [1] 49/9
signed [1] 15/13
similar [2] 24/339/24
similarities [1] 5/10
Simultaneous [3] 22/12
31/741/2
since [3] 7/124/2527/7
sir [57]
sit [4] 15/2526/929/19
38/3
site [6] 7/2418/920/3
30/1730/2232/3
sites [1] 30/15
sitting [1] 27/2
situation [1] 18/15
six [1] 8/9
SK [1] 54/24
skin [1] 28/21
slightly [1] 21/11
small [1] 38/25
SMR3 [1] 25/22
so [94]
solicit [1] 37/21
solicitation [2] 7/13
37/20
soliciting [1] 37/22
some [12] 5/97/611/22
12/1317/635/235/535/6
36/2138/742/2143/25
somebody [3] 16/18
18/1646/10
somebody's [1] 39/19
somehow [1] 49/11

someone [2] 18/137/21
someone's [1] 39/18
something [12] 7/7 12/1719/632/1836/22 39/139/339/1743/14 45/1546/1049/12
sometimes [4] 14/25 15/1327/1638/25
sorry [5] 8/1423/2038/9 43/1249/6
sort [12] 7/1810/22 14/1517/2319/423/624/7 25/1128/239/939/13 43/17
sought [1] 32/10
sound [1] 22/10
sounded [2] 21/2131/18
sounds [1] 4/17
source [1] 32/25
South [2] 49/249/24
speak [1] 46/19
speaking [1] 23/5
specific [12] 6/187/17 8/817/717/1318/2122/23 25/930/1830/2433/21 48/20
specificity [1] 25/12
Speedway [1] 2/4
spent [1] 26/21
spiky [1] 41/17
ST [11] 1/21/222/52/9 4/134/218/2415/1819/25 52/453/4
staged [1] 37/16
stamp [1] 19/21
stand [1] 8/21
standard [2] 25/1643/8
standards [1] 7/11
stands [1] 17/3
start [2] 26/426/15
started [3] 4/125/227/1
starting [1] 48/23
starts [1] 7/25
state [10] 1/52/32/54/7 5/105/1152/352/1553/3 54/3
stated [1] 35/11
statement [1] 10/20
statements [1] 10/24
states [1] 30/20
stating [1] 30/17
stay [1] 49/20

stenographic [1] 53/11
stenographically [2] 1/2053/8
stick [1] 5/19
still [4] 19/1331/12 34/1250/14
stockings [1] 12/13
stop [2] 15/2034/7
stored [4] 43/1344/11 45/1445/18
straight [1] 36/13
strapped [5] 12/16 12/1712/2012/2313/12
Street [1] 2/8
stuck [2] 5/2121/12
student [1] 6/5
studio [2] 39/2339/25
studios [1] 37/16
stuff [4] 7/1316/526/5 41/11
subfolder [1] 44/24
subfolders [2] 44/14 44/23
subject [1] 54/21
submitted [1] 14/24
substance [1] 54/21
such [1] 33/19
Suite [2] 2/42/8
super [1] 38/15
supporting [1] 9/10
sure [6] 8/199/124/22 29/1641/1648/1
suspect [1] 39/6
Suzette [4] 1/2152/14 53/653/22
Suzette's [1] 15/21
sworn [2] 4/252/8
Synchronoss [19] 9/21 11/1911/2118/1032/16 32/1932/2333/1033/13 33/1834/1834/1934/20 35/1242/2444/1144/13 44/2245/19
system [1] 25/17

**T**

tag [1] 21/12
take [2] 39/1249/20
taken [3] 1/1440/254/6
taking [2] 39/1839/19
talked [2] 20/1244/5
talking [7] 8/199/14 22/822/1231/741/249/3
Tanner [2] 25/1625/17

Task [1] 6/22
technical [1] 33/14
teen [2] 35/737/12
teenage [7] 30/2131/2 31/331/1231/1931/21 39/12
teenager [2] 35/10 38/25
tell [11] 11/1316/618/22 19/1528/728/928/10 38/1745/145/1145/25
telling [1] 28/1
tells [1] 45/25
template [2] 48/13 48/18
temporary [1] 43/14
ten [1] 29/6
Tenth [1] 2/8
term [2] 13/226/2
testified [1] 4/2
testifying [3] 51/251/6 51/7
text [1] 46/11
than [10] 23/1625/4 25/632/2136/1636/24 37/438/1840/1142/11
Thank [2] 51/951/11
Thankfully [1] 50/18
that [327]
that entire [1] 32/14
That I [1] 14/9
that the [1] 6/2
that's [34]
their [6] 21/928/21 30/1438/2038/2145/23
them [17] 10/1210/13 10/1310/1414/1214/13 17/1919/1220/1721/1 32/2139/1941/2241/24 41/2450/2150/22
themselves [1] 39/15
then [35]
there [29]
there's [10] 17/1817/19 17/1931/336/2141/141/4 44/445/2449/6
these [14] 8/2516/10 16/1119/524/1424/17 25/1225/1626/1330/4 35/1343/2545/1448/20
they [39]
they'll [2] 13/2526/6
they're [11] 18/331/4

31/1131/1331/1331/22 37/1437/1539/1839/24 50/17
thing [4] 8/2013/10 39/1346/25
think [25] 5/95/157/20 7/259/39/1611/1413/4 20/1924/2024/2226/12 28/928/1128/2233/4 40/1241/1547/147/17 47/2448/749/1350/23 51/4
thinking [1] 5/3
third [1] 40/8
thirteen [2] 40/1242/11
this [51]
those [28]
though [5] 9/1731/12 32/2138/1748/3
thought [4] 6/821/24 38/1041/22
three [4] 35/1341/142/1 43/5
through [8] 7/197/23 14/715/1719/1120/9 23/1228/25
throughout [1] 33/12
thus [2] 6/2543/18
time [13] 1/151/185/16 16/418/318/526/1626/20 29/1832/934/147/13 49/16
times [4] 6/829/639/4 50/14
tip [14] 11/1411/18 11/2014/2217/1517/17 18/218/1518/2419/319/8 19/820/721/15
tips [4] 16/1016/11 19/1119/21
titled [3] 8/198/209/8
today [1] 15/25
toddler [1] 39/24
Tolbert [1] 9/12
told [8] 20/1721/121/2 25/1927/1027/1135/3 41/22
too [1] 50/7
took [4] 7/2226/1750/21 50/22
top [8] 15/720/1341/3 41/1241/2542/542/848/7
torn [1] 35/8

**T**

totality [1] 38/21
totally [2] 21/2322/1
training [4] 6/156/20 7/1843/17
trainings [1] 6/23
transcript [3] 53/9 53/1054/2
transferred [1] 15/19
transitioned [1] 4/14
traveling [2] 37/19 38/23
true [2] 53/1054/20
try [4] 25/825/937/21 50/6
trying [4] 7/127/20 24/2026/21
twice [1] 26/14
two [10] 10/312/1013/7 15/217/1819/635/21 36/1940/341/4
type [7] 7/1717/618/13 20/735/449/1052/21

**U**

uh [4] 16/728/1835/5 35/6
uh-huh [2] 16/728/18
unable [1] 34/24
unconfirmed [1] 16/11
under [10] 4/174/229/8 22/2223/1831/431/16 38/444/2154/20
underage [2] 30/14 30/17
underneath [3] 13/25 17/2142/4
undersigned [1] 52/6
understand [2] 23/11 39/7
understanding [4] 25/1726/127/1842/10
underwear [2] 39/1 39/5
unfortunately [2] 39/1141/11
unintentionally [1] 46/6
University [1] 5/11
unless [2] 25/2445/2
until [5] 1/1515/218/17 18/1818/20
up [16] 4/258/1612/1

14/416/321/2526/21 29/2533/538/2539/842/4 44/1545/1050/851/13
upload [1] 26/16
uploaded [4] 20/720/15 20/2145/22
upon [1] 36/17
us [12] 15/215/415/6 15/1315/1315/1919/12 39/645/2545/2547/18 47/25
use [5] 26/233/2133/22 47/1248/13
used [6] 29/1129/18 30/1737/2038/738/11
using [1] 30/14
usually [4] 8/316/15 37/1648/22

**V**

vaginal [1] 26/5
Valley [3] 8/128/138/14
Verizon [7] 9/1710/1 10/232/2032/2132/22 33/7
versa [1] 15/3
versus [1] 23/3
very [4] 27/1148/17 48/2051/10
via [5] 1/121/162/32/7 52/7
vice [1] 15/2
video [4] 34/1434/23 46/2347/3
Videoconference [1] 1/16
view [9] 14/320/420/14 20/2120/2227/2133/21 43/1044/13
viewed [2] 12/1840/19
viewing [1] 34/25
VZ [1] 44/16

**W**

waive [1] 51/15
want [10] 8/914/326/19 33/2436/1136/2140/4 40/1841/1649/17
wanted [4] 18/1620/5 20/1136/8
wants [1] 51/15
warrant [13] 9/119/13 9/1812/412/732/1032/13 33/133/1147/1347/19

47/2148/10
warrants [3] 9/129/15 10/10
was [126]
wasn't [3] 9/136/347/18
watermark [1] 30/5
Watson [1] 2/4
way [11] 8/2113/19 19/1421/421/721/2224/7 38/1842/2544/445/13
we [62]
we'll [1] 10/22
we're [7] 7/188/1919/5 28/2136/1139/447/14
we've [1] 28/19
website [4] 30/630/24 33/142/13
weird [3] 38/1549/19 49/22
well [15] 5/117/2310/20 10/2019/420/1922/10 24/2224/2327/1033/24 42/745/1946/346/7
went [3] 5/1110/1932/3
were [46]
what [46]
what's [3] 8/2221/16 27/18
when [32]
whenever [2] 15/12 44/22
where [30]
whether [12] 15/25 18/118/2219/1529/20 34/2541/2041/2143/1 45/945/1346/1
which [19] 6/77/219/8 9/1410/1011/2014/1 15/1617/217/1518/11 23/1029/1531/2437/16 38/1538/1944/1745/19
while [5] 16/926/926/17 27/233/12
white [2] 12/1341/12
who [10] 7/1211/24 13/2119/1619/2220/4 24/324/924/1245/8
who's [1] 37/21
why [5] 30/1334/24 35/1336/150/1
will [10] 14/115/15 18/1119/1126/439/12 46/1347/1448/1351/7

**WILLIAM [3]** 1/712/2 54/4

within [4] 13/2427/15 44/1044/16
WITNESS [4] 3/251/17 52/1054/5
woman [1] 22/8
won't [2] 21/1145/1
word [1] 17/4
work [3] 13/1845/12 48/12
working [1] 34/7
works [1] 27/15
would [77]
wouldn't [5] 18/1729/3 34/736/1447/23
write [2] 48/2154/2
wrong [3] 21/2322/1 27/21
wrote [2] 10/1311/2

**X**

X'd [1] 22/14
XX [1] 52/20

**Y**

y'all [2] 47/1947/21
yeah [18] 5/256/16/6 6/611/616/722/1625/6 28/228/628/2430/2035/9 38/939/1445/2447/24 50/15
year [7] 5/67/114/20 16/217/2417/2527/8
years [3] 23/1723/22 48/15
Yep [3] 5/187/327/24
yes [67]
yet [2] 46/947/1
you [239]
you'd [2] 30/2245/21
you'll [2] 38/2539/2
you're [10] 8/239/13 16/919/1327/231/21 34/1237/2548/949/3
you've [6] 8/524/1827/7 27/841/1042/17
young [1] 38/18
younger [2] 12/1223/16
your [29]
yourself [6] 22/1929/3 30/330/2438/1238/24


67-13

Filing # 171112495 E-Filed 04/17/2023 10:20:36 AM

SJSO Case # SJSO23OFF001895

IN THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

## AFFIDAVIT FOR SEARCH WARRANT

**BEFORE ME**, Sergeant Eugene Tolbert of the St. Johns County Sheriff's Office, St. Johns County, Florida, personally appeared Detective Mikayla Preston, of the St. Johns County Sheriff's Office, who being duly sworn, deposes and says:

The St. Johns County Sheriff's Office is actively investigating the following crime(s): Possession of Child Sexual Abuse Material (CSAM); F.S. 827.071(4). The affiant believes evidence, which is relevant in the investigation, is located on/within a certain residence, located in St. Johns County, Florida, described as follows, to-wit:



208 Wisteria Rd., St. Augustine, FL 32086

To arrive at the target residence from the intersection of US 1 South and Shore Dr., turn left (east) onto Shore Dr. Drive for approximately 0.4 miles and turn left onto San Jose Rd. Drive for approximately 0.5 miles on San Jose Rd and then turn right onto Wisteria Rd. The target residence is a one-story home, with a two car garage. The numbers 208 are prominently displayed on the front of the residence, on the side of the garage door. ** Residence is currently secured by Law Enforcement.

There is now being kept on/within the target residence the following described property:

**The premises and the curtilage thereof are being used for the purpose of storing and/or distributing images, movies, or visual depictions of sexual conduct or sexual performance by a child or children in violation of section 827.071(4) and 827.071(5) Florida Statutes, related to the unlawful use of a two-way communication device in violation of Florida Statue 934.215, and contains evidence relevant to proving the referenced felonies have been, or are being committed.**

## AFFIANT'S EXPERTISE

Your Affiant is a Detective for the St. Johns County Sheriff's Office, with over 5 years of Law Enforcement experience. Your Affiant is currently assigned to the Special Victims Unit (Internet Crimes against Children) of the St. Johns County Sheriff's Office specializing in internet crimes against children investigations. Your Affiant began her Law Enforcement career in 2017 with the St. Augustine Beach Police Department, before working for St. Johns County Sheriff's Office, and has worked as a Patrol Deputy and Special Victims Unit/ICAC Detective. Your Affiant is a member of the North Florida Internet Crimes against Children (ICAC) Task Force. ICAC is a national organization which provides specialized high-tech training and resources to law enforcement agencies that investigate crimes dealing with online sexual-solicitation and exploitation of children, including the collection and trading of images of Child Sexual Abuse.

Your Affiant has worked with experienced ICAC Detectives who also investigate Child Exploitation offenses. Your Affiant has investigated or assisted in the investigation of matters involving the possession collection, production, advertisement, receipt, and/or transmission of images of Child Sexual Abuse. Your Affiant has been involved in searches pertaining to the possession, collection, production, and/or transmission of Child Sexual Abuse through the execution of search warrants or through the subject providing written consent to permit a search.

The statements contained in this affidavit are based on Your Affiants personal knowledge, as well as information provided by other Law Enforcement Officers, and this affidavit is being submitted for the limited purpose of securing a search warrant. Your Affiant has not included each and every fact known to her concerning this investigation and has instead set forth only the facts that she believed were necessary to establish probable cause. Your Affiant has developed probable cause to believe, and does believe, that a computer(s) or other device(s) at the above described residence or on the premises and/or the curtilage thereof, was knowingly used as an instrument in the commission of a felony crime in violation of the aforementioned Florida Statutes.

Based on training and experience, your affiant knows courts have held, "Probable cause exists if given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates, 462 U.S. 213, 238, 201 S. Ct. 2317, 76L Ed. 2d 527 (1983).* Courts have also held, "To establish probable cause to search a home, a warrant affidavit must establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).*

## SUMMARY

Your Affiant received this investigation on February 20th, 2023. The St. Johns County Sheriff's Office received cyber tip #153739160 from the National Center for Missing and Exploited Children who received the information on 1/25/2023 in reference to a "9043157058" uploading child sexual abuse material (CSAM). The cyber tip was reported by Synchronoss Technologies, Inc. and advised the user uploaded one (1) image of possible CSAM.

The following information was listed for the upload:

**Filename:**d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173 13cf489728f19896c5f79e9d4c63b80f6a487
MD5: b06fe687fae143b4c24f05eb1821ab48
Did Reporting ESP view entire contents of uploaded file? Yes
Did Reporting ESP view the EXIF of uploaded file? No
Were entire contents of uploaded file publicly available? No
Image Categorization by ESP: A2

On February 28, 2023, a search warrant was submitted to Synchronoss.

Your Affiant viewed the image attached to the cyber tip. Additionally, on February 22, 2023, Your Affiant consulted Dr. K. Dully of the First Coast Child Protection Team, who also reviewed the offending image. Dr. Dully provided the following written statement in reference to the CSAM image:

"I have examined a single color photograph displayed on a law enforcement laptop entitled: d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173 13cf489728f19896c5f79e9d4c63b80f6a487 provided to me by yourself following a cybertip from NCMEC. This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest position with her lower legs and ankles parted to expose her genitalia for the camera. This female child appears younger than 18 years of age. She would have achieved this developmental genital appearance of SMR IV at 12-15 years of age. She does not appear to be shaved as her anterior pubic hair is still present."

To note, there is a watermark of www.met-art.com on the offending image. This site has a known history of displaying CSAM images of teenage girls and CSAM content from this site has been encountered by other ICAC investigators in past investigations.

Your Affiant queried law enforcement databases and discovered the target device is associated with William Lee Lawshe (DOB 11/09/1969), a 53-year-old white male who resides in St. Augustine, FL and who is employed as a law enforcement officer with the Florida Fish and Wildlife Commission.

On March 3, 2023, your affiant received compliance from Verizon, in reference to a Search Warrant which was submitted. Verizon provided the following information in reference to the suspect target device (**904-315-7058**):

- MFG Name: Samsung

- **EQP Name: Samsung Galaxy S20 FE 5G Navy**
- Account # 625885845-1
- Name: William L. Lawshe
- Account Owner email: williamlawshe@comcast.net
- Address: 208 Wisteria Rd, St. Augustine, FL
- Contact Address: 3905 State Road 206 Elkton, FL 32033
- **IMEI: 354630363210200**

On April 4, 2023, after receiving compliance from Synchronoss, in reference to the aforementioned search warrant, multiple files were reviewed. Some of which were contained within a subfolder, entitled 'VZMOBILE' and within that folder was another subfolder entitled, 'My Samsung SM-G781V'. Your affiant reviewed numerous photographs and video files and observed images that appeared to be CSAM. Those images were later reviewed by Dr. Kathleen Dully of First Coast Child Protection Team. Dr. Dully provided the following written statements in reference to the CSAM images located:

"I previously examined a single color photograph displayed on a law enforcement laptop entitled d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d17313cf489728f19896c5179e9d4c6 3b80f6a487 provided to me by yourself following a cybertip from NCMEC. This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest position with her lower legs and ankles parted to expose her genitalia for the camera. This female child appears younger than 18 years of age. She would have achieved this developmental genital appearance of SMR IV at 12-15 years of age. She does not appear to be shaved as her anterior pubic hair is still present.

