APPEAL NO. 26-10155-DD

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

William Lee Lawshe,

Plaintiff-Appellant,

v.

Mikayla Preston and Kathleen Dully,

Defendants-Appellees.

On Appeal from the United States District Court
for the Middle District of Florida
District Court Case No. 3:24-CV-00044-JAR-MCR

**SUPPLEMENTAL APPENDIX OF APPELLEE PRESTON
VOL. II**

Matthew J. Carson (Florida Bar Number: 0827711)
Michael P. Spellman (Florida Bar Number: 0937975)
Christen A. Petruzzelli (Florida Bar Number: 1039528)

Attorneys for Appellee Preston

SPELLMAN LAW, P.A.
905 East Park Avenue
Tallahassee, Florida 32301
(850) 601-1983
mcarson@spellman.law; michael@spellman.law; cpetruzelli@spellman.law

# Doc. 82-2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.   3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE,
an individual,

Plaintiff,

vs.

MIKAYLA PRESTON, in her individual
capacity as a Detective for St. Johns
County Sheriff's Office; and KATHLEEN
DULLY, in her individual capacity as
medical director of the UF Child
Protection Team,

Defendants.

_____/

VIDEOTAPED DEPOSITION OF FALLON MCNULTY

Taken on Behalf of the Plaintiff

DATE TAKEN:                    June 12, 2025
TIME:                          10:06 AM – 1:18 PM
PLACE:                         Via Videoconference

Examination of the witness taken before:
Jodi J. Benjamin, Court Reporter
and Notary Public, State of Florida at Large.

Huseby Litigation
14 Suntree Place
Suite 101
Viera/Melbourne, FL  32940

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

                          APPEARANCES
               (all appearances via videoconference)


           APPEARANCE ON BEHALF OF THE PLAINTIFF

                 MICHAEL K. ROBERTS, ESQUIRE
        Law Offices of Nooney, Roberts, Hewett & Nowicki
                     1680 Emerson Street
                  Jacksonville, FL  32207


           APPEARANCE ON BEHALF OF FALLON MCNULTY

                 LOGAN M. RUTHERFORD, ESQUIRE
              Bryan Cave Leighton Paisner, LLP
                   One Kansas City Place
                     1200 Main Street
                       Suite 3800
                  Kansas City, MO  64105


           APPEARANCE ON BEHALF OF MIKAYLA PRESTON

                 MATTHEW J. CARSON, ESQUIRE
                   Sniffen & Spellman P.A.
                   123 North Monroe Street
                  Tallahassee, FL  32301


           APPEARANCE ON BEHALF OF KATHLEEN DULLY

                     JAMI M. KIMBRELL
                 Howell, Buchan & Strong
                    2898 Mahan Drive
                        Suite 6
                  Tallahassee, FL  32308


                      ALSO PRESENT

                 MIKE STINGO, VIDEOGRAPHER
        YIOTA SOURAS, ESQUIRE - IN-HOUSE COUNSEL FOR NCMEC
                    ALEXANDRA GROSSO
                     AUTUMN ZEPF

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

**Page 3**

INDEX OF PROCEEDINGS
DEPOSITION OF FALLON MCNULTY

                                                  PAGE NO.

Direct Examination by Mr. Roberts                    5
Cross Examination by Mr. Carson                    101

Certificate of Oath                                117
Certificate of Reporter                            118
Errata                                             119

INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS

NO.           DESCRIPTION                         PAGE NO.

 A  CyberTipline Report 153739160          (post-marked)
 B  CyberTipline Report 137877848          (post-marked)
 C  Stanford Publication                   (post-marked)
 D  Agreement                              (post-marked)
 E  Audit Letter                           (post-marked)
 F  Synchronoss Document                   (post-marked)
 G  Motion                                 (post-marked)

DEFENDANT'S EXHIBITS

NO.           DESCRIPTION                         PAGE NO.

    *************** NONE ***************

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 4

(Whereupon, the following proceedings were had:)

VIDEOGRAPHER STINGO:  We are on the record in the video deposition of Fallon McNulty, as corporate representative of National Center for Missing and Endangered Children, taken in the matter of William Lee Lawshe vs. Mikayla Preston and Kathleen Dully.

Today is June 12th, 2025, and the time is ten oh six a.m.

The court reporter is Jodi Benjamin, and the videographer is Michael Stingo.  We are here with Huseby Global Litigation.

Will counsel please introduce themselves; after which, the court reporter will swear in the witness.

MR. ROBERTS:  Michael Roberts for the plaintiff.

MR. RUTHERFORD:  Logan Rutherford, I'm here on behalf of the witness.

MR. CARSON:  Matt Carson with Sniffen and Spellman representing Detective Mikayla Preston.

MS. KIMBRELL:  Jami Kimbrell with Howell, Buchan and Strong, representing defendant Dr. Dully.

Page 5

WHEREUPON:

                    FALLON MCNULTY,

a witness herein, having been duly sworn, testified upon

her oath as follows:

        THE WITNESS:  I do.

               DIRECT EXAMINATION

    BY MR. ROBERTS:

    **Q    Good morning.  My name is Michael Roberts, I didn't get a chance to introduce myself before we started.**

    **But can you introduce yourself for the record?**

    A    Good morning.  My name is Fallon McNulty.

    **Q    And, Ms. McNulty, I understand you've been designated as a corporate representative for the National Center for Missing and Exploited Children?**

    A    Yes, that is correct.

    **Q    All right.  Can you tell me what your, what your, your job is at -- and for the court reporter's benefit, we will, we will be using some acronyms today.**

    **But is, is the National Center for Missing and Exploited Children, is that sometimes referred to as NCMEC?**

    A    It is.

    MR. ROBERTS:  Okay.  And so, Madame Court Reporter, when we say NCMEC, that's an acronym,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 15

different hash values were through, again, that

technology and PhotoDNA, and we have seen this image

reported to the CyberTipline previously.

Q    Prior to January 25th, 2023?

A    Yes, that is correct.

Q    All right.  Is there any document that you could refer to, or NCMEC has possession of, that would tell me on what occasions, you know, previous to January 25, 2023, that this image had been reported?

A    There's not currently a document that has that information.

Q    Can you give me any sort of idea how many times prior to January 25, 2023, this particular image had been reported to NCMEC?

A    It had been seen in just over two hundred CyberTipline reports.

Q    And let me ask you another question.

Did you, did you do the PhotoDNA comparison?

A    Yes.

Q    With the, with the external list?

A    We did.  With the hash-sharing list?

Q    Right.

A    Yes, that is correct.

Q    With the hash -- and that did not return any, any results?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 17

than two hundred times?

A    Yes, that is correct.

Q    Okay.  Can you, could you tell from your review of the records about whether or not the image had been viewed prior to January 25th, 2023, by NCMEC staff?

A    Yes, it had.

Q    And are there any records that reflect those reviews?

A    The prior CyberTipline reports would contain that information.

Q    Okay.  And so are you able to answer the question that I asked you, had this hash value beginning with B06, had that ever been included in a NCMEC CSAM hash list?

A    The MD5 hash value starting with B06 had not ever been included and it had never been seen by the CyberTipline before, nor had it been included in a hash-sharing list.

Q    But the content which this MD5 hash represents had been viewed by NCMEC previously?

A    Yes.

Q    All right.  Do you know how many, or approximately how many images, individual images are contained within the NCMEC CSAM list that it shares with the, with external electronic service providers?

Page 26

individual or probably individuals who categorized this content that is the subject of Exhibit A?

A    That information is not typically stored within our CyberTipline system.  It could be possible looking back at different records, but I don't have that information today.

Q    So is, is there only one for this CP unconfirmed, you've given me a definition, is that the only definition of the unconfirmed categorization?

A    Yes, that, it depicts what could be CSAM, but our team is indicating the designation as unconfirmed, again, because they are unsure of the age of the individual who is being depicted.

Q    So, and now let me just, just hone in on that a second.  It seems like a two-part, a two-part definition.

One is, is that the image depicts a sex act or something that could be characterized as pornography.

Is, is that a fair statement?

A    Correct.

Q    And then the second is a question of the age of the individual that's depicted in the sex act or pornography?

A    Yes.

Q    Would you agree though that the age of the

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 28

clear that unconfirmed means that we have a sex act or pornography, but we are unsure of the age of the individual depicted in that content.

Is that a fair representation of what unconfirmed means?

A    Yes, unconfirmed would indicate we believe it could be child sexual abuse material, but ultimately we do not have that determination of age.

Q    I've heard the term age-difficult, is that a term that you guys use at all?

A    That is a term that is sometimes used, yes.

Q    I've heard it used in law enforcement as describing someone who simply, by looking at them, you cannot determine whether they are under the age of eighteen or over the age of eighteen.

Is that the way you use that term?

A    Yes, we use it similarly.

Q    Okay.  Is that, is that, when getting down to, you know, when you talk about it's we cannot determine the age of the individual depicted, is another way to say that, that the individual is age-difficult?

A    It could be, yes.

Q    Okay.  I asked about who, do you know when this image was, the image that is the subject of Exhibit A, categorized as unconfirmed CSAM?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 63

you this.

Is it still required that they, that they include their name with the submission of a hash to the list?

A    Yes, the, the member name is always going to be included, as well as then the, the fingerprints or hashes that they are including with the entry.

Q    And for every entry, do they include both the PhotoDNA and the MD5?

A    Not necessarily.  So especially as time has gone on, we have seen different entities, different companies use a, a multitude of different hashing algorithms.  So there are certainly entries within the list that don't necessarily have both an MD5 and a PhotoDNA signature.  It could be some other type of hash fingerprint.

Q    One question that I had here, and this may be a little bit out of order.

But do you have some idea of the frequency in which NCMEC transmits reports of unconfirmed child pornography to law enforcement?

A    That would be on nearly a daily basis.

Q    So, and I know that NCMEC, CyberTip reports come from multiple sources; correct?

It's not all electronic service providers, they can come from other sources; right?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 64

A    Yes, we could receive reports from members of the public as well.

Q    Is it, I mean, can you venture a guess on like what the percentage is?

I would imagine it's, the vast majority is from the electronic service provider.

A    Yes, about ninety-nine percent of our reports come from industry.

Q    What I would like to do is your, is get your best estimate of the percentage of reports which result in unconfirmed, a report of unconfirmed child pornography.

A    I don't have a, a figure in mind for, for last year.  It is a large portion of the reports that come into the CyberTipline.  Especially as we have seen an increase in incidents concerning online enticement of children, of content that is being produced by victims and used themselves.  We might not have that information at the onset of receiving a report to indicate or to know that that individual is under the age of eighteen.

Q    I mean, is it, can it, more or less than half of, of the reports that go to law enforcement are unconfirmed?

A    So actually a, a fairly small percentage of the reports that are being referred out by the

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 110

exchange or otherwise collect CSAM, do they ever purposefully attempt to modify the picture in an effort to avoid MD5 hash matching by you or other organizations?

A    Yes.

Q    Okay.  And based on your prior testimony, that could be as simple as cropping a photograph; correct?

A    Correct.

Q    Or, or adding text in, in the corner in such a way that it is no longer the exact same image; correct?

A    Yes, editing it in any way would change the hash value.

Q    You testified earlier that this particular image was likely not triple-vetted when it was submitted in this case pursuant to this specific CyberTipline submission; is that correct?

A    The triple-verification, the tertiary review is for inclusion on the hash-sharing list, and this file was not categorized as apparent child sexual abuse material, so it is unlikely that it went for that third-pass review.

Q    Okay.  And, but you testified that it had already been vetted with, when it was submitted, when the same image was submitted but in a slightly different format resulting in a different MD5 hash value; is that

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 111

accurate?

A    Yes.

Q    And the, the document that you provided in response to the subpoena in advance of your deposition today, the PDF was created or generated on March 6th of 2025; correct?

A    This is still for the, the second report?

Q    The second report.

A    Yes, I believe so.

Q    Okay.  March, March of this year; correct?

A    Yes.

Q    And it's still listed as, it's still categorized as CP, unconfirmed; correct?

A    Yes.

Q    Okay.  At the top, and I can show it to you if it's helpful, at the top of the CyberTipline report, right underneath the number it says Priority Level E. What does that mean?

A    If you wouldn't mind screen sharing the report.

Q    Yeah, no problem, no problem.  Just one second.

A    Right underneath it will have the definition of what that priority level entails.

Q    Okay.  Are you able to see my screen?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 117

CERTIFICATE OF OATH

STATE OF FLORIDA      )

COUNTY OF INDIAN RIVER  )

I, JODI J. BENJAMIN, Court Reporter, Notary Public, State of Florida, certify that FALLON MCNULTY appeared before me via videoconference on the 12th day of June, 2025, and was duly sworn.

_____
                    Jodi J. Benjamin,
                    Court Reporter,
                 Notary Public, State of Florida
                  My Commission No.  HH 346222
               My Commission Expires:  May 1, 2027

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 118

CERTIFICATE OF REPORTER

STATE OF FLORIDA    )

COUNTY OF INDIAN RIVER  )

I, Jodi J. Benjamin, Court Reporter, do hereby certify that I was authorized to and did stenographically report the videoconference deposition of FALLON MCNULTY; and that the foregoing transcript, Pages 1 through 119, is a true and correct record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of June, 2025, at Sebastian, Indian River County, Florida.

_____

Jodi J. Benjamin, Court Reporter

# Doc. 82-3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


WILLIAM LEE LAWSHE, an
individual,

                                        CASE NO.:
                    Plaintiff,          3:24-cv-44-MMH-MCR

        vs.

MIKAYLA PRESTON, in her
individual capacity as a
detective for St. Johns County
Sheriff's Office, and KATHLEEN
DULLY, in her individual
capacity as medical director
of the UF Child Protection
Team,

                    Defendants.
_____


VIDEO-RECORDED DEPOSITION OF

**MIKAYLA PRESTON**

Taken on behalf of Plaintiff


       DATE TAKEN:   Thursday, March 13, 2025

       TIME:         1:01 p.m. - 6:38 p.m.

       PLACE:        St. Augustine Court Reporters
                     1260 North Ponce De Leon Boulevard
                     Suite E
                     St. Augustine, Florida 32084




        Examination of the witness taken before:

                    Nicole Medlock
        Registered Professional Reporter and FPR-C

A P P E A R A N C E S


MICHAEL KEITH ROBERTS, II, Esquire

Nooney, Roberts, Hewett, & Nowicki
1680 Emerson Street
Jacksonville, Florida 32207-6104
904-398-1992
mroberts@nrhnlaw.com

appearing on behalf of Plaintiff.


