No. 26-10155-D

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

WILLIAM LEE LAWSHE,

*Plaintiff-Appellant*,

v.

MIKAYLA PRESTON, and
KATHLEEN DULLY

*Defendants-Appellees*

Appeal from the United States District Court
for the Middle District of Florida, Jacksonville

No. 3:24-cv-00044-MMH-MCR

---

## APPELLEE DULLY'S SUPPLEMENTAL APPENDIX VOL. 1

---

Jami M. Kimbrell
Florida Bar No. 0657379
**Howell, Buchan & Strong**
2898-6 Mahan Drive
Tallahassee, FL 32308
Phone: (850) 877-7776
Email: Jami@jsh-pa.com

*Attorney for Appellee
Kathleen Dully*

# Index of Supplemental Appendix

**Volume 1** <u>Docket/Tab #</u>

Defendant Kathleen Dully's Notice of Filing Exhibits in Support of Response in Opposition to Plaintiff's Motion for Partial Summary Judgment ................... 76

Deposition of Dr. Scott Krugman from July 16, 2025 (Doc. 76, Exhibit L).... 76-7

Sealed Image (Doc. 85, Exhibit A) ................................................................. 85-1

Sealed Image (Doc. 85, Exhibit B) ................................................................. 85-2

Sealed Image (Doc. 85, Exhibit C) ................................................................. 85-3

Sealed Image (Doc. 85, Exhibit D) ................................................................. 85-4

Sealed Image (Doc. 85, Exhibit E) ................................................................. 85-5

Dr. Kathleen Dully's First Opinion Letter to Detective Preston, February 22, 2023 (Doc. 85, Exhibit F) ................................................................................ 85-6

Dr. Kathleen Dully's Second Opinion Letter to Detective Preston, April 5, 2023 (Doc. 85, Exhibit G)................................................................................. 85-7

Dr. Kathleen Dully's Third Opinion Letter to Detective Preston, April 5, 2023 (Doc. 85, Exhibit H)................................................................................. 85-8

Eugine Tolbert's Deposition Transcript, December 17, 2024 (Doc. 85, Exhibit I) ................................................................................................................. 85-9

**Volume 2**

Mikayla Preston's Deposition Transcript, March 13, 2025 (Doc. 85, Exhibit J, pp. 1-248) ........................................................................................................ 85-10

**Volume 3**

Mikayla Preston's Deposition Transcript, March 13, 2025 (Doc. 85, Exhibit J, pp. 248 - 310) ................................................................................................. 85-10

Dr. Kathleen Dully's Deposition Transcript, April 28, 2025 (Doc. 85, Exhibit K, pp. 1 - 186) ................................................................................................... 85-11

**Volume 4**

Dr. Kathleen Dully's Deposition Transcript, April 28, 2025 (Doc. 85, Exhibit K, pp. 186 - 230) ........................................................................................... 85-11

Dr. Scott Krugman's Deposition Transcript, July 16, 2025 (Doc. 85, Exhibit L) ............................................................................................................... 85-12

Plaintiff William Lawshe's Deposition Transcript, March 14, 2025 (Doc. 85, Exhibit M) ............................................................................................. 85-13

Respectfully,

/s/ Jami M. Kimbrell
Jami M. Kimbrell
Florida Bar No. 0657379
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
Phone: (850) 877-7776
Email: Jami@jsh-pa.com
*Attorney for Appellee*
*Kathleen Dully*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document

was filed electronically and was sent by E-Mail from the Florida Courts' E-Filing

Portal system on all counsel of record this 19th day of June, 2026.

/s/ Jami M. Kimbrell
Jami M. Kimbrell

# Doc. A

APPEAL,CLOSED,MEDIATION,SL DOC,STAYED,TANGIBLE

# U.S. District Court
## Middle District of Florida (Jacksonville)
## CIVIL DOCKET FOR CASE #: 3:24-cv-00044-JAR-MCR

Lawshe v. Hardwick et al
Assigned to: Judge Jane A. Restani
Referred to: Magistrate Judge Monte C. Richardson
Case in other court: 11th Circuit, 26-10155-D
Cause: 42:1983 Civil Rights Act

Date Filed: 01/12/2024
Date Terminated: 12/19/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

## Plaintiff

**William Lee Lawshe**
*an individual*

represented by **Michael Keith Roberts , II**
Law Offices of Nooney & Roberts
1680 Emerson St
Jacksonville, FL 32207
904/398-1992
Fax: 904/858-9943
Email: mroberts@nooneyandroberts.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Scott Nooney , Jr.**
The Law Offices of Nooney & Roberts
1680 Emerson St.
Jacksonville, FL 32207
904-398-1992
Fax: 904-858-9943
Email: jnooney@nooneyandroberts.com
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Robert A. Hardwick**
*in his official capacity as Sheriff of St. Johns County*
*TERMINATED: 10/29/2024*

represented by **Michael P. Spellman**
Spellman Law, P.A.
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: michael@spellman.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
Spellman Law, P.A.
905 E. Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: cpetruzzelli@spellman.law
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Carson**
Spellman Law, PA
905 East Park Avenue
Tallahassee, FL 32301
850-601-1983
Email: mcarson@spellman.law
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mikayla Preston**
*in her induvial capacity as a Detective for*
*St. Johns County Sheriff's Office*

represented by **Michael P. Spellman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christen Ann Petruzzelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jami McFatter Kimbrell**
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: jami@kimbrellfirm.com
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Carson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**University of Florida Board of Trustees**
*TERMINATED: 03/28/2024*

represented by **Todd Anderson Wright**
Alexander DeGance Barnett, P.A.
1500 Riverside Avenue
Jacksonville, FL 32204
904-345-3284
Fax: 904-345-3294
Email: todd.wright@adblegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Dully**
*in her individual capacity as medical*
*director of the UF Child Protection Team*

represented by **Jami McFatter Kimbrell**
(See above for address)
*LEAD ATTORNEY*

**Robert B. Buchanan**
Banker Lopez Gassler P.A.
1900 SE 18th Street
Suite 300
Ocala, FL 34475-8237
352-629-4099
Fax: 352-629-3975
Email: aperry@bankerlopez.com

*TERMINATED: 05/27/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Shevlin**
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471
352-629-4099
Email: ashevlin@rbtrial.com
*ATTORNEY TO BE NOTICED*

**John Wilson**
Howell, Buchan and Strong
2898-6 Mahan Drive
Tallahassee, FL 32308
850-877-7776
Email: johnwilson@jsh-pa.com
*ATTORNEY TO BE NOTICED*

**Mediator**

| | |
|---|---|
| **Thomas H. Bateman, III** *TERMINATED: 08/07/2025* | represented by **Thomas H. Bateman , III** Messer Caparello, PA 2618 Centennial Place Tallahassee, FL 32308 850/222-0720 Fax: 850/558-0674 Email: tbateman@lawfla.com *TERMINATED: 08/07/2025* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2024 | 1 | STRICKEN per 23 Order; COMPLAINT against All Defendants with Jury Demand (Filing fee $405 receipt number AFLMDC-21652226) filed by William L Lawshe. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons Hardwick Summons, # 3 Proposed Summons Preston Summons, # 4 Proposed Summons UF BOT Summons, # 5 Proposed Summons Dully Summons)(Roberts, Michael) Modified on 4/2/2024 to edit docket text (JDR). (Entered: 01/12/2024) |
| 01/12/2024 | 2 | NEW CASE ASSIGNED to Judge Marcia Morales Howard and Magistrate Judge Monte C. Richardson. New case number: 3:24-cv-44-MMH-MCR. (JCG) (Entered: 01/12/2024) |
| 01/16/2024 | 3 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (JW) (Entered: 01/16/2024) |

| 01/16/2024 | 4 | SUMMONS issued as to Kathleen Dully, Robert Hardwick, Mikayla Preston, University of Florida Board of Trustees. (MCB) (Entered: 01/16/2024) |
|---|---|---|
| 02/08/2024 | 5 | NOTICE TO ALL COUNSEL of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who - unless the party changes the designation - remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (GL) (Entered: 02/08/2024) |
| 02/15/2024 | 6 | NOTICE of Lead Counsel Designation by Michael Keith Roberts, II on behalf of William Lee Lawshe. Lead Counsel: Michael K Roberts, Esq.. (Roberts, Michael) (Entered: 02/15/2024) |
| 02/19/2024 | 7 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 8 | PROOF of service by William Lee Lawshe (Nooney, Jeffrey) (Entered: 02/19/2024) |
| 02/19/2024 | 9 | NOTICE of Appearance by Robert B. Buchanan on behalf of Kathleen Dully (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/19/2024 | 10 | MOTION to Dismiss for Failure to State a Claim by Kathleen Dully. (Buchanan, Robert) (Entered: 02/19/2024) |
| 02/20/2024 | 11 | **ORDER directing Defendant to file a supplement to her [Doc. 10] Motion to Dismiss Plaintiff's Complaint on or before February 27, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 2/20/2024. (JPA)** (Entered: 02/20/2024) |
| 02/20/2024 | 12 | MOTION to Dismiss Count VIII of Plaintiff's Complaint by University of Florida Board of Trustees. (Wright, Todd) (Entered: 02/20/2024) |
| 02/22/2024 | 13 | MOTION for Clerk's Default against Robert Hardwick, Mikayla Preston by William Lee Lawshe. (Nooney, Jeffrey) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/22/2024) |
| 02/27/2024 | 14 | Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 02/27/2024) |
| 02/27/2024 | 15 | NOTICE of Appearance by Michael P. Spellman on behalf of Robert Hardwick, Mikayla Preston (Spellman, Michael) (Entered: 02/27/2024) |
| 02/27/2024 | 16 | MOTION for Extension of Time to File Response/Reply as to 1 Complaint , MOTION to Set Aside Clerk Default *(Deny Entry)* by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Declaration of Trae Wylie)(Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/27/2024) |
| 02/28/2024 | 17 | NOTICE of supplemental authority re 16 MOTION for Extension of Time to File Response/Reply as to 1 Complaint MOTION to Set Aside Clerk Default *(Deny Entry) RE: Local Rule 3.01(g) Conferral* by Robert Hardwick, Mikayla Preston. (Spellman, Michael) (Entered: 02/28/2024) |
| 03/08/2024 | 18 | NOTICE of voluntary dismissal by William Lee Lawshe (Roberts, Michael) (Entered: 03/08/2024) |
| 03/08/2024 | 19 | RESPONSE in Opposition re 14 Amended MOTION to Dismiss Count VII *or, alternatively, Motion for More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 03/08/2024) |
| 03/13/2024 | 20 | RESPONSE to 16 MOTION to Deny Entry of Default filed by William Lee Lawshe. (Roberts, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |

| 03/13/2024 | 21 | NOTICE of Supplemental Authority to 16 MOTION to Deny Entry of Clerk's Default and for Extension of Time by Robert Hardwick, Mikayla Preston. (Attachments: # 1 Exhibit Savoia-McHugh v. Glass)(Spellman, Michael) Modified text on 3/14/2024 (BD). (Entered: 03/13/2024) |
|---|---|---|
| 03/28/2024 | 22 | **ORDER dismissing, without prejudice, the claims raised against Defendant University of Florida Board of Trustees; terminating 12 Motion to Dismiss; and directing the Clerk of the Court to terminate this Defendant. Signed by Judge Marcia Morales Howard on 3/28/2024. (JW)** (Entered: 03/28/2024) |
| 04/02/2024 | 23 | **ORDER striking 1 Complaint filed by William Lee Lawshe. Plaintiff shall file a corrected complaint on or before April 22, 2024. Signed by Judge Marcia Morales Howard on 4/2/2024. (JPA)** (Entered: 04/02/2024) |
| 04/12/2024 | 24 | CASE MANAGEMENT REPORT. (Spellman, Michael) (Entered: 04/12/2024) |
| 04/15/2024 | 25 | **CASE MANAGEMENT AND SCHEDULING ORDER AND REFERRAL TO MEDIATION:** Disclosure statements due by 4/26/2024. Discovery due by 6/20/2025. Dispositive motions due by 7/21/2025. Conduct mediation hearing by 8/15/2025. Final Pretrial Conference set for 12/15/2025 at 10:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Jury Trial set for trial term commencing on 1/5/2026 at 09:00 AM in Jacksonville Courtroom 10 B before Judge Marcia Morales Howard. Signed by Judge Marcia Morales Howard on 4/15/2024. (Attachments: # 1 Mediation Report Form, # 2 Court Docket)(JW) (Entered: 04/15/2024) |
| 04/16/2024 | 26 | AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) (Entered: 04/16/2024) |
| 04/19/2024 | 27 | **ORDER denying as moot 13 Plaintiff's Motion for Entry of Clerk's Default; denying as moot 14 Defendant Kathleen Dully's Motion to Dismiss; denying as moot 16 Motion to Deny Entry of Clerk's Default and for Extension of Time to Respond to Complaint. Signed by Judge Marcia Morales Howard on 4/19/2024. (JW)** (Entered: 04/19/2024) |
| 04/26/2024 | 28 | CORPORATE Disclosure Statement by Kathleen Dully. (Buchanan, Robert) (Entered: 04/26/2024) |
| 04/29/2024 | 29 | CORPORATE Disclosure Statement by Mikayla Preston. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 30 | CORPORATE Disclosure Statement by Robert Hardwick. (Spellman, Michael) (Entered: 04/29/2024) |
| 04/29/2024 | 31 | ***INCORRECT EVENT. COUNSEL TO REFILE AS "CORPORATE DISCLOSURE STATEMENT"***AMENDED document by Kathleen Dully. *Defendant Kathleen Dully's Amended Corporate Disclosure Statement.* (Buchanan, Robert) Modified on 4/30/2024 (LSS). (Entered: 04/29/2024) |
| 04/30/2024 | 32 | AMENDED Disclosure Statement Under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Kathleen Dully. (Buchanan, Robert) (Modified on 4/30/2024, to edit text) (BGR). (Entered: 04/30/2024) |
| 04/30/2024 | 33 | NOTICE of Appearance by Matthew Joseph Carson on behalf of Robert Hardwick, Mikayla Preston (Carson, Matthew) (Entered: 04/30/2024) |

| | | |
|---|---|---|
| 04/30/2024 | 34 | ANSWER and affirmative defenses with Jury Demand to 26 Amended Complaint by Mikayla Preston.(Carson, Matthew) (Entered: 04/30/2024) |
| 04/30/2024 | 35 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew). Added MOTION to Strike on 5/2/2024 (AM). (Entered: 04/30/2024) |
| 05/02/2024 | 36 | **ORDER directing Plaintiff to show cause why this case should not be dismissed for failure to prosecute or sanctions imposed due to his failure to comply with the Local Rules and this Court's Order. Show Cause Response due by 5/16/2024. Signed by Judge Marcia Morales Howard on 5/2/2024. (JW)** (Entered: 05/02/2024) |
| 05/02/2024 | 37 | CORPORATE Disclosure Statement by William Lee Lawshe. (Roberts, Michael) (Entered: 05/02/2024) |
| 05/02/2024 | 38 | RESPONSE TO ORDER TO SHOW CAUSE re 36 Order to show cause filed by William Lee Lawshe. (Roberts, Michael) Modified on 5/3/2024 to edit text (ELM). (Entered: 05/02/2024) |
| 05/03/2024 | 39 | **ENDORSED ORDER discharging 36 Order to Show Cause. Signed by Judge Marcia Morales Howard on 5/3/2024. (JW)** (Entered: 05/03/2024) |
| 05/20/2024 | 40 | SECOND AMENDED COMPLAINT against Kathleen Dully, Robert Hardwick, Mikayla Preston with Jury Demand. filed by William Lee Lawshe.(Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/20/2024 | 41 | NOTICE of Filing 40 Second Amended Complaint by William Lee Lawshe (Roberts, Michael) Modified text on 5/21/2024 (BD). (Entered: 05/20/2024) |
| 05/23/2024 | 42 | **ORDER denying as moot 35 Defendant Sheriff Hardwick's Motion to Dismiss and Motion to Strike. Signed by Judge Marcia Morales Howard on 5/23/2024. (JW)** (Entered: 05/23/2024) |
| 06/03/2024 | 43 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Mikayla Preston. (Attachments: # 1 Exhibit CybeTip Report, # 2 Exhibit Dully Opinion f6a487, # 3 Exhibit Dully Opinion 59 and 65, # 4 Exhibit Dully Opinion Screenshot Duckduckgo)(Carson, Matthew) (Entered: 06/03/2024) |
| 06/03/2024 | 44 | MOTION to Dismiss for Failure to State a Claim by Robert Hardwick. (Carson, Matthew) (Entered: 06/03/2024) |
| 06/19/2024 | 45 | MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint *or Alternatively, Motion for a More Definite Statement* by Kathleen Dully. (Buchanan, Robert) (Entered: 06/19/2024) |
| 06/24/2024 | 46 | RESPONSE to Motion re 44 MOTION to Dismiss for Failure to State a Claim filed by William Lee Lawshe. (Roberts, Michael) (Entered: 06/24/2024) |
| 07/12/2024 | 47 | RESPONSE to Motion re 45 MOTION to Dismiss Count VII of Plaintiff's Second Amended Complaint *or Alternatively, Motion for a More Definite Statement* filed by William Lee Lawshe. (Roberts, Michael) (Entered: 07/12/2024) |
| 08/16/2024 | 48 | NOTICE of Appearance by Christen Ann Petruzzelli on behalf of Robert A. Hardwick, Mikayla Preston (Petruzzelli, Christen) (Entered: 08/16/2024) |
| 08/16/2024 | 49 | MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Request for Production* by Mikayla Preston. (Spellman, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/16/2024) |
| 08/17/2024 | 50 | SUPPLEMENT re 49 MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Request for Production* by Mikayla Preston. (Spellman, Michael) |

|  |  | (Entered: 08/17/2024) |
|---|---|---|
| 08/19/2024 | 51 | **ENDORSED ORDER granting 49 Defendant Preston's Motion for Extension of Time to Respond to Plaintiff's First Request for Production. Defendant shall have until August 26, 2024, to respond to Plaintiff's First Request for Production. Signed by Magistrate Judge Monte C. Richardson on 8/19/2024. (JRC)** (Entered: 08/19/2024) |
| 10/03/2024 | 52 | **ORDER: To the extent that Plaintiff requests affirmative relief from the Court, 46 Plaintiff's Response to Defendant Hardwick's Motion to Dismiss is denied without prejudice. See Order for details. Signed by Judge Marcia Morales Howard on 10/3/2024. (JPA)** (Entered: 10/03/2024) |
| 10/29/2024 | 53 | **ORDER granting 44 Motion to Dismiss for Failure to State a Claim and denying 45 Motion to Dismiss. The Clerk of the Court is directed to terminate Defendant Robert Hardwick. Defendant Kathleen Dully shall respond to Plaintiff's Second Amended Complaint on or before November 13, 2024. See Order for details. Signed by Judge Marcia Morales Howard on 10/29/2024. (JPA)** (Entered: 10/29/2024) |
| 11/13/2024 | 54 | ANSWER and affirmative defenses with Jury Demand to 40 Amended Complaint by Kathleen Dully.(Buchanan, Robert) (Entered: 11/13/2024) |
| 02/01/2025 | 55 | MOTION to Compel Production of Documents by William Lee Lawshe. (Attachments: # 1 Exhibit Ex A - Plaintiff RTP, # 2 Exhibit Ex B - Def RTP response, # 3 Exhibit Ex C - Email Correspondence)(Roberts, Michael) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/01/2025) |
| 02/05/2025 | 56 | NOTICE of Withdrawal Motion to Compel Production of Documents by William Lee Lawshe. (Roberts, Michael) Modified on 2/6/2025 to edit text (ELA). (Entered: 02/05/2025) |
| 05/16/2025 | 57 | MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/16/2025) |
| 05/19/2025 | 58 | **ENDORSED ORDER denying without prejudice 57 Defendant Kathleen Dully's Motion for Substitution of Counsel because it fails to comply with Local Rule 3.01(g). Signed by Magistrate Judge Monte C. Richardson on 5/19/2025. (SBL)** (Entered: 05/19/2025) |
| 05/22/2025 | 59 | Amended MOTION to Substitute Attorney by Kathleen Dully. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 05/22/2025) |
| 05/27/2025 | 60 | **ENDORSED ORDER granting 59 Defendant Kathleen Dully's Amended Motion for Substitution of Counsel. Robert B. Buchanan, Esq. is relieved of any further responsibility as counsel for Defendant in this matter, but he shall comply with all applicable obligations on withdrawing counsel, including any applicable Bar rules. Jami Kimbrell, Esq. is substituted as counsel of record for Defendant. Signed by Magistrate Judge Monte C. Richardson on 5/27/2025. (SBL)** (Entered: 05/27/2025) |
| 05/27/2025 | 61 | NOTICE of Appearance by John Wilson on behalf of Kathleen Dully (Wilson, John) (Entered: 05/27/2025) |
| 06/06/2025 | 62 | Unopposed MOTION for Extension of Time to Complete Discovery by Kathleen Dully. (Wilson, John) Motions referred to Magistrate Judge Monte C. Richardson. Modified on 6/9/2025 to edit the docket text (MLB). (Entered: 06/06/2025) |
| 06/09/2025 | 63 | **ORDER granting 62 Unopposed Motion for Extension of Deadlines to Complete Discovery and File Dispositive Motions. Discovery deadline is 8/4/2025. Dispositive and Daubert motions due 9/5/2025. Final pretrial conference continued to 1/20/2026, at 10:00 a.m. Jury trial set for trial term commencing on 2/2/2026, at 9:00 a.m. See** |

| | | |
|---|---|---|
| | | **Order for additional deadlines. Signed by Judge Marcia Morales Howard on 6/9/2025. (JW)** (Entered: 06/09/2025) |
| 06/09/2025 | | Set / Reset Scheduling Order Deadlines/Hearings per [63]: Discovery due by 8/4/2025. Dispositive motions due by 9/5/2025. All other motions due by 12/29/2025. Final Pretrial Conference set for 1/20/2026 at 10:00 AM before Judge Marcia Morales Howard. Jury Trial set for 2/2/2026 at 09:00 AM before Judge Marcia Morales Howard. (EVK) (Entered: 06/10/2025) |
| 06/18/2025 | 64 | NOTICE of mediation conference/hearing to be held on 8/6/25 at 10AM before Thomas H. Bateman, III. (Carson, Matthew) (Entered: 06/18/2025) |
| 08/06/2025 | 65 | MEDIATION report Hearing held on 8-6-2025. Hearing outcome: Impasse.. (Bateman, Thomas) (Entered: 08/06/2025) |
| 08/12/2025 | 66 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/12/2025 | 67 | MOTION for Partial Summary Judgment by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P)(Roberts, Michael) (Entered: 08/12/2025) |
| 08/13/2025 | 68 | **SUMMARY JUDGMENT NOTICE AND COURTESY COPIES. Signed by Deputy Clerk on 8/13/2025. (JW)** (Entered: 08/13/2025) |
| 08/29/2025 | 69 | Unopposed MOTION for Extension of Time to File Response/Reply as to [67] MOTION for Partial Summary Judgment , [66] MOTION for Partial Summary Judgment Set / Reset Scheduling Order Deadlines/Hearings *and Extension of Time to File Motions for Summary Judgment* by All Defendants. (Kimbrell, Jami) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 08/29/2025) |
| 09/03/2025 | 70 | **ENDORSED ORDER granting [69] Defendants' Joint Unopposed Motion for Extension of Time. Defendants shall respond to Plaintiff's Motions for Partial Summary Judgment on or before September 9, 2025. The deadline for Defendants to file dispositive motions is extended until September 12, 2025. The granting of this Motion shall not serve as a basis for seeking to extend any other deadlines in the Case Management and Scheduling Order. Signed by Magistrate Judge Monte C. Richardson on 9/3/2025. (SBL)** (Entered: 09/03/2025) |
| 09/05/2025 | 71 | MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) by Mikayla Preston. (Attachments: # 1 Exhibit 1 = Siewert CV, # 2 Exhibit 2 - Siewert Report) (Carson, Matthew) (Entered: 09/05/2025) |
| 09/08/2025 | 72 | Unopposed MOTION to file DOCUMENT under seal by Kathleen Dully, Mikayla Preston (Attachments: # 1 Proposed Sealed Item Redacted f6a487, # 2 Proposed Sealed Item Redacted 0065(1), # 3 Proposed Sealed Item Redacted 0059, # 4 Proposed Sealed Item Redacted DuckDuckGo, # 5 Proposed Sealed Item Redacted VVFQ_o, # 6 Appendix Unredacted File Names and Sizes)(Carson, Matthew).Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 09/08/2025) |
| 09/08/2025 | 73 | Consent MOTION to File Excess Pages in Response to Motion for Partial Summary Judgment by Kathleen Dully. (Kimbrell, Jami) Modified text on 9/9/2025 (MGB). (Entered: 09/08/2025) |

| 09/09/2025 | 74 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
|---|---|---|
| 09/09/2025 | 75 | RESPONSE in Opposition re 66 MOTION for Partial Summary Judgment filed by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/09/2025) |
| 09/09/2025 | 76 | NOTICE by Kathleen Dully re 75 Response in Opposition to Motion *Filing Exhibits to* (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 Exhibit K, # 7 Exhibit L)(Kimbrell, Jami) Modified text on 9/10/2025 (ABM). (Entered: 09/09/2025) |
| 09/09/2025 | 77 | NOTICE by Mikayla Preston *documents in support of her response in opposition to Plaintiff's motion for partial summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty, # 3 Exhibit Deposition of Detective Mikayla Preston, # 4 Exhibit Deposition of Detective Kevin Greene, # 5 Exhibit Deposition of Sergeant Eugene Tolbert, # 6 Exhibit Deposition of Dr. Kathleen Dully I, # 7 Exhibit Deposition of Dr. Kathleen Dully II, # 8 Exhibit Affidavit of Kaitlyn M. Paine, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe)(Carson, Matthew) (Entered: 09/09/2025) |
| 09/09/2025 | 78 | RESPONSE in Opposition re 67 MOTION for Partial Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 09/09/2025) |
| 09/10/2025 | 79 | **ENDORSED ORDER granting 73 Defendant Kathleen Dully's Motion for Leave to Exceed the Page Limit and accepting as filed 75 Defendant Kathleen Dully's response to Plaintiff's Motion for Partial Summary Judgment. Signed by Judge Marcia Morales Howard on 9/10/2025. (JW)** (Entered: 09/10/2025) |
| 09/10/2025 | 80 | NOTICE by Kathleen Dully re 74 Response in Opposition to Motion *to Disregard* (Kimbrell, Jami) (Entered: 09/10/2025) |
| 09/11/2025 | 81 | **ORDER granting 72 Defendant's Unopposed Motion to Seal. See Order for details. Signed by Magistrate Judge Monte C. Richardson on 9/11/2025. (SBL)** (Entered: 09/11/2025) |
| 09/12/2025 | 82 | NOTICE by Mikayla Preston *of filing documents in support of her motion for final summary judgment* (Attachments: # 1 Exhibit Chart of Subject Images, # 2 Exhibit Deposition of Fallon McNulty (corporate representative for the National Center for Missing and Exploited Children) taken June 12, 2025 (excerpts), # 3 Exhibit Deposition of Detective Mikayla Preston taken March 13, 2025 (excerpts), # 4 Exhibit Deposition of Detective Kevin Greene taken December 17, 2024 (excerpts), # 5 Exhibit Deposition of Sergeant Eugene Tolbert taken December 17, 2024 (excerpts), # 6 Exhibit Deposition of Dr. Kathleen Dully taken April 28, 2025 (excerpts), # 7 Exhibit Deposition of Dr. Kathleen Dully taken June 18, 2025 (excerpts), # 8 Exhibit Affidavit of Kaitlyn M. Paine dated August 28, 2025, # 9 Exhibit Deposition of Plaintiff William Lee Lawshe taken March 14, 2025 (excerpts))(Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 83 | MOTION for Summary Judgment by Mikayla Preston. (Carson, Matthew) (Entered: 09/12/2025) |
| 09/12/2025 | 84 | MOTION to File Excess Pages by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 85 | MOTION for Summary Judgment by Kathleen Dully. (Kimbrell, Jami) (Entered: 09/12/2025) |
| 09/12/2025 | 86 | NOTICE of Filing Exhibits by Kathleen Dully re 85 MOTION for Summary Judgment. (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 |

