No. 26-10155-D

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

WILLIAM LEE LAWSHE,

*Plaintiff-Appellant*,

v.

MIKAYLA PRESTON, and
KATHLEEN DULLY

*Defendants-Appellees*

Appeal from the United States District Court
for the Middle District of Florida, Jacksonville

No. 3:24-cv-00044-MMH-MCR

---

## APPELLEE DULLY'S SUPPLEMENTAL APPENDIX VOL. 3

---

Jami M. Kimbrell
Florida Bar No. 0657379
**Howell, Buchan & Strong**
2898-6 Mahan Drive
Tallahassee, FL 32308
Phone: (850) 877-7776
Email: Jami@jsh-pa.com

*Attorney for Appellee*
*Kathleen Dully*

A    That I do not recall, saying that he scrubbed his phone.

Q    Do you have any -- is there -- was there ever any suspicion that he scrubbed his phone of -- of illicit images?

A    That I do not know.

Q    But you're -- you're the investigator.  You're the detective in charge of this case; correct?

A    Yes, sir.

Q    And you don't know?  Who would I ask?  Who would I ask to know if there was a suspicion that he had scrubbed illegal images off of his phone?

MR. CARSON:  Object to form.

THE WITNESS:  I don't know specifically who stated that, so I don't know who you would ask to be able --

BY MR. ROBERTS:

Q    I'm asking you as the lead investigator in this case, did you ever have any concern that my client had deleted or scrubbed any files or images off of his phone?

A    What I'm saying is I don't know, and I don't recall hearing that.  So I can't speak on it.

Q    I'm not asking --

A    Yes.

Q   I'm going to ask the question until you answer it.  Okay?  Did you have any concerns or information that Mr. Lawshe scrubbed his phone or deleted any images from his phone that were illegal?

A   And what I'm saying is I don't recall hearing that or having information that that occurred, so I don't know.

Q   Okay.  So you say you don't know.  I'm asking if you had a concern.  Okay?  I'm not asking if you heard somebody else.  So the answer is I either had a concern or I didn't have a concern.  I mean, I guess you might say that I don't remember if I had a concern or not.

But my question is did you ever have a concern that he scrubbed or deleted any illegal images off of his phone or any electronic device?

A   Like I'm saying, I cannot recall that occurring or having that thought.  Like, I can't remember.  So I don't want to speak on something that I don't remember.

Q   So I guess your answer is you don't remember if there was any evidence that he had scrubbed illegal images off of his phone or not?

A   My answer is I don't recall that occurring, so I don't know.

Q    So you just don't remember if that was something you were concerned with or not?

A    What I'm saying is I don't recall, so I can't tell you if that's something that I was concerned with or something that I wasn't because I do not recall.

Q    Okay.  All right.  And you were the lead detective in charge?

A    Yes, sir.

Q    All right.

We -- you did seek another search warrant for his home; correct?

A    Yes, sir.

Q    And you obtained two additional devices from his home?

A    I don't recall.  I would have to review what was taken because I wasn't on scene when that occurred.

Q    Well, let me ask you this:  Did -- all of the three images that he was charged with were from his personal cell phone device?

A    I don't recall.  I would have to look back at the Cellebrite extraction.

Q    Okay.  Why did you not charge -- there's -- one, two, three -- four images of -- let's call her the model from the NCMEC.

A    Yes, uh-huh.

Q   Why did you not charge her [sic] with all of the images?

A   You're talking about all of the ones that we have on this table?

Q   No, all of the images of the model that was the subject of the NCMEC report.

A   Because, like, for instance, this image, I would have to go back to the Cellebrite report.  But if it was not on the device at the time that he physically had it, we wouldn't have charged for it.

Q   Why not?

A   Because he wouldn't have been physically in possession of that image.

Q   But Synchronoss had told you that he had downloaded it.

A   That, I don't know if they stated downloaded, but at some point in time, that image was viewed.

Q   Okay.  So there's three images.  Let's take out B.

A   Okay.

Q   Okay?  Because you're saying that you don't believe that was on the -- the download.  There's three images, A, D, and C.  You did not charge for those images, all of those images.  Which images did you charge and why not the other?

A    I would have to look back at the image names to be able to determine which ones were charged --

Q    Okay.

A    -- on it.

Q    Well, why would you have not charged all three?

A    All three of these?

Q    Correct.

A    This image, I do not believe that was one of the ones that was charged, but I would have to refer back.  But I don't recall why it wasn't.

Q    You don't recall?

A    Why this image was not charged, no.

Q    And -- but this top image in E was charged; correct?

A    Yes, sir, uh-huh.

Q    Can you tell me why that image was charged?

A    Because like I said, I viewed it as CSAM, and we also got that confirmed by Dr. Dully.

Q    Yeah.  But so -- so are these.

A    Uh-huh.

Q    And you didn't charge those.

MR. CARSON:  Object to form.

THE WITNESS:  I would have to review, but -- and I don't want to misspeak.  But I would have to

look back at the PC to see if these images were charged.

BY MR. ROBERTS:

Q    Well, there were only three images charged.

A    Yes.

Q    And -- and we're looking at a total of what, five, six images?

A    Yes.

Q    We know one, you just determined it was an adult.

A    Uh-huh.

Q    Right?

One wasn't on his phone.

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know.

BY MR. ROBERTS:

Q    You don't know, but it wasn't charged.

A    No, it was not charged.

Q    You're not -- you're not sure why it wasn't charged?

A    No.  I'm saying I know that one was not charged.  I do not remember why this one was not charged.  But three images within this were charged, is what I'm saying.

Q    You didn't charge A?

A    I do not recall.  I would have to look back at the image name, the file name, on the PC.

Q    Isn't that the file name right there?

A    Yes.  But what I'm saying is I would have to refer back to my PC that lists the file names that were charged.

Q    On your arrest and booking report or on the charging document?

A    It should be on both.

Q    I mean, is there a reason -- can you -- whether you -- you charged that or not, is there a reason why you wouldn't have?

A    I think there's some confusion because within these images are the charged image.  So that's where I'm kind of confused by your question.  Because I included the NCMEC image -- the two NCMEC images, the three images that were charged and then another image.  So you're saying that I didn't charge on these images, but included within this pile are the charges.  So that's why I was --

Q    That's correct, yeah.  No, no.  And I --

A    That's why I'm a little confused by what you're saying.  Because you're saying that I didn't charge on these images, but what I'm saying is included in these images are the three that's charged.  So

something would have had to have been charged.

Q    Yeah.  And I guess you just don't know why you charged two but not three of those images of the NCMEC model?

A    What I'm saying is I don't recall why this one was not charged.  Yes, I don't recall.

Q    You're saying that the YCBLDV was not charged?

A    What I'm saying is that potentially, but I would have to review that to see.

Q    But I'm not really asking you which were charged and not.  I'm asking you why all three of these images were not charged.  Why did you just choose two and not three?

A    I'm very confused by what you're asking.

Q    Okay.  There are three pictures of this model.

A    Yes.

Q    Okay?

A    Yes.

Q    A, D, and C.

A    Uh-huh.

Q    Okay?  And it doesn't really matter which one was charged or not charged; right?  But only two of these images were charged; correct?

A    Yes, if these were the images that were charged.

Q   Well, I've asked you to bring all of the images; right?

A   Yes.  But what I'm saying is I would have to review the file name because I've looked at these images so much that I don't know what file name is associated with each image.  That's all I'm saying, is I would have to review the file name attached to that PC.

Q   You're just not understanding my question.  Okay?  I'm not asking which --

A   Probably.

Q   -- which images were charged on.  Okay?  I'm not asking that question.

A   Yes.

Q   But there are more images than there are charges.

A   Yes.  I get that.

Q   You understand.

A   Yes.

Q   One of these of the NCMEC model was not charged because you don't think you could find that on the phone.

A   Yes.

Q   Right?

So that leaves us with three images of the same model that was in the NCMEC picture; right?

A    Yes.

Q    And then you have a second model that we've already talked about; right?

A    Uh-huh.

Q    That's four images of what you consider to be CSAM on his phone.  I'm just asking why you would only charge three of those images and not all four of those images.

A    Yes.  But that's why I stated I don't recall why one of the images was not charged.  I would have to go back and review it.  I -- maybe that was not heard.

Q    Okay.  You think if I showed you which image it was that you would remember?

A    Why it was not charged?  No, just by seeing it.  Because I'm looking at them now.  Like, I still -- even with looking at them, I can't recall why a specific image --

Q    So it doesn't really matter if you know which images were charged or not.  You're not going to remember why a specific image was not charged?

A    Yes.  That's what I'm saying.  I thought you were saying why were these not charged, and that's why I was like, no, I'm pretty positive these were.  But --

Q    No.  I'm just -- for some unknown -- for some unknown reason, you just decided not to charge

Mr. Lawshe with possession of one of these images?

A    That, I don't know the reason.

Q    You just don't know the reason.  That's why I said unknown reason.

A    Yes.

Q    Right.  Okay.

A    Sorry.  I got confused with the way you asked it.

Q    That's okay.

All right.  I think those are for the court.

You were in no way part of the decision to drop the charges?

A    No, sir.  That was the State Attorney's Office.

Q    And I just -- I just want to make sure.  Your testimony today is that other detectives in -- in your department, that you ran these images by them after your initial review and they weighed in on whether they thought that it was CSAM or not?

A    What images are you referring to?

Q    The charged images.

A    Yes, sir.

Q    You -- after you looked at them, you took them to Detective Greene?

A    I don't remember verbatim who I took them to,

just because it was two years ago.  So I can't recall who specifically viewed them.

Q    In your deposition, you testified that for sure, you ran it by Detective Greene.

A    So maybe he viewed it.  I just don't recall.

Q    Detective Camden?

A    I don't recall if he was back from maternity leave at that point.

Q    Tolbert?

A    Sergeant Tolbert would have reviewed them.

Q    After your initial investigation?

A    What do you mean, like, after the initial --

Q    Like, after -- after you got the NCMEC to -- after you did your search warrants, he would have reviewed them --

A    Oh, yes.

Q    -- and been part of the decision that these are, in fact, CSAM images?

A    Yes, sir, uh-huh.

Q    Right?

Other than Greene and Tolbert, who -- who would have been your colleagues that you ran these by?

A    I don't recall who was in the office during that time.

Q    So you don't -- you don't know of anybody

else?

A    Offhand, I don't recall who else.

Q    Who were the other detectives at that time in -- in ICAC?

A    It was in 2023.  So we had, I believe, Detective Jimenero (phonetic), but I don't know if he would have been -- I don't know --

Q    Okay.

A    -- if they would have been in the office at that time.

Q    Camden, maybe, maybe not?

A    That I just -- I can't recall specific, who.

Q    Okay.  All right.  So you don't know -- you don't have a specific recollection of who you ran this by?

A    No, sir.

Q    Detective Greene has testified that he did not have any part in saying whether these were CSAM or not CSAM.  Do you disagree with that testimony?

A    What I'm saying is that if I stated back in that original depo that he viewed him, then he would have viewed them.  Now, if he doesn't recall it, he doesn't recall it.

Q    Okay.  All right.  Have you ever reached out to the FBI?

A    In reference to?

Q    ICAC issue.

A    Like, what exactly?

Q    In any investigation that you've done as an ICAC or SVU, have you ever reached out to the FBI for help?

A    Possibly.  I can't recall.

Q    Okay.  So you can't recall?

A    Uh-uh, not that I can recall, possibly.

Q    You don't have, like, a -- and I'm not being silly.  But, like, you don't have, like, memory issues, do you?

A    No.

Q    I mean, you've been an investigator since 2023, early 2023.  That's, like, two years, and you don't recall in that time ever having talked to an FBI agent?  You just don't have that recollection?

A    No, sir.  With the amount of cases that we get and the amount that goes on in that office, I can't recall specific events.

Q    Okay.

MR. ROBERTS:  All right.  I don't have any other questions.  Thank you.

MS. SHEVLIN:  Matt, I've got some questions.  I'm assuming you want me to go first?

MR. CARSON: Yeah.

MS. SHEVLIN: I do have follow-up.

MR. CARSON: Yeah. Go for it.

MS. SHEVLIN: Okay.

CROSS EXAMINATION

BY MS. SHEVLIN:

Q Detective Preston, my name is Amy Shevlin. I represent Dr. Dully in this case. There's a little bit of a delay. I suspect sometimes the audio goes down --

A Okay.

Q -- and then it pops back up. So if you have any issues hearing me, please do let me know.

A Yes, ma'am.

Q And I'll let you know if I have issues hearing your answer. Okay?

A Okay.

Q So I -- I have a couple questions for you mostly based on the testimony that (unintelligible) for Mr. Roberts. So you testified several times that you believe -- as we sit here today, you believe that the images in question show minors and not adults; correct?

A Yes, ma'am.

Q Okay. Would it be fair to say that you formulated that opinion upon viewing those images?

A Yes, ma'am.

Q   Okay.  And you viewed those images prior to taking them to Dr. Dully; is that correct?

A   Yes, ma'am.

Q   All right.  Can you tell me -- you may have said it already in your testimony, and I apologize if I'm rehashing.  But can you tell me how you know Dr. Dully?

A   So I don't -- she was referred to me by my sergeant, Sergeant Tolbert.

Q   Okay.

A   So this --

Q   And that was in the context of the underlying case with Mr. Lawshe; correct?

A   Yes, ma'am.  This was my first time meeting her, like, during this investigation.

Q   Okay.  Okay.  And I believe you also stated you have not worked with her since this case with Mr. Lawshe.  Am I remembering that correctly?

A   Yes, ma'am, that's correct.

Q   Okay.  What is your understanding of Dr. Dully's employer as we sit here today?

A   I don't remember offhand.  I know that she works in Jacksonville in -- possibly at the Child Protection Team.  I just don't remember the specifics offhand.

Q    Sure.

Do you remember her job or her title?

A    No, ma'am, not offhand.  No, I don't.

Q    Dr. Dully is not a -- she's not an employee of St. Johns; is that correct?

A    Yes, that is correct.

Q    Okay.  And when I say St. Johns, I am using shorthand.  I'm referring to your employer.  Do you understand that?

A    Yes, ma'am, the sheriff's office.  Yes, ma'am.

Q    Okay.  Thank you.  Yes, yes.

So how many times total did you meet with Dr. Dully regarding this case?

A    I believe it should have only been twice.

Sorry.

Sorry.

Q    Ms. Preston, I'm sorry.  You cut out.

A    Oh, yeah.  Sorry.  The Internet connection is saying it was unstable.

Q    Yeah.

A    I believe it should only have been twice.

Q    Twice?

A    Yes, ma'am.

Q    Okay.  And I believe you said that you met with Dr. Dully alone.  Do you remember anyone

accompanying you to either of the meetings that you had with her?

A    Not that I recall, no, ma'am.

Q    All right.  How did you come to meet with Dr. Dully, meaning who coordinated the meeting?

A    Sergeant Tolbert gave me her contact information, and then I reached out to her.

Q    And I believe the dates that you're meeting with her, I think you said February 20th and the 22nd.  Am I remembering that correctly?

A    It should have been February 22nd and April.

Q    Okay.  February 22nd.  And then was that April 5th?

A    Yes, ma'am.

Q    Okay.  All right.  And that would have been 2023?

A    Yes, ma'am.

Q    All right.  And the -- the -- let's talk about the first meeting on February 22nd.

A    Okay.

Q    Did you show Dr. Dully any of the images in question on that date, on the 22nd of February?

A    It would have been the one NCMEC photograph.

Q    Okay.  And that -- the NCMEC photograph is the first one that came in with the cyber tip?

A    No.  So it would have been the second one.  So it was the only one that we worked off because there was two photos.

Q    Okay.

A    Yeah.

Q    Okay.  Do you recollect how many photos you showed her in that first meeting on February 22nd?

A    It should have been only one.

Q    Just the one.  All right.

A    Yes, ma'am.

Q    How were the -- how was the photo presented to her?

A    On my agency-issued laptop.  I had a thumb drive, and I just plugged in the thumb drive and then opened up the image.

Q    That was your employer-issued laptop, you said?

A    Yes, ma'am.

Q    All right.  And when you showed her the images on your laptop, I am assuming when your meeting was over, you took that laptop.  You took that image.  She was not provided a copy.  Am I correct in that assumption?

A    That would be correct, yes, ma'am.

Q    All right.  Did you at any point on

February 22nd tell Dr. Dully the identity of the suspect?

A    No, ma'am.

Q    Okay.  Did you at any point reveal Mr. Lawshe's career or job or position as a law enforcement officer with -- during your meeting with Dr. Dully?

A    No, ma'am.  Because it's an active investigation.

Q    Would it be fair to say that Dr. Dully had absolutely no idea who the subject or the suspect of your investigation was?

A    That would be correct.

Q    Was Dr. Dully paid to review any of these images or render any of these opinions?

A    Not by my knowledge, not by us.

Q    Okay.  All right.  So St. Johns, through you, requested that Dr. Dully review these images; correct?

A    Yes, ma'am.

Q    Okay.  And who requested that Dr. Dully author the letters that we have?  We've got one from February 22nd.  There's one from April 5th, and then there's a second one from April 5th.  Who requested that she author those?

A    You mean, like, write her opinion on it?

Q    Yes, ma'am.

A    I don't know if anybody requested it.  I think she just wrote it herself, but I can't recall.

Q    You cut out again.  It's freezing.  I'm so sorry.

A    No.  You're good.

I'm sorry.  I don't think anybody specifically requested she, like, write an opinion on it, if that answers your question.  I think she just wrote it on her own.

Q    Would it be part of St. Johns' expectation that if they're showing these images to Dr. Dully that she would render a written opinion?

A    That I don't know, just because this was my first time using her.  But I do believe she has written these in the past.

Q    You don't have a specific recollection of you specifically asking her for anything in writing regarding these images?

A    No, ma'am.  Not from me, no.

Q    Okay.  Do you know if anyone else from St. Johns asked her to author these?

A    No, not from my knowledge.

Q    Do you know -- I know you said you've only worked with her the one time.

A    Yes, ma'am.

Q    But do you know that if it is her normal practice or course of business to author a report when she is shown images from law enforcement?

A    That I don't know, just because this is my only time working with her, so I don't know if it's --

Q    Sure.

You never provided a copy of the images showing the two models holding their passports to Dr. Dully; is that correct?

A    Yes, that is correct.

Q    Okay.  And Dr. Dully was never provided with the affidavit from -- I think it's Mr. Douglas, who's the attorney in California, who states that these girls are, in fact, over 18 in his opinion?

A    No.  She was never provided that.

Q    Okay.

MR. ROBERTS:  I'll object to that question.

BY MS. SHEVLIN:

Q    Is it fair to say that all of the information that Dr. Dully had regarding these images came either from you or from St. Johns in some fashion?

A    Yes, ma'am.

Q    Do you believe that Dr. Dully acted in good faith in reviewing these records?

A     Yes, ma'am.

Q     Do you believe that Dr. Dully acted in good faith when she authored the February 22nd and the two April 5th, 2023, letters regarding these images?

A     Yes, ma'am, I do.

Q     After -- well, let me jump a little bit further ahead.

Okay.  So on April 5th, you met with her a second time; correct?

A     Yes, ma'am.

Q     All right.  And it looks like her -- on her April 5th letter, there's the first paragraph, which is a copy from the paragraph on February 22nd, 2023?

A     Yes, uh-huh.

Q     Okay.  And then there's a second paragraph that says that she was shown two additional images of the same female that was in the first image that she looked at, and you testified that was the second NCMEC cyber tip that came in?

A     Are you saying that these two images were the second NCMEC cyber tip?

Q     No.  The -- you -- you just told me earlier that the first image that you showed to Dr. Dully was the second NCMEC cyber tip that came in.  The first one you did not show her; correct?

A    Yes, that is correct.

Q    Okay.  And then in addition to that first one, which she had already seen on April 5th, you showed her two additional images depicting the same female --

A    Oh.

Q    -- that was in the second cyber tip that you showed her on February 22nd; correct?

A    Yes, ma'am.  I'm sorry.  I misunderstood.  Yes.

Q    Okay.  Okay.  That's okay.  I just want to make sure.

And then also, on February 5th, it looks like she was also shown another -- excuse me -- two additional images.  The first image is a -- let me see.  It was -- the image is -- it looks like YCBLVVFQ_0.jpg is the file name.

A    Yes.

Q    Is that correct?

A    Yes, ma'am.

Q    Okay.  And then the second image was the image that Mr. Roberts was asking you about earlier that says Big Heart on the bottom?

A    Yes.

Q    Okay.  I'm going to -- I'm notoriously bad at screen sharing, so bear with me a moment.

A   Okay.

MR. ROBERTS:  Is it an exhibit you think we have?

MS. SHEVLIN:  It is.  I'm sure you do have it. I mean, you do.  She's looking at them right now. It's just the three letters.  I have the composite in front of me.

MR. ROBERTS:  It's just where your computer is is, like, kind of hard for her to see.  But that's my only --

MS. SHEVLIN:  Okay.  All right.  Hang on a second.  Like I said, I'm not good at this.

You know what?  I'm going to come back to this because this screen share does not appear to want to work right now.

BY MS. SHEVLIN:

Q   All right.  We're going to come back to those letters.  I have a couple additional questions for you, but --

A   Okay.

Q   -- we'll come back to that.

After your -- your second meeting with Dr. Dully on April 5th of 2023, did you ever have any (unintelligible) you met with her?

A   You said did I have any -- you broke up.

Q   After -- after April 5th of 2023, did you have any other meetings with Dr. Dully?

A   Not that I recall, no, ma'am.

Q   Did you have any phone calls with her after April 5th of 2023?

A   Not that I recall, no.

Q   Did -- did you have any correspondence with her, either e-mail or letters through the mail, text message, anything like that regarding this case?

A   Not that I recall.

Q   Okay.  You said multiple times in your testimony that there were -- there was a variety of factors that led to the decision to bring charges against Mr. Lawshe.  Can you very briefly just describe what those multiple factors were that led you to believe that charges should be brought against him?

A   Yes, ma'am.  So obviously, based off the image, me viewing it as CSAM, Dr. Dully's statement, and then the entirety of the digital download that we did, that's why we felt as though we had probable cause for the arrest.

Q   Would it be fair to say, based on what you've just told me, that you did not base your decision to bring charges against Mr. Lawshe exclusively on Dr. Dully's opinion?

A     That would be correct.

Q     Now, Mr. -- excuse me.  I think I'm going to call him by the wrong -- by the wrong title.  I think it is Sergeant Tolbert, but please correctly -- correct me if I'm wrong.

A     No.  You've got it right, Sergeant Tolbert.

Q     It is sergeant?

A     Yes, ma'am.

Q     Okay.  Wonderful.

So Sergeant Tolbert was previously deposed in this case.  And in his deposition, he stated that if we, meaning St. Johns, didn't feel like it was CSAM, we wouldn't have taken it to Dr. Dully to begin with, meaning there was already an opinion that the images were depicting minors before they were brought to Dr. Dully.

Do you agree with that statement?

A     Yes, ma'am, I do.

Q     Okay.  Do you also agree with my statement that Dr. Dully never would have seen any of these images if St. Johns hadn't already determined that they depicted minors?

A     That, I don't know how she would have been able to see them without us showing them to her.

Q     Okay.  Did Dr. Dully apply for a search

warrant in this case?

A    No, ma'am, not from my knowledge.

Q    Did Dr. Dully testify at any hearings in this case?

A    Not from my knowledge, no, ma'am.

Q    Do you recall what you told Dr. Dully about the images when she was viewing them?

A    I don't recall our conversation at all.

Q    You testified that you do not believe that the models depicted in the images are age-difficult.  Do you remember that testimony?

A    Yes, ma'am, I do.

Q    Okay.  So you believed at the time of your investigation that these images were obviously of minors?

A    Yes, ma'am.

Q    Okay.  And you still believe that today?

A    Yes, ma'am, I do.

Q    You discussed a little bit earlier with Mr. Roberts your prior deposition testimony that was in November of 2023.  You remember discussing that today?

A    Yes, ma'am, I do.

Q    Okay.  On Page 22 of your deposition, you testified -- prior to taking the photos to Dr. Dully on the time line, you testified:  So that, I did know that

it was child pornography.  I felt that she, referring to the model, was definitely under the age of 18.

As we sit here today, do you stand by that testimony?  It's on Lines 21 and 23.

A     Thank you.  Sorry.  I was trying to look for it.

Q     That's okay.

A     Yes, ma'am, I still stand by that.

Q     Okay.  And on the next page, on Page 23, we've got Lines 1 through 5.  And you answered in the affirmative to a question that you concluded that the image was a minor prior to speaking to Dr. Dully; is that true?

A     You broke up.  You said --

Q     Did I break up?

A     Yes, ma'am.

Q     Okay.  All right.  Page 23, Lines 1 through 5 of your deposition from November 23 --

A     Yes, ma'am.

Q     -- you answered in the -- in the affirmative to a question regarding that you -- you concluded that the image was a minor prior to speaking to Dr. Dully.

A     Yes, ma'am.

Q     And then on Page 29 of your deposition -- let me get there.  I believe -- it's between Lines 5 and 20.

I know that's a lot. But I'll break it down. From Lines 5 to 10, you testified: Nine times out of ten, you would always have another detective with you to confirm this is CSAM, just to get a second opinion on any image, especially if we're going to move forward with it.

And then at Lines 16 and 17, you stated that Kevin Greene reviewed the images. Detective Scoggins reviewed the images. And just a couple minutes ago, you also testified that Detective Tolbert also reviewed the images. Are all of those people -- excuse me.

Were all of these people, at the time, employees of St. Johns?

A    Yes, ma'am. They were and are. Sorry.

Q    Okay. I know you stated earlier in your testimony that you did not visit met-art.com. So I will represent to you that met-art.com refers to their model as teens and girls. Is that something you were aware of?

A    I know Kevin Greene stated something along those lines, but I don't remember verbatim what he stated.

Q    Okay. And would it surprise you to learn there are suggested search terms on met-art.com, which include Roy's teen amateurs, teenage beauties, teen from

Argentina, Asian dream teen, nude hairy teens, petite teens naked, teens in lingerie, teen nipples, teen boobs, teen boobs teen, teens wearing thongs, teens up skirt? Would any of that surprise you based on what you've seen?

A Based on what I've seen just in investigations, like, for ICAC?

Q Based on -- excuse me. Thank you for clarifying. Based on the images that you reviewed in relation to Mr. Lawshe.

A No, that wouldn't surprise me.

Q Okay. Now, Mr. Roberts had asked you earlier if you were of the opinion that someone had potentially altered the identification or the passports of the models in question to make it appear that they were 18. Do you remember that testimony?

A Yes, ma'am, I do.

Q Or that line of questions?

A Yes, ma'am.

Q Okay. And you -- you saw the images of the two models. There's one -- I believe her name is Melina (phonetic) D., and she's the one holding the two Ukrainian passports?

A Yes, uh-huh.

Q Okay. And those images -- on the image with

Melina D. with the two passports, the passports on there are, in fact, redacted; correct?

A    Yes.  Based off what I could see, yes.

Q    Okay.  So IDs can be manipulated or altered, especially in a photo; correct?

A    Yes, ma'am, in a photograph especially.

Q    And, in fact, we do have an altered photograph on this one because the information that is contained on the passports have -- has been redacted; correct?

A    As in them altering it to redact it, yes, ma'am.

Q    Yes, ma'am.

And same questions with the other model.  I cannot recall her name right now, but she's one with darker hair.

A    Yes.

Q    She's holding a Latvian passport?

A    Uh-huh, yes, ma'am.

Q    And the passport that she is holding has also been redacted; correct?

A    Yes, ma'am, it has.

Q    Okay.  So, again, that image has been altered in that it has been redacted so that we can't actually see the information on that passport?

A    Yes, ma'am.

Q    Seeing the image -- or images, I should say, of these girls holding these passports that purport to show their age do not give you any indication of how old they were at the time that these photos were taken; correct?

A    You're saying -- I'm sorry.  Because you broke up.  Just based off them holding the photographs?

Q    You froze again.

A    Yes.  Sorry.

I was saying you're saying just based off the photographs?

Q    There would -- there would be no way of knowing --

A    Sorry.

Q    Yes.  Let me ask it again just so it's clear because you broke up, and I broke up on your end.

You would have no way of knowing how old these girls were at the time these images were taken just by looking at a picture of them holding their passports?

A    No, ma'am, I wouldn't.

Q    Okay.

Okay.  I am going to attempt to screen share again.

A    Okay.

Q    I am going to be looking -- and you have

everything in front of you I'm going to screen share, just so we're on the same page. Going to have a few things highlighted.

A    Okay.