Today you have shown me two additional images of the same female child and these confirm my previous determination that she is depicted to be at most SMR III or IV and therefore again ≤ 12-15 years of age. The filenames for these photos are 0059 and 0065(1)."

"Today you have provided me two images for review displayed on a law enforcement laptop. The first is yebLVVFQ_o.jpg and depicts a female child with no pubic hair development. She does not appear to be shaved. Her breasts are partially visible and could be SMR IV-V, however her genitals are plainly visible with her thighs splayed widely apart and showing she is SMR I with respect to pubic hair. This developmental appearance is ≤ 9- 13.5 years of age.

The second image is imprinted with white script saying "Big Heart" and the filename Screenshot_20230122_174408_DuckDuckGo.jpg. This image shows a female child with her black top parted and underwear down around her parted thighs exposing her genital area clearly. She appears to have no pubic development. She does not appear to be shaved. This developmental appearance is also ≤ 9-_13.5 years of age."

## CURRENT INVESTIGATION

On 04/11/2023, at approximately 1430 hours, Sgt. E. Tolbert contacted the suspect William Lawshe on his cellular phone (**9043157058**) about meeting at the St. Johns County Sheriff Office on 04/12/2023,

under a ruse for assistance in a search. William Lawshe informed Sgt. Tolbert of the following statement, "I will come 10-8 from my house and come straight there."

Also on 04/11/2023 at approximately 1500 hours, William Lawshe contacted his Captain, Robbie Creech of the Florida Fish and Wildlife Commission (FWC). He spoke to Captain Creech on the target phone (9043157058), about a leadership project. Captain Creech informed SJSO Detectives that during that call he checked William Lawshe's GPS location on the FWC computer system and observed William Lawshe at his residence (208 Wisteria Rd. St Augustine, FL).

On April 11, 2023, your affiant obtained a signed search warrant to seize William Lawshe's Samsung Galaxy S20 FE 5G Navy (IMEI: 354630363210200).

On April 12, 2023, William Lawshe arrived at the Sheriff's Office under the guise of a ruse, and your affiant conducted a post Miranda interview with him within CID. During his initial statement, William confirmed the target phone belonged to him, and that it is a Samsung cell phone. Additionally, he confirmed the email address listed in the Verizon records return was his as well. As the interview continued, William invoked his right for an attorney and detectives left the room.

Since William Lawshe did not have the target device in his possession when he was detained for the interview, Investigators obtained permission to search from FWC Major J. Russell, to search the state owned patrol truck which William Lawshe drove to the sheriff's office in an attempt to locate the target device. After a diligent search, the target device was not located in the FWC patrol truck.

The decision was made to present the search warrant for the seizure and search of the target device to William, and to ask about the whereabouts of the device. William Lawshe informed Detectives that the target phone is currently located at his residence, 208 Wisteria Rd., St. Augustine, FL.

Investigators have no indications to suggest William Lawshe knew about this investigation before being interviewed; therefore, it is reasonable to believe he simply left or forgot, intentionally or otherwise, the target device at his residence when he came to the sheriff's office. Evidence suggests the target device was at 208 Wisteria Rd as recently as April 11, 2023, based on the information obtained from Captain Creech. Additionally, William's admission that the phone was at his home suggests the device can be located there.

## Computer/Digital Evidence

Your Affiant knows through training and experience that computers and other digital media are akin to a filing cabinet or a vault. More germane to this investigation, images and videos of child pornography are horded by those who possess it. People who possess these images, rarely, if ever, dispose of it as the sexually explicit material is treated as a prize possession. It acts as a sexual stimulus and provides sexual gratification. Great lengths will be taken to conceal and protect from discovery, theft, and damage their collections of illicit materials. The images and videos of child pornography may be moved around to different parts of the computer or moved to different external media, but it is maintained as a collection sometimes for months and even years.

SJSO Case # SJSO23OFF001895

Your Affiant knows that, since child pornography materials are illegal to distribute and possess, initial collection is difficult. Having succeeded in obtaining images, collectors are unlikely to quickly destroy them. Because of their illegality and the severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence. This proposition is not novel in either state or federal court: pedophiles, preferential child molesters, and child pornography collectors maintain their materials for significant periods of time.

Your Affiant thus believes there is probable cause that the child pornography stills exists at the above stated residence. Your Affiant knows from training and experience that searches and seizures of evidence from computers require agents to seize most or all computer items (hardware, software, passwords and instructions) to be processed later by a qualified person in a laboratory or other controlled environment. Computer storage media to include but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data or images of child pornography can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process renders it impractical to attempt this kind of data search on site.

Your Affiant knows from training and experience that searching computer systems for criminal evidence requires experience in the computer field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden", erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

Your Affiant knows from training and experience that in order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the computer. In cases like this one where the evidence consists partly of graphics files, the input and output devices to include but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected devices used for accessing computer storage media and the storage media are also essential to show the nature and quality of the graphic images which the system could produce. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as documentation, items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.

Your Affiant knows from training and experience that persons trading in, receiving, distributing or possessing images involving the exploitation of children or those interested in the actual exploitation of children often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the origin of the images as well as provide evidence of a person's interest in child pornography or child exploitation.

Your Affiant knows from training and experience that files related to the exploitation of children found on computers are usually obtained from the Internet using application software which often leaves files, logs or file remnants which would tend to show the exchange, transfer, distribution, possession or origin

of the files. Also that computer software or hardware exists that allows persons to share Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

Your Affiant knows from training and experience that computers used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the computer as well as ownership and use of internet service accounts used for the internet access. Your Affiant is aware that search warrants of residences involved in computer related criminal activity usually produces items that would tend to establish ownership or use of computers and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

Your Affiant knows from training and experience that search warrants of residences usually reveal items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

The above information leads your Affiant to believe and to have probable cause to believe that the Premises and the curtilage thereof are being used for the purpose of storing and/or distributing images, movies, or visual depictions of sexual conduct or sexual performance by a child or children, in violation of sections 827.071, Florida Statutes, related computer child exploitation and the possession of images of child pornography, unlawful use of a two-way communication device in violation of Florida Statue 934.215.

Affiant hereby requests the Court's permission to seize the following items, and to conduct an off-site search and analysis, or to delegate the search and analysis to an off-site computer forensic analyst, of the following items (hereinafter the "Property"):

1. **Samsung Galaxy S20 FE 5G Navy (IMEI: 354630363210200 registered to William Lee Lawshe)**
2. **Detailed photographs of the interior and exterior of the residence.**

WHEREFORE, Affiant makes this affidavit and prays for the issuance of a Search Warrant in due form of law commanding the Sheriff of St. Johns County, or any of his duly constituted Deputies, with any proper and necessary assistance, including forensic computer analyst experts, to search the above described premises and the curtilage thereof, and any vehicles thereon, or persons located within the premises and the curtilage reasonably believed to be connected with said illegal activity, for the said property heretofore described, and to search said computer / digital storage property described above and to seize and safely keep same, either in the daytime or in the nighttime, or on Sunday, as the exigencies of the occasion may demand, in order that the evidence may be procured to be used in the prosecution of such person or persons who have unlawfully used, possessed, or are using or possessing the same in violation of the laws of the State of Florida.

*Det. Mikayla Preston #11243*
Detective Mikayla Preston
St. Johns County Sheriff's Office

SWORN TO and subscribed before me this Wednesday, April 12, 2023

Sergeant Eugene Tolbert
St. Johns County Sheriff's Office
(notary public or law enforcement officer per FSS 117.10)

SJSO Case # SJSO22OFF007126

**IN THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA**

### SEARCH WARRANT

IN THE NAME OF THE STATE OF FLORIDA TO: ALL AND SINGULAR THE SHERIFF OF ST. JOHNS COUNTY, OR ANY OF HIS DULY CONSTITUTED DEPUTIES AND/OR CRIME SCENE TECHNICIANS, WITH ANY PROPER AND NECESSARY ASSISTANCE.

**WHEREAS**, complaint on oath and in writing supported by affidavit of credible witness, to-wit: Detective Mikayla Preston of the St. Johns County Sheriff's Office, has made to me the undersigned Judge in and for St. Johns County, Florida and

**WHEREAS**, said facts made known to me have caused me to find there is probable cause to believe evidence related to the following crime(s):

1.) Possession of Child Sexual Abuse Imagery; F.S. 827.071(4) and F.S. 827.071(5)

is being kept at a certain residence located in St. Johns County, Florida, described as follows, to-wit:



**208 Wisteria Rd., St. Augustine, FL 32086**

**To arrive at the target residence from the intersection of US 1 South and Shore Dr., turn left (east) onto Shore Dr. Drive for approximately 0.4 miles and turn left onto San Jose Rd. Drive for approximately 0.5 miles on San Jose Rd and then turn right onto Wisteria Rd. The target**

**residence is a one-story home, with a two car garage. The numbers 208 are prominently displayed on the front of the residence, on the side of the garage door. *Residence is currently secured by Law Enforcement.**

**AND WHEREAS**, the facts establishing grounds for this application are set forth in the affidavit of which affidavit is made part of this search warrant, and hereby incorporated by reference. (SEE AFFIDAVIT, attached hereto and incorporated by reference)

**THESE PRESENTS THEREFORE**, are to command you with proper and necessary assistance to search said premises, property, structures, and vehicles located thereon and seize as evidence, either in the day time or the night time or on Sunday, if required, as the exigencies of the occasion may demand or require, in and upon the said premises hereto described, and appurtenances thereunto belonging, being situated in the county of St. Johns, State of Florida, to diligently search the aforesaid residence and seize as evidence, to-wit:

**Any and all evidence relating to the investigation of the listed crime(s), to include the following:**

1. Samsung Galaxy S20 FE 5G Navy (IMEI: 354630363210200 registered to William Lee Lawshe)

2. **Detailed photographs of the interior and exterior of the residence.**

**FURTHER**, in addition to the seizure of the above-mentioned Property, the Court gives permission to conduct a forensic search and analysis of the Property for the evidence described, and if, upon arriving at the scene, the law enforcement officers executing the search conclude that it would be impractical to conduct a complete search of the computer hardware on-site for this search and analysis to be conducted off-site or to be delegated to be completed by a computer forensic analyst. The Court is aware that the recovery of data and digital evidence by a computer forensic analyst takes significant time. For this reason, the "return" inventory will be satisfied by a list of only the tangible items recovered from the premises.

**NOW THEREFORE**, you, with such lawful assistance as may be necessary, to include a computer forensic analyst, are hereby commanded, in the daytime or in the nighttime, or on Sunday, as the exigencies of the occasion may demand, to enter and search the aforesaid Premises and curtilage thereof, and or vehicles thereupon the curtilage belonging to or used by persons located at or within the Premises who are reasonably believed to be connected with said illegal activity, or any persons located on the Premises or within the curtilage reasonably believed to be connected with said illegal activity, for the Property described in this warrant, and if the same or any part thereof be found, you are hereby authorized to seize and secure same, as evidence in a case under investigation in their jurisdiction, giving proper receipt thereof and delivering a completed copy of this warrant to the person in control of the Premises, or in the absence of any such person, leaving a completed copy where the items are found, and making a return of your doings under this warrant within ten (10) days of the date hereof, and you or your designated forensic analyst are further authorized to search the Property for evidence of the crimes described herein, and you

are directed to confirm the security of said Property so it may be brought before a Court having jurisdiction of this offense to be used in the prosecution of persons violating this offense and thereafter to be disposed of according to law.

GIVEN UNDER MY HAND this Wednesday, April 12, 2023

CIRCUIT / COUNTY JUDGE
ST. JOHNS COUNTY FLORIDA

67-14

## Arrest Report

ST JOHNS COUNTY SHERIFFS OFFICE
4015 LEWIS SPEEDWAY
ST. AUGUSTINE, FL

| Report Date / Time | Report Number | Case Number/Cad Number | Reporting Officer Name |
|---|---|---|---|
| 4/22/2023 11:44 PM | SJSOCHG0056617S | SJSO23OFF004278 / SJSO23CAD098882 | CAMDEN, DENNIS JAME |

| Originating Agency ORI | Occur Date Time Range | | Jurisdiction |
|---|---|---|---|
| FL0550000 | 04/22/2023 22:10:52 - | | |

| OBTS Number | | Other Number | Clearance |
|---|---|---|---|
| | | | |

### Location of Occurrence

| County | Location Type | Location Description |
|---|---|---|
| ST. JOHNS | OTHER | ST JOHNS COUNTY SHERIFF'S OFFICE   (904) 824-8304 |

| Street Number | Street | Apt/Lot/Bldg | City | State | Zip Code |
|---|---|---|---|---|---|
| 4015 | LEWIS SPEEDWAY | | SAINT AUGUSTINE | FL | 32095 |

### Suspect

| First Name | Middle Name | Last Name | Suffix | Race | Sex | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| ALBERT | ARIEL | BODDEN | J | H | MALE | 600 | 260 | BLACK | BROWN |

| MNI # | SSN | Date of Birth | Age | ID Type | Drivers License or other ID | State | OCA / Agency ID |
|---|---|---|---|---|---|---|---|
| SJSO20MNI018687 | 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 | 11/21/1995 | 27 | | B350021954210 | FL | |

| Place of Birth: | MIAMI UNITED STATES |
|---|---|

Address

* RESIDENCE / 8343 PRINCETON SQ BLVD E 1707 , JACKSONVILLE, FL 32256 / 772-233-9417

### Arrest

| Arrest Date/Time | Arrest Location Type | Arrest Location Description |
|---|---|---|
| 4/22/2023 11:44:44 PM | OTHER | |

| Street Number | Street | Apt/Lot/Bldg | County | City | State | Zip Code |
|---|---|---|---|---|---|---|
| 4015 | LEWIS SPEEDWAY | | ST. JOHNS | SAINT AUGUSTINE | FL | 32095 |

### Charge :

| Counts | Charge | Bond Amount | | |
|---|---|---|---|---|
| 1 | 800.04.4a1 | $0.00 | ☐ | No Bond |

| Charge Degree | Charge Level |
|---|---|
| S | FELONY |

| General Offense Code | Arrest Offense Code |
|---|---|
| ATTEMPTED | LEWD LASCV BEHAVIOR |

Charge Description

LEWD OR LASCIVIOUS BATTERY VICTIM AGE 12 TO 16

Administrative Code - Description

-

### Charge :

| Counts | Charge | Bond Amount | | |
|---|---|---|---|---|
| 1 | 847.0135.4a | $0.00 | ☐ | No Bond |

---

**Arrest Report**                                                                     **Page 1 of 4**

| Report Date / Time | Report Number | Case Number/Cad Number | Reporting Officer Name |
|---|---|---|---|
| 4/22/2023 11:44 PM | SJSOCHG0056617S | SJSO23OFF004278 / SJSO23CAD098882 | CAMDEN, DENNIS JAME |

| Originating Agency ORI | Occur Date Time Range | | Jurisdiction |
|---|---|---|---|
| FL0550000 | 04/22/2023 22:10:52 - | | |

| OBTS Number | | Other Number | Clearance |
|---|---|---|---|
| | | | |

| Charge Degree | Charge Level |
|---|---|
| S | FELONY |

| General Offense Code | Arrest Offense Code |
|---|---|
| COMMITTED | OBSCENE COMMUNICATION |

**Charge Description**

TRAVEL TO MEET AFTER USE COMPUT TO LURE CHILD

Administrative Code - Description

-

**Charge :**

| Counts | Charge | Bond Amount | | No Bond |
|---|---|---|---|---|
| 1 | 847.0135.3a | $0.00 | ☐ | No Bond |

| Charge Degree | Charge Level |
|---|---|
| T | FELONY |

| General Offense Code | Arrest Offense Code |
|---|---|
| COMMITTED | OBSCENE COMMUNICATION |

**Charge Description**

USE COMPUTER TO SEDUCE SOLICIT LURE CHILD

Administrative Code - Description

-

**Charge :**

| Counts | Charge | Bond Amount | | No Bond |
|---|---|---|---|---|
| 1 | 934.215 | $0.00 | ☐ | No Bond |

| Charge Degree | Charge Level |
|---|---|
| T | FELONY |

| General Offense Code | Arrest Offense Code |
|---|---|
| COMMITTED | PUBLIC ORDER CRIMES |

**Charge Description**

USE 2 WAY COMM DEVICE TO FACIL FELONY

Administrative Code - Description

-

**Probable Cause**

The undersigned certifies and swears that there is probable cause to believe the above-named defendant, who was positively identified by his Florida Driver's License on the 22nd day of April, 2023, within St. Johns County, violated the law and did then and there:

1) Attempted Lewd and Lascivious Battery; F.S.S. 800.04.4a1
2) Travel to meet a minor for sex; F.S.S. 847.0135.4a
3) Solicitation of a minor for sex; F.S.S. 847.0135.3a
4) Unlawful use of a two-way communication device; F.S.S. 934.215

---

**Arrest Report**

| Report Date / Time | Report Number | Case Number/Cad Number | Reporting Officer Name |
|---|---|---|---|
| 4/22/2023 11:44 PM | SJSOCHG0056617S | SJSO23OFF004278 / SJSO23CAD098882 | CAMDEN, DENNIS JAME |

| Originating Agency ORI | Occur Date Time Range | | Jurisdiction |
|---|---|---|---|
| FL0550000 | 04/22/2023 22:10:52 - | | |

| OBTS Number | Other Number | Clearance |
|---|---|---|
| | | |

On the above date the St. Johns County Sheriff's Office was conducting a proactive undercover operation which targets suspects that use the internet to sexually exploit children. An undercover investigator was acting in an undercover capacity when she posted an ad to an internet commerce site while portraying a 13-year-old female.