MATTHEW JOSEPH CARSON, Esquire
CHRISTEN ANN PETRUZZELLI, Esquire (via Zoom)

Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
850-205-1996
mcarson@sniffenlaw.com
cpetruzzelli@sniffenlaw.com

appearing on behalf of Defendant Mikayla
Preston.


AMY R. SHEVLIN, Esquire (via Zoom)

Buchanan & Buchanan, P.A.
1900 SE 18th Avenue, Suite 300
Ocala, Florida 34471-8237
352-629-4099
ashevlin@rbtrial.com

appearing on behalf of Defendant Kathleen
Dully.


ALSO PRESENT:

ANDREW CUSIMANO, Videographer
AUTUMN ZEPF, Paralegal for Plaintiff

I N D E X

Witness                                                          Page

MIKAYLA PRESTON

    Direct Examination By Mr. Roberts.............  5

    Cross Examination By Ms. Shevlin.............. 263

    Redirect Examination By Mr. Roberts........... 287

    Certificate of Oath........................... 308

    Certificate of Reporter....................... 309

    Errata Sheet.................................. 310


PLAINTIFF'S EXHIBITS

| Number | Description | Page |
| --- | --- | --- |
| 1 | Cyber tip line report | 14 |
| 2 | Affidavit for search warrant | 38 |
| 3 | Deposition of Mikayla Preston on November 21, 2023 | 43 |
| 4 | met-art.com Google search results | 45 |
| 5 | 2018 Florida Statute 817.071 | 85 |
| 6 | Letters to Mikayla Preston from Kathleen Dully, M.D. | 107 |
| 7 | Photograph | 161 |
| 8 | Photographs | 223 |
| 9 | Photograph | 241 |


DEFENDANTS' EXHIBITS

(None marked.)

THE VIDEOGRAPHER: This begins Media Unit Number 1 to the video-recorded deposition of Mikayla Preston in the matter of William Lee Lawshe versus Mikayla Preston, et al., being heard before the United States District Court, Middle District of Florida, Jacksonville Division, Case Number 3:24-cv-00044-MMH-MCR. This deposition is being held at 1260 North Ponce De Leon Boulevard, Suite E, in St. Augustine, Florida. Today's date is March 13th, 2025, and the time is 1:01 p.m.

My name is Andrew Cusimano, and I am the videographer.

The court reporter is Nicole Medlock.

Counsel, will you please introduce yourselves, your affiliations, and the witness will then be sworn in.

MR. ROBERTS: Michael Roberts. I represent the plaintiff, Mr. Lawshe.

MR. CARSON: Matthew Carson, representing Detective Mikayla Preston.

MS. SHEVLIN: Amy Shevlin, representing Dr. Dully.

**MIKAYLA PRESTON,**

having been produced and first duly sworn as a witness

on behalf of Plaintiff, and after responding "Yes,

ma'am" to the oath, testified as follows:

THE VIDEOGRAPHER:  Before we start, I forgot

to ask you --

THE WITNESS:  Yes.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q    All right.  Good afternoon.  Can you just

state your name for the record, please?

A    Yes, Mikayla Preston.

Q    And, Ms. Preston, we're here today to take

your deposition.  I introduced myself earlier.  As you

know, I represent a gentleman named William Lawshe in a

case that he's brought against you and another

individual.

Are you currently employed?

A    Yes, sir, I am.

Q    And what's your current employment?

A    I'm an ICAC detective -- excuse me -- ICAC

detective.  I don't know (unintelligible).

Q    With St. Johns County?

A    Yes, sir.

Q    All right.  And how long have you been an ICAC

detective?

A    Since 2022, if I'm not mistaken, yeah.

Q    Now, for the court reporter, let's say what ICAC -- can you -- that's an acronym, I understand. What is that an acronym for?

A    Yes.  It's for Internet crimes against children.

Q    And you've been deposed in this case before, not in this case but in the case of Mr. Lawshe, the State versus Mr. Lawshe; correct?

A    Yes, sir.

Q    And have you had an opportunity to review that deposition?

A    Yes, sir.

Q    All right.  I'm not going to go through the rules of a deposition because I know you've had your deposition taken multiple times.  But from time to time, I may remind you if we start, you know, talking over one another or something like that.  Okay?

A    Yes, sir.

Q    All right.  Now, we sit here today.  It's March 13th, 2025.  What day did you effectuate this arrest on Mr. Lawshe?

A    I do not recall the specific date.

Q    Okay.  April of 2023 sound correct?

A    Yes.    It does sound around that time.

Q    All right.  So as we sit here today, have you had an opportunity to review some of the documents in this case?

A    Yes, sir.

Q    Can you tell me what you've reviewed in preparation for today's deposition?

A    So I reviewed the images, the NCMEC images --

Q    Uh-huh.

A    -- and then the images that were charged.

Q    Anything else?

A    Also my report.

Q    When you say your report, can you be a little bit more specific?

A    Yes, sir.  It was my initial -- what we call a narrative.

Q    All right.  Did you review any other documents?

A    Not that I recall.

Q    All right.  I know that you -- you completed and executed several affidavits in this case for search warrants.  Did you review any of that in preparation for today?

A    The only search warrant would have been the one I provided my attorney, which would have been the

Hold on.  I'm sorry.  I'm confused.  Are you saying that I can't believe what I saw on Google?

Q    You testified that you can't believe everything you see on Google.

A    Yes.

Q    Correct?

And so when you read that on Google, you knew that it may or may not be a credible thing that you saw?

A    Yes.

Q    And what I'm asking you is why would you swear under oath that it was credible?

A    Based off the other investigators and their dealings with MetArt.  I guess that's the right term, not really dealings but I guess prior cases that they've had and stuff like that.

Q    What investigator told you that they had a prior case with MetArt?

A    I believe it was Corporal Greene.

Q    We've taken Corporal Greene's deposition.  He's testified that he's never had a case with MetArt.

A    Well, he told me differently, unfortunately.

Q    He told you that he had investigated a case involving an image from met-art.com?

A    Yes, when we originally had this case.

Q    You haven't reviewed his testimony?

history with it.

Q    You said:   This site has a known history of displaying CSAM images of teenage girls.

A    Yes, and has been encountered by other ICAC investigators in past investigations.

Q    And the only investigator that you can identify is Detective Greene?

A    Yes, sir.

Q    And you don't know if what he was telling you was reliable or not?

A    That I don't know because it was before I was even in law enforcement, if I'm not mistaken.

Q    Did he know that you put this statement in your affidavit?

A    I don't recall.  I don't know if we've ever discussed that.

Q    Tell me about this conversation with Detective Greene.  I mean, how did this come about?

A    When I was asking him about MetArt and if he's ever heard of it and anything he knows about it.

Q    Why were you asking him about MetArt?

A    Because I had never heard of it.

Q    Did you believe there was a connection between this image and met-art.com?

A    That -- like I stated before, I don't know.

Q    Okay.  All right.  So do you know -- I think you said it was Sergeant Tolbert that suggested that you go see Dr. Dully?

A    Yes.

Q    And your recollection is that because there was some disagreement about whether or not this was a child or an adult?

A    I believe it was a disagreement --

MS. SHEVLIN:  Form.

THE WITNESS:  -- on somebody thinking it could be potentially age-difficult and then us thinking, like, no, this is for sure a child.

BY MR. ROBERTS:

Q    Okay.  So there was some disagreement about how to interpret the photograph?

A    Yes.

Q    All right.  What was explained to you by anyone at St. Johns County, Dr. Dully's qualifications to determine whether some -- a model was an adult or a child?

A    What do you mean?  Like, her qualifications? Like?

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    However you take that qualifications.  I mean,

THE WITNESS: You're saying scientifically? That's the thing. I don't know, I guess, how to answer it based off, like, that term being used.

BY MR. ROBERTS:

Q So --

A I don't want to misspeak.

Q -- you -- you were the -- ultimately responsible for this investigation; correct?

A Yes, sir.

Q And you understand that when you apply for a search warrant, you have the obligation of only presenting reliable information to the court; correct?

A Yes, sir.

Q All right. So we've talked about, you know, whether or not it was reliable that this website actually has a history of -- of child pornography. We've talked about that; correct?

A Yes, sir.

Q All right. What I'm asking you is how did you satisfy yourself, being in charge of the investigation, that Dr. Dully's opinion about the age was reliable such that you could present it to a court?

MS. SHEVLIN: Form.

MR. CARSON: I'll join.

You can answer.

THE WITNESS:  And I'm sorry.  I'm thinking back to obviously when I went to her office, just because I don't recall specifically what she used to determine the age.  But her being a doctor in the medical field working with children, I think that also played into why I felt comfortable utilizing her.

BY MR. ROBERTS:

Q    So you met with her twice?

A    Yes, for this case.

Q    Okay.  The first time you met with her on February 22nd, did -- did she tell you that she could -- yeah, I can accurately, reliably estimate the age of the individual in this digital photograph?

A    I don't remember verbatim what she said.

Q    Do you remember getting that sense from her, that she was going to give you reliable information about the age?

A    Yes.

Q    Okay.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    All right.  Now, prior to showing her the image, you told her that this image came from a cyber tip; correct?

A    Not that I recall.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    Okay.  That's okay.  I don't --

A    Yeah.

Q    -- have any record that you did.  I'm just trying to verify that I'm not missing anything.

A    No.  Sorry.  I'm just -- that's why my face kind of scrunched up.  I was thinking back to it.

Q    Sure.

All right.  And so you -- in this affidavit, you quote directly from Dr. Dully's letter; correct?

A    Yes, sir.

Q    And so you -- we've already asked you questions about the reliability of Dr. Dully's opinion. But at that point, did you believe that Dr. Dully was a reliable source of information in estimating the age?

A    Yes, sir.

Q    Okay.  All right.  So is there anything other than Dr. Dully's report and the NCMEC tip that you submitted to the court -- well, strike that.

It looks like you submitted the information from the NCMEC report.  You submitted your -- your statement that met-art.com was a known -- has a known history of displaying CSAM.  And then the third thing

Q   Okay.  But did you -- did you -- that's what I'm asking you.

A   Yes.

Q   Did you do any -- did you submit anything other than the affidavit for the search warrant in support of probable cause to seek the search warrant?

A   Not that I recall, anything other than this.

Q   Okay.

A   I just know that we don't submit, obviously, NCMEC images.

Q   Well, you could show the -- I mean, do you -- do you believe that it would be improper for you to show a judge the image?

A   So all of our, like -- excuse me.  All of our search warrant stuff is electronic-based.  So I wouldn't be able to submit that electronically, that image.

Q   You don't have the ability to go to chambers to a judge to obtain a search warrant in person?

A   I mean, we can go in person.  It's just the judges prefer to do it electronically based.

Q   Okay.  But you have the ability to bring your laptop there --

A   Yes.

Q   -- if you wanted to show the image?

A   Yes.

Q    All right.

And did -- did you get a return on -- on this -- was the -- was the search warrant issued?

A    Yes, sir.

Q    Okay.  And was there -- was it served, and was there a response?

A    Yes, sir.

Q    Okay.  What happened next?

A    We received the Synchronoss download.

Q    Okay.  And what did that download contain?

A    It contained numerous files linked to that phone number.

Q    All right.  And you got all the customer subscriber information?

A    I don't recall if they provided the customer subscriber information.  Usually, they have you reach out to Verizon.

Q    Okay.  I'm just looking down the list --

A    Yes, sir.

Q    -- of things that you requested for it.

A    Uh-huh.

Q    You requested device purchase information?

A    Yes.  Sorry.  Let me go back to that page.

Q    E-mail address -- yeah.  E-mail addresses associated with the account.

A    The call detail records?

Q    Call detail records.

Cell site information, what's the importance of that?

A    That will -- usually with cell site, if you request it fast enough, you should be able to kind of pinpoint, you know, where the phone was utilized during a specific time.

Q    And why is that important?

A    Because that can tell you, like, hey, were they in our county, or, hey, was it somewhere else, or, you know, like, where were they at specifically.  But usually, you have to do that fast, fast.

Q    Specifically at the time of the incident?

A    Yes.

Q    Okay.  All right.

All right.  And so you got the -- the download.  What happened next?

A    Then the next step is just to go through the download, review it, and see what all is contained in it.

Q    And what -- what was contained in it from your perspective?

A    That's when we located three other CSAM images, and then -- excuse me -- there was numerous

other kind of files that contained other pornographic images as well.

Q    Those were adult pornographic images?

A    To be honest, I do not know their specific age.

Q    That's true of any -- any -- any pornographic image; right?

A    Uh-huh.

Q    Correct, just for the court reporter?

A    Oh, sorry.  Yes.

Q    Yes.

A    Sorry.  I forget that.  I was -- uh-huh.

Q    So you found how many images that you thought were child pornography?

A    Total of three.

Q    Okay.  Total of three?

A    Yes.

Q    Was that unusual?

A    No.

Q    You write in your affidavit that often people hoard.  Is that true?

A    Yes.

Q    Was -- did you find any evidence of hoarding?

A    I can't recall specifically because there was a lot of files, like, a lot.

Q    Uh-huh.

A    But as it pertains to, like, the CSAM, I can't recall if there was, like, hoarding of images.

Q    Right.

You say in the affidavit that normally, people in possession of child pornography will try to hide or secret them away.

A    Uh-huh.

Q    Is that a yes?

A    Oh, yes.  Sorry.  I need to stop doing that. I'm sorry.

Q    There was no evidence that Mr. Lawshe was hiding or secreting away these -- these images; correct?

A    I don't recall offhand because I do know he was married, but I don't recall if he had them in, like, different folders specifically.

Q    But he -- but he didn't have them segregated from the other pornographic images on his phone?

A    That I don't recall.

Q    So you said there were three total images on his phone of child pornography?

A    No, three total that we, like, charged for.

Q    Were there other images of child pornography?

A    That I don't recall.  No.

Q    Okay.  So was one of those images the NCMEC

report image?

A    That we charged, one of the images, no, sir.

Q    Did you guys find that image on his phone?

A    I do not believe we located that image.

Q    I think you located an image of the same model, though?

A    Yes, sir.

Q    All right.   Actually, at least two images of the same model?

A    Yes.

Q    All right.  So I asked you earlier if this appeared to be part of a photo shoot.  Do you recall that?  Did the NCMEC image appear to be part of a photo shoot?