| | | Exhibit K, # 7 Exhibit L, # 8 Exhibit M)(Kimbrell, Jami) Modified docket text on 9/15/2025 (JOS). (Entered: 09/12/2025) |
|---|---|---|
| 09/16/2025 | 88 | **ENDORSED ORDER granting 84 Defendant Kathleen Dully's Motion for Leave to File an Over-Length Motion for Summary Judgment and accepting as filed 85 Defendant Kathleen Dully's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 9/16/2025. (JW)** (Entered: 09/16/2025) |
| 09/16/2025 | 90 | REPLY to Response to Motion re 67 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/16/2025 | 91 | REPLY to Response to Motion re 66 MOTION for Partial Summary Judgment filed by William Lee Lawshe. (Roberts, Michael) (Entered: 09/16/2025) |
| 09/19/2025 | 92 | RESPONSE to Motion re 71 MOTION In Limine regarding Plaintiff's Expert, Patrick Siewert (Daubert) filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 09/19/2025) |
| 09/24/2025 | 93 | SEALED DOCUMENT re 81 Sealed Order on Motion to Seal by Mikayla Preston (Attachments: # 1 Exhibit Redacted f6a487, # 2 Exhibit Redacted 0065(1), # 3 Exhibit Redacted 0059, # 4 Exhibit Redacted DuckDuckGo, # 5 Exhibit Redacted VVFQ_o) (Carson, Matthew). (Entered: 09/24/2025) |
| 10/03/2025 | 94 | MOTION to File Excess Pages by William Lee Lawshe. (Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 95 | RESPONSE to Motion re 85 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/03/2025 | 96 | RESPONSE to Motion re 83 MOTION for Summary Judgment filed by William Lee Lawshe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Roberts, Michael) (Entered: 10/03/2025) |
| 10/06/2025 | 97 | **ENDORSED ORDER granting 94 Plaintiff's Unopposed Motion for an Extension of Page Limit and accepting as filed 96 Plaintiff's Response to Defendant Preston's Motion for Summary Judgment. Signed by Judge Marcia Morales Howard on 10/6/2025. (JW)** (Entered: 10/06/2025) |
| 10/16/2025 | 98 | **ORDER REASSIGNING CASE to Senior Judge Jane A. Restani. Signed by Judge Marcia Morales Howard on 10/16/2025. (MHM)** (Entered: 10/16/2025) |
| 10/17/2025 | 99 | Case Reassigned to Judge Jane A. Restani. New case number: 3:24-cv-44-JAR-MCR. Judge Marcia Morales Howard no longer assigned to the case. (MDC) (Entered: 10/17/2025) |
| 10/17/2025 | 100 | REPLY to Response to Motion re 85 MOTION for Summary Judgment filed by Kathleen Dully. (Wilson, John) (Entered: 10/17/2025) |
| 10/17/2025 | 101 | REPLY to Response to Motion re 83 MOTION for Summary Judgment filed by Mikayla Preston. (Carson, Matthew) (Entered: 10/17/2025) |
| 11/17/2025 | 102 | Notice to counsel that pursuant to the summary judgment notice 68, the parties must submit courtesy copies of any motion, response, and authorized reply that exceeds twenty-five (25) pages (including exhibits or other supporting evidentiary materials) in length. Courtesy copies should be mailed by United States mail or other reliable service to Hon. Jane A. Restani, United States Court of International Trade, 1 Federal Plaza, Suite 694, New York, NY 10278-0001 (jkl) (Entered: 11/17/2025) |
| 12/18/2025 | 103 | **OPINION AND ORDER re: Cross Motion for Summary Judgment; denying 66 Motion for Partial Summary Judgment; denying 67 Motion for Partial Summary** |

| | | |
|---|---|---|
| | | Judgment; denying as moot [71](#) Motion in Limine; granting [83](#) Motion for Summary Judgment; granting [85](#) Motion for Summary Judgment. The Clerk shall enter judgment in favor of Defendants Preston and Dully and against Plaintiff Lawshe, terminate any pending motions, and close the case. Signed by Judge Jane A. Restani on 12/18/2025. (SJW) (Modified on 12/18/2025)(SJW). (Entered: 12/18/2025) |
| 12/19/2025 | 104 | **JUDGMENT is entered in favor of Defendants and against Plaintiff. Signed by Deputy Clerk on 12/19/2025. (JTM)** (Entered: 12/19/2025) |
| 12/19/2025 | 105 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (JTM) (Entered: 12/19/2025) |
| 01/06/2026 | 106 | NOTICE of change of address by Christen Ann Petruzzelli (Petruzzelli, Christen) (Entered: 01/06/2026) |
| 01/06/2026 | 107 | MOTION for Extension of Time to File Motion for Entitlement to Costs by Mikayla Preston. (Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 01/06/2026) |
| 01/16/2026 | 108 | NOTICE OF APPEAL as to [103](#) Order on Motion for Partial Summary Judgment Order on Motion in Limine, Order on Motion for Summary Judgment, [104](#) Judgment by William Lee Lawshe. Filing fee $605, receipt number AFLMDC-24340578. ***Case Stayed. (Roberts, Michael) (Entered: 01/16/2026) |
| 01/16/2026 | 109 | TRANSMITTAL of initial appeal package to the U.S. Court of Appeals - 11th Circuit re [108](#) Notice of Appeal,. Filing fee paid. (JDR) (Entered: 01/16/2026) |
| 01/20/2026 | 110 | RESPONSE in Opposition re [107](#) MOTION for Extension of Time to File Motion for Entitlement to Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 01/20/2026) |
| 01/20/2026 | | ***11th Circuit Case Number: 26-10155-D for [108](#) Notice of Appeal, filed by William Lee Lawshe. (SJW) (Entered: 01/22/2026) |
| 01/30/2026 | 111 | **ENDORSED ORDER granting [107](#) Defendant Mikayla Preston's Motion for Extension of Time. The Court has considered Plaintiff's arguments but finds that good cause exists for the requested extension. Defendant shall file the subject Motion on or before February 5, 2026. Signed by Magistrate Judge Monte C. Richardson on 1/30/2026. (SBL)** (Entered: 01/30/2026) |
| 01/30/2026 | 112 | TRANSCRIPT information form filed by William Lee Lawshe re [108](#) Notice of Appeal USCA number: 26-10155-D. No transcript(s) requested. (Roberts, Michael) (Entered: 01/30/2026) |
| 02/05/2026 | 113 | MOTION for Taxation of Costs by Mikayla Preston. (Attachments: # [1](#) Affidavit of Matthew Carson, # [2](#) Exhibit Bill of Costs)(Petruzzelli, Christen) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 02/05/2026) |
| 02/06/2026 | 114 | NOTICE by Mikayla Preston re [113](#) MOTION for Taxation of Costs *of Filing Supplement Pursuant to M.D. Fla. Loc. R. 3.01(g)*. (Petruzzelli, Christen) (Entered: 02/06/2026) |
| 02/19/2026 | 115 | MEMORANDUM in opposition re [113](#) Motion for Taxation of Costs filed by William Lee Lawshe. (Roberts, Michael) (Entered: 02/19/2026) |
| 04/30/2026 | | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Middle District of Florida certifies that the record is complete for the purposes of this appeal re: [108](#) Notice |

of Appeal,. All documents are imaged and available. USCA number: 26-10155-DD. (SJW) (Entered: 04/30/2026)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/18/2026 15:37:59 | | | |
| **PACER Login:** | jkimbrell657379 | **Client Code:** | Lawshe_v_UFBOT |
| **Description:** | Docket Report | **Search Criteria:** | 3:24-cv-00044-JAR-MCR |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

# Doc. 76

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**WILLIAM LEE LAWSHE,**
**an individual,**

      **Plaintiff,**

**v.**                            **CASE NO: 3:24-cv-00044-MMH-MCR**

**MIKAYLA PRESTON,**
**in her induvial capacity as a Detective for St. Johns County Sheriff's Office,**
**and KATHLEEN DULLY, in her individual capacity as**
**medical director of the UF Child Protection Team,**

      **Defendants.**
_____/

**DEFENDANT KATHLEEN DULLY'S NOTICE OF FILING EXHIBITS IN**
**SUPPORT OF RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

Defendant, Kathleen Dully, by and through her undersigned counsel, hereby

files the following exhibits in support of her Response in Opposition to Plaintiff's

Motion for Partial Summary Judgment:

**Exhibit**      **Description**

A.         Image *Filename f6a487 (last six characters)* (UNDER SEAL)

B.         Image *Filename 0065(1)* (UNDER SEAL)

C.         Image *Filename 0059* (UNDER SEAL)

D.         Image *Filename DuckDuckGo* (UNDER SEAL)

1

E.    Image *Filename VVFQ_o (last six characters)* (UNDER SEAL)

F.    February 22 Letter

G.    First April 5 Letter

H.    Second April 5 Letter

I.    Dr. Dully's Deposition dated April 28, 2025

J.    Eugine Tolbert's Deposition dated December 17, 2024

K.    Detective Preston's Deposition dated March 13, 2025

L.    Dr. Krugman's Deposition dated July 16, 2025

Respectfully submitted,

*/s/ Jami M. Kimbrell*
Jami M. Kimbrell
Florida Bar No. 0657379
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
Telephone: (850) 877-7776
Jami@jsh-pa.com

*/s/ John Wilson*
John Wilson, Esq.
Florida Bar No. 84798
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
Telephone: (850) 877-7776
Johnwilson@jsh-pa.com

*Attorneys for Defendant,*
*Kathleen Dully*

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of foregoing has been served on

all counsel of record by e-filing on September 9, 2025.

<u>/s/ Jami M. Kimbrell</u>
Jami M. Kimbrell

<u>/s/ John Wilson</u>
John Wilson, Esq.

3

# Doc. 76-7

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,

     Plaintiff,

vs.                   CASE NO.: 3:24-cv-00044-MMH-MCR

MIKAYLA PRESTON, in her
individual capacity as a detective for
St. Johns County Sheriff's Office,
and KATHLEEN DULLY, in her individual capacity
as medical director of the UF Child Protection Team,

     Defendants.
_____/

DEPOSITION OF DR. SCOTT KRUGMAN

Taken on Behalf of Defendant

DATE TAKEN:    July 16, 2025
TIME:        8:04 a.m. - 9:30 a.m.
PLACE:       Zoom

Examination of the witness taken before:

CLARA C. ROTRUCK, Court Reporter
For the Record Reporting, Inc.
1500 Mahan Drive - Suite 140
Tallahassee, Florida 32308

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:
Michael K. Roberts, Esquire
Law Offices of Nooney, Roberts, Hewett, and Nowicki
1680 Emerson Street
Jacksonville, FL 32207
904-398-1992
mroberts@nrhnlaw.com


On behalf of the Defendant Kathleen Dully:

JOHN ALEXANDER WILSON, ESQ.
Howell, Buchan, & Strong
2898 Mahan Drive, Suite 6
Tallahassee, FL 32308-5462
850-877-7776
johnwilson@jsh-pa.com


On behalf of the Defendant Mikayla Preston:

MATTHEW J. CARSON, ESQ.
Sniffen & Spellman, P.A.
123 N. Monroe Street
Tallahassee, FL 32301
850-205-1996
mcarson@sniffenlaw.com

INDEX TO WITNESS

| WITNESS | PAGE |
|---|---|
| DR. SCOTT KRUGMAN | |
| Examination by Mr. Wilson | 04 |
| Examination by Mr. Carson | 41 |
| Examination by Mr. Roberts | 48 |
| Further Examination by Mr. Wilson | 57 |

* * *

| Certificate of Reporter | 60 |
| Read and Sign Letter | 61 |
| Errata Sheet | 62 |

* * *

DEPOSITION

Whereupon,

DR. SCOTT KRUGMAN

was called as a witness, having been first duly sworn to speak the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. WILSON:

Q    Good morning, Dr. Krugman.  My name is John Wilson.  I represent Dr. Dully in this case.

Have you had your deposition taken before?

A    I have.

Q    Well, this will be undoubtedly just like the others.  I'm going to ask you some questions.  The court reporter will be taking down all of your answers.  So it's important to answer questions audibly, not with head nods or "uh-huhs" and "huh-uhs" because those are very hard to transcribe.

If you don't understand the question I've asked you, I'm happy to rephrase it until we get on the same page.

And if you don't know the answer to a question -- we're not here to have you guess -- just let me know you don't know and we'll move on to other topics.

And I don't want anyone to be uncomfortable while we're doing this process. So if you or anyone else needs a break, please just let me know. We'll stop questioning for a minute, go off the record, and then come back on when everyone's ready.

Dr. Krugman, can you state your full name for the record for me?

A   Scott Daniel Krugman.

Q   Sorry.

A   (Inaudible).

Q   Can you tell me how -- no, you don't need to spell it. We got your ID upfront. I'm sure the court reporter took it down.

Can you tell me how you're employed?

A   I am employed by the Sinai Hospital of Baltimore in Baltimore, Maryland.

Q   And how long have you been working there?

A   I have been at Sinai since 2018.

Q   All right. And are you licensed as a physician?

A   I am.

Q   In what states?

A   Maryland.

Q   Just Maryland?

A   Just Maryland.

Q All right. Have you ever had any discipline or public complaints against your medical license?

A I have not.

Q Okay. And I got your CV. I can tell you're very credentialed, but what I couldn't tell is how much time you're spending in clinical practice these days, what kind of patients are you seeing?

A Yeah. So for the past year and a half, I have primarily been doing outpatient general pediatrics one to one and a half days a week in clinic. Additionally, I do child abuse consults whenever they come up for the hospital.

Q And when is the last time in your career you really considered yourself full-time clinical medicine?

A I'm not sure I was ever full-time because I was always about 50 to 60 percent clinical, even right after residency in a faculty position. So, I mean, it was a full-time job, but with teaching and administrative work, I've always -- I had always been 50 to 60 percent until this past year and a half.

Q And has that always been pediatrics?

A Correct.

Q And when we noticed you for a deposition, we attached a little Schedule A to that and asked you to bring some stuff with you. I talked to Mr. Roberts

about that, and what we got back is a single journal article by the name of "The Difficult Issue of Age Assessment on Pedopornographic Material," we got your list of cases that you've participated in, I think we've got your CV and your fee schedule and your expert report, along with Dr. Dully's three reports, which are short one-pagers in the form of letters, and then Dr. Dully's depositions, her two-part deposition.

Did you rely on any other materials in the preparation of your report?

A    I didn't rely on any, but I did bring up a couple of the references in the article. So I have two other articles that I've looked at that I can forward to you that are very similar.

Q    All right. Yes, I would like copies of those, and we can talk about those articles a little bit later on in the depo.

You mentioned in your report emails from some Listserv discussion. Do you have copies of those available?

A    No, I did not make copies of the emails because that violates Listserv policy. I reviewed them. I didn't make copies.

Q    Talking about them doesn't violate Listserv policy? What is the Listserv policy then?

A My impression of the Listserv policy is that we are not to take emails and provide them to outside sources.

Q Isn't that kind of functionally what you've done by paraphrasing it into an expert opinion?

A Maybe. I don't know. I guess I might find out if somebody reports me to the Listserv that I've highlighted and that is determined to be such.

Q All right. Well, we'll talk about the Listserv and the contents based on your memory a little bit later.

So has anything you have reviewed since you authored your original report changed your opinions in this case?

A No.

Q Okay. Have you developed any new opinions in the case based on your review of new materials?

A No.

Q So what we've got written in your report, the Paragraphs A through K, that's the sum of your opinions on this case?

A Correct.

Q Have you reviewed any images in preparation of this case?

A I have not.

Q Okay. So you're well aware that this is a case about the review of some child sexual abuse material and you have not looked at those images?

A Correct.

Q All right. Tell me about your board certifications.

A Originally board certified in general pediatrics in 1999, and then I was board certified in child abuse pediatrics in 2012 and I've been recertified ever since then.

Q And in -- especially in child abuse pediatrics, is sexual exploitation of children covered in that curriculum?

A It is.

Q And is production and dissemination of child pornography covered in that curriculum?

A Not in the sense of -- like as a part of sexual exploitation, but not like the details of how pornography is done, and it's not a major part of it, let's put it that way.

Q Sure. Sure. I don't mean that you get a seminar on the porn industry itself, but handling victims of the system, is that discussed?

A Yes, it is.

Q Okay. And is it commonly understood in your

field that cases involving children who are -- are brought in unlawfully to the pornography industry, is that considered in your field to be child abuse?

A Yes.

Q And because of this Listserv discussion, I assume you know something about Dr. Dully prior to being involved in this case. Have you ever spoken to her before?

A We've been at conferences together, and I know -- I think I might be able to -- like if I had a room and saw her, I might be able to recognize her, but I don't know her well or don't know her -- I just know she is one of the child abuse pediatricians in the Florida system.

Q Okay. And prior to reviewing this case and looking at this materials, were you familiar with her name?

A Yes.

Q You would have seen it on the Listserv probably?

A Yeah, and at conferences.

Q And at conferences? Okay. And she has the same board certification as you do, correct?

A Correct.

Q So she would receive largely the same training

through that curriculum and be aware of the same standards for that board certification?

A     Yes, absolutely.

MR. ROBERTS:  Yeah.  I'm going to object to that question, but yeah.

BY MR. WILSON:

Q     So let's talk a little bit about this Listserv and the conversation.  What is the purpose of this Listserv that you all are on together?

A     It's to have peer discussion and evaluation of -- like for those of us -- it's all child abuse pediatricians, and if you have a case that's complicated or want to throw a question about -- let's call it like a procedural thing or how do you relate with that or -- it's a wide range of things.

Additionally, a lot of articles come through. Somebody often puts in a new article that come out.  And then there's some professional discussions about expert witnesses, have you worked with this one and how they testified.  So it's pretty wide-ranging.

Q     So is it fair to say it's just a general peer support, Listserv?

A     That's a much more succinct way of describing it.  Thank you.

Q     And in your discussions in that Listserv, do

they carry any weight with the specialty board or the state boards?

A  No.

Q  And do you set actual medical policies within that Listserv that you all then follow?

A  No.

Q  Do you debate appropriate standards of care?

A  Typically not.  I mean, people might express different opinions about things, but I'm not sure that's the -- that's not the location where standard of care is determined.  That's more of an American Academy of Pediatrics/American Board of Pediatrics function.

Q  Okay.  And as far as your comments on this case, can you tell me how this subject came up and who participated in the discussion?

A  On the Listserv or --

Q  On the Listserv.

A  It did not come up on this list.  When I was asked about this case, I remembered that there had been discussions on the Listserv about making judgments about pornographic pictures with one -- if you have just the genitals or just the breasts or with one image.  That's where it came up, and there was discussion around that. And so I remembered that there was discussion around that and people were uncomfortable doing that, and

that's -- that was it.

Q    And do you remember who those people were?

A    The ones who posted about it?

Q    Both.

A    I think it was somebody from Vermont, there was a colleague of mine from Maryland who commented, and I think that's -- I don't remember who else -- if there were other replies around it.

Q    Did Dr. Dully reply?

A    No.

Q    About how many emails per week does this Listserv generate?

A    Five to 10.

Q    Do you have any way of knowing if Dr. Dully even read those specific emails that week?

A    I do not.

Q    Okay.  And when this was brought up on the Listserv, it was as the result of a practice question, not as a result of reviewing any scholarly articles?

A    Correct.

Q    And how long did the discussion go back and forth before it sort of died out and other people took the floor?

A    I think it was probably like three or four emails.  It wasn't a lot.

Q Over a period of just a day?

A Couple days, yeah. A day or two.

Q A few days?

A Yeah.

Q Okay. Was any consensus reached as the thread kind of closed down?

A I mean, I guess each person who read the thread probably could have their own take on it, but my feeling from that was there was a lot of reticence to use one image to make a conclusion.

Q You do forensic work as part of your medical practice, correct?

A I do child abuse pediatrics, which includes interfacing with the legal system regularly, yes.

Q Are you regularly working with law enforcement on investigations in your current role?

A I'd say in my current role, intermittently, not regularly.

Q How often in the course of a year would you say "intermittent" is for you right now?

A I probably am producing reports on abused kids like six to eight times a year.

Q Okay. And how do those cases come to you? Is there a process?

A Most of them are children who've come through

our hospital who were injured, but a couple are -- I'm being reached out to from either state's attorney's office or law enforcement about a case because they had questions and need an expert to opine.

Q   And this is before charges are filed, or do you have the benefit of that information?

A   It depends on the case.  So some of them are well after charges have been filed, that's a court prep. Other times it's while the investigation is going on and I've done a consult and I need to interface with them and have multidisciplinary meetings to discuss what the next steps are and things like that.  So it runs the gamut.

Q   Okay.  And when you're doing these consults, be it for law enforcement or the state attorney's office, you're employing all of your medical knowledge and training, right?

A   Correct.

Q   And you're using the medical science that's available to you to guide their investigation?

A   I'm not sure I'm guiding their investigation, but providing input and insight as to, you know, what else needs to be done or taking -- as they do their scene investigation, putting that into -- it's like a -- it's a two-way street.  I don't think "guiding the

investigation" is the right term, though.

Q    Okay.

A    I think we're saying the right -- same thing.

Q    Yeah.  And by virtue of what you just explained to me, you don't consider when you offer a medical opinion on a forensic case, that that's authoritative and controlling for the rest of the investigation and the prosecution, do you?

A    I would hope not.  It should not be.

Q    You would expect law enforcement to do more work on the case than just talk to you?

A    Correct.  Yes.

Q    And as you're working with them, you're operating under the standards that are set by your specialty board and your regular licensure board; is that correct as well?

A    Correct.  Yes.

Q    You mentioned in your report some standards that the child abuse pediatric certification require of you.  Can you just flesh that out for me?  What does that specialty set as your standard of practice when you're doing work like this?

A    I think the key to the -- and I'm trying to think if the right standards are the board *per se*.  The -- our goal as child abuse pediatricians is to provide a

fair and unbiased evaluation of whatever situation comes in front of us and that it's important to make sure that we are -- you know, have honesty, integrity, try to be as unbiased as humanly possible, and state the limitations of any opinion, if there are limitations, and not sort of oversell and try to push an agenda, if that makes sense.

Q    Sure.  And is that your professional ethical standard of what you're doing, or is that adopted somewhere as a standard?

A    There are -- our child abuse society, the Helfer Society, I believe has some guidance around this. I couldn't pull off like off the top of my head which -- whether it's a policy or if it's just a standard operating procedure at times like that or if that's mine.  But I think it's discussed pretty regularly in our group about -- especially in this time, in this day and age where there's quite a bit of backlash against child abuse pediatricians, that we have to do what we can to uphold those things, but I don't think it's written in, like, the board certification guidance of what to do.  You know what I'm saying?  But I do think there are some -- there is some guidance around that. At least that's how I've been trained to do things.

Q    Okay.  Tell me -- I'm not in the child abuse

pediatric circle very often. Tell me about this backlash that you're perceiving.

A So there's a -- are you in Florida?

Q Yes.

A Okay. So the case against All Children's Johns Hopkins about kidnapping Maya and the Netflix series really put the whole system in light of, you know, the doctors are there to take your kid away from you, and that's gained a bit of traction and there's quite a few lawsuits now against child abuse pediatricians, and it's been challenging.

Q And you're aware that this case is a lawsuit against a child abuse pediatrician?

A I am.

Q Have you ever done a law enforcement review of child sex abuse material like the basis of this case?

A I -- probably about 15 years ago I had -- when I worked much more close -- in my prior role, I was the director of the Franklin Square Child Protection Team, which was the acute sex abuse center for Baltimore County from 2000 to 2018. So in that time period when I was doing a lot more sex abuse cases and working closely with law enforcement, there were intermittent times when they'd bring pictures for me to review, yes.

Q And walk me through how you went about

evaluating those images.

A So I think it was probably pretty similar to how Dr. Dully described how the police approached her. They said, "We have these images, we want to show you to them and we need your opinion as to whether or not this was a child or not."

Q And how do you go about answering that question?

A Well, I'd look at the images and try to determine the sexual maturity range and let them know if I could say one way or another if it was a child or not a child. And I think all the ones they showed me, there wasn't a single one that I said I could be certain was a child because I don't remember ever writing a report to say -- because if they did that, I would have had to write a report and stuff, and I don't ever recall writing a report on a case like this.

Q So during that period where you were a CPT doc, every time law enforcement brought photos for you to review for an age determination case, they walked away with no report?

A I don't think it was that many times. So it was probably like three or four times, but I do not recall ever writing a report. I might be -- I could be missing or not remembering one, but I don't remember

ever having said, "This one definitely is a child."

Q Okay. And when you have a situation like that when you're reviewing images, from the perspective of a medical doctor, is it functionally any different than reading diagnostic images for a patient in another context?

MR. ROBERTS: I'm just going to object to the form of the question.

THE WITNESS: Can you -- I'm not sure I understand the question completely.

BY MR. WILSON:

Q Yeah, I'm happy to flesh it out for you.

So in these child porn cases, police come to you with an image and want a medical determination about what that image means. And there are other contexts where physicians take in images, whether it be a radiograph or some still pictures of a rash or something, where they're asked, "Hey, what's going on in this picture? Can you give me a medical determination?"

My question is, given that doctors review images and make medical determinations, is there something grossly dissimilar about that process in the child pornography age review than any other medical setting?

MR. ROBERTS: I'm going to object, but you can

answer.