Q    But I'm going to refer to the February 22nd, 2023, letter from Dr. Dully and then the two letters that are authored on April 5th, 2023.

A    Okay.

Q    And I understand that my screen is a bit far from you.

A    Yes.  I have them in front of me.

Q    (Unintelligible) digital image.  Okay.

All right.  So on the first letter dated February 22nd, 2023.  So I've got some things here highlighted.  I don't know if you can see those.  But I'll just call your attention to the line so you can look at them with me.

A    Okay.

Q    And the first -- well, the first letter is only one paragraph.  The fourth line down in the paragraph states:  This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet.

A    Yes, ma'am.  I see that.

Q    Would you agree with me that that's what that

says?

A     Yes, ma'am.  That does say that.

Q     Okay.  And then two lines under that, it says: This female child appears younger than 18 years of age.

Would you agree with that assessment, that that is what this letter states?

A     Yes, ma'am.

Q     And then on the last line, it says:  She does not appear to be shaved.

Would you agree with me that that's what that says?

A     Yes, ma'am.  That's what it states.

Q     Okay.  I'm going to move to the April 5th, the first April 5th, 2020 -- excuse me -- 2023, letter.  And we've already established that first paragraph is the same as the February 22nd letter?

A     Yes.

Q     Starting on the second line of the second paragraph, she's describing the image or two images and says:  The model in that image is depicted to be, at most, SMR 3 or 4 and, therefore, between the ages of 12 and 15.

Would you agree with me that that's what that letter says?

A     I'm sorry.  What line was that?  I lost --

Q   Second paragraph.

A   Oh, okay.

Q   It starts on the second line and continues on to the third line.

A   Okay.

Q   Would you agree with me that that's what that letter says?

A   Yes, ma'am.

Q   Okay.  And then on the second April 5th letter --

A   Yes, ma'am.  I'm here.

THE WITNESS:  I don't know if she froze.

BY MS. SHEVLIN:

Q   I'm not sure if you answered because you broke up.  I'm sorry.

A   No.  I think you froze.  I couldn't hear -- this is freezing.

MR. ROBERTS:  We didn't hear the question.

MS. SHEVLIN:  I think there's a delay, yeah.  All right.

BY MS. SHEVLIN:

Q   On the first paragraph on the third line down, it states:  The model (unintelligible) visible and could be SMR 4 to 5.

Would you agree with me that that is

accurately stated in this letter; I'm -- I'm accurately stating what this letter says?

A    You froze.  But did you state her breasts are partially visible and could be SMR?  Is that --

Q    And could be SMR 4 or 5.

A    Yes, ma'am.  That's what it states on this one, yes.

Q    Okay.  And then the next line down says: Developmental appearance is 9 to 13 and a half years of age.

A    Yes, ma'am.

Q    Is that accurate?  Am I reading that accurately?

A    Yes, ma'am.

Q    Okay.  In the second paragraph, second line from the bottom, it says:  The model appears to have no pubic hair development.  She does not appear to be shaved.  Developmental appearance is 9 to 13 and a half years of age.

Am I reading that accurately?

A    Yes, ma'am, you are.

Q    Okay.  So earlier in your testimony, I believe you used the word certified, that Dr. Dully's certified that these images were of minors.  Having just looked at these letters, she says:  Appears, depicts between these

ages.

I don't see anything in here that certifies anything. Do you?

A   Not using the term certified, yes, ma'am. She does not specify that it's certified that this is what it is. So yes, I would agree.

Q   Now, there was also some earlier testimony that Mr. Roberts was asking you about why not all of the images depicting the same model had been charged, and you couldn't remember the specific reason.

A   Yes, ma'am.

Q   So would it be fair to say that the ultimate decision on which images to charge, regardless of what Dr. Dully reviewed or rendered an opinion on, ultimately, that decision was St. Johns? Correct?

A   Yes, ma'am.

Q   Okay. And St. Johns was the one that made the decision to bring the chargers forward against Mr. Lawshe; is that correct?

A   Yes, ma'am.

MS. SHEVLIN: Okay. I believe that's all I have for you. There's probably going to be some follow-up, so I'll turn it over to everybody else. But I appreciate your time, ma'am. Thank you.

THE WITNESS: Yes, ma'am.

MR. CARSON:  Do you have any more, Michael?

MR. ROBERTS:  I do.

MR. CARSON:  Go ahead.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q    So I want to show you, in Exhibit 8, A and C.

A    Okay.

Q    We previously looked at these photographs. Can you read the file number of A?  Well, first of all, you agree that these are the same models?

A    They appear to be the same.

Q    Right?

A    They appear to be, yes.

Q    And I think you said you actually -- when you -- when you picked out A, you recognized that as the NCMEC image model?

A    As appearing to be, yes.

Q    Right?

Okay.  So can you read the file number of that?

A    It should be YCBLVVFQ_ -- either an O or a 0.

Q    Okay.  Now, I want you to go to April 5th, the one that deals with -- it repeats the findings from February 22nd.

A    Where it repeats, you said, the find -- this

one?

Q    Yeah.  The one where it repeats it.

A    Okay.

Q    And then you show her the additional images?

A    Okay.

Q    You got me?

A    Yes.  I think I'm on -- on this page.

Q    I wish there was, like, a number.  We could probably call it something but --

A    This one?

Q    Yes.

A    Okay.

Q    It's the one that begins I previously examined.

A    Yes.  Yes, sir.  I'm there, yes.

Q    Okay.  Now, this is describing -- and I think her name is Melania D., so let's just call her Melania D.  Okay?

A    Okay.

Q    All right.  This is describing the original NCMEC image of Melanie D., correct, in the first paragraph?

A    Yes, sir.

Q    All right.  In the second paragraph, you show her two additional images of that model; correct?

289

A    Yes.

Q    And I think you have -- that's one of the additional -- one of the additional files; correct?

A    The 0059?

Q    05 -- 0059.  That's 8C; correct?

A    Yes, uh-huh.

Q    Okay.  Both of these are Melania D.; correct?

A    I don't know if they are both.  They appear to be the same, but I don't know if it's confirmed if they are the same person.

Q    That was your impression?

A    That it appears to be the same person, yes, sir.

Q    Right.

And so she estimated that this model was an SMM -- SMR 4 -- correct? -- originally and then SMR 3 or 4 at most, therefore, 12 to 15 years of age?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Is that what she --

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    Is that what it says in this document that we're looking at?

MR. CARSON:  Object to form.

THE WITNESS:  By saying --

MS. SHEVLIN:  Join.

THE WITNESS:  -- therefore, again, less than equal to 12 to 15.  That's what it says in this document.

BY MR. ROBERTS:

Q   So in this -- in this document that begins I previously examined a single color photograph, Dr. Dully is communicating to you.  This letter's directed to you; correct?

A   Yes, sir.

Q   That Melania D. -- and I understand you didn't know her name at the time.  But Melania D. is an SMR 4, maybe a 3, 12 to 15 years of age; correct?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  You said an SMR 4 or what was the other one?

BY MR. ROBERTS:

Q   3 or 4.  I'm just reading her opinion.

A   Yes.

Q   And I'm trying to get -- when you got this, like, you tried to understand what she was telling you; correct?

A   Uh-huh.

Q    Yes?

A    Yes.  Sorry.

Q    And it says this model, who we now know is Melania D. -- and I'm just reading the last sentence; right?

A    Okay.  Yes, yes.

Q    Right?

A    Yes, sir.

Q    And it says:  She would have achieved this developmental genital appearance of SMR 4 at 12 to 15 years of age.

Did I read that correctly?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Did I read that correctly?

MS. SHEVLIN:  Join.

THE WITNESS:  You read it as it states it on here.

BY MR. ROBERTS:

Q    Right.

And then it says:  Today, you showed me two additional images of the same female child, and these confirm my previous determination that she's depicted to be, at most, SMR 3 or 4 and, therefore, again -- I think it says less than 12 to 15 years of age; correct?

A     Yes, sir.

Q     All right.  So Melania D., according to this, is an SMR 3 or 4, 12 to 15 years old; correct?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q     Is that what you took from this?

A     Based off this model?  Yes, based off these photographs of this model.

Q     Right.

So you went and you also showed her -- I want you to go to the next.

A     Uh-huh.

Q     Okay.  Read that first paragraph for me.

A     The entire paragraph?

Q     Yeah, the entire paragraph.

A     Today, you have provided to me two images for review displayed on a law enforcement laptop.  The first is YCBLVVFQ_ -- I'm assuming it's either a O or O -- .jpg and depicts a female child with no pubic hair development.  She does not appear to be shaved.  Her breasts are partially visible and could be SMR 4 to 5. However, her genitals are plainly visible with her thighs spread widely apart and showing she's SMR 1 -- I'm assuming that's going to be 1 -- with respect to

pubic hair.  This developmental appearance is less than or equal to 9 to 13.5 years of age.

Q   Okay.  So you read this at the time before you sought the -- or the search warrant; correct?  Or the -- you made the arrest.  You read this; right?

A   Yes, uh-huh.

MS. SHEVLIN:  Form.

THE WITNESS:  I said yes.  Sorry.  I didn't know if you didn't hear me.

BY MR. ROBERTS:

Q   That's Melania D.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q   Correct?

A   That I -- like I said, I cannot confirm that it's her.

MS. SHEVLIN:  Form, assumes facts not in evidence.

BY MR. ROBERTS:

Q   You testified earlier that you believe that that was Melania D.

MR. CARSON:  Object to form.

THE WITNESS:  That it appears to be her.

MS. SHEVLIN:  Join.

THE WITNESS:  But I can't confirm that this is

her.

BY MR. ROBERTS:

Q    Uh-huh.  Right.  Now you can't confirm that.

Do you see the problem?

A    No.  Because I stated --

MS. SHEVLIN:  Form.

THE WITNESS:  -- to begin with, I can't confirm that this is her.

BY MR. ROBERTS:

Q    Yeah.

A    It appears to be her.

Q    See, it says no pubic hair development, doesn't it, in that first paragraph?

A    No pubic hair development.

Q    Right.

But -- but the other images of Melania D. shows that she clearly has pubic hair.

MR. CARSON:  Object to form.

THE WITNESS:  Yes.

MS. SHEVLIN:  Join.

THE WITNESS:  But how do I know when this photo was taken?  So I can't confirm that it's her, just like I can't confirm that these photos were taken a month apart, the same day.  I can't confirm.

BY MR. ROBERTS:

Q    Okay.  Did you recognize that indiscrepancy --
or that discrepancy when you first read these reports?

MR. CARSON:  Object to form.

THE WITNESS:  What discrepancy?

MS. SHEVLIN:  Form, assumes facts not in
evidence, lack of predicate.

BY MR. ROBERTS:

Q    That she had a different sexual maturity
rating as to Melania D. in the April 5th that begins
today, you provided me with two images.  Then she did,
in the April 5th report -- I previously -- that begins I
previously examined.  Did you -- did you recognize that
discrepancy?

MR. CARSON:  Object to form.

THE WITNESS:  I don't --

MS. SHEVLIN:  Same objections.

THE WITNESS:  -- understand where the
discrepancy -- because she's not saying that this
is the same female.  So that's what I'm saying.  I
felt as though this appears to be the same, but
Dr. Dully is not saying that this is the same exact
female.  So I can't say that that's a discrepancy
because --

BY MR. ROBERTS:

Q    Okay.

A    -- she didn't say that.

Q    But at the time --

A    Just my opinion.

Q    But at the time you read this, it was your opinion that it was the same female?

A    That it appears to be the same female.  I don't -- like I said, I don't know when this photograph was taken.

Q    Okay.  And I -- and I appreciate that you don't.  But when you saw these images and read this report, did -- did you realize that what Ms. -- that what Dr. Dully was saying, that this was a prepubertal Melania D.?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Did you make that connection in your mind?

MS. SHEVLIN:  Join.

THE WITNESS:  No.  Because she never said --

MR. ROBERTS:  Same objection.

THE WITNESS:  -- that this was the same female.

BY MR. ROBERTS:

Q    I know she didn't.

A     Yeah.  So I can't make that connection that this is the same female.  I can say, hey, this appears to be, but I don't know because I don't know when these photographs were taken.  And I also can't confirm that this is the same female.  I'm just going based off this side and it said it appears to be the same person.

Q     Right.

And I know that she didn't tell you it was the same.  But at the time you read this report, it was your understanding, your belief that it was the same person?

A     No.  I said that it appears to be the same person, but I do not know that it is the same person.  So I can't say, yes, this is the same person.  It appears to be.

Q     So it appears to be, but you didn't believe it?

A     What?

Q     You're making a distinction between it appeared to be --

A     Yes.

Q     -- and you believed it to be.  Is that what you're doing?

A     No.  What I'm saying is that this appears to be the same person.

Q     Right.

A   But I'm not saying for a fact this is the same person.  That's like if you have somebody that looks like you but it is not you, I'm not going to say, hey, that was, you know, attorney Roberts.  I could say, hey, he appeared to be or he looked similar to that person, but I'm not going to say for a fact that that is that person.

Q   Okay.  All right.  So do you -- as we sit here today, do you think that that's the same model?

A   Like I previously stated, it appears to be, but I can't say for certain if it is or isn't.

Q   If it was, would it be, like, a problem to you that in this April 5th report, there is this discrepancy in the age description by Dr. Dully?

MR. CARSON:  Object to form.

THE WITNESS:  No, sir.

MS. SHEVLIN:  Form, assumes facts not in evidence, mischaracterizes her prior testimony, and lack of predicate.

BY MR. ROBERTS:

Q   So in -- in the Exhibit C, 8C, you agree that Dr. Dully rendered an opinion that gave an age range of 12 to 15?

A   Yes.  Based off this photo, yes, sir.

Q   Correct?

A     Uh-huh.

Q     And then based on this photograph, which was 8A, she said less than 9 to 13 years old.

A     Yes, based off that photograph.

Q     Okay.  And you think that -- this is your testimony -- it appears that this is the same model.

A     Uh-huh.

Q     And is it your testimony that --

A     Yes.  Sorry.  I said uh-huh.

Q     Yes.

On the right-hand side, this appears to be a less than 19 -- 9- to 13-year-old version of Melania D., and on the left, this appears to be a 12- to 15-year-old version of Melania D.?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Form.

THE WITNESS:  Like I said, I don't know if this is the same person, so I can't say that that's a younger version of her because I do not know if that is her.  And I do not want to say for a fact this is a younger version of her because I don't know who it is.

BY MR. ROBERTS:

Q     Does it appear to be a -- a younger version of her?

A    I don't know if it would be --

MS. SHEVLIN:  Asked and answered.

THE WITNESS:  -- a younger version of her.

BY MR. ROBERTS:

Q    You said it appears to be the same model.

A    Yes.

Q    I'm asking you, does it appear to be a younger version of the model depicted in 8C?

MR. CARSON:  Object to form.

THE WITNESS:  And what I'm saying is --

MS. SHEVLIN:  Join.

THE WITNESS:  -- I can't say that because that's a hypothetical.  I don't know if it appears to be a younger version of her.

BY MR. ROBERTS:

Q    I'm -- I'm not playing semantics with you, Detective.  You testified that they appear to be the same person.

A    Yes, sir.

Q    All right.  I'm not asking you if you verified through DNA or physical passport or fingerprints.  I'm not asking you that.  I'm asking you, having testified under oath that these appear to be the same model --

A    Uh-huh.

Q    -- does the model depicted in 8A appear to be

a younger version of the model depicted in 8C?

A    Like I said --

MS. SHEVLIN:  Asked and answered, form.

THE WITNESS:  -- I can't say because I don't know if this is a younger version of her.  Like, I can't give you an answer that I don't have, unfortunately.  Like, I don't know how to reword it.

BY MR. ROBERTS:

Q    Well, I mean, this case is entirely based -- not entirely based.  I don't want to be hyperbolic.  It is based, in a large part, on your determination of how old people look; correct?

A    Uh-huh.

Q    Is your testimony that although these models appear to be the same, you cannot look at them and say one is younger than the other one?

MR. CARSON:  Object to form.

THE WITNESS:  Like I said, I'm not a doctor.

MS. SHEVLIN:  Join.

THE WITNESS:  So I can't sit there and say, yes, she looks like she's 9 and she looks like she's 15 because I'm not certified to speak on that.

BY MR. ROBERTS:

Q    But just as a human being, as a person that walks around in the world -- and you're not a doctor, but you make determinations in your job:  This person's a minor; this person's not a minor.  I'm asking you, does the model, which you think appears to be Melania D., depicted in 8A, does she appear to be a younger version of the model, Melania D., that is depicted in 8C?

MR. CARSON:  Object to form.

THE WITNESS:  And like I stated --

MS. SHEVLIN:  Join, asked and answered several times.

THE WITNESS:  Like, I don't know how to restate that any further than I already have.  Every person is different, so I can't say that this person looks younger than that nine range.  I cannot say that.

BY MR. ROBERTS:

Q    But you can say with a -- that it's obviously less than 18?

A    Yes.

Q    But you can't tell whether or not this is a model that's less than 9 to 13 and this is 12 to 15?

A    Because I can't say a specific age.  No, I

will not attest to that.

Q    I'm just asking your opinion.  That doesn't seem to be younger than this one?

A    Like I said, I don't know.

Q    When you got this report, did you realize that she was talking about Melania D. or who appeared to be Melania D.?

MR. CARSON:  Object to form.

THE WITNESS:  What do you mean?

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    Did you realize that the file that she was describing was what you believed to be Melania D.?

A    You're saying the file that I gave her --

Q    Yeah.

A    -- that I said appears to be --

Q    Melania D.?

A    -- the same female?

Q    Yes.

When you read this report, did you look at it and say, oh, she's talking about the other picture of Melania D.?

MR. CARSON:  Object to form.

THE WITNESS:  I'm very confused by this question.  What do you mean?  I'm just very

confused by the question.

BY MR. ROBERTS:

Q    Is that the reason you didn't charge this image was because this didn't make any sense?

A    No.  That is not the reason.  That's not a reason to not charge for an image.

Q    Did it make sense to you that Dr. Dully had aged the model in 8C to be a Grade 3 or 4 and the model in 8A a Grade 1?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Did that make sense to you?

MS. SHEVLIN:  Form.  Form, beyond the scope.

THE WITNESS:  She's looking at two totally different photographs, like you said, two totally different photographs, two totally different backgrounds.  I can't speak for her opinion on why she did that, but obviously, it is not the same photograph.

BY MR. ROBERTS:

Q    But it doesn't appear to be the same model at approximately the same age?

MR. CARSON:  Object to form.

THE WITNESS:  I can't speak for Dr. Dully.

BY MR. ROBERTS:

Q   I'm asking you.

MS. SHEVLIN:  Asked and answered, form.

BY MR. ROBERTS:

Q   I'm asking you.

A   Like I said, to me, it appears to be the same person at the same time.  I can't say that.

Q   But at -- around the same age; right?

MR. CARSON:  Object to form.

THE WITNESS:  That I can't say.

BY MR. ROBERTS:

Q   You can't say?

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q   You have no opinion on whether or not these appear to be roughly at the same age?

A   No.  Because I do not know when the photograph was taken.

Q   I'm not asking you when the photograph was taken.  I'm asking you -- you make determinations on how old people are by looking at them all the time without knowing when the photograph was taken; correct?

MR. CARSON:  Object to form.

THE WITNESS:  I'm sorry.  What was your question?

BY MR. ROBERTS:

Q   You make determinations on how old, if someone's an adult or a minor, all the time without knowing when the photograph was taken.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q   Correct?

A   I make the determination that they are under the age of 18.  A specific age, I cannot determine that.

Q   And what I'm asking you is do you have the ability -- and you can say no, I guess -- to look at these two images and say -- I'll just ask you the question, rather, this way:  Do these models not appear to be the same model at approximately the same age?

A   Like I said, I --

MS. SHEVLIN:  Form, asked and answered.

THE WITNESS -- cannot say that.

BY MR. ROBERTS:

Q   You have no opinion as we sit here today?

A   I cannot say that these appear to be at the same age or around about the same age.  I can't say that because I don't know.

Q   Do -- do they appear to be different ages to you?

A   I don't know because I don't know who this is.

I don't know if this is Melania. I don't know if this is also Melania. I don't know. So I can't sit there and tell you, like, yeah, they appear to be two years apart. I, unfortunately, cannot say that.

Q You can't say that they appear to be roughly the same age?

MS. SHEVLIN: Asked and answered.

THE WITNESS: No.

MR. ROBERTS: Okay. All right. No further questions.

MR. CARSON: Amy, you good?

MS. SHEVLIN: I am good. Thank you.

MR. CARSON: All right. I have no questions.

She'll read if it's ordered, through me.

THE VIDEOGRAPHER: This concludes the videotaped deposition of Mikayla Preston on March 13th, 2025. We are going off the record at 6:37 p.m.

(Witness excused.)

(Deposition concluded at 6:38 p.m.)

- - -

CERTIFICATE OF OATH

STATE OF FLORIDA     )

COUNTY OF ST. JOHNS )

        I, Nicole Medlock, Registered Professional Reporter, Notary Public, State of Florida, certify that **MIKAYLA PRESTON** personally appeared before me on March 13, 2025, and was sworn.

        Signed this 4th day of April, 2025.

/s/ Nicole Medlock_____
Nicole Medlock, RPR and FPR-C
Notary Public, State of Florida
My Commission No. HH 285922
Expires:  July 24, 2026

                    Personally known _____
         OR Produced Identification _____X_____
    Type of Identification Produced Driver's License

CERTIFICATE

STATE OF FLORIDA    )

COUNTY OF ST. JOHNS )

I, Nicole Medlock, Registered Professional Reporter, certify that I was authorized and did stenographically report the deposition of **MIKAYLA PRESTON**; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Signed this 4th day of April, 2025.


/s/ Nicole Medlock_____
Nicole Medlock, RPR and FPR-C

E R R A T A   S H E E T

WILLIAM LEE LAWSHE, an individual,
          v.
MIKAYLA PRESTON, in her individual capacity as a
detective for St. Johns County Sheriff's Office, and
KATHLEEN DULLY, in her individual capacity as medical
director of the UF Child Protection Team
Case No.:  3:24-cv-44-MMH-MCR
Depo taken:  03/13/2025
_____
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES BELOW

PAGE    LINE    CHANGE              REASON
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

"Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true."

_____        _____
Date                    MIKAYLA PRESTON

# Doc. 85-11

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.:  3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE,
an individual,

Plaintiff,

vs.

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's office
and KATHLEEN DULLY, in her
individual capacity as
medical director of the UF
Child Protection Team,

Defendants.
/

ZOOM VIDEOTAPED DEPOSITION OF:  KATHLEEN DULLY,
M.D.

DATE:           April 28, 2025

TIME:           10:00 a.m. - 12:26 p.m.

LOCATION:    Via Zoom

REPORTED BY:  LISA K. PENKACIK, RMR

A P P E A R A N C E S:

MICHAEL K. ROBERTS, ESQUIRE
Law Offices of Nooney, Roberts
Hewett and Nowicki
1680 Emerson Street
Jacksonville, Fl  32207
mroberts@nrhnlaw.com

On behalf of the Plaintiff.

AMY SHEVLIN, ESQUIRE
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471-8237
ashevlin@rbtrial.com

On behalf of the Defendant Kathleen Dully,
M.D.

MATTHEW CARSON, ESQUIRE
Sniffen & Spellman, P.A.
123 N Monroe Street
Tallahassee, FL 32301-1509
mcarson@sniffenlaw.com

On behalf of Defendant Mikayla Preston.

ALSO PRESENT:  Danny Holguin, videographer
Shayne A. Thomas, Esquire
(University of Florida)
Autumn Zepf, paralegal

I N D E X

TESTIMONY OF:   KATHLEEN DULLY, M.D.

DIRECT EXAMINATION by Mr. Roberts ...............4

CERTIFICATE OF OATH.............................87
CERTIFICATE OF REPORTER .........................88

ERRATA SHEET. ..................................89

PLAINTIFF'S EXHIBITS:

1 (Articles). ..................................85
2 (Dr. Krugman's report).......................85
3 (Demonstrative image) .......................85
4 (Dr. Dully's letters) .......................85

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties and the deponent that the reading and signing of the deposition be reserved.

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning, this is the beginning of media one in the deposition of Dr. Kathleen Dully in the matter of William Lee Lawshe versus Mikayla Preston, case number 3:24-cv-00044-MMH. Today's date is April 28, 2025 and the time is 10:01 a.m. My name is Danny Holguin. I am the videographer. The court reporter is Lisa Penkacik. We are here with Huseby Global Litigation.

Counsel please introduce yourselves after which the court reporter will swear in the witness. Thank you.

MR. ROBERTS: Michael Roberts for the plaintiff, Mr. Lawshe.

MS. SHEVLIN: Amy Shevlin on behalf of Dr. Dully.

MR. CARSON: Matt Carson representing Detective Preston.

KATHLEEN DULLY, M.D., having been first duly sworn by the reporter, thereupon testified upon her oath as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q. Okay. Dr. Dully, I introduced myself a little bit earlier, my name is Michael Roberts, I'm here to ask some questions today. I assume -- you've had your deposition taken before?

A. Yes, but never as a defendant, but, yes.

Q. Okay. You've had it taken as an expert witness?

A. Yes.

Q. Well, a deposition is a deposition, same ground rules apply, you're under oath, and I'll be asking you questions. At any time if you don't understand a question that I've asked you, please let me know and I'll try to rephrase it. I don't have a script that I'm going from, so it's probable that I will ask a bad question, so don't hesitate to question me if you don't understand. Also, there is a court reporter who is trying to take down everything that we say, question and answer, so we'll just try to be mindful of the job that she's trying to do and not speak over one another; sometimes that's difficult for me and sometimes it's difficult for witnesses. So we'll do the best we can. But the last thing that I'll say is, a lot of times we'll speak colloquially, we'll say uh-huh or uh-huh or they'll be a nod of the head, I'll ask for a verbal

response, if I catch it, just because the court reporter will not be able to describe un-huh, uh-huh, I'll know what you mean by a nod of the head, but she can't write that down so...

A. Thanks.

Q. With that, can you just state your full name for the record?

A. Kathleen Mary Dully, D-u-l-l-y.

Q. And where are you currently employed?

A. The University of Florida College of Medicine in Jacksonville.

Q. And I understand you work for the Child Protection Team?

A. Yes, I'm the medical director of the Child Protection Team for the University of Florida.

Q. And what does that mean; what is a medical director of the Child Protection Team?

A. I supervise the medical care that we deliver on a case by case basis and solve problems and help hire people, essentially.

Q. And just for those who may not know, what is the Child Protection Team?

A. The Child Protection Team is the body of experts that consults for DCF usually and sometimes law enforcement as well on suspected or advertised

child maltreatment cases. And offers them determinations on the likelihood of abuse or that it is not abuse. We cover the eight counties -- this Child Protection Team covers the eight northeast counties of Florida.

**Q. What is -- well, what is your training and background?**

A. So in 1981 I graduated from Cornell University College of Arts and Sciences, in Ithaca, New York with a Bachelor of Arts and I graduated with distinction in all subjects and Cum Laude. In 1986, I graduated from the F. Edward Hebert, H-e-b-e-r-t School of Medicine in Bethesda, Maryland, which is Fed Med or the military medical school.

And from there I went to pediatric internship followed by residency training at Naval Hospital Oakland, California from 1986 through 1989. In 1989, I was transferred to my first duty station as a pediatrician, and that was here at Naval Air Station Jacksonville, Florida where I served for two years. I was assigned to be the Chair of the Child Abuse Case Review Committee here at this military region Navy Marine Corps while I was there.

At the time the only training that was available was in the conference format, so although I

had seen and cared for children of possible child maltreatment before, I had only learned about it as a resident and on the job training is what that is and by reading and studying the cases in the medical literature.

Then in 1990 the Navy sent me to my first child abuse conference in January in San Diego, California, which was the child maltreatment conference that is offered by what is called now Navy Children's Hospital in San Diego and the American Academy of Pediatrics and the American Professional Society of Abusive Children. The conference format for many years was all that was available in terms of getting additional medical training and consultation and so I continued to pursue that all the time every year, and then in 1980 -- sorry, during Desert Shield. 1991, the Navy moved me to Naval Medical Center San Diego.

In San Diego they made me in charge because I had the training, child abuse case review, subcommittees for physical abuse, sexual abuse and something they called the multi-problem family unit. And those I was the Chair, but actually functioned as the medical consultant to a team of people doing case reviews for military commanders.

In 1993, there was some ability to propose to the military that specialized fellowships could be developed, and were slowly becoming available, and in 1994 the Navy sent me to the Chadwick Center for Children & Families, which was Rady Children's Hospital for a year of fellowship. And there I was able to see cases under supervision of people who had been working in the field for 30 and more years, and do the medical assessments on suspected child maltreatment cases, as well as that which is not. So that was a specialized opportunity.