The undercover (UC) was contacted by the suspect via text message and audio recorded text messages. It should be noted the below messages are not a full depiction of the conversation which transpired between the undercover and the suspect:

Suspect: Do you do bare?
UC: I can but im nervous about it
UC: it be weird being preggo so young
Suspect: We could get plan b pil
UC: they don give those to 13 year olds
Suspect: Wtf. I could have gotten it.
Suspect: Are you 18 years old or older?
UC: ummmm no lol
Suspect: I lost that other number. Would you do bare tho?
UC: I mean i would but i don wanna get preg
Suspect: Just have to take the pill after and you wouldn't
UC: But i cant get the pill with out help
Suspect: I would bring it
UC: Ok cool... can u get one this late?
Suspect: Yes
Suspect: It's not crazy but I want to cum inside since the pill
Suspect: Are you with law enforcement?
UC: no
UC: Ru?
Suspect: No, I'm not. but how can i be sure that you aren't with your age?
UC: I don know no cops that are my age sooooo
UC: But if ur not comfortable wit it u dont ahve to meet me rlly
Suspect: Can you send a nude while holding up 3 fingers?
Suspect: I'll just start heading there

The suspect who was positively identified as Albert A. Bodden (11/21/1995) traveled to a predetermined location within St. Johns County where he was taken into custody.

Post Miranda Albert, invoked.

Citation No. _____

---

**Arrest Report**                                                                 Page 3 of 4

| Report Date / Time | Report Number | Case Number/Cad Number | Reporting Officer Name |
|---|---|---|---|
| 4/22/2023 11:44 PM | SJSOCHG0056617S | SJSO23OFF004278 / SJSO23CAD098882 | CAMDEN, DENNIS JAME |

| Originating Agency ORI | Occur Date Time Range | | Jurisdiction |
|---|---|---|---|
| FL0550000 | 04/22/2023 22:10:52 - | | |

| OBTS Number | | Other Number | Clearance |
|---|---|---|---|
| | | | |

Domestic Violence: []
Probation: [] Yes [x] No If yes, Location: _____ Sexual Predator: [] Yes [x] No
English: [x] Yes [] No _____ Deaf/Mute: [] Yes [x] No
Attachments, Statements: [] Traffic Citations: [] DUI: []

## Jail Booking Facility

| ▶ | Booking Date/Time | Booking County | Booking Facility | | Booking Facility Phone |
|---|---|---|---|---|---|
| | | ST. JOHNS | ST. JOHNS COUNTY JAIL | | 904-824-8304 |

| Booking Facility Location | Booking Number |
|---|---|
| 3955 LEWIS SPEEDWAY ST. AUGUSTINE, FL 32084 | |

Booking Comments

## Court

| ▶ | Court County | Court Location |
|---|---|---|
| | ST. JOHNS | 4010 LEWIS SPEEDWAY ST AUGUSTINE, FLORIDA 32084 |

| Court | Court Phone | Court Appereance Date / Time | Court Fine |
|---|---|---|---|
| ST JOHNS COUNTY COURT | (904) 819-3600 | | |

Comments

| Officer Name Rank / ID # | Involvement On Report / Reporting Role | Officer Agency Org/Unit |
|---|---|---|
| CAMDEN, DENNIS JAME LE DEPUTY        10946 | REPORTING OFFICER | ST JOHNS COUNTY SHERIFFS OFFICE SJSO\INVEST\SPECIAL VICTIMS\ICAC |

The undersigned certifies and swears that he/she has just and reasonable grounds to believe that the above named Defendant, committed violation(s), of law, on the below date(s) and time(s), as listed in the probable cause associated with this report:

### Reporting Officer

| Officer Name | Office Rank | Officer ID No | Sworn and subscribed before me, the undersigned authority |
|---|---|---|---|
| CAMDEN, DENNIS JAME | LE DEPUTY | 10946 | This the _____ day of _____. _____ |
| Officer Agency | | | DEPUTY OF THE COURT, NOTARY OR LAW ENFORCEMENT |
| ST JOHNS COUNTY SHERIFFS OFFICE | | | |

Officer Signature

| ◯ No Bill / Petition | ◯ Issue Warrant | ◯ Prosecution Approved | |
|---|---|---|---|
| | | | Signature of Assistant State Attorney          Date |


67-15

CLASSIFICATION: FELONY

STATE OF FLORIDA

VS.

WILLIAM LEE LAWSHE
W/M; DOB: 11/09/1969  SS# 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

IN THE CIRCUIT COURT OF THE SEVENTH
JUDICIAL CIRCUIT, IN AND FOR ST. JOHNS
COUNTY, FLORIDA, IN THE YEAR TWO
THOUSAND TWENTY THREE

CASE NO:    CF2300516
AGENCY:    SJSO/23OFF001895

## INFORMATION

CHARGE(S):
I)    POSSESSION OF SEXUAL PERFORMANCE BY A CHILD
II)   POSSESSION OF SEXUAL PERFORMANCE BY A CHILD
III)  POSSESSION OF SEXUAL PERFORMANCE BY A CHILD

R.J. LARIZZA, State Attorney for the Seventh Judicial Circuit of the State of Florida and as such prosecuting attorney for this Court, in the name of and by the authority of the State of Florida charges that:

COUNT I: WILLIAM LEE LAWSHE, on or between January 25, 2023 and April 12, 2023 and on dates in between, in the County of ST. JOHNS and State of Florida, was unlawfully and knowingly in possession or control of or did intentionally view an image which, in whole or in part, file name: 0065(1) depicts a female juvenile bending down on her knees with her legs spread apart exposing her anus and a portion of her vagina, and WILLIAM LEE LAWSHE knew that image to include any sexual conduct by a child, contrary to Florida Statute 827.071(5). (3 DEG FEL)

COUNT II: WILLIAM LEE LAWSHE on or between January 25, 2023 and April 12, 2023 and on dates in between, in the County of ST. JOHNS and State of Florida, was unlawfully and knowingly in possession or control of or did intentionally view an image which, in whole or in part, with file name: 0059, depicts a female juvenile exposing her breasts and vagina, and WILLIAM LEE LAWSHE knew this image to include any sexual conduct by a child, contrary to Florida Statute 827.071(5). (3 DEG FEL)

COUNT III: WILLIAM LEE LAWSHE, on or between January 25, 2023 and April 12, 2023 and on dates in between, in the County of ST. JOHNS and State of Florida, was unlawfully and knowingly in possession or control of or did intentionally view an image which, in whole or in part, with file name: Screeenshot_20230122_174408_DuckDuckGo depicts, a female juvenile on a bed lifting clothing and exposing her vagina, and WILLIAM LEE LAWSHE knew that image to include any sexual conduct by a child, contrary to Florida Statute 827.071(5). (3 DEG FEL)

FOR THE STATE ATTORNEY

KAITLYN MAIRS PAYNE
Bar No. 99539
ASSISTANT STATE ATTORNEY
SEVENTH JUDICIAL CIRCUIT OF THE
STATE OF FLORIDA
4010 LEWIS SPEEDWAY
ST AUGUSTINE, FL 32084
(904) 209-1620
ESERVICESTJOHNS@SAO7.ORG

COUNTY OF ST. JOHNS

STATE OF FLORIDA

Personally appeared before me KAITLYN MAIRS PAYNE, Assistant State Attorney, for the Seventh Judicial Circuit of the State of Florida, known to me to be the foregoing prosecuting officer, who being duly sworn, says that the allegations set forth in the foregoing information are based upon facts that have been sworn to as true, and which, if true, would constitute the offense therein charged. Subscribed in good faith. Said facts based on testimony of material witnesses.

SWORN to and subscribed before me this __5__ day of May, 2023.

Submitted to the Clerk of the CIRCUIT Court, Seventh Judicial Circuit, in and For ST. JOHNS County, Florida, on the __5__ day of May, 2023.

NOTARY PUBLIC AT LARGE
STATE OF FLORIDA

LESLEY ROSARIO
Commission # HH 211665
Expires February 15, 2026

67-16

Good Morning Gentlemen,

Please find the Nolle Prosse filed moments ago attached for CF23-516.

Kaitlyn Mairs Payne
Assistant State Attorney
SVU/CCU/ICAC Prosecutor
4010 Lewis Speedway
Saint Augustine, Florida 32084
(904) 209-1620 ex. 1646

**From:** Payne, Kaitlyn
**Sent:** Friday, December 22, 2023 12:00 PM
**To:** Michael Roberts <mroberts@nrhnlaw.com>
**Cc:** C. Crawford Pierce, IV <crawfordpiercelaw@gmail.com>; Rich, Benjamin <RichB@sao7.org>
**Subject:** Re: WIliam Lawshe (2023-CF-00516)

We have recieved both this email and the previous regarding the aforementioned case and are looking into the matter.


Regards,

Kaitlyn


> On Dec 22, 2023, at 9:24 AM, Michael Roberts <mroberts@nrhnlaw.com> wrote:
>
>
> Kaitlyn and Ben -
>
> I know that it's the Friday before Christmas and everyone is trying to get out of the office to be with family - but I wanted to follow up on Crawford's email, as we haven't gotten a response or confirmation that you received it.
>
> As you can imagine, Mr. Lawshe is ready to put this chapter behind him and your action is required to do that.
>
> I also expect that given all that you guys deal with on a daily basis, this must be a welcome relief - to discover that a person is innocent and have the power to give them back their freedom. It must be especially gratifying to you Ben - who (I understand) worked with and knew Mr. Lawshe professionally.
>
> I know that you guys have to "dot the I's and cross the T's" but any timeline or update you can give would be greatly appreciated.
>
> I am out of town with my family - but you can email or call me anytime. My cell is (904)729-2346.
>
> Get Outlook for iOS
> <9AB6E04486614E4ABAA8C3E8B7B83026.png>
> **From:** C. Crawford Pierce, IV <crawfordpiercelaw@gmail.com>
> **Sent:** Wednesday, December 20, 2023 10:38:00 AM
> **To:** Kaitlyn Payne <PayneK@sao7.org>
> **Cc:** Michael Roberts <mroberts@nrhnlaw.com>; Benjamin Rich <RichB@sao7.org>
> **Subject:** WIliam Lawshe (2023-CF-00516)

Kaitlyn,

Please allow this email to serve as an update of our investigation into the ages and identities of the models in question. As you are aware, our ability to aggressively defend this case has been severely hampered by fear of the State's criminal investigation turning towards defense counsel simply for filling the holes left by law enforcement's investigation and turning stones that the State elected not to turn despite having the available resources as its disposal. If you recall, defense counsel was challenged during our evidence review to "Go home and do my own research on my computer." The challenge was ultimately accepted, and what follows is our findings.

At this time, we can conclusively prove that the two models, which are the subject of this case, are and were adults at the time the subject photos were taken.

1. The websites in question clearly state that the subject models are 18 years of age or older at the time of the photo shoot in question.
2. One of the images was watermarked with the URL, www.met-art.com
3. Met-art (website), which contains all of the subject images, describes the models as "verified" and states that it operates in compliance with 18 US Code §2257, 28 CFR 75
4. As you are aware, §2257 requires publishers of pornographic images to keep and maintain certain records verifying the age of all models.
5. Along with the statutory compliance statement, Met-art provides a link to its legal representative.
6. This legal representative, Jeffrey J. Douglas, is a licensed attorney in the State of California.
7. He is also the designated records custodian of Met-Art.
8. *Within one business day of contacting Mr. Douglas*, he provided the attached images of the two models in question.
9. The first model, who goes by the names "Sanija" and "Kacy Lane" was born on April 28, 2001, as documented in the government issued passport showing in the attached exhibit. The earliest images of her were recorded on October 10 - 13, 2019. Those images were published on November 18, 2019. This would make her an adult at the time the subject images were taken.
10. I have attached a screenshot the model's Instagram page and bio page on "babepedia.com" which confirms a birthday in April of 2001. You will note that her Instagram account links to Met Art's website.
11. The second model, Milena D. aka Milena Angel, has a birthday of 10 June 1991. Please see the attached exhibit with her passport images and an affidavit from the records custodian regarding her age at the time of the subject photo session. She was also an adult when the subject photos were taken.
12. I have attached screenshots of Milena D aka Milena Angel's Onlyfans account and Google profile which confirms a birthday

in 1991.

13. Both models are locatable on numerous adult pornography websites through a basic Google images search for their name and the search terms "adult nude model." Per our computer forensics expert, Aaron Weiss, a Google images search will not return images that contain child pornography.

At this point, we have definitive proof of the ages and identities of the models, which confirms that the images that are subject of the 3 counts charged against William Lawshe are **NOT** illegal, and therefore, do **NOT** violate section 827.071(5), as charged in the State's Information filed on May 5, 2023.

Next week is Christmas and Mr. Lawshe's entire family will be arriving in town in the coming days. We would expect that you will have filed the Notice of Nolle Prosequi prior to their arrival.

*Please acknowledge receipt of this email and its attached documents, and forward an advanced copy of the Notice to my attention at the time of its filing.*

Thank you very much for your time and attention to this matter. I wish you all a very merry Christmas!

Crawford Pierce, IV, Esq.
The Law Office of C. Crawford Pierce, IV
2807 N. Tenth Street, Suite 12
St. Augustine, FL 32084
(904) 468-3575
wwww.CrawfordPierceLaw.com
CrawfordPierceLaw@Gmail.com
<6E59BB4B46444B95A11FE2CED6A7F2FC.jpg>

<5B6FB52706B040C68C7CDC0972BA3048.png>

LEGAL NOTIFICATION: Florida Sunshine Statutes entail very broad public records requirements (F.S. 119). As required by law, all e-mails to and from the State Attorney's Office of Circuit 7 are kept as a public record. Your e-mail communications, including your e-mail address may be disclosed to the public and media at any time. If you have received this communication in error, do not distribute it. Please notify the sender immediately by electronic mail and delete this message.

<928AB0B17276403C881F33B9981A2DC4.png>

LEGAL NOTIFICATION: Florida Sunshine Statutes entail very broad public records requirements (F.S. 119). As required by law, all e-mails to and from the State Attorney's Office of Circuit 7 are kept as a public record. Your e-mail communications, including your e-mail address may be disclosed to the public and media at any time. If you have received this communication in error, do not distribute it. Please notify the sender immediately by electronic mail and delete this message.

LEGAL NOTIFICATION: Florida Sunshine Statutes entail very broad public records requirements (F.S. 119). As required by law, all e-mails to and from the State Attorney's Office of Circuit 7 are kept as a public record. Your e-mail communications, including your e-mail address may be disclosed to the public and media at any time. If you have received this communication in error, do not distribute it. Please notify the sender immediately by electronic mail and delete this message.

<Property Report - 5.10.23 - Lawshe.PDF>

LEGAL NOTIFICATION: Florida Sunshine Statutes entail very broad public records requirements (F. S. 119). As required by law, all e-mails to and from the State Attorney's Office of Circuit 7 are kept as a public record. Your e-mail communications, including your e-mail address may be disclosed to the public and media at any time. If you have received this communication in error, do not distribute it. Please notify the sender immediately by electronic mail and delete this message.

LEGAL NOTIFICATION: Florida Sunshine Statutes entail very broad public records requirements (F. S. 119). As required by law, all e-mails to and from the State Attorney's Office of Circuit 7 are kept as a public record. Your e-mail communications, including your e-mail address may be disclosed to the public and media at any time. If you have received this communication in error, do not distribute it. Please notify the sender immediately by electronic mail and delete this message.

LEGAL NOTIFICATION: Florida Sunshine Statutes entail very broad public records requirements (F. S. 119). As required by law, all e-mails to and from the State Attorney's Office of Circuit 7 are kept as a public record. Your e-mail communications, including your e-mail address may be disclosed to the public and media at any time. If you have received this communication in error, do not distribute it. Please notify the sender immediately by electronic mail and delete this message.

CAUTION: This email originated from outside of the Sheriff's Office. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you believe this message is fraudulent or malicious, please contact SO IT for further assistance by email so_it_group@sjso.org , or phone 904-209-3138.

CASE NO.  CF

STATE OF FLORIDA

VS.

WILLIAM LEE LAWSHE

OSSESSION OF SE   UAL   ERFORMANCE BY A CHILD
OSSESSION OF SE   UAL   ERFORMANCE BY A CHILD
OSSESSION OF SE   UAL   ERFORMANCE BY A CHILD

ST JOHNS COUNTY SHERIFFS OFFICE SJSO    OFF

# ECF 75

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

     Plaintiff,

v.                                CASE NO: 3:24-cv-00044-MMH-MCR

MIKAYLA PRESTON,
in her induvial capacity as a Detective for St. Johns County Sheriff's Office,
and KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

     Defendants.
_____/

## DEFENDANT KATHLEEN DULLY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Kathleen Dully ("Dr. Dully" or "Defendant"), by and through her undersigned counsel and pursuant to Federal Rules of Civil Procedure 56, files this Response in opposition to Plaintiff's Motion for Partial Summary Judgment [Doc. 66]. In support therefore, Defendant states the following:

### I.    INTRODUCTION AND SUMMARY OF ARGUMENT

This case considers a prior investigation into Plaintiff's possession of child sexual abuse materials and his subsequent arrest. Plaintiff now brings this suit against those whom he considers to have been responsible for his investigation. A singular count of the Second Amended Complaint—Count VII—was brought

1

against Dr. Dully in her individual capacity, alleging a violation of the 14th Amendment Due Process Clause pursuant to 42 U.S.C. § 1983. [Doc. 40, ¶¶ 206-218]. Dr. Dully's involvement in the matter was limited to reviewing five images (*Exhibits A - E*) and authoring three opinions (*Exhibits F - H*) at the request of law enforcement. Each opinion stated that the individual pictured appears to be under 18 years of age based on their visible anatomical signs of sexual maturity pursuant to a Sexual Maturity Rating (SMR).