A    Sorry.  I'm just thinking back to the other two images, just trying to make sure that they were of the same model.  I know one, for sure, was of the same model, but two, I'm not certain.  I would have to review that image.

Q    And we have these images.

A    Yes.

Q    We're probably going to get to those a little bit later.

A    Uh-huh.

Q    But my question to you is there was a

pornography, would they?

A    What are you talking -- like, what are you referring --

Q    This officer that -- your colleague who looked at this and said, ah, this -- this is -- this could be age-difficult or an adult, however they characterize it, if they possessed this particular image, it would not be a crime; right?

A    That I can't say.

Q    Well, they don't believe that it's a minor, do they?

A    Yes.  But if somebody else was to -- let's say, had that investigation and investigated that officer and they felt the same way that I felt, it would be a crime.

Q    So you -- you're -- you're the determiner of what's a crime and not a crime?

A    No.  But I'm saying that they could have felt, hey, I have probable cause for this specific crime.

Q    But -- but this is what I'm struggling with, is you've acknowledged you've got no expertise as anybody else in this room, yet you get to determine what is and is not CSAM and what is or is not potentially a crime.  And that doesn't seem right to me.  But is that what you're saying; that's what it is?

MR. CARSON:   Object to form.

THE WITNESS:   That's not what I'm saying.   I'm not saming -- excuse me -- saying that I'm the judge and executioner of what is a crime.   What I'm saying is that I felt that this depicted a child, and I had that probable cause.   I had it reviewed by another doctor.   I had it reviewed by a state attorney, and that is why we proceeded with the investigation.   But I'm not saying that I am the end all/be all, no, sir.

BY MR. ROBERTS:

Q     Do you think that you conducted a reasonable investigation prior to arresting my client?

A     Yes, sir, I do.

Q     And why -- explain to me why that investigation did not include going to the website met-art.com.

A     Because at that point in my investigation, when I am trying to obtain probable cause for an arrest, going to MetArt was not during that point in my investigation.

Q     You knew that med-art.com potentially had exculpatory information.

MR. CARSON:  Object to form.

THE WITNESS:  No, I did not.

Q    Right.

So tell me, when did you make the decision to arrest Mr. Lawshe?

A    This was after everything was reviewed by both my sergeant, lieutenant, and then the state attorney.

Q    Okay.   If Dr. Dully would have told you that she could not help you, would you have pursued charges against Mr. Lawshe?

A    The case --

MS. SHEVLIN:   Form.

THE WITNESS:   -- wouldn't have stopped there.

BY MR. ROBERTS:

Q    So in a way, I guess your position is Dr. Dully -- really, her -- her opinion was the deciding factor in whether or not to proceed to -- pursue the charges or not pursue the charges?

MR. CARSON:   Object to form.

MS. SHEVLIN:   Form.

THE WITNESS:   I can't say that.

MS. SHEVLIN:   Mischaracterization of prior testimony.

BY MR. ROBERTS:

Q    Okay.   Well, let's just say -- I guess then, if I'm mischaracterizing it, just to confirm, if Dr. Dully, on February 22nd, would have told you, look,

I just can't help you for whatever reason, you would not have sought a search warrant in this matter?

A    That I can't say because --

MS. SHEVLIN:    Form.

THE WITNESS:    -- it would have been reviewed by my sergeant.  So I would have went back to the office, informed my sergeant of everything that occurred, and then it would have been his deciding factor.

BY MR. ROBERTS:

Q    If, on April 5th, you had gone to Dr. Dully and she would have said, I can't help you, would you have made the decision to arrest?

A    It would have been the same answer.  I would have gone back to my sergeant.

MS. SHEVLIN:    Form.

BY MR. ROBERTS:

Q    So when you said earlier that the investigation which would have ended, that wasn't true.

A    I'm saying that I would have went back to my sergeant, and he would have been the deciding factor. So I'm sorry.  I misspoke on that.

Q    Right.

MR. CARSON:    If -- if I could, I think you misheard what she said.

Q    Who -- who was responsible for making the decision to effectuate the arrest in this case?

A    That was something, like I said, that it was a group discussion, where it passed multiple points.  It passed not only the sergeant, the lieutenant as well as the state attorney.  It wasn't solely just one person.

Q    You were involved in that decision?

A    Yes, because it passed multiple points.

Q    And was Sergeant Tolbert part of that decision?

A    Yes, sir.

Q    Who was the -- who was the person in St. Johns County Sheriff's Office that was responsible for that decision?

A    I don't understand your question because --

Q    Where does the buck stop for that decision in ICAC at the time that this arrest was made?

A    I guess I'm a little confused.  And please correct me if I'm not going down the right path.

Q    Don't want you to.

A    But what I'm saying is it's not just one person.  Like, it doesn't just stop at one buck.  Like, it's multiple different people, including the state attorney, that it has to go through before we even get to that point.  So I can't just say, yeah, it's one

person because it's not, if that makes sense.

Q    But it wasn't you?  Was it you that made the decision to make this arrest?

A    What I'm saying is it's multiple people.  I agreed, if that's what you're saying, with the arrest as well as everybody else that was reviewing it, if that answers your question.  I don't know.

Q    Okay.  Did you make a recommendation to your supervisors?  How did you present that to your supervisors?

A    By doing the probable cause.  So I --

Q    So you did your probable cause affidavit for the search warrant.

A    Yes, uh-huh.

Q    You stated there was probable cause, and then you asked them to sort of sign off on that?

A    So they review it, yes.  But we also do have to have somebody sign off on it.  But they review it as well as the state attorney is reviewing the investigation and obviously Dr. Dully's statements, everything in its entirety.

Q    Okay.  So really, if there were this information that we're talking about, the passports and the website record custodian, Detective Tolbert's opinion or testimony about that would be relevant on

A    Yes.

Q    Not every case that you have do you present to the state attorney, do you?

A    If it's one that we're going to try to do a physical arrest day of, yes.

Q    But if you make the decision that we're not going to arrest, you don't -- do you have to get the state attorney's involvement in that?

A    They do.  Especially if we're going to be eventually forwarding charges, they're going to involved in it.

Q    I'm sorry.  I'm asking actually a different question.

A    Okay.  Sorry.

Q    If you make the decision that you're not going to -- there was another image that was the subject of the NCMEC report in this.  You're familiar?

A    Yes, uh-huh.

Q    You looked at it, and you discarded it.  You said, no, this is not CSAM; correct?

A    Uh-huh, yes.

Q    Was that your decision?

A    Yes.

Q    Did you run that by Sergeant Tolbert?

A    Yes.  He reviewed the image as well.

Q    So you just don't remember if that was something you were concerned with or not?

A    What I'm saying is I don't recall, so I can't tell you if that's something that I was concerned with or something that I wasn't because I do not recall.

Q    Okay.  All right.  And you were the lead detective in charge?

A    Yes, sir.

Q    All right.

We -- you did seek another search warrant for his home; correct?

A    Yes, sir.

Q    And you obtained two additional devices from his home?

A    I don't recall.  I would have to review what was taken because I wasn't on scene when that occurred.

Q    Well, let me ask you this:  Did -- all of the three images that he was charged with were from his personal cell phone device?

A    I don't recall.  I would have to look back at the Cellebrite extraction.

Q    Okay.  Why did you not charge -- there's -- one, two, three -- four images of -- let's call her the model from the NCMEC.

A    Yes, uh-huh.

Q    Why did you not charge her [sic] with all of the images?

A    You're talking about all of the ones that we have on this table?

Q    No, all of the images of the model that was the subject of the NCMEC report.

A    Because, like, for instance, this image, I would have to go back to the Cellebrite report.  But if it was not on the device at the time that he physically had it, we wouldn't have charged for it.

Q    Why not?

A    Because he wouldn't have been physically in possession of that image.

Q    But Synchronoss had told you that he had downloaded it.

A    That, I don't know if they stated downloaded, but at some point in time, that image was viewed.

Q    Okay.  So there's three images.  Let's take out B.

A    Okay.

Q    Okay?  Because you're saying that you don't believe that was on the -- the download.  There's three images, A, D, and C.  You did not charge for those images, all of those images.  Which images did you charge and why not the other?

CERTIFICATE OF OATH

STATE OF FLORIDA     )

COUNTY OF ST. JOHNS )

I, Nicole Medlock, Registered Professional Reporter, Notary Public, State of Florida, certify that **MIKAYLA PRESTON** personally appeared before me on March 13, 2025, and was sworn.

Signed this 4th day of April, 2025.

/s/ Nicole Medlock_____
Nicole Medlock, RPR and FPR-C
Notary Public, State of Florida
My Commission No. HH 285922
Expires:  July 24, 2026

Personally known _____
OR Produced Identification _____X_____
Type of Identification Produced Driver's License

C E R T I F I C A T E

STATE OF FLORIDA     )

COUNTY OF ST. JOHNS )

I, Nicole Medlock, Registered Professional Reporter, certify that I was authorized and did stenographically report the deposition of **MIKAYLA PRESTON**; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Signed this 4th day of April, 2025.


                    /s/ Nicole Medlock_____
                    Nicole Medlock, RPR and FPR-C

# Doc. 82-4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case 3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE, an individual,

     Plaintiff,

-vs-

ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

     Defendants.

_____/

REMOTE DEPOSITION OF KEVIN GREENE

Taken on Behalf of the Plaintiff

DATE TAKEN:  Tuesday, December 17, 2024
TIME:        10:02 a.m. - 12:12 p.m.
PLACE:       Remotely via Zoom

Deposition of the witness taken before:

Maureen Hall, RPR, FPR

**Page 2**

APPEARANCES:

Counsel for Plaintiff:

        MICHAEL K. ROBERTS, ESQUIRE
        LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI
        1680 Emerson Street
        Jacksonville, Florida 32207
        mroberts@nrhnlaw.com

Counsel for Defendants, Robert Hardwick and Mikayla Preston:

        MATTHEW JOSEPH CARSON, ESQUIRE
        SNIFFEN & SPELLMAN, P.A.
        123 Monroe Street
        Tallahassee, Florida 32301-1509
        mcarson@sniffenlaw.com

Counsel for Defendant, Kathleen Dully:

        AMY K. SHEVLIN, ESQUIRE
        BUCHANAN & BUCHANAN, P.A.
        1900 Southeast 18th Avenue, Suite 300
        Ocala, Florida 34471-8237
        ashevlin@rbtrial.com

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 3

I N D E X

REMOTE ZOOM DEPOSITION OF KEVIN GREENE

DIRECT EXAMINATION BY MR. ROBERTS:                    4

CROSS EXAMINATION BY MS. SHEVLIN:                    80

REDIRECT EXAMINATION BY MR. ROBERTS:                87

E X H I B I T S

Plaintiff's Ex. No. 1  Statute                       39

Plaintiff's Ex. No. 2  CyberTipline Report           62

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 4

PROCEEDINGS

Whereupon,

KEVIN GREENE, called as a witness by the Plaintiff, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.  Can you state your name for the record.

A.  Kevin Greene.

Q.  And I understand you're employed with St. Johns County Sheriff's Office?

A.  Yes.

Q.  And you're a corporal or detective corporal at --

A.  Yes.

Q.  Yeah.  What's your -- your job title today as we sit here?

A.  I'm a digital forensics detective.  I'm kind of like assistant supervisor of the digital forensics lab.

Q.  How many people are in that lab?

A.  Currently there are four of us.  And we have a lieutenant who oversees us.

Q.  And how long have you been doing that for

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 5

St. Johns County?

A.    Full-time just -- well, almost five years. Next month it will be five years.

Q.    I understand before that you were -- did you work for -- were you an ICAC detective?

A.    From 2015, like late 2015 until I think mid-2017.  It's internet crimes against children, I-C-A-C.

Q.    And I was just going to ask you, what -- what is that?

A.    It's investigating like online enticement of children.

Q.    Okay.  Well, as -- I think we're here today about an investigation that involved the alleged possession of child pornography.  Would that be under the -- the purview of -- of ICAC investigators?

A.    Yes.

Q.    And in your -- in the past, while you were an ICAC investigator or detective, was that with St. Johns County Sheriff's Office?

A.    Yes.

Q.    Sometimes I see the -- a special victims unit or SVU; did you work in that department?

A.    Yes.  I went from ICAC to special victims.

Q.    Okay.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 52

A.   A little bit, not much.

Q.   What do you know?  Let me ask you this. Before I ask you this, I want to ask a better question. When did you know prior to Mr. Lawshe's case?

A.   I had read -- I know -- I mean, I know what you're getting at.  I had read somewhere back when I was doing ICAC investigations that they used 17 year old models from the Ukraine back years ago.

Q.   What was the source of that?

A.   Something when I was doing investigations when I was -- I read it on the internet somewhere.

Q.   You read it on the internet somewhere?

A.   I can't remember.  I mean, I don't have it in a book or anything.

Q.   No, but, I mean, like, was it a -- a Google review or...

A.   I don't recall.  That was almost ten years ago, you know.

Q.   So you have no idea if that was a credible accusation?

A.   I don't recall.  It could have been at the time.  I just -- I mean, I don't have it.

Q.   It could have been credible, but it also could have not been credible, correct?

A.   I mean, it very well -- I mean --

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 53

Q.   I mean --

A.   It was -- it was from 2015 or 2016.  I don't -- I don't have -- it's something I remembered from when I was in ICAC.

Q.   Okay.  All right.  Actually not what I was going to, but I appreciate it.  I was going to go there.

Have you ever visited -- have you ever -- have you ever Googled metart.com in response to this case?

A.   Yes.  This morning.  Yeah.

Q.   Okay.  Okay.  Okay.  Did you and Ms. -- did you and Detective Preston Google metart.com together at any point in time?

A.   Not that I recall.

Q.   Did you tell her that metart.com was publishing illegal content?

A.   I don't think so.

Q.   All right.

A.   Did I?  Did she say I did?  Because I don't remember telling her that I did.

Q.   Okay.  You made a comment about -- well, I'm going to go through something else first.  You said you reviewed the NCMEC report?

A.   Yes.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

          I, the undersigned authority, certify that the aforementioned witness Kevin Greene, personally appeared before me via remote teleconference and was duly sworn on Tuesday, December 17, 2024.

          Dated this 27th day of December, 2024

_____

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida
My Commission Expires:  3/17/25
My Commission No.:  HH065896

Identification presented by Deponent: License

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

**Page 93**

                    C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF JACKSONVILLE


        I, MAUREEN HALL, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition; and that the transcript is a true record of the testimony given by the witness.

        I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in this action.

        Dated this 27th day of December, 2024.