THE WITNESS: I would say that in the general sense, you're correct, right. So whether I have a child with -- they're showing me bruises or determine -- age determination or here's an x-ray with fractures, it's the same approach.

I think the second layer of that is how you're able to and the scientific backing of your conclusion, and I think when you're dealing with, like, images of bruises, it can be challenging because the camera can distort it a little bit or might look darker than it is in real life. So you have to be cautious and -- I'm not sure "couched" is the right term, but you have to be like "To the degree to which what I've seen, this is what the answer is."

With age determination based on sexual maturity rating, again, if the child is, like, sexual maturity 3 or under, I'm very confident and I'm happy to put this child is under 18. The problem is when they're 4 or 5, you could be that at age 9, you could be that at age 15, you could be at that age 25, and you can't really just go based on those -- the maturity rating alone.

So it's a bit nuanced, but in general, yeah,

it's -- like it's the same approach.

BY MR. WILSON:

Q    And do you do much telehealth?

A    I do a fair amount, yeah.

Q    So, obviously, telehealth has exploded in the last decade, but that prevents a challenge for doctors in that they don't have the patient in the room with them to do the live exam.  It's synchronous or asynchronous video, but it's still practicing medicine based on a digital image consult at the end.  Is that your understanding?

A    Yes.

Q    And as you highlight in your report, and, of course, we're all aware, any digital images and video at the point of our technological savvy in society now can be altered?

A    Yes.

Q    And I think you say directly in your report that there's no medical training that can reliably allow you to determine when and how a digital image or video has been altered?

A    Correct.

Q    So knowing that, that any image could be altered and there's no way for you to know if it's been altered, speaking from a medical science perspective,

you still in your day-to-day practice rely on images; is that correct?

A   I mean, not day-to-day, but we rely on them -- yes, correct.

Q   When the situation calls for it --

A   When the situation calls for it, yeah.

Q   -- and you're looking at bruising?

A   Correct.

Q   And when you're doing those image and video reviews, that's standard medical practice?

A   Yes.

Q   And you're operating under established standards of care?

A   Yes.

Q   And those standards of care apply -- do they apply the same for a photograph in a patient that's in your office?

A   Yes.

Q   And does it change any quality of the actual medical services you're providing that one case of bruising is based on a photograph and another case, you have a patient in your office to evaluate physically?

A   I mean, it can, right?  It might not be as accurate with a video.  So I think that's where the -- highlighting the limitations of the technology and of

what your opinion is based on is super important.

Q   Sure.  And I've read some medical records, maybe not full-time medical record reviewer, but I can't remember a time -- let's say I saw a radiologist consult looking at an x-ray where they wrote in, "The limitation of this image might be digitally altered."  Is that something that's in the mind of physicians as they're doing casework?

A   So, again --

MR. ROBERTS:  I'm going to object to the question.

THE WITNESS:  -- if you are a radiologist, you have set up the system with whoever's taking the x-ray to not have it -- like there's quality control there, right?

So when -- I'll give an example.  If I have a child who Mom's like, "I can't bring the kid in, I need to do telehealth, they have a rash," I'm putting in my report "To the best of -- it looks like this, but I can't be certain."  And I'm going to tell Mom, "If this doesn't work, you need to come in because it can be very hard to tell through a digital image exactly what is going on."

So I think there's a big difference between -- you know, there's a lot of degrees of this, and the

farther away -- like if I'm having a telehealth or a mom's taking a picture and sending an image, you know, sometimes I can see, sometimes like I can't see, you got to come in, which is still me having a direct relationship with the patient and knowing where the image is coming from, but a lot of these -- and if we take this to the child sexual abuse material type stuff, the CSAM material, you don't know where that image is going, you don't know how many times -- who -- I think the risk for manipulation, altering, and things like that is much greater than me having a conversation with Mom on Zoom, right, or Mom taking -- so I think there's a lot of different degrees of this. So I -- but in general, yes, you're correct, but the presumption isn't that parents who are taking pictures of rashes or bruises or radiology techs who are doing images aren't manipulating pictures for a purpose. So that's why they're not putting those things in there, if that makes sense.

BY MR. WILSON:

Q So let's sort of get back to the way you would review child sexual abuse material. You said SMR-3 is an easy case for you?

A Correct.

Q   Tell me as a layperson what it means to pass that barrier -- what you're clinically observing that makes a case -- a SMR-3 transition into an unclear area?

A   Well, there's nothing -- so when you're evaluating breast and pubic hair -- we're going to go with -- let's go with girls because those are more common victims.  The breast development at 3 is there's no -- it would be a rare genetic, weird medical situation where somebody over the 18 had breast developments of 3.  Theoretically, it could happen, but it's super, super uncommon, right?  Whereas it's more likely for younger kids, because kids are going through puberty earlier, to have Breast Development 3.  So I can be very confident that at Development 3, it's a child under 18.

If it's 4, it's pretty likely -- it's more likely than not that they're under 18, but not necessarily.  Especially if you just have breasts, there's plenty of 30-year-olds with -- women with Tanner 4 breasts or Stage 4 breasts.

When -- what's important, I think, is the whole picture, like making sure you're able to see completely both at the same time, because when you only have one, you don't know what -- it can make it -- again, if the image has been altered, it could look like

Tanner -- like Stage 1 genitals, and if it's not Stage 1 or 2 of breast development, there's a big disconnect there, something's up. So it makes it hard. So you need good images, you need to have the ability to see -- Again, if you have facial features as well, that can help, but, again, I'm not an expert on saying, "That is a face of a 9-year-old, and that's a" -- I don't think there's -- I don't think there's good scientific evidence to state that a certain appearance of somebody's face is a certain age. That gets more into just hocus-pocus type stuff.

Q So it's still within the standard of care when you're evaluating the age of a patient in any context to go through the criteria in SMR or Tanner scales in evaluating? That's still standard of care, right?

A Yes. Yes. It's still -- it's a helpful piece of information, absolutely.

Q Okay. But in some cases, it just can't be conclusive?

A Correct. And we have to remember two things: One is that Tanner scales were designed for going forward, right, and to make sure kids were making progress. They weren't designed to go backwards and assign an age to them.

And the second part is the certainty of that

age range.  Like for me to see a Tanner 2, I can't tell you if they're 2, 4, 6, 8, 10, 12.  Like you can't really give an age, if that makes sense.  I think making age range, I think that's why it's like under 18 or -- that would be how I would put it because you just cannot assign an age to -- by an image.  It just doesn't work.

Q    Is that the prevailing opinion in the child abuse pediatrics community?

A    I think that a lot of people feel that way, but there are probably others who feel like they have the ability to be a little more precise, but I'm not sure there's good scientific evidence around that, or at least if there is, I haven't seen it.  If you have it, please share, but I've never seen anything very specific about that.  And when you have -- when you have women who are over 18 with Tanner 4, whatever percent it is, 10, 15, 20, 30, it makes using that very challenging as the -- to have certainty that they're under 18.

Q    So as I understand your answer, the problem, in your opinion, with Dr. Dully's work was not the clinical markers that she used, but, rather, her determination to assign an age range based on those markers?

A    Yes, and the discrepancy between the breast development and the genital development and that not

raising concerns about either the image being altered or the person being shaved or just because it's Genital 1, that is a child in -- you know, I think she put 9 to 13 or something like that. I think that was a bit -- I think that was erroneous. I just -- to be able to have that discrepancy, it just doesn't make any sense.

Q  Now, given that discrepancy, do you think Dr. Dully was below the standard of care for an age evaluation, or do you think Dr. Dully is just being too dogmatic?

MR. ROBERTS:  I'm going to object to that question.

THE WITNESS:  I can't say what -- I think that writing a report that is saying that this child is for sure under 18 when there's uncertainty is -- it's problematic because -- because it has consequences, right?  If it was just in a medical chart, you know, and then a year later, it comes out that something's different, that's fine.  But when it's being used to go in front of a judge, that's where you have to be -- if you're going to be certain, you got to be certain, and I don't think the -- I don't think that there was enough scientific basis for her conclusion to have the certainty that was in her report.

BY MR. WILSON:

Q    Well, taking that, are you able to testify based on your review of the material that Dr. Dully provided deliberately false information?

A    No.

Q    Are you able to testify that she participated in some sort of conspiracy with law enforcement to achieve a specific result?

A    No.

Q    Are you able to testify that her report was anything more than negligently applying medical standards?

MR. ROBERTS:  I'm going to object to -- and I'm sorry I didn't object earlier to these questions about mental state and mental culpability and that kind of thing.  You can answer.

THE WITNESS:  I think that's what I would testify to, that last statement, the --

BY MR. WILSON:

Q    There's medical negligence?

A    Yeah.

Q    Okay.  And given that you believe medical negligence occurs, can you just state for me and articulate what you believe the bottom line standard of appropriate care for this review should have been?

A     At a minimum in her report, having a line about the potential uncertainty of the images being altered, the child -- or adult in this case -- being, you know, groomed, whether it's waxing, shaving, or whatever, to look like a younger child should have been mentioned. And, additionally, I do think when there is such a discrepancy between genitals and breasts, you're probably better off not making the conclusion that there -- with certainty that this was a child and that this could be an adult. And I think if there was hedging, if there -- I don't mean hedging. If there was some sort of, you know, caveat to these conclusions, that these conclusions are based on what I saw, it just was too concrete and certain given the data that was presented.

Q     All right. So we've talked a little bit about how you go about doing these evaluations and what the standards are in play. In Paragraph D of your report, you mentioned that there's "published research that has shown chronological age estimation of models depicted in digital pornographic photographs by physicians is not medically or scientifically supported." But you've also told me today at SMR-3, it's kind of a different story and you would be comfortable offering an opinion there.

Am I correctly understanding that there's maybe some more qualification to that Paragraph D than

you've given me?

A Yeah, I think that probably should have been qualified with -- at SMR-4 or 5. That's probably fair, yes.

Q So once we're in SMR-4 or 5, it's your opinion all bets are off from a medical certainty standpoint?

A I don't know if all bets are off, but the degree of certainty goes down substantially and there needs to be -- again, if -- you could come up with a lot of scenarios where, you know, they identify who the person is, they have a birth certificate and they have images, and then you're good, right? Those probably aren't coming to the doctor, but they might come to the doctor early and say, "Well, it looks like a child, but I'm not a hundred percent sure. Can you corroborate?" That's where it could be helpful, right? But to have the image itself and be certain that it is a child, some people might feel comfortable doing that, but I think it's on shaky ground. That's all I can say.

Q Okay. And let's take the image and photograph part out of the analysis for a minute. If you have a patient come in and you need for clinical reasons to determine their age and you're doing an exam in person with them and they are SMR-4, does that change the reliability of a physician determining the age of that

patient to have them in person and be able to examine them?

A   I'm not sure where -- I mean, I don't think any of us have been trained to determine the age of a pers- -- like it's not -- I'm trying to think of a scenario -- like if someone came in as, like, a Jane Doe in a car crash and someone needs to know an age, you're still just going to be like guessing, right, based on height, weight, size, things like that.  But there is no scenario in which I can think of where I would be like, "Okay, that's a 12-year-old, that's a" -- I don't know if you can.  I mean, there are 12-year-olds out there who look like they're 18, and there's 18-year-olds out there who look like they're 12, and it's really hard. You can't just determine that.

Q   Yeah.  You'd need other information than what you'd get in a clinical patient exam; is that fair to say?

A   Yeah.

Q   And, obviously, because the needs of these kinds of cases is to determine that someone is under 18 to move forward with the prosecution for child pornography possession, promotion, or what have you, is everything we've talked about today on the limitations of aging an image or a patient, is it also true for a

determination that someone is over 18, could you confidently say an SMR-4 or 5 presentation photo was over the age of 18?

A I don't think -- I mean, no, you can't. It's -- it goes both ways, and that's the challenge, is that you can have 20-year-olds who can look very much like 12-year-olds -- I think, yes, I would agree with what you said. It's challenging.

Q So -- and I know you haven't even seen these pictures, but if you saw these pictures that are the subject of the discussions of this case, would it be medically possible for you to determine that they were over the age of 18?

A With certainty?

Q With the degree of medical certainty you expect from a physician doing this kind of review.

A I would probably say I -- hypothetically, if they're right on that borderline, I would not be able to include one way or the other. And I think that's probably what my usual response to police in these type of situations is, is "I can't help you."

Q And that ultimately is the basis of your criticism for Dr. Dully, you believe she should have told them, "I can't help you in this case"?

A Or "I'm not as" -- or couch the certainty --

yeah. I wouldn't be here if there were a couple lines of, "I'm not" -- you know, unless there's -- you know, if she couched it, there may have been grooming or something -- if she put those things in there, I wouldn't be here today.

Q Gotcha. And you talked about, when we were talking about aging a patient, the possibility of collateral information like passports. Have you gone over the case to the extent that you know that there are passports as evidence related to these images that Dr. Dully reviewed?

A I think that that was in one of the -- in her deposition, that there was mention of that, yes.

Q Did you view any of those passports --

A I did.

Q -- or anything?

Okay. Would it change your opinion to see passports that showed that the images in question had passports showing they were over 18?

MR. ROBERTS: Object to form.

THE WITNESS: I mean, I think it would -- if they're over 18, I think it reinforces my opinion, but I don't think it would change it.

BY MR. WILSON:

Q Would it change your opinion if they had

passports that showed they were clearly under 18?

A    Yeah, because then there would be corroborating evidence that they were under eight- -- I mean, again, I wouldn't be here if that was the case because there would have been -- there would have been a list of things to show that this was a child and her report would have been part of it, not it.  So I think that's the difference.

So I don't think it would change my opinion, but I think, again, it's -- that's where it's super important to have other data or evidence or timestamps or some- -- you know, something to ground the images into an actual timeframe that you can use.

Q    Gotcha.  Let's talk a little bit about the study you've provided that I've had a chance to review the difficult issue of age assessment (inaudible) pornographic material.

So in my lay reading, it looks like a panel of reviewers were given images that were all images of adults --

A    Correct.

Q    -- and asked to do an age determination?

A    Correct.

Q    So there was no possibility that --

A    They actually determined are they over or

under 18. That was the (inaudible).

Q Okay. But there was no -- there was nothing in the panel of images they were showed that was actually under 18, they were all over 18?

A Correct.

Q And bringing in a group of pediatricians asking for an over/under age assessment where the only correct answer is over, does that seem to you like you might get a little bit of bias in your results on an exercise like that?

A I don't -- would you get a bi- -- I mean, I think you could get biased either way like -- so if I'm being brought an image where I'm being told it's a child, then that's going to bias you to child. If you're told nothing and they're all adults, I think if they said if -- a lot of it will depend on how the question was asked, like "We're doing a study on child sexual abuse materials," and then they bring only 18-year-olds, I would agree with you, yes, that would be biased. But if they're asked, "Can you make a deter-" -- like it depends on the framing. I don't know the framing of the question here, but I think the point of the matter is women over 18 can be confused for children under 18. Whether it's 70 percent or if it's unbiased and asked a different way, it's 20 percent, I

think the point's the same, to be honest with you. But, sure, they could have biased easily how they -- they could have said, "This is child sex abuse material," right, and then that would bias them to think that they're under 18, absolutely.

Q   And you're not sure exactly how the question was framed to them in this study?

A   No, I am not.

Q   Okay. You mentioned you had some other studies. Can you tell me about those?

A   They're very similar. One was a systematic review of using these agents where they summarized all the literature. And I can give you the citation.

Q   You know, for me, not being in the academic world, it might be easier if you could just give these to Mr. Roberts and he can send me a copy.

A   Yeah. I think you might have this one, and I just -- it cited a paper from the U.S., so I reviewed that one, and that's in pediatrics, "Tanner 4 Breast Development in Adults: Forensic Implications."

MR. WILSON: Okay. Yeah, if you could send those to Mr. Roberts, and Mr. Roberts, if you could send them over to us, we'd appreciate that.

THE WITNESS: They pretty much say the same thing that adults can be Tanner 4. That's...

BY MR. WILSON:

Q Yeah. And I guess to really simplify it, I don't think anyone's position is that you can obviously know an SMR-4 and 5 one way or the other. It's hard, difficult work, and maybe it meets the level of scientific scrutiny, maybe it doesn't. But there are easy child porn cases where they're SMR-3 and under, and there are difficult ones, and different people have different names for those cases, whether they're hard cases, age-difficult (inaudible) --

A (Inaudible)?

Q -- indeterminate. Yeah. These articles are just reinforcing that general principle that there's a sexual maturity where it is very difficult to determine an age?

A You summed it up well again. You're very good at this. Thank you.

Q Give me just a minute to take a look at my notes here, but I think I'm wrapping up.

(Brief pause.)

BY MR. WILSON:

Q All right. I don't want to belabor this because Dr. Dully was questioned on it at length and she agrees with you, there's no recognized medical method or expertise necessarily in determining whether a model is

shaved or groomed by looking at a digital photograph.

Again, as a matter of qualification, if you can see hair in the photograph, you can have some certainty about shaving; isn't that true?

A    True.  I think the point is if there's no pubic hair, you don't know if there was pubic hair. Like if you can't see pubic hair on the -- but if you see some, like there's a patch here and there's part there, then you know they were shaved, right?  So -- but -- and if they are shaved, then you know that they're at least Tanner 4 probably -- or SMR-4 because they're shaving and grooming certain areas.  So I think it just rules out that they're Tanner 1 if there's shaving going on, and 2 and 3, to be honest with you, because you're not shaving at any of those stages.

Q    Yeah.  And not saying it applies to any of the -- necessarily the photos in question here since you haven't had the opportunity to look at them, but with a sufficiently clear digital image, you could see bumps and follicles that would suggest that shaving occurred? Is that a feeling --

A    You might be able to, but, again, I -- they could be, you know, Photoshop, too, that they're gone.

Q    Yeah.

A    I think if it's there, yes, but in the

absence, you can't say it didn't happen, if that...

Q Sure. Yeah. I just want to make sure we're in agreement that there can be --

A Yes.

Q -- medical markers of shaving or not shaving that can be seen on digital images?

A Correct. Yes, I agree with that.

Q Okay. It's just whether or not they're appropriately observed, characterized, and documented that's the substance of your criticism of Dr. Dully's work?

A Yes.

MR. WILSON: Okay. All right. Dr. Krugman, that's all the questions I have.

Matt, do you have questions?

MR. CARSON: I've got just a couple for you, Dr. Krugman.

EXAMINATION

BY MR. CARSON:

Q My name is Matt Carson. I represent Detective Mikayla Preston, who is also a defendant in this action. I just wanted to ask a couple of clarification questions regarding your time where you would intermittently review pictures as part of your role as director of the child abuse team in Baltimore.

A    Yes.

Q    You said that was approximately 15 years ago?

A    At -- the timeframe when I was doing the primary sex abuse work was 2000 to 2018.  So I don't remember exactly when in that range, but I think it was in the 2010 to 2015 range when I was covering the Child Advocacy Center when I was asked about the images, yes.

Q    Okay.  So just trying to get a picture in my head.  So there was a five-year period, give or take, where you were asked to review pictures, kind of like Dr. Dully was asked to review pictures in this case?

A    Yes.

Q    Okay.  And in the past 10 years or so, you've not reviewed any pictures in that context?

A    Correct.

Q    Okay.  What pictures were you reviewing during that time?  Can you describe the photographs that you were asked to review?

A    I'm not sure I can even remember these.  Like I think they were images of naked women or girl -- I can't describe -- I do not have as good enough memory to remember exactly what I saw that long ago, sorry.

Q    I should have asked my question more artfully than that.  I presumed they were naked individuals or somehow sexually --

A    Yes.

Q    Here's what I meant to ask, and I'll try to ask more for you now:  Did someone come in with printed pictures?  Did someone come in with a computer?  How was it that you were shown these pictures?

A    I was at the Child Advocacy Center, so I'm pretty sure they showed me on a computer screen, if I remember correctly.

Q    Do you remember -- so you were never shown like a 5 by 7 --

A    No.

Q    -- photograph?

You know, I think we're all of the age that we remember a period of time where you would drop your roll of film off at Eckerd's, and two days later, you'd pick up photographs.  But even when you were doing this 10 years ago or so, it was all online or all digital?

A    It was all on a computer, yes.

Q    Do you have any recollection of seeing or learning information about how those images were obtained?

A    No, I did not -- I think it was more, "Can you say with certainty that this is a child, yes or no," and my answer was, "No, I cannot say with certainty," and -- but I did not -- I was not privy or didn't get the whole

this is the whole scoop and all that stuff.

Q  Was there anything on the photographs that you recall that showed whether or not they were downloaded from the internet?

A  I don't have any knowledge of that whatsoever.

Q  Was there any sort of watermark, digital timestamp, anything like that on the photographs that you recall?

A  I don't recall.

Q  And what kind of cases -- if you recall, what kind of cases was law enforcement working on where they would come to you and say, "Hey, could you give us an opinion about the age of the subject?"

A  I honestly don't recall whether -- if it was a -- something they found like on a perpetrator's computer or if it was a report from a national -- I don't recall. It could have been either or both.  I just don't remember.

Q  It didn't matter for purposes of the opinion you were asked to get?

A  It shouldn't, I don't think.

Q  So you don't know if the subject of the photograph was somebody who was in the Baltimore area or in the United States or elsewhere?

A  I have no recollection either way.

Q And there was no way for you to know based on the information you were given in order to form your opinion?

A Correct.

Q You said this in passing, but I picked up on it. You were talking about different ratings and looking at pictures and opining on the potential age of the subject, and you said, you know, "the child, comma, or adult in this case," and I was wondering -- and you're nodding now. You remember saying that?

A Yes.

Q What makes you so certain that the subjects of the photographs that are at issue in this case are adults?

A I guess I'm relying on what was presented in Dr. Dully's deposition that the images are of an adult that were taken off the internet and what Mr. Roberts has told me about that. So that was -- my understanding for the factual base of the case was these were adult images that have been circulating around the internet for a long time.

Q Okay. And that's what I thought might have been the basis for your statement, but you don't have any factual knowledge such that you would give an opinion one way or the other as to the age of the

subjects of these photographs at the time the photographs --

A    I am not going to opine on the age of the subject of the photographs at all.

Q    Perfect.  Do you know what happened -- in the cases where you were asked to opine on the age of a subject in a photograph as a member of the child abuse team in Baltimore, do you remember what happened with those cases when you told law enforcement, "I can't help you"?

A    I did not hear any outcomes of those, no.

Q    Did you understand that whether or not you could give an opinion might dictate whether or not a prosecution moved forward?

A    Yeah.  I mean, I think in these type of situations when I'm asked for a report or anything, the assumption is that's going to be used to move forward as part of an evidence package for the judicial process. That's my assumption anytime I'm asked about these things.  So whether or not they went forward without me, I don't know.  It's...

Q    You were never able to give an opinion one way or the other, but during your time and your years of involvement in this area, do you know of situations where coworkers, other members of the child abuse team,

medical folks, medical doctors, did give opinions to law enforcement that they believed -- or that it was their opinion that the subject of a photograph was a child?

A    I honestly don't know.  I'm pretty sure that some of my colleagues have, but I can't say, "Dr. Chudow testified on this case," I just -- we never had those conversations, let's put it that way.

Q    Right.  And I guess my next question is, do you understand that when law enforcement comes to the medical doctors that are part of these teams, or at least as are part of the child abuse team in Baltimore, that they're coming to you because of the inherent difficulty in determining the age of the victim -- or of the subject of the photograph, I'm sorry?

A    Yes.

Q    In other words, you don't know of anybody coming to you with a picture of an obvious --

A    If it's a 5-year-old, I'm guessing they don't need a medical opinion to say it's a 5-year-old, right?

Q    That was my question.  You answered it better than I asked it.

MR. CARSON:  That's all I have for you, Doctor.  I appreciate your time.

THE WITNESS:  Thank you.

MR. ROBERTS:  Doctor, I have just a couple of

follow-ups just to kind of -- and it'll be mixing around a little bit.

EXAMINATION

BY MR. ROBERTS:

Q But you were asked some questions about the use of imaging in general medical practice by Mr. Wilson. Do you recall those questions?

A Yes.

Q I wanted to -- the question struck me and, you know, I do many types of law and also read medical records, and I see radiologist reports all the time that reference a motion artifact or an inability to read an MRI. What is a motion artifact and why do radiologists put that in their reports?

A Yeah. So that happens a lot in kids because kids don't hold still in the CT scanner or the MRI. And when there is motion artifact, there's certain images that make it harder to see the details. So they're doing that to say, "If there is a teeny little brain tumor in that spot I couldn't see, it's not my fault, it's motion artifact." So they are in a sense hedging their conclusions based on an incomplete image or an image that isn't perfect.

Q And I know you're not a radiologist, but if there were motion artifact and the radiologist could not

accurately read it, or as you as a physician may actually look at the images yourself and not be able to see -- you know, interpret that, you would expect that rather than relying on an image that was not -- that was affected by motion artifact, you would redo that MRI, generally speaking?

A     If there was clinical concern that you needed to, yes, you would.  So, like, if you were convinced that this child had something and you wanted to make sure and there was more (inaudible), you'd redo it, absolutely.

Q     And sometimes you may be suspicious of a disease or pathology that isn't very well depicted on an MRI; for example, a bleed or a subdural hematoma or something like that.  You might order a CAT scan to see some things differently than you would an MRI, for example?

A     Yeah --

Q     Maybe I gave a bad example, but yeah.

A     The skull fracture is not seen on MRI, but seen on CAT scan.  So that would be a better example. But, yes, you would order a different test to get a better look at it.

Q     Because some imaging just inherently has limitations in what it reveals?

A    Correct.

Q    All right.  So what I've also seen in reviewing medical records that happens is sometimes, you know, somebody will go in for one condition and -- I assume in your practice, you're familiar with reading radiology reports.  Do I understand that correctly?

A    Right.

Q    There'll be a reason given or a history of present illness or something on there, and it'll say something like "automobile accident" or "back pain secondary to trauma," something like that.  And the radiologist will read an MRI and sometimes tragically will come back with a finding that they weren't expecting.  You hear cases where somebody goes into the hospital for one thing and testing reveals they have a brain tumor and they never really knew it, they didn't even have any symptoms of that.  Are you familiar with things like that happening?

A    Yes.

Q    All right.  And because the radiologists, when they're looking at an MRI, they're not biased or they're not, like, only looking for what is in the history of present illness, correct?

A    Radiology uses a systematic approach to do the entire -- everything, so yeah.

Q   Right.  And the reason I'm bringing this up is because when we talk about medical science -- and I think you testified this earlier -- the goal is to have objective, reliable, scientific opinions when a doctor gives an opinion, correct?

A   Correct.

Q   So if the opinions are greatly affected -- you recall the questions by Mr. Wilson where he says, "Well, you know, the results might be skewed by the way you ask the question"?  Do you recall his questions about that?

A   Yes.

Q   If the results of a test are dramatically skewed by something as simple as how you ask the question, doesn't it follow that the methods being applied are not really scientific in the way that we hope science to function?