When I finished that in 1994, the Navy moved me to the Naval Hospital Camp Pendleton, California, and there I was again the medical consultant for the child abuse case review committee for Marine Corps Commanders and then I was also the domestic violence consultant for their domestic violence case review committees.

In all of this time I had served as faculty and am a teacher for medical residents and positions in training at all levels in child maltreatment, be it radiology or orthopedics, or OB/GYN or pediatrics, of course, and emergency medicine.

And after 1994 when I finished the fellowship, my additional training went back to

conferences and continuing medical education and then I was able -- though I had passed the general pediatric specialty boards in 1989, the first child abuse specialty board became available in 2009 and I was grandmothered into the field with about 200 others, and I was able to sit for and pass that EXAMINATION in 2009 to be a board certified specialist in child abuse pediatrics.

Q. Very good. Thank you for that.

So currently at the Child Protection Team, do you -- do you see -- do you have patients; do you form a patient -- a doctor/patient relationship with the people that you examine?

A. On a case by case basis, yes.

Q. And tell me, what do you mean by that?

A. So I am consultant. I don't become the child's pediatrician, but I consult for DCF and law enforcement and the hospitals and so I have a time of a doctor/patient relationship, but the relationship goes back to the primary care pediatrician.

Q. In the time that you consult, do you -- do you agree that you have to practice within the standard of applicable care, medical care?

A. Yes.

MS. SHEVLIN: Form.

Q. And so this child abuse board certification, is that a medical/legal certification?

MS. SHEVLIN: Form.

A. It's a medical from -- administered by the American Board of Pediatrics.

Q. Is there a legal component to it?

MS. SHEVLIN: Form.

A. No.

Q. Okay. All right. Is part of that curriculum designed to help you interface with law enforcement or DCF?

MS. SHEVLIN: Form.

A. Not in any direct way, no. Of course you have to be able to do that.

Q. Do you understand that the child abuse -- that the purpose of the child abuse certification is to aid DCF and law enforcement in investigations?

MS. SHEVLIN: Form.

A. That is not the purpose, that is one of the practice points, I would say yes, but it is to take care of kids and try to stop whatever is going on, if, in fact, something is going on.

Q. Okay. Well, what do you mean by "trying to stop something that's going on"?

A. If there is child maltreatment going on,

sometimes it can be stopped and then the child can have a more normal life.

Q. Do doctors stop that?

MS. SHEVLIN: Form, speculation.

Q. Well, let me ask you a better way.

As a doctor, are you trained in your -- in your child abuse specialty, are you trained to stop child abuse in a home setting?

MS. SHEVLIN: Form.

You can answer, Dr. Dully. I'm laying a record. Unless I tell you not to answer a question, just go ahead and answer to the best of your ability if you understand the question, I'm just making some objections for the record.

A. I was missing those completely. I'm sorry, I didn't understand.

MS. SHEVLIN: That's okay. I just objected to form. If you understood the question and you can answer, you can go ahead and answer.

A. I have no ability to stop it, but by helping to assess the evidence that is present that may contribute to stopping it.

Q. Okay. So who -- who stops it? As a medical doctor, what are you talking about?

MS. SHEVLIN: Form.

A.    The community, which involves responsible investigators and agencies.

Q.    So is it not a fair statement to say that the child abuse board -- like that training exist to provide expertise to determine what is and what is not child abuse?

MS. SHEVLIN:  Form.

A.    There is various levels of certainty, but at one end of the spectrum, it may not be child abuse and at the other end of the spectrum, it may only be child abuse.

Q.    Right.  But to treat the condition or the injury, you were qualified to treat injuries or illnesses as a pediatrician without the child abuse specialty; do I understand that correctly?

MS. SHEVLIN:  Form.

A.    I think I do, as a general pediatrician, I take care of kids.

Q.    Right.  So the only -- what I'm trying to get at, the child abuse specialty is really solely aimed at the distinction or you making a distinction between what may or may not constitute abuse, correct?

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

A.    There are things that look like child abuse that are not and I'm consulted in those and there are things where we can't say for sure, and there are things that are child abuse and not something else. And that is part of the determination and diagnostic process.

**Q.    And that, grappling with those decisions, that is the job of a child abuse specialist, correct?**

MS. SHEVLIN: Form.

A.    That is what we do in the medical case, yes.

**Q.    And that's what I'm getting at, right.  I understand that you're a pediatrician, but the board certification specifically regarding child abuse, that is what gives you the purported expertise of making a determination or an opinion about whether something is or is not child abuse; is that a fair characterization of what that specialty is?**

MS. SHEVLIN: Form.

A.    The board certification is a board certification and I passed it because of a lot of other things, and so there's training, experience, literature and the years that go by and the things that children and parents have taught me.  So it doesn't distill down to an exam or a -- a yes or no

determination.

Q. And I am sorry if you took that question as being like what the test entails. What I'm trying to understand, and I'll just ask you the question.

What does it mean to be a child abuse -- do you consider you to be an expert on child abuse medicine?

MS. SHEVLIN: Form.

A. -- abuse pediatrics.

Q. What does that mean?

A. That is what the board -- American Board of Pediatrics decided to call it, and it is a specialty where we can see the children and put the time in, and whatever else is required to help determine how correct that concern may be or not.

Q. And when you say concern, you're talking about abuse?

A. Yes.

Q. Concern for abuse, correct?

A. So people report things and then I am in a position if there are medical concerns to bring those to bear on what they reported to help decide if they could be right or not right or we cannot say for sure.

Q. And so how long have you been with the

University of Florida?

A.   10 and a half years now.

Q.   And other than the Navy is the University of Florida the only other employer that you had in your career?

A.   No.  I also did the same work as a child abuse pediatrician and sex assault examiner for the Rady Children's Hospital before I came here.  There I was not medical director, and there, technically, I worked for their specialty group, not necessary -- not for the center -- not for the hospital.  Although those are the patients that I saw.

Q.   Do you -- and I'm going to use the term "moonlight"; do you know what that means?

A.   Yes.

Q.   Have you moonlighted anywhere else as a pediatrician or anything like that?

MS. SHEVLIN:  Form.

A.   When I was active duty military, my work for Rady Children's, Chadwick Center for Children & Families as a child abuse pediatrician and sex assault examiner, that was considered moonlighting through 2006 and I retired upon my return from Iraq. The moonlighting after that, I did not do or need to do because I was able to work continuously in my

specialty.

Q.   So how many physicians currently work for your department that you're a medical director of?

A.   In the division, there are three of us and all three of us participate on the team.

Q.   And are you responsible for setting policies and procedures?

MS. SHEVLIN:  Form.

A.   I contribute to them.  I make recommendations about them, I may be the person who writes and signs them, but these other two pediatricians are also board certified child abuse pediatricians with many years experience and I consult with them before putting things in writing in general.

Q.   Okay.  So we're here today about a case that you consulted on -- do you understand that correctly; did you consult on the case against Mr. Lawshe?

MS. SHEVLIN:  Form.

A.   I did not know that person's name at the time.  I consulted for a detective at the St. Johns Sheriff's office.

Q.   Subsequently have you learned that Mr. Lawshe was the subject of that investigation?

A. Yes.

Q. I have three letters; one is dated February 22nd; one is April 5th and the other is April 5th; do you have access to those as we sit here today?

A. I do not have the February 22 letter. I can't find it.

Q. I'll share it with you when we get to that.

I want to ask you just to start off, some general -- some general questions.

So what is sexual maturity rating?

A. Sexual maturity rating is a way of stating how close to puberty or in the middle of puberty or completed puberty may be progressing.

Q. I've also seen it referred to as Tanner staging; is Tanner staging and SMR or sexual maturity, is that the same thing; are those two terms synonymous?

MS. SHEVLIN: Form.

A. In the 1980s and 1990s early, it was called Tanner staging. In about 1998 it changed because there had been so many other studies both before and after Tanner and Marshall and it was changed to sexual maturity rating. As the years go by, there's more data than just Dr. Tanner's data.

Q. All right. And so when did you first

learn -- when you first learned about it, it was called Tanner staging?

MS. SHEVLIN: Form.

A. Well, it didn't have a formal name and I actually don't remember what the other pediatricians were calling it in fellowship.

Q. Okay. And do you know what the -- the test was designed to do?

MS. SHEVLIN: Form.

A. In the clinical setting?

Q. In the clinical setting, yes.

A. Yes.

Q. First of all, was it designed as a clinical test?

MS. SHEVLIN: Form, speculation.

A. It was -- sexual maturity rating was designed to be able to monitor progress through puberty or a completion thereof or delay thereof, as well as early puberty.

Q. So a pediatrician would be able to assess whether or not there were any delays or abnormal start to puberty in their patients; that was sort of the reason -- that was the function of Tanner staging or sexual maturity rating as you understand it?

MS. SHEVLIN: Form, prior

mischaracterization of prior testimony.

A. For most pediatricians that is its function.

Q. Okay. And what do you mean by that "for most pediatricians that's its function"?

A. Well, even newborns aren't Tanner two or SMR two, so it is normal to have some variability in the development of puberty. Sometimes it's actually the sign of a tumor, so we want to have some idea of what's normal, so that we can identify deviations from normal. For instance, a three year old who already has Tanner three or SMR three breast buds, plus pubic hair, that would not be normal. So we use it on the very little kids as well as those who are approaching puberty and in reference to the concerns from the parents or the child, sometimes a teen-age child is worried that they're not normal.

Q. But that is not the way in which you employ sexual maturity rating in this case, is it?

A. In this case, the opportunity to assess the patient never occurred.

Q. But you did use the sexual maturity rating in forming your opinions in this case?

A. Yes.

Q. All right, okay. So let me -- let's just

go back.

How long have you been using sexual maturity rating to -- let me ask you this. Looking for predicate for this.

Do you use sexual maturity rating to chronologically estimate the age of individuals in digital pornographic photographs?

MS. SHEVLIN: Form.

A.    It is not to estimate the age, it's to estimate the appearance of the age, yes.

Q.    What does that mean?

A.    The appearance of the age is not the same thing as knowing the chronological age.

Q.    What's the difference?

A.    One is in terms of years of age and has documents to go with it. And the other is based on appearance and in this case, in photographs.

Q.    So I'm struggling with that distinction. So you -- so you're -- you're not attempting to state or estimate how old the individual depicted in the photograph is, you are trying to estimate how old they appear to be?

A.    Yes.

Q.    So any type of -- you're aware that photographs can be digitally edited?

MS. SHEVLIN: Form.

A. Yes.

Q. You're aware that models can remove pubic hair through multiple different modalities, correct?

MS. SHEVLIN: Form.

A. Yes.

Q. Any digital altering of a photograph would render your opinion say -- would not make it a reliable opinion, correct?

MS. SHEVLIN: Form.

MR. CARSON: Join.

A. That's not true, it will be a reliable opinion about the appearance of the image.

Q. But it would not be a reliable opinion about the actual age of the individual that is depicted?

A. It may not be.

Q. And that's true as well as grooming. If somebody had been groomed, it may not be -- it may be an -- you may be given an accurate depiction or opinion about the appearance, but if there were grooming that was undetectable to you, it would not be an accurate opinion or reliable opinion about the actual age of the individual?

MS. SHEVLIN: Form.

A. The chronological age is a different question. This is just the appearance of the image.

Q. Okay. So from a scientific -- you understand that -- let me just ask you.

Would you agree with me that that is a -- a limitation on what your opinion could be accurately understood to be?

A. Yes.

MS. SHEVLIN: Form.

Q. Can you describe that limitation for me?

A. It is not an opinion about chronological age, it is an opinion about the apparent appearance of the image and what its age may be. It's not the same thing.

Q. How long have you interacted with law enforcement -- let me ask you this question.

How long do you think you have been using SMR in this way, to look at a pornographic image and estimate the appearance of chronological age?

MS. SHEVLIN: Form.

A. Since shortly after 1994.

Q. And is that sort of like the burst of the internet or like widely used internet, what was 1994?

MS. SHEVLIN: Form.

A. It was just my fellowship.

Q.   Okay.  What was special about that fellowship that that's what made you start doing that?

MS. SHEVLIN: Form.

A.   Law enforcement was bringing cases for evaluation to Rady Children's and my colleague pediatricians were also doing these evaluations.  I had not been aware of it before 1994.

Q.   And when is the last time you did an evaluation like this?

A.   2024.  Maybe Nassau County Sheriff.  I know I did at least one for them in 2024.

Q.   You don't think you've done any this year?

A.   I have not.

Q.   Has there been any change in your practice or policies since 2023 in regards to evaluation of these types of images?

MS. SHEVLIN: Wait, Dr. Dully, hang on a second.  Michael, we're getting into subsequent remedial measures, there's case law on this.  I'm not going to let her answer this question.

MR. ROBERTS: You can't direct her not to answer questions, whether it's relevant or not is not a reason for you to instruct her not to answer.

MS. SHEVLIN: It's not relevant. It's subsequent remedial measures. There's case law on it.

MR. ROBERTS: That's not -- that's not the law. And you cannot -- and you can't -- you can, but there's two reasons why you can instruct the witness not to answer and they both deal with privilege.

MS. SHEVLIN: You're asking her for subsequent remedial measures.

MR. ROBERTS: And that is perfectly discoverable. That is perfectly discoverable.

MS. SHEVLIN: If you want to provide me case law on your position, I'm happy to look at it.

MR. ROBERTS: Are you instructing her -- are you instructing her not to answer that question?

MS. SHEVLIN: At this time I'm instructing her not to answer that question. If there is case law, tell me that I'm wrong, I'm happy to look at it.

MR. ROBERTS: I haven't briefed the issue, I've only done this for 21 years but --

Q. **Have you -- have you read my -- or Mr.**

Lawshe's expert report in this case?

A.   I saw it on Friday, yes.

Q.   Okay.  What was your impression of that?

MS. SHEVLIN:  Form.

A.   I don't agree with it.

Q.   Have you read the article The Difficult Issue of Age Assessment on pedo-pornographic material?

A.   Not to my knowledge, no.

Q.   The last time you attempted to do any research on the reliability of applying sexual maturity rating to online pornographic images?

MS. SHEVLIN:  Form.

A.   I was reviewing what I already have last night.

Q.   What is it that you already have?

A.   I have the original Tanner and Marshall articles from 1959 and '70, the Noshney (ph) publication that came a decade or so later.  It's sort of an update on sexual maturity ratings.  The Herman and Giddens work that came about 10 years after that in the 1990s on sexual maturity in American girls.  I do have some other population evaluation articles such as from Switzerland or from Hong Kong or Asia, but those don't really apply in

this case to my knowledge, and I did not review them much at all. And what else? I did look at an American Academy of Pediatrics publication that summarizes all of the pubertal stage photographs from, I think it's from 1996 and then also the -- was there anything else good? There is another article that I reviewed. Let me see. I don't know if I have -- well, and of course, the standard textbook that I use which is the 15th Edition of Nelson's textbook of pediatrics.

Q. So those sound like journals that are pediatric journals about Tanners staging or sexual maturity rating in the clinical setting?

A. They -- they are and also a -- a publication, I think it's a desktop publication from the military from the Armed Forces Center for Child Protection in 1998, I think it was. I looked at it, that was -- I was actually asked to help get these images taken care of by the Armed Forces Center for Child Protection about that time when I was active duty.

Q. And just so -- anyway, clinical setting by clinical setting, I mean and I want to make sure we're on the same page, a pediatrician who is treating a patient in the clinical or office setting;

is that -- is that a fair way to use clinical?

A. Yes. Except that all the work was done from photographs -- where most of the work was done from photographs as a study modality. So it is a clinical tool, and if you ever get access to the child, then you can use it that way. But sometimes in child abuse pediatrics, you do or do not have access to the child; you do have access to the images and are consulted to estimate the appearance of their sexual maturity based on photographs.

Q. Okay. So I want to share the screen here. This is an article that we disclosed to you a month ago, a couple months ago. Can you see this on your screen?

A. Okay. Yeah, that's a lot of fine print.

Q. Let me -- Forensic Science international; have you heard of that journal?

A. Well, it's not a medical journal, but I have heard of it.

Q. I just want to go down here to the conclusion. I'm going to read some of these -- well, let me just read this. We'll start with this. Much pornographic, pedo-pornographic material depicts women who seem sexually mature and who may be late teenagers or women over the 18 years of age. Our

study, in fact, proves that it is nearly impossible to say that adults who look like sub adults are indeed adults, which obviously may apply to all those sub adults who seem sexually mature. Did I read that correctly?

A. You read it out loud, yes.

Q. And it says, forensic and medical experts should avoid using such unscientific behavior which may have drastic consequences in a Court of law; did I read that correctly?

A. Yes.

Q. Now, you're unfamiliar with this, but I'd ask you to get familiar with it. This study shows that pediatricians who attempt to age pornographic images of women are wrong between 95 and 73 percent of the time when they do that; does that surprise you?

A. Well, they're against it, so it doesn't surprise me. I think that's what they wanted to find.

Q. This study was funded by the E.U. Project to help develop ways of detecting child ponography online; why do you see that this is what they wanted?

MS. SHEVLIN: Form, she has not had an opportunity to read the entire article.

MR. ROBERTS: Stop, stop, I don't want a speaking objection. She said this article was published by people who wanted to find that.

Q. **Dr. Dully, why do you think the people who wrote this article wanted to find that?**

MS. SHEVLIN: Form.

A. Because their conclusion and their tables say that in what you have shown me. It needs to be read critically with a jaundiced eye because it appears on the surface that that is their aim. It's also a legal journal, not a medical journal. It would be read with a jaundiced eye.

Q. **So you're discounting an article that you've never seen or read?**

MS. SHEVLIN: Form.

A. I am discounting a journal that is not a medical journal and I would read it critically if you give me the chance.

Q. **Well, you had a chance and you haven't done it, have you?**

MS. SHEVLIN: Form.

A. I haven't seen this before.

Q. **Well, you -- you -- you had access to the article last week.**

MS. SHEVLIN: Form.

A.   I have never seen this before.

Q.   Because you chose not to look at it.

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

A.   I have never seen this before.

Q.   Why have you not seen it before?

A.   It was not provided to me.  I have never seen it before.

Q.   It was in the expert's report that you said you read last week?

A.   It's certainly not in there.

Q.   Okay.  I'm going to share what we'll mark as Exhibit 2.  That will be Exhibit 1.

This is the report of Scott Krugman; does this look familiar to you?

A.   Yes.

Q.   See three here, The Difficult Issue of Age Assessment on Pedo Pornographic Material?

A.   It is a reference, yes.

Q.   You agree it was -- the name of the article, the journal and the citation was provided in his report?

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

A.   The citation is there.

Q.   So why -- why didn't you look at it?

MS. SHEVLIN: Form.

A.   Because I know it's a difficult assessment. I know that it's difficult.

Q.   Why do you say that it's difficult?

A.   Because it is an appearance, it is not a chronicle age.  Chronological age, sorry, not enough syllables.

Q.   So let me ask you this.  So if I was a person who had to make a legal determination about whether or not someone was, in fact, or -- let me re-ask the question.  If I was someone who was being asked to make a factual determination about whether or not a model depicted in a pornographic image on the internet was a minor; in fact, a minor, would your opinion about the appearance be a reliable opinion for me to base that decision on?

MS. SHEVLIN: Form.

A.   No, that's what the investigation is for.

Q.   That seems like a major limitation in your opinion about age; would you agree with that?

MS. SHEVLIN: Form.

Q.   I'm sorry, almost all of your answers are being interrupted by Amy's objection.  Was that a yes?

A. It was a correct.

MS. SHEVLIN: Give us just like one second so I can make an objection and then we won't talk over other.

A. Sorry, sorry.

Q. And maybe I'm -- do you tell law enforcement officers about the limitations in your opinions before you give them to them?

MS. SHEVLIN: Form.

A. Yes.

Q. It happened again. It happened again. So you said yes to that question, correct?

A. Yes.

Q. Can you tell me what you explain to law enforcement officers when you give them your opinion?

A. That this is the appearance of the person in the image, and that is, if I can see the image; sometimes the images are too blurry or just not good enough to even see. So they know quality of the image and they know that it is only an image and that the appearance depicts something that is based on sexual maturity rating that may or may not prove to be a minor. They don't bring the little kids, they bring these borderline kids to be looked at or images and they investigate after that. Because I can only

give them appearance.

Q. So you're aware that a lot -- I mean, do you have any impression of how much or how many images that are published on the internet have been digitally altered in some way?

MS. SHEVLIN: Form.

A. I'm sure it's an astrological number. I don't know the number.

Q. As we sit here, I mean, you're -- I mean, you believe -- let me just -- you think that most images have some sort of digital altering on them for aesthetic purposes?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. No. A lot of images have -- may have alterations and a lot of images may not have alterations, I don't know what those numbers might be.

Q. And that is a fair answer. If you don't know the answer, just say I don't know.

But whether or not there were alterations would have a significant impact on the accuracy or the reliability of your opinion as to the actual age of the model?

MS. SHEVLIN: Form, speculation.

A.   What I see on the image does not necessarily give an indication of the actual chronological age that may be discovered during investigations.

Q.   So what is -- what do you see -- what is the value -- I mean, your -- your job is to consult with law enforcement in these cases, correct?

A.   Yes.

Q.   What do you see the value of your opinions being?

MS. SHEVLIN:  Form.

A.   There are times when it leads to a real child or a trafficked child and it may be local; it may not have any bearing at all because it may turn out to be modified images that were made to look like an adolescent. So I don't know what direction it will go after I tell them, yes, they have an appearance of an adolescent going through puberty and that is its only value.

Q.   So, okay.  I'm going to put a pin in that statement.  I want to go to actually sexual maturity rating.  In terms -- and let's just have this and just talk about females.  All of the images you reviewed in this case were females, correct?

A.   Yes.

Q.   So and let's just start with a genital or vaginal appearance in females.  Can you describe what the grades of sexual maturity -- first of all, what are the grades of sexual maturity rating?

A.   I, II, III, IV, V and for pubic hair there may be a VI.

Q.   Okay.  So can you just give me the pubic hair -- first of all, in the genital region is there any other factor other than pubic hair development in sexual maturity rating?

A.   There is another factor but we usually can't see it and that is the appearance of the hymen itself.

Q.   And that's an internal anatomical body part?

A.   It's a little bit internal; it's not -- it's still considered external, but it's not readily visible.

Q.   Did that have any bearing on your opinions in this case, the hymen?

A.   No, I could not see that structure.

Q.   So, the only, I guess anatomical appearance would be the appearance of pubic hair in terms of genital development?

A.   Generally speaking, yes.  I don't have the

images, so I haven't seen them in two years, so...

Q.   **Well, we'll talk about that because, Amy, I thought that's what we were doing, is you were going to give her the images.**

MS. SHEVLIN:  I meant to talk to you about that on Friday.  When we take a break, I'll call you.

MR. ROBERTS: Okay. All right.

Q.   **So, grade- -- what's grade I?  I'm sorry, we're just talking about genitals or pubertal hair --**

A.   For the female child, that's the little girl, so she will have fully developed labia majora if she's a term infant and that appearance will continue until she becomes -- developed some pubic hair.  So once she starts developing some pubic hair that is not vellus hair, different from the hair on her abdomen, she could be called SMR II.

Q.   **Okay. And grade -- what is grade III?**

A.   Grade III is a little bit more pubic hair on the labia and also where the labia come together up front that will no longer be clearly or plainly visible because there is pubic hair at the top of that, the labia majora where they come together, the interior commissure, and part of the mons pubis is covered with pubic hair that is not the same as

vellus hairs on the abdomen.

Q. And grade IV.

A. Grade IV fills out the entire triangle shape of the labia majora, the anterior commissure and the mons pubis over to, but not involving where the thighs join at the pelvis.

Q. What do you mean by triangle?

A. That is the shape when the legs are together of the hair bearing parts over the mons pubis in front of the anterior commissure and on either side it's wider and between the legs, it will come to appointment so it may look like an inverted triangle.

Q. And grade IV?

A. Grade IV will involve the inner thighs as well. And also hair will be thicker or more abundant.

Q. So, I mean, human beings are all different; the thickness is a very subjective evaluation, I would imagine?

MS. SHEVLIN: Form.

A. Is that a clinical question or --

Q. Yeah, it is. Between making the distinction between IV and V, I mean, how -- what is the thickness of a V versus the thickness of a IV?

A.   I would look at the inner thighs to tell the difference.  And most -- most of the children are shaved, so we don't get to assess thickness, there isn't anything to see, there are whiskers there.

Q.   Because most -- most people at that age do groom themselves at least at the thigh level?

MS. SHEVLIN: Form, speculation.

Q.   Well, I think that was just your testimony, wasn't it?

A.   No, that wasn't my testimony, but --

Q.   What did you say?  I'm sorry, can you just say it again, you don't get to see at the thigh, you said something about shaving?

A.   There are whiskers.  We cannot judge the thickness of the pubic hair, we can only look at the location of the hair bearing parts by looking for the whiskers, the obvious shaving.

Q.   So, really, the difference between four and five is whether or not you see over the inguinal notch, that crease between our thighs and the pubic level, the pubic area?

A.   Practically speaking, it is the inner thighs.

Q.   Yep, okay.  And if there were waxing or grooming such that you couldn't see whiskers or

something, but it was obviously being groomed, you would not be able to distinguish between IV and V?

A. So I can see whiskers on the inner thighs, that distinguishes V from IV.

Q. But if you can't, because of the method of grooming or the digital altering, you would not be able to tell the difference between a IV and a V?

MS. SHEVLIN: Form.

A. I'm talking about an actual patient. You're talking about images?

Q. Oh, is there a difference?

MS. SHEVLIN: Form.

A. An actual patient, I can see the difference because I can see the hair follicles.

Q. So what's the difference when you're evaluating an image?

A. There isn't as much fine focus or close view to necessarily be able to see and blond individuals may be less obvious as well.

Q. So it's much more difficult or it's more difficult for you to make the distinction between a IV and a V on -- on a digital image?

MS. SHEVLIN: Form.

A. On any image, yes.

Q. Okay, okay. All right.

So this triangle of pubic hair, what -- what's the significance of that?  Why do you say a triangle?

A.   Because I'm trying to be descriptive.

Q.   No, but I mean, is that the way that pubic hair grows in on females is in a triangle -- is that the way it's supposed to grow in?

A.   At a certain maturity, it will look like a triangle.  Early on it does not look like a triangle.

Q.   But at the IV to V stage, an ungroomed female model should have a triangle shape to her pubic hair?

MS. SHEVLIN:  Form.

A.   Roughly, except for what's out on the inner thigh they're going more posterior.  Some people have it going up to their belly button as well, that's called a six.

Q.   Okay.  Pubic hair that goes up to your belly button would be a VI?  Grade VI; is that correct?

A.   In a straight line up the midline lafay (ph), there can be a VI, and it may go posterior around the anus, too.

Q.   How long can people appear to be -- well, before I ask that question.  Give me the same rundown

with breasts.  Grades IV through V in breasts, just describe what those are.

A.    Grade IV, just grade IV and V?

**Q.    No, I'm sorry, grade I through V.  I'm sorry if I asked that question wrong.**

A.    Okay.  So most newborns are II, maybe III in their sexual maturity rating, they've been exposed to estrogen in utero.  Even the male infant has breast buds, so the newborn is, by definition, a sexual maturity rating of II and sometimes III.  As the estrogen effect from being a fetus goes down in their bloodstream in little girls that takes two to four years.  The breast buds become small and flat and no longer palpable.  So there will be a flat little pale nipple and if they're cold, they may have a papilla protruding in the middle.  As the -- that is an SMR I, which is sometime after birth until estrogen effects starts being produced by their own body.  The breast buds will then redevelop and when it's confined to just under the nipple and its areola, then that is an SMR II.

When there is a little bit more enlargement of a mound outside the area of the pink areola, then that's a III.  When the breast tissue is beginning to meet at the sternum and the midline, then it is a IV

when looking at it an anterior/posterior way, so we're looking directly at the person's chest. If we look from the side, you -- or have a side view, you can see that a IV has two mounds; one mound for the breast tissue and a separate mound on top of it for the nipple for areola and papilla. So IV, sexual maturity rating is two mounds instead of one. V has become a single globular shape, and so it has a papilla at the top of the nipple, but there is one mound that is under the pink of the areola and the breast tissue all the way to the chest wall.

Q. Okay. So how long in chronological age can a female present as a grade IV on clinical exam?

MS. SHEVLIN: Form.