On August 12, 2025, Plaintiff filed his Motion for Partial Summary Judgment against Dr. Dully. Plaintiff's Motion alleges that Dr. Dully willfully and maliciously fabricated false evidence as demonstrated by the following "Undisputed Facts" provided by Plaintiff: (1) Dr. Dully produced three separate reports in the investigation of Plaintiff; (2) Dr. Dully knew that the reports were part of a criminal investigation and may be used in court; (3) the reports were written on UF Child Protection Team letterhead with all indicia that they were reliable medical opinions, signed by the medical director; (4) in each of these reports, Dr. Dully offered opinions in clear, plain language that the individuals depicted were children, under the age of 18; (5) Dr. Dully intended and hoped that anyone reading the reports would understand that she, acting as the medical director of the UF Child Protection Team, was offering an opinion about the actual chronological age of the individuals depicted; (6) when the reports were produced, Dr. Dully knew that there was no

2

medically reliable method of determining the chronological age of an individual from digital photographs; (7) Dr. Dully knew that the opinions she offered were not probative of the actual chronological age of the individuals depicted or helpful to a finder of fact engaged in determining the actual age of the individuals depicted; (8) Detective Preston relied on these opinions to make the probable cause determination for a search and arrest; and (9) Dr. Dully's opinions were quoted in both affidavits supporting the search warrants issued in this case.

Contrary to Plaintiff's assertions, Defendant Dully does, in fact, dispute numbers 4, 5, and 7 of his Undisputed Facts. Notably, the testimonial and documentary evidence in the record proves the opposite of what Plaintiff has claimed; Dr. Dully did not opine as to the chronological age of the individuals depicted in the images she reviewed, Dr. Dully does believe her opinions have probative value, and Dr. Dully conveyed the inherent limitations of SMR directly to Detective Preston. As such, Plaintiff failed to prove that Dr. Dully fabricated false and misleading evidence in her minimal involvement in the investigation of Plaintiff. Of note, this list of undisputed facts avoids entirely a crucial element of his singular claim against Dr. Dully – that her reports were false or fabricated. Plaintiff does not even attempt to establish their falsehood, much less Dr. Dully's actual knowledge of their falsehood.

Accordingly, Plaintiff's Motion for Summary Judgment should be denied for the following reasons: (1) There are genuine disputes as to material facts related to Dr. Dully's alleged willful and malicious fabrication of evidence as presented by Plaintiff; (2) Dr. Dully is entitled to complete immunity from liability for civil and criminal claims against her in this matter pursuant to 34 U.S.C. § 20342 and qualified immunity because Plaintiff failed to provide evidence that Dr. Dully fabricated her reports.

## II.    STATEMENT OF FACTS

### A. The Initiation of the Investigation

On or about February 20, 2023, the St. Johns County Sheriff's Office (the "Sheriff's Office") received a cyber tip (#153739160) from the National Center for Missing and Exploited Children reporting that Plaintiff was in possession of "Apparent Child Pornography (Unconfirmed)." [Doc. 40, ¶¶ 35-36]. After receiving the tip, detective Mikayla Preston was assigned to the case, and she reviewed the image of unconfirmed child sex abuse material ("CSAM") that accompanied the tip and initiated an investigation. [Doc. 40, ¶¶ 45-55]. Plaintiff does not allege, nor offer any proof that the investigation did not begin in good faith.

Dr. Dully is employed by the University of Florida College of Medicine as the medical director of the Child Protection Team ("CPT"), which assists with suspected or advertised child maltreatment cases for much of northern Florida. *Dr. Dully's*

4

*Deposition*, 6:9-7:5. Dr. Dully and the CPT provide their services to law enforcement—both in this matter and in other matters—gratuitously. *Eugene Tolbert's Deposition*, 75:10-13; *Detective Preston's Deposition*, 268: 14-16. Before assuming this position, Dr. Dully worked in various occupations related to child maltreatment starting as early as 1989 when she passed the general pediatric specialty board examinations, and she proceeded to receive her board certification in child abuse pediatrics in 2009. *Dr. Dully's Deposition*, 7:6-10:8. Starting in 1994, Dr. Dully began using the sexual maturity rating ("SMR") or Tanner scale to review pornographic images to estimate the sexual maturity of the appearance of the individuals who were in them. *Dr. Dully's Deposition*, 23:15-21.

**B. Dr. Dully's Review of the Images**

When Detective Preston presented the first image (*Exhibit A – Filename f6a487 (last six characters)*) to Dr. Dully on a law enforcement laptop, she explained the image was the subject of a law enforcement investigation into a NCMEC cyber tip. After reviewing the image, Dr. Dully offered her medical opinion that the individual "appear[ed] to be younger than the age of 18" and could have been as young as 12. [Doc. 40, ¶¶ 103-106]. Dr. Dully used the SMR to evaluate the appearance of the individual in the image and provide an estimated age range; however, she did not attempt to state or estimate the exact chronological age of the individual. *Dr. Dully's Deposition*, 21:2-23. Contrary to Plaintiff's assertion in his

5

Motion, it is within the standard of care for medical professionals to use SMR when evaluating the age of a patient in any context. *Dr. Krugman's Deposition*, 27:12-17. Dr. Dully provided a letter to Detective Preston on February 22, 2023, explaining that the developmental genital appearance of the individual in the image was SMR IV and would be achieved at 12-15 years of age. *Exhibit F – February 22 Letter*. It is more likely than not that an individual evaluated at SMR IV for breast development is younger than 18 years old. *Dr. Krugman's Deposition*, 26:1-20. This process of reviewing images to determine the SMR that Dr. Dully followed is the same—or at least similar to—the process the Plaintiff's expert, Dr. Krugman, follows when working with law enforcement on CSAM issues. *Dr. Krugman's Deposition*, 18:17-19:17.

Detective Preston returned to Dr. Dully on April 5, 2023, with more images to review. Detective Preston told Dr. Dully that two of the images appeared to depict the same individual as the first image she reviewed, but provided no other investigative information. *Exhibit B – Filename 0065(1) and C – Filename 0059*. Dr. Dully provided a second opinion letter to Detective Preston on April 5, 2023, explaining that Detective Preston showed her two additional images of the what appears to be the same individual in the first image, and that Dr. Dully opined that the appearance of the individual in those images depicts development of SMR III or IV which would be achieved at 12-15 years of age. *Exhibit G – First April 5 Letter.*

The same day, Detective Preston presented two additional images to Dr. Dully that were retrieved from Plaintiff's phone. *Exhibit D – Filename DuckDuckGo (last phrase) and E – Filename VVFQ_o (last six characters)*. [Doc. 40, ¶¶ 122, 124]. After reviewing these images presented to her by Detective Preston, Dr. Dully offered her medical opinion that the individuals appeared to be "less than or equal to 9-13.5 years old." [Doc. 40, ¶¶ 122-126]. Dr. Dully provided a separate letter to Detective Preston on April 5, 2023, explaining that she made this opinion based on the depicted appearance of the individuals' breasts and genital areas. *Exhibit H – Second April 5 Letter*.

**C. Scope of Dr. Dully's Review**

When offering these opinions, Dr. Dully assumed that other information outside of her opinions would be considered by Detective Preston in conducting the investigation, and Dr. Dully did not know that her opinions would be used in a probable cause affidavit to seek a search warrant. *Dr. Dully's Deposition*, 48:14-24. Moreover, Dr. Dully did not consider the opinions she offered about sexual maturity from the appearance of a model in a pornographic image to be reliable as a sole basis for law enforcement to base their decision to make an arrest. *Dr. Dully's Deposition*, 32:9-19, 70:13-17. Similarly, the Plaintiff's expert, Dr. Krugman, would have expected law enforcement agents who requested his medical opinion to do more than

solely request and review that opinion in their investigation. *Dr. Krugman's Deposition*, 14:4-12.

As required by statute, Dr. Dully provided assistance in a law enforcement investigation of suspected child abuse. She did not endeavor to establish as a scientific certainty, solely by her application of the SMR scales, the ultimate facts of a child pornography prosecution. The use of SMR is not scientifically reliable in determining the actual chronological age of a model depicted in an image, so Dr. Dully did not offer any medical opinions on the actual age of the individuals in the images she examined. *Dr. Dully's Deposition*, 46:13-18, 71:5-10. As such, the letters Dr. Dully wrote to Detective Preston speak only to the appearance and depiction of the individuals in the images. *Ex. F, G, and H.* When providing her opinion to Detective Preston and any other law enforcement officers, Dr. Dully explained these limitations. *Dr. Dully's Deposition*, 33:6-13, 47:9-17. The medical opinions Dr. Dully provided in this matter were not the driving factor in the investigation; instead, Detective Preston stated that, even if Dr. Dully had refused to provide her services by reviewing the images, the case would not have stopped there. *Detective Preston's Deposition*, 192:6-195:7.

### D. Summary of Expert Testimony

Dr. Dully is the only witness identified in this case with any medical training that has reviewed the images. *Dr. Krugman's Deposition*, 8:23-25. While Plaintiff's

expert offers some criticism of Dr. Dully's application of the SMR scale, Plaintiff offers no actual rebuttal of Dr. Dully's ultimate opinion that the individuals appear to be younger than 18. Plaintiff offers no evidence that Dr. Dully knew or had any reason to know that the individuals were over the age of 18 at the time she completed her review. *Dr. Krugman's Deposition*, 33:2.-34:8.

### III.   ARGUMENT

Dr. Dully's depositions and other evidence relevant to this case have consistently shown that Dr. Dully was acting in good faith and within the standard of care when she provided her medical opinions in this matter. Moreover, Plaintiff makes the case that Dr. Dully's willingness to use SMR scales, an inexact science, in a criminal case is malicious as a matter of law. In doing so, he conveniently forgets the testimony of his own expert pediatrician and instead favors stacking up inferences and insinuations. Plaintiff argues Dr. Dully's honesty about the limitations of her opinion demonstrates malice and points to no other evidence establishing that she knew her opinion was unsupported.

**A. No Willfully False Information is Contained in Dully's Report**

Plaintiff alleged that Dr. Dully's opinions were willfully misleading and false. [Doc. 66, p. 9]. In support of this claim, Plaintiff quoted deposition language showing that: (1) Dr. Dully's opinions, alone, were insufficient to determine the actual age of the individuals; (2) Dr. Dully did not offer an opinion on the actual age

9

of the individuals; and (3) the images do not necessarily give an indication of the actual chronological age that may be discovered during the investigation. [Doc. 66, p. 9]. This is accurate.

Plaintiff showed repeatedly in his Motion that Dr. Dully's "opinions are in no way related to chronological age," and that the opinions were based entirely on the appearances of the individuals in the image. [Doc. 66, pp. 5, 7-8]. Plaintiff also quoted language showing that Dr. Dully expected that any factual determination of the actual age of an individual in a pornographic image would be established through the investigation by law enforcement, not through her opinion alone. [Doc. 66, p. 8]. Finally, Plaintiff quoted language demonstrating that Dr. Dully directly informed Detective Preston of the limitations of SMR and the unreliability of her opinion as to the chronological age of the individuals depicted in images. [Doc. 66, p. 10].

Considering this information, Plaintiff makes the remarkable leap in logic to conclude that Dr. Dully's reports "can *only* be explained by a malicious disregard for the truth or consequences of her actions..." [Doc. 66, pp. 10-11] (emphasis added). It is unclear what "truth" Plaintiff is referring to in this conclusion. Dr. Dully had no knowledge of the actual, chronological age of the individuals in the images. Her opinions spoke of the appearance of the individuals, and she made sure to convey the limitations of her opinions regarding chronological age directly to Detective Preston as she reviewed the images. Because fabrication of evidence

10

claims under the 14th Amendment as alleged by Plaintiff require *knowledge* that the evidence is false, the deposition testimony quoted by Plaintiff cannot satisfy the requirements of his claim. *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).

**B. Plaintiff Fails to Establish Intent to Deceive or Admission of Fabrication**

Plaintiff stated that Dr. Dully offered direct proof in deposition that she "intended for anyone reading her reports to believe that she was offering a medical opinion about the *actual age* of the individuals." [Doc. 66, p. 11] (emphasis added). Additionally, Plaintiff concluded that this direct proof constitutes a confession to "fabricating false and misleading evidence in a criminal investigation." [Doc. 66, p. 15]. The only proffered deposition testimony of these significant allegations fails to bear their weight. Plaintiff provided the following excerpt:

> Q· · ·Okay. I want to share again Exhibit 5 – I mean, I am sorry, Exhibit 4 from the original deposition, and let me go to the February 22nd. I am going to read a line. You say, "This female child appears younger than the age of 18." Is that what you mean when you say "appears," that makes it obvious that you are just talking about appearance, not her actual age?
>
> A· · ·Yes.
>
> Q· · ·Okay. April 5th, and I am moving down to the third letter in our exhibit, in the second paragraph you wrote, "This image shows a female child with her black top parted and her underwear down around her parted thighs, exposing her genital area clearly." You didn't use the word appear in that sentence. Why not?
>
> A· · ·I don't know why not. Maybe I did or maybe I didn't. What does it say? It is very easy to see. She has -- she's prepubertal.

11

Q· · ·You say, "This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly," but you don't say anything about appearances or appear in that.

A· · ·"She appears to have no pubic hair development in" --

Q· · ·Right. But did you call her a female child?· Do you see if I read that sentence how a person might interpret that as you saying that this person is a child, an actual child?

A· · ·Well, I hope so, yes, but I don't know that.

Q· · ·Wait, wait, wait, wait. You hope that someone would interpret this as you -- as you offering the opinion that this was actually a child, like her actual age was under the age of 18?

A· · ·Her age is indeterminant. But she is well under the age of 18, and that is her appearance.

Q· · ·So are you offering an opinion now on this image that the actual age of the model -- not just the appearance, but the actual age of the model is under the age of 18?

A· · ·No. Her appearance is under the age of 18 very clearly.

*Dr. Dully's Deposition*, 50:15-52:9.

Dr. Dully explicitly stated multiple times in this excerpt that she was opining on appearance and not actual age, which she considered to be indeterminate. Despite Plaintiff's attempts to characterize Dr. Dully's statements as being made with intent to deceive, it is clear from her testimony that she intended her opinion to convey that the individuals in the images she reviewed had the appearance of being underage. It is Plaintiff's counsel who misstates Dr. Dully's words in saying that she hoped or

intended that the reader(s) of her opinion would understand it to say that the individuals' actual, chronological ages were under 18.

Dr. Dully clarified that the chronological ages were indeterminate, but it was instead her conclusion that the appearances of the individuals were underage that she intended to convey. Plaintiff relies on one sentence in Dr. Dully's second April 5, 2023, letter that describes the individual in the image as a "female child," but he ignores that Dr. Dully concludes that same paragraph by stating that "[t]his developmental **appearance** is also ≤9-13.5 years of age. *Ex. H (emphasis added)*. In fact, throughout this short, two paragraph letter, Dr. Dully used the words "depicts," "appear," and "could be" seven times. *Ex. H*. Her other letters follow this same pattern.

Moreover, even if Dr. Dully did offer inaccurate opinions or used the SMR scale in a manner that was not scientifically supported as Plaintiff alleged, she still did not have any knowledge of the actual, chronological age of the individuals in the images, so Dr. Dully *could not* have intended to deceive anyone about their ages. What courts have found to constitute false evidence in violation of the 14th Amendment goes well beyond the scope of the medical opinions Dr. Dully provided in this matter. See *State v. Cayward*, 552 So. 2d 971 (Fla. 2d DCA 1989) (finding false evidence where police investigators deliberately manufactured *fake* laboratory reports and presenting them to a suspect during an interrogation to secure a

13

confession); *Napue v. People of State of Ill.*, 360 U.S. 264 (1959) (finding false evidence where a crucial witness for the State in a murder prosecution offered false testimony that the State Attorney *recognized as false when it was given*, and they chose to not correct that false testimony); *Ashley v. City of New York*, 992 F.3d 128 (2021) (finding false evidence where police detective *admitted to knowing the complaint was false* when signed);

The evidence in the case shows that Dr. Dully did not deceive or intend to deceive law enforcement about the reliability of the SMR scale, as: (1) she directly informed Detective Preston of the limitations of SMR and the unreliability of her opinion as to the chronological age of the individuals depicted in the images; (2) evaluated the images in good faith with little investigatory context; and (3) she expected that any factual determination of the actual age of an individual in a pornographic image would be established through the investigation by law enforcement, not through her opinion alone. [Doc. 66, pp. 8, 10].

### C. Probative Value is Irrelevant

Plaintiff quotes a limited portion of Dr. Dully's deposition to stand for the principle that she believes her opinions are not reliable or useful. This is a gross mischaracterization of her testimony. Plaintiff's quote highlights her insistence that her opinion should not stand alone. She was not admitting that it had no value at all. She states the exact opposite:

14

Q· · ·But that other purpose is not to provide reliable opinions on the actual age of models depicted in pornographic images, is it?

A· · ·Only appearance.

Q· · ·Right. And -- and appearance -- there's really no value to your opinion regarding appearance, is there?

A· · ·I am not sure -- I am not doing the investigation. I provide the consultation because I am required to and requested to.

Q· · ·But I am not -- I'm going to ask you the question again. There really is no value to your opinion regarding the appearance of a sexual maturity rating in a pornographic image, is there?

MR. WILSON:· Object to form.

A· · ·I don't --

Q· · ·It's a yes or no. Is there value or is there not value?

A· · ·There is value. In my opinion, there is value.

*Dr. Dully's Deposition*, 41:3-23.

Dr. Dully is not a detective or a prosecutor. The detectives approached her for an opinion, and they are free to reach their own conclusions about its probative value. Not every piece of evidence needs to be a smoking gun. The limited value of her testimony could mean many things as the case progressed, but it does *not* establish that her testimony is false.