_____
MAUREEN HALL, RPR, FPR
Notary Public - State of Florida

# Doc. 82-5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case 3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE, an individual,

      Plaintiff,

-vs-

ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

      Defendants.

_____/

REMOTE DEPOSITION OF EUGINE TOLBERT

Taken on Behalf of the Plaintiff

DATE TAKEN:  Tuesday, December 17, 2024
TIME:        1:01 p.m. - 2:47 p.m.
PLACE:       Remotely via Zoom

Deposition of the witness taken before:

Maureen Hall, RPR, FPR

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

**Page 2**

APPEARANCES:

Counsel for Plaintiff:

       MICHAEL K. ROBERTS, ESQUIRE
       LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI
       1680 Emerson Street
       Jacksonville, Florida 32207
       mroberts@nrhnlaw.com

Counsel for Defendants, Robert Hardwick and Mikayla Preston:

       MATTHEW JOSEPH CARSON, ESQUIRE
       SNIFFEN & SPELLMAN, P.A.
       123 Monroe Street
       Tallahassee, Florida 32301-1509
       mcarson@sniffenlaw.com

Counsel for Defendant, Kathleen Dully:

       AMY K. SHEVLIN, ESQUIRE
       BUCHANAN & BUCHANAN, P.A.
       1900 Southeast 18th Avenue, Suite 300
       Ocala, Florida 34471-8237
       ashevlin@rbtrial.com

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 3

I N D E X

REMOTE ZOOM DEPOSITION OF EUGINE TOLBERT

DIRECT EXAMINATION BY MR. ROBERTS:                    4

CROSS EXAMINATION BY MS. SHEVLIN:                     72

REDIRECT EXAMINATION BY MR. ROBERTS:                  82

E X H I B I T S

Plaintiff's Ex. No. 1  CyberTipline Report       49

Plaintiff's Ex. No. 2  4-5-23 Letter             59

Plaintiff's Ex. No. 3  Photo ID                  65

Page 4

PROCEEDINGS

Whereupon,

EUGINE TOLBERT, called as a witness by the Plaintiff, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.  Good afternoon, Detective.  Is it detective? I saw -- are you sergeant detective or detective?

A.  Yeah, detective sergeant.  Call me anything, just don't call me late for dinner.

Q.  It won't be the worst thing you've been called, right?

Okay.  So Detective, I introduced myself just before we got on to the record.  My name is Michael Roberts.  I'm here to take your deposition today.  I understand that you have had your deposition taken before, so I won't go through the -- the kind of ground rules and procedure stuff with you.

We're here about a case, it's a -- my client is a guy named William Lee Lawshe.  Are you familiar with the investigation or the prosecution of Mr. Lawshe for allegations of possession of child pornography?

A.  Can you hear me?

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 5

I am.

Q. You are. Okay.

A. Yes, sir.

Q. Yeah, sorry.

So first of all, tell me, what -- what's your -- your title, your job title, as we sit here today?

A. So currently I'm of two sergeants assigned to supervise the major crimes unit at the St. Johns County Sheriff's Office.

Q. And what was your -- your job back in the beginning of 2023?

A. When this case was going? Are you referring to when this case --

Q. Yeah.

A. -- was going on?

Q. Yes.

A. I was in -- I was in transition at that point. I was transitioning as the supervisor of the Internet Crimes Against Children Unit, ICAC, transitioning back to major crimes unit.

Q. So how long were you -- I think you -- were you the supervisor of the ICAC unit --

A. Yeah.

Q. -- back at that time?

Page 6

A.    Yes.

Q.    And how long had you done that?  And just give me kind of the timeframe of when you were the supervisor of the ICAC unit.

A.    About two years.

Q.    And prior to that two years, so I'm guessing '21 to '23 timeframe, you were the ICAC supervisor?

A.    Correct.

Q.    Prior to that, it sounds like you were in the major crimes unit at that time, too?

A.    Correct, prior to.  So I was -- I was a patrol deputy from 2001 to 2009, if this makes it easy.

Q.    Yeah.

A.    2009 I came to investigations in what was then referred to as robbery/homicide is now referred to as major crimes, so it's changed its name.  I was there for ten and-a-half years as a homicide detective. While I was there, I got promoted to sergeant in 2018 and supervised that unit for two additional years.  And then in 2020, I rotated back to patrol.  I did just a little over a year in patrol.  In '21 I transitioned to ICAC as a supervisor of ICAC.  I was there for about two years, and then I transitioned back to the supervisor of major crimes because the other sergeant retired.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 7

Q.   So can you just describe for me what your involvement in the investigation of Mr. Lawshe's case was?

A.   Yeah.  So as the ICAC supervisor, I reviewed -- received and reviewed the cyber tips that were sent to our agency through the North Florida ICAC task force.  And I assigned tips out to detectives for follow-up investigation and then general supervision of the investigation.

Q.   In this case, did -- were you the lead investigator investigating Mr. Lawshe's case?

A.   I was not, no.  I assigned it to a detective.

Q.   Now, I understand you assigned it to Detective Preston; is that correct?

A.   Yes, correct.

Q.   And she was the detective in the ICAC unit at St. Johns County Sheriff's Office?

A.   She was, yes.  She still is.

Q.   Is there any particular reason that you assigned this case to Detective Preston?

A.   It was her turn in the barrel.

Q.   So let me ask you this.  I just want to understand your -- your process of dealing with the -- the -- the cyber tips.  That's what we're talking about, correct?

**Page 8**

A.   Yes.

Q.   We just had a deposition with Mr. Greene or Detective Greene, and we talked about National Centers for Missing & Exploited Children.  That's what we're -- you understand that's what I'm referring to when I say "NCMEC"?

A.   Yes.

Q.   All right.  And do you, when you get the cyber tip -- and we're talking about in the timeframe, let's just say first quarter of 2023, do you refer every cyber tip to an investigator or detective for what you say, further follow-up investigation?

A.   No.

Q.   Did you cull out any cyber tips prior to assigning them to the detectives?

A.   When you say "call out," I'm not quite sure what you mean by that.

Q.   Yeah.  So cull, my grandmother used to cull things, but --

A.   Oh, I'm sorry, cull.  I thought you said "call."  I apologize.

Q.   No, no, cull.

A.   Yeah.  So not all tips are -- have enough information for a follow-up investigation.

Q.   Uh-huh.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 9

A.    So instead of just drowning the detectives in tips that don't go anywhere, at the supervisor level, we tend to try to triage those to a certain extent for tips that are actionable.

Q.    Okay.  And what makes a tip actionable?  Is it like an identifiable suspect that you can -- you can locate?

A.    Those are great tips, sure.  Yeah, if -- if we know who the bad guy is when the tip comes in, that's -- that's a great start.

Q.    Okay.  Do you evaluate whether or not the particular image is or is not of a minor at the time that you're assigning these tips?

A.    Yes.

Q.    And tell me, how do you do that?

A.    Just based on kind of a common sense approach.  If it looks like a duck and walks like a duck, then we call it a duck.

Q.    So we were talking to Detective Greene, and he described something called age-difficult as a category.  Are you familiar with that?

A.    I don't know that it's a category, more of a description, but, yes, I understand what you're referring to.

Q.    What do you understand that term to mean?

Page 10

A.   So for instance, in -- in -- and I don't want to get ahead of you, but I think I'm answering your question.   But in Mr. Lawshe's case, we received two separate tips on Mr. Lawshe.   One of those images I did not assign out because I deemed it to be age-difficult. The second image that we received, I did assign out because I deemed it to be decent.

Q.   Okay.  Is it sometimes that investigators in your office disagree about what is age-difficult or what is CSAM?

A.   I wouldn't say we have a deliberate conversation about it.  I can't really remember a time that there was a delineated disagreement.  I suppose it's possible that there would be a disagreement, but I just don't remember a time when someone said, No, I don't agree with you.

Q.   Okay.  Would you -- if something was age-difficult, I mean, do you ever investigate age-difficult images?

A.   We do, yes.

Q.   Yeah.  So do you recall whether or not the images involved in Mr. Lawshe's case were age-difficult?

A.   So the initial tip that did not get assigned out, I did deem that to be age-difficult.  The second

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

**Page 11**

tip that we received in Mr. Lawshe's case, we felt like it was CSAM, but we inquired about a second opinion.

Q.    And the reason I ask is, I asked Detective Greene, and in his opinion, all of the images on Mr. Lawshe's phone were age-difficult.  Is that just you guys disagree about that, or some people have a different definition of what age-difficult means?

A.    No.  So I think it's really based on the personal experience in kind of -- so I have two daughters, obviously, you know, there is a point of reference there.  Everybody might not have that point of reference when, you know, reviewing these things.  I don't know what Detective Greene's point of reference is, so I can't speak to that.  But from my point of reference, I felt that it was an actionable tip.  But as I said, we did seek a second opinion through Dr. Dully at the Child Protection Team.

Q.    Did you communicate to Detective Preston at the time that you communicated the tip that you felt like the image -- image constituted child sexual abuse material?

A.    Yes.

Q.    Did you ask her to investigate that?

A.    Yes.

Q.    And -- all right.  Were you a part of the

Page 12

investigation?

A. So as far as the -- I went with Detective Preston to see Dr. Dully when we presented the images to the doctor.

Q. Okay.

A. It was more of a -- kind of a let's just get it done and take care of this kind of deal as opposed to kind of holding her hand, so to speak. But that's just kind of how it worked out. It wasn't really that, you know, I had any skin in the game. I just kind of tagged along.

Q. So you went with Detective Preston to the meeting with Dr. Dully?

A. Correct.

Q. All right. I want to -- I'll ask you some more detailed questions about that in a minute.

So other than, you know, the fact that you have two daughters, what training do you have in determining if a particular individual displayed on a -- a photograph is, let's say, the difference between 17 and 18 years old?

A. I don't know that we would get into those leads in an investigation. By that point, you're -- you're kind of past puberty, and those are going to be very difficult images to kind of hash out, between a 17

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 15

you look at a duck, you can usually tell a duck is a duck. I don't mean to be facetious, but this is the best way I can explain it. So if you have a question as to, you know, any further detail, then you might need to dig deeper. And that's what we did in this scenario when we reached out to Dr. Dully and the CPT team. So obviously Dr. Dully has a medical background. She has specialized training and things like that. She has references she can refer to as far as literature to give us a better estimate of age. But it's really just kind of a, you know, this one looks like this and this one looks like that initial assessment of the case.

Q. Okay. So does the fact that you took the image to Dr. Duly mean that there was some question about the -- the model's age?

A. No. So if we didn't feel like it could be CSAM, we wouldn't have taken it to Dr. Dully to begin with. So as I said, in -- in Mr. Lawshe's case, we got two tips. The first tip we deemed not -- to not be actionable right off the bat. We did not take that to Dr. Dully. I just closed that tip out. The second tip I felt like was actionable. We took that tip to Dr. Dully. Dr. Dully agreed that it appeared to be a child, and then we went forward with the investigation from there.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 16

Q.   Yeah, and I -- and I -- so I'm just -- I'm trying to understand.  So sometimes you don't take images to Dr. Dully, correct?

A.   That's correct.

Q.   If something is obviously a child, you -- you don't take it to -- to Dr. Dully, correct?

A.   Correct.

Q.   And that's what I'm trying to understand is, in this case, doesn't it say that this was not obviously a minor because you took it to Dr. Dully?

A.   I mean, I don't know how to better answer your question.  I felt it was a minor when I reviewed the tip.  And, you know, to be fair, if we had taken it to Dr. Dully and Dr. Dully said, No, this is not a minor, then we would have went with what Dr. Dully said.  You know what I mean?  But on face value when I reviewed the tip, when I received the tip, I believed the image to be of a minor.  I assigned it to Detective Preston.

Q.   Right.

A.   And we took the image to Dr. Dully for a second opinion.

Q.   For a second opinion.  Okay.

A.   So I don't have a better answer than that.

Q.   Well, really, and you just keep answering the

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 17

best you can.  Okay?

A.   Sure.

Q.   But -- but when you say you believed that this was a child, it -- it wasn't obviously a child, though, was it?

A.   So I can tell you this.  And I will give you a scenario.  If I --

Q.   I really just want you to answer the question, really.  I mean, it wasn't obviously a child. You wouldn't have taken it to Dr. Dully if it was obviously a child, would you?

A.   Well, it obviously wasn't a two year old, so I believed it to be an early teen child.

Q.   And if someone would have told you, no, this -- this is an 18 year old, you would have believed that too?

A.   If someone who had the expertise to give that opinion, then, yeah.

Q.   What if someone had a copy of her ID and said here's her ID, she's 18, would you have believed that?

A.   Oh, absolutely.  Yes.

Q.   Okay.  All right.  Okay.

But I guess what I'm saying is, is the type and quality of imaging that we're -- that the model is, it's not something that you would look at and say

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 18

there's no way this person is 18 years old, correct?

A. Well, I don't know that there is -- I kind of learned my lesson about absolutes in law enforcement.

Q. Sure.

A. So I -- I -- I don't know that there's really a scenario that I would want to submit to an absolute like that.

Q. Right. But you would accept either Dr. Dully's opinion that this particular model was 18, and you would accept that the model was 18 if she had said that it was 18?

A. Absolutely, yes.

Q. And if someone produced a photograph of an ID and said, Hey, she was 18 at the time of the photograph, you would have also accepted that as being she was 18?

MS. SHEVLIN: Form.

THE WITNESS: Considering the source, but, yes.

BY MR. ROBERTS:

Q. Yeah, generally speaking, yes, right?

A. Correct.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q. So would you just agree with me, because, I

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 28

just --

          MR. ROBERTS:  Absolutely.

          THE WITNESS:  I'll pop out and go on my laptop.

          MR. ROBERTS:  Absolutely.

          (Off record)

          THE WITNESS:  I'm not aware of that, no.

BY MR. ROBERTS:

Q.  So you indicated that you went with Detective Dully to -- I'm sorry, Detective Preston to Dr. Dully's office, and you participated in that meeting.  Other than that, what else, if anything, did you do in this investigation?

A.  I reviewed a search warrant for the -- I think it was Synchronoss.  Hang on a second.  I've got the case file right here.  Is Synchronoss correct?

Q.  Yeah, that's right, Verizon --

A.  Yeah.

Q.  -- Synchronoss, or something like that.

A.  Yeah.  So I reviewed the search warrant for Synchronoss, and I participated in the ruse when Lee came into the sheriff's office and was interviewed.