A   They're not as objectively reliable as we would like for sure.

Q   Right.  I mean, when I get an opinion from a doctor, or a diagnosis, I hope, as I hope everyone here does, that that diagnosis isn't based on solely my -- you know, what I'm telling them, but based on some sort of science that could include what I'm telling them, but is based on the objective medical testing and differential diagnosis and things like that.  Do you

think that's a reasonable expectation for people understanding --

A    Yes.

Q    Okay.  All right.  Now, in your opinions, you talked about this sort of dividing line with sexual maturity rating and Grade 4 and Grade 3 and all this kind of stuff.  I think what -- I think maybe in the question that -- maybe it was just assumed, but I want to make sure is clear is your testimony that a Grade 3 is pretty -- you know, more likely pretty certain that that's not an 18-year-old, that's based on an accurate sexual maturity rating, though, correct?

A    Correct, yes.

Q    Yeah.  I mean, all of your opinions, what you're talking about is if I have a true, accurate sexual maturity rating, then I could say this person is most likely under the age of 18?  Did I understand that correctly?

A    Yes.

Q    Okay.  And do I also understand from your report and your testimony that one of the real problems of using online pornographic images is it is very, very difficult to obtain an accurate sexual maturity rating from a professionally produced pornographic image?

A    I think the farther you are away from the

patient, the less reliable it is. And, again, the more that it's a photo shoot and -- like we know that people doctor up -- like we're in the Instagram world. Most pictures on Instagram aren't really what people look like, and it's because you can put filters and do things. So I think the farther you are away from the patient, the less reliable it is. So anything that's circulating or been professionally done is going to be a lot less reliable than having the patient or having me taking a picture of a patient or having someone I know take a picture of a pa- -- you know, you can walk down the line, and the farther you get, the less reliable it is.

Q So let me just make a statement and see if you agree with it or not: The absence of visible pubic hair in and of itself on a pornographic model does not establish that they are a sexual maturity rating of 1 with any reliability.

A I would agree with that.

Q I think you said this earlier in your testimony that really to obtain an accurate sexual maturity rating, you need to look, at the very least, both the breast and the pubic region or genital region?

A I believe that's the case. I think there's people who will do it without that, but I think it's

much more accurate if you have both.

Q Well, and, of course, going to the -- we talked about this study that you pulled it up, I mean, the results were dramatic that -- correct me if I'm wrong. I think in some instances, pediatricians were wrong about the age ninety something percent of the time?

A I think it was 75, but it wasn't great.

Q Yeah. I mean, pathologists -- it looked like gynecologists or pathologists may be a little bit better than pediatricians in the result. Did I read that correct?

A Yeah.

Q Yeah. Those types of results are -- what's the takeaway from you as a medical doctor looking at that study?

A The takeaway from me is it's very hard to have certainty based on an image when an image is of Maturity Levels 4 or 5. You just -- you can't be certain that it is a child just based on the image alone.

Q Right. I think -- and I've just pulled it up here that -- and this is just a quote. Do you have it there in front of you?

A I do.

Q I'm just reading from the last paragraph

before the acknowledgment: "These researchers determined that our study, in fact, proves that it's nearly impossible to say that adults who look like sub-adults are indeed adults, which obviously may apply to all those sub-adults who seem sexually immature."

Did I read that correctly?

A    That's their conclusion, yes.

Q    Yeah. Isn't that what you were saying, though, when you were talking about, like, look, you know -- I don't know what you said. 18-year-old may look 12 or a 17-year-old may look 22. Is that really what you're getting at is that you really can't look at someone in this subadult category and say they are above or below the age of 18 with any reliability?

A    At least without any certainty, and the reliability part (inaudible) in question as well.

Q    Yeah. And so just kind of bringing it back to the analogy of the radiologist and the MRI and talking about the value of talking about that, you know, when a radiologist puts in there, "Hey, there's motion artifact," right, you've talked about what you think the science is or the ability to, you know, accurately sexual immaturity rate an individual from a pornographic image, but you've also talked about, look, if you're going to engage in this, you have to put qualifiers on

there to explain, you know, any limitations in what you're talking about. Is that kind of what you're talking about is, you know, like a radiologist puts, "Hey, the image was unreadable because of motion artifact," or "There are limitations on my opinions because there's motion artifact"? You're talking about that as a child protection team doctor, at the very least you should do the same as a radiologist and notify whoever is reading this that there are limitations, serious limitations, or however you see those limitations, but that should be in any report that you're giving to someone else?

A    I would agree with that, and I think it's -- again, your degree of certainty needs to be communicated and the limitations of the certainty need to be communicated as well, whether it's physical abuse, sexual abuse, pornography. We have to be open and honest about what our abilities are to conclude what we conclude and why we conclude them.

Q    And your opinion is that these three letters were not open and honest about the science that supported the opinions?

A    The science and the limitations.

Q    Right. You've been asked a lot of questions, and we have your affidavit. Is anything that's been

asked of you today changed the opinions that you expressed in your affidavit?

A     No.

MR. ROBERTS:  I don't have any other questions.

MR. CARSON:  John, do you want to follow up with more questions, or are you good?

MR. WILSON:  Yeah, I just have one final follow-up.

FURTHER EXAMINATION

BY MR. WILSON:

Q     Dr. Krugman, we've talked a lot about the scientific reliability of these age estimations, how doctors should go about doing them, and even in some cases, what other evidence should be used in determining the age of a person.

Is it your opinion that even in an SMR-4 case, that with other reliable evidence to consider other than just photographs, say passports, historical data, birth certificates, an actual interview with patients, the medical evaluation is an important part of determining that age of that person?

MR. ROBERTS:  I'm going to object to that question.

THE WITNESS:  I think -- is the medical piece

an important part? I think it's -- I believe that there's a role for child abuse pediatricians to produce reports to help put things in context, and there can be definite value of having a medical opinion about these things, but I don't know if you'd be relying on it in the situation you described where you have other corroborating evidence. You know, a lot of times, if that's the case, we're seeing the child just to make sure that they're well taken care of, there's no trauma, you know, we're doing our medical piece to them and not using it to make a determination of the images. So I don't know how to answer that any better than I just did.

BY MR. WILSON:

Q Sure. It was not the most clear question. Let me try one more time then.

Is there a legitimate place for a child abuse pediatrician to provide testimony on a case that's admittedly hard to age the picture?

MR. ROBERTS: Object --

THE WITNESS: There might be, yes.

MR. WILSON: Okay. Thank you. That's the only question.

Okay. Dr. Krugman, are you familiar with the concept of reading or waiving?

THE WITNESS: I am.

MR. WILSON: Would you like to read or waive?

THE WITNESS: I'll read, that's fine, just to make sure I didn't mess anything up and it was transcribed correctly.

(Whereupon, the witness did not waive reading and signing of the deposition, and the deposition was concluded at 9:30 a.m.)

C E R T I F I C A T E

STATE OF FLORIDA    )

COUNTY OF LEON      )

I hereby certify that the foregoing transcript is of a tape-recording taken down by the undersigned, and the contents thereof were reduced to typewriting under my direction;

That the foregoing pages 4 through 59 represent a true, correct, and complete transcript of the tape-recording;

And I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

Dated this 29th day of July, 2025.


CLARA C. ROTRUCK

Notary Public

State of Florida at Large

Commission Expires:

November 13, 2026

Commission No.: HH 327478

For the Record Reporting, Inc.
1500 Mahan Drive, Suite 140
Tallahassee, Florida 32317
850-222-5491

July 29, 2025

Dr. Scott Krugman

C/O Attorney address

RE:   William Lee Lawshe vs.
      Mikayla Preston and Kathleen Dully

Dear Dr. Krugman:

The deposition of Dr. Scott Krugman, taken on July 16, 2025, in the above-styled case, is ready for review.  Please have the deponent make an appointment to review the transcript in our office.

In the alternative, if you have ordered a copy of the transcript and will be handling reading and signing, have the deponent note any corrections on the errata sheet provided.  The review must be completed on or before August 29, 2025, and the errata sheet returned to For the Record Reporting, Inc., 1500 Mahan Drive, Suite 140, Tallahassee, Florida 32317 so it may be included with the original transcript.

Please contact our office if there are any questions you may have.  Thank you for your prompt and careful attention to this matter.

                    Sincerely,

                    For the Record Reporting, Inc.


cc:   Matthew Carson, Esq.
      Michael Roberts, Esq.
      John Wilson, Esq.

ERRATA SHEET

IN RE: Corrections to the Deposition of Dr. Scott Krugman, William Lee Lawshe vs. Mikayla Preston and Kathleen Dully, on July 16, 2025.

PAGE    LINE    CORRECTION

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

    Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____        _____

Date                            Signature

# Doc. 85-1

# Doc. 82-1

[Sealed Image]

# Doc. 85-2

# Doc. 82-2

[Sealed Image]

# Doc. 85-3

# Doc. 82-3

[Sealed Image]

# Doc. 85-4

# Doc. 82-4

[Sealed Image]

# Doc. 85-5

# Doc. 82-5

[Sealed Image]

# Doc. 85-6



College of Medicine – *Jacksonville*
Department of Pediatrics
First Coast Child Protection Team
Fax: (904) 633-0301

4100 Building, 4539 Beach Boulevard
Jacksonville, FL 32207
Tel: (904) 633-0300

February 22, 2023

Detective Mikayla Preston
Internet Crimes Against Children
Saint Johns County Sheriff's Office
4015 Lewis Speedway
St. Augustine, FL  32084

Dear Detective Preston:

I have examined a single color photograph displayed on a law enforcement laptop entitled  d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173 13cf489728f19896c5f79e9d4c63b80f6a487  provided to me by yourself following a cybertip from NCMEC.   This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest position with her lower legs and ankles parted to expose her genitalia for the camera.   This female child appears younger than 18 years of age.  She would have achieved this developmental genital appearance of SMR IV at 12-15 years of age.  She does not appear to be shaved as her anterior pubic hair is still present.

Please contact me if I can provide further assistance.

Sincerely,

Kathleen Dully, M.D.
Child Abuse Pediatrician
Sex Assault Forensic Examiner
Medical Director, First Coast
Child Protection Team

# Doc. 85-7



College of Medicine – *Jacksonville*
Department of Pediatrics
First Coast Child Protection Team
Fax: (904) 633-0301

4100 Building, 4539 Beach Boulevard
Jacksonville, FL 32207
Tel: (904) 633-0300

April 5, 2023

Detective Mikayla Preston
Internet Crimes Against Children
Saint Johns County Sheriff's Office
4015 Lewis Speedway
St. Augustine, FL 32084

Dear Detective Preston:

I previously examined a single color photograph displayed on a law enforcement laptop entitled d263b35ae41646b39d5947a281e7044e_97b74a7903ff530898ec421d173 13cf489728f19896c5f79e9d4c63b80f6a487 provided to me by yourself following a cybertip from NCMEC. This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet. She is sitting on a wood floor in a knees-to-chest position with her lower legs and ankles parted to expose her genitalia for the camera. This female child appears younger than 18 years of age. She would have achieved this developmental genital appearance of SMR IV at 12-15 years of age. She does not appear to be shaved as her anterior pubic hair is still present.

Today you have shown me two additional images of the same female child and these confirm my previous determination that she is depicted to be at most SMR III or IV and therefore again ≤ 12-15 years of age. The filenames for these photos are 0059 and 0065(1).

Please contact me if I can provide further assistance.

Sincerely,

Kathleen Dully, M.D.
Child Abuse Pediatrician
Sex Assault Forensic Examiner
Medical Director, First Coast
Child Protection Team

# Doc. 85-8



College of Medicine – *Jacksonville*
Department of Pediatrics
First Coast Child Protection Team
Fax: (904) 633-0301

4100 Building, 4539 Beach Boulevard
Jacksonville, FL 32207
Tel: (904) 633-0300

April 5, 2023

Detective Mikayla Preston
Internet Crimes Against Children
Saint Johns County Sheriff's Office
4015 Lewis Speedway
St. Augustine, FL  32084

Dear Detective Preston:

Today you have provided to me two images for review displayed on a law enforcement laptop. The first is ycbLVVFQ_o.jpg and depicts a female child with no pubic hair development. She does not appear to be shaved. Her breasts are partially visible and could be SMR IV-V, however her genitals are plainly visible with her thighs splayed widely-apart and showing she is SMR I with-respect-to-pubic hair. This developmental appearance is $\leq$ 9-13.5 years of age.

The second image is imprinted with white script saying "Big Heart" and the filename Screenshot_20230122_174408_DuckDuckGo.jpg. This image shows a female child with her black top parted and underwear down around her parted thighs exposing her genital area clearly. She appears to have no pubic hair development. She does not appear to be shaved. This developmental appearance is also $\leq$ 9-13.5 years of age.

Please contact me if I can provide further assistance.

Sincerely,

Kathleen Dully, M.D.
Child Abuse Pediatrician
Sex Assault Forensic Examiner
Medical Director, First Coast
Child Protection Team

# Doc. 85-9

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case 3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE, an individual,

     Plaintiff,

-vs-

ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

     Defendants.

_____/

REMOTE DEPOSITION OF EUGINE TOLBERT

Taken on Behalf of the Plaintiff

DATE TAKEN: Tuesday, December 17, 2024
TIME:       1:01 p.m. - 2:47 p.m.
PLACE:      Remotely via Zoom

Deposition of the witness taken before:

Maureen Hall, RPR, FPR

APPEARANCES:

Counsel for Plaintiff:

        MICHAEL K. ROBERTS, ESQUIRE
        LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND
        NOWICKI
        1680 Emerson Street
        Jacksonville, Florida 32207
        mroberts@nrhnlaw.com

Counsel for Defendants, Robert Hardwick and Mikayla Preston:

        MATTHEW JOSEPH CARSON, ESQUIRE
        SNIFFEN & SPELLMAN, P.A.
        123 Monroe Street
        Tallahassee, Florida 32301-1509
        mcarson@sniffenlaw.com

Counsel for Defendant, Kathleen Dully:

        AMY K. SHEVLIN, ESQUIRE
        BUCHANAN & BUCHANAN, P.A.
        1900 Southeast 18th Avenue, Suite 300
        Ocala, Florida 34471-8237
        ashevlin@rbtrial.com

I N D E X

REMOTE ZOOM DEPOSITION OF EUGINE TOLBERT

DIRECT EXAMINATION BY MR. ROBERTS:                     4

CROSS EXAMINATION BY MS. SHEVLIN:                     72

REDIRECT EXAMINATION BY MR. ROBERTS:                 82

E X H I B I T S

Plaintiff's Ex. No. 1   CyberTipline Report        49

Plaintiff's Ex. No. 2   4-5-23 Letter              59

Plaintiff's Ex. No. 3   Photo ID                   65

PROCEEDINGS

Whereupon,

EUGINE TOLBERT, called as a witness by the Plaintiff, having been first duly sworn, testified as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q. Good afternoon, Detective. Is it detective? I saw -- are you sergeant detective or detective?

A. Yeah, detective sergeant. Call me anything, just don't call me late for dinner.

Q. It won't be the worst thing you've been called, right?

Okay. So Detective, I introduced myself just before we got on to the record. My name is Michael Roberts. I'm here to take your deposition today. I understand that you have had your deposition taken before, so I won't go through the -- the kind of ground rules and procedure stuff with you.

We're here about a case, it's a -- my client is a guy named William Lee Lawshe. Are you familiar with the investigation or the prosecution of Mr. Lawshe for allegations of possession of child pornography?

A. Can you hear me?

I am.

Q. You are. Okay.

A. Yes, sir.

Q. Yeah, sorry.

So first of all, tell me, what -- what's your -- your title, your job title, as we sit here today?

A. So currently I'm of two sergeants assigned to supervise the major crimes unit at the St. Johns County Sheriff's Office.

Q. And what was your -- your job back in the beginning of 2023?

A. When this case was going?  Are you referring to when this case --

Q. Yeah.

A. -- was going on?

Q. Yes.

A. I was in -- I was in transition at that point.  I was transitioning as the supervisor of the Internet Crimes Against Children Unit, ICAC, transitioning back to major crimes unit.

Q. So how long were you -- I think you -- were you the supervisor of the ICAC unit --

A. Yeah.

Q. -- back at that time?

A.   Yes.

Q.   And how long had you done that?  And just give me kind of the timeframe of when you were the supervisor of the ICAC unit.

A.   About two years.

Q.   And prior to that two years, so I'm guessing '21 to '23 timeframe, you were the ICAC supervisor?

A.   Correct.

Q.   Prior to that, it sounds like you were in the major crimes unit at that time, too?

A.   Correct, prior to.  So I was -- I was a patrol deputy from 2001 to 2009, if this makes it easy.

Q.   Yeah.

A.   2009 I came to investigations in what was then referred to as robbery/homicide is now referred to as major crimes, so it's changed its name.  I was there for ten and-a-half years as a homicide detective. While I was there, I got promoted to sergeant in 2018 and supervised that unit for two additional years.  And then in 2020, I rotated back to patrol.  I did just a little over a year in patrol.  In '21 I transitioned to ICAC as a supervisor of ICAC.  I was there for about two years, and then I transitioned back to the supervisor of major crimes because the other sergeant retired.

Q.   So can you just describe for me what your involvement in the investigation of Mr. Lawshe's case was?

A.   Yeah.  So as the ICAC supervisor, I reviewed -- received and reviewed the cyber tips that were sent to our agency through the North Florida ICAC task force.  And I assigned tips out to detectives for follow-up investigation and then general supervision of the investigation.

Q.   In this case, did -- were you the lead investigator investigating Mr. Lawshe's case?

A.   I was not, no.  I assigned it to a detective.

Q.   Now, I understand you assigned it to Detective Preston; is that correct?

A.   Yes, correct.

Q.   And she was the detective in the ICAC unit at St. Johns County Sheriff's Office?

A.   She was, yes.  She still is.

Q.   Is there any particular reason that you assigned this case to Detective Preston?

A.   It was her turn in the barrel.

Q.   So let me ask you this. I just want to understand your -- your process of dealing with the -- the -- the cyber tips.  That's what we're talking about, correct?

A.   Yes.

Q.   We just had a deposition with Mr. Greene or Detective Greene, and we talked about National Centers for Missing & Exploited Children.  That's what we're -- you understand that's what I'm referring to when I say "NCMEC"?

A.   Yes.

Q.   All right.  And do you, when you get the cyber tip -- and we're talking about in the timeframe, let's just say first quarter of 2023, do you refer every cyber tip to an investigator or detective for what you say, further follow-up investigation?

A.   No.

Q.   Did you cull out any cyber tips prior to assigning them to the detectives?

A.   When you say "call out," I'm not quite sure what you mean by that.

Q.   Yeah.  So cull, my grandmother used to cull things, but --

A.   Oh, I'm sorry, cull.  I thought you said "call."  I apologize.

Q.   No, no, cull.

A.   Yeah. So not all tips are -- have enough information for a follow-up investigation.

Q.   Uh-huh.

A. So instead of just drowning the detectives in tips that don't go anywhere, at the supervisor level, we tend to try to triage those to a certain extent for tips that are actionable.

Q. Okay. And what makes a tip actionable? Is it like an identifiable suspect that you can -- you can locate?

A. Those are great tips, sure. Yeah, if -- if we know who the bad guy is when the tip comes in, that's -- that's a great start.

Q. Okay. Do you evaluate whether or not the particular image is or is not of a minor at the time that you're assigning these tips?

A. Yes.

Q. And tell me, how do you do that?

A. Just based on kind of a common sense approach. If it looks like a duck and walks like a duck, then we call it a duck.

Q. So we were talking to Detective Greene, and he described something called age-difficult as a category. Are you familiar with that?

A. I don't know that it's a category, more of a description, but, yes, I understand what you're referring to.

Q. What do you understand that term to mean?

A. So for instance, in -- in -- and I don't want to get ahead of you, but I think I'm answering your question. But in Mr. Lawshe's case, we received two separate tips on Mr. Lawshe. One of those images I did not assign out because I deemed it to be age-difficult. The second image that we received, I did assign out because I deemed it to be decent.

Q. Okay. Is it sometimes that investigators in your office disagree about what is age-difficult or what is CSAM?

A. I wouldn't say we have a deliberate conversation about it. I can't really remember a time that there was a delineated disagreement. I suppose it's possible that there would be a disagreement, but I just don't remember a time when someone said, No, I don't agree with you.

Q. Okay. Would you -- if something was age-difficult, I mean, do you ever investigate age-difficult images?

A. We do, yes.

Q. Yeah. So do you recall whether or not the images involved in Mr. Lawshe's case were age-difficult?

A. So the initial tip that did not get assigned out, I did deem that to be age-difficult. The second

tip that we received in Mr. Lawshe's case, we felt like it was CSAM, but we inquired about a second opinion.

Q. And the reason I ask is, I asked Detective Greene, and in his opinion, all of the images on Mr. Lawshe's phone were age-difficult. Is that just you guys disagree about that, or some people have a different definition of what age-difficult means?

A. No. So I think it's really based on the personal experience in kind of -- so I have two daughters, obviously, you know, there is a point of reference there. Everybody might not have that point of reference when, you know, reviewing these things. I don't know what Detective Greene's point of reference is, so I can't speak to that. But from my point of reference, I felt that it was an actionable tip. But as I said, we did seek a second opinion through Dr. Dully at the Child Protection Team.

Q. Did you communicate to Detective Preston at the time that you communicated the tip that you felt like the image -- image constituted child sexual abuse material?

A. Yes.

Q. Did you ask her to investigate that?

A. Yes.

Q. And -- all right. Were you a part of the

investigation?

A. So as far as the -- I went with Detective Preston to see Dr. Dully when we presented the images to the doctor.

Q. Okay.

A. It was more of a -- kind of a let's just get it done and take care of this kind of deal as opposed to kind of holding her hand, so to speak. But that's just kind of how it worked out. It wasn't really that, you know, I had any skin in the game. I just kind of tagged along.

Q. So you went with Detective Preston to the meeting with Dr. Dully?

A. Correct.

Q. All right. I want to -- I'll ask you some more detailed questions about that in a minute.

So other than, you know, the fact that you have two daughters, what training do you have in determining if a particular individual displayed on a -- a photograph is, let's say, the difference between 17 and 18 years old?

A. I don't know that we would get into those leads in an investigation. By that point, you're -- you're kind of past puberty, and those are going to be very difficult images to kind of hash out, between a 17

and 18 year old, unless we have some kind of specific information to the identity of the child. So that's probably not a scenario that we would be involved with.

Q. So you say "puberty." What do you mean by that?

A. So I mean, everybody hits puberty a little differently, but it's generally the development of -- like for females it's generally the development of breast buds, you know, body hair, things like that.

Q. And so generally it was y'all's practice if someone had developed pubic hair that you would not get into those weeds as to whether or not this was a 17 or 18 year old?

A. Not -- not in so many words. That might be something that we took the CPT if we -- if we felt a certain way about it, and we felt like that, you know, it presented as CSAM, we might get a second opinion from CPT, and that's what we did in this case.

Q. Yeah, I'm not trying to put words in your -- in your mouth. You said, you know, if someone is experiencing puberty -- I'm trying to understand what training. The original question I asked was, What training do you have to distinguish whether someone is 16, 17, 18, 19, what training do you have to make that determination, other than you have two daughters?

A.   Just me being on this earth for 48 years.  So there's -- there's not a class that I have taken. There's not a seminar that I have attended that says that this person is 16 versus this person is 17, so...

Q.   So you have no specialized training or knowledge in understanding -- in -- in estimating someone's age other than what we all have, just living on the earth?

A.   Yeah, I mean, generally speaking, you know, as a layperson, if you're out in public, you can generally look at a person, even an adult, and approximate their age.  And that's just based on, you know, your interaction with society, things that you have experienced in your lifetime, you're drawing on all those things, you know, as it is generally termed law enforcement training experience, you know, that personal experience in life weighs heavily in that as well. So...

Q.   Right.  And -- but I'm just a lawyer, and I'm trying to be, you know -- you have all of that life experience, but you don't have any specialized training; you haven't taken classes or been educated on estimating someone's age in this regard?

A.   So, no.  But like I said before, I don't know how to better answer your question, so, you know, if

you look at a duck, you can usually tell a duck is a duck.  I don't mean to be facetious, but this is the best way I can explain it.  So if you have a question as to, you know, any further detail, then you might need to dig deeper.  And that's what we did in this scenario when we reached out to Dr. Dully and the CPT team.  So obviously Dr. Dully has a medical background.  She has specialized training and things like that.  She has references she can refer to as far as literature to give us a better estimate of age.  But it's really just kind of a, you know, this one looks like this and this one looks like that initial assessment of the case.

**Q.   Okay.  So does the fact that you took the image to Dr. Duly mean that there was some question about the -- the model's age?**

A.   No.  So if we didn't feel like it could be CSAM, we wouldn't have taken it to Dr. Dully to begin with.  So as I said, in -- in Mr. Lawshe's case, we got two tips.  The first tip we deemed not -- to not be actionable right off the bat.  We did not take that to Dr. Dully.  I just closed that tip out.  The second tip I felt like was actionable.  We took that tip to Dr. Dully.  Dr. Dully agreed that it appeared to be a child, and then we went forward with the investigation from there.

Q.   Yeah, and I -- and I -- so I'm just -- I'm trying to understand.  So sometimes you don't take images to Dr. Dully, correct?

A.   That's correct.

Q.   If something is obviously a child, you -- you don't take it to -- to Dr. Dully, correct?

A.   Correct.

Q.   And that's what I'm trying to understand is, in this case, doesn't it say that this was not obviously a minor because you took it to Dr. Dully?

A.   I mean, I don't know how to better answer your question.  I felt it was a minor when I reviewed the tip.  And, you know, to be fair, if we had taken it to Dr. Dully and Dr. Dully said, No, this is not a minor, then we would have went with what Dr. Dully said. You know what I mean?  But on face value when I reviewed the tip, when I received the tip, I believed the image to be of a minor.  I assigned it to Detective Preston.

Q.   Right.

A.   And we took the image to Dr. Dully for a second opinion.

Q.   For a second opinion.  Okay.

A.   So I don't have a better answer than that.

Q.   Well, really, and you just keep answering the

best you can. Okay?

A.   Sure.

Q.   But -- but when you say you believed that this was a child, it -- it wasn't obviously a child, though, was it?

A.   So I can tell you this. And I will give you a scenario. If I --

Q.   I really just want you to answer the question, really.  I mean, it wasn't obviously a child. You wouldn't have taken it to Dr. Dully if it was obviously a child, would you?

A.   Well, it obviously wasn't a two year old, so I believed it to be an early teen child.

Q.   And if someone would have told you, no, this -- this is an 18 year old, you would have believed that too?

A.   If someone who had the expertise to give that opinion, then, yeah.

Q.   What if someone had a copy of her ID and said here's her ID, she's 18, would you have believed that?

A.   Oh, absolutely.  Yes.

Q.   Okay. All right. Okay.

But I guess what I'm saying is, is the type and quality of imaging that we're -- that the model is, it's not something that you would look at and say

there's no way this person is 18 years old, correct?