A. About 20 percent of women who are not pregnant revert to a IV. And will be that way through parts of their adulthood.

Q. So a female being a grade IV is not inconsistent with them being over the age of 18?

A. Correct.

MS. SHEVLIN: Form.

Q. And when you meet with detectives, do you give them some explanation of what the -- the sexual maturity rating is; do you give them like a little primer course if you've never met them before?

MR. STEWART: Form.

A. In general, I don't -- I'm not the first pediatrician that they have met with, but I will ask them if they have any questions and show them what I use, my reference.

Q. You show them a reference book or something like that?

A. The pediatric, Nelson's Textbook of Pediatrics, yes.

Q. Okay. Actually, and I'm just going to show you this. It's just -- and you can tell me if it's helpful or not helpful. I guess that means it's a demonstrative aid, it just has -- it's like a textbook, I don't know if it's from your textbook or not, and you can tell me if it's not helpful. Do you see this?

A. I can see it.

Q. Is that a visual depiction of what you just testified to, that image there? What's that?

A. Yes, they are trying to depict that here.

Q. And I understand it's like -- it's a drawing, it's probably just a pen drawing, but this -- this is kind of -- I see a triangle at IV and I see a larger triangle at V; is this generally what you were testifying to earlier?

A. Yes, roughly.

MS. SHEVLIN: Are you making that as an exhibit?

MR. ROBERTS: We can mark that as 3. 1 was the article. 2 was the expert report and 3 was that demonstrative image.

Q. I want to go back to Exhibit 2, which is Dr. Krugman's report and you said you disagreed with the report, but I just want to maybe dial in on that.

For example, I just want to go to the -- the letter E here, Dr. Dully. It's well-known and documented that adult females can exhibit and appear to be SMR IV; you would agree with Dr. Krugman on that point?

A. Yes.

Q. Do you know Dr. Krugman?

A. I know Dick Krugman, I don't think I know Scott Krugman.

Q. Okay. In this he says that you're a member of a list serves that he's a member of and this issue about the concerns and limitations of using SMR in CSAM investigations has been raised in that -- in that e-mail list serve; is that true?

A. It's been discussed off and on for at least a decade, yes.

Q. I mean, has anyone suggested on there that it is not scientific to be applying SMR ratings to the pornographic images on the internet to determine chronological age?

MS. SHEVLIN: Form.

A. I don't remember anybody saying that it was unscientific, but we all agree that there are limitations to stating what the appearance may be versus what the age of the patient may actually be.

Q. Let me ask a question in a different way, because we may be just ships passing in the nights here.

Do you agree that it is not scientifically reliable to use SMR ratings to determine the actual chronological age of a model depicted in a pornographic image on the internet?

MS. SHEVLIN: Form.

A. Yes.

Q. Yes. Sorry.

So you agree that that's not scientific to say the actual age of the model?

A. I agree.

Q. What you are saying is, is that you can apply SMR and say what it appears to be, irrespective of the possibility of grooming or digital

manipulation?

MS. SHEVLIN: Form.

MR. CARSON: Join.

Q. I didn't even -- I don't even know I know what your answer is there, so can you restate your answer?

A. I said correct.

Q. Correct, okay.

Do you think that you communicate that idea to law enforcement when they come to you?

A. Yes.

Q. So when Detective Preston came to you with these images and she left, you would have told her that you cannot give her any reliable information about the actual age of this individual depicted in this image?

A. Yes.

Q. All right. So, in some ways, I think maybe you agree with Dr. Krugman if he is talking about actual age; is that fair enough -- is that a fair statement?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

Q. Do you understand my question, Dr. Dully?

A. I'm -- I'm not sure how your question is

different from all the others. I guess I'm not sure. I must be missing the nuance.

Q.   Well, you said originally that you disagreed with his opinions; do you remember that testimony?

A.   I disagreed with his opinion about my opinion.

Q.   If he thought that your opinion was stating the actual age of the individual, rather than just the appearance, would that be an explanation for the disagreement between Dr. Krugman and yourself?

MS. SHEVLIN: Form, speculation.

A.   Yes.

Q.   Okay. So did you understand that your opinions were going to be used in a probable cause affidavit to seek a search warrant?

MS. SHEVLIN: Form.

A.   No.

Q.   What did you think that they were going to be used for?

A.   That there were probably other files to be looked at or other circumstances and there would be some determination on whether they would move forward or not.

Q.   Do you think -- I'm sorry, I didn't mean to

cut you off. Were you finished? I'm sorry.

A. I think I was finished.

Q. Okay. Sometimes on Zoom it's a little hard to know when people are finished or not, but...

Would you be comfortable with your opinions being used in a probable cause affidavit without the caveat --

MS. SHEVLIN: Form.

Q. -- that you've just given us here about the limitations of your opinion?

A. I don't think my comfort matters. I'm just making a statement about the appearance. And then there's decisions on whether to move forward with that or not. Sometimes they do and sometimes they don't, and I don't know that one image is going very far ever; I don't know that.

Q. Well, no, that's not my -- so it's, you know, as a child abuse expert that your opinion sometimes have serious legal consequences, correct?

A. Yes.

MS. SHEVLIN: Form.

Q. Parents lose their children sometimes because of your opinions.

A. Yes.

Q. In this case someone went to jail, in part,

because of your opinion; were you aware of that?

MR. STEWART: Form.

A. I was informed after it was published in a newspaper. A colleague informed me that that had been in the newspaper, but I did not know that.

Q. Did you suspect that your opinions might be used in front of a judge?

MS. SHEVLIN: Form.

A. Sometimes they go before a judge, sometimes they go before a jury; that's not my determination.

Q. But that's not my question.

My question was, when you gave this -- when you wrote these letters, did you expect that the law enforcement officer, Detective Preston, was -- was going to quote them in a probable cause affidavit for a judge?

A. I know that she was going to investigate further, but I did not know what the next step might be.

Q. All right. So I'm going to just pull up and share the -- you don't have the February 22nd report; did I understand that correctly?

A. I did not.

Q. So -- and we'll mark this as Plaintiff's Exhibit 4. And it will be a composite exhibit

because I have them in a PDF that has all three of your letters. I'll represent to you that this letter is almost verbatim copy and pasted from your -- in your April 5th, so the words are going to probably look very similar, but just take a second and look at it. Just tell me when you're done.

A. Okay.

Q. So my first question is, why did you not include in your letter any commentary on the limitations of your opinion in regards to the actual age of the model or the ima- -- the person depicted in the photograph?

A. I think the limitations are obvious, and I say what appears to be. And that is the appearance, the developmental genital appearance and she does not appear to be shaved; the whole thing is about appearance. I think that's pretty apparent.

Q. Well, you told -- you've already testified that you would have told Detective Preston explicitly that I am not talking about the actual age of the individual, I'm only talking about the appearance?

A. I'm only talking about the appearance that's --

Q. And you would have communicated that to Detective Preston?

A.   And it's in writing, yes.

Q.   And when you say it's in writing, you're talking about your use of the word "appears," you use the word appears over and over again?

A.   Yes.

Q.   Okay.  So I understand you don't have the images in front of you and we're going to take a break here in just a minute and I can talk to Amy about that, but I just want -- I want to go through this real quick, okay.

You, in this depict -- you describe the image that you're looking at, correct?

A.   Yes.

Q.   And can you describe for the record -- do you -- first of all, do you remember meeting for the first time Detective Preston?

A.   I remember that I met her, yes.

Q.   Do you remember -- you had that meeting in general, maybe not word for word, but in general do you remember that meeting?

A.   Only vaguely.

Q.   So she showed you an image on her laptop is what's related in this letter.  Can you describe what that image looked like?

A.   I can only read to you what I typed.

Q.   Please do.

A.   The image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet. She is on a wood floor in a knees to chest position with her lower legs and ankles parted to expose her genitalia for the camera.

Q.   So she was in a knees to chest position; is that correct?

A.   Yes.

Q.   Now, you were of the opinion -- Oh, I'm sorry, I didn't mean to stop sharing there, I'm sorry.

Your opinion was that she appeared to be SMR IV; is that correct?

A.   Just of her genitals, yes.

Q.   Because you -- you couldn't evaluate her breasts?

A.   I don't think I was able to see them or I would have put them in there.

Q.   Well, knees to chest, in theory, she would be covering her breasts with her knees or her legs, correct?

MR. KASS:  Form.

A.   That sounds right.

Q.   Yeah.

You put that she would have achieved this developmental genital appearance of SMR IV at 12 to 15 years of age.  Why didn't you put that she could -- but she could be 18 or 19 or 20 with an SMR IV?

MS. SHEVLIN: Form.

A.  Well, that would depend on the modifications and grooming, as you're calling it, that she would undertake, and I'm not assessing grooming, I'm assessing appearance of the photograph, which is what pornography is all about.

Q.  Well, you testified earlier and you agreed with Dr. Krugman that women can present as SMR IV for their entire life?

A.  For their breast development, yes.

Q.  And genital pubic hair?

A.  That depends on shaving and heritage or depilatories or waxing or other things.

Q.  You say that she (sic) did not assess her grooming, but you did in the next sentence assess the grooming?

A.  She did not appear to be shaved; that, again, is an appearance.

Q.  How -- what scientific basis do you have to make that determination?

MS. SHEVLIN: Form.

A.   I don't see any hair there and so she does not appear, you know, to be shaved.  I mean, there is or there isn't hair, right, why say that there is anterior pubic hair present.

Q.   But that's just a lay opinion, right, that's not a scientific opinion, you're just saying I don't see any hair?

A.   No, I think you mischaracterize it big time, clinically.

Q.   Tell me, I asked the question and you didn't answer it.

What is the scientific basis for your opinion that she does not appear to be shaved, medical, scientific basis for your opinion?

A.   The hair is still there.

Q.   I don't understand, you said the hair is still hair?

A.   Shaving removes hair, but the hair is still there; it's present or absent in the image.

Q.   Is that a medical opinion?

A.   That's a clinical medical assessment what the image looks like.

Q.   What about waxing or electrolysis or chemical hair removal?

MS. SHEVLIN: Form, speculation.

A.   What about it?  The hair --

Q.   Do those leave visible signs of hair?

MS. SHEVLIN:  Same objections.

Q.   Well, hold on.  You're saying as a medical expert, you can determine whether someone is groomed or not groomed, correct?

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

A.   I know what shaving looks like because I see it all the time and it has been that way since the 90's so --

Q.   Yeah, and I'm asking about go waxing or electrolysis; you're familiar that there are other types of grooming other than shaving, correct?

A.   There are, yes.

Q.   And they leave a different -- they look different; the results is different than shaving, correct?

MS. SHEVLIN:  Objection, speculation.

A.   They're designed to be the same or they can be designed to be different.

Q.   Right.

So, how can you look at a pornographic image and determine whether or not they have been waxed or electrolysis hair removal, some other form

of hair removal?

A. I'm not assessing the hair removal, I am saying the pubic hair is present.

Q. But if she is groomed that would destroy any validity to your SMR rating as -- as regards to pubic hair, correct?

MS. SHEVLIN: Form.

A. The hair is still present. It can be assessed for its appearance.

Q. We're going to follow back up with that. But before we take a break, I'm going to ask you this quick and I'm going to go back to this image.

Okay. This is the general image and we talked were the triangle. Dr. Dully, you've described this model in the February 22nd, 2023 as sitting towards the camera, knees to chest, correct?

A. Yes.

Q. It would have been impossible for you to determine whether this model had a triangle or not based on the way that she was sitting, correct?

A. I do not know; I do not know what the image looks like.

Q. You've described the image as knees to chest, sitting on the floor, that would obscure the inguinal notch or the inner thigh from your view,

correct?

MS. SHEVLIN: Form.

A. No, that depends on the image.

Q. Well, if the image, because I've seen it, if the image obscured the inguinal notch, it would be impossible for you to determine whether or not the model had a triangle or the hair crossed the inguinal notch to the thigh, correct?

MS. SHEVLIN: Form.

A. Well, there is not -- there is no inguinal notch, I don't know what you're talking about, and I can see -- I state that I can see, but I don't have the image, you have an advantage over me, you're not seeing it, correctly.

Q. Okay. The thigh -- you testified -- tell me what was the difference between, again, IV and V?

A. Can I see the image?

Q. I am not actually comfortable because the image is still on a Nick Nick database because no one is doing their job, and I'm afraid that if we transmit it, we're all going to get investigated for child pornography even though it's an adult, so I'm just going to ask you questions right now based on the hypothetical and I will show you the image, but can you, once again, tell me what is the difference

between a IV and a grade V pubic hair?

A. The presence of hair or the shaved area of hair on the inner thighs, on either side of the fully developed roughly triangle shape of hair.

Q. So if you could not see the inner thigh, you could not distinguish -- it would be impossible for you to even say what appears to be a grade IV versus a grade V?

MS. SHEVLIN: Form.

A. I cannot see the image. I can't comment one way or the other.

Q. You have to answer my questions unless you don't understand them.

A. I can't see the image. You're asking me --

Q. I'm asking you a hypothetical question, Dr. Dully.

A. Okay. A hypothetical, not about this case, about something else, okay, try that.

Q. Hypothetically, if the image did not show the inner thigh or the inner section of the inner thigh and the pubic region, you could not distinguish between a grade IV and a grade V in terms of sexual maturity rating appearance?

MS. SHEVLIN: Form.

A. I would need to see the image, but I would

consider that as facts, yes.

Q.   Evaluating whether or not pubic hair has crossed the line onto the thigh is the distinguishing factor between a grade IV and grade V, pubic hair distribution for sexual maturity rating, correct?

A.   It is the most helpful distinction, yes.

Q.   Okay. All right. Why don't we take a break, we've been going for an hour and a half.

Amy, do you want to call me?

MS. SHEVLIN:  Yeah, I'll you on your cell.

THE VIDEOGRAPHER:  Going off the record the time is 11:29 a.m.

(Whereupon a break was taken.)

THE VIDEOGRAPHER:  We're on the record, the time is 11:47 a.m.

Q.   Okay.  So we had an off record discussion and through no fault of Dr. Dully, there's just a logistical issue with Miss Shevlin's office and the photographs did not get sent to her.  So we are going to ask a few more questions, but then continue the deposition to a later time in which she will have access to those photographs and we will reschedule it, Matt raised the concern about him asking questions and that certainly will be accommodated when we reschedule the deposition.  He also has the

ability to reset a deposition as well.  Is that a fair summary, Matt and Amy?

MS. SHEVLIN:  I think that's a fair summary.

MR. CARSON:  Agreed.

MS. SHEVLIN:  And I do also want to add just one thing.  The questions that you'll be asking her are largely going to be hypothetical if we're talking about the images from this point forward and then when we have an opportunity for her to look at the images, they'll be specific to those images, correct?

MR. ROBERTS:  Some of them may be hypothetical.  I don't intend to go through every image in a hypothetical way, but I am going to ask about some general principles, you know, that maybe we don't even need the images for, but yeah, some may be hypothetical, but I don't intend to go through everything like that.

Q.  All right, Dr. Dully, I want to ask you -- and this is not a hypothetical, when you were making these assessments at the request of law enforcement, do you use any other set of scientific principles or methods in rendering the opinion on the appearance of the model, other than sexual maturity rating?

A.   Yes, sometimes I do.  It depends on the image. So sometimes I --

Q.   **What would those be?**

A.   So sometimes I can see the teeth, and I can tell if they're baby teeth or mixed dentition, which is adult teeth in some stage of eruption, sometimes with missing teeth as well.  And then sometimes if they're very young, I can look at it by proportion, if they're very young, images of the very young, I can look at body proportion which is head size to body size.  And most of the size or height is not visible in most images; sometimes they're standing next to an adult and I can look at approximate height, but most of these images are not that, and so occasionally, you know, there's more information or appearance information on the images and sometimes, there is not.

Q.   **If you relied on any other data such as proportion, height, teeth, would that be information that would be included in your report?**

A.   Yes.

Q.   **So if it's not included in your report, I can take from that that you did not consider other data in forming that opinion?**

A.   Not other image data. Sometimes I look at

the bio main or something that's printed on it, or for sexual content, but that's often not helpful either.  It's just all letters and numbers and asterisks, that doesn't help.

Q.   Yeah, I understand.  If -- if there was something, though, you would put that in your report?

A.   I would.

Q.   All right.  So I think when we left off, there was this hypothetical and I don't -- and I apologize, and I'm going to ask this hypothetical again, and I use inguinal notch, but I think it's inguinal -- what is it that --

MS. SHEVLIN: Form.

A.   I don't know.

Q.   It's -- I'm sorry, do you know the anatomical term that I'm talking about?

MR. CARSON: Groove.

Q.   Inguinal groove?

A.   Yeah, I don't know what you're referring to.

Q.   It's just an anatomy term.  It's the -- it's the -- it's the line between the abdominal wall and your hip, that groove, that crease.

A.   Oh, that would be -- you could call that an inguinal fold.

Q. Inguinal fold, yeah, I've seen notch, I've seen fold, I've seen groove, I've seen -- but that's the line that you're talking about in the distinction of -- between IV and V, correct?

A. No, that is very anterior. I'm talking about medial thighs, which is the inner surface of the upper thighs.

Q. But if a picture did not -- if an image did not depict the upper thigh or the abdominal wall where it meets the thigh, it would be impossible for you to distinguish between a grade IV and a grade V pubic hair presentation, correct?

MS. SHEVLIN: Form.

A. No, that's not the location. The location isn't abdominal wall and it's not in the inguinal fold. It is between where the thighs come together in the middle, so it's anterior and medial, the inner thigh.

Q. Okay. So if you cannot see in a digital image, the interior thigh, it would be impossible for you to distinguish between a grade IV and a grade V?

MS. SHEVLIN: Form.

A. No, it's the anterior, a-n-t-e-r-i-o-r and medial thigh, m-e-d-i-a-l, which is where the legs come together between the upper thighs and on the

front of the medial surface of the thighs.

Q. If you cannot see that area, it would be impossible for you to distinguish between a grade IV or a grade V presentation, correct?

MS. SHEVLIN: Form.

A. Probably, but grade IV and grade V are also a subjective determination of quantity amount of pubic hair.

Q. You would not be able to, scientifically, with any degree of reliability distinguish between a grade IV and grade V if you had not seen the area that you have just described?

MS. SHEVLIN: Form.

A. At a hundred percent level of certainty, probably not.

Q. No, you can't ever say with 100 degree -- 100, you know, that's not -- that's not what I'm talking about. And I want to -- I'm going to spend as much time on this as we need to. What I'm going to do, is I'm going to pull back up our demonstrative aid.

Mr. Videographer, do you have this demonstrative aid?

THE VIDEOGRAPHER: Yes, sir, if I see it?

MR. ROBERTS: Yeah, can you do like a split

screen, the ability to do a split screen with the witness in this?

THE VIDEOGRAPHER: I see it now. She's on the -- do you guys see it? She's on the side right now.

MR. ROBERTS: That's fine, yeah, that's fine.

THE VIDEOGRAPHER: Okay.

Q. So we have a -- can you see cursor, Dr. Dully?

A. Yes.

Q. So on grade IV, grade V; is my cursor, the area where my cursor on both the IV and the V, is that the area that you're talking about?

A. Yes. Also between the thighs.

Q. Also between the thighs.

A. To each other.

Q. If you cannot see this area that I am running my cursor on, you cannot do a SMR rating to distinguish between a IV and a V on a pornographic image off the internet, can you?

MS. SHEVLIN: Form.

A. There can be a difference in quality, as you can see, and then also there's medial thighs which you can't see on these diagrams, so if I can

see better than just this, maybe.

Q.   At what point would you say to -- first of all, have you ever told a law enforcement officer, you know, there's just not enough here for me to reliably give you an opinion about the sexual maturity rating.

A.   Yes.

Q.   And what would be the criteria for that?

A.   Sometimes the image is too pixilated or blurry or the clothes are covering the vital structures.

Q.   What are the vital structures?

A.   The breast area from more than one view, and the pubic area as well.

Q.   Okay.  So if the breast area is obscured and the pubic area is obscured, those are circumstances in which you believe you have communicated to a law enforcement officer that this just isn't enough for me to reliably opine on the sexual maturity rating as it appears in the photograph?

MS. SHEVLIN:  Form.

A.   Correct. Maybe I can see the teeth, maybe it's an image that belongs to a bigger file that shows more information, but based on that one image

alone, I can't do the sexual maturity rating.

Q. So you do have -- first of all, do you recall, I think you met with Detective Preston twice; is that what your rec- -- records indicate?

A. Yes.

Q. February 22nd and April 5th. Do you have any calendars or anything in your possession that document those meetings?

A. I have a date and a time on my Outlook calendar.

Q. Have you gone back and checked that Outlook calendar and -- and found an April 5th and a February 22nd?

A. I did not remember the February visit, so when I went back, I did find the February visit on my calendar.

Q. Have you met with her any other times other than April 5th or April (sic) 22nd?

A. Not met with her. I may have seen her in the hallway, potentially, but, no, I didn't share any cases with her to my knowledge.

Q. Okay. Did you check for that?

A. No.

Q. So you just don't recall having any other cases that you consulted with her about?

A.   I don't know that they were with her; sometimes it's a team.  I have seen other St. John's County cases at the hospital --

Q.   Right.

A.   -- but I don't remember her being a prominent figure in any of the others.

Q.   Okay.  So do you recall -- so you don't recall her -- meeting her in February with a single image as we sit here today?

A.   I do not.

Q.   Do you recall meeting her in April with multiple images?

A.   Yes, because we scheduled that.  And she had images, more than one, yes.

Q.   And we've talked a little bit about that meeting.  Do you recall the discussions that you had with her during that meeting?

A.   In any vivid way, no.

Q.   You testified earlier that you would have counseled her on the limitations of your opinions regarding appearance versus actual age; is that correct?

A.   In a simple way, yes, that's all I would have said.

Q.   In any way you wouldn't be misleading

anybody in what your opinions are, correct?

MS. SHEVLIN: Form.

MR. CARSON: Join.

A. Correct, the investigation needs to occur.

Q. What do you mean by that, the investigation need to occur?

A. I have no access to actual -- any additional information at all about the case, the person depicted, other computer's images, I don't have any of that information, so if there is an investigation that's occurring, that I am not part of.

Q. Do you mean that, in part, that your opinions are not enough to establish the actual age of the individuals depicted from a medical standpoint?

A. Right.

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

Q. So, it's okay. I got your answer that time.

MR. CARSON: If you don't mind, I didn't hear her. I think I might have spoken over the witness.

Q. I think you gave me another "correct"?

A.   I think I did, yes.

MR. CARSON:  I apologize, Doctor.

A.   I'm sorry, I'm sorry.

Q.   I'll re-ask it.

You have not -- in these -- in these three reports that I have that you produced in this case, you have not rendered a reliable medical opinion on the actual age of the individuals depicted in this -- in these images, correct?

A.   Correct.

Q.   So let me ask you this and these are kind of hypothetical questions, but they are about the images, so does that mean when you're presented an image and, for example, the model appears, for whatever reason, to have no pubic hair, that in regards to sexual maturity rating is going to be -- that that is a sexual maturity rating of one?

A.   Probably, but I'll look to see if I can see the other areas, too, and countenance of the person.

Q.   Right.  But I mean, you're not, if you're not -- if you can't look at the breast and you don't have a picture of her face or anything like that and you just see a genital area and there's no pubic hair that is visible to you, that's a sexual maturity rating of what?

A.   That would be the appearance -- if the person is blonde, I will explain that I might not be able to see blonde pubic hair even if it's there, so I don't know the image, so I don't know if it was a blonde or not.

Q.   Well, I guess for whatever reason, right, I'm just asking, brunette red head or whatever, if you look at an image and you do not see any pubic hair, that would result in a sexual maturity rating of one in terms of appearance?

A.   Yes.

Q.   And do you make any effort to determine whether or not the image has been manipulated, touched up, edited in any way?

A.   No, I have no expertise in that.

Q.   Talk about shaving, do you have any expertise in the appearance of electrolysis, hair removal?

A.   Not to my knowledge, no.

Q.   Do you have any expertise in what an individual who has received electrolysis looks like when you take a picture of them -- of their pubic hair?

A.   No.

Q.   Same question with waxing; do you -- are --

do you have any expertise in determining whether or not from looking at a picture someone has been waxed?

A. If there's folliculitis where the hairs are starting to grow back, maybe, otherwise, no.

Q. Because your understanding is waxing pulls the hair follicles out of the skin in that process, correct?

A. Yes. And there would be a period of time where the follicles look healed over.

Q. And that would be the appearance of no growth of pubic hair?

A. Yes.

Q. Is there a reason why you only say in -- in these opio- -- in these letters that the model or she does not appear to be shaved rather than waxed?

A. No, I just used shaved as the customary term.

Q. So by shaved, you mean grooming of any type?

MS. SHEVLIN: Form.

A. The after care is still present, not shaved in a general sense, not absent.

Q. Hold on, I'm not understanding you. Let's not even look at the first letter, let's just look at April 5th, okay? You've got an April 5th. I can

pull it up.

MS. SHEVLIN: Could you pull it up, I want to make sure it's the correct one for all of us to pull up at the same time.

MR. ROBERTS: There's two April 5ths.

Q. So I'm going to share your report again. I'm going to scroll down to the second -- so, I just want to go over here on the second paragraph, can you see this, the second image is imprinted with white script. That's the way it begins. You say she does not appeared to be shaved. What do you mean by that statement?

A. That there's no shaving bumps or folliculitis that we might see, and I don't see -- you can see that I say she appears to have no pubic hair development.

Q. So I guess what I'm saying, what I'm getting at is what if she was waxed?

MS. SHEVLIN: Form, speculation.

A. I could have said she does not appear to be waxed, I would be saying the same thing.

Q. Bill, but -- do you get bumps from waxing?

MS. SHEVLIN: Form, speculation.

A. You can.

Q. But I think we just established that there

is a period after waxing where it appears that you have no pubic hair growth, correct?

A. It may appear you have no hair growth wherever was waxed, I don't know how long that lasted.

Q. So how could you rule out in giving your opinion here that she hadn't been waxed?

MS. SHEVLIN: Form.

A. I'm not making any statement about waxing at all.

Q. And that's my question, why not? Why not?

A. Because the presence of pubic hair is the presence of pubic hair; what cosmetic procedure is not part of the question.

Q. She doesn't have any presence of pubic hair, so isn't it part of the question, why does she not have pubic hair; your answer is that she's prepubescent, there are other explanations, correct?

MS. SHEVLIN: Form.

A. Correct, she has appearance of prepubescent or -- yes.

Q. Or she has the appearance of one is who is just been waxed?

MS. SHEVLIN: Form, speculation.

A. I can't see the image, but hypothetically,

that is one explanation.

Q. Why is that explanation less likely than your given explanation that she's prepubescent?

MS. SHEVLIN: Form.

A. Which explanation?

Q. That she's just been waxed?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. I was a military doctor and all the young women are shaved, they're not waxed. Waxing and electrolysis and laser hair treatments are expensive, and so in general, they're shaved. So for me as a military physician, shaved is a general term.

Q. Whatever happens in the military happens in the military. I'm not asking about the military; you've been a U.F. physician for 10 years, correct?

A. And a military physician since 1982.

Q. And you had no reason to believe that this model was in the military, correct?

MS. SHEVLIN: Form, speculation.

A. Correct, but my customary vocabulary is definitely effected,

Q. No, and I'm not talking semantics, Dr. Dully, and I -- I apologize if you think I am talking semantics, I am not. You just testified that one

possible explanation for her not having the appearance of hair, is that she was waxed?

A. Okay.

Q. That's correct, right?

A. Or shaved or something else, yes.

Q. Or electrolysis, correct?

A. Maybe.

Q. Now, my question to you is, you offered the opinion that the reason why she does not have pubic hair is because she is less than nine to 13 years old, correct?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. Based on the appearance.

Q. But the appearance is also consistent with someone who's been waxed, correct?

MS. SHEVLIN: Same objections.

A. Correct, but I'm not seeing the image, so hypothetically, it could be.

Q. Right, so here's my question. What makes it more likely that your opinion, that it is her pubertal development that explains her lack of pubic hair, rather than waxing or electrolysis?

MS. SHEVLIN: Form.

A. The investigation will verify or refute. I

have no ability to do that.

Q. Well, I'm just asking you from a medical perspective, okay. You get an image, right, from the internet, you knew this was an image from the internet, correct?

A. No, I know it was a Nick Nick tip based on what I was told, I don't actually know.

Q. Actually, and you may not know this, this was not a Nick Nick tip, this picture, you describe it, it had a file name, it's a screen shot and then there is Duck Duck Go dot -- did you not know that that was a screen shot from the internet?

MS. SHEVLIN: Form.