## D. Plaintiff's Inapplicable Case Law

The Complaint brings only a 14th Amendment Due Process claim against Dr. Dully, with Plaintiff's Motion focusing on the violation being Dr. Dully's alleged

15

deliberate fabrication of false evidence. However, Plaintiff's memorandum on fabrication of evidence refers to cases involving malicious prosecution. [Doc. 66, pp. 16-18]. While a fabrication of evidence claim most certainly is a "species of malicious prosecution," they are not the same. *Watkins v. Officer Davlin Session*, No. 19-60810-CIV, 2021 WL 66372 at *10 & n.6 (S.D. Fla. 2021); see *McDonough v. Smith*, 588 U.S. 109, 114-15 (2019); see also *Foulke v. Morgan*, No. 3:20-CV-5506-MCR-EMT, 2021 WL 12170573 at *5 (N.D. Fla. 2021). Moreover, "under the Fourteenth Amendment, there is no substantive due process right to be free from malicious prosecution without probable cause" because "[a] malicious prosecution claim arises under the Fourth Amendment, not Fourteenth Amendment substantive due process." *Rehberg v. Pault*, 611 F.3d 828, 853 (11th Cir. 2010).

Unsurprisingly, nearly all of Plaintiff's cases, including *Aguirre-Jarquin v. Hemmert*, the case that was singled out in Plaintiff's Motion as being particularly "instructive," only consider malicious prosecution claims pursuant to the Fourth Amendment. No. 6:20-CV-25-RBD-DCI, 2023 WL 2558479 at *6 (M.D. Fla. 2023); *Watkins v. Officer Davlin Session*, No. 19-60810-CIV, 2021 WL 66372 (S.D. Fla. 2021); *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004); *Williams v. Miami-Dade Police Dept.*, 297 Fed. Appx. 941 (11th Cir. 2008); *Ashley v. City of New York*, 992 F.3d 128 (2d Cir. 2021); *Mills v. Barnard*, 869 F.3d 473 (6th Cir.

2017); *Foulke v. Morgan*, No. 3:20-CV-5506-MCR-EMT, 2021 WL 12170573 (N.D. Fla. 2021).

The only exception to the list of 14th Amendment cases provided by Plaintiff is the notion that "an acquitted criminal defendant may have a stand-alone fabricated evidence claim against the state actors under the due process clause of the Fourteenth Amendment…" *Black v. Montgomery County*, 835 F.3d 358, 371 (3d Cir. 2016). The Court further explains that, for this fabricated evidence claim to stand under the Fourteenth Amendment, the plaintiff must "draw a meaningful connection between [his] particular **due process injury** and the use of fabricated evidence against [him]." *Id*. at 371-72 (internal citations removed) (emphasis added). The Eleventh Circuit addressed this even more clearly by stating that a Fourteenth Amendment claim of fabrication of evidence must allege a procedural due process claim such as denying a plaintiff "the constitutionally required procedures necessary to challenge his indictments and arrest." *Rehberg v. Pault*, 611 F.3d 828, 853 (11th Cir. 2010). In fact, the Eleventh Circuit in *Rehberg* found that the plaintiff's successful challenges to the indictments brought against him demonstrated that there was no due process violation. *Id*. Similarly, Plaintiff successfully used the legal system to challenge the allegations against him, and he made no procedural due process claims that would implicate the Fourteenth Amendment.

17

Even if Plaintiff's allegations were to improperly be considered under the Fourteenth Amendment, Dr. Dully's minimal involvement does not satisfy the requirements of a fabricated evidence or malicious prosecution claim. Each case cited by Plaintiff found that the state actor charged with fabricating evidence had **knowledge** of that evidence being false. For example, in *Aguirre-Jarquin* (although summary judgment on the fabrication of evidence claim in favor of the plaintiff was *still* denied) the court found that a state finger-print examiner could have violated the plaintiff's due process rights by fabricating evidence through the following: (1) repeatedly sending print matches to an older analyst with medical issues who was considered to be incompetent; (2) violating policy by sending print matches for verification after other examiners in the office had expressly disagreed with the identification; (3) and failing to get prints verified by anyone else at all. No. 6:20-CV-25-RBD-DCI, 2023 WL 2558479 at *7 (M.D. Fla. 2023).

Here, Plaintiff has only proven that Dr. Dully knew, at the time her opinions were written, that the SMR scale was not a reliable method to determine the exact chronological age of individuals in images. The evidence is undisputed that Dr. Dully went to lengths to explain these limitations directly to Detective Preston and include supporting language in her written opinions. In fact, Plaintiff's expert stated that he is unable to testify that Dr. Dully provided deliberately false information, conspired with law enforcement to achieve a specific result, or did anything beyond

18

what he would consider to be negligently applying medical standards. *Dr. Krugman's Deposition*, 30:2-21. It is also important to note that, in providing his expert report, Dr. Krugman did not review any of the images himself. *Dr. Krugman's Deposition*, 8:23-9:4. He does not and cannot make the claim that Dr. Dully's evaluation was wrong, or that she should have been able to identify the individuals as adults. In no way can Dr. Dully's actions, in light of her knowledge of SMR limitations, be construed as malicious or fabricated.

### Dr. Dully's Protections

These protections will be addressed in greater detail in Dr. Dully's Motion for Summary Judgment, but she is entitled to the following:

### A. 34 U.S.C. § 20342 provides a Presumption of Good Faith

Title 34 U.S.C. § 20342 shields Dr. Dully from civil liability for providing her medical opinions in this matter. The broad protections of section 20342 apply because Dr. Dully is an individual who provided medical opinions through consultations with law enforcement regarding an investigation pursuant to a good faith report of CSAM. It is commonly understood that cases involving children who are unlawfully brought into the pornography industry constitute child abuse. *Dr. Krugman's Deposition*, 9:25-10:4. Because Dr. Dully's role in this matter is covered by section 20342, she **must** be excluded from any civil liability, and further, she is entitled to a presumption of good faith.

Even if Plaintiff did provide evidence rebutting this presumption of good faith, determining whether a presumption has been rebutted requires a weighing and consideration of the evidence that "cannot be appropriately undertaken in summary judgment proceedings." *RBC Ministries v. Tompkins*, 974 So.2d 569, 571 (Fla. 2d DCA 2008) (quoting *Heisig v. Heisig*, 620 So.2d 1106, 1106 (Fla. 4th DCA 1993). "[W]here there is evidence supporting the existence of a rebuttable presumption with respect to a material issue and the moving party bears the burden of disproving the presumed fact, the moving party is precluded from obtaining summary judgment." *Leitner v. Leitner*, 391 So. 3d 1023, 1026 (Fla. 5th DCA 2024) (citing *RBC Ministries v. Tompkins*, 974 So.2d 569, 571 (Fla. 2d DCA 2008). Here, the rebuttable presumption of good faith is material, and as the moving party, Plaintiff bears the burden of disproving the presumption of good faith. Therefore, summary judgment in Plaintiff's favor is **precluded**.

## B. Dr. Dully is entitled to Qualified Immunity

Pursuant to Section 768.28(9)(a), Fla. Stat., state officers, employees and agents are immune from lawsuits arising from "act[s], event[s], or omission[s] of action in the scope of [their] employment or functions." *Eiras v. State Dep't of Bus. & Prof'l Regulation Div. of Alcoholic Bevs. & Tobacco*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017). This immunity "may be pierced only if state agents either act outside the scope of their employment, or act 'in bad faith or with malicious purpose

or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.'" *Id.* (quoting Fla. Stat.§ 768.28(9)(a)). Thus:

In order to pierce the statutory immunity defense, Plaintiff must prove that the public official either acted outside the scope of their employment or in bad faith. The statute places an affirmative duty on the plaintiff to satisfy this pleading requirement. This duty cannot be satisfied by mere conclusory allegations. Without support, the complaint must fail. *Id.* (quoting Brown v. McKinnon, 964 so.2d 173, 175 (Fla. 3d DCA 2007) (internal citations omitted)). In this case, Dr. Dully is entitled to a presumption of good faith. 34 U.S.C.A. § 20342(2).

As the Second Amended Complaint expressly states that Dr. Dully was at all times "acting under the color of State Law" and "[with]in the course and scope of her role," the burden of proof necessarily shifts to Plaintiff to show that Dr. Dully violated a clearly established constitutional right in bad faith—meaning actual malice—when she provided her medical opinions to the Sheriff's Office. [Doc. 40 ¶¶ 146-148]. Plaintiff has failed to prove either prong of this requirement.

## CONCLUSION

Because there are genuine disputes of material fact, and Plaintiff is attempting to rebut a presumption of good faith, Plaintiff's Motion for Partial Summary Judgment should be denied. Additionally, Plaintiff has failed to show that Dr. Dully was acting in bad faith or with malicious intent, so she is entitled to qualified

immunity protections. Finally, Plaintiff has improperly argued a violation of the 14th Amendment Due Process Clause for fabrication of evidence without arguing or showing evidence of a due process violation.

WHEREFORE, Defendant respectfully requests this Court deny Plaintiff's Motion for Partial Summary Judgment.

Respectfully submitted,

*/s/ Jami M. Kimbrell*
Jami M. Kimbrell, Esq.
Florida Bar No. 0657379
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
Telephone: (850) 877-7776
Jami@jsh-pa.com
*Attorney for Defendant,*
*Kathleen Dully*

*/s/ John Wilson*
John Wilson, Esq.
Florida Bar No. 84798
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
Telephone: (850) 877-7776
Johnwilson@jsh-pa.com
*Attorney for Defendant,*
*Kathleen Dully*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served

on all counsel of record by e-filing on September 9, 2025.


_/s/ Jami M. Kimbrell_
Jami M. Kimbrell, Esq.

_/s/ John Wilson_
John Wilson, Esq.

ECF 78

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,

    Plaintiff,

v.                                Case No. 3:24-CV-00044-MMH-MCR

MIKAYLA PRESTON, et al.,

    Defendants.

_____/

**DEFENDANT DETECTIVE PRESTON'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant DETECTIVE MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, by and through undersigned counsel, and pursuant to Rule 56, Federal Rules of Civil Procedure, and Local Rule 3.01(b), files her response in opposition to Plaintiff's motion for partial summary judgment [ECF No. 67].

Plaintiff's motion should be denied. Plaintiff has not presented undisputed facts that, when applied to applicable law, would entitle him to judgment in his favor as to his unreasonable search and unreasonable arrest claims against Detective Preston.[1]

**DETECTIVE PRESTON'S OPPOSING STATEMENT OF FACTS**

This case centers around digital images that resulted in criminal charges against

---

[1] Plaintiff also raised a first amendment claim in his second amended complaint. ECF No. 40, Count V, p. 32. Plaintiff does not seek partial summary judgment on that claim.

Plaintiff for possession of child sexual abuse material ("CSAM"). ECF No. 40, ¶¶ 19, 34, 37; ECF No. 77-1. For purposes of this response only, Detective Preston does not dispute the facts presented in the section of Plaintiff's motion titled "Factual Background," except as noted below.

### "Documentation" Regarding Age of Individuals Depicted in Subject Images

Plaintiff asserts that after his arrest, his "criminal defense team located the contact information of the website's records' custodian (published on the website) and promptly received records with documentation of the models' age." ECF No. 67, p. 8. This is incorrect. At no point from Plaintiff's arrest to the present has anyone provided "documentation" of the ages of the individuals in the subject images at the time they were captured.

Jeffrey Douglas purports to be the custodian of records for the website met-art.com. ECF No. 67-8, p. 7. Mr. Douglas provided Plaintiff's criminal defense team redacted photographs of "Kasey Lane" and "Milena D." holding foreign passports. Id., p. 6. Neither of these photographs contain the individuals' names. Id.

Three of the images at issue in this litigation (f6a487, 0059, and 0065(1)) contain a tiny "met-art.com" watermark. Throughout this litigation, Plaintiff has referred to the individual in these images as "Milena D." Id., p. 6. The f6a487 image comprised the NCMEC Cybertip, and supported the search warrant for Plaintiff's cell phone records. ECF No. 67-1, p. 2. The 0059 and 0065(1) images supported Counts I and II of the Information. ECF No. 67-15.

During Plaintiff's criminal case, Mr. Douglas provided an affidavit executed in

2

2015 wherein he averred "to the best of his knowledge and belief" that "Milena D."[2] was born in June 1991, and "[t]he earliest photography of her was recorded in February 2010" when "[s]he was eighteen years (and seven months) old..." ECF No. 67-8, p. 7. Mr. Douglas provided no concrete or meaningful information to establish: (1) her real name; (2) her date of birth; or (3) the date(s) on which the 0059, 0065(1), or f6a487 images were captured. This is far from "documentation" of the "model's" age at the time the images were taken.

Mr. Douglas noted "she has been the subject of many inquiries" and the subject of "cases...in England, Iowa, Holland, and France." Id., p. 6.[3] Mr. Douglas stated further that he has "asked when [the] 'Top Model' film shoot occurred..." Id. The record does not establish when that "film shoot" occurred, or which pictures at issue in this litigation, if any, were taken as part of the "Top Model" "shoot."

Plaintiff was also charged with possession of sexual performance of a child based on the DuckDuckGo image. ECF No. 67-15. Plaintiff has referred to the individual in this image as "Kacey Lane." ECF No. 67-8, p. 6. By all accounts, the DuckDuckGo image has no connection to met-art.com. Mr. Douglas provided no concrete or meaningful information to establish: (1) her real name; (2) her date of birth; or (3) the date on which the DuckDuckGo image was captured. Moreover, Mr.

---

[2] The affidavit is silent as to "Kacey Lane."

[3] The f6a487 image had been viewed by NCMEC staff prior to January 25, 2023. ECF No. 77-2, 17:3-6, 110:13-111:2. Prior to January 25, 2023, this image had been seen in over 200 CyberTipline reports. Id., 15:12-16. As of earlier this year, NCMEC still classified the image as "CP, unconfirmed." Id., 111:3-14; *see also* Plaintiff's Motion to Seal, Case No. 3:24-00137-MMH-LLL, ECF No. 70.

Douglas provided no "documentation" that the individual in the DuckDuckGo image is, in fact, "Kacey Lane." To be sure, all Mr. Douglas provided was the thin promise that "[t]he earliest images of her" – whatever they may be – were taken when she was 18 years, 4 months, and 12 days old. Id.

Mr. Douglas did not assert that he was present when any of these images were captured. At best, he provided information of dubious veracity through multiple layers of hearsay. In any event, it fell well short of any definition of "documentation."

**First Affidavit for Search Warrant**

This section of Plaintiff's motion contains legal arguments masquerading as "factual background." ECF No. 67, pp. 12-13. For example, Plaintiff asserts that "Preston knew that Dr. Dully's opinion was not a reliable medical opinion." Id., p. 13. To the contrary, Detective Preston testified that she believed Dr. Dully was a reliable source of information in estimating the age of the individuals in these images. ECF No. 77-3, 105:19-106:19, 131:14-18. Detective Preston included the body of Dr. Dully's opinion verbatim in the search warrant affidavit. Compare ECF No. 67-1, pp. 2-3, and ECF No. 67-9, p. 1.

Plaintiff also asserts that Detective Preston "made material false and/or misleading statements" in her search warrant affidavit, and that she "did not know any ICAC [Internet Crimes Against Children] investigators who had encountered this website in past investigations." ECF No. 67, p. 13. To the contrary, Detective Preston testified that SJCSO Detective Kevin Greene told her he had encountered met-art.com in other investigations. ECF No. 77-3, 51:10-24, 54:2-22. Further, Detective Greene

4

testified that he had read that met-art.com had "used 17 year old models from the Ukraine back years ago" when he "was doing investigations,"[4] although he doesn't remember talking with Detective Preston about it. ECF No. 77-4, 52:2-11, 53:12-21.[5]

But perhaps most egregiously, Plaintiff asserts that "[b]ased on these false statements and omissions of exculpatory evidence, the judge executed the Search Warrant." ECF No. 67, p. 13. There is no factual basis for this claim in the record.

### Undisputed Facts Omitted from Plaintiff's Motion

Detective Preston's investigation began when Sgt Eugene Tolbert assigned the investigation of the NCMEC Cybertip to Detective Preston. ECF No. 77-5, 7:1-15. Sgt Tolbert was the first person to believe that the individual in the Cybertip image was a minor. Id., 7:1-10:7, 10:25-11:2, 11:18-24, 15:13-18, 16:12-13, 16:16-19, 17:13, 74:2-10. When reviewing NCMEC Cybertips for assignment to detectives, Sgt Tolbert would try to "weed out as many [tips] as possible just to keep the detectives' case loads manageable," and estimates that he would only assign around 50 percent of the Cybertips received. Id., 35:7-19.

Sgt Tolbert accompanied Detective Preston to meet Dr. Dully. Id., 11:25-12:14. Dr. Dully agreed that the individual in the f6a487 image appeared to be a child. Id., 15:22-25; ECF No. 67-9, p.1.

---

[4] Detective Green was an ICAC investigator from 2015 until 2017, during which time he investigated crimes. ECF No. 77-4, 5:4-21. For the past five years, he has been a digital forensics detective. Id., 4:11-5:3.

[5] Sgt. Tolbert also remembers Detective Greene telling him that met-art had previously displayed images of underage females. ECF No. 77-5, 39:21-40:8.

Dr. Dully is the medical director of the Child Protection Team for the University of Florida. ECF No. 77-6 6:9-15. The Child Protection Team is a body of experts that consults with agencies, including law enforcement agencies such as the St. Johns County Sheriff's Office. Id., 6:21-7:5. Dr. Dully is board certified in both pediatrics and child abuse pediatrics. Id., 10:2-8. Dr. Dully knows that law enforcement agencies will consult with her on suspected CSAM cases to assist with determining the age of the individual in an image. ECF No. 77-7, 78:24-79:20, 80:21-81:8. Dr. Dully understands that law enforcement is going to use her opinion, at least in part, in their decision-making process, such as whether or not to seek a search warrant. Id., 82:11-83:14. If Dr. Dully had not been willing to render her services, Detective Preston would have spoken to her supervisor. ECF No. 77-3, 192:6-193:22. According to Sgt. Tolbert, If Dr. Dully would have told detectives that the individual in the image was not a minor, they "would have went with what Dr. Dully said." ECF No. 77-5, 16:13-16; *see also* ECF No. 77-3, 192:23-193:9.