Q.  Did you -- did you reach out to Mr. Lawshe to get him to come in to the office?

A.  I did, yes.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 29

Q.   Did you know Mr. Lawshe?

A.   Professionally because of a prior investigation, yes.

Q.   Tell me about what you knew of Mr. Lawshe before this.

A.   So back in 2013 I was working a homicide case, and Mr. Lawshe was working for FWC at the time, and he participated in a search out in the Flagler Estates area in the southwest corner of our county, and he actually located the remains of our homicide victim.

Q.   Did you form any impressions about him as a law enforcement officer during that interaction?

A.   No, not really.  So I mean, we didn't know each other intimately, like we didn't hang out on the weekends, drink beer together or anything like that.  I didn't know anything about him.  That was really my only interaction with him.

Q.   When did you first learn that this investigation that we're here talking about involved Mr. Lawshe?

A.   When I opened the cyber tip.

Q.   You knew that that cyber tip involved a law enforcement officer, local law enforcement officer at that moment?

A.   I did.  I recognized his name.

**Page 30**

Q.   Did you communicate that information to Detective Preston?

A.   I did.

Q.   So the entire time she investigated this case, she was aware that Mr. Lawshe was a law enforcement officer?

A.   Yes.

Q.   Okay.  So you participated in the interview. I understand that his supervisor at FWC had been informed about this investigation prior to him being brought in or the arrest.  First of all, do you know who informed his supervisor at FWC of this investigation?

A.   Captain Bill Werle.

Q.   And that's -- that's the St. Johns County Sheriff's officer?  And you said Werle; is that correct?

A.   Yeah.  It's W-E-R-L-E.  His first name is William.  He goes by Bill.

Q.   And how did Mr. Werle find out about this investigation?

A.   He's the captain of criminal investigations at the Sheriff's office.

Q.   I mean, does he know about every criminal investigation, or did someone bring this to him saying

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 31

that this was a law enforcement officer?

A.    Both.    So he is the chain of command for criminal investigations.    So any large scale investigation or any sensitive investigation, like in this situation involving a law enforcement officer, he would be briefed on.

Q.    This was a -- you considered this a sensitive investigation?

A.    Yes.

Q.    Is the only reason that he was a law enforcement officer --

A.    I --

Q.    I'm just trying to say, are all -- are all investigations of CSAM sensitive, or is it just the fact that he was a law enforcement officer that made this particular investigation sensitive?

A.    No.   All investigations are sensitive, but this one, like, it adds a little bit more to it by the fact that he's a law enforcement officer.

Q.    Was this investigation treated any differently because Mr. Lawshe was a law enforcement officer?

A.    Other than who had access to the information being limited, no.

Q.    Nothing was done or not done in the

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 32

investigation because he was a law enforcement officer?

A.   Well, I would say that the contact with his agency was done because he was a law enforcement officer, but I -- I wasn't party to that.  I just know it happened.

Q.   I understand that media was contacted upon his arrest.  Do you know how they were contacted?

A.   I'm not positive that the sheriff's office contacted the media.  If I remember correctly, and I could be mistaken because we're going back in time a little bit, I believe that media contacted us because someone had saw his name and recognized his name on the booking log, and then a release was made after that.

Q.   Were you involved with that at all?

A.   No.

Q.   Okay.  So you were part of the interview and were you the one that communicated to Captain Werle about this case involving a law enforcement officer?

A.   I communicated to my lieutenant, who is Jose Jimenez, and then the chain of command kind of goes from there.  I did have conversations with Captain Werle, but I'm not the person who told him about it.

Q.   Tell me about those conversations.  What did you guys talk about?

A.   They just wanted to be kept abreast of the

Page 33

investigation as it went forward. And then when Lee came in during the ruse, we actually met in Bill's office.

Q. Okay. All right. So other than assigning the tip, going with Detective Preston to Dr. Dully's office, participating in the interview, are there any other tasks that you performed on this investigation?

A. I never said I participated in the interview. I'm not sure where you got that from, but I did not -- I did not --

Q. I thought you said you were there. Yeah, I'm sorry.

A. No, I was involved in the ruse when he was --

Q. Okay.

A. -- taken into custody. I didn't participate in the interview, no, sir.

Q. My bad. So you did not participate in the interview?

A. No, sir.

Q. All right. Whose decision was it to make an arrest?

A. I got to be honest with you, I don't know.

Q. That's okay. Would that usually be the lead detective's decision?

A. It's generally a kind of a -- a combination

Page 34

of the lead detective and the chain of command kind of supporting the decision.  We were in a little bit of a transition during that timeframe, so we had two layers of chain of command.  So that's why I don't know whose decision it was.

Q.   As we sit here today, do you have an independent recollection of a conversation that you had with anyone regarding the decision to make an arrest of Mr. Lawshe?

A.   I don't.  I was just informed that it happened.

Q.   Okay.  All right.  Who informed you?

A.   I don't remember.  I -- it was -- at that point, there were a lot of moving parts.  I just -- I don't remember who actually told me that he was going to be arrested.  It might have been Captain Werle.  It might have been my lieutenant.  I don't remember.

Q.   At that time, it sounds like you were responsible for receiving and disseminating the NCMEC cyber reports.  Did I understand that correctly?

A.   Correct, yes.

Q.   How many reports do you think you would get back first quarter of -- of 2023?  And you can estimate by week or month, if you can.

A.   It's kind of hard to estimate because some

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 35

weeks were busier than others.

Q.   Uh-huh.

A.   So some weeks we would get upward of 50. Some weeks we would get two.  So really it -- there was really no rhyme or reason to it.  It's just kind of, you know, however we received them.

Q.   And is there a way for you to estimate how many of those you -- we used the word culled, but did not assign because you felt like they weren't actionable just by looking at the image?

A.   I tried to weed out as many as possible just to keep the detectives' case loads manageable.  If I had to put an estimate on it, I would say probably somewhere around 50 percent.  But, you know, there's wiggle room on both sides there, so...

Q.   Was it a relatively common thing that you would get a NCMEC report and it would not be actionable?

A.   Correct, yes.

Q.   All right.  Whether it was 60 or 40, I understand you can't testify to that?

A.   Correct.

Q.   Are you familiar with the NCMEC term "Unconfirmed child pornography"?

A.   I am, yes.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 39

be prohibitive to pursue that, so...

Q.   Detective Greene has testified that he located, along with counsel for Mr. Lawshe, both of the models that are in question here within about 20 to 30 minutes based solely on the information that was contained in the images.  He found those images and models on the internet.  Do you have any reason to disagree with that?

MS. SHEVLIN:  Form.

THE WITNESS:  If that's what Detective Greene said, that's fine.  I'm not aware of that.

BY MR. ROBERTS:

Q.   Okay.  But if that's true, don't you believe that a reasonable investigation would include going to that website to investigate the context or potential identity of the victim?

MR. CARSON:  Object to form.

THE WITNESS:  Again, not in every scenario, so...

BY MR. ROBERTS:

Q.   But in this scenario where you had information that told you where they were being published, don't you think that that should be a reasonable part of the investigation?

A.   So I remember having a conversation with

Page 40

Detective Greene about this case and him making a reference -- he's been doing ICAC investigations for quite a bit longer than I have -- and him telling me that Metart that had the watermark on the image or one of the images, I'm not sure if it was on all of them or not, but I remember at least one of them having that watermark, that that website had had -- previously had issues with displaying images of underage females. Now, beyond that, whether or not someone should have gone to Metart to investigate that, I don't know if that occurred. I certainly don't think it would have been a bad idea, but, again, context-wise, you know, not in every scenario.

Q. Okay. And I appreciate your answer. And I appreciate that you do not know exactly what was done, but my question to you is, do you agree that given the context that you know or have information that leads you to believe that it was published on particular websites, that it would be reasonable to go to those websites to investigate the publication or identity of the victims contained in those images?

MR. CARSON: Object to form.

THE WITNESS: I don't think it's unreasonable. Again, like I said, it's situational based upon, you know --

Page 56

without having the advantage of seeing the image, you know.

BY MR. ROBERTS:

Q.   But it at least raises a question in your mind about the charge of a -- of a picture that doesn't show the face or breast of the model?

A.   I mean, it certainly makes it more challenging.  So I don't know the circumstances in which that decision was made, so I don't know if there's more information available that I'm not aware of.

Q.   Okay.

A.   Like I said, based on not having seen the image, I couldn't really say one way or another.

Q.   Okay.  Doctor Dully, do you know Dr. Dully?

A.   I mean, we don't hang out on the weekends, but I have met her probably a half a dozen times or so when I was in iTech.

Q.   And was it all under similar circumstances where you were investigating possession of child pornography?

A.   Yes, correct.

Q.   I heard that sort of the office policy or custom was that if an image was age-difficult and there was a disagreement about the age of the individual,

Page 57

that the procedure was to take it to Dr. Dully and let her be the tiebreaker.  Is that true?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  I don't know that that's a fair characterization of it.

BY MR. ROBERTS:

Q.    Just tell me what -- what circumstances would Dr. Dully be brought in on a case?

A.    Sure.  So if it's one of those things where you're just looking for, I guess, an extra layer of confirmation, you know, I think we all can kind of look at something and say, Oh, that appears to be this to me, but maybe I want a second opinion.  You know, there's plenty of things in life that you can refer to in that, so in those scenarios, we would reach out to Dr. Dully or someone from CPT.  I only ever dealt with Dr. Dully, but I'm sure CPT has someone else that you could also, you know, speak to, so...

Q.    Did you ever review her reports in this case?

A.    So she didn't do a report.  She did like a memo.  I'm not familiar with an actual report, but it was like a kind of a letter memo kind of deal.  I'm not sure if you're calling that a report.

Q.    Yeah, I -- I -- I don't -- yeah, yeah -- no,

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 59

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

BY MR. ROBERTS:

Q.   I mean, is there something -- do you understand what I'm saying?  I mean, is she just a resource, and you say you don't hang out with her.  I mean, you just implicitly -- you trust her, that she's telling you the truth?

MR. CARSON:  Form.

THE WITNESS:  Well, I trust the process in that she has consulted on cases before.  She works for the child protective team with the University of Florida.  You know, she obviously is a medical professional, would obviously be able to give her expert opinion in situations, where we as lay people can't, and I trust that a court would give her latitude with that, and from my understanding, has in the past.  So I'm not aware of any issues, you know, with any -- any kind of -- you know, for me to doubt that process or for me to doubt her reliability.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. ROBERTS:

Q.   Right.  Okay.  So I just want to show you,

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 74

A.   Vaguely.

Q.   Can you describe it for me?

A.   If I remember correctly, it's a little girl, kind of seated with her legs spread.  I think that's the one where she's wearing white socks or like little lacy socks, is the only thing that she has on.

Q.   And can you see the -- you said "little girl," but can you see the little girl's face in the image?

A.   Yes, yes, you could.

Q.   And when Dr. Dully was shown this image, was she given a copy, or was she shown the image on the computer, and then the computer left with you and Detective Preston, and Dr. Dully does not have access to that?

A.   No, she doesn't have access to it.  We -- we -- it was only on the computer, and we took the computer with us.

Q.   Okay.  At the time of this meeting, was Dr. Dully informed of the identity of Mr. Lawshe?

A.   I don't remember.

Q.   Would it be typical that Dr. Dully be informed of who the subject of investigation is?

A.   No.

Q.   More likely than not she was not informed

Page 75

regarding the name or identity of the subject of the investigation, meaning Mr. Lawshe?

A.   Yeah, she wouldn't really have a reason to know that, so...

Q.   Would she have been informed of Mr. Lawshe's status as a law enforcement officer during this meeting?

A.   No, again, she really wouldn't have a reason to know that.

Q.   And Dr. Dully was not paid for this service, correct?

A.   No, she's part of the CPT, so they offer this service to law enforcement.

Q.   And can you define "CPT" for the record?

A.   Child protection team at the University of Florida.  They have an office in Jacksonville, and they handle abuse cases.  They have doctors that are forensically trained to provide law enforcement support for abuse investigations.

Q.   And you testified earlier you had some prior interactions with Dr. Dully.  I think you said you've met her approximately six times.  Am I remembering that testimony correctly?

A.   Five or six, yes.  I don't remember the exact number.  But that's a fair estimate.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 76

Q. And on those five or six occasions that you had previously met Dr. Dully, were they all within the context of investigations regarding probable CSAM?

A. Yes.

Q. Give me one moment. I'm just looking through my notes here.

I misunderstood your testimony earlier. I want to ask you again to make sure the record is clear, prior to the investigation regarding Mr. Lawshe, were you familiar with the website metart.com?

A. No.

Q. Okay. Do you know what the MET in Metart stands for?

A. I do not.

Q. If I told you it stood for most erotic teens, would that surprise you, based on the content that you saw?

A. No, there's often, like in ICAC investigations, there's often hidden meanings in different terms.

Q. And were you aware that metart.com refers to their models as teens and girls?

A. I'm not aware of that, no.

Q. Would it surprise you?

A. No, it doesn't surprise me.

**Page 84**

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, the undersigned authority, certify that the aforementioned witness Eugine Tolbert, personally appeared before me via remote teleconference and was duly sworn on Tuesday, December 17, 2024.

Dated this 27th day of December, 2024

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida
My Commission Expires:  3/17/25
My Commission No.:  HH065896

Identification presented by Deponent: License

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

**Page 85**

C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, MAUREEN HALL, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition; and that the transcript is a true record of the testimony given by the witness.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in this action.

Dated this 27th day of December, 2024.

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida

# Doc. 82-6

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


CASE NO.:  3:24-cv-00044-MMH-MCR


WILLIAM LEE LAWSHE,
an individual,

        Plaintiff,

vs.

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's office
and KATHLEEN DULLY, in her
individual capacity as
medical director of the UF
Child Protection Team,

        Defendants.
                              /


ZOOM VIDEOTAPED DEPOSITION OF:  KATHLEEN DULLY,
                                M.D.

DATE:          April 28, 2025

TIME:          10:00 a.m. - 12:26 p.m.

LOCATION:      Via Zoom

REPORTED BY:  LISA K. PENKACIK, RMR

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 2

A P P E A R A N C E S:


MICHAEL K. ROBERTS, ESQUIRE
Law Offices of Nooney, Roberts
Hewett and Nowicki
1680 Emerson Street
Jacksonville, Fl  32207
mroberts@nrhnlaw.com

On behalf of the Plaintiff.


AMY SHEVLIN, ESQUIRE
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471-8237
ashevlin@rbtrial.com

On behalf of the Defendant Kathleen Dully, M.D.