A.   Well, I don't know that there is -- I kind of learned my lesson about absolutes in law enforcement.

Q.   Sure.

A.   So I -- I -- I don't know that there's really a scenario that I would want to submit to an absolute like that.

Q.   Right.  But you would accept either Dr. Dully's opinion that this particular model was 18, and you would accept that the model was 18 if she had said that it was 18?

A.   Absolutely, yes.

Q.   And if someone produced a photograph of an ID and said, Hey, she was 18 at the time of the photograph, you would have also accepted that as being she was 18?

MS. SHEVLIN: Form.

THE WITNESS:  Considering the source, but, yes.

BY MR. ROBERTS:

Q.   Yeah, generally speaking, yes, right?

A.   Correct.

MS. SHEVLIN: Form.

BY MR. ROBERTS:

Q.   So would you just agree with me, because, I

mean, I have the same life experience that you do, is, sometimes it is difficult to tell whether or not somebody is 16 or 19 years old?

A.   I agree.

Q.   Yeah.  Kind of seems like the older I get the harder it is to look at someone and say, Oh, no, that person's in college or that person -- is that your experience?

MS. SHEVLIN: Form.

THE WITNESS:  Do I hear something in the background?  I'm not sure if it's --

MR. ROBERTS:  Someone is objecting.  Someone is just objecting for the record.

MS. SHEVLIN:  You may hear objections from time to time.

THE WITNESS:  I'm only hearing a blip, and I can't quit make out what it is.  I apologize.

MS. SHEVLIN:  It's just me objecting to form. You can ignore me.  It's just for the record.

THE WITNESS: No problem. No problem.

MR. CARSON:  If we could, for just -- if we could, for just a second, I -- I objected to the form of a question a few minutes ago, and I wasn't sure, I didn't see the green border of my Zoom window light up, so, Madam Court Reporter, could

you confirm that you can -- you can hear me object to the form previously?

THE COURT REPORTER:  I did not hear anything from you previously, and the green light didn't show up on my end.  So maybe if they pause a little bit, it will get it.

MR. CARSON:  Yeah, Sergeant Tolbert, if you don't mind making sure you just give us one second between the end of Mr. Roberts' question and you starting your answer, and that will allow Ms. Shevlin and myself to object to the form, if we deem it appropriate.  And you can still answer, if you can. All right?

THE WITNESS: Absolutely.

MR. CARSON:  Thank you, sir.

BY MR. ROBERTS:

Q.   So, I want to just kind of go through some -- some basic -- and I -- I'm not trying to -- I know you're a professional, and you do this for a living or you have done the ICAC investigation for a living, but I just want to just kind of confirm some things.  I'm a lawyer, that's my job.  Do you understand?

A.   No problem.

Q.   The private possession of adult pornography images is legal and protected by the Constitution of

the United States. Do you agree with that statement?

A. Yes.

Q. And at the time of this investigation, that right was well-established, and you were aware of it?

A. Yes.

Q. You understand what probable cause means?

A. I do.

Q. What do you understand the term "probable cause" to mean?

A. The facts and circumstances that would lead one to believe that a circumstance probably occurred.

Q. Okay. And in terms of probable cause that a crime was committed, can you tell me what that means?

A. Facts and circumstances that would lead you to believe that circumstances or crimes probably occurred.

Q. And you understood at the time of this investigation that the Constitution of the United States required a finding of probable cause prior to issuing a search warrant in this case?

A. Correct.

Q. And you also understood that the Constitution of the United States required a finding of probable cause prior to effectuating an arrest?

A. Correct.

Q. Those rights and the requirement of probable cause were long established, and you were aware of them at the time of this investigation?

A. Correct.

Q. Okay. You are familiar with Florida Statute Section 827.071, Subsection 5, which is the possession of child sexual abuse material statute? Are you familiar with that statute?

A. I have read it before. I couldn't quote it to you.

Q. You have -- you have arrested people based on that statute before?

A. I have been involved in investigations based on that statute before.

Q. I'm just going to read the statute and see if that -- if it purports with your recollection. Okay?

"It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction or other presentation which in whole or in part he or she knows to include any sexual conduct by a child." Does that sound like the statute that you're familiar with?

A. Yes.

MR. CARSON: I'm going to object to form.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q. Do you understand and did you understand at the time of this investigation that Florida law required Mr. Lawshe to know that the images in his possession contained images of a child?

A. Yes.

Q. So in order to believe that an individual has committed the crime of possession of child pornography in Florida, the officer would have to believe that the person knew that the image in their possession depicted a child, correct?

A. Correct.

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

BY MR. ROBERTS:

Q. The opposite of that is true as well. If the law enforcement officer had reason to believe that the suspect believed that the image depicted an adult, then there would not be probable cause to believe that the suspect had committed the crime of possession of child sexual abuse material?

MS. SHEVLIN: Form.

MR. CARSON: Object to form.

THE WITNESS: I'm sorry, was that a question?

I thought you were just making a statement.

BY MR. ROBERTS:

Q. No, it's a question.

A. I apologize. I'm sorry, can you repeat it?

Q. Yeah. If -- and that usually signifies the question, "if." If a law enforcement officer had reason to believe that the suspect believed the image depicted an adult, then there would not be probable cause to believe that the suspect had committed the crime of possession of child sexual abuse material?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: Generally speaking, yes.

BY MR. ROBERTS:

Q. You would agree that it is important to understand the context in which an image is published to understand what the suspect may or may not have believed at the time that they possessed the image?

A. I'm not quite sure what you mean by "context."

Q. Do you not understand the word "context"?

A. I do. I just don't know what you're -- what you're referring to by context. You mean like by the means, like be it the internet or -- I'm not quite following what you mean by that.

Q.   So like a picture of a naked baby that a mom has taken of her own child in a bathtub, probably not possession of child sexual abuse material?

A.   I think it could be innocently possessed, but I -- I think it could be innocently possessed, but I think that could also be a criminal situation.  I think it really depends on what the circumstances are.

Q.   I mean, did -- you have two daughters.  I mean, I have kids.  I mean, sometimes my wife will take pictures, and my kids are naked in the pictures.  I'm not committing a crime of possession of child sexual abuse material, am I?

MS. SHEVLIN: Form.

THE WITNESS:  So in -- in that context, to use your words, no.

BY MR. ROBERTS:

Q.   Okay.  So the -- but if someone else was trading or selling it on the dark web, that very well may be, that same image very well may constitute a crime of possession of child sexual abuse material, correct?

A.   Correct.  And that's kind of what I was getting at, is just because the image itself being innocent doesn't necessarily mean that it is innocent.  So the context is important in that scenario.

Q.   Right.  You also agree that if an image such as the one that Mr. Lawshe was viewing was available on a public website with a disclaimer that the model was verified to be an adult, that would be an important context to consider before making a probable cause determination?

MR. CARSON:  Object to form.

MS. SHEVLIN: Join.

THE WITNESS:  Well, I -- I think generally, yes, but I don't know what website that image was posted to, so there is -- I just don't have that information listed here, so...

BY MR. ROBERTS:

Q.   Okay.  And I understand you were not intimately involved with the investigation of this image, correct?

A.   Correct.

Q.   Right.  You, as we sit here today, don't recall having the information of what website it was published on?

A.   I do believe there was a watermark on the photo for Metart, if memory serves me correctly.  I don't want to get my wires crossed, but I don't know what website that that image was received from.

Q.   Okay.  Did you ever investigate -- did you

personally ever go to that website to see the context and the disclaimers in which that image was published?

A.   No.

Q.   Did you go to any website where any of the images that Mr. Lawshe was charged with were published on the internet?

A.   No.

Q.   Are you aware today that -- that all three of the images were published on the public internet?

A.   No, I'm not.

Q.   Have you ever seen photographs of these two models with their IDs, pictures of holding their IDs?

A.   I have not.

Q.   You have not.  Okay. All right.  Are you aware of whether or not Detective Preston ever visited metart.com or any other website to investigate the context in which these images were published?

I didn't hear your answer.  I'm sorry.

THE COURT REPORTER:  I didn't either.

THE WITNESS:  I almost wonder if we need to take just two minutes and let me swap this microphone, if you're having a really hard time. I'm leaning into the microphone, and if you still can't hear me, I don't know what else I can do. Can we just hit pause for like a minute, and I'll

just --

MR. ROBERTS: Absolutely.

THE WITNESS: I'll pop out and go on my laptop.

MR. ROBERTS: Absolutely.

(Off record)

THE WITNESS: I'm not aware of that, no.

BY MR. ROBERTS:

Q. So you indicated that you went with Detective Dully to -- I'm sorry, Detective Preston to Dr. Dully's office, and you participated in that meeting. Other than that, what else, if anything, did you do in this investigation?

A. I reviewed a search warrant for the -- I think it was Synchronoss. Hang on a second. I've got the case file right here. Is Synchronoss correct?

Q. Yeah, that's right, Verizon --

A. Yeah.

Q. -- Synchronoss, or something like that.

A. Yeah. So I reviewed the search warrant for Synchronoss, and I participated in the ruse when Lee came into the sheriff's office and was interviewed.

Q. Did you -- did you reach out to Mr. Lawshe to get him to come in to the office?

A. I did, yes.

Q. Did you know Mr. Lawshe?

A. Professionally because of a prior investigation, yes.

Q. Tell me about what you knew of Mr. Lawshe before this.

A. So back in 2013 I was working a homicide case, and Mr. Lawshe was working for FWC at the time, and he participated in a search out in the Flagler Estates area in the southwest corner of our county, and he actually located the remains of our homicide victim.

Q. Did you form any impressions about him as a law enforcement officer during that interaction?

A. No, not really. So I mean, we didn't know each other intimately, like we didn't hang out on the weekends, drink beer together or anything like that. I didn't know anything about him. That was really my only interaction with him.

Q. When did you first learn that this investigation that we're here talking about involved Mr. Lawshe?

A. When I opened the cyber tip.

Q. You knew that that cyber tip involved a law enforcement officer, local law enforcement officer at that moment?

A. I did. I recognized his name.

Q. Did you communicate that information to Detective Preston?

A. I did.

Q. So the entire time she investigated this case, she was aware that Mr. Lawshe was a law enforcement officer?

A. Yes.

Q. Okay. So you participated in the interview. I understand that his supervisor at FWC had been informed about this investigation prior to him being brought in or the arrest. First of all, do you know who informed his supervisor at FWC of this investigation?

A. Captain Bill Werle.

Q. And that's -- that's the St. Johns County Sheriff's officer? And you said Werle; is that correct?

A. Yeah. It's W-E-R-L-E. His first name is William. He goes by Bill.

Q. And how did Mr. Werle find out about this investigation?

A. He's the captain of criminal investigations at the Sheriff's office.

Q. I mean, does he know about every criminal investigation, or did someone bring this to him saying

that this was a law enforcement officer?

A. Both. So he is the chain of command for criminal investigations. So any large scale investigation or any sensitive investigation, like in this situation involving a law enforcement officer, he would be briefed on.

Q. This was a -- you considered this a sensitive investigation?

A. Yes.

Q. Is the only reason that he was a law enforcement officer --

A. I --

Q. I'm just trying to say, are all -- are all investigations of CSAM sensitive, or is it just the fact that he was a law enforcement officer that made this particular investigation sensitive?

A. No. All investigations are sensitive, but this one, like, it adds a little bit more to it by the fact that he's a law enforcement officer.

Q. Was this investigation treated any differently because Mr. Lawshe was a law enforcement officer?

A. Other than who had access to the information being limited, no.

Q. Nothing was done or not done in the

investigation because he was a law enforcement officer?

A. Well, I would say that the contact with his agency was done because he was a law enforcement officer, but I -- I wasn't party to that. I just know it happened.

Q. I understand that media was contacted upon his arrest. Do you know how they were contacted?

A. I'm not positive that the sheriff's office contacted the media. If I remember correctly, and I could be mistaken because we're going back in time a little bit, I believe that media contacted us because someone had saw his name and recognized his name on the booking log, and then a release was made after that.

Q. Were you involved with that at all?

A. No.

Q. Okay. So you were part of the interview and were you the one that communicated to Captain Werle about this case involving a law enforcement officer?

A. I communicated to my lieutenant, who is Jose Jimenez, and then the chain of command kind of goes from there. I did have conversations with Captain Werle, but I'm not the person who told him about it.

Q. Tell me about those conversations. What did you guys talk about?

A. They just wanted to be kept abreast of the

investigation as it went forward. And then when Lee came in during the ruse, we actually met in Bill's office.

Q. Okay. All right. So other than assigning the tip, going with Detective Preston to Dr. Dully's office, participating in the interview, are there any other tasks that you performed on this investigation?

A. I never said I participated in the interview. I'm not sure where you got that from, but I did not -- I did not --

Q. I thought you said you were there. Yeah, I'm sorry.

A. No, I was involved in the ruse when he was --

Q. Okay.

A. -- taken into custody. I didn't participate in the interview, no, sir.

Q. My bad. So you did not participate in the interview?

A. No, sir.

Q. All right. Whose decision was it to make an arrest?

A. I got to be honest with you, I don't know.

Q. That's okay. Would that usually be the lead detective's decision?

A. It's generally a kind of a -- a combination

of the lead detective and the chain of command kind of supporting the decision. We were in a little bit of a transition during that timeframe, so we had two layers of chain of command. So that's why I don't know whose decision it was.

Q. As we sit here today, do you have an independent recollection of a conversation that you had with anyone regarding the decision to make an arrest of Mr. Lawshe?

A. I don't. I was just informed that it happened.

Q. Okay. All right. Who informed you?

A. I don't remember. I -- it was -- at that point, there were a lot of moving parts. I just -- I don't remember who actually told me that he was going to be arrested. It might have been Captain Werle. It might have been my lieutenant. I don't remember.

Q. At that time, it sounds like you were responsible for receiving and disseminating the NCMEC cyber reports. Did I understand that correctly?

A. Correct, yes.

Q. How many reports do you think you would get back first quarter of -- of 2023? And you can estimate by week or month, if you can.

A. It's kind of hard to estimate because some

weeks were busier than others.

Q. Uh-huh.

A. So some weeks we would get upward of 50. Some weeks we would get two. So really it -- there was really no rhyme or reason to it. It's just kind of, you know, however we received them.

Q. And is there a way for you to estimate how many of those you -- we used the word culled, but did not assign because you felt like they weren't actionable just by looking at the image?

A. I tried to weed out as many as possible just to keep the detectives' case loads manageable. If I had to put an estimate on it, I would say probably somewhere around 50 percent. But, you know, there's wiggle room on both sides there, so...

Q. Was it a relatively common thing that you would get a NCMEC report and it would not be actionable?

A. Correct, yes.

Q. All right. Whether it was 60 or 40, I understand you can't testify to that?

A. Correct.

Q. Are you familiar with the NCMEC term "Unconfirmed child pornography"?

A. I am, yes.

Q. What do you understand that term to mean?

A. Just -- so, to me it can be a couple of different things, but generally speaking, it hasn't been viewed independently by someone from the center, meaning the national center, or some other review process.

Q. So is it your understanding or your position, I guess, that if you received a NCMEC report of unconfirmed child pornography, that report in and of itself would not constitute probable cause that the image was child sexual abuse material?

A. I agree with that.

Q. Okay. That would require some level of investigation by either you or your subordinates?

A. That's correct.

Q. So I know that you have talked about assigning this to Detective Preston, and I know that you've talked about going to Dr. Dully's office with her. Are you aware of any steps that she took to investigate this image other than going to Dr. Dully?

A. Off the top of my head -- I can read a report but I know she went to Dr. Dully, and I know -- can you hear me okay?

Q. I can.

A. Okay. I know she went to Dr. Dully and I

know that she did the search warrant for Synchronoss and got some data back there. I'm not sure if there's -- she might have did a cell cite search warrant. I'm vaguely remembering something about that. I'm trying to skim over the report right now.

Q. Other than what's contained in the report, are you aware of any steps that she took to complete her investigation into whether or not these images constituted child sexual abuse material?

A. No, I'm not aware of anything outside of what is documented in her report.

Q. Okay. Do you agree that any reasonable investigation of -- that a purported depiction of CSAM would include visiting the website where that image was published, if that information was available?

MR. CARSON: Object, form.

THE WITNESS: No, I don't --

MS. SHEVLIN: Join.

THE WITNESS: -- I don't agree with that.

BY MR. ROBERTS:

Q. You don't agree with that?

A. No, I don't.

Q. Okay. So do you agree that ICAC's purpose is to prevent the proliferation and spread of child sexual abuse material?

A.   I think that's one of their goals, yes.

Q.   I mean, is that St. Johns County, is that your goal, the sheriff's office, is to prevent the exploitation of children?

A.   Correct, yes.

Q.   All right.  So I mean, would you agree that an investigator should have taken reasonable steps to obtain the identity of someone that they believed was being sexually exploited?

A.   I do, yes.

Q.   Wouldn't that information potentially be found on the website where the image was published?

A.   Well, it's -- so the reason why I said not necessarily that I don't agree with that is, it's not -- it's not really a hard no.  It's more of a situation context type scenario.  Generally speaking, the -- the -- the download of the device when the search warrant is down on the device would give us clues as to the origin or the -- kind of the path that that image took.

Q.   Right.

A.   And that might lead to additional information as far as being able to investigate that, but if we can't identify where the image originated from, in some circumstances, then that might be something that would

be prohibitive to pursue that, so...

Q. Detective Greene has testified that he located, along with counsel for Mr. Lawshe, both of the models that are in question here within about 20 to 30 minutes based solely on the information that was contained in the images. He found those images and models on the internet. Do you have any reason to disagree with that?

MS. SHEVLIN: Form.

THE WITNESS: If that's what Detective Greene said, that's fine. I'm not aware of that.

BY MR. ROBERTS:

Q. Okay. But if that's true, don't you believe that a reasonable investigation would include going to that website to investigate the context or potential identity of the victim?

MR. CARSON: Object to form.

THE WITNESS: Again, not in every scenario, so...

BY MR. ROBERTS:

Q. But in this scenario where you had information that told you where they were being published, don't you think that that should be a reasonable part of the investigation?

A. So I remember having a conversation with

Detective Greene about this case and him making a reference -- he's been doing ICAC investigations for quite a bit longer than I have -- and him telling me that Metart that had the watermark on the image or one of the images, I'm not sure if it was on all of them or not, but I remember at least one of them having that watermark, that that website had had -- previously had issues with displaying images of underage females. Now, beyond that, whether or not someone should have gone to Metart to investigate that, I don't know if that occurred. I certainly don't think it would have been a bad idea, but, again, context-wise, you know, not in every scenario.

Q. Okay. And I appreciate your answer. And I appreciate that you do not know exactly what was done, but my question to you is, do you agree that given the context that you know or have information that leads you to believe that it was published on particular websites, that it would be reasonable to go to those websites to investigate the publication or identity of the victims contained in those images?

MR. CARSON: Object to form.

THE WITNESS: I don't think it's unreasonable. Again, like I said, it's situational based upon, you know --

BY MR. ROBERTS:

Q. Well, I mean, if your goal is to end or to stop the proliferation of online sexual abuse material, wouldn't the publisher of that website be committing a crime but publishing this image?

A. Oh, agreeable. But not all websites are housed within the borders of the United States. We frequently in an ICAC investigation more often than not run into companies that are overseas where, you know, unfortunately, it's -- it kind of just comes to a dead end. So again, like I said, I don't think it's unreasonable at all, but it might not be feasible in every scenario, so...

Q. But you would have to go to the website to determine whether it was an offshore website or housed in the United States, wouldn't you?

A. Not necessarily. There may be a legal process that you could do to the company. You know, there's a couple of different avenues that you can pursue, so...

Q. But going to the internet would probably be the -- the website itself would probably be the first step in that investigation, wouldn't you agree?

A. Well, I mean, you know, typically speaking, we don't want to go to, you know, an illicit website on

a, you know, county computer that's on a sheriff's office network that can be infected by mal-ware or something along those lines to kind of, you know, just willy-nilly go fishing around.  So there are ways to do that.  It might not be on our, you know, network computers. It might be on a -- on a -- on a different interface, but -- but, yes, that is one way to do it, is to go to the website, so...

Q.   And do you have any information -- I can represent to you Metart's record custodian is a barred attorney in the State of California.  Have you ever heard that?

A.   No, I haven't heard that.

Q.   Okay.  Are you familiar -- and let me just ask this.  Did Detective Greene do anything wrong by using a St. John's County Sheriff's Office computer to search these websites to find these models on the internet?

A.   No, he has forensic machines that are on a protected network that are not on the Sheriff's Office network, so he has the ability to do that.

Q.   And Detective Greene has access -- I mean, I'm sorry -- Detective Preston has access to ask Detective Greene for assistance in her investigation anytime she feels free to, correct?

A.   She does, yes.

Q.   Right.  So has St. John County Sheriff's office ever pursued or referred publication of child sexual abuse material to another law enforcement agency in another jurisdiction to prosecute the publisher of that image?

A.   Well, you used the word "ever."  I don't know.  I'm not familiar with a scenario where that has happened.  But I can't answer the "ever" part of your question.

Q.   Do you know why not, why it hasn't happened under when you were the supervisor?

A.   I don't know that the scenario has presented itself.

Q.   Well, this scenario presented itself, right?  I mean, there is a website that purports to own this image. And it's a ww.com.  I mean, that's the scenario that we're talking about, right?

A.   Again, I can't tell you.  The only thing I can tell you is, I'm not familiar with that ever occurring.

Q.   Okay.

A.   Now, whether or not it has ever occurred, I don't know.

Q.   All right.  So getting your ICAC training,

investigative experience, you are familiar with federal age verification laws?

A. Yes.

Q. That federal government has laws that publishers of pornography under certain circumstances are required to keep age-verification documents of the models; you're aware of that, correct?

A. Yes.

Q. All right. Have you ever utilized that statute to obtain identification or age confirming information from a website?

A. I have not.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q. Do you know --

MR. CARSON: Hold on a second. Madam Court Reporter, did you get my objection?

THE COURT REPORTER: Yes. Yes.

MR. CARSON: Thank you, ma'am. I'm sorry to interrupt. Go ahead.

MR. ROBERTS: That's okay.

BY MR. ROBERTS:

Q. Do you know how this case was ultimately disposed of?

A. I don't know the details. Again, like right

as this case was coming to a culmination, I transferred out of ICAC and moved back to major crimes, so I don't know the details, the kind of behind the scenes, if you will. But I know the charges got dropped, so...

Q. You know the charges got dropped?

A. Correct.

Q. You don't know why the charges got dropped?

A. I don't know all the details.

Q. Do you know any of the details?

A. Not enough to say that it's reliable information, so...

Q. You made a comment about what you heard from Detective Greene regarding metart.com. Do you recall that testimony?

A. I do, yes.

Q. Do you have -- or at the time, right, when you got -- at the moment that you got the cyber tip, did you have any information or opinions about metart.com?

A. I never heard of it before this investigation.

Q. Okay. And I think I know the answer to this, but I'm just going to make sure. You never investigated metart.com as part of your work in this investigation?

A.   Correct.

Q.   ICAC provides training to investigators, correct?

A.   They do.

Q.   One of the things that they are trained to do is to attempt to identify victims of child sexual abuse?

A.   Yes.

Q.   All right.  I mean, to the extent that Detective Preston never attempted to identify these individuals, would you agree that that would be a violation of her duty as a law enforcement officer at St. John's County Sheriff's Office?

MR. CARSON:  Object to form.

THE WITNESS:  I think it's sloppy police work.

BY MR. ROBERTS:

Q.   You're aware of federal age verification statutes.  You've testified to that.  Would you agree if that information was available to a detective such as Detective Preston, she should inquire with the records custodian of the website to see if they have age verification documentation of the models in question?

A.   Well, again, you're kind of talking in

absolute terms, and I would say it's situational.  So when you say should she have, I don't know that she should have.  Could she have, yes, she could have.  So...

Q.  Right.  If she had the ability to be able to go to the website, and that website said, Hey, we -- we complied with federal age verification statutes, she could have asked for that documentation, correct?

A.  She could have, yes.

Q.  I mean, do you think it's sloppy police work to not do that, in this case?

A.  So I can tell you that I'm not aware in the year and-a-half, just under two years that I was in ICAC, of us in -- I could just not be remembering a scenario, but I'm not aware of us ever pursuing that information in an investigation.  So is it one of those things that you could do, yes, but when you say -- you know, when you use the word "should," well, we have quite a few cases that we've investigated successfully prosecuted, closed out, that that was never done in. So is it a necessity for an investigation, no, not necessarily.

Q.  It's not necessary to obtain a conviction, but is it necessary to at least get all of the information that's available?

A. Well, again, I think it's a circumstantial scenario, you know, based on the circumstances, the contact of the investigation. And like I said, I'm not familiar with a case where we have pursued that information in the past from a website.

Q. But you agree, if someone, as you say, was successfully prosecuted and convicted of possession of child pornography, and it turned out that that individual was an adult, that would be a travesty, a miscarriage of justice, correct?

A. Oh, I agree with that. Yes.

Q. It is not just your goal as a detective just to convict people. It's to seek justice, correct?

A. Correct.

Q. All right. You would agree that sometimes -- and I think we have already said that this -- it is difficult to look at an image and determined with any sort of certainty the age of the model depicted, correct?

A. The best you can probably get is an estimation, an age range, correct.

Q. The federal age verification laws, would you agree, are a powerful tool at your disposal in order to attempt to verify someone's age through government issued ID?

MR. CARSON:  Object to form.

MS. SHEVLIN: Join.

THE WITNESS:  I would agree, yes.

BY MR. ROBERTS:

Q.  You would agree, correct?

A.  Yes.

Q.  All right.  You are getting these cyber tip reports, and I think you would agree, that as a detective, it's your job prior to making any probable cause decisions to determine the credibility of that tip before taking any actionable steps?

A.  Yes.

Q.  In this cyber tip report, and I -- I don't -- and I know you looked at it probably multiple times, isn't it true that this cyber tip report describes the image as prepubescent?

A.  I have it right here.  I can verify that.

Q.  Yeah, please do.

A.  Can you point to me to where you're referring to?

Q.  Yeah, and actually, you know, rather than making you do that, I can -- what I can do is, I can share my screen, and we can attach this as Exhibit 1.

(Plaintiff's Exhibit No. 1 was marked for Identification.)

THE WITNESS: If it's further information on uploaded files, I see where it says, Prepubescent minor is a -- Is that what you're referring to?

BY MR. ROBERTS:

Q. Yeah. You see where it says A-2?

A. Yeah.

Q. A-2.

A. I just want to make sure that's what we were talking about, yeah.

Q. Right. And the A stands for prepubescent, correct?

A. I'm assuming.

Q. What does it say right under there?

A. Yes.

MS. SHEVLIN: I don't -- I don't want to interrupt you, but can you screen share anyway so we can --

MR. ROBERTS: Sure.