A. No, I didn't know where it came from.

Q. Well, you'll look at it when you look at the image, you'll agree it is from the internet; it has the website.

MS. SHEVLIN: Form.

Q. Well, let's not get into that, we'll ask that later.

You're being asked a medical opinion by the detective, correct?

MS. SHEVLIN: Form.

A. Yes.

Q. Now, you know, as a medical doctor that

there can be multiple explanations for a model in an image not having the appearance of pubic hair, correct?

A.   There can be, yes.

Q.   Right.

One of those is that the image has just been digitally altered to remove evidence of pubic hair, correct?

A.   Yes.

MS. SHEVLIN:  Form.

Q.   One of those would be waxing or electrolysis or some form of hair removal that did not leave any visible evidence of hair, correct?

MS. SHEVLIN:  Form.

A.   Yes.

Q.   All right.  One of the explanations would be that the model has not reached a certain level of puberty, correct?

A.   Yes.

Q.   So as a medical doctor, this would be what we call kind of a differential diagnosis, correct?  You got -- you got three different things that could explain what you are observing; is that a fair characterization?

MS. SHEVLIN:  Form.

A.    Potentially, yes.

Q.    What makes you think that pubertal development would be more likely than digitally altering the image or some sort form of hair removal that you couldn't see on the picture?

MS. SHEVLIN: Speculation.

A.    I am not saying how likely or unlikely it is, I'm only saying what the appearance is.

Q.    So when you're entering these opinions, you're not saying with any degree of reliability that they're correct?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

A.    It's not chronological age, their appearance.

Q.    Well, why didn't you -- I guess my question here is and I don't think you need to look at the image for this, you acknowledge that waxing can produce the same effect of no visual evidence of pubic hair; why would you as a doctor say that she is an SMR I rather than she just had a really good wax job?

MS. SHEVLIN: Form, speculation.

A.    Again, I need to see the patient, which is the image.

Q. Okay. Well, we'll certainly do that when we get the images and I guess we can answer those questions then.

In this same -- and this perhaps highlights what we've been going around today more than anything else. In the first paragraph here you review another image, and this is -- let's just call it by its file name: YCBLVVFQ underscore O.JPG. This is an image that you evaluated and I'm just going to read your opinion. Her breasts are partially visible and could be SMR IV to V. However, her genitals -- genitals are plainly visible and her thighs spread widely apart and showing she is SMR I with respect to pubic hair. Then you say this developmental appearance is less than nine to 13 years of age.

So my first question is, what developmental appearance is less than nine to 13 and a half years of age with this model?

MS. SHEVLIN: Form.

A. Absence of hair bearing parts.

Q. Okay. But what about her breasts?

A. Well, I did not have a good view of her breasts, so that was the best that I could do was IV to V.

Q. Yeah, but what's the developmental

appearance of a V breast; what's the age ra- -- age range of that?

A.   Post pubertal or beyond.

Q.   **Greater than 18 years old, correct?**

A.   Well, no, not necessarily, because part of the sexual maturity rating is looking for disorders that involve estrogen exposure at any age, and the five can -- breast development sometimes starts first and finishes first and so you can have a V during puberty, so it's good to be able to see both areas if possible.

Q.   **What kind of disorder would that be called, someone who has an SMR rating of V breasts, but no pubertal hair development?**

A.   Well, it can be normal, and it can be normal based on the limitations of the photographs, and there are cases of precocious thelarche it's called where breast development happens without actual pubertal development.

Q.   **Your testimony here today is that it is normal for a female to have grade IV to V breasts, but no pubic -- pubertal hair development in a clinical setting?**

A.   It is possible, yes.

Q.   **And if that is possible, you would look at**

it and say -- you would run some diagnostic tests to try to explain why that was happening, correct?

A. No, not necessarily. It depends on the whole picture.

Q. How many pictures have you seen -- have you ever treated that had grade V breasts, but no pubertal development; is that someone that you've treated before?

MS. SHEVLIN: Form.

A. Yes. I have seen one in the military and she had a sexual development disorder.

Q. Okay. So something that was not normal?

A. It turned out that it was not normal, but when we started, that was not necessarily so.

Q. How old was she when you stopped treating her?

A. 17.

Q. So at 17 she had no pubertal hair development?

A. That was why I was seeing her, yes.

Q. Did she have pubertal development when she was 18?

A. I didn't see her past 17, I don't know.

Q. So it's possible for someone to present with an SMR IV -- IV or V breast, no pubertal hair

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

development and be 18 years-old?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. Well, it's -- it's possible; it would depend on the underlying causes.

Q. You would have to be in a clinical setting to diagnose and figure that out, right?

MS. SHEVLIN: Form.

A. Yeah.

Q. Why did you -- why in this one, though, would you have -- would you have relied on the pubic hair SMR rating, but not the breast development SMR rating?

A. Because I can see the pubic hair development.

Q. But there was enough for you to say SMR IV to V?

A. I erred on the old side since I could not really see, so the breast development was potentially that mature.

MR. ROBERTS: Give me one second, okay. I think it's probably a good point to just continue the deposition, go through the photographs and all that stuff, I'm sure there will be a lot more questions. Does that sound good to everybody?

MS. SHEVLIN:  Fine with me.

THE VIDEOGRAPHER:  Sorry, Mr. Roberts, no video orders right now?

MR. ROBERTS:  Yeah, no video orders.  I will actually order a copy of the transcript.

MS. SHEVLIN:  We'll take a copy as well, just E-Tran.

THE COURT REPORTER:  Mr. Carson, do you need a copy?

MR. CARSON:  I'm good for now.

THE COURT REPORTER:  Read or waive?

MR. ROBERTS:  You know, I don't even know if we're continuing it, if it's an official transcript.  It's up to you, Doctor, you can read it if you want.

MS. SHEVLIN:  I'm going to have her read, but given the circumstances, we'll make sure it gets to her as soon as possible as soon as we get it.

THE VIDEOGRAPHER:  The video recorded deposition of Dr. Kathleen Duffy, going off the record, the time is 12:26 p.m.  Thank you.

(Plaintiff's Exhibit Nos. 1 through 4 were marked by the reporter subsequent to the deposition.)

(Whereupon the deposition terminated at 12:26 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA    )

COUNTY OF ORANGE    )

I, the undersigned authority, certify that KATHLEEN DULLY, M.D. personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 10th day of May 2025.

_____

LISA K. PENKACIK, RMR
Notary Public - State Of Florida
My Commission expires 9/7/2026
Commission No.:  HH 289853

CERTIFICATE OF REPORTER


STATE OF FLORIDA )

COUNTY OF ORANGE )


I, LISA K. PENKACIK, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of KATHLEEN DULLY, M.D.; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I, further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

Dated this 10th day of May, 2025.

_____
LISA K. PENKACIK, RMR

ERRATA SHEET

PAGE:     LINE:       CORRECTION:       REASON:

_____
DATE

_____
KATHLEEN DULLY, M.D.

### Exhibits

**Plt Exhibit 1**
  3:8 31:13

**Plt Exhibit 2**
  3:8 31:13
  45:7

**Plt Exhibit 3**
  3:9

**Plt Exhibit 4**
  3:9 50:25

### 1

**1** 31:13
  45:4 85:23

**10** 16:2
  26:21
  76:16

**100** 65:16,
  17

**10:01** 4:7

**11:29** 60:12

**11:47** 60:15

**12** 54:2

**12:26** 85:22
  86:2

**13** 77:10
  81:15,17

**15** 54:3

**15th** 27:9

**17** 83:17,
  18,23

**18** 28:25
  43:19 54:4
  82:4 83:22
  84:1

**19** 54:4

**1959** 26:18

**1980** 8:16

**1980s** 18:19

**1981** 7:8

**1982** 76:17

**1986** 7:11,
  17

**1989** 7:17,
  18 10:3

**1990** 8:6

**1990s** 18:19
  26:22

**1991** 8:17

**1993** 9:1

**1994** 9:4,
  12,24
  23:21,23
  24:8

**1996** 27:5

**1998** 18:20
  27:17

### 2

**2** 31:13
  45:5,7

**20** 43:15

54:4

**200** 10:5

**2006** 16:23

**2009** 10:4,7

**2023** 24:16
  57:15

**2024** 24:11,
  12

**2025** 4:7

**21** 25:24

**22** 18:5

**22nd** 18:3
  50:21
  57:15
  68:6,13,18

**28** 4:6

### 3

**3** 45:4,5

**30** 9:8

**3:24-cv-00044-
mmh** 4:6

### 4

**4** 50:25
  85:23

### 5

**5th** 18:3
  51:4 68:6,
  12,18

73:25

**5ths** 74:5

### 7

**70** 26:18

**73** 29:15

### 9

**90's** 56:11

**95** 29:15

### A

**a-n-t-e-r-i-o-
r** 64:23

**a.m.** 4:7
  60:12,15

**abdomen**
  37:17 38:1

**abdominal**
  63:22
  64:9,15

**ability** 9:1
  12:13,20
  61:1 66:1
  78:1

**abnormal**
  19:21

**Absence**
  81:20

**absent** 55:19
  73:22

**abundant**
  38:17

**abuse**  7:2,3,
  22 8:7,20,
  21 9:15
  10:4,8
  11:1,15,16
  12:7,8
  13:4,6,9,
  11,14,20,
  22 14:1,4,
  8,14,17
  15:5,6,9,
  17,19
  16:7,21
  17:12 28:7
  49:18

**Abusive**  8:12

**Academy**  8:11
  27:3

**access**  18:4
  28:5,8
  30:23
  60:22 70:7

**accommodated**
  60:24

**accuracy**
  34:22

**accurate**
  22:20,23

**accurately**
  23:6

**achieved**
  54:1

**acknowledge**
  80:18

**active**  16:19
  27:20

**actual**
  22:15,24
  34:23 35:2
  40:9,13
  46:14,21
  47:15,20
  48:9
  51:10,20
  69:21
  70:7,14
  71:8 82:19

**add**  61:6

**additional**
  8:14 9:25
  70:8

**administered**
  11:4

**adolescent**
  35:16,18

**adult**  45:12
  58:22
  62:6,13

**adulthood**
  43:17

**adults**  29:2,
  3,4

**advantage**
  58:13

**advertised**
  6:25

**aesthetic**
  34:12

**affidavit**
  48:16 49:6
  50:15

**afraid**  58:20

**age**  21:6,9,
  10,12,13,
  15 22:15,
  24 23:1,
  12,13,19
  26:7 28:25
  29:14
  31:17
  32:7,21
  34:23 35:3
  39:5
  43:12,19
  46:4,9,15,
  21 47:15,
  20 48:9
  51:11,20
  54:3 69:21
  70:14 71:8
  80:14
  81:15,18
  82:1,7

**agencies**
  13:2

**agree**  10:22
  23:5 26:5
  31:20
  32:21
  45:13
  46:7,13,
  20,22

**47:19**
  78:16

**agreed**  54:11
  61:5

**ahead**  12:12,
  19

**aid**  11:17
  44:13
  65:21,23

**aim**  30:10

**aimed**  13:21

**Air**  7:19

**alterations**
  34:16,17,
  21

**altered**  34:5
  79:7

**altering**
  22:7 34:11
  40:6 80:4

**American**
  8:10,11
  11:5 15:11
  26:23 27:3

**amount**  65:7

**Amy**  4:16
  37:2 52:8
  60:9 61:2

**Amy's**  32:24

**anatomical**
  36:14,22
  63:16

**anatomy** 63:21

**ankles** 53:6

**answers** 32:23

**anterior** 38:4,10 55:4 64:5, 17,23

**anterior/ posterior** 43:1

**anus** 41:23

**apologize** 63:10 71:2 76:24

**apparent** 23:12 51:17

**appearance** 21:10,12, 17 22:13, 21 23:2, 12,19 28:9 32:6,16 33:16,21 34:1 35:18 36:2,12, 22,23 37:13 46:8 48:10 49:12 51:14,15, 17,21,22 54:2,9,22

57:9 59:23 61:24 62:16 69:21 72:1,10,17 73:10 75:20,22 77:2,14,15 79:2 80:8, 15 81:14, 17 82:1

**appeared** 53:13 74:11

**appears** 30:10 46:24 51:14 52:3,4 53:2 59:7 67:20 71:14 74:15 75:1

**applicable** 10:23

**apply** 5:10 26:25 29:3 46:24

**applying** 26:11 46:2

**appointment** 38:12

**approaching** 20:15

**approximate**

62:13

**April** 4:6 18:3 51:4 68:6,12,18 69:11 73:25 74:5

**area** 39:21 42:23 59:2 65:2,11 66:13,14, 18 67:13, 14,15,16 71:23

**areas** 71:19 82:10

**areola** 42:21,23 43:6,10

**Armed** 27:16, 19

**article** 26:6 27:6 28:12 29:25 30:2,5,13, 24 31:21 45:5

**articles** 26:18,24

**Arts** 7:9,10

**Asia** 26:25

**assault** 16:7,22

**assess** 12:21 19:20

20:20 39:3 54:18,19

**assessed** 57:9

**assessing** 54:8,9 57:2

**assessment** 26:7 31:18 32:3 55:21

**assessments** 9:9 61:22

**assigned** 7:21

**assume** 5:3

**asterisks** 63:4

**astrological** 34:7

**attempt** 29:14

**attempted** 26:10

**attempting** 21:19

**avoid** 29:8

**aware** 21:24 22:3 24:8 34:2 50:1

---
**B**
---

**baby** 62:5

**Bachelor**
  7:10

**back**  9:25
  10:20 21:1
  45:7
  57:10,12
  65:20
  68:11,15
  73:4

**background**
  7:7

**bad**  5:15

**base**  32:17

**based**  21:16
  28:10
  33:21
  57:20
  58:23
  67:25
  77:14 78:6
  82:16

**basis**  6:19
  10:14
  54:23
  55:12,14

**bear**  15:22

**bearing**
  35:14
  36:19 38:9
  39:16
  81:20

**beginning**
  4:3 42:24

**begins**  74:10

**behalf**  4:16

**behavior**
  29:8

**beings**  38:18

**belly**  41:16,
  19

**belongs**
  67:24

**Bethesda**
  7:13

**big**  55:8

**bigger**  67:24

**Bill**  74:22

**bio**  63:1

**birth**  42:17

**bit**  5:2
  36:16
  37:19
  42:22
  69:15

**blond**  40:18

**blonde**  72:2,
  3,5

**bloodstream**
  42:12

**blurry**  33:18
  67:10

**board**  10:4,7
  11:1,5
  13:4
  14:13,20
  15:11

  17:12

**boards**  10:3

**body**  6:23
  36:14
  42:19
  62:10,11

**book**  44:6

**borderline**
  33:24

**break**  37:6
  52:8 57:11
  60:8,13

**breast**  20:12
  42:9,13,
  19,24
  43:5,11
  54:14
  67:13,15
  71:21
  82:1,8,18
  83:25
  84:12,19

**breasts**  42:1
  53:17,21
  81:10,21,
  23 82:13,
  21 83:6

**briefed**
  25:23

**bring**  15:21
  33:23,24

**bringing**
  24:5

**brunette**

  72:7

**buds**  20:12
  42:9,13,19

**bumps**  74:13,
  22

**burst**  23:22

**button**
  41:16,19

_____

C

**calendar**
  68:10,12,
  16

**calendars**
  68:7

**California**
  7:17 8:8
  9:14

**call**  15:12
  37:6 60:9
  63:24
  79:21 81:7

**called**  8:9,
  22 18:19
  19:2 37:17
  41:17
  82:12,18

**calling**  19:6
  54:7

**camera**  53:6
  57:16

**Camp**  9:13

**care**  6:18

10:20,23
11:21
13:18
27:19
73:21

**cared** 8:1

**career** 16:5

**Carson** 4:18
22:11 47:3
61:5 63:17
70:3,18,22
71:2 85:8,
10

**case** 4:5
6:19 7:22
8:20,24
9:15,18
10:14
14:10
17:16,18
20:19,20,
23 21:17
24:20
25:2,14,21
26:1 27:1
35:24
36:20
49:25
59:17 70:8
71:6

**cases** 7:1
8:4 9:7,10
24:5 35:7
68:21,25
69:3 82:17

**catch** 6:1

**caveat** 49:7

**cell** 60:10

**center** 8:18
9:4 16:11,
20 27:16,
19

**certainty**
13:8 65:14

**certification**
11:2,16
14:14,20,
21

**certified**
10:7 17:12

**Chadwick** 9:4
16:20

**Chair** 7:21
8:23

**chance**
30:18,19

**change** 24:15

**changed**
18:20,22

**characterizati
on** 14:18
79:24

**charge** 8:19

**check** 68:22

**checked**
68:11

**chemical**
55:24

**chest** 43:2,
11 53:5,7,
20 57:16,
24

**child** 6:12,
14,17,22,
23 7:1,4,
21 8:1,7,
8,20 9:9,
15,21
10:3,8,10
11:1,15,
16,25
12:1,7,8
13:4,6,9,
11,14,20
14:1,4,8,
14,17
15:5,6
16:6,21
17:12
20:16,17
27:16,20
28:6,7,8
29:22
35:13
37:11
49:18 53:3
58:22

**child's**
10:17

**children**
8:1,12 9:5
14:24
15:13
16:20 39:2
49:22

**Children's**
8:10 9:5
16:8,20
24:6

**chose** 31:2

**chronicle**
32:7

**chronological**
21:13
23:1,11,19
32:7 35:3
43:12
46:4,15
80:14

**chronological
y** 21:6

**circumstances**
48:22
67:17
85:17

**citation**
31:21,25

**clinical**
19:10,11,
13 27:13,
22,23,25
28:1,5
38:22
43:13
55:21
82:23 84:6

**clinically**
55:9

**close** 18:12
40:17

**clothes**
  67:10

**cold**   42:15

**colleague**
  24:6 50:4

**College**   6:10
  7:9

**colloquially**
  5:24

**comfort**
  49:11

**comfortable**
  49:5 58:18

**commanders**
  8:25 9:16

**comment**
  59:10

**commentary**
  51:9

**commissure**
  37:24
  38:4,10

**committee**
  7:22 9:15

**committees**
  9:18

**communicate**
  47:9

**communicated**
  51:24
  67:18

**community**
  13:1

**completed**
  18:13

**completely**
  12:15

**completion**
  19:18

**component**
  11:6

**composite**
  50:25

**computer's**
  70:9

**concern**
  15:15,16,
  19 60:23

**concerns**
  15:21
  20:15
  45:21

**conclusion**
  28:21 30:7

**condition**
  13:12

**conference**
  7:25 8:7,
  9,12

**conferences**
  10:1

**confined**
  42:20

**consequences**
  29:9 49:19

**considered**

  16:22
  36:17

**consistent**
  77:15

**constitute**
  13:22

**consult**
  10:17,21
  17:14,18
  35:6

**consultant**
  8:24 9:15,
  17 10:16

**consultation**
  8:14

**consulted**
  14:2
  17:17,22
  28:9 68:25

**consults**
  6:24

**content**   63:2

**continue**
  37:14
  60:20
  84:22

**continued**
  8:15

**continuing**
  10:1 85:13

**continuously**
  16:25

**contribute**

  12:22 17:9

**copy**   51:3
  85:5,6,9

**Cornell**   7:8

**Corps**   7:23
  9:16

**correct**
  13:23 14:8
  15:15,19
  22:4,9
  33:1,12
  35:7,24
  41:20
  43:20
  47:7,8
  49:19
  52:12
  53:8,14,22
  56:6,14,18
  57:6,16,20
  58:1,8
  60:5 61:12
  64:4,12
  65:4 67:23
  69:22
  70:1,4,25
  71:9,10
  73:7 74:3
  75:2,18,20
  76:16,19,
  21 77:4,6,
  11,16,18
  78:5,22
  79:3,8,13,
  18,21
  80:11 82:4
  83:2

**correctly**
13:15
17:18
29:5,10
50:22
58:14

**cosmetic**
75:13

**Counsel**  4:11

**counseled**
69:20

**countenance**
71:19

**counties**
7:3,5

**County**  24:11
69:3

**couple**  28:13

**court**  4:8,12
5:17  6:1
29:9  85:8,
11

**cover**  7:3

**covered**
37:25

**covering**
53:21
67:10

**covers**  7:4

**crease**  39:20
63:23

**criteria**
67:8

**critically**
30:9,17

**crossed**  58:7
60:3

**CSAM**  45:22

**Cum**  7:11

**curriculum**
11:10

**cursor**  66:9,
12,13,19

**customary**
73:16
76:21

**cut**  49:1

---
**D**
---

**D-U-L-L-Y**
6:8

**Danny**  4:7

**data**  18:24
62:18,24,
25

**database**
58:19

**date**  4:6
68:9

**dated**  18:2

**DCF**  6:24
10:17
11:11,17

**deal**  25:7

**decade**  26:19
45:25

**decide**  15:22

**decided**
15:12

**decision**
32:17

**decisions**
14:7  49:13

**defendant**
5:5

**definition**
42:9

**degree**
65:10,16
80:10

**delay**  19:18

**delays**  19:21

**deliver**  6:19

**demonstrative**
44:13  45:6
65:20,23

**dentition**
62:5

**department**
17:3

**depend**  54:6
84:5

**depends**
54:16  58:3
62:1  83:3

**depict**  44:20

52:11  64:9

**depicted**
21:20
22:16
32:14
46:15
47:15
51:11
70:9,15
71:8

**depiction**
22:20
44:18

**depicts**
28:23
33:21  53:2

**depilatories**
54:17

**deposition**
4:3  5:4,9
60:21,25
61:1  84:23
85:21,25
86:1

**describe**  6:2
23:10  36:2
42:2
52:11,14,
23  78:9

**descriptive**
41:4

**Desert**  8:16

**designed**
11:10
19:8,13,17

56:20,21

**desktop**
27:15

**destroy** 57:4

**detecting**
29:22

**detective**
4:19 17:22
47:12
50:14
51:19,25
52:16 68:3
78:22

**detectives**
43:22

**determination**
14:5,16
15:1
32:10,13
48:23
50:10
54:24 65:7

**determinations**
7:2

**determine**
13:5 15:14
46:3,14
56:5,24
57:19 58:6
72:12

**determining**
73:1

**develop**
29:22

**developed**
9:3 37:12,
14 59:4

**developing**
37:15

**development**
20:8 36:9,
24 54:14
74:16
77:22 80:3
82:8,14,
18,19,22
83:7,11,
19,21
84:1,12,
15,19

**developmental**
51:15 54:2
81:14,16,
25

**deviations**
20:10

**diagnose**
84:7

**diagnosis**
79:21

**diagnostic**
14:5 83:1

**diagrams**
66:25

**dial** 45:9

**Dick** 45:17

**Diego** 8:7,
10,18,19

**difference**
21:14
39:2,18
40:7,11,
13,15
58:16,25
66:23

**differential**
79:21

**difficult**
5:21 26:6
31:17
32:3,4,5
40:20,21

**digital** 21:7
22:7 34:11
40:6,22
46:25
64:19

**digitally**
21:25 34:5
79:7 80:3

**direct** 4:24
11:13
24:22

**direction**
35:16

**directly**
43:2

**director**
6:14,17
16:9 17:3

**disagreed**
45:8 48:4,
6

**disagreement**
48:11

**disclosed**
28:12

**discounting**
30:13,16

**discoverable**
25:12

**discovered**
35:3

**discussed**
45:24

**discussion**
60:16

**discussions**
69:16

**disorder**
82:12
83:11

**disorders**
82:6

**distill**
14:25

**distinction**
7:11 13:21
21:18
38:24
40:21 60:6
64:3

**distinguish**
40:2 59:6,
21 64:11,
21 65:3,10
66:20

**distinguishes**
40:4

**distinguishing**
60:3

**distribution**
60:5

**division**
17:4

**doctor** 12:6,
24 71:2
76:9 78:25
79:20
80:20
85:14

**doctor/patient**
10:12,19

**doctors** 12:3

**document**
68:8

**documented**
45:12

**documents**
21:16

**domestic**
9:17

**dot** 78:11

**drastic** 29:9

**drawing**
44:22

**Duck** 78:11

**Duffy** 85:21

**Dully** 4:4,

17,20 5:1
6:8 12:10
24:18 30:4
45:11
47:24
57:14
59:16
60:17
61:20
66:10
76:24

**duly** 4:21

**duty** 7:18
16:19
27:21

———————

**E**
———————

**e-mail** 45:23

**E-TRAN** 85:7

**E.U.** 29:21

**earlier** 5:2
44:25
54:11
69:19

**early** 18:19
19:19 41:9

**earrings**
53:3

**edited** 21:25
72:14

**Edition** 27:9

**education**
10:1

**Edward** 7:12

**effect** 42:11
80:19

**effected**
76:22

**effects**
42:18

**effort** 72:12

**electrolysis**
55:23
56:13,25
72:17,21
76:11
77:6,23
79:12

**emergency**
9:23

**employ** 20:18

**employed** 6:9

**employer**
16:4

**end** 13:9,10

**enforcement**
6:25 10:18
11:11,17
23:16 24:5
33:7,15
35:7 47:10
50:14
61:22
67:3,18

**enlargement**
42:22

**entails** 15:3

**entering**
80:9

**entire** 29:25
38:3 54:13

**erred** 84:18

**eruption**
62:6

**essentially**
6:20

**establish**
70:14

**established**
74:25

**estimate**
21:6,9,10,
20,21
23:19 28:9

**estrogen**
42:8,11,18
82:7

**evaluate**
53:16

**evaluated**
81:9

**evaluating**
40:16 60:2

**evaluation**
24:6,10,16
26:24
38:19

**evaluations**
24:7

evidence
  12:21
  79:7,13
  80:19

exam  14:25
  43:13

EXAMINATION
  4:24 10:7

examine
  10:13

examiner
  16:7,22

exhibit
  31:13
  45:3,7,12
  50:25
  85:23

exist  13:4

expect  50:13

expensive
  76:11

experience
  14:22
  17:13

expert  5:6
  15:6 26:1
  45:5 49:18
  56:5

expert's
  31:9

expertise
  13:5 14:15
  72:15,17,
  20 73:1

experts  6:24
  29:7

explain
  33:14 72:2
  79:23 83:2

explains
  77:22

explanation
  43:23
  48:10
  76:1,2,3,5
  77:1

explanations
  75:18
  79:1,16

explicitly
  51:19

expose  53:6

exposed  42:7

exposure
  82:7

external
  36:17

eye  30:9,12

—— F ——

face  71:22

fact  11:22
  29:1
  32:11,15

factor  36:9,
  11 60:4

facts  60:1

factual
  32:13

faculty  9:19

fair  13:3
  14:17 28:1
  34:19
  47:20
  61:2,3
  79:23

familiar
  29:13
  31:15
  56:13

Families  9:5
  16:21

family  8:22

fault  60:17

February
  18:2,5
  50:21
  57:15
  68:6,13,
  14,15 69:8

Fed  7:14

feet  53:4

fellowship
  9:6,25
  19:6 23:25
  24:2

fellowships
  9:2

female  37:11

41:11
  43:13,18
  53:3 82:21

females
  35:23,24
  36:2 41:6
  45:12

fetus  42:11

field  9:8
  10:5

figure  69:6
  84:7

file  67:24
  78:10 81:7

files  48:21

fills  38:3

find  18:6
  29:20
  30:3,5
  68:15

fine  28:15
  40:17
  66:6,7
  85:1

finished
  9:12,24
  49:1,2,4

finishes
  82:9

flat  42:13,
  14

floor  53:4
  57:24

**Florida**
6:10,15
7:5,20
16:1,4

**focus** 40:17

**fold** 63:25
64:1,2,16

**follicles**
40:14
73:6,9

**folliculitis**
73:3 74:14

**follow** 57:10

**Forces**
27:16,19

**forensic**
28:16 29:7

**form** 10:12,
25 11:3,7,
12,18
12:4,9,18,
25 13:7,
16,24
14:9,19
15:8 16:18
17:8,20
18:18
19:3,9,15,
25 21:8
22:1,5,10,
25 23:9,
20,24 24:4
26:4,13
29:24
30:6,15,

21,25
31:3,23
32:2,18,22
33:9 34:6,
13,25
35:11
38:21 39:7
40:8,12,23
41:13
43:14,21
44:1 46:5,
17 47:2,22
48:12,17
49:8,21
50:2,8
53:23
54:5,25
55:25
56:7,25
57:7 58:2,
9 59:9,24
63:13
64:13,22
65:5,13
66:22
67:22
70:2,18
73:20
74:19,23
75:8,19,24
76:4,7,20
77:12,24
78:13,18,
23 79:10,
12,14,25
80:4,12,23
81:19 83:9
84:2,8