In addition to consulting with Dr. Dully prior to filing her affidavit for search warrant, Detective Preston also consulted with Kaitlyn Payne, then-assistant state attorney with the State Attorney's Office for the 7th Judicial Circuit of Florida. ECF No. 77-3, 182:20-183:10; ECF No. 77-8, ¶¶ 1-5. At the time of Plaintiff's arrest, Ms. Payne had years of experience and had prosecuted hundreds of cases involving internet crimes against children. Id., ¶ 3. Ms. Payne routinely and regularly relied on Dr.

6

Dully's opinions regarding the ages of individuals in these types of images. Id., ¶ 6.[6]

Ms. Payne reviewed the unredacted version of image f6a487, and reviewed and approved Detective Preston's affidavit for search warrant to Verizon/Synchronoss. Id., ¶ 5. Ms. Payne believed there was probable cause to seek a search warrant to obtain images on Plaintiff's phone. Id., ¶ 5-7. She believed there was probable cause even if Detective Preston would have omitted references to met-art.com in her affidavit for search warrant. Id., ¶ 5.

Detective Preston also consulted with Ms. Payne prior to arresting Plaintiff. ECF No. 77-3, 192:2-5, 198:1-199:21, 201:2-5; ECF No. 77-8, ¶ 11. Ms. Payne reviewed unredacted versions of the images titled 0065(1), 0059, and DuckDuckGo, and confirmed to Detective Preston that she would prosecute Plaintiff for possession of those images. ECF No. 77-8, ¶ 11. The decision to arrest passed through a SJCSO sergeant and lieutenant, as well. ECF No. 77-3, 192:2-5; 198:1-11; ECF No. 77-5, 33:23-34:5. Ultimately, Sgt. Tolbert participated in the ruse to get Plaintiff to come to the Sheriff's Office. ECF No. 77-5, 28:9-25.

Sgt. Tolbert does not agree that a reasonable investigation necessarily includes visiting the website where the image was published. Id., 37:12-19. Oftentimes, the companies that publish these images are overseas. Id., 41:2-13. Sgt. Tolbert cannot remember a scenario where detectives in his unit pursued age verification

---

[6] Sgt. Tolbert met with Dr. Dully approximately six times for her assistance in his investigations of child pornography. ECF No. 77-5, 56:15-22, 75:20-76:4. He understood her to be qualified to provide an expert opinion. ECF No. 77-5, 59:4-21.

documentation as part of an investigation. Id., 47:12-22. Sgt Tolbert reviewed and notarized the affidavit for search warrant. Id., 28:9-22; ECF No. 67-1, pp. 1, 5.

On May 5, 2023, Ms. Payne filed an Information charging Plaintiff with three counts of possession of sexual performance by a child for the 0065(1), 0059, and DuckDuckGo images. ECF No. 77-8, ¶ 12-13; ECF No. 67-15. The State Attorney's Office later decided to drop those charges. ECF No. 77-8, ¶ 14; ECF No. 67-16, p. 5.

## MEMORANDUM OF LAW

The Court is familiar with the standard for evaluating motions for summary judgment. In the interest of brevity, Detective Preston moves directly into legal argument.[7]

### I.    Plaintiff's Unreasonable Search Claim Fails

#### a.  Detective Preston had probable cause to seek a search warrant

In his complaint, Plaintiff asserted that "[a]t no time did Det. Preston ... have a reasonable basis to believe the image [was] CSAM." ECF No. 40, ¶57. In the instant motion, Plaintiff claims "[Detective] Preston never had probable cause to seek a search warrant or make an arrest because there was a complete lack of reasonably trustworthy information to support the search warrant." ECF No. 67, p. 23.

Probable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish a

---

[7] Plaintiff does not clearly divide his legal argument into sections addressing the two counts (unreasonable search and unreasonable arrest) addressed in his Motion. Nonetheless, Detective Preston will attempt to organize her Response to Plaintiff's memorandum of law by claim.

probability or substantial chance of criminal activity. *Washington v. Howard*, 25 F.4th 891, 898-99 (11th Cir. 2022) (*quoting District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). Probable cause "is not a high bar" and does not require an actual showing of criminal activity. *Wesby*, 583 U.S. at 57. It "does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). "So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." *Id.*

Viewed from the perspective of a reasonable officer, Detective Preston had probable cause to seek a search warrant based on the f6a487 image. Sgt Tolbert, Dr. Dully, Ms. Payne, and Detective Preston all thought the image depicted a minor.[8]

### b. Detective Preston did not make materially false statements in the search warrant affidavit

Plaintiff asserts that Detective Preston "made material false and/or misleading statements" in the search warrant affidavit. ECF No. 67, p. 13. In support, Plaintiff asserts that Detective Preston "knew that Dr. Dully's opinion was not a reliable medical opinion." Id. Again, that statement is without any factual support in the record. Moreover, based on her training and experience, Dr. Dully's opinions were

---

[8] Plaintiff avers, based on "observation skills," that the girl in the image looks 23 or 24 years old. ECF No. 77-9, 61:8-24.

reliable, and, in fact, had been relied upon by law enforcement in northeast Florida for some time. ECF No. 77-8, ¶ 6.

Plaintiff also asserts that Detective Preston had "no personal knowledge about whether or not there is a known history of illegal content on this site." ECF No. 67, p. 4. As discussed above, Detective Preston recalled that Detective Greene told her he had encountered met-art.com in other CSAM investigations. And while Detective Greene does not specifically recall talking with Detective Preston about that, Sgt Tolbert also remembers Detective Greene telling him that met-art.com had previously displayed images of underage females. The fact that Detective Preston learned that information from her fellow officers has no bearing on the Court's analysis regarding probable cause. "It is well established that '[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.'" *Smith v. City of Fairburn, Georgia,* 679 Fed. Appx. 916, 922 (11th Cir. 2017) (*quoting United States v. Ventresca,* 380 U.S. 102, 111 (1965)). Detective Preston did not have any reason to question the reliability of Detective Greene's statements.

### c. Detective Preston did not omit exculpatory evidence in the search warrant affidavit

Plaintiff asserts that Detective Preston omitted from her affidavit that NCMEC categorized the f6a487 image as "unconfirmed" child pornography. ECF No. 67, p. 13. All "unconfirmed" means is NCMEC believes it "could be CSAM, but [their] team is ... unaware of the age of the individual who is being depicted." ECF No. 77-2, 26:7-

13; 28:6-8. A large portion of the reports that come into the CyberTipline are "unconfirmed" child pornography, and NCMEC transmits reports of "unconfirmed" child pornography to law enforcement "on nearly a daily basis." Id., 63:18-21, 64:9-15. Moreover, the complete NCMEC classification is "Apparent Child Pornography (Unconfirmed)" [ECF No. 67-2, p. 1], "which indicates the image appears to be child pornography." *See, e.g., United States v. Lynch*, No. 3:21-CR-00236, 2025 WL 43552, at *6 (M.D. Tenn. Jan. 7, 2025) ("This classification [Apparent Child Pornography (Unconfirmed)] indicates that the image appears to be child pornography. That the label includes the qualifier 'unconfirmed,' does not convey that it is not possible to ascertain whether the image is in fact child pornography; it is merely a reflection of NCMEC's role as a national clearinghouse and resource center rather than an investigative agency.") Regardless, Detective Preston *did* include in the affidavit for search warrant that the CyberTip "advised that the user uploaded one (1) image of *possible* CSAM." ECF No. 67-1, p. 2 (emphasis added). Accordingly, NCMEC's categorization of the f6a487 image as "unconfirmed" was not "exculpatory," and certainly had no bearing on the issue of probable cause.

Similarly, Plaintiff asserts that Detective Preston omitted from the affidavit that some detectives disagreed whether the individual depicted in the image was underage. ECF No. 67, p. 13. With all due respect to these other detectives, their opinions are not "exculpatory evidence." Especially here, when both Dr. Dully and Ms. Payne opined that the individual depicted in the f6a487 image appeared to be a child.

Finally, Plaintiff appears to suggest that Detective Preston "omitt[ed] material

11

exculpatory evidence [because] [s]he did not attach or include the subject image [with her search warrant affidavit]." ECF No. 67, p. 13. This argument fails for at least two reasons. First, the subject image (which Plaintiff did not attach to his motion, but which Detective Preston is filing in support of her response) *supports* a finding of probable cause, as the individual depicted in the f6a487 image clearly appears to be a child. Second, it is undisputed that the judges Detective Preston worked with preferred search warrants be submitted electronically, which could not have included attaching the image. ECF No. 77-3, 133:11-20.

### d. Even if there were falsities or omissions, the search warrant was still valid

Even if the affidavit contained falsities or omissions, the search warrant still would have been supported by probable cause. In *Franks v. Delaware*, 438 U.S. 154, 171 (1978), the Supreme Court held that a search warrant is void under the Fourth Amendment if the affidavit supporting the warrant contains "deliberate falsity or ... reckless disregard" for the truth. However, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause[,]" then the warrant is valid. *Id.* at 171-72. Negligent or innocent mistakes do not violate the Fourth Amendment. *Id.* at 171.

Here, there is nothing to suggest that Detective Preston deliberately falsified or omitted any information with reckless disregard for truth or an intent to mislead the judge reviewing and signing the search warrant. More importantly, nothing that was

12

allegedly false or omitted would have been critical to the finding of probable cause or lack thereof. Considering the remainder of the information provided in the search warrant affidavit (a detailed description of the image; that the CyberTip advised one image of possible CSAM; that Dr. Dully reviewed the image and opined that the "female child" in the image "appears younger than 18 years of age"), removal of the allegedly "false" information and inclusion of the allegedly "omitted" information would have had no effect on the probable cause determination.

### e. Detective Preston enjoys qualified immunity from Plaintiff's unlawful search claim

Plaintiff's motion contains a section titled "Qualified Immunity" that provides two paragraphs of general overview of the doctrine, and the threadbare assertion that "the requirement of probable cause, an objectively reasonable investigation and the prohibition against false statements to judicial authorities were clearly established." ECF No. 67, p. 20 (*citing Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004)).

The only other place the phrase "qualified immunity" appears is in the "Conclusion" section, where Plaintiff states "Det. Preston is not entitled to qualified immunity..." ECF No. 67, p. 24.

Plaintiff has not presented sufficient (or really, any) argument to support his assertions that Detective Preston does not enjoy qualified immunity. Plaintiff does not even outline the analysis the Court must undertake. Accordingly, Plaintiff cannot meet his burden of establishing that qualified immunity does not apply. Even if Plaintiff had undergone a thorough analysis, he could not show qualified immunity would not

13

preclude his unlawful search claim against Detective Preston.

The qualified immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted). Qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

To invoke qualified immunity, a public official must demonstrate that he was acting within the scope of his or her discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). The term discretionary authority "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it cannot be disputed that Detective Preston was acting within the scope of her discretionary authority, as all of the challenged actions occurred while she was on duty as a law enforcement officer conducting investigative and arrest functions.

Because Detective Preston was acting within the scope of her discretionary

14

authority, the burden shifts to Plaintiff to demonstrate that qualified immunity is inappropriate. *See id.* To do that, Plaintiff must show that, when viewed in the light most favorable to him, the facts demonstrate that Detective Preston violated his constitutional right and that that right was "clearly established...in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officer's actions. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. 223. The Court may decide these issues in either order, but to survive a qualified immunity defense, Plaintiff must satisfy both showings. *Maddox*, 727 F.3d at 1120 (citation omitted).

A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law. *Gilmore v. Ga. Dep't of Corr.*, No. 23-10343, --- F.4th ---, 2025 WL 1911728, at *8 (11th Cir. July 11, 2025) (en banc) (*quoting T.R. by and through Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 883 (11th Cir. 2022)).

Here, for the reasons discussed above, Plaintiff cannot establish that Detective Preston violated his constitutional rights in seeking a search warrant. Accordingly, Detective Preston enjoys qualified immunity under the first prong.

Additionally, Plaintiff cannot establish that the constitutional right allegedly violated was clearly established in light of the specific context of the case and not as a

15

broad general proposition. To be sure, Plaintiff asserts that "the requirement of probable cause, an objectively reasonable investigation and the prohibition against false statements to judicial authorities were clearly established." ECF No. 67, p. 20. But that is precisely the sort of "broad general proposition" that is insufficient to defeat qualified immunity. And Plaintiff makes no real effort to show a clearly established right under any of the aforementioned three ways.

Moreover, for purposes of qualified immunity, the lower standard of "arguable probable cause" applies. *Ross v. James*, 861 Fed. Appx. 770, 778 (11th Cir. 2021) (*quoting Paez*, 915 F.3d at 1288) ("If the affidavits, including the omitted information, 'would have demonstrated even arguable probable cause ... then the officers are entitled to qualified immunity.'"). Here, the evidence that Detective Preston had at the time she sought a search warrant – even with the allegedly omitted information – would have provided arguable probable cause.

For these reasons, Detective Preston enjoys qualified immunity from Plaintiff's unlawful search claim.

## II.     Plaintiff's Unreasonable Arrest Claim Fails

### a. Detective Preston had probable cause to arrest Plaintiff

The return on the search warrant on Plaintiff's phone revealed three additional pictures that supported Plaintiff's arrest and became Counts I, II, and III of the Information. ECF No. 77-8, ¶ 12-13; ECF No. 67-15. Prior to arresting Plaintiff, Detective Preston conferred with Dr. Dully, who opined that the "female child" in the

16

0065(1) and 0059 images "is depicted to be...≤12-15 years of age," and "female child" in the DuckDuckGo image has the developmental appearance of ≤9-13.5 years of age." ECF No. 67-9, pp. 2-3. Detective Preston also met with Ms. Payne, who confirmed that she would prosecute Plaintiff for possession of those images. ECF No. 77-8, ¶ 11. All of this provides Detective Preston with ample probable cause to arrest Plaintiff.

Plaintiff's arguments regarding an alleged lack of probable cause are actually arguments for potential defenses to the charged crimes. An affirmative defense to an alleged crime does not necessarily vitiate probable cause. *Manners v. Cannella*, 891 F.3d 959, 971-72 (11th Cir. 2018). Indeed, "arresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed." *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002), *abrogated on other grounds by Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018). This is so, in part, because probable cause is a preliminary determination made initially in an ex parte proceeding. *Paez*, 915 F.3d at 1286. It does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence. *See Manners*, 891 F.3d at 968. A law enforcement officer is not required to resolve every inconsistency found in the evidence. *Paez*, 915 F.3d at 1286. Moreover, police officers aren't lawyers, and are not expected to resolve legal questions or to weigh the viability of most affirmative defenses. *See Williams v. City of Albany*, 936 F.2d 1256, 1260 (11th

17

Cir. 1991). So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause. *Paez*, 915 F.3d at 1286. The touchstone remains the reasonableness of the officer's conduct. *Id.*

Detective Preston conducted a reasonable investigation. Plaintiff cites *Cozzi v. City of Birmingham*, 892 F.3d 1288, to support his argument that Detective Preston disregarded easily obtainable facts that might tend to exculpate a suspect. ECF No. 67, p. 19. *Cozzi* has been abrogated, as it applied a more demanding probable cause standard that Eleventh Circuit and Supreme Court precedent require. *See, e.g., Harris v. Hixon*, 102 F.4th 1120, 1128 (11th Cir. 2024) (*citing Washington*, 25 F.4th at 899–901 and *Garcia v. Casey*, 75 F.4th 1176, 1186 n.1 (11th Cir. 2023)). Moreover, in *Cozzi*, the perpetrator had multiple tattoos up and down his arm, while the suspect had only one tattoo which the arresting officer refused to look at. *Cozzi*, 892 F.3d at 1297. Here, Plaintiff has not identified similar "plainly exculpatory and easily verifiable information" that Detective Preston ignored. *Id.* Rather, he merely "points to additional steps in the investigation that he thinks would have been useful for [Detective Preston] to perform." *Harris*, 102 F.4th at 1129. "His investigative suggestions are not evidence of a constitutional violation." *Id.*

Moreover, the fact that Detective Preston consulted with Ms. Payne (an experienced prosecutor of internet crimes against children) also supports Detective Preston's belief that probable cause existed and that her investigation was sufficient.

18

*Poulakis v. Rogers*, 341 Fed. Appx. 523, 533 (11th Cir. 2009) ("It stands to reason that an officer who, prior to an arrest, presents the facts to an assistant state attorney in the course of his official duties, and receives the prosecutor's advice that there is probable cause to arrest, would have a stronger reason to believe that there was probable cause."). Notably, neither Detective Preston's supervisors nor Ms. Payne instructed Detective Preston to visit websites or seek age verification information. And even Plaintiff concedes that a website purporting to comply with age verification laws may still post pictures of underaged individuals. ECF No. 77-9, 84:20-85:3.

Plaintiff also argues that Detective Preston had "no evidence to support a reasonable belief that Mr. Lawshe knew or believed that the image ... depicted a minor." ECF No. 67, p. 5. But Detective Preston was not required to definitively prove intent prior to arresting Plaintiff. A reasonable officer could infer Plaintiff's intention from his actions. *See United States v. Martinez*, 96 F.3d 473, 478 n. 7 (11th Cir.1996) ("'[A]cts indicate the intention' is an old maxim.").

### b. Detective Preston enjoys qualified immunity from Plaintiff's unlawful arrest claim

"[O]fficers who make an arrest ... are entitled to qualified immunity if there was arguable probable cause for the arrest." *Kingsland*, 382 F.3d at 1232 (*citing Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999)). Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge ... could have believed that probable cause existed to arrest." *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001). In other words, Plaintiff must establish that no reasonable

19

officer would have probable cause under the totality of the circumstances. *Kingsland*, 382 F.3d at 1232 (*citing Storck v. City of Coral Springs*, 354 F.3d 1307, 1313 (11th Cir. 2003)).