MATTHEW CARSON, ESQUIRE
Sniffen & Spellman, P.A.
123 N Monroe Street
Tallahassee, FL 32301-1509
mcarson@sniffenlaw.com

On behalf of Defendant Mikayla Preston.

ALSO PRESENT:  Danny Holguin, videographer
               Shayne A. Thomas, Esquire
               (University of Florida)
               Autumn Zepf, paralegal

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

**Page 3**

                              I N D E X


     TESTIMONY OF:   KATHLEEN DULLY, M.D.

       DIRECT EXAMINATION by Mr. Roberts . . . . . .  4

       CERTIFICATE OF OATH . . . . . . . . . . . . . . 87
       CERTIFICATE OF REPORTER . . . . . . . . . . . . 88

       ERRATA SHEET. . . . . . . . . . . . . . . . . . 89

       PLAINTIFF'S EXHIBITS:

       1 (Articles). . . . . . . . . . . . . . . . . . 85
       2 (Dr. Krugman's report). . . . . . . . . . . . 85
       3 (Demonstrative image) . . . . . . . . . . . . 85
       4 (Dr. Dully's letters) . . . . . . . . . . . . 85











                     S T I P U L A T I O N S

             It is hereby stipulated and agreed by and

     between counsel for the respective parties and the

     deponent that the reading and signing of the

     deposition be reserved.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

**Page 4**

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning, this is the beginning of media one in the deposition of Dr. Kathleen Dully in the matter of William Lee Lawshe versus Mikayla Preston, case number 3:24-cv-00044-MMH.  Today's date is April 28, 2025 and the time is 10:01 a.m.  My name is Danny Holguin.  I am the videographer.  The court reporter is Lisa Penkacik.  We are here with Huseby Global Litigation.

Counsel please introduce yourselves after which the court reporter will swear in the witness.  Thank you.

MR. ROBERTS:  Michael Roberts for the plaintiff, Mr. Lawshe.

MS. SHEVLIN:  Amy Shevlin on behalf of Dr. Dully.

MR. CARSON:  Matt Carson representing Detective Preston.

KATHLEEN DULLY, M.D., having been first duly sworn by the reporter, thereupon testified upon her oath as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 5

Q.   Okay.  Dr. Dully, I introduced myself a little bit earlier, my name is Michael Roberts, I'm here to ask some questions today.  I assume -- you've had your deposition taken before?

A.   Yes, but never as a defendant, but, yes.

Q.   Okay.  You've had it taken as an expert witness?

A.   Yes.

Q.   Well, a deposition is a deposition, same ground rules apply, you're under oath, and I'll be asking you questions.  At any time if you don't understand a question that I've asked you, please let me know and I'll try to rephrase it.  I don't have a script that I'm going from, so it's probable that I will ask a bad question, so don't hesitate to question me if you don't understand.  Also, there is a court reporter who is trying to take down everything that we say, question and answer, so we'll just try to be mindful of the job that she's trying to do and not speak over one another; sometimes that's difficult for me and sometimes it's difficult for witnesses.  So we'll do the best we can.  But the last thing that I'll say is, a lot of times we'll speak colloquially, we'll say uh-huh or uh-huh or they'll be a nod of the head, I'll ask for a verbal

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 6

response, if I catch it, just because the court reporter will not be able to describe un-huh, uh-huh, I'll know what you mean by a nod of the head, but she can't write that down so...

A.    Thanks.

Q.    With that, can you just state your full name for the record?

A.    Kathleen Mary Dully, D-u-l-l-y.

Q.    And where are you currently employed?

A.    The University of Florida College of Medicine in Jacksonville.

Q.    And I understand you work for the Child Protection Team?

A.    Yes, I'm the medical director of the Child Protection Team for the University of Florida.

Q.    And what does that mean; what is a medical director of the Child Protection Team?

A.    I supervise the medical care that we deliver on a case by case basis and solve problems and help hire people, essentially.

Q.    And just for those who may not know, what is the Child Protection Team?

A.    The Child Protection Team is the body of experts that consults for DCF usually and sometimes law enforcement as well on suspected or advertised

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 7

child maltreatment cases.  And offers them determinations on the likelihood of abuse or that it is not abuse.  We cover the eight counties -- this Child Protection Team covers the eight northeast counties of Florida.

Q.  What is -- well, what is your training and background?

A.  So in 1981 I graduated from Cornell University College of Arts and Sciences, in Ithaca, New York with a Bachelor of Arts and I graduated with distinction in all subjects and Cum Laude.  In 1986, I graduated from the F. Edward Hebert, H-e-b-e-r-t School of Medicine in Bethesda, Maryland, which is Fed Med or the military medical school.

And from there I went to pediatric internship followed by residency training at Naval Hospital Oakland, California from 1986 through 1989. In 1989, I was transferred to my first duty station as a pediatrician, and that was here at Naval Air Station Jacksonville, Florida where I served for two years.  I was assigned to be the Chair of the Child Abuse Case Review Committee here at this military region Navy Marine Corps while I was there.

At the time the only training that was available was in the conference format, so although I

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

**Page 10**

conferences and continuing medical education and then I was able -- though I had passed the general pediatric specialty boards in 1989, the first child abuse specialty board became available in 2009 and I was grandmothered into the field with about 200 others, and I was able to sit for and pass that EXAMINATION in 2009 to be a board certified specialist in child abuse pediatrics.

Q.   Very good.  Thank you for that.

So currently at the Child Protection Team, do you -- do you see -- do you have patients; do you form a patient -- a doctor/patient relationship with the people that you examine?

A.   On a case by case basis, yes.

Q.   And tell me, what do you mean by that?

A.   So I am consultant.  I don't become the child's pediatrician, but I consult for DCF and law enforcement and the hospitals and so I have a time of a doctor/patient relationship, but the relationship goes back to the primary care pediatrician.

Q.   In the time that you consult, do you -- do you agree that you have to practice within the standard of applicable care, medical care?

A.   Yes.

MS. SHEVLIN:  Form.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 87

CERTIFICATE OF OATH

STATE OF FLORIDA   )

COUNTY OF ORANGE   )

I, the undersigned authority, certify that KATHLEEN DULLY, M.D. personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 10th day of May 2025.

_____

LISA K. PENKACIK, RMR
Notary Public - State Of Florida
My Commission expires 9/7/2026
Commission No.:  HH 289853

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

**Page 88**

CERTIFICATE OF REPORTER

STATE OF FLORIDA    )

COUNTY OF ORANGE    )

I, LISA K. PENKACIK, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of KATHLEEN DULLY, M.D.; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I, further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

Dated this 10th day of May, 2025.

_____
LISA K. PENKACIK, RMR

# Doc. 82-7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

  Plaintiff,

vs.                         CASE NO.:  3:24-cv-00044-MMH-MCP

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's Office, and
KATHLEEN DULLY, in her individual
capacity as medical director of the
UF Child Protection Team,

  Defendant.

_____

CONTINUED
REMOTE VIDEO
DEPOSITION OF:     KATHLEEN M. DULLY, M.D.


DATE:              June 18th, 2025


TIME:              3:05 p.m. - 5:10 p.m.


PLACE:             Videoconference


STENOGRAPHICALLY
REPORTED BY:       Deborah J. Guest, RPR
                   Shorthand Reporter


                         (1 - 89)

**Page 2**

A P P E A R A N C E S:

(All parties appearing via Zoom.)

MICHAEL K. ROBERTS, II, ESQUIRE
OF:  Nooney, Roberts, Hewett & Nowicki
1680 Emerson Street
Jacksonville, FL 32207-6104
Office:  904-398-1992
Cell:  904-398-1992
E-mail:  mroberts@nrhnlaw.com

   Appearing on behalf of the Plaintiff,
William Lee Lawshe

MATTHEW J. CARSON, ESQUIRE
OF:  Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, FL 32301-1509
Office: 850-205-1996
E-mail:  mcarson@sniffenlaw.com

Appearing on behalf of the Defendant,
Mikayla Preston

-and-

JOHN A. WILSON, ESQUIRE
OF:  Howell, Buchan & Strong
2898 Mahan Drive
Suite 6
Tallahassee, FL 32308-5462
Office:  850-877-7776
E-mail:  johnwilson@jsh-pa.com

   Appearing on behalf of the Defendant,
Kathleen M. Dully, M.D.

ALSO PRESENT:  Cameron Hodges, Videographer

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

I N D E X

TESTIMONY OF KATHLEEN M. DULLY, M.D.

PAGE

Review of previously marked exhibits - no video........................................  4
Direct Examination by Mr. Roberts..........  7
Cross-Examination by Mr Carson............ 78
Cross-Examination by Mr. Wilson........... 84
Redirect Examination by Mr. Roberts....... 85
Certificate of Oath....................... 88
Certificate of Reporter................... 89

INDEX OF EXHIBITS

PAGE

(DR. DULLY'S FIRST DEPOSITION)
(Previously marked - attached to first deposition)

No. 3 (a demonstrative diagram of the pubertal stages).......................... 37

No. 4 (composite exhibit of three letters written by Dr. Dully in this case)........ 18,50,69

(DETECTIVE PRESTON'S DEPOSITION)
(Previously marked - not attached)

8-A (image YCBLVVFQ)......................  69

8-B (image B06FE687)......................  23

8-C (0059)................................  15,25

8-D (0065(1)).............................  25

8-E (20230122_174408DuckDuckGo.jpg)........  53

—  —  —

S T I P U L A T I O N S

It is hereby stipulated and agreed by and among the counsel for the respective parties and the Defendant that the reading and signing of the Zoom video deposition transcript be waived.

Page 4

P R O C E E D I N G S

\* \* \* \*

MR. WILSON:  Counsel, will you be sharing exhibits today?

MR. ROBERTS:  Maybe.

MR. WILSON:  Maybe.

MR. ROBERTS:  I don't know that there will be any other ones, but I'll simply refer to the images either by their file name or -- and we can go on the record -- but they were attached in letter form to Detective Preston's deposition as lettered exhibits, and so we can refer to them in both ways.  But we'll make sure that we're on the same page before we begin discussing the exhibit. Fair enough?

MR. WILSON:  Yes.  Can we go through the exhibits for clarity that were attached to the first deposition?

MR. ROBERTS:  Yes.  Exhibit 1 was a journal article, Exhibit 2 was the affidavit of the Plaintiff's expert, Dr. Krugman, Exhibit 3 was a demonstrative diagram of the pubertal stages, and Exhibit 4 was the -- it's a composite exhibit of three letters written by Dr. Dully all in this case.

Page 78

take a comfort break.  We may not have that much longer.  Thank you.

THE VIDEOGRAPHER:  We're off the record at 4:48 p.m.

(Recess from 4:48 p.m. to 4:55 p.m.)

THE VIDEOGRAPHER:  This begins media unit 2.  We're back on the record at 4:55 p.m.

MR. ROBERTS:  Okay.  Dr. Dully, I do not have any other questions.  I will turn it over to Mr. Carson.

THE DEFENDANT:  Thank you.

CROSS-EXAMINATION

BY MR. CARSON:

Q    Hi, Dr. Dully.

A    Hello.  Good afternoon.

Q    Yeah, good afternoon.  My name is Matt Carson.  We have met one other time I think at your deposition.  My law firm represents Detective Preston who has also been sued in this litigation.

I have just a few questions for you just to get on the record kind of what your overall experience is in helping law enforcement as a member of the Child Protective Team.

I think you testified about this a little bit at your first deposition, but there have been

**Page 79**

other instances where you have had the opportunity to assist law enforcement, correct?

A     Yes.

Q     And would some of those have been when you have been shown pictures, images, videos, and asked to opine on the appearance of the age of the individual in the photograph image or video, correct?

A     Yes.

Q     And those -- have those been mostly close calls?  Meaning, does law enforcement come to you when there is -- and, unfortunately, this is, I imagine, part of the work that you do as well as my client -- instances where it is a six-year-old or an eight-year-old or somebody who is, you know, clearly very, very young?

A     That has happened.  It used to happen in the past.  But now I think most law enforcement agencies are not bringing us the easy ones.  They are bringing us the in between children where they might decide to use a medical opinion; they might not.

Q     And is it your understanding that that was a major -- I am sorry, there is background noise.

Is that your understanding, that that is what Detective Preston was asking you to help with?

A     Yes.

**Page 80**

Q    We talked a little bit about an investigation maybe resulting in the location of the individual in the photograph, correct?

A    Possibly --

Q    Possibly.

A    -- yes.

Q    In your experience, if you know, how often is the individual that is in these photos and these images local or, otherwise, able to be identified and located?

A    I see the patients and am told about the images that have been found but don't see those.  But if they have a patient, they will bring me the patient and handle the images on their own.

However, I don't know a number of how many cyber tips go out there and how each law enforcement functions and what the different state laws and UCMJ may be saying now, so I follow law enforcement's leads since they know their local policies and procedures and laws.

Q    Do you understand that at least some of the time that you work with law enforcement in providing an opinion about the age of an individual and an image, that the individual will never be located?

A    I believe that that is probably true very

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 81

often but I don't know a number.

Q    Does it follow, then, that you understand that a lot of times the investigation is into potential charges for possession of child pornography?

A    That can happen.  That is really not my interest.  It is in finding the local victims which is the reason that I participate.

Q    Did Detective Preston ever tell you what she was investigating with respect to any of the photographs she showed you?

A    All I knew is this was a National Center For Missing and Exploited Children cyber tip, and that this law enforcement agency had been chosen because there might be proximity.  I mean, that is all I knew.

Q    And proximity to what, ma'am, or to who?

A    That maybe this ZIP Code or this area of Florida or that that particular office might have a role to play.  I don't know if that's the victim or the possessor or what, but it -- for some reason, the National Center would have picked St. John's Sheriff, and I assume there's a logical reason.

Q    You assist other law enforcement agencies in your general geographic area, correct?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen M. Dully, M.D. on 06/18/2025

Page 82

A    Yes.

Q    Like the Jacksonville Sheriff's Office, Nassau Sheriff's Office, that sort of thing?

A    Yes.

Q    Okay.  Same --

A    Clay.

Q    Clay, right.  Same type of work, different law enforcement agencies with a different jurisdiction?

A    Yes.

Q    You understand that when these agencies come to you and ask you to provide your opinion on the appearance of an individual in these images, that they are going to use that opinion, at least in part, in their decision-making moving forward; is that correct?

A    Yes.

Q    For example, if they are going to decide whether or not they are going to seek a search warrant, they might use your opinion in that decision; is that correct?