MS. SHEVLIN: -- make sure we know exactly what he's referring to?

MR. ROBERTS: Absolutely.

MS. SHEVLIN: Thank you. And you're marking this as Exhibit 1, you said?

MR. ROBERTS: Yes.

MS. SHEVLIN: Okay.

BY MR. ROBERTS:

Q. Detective Tolbert, were you looking at this document that I just shared on the screen?

A. Yes.

Q. All right. And you agree that when you received this tip, the tip to you was that the -- that the final contained one image of a prepubescent minor in a lascivious expedition -- exhibition. I don't know why I can't say that word. I'm sorry.

A. Lascivious, yes, sir.

Q. Lascivious exhibition. That was what you were told?

A. That's what the tip says, yes.

Q. Right. As we sit here today, though, do you recall that the image actually was of a pubescent individual?

A. No, I don't. I don't have the image in front of me, though. There's two different cyber tips, but can we verify we're talking about the one in 9160?

Q. Yeah, that was the one I was just showing you.

A. Okay. All right.

Q. Would it -- would it -- would it be important if that was incorrect and this was actually a pubescent image, an image of a pubescent individual?

A.   No, it's not important.  We don't rely on that information.

Q.   Well, do you attempt to verify the credibility of a tip, especially when it's been an unconfirmed tip?

A.   So I -- when I was reviewing tips, I didn't look at that information at all, that category.

Q.   Okay.

A.   That meant very little to me.  The thing that I wanted to look at was kind of like a -- you know, kind of firsthand scenario is the image itself.  And then the suspect information as far as assigning out tips.

Q.   Okay.

A.   In theory, if that was a -- and I'm not suggesting this never happens, but in theory, if that was a pubescent minor or adult pornography, we shouldn't have received a tip to begin with.  So in my experience, most, if not all of the tips that we received, I'm trying to think of a scenario where it would be different, I'll say that.  So does that make sense?

Q.   Yeah, I mean, some of them say pubescent.  I mean, it's A or B, right?

A.   Sure.

Q. Yeah, yeah. But I think you said 50 percent or somewhere around 50 percent you call out as being either age-difficult or not actionable?

A. The non-actionable could be as simple as it's very clear CSAM, but there is no information or follow-up on as far as pursuing a suspect.

Q. But you also call out that some age-difficult images as well?

A. You're correct, yes.

Q. So you know that -- I mean, just because you get a cyber tip doesn't mean that it's actually CSAM?

A. Correct.

Q. And did you hear through the grapevine or any other way that one of the reasons or at least the defendant or Mr. Lawshe's attorney presented government-issue ID, photographs, something like that, to the State Attorney?

A. So I remember having a conversation -- I never saw the documents about, I want to say it was passports, but I don't know the details as far as how that flushed out.

Q. Let me ask you a question. This is a hypothetical question. If prior to making a decision to let's start with seek a search warrant, if you would have had an image of government-issued ID and

information that the model was 18 or older at the time of the photo shoot, would you have sought a search warrant, and would you have claimed to have had probable cause to search Mr. Lawshe's data?

A. No.

Q. Same question. If you had images of the models in question with a government issued ID and an affidavit stating their age or information from a records custodian stating their age at the time of the photographs, would you have supported an affidavit, or would you have supported the decision for probable cause to make an arrest of Mr. Lawshe?

A. No.

Q. Do you have any reason to believe in this case that those documents were not easily assessable to Detective Preston?

A. I mean, in hindsight, so...

Q. In hindsight. I mean, look, we're talking about things that happened in the past.

A. Sure.

Q. That information was readily available to Detective Preston at the time she made the decision or at the time the arrest was made?

A. In hindsight, correct.

Q. Correct. One of the images that Mr. Lawshe

was charged with -- first of all, did you ever see all of the images -- there were three images that we were charged with. Did you see all three of those?

A. No.

Q. Okay. Did you only see the numbering NCMEC tip image?

A. Correct.

Q. Okay. It's my understanding he actually wasn't charged with that. Do you have any knowledge about that?

A. I do not.

Q. Okay. Well, I can relate to you that one of the images only showed the vantage point of bellybutton to genital area, vaginal area of the model, there was no face, no breast, it was just that cross-section. Is that -- is that ordinarily the type of image that would be picked out to charge someone with possession of CSAM?

A. If that image alone was the only image you had, probably not.

Q. Okay. So if that was the only image of that model, would you agree that that should not have been charged in this case against Mr. Lawshe?

MR. CARSON: Object to form.

THE WITNESS: It's kind of difficult to say

without having the advantage of seeing the image, you know.

BY MR. ROBERTS:

Q. But it at least raises a question in your mind about the charge of a -- of a picture that doesn't show the face or breast of the model?

A. I mean, it certainly makes it more challenging. So I don't know the circumstances in which that decision was made, so I don't know if there's more information available that I'm not aware of.

Q. Okay.

A. Like I said, based on not having seen the image, I couldn't really say one way or another.

Q. Okay. Doctor Dully, do you know Dr. Dully?

A. I mean, we don't hang out on the weekends, but I have met her probably a half a dozen times or so when I was in iTech.

Q. And was it all under similar circumstances where you were investigating possession of child pornography?

A. Yes, correct.

Q. I heard that sort of the office policy or custom was that if an image was age-difficult and there was a disagreement about the age of the individual,

that the procedure was to take it to Dr. Dully and let her be the tiebreaker.  Is that true?

MR. CARSON:  Object to form.

MS. SHEVLIN: Join.

THE WITNESS:  I don't know that that's a fair characterization of it.

BY MR. ROBERTS:

Q.    Just tell me what -- what circumstances would Dr. Dully be brought in on a case?

A.    Sure.  So if it's one of those things where you're just looking for, I guess, an extra layer of confirmation, you know, I think we all can kind of look at something and say, Oh, that appears to be this to me, but maybe I want a second opinion.  You know, there's plenty of things in life that you can refer to in that, so in those scenarios, we would reach out to Dr. Dully or someone from CPT.  I only ever dealt with Dr. Dully, but I'm sure CPT has someone else that you could also, you know, speak to, so...

Q.    Did you ever review her reports in this case?

A.    So she didn't do a report.  She did like a memo.  I'm not familiar with an actual report, but it was like a kind of a letter memo kind of deal.  I'm not sure if you're calling that a report.

Q.    Yeah, I -- I -- I don't -- yeah, yeah -- no,

all I have are three separate, I guess you could call them even a letter.  It's all on letterhead, with her opinions in them.

A.   Correct, yes, I am -- I guess it's semantics. I guess you could call it a report.  I wouldn't refer to it as a report, but I remember looking at them.  I don't remember them in any great detail at this point. I might have copies of them.  I printed everything out from this case and kind of held onto it.  I do have copies of them.

Q.   So I just want to ask you a couple of questions.  Are you generally familiar with the sexual maturity rating that it goes from 1 to 5?

A.   I don't know the details behind that.  I've had very little exposure to it as far as the medical side of it.

Q.   Okay.

A.   I mean, I -- I -- I put a great deal of weight in the fact that a medical professional is telling us their opinion on something, so I don't know the signs behind that, so...

Q.   Okay.  Well, I just want to look right here. I mean, other than -- let me just ask you this.  Other than the fact that she has a medical license, do you have any reason to trust Dr. Dully?

MS. SHEVLIN: Form.

MR. CARSON: Join.

BY MR. ROBERTS:

Q. I mean, is there something -- do you understand what I'm saying? I mean, is she just a resource, and you say you don't hang out with her. I mean, you just implicitly -- you trust her, that she's telling you the truth?

MR. CARSON: Form.

THE WITNESS: Well, I trust the process in that she has consulted on cases before. She works for the child protective team with the University of Florida. You know, she obviously is a medical professional, would obviously be able to give her expert opinion in situations, where we as lay people can't, and I trust that a court would give her latitude with that, and from my understanding, has in the past. So I'm not aware of any issues, you know, with any -- any kind of -- you know, for me to doubt that process or for me to doubt her reliability.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. ROBERTS:

Q. Right. Okay. So I just want to show you,

this is a letter from April 5th, 2023.  I'm sharing it from the screen, and we'll make all three of her letters Exhibit 2.  It's a composite exhibit to this deposition, okay?  Can you see it?

A.  I can. And I'm looking at it in my case file as well.

Q.  Right.  So I'm showing you the first paragraph.  Today you've provided me with two images for review displayed on a law enforcement laptop.  The first is -- and then there's a file number and depicts a female child with no pubic hair development.  She does not appear to be shaved.  Her breasts are partially visible and could be SMR 4 to 5; however, her genitals are plainly visible, with her thighs displayed widely apart and showing she is an SMR 1 with respect to pubic hair.  This developmental appearance is nine to 13 years -- 13 and-a-half -- less than nine to 13 years of age. Did I read that correctly?

A.  Yes, you did.

Q.  And you were there for this meeting?

A.  No, I wasn't, not for the April one.  I was there in February.  There's a letter dated February.  That's the one that I -- that was the initial meeting when we met with Dr. Dully.

Q.  Thank you for that clarification.  I

appreciate it.

So you were not there --

A. I apologize for the misunderstanding.

Q. No, no, it's my fault. I knew that there were two meetings, or I should have known there was two meetings. So you know that this was a digital image, correct?

A. I do. Well, I mean, I'm assuming it was. My -- on the April one, the one from February that I can speak to personally was a digital image.

Q. Right. So you understand -- and I'm sure you're not a doctor, but you understand what Dr. Dully was saying is that it does not appear -- there is no pubic hair development on the model, you understand what that means, right?

A. Yes.

Q. Okay. I'm sure in your -- your experience as an investigator, you see a lot of images of pornography, adult pornography, age-difficult pornography, you see a lot of that, don't you, or you did back when you were doing the ICAC investigations?

A. Yes, correct.

Q. You agree that it is common for adult models to have groomed themselves so that there is no appearance of a pubic hair?

A.   I vote yes, but okay.  Yeah.

Q.   **Okay, yeah.**

**You're familiar with that; you know that, right?**

A.   Yes.

Q.   **And as a -- I mean, as an investigator of pornographic images, that would be something that you really have to be familiar with, correct?**

A.   Yes.

Q.   **So you, as an ICAC trained investigator and a major crimes investigator, you understand that apart from grooming, images can be digitally altered or touched up to improve the esthetics of that -- of that image, correct?**

A.   Correct.

Q.   **You have no belief that Dr. Dully is an expert in determining if an image has been touched up or digitally altered, do you?**

MS. SHEVLIN:  Form.

THE WITNESS:  No, but there's not a requirement in the Florida Statute for that delineation to be made.  For instance, if the image is intentionally altered for the purposes of trying to put a particular person's face on a particular body, and that still represents a

child, it doesn't matter that that image has been altered.  It still depicts child sexual abuse material, so I mean, the --

BY MR. ROBERTS:

Q.   But it is relevant -- you agree it is relevant given her opinion about whether or not this model is grooming or altering the photograph to have no pubic hair, or if she has not developed pubic hair because she's prepubescent, you agreed that that's like the heart of the matter from an investigative standpoint, correct?

MS. SHEVLIN: Form.

MR. CARSON: Join.

THE WITNESS:  I mean, I don't know that that is solely what she relies on.  I have to assume that she takes other factors into consideration.

BY MR. ROBERTS:

Q.   Did she put any other factors in her letter?

A.   No, I've read the letter, and --

Q.   No.  Do you know -- do you know what --

MS. SHEVLIN:  The witness is still trying to answer the question.

THE WITNESS:  I said, I've read the letter, and you just read it out loud, is what I said.

BY MR. ROBERTS:

Q. Do you know -- do you understand that an SMR 4 to 5, a 5 is an adult breast; are you aware of that?

A. No, I don't think I've ever known that before, no.

Q. Do you think that an ICAC investigator prosecuting crimes, investigating crimes of child pornography, should know the basics of the SMR rating?

A. I do think there's some value in understanding that language, yes.

Q. Would it give you concern to know that this model had potentially adult breasts, but because she did not have pubic hair, according to Dr. Dully, she was less than nine to 13 and-a-half years old. Does that give you concern as an investigator?

MS. SHEVLIN: Form.

THE WITNESS: Well, to kind of correct what counsel said, I don't think it says less than nine. I think it's a range between nine and 13 and-a-half.

BY MR. ROBERTS:

Q. Does your copy have that -- that angle that -- that -- with a line under it?

A. Yeah, yeah, so it's greater than or --

Q. That's less than or equal to. Yeah.

A.   It does, yes. Yes. Greater than or equal to.

Q.   Well, I think it's -- the way I interpret that is her appearance is less than or equal to nine to 13 and-a-half years old?

A.   Oh, I'm sorry. You're correct. Yes, I stand corrected. Yes.

Q.   Okay.  Does that give you concern as an investigator, that this model has what may be interpreted as adult breasts, but this doctor, because of the lack of appearance of pubic hair, is saying that she is prepubescent, does that give you concern, as an investigator?

A.   As we sit here --

MS. SHEVLIN:  Object to form.

MR. CARSON: I join.

MS. SHEVLIN:  I objected to form, and I --

MR. CARSON: I joined.

MS. SHEVLIN:  Yes, counsel joined.

THE WITNESS:  So it's certainly a conversation I would want to have with her, to try to get that hashed out.  I came across my --

(Plaintiff's Exhibit No. 3 was marked for identification.)

BY MR. ROBERTS:

Q. I'm going to share -- I'm going to share the photograph of the ID. I don't think you've seen this before. We'll mark this as Exhibit 3.

In any world or interpretation, would you interpret the model that's depicted in Exhibit 3 as being less than nine to 13 years old?

A. No.

Q. Would you look at this model and say that it is entirely possible that she is 18 or older?

A. I do believe it's a possible -- it's possible she's 18 or older.

Q. Okay.

MS. SHEVLIN: Are you attaching that as an exhibit, Michael?

MR. ROBERTS: Exhibit 3.

BY MR. ROBERTS:

Q. During this deposition, Detective Greene testifies that he wished that the investigators had spent a little bit more time on this case prior to making a decision for arrest. Would you agree with that comment?

A. I do agree with that comment.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q.   You do agree with that comment?

A.   I don't know what just happened, but I just got a lot of feedback.  Can you say that again?

Q.   Did you agree with that comment?

A.   I do agree with that comment, yes.

Q.   Okay.  One of the things that you -- I want to understand -- one of the things in taking more time is Detective Preston could have gone to the website and requested the age documentation information, correct?

A.   Yes, she could have.

Q.   And had she done that, at least in your opinion, there would not have been probable cause to believe that these two images constituted probable cause for an arrest for possession of child sexual abuse material?

MR. CARSON:  Object to form.

MS. SHEVLIN: Join.

THE WITNESS: Correct.

BY MR. ROBERTS:

Q.   You agree with that statement?

A.   Yes, correct.

Q.   I want to use -- you understand the implications of an allegation like this against Mr. Lawshe, don't you?

A. Of course.

Q. He was -- you understood that he was like a decorated law enforcement officer?

A. I know he's a law enforcement officer. I don't know, you know, what his background is, so...

Q. Okay. All right. You knew the moment that you saw this cyber tip, that if he was charged or arrested with this crime, it would end his law enforcement career?

A. Yes.

Q. You knew that it would devastate his reputation in the community?

A. Yes.

Q. You know that the allegation alone, whether or not he was guilty or not, would be enough to irreparably damage his reputation?

A. Yes.

Q. I mean, I can tell you, I mean, I don't know if you care, but Mr. Lawshe, I mean, this has -- this has changed his life. Do you have any reason to believe that it hasn't?

A. No, I don't have a reason to believe it hasn't, no.

Q. I mean, do you think that St. John's County owes him an apology or something for what it's done to

him?

MR. CARSON: Object to the form.

THE WITNESS: No, I do not.

BY MR. ROBERTS:

Q. You just think -- what do you think in that regard? This is the way it should happen, it should have happened to him?

A. No. I think that the case happened the way it happened. I think that there are aspects of the case that give me a great deal of concern as far as I wasn't involved in the investigation in the aftermath, but it was my understanding that there was some evidence that his phone had been wiped.

Q. Yeah. Who said that? Who said that?

A. Who told me that?

Q. Yeah, who told you that?

A. I don't know who told me that.

Q. And you didn't remember who told you that?

A. I don't know who told me that.

Q. Because it's a defamatory statement that somebody is perpetuating in law enforcement or at the State Attorney's Office. Are you aware of any evidence that he wiped his phone?

A. Do I? No, that's just -- that's just something that I was told. I just don't remember

specifically who told me that, so...

Q. Did they say they had evidence of that, or was it just an allegation?

A. I -- I got to be honest with you, I don't remember the details of it.

Q. But this individual was publishing this statement to whoever would listen?

A. Well, I mean, I was told it, so --

Q. And was it told you -- did you interpret it as meaning, well, he really is a pedophile; we just couldn't prove it? Is that the way you took it?

A. So like I said, it causes some concerns as far as like, you know, there's that kind of wonderance as far as what did we miss, so to speak.

Q. Yeah. Makes you think maybe he was guilty, doesn't it?

A. Well, I don't know. So, I mean --

Q. That's a very damaging statement --

A. Yes.

Q. -- and it makes you think -- makes you think --

It's a very damaging statement, isn't it?

A. Well, I guess in the grand scheme of things I don't know enough about the case, the aftermath of the case, to even know if that was true or not. I just

know that that's what I was told. I don't remember the circumstances in which I was told that.

Q. Do you know Kevin Greene?

A. I do know Kevin Greene.

Q. Is he a competent forensic investigator?

A. Based on my interaction with him, yeah, he's worked plenty of cases for me in the past.

Q. Have you reviewed his report?

A. I have not.

Q. If somebody had wiped a device, don't you think that would be something that would be included in his forensic report?

A. I have to assume, but I don't know if it's there or not. So I'm assuming --

Q. You're not --

A. I'm sorry.

Q. You're not telling anybody that Mr. Lawshe has wiped a phone or anything like that, are you?

A. I'm sorry. Repeat that.

Q. You're not telling people that Mr. Lawshe has wiped a phone or destroyed evidence, are you?

A. No, beyond the conversation that I've had with you guys about the deposition, I haven't talked about this case since it happened.

Q. But you haven't repeated that comment that

you were told, Oh, he -- there's evidence that he wiped a device, you haven't repeated that to anybody?

A.   No.  I don't remember telling anybody that.

Q.   Has there been any sort of after action report or investigation into Detective Preston's conduct in this investigation?

A.   I don't know the answer to that.

Q.   Is she still a special victims unit investigator?

A.   ICAC, yes.

Q.   ICAC. Okay.

Let me just go through my notes.  I think I'm done, but just give me one second.  Okay?

A.   Sure. Sure. No problem.

MR. ROBERTS:  Thanks, Detective.  I don't have any other questions.  I appreciate your time.

THE WITNESS: All right.

CROSS-EXAMINATION

BY MS. SHEVLIN:

Q.   I have a couple of questions for you, sir.  My name is Amy.  I represent Dr. Dully in this case, and I have a couple of follow-up questions for you based on your prior testimony.

I want to make sure I understood you.  I believe you said you were at only one of the meetings

that took place with Dr. Dully. Did I hear you
correctly?

A. Yeah, the first one is the one I remember
going to.

Q. Okay. And when was that?

A. Her letter is dated February 22nd. I have to
assume that's reliable. I know she would generally
type the letter right there and give it to us before we
would leave in the past. I just don't remember if she
did that in this particular case.

Q. Okay. But safe to say it was a meeting that
took place in February of 2023?

A. Correct.

Q. Okay. At that meeting, the February 2023
meeting, how many images were presented to Dr. Dully?

A. I believe one.

Q. And how were they presented to her or shown
to her?

A. On a laptop.

Q. And whose laptop was that?

A. Detective Preston.

Q. And who physically showed her the image on
the laptop? Was that you or Detective Preston?

A. Detective Preston.

Q. Do you remember what that image looks like?

A.   Vaguely.

Q.   Can you describe it for me?

A.   If I remember correctly, it's a little girl, kind of seated with her legs spread.  I think that's the one where she's wearing white socks or like little lacy socks, is the only thing that she has on.

Q.   And can you see the -- you said "little girl," but can you see the little girl's face in the image?

A.   Yes, yes, you could.

Q.   And when Dr. Dully was shown this image, was she given a copy, or was she shown the image on the computer, and then the computer left with you and Detective Preston, and Dr. Dully does not have access to that?

A.   No, she doesn't have access to it. We -- we -- it was only on the computer, and we took the computer with us.

Q.   Okay. At the time of this meeting, was Dr. Dully informed of the identity of Mr. Lawshe?

A.   I don't remember.

Q.   Would it be typical that Dr. Dully be informed of who the subject of investigation is?

A.   No.

Q.   More likely than not she was not informed

regarding the name or identity of the subject of the investigation, meaning Mr. Lawshe?

A.   Yeah, she wouldn't really have a reason to know that, so...

Q.   Would she have been informed of Mr. Lawshe's status as a law enforcement officer during this meeting?

A.   No, again, she really wouldn't have a reason to know that.

Q.   And Dr. Dully was not paid for this service, correct?

A.   No, she's part of the CPT, so they offer this service to law enforcement.

Q.   And can you define "CPT" for the record?

A.   Child protection team at the University of Florida.  They have an office in Jacksonville, and they handle abuse cases.  They have doctors that are forensically trained to provide law enforcement support for abuse investigations.

Q.   And you testified earlier you had some prior interactions with Dr. Dully.  I think you said you've met her approximately six times.  Am I remembering that testimony correctly?

A.   Five or six, yes.  I don't remember the exact number.  But that's a fair estimate.

Q. And on those five or six occasions that you had previously met Dr. Dully, were they all within the context of investigations regarding probable CSAM?

A. Yes.

Q. Give me one moment. I'm just looking through my notes here.

I misunderstood your testimony earlier. I want to ask you again to make sure the record is clear, prior to the investigation regarding Mr. Lawshe, were you familiar with the website metart.com?

A. No.

Q. Okay. Do you know what the MET in Metart stands for?

A. I do not.

Q. If I told you it stood for most erotic teens, would that surprise you, based on the content that you saw?

A. No, there's often, like in ICAC investigations, there's often hidden meanings in different terms.

Q. And were you aware that metart.com refers to their models as teens and girls?

A. I'm not aware of that, no.

Q. Would it surprise you?

A. No, it doesn't surprise me.

Q. Now, I know you said you stated you never saw the passports that Mr. Roberts had referred to earlier on his questioning of you. Do you know what country those passports were issued from?

A. I don't.

Q. Do you know if they were issued in the United States?

A. I don't.

Q. If those passports -- passports were not issued in the United States, would that cause you some concern regarding verification of the ages of the models?

A. I don't know that them being issued in the United States or outside the United States really matters. Any ID can really be manipulated, so I guess to answer your question is -- I guess the simple answer is yes.

Q. The purported ages of the models using the passports for identification that was issued for them would not prove to you that the images in question were taken at a time that the models were 18 or older; is that correct?

A. That's correct.

Q. I want to refer you back to Exhibit 2, which was the April 5th, 2023 report of Dr. Dully. I know

you said you were not present at that meeting, but we did discuss that.

And Michael, just for ease of use, could you throw Exhibit 2 back up there, the April 5th report.

Much appreciated.  Okay.

In the letter that we're looking at, the same one that you discussed with Mr. Roberts earlier, there are descriptions of the images that Dr. Dully reviewed, correct?

A.   If you are referring to paragraph 2, the second image is imprinted with the word "script" saying "big heart."  Is that what you're referring to?

Q.   Correct.

A.   Yes, correct.

Q.   Okay.  And it also -- it describes the images in terms of it shows, you know, a female child with a black top, underwear down.  It describes what she's seeing in the images, correct?

A.   Correct.

Q.   Okay.  And you just noted that there is an indication that there is white script on the image, saying, "big heart," correct?

A.   Correct.

Q.   And it also indicates what the file names are for these two images, correct?

A. Correct.

Q. Okay. Nowhere in this letter does it indicate that there is any type of watermark on any of these images, correct?

A. Not on this one.

Q. Okay. And nowhere in this letter does it indicate that there's any other text on these images other than what she's noted with the quote/unquote, big heart in the second image, correct?

A. That is correct.

Q. And Dr. Dully was not asked to provide an opinion as to whether any of these images appeared altered, correct?

A. That's correct.

Q. And Dr. Dully was not asked to provide an opinion regarding the potential grooming habits of any of these models, correct?

A. That's correct.

Q. Now, Mr. Roberts asked you about the sexual maturity rating scale, the SMR, and he made a representation to you that Stage 5 was an adult. Do you remember that earlier in your testimony?

A. I do.

Q. Okay. Now, Stage 5, which is fully developed, does not necessarily mean that a fully

developed sexually mature person is in fact over the age of 18, correct?

A. I'm not familiar with the SMR scale, like I told Mr. Roberts, so I took for granted what he said was true. I don't -- I don't know the answer to that.

Q. Okay. Let me ask it a different way. In your experience with these investigations, would it be possible for an image of a breast to appear to be fully developed and that breast belonged to a person who is still under the age of 18? So, for example, a 16 or 17 year old may have a fully developed looking breast?

A. Yes.

MS. SHEVLIN: Michael, could you put Exhibit 3 back up, please. It was the image of the model holding the passport.

BY MS. SHEVLIN:

Q. Thank you. Mr. Roberts asked you earlier while were you looking at this picture if you could believe that she was 18 or older, and you answered in the affirmative. Do you remember that?

A. Yes.

Q. Looking at this image, could you also believe that she was under the age of 18?

A. I think she could be.

Q. I'm looking through my notes here.

A.   Not that it matters, but where is that passport from?

Q.   **My understanding is it is from the Ukraine. Have you seen this before?**

A.   No, I've never seen it before, and I didn't recognize the wording.

MR. ROBERTS:  It's actually Lat --

MS. SHEVLIN: It says Latvia. Excuse me.  It says Latvia.

Have you seen a Latvian passport before?

THE WITNESS: I have not.  I'm not worldly traveled, so...

BY MS. SHEVLIN:

Q.   **And in fact, this passport in this image is redacted in several spots, correct?**

A.   Yes, that's correct.

Q.   **And we're looking at this image again, and I think you answered me already, but the passport in question in this image is redacted in several places, correct?**

A.   Correct.

Q.   **Okay.  So we do see some alteration in this photograph, which is apparent, correct?**

A.   Correct.

Q.   **Okay.**

MS. SHEVLIN: Michael, you can take it down. Thank you.

I believe that is all I have for you, sir. I appreciate your time. Some of the other counsels may have questions for you.

MR. ROBERTS: I just have a little bit of redirect on that, but...

MR. CARSON: Go ahead.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q. Detective Tolbert, you understand that probable cause for possession of child pornography cannot be based on the mere possibility that the model is underage, correct?