**formal** 19:4

**format** 7:25
8:12

**forming**
20:23
62:24

**forward**
48:23
49:13
61:10

**found** 68:12

**Friday** 26:2
37:6

**front** 37:21
38:10 50:7
52:7 65:1

**full** 6:6

**fully** 37:12
59:3

**function**
19:23
20:3,5

**functioned**
8:23

**funded** 29:21

---

**G**

---

**gave** 50:12
70:25

**general** 10:2
13:17
17:15 18:9
44:2 52:19

57:13
61:16
73:22
76:12,13

**generally**
36:25
44:24

**genital**
36:1,8,24
51:15
54:2,15
71:23

**genitalia**
53:6

**genitals**
37:10
53:15
81:11

**Giddens**
26:21

**girl** 37:12

**girls** 26:23
42:12

**give** 30:18
33:2,8,15
34:1 35:2
36:7 37:4
41:25
43:23,24
47:14 67:5
84:21

**giving** 75:6

**Global** 4:10

**globular**

43:8

**good**  4:2
10:9 27:6
33:18
80:21
81:22
82:10
84:22,25
85:10

**grade**  37:9,
18,19
38:2,3,14,
15 41:19
42:3,4
43:13,18
59:1,7,8,
22 60:4
64:11,21
65:3,4,6,
11 66:12
82:21 83:6

**grade-**  37:9

**grades**  36:3,
4 42:1

**graduated**
7:8,10,12

**grandmothered**
10:5

**grappling**
14:7

**Greater**  82:4

**groom**  39:6

**groomed**
22:19 40:1

56:5,6
57:4

**grooming**
22:18,22
39:25 40:6
46:25
54:7,9,19,
20 56:14
73:18

**groove**
63:17,18,
23 64:2

**ground**  5:10

**group**  16:10

**grow**  41:7
73:4

**grows**  41:6

**growth**  73:11
75:2,3

**guess**  36:22
44:12 48:1
72:6 74:17
80:16 81:2

**guys**  66:4

─────────────
**H**
─────────────

**H-E-B-E-R-T**
7:12

**hair**  20:13
22:4 36:5,
8,9,23
37:10,15,
16,19,22,
25 38:9,16

39:15,16
40:14
41:1,6,12,
18 54:15
55:1,3,4,
7,15,16,
17,18,24
56:1,2,25
57:1,2,3,
6,8 58:7
59:1,2,3,4
60:2,4
64:12 65:8
71:15,23
72:3,9,17,
23 73:6,11
74:16
75:2,3,12,
13,16,17
76:11
77:2,10,23
79:2,8,12,
13 80:4,20
81:14,20
82:14,22
83:18,25
84:12,14

**hairs**  38:1
73:3

**half**  16:2
60:8 81:17

**hallway**
68:20

**hang**  24:18

**happened**
33:11

**happening**
83:2

**happy**  25:14,
21

**hard**  49:3

**head**  5:25
6:3 62:10
72:7

**healed**  73:9

**hear**  70:23

**heard**  28:17,
19

**Hebert**  7:12

**height**
62:11,14,
19

**helpful**
44:12,15
60:6 63:2

**helping**
12:21

**heritage**
54:16

**Herman**  26:21

**hesitate**
5:15

**highlights**
81:4

**hip**  63:23

**hire**  6:20

**hold**  56:4
73:23

Holguin  4:8

home  12:8

Hong  26:25

hospital
  7:17 8:10
  9:6,13
  16:8,11
  69:3

hospitals
  10:18

hour  60:8

human  38:18

hundred
  65:14

Huseby  4:10

hymen  36:12,
  20

hypothetical
  58:24
  59:15,17
  61:8,14,
  15,18,21
  63:9,10
  71:12

hypothetically
  59:19
  75:25
  77:19

—————————
          I
—————————

idea  20:9
  47:9

identify

20:10

II  36:5
  37:17
  42:6,10,21

III  36:5
  37:18,19
  42:6,10,24

illnesses
  13:14

ima-  51:11

image  22:13
  23:2,13,18
  32:14
  33:17,20
  35:1
  40:16,22,
  24 44:19
  45:6 46:16
  47:16
  49:15
  52:12,22,
  24 53:2
  55:19,22
  56:24
  57:12,13,
  21,23
  58:3,4,5,
  13,17,19,
  24 59:10,
  14,19,25
  61:15
  62:2,25
  64:8,20
  66:21
  67:9,24,25
  69:9 71:14

72:4,8,13
  74:9 75:25
  77:18
  78:3,4,16
  79:2,6
  80:4,18,25
  81:7,8

images  24:17
  26:12
  27:19 28:8
  29:15
  33:18,24
  34:4,11,
  15,16
  35:15,23
  37:1,4
  40:10 46:3
  47:13 52:7
  61:9,11,
  12,17
  62:9,12,
  14,16
  69:12,14
  70:9 71:9,
  13 81:2

imagine
  38:20

impact  34:22

impossible
  29:1 57:18
  58:6 59:6
  64:10,20
  65:3

impression
  26:3 34:3

imprinted

74:9

include  51:9

included
  62:20,22

inconsistent
  43:19

indication
  35:2

individual
  21:20
  22:15,24
  47:15 48:9
  51:21
  72:21

individuals
  21:6 40:19
  70:15 71:8

infant  37:13
  42:8

information
  47:14
  62:15,16,
  19 67:25
  70:8,10

informed
  50:3,4

inguinal
  39:19
  57:25
  58:5,7,10
  63:11,12,
  18,25
  64:1,15

injuries

13:13

**injury** 13:13

**instance** 20:11

**instruct** 24:24 25:6

**instructing** 25:16,17, 19

**intend** 61:14,19

**interacted** 23:15

**interface** 11:10

**interior** 37:24 64:20

**internal** 36:14,16

**international** 28:16

**internet** 23:23 32:15 34:4 46:3,16 66:21 78:4,5,12, 16

**internship** 7:16

**interrupted** 32:24

**introduce** 4:11

**introduced** 5:1

**inverted** 38:12

**investigate** 33:25 50:17

**investigated** 58:21

**investigation** 17:25 32:19 70:4,5,11 77:25

**investigations** 11:17 35:4 45:22

**investigators** 13:2

**involve** 38:15 82:7

**involves** 13:1

**involving** 38:5

**Iraq** 16:23

**irrespective** 46:24

**issue** 25:23 26:7 31:17 45:20

60:18

**Ithaca** 7:9

**IV** 36:5 38:2,3,14, 15,24,25 40:2,4,7, 22 41:10 42:1,3,25 43:4,6,13, 16,18 44:23 45:13 53:14 54:2,4,12 58:16 59:1,7,22 60:4 64:4, 11,21 65:3,6,11 66:12,13, 20 81:11, 23 82:21 83:25 84:16

**J**

**Jacksonville** 6:11 7:20

**jail** 49:25

**January** 8:7

**jaundiced** 30:9,12

**job** 5:19 8:3 14:8 35:6 58:20

80:22

**John's** 69:2

**Johns** 17:22

**join** 22:11 38:6 47:3 70:3,19

**journal** 28:17,18 30:11,16, 17 31:21

**journals** 27:11,12

**judge** 39:14 50:7,9,16

**jury** 50:10

**K**

**KASS** 53:23

**Kathleen** 4:4,20 6:8 85:21

**kids** 11:21 13:18 20:14 33:23,24

**kind** 44:23 71:11 79:21 82:12

**knees** 53:5, 7,20,21 57:16,23

**knew** 78:4

**knowing**
  21:13

**knowledge**
  26:9 27:1
  68:21
  72:19

**Kong**  26:25

**Krugman**
  31:14
  45:13,16,
  17,18
  47:19
  48:11
  54:12

**Krugman's**
  45:8

———————

**L**
————————

**labia**  37:12,
  20,23 38:4

**lace**  53:4

**lack**  77:22

**lafay**  41:21

**laptop**  52:22

**largely**  61:8

**larger**  44:24

**laser**  76:11

**lasted**  75:5

**late**  28:24

**Laude**  7:11

**law**  6:25
  10:17

  11:10,17
  23:15
  24:5,20
  25:2,5,14,
  21 29:9
  33:6,14
  35:7 47:10
  50:13
  61:22
  67:3,18

**Lawshe**  4:5,
  15 17:19,
  25

**Lawshe's**
  26:1

**lay**  55:5

**laying**  12:10

**leads**  35:12

**learn**  19:1

**learned**  8:2
  17:24 19:1

**leave**  56:2,
  16 79:13

**Lee**  4:4

**left**  47:13
  63:8

**legal**  11:6
  30:11
  32:10
  49:19

**legs**  38:8,
  11 53:5,21
  64:24

**letter**  18:5
  45:11
  51:2,9
  52:23
  73:24

**letters**  18:2
  50:13 51:2
  63:3 73:14

**level**  39:6,
  21 65:14
  79:17

**levels**  9:21
  13:8

**life**  12:2
  54:13

**likelihood**
  7:2

**limitation**
  23:6,10
  32:20

**limitations**
  33:7 45:21
  46:8 49:10
  51:10,13
  69:20
  82:16

**Lisa**  4:9

**list**  45:20,
  23

**literature**
  8:5 14:23

**Litigation**
  4:10

**local**  35:13

**location**
  39:16
  64:14

**logistical**
  60:18

**long**  15:25
  21:2
  23:15,17
  41:24
  43:12 75:4

**longer**  37:21
  42:14

**looked**  27:17
  33:24
  48:22
  52:24

**lose**  49:22

**lot**  5:23
  14:21
  28:15
  34:2,15,16
  84:24

**loud**  29:6

**lower**  53:5

————————

**M**
————————

**m-e-d-i-a-l**
  64:24

**M.D.**  4:20

**made**  8:19
  24:2 35:15

**main**  63:1

**major** 32:20

**majora** 37:12,23 38:4

**make** 17:9 22:8 27:23 32:10,13 33:3 40:21 54:24 72:12 74:3 85:17

**makes** 77:20 80:2

**making** 12:14 13:21 14:16 38:23 45:2 49:12 61:21 75:9

**male** 42:8

**maltreatment** 7:1 8:2,8 9:10,21 11:25

**manipulated** 72:13

**manipulation** 47:1

**Marine** 7:23 9:16

**mark** 31:12 45:4 50:24

**marked** 85:24

**Marshall** 18:22 26:17

**Mary** 6:8

**Maryland** 7:13

**material** 26:8 28:23 31:18

**Matt** 4:18 60:23 61:2

**matter** 4:4

**matters** 49:11

**mature** 28:24 29:4 84:20

**maturity** 18:10,11, 16,23 19:16,24 20:19,22 21:3,5 26:12,20, 22 27:13 28:10 33:22 35:21 36:3,4,10 41:8 42:7, 10 43:7,24 59:23 60:5 61:25 67:6,20 68:1 71:16,17,

24 72:9 82:6

**means** 16:14 44:12

**meant** 37:5

**measures** 24:20 25:2,10

**Med** 7:14

**media** 4:3

**medial** 64:6, 17,24 65:1 66:24

**medical** 6:14,16,18 7:14 8:4, 14,17,24 9:9,14,20 10:1,23 11:4 12:24 14:10 15:21 16:9 17:3 28:18 29:7 30:11,17 55:14,20, 21 56:4 70:15 71:7 78:2,21,25 79:20

**medical/legal** 11:2

**medicine** 6:11 7:13 9:23 15:7

**meet** 42:25 43:22

**meeting** 52:15,18, 20 69:8, 11,16,17

**meetings** 68:8

**meets** 64:10

**member** 45:19,20

**met** 43:25 44:3 52:17 68:3,17,19

**method** 40:5

**methods** 61:24

**Michael** 4:14 5:2 24:19

**middle** 18:12 42:16 64:17

**midline** 41:21 42:25

**Mikayla** 4:5

**military** 7:14,22 8:25 9:2 16:19 27:16 76:9,13, 14,15,17, 19 83:10

**mind** 70:22

**mindful** 5:19

**minor** 32:15 33:23

**minute** 52:8

**mischaracterization** 13:24 20:1 31:3, 23 34:13 47:22 56:7 76:7 77:12 80:12 84:2

**mischaracterize** 55:8

**misleading** 69:25

**missing** 12:15 48:2 62:7

**mixed** 62:5

**modalities** 22:4

**modality** 28:4

**model** 32:14 34:24 41:11 46:15,21 51:11 57:15,19 58:7 61:25 71:14 73:14 76:19

**79:1,17** 81:18

**models** 22:3

**modifications** 54:7

**modified** 35:15

**monitor** 19:17

**mons** 37:24 38:5,9

**month** 28:12

**months** 28:13

**moonlight** 16:14

**moonlighted** 16:16

**moonlighting** 16:22,24

**morning** 4:2

**mound** 42:23 43:4,5,10

**mounds** 43:4, 7

**move** 48:23 49:13

**moved** 8:17 9:13

**multi-problem** 8:22

**multiple** 22:4 69:12

79:1

---

**N**

---

**naked** 53:3

**Nassau** 24:11

**Naval** 7:16, 19 8:17 9:13

**Navy** 7:23 8:6,9,17 9:4,12 16:3

**necessarily** 35:2 40:18 82:5 83:3, 14

**Nelson's** 27:9 44:8

**newborn** 42:9

**newborns** 20:6 42:6

**newspaper** 50:4,5

**Nick** 58:19 78:6,9

**night** 26:15

**nights** 46:11

**nipple** 42:15,20 43:6,9

**nod** 5:25 6:3

**normal** 12:2 20:7,10, 11,13,17 82:15,16, 21 83:12, 13

**northeast** 7:4

**Nos** 85:23

**Noshney** 26:18

**notch** 39:20 57:25 58:5,8,11 63:11 64:1

**nuance** 48:2

**number** 4:5 34:7,8

**numbers** 34:17 63:3

---

**O**

---

**O.JPG.** 81:8

**Oakland** 7:17

**oath** 4:22 5:10

**OB/GYN** 9:22

**Object** 70:18

**objected** 12:17

**objection** 30:2 32:24

33:3 56:19

**objections**
12:14 56:3
77:17

**obscure**
57:24

**obscured**
58:5
67:15,16

**observing**
79:23

**obvious**
39:17
40:19
51:13

**occasionally**
62:15

**occur** 70:4,6

**occurred**
20:21

**occurring**
70:11

**offered** 8:9
77:8

**offers** 7:1

**office** 17:23
27:25
60:18

**officer**
50:14
67:3,18

**officers**
33:7,15

**official**
85:13

**online** 26:12
29:23

**opine** 67:19

**opinion**
14:16
22:8,9,13,
14,21,23
23:6,11,12
32:16,17,
21 33:15
34:23
48:6,7,8
49:10,18
50:1 51:10
53:10,13
55:5,6,13,
14,20
61:24
62:24 67:5
71:7 75:7
77:9,21
78:21
81:10

**opinions**
20:23 33:8
35:9 36:19
48:4,15
49:5,23
50:6 69:20
70:1,14
80:9

**opio-** 73:14

**opportunity**
9:11 20:20

29:25
61:10

**order** 85:5

**orders** 85:3,
4

**original**
26:17

**originally**
48:3

**orthopedics**
9:22

**Outlook**
68:9,11

---

**P**

---

**p.m.** 85:22
86:2

**pale** 42:15

**palpable**
42:14

**papilla**
42:16
43:6,9

**paragraph**
74:8 81:6

**parents**
14:24
20:16
49:22

**part** 11:9
14:5 36:15
37:24
49:25

70:11,13
75:14,16
82:5

**parted** 53:6

**partially**
81:10

**participate**
17:5

**parts** 38:9
39:16
43:17
81:20

**pass** 10:6

**passed** 10:2
14:21

**passing**
46:11

**past** 83:23

**pasted** 51:3

**patient**
10:12
20:21
27:25
40:9,13
46:9 80:24

**patients**
10:11
16:12
19:22

**PDF** 51:1

**pediatric**
7:15 10:3
27:12 44:8

**pediatrician**
7:19
10:17,20
13:14,17
14:13
16:7,17,21
19:20
27:24 44:3

**pediatricians**
17:12,13
19:5 20:2,
5 24:7
29:14

**pediatrics**
8:11 9:22
10:8 11:5
15:9,12
27:3,10
28:7 44:9

**Pedo** 31:18

**pedo-**
**pornographic**
26:7 28:23

**pelvis** 38:6

**pen** 44:22

**Pendleton**
9:13

**Penkacik** 4:9

**people** 6:20
8:24 9:7
10:13
15:20
30:3,4
39:5
41:15,24

49:4

**percent**
29:15
43:15
65:14

**perfectly**
25:11,12

**period** 73:8
75:1

**person** 17:10
32:10
33:16
51:11 70:9
71:19 72:2

**person's**
17:21 43:2

**perspective**
78:3

**ph** 26:18
41:22

**photograph**
21:21 22:7
51:12 54:9
67:21

**photographs**
21:7,17,25
27:4 28:3,
4,10
60:19,22
82:16
84:23

**physical**
8:21

**physician**

76:13,16,
17

**physicians**
17:2

**picture** 64:8
71:22
72:22 73:2
78:9 80:5
83:4

**pictures**
83:5

**pin** 35:20

**pink** 42:23
43:10 53:3

**pixilated**
67:9

**plainly**
37:21
81:12

**plaintiff**
4:15

**plaintiff's**
50:24
85:23

**point** 45:14
61:9 67:2
84:22

**points** 11:20

**policies**
17:7 24:16

**ponography**
29:22

**population**

26:23

**pornographic**
21:7 23:18
26:12
28:23
29:14
31:18
32:14
46:3,16
56:23
66:20

**pornography**
54:10
58:22

**position**
15:21
25:14
53:5,7

**positions**
9:20

**possession**
68:7

**possibility**
46:25

**Post** 82:3

**posterior**
41:15,22

**potentially**
68:20 80:1
84:19

**Practically**
39:22

**practice**
10:22

11:20 24:15

**precocious** 82:17

**predicate** 21:4

**pregnant** 43:16

**prepubescent** 75:18,20 76:3

**presence** 59:2 75:12,13, 15

**present** 12:21 43:13 54:12 55:4,19 57:3,8 73:21 83:24

**presentation** 64:12 65:4

**presented** 71:13

**Preston** 4:5, 19 47:12 50:14 51:19,25 52:16 68:3

**pretty** 51:17

**primary**

10:20

**primer** 43:25

**principles** 61:16,23

**print** 28:15

**printed** 63:1

**prior** 13:25 19:25 20:1 31:4,24 34:14 47:23 56:8 76:8 77:13 80:13 84:3

**privilege** 25:8

**probable** 5:14 48:15 49:6 50:15

**problems** 6:19

**procedure** 75:13

**procedures** 17:7

**process** 14:6 73:6

**produce** 80:19

**produced** 42:18 71:6

**Professional** 8:11

**progress** 19:17

**progressing** 18:13

**Project** 29:21

**prominent** 69:6

**proportion** 62:8,10,19

**propose** 9:1

**Protection** 6:13,15, 17,22,23 7:4 10:10 27:17,20

**protruding** 42:16

**prove** 33:22

**proves** 29:1

**provide** 13:5 25:13

**provided** 31:7,21

**pubertal** 27:4 37:10 53:3 77:22 80:2 82:3, 14,19,22 83:7,18, 21,25

**puberty** 18:12,13

19:18,19, 22 20:8,15 35:18 79:18 82:10

**pubic** 20:13 22:3 36:5, 7,9,23 37:14,15, 19,22,25 39:15,20, 21 41:1,5, 12,18 54:15 55:4 57:3,6 59:1,21 60:2,4 64:12 65:8 67:14,16 71:15,23 72:3,8,22 73:11 74:15 75:2,12, 13,15,17 77:9,22 79:2,7 80:20 81:13 82:22 84:11,14

**pubis** 37:24 38:5,10

**publication** 26:19 27:3,15

**published**
30:3 34:4
50:3

**pull** 50:20
65:20
74:1,2,4

**pulls** 73:5

**purported**
14:15

**purpose**
11:16,19

**purposes**
34:12

**pursue** 8:15

**put** 15:13
35:20
53:19
54:1,3
63:6

**putting**
17:14

---

### Q

**qualified**
13:13

**quality**
33:19
66:23

**quantity**
65:7

**question**
5:12,15,
16,18

12:12,13,
18 15:2,4
23:2,16
24:21
25:18,20
32:12
33:12
38:22
41:25 42:5
46:10
47:24,25
50:11,12
51:8 55:10
59:15
72:25
75:11,14,
16 77:8,20
80:16
81:16

**questions**
5:3,11
18:9 24:23
44:4 58:23
59:12
60:20,24
61:7 71:12
81:3 84:25

**quick** 52:10
57:12

**quote** 50:15

---

### R

**ra-** 82:1

**radiology**
9:22

**Rady** 9:5
16:8,20
24:6

**raised** 45:22
60:23

**range** 82:2

**rating**
18:10,11,
23 19:16,
24 20:19,
22 21:3,5
26:12
27:13
33:22
35:22
36:4,10
42:7,10
43:7,24
57:5 59:23
60:5 61:25
66:19
67:6,20
68:1
71:16,17,
25 72:9
82:6,13
84:12,13

**ratings**
26:20
46:2,14

**re-ask** 32:12
71:4

**reached**
79:17

**read** 25:25
26:6

28:21,22
29:4,6,10,
25 30:9,
12,14,17
31:10
52:25 81:9
85:11,14,
16

**readily**
36:17

**reading** 8:4

**real** 35:12
52:10

**reason** 19:23
24:24
71:15 72:6
73:13
76:18 77:9

**reasons** 25:6

**rec-** 68:4

**recall** 68:3,
24 69:7,8,
11,16

**received**
72:21

**recommendation
s** 17:10

**record** 6:7
12:11,14
52:14
60:11,14,
16 85:22

**recorded**
85:20

**records** 68:4

**red** 72:7

**redevelop** 42:19

**reference**
20:15
31:19
44:5,6

**referred**
18:14

**referring**
63:19

**refute** 77:25

**region** 7:23
36:8 59:21

**related**
52:23

**relationship**
10:12,19

**relevant**
24:23 25:1

**reliability**
26:11
34:23
65:10
80:10

**reliable**
22:9,12,
14,23
32:16
46:14
47:14 71:7

**reliably**

67:5,19

**relied** 62:18
84:11

**remedial**
24:20
25:2,10

**remember**
19:5 46:6
48:4
52:15,17,
18,20
68:14 69:5

**removal**
55:24
56:25
57:1,2
72:18
79:12 80:4

**remove** 22:3
79:7

**removes**
55:18

**render** 22:8

**rendered**
71:7

**rendering**
61:24

**rephrase**
5:13

**report** 15:20
26:1 31:9,
14,22
45:5,8,9
50:22

62:20,22
63:6 74:6

**reported**
15:22

**reporter**
4:9,12,21
5:17 6:2
85:8,11,24

**reports** 71:6

**represent**
51:2

**representing**
4:18

**request**
61:22

**required**
15:14

**reschedule**
60:22,25

**research**
26:11

**reset** 61:1

**residency**
7:16

**resident** 8:3

**residents**
9:20

**respect**
81:13

**response** 6:1

**responsible**
13:1 17:6

**restate** 47:5

**result** 72:9

**results**
56:17

**retired**
16:23

**return** 16:23

**revert** 43:16

**review** 7:22
8:20 9:15,
18 27:1
81:6

**reviewed**
27:7 35:24

**reviewing**
26:14

**reviews** 8:25

**Roberts**
4:14,25
5:2 24:22
25:4,11,
16,23 30:1
37:8 45:4
61:13
65:25 66:6
74:5 84:21
85:2,4,12

**roughly**
41:14 45:1
59:4

**rule** 75:6

**rules** 5:10

**run** 83:1

**rundown**
41:25

**running**
66:19

---
### S
---

**San** 8:7,10, 18,19

**scheduled**
69:13

**school** 7:13, 14

**Science**
28:16

**Sciences** 7:9

**scientific**
23:3 46:2, 20 54:23 55:6,12,14 61:23

**scientifically**
46:13 65:9

**Scott** 31:14 45:18

**screen**
28:11,14 66:1 78:10,12

**script** 5:14 74:10

**scroll** 74:7

**search** 48:16

**section**
59:20

**seek** 48:16

**semantics**
76:23,25

**sense** 73:22

**sentence**
54:19

**separate**
43:5

**serve** 45:23

**served** 7:20 9:19

**serves** 45:20

**set** 61:23

**setting** 12:8 17:6 19:10,11 27:13,22, 23,25 82:23 84:6

**sex** 16:7,21

**sexual** 8:21 18:10,11, 15,23 19:16,24 20:19,22 21:2,5 26:11,20, 22 27:12 28:10 33:22 35:21 36:3,4,10

42:7,10 43:6,23 59:22 60:5 61:25 63:2 67:5,20 68:1 71:16,17, 24 72:9 82:6 83:11

**sexually**
28:24 29:4

**shape** 38:4,8 41:11 43:8 59:4

**share** 18:7 28:11 31:12 50:21 68:20 74:6

**sharing**
53:11

**shaved** 39:3 51:16 54:21 55:2,13 59:2 73:15,16, 18,21 74:11 76:10,12, 13 77:5

**shaving**
39:13,17 54:16 55:18 56:9,14,17

72:16 74:13

**Sheriff**
24:11

**Sheriff's**
17:23

**Shevlin** 4:16 10:25 11:3,7,12, 18 12:4,9, 17,25 13:7,16,24 14:9,19 15:8 16:18 17:8,20 18:18 19:3,9,15, 25 21:8 22:1,5,10, 25 23:9, 20,24 24:4,18 25:1,9,13, 19 26:4,13 29:24 30:6,15, 21,25 31:3,23 32:2,18,22 33:2,9 34:6,13,25 35:11 37:5 38:21 39:7 40:8,12,23 41:13 43:14,21 45:2 46:5,

47:2,22 48:12,17 49:8,21 50:8 54:5, 25 55:25 56:3,7,19 57:7 58:2, 9 59:9,24 60:10 61:3,6 63:13 64:13,22 65:5,13 66:22 67:22 70:2,19 73:20 74:2,19,23 75:8,19,24 76:4,7,20 77:12,17, 24 78:13, 18,23 79:10,14, 25 80:6, 12,23 81:19 83:9 84:2,8 85:1,6,16

**Shevlin's** 60:18

**Shield** 8:17

**ships** 46:11

**shortly** 23:21

**shot** 78:10, 12

**show** 44:4, 6,10 58:24 59:19

**showed** 52:22

**showing** 81:13

**shown** 30:8

**shows** 29:13 67:25

**sic** 54:18 68:18

**side** 38:11 43:3 59:3 66:4 84:18

**sign** 20:9

**significance** 41:2

**significant** 34:22

**signs** 17:11 56:2

**similar** 51:5

**simple** 69:23

**single** 43:8 69:8

**sir** 65:24

**sit** 10:6 18:4 34:9 69:9

**sitting** 57:16,20, 24

**size** 62:10, 11

**skin** 73:6

**slowly** 9:3

**small** 42:13

**SMR** 18:15 20:7,12 23:18 37:17 42:17,21 45:13,21 46:2,14,24 53:14 54:2,4,12 57:5 66:19 80:21 81:11,13 82:13 83:25 84:12,16