Here, Detective Preston had, at least, arguable probable cause. There is little question that a reasonable officer in Detective Preston's position could have credited Dr. Dully opinions and determined probable cause existed to arrest Plaintiff. In fact, Detective Preston's supervisors, as well as Ms. Payne, so agreed. For the foregoing reasons, Plaintiff's motion should be denied.

Respectfully submitted this 9th day of September, 2025.

/s/ *Matthew J. Carson*
**MATTHEW J. CARSON**
Florida Bar Number: 0827711
mcarson@sniffenlaw.com
**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004
*Attorneys for Detective Mikayla Preston*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of September, 2025, a true and correct copy of the foregoing was electronically filed in the United States District Court for the Middle District of Florida using the CM/ECF system, which will serve counsel of record.

/s/ *Matthew J. Carson*
**MATTHEW J. CARSON**

20

# ECF 83

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,

     Plaintiff,

v.                                                            Case No. 3:24-CV-00044-MMH-MCR

MIKAYLA PRESTON, et al.,

     Defendants.

_____/

**DEFENDANT DETECTIVE PRESTON'S
MOTION FOR FINAL SUMMARY JUDGMENT**

Defendant MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, by and through undersigned counsel, and pursuant to Rule 56, Federal Rules of Civil Procedure, and Local Rule 3.01(b), files her motion for final summary judgment in her favor.

This case stems from the investigation and arrest of Plaintiff for possession of child sexual abuse material ("CSAM"). Plaintiff's second amended complaint [ECF No. 40] brings three counts against Detective Preston:

Count I – Fourth Amendment, Unreasonable Search

Count III – Fourth Amendment, Unreasonable Arrest

Count V – First Amendment

As detailed below, based on the undisputed facts in this case, Plaintiff's claims fail as a matter of law. Moreover, Detective Preston enjoys qualified immunity from

Plaintiff's claims. For these reasons, Detective Preston is entitled to summary final judgment in her favor.

## STATEMENT OF UNDISPUTED FACTS

In or around February 2023, SJCSO Sgt. Eugene Tolbert assigned SJCSO Detective Mikayla Preston to investigate a CyberTip received from the National Center for Missing and Exploited Children (NCMEC). ECF Nos. 67-1, 67-2; ECF No. 5, 7:1-15. The NCMEC CyberTipline Report indicated that Synchronoss Technologies – the cloud-based storage provider for Verizon – had reported a file (f6a487) had been uploaded by a phone belonging to Plaintiff. ECF Nos. 67-1, 67-2. NCMEC classified the image as "Apparent Child Pornography (Unconfirmed)." ECF No. 67-1.

Sgt. Tolbert reviewed the CyberTip image before assigning it to Detective Preston and believed it constituted CSAM.[1] ECF No. 5, 7:1-10:7, 9:11-18, 10:25-11:24, 15:13-23, 16:12-13, 16:16-19, 17:13, 74:2-10.

Sgt. Tolbert accompanied Detective Preston to meet Dr. Kathleen Dully to get "an extra layer of confirmation" that the individual in the f6a487 image was a minor. ECF No. 5, 11:14-17, 11:25-12:14, 15:3-12, 57:8-19. Dr. Dully is the medical director of the Child Protection Team for the University of Florida. ECF No. 6, 6:9-15. The Child Protection Team is a body of experts that consults with agencies, including law enforcement agencies such as the St. Johns County Sheriff's Office. Id., 6:21-7:5. Dr.

---

[1] When reviewing NCMEC CyberTips for assignment to detectives, Sgt. Tolbert would try to "weed out as many [tips] as possible just to keep the detectives' case loads manageable," and estimates that he would only assign around 50 percent of the CyberTips received. ECF No. 5, 35:7-19.

Dully is board certified in both pediatrics and child abuse pediatrics. Id., 10:2-8. Dr. Dully knows that law enforcement agencies will consult with her on suspected CSAM cases to assist with determining the age of the individual in an image. ECF No. 7, 78:24-79:20, 80:7-81:8. Dr. Dully understands that law enforcement is going to use her opinion, at least in part, in their decision-making process, such as whether or not to seek a search warrant. Id., 82:11-83:14.

Dr. Dully agreed that the individual in the f6a487 image appeared to be a child. ECF No. 5, 15:22-25; ECF No. 67-9, p.1. Detective Preston believed Dr. Dully was a reliable source of information in estimating the age of the individuals in these images. ECF No. 3, 101:1-4, 105:19-106:19, 131:14-18. Detective Preston included the body of Dr. Dully's opinion verbatim in the search warrant affidavit. Compare ECF No. 67-1, pp. 2-3, and ECF No. 67-9, p. 1.

If Dr. Dully had not been willing to render her services, Detective Preston would have spoken to her supervisor, Sgt. Tolbert. ECF No. 5, 192:6-193:22. According to Sgt. Tolbert, if Dr. Dully would have told detectives that the individual in the image was not a minor, they "would have went with what Dr. Dully said." ECF No. 5, 16:13-16, 18:8-12, 15:23-25; see also ECF No. 6, 192:23-193:9.

On February 22, 2023, Dr. Dully provided a letter to Detective Preston wherein Dr. Dully described the f6a487 image in some detail and stated her opinion that "[t]his female child appears younger than 18 years of age. She would have achieved this developmental genital appearance of SMR IV at 12-15 years of age." ECF No. 67-9, p. 1

3

On or around February 28, 2023, Detective Preston submitted an affidavit for search warrant for Plaintiff's cell phone records. ECF No. 67-1. She included in the affidavit information taken verbatim from the NCMEC CyberTip and information taken verbatim from Dr. Dully's February 22, 2023, opinion letter. Id. Detective Preston also noted "there is a watermark of www.met-art.com on the offending image. This site has a known history of displaying CSAM images of teenage girls and CSAM content from this site has been encountered by other ICAC investigators in past investigations." ECF No. 67-1, p. 3. Detective Preston recalls that she spoke with SJCSO Detective Kevin Greene who told her he had encountered met-art.com in other investigations. ECF No. 6, 51:10-24, 54:2-22. Sgt. Tolbert also remembers Detective Greene telling him that met-art had previously displayed images of underage females. ECF No. 5, 39:21-40:8. Detective Greene had read that met-art.com had "used 17 year old models from the Ukraine back years ago" when he "was doing investigations,"[2] although he doesn't remember talking with Detective Preston about it. ECF No. 4, 52:2-11, 53:12-21.

Detective Preston also consulted with Kaitlyn Payne, then-assistant state attorney with the State Attorney's Office for the 7th Judicial Circuit of Florida. ECF No. 5, 182:20-183:10; ECF No. 8, ¶¶ 1-5. At the time of Plaintiff's arrest, Ms. Payne had years of experience and had prosecuted hundreds of cases involving internet

---

[2] Detective Green was an ICAC investigator from 2015 until 2017, during which time he investigated crimes. ECF No. 4, 5:4-21. For the past five years, he has been a digital forensics detective. ECF No. 4, 4:11-5:3.

crimes against children. ECF No. 8, ¶ 3. Ms. Payne routinely and regularly relied on Dr. Dully's opinions regarding the ages of individuals in these types of images. ECF No. 8, ¶ 6.[3]

Ms. Payne reviewed the unredacted version of the f6a487 image, and reviewed and approved Detective Preston's affidavit for search warrant to Verizon/Synchronoss. Id., ¶ 5. Ms. Payne believed there was probable cause to seek a search warrant to obtain images on Plaintiff's phone. Id., ¶ 5-7. She believed there was probable cause even if Detective Preston would have omitted references to met-art.com in her affidavit for search warrant. Id., ¶ 5.

On or around February 28, 2023, a circuit court judge signed the warrant. ECF No. 67-1, p. 8. On April 4, 2023, Synchronoss complied with the search warrant. ECF No. 67-13, p. 4; ECF No. 3, 134:5-9. Detective Preston reviewed numerous images provided by Synchronoss. ECF No. 3, 135:17-136:2. Detective Preston found three images that she thought were child pornography and for which Plaintiff was criminally charged – 0065(1), 0059, and DuckDuckGo. ECF No. 3, 136:13-17, 137:20-24; ECF No. 67-9, pp. 2, 3. The 0065(1) and 0059 images appear to be of the same individual as the f6a487 image. ECF No. 3, 138:5-10; ECF No. 67-9, p. 2.

On April 5, 2023, Detective Preston met with Dr. Dully again and showed her the 0065(1), 0059, and DuckDuckGo images. ECF No. 67-9, pp. 2, 3. Dr. Dully

---

[3] Sgt. Tolbert met with Dr. Dully approximately six times for her assistance in his investigations of child pornography. ECF No. 5, 56:15-22, 75:20-76:4. He understood her to be qualified to provide an expert opinion. ECF No. 5, 59:4-21.

provided letters to Detective Preston wherein she described the images in some detail and stated her opinion that the "female child" in the 0065(1) and 0059 images "is depicted to be...≤12-15 years of age," and the "female child" in the DuckDuckGo image has the developmental appearance of ≤9-13.5 years of age." ECF No. 67-9, pp. 2, 3.

Detective Preston also consulted with Ms. Payne prior to arresting Plaintiff. ECF No. 3, 192:2-5, 198:1-199:21, 201:2-5; ECF No. 8, ¶ 11. Ms. Payne reviewed unredacted versions of the images titled 0065(1), 0059, and DuckDuckGo, and confirmed to Detective Preston that she would prosecute Plaintiff for possession of those images. ECF No. 8, ¶ 11. The decision to arrest passed through a SJCSO command staff, as well. ECF No. 3, 192:2-5; 198:1-199:21; ECF No. 5, 30:8-31:6, 32:16-33:3, 33:23-34:5, 34:12-17.

Sgt. Tolbert also participated in the ruse to get Plaintiff to come to the Sheriff's Office. ECF No. 5, 28:23-25. Sgt. Tolbert worked with Plaintiff in a law enforcement case in 2013. ECF No. 5, 29:1-29:10. Sgt. Tolbert called Plaintiff and said the Sheriff's Office needed his help locating a missing person. ECF No. 9, 23:16-24:1, 24:12-17. Plaintiff drove to the Sheriff's Office to meet with detectives. ECF No. 9, 24:18-21. Upon arrival, SJCSO deputies removed Plaintiff's gun and other duty equipment.[4] ECF No. 9, 25:11-26:13. Shortly thereafter, Detective Greene and Detective Preston began asking Plaintiff about his cell phone. ECF No. 9, 28:10-22. Plaintiff had

---

[4] Plaintiff was a certified law enforcement officer with Florida Fish and Wildlife Commission at the time. ECF No. 9, 8:24-9:4, 26:7-11.

forgotten it at home. ECF No. 9, 28:6-7. Detective Preston then sought and received a residential search warrant to enter Plaintiff's residence and seize the target phone. ECF No. 3, 251:6-12; ECF No. 9, 28:23-29:10. Detective Preston then arrested Plaintiff. ECF No. 9, 31:19-21; ECF No. 3, 6:21-7:1.

On May 5, 2023, Ms. Payne filed an Information charging Plaintiff with three counts of possession of sexual performance by a child for the 0065(1), 0059, and DuckDuckGo images.[5] ECF No. 8, ¶ 12-13; ECF No. 67-15. The state attorney's office attempted to secure a conviction. ECF No. 40, ¶ 30.

Following Plaintiff's arrest, his criminal defense team contacted Jeffrey Douglas who purports to be the custodian of records for the website met-art.com. ECF No. 67-8, p. 7. Mr. Douglas provided Plaintiff's criminal defense team redacted photographs of "Kasey Lane" and "Milena D." holding foreign passports. Id., p. 6. Neither of these photographs identify the individuals by name. Id.

Three of the images at issue in this litigation (f6a487, 0059, and 0065(1)) contain a tiny "met-art.com" watermark. Throughout this litigation, Plaintiff has referred to the individual in these images as "Milena D." ECF No. 67-8, p. 6. Mr. Douglas provided an affidavit executed in 2015 wherein he averred "to the best of his knowledge and belief" that "Milena D."[6] was born in June 1991, and "[t]he earliest photography of her was recorded in February 2010" when "[s]he was eighteen years

---

[5] The documents returned by Synchronoss did not include the f6a487 image. ECF No. 4, 137:25-138:4. Plaintiff was not criminally charged with possession of the f6a487 image. ECF No. 67-15; ECF No. 3, 252:1-13.
[6] The affidavit is silent as to "Kacey Lane."

(and seven months) old..." ECF No. 67-8, p. 7. Mr. Douglas provided no concrete or meaningful information to establish: (1) her real name; (2) her date of birth; or (3) the date(s) on which the 0059, 0065(1), or f6a487 images were captured.

Mr. Douglas noted in his affidavit that "she has been the subject of many inquiries" and the subject of "cases...in England, Iowa, Holland, and France." Id., p. 6.[7] Despite being the purported records custodian for met-art.com, Mr. Douglas stated he had to ask "when [the] 'Top Model'[8] film shoot occurred..." Id. The record does not establish when that "film shoot" occurred, or which pictures at issue in this litigation, if any, were taken as part of the "Top Model" "shoot."

Plaintiff was also charged with possession of sexual performance of a child based on the DuckDuckGo image. ECF No. 67-15. Plaintiff has referred to the individual in this image as "Kacey Lane." ECF No. 67-8, p. 6. By all accounts, the DuckDuckGo image has no connection to met-art.com. The record contains no admissible evidence to establish: (1) her real name; (2) her date of birth; or (3) the date on which the DuckDuckGo image was captured – or even that the individual in the

---

[7] The f6a487 image had been viewed by NCMEC staff prior to January 25, 2023. ECF No. ECF No. 2, 17:3-6, 110:13-111:2. Prior to January 25, 2023, this image had been seen in over 200 CyberTipline reports. Id., 15:12-16. As of earlier this year, NCMEC still classified the image as "CP, unconfirmed." Id., 111:3-14; *see also* Plaintiff's Motion to Seal, Case No. 3:24-cv-00137-MMH-LLL, ECF No. 70.

[8] Plaintiff's criminal attorney had requested information regarding "Milena D in 'Top Star..." ECF No. 67-8, p. 16.

8

DuckDuckGo image is, in fact, "Kacey Lane."[9]

To be sure, the record only contains Mr. Douglas' thin promise that "[t]he earliest images of her" (whatever they may be) were taken when she was 18 years, 4 months, and 12 days old. ECF No. 67-8, p. 15. Mr. Douglas does not aver that the DuckDuckGo image was ever published on met-art.com, or that he is the records custodian for whatever websites might have published the DuckDuckGo image.

Mr. Douglas did not assert that he personally knows the individuals in the images or when the images were captured. Nonetheless, following receipt of the information provided by Mr. Douglas, the State Attorney's Office dropped the criminal charges. ECF No. 8, ¶ 14; ECF No. 67-16, p. 5.

Plaintiff has alleged that Detective Preston "singled out Plaintiff William Lee Lawshe, at least in part, due to his position as a respected law enforcement officer and the potential for publicity associated with arresting a law such an officer." ECF No. 40, ¶ 80. Plaintiff has also alleged that Detective Preston "devised a scheme to manufacture the illusion of evidence in an attempt to thwart the judicial process, including but not limited to the search warrant requirement of the Fourth Amendment of the Constitution of the United State of America." ECF No. 40, ¶ 82. Plaintiff has also alleged that Detective Preston "conspired with Defendant, Dr. Kathleen Dully for the purpose of manufacturing false, misleading, unsupported evidence in the form of

---

[9] The image itself suggests her name is "Sanija." ECF No. 72-4. The image also contains a QR code. The record is silent as to where that QR code directs. The web address "www.met-art.com" does not appear on the image.

9

fake or pseudo-scientific opinions." Id., ¶ 83. These baseless accusations have no support in the record.

## MEMORANDUM OF LAW

The Court is familiar with the standard for evaluating motions for summary judgment. In the interest of brevity, Detective Preston moves directly into legal argument.

### I.     Plaintiff's 4th Amendment Unreasonable Search Claim Fails

#### a.   Detective Preston had probable cause to seek a search warrant

Probable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish a probability or substantial chance of criminal activity. *Washington v. Howard*, 25 F.4th 891, 898-99 (11th Cir. 2022) (*quoting District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). Probable cause "is not a high bar" and does not require an actual showing of criminal activity. *Wesby*, 583 U.S. at 57. It "does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). "So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." *Id.*

Viewed from the perspective of a reasonable officer, Detective Preston had

probable cause to seek a search warrant based on the f6a487 image. Sgt. Tolbert, Dr. Dully, Ms. Payne, and Detective Preston all thought the image depicted a minor.[10]

### b. Detective Preston did not make materially false statements or omit readily available exculpatory evidence in the search warrant affidavit

Plaintiff asserts that Detective Preston's affidavit contains multiple false and misleading statements. ECF No. 40, ¶ 111. First, Plaintiff claims Detective Preston made a false statement when she stated in her affidavit that the website met-art.com "has a known history of displaying CSAM of teenage girls..." Id., ¶ 111(a). As discussed above, Detective Preston recalled that Detective Greene told her he had encountered met-art.com in other CSAM investigations. And while Detective Greene does not specifically recall talking with Detective Preston about that, Sgt. Tolbert also remembers Detective Greene telling him that met-art.com had previously displayed images of underage females. The fact that Detective Preston learned that information from her fellow officers has no bearing on the Court's analysis regarding probable cause. "It is well established that '[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.'" *Smith v. City of Fairburn, Georgia*, 679 Fed. Appx. 916, 922 (11th Cir. 2017) (*quoting United States v. Ventresca*, 380 U.S. 102, 111 (1965)). Detective Preston did not have any reason to question the reliability of Detective Greene's statements.

---

[10] Plaintiff avers, based on "observation skills," that the girl in the image looks 23 or 24 years old. ECF No. 9, 61:8-24.