A    Yes.

Q    In getting the search warrant, they might tell the Judge, "We have shown this image to Dr. Dully, she has these qualifications, and it was

Page 83

her opinion that the individual appeared to be of X or Y age."

Do you understand that that happens from time to time?

A     Yes.

Q     You understand that if you would have looked at any of these pictures and said to Detective Preston that the individual -- let me -- let me start my question all over again.

If law enforcement comes to you and you give an opinion that you believe the individual in an image appears to be 18 years or older, that that would impact the course of the investigation?

A     Yes.

Q     Have you ever been deposed in any other case involving your opinions as it relates to the appearance of individuals in an image?

A     I have testified to them.  The military doesn't do depositions.  They do Article 32s.  And California doesn't do depositions.  I did three in 20 years there.

So, no, I was probably never deposed in these cases, but I was testifying in a handful of them.

Q     And in those cases, were any of those of

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen M. Dully, M.D. on 06/18/2025

**Page 88**

CERTIFICATE OF OATH

STATE OF FLORIDA            )

COUNTY OF HILLSBOROUGH   )

I, Deborah J. Guest, RPR, Notary Public, State of Florida, do hereby certify that the witness, KATHLEEN M. DULLY, M.D., remotely appeared before me on June 18th, 2025, and was duly sworn and showed her work identification.

Signed the 25th day of June, 2025.

_____
Deborah J. Guest
Notary Public, State of Florida
Commission Number:  HH 280696
Expires:  August 6th, 2026

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen M. Dully, M.D. on 06/18/2025**

**Page 89**

CERTIFICATE OF REPORTER

STATE OF FLORIDA            )

COUNTY OF HILLSBOROUGH   )

        I, Deborah J. Guest, RPR, Notary Public, State
of Florida, certify that I was authorized to and did
stenographically report the continued remote video
deposition of KATHLEEN M. DULLY, M.D., that a review
of the transcript was not requested; and that the
foregoing transcript, pages 4 through 87, is a true
and accurate record of my stenographic notes.

        I further certify that I am not a relative,
employee, or attorney, or counsel of any of the
parties, nor am I a relative or employee of any of
the parties' attorneys or counsel connected with the
action, nor am I financially interested in the
action.

        DATED this the 25th day of June, 2025.

_Deborah J. Guest_

_____
Deborah J. Guest, RPR
Shorthand Reporter

# Doc. 82-8

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,

     Plaintiff,

v.                            Case No. 3:24-CV-00044-MMH-MCR

ROBERT HARDWICK, in his official
capacity as Sheriff of St. Johns County,
MIKAYLA PRESTON, in her individual
capacity as a Detective for St. Johns County
Sheriff's Office, and KATHLEEN
DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

     Defendants.

_____/

## AFFIDAVIT OF KAITLYN M. PAYNE

STATE OF FLORIDA  )
COUNTY OF LEON   )

Before me, the undersigned authority and one authorized by law to administer

oaths, personally appeared Kaitlyn M. Payne, who after being duly sworn states as

follows:

1.     My name is Kaitlyn M. Payne. I am over the age of 18 and have personal

knowledge of the facts stated herein.

2.      From February 2013 to August 2024, I was an Assistant State Attorney with the State Attorney's Office 7th Judicial Circuit of Florida.

3.      From 2022 to 2024, I was assigned to the Career Criminal Unit. In that role, I was responsible for the prosecution of sex-based offenses, internet crimes against children, firearms offenses, vehicular homicides, and repeat offenders. Prior to being assigned to the Career Criminal Unit, I was responsible for prosecuting internet crimes against children cases since 2015. In that time, I prosecuted hundreds cases involving internet crimes against children.

4.      I was the prosecutor in Case Number CF2300516. State of Florida vs. William Lee Lawshe.

5.      I have reviewed a redacted copy of the image with a filename ending in f6a487. I recall looking at an unredacted version of that image in 2023. At that time, I consulted with Detective Mikayla Preston regarding that photograph, and reviewed and approved Detective Preston's affidavit for search warrant to Verizon/Synchronoss that was based on that image. I believe there was probable cause to apply for a search warrant to obtain images on Mr. Lawshe's cell phone. I believe there was probable cause even if Detective Preston did not include reference to met-art.com in her affidavit for search warrant.

6.      I also understood that Dr. Kathleen Dully with the First Coast Child Protective Team had reviewed the image and opined, in part, that "[t]his female child appears younger than 18 years of age." During my time prosecuting internet crimes

2

against children cases, we routinely and regularly relied on Dr. Dully's opinions regarding the ages of individuals in these types of images.

7. Based on my experience, I believe that the image is child sexual abuse material.

8. I have also reviewed redacted copies of the images with filenames 0065(1), 0059, and ending in DuckDuckGo. I recall looking at unredacted versions of these images in 2023. I understand that these images were returned in compliance with the Verizon/Synchronoss search warrant.

9. I also understood that Dr. Dully had reviewed those images and opined, in part, for each image that "[t]his female child" appears younger than 18 years of age.

10. Based on my experience, I believe that the images with the filenames 0059 and 0065(1) are child sexual abuse material.

11. I spoke with Detective Preston prior to Mr. Lawshe's arrest and confirmed that I would prosecute Mr. Lawshe for possession of those images. I believe there was probable cause to arrest Mr. Lawshe for those charges.

12. On May 5, 2023, I filed an information charging Mr. Lawshe with three counts of possession of sexual performance by a child for the images with filenames 0065(1), 0059, and ending in DuckDuckGo.

13. I would not have charged Mr. Lawshe with possession of sexual performance by a child if I did not believe that I had evidence necessary to convict him.

3

14.    During Mr. Lawshe's criminal case, Mr. Lawshe's defense counsel showed me photographs of what he represented to be the individuals in the charged images holding Latvian and Ukrainian passports. I could not verify the veracity or authenticity of these passports, or definitively determine whether the passport-holders were the individuals in the charged images. I was not provided with any evidence regarding the dates the images were taken. Nonetheless, the State Attorney's Office decided to drop the charges against Mr. Lawshe.

FURTHER AFFIANT SAYETH NAUGHT.

Kaitlyn M. Payne

STATE OF FLORIDA    )
COUNTY OF LEON     )

Sworn to and subscribed before me by this 28th day of August, 2025.

_____ he is personally known to me, **OR**
___✓___ has produced ____FLDL_____ as identification.

_____
NOTARY PUBLIC, Signature

Leigh Ann Kiser
_____
(Printed, Typed, or Stamped Name)
My Commission Expires: 10/1/2027

LEIGH ANN KISER
Commission # HH 405628
Expires October 1, 2027

4

# Doc. 82-9



**1260 North Ponce de Leon Blvd., Suite E**
**St Augustine, FL 32084**
**(904) 825-0570    www.staugcr.com**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO. 3:24-cv-00044-MMH-MCR

WILLIAM LAWSHE,

        Plaintiff,

vs.

MIKAYLA PRESTON, in her individual capacity as a detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

        Defendants.

_____

VIDEO RECORDED

DEPOSITION OF:    WILLIAM LEE LAWSHE

DATE TAKEN:    Friday, March 14, 2025

PLACE TAKEN:    1260 North Ponce de Leon Boulevard Suite E St. Augustine, Florida 32084

TIME:    9:16 a.m. - 12:16 p.m

BEFORE:    LAURA DWYER PIERLE, RPR STENOGRAPHIC COURT REPORTER AND NOTARY PUBLIC - STATE OF FLORIDA AT LARGE

*****************************************************

ST. AUGUSTINE COURT REPORTERS
1260 NORTH PONCE DE LEON BOULEVARD, SUITE E
ST. AUGUSTINE, FLORIDA  32084
904-825-0570

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

APPEARANCES:


On behalf of the Plaintiff:
NOONEY AND ROBERTS, P.A.
1680 EMERSON STREET
JACKSONVILLE, FLORIDA  32207
By:  MICHAEL KEITH ROBERTS, II, ESQUIRE


On behalf of the Defendant Mikayla Preston:
SNIFFEN & SPELLMAN, P.A.
123 NORTH MONROE STREET
TALLAHASSEE, FLORIDA  32301
By:  MATTHEW J. CARSON, ESQUIRE
          AND
     CHRISTEN PETRUZZELLI, ESQUIRE
     (Present via videoconference)

On behalf of the Defendant Dr. Dully:
BANKER, LOPEZ, GASSLER, PA
1900 SOUTHEAST 18th AVENUE
SUITE 300
OCALA, FLORIDA 34471-8237
By:  AMY SHEVLIN, ESQUIRE
     (Present via videoconference)

ALSO PRESENT:

DAN BISHOP, VIDEOGRAPHER

- - -
I N D E X
- - -

WITNESS:                                                        PAGE
WILLIAM LEE LAWSHE

DIRECT EXAMINATION BY MR. CARSON                                5
CROSS EXAMINATION BY MS. SHEVLIN                                88
REDIRECT EXAMINATION BY MR. CARSON                             121


CERTIFICATE OF OATH                                            127
CERTIFICATE OF REPORTER                                        128

- - -
E X H I B I T S
- - -

NUMBER                        DESCRIPTION                       PAGE

DEFENDANT'S EX. 10  PLAINTIFF'S ANSWERS TO DEFENDANT    40
                    MIKAYLA PRESTON'S INTERROGATORIES
DEFENDANT'S EX. 11  PLAINTIFF'S ANSWERS TO DEFENDANT    40
                    DR. DULLY'S INTERROGATORIES

- - -

VIDEOGRAPHER:  This begins media unit number one to the video recorded deposition of William Lee Lawshe in the matter of William Lee Lawshe versus Mikayla Preston, et al. being heard before the U.S. District Court, Middle District of Florida, Jacksonville Division.  Case Number is 3:24-cv-00044-MMH-MCR.

Today's deposition is being conducted at 1260 North Ponce de Leon Boulevard, Suite E, in St. Augustine, Florida.  Today is March 14th, year 2025.  The time is 9:16 a.m.

My name is Dan Bishop.  And I'm your videographer.  The court reporter this morning is Laura Pierle.

Counsel, will you please state your appearances for the record and then our court reporter may swear in the witness.

MR. ROBERTS:  Michael Roberts for Mr. Lawshe.

MR. CARSON:  Matthew Carson for Detective Mikayla Preston.

MS. SHEVLIN:  Amy Shevlin on behalf of Dr. Dully.

- - -

Thereupon,

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

WILLIAM LEE LAWSHE,

Being by the undersigned Notary Public first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. CARSON:

Q    Good morning, Mr. Lawshe.

A    Good morning.

Q    My name is Matt Carson.  I represent Detective Mikayla Preston one of the Defendants in this action. You and I just met a couple of minutes ago, correct?

A    Yes, sir.

Q    Okay.  And you were having a little bit of a hard time maintaining your composure then, and, you know, you're just getting started and you're already a little bit upset.  I want you to know that if at any point during the deposition today you need to take a break for whatever reason, to use the restroom, to, you know, take a breath, take a walk outside, that's fine. You've just got to let me know.  All right.  As long as there is not a question pending that shouldn't be a problem.  Okay.

It's not my intent to unnecessarily prolong the deposition today or to make it any worse for you than it is, but I have to ask questions and this is my

A    1969.

Q    Okay.  Where were you born?

A    Gainesville, Florida.

Q    Where else have you lived other than Gainesville and St. Augustine?

A    We spent some time in Miramar, Florida and Hollywood, Florida, Savannah, Georgia and I think that's most of -- well, I lived in Hawaii when I was in the military, too.

Q    Okay.  So you said that you've been in St. Augustine since roughly 1980?

A    Yes, sir.

Q    Okay.  And then have there been breaks where you've lived in other areas?

A    Once I become an adult I started living and I got my job with FWC, yes, but other than that I've lived here all of the time.  I was in Stuart, Florida for a little while when I got hired on with FWC.

Q    Okay.  When did you start working with FWC?

A    I'd probably have to look at some of my paperwork you-all sent me.  I don't -- I can't remember the date now.  It was roughly 15 years ago.  I worked for them 15 years.

Q    Okay.  And you worked -- that's Fish and Wildlife Commission, correct?

A    Yes, sir.

Q    And you were a certified law enforcement officer for them?

A    Yes, sir.

Q    What kind of work did you do?

A    Just what they do enforcement of the wildlife laws and, I mean, other laws because we do mainstream law enforcement as well.

Q    So I'm just trying to start our consideration in hopefully a lighthearted way so that, you know, we can get comfortable talking with each other.  Are you looking for people that are catching fish above the limit, undersized, that kind of thing?

A    That's the primary enforcement.  Anything to do with wildlife.  I was a -- I was a hill officer so I did more investigative stuff to where I was out in the woods working alone mostly listening for gunshots, going to gunshots, seeing if there any violations of that, DUI, BUI, all that kind of stuff.

Q    Did you say hill officer?

A    Hill officer.

Q    Okay.  And what does that mean?

A    I primarily worked in the woods and didn't work on the water.  They typically put the more seasoned officers on the hill because it's more difficult work,

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

part Indian, so maybe that is part of it.  Just tracking piece of it.  It takes a lot of attention to detail.

I need some more water.

MR. ROBERTS:  Yeah.  Just real quick I will grab some.  We don't need to go off the record.  I will just --

MR. CARSON:  No worries.  No worries.

MR. ROBERTS:  Is it right down here?

THE WITNESS:  Thank you.

BY MR. CARSON:

Q     So you're called by somebody with the St. Johns County Sheriff's Office?

A     Commander Strickland called me specifically.

Q     Okay.  The first time or the second time?

A     I am losing track.  First, second.

Q     Yeah.  Let me be clear then.  I am talking about in April 2023?

A     Okay.  No, he didn't call me for that.

Q     Yeah.

A     It was just Tolbert.

Q     You believe it was Tolbert?

A     Well, I think -- I think he said it was Tolbert on the phone when he called me.

Q     And he said need your help with a missing person, can you come in?

A    Yes, sir.

Q    Okay.  What phone did he call?

A    It would have been the phone that I had at that time which was, I guess, the phone that you-all got all the data off of still.

Q    Is that your personal phone?

A    That was my personal phone.

Q    Okay.  Because I understand at the time you had a personal cellphone and then you had a cellphone that had been issued by Fish and Wildlife, correct?

A    Yes, sir.  Yes, sir.

Q    So when he called you and said we need help with a missing person, did you believe that that was the purpose for you going to the Sheriff's Office to meet with him?

A    Of course.  I mean, I had no other reason not to believe it.