A. Correct.

Q. Unless the evidence satisfies a reasonable person that a crime has likely occurred, correct?

A. Correct.

Q. When I asked you about the way that model looked, I asked you if that model, if a reasonable person can believe that that model was 18 and you testified yes, that had nothing to do with her passport, did it?

A. No, it was just visually looking at the photo that was displayed on the screen.

Q.   Well, actually, you understand that it's not Mr. Lawshe's burden to prove his innocence to St. Johns County for the State of Florida, correct?  It's the state's burden to prove that he committed a crime?

MR. CARSON:  Object to form.

THE WITNESS: Yes.

MR. ROBERTS: Okay.  No further questions.

MR. CARSON:  Sergeant Tolbert, I'm Matt Carson.  I'm an attorney representing Detective Preston in this action.  I have no questions for you today.  Mr. Roberts, are you ordering?

MR. ROBERTS:  I will order.

MR. CARSON:  Yeah, he'll read through me.

THE COURT REPORTER:  And do you want a copy?

MS. SHEVLIN: Yes.

MR. CARSON: Same order.  Thank you.

(Thereupon, the deposition was concluded at 2:47 p.m. and the signature and formalities were not waived.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, the undersigned authority, certify that the aforementioned witness Eugine Tolbert, personally appeared before me via remote teleconference and was duly sworn on Tuesday, December 17, 2024.

Dated this 27th day of December, 2024

_maureen Uebelacker Hall_

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida
My Commission Expires:  3/17/25
My Commission No.:  HH065896

Identification presented by Deponent:
License

C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

     I, MAUREEN HALL, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition; and that the transcript is a true record of the testimony given by the witness.

     I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in this action.

     Dated this 27th day of December, 2024.

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida

EUGINE TOLBERT
C/O MATTHEW JOSEPH CARSON, ESQUIRE
SNIFFEN & SPELLMAN, P A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
mcarson@sniffenlaw.com

IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA PRESTON AND KATHLEEN DULLY,

CASE NO.:  3:24-cv-00044-MMH-MCR

Dear Mr. Carson,

The deposition of Eugine Tolbert, taken in the above-styled cause on December 17, 2024 is now ready for signature of the witness.  Please contact our office to make arrangements for the witness to sign the same; or, if you wish to waive the signature of the deposition, please so advise.

If this deposition has not been signed by January 27th, 2025, or the signature thereto waived, we shall consider such delay a refusal to sign under Rule 1.310(e) of the Florida Rules of Civil Procedure.

If you have any reason which you would like for me to place on the deposition as to the witness' failure to sign the same, please advise.

Very truly yours,
HUSEBY COURT REPORTING, COURT REPORTER

By:

Maureen Hall, RPR, FPR

Dated:  December 27, 2024

cc:  Counsel of Record

E R R A T A   S H E E T

IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA PRESTON AND KATHLEEN DULLY

DEPO OF:  EUGINE TOLBERT

DATE TAKEN:  12/17/24

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Please forward the original signed errata sheet to this office so that copies may be distributed to all parties.

DATE:_____

SIGNATURE OF DEPONENT:_____

**1**

**1** 49:23,24
50:23
58:13
60:15

**13** 60:17,18
64:14,19
65:5 66:7

**16** 13:24
14:4 19:3
80:10

**17** 12:21,25
13:12,24
14:4 80:10

**18** 12:21
13:1,13,24
17:15,20
18:1,9,10,
11,14,16
54:1
66:10,12
77:21
80:2,10,
19,23
82:21

**19** 13:24
19:3

**2**

**2** 59:22
60:3 77:24
78:4,10

**20** 39:4

**2001** 6:12

**2009** 6:12,
14

**2013** 29:6

**2018** 6:18

**2020** 6:20

**2023** 5:12
8:10 34:23
60:1
73:12,14
77:25

**21** 6:7,21

**22nd** 73:6

**23** 6:7

**2:47** 83:19

**3**

**3** 65:23
66:4,6,16
80:14

**30** 39:4

**4**

**4** 60:13
64:3

**40** 35:20

**48** 14:1

**5**

**5** 22:6
58:13

**60:13** 64:3
79:21,24

**50** 35:3,14
53:1,2

**5th** 60:1
77:25 78:4

**6**

**60** 35:20

**8**

**827.071** 22:6

**9**

**9160** 51:19

**A**

**A-2** 50:5,7

**ability**
42:21 47:5

**abreast**
32:25

**absolute**
18:6 47:1

**absolutely**
17:21
18:12
20:14
28:2,5
50:21

**absolutes**
18:3

**abuse** 11:20
22:7 23:22
24:10
25:3,12,20
36:11
37:9,25
41:3 43:4
46:7 63:2
67:16
75:17,19

**accept** 18:8,
10

**accepted**
18:15

**access** 31:23
42:22,23
74:14,16

**action** 72:4
83:10

**actionable**
9:4,5
11:15
15:20,22
35:10,18
49:11 53:3

**actual** 57:22

**additional**
6:19 38:22

**adds** 31:18

**adult** 14:11
20:24
23:19 24:8
26:4 48:9
52:17
61:19,23

64:3,12
65:10
79:21

**advantage**
56:1

**affidavit**
54:8,10

**affirmative**
80:20

**aftermath**
69:11
70:24

**afternoon**
4:9

**age**  14:7,
12,23
15:10,15
44:2,10
46:18,23
47:7
48:18,21,
22,24
54:8,9
56:25
60:18
67:10
80:2,10,23

**age-difficult**
9:20 10:5,
9,18,19,
23,25
11:5,7
53:3,7
56:24
61:19

**age-
verification**
44:6

**agency**  7:6
32:3 43:4

**ages**  77:11,
18

**agree**  10:16
18:25 19:4
21:1 24:15
26:1 36:12
37:12,19,
21,23
38:6,14
40:16
41:23
46:11,19
48:6,11,
15,23
49:3,5,8
51:5 55:22
61:23 63:5
66:21,23
67:2,5,6,
21

**agreeable**
41:6

**agreed**  15:23
63:9

**ahead**  10:2
44:20 82:8

**allegation**
67:24
68:14 70:3

**allegations**

4:24

**alteration**
81:22

**altered**
62:12,18,
23 63:2
79:13

**altering**
63:7

**Amy**  72:21

**and-a-half**
6:17 47:13
60:17
64:14,20
65:5

**angle**  64:22

**answering**
10:2 16:25

**anytime**
42:25

**apologize**
8:21 19:17
24:4 61:3

**apology**
68:25

**apparent**
81:23

**appearance**
60:16
61:25
65:4,11

**appeared**
15:23

79:12

**appears**
57:13

**appreciated**
78:5

**approach**
9:17

**approximate**
14:12

**approximately**
75:22

**April**  60:1,
21 61:9
77:25 78:4

**area**  29:9
55:14

**arrest**  21:24
30:11 32:7
33:21 34:8
54:12,23
66:21
67:15

**arrested**
22:11
34:16 68:8

**aspects**  69:9

**assessable**
54:15

**assessment**
15:12

**assign**  10:5,
6 35:9

**assigned**  5:8

7:7,12,13,
20 10:24
16:18

**assigning**
8:15 9:13
33:4 36:17
52:12

**assistance**
42:24

**assume** 63:15
71:13 73:7

**assuming**
50:12 61:8
71:14

**attach** 49:23

**attaching**
66:14

**attempt** 46:6
48:24 52:3

**attempted**
46:10

**attended**
14:3

**attorney**
42:11
53:15,17
83:9

**Attorney's**
69:22

**avenues**
41:19

**aware** 21:4
22:2 27:8,

15 28:7
30:5 36:19
37:7,10
39:11 44:7
46:18
47:12,15
56:10
59:18 64:3
69:22
76:21,23

─────────
**B**
─────────

**baby** 25:1

**back** 5:11,
21,25
6:20,23
29:6 32:10
34:23 37:2
45:2 61:21
77:24 78:4
80:14

**background**
15:7 19:11
68:5

**bad** 9:9
33:17
40:12

**barred** 42:10

**barrel** 7:21

**based** 9:16
11:8 14:12
22:11,13
39:5 40:25
48:2 56:13
71:6 72:23

76:16
82:13

**basic** 20:18

**basics** 64:8

**bat** 15:20

**bathtub** 25:2

**beer** 29:15

**begin** 15:17
52:18

**beginning**
5:12

**belief** 62:16

**believed**
16:17
17:3,13,
15,20
23:19
24:7,18
38:8

**bellybutton**
55:13

**belonged**
80:9

**big** 78:12,
22 79:8

**Bill** 30:14,
19

**Bill's** 33:2

**bit** 20:6
31:18
32:11 34:2
40:3 66:20
82:6

**black** 78:17

**blip** 19:16

**body** 13:9
62:25

**booking**
32:13

**border** 19:24

**borders** 41:7

**breast** 13:9
55:15 56:6
64:3 80:8,
9,11

**breasts**
60:12
64:12
65:10

**briefed** 31:6

**bring** 30:25

**brought**
30:11 57:9

**buds** 13:9

**burden** 83:2,
4

**busier** 35:1

─────────
**C**
─────────

**California**
42:11

**call** 4:11,
12 8:16,21
9:18 53:2,
7 58:1,5

called  4:3,
14 9:20

calling
57:24

captain
30:14,22
32:17,21
34:16

care  12:7
68:19

career  68:9

Carson  19:21
20:7,15
22:25
23:14,24
24:11 26:7
37:16
39:17
40:22
44:13,16,
19 46:14
49:1 55:24
57:3 59:2,
9 63:13
65:16,18
66:24
67:17 69:2
82:8 83:5,
8,9,14,17

case  4:21
5:13,14
7:2,10,11,
20 10:3,22
11:1 13:18
15:12,18
16:9 21:20

28:16 29:7
30:5 32:18
35:12 40:1
44:23 45:1
47:11 48:4
54:15
55:23
57:9,20
58:9 60:5
66:20
69:8,10
70:24,25
71:24
72:21
73:10

cases  47:19
59:11 71:7
75:17

category
9:21,22
52:7

cell  37:3

center  36:4,
5

Centers  8:3

certainty
48:18

chain  31:2
32:20
34:1,4

challenging
56:8

changed  6:16
68:20

characterizati
on  57:6

charge  55:17
56:5

charged  27:5
55:1,3,9,
23 68:7

charges
45:4,5,7

child  4:24
11:17,20
13:2 15:24
16:5 17:4,
9,11,13
22:7,22
23:6,9,12,
21 24:10
25:2,3,11,
20 35:24
36:9,11
37:9,24
43:3 46:6
48:8 56:20
59:12
60:11
63:1,2
64:7 67:15
75:15
78:16
82:12

children
5:20 8:4
38:4

circumstance
21:11

circumstances
21:10,14,
15 25:7
38:25 44:5
48:2 56:8,
19 57:8
71:2

circumstantial
48:1

cite  37:3

claimed  54:3

clarification
60:25

class  14:2

classes
14:22

clear  53:5
76:8

client  4:21

closed  15:21
47:20

clues  38:19

college  19:7

combination
33:25

command  31:2
32:20
34:1,4

comment
45:12
66:22,23
67:2,5,6
71:25

committed
21:13
23:9,21
24:9 83:4

committing
25:11 41:4

common 9:16
35:16
61:23

communicate
11:18 30:1

communicated
11:19
32:17,19

community
68:12

companies
41:9

company
41:18

competent
71:5

complete
37:7

complied
47:7

composite
60:3

computer
22:20
42:1,16
74:13,17,
18

computers
42:6

concern
64:11,15
65:8,12
69:10
77:11

concerns
70:12

concluded
83:18

conduct
22:22 72:6

confirm
20:1,21

confirmation
57:12

confirming
44:10

consideration
63:16

considered
31:7

constitute
25:19
36:10

constituted
11:20 37:9
67:14

Constitution
20:25
21:18,22

consulted

59:11

contact 32:2
48:3

contacted
32:6,7,9,
11

contained
23:6 37:6
39:6 40:21
51:7

content
76:16

context
24:16,20,
21,23
25:14,25
26:5 27:1,
17 38:16
39:15
40:17 76:3

context-wise
40:12

control
22:18

conversation
10:12 34:7
39:25
53:18
65:21
71:22

conversations
32:21,23

convict
48:13

convicted
48:7

conviction
47:23

copies 58:8,
10

copy 17:19
64:22
74:12
83:15

corner 29:9

correct 6:8,
11 7:14,
15,25
12:14
16:3,4,6,7
18:1,22
21:21,25
22:4
23:12,13
25:21,22
26:16,17
28:16
30:17
34:21
35:19,22
36:15 38:5
42:25 44:7
45:6 46:1,
3 47:8
48:10,13,
14,19,21
49:5 50:11
53:9,12
54:24,25
55:7 56:22

58:4 61:7, 22 62:8, 14,15 63:11 64:17 65:6 67:10,19, 22 73:13 75:11 77:22,23 78:9,13, 14,18,19, 22,23,25 79:1,4,9, 10,13,14, 17,18 80:2 81:15,16, 20,21,23, 24 82:14, 15,17,18 83:3

**corrected** 65:7

**correctly** 26:22 32:9 34:20 60:18 73:2 74:3 75:23

**counsel** 39:3 64:18 65:19

**counsels** 82:4

**country** 77:3

**county** 5:9 7:17 29:9 30:15 38:2

42:1,16 43:2 46:13 68:24 83:3

**couple** 36:2 41:19 58:11 72:20,22

**court** 19:25 20:3 27:19 44:16,18 59:16 83:15

**CPT** 13:15, 18 15:6 57:17,18 75:12,14

**credibility** 49:10 52:4

**crime** 21:13 23:9,21 24:10 25:11,20 41:5 68:8 82:17 83:4

**crimes** 5:9, 20,21 6:10,16,24 21:15 45:2 62:11 64:7

**criminal** 25:6 30:22,24 31:3

**CROSS-EXAMINATION**

72:18

**cross-section** 55:15

**crossed** 26:23

**CSAM** 10:10 11:2 13:17 15:17 31:14 37:13 53:5,11 55:18 76:3

**cull** 8:14, 18,20,22

**culled** 35:8

**culmination** 45:1

**custodian** 42:10 46:22 54:9

**custody** 33:15

**custom** 56:24

**cyber** 7:5,24 8:9,11,14 29:21,22 34:20 45:17 49:7,13,15 51:18 53:11 68:7

—————
D
—————

**damage** 68:16

**damaging** 70:18,22

**dark** 25:18

**data** 22:20 37:2 54:4

**dated** 60:22 73:6

**daughters** 11:10 12:18 13:25 25:8

**dead** 41:10

**deal** 12:7 57:23 58:18 69:10

**dealing** 7:23

**dealt** 57:17

**decent** 10:7

**decision** 33:20,24 34:2,5,8 53:23 54:11,22 56:9 66:21

**decisions** 49:10

**decorated** 68:3

**deem** 10:25 20:12

**deemed** 10:5, 7 15:19

deeper   15:5

defamatory
69:20

defendant
53:15

define   75:14

definition
11:7

deliberate
10:11

delineated
10:13

delineation
62:22

depends   25:7

depicted
23:11,19
24:8 48:18
66:6

depiction
22:20
37:13

depicts
60:10 63:2

deposition
4:17,18
8:2 60:4
66:18
71:23
83:18

deputy  6:12

describe   7:1
74:2

describes
49:15
78:15,17

description
9:23

descriptions
78:8

destroyed
71:21

detail   15:4
58:7

detailed
12:16

details
44:25
45:3,8,9
53:20
58:14 70:5

detective
4:9,10,11,
15 6:17
7:12,14,
16,20 8:3,
11 9:19
11:4,13,18
12:2,12
16:18
27:15
28:9,10
30:2 33:5
34:1 36:17
39:2,10
40:1
42:15,22,
23,24

45:13
46:10,20,
21 48:12
49:9 51:2
54:16,22
66:18 67:9
72:5,15
73:21,23,
24 74:14
82:11
83:10

detective's
33:24

detectives
7:7 8:15
9:1

detectives'
35:12

determination
13:25 26:6

determine
41:15
49:10

determined
48:17

determining
12:19
62:17

devastate
68:11

developed
13:11 63:8
79:25
80:1,9,11

development
13:7,8
60:11
61:14

developmental
60:16

device
38:17,18
71:10 72:2

difference
12:20

differently
13:7 31:21

difficult
12:25 19:2
48:17
55:25

dig   15:5

digital
61:6,10

digitally
62:12,18

dinner   4:12

DIRECT   4:7

disagree
10:9 11:6
39:8

disagreement
10:13,14
56:25

disclaimer
26:3

disclaimers

27:2

discuss 78:2

discussed
78:7

displayed
12:19
60:9,14
82:25

displaying
40:8

disposal
48:23

disposed
44:24

disseminating
34:19

distinguish
13:23

doctor 12:4
56:15
61:12
65:10

doctors
75:17

document
51:3

documentation
46:23 47:8
67:10

documented
37:11

documents
44:6 53:19

54:15

doubt 59:20

download
38:17

dozen 56:17

drawing
14:14

drink 29:15

dropped
45:4,5,7

drowning 9:1

duck 9:17,
18 15:1,2

Dully 11:17
12:3,13
15:6,7,17,
21,23
16:3,6,10,
14,15,21
17:10
28:10
36:20,22,
25 56:15
57:1,9,17,
18 58:25
60:24
61:12
62:16
64:13
72:21
73:1,15
74:11,14,
20,22
75:10,21
76:2 77:25

78:8
79:11,15

Dully's 18:9
28:10 33:5
36:18

duly 4:4
15:14

duty 46:12

————————

**E**
————————

earlier
75:20 76:7
77:2 78:7
79:22
80:17

early 17:13

earth 14:1,8

ease 78:3

easily 54:15

easy 6:12

educated
14:22

effectuating
21:24

end 20:5,9
41:2,11
68:8

enforcement
14:16 18:3
23:18 24:6
29:12,23
30:6 31:1,
5,11,15,

19,21
32:1,3,18
43:4 46:12
60:9 68:3,
4,9 69:21
75:6,13,18

entire 30:4

equal 64:25
65:1,4

erotic 76:15

established
22:2

Estates 29:9

esthetics
62:13

estimate
15:10
34:23,25
35:7,13
75:25

estimating
14:6,23

estimation
48:21

EUGINE 4:3

evaluate
9:11

evidence
69:13,22
70:2 71:21
72:1 82:16

exact 75:24

EXAMINATION

4:7 82:9

**Excuse** 81:8

**exhibit**
49:23,24
50:23
59:22 60:3
65:23
66:4,6,15,
16 77:24
78:4 80:14

**exhibition**
22:19
51:8,11

**expedition**
51:8

**experience**
11:9
14:16,17,
21 19:1,8
44:1 52:19
61:17 80:7

**experienced**
14:14

**experiencing**
13:21

**expert** 59:15
62:17

**expertise**
17:17

**explain** 15:3

**exploitation**
38:4

**exploited**
8:4 38:9

**exposure**
58:15

**extent** 9:3
46:9

**extra** 57:11

---

**F**

---

**face** 16:16
55:15 56:6
62:24 74:8

**facetious**
15:2

**fact** 12:17
15:13
31:15,19
58:19,24
80:1 81:14

**factors**
63:16,18

**facts** 21:10,
14

**fair** 16:13
57:5 75:25

**familiar**
4:22 9:21
22:5,8,23
35:23
42:14
43:8,20
44:1 48:4
57:22
58:12
62:3,8
76:10 80:3

**fault** 61:4

**feasible**
41:12

**February**
60:22 61:9
73:6,12,14

**federal**
44:1,4
46:18 47:7
48:22

**feedback**
67:4

**feel** 15:16

**feels** 42:25

**felt** 11:1,
15,19
13:15,16
15:22
16:12 35:9

**female** 60:11
78:16

**females** 13:8
40:8

**file** 28:16
60:5,10
78:24

**files** 50:2

**final** 51:7

**find** 30:20
42:17

**finding**
21:19,23

**fine** 39:11

**firsthand**
52:11

**fishing** 42:4

**Flagler** 29:8

**Florida** 7:6
22:5 23:4,
10 59:13
62:21
75:16 83:3

**flushed**
53:21

**follow-up**
7:8 8:12,
24 53:6
72:22

**force** 7:7

**forensic**
42:19
71:5,12

**forensically**
75:18

**form** 18:17,
23 19:9,
18,23
20:2,11
22:25
23:14,23,
24 24:11
25:13 26:7
29:11
37:16
39:9,17
40:22

44:13 46:14 49:1 55:24 57:3 59:1,9 62:19 63:12 64:16 65:15,17 66:24 67:17 69:2 83:5

**formalities** 83:19

**forward** 15:24 33:1

**found** 38:12 39:6

**free** 42:25

**frequently** 41:8

**front** 51:17

**fully** 79:24, 25 80:8,11

**FWC** 29:7 30:9,12

**G**

**game** 12:10

**general** 7:8

**generally** 13:7,8,10 14:9,11,15 18:21 24:13 26:9

33:25 36:3 38:16 58:12 73:7

**genital** 55:14

**genitals** 60:14

**get all** 47:24

**girl** 74:3,8

**girl's** 74:8

**girls** 76:22

**give** 6:3 15:10 17:6,17 20:8 38:18 59:14,16 64:11,15 65:8,12 69:10 72:13 73:8 76:5

**goal** 38:3 41:2 48:12

**goals** 38:1

**Good** 4:9

**government** 44:4 48:24 54:7

**government-issue** 53:16

**government-issued** 53:25

**grand** 70:23

**grandmother** 8:18

**granted** 80:4

**grapevine** 53:13

**great** 9:8,10 58:7,18 69:10

**greater** 64:24 65:1

**green** 19:24 20:4

**Greene** 8:2,3 9:19 11:4 39:2,10 40:1 42:15,22, 24 45:13 66:18 71:3,4

**Greene's** 11:13

**groomed** 61:24

**grooming** 62:12 63:7 79:16

**ground** 4:19

**guess** 17:23 36:8 57:11 58:1,4,5 70:23 77:15,16

**guessing** 6:6

**guilty** 68:15 70:15

**guy** 4:22 9:9

**guys** 11:6 32:24 71:23

**H**

**habits** 79:16

**hair** 13:9, 11 60:11, 16 61:14, 25 63:8 64:13 65:11

**half** 56:17

**hand** 12:8

**handle** 75:17

**hang** 28:15 29:14 56:16 59:6

**happen** 69:6

**happened** 32:5 34:11 43:9,11 54:19 67:3 69:7,8,9 71:24

**hard** 27:22 34:25 38:15

harder 19:6

hash 12:25

hashed 65:22

he'll 83:14

head 36:21

hear 4:25
19:10,14
20:1,3
27:18,24
36:23
53:13 73:1

heard 42:12,
13 45:12,
20 56:23

hearing
19:16

heart 63:10
78:12,22
79:9

heavily
14:17

held 58:9

Hey 18:14
47:6

hidden 76:19

hindsight
54:17,18,
24

hit 27:25

hits 13:6

Hold 44:16

holding 12:8

27:12
80:15

homicide
6:17 29:6,
10

honest 33:22
70:4

housed 41:7,
15

hypothetical
53:23

---

**I**

---

ICAC 5:20,
23 6:4,7,
22 7:4,6,
16 20:20
40:2 41:8
43:25 45:2
46:2 47:14
61:21
62:10 64:6
72:10,11
76:18

ICAC's 37:23

ID 17:19,20
18:13
48:25
53:16,25
54:7 66:3
77:15

idea 40:12

identifiable
9:6

identification
44:10
49:25
59:23
65:24
77:19

identify
38:24
46:6,10

identity
13:2 38:8
39:16
40:20
74:20 75:1

IDS 27:12

ignore 19:19

illicit
41:25

image 9:12
10:6 11:20
15:14
16:18,21
22:20
23:11,19
24:7,16,18
25:19,23
26:1,10,
16,24 27:2
35:10
36:11,20
37:14
38:12,20,
24 40:4
41:5 43:6,
17 48:17
49:16

51:7,15,
17,25
52:11
53:25
55:6,16,
19,21
56:1,14,24
61:6,10
62:14,17,
23 63:1
73:22,25
74:9,11,12
78:11,21
79:9 80:8,
14,22
81:14,17,
19

images 10:4,
19,22 11:4
12:3,25
16:3 20:25
23:5,6
27:5,9,17
37:8 39:6
40:5,8,21
53:8 54:6,
25 55:2,13
60:8 61:18
62:7,12
67:14
73:15
77:20
78:8,15,
18,25
79:4,7,12

imaging
17:24

| | | | |
|---|---|---|---|
| implications | individuals | inquire | 33:6,8,16, |
| 67:24 | 46:11 | 46:21 | 18 |
| implicitly | infected | inquired | interviewed |
| 59:7 | 42:2 | 11:2 | 28:22 |
| important | information | instance | intimately |
| 24:15 | 8:24 13:2 | 10:1 62:22 | 26:15 |
| 25:25 26:4 | 26:12,19 | intentionally | 29:14 |
| 51:23 52:1 | 30:1 31:23 | 22:18 | introduced |
| impressions | 37:15 | 62:23 | 4:15 |
| 29:11 | 38:11,22 | interaction | investigate |
| imprinted | 39:5,22 | 14:13 | 10:18 |
| 78:11 | 40:17 42:9 | 29:12,17 | 11:23 |
| improve | 44:11 | 71:6 | 26:25 |
| 62:13 | 45:11,18 | interactions | 27:16 |
| include | 46:20 | 75:21 | 36:20 |
| 22:21 | 47:16,25 | interface | 38:23 |
| 37:14 | 48:5 50:1 | 42:7 | 39:15 |
| 39:14 | 52:2,7,12 | internet | 40:10,20 |
| included | 53:5 54:1, | 5:20 24:24 | investigated |
| 71:11 | 8,21 56:10 | 27:6,9 | 30:4 45:24 |
| incorrect | 67:10 | 39:7 41:21 | 47:19 |
| 51:24 | informed | 42:18 | investigating |
| independent | 30:10,12 | interpret | 7:11 56:20 |
| 34:7 | 34:10,12 | 65:3 66:6 | 64:7 |
| independently | 74:20,23, | 70:9 | investigation |
| 36:4 | 25 75:5 | interpretation | 4:23 7:2, |
| indication | initial | 66:5 | 8,9 8:12, |
| 78:21 | 10:24 | interpreted | 24 12:1,23 |
| individual | 15:12 | 65:10 | 15:24 |
| 12:19 23:8 | 60:23 | interrupt | 20:20 |
| 48:9 | innocence | 44:20 | 21:3,18 |
| 51:16,25 | 83:2 | 50:16 | 22:3 23:4 |
| 56:25 70:6 | innocent | interview | 26:15 |
| | 25:24 | 30:8 32:16 | 28:13 |
| | innocently | | 29:3,19 |
| | 25:4,5 | | 30:10,13, |

21,25
31:4,8,16,
20 32:1
33:1,7
36:14
37:8,13
39:14,24
41:8,23
42:24
45:21,25
47:16,21
48:3 69:11
72:5,6
74:23 75:2
76:9