**Society** 8:12

**socks** 53:4

**solely** 13:20

**solve** 6:19

**sort** 19:22 23:22 26:20 34:11 80:4

**sound** 27:11 84:25

**sounds** 53:24

**speak** 5:20, 24

**speaking** 30:2 36:25 39:22

**special** 24:1

**specialist** 10:8 14:8

**specialized** 9:2,11

**specialty** 10:3,4 12:7 13:15,20 14:18 15:12 16:10 17:1

**specific** 61:11

**specifically** 14:14

**spectrum** 13:9,10

**speculation** 12:4 19:15 34:25 39:7 48:12 55:25 56:19 74:19,23 75:24 76:20 80:6,23

**spend** 65:18

**split** 65:25

66:1

**spoken**  70:23

**spread**  81:12

**St**  17:22
69:2

**stage**  27:4
41:10 62:6

**staging**
18:15,20
19:2,23
27:12

**standard**
10:23 27:8

**standing**
62:12

**standpoint**
70:16

**start**  18:8
19:22 24:2
28:22 36:1

**started**
83:14

**starting**
73:4

**starts**  37:15
42:18 82:8

**state**  6:6
21:19
58:12

**statement**
13:3 35:21
47:21
49:12

74:12 75:9

**stating**
18:11 46:8
48:8

**station**
7:18,20

**step**  50:18

**sternum**
42:25

**STEWART**  44:1
50:2

**stop**  11:21,
24 12:3,7,
20 30:1
53:11

**stopped**  12:1
83:15

**stopping**
12:22

**stops**  12:23

**straight**
41:21

**structure**
36:21

**structures**
67:11,12

**struggling**
21:18

**studies**
18:21

**study**  28:4
29:1,13,21

**studying**  8:4

**stuff**  84:24

**subcommittees**
8:21

**subject**
17:25

**subjective**
38:19 65:7

**subjects**
7:11

**subsequent**
24:19
25:2,10
85:24

**Subsequently**
17:24

**suggested**
46:1

**summarizes**
27:4

**summary**
61:2,4

**supervise**
6:18

**supervision**
9:7

**supposed**
41:7

**surface**
30:10 64:6
65:1

**surprise**
29:16,19

**suspect**  50:6

**suspected**
6:25 9:9

**swear**  4:12

**Switzerland**
26:24

**sworn**  4:21

**syllables**
32:8

**synonymous**
18:17

---

**T**

---

**tables**  30:7

**takes**  42:12

**talk**  33:4
35:23
37:2,5
52:8 72:16

**talked**  57:14
69:15

**talking**
12:24
15:16
37:10
40:9,10
47:19
51:20,21,
22 52:3
58:11 61:9
63:16
64:3,5
65:18
66:14

76:23,24

**Tanner**
18:14,15,
20,22
19:2,23
20:6,12
26:17

**Tanner's**
18:24

**Tanners**
27:12

**taught**  14:24

**teacher**  9:20

**team**  6:13,
15,17,22,
23 7:4
8:24 10:10
17:5 69:2

**technically**
16:9

**teen-age**
20:16

**teenagers**
28:25

**teeth**  62:4,
5,6,7,19
67:23

**term**  16:13
37:13
63:16,21
73:17
76:13

**terminated**
86:1

**terms**  8:13
18:16
21:15
35:22
36:23
59:22
72:10

**test**  15:3
19:7,14

**testified**
4:22 44:19
51:18
54:11
58:15
69:19
76:25

**testifying**
44:25

**testimony**
13:25 20:1
31:4,24
34:14
39:8,10
47:23 48:5
56:8 76:8
77:13
80:13
82:20 84:3

**tests**  83:1

**textbook**
27:8,9
44:8,14

**thelarche**
82:17

**theory**  53:20

**thereof**
19:18

**thicker**
38:16

**thickness**
38:19,25
39:3,15

**thigh**  39:6,
12 41:15
57:25
58:8,15
59:5,20,21
60:3 64:9,
10,18,20,
24

**thighs**  38:6,
15 39:1,
20,23 40:3
59:3 64:6,
7,16,25
65:1
66:15,16,
24 81:12

**thing**  5:23
18:16
21:13
23:14
51:16 61:7
74:21

**things**  14:1,
3,4,22,23
15:20
17:14
54:17
79:22

**thought**  37:3
48:8

**time**  4:7
5:11 7:24
8:15 9:19
10:18,21
15:13
17:22 24:9
25:19
26:10
27:20
29:16
52:16 55:9
56:10
60:12,15,
21 65:19
68:9 70:21
73:8 74:4
85:22

**times**  5:23
35:12
68:17

**tip**  78:6,9

**tissue**  42:24
43:5,11

**today**  5:3
17:16 18:4
69:9 81:5
82:20

**Today's**  4:6

**told**  47:13
51:18,19
67:3 78:7

**tool**  28:5

**top**  37:22

43:5,9

**touched**
72:14

**trafficked**
35:13

**trained**
12:6,7

**training**
7:6,16,24
8:3,14,20
9:21,25
13:4 14:22

**transcript**
85:5,14

**transferred**
7:18

**transmit**
58:21

**treat** 13:12,
13

**treated**
83:6,8

**treating**
27:25
83:15

**treatments**
76:11

**triangle**
38:3,7,13
41:1,3,6,
9,11
44:23,24
57:14,19
58:7 59:4

**true** 22:12,
18 45:23

**tumor** 20:9

**turn** 35:14

**turned** 83:13

**type** 21:24
73:19

**typed** 52:25

**types** 24:17
56:14

---
**U**
---

**U.F.** 76:16

**uh-huh** 5:24
6:2

**un-huh** 6:2

**underlying**
84:5

**underscore**
81:8

**understand**
5:12,16
6:12 11:15
12:13,16
13:15
14:13 15:4
17:17
19:24 23:4
44:21
47:24
48:14
50:22 52:6
55:16

59:13 63:5

**understanding**
73:5,23

**understood**
12:18 23:7

**undertake**
54:8

**undetectable**
22:22

**unfamiliar**
29:12

**ungroomed**
41:10

**unit** 8:22

**University**
6:10,15
7:9 16:1,3

**unscientific**
29:8 46:7

**update** 26:20

**upper** 64:7,
9,25

**utero** 42:8

---
**V**
---

**vaginal** 36:2

**vaguely**
52:21

**validity**
57:5

**variability**
20:7

**vellus** 37:16
38:1

**verbal** 5:25

**verbatim**
51:3

**verify** 77:25

**versus** 4:5
38:25 46:9
59:8 69:21

**VI** 36:6
41:19,22

**video** 85:3,
4,20

**view** 40:18
43:3 57:25
67:13
81:22

**violence**
9:17,18

**visible**
36:18
37:22 56:2
62:12
71:24
79:13
81:10,12

**visit** 68:14,
15

**visual** 44:18
80:19

**vital** 67:10,
12

**vivid** 69:18

**vocabulary** 76:21

---

### W

**Wait** 24:18

**waive** 85:11

**wall** 43:11 63:22 64:9,15

**wanted** 29:19,23 30:3,5

**warrant** 48:16

**wax** 80:21

**waxed** 56:25 73:2,15 74:18,21 75:4,7,23 76:6,10 77:2,16

**waxing** 39:24 54:17 55:23 56:12 72:25 73:5 74:22 75:1,9 76:10 77:23 79:11 80:18

**ways** 29:22 47:18

**wearing** 53:3

**website** 78:17

**week** 30:24 31:10

**well-known** 45:11

**whiskers** 39:4,14, 17,25 40:3

**white** 53:4 74:9

**widely** 23:23 81:12

**wider** 38:11

**William** 4:4

**witnesses** 5:22

**women** 28:24, 25 29:15 43:15 54:12 76:10

**wood** 53:4

**word** 52:3, 4,19

**words** 51:4

**work** 6:12 16:6,19,25 17:2 26:21 28:2,3

**worked** 16:10

**working** 9:8

**worried** 20:17

**write** 6:4

**writes** 17:11

**writing** 17:14 52:1,2

**wrong** 25:21 29:15 42:5

**wrote** 30:5 50:13

---

### Y

**YCBLVVFQ** 81:8

**year** 8:16 9:6 20:11 24:13

**years** 7:21 8:13 9:8 14:23 16:2 17:13 18:23 21:15 25:24 26:21 28:25 37:1 42:13 54:3 76:16 77:10 81:15,17 82:4

**years-old**

84:1

**York** 7:10

**young** 62:8,9 76:9

---

### Z

**Zoom** 49:3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

  Plaintiff,

vs.                       CASE NO.:  3:24-cv-00044-MMH-MCP

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's Office, and
KATHLEEN DULLY, in her individual
capacity as medical director of the
UF Child Protection Team,

  Defendant.

_____

CONTINUED
REMOTE VIDEO
DEPOSITION OF:     KATHLEEN M. DULLY, M.D.


DATE:              June 18th, 2025


TIME:              3:05 p.m. - 5:10 p.m.


PLACE:             Videoconference


STENOGRAPHICALLY
REPORTED BY:       Deborah J. Guest, RPR
                   Shorthand Reporter


                   (1 - 89)

A P P E A R A N C E S:

(All parties appearing via Zoom.)

MICHAEL K. ROBERTS, II, ESQUIRE
OF:  Nooney, Roberts, Hewett & Nowicki
1680 Emerson Street
Jacksonville, FL 32207-6104
Office:  904-398-1992
Cell:  904-398-1992
E-mail:  mroberts@nrhnlaw.com

   Appearing on behalf of the Plaintiff,
William Lee Lawshe

MATTHEW J. CARSON, ESQUIRE
OF:  Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, FL 32301-1509
Office: 850-205-1996
E-mail:  mcarson@sniffenlaw.com

Appearing on behalf of the Defendant,
Mikayla Preston

-and-

JOHN A. WILSON, ESQUIRE
OF:  Howell, Buchan & Strong
2898 Mahan Drive
Suite 6
Tallahassee, FL 32308-5462
Office:  850-877-7776
E-mail:  johnwilson@jsh-pa.com

   Appearing on behalf of the Defendant,
Kathleen M. Dully, M.D.

ALSO PRESENT:  Cameron Hodges, Videographer

I N D E X

TESTIMONY OF KATHLEEN M. DULLY, M.D.

PAGE
Review of previously marked exhibits - no video............................................... 4
Direct Examination by Mr. Roberts. ........... 7
Cross-Examination by Mr Carson. ............ 78
Cross-Examination by Mr. Wilson. ............ 84
Redirect Examination by Mr. Roberts........ 85
Certificate of Oath. ......................... 88
Certificate of Reporter. ..................... 89

INDEX OF EXHIBITS

PAGE
(DR. DULLY'S FIRST DEPOSITION)
(Previously marked - attached to first deposition)

No. 3 (a demonstrative diagram of the pubertal stages)............................. 37

No. 4 (composite exhibit of three letters written by Dr. Dully in this case).......... 18,50,69

(DETECTIVE PRESTON'S DEPOSITION)
(Previously marked - not attached)

8-A (image YCBLVVFQ). ........................ 69

8-B (image B06FE687). ........................ 23

8-C (0059). ............................... 15,25

8-D (0065(1)). ............................... 25

8-E (20230122_174408DuckDuckGo.jpg)......... 53

— — —

S T I P U L A T I O N S

It is hereby stipulated and agreed by and among the counsel for the respective parties and the Defendant that the reading and signing of the Zoom video deposition transcript be waived.

P R O C E E D I N G S

\* \* \* \*

MR. WILSON:  Counsel, will you be sharing exhibits today?

MR. ROBERTS:  Maybe.

MR. WILSON:  Maybe.

MR. ROBERTS:  I don't know that there will be any other ones, but I'll simply refer to the images either by their file name or -- and we can go on the record -- but they were attached in letter form to Detective Preston's deposition as lettered exhibits, and so we can refer to them in both ways.  But we'll make sure that we're on the same page before we begin discussing the exhibit. Fair enough?

MR. WILSON:  Yes.  Can we go through the exhibits for clarity that were attached to the first deposition?

MR. ROBERTS:  Yes.  Exhibit 1 was a journal article, Exhibit 2 was the affidavit of the Plaintiff's expert, Dr. Krugman, Exhibit 3 was a demonstrative diagram of the pubertal stages, and Exhibit 4 was the -- it's a composite exhibit of three letters written by Dr. Dully all in this case.

MR. WILSON:  And you are prepared to show those on the screen as they come up, if necessary?

MR. ROBERTS:  Yes.  I mean, I am not going to plow the same field.  We're not going to -- you know, I may ask her a question about one or two, and it may become relevant.

But as this is a continuation of the prior deposition, you know, I will assume that these exhibits are going to be attached as exhibits to this deposition as well.

THE VIDEOGRAPHER:  Counselor, is this a continuation?

MR. ROBERTS:  It is a continuation, yes.

THE VIDEOGRAPHER:  All right, perfect.  Are there any other housekeeping matters?

MR. WILSON:  I believe Mr. Carson called in and dropped off of the call.  I do not know what has happened to Mr. Carson.

MR. CARSON:  I'm still here.

MR. WILSON:  Okay, thank you.

MR. CARSON:  I am trying not to clog the gallery.  I will probably just stay hidden until or unless I need to say anything.

MR. ROBERTS:  All right, thank you.

THE VIDEOGRAPHER: All right, then. Counsel, are we ready to begin?

MR. ROBERTS: Yes.

(Discussion off the record.)

THE VIDEOGRAPHER: Good afternoon. We're now on the record at 3:10 p.m. this June 18th, 2025. This begins the continued deposition of Dr. Kathleen Dully, taken in the matter of William Lee Lawshe versus Mikayla Preston, et al. This deposition is being conducted remotely via Zoom.

My name is Cameron Hodges. I am the videographer. The court reporter is Deborah Guest. We represent Huseby Global Litigation.

Will counsel please introduce themselves, after which will the court reporter please swear in the witness. Thank you.

MR. ROBERTS: Michael Roberts for Mr. Lawshe, the Plaintiff.

MR. WILSON: John Wilson for Dr. Dully.

MR. CARSON: Matt Carson for Detective Mikayla Preston.

COURT REPORTER: Doctor, would you raise your right hand, please.

Do you solemnly swear the testimony you're

about to give in this cause today will be the truth,
the whole truth, and nothing but the truth?

THE DEFENDANT: I do.

COURT REPORTER: Thank you.

KATHLEEN DULLY, M.D.,

having been duly sworn to tell the truth, testified
as follows:

DIRECT EXAMINATION

BY MR. ROBERTS:

**Q All right. Doctor, it is good to see you again. Where are you currently located?**

A In this particular room?

**Q What building?**

A This is the Forensic Pediatrics Office, sort of that administrative office which is one building over from the clinic building.

**Q And when you say "clinic building," what are you referring to?**

A Well, there's two buildings for this division. And one has the clinic where we actually see children and have our offices and exam rooms and equipment and medication, and then this is an administrative building with a xerox machine and this very nice Zoom/conference room.

**Q And when you say -- and I just made this a**

little more obvious, but this is the Child Protection Team. When you say "division," you are talking about the Child Protection Team?

A   No, this is not the Child Protection Team office. This is the Division of Forensic Pediatrics for the University of Florida, and the Child Protection Team is part of the division and major activity.

Q   What does forensics mean?

A   Open to debate.

Q   So that is what -- if you say, "I am a forensic PD -- pediatrician," that means it's up for debate, pediatrics?

A   That we specialize in the debates of pediatrics, yes. In this case, I think that applies.

Q   Okay. Sometimes I have heard -- maybe it's colloquially, but forensics as being a subspecialty of either medicine or engineering, some science which attempts to examine or offer opinions on legal questions.

Is that -- are you not familiar with that use of the word forensics?

A   No. I use it as part of pediatrics.

Q   Okay.

A   I don't engage in those other activities.

Q   You don't practice -- you don't offer opinions in legal proceedings?

A   I do if I am subpoenaed.

Q   Okay.  But isn't that like part of your job, to offer opinions in legal proceedings on behalf of the State of Florida?

A   That is part of my job as a pediatrician, and the American Board of Pediatrics does not like to use the term forensics.  That's why they call it child abuse pediatrics.

Q   And, in fact, the statute that establishes the Child Protection Team directs that the Child Protection Team will investigate and support law enforcement activities in regards to child abuse allegations, doesn't it?

A   I don't know the statute by heart.  It probably says that or something about like that.  It does establish the Child Protection Teams throughout Florida.

Q   Okay, all right. So have you -- this is a continuation of our prior deposition.

Since that time, have you spoken with any representatives of Detective Preston?

A   No.

Q   Have you spoken with Detective Preston?

A     No.

Q     Have you spoken with anyone other than your attorney about the facts or circumstances arising out of this case?

A     No, but the attorneys did change. So I have spoken to two attorneys, the previous and then also Mr. Wilson.

Q     Has anyone from Verizon or Synchronoss Corporations reached out to you about this case?

A     No.

Q     Have you made any statements or conducted any -- or have been part of any interviews regarding the facts and circumstances of this case since we last met?

A     No.

Q     All right. So have you had an opportunity to review your deposition transcript prior to today's continuation of that deposition?

A     I went through it one time today.

Q     Okay, all right. So we ended the last deposition because you did not have the photographs or the digital images which were the subject of your reports in this case. Did I understand that correctly?

A     Yes. And I had not seen them in two years

and could not recollect.

Q    Sure.  And today, do you have them?

A    I have them, yes.

Q    And have you had a chance to review them prior to us getting on the record here today?

A    Yes.

Q    Okay.  So let's -- I am just going to -- we left off in your deposition talking about opinions in general -- your opinions in general, and let's pick up today with your -- your interactions with -- just to set the scene, I guess, so to speak, with -- your interactions with Detective Preston and reviewing these particular photographs because you have them now, and that's really what I intend to go through today.

So at some point, you received an e-mail from Detective Preston introducing herself.  Do I understand that correctly?

A    At some point, she was introduced to me at CPT, but I don't remember the specifics.

Q    Do -- have you reviewed any e-mails she sent to you attempting to set up a meeting regarding this particular case?

A    She did send one e-mail between the two dates -- I don't know the date -- asking for another

appointment.

Q    So you had one meeting with her on February 22nd, 2023; is that correct?

A    Yes.

Q    And in that meeting, you examined a single colored photograph that she showed you on a law enforcement laptop; is that correct?

A    Yes.

Q    That file name -- I am not going to read the entire file name, but it begins with D263B; is that correct?

A    Yes.

Q    All right.  You met with her again on April 5th, 2023; is that correct?

A    Yes.

Q    And you reviewed additional photographs, which we'll get into in a second.

So I believe you testified in your original deposition you do have some recollection of meeting with Detective Preston; correct?

A    Yes.

Q    All right.  And when you met with her, you explained to her that you could not offer her scientific reliable opinions regarding the actual age of the models depicted in these images, correct?

A    Yes.

Q    You told her that you could only offer her an opinion about what the sexual maturity rating of the appearance of the image was, correct?

A    Yes.

Q    And I think we went through this in your prior deposition.  For example, if you were shown a photograph that just showed belly button to thighs and it showed genitals, if there was no pubic hair development, your opinion would be that that is a sexual maturity rating of a woman, correct?

A    In general, yes.

Q    You do not consider the possibility of digital altering of the photograph to make it appear as though there is no pubic hair?

A    That is not my expertise.

Q    And you do not consider that possibility in rendering your opinions?

A    That is always a possibility.  However, I am commenting on appearance, not knowing anything more about the photograph.

Q    And you made that clear to Detective Preston in your meeting on February 22nd?

A    I think that's obvious.  That's what the investigation is for, which is not something that I

do.

Q     Whether you think it is obvious or not, your testimony is that you made that clear to Detective Preston in your meeting?

A     Well, it's in writing that it's appearance, and I said it's appearance.

Q     Your prior testimony even today was that you explained to her that you could not give her a scientifically reliable opinion about the actual age of the model depicted, correct?

A     Well, those are your words. That's not my words. I never used the word scientific. It is not -- it's a medical question, and those are your words, not mine. And it has been two years, and I don't remember my exact words.

Q     I am not -- I am not asking you your exact words. I am asking if you related to her -- in whatever words you chose but related to her in what you consider to be a clear manner that you could not offer her a medical opinion about the actual age of the individual depicted in these images, correct?

A     Yes.

Q     All right. One second.

I would like for you to pull up on the laptop the file 0059, and just tell me when you have

that image up for you to view.

A     And which letter is that?

(Exhibit 8-C, previously marked in Detective

Preston's deposition, was identified for the record.)

BY MR. ROBERTS:

Q     If you can just pull the image up, and then I'll ask questions and direct you.  While you are pulling it up, I am going to, for the record, identify this.

The redacted image was attached to Detective Preston's deposition as Exhibit C.  Do you have this pulled up in front of you, 0059?

A     That is what the label says, yes.

Q     Okay. This depicts a female model with it looks like a pink lace lingerie -- wearing like a pink lace lingerie.  Do you see that?

A     Yes.

Q     A red background?

A     I would call that orange, but yes.

Q     Okay.  Maybe we got a different color tone on our screen.

All right.  And the model appears to even have her eyes closed or be looking down towards the floor?

A     Yes.

Q     All right.  This model clearly has utilized some form of grooming of her pubic hair, correct?

A     She may have and so -- you know, maybe, yeah.

Q     It appears -- now, you are a medical doctor and you -- we talked a lot about this in your -- in your prior -- in your original testimony in the beginning of this case.

The appearance of pubic hair is the -- I guess the leading determining factor in the sexual maturity rating as it pertains to female individuals, correct?

A     Yes.

Q     All right.  And we went through diagrams about what Grade I, Grade II, Grade III, Grade IV, Grade V pubic hair development looks like, did we not?

A     Yes.

Q     This appearance of pubic hair does not match any of the diagrams that -- or the depictions on the diagrams that we saw, does it?

A     Not very well.  It is in the midline and anterior which is how it develops.

Q     Right.  But this clearly -- this model has clearly either shaven or waxed or groomed in some way

her pubic hair, correct?

A    I don't know if that is clearly, but I think that is a possibility, yes.

Q    Well, your medical opinions are based on the appearance of pubic hair in this case, correct?

A    Yes.  To a large degree, yes.

Q    Would you say that by looking at this you cannot determine whether or not this model has utilized some sort of grooming, shaving, waxing, some sort of hair removal process?

A    No.  I am saying that she may have --

Q    Okay.

A    -- but I don't know for sure.  Usually I ask the child.

Q    Okay.  You can't ask the child, though, when you are reviewing images pulled off of the internet, can you?

A    Correct.  That's what the investigation is for.

Q    Right.  Your opinions were part of the investigation, though, correct?

A    I think I am assuming that they must be because here we are.

Q    Right?

A    But, no, I never know what role my

statements play.

Q     Well, what did you surmise when a detective, a law enforcement detective, asked you to render some opinions about some images, some pornographic images?  Did you not -- did you not surmise that they were contacting you as part of their investigation?

MR. WILSON:  Object to form, but go ahead.

A     They were contacting me, asking for an opinion. What they do next, I don't know.  And I don't know that they ever used these until now.

Q     Well --

A     You are telling me so.

Q     And I am sorry for cutting you off.  But you know that the detectives -- you knew that the detective was investigating a potential crime, correct?

A     Yes. By the 5th of April, I surmised that because she came back with more.

Q     Right.  And you knew that she was coming to you as part of that investigation, did you not?

A     It would be likely.

Q     Yes.

A     I did not pin her down.

(Plaintiff's Exhibit No. 4, previously marked, was

identified for the record.)

BY MR. ROBERTS:

Q    Okay.  I am going to share my screen which is Plaintiff's Exhibit 4.

I'm trying to move that.  I don't know what that is on there.  I don't know what this blue line is, I apologize, but do you see this?

A    Yes.

Q    Okay.  I am going to show you what is marked February 22nd.  That is the date that you have.  We looked at this letter, okay?

April 5th, do you see this letter?

A    Yes.

Q    Do you agree that the first paragraph is largely a copy and paste from the February 22nd, 2023 letter?

A    Oh.  It would appear that that is true, yeah.

Q    Can you read the second paragraph of your letter --

A    April --

Q    -- from April 5th, 2023?

A    "Today you have shown me two additional images" --

Is that what you are referring to?

Q    Yes.

A    -- "of the same female child, and these confirm my previous determination that she is depicted to be at most sexual maturity of maybe III or IV and, therefore, again less than 12 to 15 years of age."

Q    There is one more sentence.

A    Oh.  "The file names for these photos are 0059 and 0065(1)."

Q    Now, the last sentence of the first paragraph says, "She does not appear to be shaved as her anterior pubic hair is still present."

But on April 5th, 2023, when you saw the 0059 image, you knew that this model had been shaved, waxed, or removed her pubic hair in some way, correct?

A    No.

MR. WILSON: Object to form.

A    No.

Q    You just testified that the 0059 -- that she very well may have used some form of hair removal process.  Did I understand that correctly?

A    You misstate my testimony.

Q    Please restate it --

A    It was --

Q    -- for me. Please restate it.

A    It was possible, and that's what the investigation is for.

Q    **Well, you are the expert on pubic hair development, correct?**

A    Yes, but not depilatories, waxes, lasers, and you brought up electrolysis, as I recall.

Q    **Or chemical hair removal or just digital alterations of images or all the things that I brought up. But you made the affirmative statement on April 5th, 2023 that this model does not appear to be shaved, correct?**

A    I said that on February 22, and I did not change it on April 5.

Q    **That was an untrue statement, though, correct?**

A    Not correct.

Q    **So is it your testimony that the model depicted in 0059 does not appear to be shaved?**

A    Is 0059 the same image as the D2635841644B390? You know, I don't know if that is actually the same image or not.

Q    **It's not the same image. It's an image taken from the exact same photo shoot.**

A    I don't know that.

Q    Well, why don't you look -- why don't you open up the files for -- I'll give you the file number. Why don't you just open up the file that starts in D263B, open that up for me, and also open up 0065. And tell me when they are open.

A    Is this supposed to be --

COURT REPORTER: Ma'am, I can't hear.

THE DEFENDANT: I don't know what I am looking at. I am sorry, I am trying to figure out what I am looking at. This is a different file. I don't know what is what. I don't know what is what.

BY MR. ROBERTS:

Q    So let me read the file name for you, okay? It's B06F --

A    To what? A file name to what? There is more than one file. B06F, that is what that one says here.

Q    Knees-to-chest. So the image that you are looking for is a female model with knees-to-chest.

A    That is not the file name that I looked it up as according to my statements in 2023.

MR. WILSON: Yes. Mr. Roberts, if I may interject for a moment, the file names that we have as evidence in this case for Exhibit 8-B of

Detective Preston's interview and the one that is referenced in the first paragraph of the February 22nd letter, they are a different file name than is shown on Dr. Dully's letters here. But the description matches, and it is the image marked for identification purposes in other testimony in this case.

MR. ROBERTS: Thank you, John. I appreciate that.

(Exhibits 8-B and 8-D, previously marked in Detective Preston's deposition, were identified for the record.)

BY MR. ROBERTS:

Q Let's look at the image that you are describing rather than the file name, okay?

Can you -- can you open the file where it shows the model sitting on a wooden floor in a knees-to-chest position with her lower legs and ankles parted to expose her genital for the camera. I have that -- and it may have been miswritten in the report, but I have that as B06FE687.

A That is what is on this photo that says Exhibit 8-B.

Q Okay. Do you agree that that photograph showing the female in the knees-to-chest position was

taken at the same photo shoot, the same time as the other two images --

A     I --

Q     -- that you reference in that letter, 0059?

A     I have no idea.

Q     Can you explain why -- can you explain that, why you have no idea?

A     I wasn't at the photo shoot.  I have no idea.

Q     Well, does she appear to be wearing the same clothes?

A     What is --

Q     Well, first of all -- sorry, strike that. Strike that.

          Is it the same model?

A     What is the second picture that you are referring to?

Q     Okay, all right.

          MR. WILSON:  I will go ahead and interject again.

          MR. ROBERTS:  Okay.

          MR. WILSON: We have on the screen on this laptop Exhibit 8-B, which we were previously discussing, and Exhibit 8-D, which is also marked in Dr. Dully's reports as image 0065(1).  Those

are the two images that are currently on the laptop screen.

BY MR. ROBERTS:

Q    Okay.  So 0065(1), gotcha, 0059, that is the image that we were originally talking about today, let's just talk about those two images first, okay?

Do you agree that those two images were taken at the same photo shoot around the same time?

MR. WILSON: Let -- let me pull up those two images.

(Exhibits 8-C and 8-D, previously marked in Detective Preston's deposition, were identified for the record.)

MR. WILSON: All right, and now we have on the laptop screen Exhibit 8-C 0059 and Exhibit 8-D 0065(1), both displayed side by side.

MR. ROBERTS: Okay.

BY MR. ROBERTS:

Q    Having a look at those, do they appear to be taken from the same photo shoot?

A    It is all the same accoutrements, so they could be.  But, otherwise, I don't actually know.

Q    It's the same model --

A    Probably.

Q    -- correct?

Well, you say -- I think you say it is the same model in your letter of -- let's see.

A    Detective Preston told me that.

Q    April 5th, 2023, you indicate that you show me two -- pardon me, "Today you show me two additional images of the same female child." Did I read that correctly?

A    Yes.

Q    Okay. So it is the same female model that is depicted in the original image which you described as sitting on a wooden floor in a knees-to-chest position, correct?

A    She told me they were the same child, and I did not know any way to validate that. So I accepted it. I do think it looks like the same child, but I am not the investigating person, so...

Q    Okay. She's wearing the same earrings, correct?

A    Oh, I didn't notice the earrings. Sorry.

Q    Yes? Wearing the same earrings?

A    No, I don't know what the earrings are. Maybe you better go back to another screen.

Q    Oh, I am sorry.

MR. ROBERTS: Can you pull this back up?

MR. WILSON: They are up.

THE DEFENDANT: No, he's talking back now about the one I saw in February.

MR. WILSON: Oh, okay.

MR. ROBERTS: I'm talking about -- let's pull all three up, okay, the image from February with the knees-to-chest and then the two subsequent images that you viewed April 5th, which are 0059 and 0065(1). And just tell me when you have them up.

THE DEFENDANT: Thank you.

MR. WILSON: You're very welcome.

I am working on it.