Plaintiff alleges that Detective Preston's affidavit represents that the image was not publicly available, when, in fact, it was. ECF No. 40, ¶ 111(b). Plaintiff also alleges that Detective Preston's affidavit did not inform the Court that "that the published image was purportedly that of an adult" or "that the publisher of the image claimed to be in compliance with 18 USC §2257 and the models were purportedly verified." Id., ¶111(e) and (f). However, Detective Preston did include in her affidavit for search warrant that the f6a487 image contained a "met-art.com" watermark. Moreover, if what Plaintiff has outlined here is material, it would have been noted by her supervisor, or Ms. Payne, or the judge reviewing and signing the search warrant – and, of course, it was not. But it really does not matter, as even Plaintiff concedes that a website purporting to comply with age verification laws may still post pictures of underaged individuals. ECF No. 9, 84:20-85:3.

Plaintiff also alleges that Detective Preston omitted from her affidavit that the CyberTip was "unconfirmed." ECF No. 40, ¶ 111(c). All "unconfirmed" means is NCMEC believes it "could be CSAM, but [their] team is ... unaware of the age of the individual who is being depicted." ECF No. 2, 26:7-13; 28:6-8. A large portion of the reports that come into the CyberTipline are "unconfirmed" child pornography, and NCMEC transmits reports of "unconfirmed" child pornography to law enforcement "on nearly a daily basis." Id., 63:18-21, 64:9-15. Moreover, the complete NCMEC classification is "Apparent Child Pornography (Unconfirmed)" [ECF No. 67-2, p. 1], which "indicates that the image appears to be child pornography." *See, e.g., United States v. Lynch*, No. 3:21-CR-00236, 2025 WL 43552, at *6 (M.D. Tenn. Jan. 7, 2025)

12

("This classification [Apparent Child Pornography (Unconfirmed)] indicates that the image appears to be child pornography. That the label includes the qualifier 'unconfirmed,' does not convey that it is not possible to ascertain whether the image is in fact child pornography; it is merely a reflection of NCMEC's role as a national clearinghouse and resource center rather than an investigative agency.") Regardless, Detective Preston *did* include in the affidavit for search warrant that the CyberTip "advised that the user uploaded one (1) image of *possible* CSAM." ECF No. 67-1, p. 2 (emphasis added). Accordingly, Detective Preston's failure to specifically include NCMEC's categorization of the f6a487 image as "unconfirmed" was not a material omission.

Plaintiff alleges that Detective Preston "did not show the subject image to the Court making the determination of Probable Cause." ECF No. 40, ¶111(d). This argument is unavailing for at least two reasons. First, the subject image (which Plaintiff did not attach to his motion for partial summary, but which Detective Preston is filing in support of her motion for final summary judgment) *supports* a finding of probable cause, as the individual depicted in the f6a487 image clearly appears to be a child. Second, it is undisputed that the judges Detective Preston worked with preferred search warrants be submitted electronically, which could not have included attaching the image. ECF No. 3, 133:11-20.

Next, Plaintiff alleges that Detective Preston should not have included "the non-expert, subjective and false opinion of Dr. Dully who she knew or should have known is not an expert in determining the age of young women from a photograph with any

13

degree of certainty..." ECF No. 40, ¶ 111(g). There is no record evidence to suggest that Detective Preston "knew or should have known" that Dr. Dully could not provide an opinion regarding the appearance of age of an individual in an image. To the contrary, Detective Preston's supervisor had utilized Dr. Dully's expertise in prior similar cases, and Dr. Dully has provided this type of service to numerous law enforcement agencies in northeast Florida.

### c. Even if there were falsities or omissions, the search warrant was still valid

Even if the affidavit contained falsities or omissions, the search warrant still would have been supported by probable cause. In *Franks v. Delaware*, 438 U.S. 154, 171 (1978), the Supreme Court held that a search warrant is void under the Fourth Amendment if the affidavit supporting the warrant contains "deliberate falsity or ... reckless disregard" for the truth. However, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause[,]" then the warrant is valid. *Id.* at 171-72. Negligent or innocent mistakes do not violate the Fourth Amendment. *Id.* at 171.

Here, there is nothing to suggest that Detective Preston deliberately falsified or omitted any information with reckless disregard for truth or an intent to mislead the judge reviewing and signing the search warrant. More importantly, nothing that was allegedly false or omitted would have been critical to the finding of probable cause or lack thereof. Considering the remainder of the information provided in the search

warrant affidavit (a detailed description of the image; that the CyberTip advised one image of possible CSAM; that Dr. Dully reviewed the image and opined that the "female child" in the image "appears younger than 18 years of age"), removal of the allegedly "false" information and inclusion of the allegedly "omitted" information would have had no effect on the probable cause determination.

### d. Detective Preston enjoys qualified immunity from Plaintiff's unlawful search claim

The qualified immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted). Qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

To invoke qualified immunity, a public official must demonstrate that he was acting within the scope of his or her discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). The term discretionary authority "include[s] all actions of a governmental official that (1) were undertaken pursuant to the

performance of his duties, and (2) were within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it cannot be disputed that Detective Preston was acting within the scope of her discretionary authority, as all of the challenged actions occurred while she was on duty as a law enforcement officer conducting investigative and arrest functions.

Because Detective Preston was acting within the scope of her discretionary authority, the burden shifts to Plaintiff to demonstrate that qualified immunity is inappropriate. *See id.* To do that, Plaintiff must show that, when viewed in the light most favorable to him, the facts demonstrate that Detective Preston violated his constitutional right and that that right was "clearly established...in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officer's actions. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. 223. The Court may decide these issues in either order, but to survive a qualified immunity defense, Plaintiff must satisfy both showings. *Maddox*, 727 F.3d at 1120 (citation omitted).

A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law. *Gilmore v. Ga. Dep't of Corr.*, No. 23-10343, --- F.4th ---, 2025 WL 1911728, at *8 (11th Cir. July 11, 2025) (en banc) (*quoting T.R. by and through Brock v. Lamar Cnty. Bd. of*

16

*Educ.*, 25 F.4th 877, 883 (11th Cir. 2022)).

Here, for the reasons discussed above, Plaintiff cannot establish that Detective Preston violated his constitutional rights in seeking a search warrant. Accordingly, Detective Preston enjoys qualified immunity under the first prong.

Additionally, Plaintiff cannot establish that the constitutional right allegedly violated was clearly established in light of the specific context of the case. In the absence of broad statements of principle, precedent can clearly establish the applicable law where "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar," to the particularized facts of prior case law. *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002). Such precedent must be found in decisions from the Supreme Court, the controlling circuit court of appeals, or the pertinent state supreme court. *Id.* at 1351. Undersigned counsel has been unable to locate any materially similar case from the Supreme Court of the United States, the Eleventh Circuit, or the Supreme Court of Florida. There is a similar case from the Fourth Circuit Court of Appeals that is instructive on this issue. In *United States v. Gatherum*, 338 F. App'x 271, 272 (4th Cir. 2009) (unpublished), a law enforcement officer sought a search warrant for Gatherum's computer after observing images that the officer believed were child pornography. *Gatherum*, 338 F. App'x at 272-73.

> When [the officer] described the pictures at issue to Gatherum, Gatherum explained that he had gotten the pictures from a website called "Mike18.com" and that the website had a disclaimer stating that all of the models were at least 18 years old. (Each of the images had a Mike18.com logo in the corner, although [the officer] was not aware of that fact at the time). [The officer] refused Gatherum's offer to log-on to Mike18.com to show the troopers the age certification for the model the

17

> troopers believed to be underage. At the [officer's] request, Gatherum accompanied them to the state police barracks for further questioning. Gatherum continued to maintain that the images all came from the Mike18.com website, and Gatherum told the troopers that the website included a picture of the apparently underage model holding a passport that showed his birth date.

*Id.* at 273.

The officer submitted an affidavit for search warrant that "did not include copies of the images themselves or otherwise describe the nature of the sexually explicit conduct pictured, nor did the affidavit recount Gatherum's claim about the age-disclaimer on Mike18.com." *Id.* A state-court judge concluded that the affidavit established probable cause. *Id.* Gatherum challenged the search warrant, raising many of the same arguments Plaintiff raises here.

The Fourth Circuit "reject[ed] any suggestion that a search-warrant affidavit must include copies of images giving rise to the request for a warrant." *Id.*, at 274. This is also the law in the Eleventh Circuit. *See, e.g., United States v. Smith*, 459 F.3d 1276, 1291 (11th Cir. 2006) ("We are satisfied, moreover, that the magistrate judge relied upon the testimony of a sex crimes and child abuse expert in determining whether it could have been obvious to Officer Mayo that the photographs were of young girls. While it may have been prudent for the magistrate judge to view the photos independently, we cannot say that, as a matter of law, the court must view the evidence to determine whether probable cause existed."); *see also New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 n. 5 (1986) ("we have never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure. On the

18

contrary, we think that a reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene, and whether a warrant authorizing the seizure of the film should issue." (citation omitted)).

The Fourth Circuit in *Gatherum* also found "it was entirely reasonable for the magistrate to accept the officers' estimation of the child's age when determining whether probable cause existed. While some 16– or 17–year–old models might be difficult to distinguish from 18–year–olds, the physical differences between a 12-year-old model and an 18–year–old model generally would be significant and readily apparent. That both troopers believed the model at issue might be so young provided the magistrate with a reasonable basis for concluding that the images at issue involved a minor." *Id.* at 275 (*citing United States v. Battershell*, 457 F.3d 1048, 1053–54 (9th Cir.2006) (finding affidavit sufficient in child pornography case where officer described images as depicting "young female[s] (8–10 YOA)" and noting that "we have accepted, for purposes of an affidavit in support of a search warrant, the conclusory age estimates made by civilians and other untrained lay witnesses without demanding a detailed explanation of how the witnesses reached that conclusion")).

Finally, the Fourth Circuit in *Gatherum* rejected the argument that the search warrant must be voided under *Franks v. Delaware* "because [the officer] intentionally omitted from his affidavit any mention of the Mike18.com website or the website's disclaimer asserting that all of its models, including the one [the officer] believed to be a minor, were at least 18 years old." *Id.* at 277.

> Beyond the mere fact of omission, the record is devoid of evidence suggesting that [the officer] intentionally or recklessly failed to disclose to the issuing magistrate the Mike18.com information. Moreover, even if information about the disclaimers on the website and Gatherum's belief about the age of the models had been included in the affidavit, their presence would not have defeated probable cause. As discussed above, [the officers] both looked at the images and concluded that one of the models was between 12 and 14 years old. That was enough to establish probable cause that the model was underage, even in the face of Gatherum's (and Mike18.com's) insistence to the contrary. The district court therefore properly denied Gatherum relief on his *Franks v. Delaware* claim. *See United States v. Shorter*, 328 F.3d 167, 171, n. 2 (4th Cir.2003) (explaining that "the fact of an omission, standing alone, is not sufficient to demonstrate intent or reckless disregard" in cases where the omitted material is not "clearly critical" to the probable-cause determination (internal quotation marks omitted)).

*Id.* at 277-78.

Admittedly, *U.S. v. Gatherum* is an unpublished opinion from another Circuit, and therefore is neither binding nor persuasive to this Court. However, the facts and legal arguments in *Gatherum* are nearly indistinguishable from the case at bar. The existence of *Gatherum* and the apparent non-existence of caselaw from the Supreme Court of the United States, the Eleventh Circuit, or the Supreme Court of Florida to the contrary strongly suggests that Detective Preston could not possibly have been on notice that her actions were potentially constitutionally problematic.

Finally, for purposes of qualified immunity, the lower standard of "arguable probable cause" applies. *Ross v. James*, 861 Fed. Appx. 770, 778 (11th Cir. 2021) (*quoting Paez*, 915 F.3d at 1288) ("If the affidavits, including the omitted information, 'would have demonstrated even arguable probable cause ... then the officers are entitled to qualified immunity.'"). Here, the evidence that Detective Preston had at the

time she sought a search warrant – even with the allegedly omitted information – would have provided arguable probable cause.

For these reasons, Detective Preston enjoys qualified immunity from Plaintiff's unlawful search claim.

## II.   Plaintiff's Unreasonable Arrest Claim Fails

### a.   Detective Preston had probable cause to arrest Plaintiff

The return on the search warrant on Plaintiff's phone revealed three additional pictures that supported Plaintiff's arrest and became Counts I, II, and III of the Information. ECF No. 8, ¶ 12-13; ECF No. 67-15. Prior to arresting Plaintiff, Detective Preston conferred with Dr. Dully, who opined that the "female child" in the 0065(1) and 0059 images "is depicted to be…≤12-15 years of age," and "female child" in the DuckDuckGo image has the developmental appearance of ≤9-13.5 years of age." ECF No. 67-9, pp. 2, 3. Detective Preston also met with Ms. Payne, who confirmed that she would prosecute Plaintiff for possession of those images. ECF No. 8, ¶ 11. All of this provides Detective Preston with ample probable cause to arrest Plaintiff.

Plaintiff's arguments regarding an alleged lack of probable cause are actually arguments for potential defenses to the charged crimes. An affirmative defense to an alleged crime does not necessarily vitiate probable cause. *Manners v. Cannella*, 891 F.3d 959, 971-72 (11th Cir. 2018). Indeed, "arresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for

believing that an offense has been committed." *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002), *abrogated on other grounds by Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018). Probable cause does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence. *See Manners*, 891 F.3d at 968. A law enforcement officer is not required to resolve every inconsistency found in the evidence. *Paez*, 915 F.3d at 1286. Moreover, police officers aren't lawyers, and are not expected to resolve legal questions or to weigh the viability of most affirmative defenses. *See Williams v. City of Albany*, 936 F.2d 1256, 1260 (11th Cir. 1991). So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause. *Paez*, 915 F.3d at 1286. The touchstone remains the reasonableness of the officer's conduct. *Id.*

Detective Preston conducted a reasonable investigation. Plaintiff has not identified plainly exculpatory and easily verifiable information that Detective Preston ignored. Rather, he merely "points to additional steps in the investigation that he thinks would have been useful for [Detective Preston] to perform." *Harris v. Hixon*, 102 F.4th 1120, 1129 (11th Cir. 2024). "His investigative suggestions are not evidence of a constitutional violation." *Id.*

Moreover, the information that has been provided (exclusively by Mr. Douglas) in Plaintiff's criminal case as well as through Plaintiff's motion for partial summary judgment suggests, at best, that the individuals holding passports (which may or may

22

not be the individuals in the images) are *currently* over 18 years old – **but we have no admissible evidence to establish when these images were captured**. Mr. Douglas has only provided vague and unverified information on information and belief regarding when "earliest images" or "earliest shoots" occurred. Even Plaintiff's criminal defense attorney, who submitted an affidavit in support of Plaintiff's motion for partial summary judgment (as part of what Plaintiff calls "Age Verification Documents") conditions his statement that "the models were adults at the time of the relevant photography" with "[b]ased on information and belief..." ECF No. 67-8, p. 12.

Moreover, the fact that Detective Preston consulted with Ms. Payne (an experienced prosecutor of internet crimes against children) also supports Detective Preston's belief that probable cause existed and that her investigation was sufficient. *Poulakis v. Rogers*, 341 Fed. Appx. 523, 533 (11th Cir. 2009) ("It stands to reason that an officer who, prior to an arrest, presents the facts to an assistant state attorney in the course of his official duties, and receives the prosecutor's advice that there is probable cause to arrest, would have a stronger reason to believe that there was probable cause."). Notably, neither Detective Preston's supervisors nor Ms. Payne instructed Detective Preston to visit websites or seek age verification information or conduct *any* additional investigation.

### b. Detective Preston enjoys qualified immunity from Plaintiff's unlawful arrest claim

"[O]fficers who make an arrest ... are entitled to qualified immunity if there was arguable probable cause for the arrest." *Kingsland*, 382 F.3d at 1232 (*citing Jones v.*

23

*Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999)). Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge ... could have believed that probable cause existed to arrest." *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001). In other words, Plaintiff must establish that no reasonable officer would have probable cause under the totality of the circumstances. *Kingsland*, 382 F.3d at 1232 (*citing Storck v. City of Coral Springs*, 354 F.3d 1307, 1313 (11th Cir. 2003)).

Here, Detective Preston had, at least, arguable probable cause. There is little question that a reasonable officer in Detective Preston's position could have credited Dr. Dully's opinions and determined probable cause existed to arrest Plaintiff. Her supervisors agreed. Ms. Payne agreed. That Plaintiff appears to have conjured reasonable doubt (a different standard) and have the charges dropped is of no moment.

## III.    Plaintiff's First Amendment Claim Fails

Plaintiff's First Amendment claim falls with his Fourth Amendment claims. It is axiomatic that child pornography is not speech protected by the First Amendment. *New York v. Ferber*, 458 U.S. 747, 758 (1982); *United States v. Miller*, 776 F.2d 978, 980 n. 4 (11th Cir.1985); *see also P.J. Video*, 475 U.S. at 875 (1986) ("an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally."). As discussed above, so long as Detective Preston had arguable probable cause to seek a search warrant and arrest Plaintiff for possession of CSAM, Plaintiff's Fourth Amendment claims fail. Plaintiff cannot seek

recovery against Detective Preston through some unspecified "Violation of the First Amendment" based on these facts when Detective Preston cannot be liable for Plaintiff's Fourth Amendment claims. And just as she enjoys qualified immunity from Plaintiff's Fourth Amendment claims, Detective Preston also enjoys qualified immunity from Plaintiff's First Amendment claims.

## CONCLUSION

For the foregoing reasons, Defendant Detective Mikayla Preston respectfully requests this Honorable Court grant the instant motion, enter final summary judgment in her favor, and grant any other relief this court deems proper.

Respectfully submitted this 12th day of September, 2025.

/s/ Matthew J. Carson
**MATTHEW J. CARSON**
Florida Bar Number: 0827711
mcarson@sniffenlaw.com
**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004
*Attorneys for Detective Mikayla Preston*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of September, 2025, a true and correct copy of the foregoing was electronically filed in the United States District Court for the Middle District of Florida using the CM/ECF system, which will serve counsel of record.

/s/ Matthew J. Carson
**MATTHEW J. CARSON**

25

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on March 4, 2026.

/s/ Michael K. Roberts
**MICHAEL K. ROBERTS**