Q    All right.  You get there.  You said that you waited a while and then you went back and met with some folks; correct?

A    Yes, sir.

Q    Okay.  Who did you meet with?

A    The only one I know was Tolbert or deputy or Officer, Detective Tolbert, whatever his nomenclature is.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Q    I'll just tell you this, we have been calling everyone detective, because they have rank and then they get promoted.  And so detective, I think, covers it.

A    Okay.

Q    No one will fault you if you call everyone you dealt with detective.

A    Okay.

Q    All right.  Was anybody else in the room when you meet with Detective Tolbert?

A    Not at the time.

Q    What did Detective Tolbert and you talk about during the initial meeting?

A    Nothing really.  There wasn't time for it.  He asked me if I wanted to sit down.  I went to sit down and out of nowhere two other officers appeared and grabbed me by my left and right hand and told me don't move.  And asked me where my -- well, they didn't ask me where my gun was because they seen my gun.  But they basically stripped me of all my equipment.

Q    Do you know the two other officers that entered the room?

A    No, sir.

Q    Okay.  Did they appear to be uniformed deputies?

A    As best I can recall they were uniformed.  But

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

honestly as soon as it happened I was in such shock if I could have known them I wouldn't even be able to tell you I knew them.

Q    Sure.  You said that they took your gun, they took your other equipment?

A    Yes, sir.

Q    Okay.  Were you in full Fish and Wildlife Commission garb?

A    I was.

Q    Okay.  So you had your duty belt?

A    Vest, everything.

Q    Okay.

A    They took it all off.

Q    So before you and Detective Tolbert, or really anyone at the Sheriff's Office had any opportunity to talk that was the first thing that happened?

A    Yes, sir.

Q    Okay.  What did you think was going on?

A    I really had no idea I was in shock.  I kept asking, "What's going on?  What's going on?  What is this all about?"

And he kept telling me or he told me several times, "We'll get to that.  We'll get to that."

And I don't remember at what point they escorted me to a room and I actually started to deal

said, we'll get to that.  Just to sit tight.  And I think he had to ask -- he asked me something about my phone.  Like where is my phone, because I guess they went through my equipment and couldn't find the phone in question that they were looking for.

Q    Where was the phone?

A    I had forgotten it at home.

Q    Did you have your work issued phone?

A    I think I did, but I'm not positive.

Q    All right.  And a short time or some period of time later Detective Preston joins you and Detective Greene?

A    Yes, sir.

Q    And what, if anything, do you remember being said during that time?

A    It was all focused around the phone.  They came and asked me where is my phone and then they asked specifically where is my phone.  And it took me a little bit to realize that I left it -- I thought it was in my truck or on me.  But I guess in getting ready that morning I just forgot it.  Anyway I told them it must be at home.

And they were asking me maybe where.  And so I kind of went back through my mind where it could be. They left for a little bit.  They came back in.  They

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

said they were getting a search warrant.  That they needed to know specifically where it was at.  They left a little bit, they came back, they said they couldn't get into my house.  So I think I gave them a garage door number to get in the garage door.  And then some more time went by when they weren't in there.  And then they came back and said okay.  I don't know if they told me they got my phone or not.  I just assumed maybe they got it.  And I think that's when they started questioning.  So, yeah, I think.  That's the best I can recall.

Q    And that's fine.  You know, the purpose of today is for me to find out what you remember.  And I don't expect you to remember everything.  But you are doing a really good job of trying and I appreciate that.

Other than what you've already said, do you remember anything that was said during your time being interviewed, questioned at the St. Johns County Sheriff's Office on April 12, 2023?

A    I mean, is there something I'm not saying?

Q    No.  Listen.  I'll be clear.  I'll just put this out there.  What I am trying to do and, you know, your lawyer may tell you the same kind of thing when you meet with him privately.  Lawyers like to know what the witnesses are going to say at trial.  And what I don't want to do is get to trial and have you all of a sudden

remember that Detective Greene or Detective Tolbert or Detective Preston said this or that. I prefer to know that now. So when I ask you those kind of questions saying is there anything else, I am not suggesting that there is anything else that you should remember, what I am trying to do is prevent me leaving here today not knowing everything I need to know. Does that make sense?

A   Yes, sir. Well, I think I'm pretty sure they were recording it. So I don't want to say something that's inappropriate wrong. I do remember at some point them asking me or them telling me finally what it was about. And I don't remember how she said it. I remember him kind of cracking a joke about something. And I just thought that was weird about why is he cracking a joke with this going on. And then that's when I told him I wanted a lawyer. I wasn't going to talk to him anymore.

Q   Who cracked a joke?

A   Greene.

Q   Okay. Do you remember what he said?

A   I don't. It had something to do about the name of a school, the school or training center that we have in Tallahassee.

Q   What's the name of the school?

A    Now it's -- I don't even know if I can remember.  Tallahassee something Institute.  I can't remember.

Q    Is it the Old Pat Thomas?

A    Yeah.  He made a joke about the name of Pat Thomas versus what the new name is.  It was just weird.

Q    It wasn't inappropriate?  It wasn't rude --

A    I don't know.  Anything at that point in my life would have been inappropriate.

Q    Okay.

A    But, no, there was nothing like lude or lascivious about it.

Q    Gotcha.  What happened after you said that you wanted a lawyer?

A    They got up and walked out.

Q    Were you in handcuffs at this point?

A    I think they had taken -- I think they took them off once they put me in the room.

Q    At some point were you placed back in handcuffs?

A    And walked into the jail.  I'm fine.

Q    All right.  Do you remember anything being said either by you or the detectives as you were walked into the jail?

A    I don't.  I remember walking by a deputy and

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

A    Yeah.

Q    So Dr. Kaye told you that maybe to look at stories or pictures?

A    Yeah.  She just said have you tried pornography.  She didn't really -- I don't think she specified exactly what, but -- and she put me on testosterone and some other things to try to help.

Q    Showing you 8B and C.

A    Yes, sir.  That's the same girl.

Q    Yeah.  How old is that girl in that picture?

MR. ROBERTS:  Objection.  You can still answer.

THE WITNESS:  Oh, yeah.  Yeah.

BY MR. CARSON:

Q    You can answer.

A    23, 24.

Q    What makes you say that?

A    Just observation skills.  I mean, just looking at her she looks 23, 24 years old.

Q    Other than just observation skills anything else that leads you to believe that young lady is 23 or 24 years old?

A    No, sir, there is nothing else there.  I mean, I would say she's 23 or 24.

Q    Do you know what website that photograph is

that is the top of 8E?

A    No.

Q    And when I say -- when I ask you questions about the photographs obviously we've redacted these for purposes of being able to handle them and not, you know, unnecessarily embarrass the folks that need to look at these when they become part of the record.  But when I'm asking you these questions I'm talking about the unredacted version and stuff?

A    No, I understand.  Yeah, I know.  They're of legal age.

Q    Pardon me.

A    They're of legal age.

Q    Okay.  That's -- your testimony is that they are of legal age?

A    They look legal to me, yes.

Q    Do you know where any of those photographs were taken?

A    No, sir.

Q    In the whole of the internet, is it possible that a website that states it complies with all federal age verification law requirements and tries to comply with all federal age verification requirements might inadvertently fail to comply with federal age verification law requirements and inadvertently post a

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

picture of say a 17-year old model?

     A     Is it possible?  Absolutely.  I guess it's possible.  Anything is possible.

     Q     Have you received any medical, psychiatric, mental health treatment as a result of this incident?

     A     No.  Can I get more water?

     Q     Why don't we take another break.

          MR. ROBERTS:  Yeah, I could use the restroom.

          VIDEOGRAPHER:  All right.  We are off the record at 11:04.  End of media unit number one.

          (Whereupon a recess was taken 11:04 to 11:16 a.m.)

          VIDEOGRAPHER:  We are back on the record at 11:16 beginning of media number two.

BY MR. CARSON:

     Q     Mr. Lawshe, I've asked you to provide a computation of the damages that you allege that you suffered as a result of this incident.  In your Rule 26 disclosure you've listed past loss of earnings, future loss of earnings, past and future cost of medical care, and pain and suffering, damaged reputation, loss of enjoyment of life, et cetera, past and future.

          Let's talk about past loss of earnings.  Have you calculated your past loss of earnings you allege are a result of this incident?

THE STATE OF FLORIDA,      )
COUNTY OF ST. JOHNS.      )

    I, the undersigned authority, certify that WILLIAM LAWSHE personally appeared before me and was duly sworn this 14th day of March 2025.

        WITNESS my hand and official seal this 29th day of July 2025.

Laura Dwyer Pierle, RPR
Notary Public-State of FL
My Commission #HH 598918
My Commission Expires
10/26/28

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

C E R T I F I C A T E

The State of Florida      )
County of St. Johns       )

        I, Laura Dwyer Pierle, Court Reporter, do hereby certify that I was authorized to and did report the above deposition in stenotype; and that the foregoing pages numbered from 1 to 126, inclusive, are a true and correct transcription of my stenotype notes taken during said deposition.

        I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

        The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of July, 2025.

                              Laura Dwyer Pierle, Notary Public, in and for the State of Florida at large.
                              My Commission Expires 10/26/28
                              My Commission #HH 598918

# Doc. 96-2

Case 3:24-cv-00044-MMH-MCR    Document 96-2    Filed 10/03/25    Page 1 of 3 PageID
3338

 Outlook

---

## RE: Lawshe

---

**From** C. Crawford PIerce, IV <crawfordpiercelaw@gmail.com>

**Date** Thu 12/14/2023 5:10 PM

**To** Kaitlyn Payne <PayneK@sao7.org>

**Cc** Mike Roberts (Cell) <mroberts@nrhnlaw.com>

Kaitlyn,

My apologies for the delay, but this was the first time I had heard any mention of "various phone scrubbers," so I needed to follow up with Aaron Weiss to see if that was consistent with his data-imaging of the cell phone. He confirmed that there were no such applications on Mr. Lawshe's device, so if that is something that the State would be presenting at trial I need that evidence disclosed in discovery. If you have the name of the application that might be helpful.

Also, I have a civil firm and their investigators looking at potentially tracking down at least one of the females in the images, since we have her model name from the evidence review, in order to confirm the models' ages and identities. They are fairly confident that they have been able to identify the one whose name we obtained, because it appears she has active Instagram and Only Fans accounts, and could be in her late 20's or 30's.

They also believe they've been able to confirm the date of the photo shoot and the contact information for the photographer, as the very same image is locatable through a basic "adult model" search on Google images once you have her name. However, their preliminary findings suggest that this is a European model and photographer, so if we don't get any confirmation through social media, then we may have to seek a foreign subpoena for the photographer's files. They're hoping he will just release it, because apparently his website provides his contact info for that purpose.

I appreciate you reaching out to me on this matter, and you seeing the case from our respective position. I don't want to foreclose the possibility of a pretrial resolution, but I would like to see how much more information we're able to confirm about the age and identity of the models before deciding how the case should be resolved. I would also like to have Aaron look further into the "various phone scrubbers" that you mentioned in your email to try and better understand the significance to your side of the case.

When you get a chance, send me whatever information you have about the "phone scrubbers," so that I can have Aaron look into it, and I will let you know as soon as I receive any additional information on the identities of these models.

Thank you,

Crawford Pierce, IV, Esq.
The Law Office of C. Crawford Pierce, IV
2807 N. Tenth Street, Suite 12
St. Augustine, FL 32084
(904) 468-3575
wwww.CrawfordPierceLaw.com
CrawfordPierceLaw@Gmail.com



**From:** Payne, Kaitlyn
**Sent:** Wednesday, December 13, 2023 1:22 PM
**To:** C. Crawford PIerce, IV
**Subject:** Lawshe

Hey so Ben and I have been talking about the case and I do see where you are coming from I just feel like there is other information, like the various phone scrubbers, contained on the download that give me pause. That being said what do you think we could do to come to a resolution on this case? I would love to have a phone conference where we chat about potential resolutions.  A straight up dropping of all charges is unlikely, but maybe we can come to terms on something.

**Kaitlyn Mairs Payne**
**Assistant State Attorney**
**SVU/CCU/ICAC Prosecutor**
**4010 Lewis Speedway**
**Saint Augustine, Florida 32084**
**(904) 209-1620 ex. 1646**

LEGAL NOTIFICATION: Florida Sunshine Statutes entail very broad public records requirements (F. S. 119). As required by law, all e-mails to and from the State Attorney's Office of Circuit 7 are kept as a public record. Your e-mail communications, including your e-mail address may be disclosed to the public and media at any time. If you have received this communication in error, do not distribute it. Please notify the sender immediately by electronic mail and delete this message.

# Doc. 108

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

      Plaintiff,

v.                                                              Case No. 3:24-cv-00044-MMH-MCR

MIKAYLA PRESTON,
in her induvial capacity as a Detective for St. Johns County Sheriff's Office, and
KATHLEEN DULLY, in her individual capacity as
medical director of the UF Child Protection Team,

      Defendants.

_____/

## NOTICE OF APPEAL

Plaintiff, William Lee Lawshe appeal to the United States Court of Appeals

for the Eleventh Circuit from the judgment entered on December 19, 2025 (Doc.

104).

A notice of appeal "encompasses all orders that, for purposes of appeal,

merge into the designated judgment . . . . It is not necessary to designate those

orders in the notice of appeal." Fed. R. App. P. 3(c)(4).

Nevertheless, in an abundance of caution, Plaintiffs designate the

following order for appeal: (1) the December 18, 2025 order granting summary

judgement in favor of Defendant Preston and Defendant Dully (Doc. 103).

This notice is timely because it is filed within 30 days of the judgment appealed from. Fed. R. App. P. 4(a)(1)(A).

Date: January 16, 2025.

Respectfully submitted,

**LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI**

*/s/ Michael K. Roberts*

**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
mroberts@nrhnlaw.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on the following parties via electronic service on January 16, 2026, to all parties of record as follows:

**Mathew Carson, Esq.**
23 North Monroe Street
Tallahassee, Florida 32301
T (850) 205-1996 / F (850) 205-3004
E-mail: mcarson@sniffenlaw.com
*Counsel for Defendant Preston*

**John Wilson, Esq.**
**Jamie Kimbrell, Esq.**
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
850-877-7776 (Phone)
johnwilson@jsh-pa.com
jami@kimbrellfirm.com
*Counsel for Defendant Dully*

Respectfully Submitted,

*/s/ Michael K. Roberts*
**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
mroberts@nrhnlaw.com
Attorney for Plaintiff