**investigations**
6:14 22:13
30:22
31:3,14,17
40:2 61:21
75:19
76:3,19
80:7

**investigative**
44:1 63:10

**investigator**
7:11 8:11
38:7 61:18
62:6,10,11
64:6,15
65:9,13
71:5 72:9

**investigators**
10:8 46:2
66:19

**involved**

10:22 13:3
22:13
26:15
29:19,22
32:14
33:13
69:11

**involvement**
7:2

**involving**
31:5 32:18

**irreparably**
68:16

**issued** 48:25
54:7 77:4,
6,10,13,19

**issues** 40:8
59:18

**issuing**
21:20

**itech** 56:18

_____

**J**
_____

**Jacksonville**
75:16

**Jimenez**
32:20

**job** 5:6,11
20:22 49:9

**John** 43:2

**John's** 42:16
46:13
68:24

**Johns** 5:9
7:17 30:15
38:2 83:2

**join** 23:1,
15 24:12
26:8 37:18
49:2 57:4
59:2 63:13
65:16
67:18

**joined**
65:18,19

**Jose** 32:19

**jurisdiction**
43:5

**justice**
48:10,13

_____

**K**
_____

**Kevin** 71:3,4

**kids** 25:9,
10

**kind** 4:19
6:3 9:16
11:9 12:6,
7,8,9,10,
24,25 13:1
15:11 18:2
19:5
20:17,21
25:22
32:20
33:25
34:1,25
35:5 38:19

41:10 42:3
45:3 46:25
52:10,11
55:25
57:12,23
58:9 59:19
64:17
70:13 74:4

**knew** 23:11
29:4,22
61:4 68:6,
11

**knowingly**
22:17

**knowledge**
14:6 55:9

_____

**L**
_____

**lack** 65:11

**lacy** 74:6

**language**
64:10

**laptop** 28:4
60:9
73:19,20,
23

**large** 31:3

**lascivious**
51:8,10,11

**Lat** 81:7

**late** 4:12

**latitude**
59:17

Latvia 81:8, 9

Latvian 81:10

law 14:16 18:3 23:4, 18 24:6 29:12,22, 23 30:5 31:1,5,10, 15,19,21 32:1,3,18 43:4 46:12 60:9 68:3, 4,8 69:21 75:6,13,18

laws 44:2,4 48:22

Lawshe 4:22, 23 10:4 23:5 26:2 27:5 28:23 29:1,4,7, 20 30:5 31:21 34:9 39:3 54:12,25 55:23 67:25 68:19 71:17,20 74:20 75:2 76:9

Lawshe's 7:2,11 10:3,22

11:1,5 15:18 53:15 54:4 75:5 83:2

lawyer 14:19 20:22

lay 59:15

layer 57:11

layers 34:3

layperson 14:10

lead 7:10 21:10,14 33:23 34:1 38:22

leads 12:23 40:17

leaning 27:23

learn 29:18

learned 18:3

leave 73:9

Lee 4:22 28:21 33:1

left 74:13

legal 20:25 41:17

legs 74:4

lesson 18:3

letter 57:23 58:2 60:1, 22 63:18,

19,23 73:6,8 78:6 79:2, 6

letterhead 58:2

letters 60:3

level 9:2 36:13

license 58:24

lieutenant 32:19 34:17

life 14:17, 20 19:1 57:15 68:20

lifetime 14:14

light 19:25 20:4

limited 31:24

lines 42:3

listed 26:12

listen 70:7

literature 15:9

living 14:7 20:19,20

loads 35:12

local 29:23

locate 9:7

located 29:10 39:3

log 32:13

long 5:22 6:2 22:2

longer 40:3

looked 49:14 82:20

lot 34:14 61:18,20 67:4

loud 63:24

---

**M**

machines 42:19

Madam 19:25 44:16

made 31:15 32:13 45:12 54:22,23 56:9 62:22 79:20

major 5:9,21 6:10,16,24 45:2 62:11

make 13:24 19:17 33:20 34:8 45:23

50:8,19
52:21
54:12 60:2
72:24 76:8

**makes** 6:12
9:5 56:7
70:15,20

**making** 20:8
24:1 26:5
40:1 49:9,
22 53:23
66:21

**mal-ware**
42:2

**manageable**
35:12

**manipulated**
77:15

**mark** 66:4

**marked** 49:24
59:22
65:23

**marking**
50:22

**material**
11:21 22:7
23:22
24:10
25:3,12,20
36:11
37:9,25
41:3 43:4
63:3 67:16

**Matt** 83:8

**matter** 63:1,
10

**matters**
77:15 81:1

**mature** 80:1

**maturity**
58:13
79:20

**meaning** 36:5
70:10 75:2

**meanings**
76:19

**means** 11:7
21:6,13
24:24
61:15

**meant** 52:9

**media** 32:6,
9,11

**medical** 15:7
58:15,19,
24 59:13

**meeting**
12:13
28:11
60:20,23
73:11,14,
15 74:19
75:7 78:1

**meetings**
61:5,6
72:25

**memo** 57:22,
23

**memory** 26:22

**mere** 82:13

**met** 33:2
56:17
60:24
75:22
76:2,12

**Metart** 26:22
40:4,10
76:12

**Metart's**
42:10

**metart.com**
27:16
45:19,24
76:10,21

**metart.com.**
45:13

**Michael** 4:16
66:15 78:3
80:13 82:1

**microphone**
27:22,23

**mind** 20:8
56:5

**minor** 9:12
16:10,12,
15,18 50:3
51:7 52:17

**minute** 12:16
27:25

**minutes**
19:23
27:21 39:5

**miscarriage**
48:10

**Missing** 8:4

**mistaken**
32:10

**misunderstandi
ng** 61:3

**misunderstood**
76:7

**model** 17:24
18:9,10
26:3 48:18
54:1
55:14,22
56:6 61:14
63:7 64:12
65:9 66:6,
9 80:15
82:13,19,
20,21

**model's**
15:15

**models** 27:12
39:4,7
42:17 44:7
46:23 54:7
61:23
76:22
77:12,18,
21 79:17

**mom** 25:1

**moment** 29:24
45:17 68:6
76:5

| | | | |
|---|---|---|---|
| month 34:24 | North 7:6 | 19:14 | 75:6 |
| motion 22:19 | noted 78:20 | obtain 38:8 | offshore |
| mouth 13:20 | 79:8 | 44:10 | 41:15 |
| moved 45:2 | notes 72:12 | 47:23 | older 19:5 |
| moving 34:14 | 76:6 80:25 | occasions | 54:1 |
| multiple | number 60:10 | 76:1 | 66:10,12 |
| 49:14 | 75:25 | occurred | 77:21 |
| | numbering | 21:11,16 | 80:19 |
| **N** | 55:5 | 40:11 | online 41:3 |
| | | 43:23 | opened 29:21 |
| naked 25:1, | **O** | 82:17 | opinion |
| 10 | | occurring | 11:2,4,16 |
| named 4:22 | object 20:1, | 43:21 | 13:17 |
| names 78:24 | 11 22:25 | offer 75:12 | 16:22,23 |
| national 8:3 | 23:14,24 | office 5:10 | 17:18 18:9 |
| 36:5 | 24:11 26:7 | 7:17 10:9 | 57:14 |
| NCMEC 8:6 | 37:16 | 28:11,22, | 58:20 |
| 34:19 | 39:17 | 24 30:23 | 59:15 63:6 |
| 35:17,23 | 40:22 | 32:8 33:3, | 67:13 |
| 36:8 55:5 | 44:13 | 6 36:18 | 79:12,16 |
| necessarily | 46:14 49:1 | 38:3 42:2, | opinions |
| 25:24 | 55:24 57:3 | 16,20 43:3 | 45:18 58:3 |
| 38:14 | 65:15 | 46:13 | opposed 12:7 |
| 41:17 | 66:24 | 56:23 | opposite |
| 47:22 | 67:17 69:2 | 69:22 | 23:17 |
| 79:25 | 83:5 | 75:16 | order 23:8 |
| necessity | objected | officer | 48:23 |
| 47:21 | 19:22 | 23:10,18 | 83:13,17 |
| network | 65:17 | 24:6 | ordering |
| 42:2,5,20, | objecting | 29:12,23 | 83:12 |
| 21 | 19:12,13, | 30:6,16 | ordinarily |
| non-actionable | 18 | 31:1,5,11, | 55:16 |
| 53:4 | objection | 15,19,22 | origin 38:19 |
| | 44:17 | 32:1,4,18 | |
| | objections | 46:12 | |
| | | 68:3,4 | |

original
13:22

originated
38:24

overseas
41:9

owes 68:25

**P**

p.m. 83:19

paid 75:10

paragraph
60:8 78:10

part 11:25
22:21
32:16
39:24 43:9
45:24
75:12

partially
60:13

participate
33:15,17

participated
28:11,21
29:8 30:8
33:8

participating
33:6

parts 34:14

party 32:4

passport

80:15
81:2,10,
14,18
82:23

passports
53:20
77:2,4,9,
19

past 12:24
48:5 54:19
59:18 71:7
73:9

path 38:19

patrol 6:12,
20,21

pause 20:5
27:25

pedophile
70:10

people 11:6
22:11
48:13
59:16
71:20

percent
35:14
53:1,2

performed
33:7

perpetuating
69:21

person 14:4,
11 18:1
19:7 22:17

23:11
32:22
80:1,9
82:17,21

person's
19:7 62:24

personal
11:9 14:17

personally
27:1 61:10

phone 11:5
69:13,23
71:18,21

photo 26:22
54:2 82:24

photograph
12:20
18:13,15
22:18 63:7
66:3 81:23

photographs
27:11
53:16
54:10

physically
73:22

picked 55:17

picture
22:19 25:1
56:5 80:18

pictures
25:10
27:12

place 73:1,
12

places 81:19

plainly
60:14

Plaintiff
4:4

plaintiff's
49:24
59:22
65:23

plenty 57:15
71:7

point 5:19
11:10,11,
13,14
12:23
34:14
49:19
55:13 58:7

police 46:15
47:10

policy 56:23

pop 28:3

pornographic
62:7

pornography
4:24 20:24
23:9 35:24
36:9 44:5
48:8 52:17
56:21
61:19,20
64:8 82:12

position
  36:7

positive
  32:8

possess
  22:18

possessed
  24:18
  25:4,5

possession
  4:24 20:24
  22:6 23:6,
  9,11,21
  24:10
  25:3,11,20
  48:7 55:17
  56:20
  67:15
  82:12

possibility
  82:13

posted   26:11

potential
  39:15
  79:16

potentially
  38:11
  64:12

powerful
  48:23

practice
  13:10

prepubescent
  49:16

50:2,10
51:7 63:9
65:12

present   78:1

presentation
  22:20

presented
  12:3 13:17
  43:13,15
  53:15
  73:15,17

Preston
  7:14,20
  11:18
  12:3,12
  16:19
  27:15
  28:10 30:2
  33:5 36:17
  42:23
  46:10,21
  54:16,22
  67:9
  73:21,23,
  24 74:14
  83:10

Preston's
  72:5

prevent
  37:24 38:3

previously
  20:2,4
  40:7 76:2

printed   58:8

prior   6:6,9,

11 8:14
21:19,24
29:2 30:10
49:9 53:23
66:20
72:23
75:20 76:9

private
  20:24

probable
  21:6,8,12,
  19,23 22:1
  23:20 24:8
  26:5 36:10
  49:9 54:4,
  11 67:13,
  14 76:3
  82:12

problem
  19:20
  20:23
  72:14

procedure
  4:20 57:1

PROCEEDINGS
  4:1

process   7:23
  36:6 41:18
  59:10,20

produced
  18:13

professional
  20:19
  58:19
  59:14

Professionally
  29:2

prohibitive
  39:1

proliferation
  37:24 41:3

promoted
  6:18

prosecute
  43:5

prosecuted
  47:20 48:7

prosecuting
  64:7

prosecution
  4:23

protected
  20:25
  42:20

protection
  11:17
  75:15

protective
  59:12

prove   70:11
  77:20
  83:2,4

provide
  75:18
  79:11,15

provided
  60:8

puberty

12:24
13:4,6,21

**pubescent**
51:15,24,
25 52:17,
23

**pubic** 13:11
60:11,16
61:14,25
63:8 64:13
65:11

**public** 14:10
26:3 27:9

**publication**
40:20 43:3

**published**
24:16
26:20
27:2,5,9,
17 37:15
38:12
39:23
40:18

**publisher**
41:4 43:5

**publishers**
44:5

**publishing**
41:5 70:6

**purported**
37:13
77:18

**purports**
22:16

43:16

**purpose**
37:23

**purposes**
62:23

**pursue** 39:1
41:20

**pursued** 43:3
48:4

**pursuing**
47:15 53:6

**put** 13:19
35:13
58:18
62:24
63:18
80:13

---

### Q

**quality**
17:24

**quarter** 8:10
34:23

**question**
10:3 13:22
14:25
15:3,14
16:12 17:9
19:23 20:9
23:25
24:3,6
39:4 40:16
43:10
46:24

53:22,23
54:6,7
56:4 63:22
77:16,20
81:19

**questioning**
77:3

**questions**
12:16
58:12
72:16,20,
22 82:5
83:7,11

**quit** 19:17

**quote** 22:9

**quote/unquote**
79:8

---

### R

**raises** 56:4

**range** 48:21
64:19

**rating** 58:13
64:8 79:20

**reach** 28:23
57:16

**reached** 15:6

**read** 22:9,
15 36:21
60:18
63:19,23,
24 83:14

**readily**

54:21

**reason** 7:19
11:3 23:18
24:7 31:10
35:5 38:13
39:7 54:14
58:25
68:20,22
75:3,8

**reasonable**
37:12 38:7
39:14,24
40:19
82:16,20

**reasons**
53:14

**recall** 10:21
26:19
45:13
51:15

**received** 7:5
10:3,6
11:1 16:17
26:24 35:6
36:8 51:6
52:18,20

**receiving**
34:19

**recognize**
81:6

**recognized**
29:25
32:12

**recollection**
22:16 34:7

**record** 4:16 19:13,19 28:6 42:10 75:14 76:8

**records** 46:22 54:9

**redacted** 81:15,19

**redirect** 82:7,9

**refer** 8:10 15:9 57:15 58:5 77:24

**reference** 11:11,12, 13,15 40:2

**references** 15:9

**referred** 6:15 43:3 77:2

**referring** 5:13 8:5 9:24 24:23 49:19 50:3,20 78:10,12

**refers** 76:21

**regard** 14:23 69:6

**relate** 55:12

**release** 32:13

**relevant** 63:5,6

**reliability** 59:21

**reliable** 45:10 73:7

**relies** 63:15

**rely** 52:1

**remains** 29:10

**remember** 10:12,15 32:9 34:13,15, 17 39:25 40:6 53:18 58:6,7 69:18,25 70:5 71:1 72:3 73:3, 9,25 74:3, 21 75:24 79:22 80:20

**remembering** 37:4 47:14 75:22

**repeat** 24:4 71:19

**repeated** 71:25 72:2

**report** 35:17 36:8,9,21 37:5,6,11

49:13,15 57:21,22, 24 58:5,6 71:8,12 72:5 77:25 78:4

**Reporter** 19:25 20:3 27:19 44:17,18 83:15

**reports** 34:20,22 49:8 57:20

**represent** 42:10 72:21

**representation** 22:19 79:21

**representing** 83:9

**represents** 62:25

**reputation** 68:12,16

**requested** 67:10

**require** 36:13

**required** 21:19,23 23:5 44:6

**requirement**

22:1 62:21

**resource** 59:6

**respect** 60:15

**responsible** 34:19

**retired** 6:25

**review** 36:5 57:20 60:9

**reviewed** 7:5 16:12,17 28:14,20 71:8 78:8

**reviewing** 11:12 52:6

**rhyme** 35:5

**rights** 22:1

**robbery/ homicide** 6:15

**Roberts** 4:8, 17 18:20, 24 19:12 20:16 23:2,16 24:2,14 25:16 26:13 28:2,5,8 37:20 39:12,20 41:1 44:14,21,

22 46:17
49:4 50:4,
18,21,24
51:1 56:3
57:7 59:3,
24 63:4,17
64:1,21
66:1,16,17
67:1,20
69:4 72:15
77:2 78:7
79:19
80:4,17
81:7 82:6,
10 83:7,
11,13

**Roberts'**
20:9

**room** 35:15

**rotated** 6:20

**rules** 4:20

**run** 41:9

**ruse** 28:21
33:2,13

———————

**S**

———————

**safe** 73:11

**satisfies**
82:16

**scale** 31:3
79:20 80:3

**scenario**
13:3 15:6
17:7 18:6

25:25
38:16
39:18,21
40:13
41:13
43:8,13,
15,17
47:15 48:2
52:11,20

**scenarios**
57:16

**scenes** 45:3

**scheme** 70:23

**screen** 49:23
50:16 51:3
60:2 82:25

**script**
78:11,21

**search** 21:20
28:14,20
29:8 37:1,
3 38:18
42:17
53:24
54:2,4

**seated** 74:4

**Section** 22:6

**seek** 11:16
48:13
53:24

**selling**
25:18

**semantics**
58:4

**seminar** 14:3

**sense** 9:16
52:22

**sensitive**
31:4,7,14,
16,17

**separate**
10:4 58:1

**sergeant**
4:10,11
6:18,24
20:7 83:8

**sergeants**
5:8

**serves** 26:22

**service**
75:10,13

**sexual** 11:20
22:7,22
23:22
24:10
25:3,11,20
36:11
37:9,24
41:3 43:4
46:6 58:12
63:2 67:15
79:19

**sexually**
38:9 80:1

**share** 49:23
50:16 66:2

**shared** 51:3

**sharing** 60:1

**shaved** 60:12

**sheriff's**
5:10 7:17
28:22
30:16,23
32:8 38:3
42:1,16,20
43:2 46:13

**Shevlin**
18:17,23
19:9,14,18
20:11
23:1,15,23
24:12
25:13 26:8
37:18 39:9
49:2
50:15,19,
22,25 57:4
59:1 62:19
63:12,21
64:16
65:15,17,
19 66:14
67:18
72:19
80:13,16
81:8,13
82:1 83:16

**shoot** 54:2

**show** 20:5
22:19 56:6
59:25

**showed** 55:13
73:22

showing
  51:20
  60:7,15

shown  73:17
  74:11,12

shows  78:16

side  58:16

sides  35:15

signature
  83:19

signifies
  24:5

signs  58:21

similar
  56:19

simple  53:4
  77:16

sir  5:3
  20:15
  33:16,19
  51:10
  72:20 82:3

sit  5:6
  26:18 34:6
  51:14
  65:14

situation
  25:6 31:5
  38:16

situational
  40:25 47:1

situations
  59:15

skim  37:5

skin  12:10

sloppy  46:15
  47:10

SMR  60:13,
  15 64:2,8
  79:20 80:3

society
  14:13

socks  74:5,6

solely  39:5
  63:15

someone's
  14:7,23
  48:24

sort  48:18
  56:23 72:4

sought  54:2

sound  22:22

sounds  6:9
  34:18

source  18:18

southwest
  29:9

speak  11:14
  12:8 57:19
  61:10
  70:14

speaking
  14:9 18:21
  24:13 36:3
  38:16
  41:24

special  72:8

specialized
  14:5,21
  15:8

specific
  13:1

specifically
  70:1

spent  66:20

spots  81:15

spread  37:24
  74:4

St  5:9 7:17
  30:15 38:2
  42:16 43:2
  46:13
  68:24 83:2

Stage  79:21,
  24

stand  65:6

standpoint
  63:11

stands  50:10
  76:13

start  9:10
  53:24

starting
  20:10

State  42:11
  53:17
  69:22 83:3

state's  83:4

stated  77:1

statement
  21:1 24:1
  67:21
  69:20
  70:7,18,22

States  21:1,
  19,23
  41:7,16
  77:7,10,14

stating
  54:8,9

status  75:6

statute
  22:5,7,8,
  12,14,15,
  23 44:10
  62:21

statutes
  46:19 47:7

step  41:23

steps  36:19
  37:7 38:7
  49:11

stood  76:15

stop  41:3

stuff  4:20

subject
  74:23 75:1

submit  18:6

subordinates
  36:14

| | | | |
|---|---|---|---|
| Subsection 22:6 | swap 27:21 | 71:17,20 72:3 | things 8:19 11:12 13:9 14:13,15 |
| successfully 47:19 48:7 | sworn 4:4 | ten 6:17 | 15:8 20:21 36:3 46:5 |
| suggesting 52:16 | Synchronoss 28:15,16, 19,21 37:1 | tend 9:3 | 47:17 54:19 |
| supervise 5:9 | **T** | term 9:25 21:8 35:23 36:1 | 57:10,15 67:7,8 70:23 |
| supervised 6:19 | tagged 12:11 | termed 14:15 | thought 8:20 24:1 33:11 |
| supervision 7:8 | takes 63:16 | terms 21:12 47:1 76:20 78:16 | throw 78:4 |
| supervisor 5:19,23 6:4,7,22, 24 7:4 9:2 30:9,12 43:12 | taking 49:11 67:8 | testified 4:4 39:2 46:19 75:20 82:22 | tiebreaker 57:2 |
| | talk 32:24 | | time 5:25 6:10 9:12 10:12,15 11:19 |
| | talked 8:3 36:16,18 71:23 | | 18:14 19:15 |
| support 75:18 | talking 7:24 8:9 9:19 29:19 43:18 46:25 50:9 51:19 54:18 | testifies 66:19 | 21:3,17 22:3 23:4 24:18 |
| supported 54:10,11 | | testify 35:21 | 27:22 29:7 30:4 32:10 |
| supporting 34:2 | | testimony 45:14 72:23 75:23 76:7 79:22 | 34:18 45:16 |
| suppose 10:13 | task 7:7 | | 54:1,9,22, 23 66:20 |
| surprise 76:16,24, 25 | tasks 33:7 | text 79:7 | 67:8 72:16 74:19 |
| | team 11:17 15:7 59:12 75:15 | theory 52:15,16 | 77:21 82:4 |
| | teen 17:13 | thighs 60:14 | timeframe 6:3,7 8:9 34:3 |
| suspect 9:6 23:19,21 24:7,9,17 52:12 53:6 | teens 76:15, 22 | thing 4:13 35:16 43:19 52:9 74:6 | |
| | telling 40:3 58:20 59:8 | | |

times  49:14
56:17
75:22

tip  8:9,11
9:5,9
10:24
11:1,15,19
15:19,21,
22 16:13,
17 29:21,
22 33:5
45:17
49:7,11,
13,15
51:6,13
52:4,5,18
53:11 55:6
68:7

tips  7:5,7,
24 8:14,23
9:2,4,8,13
10:4 15:19
51:18
52:6,13,19

title  5:6

today  4:17
5:7 26:18
27:8 34:6
51:14 60:8
83:11

Tolbert  4:3
20:7 51:2
82:11 83:8

told  17:14
32:22
34:15

39:22
51:12
69:15,16,
17,18,19,
25 70:1,8,
9 71:1,2
72:1 76:15
80:4

tool  48:23

top  36:21
78:17

touched
62:13,17

trading
25:18

trained  46:5
62:10
75:18

training
12:18
13:22,23,
24 14:5,
16,22 15:8
43:25 46:2

transferred
45:1

transition
5:18 34:3

transitioned
6:21,23

transitioning
5:19,21

traveled
81:12

travesty
48:9

treated
31:20

triage  9:3

true  23:17
39:13
49:15 57:2
70:25 80:5

trust  58:25
59:7,10,16

truth  59:8

turn  7:21

turned  48:8

type  17:23
38:16
55:16 73:8
79:3

typical
74:22

typically
41:24

———————

**U**

———————

Uh-huh  8:25
35:2

Ukraine  81:3

ultimately
44:23

unconfirmed
35:24 36:9
52:5

underage
40:8 82:14

understand
4:18 7:13,
23 8:5
9:23,25
13:21
16:2,8
20:22
21:6,8
23:3
24:16,17,
21 26:14
30:9 32:6
34:20
35:21 36:1
59:5
61:11,12,
14 62:11
64:2 67:8,
23 82:11
83:1

understanding
14:6 36:7
55:8 59:17
64:10
69:12 81:3

understood
21:17,22
68:2 72:24

underwear
78:17

unit  5:9,
20,21,23
6:4,10,19
7:16 72:8

United  21:1,
  18,23
  41:7,16
  77:6,10,14

University
  59:12
  75:15

unlawful
  22:17

unreasonable
  40:24
  41:12

uploaded
  50:2

upward  35:3

utilized
  44:9

---

### V

vaginal
  55:14

vaguely  37:4
  74:1

vantage
  55:13

verification
  44:2
  46:18,23
  47:7 48:22
  77:11

verified
  26:4

verify  48:24

49:17
51:19 52:3

Verizon
  28:17

versus  14:4

victim  29:10
  39:16

victims
  40:21 46:6
  72:8

view  22:18

viewed  36:4

viewing  26:2

violation
  46:12

visible
  60:13,14

visited
  27:15

visiting
  37:14

visually
  82:24

vote  62:1

---

### W

W-E-R-L-E
  30:18

waived  83:20

walks  9:17

wanted  32:25

52:10

warrant
  21:20
  28:14,20
  37:1,4
  38:18
  53:24 54:3

watermark
  26:21
  40:4,7
  79:3

ways  42:4

wearing  74:5

web  25:18

website
  26:3,10,
  19,24
  27:1,4,16
  37:14
  38:12
  39:15 40:7
  41:4,14,
  15,22,25
  42:8 43:16
  44:11
  46:22 47:6
  48:5 67:9
  76:10

websites
  40:19,20
  41:6 42:17

weed  35:11

weeds  13:12

week  34:24

weekends
  29:15
  56:16

weeks  35:1,
  3,4

weighs  14:17

weight  58:19

well-
established
  21:4

Werle  30:14,
  16,20
  32:17,22
  34:16

white  74:5
  78:21

widely  60:15

wife  25:9

wiggle  35:15

William  4:22
  30:19

willy-nilly
  42:4

window  19:25

wiped  69:13,
  23 71:10,
  18,21 72:1

wires  26:23

wished  66:19

wonderance
  70:13

word  24:21

35:8 43:7
47:18 51:9
78:11

**wording** 81:6

**words** 13:14,
19 25:15

**work** 45:24
46:16
47:10

**worked** 12:9
71:7

**working**
29:6,7

**works** 59:11

**world** 66:5

**worldly**
81:11

**worst** 4:13

**wrong** 42:15

**ww.com.**
43:17

12:21 14:1
18:1 19:3
47:13
60:17,18
64:14 65:5
66:7

---

**Z**

---

**Zoom** 19:24

---

**Y**

---

**y'all's**
13:10

**year** 6:21
13:1,13
17:12,15
47:13
80:11

**years** 6:5,6,
17,19,23