THE DEFENDANT: It's going to be very small.

MR. WILSON: All right. I have got all three up, side by side, on the laptop screen.

MR. ROBERTS: Okay.

BY MR. ROBERTS:

Q    So, Dr. Dully, you weren't able to tell me whether or not these appeared to be from the same photo shoot taken at approximately the same time, so I am going to ask you:  Is the model wearing the same earrings in all three photographs?

A    It looks like the same earrings, yes.

Q    Is her hairstyle the same in all three photographs?

A    Well, with partial views, I -- I think they could be, but I can't really see her whole hairstyle in the first photo.

Q    Wearing the same clothes?

A    No, I don't see the same clothes. I see her knees and her legs and her bare arms.

Q    Do you see some pink lace on the floor?

A    There is something on the floor. I can't see what it is.

Q    Does it appear to be consistent with pink lace --

A    It could --

Q    -- lingerie?

A    Yeah, it could be. Yes.

Q    The same pink lingerie that she's wearing in 0059 and 0065(1)?

A    It could be, yes.

Q    Yeah. The wall color in the background is the same on all three images?

A    Yes.

Q    The drapes are the same in all three images?

A    They look like it, yes.

Q    The house plants in the image all appear to be the same house plants?

A    The ones that I can see, yes.

Q    So all indicia seem to be that these were taken at the same location at approximately the same time?

A    No, I don't know that.

Q    Okay, all right.

A    This is a costume.

COURT REPORTER:  I'm sorry, ma'am.  Could you repeat that, please?

THE DEFENDANT:  This is a costume.

BY MR. ROBERTS:

Q    What does that mean?

A    Something that you can put on every time it's time to put it on.

Q    Sure.  All clothes are costumes in that way, though, right?

A    No.

Q    I mean, you can put on the dress that you are wearing any time that you want, right?

THE DEFENDANT:  Do I have to answer that?

MR. WILSON:  Yes.

MR. ROBERTS:  Yes, you do.

A    Yes.

Q    Okay.  So to the extent that these appear to be -- and I guess I'll just have to ask it in a hypothetical way:  These appear to be part of the same photo shoot.  The model depicted does appear to have, as you put it, shaved her pubic hair, correct?

A    No, not in all three images.  I don't know that it's the same photo shoot.  I think it's likely it's not the same photo shoot, and it is not necessarily something that happened all at one time.  And you are putting words in my mouth, and I --

Q    Ms. Dully -- Dr. Dully, you realize you are under oath today, correct?

A    Yes, I am under oath --

Q    And you swore to tell the truth?

A    -- and you are telling me what I said, and that's not what I said.

Q    Okay.  And you are sworn to tell the truth.  What makes you believe in the original image, knees-to-chest, that her pubic hair grooming is any different than it is in 0059?

A    Because it is different, it is not the same view, and she looks younger to me.

Q    She looks younger to you?  What do you mean by that?

A    She has an immature face, she has large

eyes, she has a prominent forehead, she has her labia very well exposed, and she only has a little tiny bit of anterior pubic hair, which is exactly what early pubic hair in puberty looks like.  She still looks young to me.

Q    Why --

A    She's not old- --

Q    Why didn't you include any of that in your letter?

A    No one asked. You didn't ask. I did not change my opinion.  It's there in the letter.

Q    So let's just break it down.

On 0059, you agree that there is a -- as you put it, a possibility that she is groomed, correct?

A    Which one is 0059?

Q    That's the one where you can see what I think in common parlance is referred to as a landing strip of pubic hair.

A    Okay, that's the middle image here?

Q    Right.  Do you agree that there is at least a possibility that that is -- that she has shaved or used some sort of grooming?

A    Yes, I said that. Yes.

Q    Yeah.  Generally, pubic hair doesn't grow

in that way, like in a straight line, a straight line up towards your belly button, does it?

A    Not as uniformly, no.

Q    No.  So -- just so we understand and it's clear for the record, if a model has groomed, you cannot offer any opinions about the sexual maturity rating of that model as it pertains to the development of pubic hair, correct?

MR. WILSON: Object to form.  But go ahead.

A    It is an appearance, and it was not just one photograph.

Q    Well, according to you, on the day that 0059 was taken -- because you, I think, testified earlier that it is likely that these were taken on different days, correct?

A    I think it's likely that the knees exposure is younger but not necessarily the same time.

Q    So like developmentally younger, like her facial features are different, things like that?

A    Yes.

Q    So we're talking years younger in your opinion?

A    No, not necessarily.  Puberty is all happening in a year or two.

Q    Okay. So I just want to make sure:  Under

oath, your testimony is it's your opinion right now that the knees-to-chest was taken how much earlier than 0059 and 0065(1)?

A    It appears to be earlier.  I cannot say how many days or weeks or months.

Q    And so when I read your letter of February -- of April 5th where you write that these two additional photographs confirm your prior opinion, that would be incorrect then, correct?

A    No.  She is older and she was younger, and that's consistent.

Q    But your prior opinion was that she was Grade IV in the -- in the February 22nd letter, correct, a sexual maturity rating IV?

A    That is what it says.

Q    You actually say in your letter that from the second two images, 0059, 0065(1) -- you say III to IV in those images.  So you actually in your letter place her as being younger in the 0059 and the 0065 [sic] than in the knees-to-chest version of the image, correct?

A    Can you say that again? I didn't follow it.

Q    Yeah.  So on the original image, the February letter that you wrote, you placed the sexual

maturity rating at Grade IV, correct?

A     That is what I typed.

Q     Now, you've testified today that you believe that the model was younger, developmentally younger --

A     Yes.

Q     -- in the knees-to-chest picture that was subject of the February 22nd letter, correct?

A     Yes, she appears younger.

Q     But in your letter, you actually put -- of April 5th, you actually state that it confirms your opinion that she's a Grade III or IV by looking at the 0059 and the 0065(1) images, correct?

A     Yes.

Q     So you actually have those as being developmentally younger than the original picture, of the knees-to-chest picture?

A     Well, I did not change my statement in terms of her age.  But based on those photographs, I didn't type the exact same thing, no.

Q     What is the appearance of the model -- sexual maturity rating -- what is the appearance of her genitals in terms of sexual maturity rating in the 0059?

A     Okay, which one is the 0059?

Q    That's the one with the straight line of pubic hair --

A    Okay, sorry.

Q    -- anterior, I think, to her genitals.

A    She has midline pubic hair development and anterior, like a low maturity that could be a III. That is a distribution that we do see.

I do agree that there is a uniformity that suggests that she could also be altered in one of the ways you already suggested.

Q    And if she has altered her pubic hair, you could not offer any appearance -- any opinion even of her appearance, could you?

A    It's her appearance, and a III and a IV is possible. And I am told it's the same child, and I've already said she's a IV. And now this view, she could also be a III. But I don't think it fits perfectly, no.

Q    That is not my question.

A    She --

Q    Ma'am, that is not my question.

A    What is your question?

Q    In your -- the original part of your deposition, we went through, I thought, in quite a bit of detail regarding the difference between III,

IV, and V, the appearance of pubic hair development. And you made it very clear in your deposition that the distinction between a IV and a V or a III and a IV was the distribution of the pubic hair, correct?

A     Yes.

Q     All right.  If the pubic hair has been removed so that you cannot see the biological -- the natural distribution of pubic hair, how could you possibly offer an opinion about a sexual maturity rating based on the pubic hair distribution?

A     Because it's based on appearance.

Q     Right.  But the appearance here is that she has been shaved.

A     That is your opinion. I think it's possible --

Q     Well, you've acknowledged -- you've acknowledged that that is a -- that that is a possibility here that is consistent with grooming, that this image is consistent with grooming.

And my question to you is:  If you saw that she had been groomed, why would you not tell Detective Preston, "Hey, I can't help you here; she's being groomed; I don't know what her pubic hair distribution is"?

MR. WILSON: Object to form.

A    I still have the first image.

Q    Let's talk about the first image. Before we do that, I want to share what was originally an exhibit. It was Exhibit 3 -- Exhibit 3 to your -- to this deposition.

(Plaintiff's Exhibit No. 3, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q    Now, you previously testified that this diagram roughly -- and it is a pen and ink drawing -- displays the development through the stages of pubic hair and breast development, correct?

A    It's close, yes.

Q    All right. And we talked in detail that the development of -- and this is what you said, was a triangle or an inverted triangle in the area above the genitals was the determining or one of the determining factors in assessing whether or not someone was a sexual maturity rating of a III, IV, or a V, correct?

A    If you only have an anterior view, that is what you see. And you see it on your diagram on III, IV, and V.

Q    Right. So I want you to go back now to the knees-to-chest image, the original image that

Detective Preston brought to you on February 22nd.

MR. ROBERTS: Tell me when that's up. I know it takes some time.

MR. WILSON: It's up. All three images are still open.

MR. ROBERTS: Okay, they're still up.

BY MR. ROBERTS:

Q     Isn't it true, ma'am, that in the knees-to-chest position, you cannot see the anatomical area of the body which is displayed in these diagrams?

A     In your limited diagram, it does not show the same view.

Q     It does not show the area above the genitals, does it?

A     You mean the photograph?

Q     I mean the photograph, yes.

A     It does not. It's not showing the same view at all.

Q     It is impossible for you to tell whether or not that is a III, IV, or V distribution of pubic hair based on the positioning of that model in that photograph, correct?

A     No, not true.

Q     Can you see how the pubic hair is

distributed in the inverse triangle that you've described earlier in your testimony?

A     It is not the same view, no.

Q     So you can't?

A     Not with your limited diagram, no.

Q     Is there another diagram that you would refer me to?

A     There are lots of them.

Q     And are there any diagrams that would show females in a knee-to-chest positioning?

A     There certainly are, and there are other positions as well.

Q     Tell me about those.  Can you tell me the names of those diagrams?  Where can I find them?

A     There are some.

Q     I can't -- I can't see them.  What -- can you just tell me the name of the book you are referring to?

A     "Assessment of Sexual Maturity Stages In Girls," American Academy of Pediatrics.

Q     And in that book, does it have diagrams of where doctors are assessing a sexual maturity rating of girls from images where they are on their knees-to-chest, in a knees-to-chest position?

A     It has similar exposures. But, no, they're

certainly not in that position.

Q    Okay.  Why is that?

A    Because this is not pornography.  That is.

Q    Right.  The entire test that you are talking about was never intended to use it as you are using it, correct?

A    That is not necessarily true.

Q    Well, the book you just referred to me is a clinical -- clinical treatise, correct?

A    It has diagrams and photographs and answers your question.

Q    But you are not answering my question, Dr. Dully, which is:  The book that you are referring to is designed to help clinicians assess the sexual maturity rating of their patients in a clinical setting, does it not?

A    Including me, yes.

Q    And it's also designed to -- really what it's designed to do is to ensure that young people are appropriately developing through the stages of puberty and to help diagnose any sort of disorders that they may have in that regard?

A    In clinical medicine, that is how I use it.

Q    That is, in fact, what the test was designed to do, correct?

A    That was what Dr. Tanner did in the 1950s. It certainly has another purpose now as well.

Q    But that other purpose is not to provide reliable opinions on the actual age of models depicted in pornographic images, is it?

A    Only appearance.

Q    Right. And -- and appearance -- there's really no value to your opinion regarding appearance, is there?

A    I am not sure -- I am not doing the investigation. I provide the consultation because I am required to and requested to.

Q    But I am not -- I'm going to ask you the question again.

There really is no value to your opinion regarding the appearance of a sexual maturity rating in a pornographic image, is there?

MR. WILSON: Object to form.

A    I don't --

Q    It's a yes or no. Is there value or is there not value?

A    There is value. In my opinion, there is value.

Q    Okay. You can't tell me if these pictures appear to be from the same day, can you?

A     I cannot.

Q     You can't really tell me -- you don't actually believe they are from the same photo shoot?

A     I do not.

Q     You think that in between some of these photographs, this model groomed her pubic hair; is that right?

A     I think that she matured, and she may have groomed. I cannot rule that out because I would normally ask the patient.

Q     And is there any evidence, like actual evidence, for that testimony that you have today?

A     Well, from many hours of it, I would say, yes.

Q     Tell me -- tell me: What is the evidence that -- between the original knees-to-chest photograph and 0059 that this model groomed her pubic hair?

A     I don't know that she groomed her pubic hair. I think you are testifying she did, but I don't know that. I --

Q     Okay. And I guess that is my point, right? That if you can't even tell if somebody has groomed or not groomed, what is the value of your testimony?

A     Ask law enforcement. They ask for these

all the time.

Q    I am asking you. You -- you hold yourself out as an expert to law enforcement in sexual maturity rating, correct?

A    Yes.

Q    And you can't even tell me, as we sit here today with hindsight, whether or not this model in 0059 has groomed her pubic hair; you can't tell me that, can you?

A    No.

Q    So what -- if you can't even say that, how can you in good faith offer any -- any opinions about the sexual maturity rating of these models?

MR. WILSON: Object to form. And your tone is getting awfully accusatory for a deposition.

MR. ROBERTS: All right. Well, hold on. For the record, it is accusatory.

THE DEFENDANT: Yes, I would agree.

BY MR. ROBERTS:

Q    I am telling you, it is accusatory. You cannot tell me whether or not this woman has groomed, can you?

A    That is what the investigation is for. Asked and answered.

Q    I am not asking about the investigation,

Dr. Dully.  I am asking you.

A    Not what I do.  That is not what I do, and I have never offered myself as an expert in pubic hair grooming.

Q    Ma'am, I am going to ask you to go back to your letters in this case.  You say, "She does not appear to be shaved."

A    She does not --

Q    You offered that opinion?

A    -- appear to be shaved.  Yes, she does not --

Q    And there's no basis for that opinion; is there?

COURT REPORTER:  Sir, I didn't get your question.  This is the court reporter.

BY MR. ROBERTS:

Q    You offered the opinion to Detective Preston that this model was not shaved; isn't that true?

A    That's my opinion.  It is still true.

Q    But today you can't tell me whether or not she was shaved or not?

A    I cannot.  That is what the investigation is for.

Q    Do you understand that most people

generally understand that to be a false statement?

If you told the detective something and now you say, "I don't know if it is true or not," that would be a false statement, wouldn't it be?

A     No.  It is a statement for investigation.

Q     Do you endeavor to give truthful statements to an investigation?

A     Of course.

Q     Why would you say that this model does not appear to be shaved if you cannot tell whether or not she was shaved?

A     We're talking about two different images. So the first image, she does not appear to be shaved. The second image, she could be groomed.  I can't say for sure, and the investigation should clear that up.

Q     How would an investigation clear up whether or not she was shaved on the day of this image?

A     When they find her, they can ask her, if they find her.

Q     Why did you not include in your report when you were talking and describing 0059 that this image may represent that it appears she may have groomed or shaved, as you put it?

A     I find it is also possible that she is a III.  I did not know which it was, but it is based on

appearance.

Q     But the appearance -- in every other image, you talk about whether or not they appear to be shaved or not shaved.

I am asking you: In regards to 0059, why did you not include in your report that it may be that this model has shaved?

A     I don't know. I don't see that as my expertise. I think that that needed more investigation. And that was clearly what was, you know, probably underway because she was back for a second time.

Q     Is it true that you only include a notation on shaving when you say that they do not appear to be shaved?

A     No. I do that on every medical assessment.

Q     Well, then, why didn't -- I am going to ask you again. If you do that on every medical assessment, and 0059 you have acknowledged may be shaved, why did you not -- why did you not note that?

A     The comment I make is if they appear to be shaved and usually the answer is yes.

And in this case, I didn't think I could know that statement and the investigation needs to proceed. In photograph number one, she does not

appear to be shaved.

Q   But you don't -- let me ask you this.  If you look at 0059 and the original image, knees-to-chest --

A   The knees-to-chest one, the first one -- yes.  Go ahead.

Q   -- and 0059 that has the very regular, vertical strip of pubic hair, okay, those two presentations of pubic hair are perfectly consistent, correct?

A   No.  They are consistent with a change in age and a change in habits, potentially, but they are not, you know, the same thing twice, no.

Q   The original knees-to-chest image does not show the area of pubic hair that is depicted in 0059, does it?

A   Ah, let me see here.  It's not exactly the same, but the views are -- I would say the second photo is a little more exposed than your diagrams, and then the first photo is a completely different view.

Q   It is a completely different view, and that view hides the area that is exposed in 0059, correct?

A   Partially.

Q   Yeah.  To the extent that you can't tell

what her pubic hair looks like above the area that is exposed, can you?

A   Above what area?

Q   There is an area of exposed pubic hair in the original knees-to-chest image, correct?

A   I --

Q   You can see pubic hair exposed in that image, can you not?

A   At the very top of her labial opening, yes.

Q   Above that area of exposed pubic hair, you cannot see that area because of her body positioning, correct?

A   Up towards her belly button and her lower abdomen, I cannot see those areas.

Q   And so it may be that her pubic hair is exactly the same in Image 1, where she has got the knees to the chest, as it is in 0059; there is no way for you to know because you just can't see that area, can you?

MR. WILSON: Object to form.

A   I disagree.

Q   Okay. You said earlier that Detective Preston told you that this was the same model. Do you recall that testimony?

A   Yes.

Q    Were you not able to surmise from your review of these images that it was the same model?

A    I suspected they were the same, and she said yes.

Q    Do you agree?  Is there any question in your mind that they are the same model?

A    Well, they appear to be the same model. That's all I have.  But investigators would know better.

Q    When you say "investigators," ma'am, you are a forensic investigator in this case, are you not?

A    I am not.

Q    You didn't offer forensic opinions in this case to Detective Preston?

A    A forensic medical opinion.

Q    Did you offer a forensic medical opinion to Detective Preston in this case?

A    Yes.  On her request, yes.

Q    So you are part of the investigation; you agree with that?

A    It would appear that I am.

Q    Did you not know that at the time?  Did you not realize that at the time?

A    I knew that there was some likelihood, yes.

Q   Okay.

A   I did not know what was happening next.

Q   Now, you say -- you have talked about -- and we talked about this in appearance.  And you have testified, I think to be fair, that in your opinion it was obvious that you were not offering any opinions about the actual age of the models in question from the way you wrote your reports.  Did I understand that correctly?

A   I think I am pretty clear that it is appearance.

(Plaintiff's Exhibit No. 4, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q   Okay.  I want to share again Exhibit 5 -- I mean, I am sorry, Exhibit 4 from the original deposition, and let me go to the February 22nd.  I am going to read a line.  You say, "This female child appears younger than the age of 18."

Is that what you mean when you say "appears," that makes it obvious that you are just talking about appearance, not her actual age?

A   Yes.

Q   Okay.  April 5th, and I am moving down to the third letter in our exhibit, in the second

paragraph you wrote, "This image shows a female child with her black top parted and her underwear down around her parted thighs, exposing her genital area clearly."

You didn't use the word appear in that sentence. Why not?

A    I don't know why not. Maybe I did or maybe I didn't. What does it say? It is very easy to see. She has -- she's prepubertal.

Q    You say, "This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly," but you don't say anything about appearances or appear in that.

A    "She appears to have no pubic hair development in" --

Q    Right. But did you call her a female child? Do you see if I read that sentence how a person might interpret that as you saying that this person is a child, an actual child?

A    Well, I hope so, yes, but I don't know that.

Q    Wait, wait, wait, wait. You hope that someone would interpret this as you -- as you offering the opinion that this was actually a child,

like her actual age was under the age of 18?

A    Her age is indeterminant.  But she is well under the age of 18, and that is her appearance.

Q    So are you offering an opinion now on this image that the actual age of the model -- not just the appearance, but the actual age of the model is under the age of 18?

A    No.  Her appearance is under the age of 18 very clearly.

Q    Because she doesn't have pubic hair?

A    We'll need to pull up the image because you are missing the basics.

Q    I am missing what?

A    The basics.

Q    I am missing the basics?  Like, what are the basis?

A    I am pulling up the image so I can review them with you. Would you like to pull yours up?  I'm not -- what is this one?  Is this the DuckDuckGo one?

Q    Correct.  This is the one with no face, no breasts, only a magazine cover with belly button to knees.  Tell me:  What am I leaving out?

MR. WILSON: Before she answers, I am pulling up on the laptop screenshot 20230122_174408DuckDuckGo.jpg which was listed in

Detective Preston's deposition as 8-E. And it is focused on the top image that has been colloquially referred to in this case at the Bay Heart image.

MR. ROBERTS: Thank you, John.

(Exhibit 8-E, previously marked in Detective Preston's deposition, was identified for the record.)

BY MR. ROBERTS:

Q     So you said that I was leaving stuff out. What am I leaving out?

A     This child has no pubic hair. It is a very clear view. She has the labial majora that meet right in the middle. She does not have labial minora development as an older child or teen would have. And you can also see her hand. And she is a child by looking at this.

This is an appearance. This is what they look like on the exam table.

Q     You keep saying this is a child. But you are not actually testifying that in chronological age, this person is under the age of 18, are you?

A     I am not giving a chronological age. I am telling you what she looks like.

Q     Right. And so when you say "what she looks like," you are talking about a frontal view of the

genitals where she is vertically standing I think on her knees, correct?

A    Yes. It's not just frontal. You can see her labial majora and the cleft between them and her buttocks behind those a little bit, just the medial portion, because her legs are parted.

Q    I want you to Zoom in on that image for me.

MR. WILSON: On?

BY MR. ROBERTS:

Q    When you Zoom in, I want you -- I want you to see how far you can Zoom in before it becomes pixilated.

A    On this particular -- yeah.

Q    You testified earlier in your deposition that if the quality of the photograph isn't good enough, you wouldn't be able to see things like a razor burn or stuff like that.

I am going to ask your opinion: Is quality of this photograph good enough for you to see whether or not there's evidence of grooming, shaving, waxing, those kinds of things?

A    Yes.

Q    It is good enough?

A    Yes.

Q    Okay. And so was that a misstatement when

you said, "This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly? Did you mean to say, "This is what appears to be a female child"?

A   This appears to be a female child, and I specified that. She has no pubic hair development. None.

Q   And you say here again, "She does not appear to be shaved"?

A   She does not.

Q   And what is that based on?

A   She is immature. She does not need to shave.

Q   Has anyone related -- you know that this is an adult, right?

MR. WILSON: Form.

A   No, I don't know that. You are saying so.

Q   Well, not just me.

A   I don't know that.

Q   Okay. You are saying, though, that this child doesn't need to shave; that's your -- that's your medical opinion today?

A   My medical opinion is she is so immature, she does not need to shave and she does not appear

shaved.  She has all the immature anatomy appearance of a child who has not entered puberty.

Q    And you can tell all of that by this photograph?

A    Yes.

Q    And if I showed you a passport and the date of this picture, you would still say that she is prepubescent?

A    Well, I would not know when this picture was taken versus the passport picture taken that --

Q    No, I just said -- I just told that to you. I said if I -- if I showed you the passport and the date that this photograph was taken -- it's actually on the image that you are looking at.

But if I showed you that, you would disagree and you would say, "No, no, she's not an adult"?

A    I would -- I would not presume that those are the same two people.

Q    That is not my question.  You would say, "I don't care what her passport says, I don't care what the date of the photograph is, this is not an adult"?

A    This does not appear to be an adult, and I do not know if there is a passport linked to it or not or if it's a valid passport.  I don't know.

Q    Do you know whether or not she waxed?

A    She does not need to wax.

Q    Do you know if this image has been digitally altered?

A    It doesn't appear so, but there are other experts to look at that.

Q    When you say, "it doesn't appear so," what is that based on?

A    How it looks.

Q    Do you have any expertise in that?

A    In how it looks?  Yes.

Q    In what a digitally altered photograph looks like?

A    I do not have the expertise to find out if that's occurred or not.

Q    Why would you be willing to offer an opinion about it appearing not to be digitally altered, then?

A    Because it doesn't appear to be digitally altered.

Q    What do you mean --

A    But there are other experts that can look at that.  It doesn't --

Q    But I am asking you.  You have said it. What is your basis for saying that?

A    This is what little girls look like.  No alteration required or involved.

Q    So I'm very -- you're looking at me in this way and I will be honest with you, I am confused by your testimony, because now you seem to be very emphatically offering an opinion about the actual age of this person and not the appearance.

A    Well, that's your opinion, but that's not what I have said.  She appears to be a child, and she appears to be a child for the reasons that I have stated.  And I have no burden to provide computer-based testimony or expertise in that area.

This is the beginning of looking at images. This is not necessarily -- sorry, the conclusion that would be reached if a good investigation occurred.  I am not involved in that.  I don't know how that went.

Q    So you -- you indicate in this letter, you say, "She appears to have no pubic hair development." Why do you put that she does not appear to be shaved?

A    Because she does not.

Q    No, but today you have testified that she doesn't need to shave.

A    She does not appear to need to shave.  Her skin is perfectly smooth.

Q    Why didn't you put that in your report?

A   Because that is more information for testimony. I don't put all the transcript [sic] that I might say in the future in one letter.

Q   So these letters don't include the basis -- all of the bases for your opinions?

A   No.  It is not possible.

Q   Okay. So "she does not appear to be shaved," that was just -- you just wrote that -- even though you didn't think that she needed to shave, you say "she does not appear to be shaved."  Because to me that sounds like you are saying, "Hey, she might shave but it appears like she hasn't shaved."

MR. WILSON: Object to form if that -- if there was a question there.

THE DEFENDANT:  I think asked and answered would be good.

MR. ROBERTS: I think you are not an attorney.

THE DEFENDANT:  I think you are right.

BY MR. ROBERTS:

Q   "She does not appear to be shaved" -- "she does not appear to be shaved," why did you write that?

A   Because she does not appear to be shaved.

Q   Does she appear to be waxed?

A     No.  She has perfectly smooth skin.  There are no signs of a pubic hair that would still be there.  There's no folliculitis.  She does not have the signs of somebody who is doing things that they don't even need to do.  She is a -- looks like a child.

**Q     We talked a little bit earlier in your deposition the last time we were here about your opinions regarding the model who had the Grade IV to V breasts, but you had her at sexual maturity I.  Do you recall that testimony?**

A     Yes.

**Q     What do you recall about it?  You are shaking your head for a reason, I guess.  What do you recall about it?**

A     I said she could have mature breasts but I could not see them well, so I did not assess them for her maturity rating.  So I can see in that statement that she could be mature which would be, you know, a IV or V.

**Q     You said you did not assess her breasts for a sexual maturity rating.**

A     Correct.  You cannot see it, which is what my statement says, as I recall.

**Q     Well, you do --**

A    That's what I said in the last deposition as well.

Q    You do say that she could be a sexual maturity rating of a IV or V.

A    Right.  I just said that.

Q    I mean, it seems like that is an assessment.

A    That she could be a IV or a V?

Q    Correct.

A    No, it is a concession.  It is not an assessment.  It is a concession.

Q    What do you mean by concession?

A    I am conceding that I cannot exactly assess her breast development because I cannot see that well, so she could be mature.  I cannot see that well.  And if she was mature, she could be a IV or a V.

Q    Is that in the same way you couldn't really see the pubica -- pubert- -- pubic hair development in the knees-to-chest image?

A    No.

Q    Do you agree that you couldn't really see the area of pubic hair development in the knees-to-chest photograph?

A    I do not agree.

Q You think you could see the lower abdomen above the genitals where the thighs meet the lower stomach; you think you could see that in that image?

A We talked about that, no, and that is not the only thing to look at.

Q Right. But it is difficult to see that area, correct --

A That area --

Q -- in that image?

A Yes.

Q In that image?

A In that image, that area is not well seen or seen at all, but the rest of the genitals are very well-exposed.

Q Well, why didn't you give the same concession on that knees-to-chest image that you were talking about with the breasts?

A Because the genitals are well-exposed, and I can see them and so can you.

Q But the only opinion that you offer is to pubic hair development.

A Right.

Q And you cannot see the area where your pubic hair develops clearly in the knees-to-chest photograph, can you?

A    Wrong.

Q    Well, I guess the image speaks for itself.
I guess people can just make their own opinion about
what it shows.

A    No.

Q    But your testimony is is that it does not
show the area where pubic hair begins to develop in
children?

A    Yes.

Q    Because your earlier testimony was that it
begins in an inverse triangle above the genitals.
That was your earlier testimony.

A    That is what you wanted from your diagram
which is very limited.  I am trying to help you with
your diagram.

Q    Actually --

A    That is not the only exposure, and her
knee-chest is not that exposure.

Q    I am going to share with you your
deposition transcript.  This is page 37 going into
38.  I am asking you to describe the grades of sexual
maturity rating.  On page 37, I ask about III.  And
on 38, I ask about Grade IV.  Can you read your
answer for the jury, please?

A    I will read my answer, but there is no