No. 26-10155-D

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

WILLIAM LEE LAWSHE,

*Plaintiff-Appellant*,

v.

MIKAYLA PRESTON, and
KATHLEEN DULLY

*Defendants-Appellees*

Appeal from the United States District Court
for the Middle District of Florida, Jacksonville

No. 3:24-cv-00044-MMH-MCR

---

## APPELLEE DULLY'S SUPPLEMENTAL APPENDIX VOL. 4

---

Jami M. Kimbrell
Florida Bar No. 0657379
**Howell, Buchan & Strong**
2898-6 Mahan Drive
Tallahassee, FL 32308
Phone: (850) 877-7776
Email: Jami@jsh-pa.com

*Attorney for Appellee
Kathleen Dully*

jury.  Where am I starting?

Q     Ma'am, this very well may be played in front of a jury.  I hope you understand that.

But it is -- the question is:  At line 2 and Grade IV, can you read your answer at 3?

A     What is Grade IV?  Line 2, Grade IV.

Q     Line 3.

MR. WILSON:  Can you give us the page, please?

MR. ROBERTS:  38.

THE DEFENDANT:  Oh, 38.  Line 2 and Grade IV.  Grade IV, that was it on the end.  Okay, Grade IV --

BY MR. ROBERTS:

Q     Page 38, line 3, can you read your answer when I ask you to describe Grade IV?

A     "Grade IV fills out the entire triangle shape of the labial majora, the anterior commissure, and the mons pubis over to, but not involving, where the thighs join the pelvis."

Q     You could not see -- that's your answer, correct; that's not my -- my words?

A     That is my answering you on asking me what the stage is.  That is not about one of the photographs.

Q   And then on -- keep that -- keep that there because I ask you: "What do you mean by triangle?" Can you answer that?

A   Is that a question?

Q   Can you read your answer?  Can you read your answer?

A   "That is the shape when the legs are together of the hair-bearing parts over the mons pubis in front of the anterior commissure.  And on either side, it's wider.  In between the legs, it will come to" -- it's supposed to say -- "a point so that it may look like an inverted triangle."

Q   So I asked you to describe the difference between -- or what a Grade IV was.  You told me about an inverted triangle, correct?

A   From your diagram, yes.

Q   Actually, if you go back and look, I don't think I had shown the diagram at that point.

A   I don't know.

Q   Okay.  Are you answering this question on page 38 based on what my diagram was or were you just answering just what Grade IV is?

A   Well, we need to go back and read, then, because I don't --

Q   Take as much time as you'd like.

THE DEFENDANT: Lower. I am getting paged. Let's see.

A You were asking me for a basic description, so I was giving you a description by each grade.

Q And you identified the triangle and distribution of the pubic hair within that triangle, inverted triangle, as the definition for Grade III, Grade IV, and Grade V, correct?

A Well, that is how we teach the basics, yes.

Q You cannot see the development of a triangle in the model depicted in the knees-to-chest image, can you?

A No.

Q And in the 0059, there is no triangle on that model, is there?

A No.

Q And that would indicate the possibility that she has groomed, correct?

A There is a possibility that she groomed.

Q And if the model had groomed, you would not be able to use what you described earlier in your testimony as the definition of Grade IV and Grade V? You would not be able to use that to sexual maturity -- to do a sexual maturity rating of her pubic hair, would you?

A   I can't use your oversimplified, basic description that you asked me for as the sole source of information for a completely different exposure.

So the first image of the knee-chest is a different exposure and it is a good one, and she does not appear to have mature pubic hair there.  It is not in the basic diagram that you have.

The subsequent photograph does not look like it is the same moment in time or the same photo shoot, and there is a possibility that she is groomed.

Also, there are children who can be a sexual maturity rating II to III, or III, and it is on either side of the cleft like this.  I think it would be part of the investigation.  Or had she been brought to me, I could have asked her and take it from there.  I don't think that is different than anything I have tried to keep explaining.

Q   So on the date you reviewed these -- let me just ask you a hypothetical question, okay, because I guess we're just not going to agree.

If these images were taken during the same photo shoot at approximately the same time and location, would the fact or the possibility that this model had groomed alter your ultimate opinions that

you offered to Detective Preston?

A    I don't know if I had seen them all.  I don't think so because I do think this child in the knee-chest looks younger, and I don't think so.  But, of course, that is not what happened.

Q    Well, on April 5th, you did have all three images in front of you, correct?

A    Not at the same time, but it would appear I had several.  I am sorry, there are so many file names I don't know.

Q    So you are saying at the time of April 5th when you wrote the letter regarding 0059 and zero, zero, six, paragraph one [sic], you formed the opinion that these images were taken at different times?

A    Yes.

Q    And it was your opinion back then that she possibly had groomed between the first knees-to-chest image and then the 059 image?

A    No.  She had aged and developed more pubic hair and could have groomed.

Q    But you formed that opinion on April 5th, 2023?

A    Yes.

Q    You just didn't include it in your -- in

your letter?

A     Well, it is included because it doesn't change my original determination on the first photo. But I didn't go on for pages about it, no.

Q     Well, I am not asking if you went on for pages.  But you didn't say something like, "These pictures appear to be taken at different times, at different ages, of the same model"?

A     I did not say that.

Q     But that was, in fact, your opinion back then?

A     Yes.

(Plaintiff's Exhibit No. 4, previously marked, was identified for the record.)

BY MR. ROBERTS:

Q     Okay.  I am going to share again Exhibit 4, and I am going to go to the first paragraph this time.

This is the YCBLVVFQ.  Can you pull this image up?

(Exhibit 8-A, previously marked in Detective Preston's deposition, was identified for the record.)

MR. WILSON:  I am pulling up on the laptop what was marked in Detective Preston's deposition as Exhibit 8-A, YCBLVVFQ, it looks like,

underscore 0.

MR. ROBERTS: Thank you, John.

BY MR. ROBERTS:

Q      Have you had a chance to look at that, Doctor?

A      I see it, yes.

Q      Do you recognize this model as the same model which is the subject of the knees-to-chest and 0059 and 0065(1)?

A      I think she is the same model. She looks older to me, but I think she is the same model based on appearance.

Q      And the appearance to you is that this is an older version of the model, correct?

A      Yes.

Q      All right. Despite that, when in the knees-to-chest 0059 you have this model, we'll call her Melania D, as a Grade III or IV sexual maturity rating, now, even though you think that she appears older, you have the same model as a sexual maturity rating of I, prepubescent.

Can you please explain that?

A      That is based on the view of her pubic hair being completely absent.

Q      Right. But you just testified under oath

that looking at her, she appears to be older than when she was depicted in 0059, correct?

A    I think so, yes.  That is my opinion.

Q    This isn't Benjamin Button, though, is it? I mean, she gets older over time; her puberty gets more developed over time, correct, not less developed?  Do I understand that correctly?

A    Yes.  That would be the normal sequence, yes.

Q    Yeah.  Can you please explain how an older version of Melania D has a lower sexual maturity rating, a prepubescent maturity rating?

A    Well, if she is the same child, then she would be altered.

Q    Is it your testimony that this is an altered image?

A    It could be.  I don't know that it is the same child.  I am assuming that --

Q    I -- sorry, sorry.  I didn't mean to cut you off.  Go ahead.

A    I don't know that it is the same child.  I am assuming that it is possible that she is the same child.

Q    So when you say "altered," what do you mean?

A     That her pubic hair is missing if she is the same child because it would appear she had it before.

Q     Well, in this letter, you specifically say she -- in regards to this image, that she does not appear to be shaved.  Was that a lie?

A     Which letter are you talking about?

Q     April 5th --

A     Oh --

Q     -- YCBL.  You told the detective that she does not appear to be shaved.  Today you are testifying that she must be altered in some way.  I am asking: Was that a false statement that you gave Detective Preston?

A     No, I didn't know it was the same child, if it is.

Q     You just testified, Doctor, that you believe that this is the same child but older.  Is that not your opinion?

A     I testified that this could be the same child in my opinion, but I don't know.

Q     So you don't know if this model has been shaved or waxed or the image has been digitally altered at all, do you?

A     No, I don't.

Q     And yet you told Detective Preston that it did not appear that she had been shaved, right?

A     It does not appear that she was shaved.  It does not appear, no.

Q     But now your testimony is that it does appear that she may be shaved.

A     No, your testimony is.  She is -- if she is the same child and the child had pubic hair before, then we would know that she could be altered one way or the other, or grooming or computer manipulation.  But she does not appear to be shaved in this image.

      I -- I don't know if she is the same child.  I do think that's possible that it could be her sister or some other child of a same heritage.  But the investigation should clear that up.

Q     So you had all of these images on the same day, April 5th, correct?

A     Eventually, there were more images, yes.

Q     On April 5th, you had both 0059 and the YCBLVVFQ, correct?

A     Yes.

Q     And at that time, you thought that they might be the same person, correct?

A     I did not know this was the same person but I thought that they could be.  The -- this is not the

same outfit, the same earrings, the same hair, the same background. None of that is there. This looks pretty different. I don't know if it is the same child or not at a different age in her time of growing up, and it looks pretty clearly like a different photo shoot. If --

Q     Okay. You already testified -- I am sorry. I am sorry.

Yeah, it is clearly a different photo shoot. I agree with you, yes. But I think you testified that you thought that this was an older version possibly of the Melania D that was described in 0059, correct?

A     I am conceding that that is possible.

Q     Right. And so on the day that you wrote this letter, April 5th, you knew -- you knew about this possibility that this was the same model and that she had shaved between the first photo shoot and then this photo shoot, correct? You knew that at the time that you wrote this letter?

A     No, I did not know that. I am still not sure of that. I --

Q     I am not asking you -- sorry, ma'am. I am not asking if you are sure. I said you knew about the possibility that this was the same model that was

older; you knew that was a possibility on April 5th when you looked at all of these images, correct?

A     I don't remember assessing that, no.

Q     Well, as we assess it today, do you have any concerns about your affirmative statement to Detective Preston that she does not appear to be shaved?

A     No.  I mean, I would concede for a jury that this could have turned out to be the same child at a different age.  It's in the separate letter along with the other Bay Heart, and it is not one of the two that she told me was the same female child. And I don't remembering thinking that it was, and it is not the same photo shoot.

Q     Right.  Today you've testified that you think maybe it's the same model but she is older, correct?

A     Yeah.  And now that I see them in this sequence, it could be the same child.  But I said I did not know that.

Q     Well, you had all of these photographs on April 5th in front of you with Detective Preston, correct?

A     And she said the other two were the same child.

Q    Right. What I am trying to understand, as we sit here today, is how is it possible that you have given the opinion that an older version of Melania D has a lower or more immature sexual maturity rating?

A    I have conceded that she could be the same person, but I did not know that and I do not know that.  If she is the same person, then her pubertal development continued and that would be consistent with -- I'm introducing another term -- her using some sort of alteration, technique, or the computer being done for her.

This was not represented to me as the same person, and I don't know that it is.  I am conceding that it could be, but I did not know that and I don't know that now.

Q    While we're conceding things, will you concede that the first three images -- the knees-to-chest, 0059, and 0065(1) -- could be all from the same photo shoot?

A    The child with the knee-chest position looks younger to me.  It does not look like the same moment in time to me.

Q    Would you concede that it could be, though?

A    I don't think it looks that way.  It is a

costume in a set, and the child looks different.

Q    Let me ask the converse. Your entire opinion that you offered to Detective Preston is predicated on the opinion that these photographs were taken at different times, substantially different times?

A    I don't know what "substantially different times" means.  I've already said I don't know how many weeks or months might have gone by.

Q    But your entire opinion to Detective Preston is predicated on your opinion that the knees-to-chest photo was taken weeks, months, some time prior to 059 and 0065(1)?

A    That's how it appears to me, yes.

Q    Okay.  And when did you develop that opinion that they are different times -- that they were different times?  When did you develop that opinion?

A    I don't think I've changed it.

Q    That was your opinion on February -- on April 5th?

A    My assessment on April 5th did not change what I said on February 22.

MR. ROBERTS: Okay.  We have been going for a little while. Let me take a break.  Everybody

take a comfort break. We may not have that much longer. Thank you.

THE VIDEOGRAPHER: We're off the record at 4:48 p.m.

(Recess from 4:48 p.m. to 4:55 p.m.)

THE VIDEOGRAPHER: This begins media unit 2. We're back on the record at 4:55 p.m.

MR. ROBERTS: Okay. Dr. Dully, I do not have any other questions. I will turn it over to Mr. Carson.

THE DEFENDANT: Thank you.

CROSS-EXAMINATION

BY MR. CARSON:

Q Hi, Dr. Dully.

A Hello. Good afternoon.

Q Yeah, good afternoon. My name is Matt Carson. We have met one other time I think at your deposition. My law firm represents Detective Preston who has also been sued in this litigation.

I have just a few questions for you just to get on the record kind of what your overall experience is in helping law enforcement as a member of the Child Protective Team.

I think you testified about this a little bit at your first deposition, but there have been

other instances where you have had the opportunity to assist law enforcement, correct?

A     Yes.

Q     And would some of those have been when you have been shown pictures, images, videos, and asked to opine on the appearance of the age of the individual in the photograph image or video, correct?

A     Yes.

Q     And those -- have those been mostly close calls? Meaning, does law enforcement come to you when there is -- and, unfortunately, this is, I imagine, part of the work that you do as well as my client -- instances where it is a six-year-old or an eight-year-old or somebody who is, you know, clearly very, very young?

A     That has happened. It used to happen in the past. But now I think most law enforcement agencies are not bringing us the easy ones. They are bringing us the in between children where they might decide to use a medical opinion; they might not.

Q     And is it your understanding that that was a major -- I am sorry, there is background noise.

Is that your understanding, that that is what Detective Preston was asking you to help with?

A     Yes.

Q    We talked a little bit about an investigation maybe resulting in the location of the individual in the photograph, correct?

A    Possibly --

Q    Possibly.

A    -- yes.

Q    In your experience, if you know, how often is the individual that is in these photos and these images local or, otherwise, able to be identified and located?

A    I see the patients and am told about the images that have been found but don't see those.  But if they have a patient, they will bring me the patient and handle the images on their own.

However, I don't know a number of how many cyber tips go out there and how each law enforcement functions and what the different state laws and UCMJ may be saying now, so I follow law enforcement's leads since they know their local policies and procedures and laws.

Q    Do you understand that at least some of the time that you work with law enforcement in providing an opinion about the age of an individual and an image, that the individual will never be located?

A    I believe that that is probably true very

often but I don't know a number.

Q    Does it follow, then, that you understand that a lot of times the investigation is into potential charges for possession of child pornography?

A    That can happen.  That is really not my interest.  It is in finding the local victims which is the reason that I participate.

Q    Did Detective Preston ever tell you what she was investigating with respect to any of the photographs she showed you?

A    All I knew is this was a National Center For Missing and Exploited Children cyber tip, and that this law enforcement agency had been chosen because there might be proximity.  I mean, that is all I knew.

Q    And proximity to what, ma'am, or to who?

A    That maybe this ZIP Code or this area of Florida or that that particular office might have a role to play.  I don't know if that's the victim or the possessor or what, but it -- for some reason, the National Center would have picked St. John's Sheriff, and I assume there's a logical reason.

Q    You assist other law enforcement agencies in your general geographic area, correct?

A     Yes.

Q     Like the Jacksonville Sheriff's Office, Nassau Sheriff's Office, that sort of thing?

A     Yes.

Q     Okay.  Same --

A     Clay.

Q     Clay, right.  Same type of work, different law enforcement agencies with a different jurisdiction?

A     Yes.

Q     You understand that when these agencies come to you and ask you to provide your opinion on the appearance of an individual in these images, that they are going to use that opinion, at least in part, in their decision-making moving forward; is that correct?

A     Yes.

Q     For example, if they are going to decide whether or not they are going to seek a search warrant, they might use your opinion in that decision; is that correct?

A     Yes.

Q     In getting the search warrant, they might tell the Judge, "We have shown this image to Dr. Dully, she has these qualifications, and it was

her opinion that the individual appeared to be of X or Y age."

Do you understand that that happens from time to time?

A     Yes.

Q     You understand that if you would have looked at any of these pictures and said to Detective Preston that the individual -- let me -- let me start my question all over again.

If law enforcement comes to you and you give an opinion that you believe the individual in an image appears to be 18 years or older, that that would impact the course of the investigation?

A     Yes.

Q     Have you ever been deposed in any other case involving your opinions as it relates to the appearance of individuals in an image?

A     I have testified to them. The military doesn't do depositions. They do Article 32s. And California doesn't do depositions. I did three in 20 years there.

So, no, I was probably never deposed in these cases, but I was testifying in a handful of them.

Q     And in those cases, were any of those of

situations where the individual in the image was not found?

I can ask that in a different way. Were these possession of child pornography cases?

A    To my knowledge, yes.

Q    Okay.  To your knowledge, was anybody -- law enforcement, anyone else -- ever able to locate the individuals in these photographs?

A    Not to my knowledge, no.

MR. CARSON:  Dr. Dully, that is all the questions I have for you.  Thank you very much.

THE DEFENDANT:  Thank you.

MR. WILSON: All right.  This is John Wilson for Dr. Dully.  I just have a couple questions for you.

CROSS-EXAMINATION

BY MR. WILSON:

Q    The first is: Do you know the Plaintiff in this case, William Lee Lawshe?

A    No.

Q    After April 5th when you provided your letters to the detective on this case, did you have any further involvement in the case at all?

A    No.

Q    When was the next time you heard about the

case after you authored your April 5th letters?

A     In the Spring of 2024, I was told there had been an article in the newspaper about this particular case, and that's all I knew.

Q     So you didn't participate in a search warrant?

A     No.

Q     And you didn't participate in or were consulted beyond your letters in any sort of decision to make an arrest or file a charge?

A     Not at all.

MR. WILSON: Thank you.  That is all the questions I have.

MR. ROBERTS: I just have one -- kind of a follow-up with maybe one or two questions.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q     But, Dr. Dully, if you were told in this case after rendering your opinions that the models in question had been located and identified and that a licensed attorney in California who was a records custodian had produced age verification information, the dates of the photographs that established that the models were 18 at the time of the images, would you have testified in that case consistent with your

opinions that you wrote in these three letters?

MR. WILSON:  Object to form.  But go ahead.

MR. CARSON:  Join.

A    I would testify about my work, yes.  But I would concede that I am not the end of the case at all and not part of the investigation determinations.

MR. ROBERTS:  Okay, thank you.  I don't have any other questions.

So we'll order a transcript.  And do you guys want to read or waive, Mr. Wilson?

MR. WILSON:  Do you know what that question is?

THE DEFENDANT:  Oh, I always waive.

MR. WILSON:  Okay.  We'll waive.

THE VIDEOGRAPHER:  Any other transcript orders or video orders, Counsel?

MR. WILSON:  Yes.  One for John Wilson, Dr. Dully's transcript.

THE VIDEOGRAPHER:  We are off the record at 5:06 p.m.  This concludes the deposition.

COURT REPORTER:  Mr. Wilson, are you ordering a copy, then, of the transcript?

MR. WILSON:  Yes.

COURT REPORTER:  Mr. Carson, do you need a copy?

MR. CARSON:  No, ma'am.

(Continued video Zoom deposition concluded at 5:10 p.m.)

                                    *   *   *

CERTIFICATE OF OATH

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH    )

I, Deborah J. Guest, RPR, Notary Public, State of Florida, do hereby certify that the witness, KATHLEEN M. DULLY, M.D., remotely appeared before me on June 18th, 2025, and was duly sworn and showed her work identification.

Signed the 25th day of June, 2025.

*Deborah J. Guest*
_____
Deborah J. Guest
Notary Public, State of Florida
Commission Number:  HH 280696
Expires:  August 6th, 2026

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH   )

I, Deborah J. Guest, RPR, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the continued remote video deposition of KATHLEEN M. DULLY, M.D., that a review of the transcript was not requested; and that the foregoing transcript, pages 4 through 87, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this the 25th day of June, 2025.

_____
Deborah J. Guest, RPR
Shorthand Reporter

---

**0**

---

**0**   70:1

**0059**   14:25
15:12
20:9,14,20
21:19,20
24:4 25:4,
16 27:9
28:18
30:20
31:13,16
32:13
33:3,17,19
34:13,24,
25 42:17
43:8 45:21
46:5,19
47:3,7,15,
23 48:17
66:14
68:12
70:9,17
71:2 73:19
74:13
76:19

**0065**   22:5
33:20

**0065(1)**   20:9
24:25
25:4,17
27:9 28:18
33:3,17
34:13 70:9
76:19
77:13

**059**   68:19
77:13

---

**1**

---

**1**   4:19
48:16

**12**   20:5

**15**   20:5

**18**   50:19
52:1,3,7,8
53:21
83:12
85:24

**18th**   6:6

**1950s**   41:1

---

**2**

---

**2**   4:20
64:4,6,11
78:7

**20**   83:21

**2023**   12:3,
14 19:15,
22 20:13
21:11
22:22 26:5
68:23

**20230122_**
**174408duckduck**
**go.jpg**   52:25

**2024**   85:2

**2025**   6:7

**22**   21:13
77:23

**22nd**   12:3
13:23
19:10,15
23:3 33:13
34:8 38:1
50:17

---

**3**

---

**3**   4:21
37:4,6
64:5,7,15

**32s**   83:19

**37**   63:20,22

**38**   63:21,23
64:10,11,
15 65:21

**3:10**   6:6

---

**4**

---

**4**   4:23
18:25 19:4
50:12,16
69:13,16

**4:48**   78:4,5

**4:55**   78:5,7

---

**5**

---

**5**   21:14
50:15

**5:06**   86:20

**5:10**   87:3

**5th**   12:14
18:18
19:12,22
20:13
21:11 26:5
27:8 33:7
34:11
50:24
68:6,11,22
72:8
73:17,19
74:16
75:1,22
77:21,22
84:21 85:1

---

**8**

---

**8-A**   69:21,
25

**8-B**   22:25
23:10,23
24:23

**8-C**   15:3
25:12,16

**8-D**   23:10
24:24
25:12,17

**8-E**   53:1,6

---

**A**

---

**abdomen**
48:14 62:1

**absent**   70:24

abuse 9:10, 14

Academy 39:20

accepted 26:15

accoutrements 25:22

accusatory 43:15,17, 20

acknowledged 36:16,17 46:19

activities 8:25 9:14

activity 8:8

actual 12:24 14:9,20 41:4 42:11 50:7,22 51:20 52:1,5,6 58:6

additional 12:16 19:23 26:7 33:8

administrative 7:15,23

adult 55:16 56:17,22, 23

affidavit 4:20

affirmative 21:10 75:5

afternoon 6:5 78:15, 16

age 12:24 14:9,20 20:6 34:19 41:4 47:12 50:7,19,22 52:1,2,3, 5,6,7,8 53:21,22 58:6 74:4 75:10 79:6 80:23 83:2 85:22

aged 68:20

agencies 79:18 81:24 82:8,11

agency 81:14

ages 69:8

agree 19:14 23:24 25:8 31:13,21 35:8 43:18 49:5,21 61:22,25 67:21 74:10

ahead 18:8

24:19 32:9 47:6 71:20 86:2

allegations 9:15

alter 67:25

alteration 58:2 76:11

alterations 21:9

altered 35:9,11 57:4,12, 18,20 71:14,16, 24 72:12, 24 73:9

altering 13:14

American 9:8 39:20

anatomical 38:10

anatomy 56:1

ankles 23:19

answering 40:12 64:23 65:20,22

answers 40:10 52:23

anterior

16:23 20:12 31:3 35:4,6 37:21 64:18 65:9

apologize 19:7

appearance 13:4,20 14:5,6 16:9,19 17:5 32:10 34:21,22 35:12,13, 14 36:1, 11,12 41:6,7,8, 16 46:1,2 50:4,11,22 52:3,6,8 53:17 56:1 58:7 70:12,13 79:6 82:13 83:17

appearances 51:14

appeared 27:21 83:1

appearing 57:17

appears 15:22 16:5 33:4 34:9 45:22 50:19,21

51:15 55:4,6 58:9,10,18 59:12 70:19 71:1 77:14 83:12

applies  8:15

appointment 12:1

appropriately 40:20

approximately 27:22 29:5 67:23

April  12:14 18:18 19:12,21, 22 20:13 21:11,14 26:5 27:8 33:7 34:11 50:24 68:6,11,22 72:8 73:17,19 74:16 75:1,22 77:21,22 84:21 85:1

area  37:16 38:10,14 47:15,23 48:1,3,4, 10,11,18 51:3,12

55:3 58:12 61:23 62:7,8,12, 23 63:7 81:18,25

areas  48:14

arising  10:3

arms  28:8

arrest  85:10

article  4:20 83:19 85:3

assess  40:14 60:17,21 61:13 75:4

assessing 37:18 39:22 75:3

assessment 39:19 46:16,19 61:7,11 77:22

assist  79:2 81:24

assume  5:9 81:23

assuming 17:22 71:18,22

attached 4:10,17 5:10 15:10

attempting

11:22

attempts 8:19

attorney 10:3 59:18 85:21

attorneys 10:5,6

authored 85:1

―――――――――

B

―――――――――

B06f  22:15, 17

B06fe687 23:21

back  18:19 26:23,25 27:2 37:24 44:5 46:11 65:17,23 68:17 69:10 78:7

background 15:18 28:20 74:2 79:22

bare  28:8

based  17:4 34:19 36:10,11 38:22 45:25 55:12 57:8

65:21 70:11,23

bases  59:5

basic  66:3 67:1,7

basics 52:12,14, 15 66:9

basis  44:12 52:16 57:25 59:4

Bay  53:3 75:11

begin  4:14 6:2

beginning 16:8 58:13

begins  6:7 12:10 63:7,11 78:6

behalf  9:5

belly  13:8 32:2 48:13 52:21

Benjamin 71:4

biological 36:7

bit  31:2 35:25 54:5 60:7 78:25 80:1

black  51:2,
11 55:2

blue  19:6

Board  9:8

body  38:10
48:11

book  39:17,
21 40:8,13

break  31:12
77:25 78:1

breast  37:12
61:14

breasts
52:21
60:10,16,
21 62:17

bring  80:13

bringing
79:18,19

brought
21:7,10
38:1 67:16

building
7:13,16,
17,23

buildings
7:19

burden  58:11

burn  54:17

buttocks
54:5

button  13:8

32:2 48:13
52:21 71:4

—————————

**C**

—————————

California
83:20
85:21

call  5:18
9:9 15:19
51:17
70:17

called  5:17

calls  79:10

camera  23:19

Cameron  6:12

care  56:21

Carson  5:17,
19,20,22
6:21
78:10,13,
17 84:10
86:3,24
87:1

case  4:25
8:15 10:4,
9,13,23
11:23 16:8
17:5 22:25
23:7 44:6
46:23
49:11,15,
18 53:3
83:16
84:19,22,

23 85:1,4,
19,25 86:5

cases  83:23,
25 84:4

Center
81:12,22

chance  11:4
70:4

change  10:5
21:14
31:11
34:18
47:11,12
69:3 77:22

changed
77:19

charge  85:10

charges  81:4

chemical
21:8

chest  48:17

child  8:1,3,
4,6 9:10,
12,14,18
17:14,15
20:2 26:7,
14,16
35:15
50:18
51:1,10,
18,20,25
53:11,14,
15,19
55:1,5,6,

22 56:2
58:9,10
60:6 68:3
71:13,18,
21,23
72:2,15,
18,21
73:8,12,14
74:4 75:9,
12,19,25
76:21 77:1
78:23 81:4
84:4

children
7:21 63:8
67:12
79:19
81:13

chose  14:18

chosen  81:14

chronological
53:20,22

circumstances
10:3,13

clarity  4:17

Clay  82:6,7

clear  13:22
14:3,19
32:5 36:2
45:15,16
50:10
53:12
73:15

cleft  54:4
67:14

client 79:13

clinic 7:16, 17,20

clinical 40:9,15,23

clinicians 40:14

clog 5:22

close 37:13 79:9

closed 15:23

clothes 24:11 28:6,7 29:17

Code 81:18

colloquially 8:17 53:3

color 15:20 28:20

colored 12:6

comfort 78:1

comment 46:21

commenting 13:20

commissure 64:18 65:9

common 31:18

completely 47:20,22 67:3 70:24

composite 4:23

computer 73:10 76:11

computer-based 58:12

concede 75:8 76:18,24 86:5

conceded 76:6

conceding 61:13 74:14 76:14,17

concerns 75:5

concession 61:10,11, 12 62:16

concluded 87:2

concludes 86:20

conclusion 58:14

conducted 6:10 10:11

confirm 20:3 33:8

confirms 34:11

confused 58:4

consistent 28:12 33:11 36:18,19 47:9,11 76:9 85:25

consultation 41:11

consulted 85:9

contacting 18:6,9

continuation 5:8,13,14 9:21 10:18

continued 6:7 76:9 87:2

converse 77:2

copy 19:15 86:22,25

Corporations 10:9

correct 12:3,7,11, 14,20,25 13:4,11 14:10,21 16:2,12 17:1,5,18, 21 18:17

20:16

21:5,12, 16,17

26:1,13,19

30:5,12

31:15

32:8,15

33:9,14,21

34:1,8,13

36:4

37:12,20

38:23

40:6,9,25

43:4

47:10,23

48:5,12

52:20 54:2

60:23 61:9

62:7 64:22

65:15

66:8,18

68:7 70:14

71:2,6

73:17,20,

23 74:13,

19 75:2,

17,23

79:2,7

80:3 81:25

82:16,21

correctly

10:24

11:18

20:22 26:8

50:9 71:7

costume

29:9,12

77:1

**costumes**
29:17

**counsel** 4:3
6:2,15
86:16

**Counselor**
5:12

**couple** 84:14

**court** 6:13,
16,23 7:4
22:7 29:10
44:14,15
86:21,24

**cover** 52:21

**CPT** 11:20

**crime** 18:16

**CROSS-
EXAMINATION**
78:12
84:16

**custodian**
85:22

**cut** 71:19

**cutting**
18:14

**cyber** 80:16
81:13

---

**D**

---

**D2635841644b39
0** 21:21

**D263b** 12:10
22:4

**date** 11:25
19:10
56:6,13,22
67:19

**dates** 11:25
85:23

**day** 32:12
41:25
45:17
73:17
74:15

**days** 32:15
33:5

**debate** 8:10,
13

**debates** 8:14

**Deborah** 6:13

**decide** 79:20
82:18

**decision**
82:21 85:9

**decision-
making** 82:15

**DEFENDANT**
7:3 22:8
27:2,11,14
29:12,22
43:18
59:15,19
64:11 66:1
78:11
84:12

86:13

**definition**
66:7,22

**degree** 17:6

**demonstrative**
4:22

**depicted**
12:25
14:10,21
20:4 21:19
26:11 30:4
41:5 47:15
66:11 71:2

**depictions**
16:20

**depicts**
15:14

**depilatories**
21:6

**deposed**
83:15,22

**deposition**
4:11,18
5:9,11
6:7,10
9:21
10:17,18,
21 11:8
12:19 13:7
15:4,11
23:11
25:13
35:24 36:2
37:5 43:15
50:17

53:1,7
54:14 60:8
61:1 63:20
69:22,24
78:18,25
86:20 87:2

**depositions**
83:19,20

**describe**
63:21
64:16
65:13

**describing**
23:15
45:21

**description**
23:5 66:3,
4 67:2

**designed**
40:14,18,
19,25

**detail** 35:25
37:14

**detective**
4:11 6:21
9:23,25
11:12,17
12:20
13:22 14:4
15:3,11
18:3,16
23:1,10
25:12 26:4
36:22 38:1
44:17 45:2

48:23
49:15,18
53:1,6
68:1
69:21,24
72:10,14
73:1 75:6,
22 77:3,10
78:18
79:24 81:9
83:7 84:22

**detectives**
18:15

**determination**
20:3 69:3

**determinations**
86:6

**determine**
17:8

**determining**
16:10
37:17,18

**develop**  63:7
77:15,17

**developed**
68:20
71:6,7

**developing**
40:20

**development**
13:10
16:16 21:5
32:8 35:5
36:1
37:11,12,

15 51:16
53:14 55:7
58:18
61:14,19,
23 62:21
66:10 76:9

**developmentall
y** 32:18
34:4,16

**develops**
16:23
62:24

**diagnose**
40:21

**diagram**  4:22
37:10,22
38:12
39:5,6
63:13,15
65:16,18,
21 67:7

**diagrams**
16:14,20,
21 38:11
39:9,14,21
40:10
47:19

**difference**
35:25
65:13

**difficult**
62:6

**digital**
10:22
13:14 21:8

**digitally**
57:4,12,
17,19
72:23

**direct**  7:8
15:7

**directs**  9:12

**disagree**
48:21
56:16

**discussing**
4:14 24:24

**discussion**
6:4

**disorders**
40:21

**displayed**
25:17
38:10

**displays**
37:11

**distinction**
36:3

**distributed**
39:1

**distribution**
35:7 36:4,
8,10,24
38:21 66:6

**division**
7:20 8:2,
5,7

**doctor**  6:23

7:10 16:5
70:5 72:17

**doctors**
39:22

**drapes**  28:23

**drawing**
37:10

**dress**  29:20

**dropped**  5:18

**Duckduckgo**
52:19

**Dully**  4:24
6:8,20 7:5
27:20
30:11
40:13 44:1
78:8,14
82:25
84:10,14
85:18

**Dully's**  23:4
24:25
86:18

**duly**  7:6

---
**E**
---

**e-mail**
11:16,24

**e-mails**
11:21

**earlier**
32:14
33:2,4

39:2 48:22
54:14 60:7
63:10,12
66:21

**early**  31:3

**earrings**
26:18,20,
21,22
27:24,25
74:1

**easy**  51:8
79:18

**eight-year-old**
79:14

**electrolysis**
21:7

**emphatically**
58:6

**end**  64:12
86:5

**endeavor**
45:6

**ended**  10:20

**enforcement**
9:14 12:7
18:3 42:25
43:3 78:22
79:2,10,17
80:16,22
81:14,24
82:8 83:10
84:7

**enforcement's**
80:18

**engage**  8:25

**engineering**
8:18

**ensure**  40:19

**entered**  56:2

**entire**  12:10
40:4 64:17
77:2,10

**equipment**
7:22

**establish**
9:18

**established**
85:23

**establishes**
9:11

**et al**  6:9

**Eventually**
73:18

**evidence**
22:25
42:11,12,
15 54:20

**exact**  14:15,
16 21:24
34:20

**exam**  7:21
53:18

**EXAMINATION**
7:8 85:16

**examine**  8:19

**examined**

12:5

**exhibit**
4:14,19,
20,21,23
15:3,11
18:25 19:4
22:25
23:23
24:23,24
25:16,17
37:4,6
50:12,15,
16,25 53:6
69:13,16,
21,25

**exhibits**
4:4,12,17
5:10 23:10
25:12

**experience**
78:22 80:7

**expert**  4:21
21:4 43:3
44:3

**expertise**
13:16 46:9
57:10,14
58:12

**experts**
57:6,22

**explain**  24:6
70:22
71:10

**explained**
12:23 14:8

**explaining**
67:18

**Exploited**
81:13

**expose**  23:19

**exposed**  31:2
47:19,23
48:2,4,7,
10

**exposing**
51:3,12
55:3

**exposure**
32:16
63:17,18
67:3,5

**exposures**
39:25

**extent**  30:1
47:25

**eyes**  15:23
31:1

---

**F**

---

**face**  30:25
52:20

**facial**  32:19

**fact**  9:11
40:24
67:24
69:10

**factor**  16:10

**factors**

37:18

**facts** 10:3, 13

**fair** 4:15 50:5

**faith** 43:12

**false** 45:1,4 72:13

**familiar** 8:21

**features** 32:19

**February** 12:3 13:23 19:10,15 21:13 23:3 27:3,6 33:7,13,25 34:8 38:1 50:17 77:20,23

**female** 15:14 16:11 20:2 22:20 23:25 26:7,10 50:18 51:1,10,17 55:1,4,6 75:12

**females** 39:10

**field** 5:5

**figure** 22:9

**file** 4:9 12:9,10 14:25 20:8 22:2,3,11, 14,16,17, 21,24 23:3,15,16 68:9 85:10

**files** 22:2

**fills** 64:17

**find** 39:14 45:18,19, 24 57:14

**finding** 81:7

**firm** 78:18

**fits** 35:17

**floor** 15:24 23:17 26:12 28:9,10

**Florida** 8:6 9:6,19 81:19

**focused** 53:2

**folliculitis** 60:3

**follow** 33:22 80:18 81:2

**follow-up** 85:15

**forehead** 31:1

**forensic**

7:14 8:5, 12 49:11, 14,16,17

**forensics** 8:9,17,22 9:9

**form** 4:11 16:2 18:8 20:18,21 32:9 36:25 41:18 43:14 48:20 55:17 59:13 86:2

**formed** 68:13,22

**forward** 82:15

**found** 80:12 84:2

**front** 15:12 64:3 65:9 68:7 75:22

**frontal** 53:25 54:3

**functions** 80:17

**future** 59:3

───────
**G**
───────

**gallery** 5:23

**gave** 72:13

**general** 11:9 13:12 81:25

**generally** 31:25 45:1

**genital** 23:19 51:3,12 55:3

**genitals** 13:9 34:23 35:4 37:17 38:15 54:1 62:2,13,18 63:11

**geographic** 81:25

**girls** 39:20, 23 58:1

**give** 7:1 14:8 22:2 45:6 62:15 64:8 83:11

**giving** 53:22 66:4

**Global** 6:14

**good** 6:5 7:10 43:12 54:15,19, 23 58:15 59:16 67:5 78:15,16

**gotcha** 25:4

**grade** 16:15,

16 33:13 34:1,12 60:9 63:23 64:5,6,11,12,13,16,17 65:14,22 66:4,7,8,22 70:18

grades 63:21

groomed 16:25 31:14 32:5 36:21,23 42:6,9,17,19,23,24 43:8,21 45:14,22 66:18,19,20 67:11,25 68:18,21

grooming 16:2 17:9 30:19 31:23 36:18,19 44:4 54:20 73:10

grow 31:25

growing 74:5

guess 11:11 16:10 30:2 42:22 60:14 63:2,3 67:21

Guest 6:14

guys 86:10

---

**H**

habits 47:12

hair 13:9,15 16:2,9,16,19 17:1,5,10 20:12,15,21 21:4,8 30:5,19 31:3,4,19,25 32:8 35:2,5,11 36:1,4,6,8,10,23 37:12 38:22,25 42:6,18,20 43:8 44:4 47:8,9,15 48:1,4,7,10,15 51:15 52:10 53:11 55:7 58:18 60:2 61:19,23 62:21,24 63:7 66:6,25 67:6 68:21 70:23 72:1 73:8 74:1

hair-bearing

65:8

hairstyle 28:1,4

hand 6:24 53:15

handful 83:23

handle 80:14

happen 79:16 81:6

happened 5:19 30:9 68:5 79:16

happening 32:24 50:2

head 60:14

hear 22:7

heard 8:16 84:25

heart 9:16 53:4 75:11

helping 78:22

heritage 73:14

Hey 36:22 59:11

hidden 5:23

hides 47:23

hindsight 43:7

Hodges 6:12

hold 43:2,16

honest 58:4

hope 51:21,23 64:3

hours 42:13

house 29:1,2

housekeeping 5:16

Huseby 6:14

hypothetical 30:3 67:20

---

**I**

idea 24:5,7,9

identification 23:6

identified 15:4 19:1 23:11 25:13 37:7 50:13 53:7 66:5 69:14,22 80:9 85:20

identify 15:9

II 16:15 67:13

III 16:15

20:4 33:17
34:12
35:6,14,
17,25 36:3
37:19,22
38:21
45:25
63:22 66:7
67:13
70:18

image  13:4
15:1,6,10
20:14
21:20,22,
23 22:19
23:5,14
24:25 25:5
26:11 27:6
29:1 30:18
31:20
33:21,24
36:19
37:1,2,25
41:17
45:13,14,
17,21 46:2
47:3,14
48:5,8,16
51:1,10
52:5,11,17
53:2,4
54:7 55:1
56:14 57:3
61:20
62:3,9,11,
12,16 63:2
66:12 67:4
68:19

69:20
71:16
72:5,23
73:11 79:7
80:24
82:24
83:12,17
84:1

images  4:9
10:22
12:25
14:21
17:16
18:4,5
19:24 21:9
24:2 25:1,
6,8,11
26:7 27:8
28:21,24
30:6
33:17,18
34:13 38:4
39:23 41:5
45:12 49:2
58:13
67:22
68:7,14
73:16,18
75:2 76:18
79:5 80:9,
12,14
82:13
85:24

imagine
79:12

immature
30:25

55:13,24
56:1 76:4

impact  83:13

impossible
38:20

include  31:8
45:20
46:6,13
59:4 68:25

included
69:2

Including
40:17

incorrect
33:9

indeterminant
52:2

indicia  29:4

individual
14:21 79:7
80:3,8,23,
24 82:13
83:1,8,11
84:1

individuals
16:11
83:17 84:8

information
59:1 67:3
85:22

ink  37:10

instances
79:1,13

intend  11:14

intended
40:5

interactions
11:10,12

interest
81:7

interject
22:24
24:19

internet
17:17

interpret
51:19,24

interview
23:1

interviews
10:12

introduce
6:15

introduced
11:19

introducing
11:17
76:10

inverse  39:1
63:11

inverted
37:16
65:12,15
66:7

investigate
9:13

**investigating**
  18:16
  26:17
  81:10

**investigation**
  13:25
  17:18,21
  18:7,21
  21:3 41:11
  43:23,25
  44:23
  45:5,7,15,
  16 46:10,
  24 49:20
  58:15
  67:15
  73:15 80:2
  81:3 83:13
  86:6

**investigator**
  49:11

**investigators**
  49:8,10

**involved**
  58:2,16

**involvement**
  84:23

**involving**
  64:19
  83:16

**IV** 16:15
  20:5
  33:13,14,
  18 34:1,12
  35:14,16
  36:1,3,4

  37:19,23
  38:21
  60:9,20
  61:4,8,16
  63:23
  64:5,6,12,
  13,16,17
  65:14,22
  66:8,22
  70:18

─────────────
        **J**
─────────────

**Jacksonville**
  82:2

**job** 9:5,7

**John** 6:20
  23:8 53:5
  70:2 84:13
  86:17

**John's** 81:22

**join** 64:20
  86:3

**journal** 4:19

**Judge** 82:24

**June** 6:6

**jurisdiction**
  82:9

**jury** 63:24
  64:1,3
  75:8

─────────────
        **K**
─────────────

**Kathleen** 6:8

  7:5

**kind** 78:21
  85:14

**kinds** 54:21

**knee-chest**
  63:18 67:4
  68:4 76:21

**knee-to-chest**
  39:10

**knees** 28:8
  32:16
  48:17
  52:22 54:2

**knees-to-chest**
  22:19,20
  23:18,25
  26:12 27:7
  30:19
  33:2,20
  34:7,17
  37:25 38:9
  39:24
  42:16
  47:4,5,14
  48:5
  61:20,24
  62:16,24
  66:11
  68:18
  70:8,17
  76:19
  77:12

**knew** 18:15,
  20 20:14
  49:25
  74:16,19,

  24 75:1
  81:12,16
  85:4

**knowing**
  13:20

**knowledge**
  84:5,6,9

**Krugman** 4:21

─────────────
        **L**
─────────────

**label** 15:13

**labia** 31:1

**labial** 48:9
  53:12,13
  54:4 64:18

**lace** 15:15,
  16 28:9,13

**landing**
  31:18

**laptop** 12:7
  14:25
  24:23
  25:2,16
  27:17
  52:24
  69:23

**large** 17:6
  30:25

**largely**
  19:15

**lasers** 21:6

**law** 9:13
  12:6 18:3

42:25 43:3 78:18,22 79:2,10,17 80:16,18, 22 81:14, 24 82:8 83:10 84:7

**laws** 80:17, 20

**Lawshe** 6:9, 19 84:19

**leading** 16:10

**leads** 80:19

**leaving** 52:22 53:9,10

**Lee** 6:9 84:19

**left** 11:8

**legal** 8:19 9:2,5

**legs** 23:18 28:8 54:6 65:7,10

**letter** 4:11 15:2 19:11,12, 16,20 23:3 24:4 26:3 31:9,11 33:6,13, 16,19,25 34:8,10

50:25 58:17 59:3 68:12 69:1 72:4,7 74:16,20 75:10

**lettered** 4:12

**letters** 4:24 23:4 44:6 59:4 84:22 85:1,9 86:1

**licensed** 85:21

**lie** 72:6

**likelihood** 49:25

**limited** 38:12 39:5 63:14

**lingerie** 15:15,16 28:15,17

**linked** 56:24

**listed** 52:25

**litigation** 6:14 78:19

**local** 80:9, 19 81:7

**locate** 84:7

**located** 7:11 80:10,24

85:20

**location** 29:5 67:24 80:2

**logical** 81:23

**longer** 78:2

**looked** 19:11 22:21 75:2 83:7

**lot** 16:6 81:3

**lots** 39:8

**low** 35:6

**lower** 23:18 48:13 62:1,2 66:1 71:11 76:4

———————————
**M**
———————————

**M.D.** 7:5

**machine** 7:23

**made** 7:25 10:11 13:22 14:3 21:10 36:2

**magazine** 52:21

**major** 8:7 79:22

**majora** 53:12

54:4 64:18

**make** 4:13 13:14 32:25 46:21 63:3 85:10

**makes** 30:18 50:21

**manipulation** 73:10

**manner** 14:19

**marked** 15:3 18:25 19:10 23:6,10 24:24 25:12 37:6 50:12 53:6 69:13,21, 24

**match** 16:20

**matches** 23:5

**Matt** 6:21 78:16

**matter** 6:8

**matters** 5:16

**mature** 60:16,19 61:15,16 67:6

**matured** 42:8

**maturity** 13:3,11

16:11 20:4
32:6 33:14
34:1,22,23
35:6 36:9
37:19
39:19,22
40:15
41:16
43:4,13
60:10,18,
22 61:4
63:22
66:24
67:13
70:18,20
71:11,12
76:5

**Meaning**
  79:10

**means**  8:12
  77:8

**media**  78:6

**medial**  54:5

**medical**
  14:13,20
  16:5 17:4
  46:16,18
  49:16,17
  55:23,24
  79:20

**medication**
  7:22

**medicine**
  8:18 40:23

**meet**  53:12

62:2

**meeting**
  11:22
  12:2,5,19
  13:23 14:4

**Melania**
  70:18
  71:11
  74:12 76:4

**member**  78:22

**met**  10:14
  12:13,22
  78:17

**Michael**  6:18

**middle**  31:20
  53:13

**midline**
  16:22 35:5

**Mikayla**  6:9,
  22

**military**
  83:18

**mind**  49:6

**mine**  14:14

**minora**  53:13

**missing**
  52:12,13,
  15 72:1
  81:13

**misstate**
  20:23

**misstatement**
  54:25

**miswritten**
  23:20

**model**  14:10
  15:14,22
  16:1,24
  17:8 20:14
  21:11,18
  22:20
  23:17
  24:15
  25:24
  26:3,10
  27:23 30:4
  32:5,7
  34:4,21
  38:22
  42:6,17
  43:7 44:18
  45:9 46:7
  48:24
  49:2,6,7
  52:5,6
  60:9
  66:11,15,
  20 67:25
  69:8 70:7,
  8,10,11,
  14,17,20
  72:22
  74:17,25
  75:16

**models**  12:25
  41:4 43:13
  50:7
  85:19,24

**moment**  22:24
  67:9 76:23

**mons**  64:19
  65:8

**months**  33:5
  77:9,12

**mouth**  30:10

**move**  19:5

**moving**  50:24
  82:15

---

**N**

**names**  20:8
  22:24
  39:14
  68:10

**Nassau**  82:3

**National**
  81:12,22

**natural**  36:8

**necessarily**
  30:9
  32:17,23
  40:7 58:14

**needed**  46:9
  59:9

**newspaper**
  85:3

**nice**  7:24

**noise**  79:22

**normal**  71:8

**notation**
  46:13

note  46:20

notice  26:20

number  22:3
46:25
80:15 81:1

**O**

oath  30:12,
13 33:1
70:25

Object  18:8
20:18 32:9
36:25
41:18
43:14
48:20
59:13 86:2

obvious  8:1
13:24 14:2
50:6,21

occurred
57:15
58:15

offer  8:19
9:1,5
12:23 13:2
14:20 32:6
35:12 36:9
43:12
49:14,17
57:16
62:20

offered
44:3,9,17
68:1 77:3

offering
50:6 51:25
52:4 58:6

office  7:14,
15 8:5
81:19
82:2,3

offices  7:21

old-  31:7

older  33:10
53:14
70:11,14,
20 71:1,5,
10 72:18
74:11
75:1,16
76:3 83:12

open  8:10
22:2,3,4,5
23:16 38:5

opening  48:9

opine  79:6

opinion
13:3,10
14:9,20
18:10
31:11
32:22
33:1,9,12
34:12
35:12
36:9,14
41:8,15,22
44:9,12,
17,20

49:16,17
50:5 51:25
52:4 54:18
55:23,24
57:17
58:6,8
62:20 63:3
68:14,17,
22 69:10
71:3
72:19,21
76:3 77:3,
4,10,11,
16,18,20
79:20
80:23
82:12,14,
20 83:1,11

opinions
8:19 9:2,5
11:8,9
12:24
13:18
17:4,20
18:4 32:6
41:4 43:12
49:14 50:7
59:5 60:9
67:25
83:16
85:19 86:1

opportunity
10:16 79:1

orange  15:19

order  86:9

ordering

86:22

orders  86:16

original
12:18 16:7
26:11
30:18
33:24
34:16
35:23
37:25
42:16
47:3,14
48:5 50:16
69:3

originally
25:5 37:3

outfit  74:1

oversimplified
67:1

**P**

p.m.  6:6
78:4,5,7
86:20 87:3

paged  66:1

pages  69:4,6

paragraph
19:14,19
20:11 23:2
51:1 68:13
69:17

pardon  26:6

parlance
31:18

part  8:7,23
  9:4,7
  10:12
  17:20
  18:6,21
  30:3 35:23
  49:20
  67:15
  79:12
  82:14 86:6

parted  23:19
  51:2,3,11,
  12 54:6
  55:2

partial  28:3

Partially
  47:24

participate
  81:8 85:5,
  8

parts  65:8

passport
  56:6,10,
  12,21,24,
  25

past  79:17

paste  19:15

patient
  42:10
  80:13,14

patients
  40:15
  80:11

PD  8:12

pediatrician
  8:12 9:7

pediatrics
  7:14 8:5,
  13,15,23
  9:8,10
  39:20

pelvis  64:20

pen  37:10

people  40:19
  44:25
  56:19 63:3

perfect  5:15

perfectly
  35:18 47:9
  58:24 60:1

person  26:17
  51:19,20
  53:21 58:7
  73:23,24
  76:7,8,14

pertains
  16:11 32:7

photo  21:24
  23:22
  24:1,8
  25:9,21
  27:22 28:5
  30:4,7,8
  42:3
  47:19,20
  67:9,23
  69:3 74:6,
  9,18,19
  75:14

76:20
77:12

photograph
  12:6 13:8,
  14,21
  23:24
  32:11
  38:16,17,
  23 42:17
  46:25
  54:15,19
  56:4,13,22
  57:12
  61:24
  62:25 67:8
  79:7 80:3

photographs
  10:21
  11:13
  12:16
  27:24 28:2
  33:8 34:19
  40:10 42:6
  64:25
  75:21 77:4
  81:11 84:8
  85:23

photos  20:8
  80:8

pick  11:9

picked  81:22

picture
  24:16
  34:7,16,17
  56:7,9,10

pictures
  41:24 69:7
  79:5 83:7

pin  18:24

pink  15:15,
  16 28:9,
  12,17

pixilated
  54:12

place  33:19

Plaintiff
  6:19 84:18

plaintiff's
  4:21 18:25
  19:4 37:6
  50:12
  69:13

plants  29:1,
  2

play  18:1
  81:20

played  64:2

plow  5:5

point  11:16,
  19 42:22
  65:11,18

policies
  80:19

pornographic
  18:5 41:5,
  17

pornography
  40:3 81:5

84:4

**portion**  54:6

**position**
23:18,25
26:13 38:9
39:24 40:1
76:21

**positioning**
38:22
39:10
48:11

**positions**
39:12

**possession**
81:4 84:4

**possessor**
81:21

**possibility**
13:13,17,
19 17:3
31:14,22
36:18
66:17,19
67:10,24
74:17,25
75:1

**possibly**
36:9 68:18
74:12
80:4,5

**potential**
18:16 81:4

**potentially**
47:12

**practice**  9:1

**predicated**
77:4,11

**prepared**  5:1

**prepubertal**
51:9

**prepubescent**
56:8 70:21
71:12

**present**
20:12

**presentations**
47:9

**Preston**  6:9,
22 9:23,25
11:12,17
12:20
13:23 14:4
26:4 36:22
38:1 44:18
48:23
49:15,18
68:1 72:14
73:1 75:6,
22 77:3,11
78:18
79:24 81:9
83:8

**Preston's**
4:11 15:4,
11 23:1,11
25:13
53:1,7
69:22,24

**presume**

56:18

**pretty**  50:10
74:3,5

**previous**
10:6 20:3

**previously**
15:3 18:25
23:10
24:23
25:12
37:6,9
50:12 53:6
69:13,21

**prior**  5:8
9:21 10:17
11:5 13:7
14:7 16:7
33:8,12
77:13

**procedures**
80:20

**proceed**
46:25

**proceedings**
9:2,5

**process**
17:10
20:22

**produced**
85:22

**prominent**
31:1

**Protection**
8:1,3,4,7

9:12,13,18

**Protective**
78:23

**provide**
41:3,11
58:11
82:12

**provided**
84:21

**providing**
80:22

**proximity**
81:15,17

**pubert-**
61:19

**pubertal**
4:22 76:8

**puberty**  31:4
32:23
40:21 56:2
71:5

**pubic**  13:9,
15 16:2,9,
16,19
17:1,5
20:12,15
21:4 30:5,
19 31:3,4,
19,25 32:8
35:2,5,11
36:1,4,6,
8,10,23
37:11
38:21,25
42:6,17,19

43:8 44:3
47:8,9,15
48:1,4,7,
10,15
51:15
52:10
53:11 55:7
58:18 60:2
61:19,23
62:21,24
63:7 66:6,
25 67:6
68:20
70:23 72:1
73:8

**pubica** 61:19

**pubis** 64:19
65:9

**pull** 14:24
15:6 25:10
26:25 27:6
52:11,18
69:19

**pulled** 15:12
17:16

**pulling** 15:8
52:17,24
69:23

**purpose**
41:2,3

**purposes**
23:6

**put** 29:15,
16,20 30:5
31:14

34:10
45:23
58:19,25
59:2

**putting**
30:10

_____

## Q

_____

**qualifications**
82:25

**quality**
54:15,18

**question** 5:6
14:13
35:19,21,
22 36:20
40:11,12
41:14
44:15 49:5
50:8 56:20
59:14 64:4
65:4,20
67:20 83:9
85:20
86:11

**questions**
8:20 15:7
78:9,20
84:11,15
85:13,15
86:8

_____

## R

_____

**raise** 6:23

**rating** 13:3,
11 16:11
32:7 33:14
34:1,22,23
36:10
37:19
39:22
40:15
41:16
43:4,13
60:18,22
61:4 63:22
66:24
67:13
70:19,21
71:12 76:5

**razor** 54:17

**reached** 10:9
58:15

**read** 12:9
19:19
22:14 26:8
33:6 50:18
51:18
63:23,25
64:5,15
65:5,23
86:10

**ready** 6:2

**realize**
30:11
49:24

**reason** 60:14
81:8,21,23

**reasons**
58:10

**recall** 21:7
48:24
60:11,13,
15,24

**received**
11:16

**recess** 78:5

**recognize**
70:7

**recollect**
11:1

**recollection**
12:19

**record** 4:10
6:4,6 11:5
15:4,8
19:1 23:12
25:14 32:5
37:7 43:17
50:13 53:7
69:14,22
78:3,7,21
86:19

**records**
85:21

**red** 15:18

**redacted**
15:10

**REDIRECT**
85:16

**refer** 4:8,12
39:7

**reference**
24:4

referenced
  23:2

referred
  31:18  40:8
  53:3

referring
  7:18  19:25
  24:17
  39:18
  40:13

regard  40:22

regular  47:7

related
  14:17,18
  55:15

relates
  83:16

relevant  5:7

reliable
  12:24  14:9
  41:4

remember
  11:20
  14:15  75:3

remembering
  75:13

remotely
  6:10

removal
  17:10
  20:21  21:8

removed
  20:15  36:7

render  18:4

rendering
  13:18
  85:19

repeat  29:11

report  23:21
  45:20  46:6
  58:25

reporter
  6:13,16,23
  7:4  22:7
  29:10
  44:14,15
  86:21,24

reports
  10:23
  24:25  50:8

represent
  6:14  45:22

representative
s  9:23

represented
  76:13

represents
  78:18

request
  49:19

requested
  41:12

required
  41:12  58:2

respect
  81:10

rest  62:13

restate
  20:24  21:1

resulting
  80:2

review  10:17
  11:4  49:2
  52:17

reviewed
  11:21
  12:16
  67:19

reviewing
  11:12
  17:16

Roberts  4:5,
  7,19  5:4,
  14,25  6:3,
  18  7:9
  15:5  19:2
  22:13,23
  23:8,13
  24:21
  25:3,18,19
  26:25
  27:5,18,19
  29:13,24
  37:8  38:2,
  6,7  43:16,
  19  44:16
  50:14
  53:5,8
  54:9
  59:17,20
  64:10,14
  69:15

70:2,3
  77:24  78:8
  85:14,17
  86:7

role  17:25
  81:20

room  7:12,
  24

rooms  7:21

roughly
  37:10

rule  42:9

---

**S**

scene  11:11

science  8:18

scientific
  12:24
  14:12

scientifically
  14:9

screen  5:2
  15:21  19:3
  24:22
  25:2,16
  26:23
  27:17

screenshot
  52:24

search
  82:19,23
  85:5

seek  82:19

send  11:24

sentence
  20:7,10
  51:6,18

separate
  75:10

sequence
  71:8  75:19

set  11:11,
  22  77:1

setting
  40:16

sexual  13:3,
  11  16:10
  20:4  32:6
  33:14,25
  34:22,23
  36:9  37:19
  39:19,22
  40:14
  41:16
  43:3,13
  60:10,22
  61:3  63:21
  66:23,24
  67:13
  70:18,20
  71:11  76:4

shaking
  60:14

shape  64:18
  65:7

share  19:3
  37:3  50:15
  63:19

69:16

sharing  4:3

shave  55:14,
  22,25
  58:22,23
  59:9,12

shaved
  20:11,14
  21:12,19
  30:5  31:22
  36:13
  44:7,10,
  18,22
  45:10,11,
  13,17,23
  46:4,7,15,
  20,22  47:1
  55:10  56:1
  58:19
  59:8,10,
  12,21,22,
  24  72:6,
  11,23
  73:2,3,6,
  11  74:18
  75:7

shaven  16:25

shaving  17:9
  46:14
  54:20

Sheriff
  81:22

Sheriff's
  82:2,3

shoot  21:24

24:1,8
  25:9,21
  27:22
  30:4,7,8
  42:3
  67:10,23
  74:6,10,
  18,19
  75:14
  76:20

show  5:1
  19:9  26:5,
  6  38:12,14
  39:9  47:15
  63:7

showed  12:6
  13:8,9
  56:6,12,15
  81:11

showing
  23:25
  38:18

shown  13:7
  19:23  23:4
  65:18  79:5
  82:24

shows  23:17
  51:1,10
  55:1  63:4

sic  33:20
  59:2  68:13

side  25:17
  27:17
  65:10
  67:14

signs  60:2,4

similar
  39:25

simply  4:8

single  12:5

Sir  44:14

sister  73:14

sit  43:6
  76:2

sitting
  23:17
  26:12

situations
  84:1

six-year-old
  79:13

skin  58:24
  60:1

small  27:15

smooth  58:24
  60:1

sole  67:2

solemnly
  6:25

sort  7:15
  17:9,10
  31:23
  40:21
  76:11  82:3
  85:9

sounds  59:11

source  67:2

speak   11:11

speaks   63:2

specialize
  8:14

specifically
  72:4

specifics
  11:20

spoken   9:22,
  25 10:2,6

Spring   85:2

St   81:22

stage   64:24

stages   4:22
  37:11
  39:19
  40:20

standing
  54:1

start   83:8

starting
  64:1

starts   22:4

state   9:6
  34:11
  80:17

stated   58:11

statement
  21:10,15
  34:18
  45:1,4,5
  46:24

60:18,24
  72:13 75:5

statements
  10:11 18:1
  22:22 45:6

statute
  9:11,16

stay   5:23

stomach   62:3

straight
  32:1 35:1

strike
  24:13,14

strip   31:19
  47:8

stuff   53:9
  54:17

subject
  10:22 34:8
  70:8

subpoenaed
  9:3

subsequent
  27:8 67:8

subspecialty
  8:17

substantially
  77:5,7

sued   78:19

suggested
  35:10

suggests

35:9

support   9:13

supposed
  22:6 65:11

surmise
  18:2,6
  49:1

surmised
  18:18

suspected
  49:3

swear   6:16,
  25

swore   30:14

sworn   7:6
  30:17

Synchronoss
  10:8

---
**T**
---

table   53:18

takes   38:3

talk   25:6
  37:2 46:3

talked   16:6
  37:14
  50:3,4
  60:7 62:4
  80:1

talking   8:2
  11:8 25:5
  27:2,5

32:21 40:5
  45:12,21
  50:22
  53:25
  62:17 72:7

Tanner   41:1

teach   66:9

Team   8:2,3,
  4,7 9:12,
  13 78:23

Teams   9:18

technique
  76:11

teen   53:14

telling
  18:13
  30:15
  43:20
  53:23

term   9:9
  76:10

terms   34:19,
  23

test   40:4,
  24

testified
  7:6 12:18
  20:20
  32:13 34:3
  37:9 50:5
  54:14
  58:21
  70:25
  72:17,20

74:7,11
75:15
78:24
83:18
85:25

testify  86:4

testifying
 42:20
 53:20
 72:12
 83:23

testimony
 6:25 14:3,
 7 16:7
 20:23
 21:18 23:7
 33:1 39:2
 42:12,24
 48:24
 58:5,12
 59:2 60:11
 63:6,10,12
 66:22
 71:15
 73:5,7

thighs  13:8
 51:3,12
 55:3 62:2
 64:20

thing  34:20
 47:13 62:5
 82:3

things  21:9
 32:19
 54:16,21
 60:4 76:17

thinking
 75:13

thought
 35:24
 73:22,25
 74:11

time  9:22
 10:19 24:1
 25:9 27:22
 29:6,15,
 16,21 30:9
 32:17 38:3
 43:1 46:12
 49:23,24
 60:8 65:25
 67:9,23
 68:8,11
 69:18
 71:5,6
 73:22
 74:4,20
 76:23
 77:13
 78:17
 80:22 83:4
 84:25
 85:24

times  68:15
 69:7 77:5,
 6,8,16,17
 81:3

tiny  31:2

tip  81:13

tips  80:16

today  4:4
 7:1 10:19

11:2,5,10,
15 14:7
19:23 25:6
26:6 30:12
34:3 42:12
43:7 44:21
55:23
58:21
72:11
75:4,15
76:2

today's
 10:17

told  13:2
 26:4,14
 35:15 45:2
 48:23
 56:11
 65:14
 72:10 73:1
 75:12
 80:11
 85:2,18

tone  15:20
 43:14

top  48:9
 51:2,11
 53:2 55:2

transcript
 10:17 59:2
 63:20
 86:9,15,
 18,22

treatise
 40:9

triangle
 37:16 39:1
 63:11
 64:17
 65:2,12,15
 66:5,6,7,
 11,14

true  19:17
 38:8,24
 40:7
 44:19,20
 45:3 46:13
 80:25

truth  7:1,2,
 6 30:14,17

truthful
 45:6

turn  78:9

turned  75:9

type  34:20
 82:7

typed  34:2

---

U

---

UCMJ  80:17

ultimate
 67:25

underscore
 70:1

understand
 10:23
 11:18
 20:22 32:4
 44:25 45:1

50:9 64:3 71:7 76:1 80:21 81:2 82:11 83:3,6

**understanding** 79:21,23

**underway** 46:11

**underwear** 51:2,11 55:2

**uniformity** 35:8

**uniformly** 32:3

**unit** 78:6

**University** 8:6

**untrue** 21:15

**utilized** 16:1 17:9

---

**V**

**valid** 56:25

**validate** 26:15

**verification** 85:22

**Verizon** 10:8

**version** 33:20

70:14 71:11 74:12 76:3

**versus** 6:9 56:10

**vertical** 47:8

**vertically** 54:1

**victim** 81:20

**victims** 81:7

**video** 79:7 86:16 87:2

**videos** 79:5

**view** 15:1 30:22 35:16 37:21 38:13,19 39:3 47:21,22, 23 53:12, 25 70:23

**viewed** 27:8

**views** 28:3 47:18

---

**W**

**wait** 51:23

**waive** 86:10, 13,14

**wall** 28:20

**wanted** 63:13

**warrant** 82:20,23 85:6

**wax** 57:2

**waxed** 16:25 20:15 57:1 59:25 72:23

**waxes** 21:6

**waxing** 17:9 54:20

**ways** 4:13 35:10

**wearing** 15:15 24:10 26:18,21 27:23 28:6,17 29:21

**weeks** 33:5 77:9,12

**well-exposed** 62:14,18

**wider** 65:10

**William** 6:9 84:19

**Wilson** 4:3, 6,16 5:1, 17,21 6:20 10:7 18:8 20:18 22:23

24:19,22 25:10,15 27:1,4,12, 16 29:23 32:9 36:25 38:4 41:18 43:14 48:20 52:23 54:8 55:17 59:13 64:8 69:23 84:13,14, 17 85:12 86:2,10, 11,14,17, 21,23

**woman** 13:11 43:21

**wooden** 23:17 26:12

**word** 8:22 14:12 51:5

**words** 14:11, 12,14,15, 17,18 30:10 64:22

**work** 79:12 80:22 82:7 86:4

**working** 27:13

**write** 33:7 59:22

```
writing   14:5

written   4:24

Wrong   63:1

wrote   33:25
  50:8 51:1
  59:8 68:12
  74:15,20
  86:1
```

### X

```
xerox   7:23
```

### Y

```
YCBL   72:10

YCBLVVFQ
  69:19,25
  73:20

year   32:24

years   10:25
  14:14 20:5
  32:21
  83:12,21

young   31:5
  40:19
  79:15

younger
  30:22,23
  32:17,18,
  21 33:10,
  19 34:4,5,
  9,16 50:19
  68:4 76:22
```

### Z

```
ZIP   81:18

Zoom   6:11
  54:7,10,11
  87:2

Zoom/
conference
  7:24
```

# Doc. 85-12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,

       Plaintiff,

vs.                  CASE NO.: 3:24-cv-00044-MMH-MCR

MIKAYLA PRESTON, in her
individual capacity as a detective for
St. Johns County Sheriff's Office,
and KATHLEEN DULLY, in her individual capacity
as medical director of the UF Child Protection Team,

       Defendants.
_____/

DEPOSITION OF DR. SCOTT KRUGMAN

Taken on Behalf of Defendant

DATE TAKEN:    July 16, 2025
TIME:         8:04 a.m. - 9:30 a.m.
PLACE:        Zoom

Examination of the witness taken before:

CLARA C. ROTRUCK, Court Reporter
For the Record Reporting, Inc.
1500 Mahan Drive - Suite 140
Tallahassee, Florida 32308

FOR THE RECORD REPORTING, INC. 850.222.5491

1

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:
Michael K. Roberts, Esquire
Law Offices of Nooney, Roberts, Hewett, and Nowicki
1680 Emerson Street
Jacksonville, FL 32207
904-398-1992
mroberts@nrhnlaw.com


On behalf of the Defendant Kathleen Dully:

JOHN ALEXANDER WILSON, ESQ.
Howell, Buchan, & Strong
2898 Mahan Drive, Suite 6
Tallahassee, FL 32308-5462
850-877-7776
johnwilson@jsh-pa.com


On behalf of the Defendant Mikayla Preston:

MATTHEW J. CARSON, ESQ.
Sniffen & Spellman, P.A.
123 N. Monroe Street
Tallahassee, FL 32301
850-205-1996
mcarson@sniffenlaw.com

INDEX TO WITNESS

WITNESS                                              PAGE
DR. SCOTT KRUGMAN
          Examination by Mr. Wilson                  04

          Examination by Mr. Carson                  41

          Examination by Mr. Roberts                 48

          Further Examination by Mr. Wilson          57


                        * * *

Certificate of Reporter                              60
Read and Sign Letter                                 61
Errata Sheet                                         62

                        * * *

D E P O S I T I O N

Whereupon,

DR. SCOTT KRUGMAN

was called as a witness, having been first duly sworn to speak the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. WILSON:

Q    Good morning, Dr. Krugman.  My name is John Wilson.  I represent Dr. Dully in this case.

Have you had your deposition taken before?

A    I have.

Q    Well, this will be undoubtedly just like the others.  I'm going to ask you some questions.  The court reporter will be taking down all of your answers.  So it's important to answer questions audibly, not with head nods or "uh-huhs" and "huh-uhs" because those are very hard to transcribe.

If you don't understand the question I've asked you, I'm happy to rephrase it until we get on the same page.

And if you don't know the answer to a question -- we're not here to have you guess -- just let me know you don't know and we'll move on to other topics.

And I don't want anyone to be uncomfortable while we're doing this process. So if you or anyone else needs a break, please just let me know. We'll stop questioning for a minute, go off the record, and then come back on when everyone's ready.

Dr. Krugman, can you state your full name for the record for me?

A    Scott Daniel Krugman.

Q    Sorry.

A    (Inaudible).

Q    Can you tell me how -- no, you don't need to spell it. We got your ID upfront. I'm sure the court reporter took it down.

Can you tell me how you're employed?

A    I am employed by the Sinai Hospital of Baltimore in Baltimore, Maryland.

Q    And how long have you been working there?

A    I have been at Sinai since 2018.

Q    All right. And are you licensed as a physician?

A    I am.

Q    In what states?

A    Maryland.

Q    Just Maryland?

A    Just Maryland.

Q    All right.  Have you ever had any discipline or public complaints against your medical license?

A    I have not.

Q    Okay.  And I got your CV.  I can tell you're very credentialed, but what I couldn't tell is how much time you're spending in clinical practice these days, what kind of patients are you seeing?

A    Yeah.  So for the past year and a half, I have primarily been doing outpatient general pediatrics one to one and a half days a week in clinic.  Additionally, I do child abuse consults whenever they come up for the hospital.

Q    And when is the last time in your career you really considered yourself full-time clinical medicine?

A    I'm not sure I was ever full-time because I was always about 50 to 60 percent clinical, even right after residency in a faculty position.  So, I mean, it was a full-time job, but with teaching and administrative work, I've always -- I had always been 50 to 60 percent until this past year and a half.

Q    And has that always been pediatrics?

A    Correct.

Q    And when we noticed you for a deposition, we attached a little Schedule A to that and asked you to bring some stuff with you.  I talked to Mr. Roberts

about that, and what we got back is a single journal article by the name of "The Difficult Issue of Age Assessment on Pedopornographic Material," we got your list of cases that you've participated in, I think we've got your CV and your fee schedule and your expert report, along with Dr. Dully's three reports, which are short one-pagers in the form of letters, and then Dr. Dully's depositions, her two-part deposition.

Did you rely on any other materials in the preparation of your report?

A    I didn't rely on any, but I did bring up a couple of the references in the article.  So I have two other articles that I've looked at that I can forward to you that are very similar.

Q    All right.  Yes, I would like copies of those, and we can talk about those articles a little bit later on in the depo.

You mentioned in your report emails from some Listserv discussion.  Do you have copies of those available?

A    No, I did not make copies of the emails because that violates Listserv policy.  I reviewed them. I didn't make copies.

Q    Talking about them doesn't violate Listserv policy?  What is the Listserv policy then?

A    My impression of the Listserv policy is that we are not to take emails and provide them to outside sources.

Q    Isn't that kind of functionally what you've done by paraphrasing it into an expert opinion?

A    Maybe.  I don't know.  I guess I might find out if somebody reports me to the Listserv that I've highlighted and that is determined to be such.

Q    All right.  Well, we'll talk about the Listserv and the contents based on your memory a little bit later.

So has anything you have reviewed since you authored your original report changed your opinions in this case?

A    No.

Q    Okay.  Have you developed any new opinions in the case based on your review of new materials?

A    No.

Q    So what we've got written in your report, the Paragraphs A through K, that's the sum of your opinions on this case?

A    Correct.

Q    Have you reviewed any images in preparation of this case?

A    I have not.

Q Okay. So you're well aware that this is a case about the review of some child sexual abuse material and you have not looked at those images?

A Correct.

Q All right. Tell me about your board certifications.

A Originally board certified in general pediatrics in 1999, and then I was board certified in child abuse pediatrics in 2012 and I've been recertified ever since then.

Q And in -- especially in child abuse pediatrics, is sexual exploitation of children covered in that curriculum?

A It is.

Q And is production and dissemination of child pornography covered in that curriculum?

A Not in the sense of -- like as a part of sexual exploitation, but not like the details of how pornography is done, and it's not a major part of it, let's put it that way.

Q Sure. Sure. I don't mean that you get a seminar on the porn industry itself, but handling victims of the system, is that discussed?

A Yes, it is.

Q Okay. And is it commonly understood in your

field that cases involving children who are -- are brought in unlawfully to the pornography industry, is that considered in your field to be child abuse?

A Yes.

Q And because of this Listserv discussion, I assume you know something about Dr. Dully prior to being involved in this case. Have you ever spoken to her before?

A We've been at conferences together, and I know -- I think I might be able to -- like if I had a room and saw her, I might be able to recognize her, but I don't know her well or don't know her -- I just know she is one of the child abuse pediatricians in the Florida system.

Q Okay. And prior to reviewing this case and looking at this materials, were you familiar with her name?

A Yes.

Q You would have seen it on the Listserv probably?

A Yeah, and at conferences.

Q And at conferences? Okay. And she has the same board certification as you do, correct?

A Correct.

Q So she would receive largely the same training

through that curriculum and be aware of the same standards for that board certification?

A     Yes, absolutely.

MR. ROBERTS:  Yeah.  I'm going to object to that question, but yeah.

BY MR. WILSON:

Q     So let's talk a little bit about this Listserv and the conversation.  What is the purpose of this Listserv that you all are on together?

A     It's to have peer discussion and evaluation of -- like for those of us -- it's all child abuse pediatricians, and if you have a case that's complicated or want to throw a question about -- let's call it like a procedural thing or how do you relate with that or -- it's a wide range of things.

Additionally, a lot of articles come through. Somebody often puts in a new article that come out.  And then there's some professional discussions about expert witnesses, have you worked with this one and how they testified.  So it's pretty wide-ranging.

Q     So is it fair to say it's just a general peer support, Listserv?

A     That's a much more succinct way of describing it.  Thank you.

Q     And in your discussions in that Listserv, do

they carry any weight with the specialty board or the state boards?

A No.

Q And do you set actual medical policies within that Listserv that you all then follow?

A No.

Q Do you debate appropriate standards of care?

A Typically not. I mean, people might express different opinions about things, but I'm not sure that's the -- that's not the location where standard of care is determined. That's more of an American Academy of Pediatrics/American Board of Pediatrics function.

Q Okay. And as far as your comments on this case, can you tell me how this subject came up and who participated in the discussion?

A On the Listserv or --

Q On the Listserv.

A It did not come up on this list. When I was asked about this case, I remembered that there had been discussions on the Listserv about making judgments about pornographic pictures with one -- if you have just the genitals or just the breasts or with one image. That's where it came up, and there was discussion around that. And so I remembered that there was discussion around that and people were uncomfortable doing that, and

that's -- that was it.

Q    And do you remember who those people were?

A    The ones who posted about it?

Q    Both.

A    I think it was somebody from Vermont, there was a colleague of mine from Maryland who commented, and I think that's -- I don't remember who else -- if there were other replies around it.

Q    Did Dr. Dully reply?

A    No.

Q    About how many emails per week does this Listserv generate?

A    Five to 10.

Q    Do you have any way of knowing if Dr. Dully even read those specific emails that week?

A    I do not.

Q    Okay.  And when this was brought up on the Listserv, it was as the result of a practice question, not as a result of reviewing any scholarly articles?

A    Correct.

Q    And how long did the discussion go back and forth before it sort of died out and other people took the floor?

A    I think it was probably like three or four emails.  It wasn't a lot.

Q   Over a period of just a day?

A   Couple days, yeah.  A day or two.

Q   A few days?

A   Yeah.

Q   Okay.  Was any consensus reached as the thread kind of closed down?

A   I mean, I guess each person who read the thread probably could have their own take on it, but my feeling from that was there was a lot of reticence to use one image to make a conclusion.

Q   You do forensic work as part of your medical practice, correct?

A   I do child abuse pediatrics, which includes interfacing with the legal system regularly, yes.

Q   Are you regularly working with law enforcement on investigations in your current role?

A   I'd say in my current role, intermittently, not regularly.

Q   How often in the course of a year would you say "intermittent" is for you right now?

A   I probably am producing reports on abused kids like six to eight times a year.

Q   Okay.  And how do those cases come to you?  Is there a process?

A   Most of them are children who've come through

our hospital who were injured, but a couple are -- I'm being reached out to from either state's attorney's office or law enforcement about a case because they had questions and need an expert to opine.

Q    And this is before charges are filed, or do you have the benefit of that information?

A    It depends on the case.  So some of them are well after charges have been filed, that's a court prep. Other times it's while the investigation is going on and I've done a consult and I need to interface with them and have multidisciplinary meetings to discuss what the next steps are and things like that.  So it runs the gamut.

Q    Okay.  And when you're doing these consults, be it for law enforcement or the state attorney's office, you're employing all of your medical knowledge and training, right?

A    Correct.

Q    And you're using the medical science that's available to you to guide their investigation?

A    I'm not sure I'm guiding their investigation, but providing input and insight as to, you know, what else needs to be done or taking -- as they do their scene investigation, putting that into -- it's like a -- it's a two-way street.  I don't think "guiding the

investigation" is the right term, though.

Q    Okay.

A    I think we're saying the right -- same thing.

Q    Yeah.  And by virtue of what you just explained to me, you don't consider when you offer a medical opinion on a forensic case, that that's authoritative and controlling for the rest of the investigation and the prosecution, do you?

A    I would hope not.  It should not be.

Q    You would expect law enforcement to do more work on the case than just talk to you?

A    Correct.  Yes.

Q    And as you're working with them, you're operating under the standards that are set by your specialty board and your regular licensure board; is that correct as well?

A    Correct.  Yes.

Q    You mentioned in your report some standards that the child abuse pediatric certification require of you.  Can you just flesh that out for me?  What does that specialty set as your standard of practice when you're doing work like this?

A    I think the key to the -- and I'm trying to think if the right standards are the board *per se*.  The -- our goal as child abuse pediatricians is to provide a

fair and unbiased evaluation of whatever situation comes in front of us and that it's important to make sure that we are -- you know, have honesty, integrity, try to be as unbiased as humanly possible, and state the limitations of any opinion, if there are limitations, and not sort of oversell and try to push an agenda, if that makes sense.

Q   Sure.  And is that your professional ethical standard of what you're doing, or is that adopted somewhere as a standard?

A   There are -- our child abuse society, the Helfer Society, I believe has some guidance around this. I couldn't pull off like off the top of my head which -- whether it's a policy or if it's just a standard operating procedure at times like that or if that's mine.  But I think it's discussed pretty regularly in our group about -- especially in this time, in this day and age where there's quite a bit of backlash against child abuse pediatricians, that we have to do what we can to uphold those things, but I don't think it's written in, like, the board certification guidance of what to do.  You know what I'm saying?  But I do think there are some -- there is some guidance around that. At least that's how I've been trained to do things.

Q   Okay.  Tell me -- I'm not in the child abuse

pediatric circle very often. Tell me about this backlash that you're perceiving.

A So there's a -- are you in Florida?

Q Yes.

A Okay. So the case against All Children's Johns Hopkins about kidnapping Maya and the Netflix series really put the whole system in light of, you know, the doctors are there to take your kid away from you, and that's gained a bit of traction and there's quite a few lawsuits now against child abuse pediatricians, and it's been challenging.

Q And you're aware that this case is a lawsuit against a child abuse pediatrician?

A I am.

Q Have you ever done a law enforcement review of child sex abuse material like the basis of this case?

A I -- probably about 15 years ago I had -- when I worked much more close -- in my prior role, I was the director of the Franklin Square Child Protection Team, which was the acute sex abuse center for Baltimore County from 2000 to 2018. So in that time period when I was doing a lot more sex abuse cases and working closely with law enforcement, there were intermittent times when they'd bring pictures for me to review, yes.

Q And walk me through how you went about

evaluating those images.

A So I think it was probably pretty similar to how Dr. Dully described how the police approached her. They said, "We have these images, we want to show you to them and we need your opinion as to whether or not this was a child or not."

Q And how do you go about answering that question?

A Well, I'd look at the images and try to determine the sexual maturity range and let them know if I could say one way or another if it was a child or not a child. And I think all the ones they showed me, there wasn't a single one that I said I could be certain was a child because I don't remember ever writing a report to say -- because if they did that, I would have had to write a report and stuff, and I don't ever recall writing a report on a case like this.

Q So during that period where you were a CPT doc, every time law enforcement brought photos for you to review for an age determination case, they walked away with no report?

A I don't think it was that many times. So it was probably like three or four times, but I do not recall ever writing a report. I might be -- I could be missing or not remembering one, but I don't remember

ever having said, "This one definitely is a child."

Q Okay. And when you have a situation like that when you're reviewing images, from the perspective of a medical doctor, is it functionally any different than reading diagnostic images for a patient in another context?

MR. ROBERTS: I'm just going to object to the form of the question.

THE WITNESS: Can you -- I'm not sure I understand the question completely.

BY MR. WILSON:

Q Yeah, I'm happy to flesh it out for you.

So in these child porn cases, police come to you with an image and want a medical determination about what that image means. And there are other contexts where physicians take in images, whether it be a radiograph or some still pictures of a rash or something, where they're asked, "Hey, what's going on in this picture? Can you give me a medical determination?"

My question is, given that doctors review images and make medical determinations, is there something grossly dissimilar about that process in the child pornography age review than any other medical setting?

MR. ROBERTS: I'm going to object, but you can

answer.

THE WITNESS: I would say that in the general sense, you're correct, right. So whether I have a child with -- they're showing me bruises or determine -- age determination or here's an x-ray with fractures, it's the same approach.

I think the second layer of that is how you're able to and the scientific backing of your conclusion, and I think when you're dealing with, like, images of bruises, it can be challenging because the camera can distort it a little bit or might look darker than it is in real life. So you have to be cautious and -- I'm not sure "couched" is the right term, but you have to be like "To the degree to which what I've seen, this is what the answer is."

With age determination based on sexual maturity rating, again, if the child is, like, sexual maturity 3 or under, I'm very confident and I'm happy to put this child is under 18. The problem is when they're 4 or 5, you could be that at age 9, you could be that at age 15, you could be at that age 25, and you can't really just go based on those -- the maturity rating alone.

So it's a bit nuanced, but in general, yeah,

it's -- like it's the same approach.

BY MR. WILSON:

Q    And do you do much telehealth?

A    I do a fair amount, yeah.

Q    So, obviously, telehealth has exploded in the last decade, but that prevents a challenge for doctors in that they don't have the patient in the room with them to do the live exam.  It's synchronous or asynchronous video, but it's still practicing medicine based on a digital image consult at the end.  Is that your understanding?

A    Yes.

Q    And as you highlight in your report, and, of course, we're all aware, any digital images and video at the point of our technological savvy in society now can be altered?

A    Yes.

Q    And I think you say directly in your report that there's no medical training that can reliably allow you to determine when and how a digital image or video has been altered?

A    Correct.

Q    So knowing that, that any image could be altered and there's no way for you to know if it's been altered, speaking from a medical science perspective,

you still in your day-to-day practice rely on images; is that correct?

A    I mean, not day-to-day, but we rely on them -- yes, correct.

Q    When the situation calls for it --

A    When the situation calls for it, yeah.

Q    -- and you're looking at bruising?

A    Correct.

Q    And when you're doing those image and video reviews, that's standard medical practice?

A    Yes.

Q    And you're operating under established standards of care?

A    Yes.

Q    And those standards of care apply -- do they apply the same for a photograph in a patient that's in your office?

A    Yes.

Q    And does it change any quality of the actual medical services you're providing that one case of bruising is based on a photograph and another case, you have a patient in your office to evaluate physically?

A    I mean, it can, right?  It might not be as accurate with a video.  So I think that's where the -- highlighting the limitations of the technology and of

what your opinion is based on is super important.

Q   Sure.  And I've read some medical records, maybe not full-time medical record reviewer, but I can't remember a time -- let's say I saw a radiologist consult looking at an x-ray where they wrote in, "The limitation of this image might be digitally altered."  Is that something that's in the mind of physicians as they're doing casework?

A   So, again --

MR. ROBERTS:  I'm going to object to the question.

THE WITNESS:  -- if you are a radiologist, you have set up the system with whoever's taking the x-ray to not have it -- like there's quality control there, right?

So when -- I'll give an example.  If I have a child who Mom's like, "I can't bring the kid in, I need to do telehealth, they have a rash," I'm putting in my report "To the best of -- it looks like this, but I can't be certain."  And I'm going to tell Mom, "If this doesn't work, you need to come in because it can be very hard to tell through a digital image exactly what is going on."

So I think there's a big difference between -- you know, there's a lot of degrees of this, and the

farther away -- like if I'm having a telehealth or a mom's taking a picture and sending an image, you know, sometimes I can see, sometimes like I can't see, you got to come in, which is still me having a direct relationship with the patient and knowing where the image is coming from, but a lot of these -- and if we take this to the child sexual abuse material type stuff, the CSAM material, you don't know where that image is going, you don't know how many times -- who -- I think the risk for manipulation, altering, and things like that is much greater than me having a conversation with Mom on Zoom, right, or Mom taking -- so I think there's a lot of different degrees of this. So I -- but in general, yes, you're correct, but the presumption isn't that parents who are taking pictures of rashes or bruises or radiology techs who are doing images aren't manipulating pictures for a purpose. So that's why they're not putting those things in there, if that makes sense.

BY MR. WILSON:

Q So let's sort of get back to the way you would review child sexual abuse material. You said SMR-3 is an easy case for you?

A Correct.

Q Tell me as a layperson what it means to pass that barrier -- what you're clinically observing that makes a case -- a SMR-3 transition into an unclear area?

A Well, there's nothing -- so when you're evaluating breast and pubic hair -- we're going to go with -- let's go with girls because those are more common victims. The breast development at 3 is there's no -- it would be a rare genetic, weird medical situation where somebody over the 18 had breast developments of 3. Theoretically, it could happen, but it's super, super uncommon, right? Whereas it's more likely for younger kids, because kids are going through puberty earlier, to have Breast Development 3. So I can be very confident that at Development 3, it's a child under 18.

If it's 4, it's pretty likely -- it's more likely than not that they're under 18, but not necessarily. Especially if you just have breasts, there's plenty of 30-year-olds with -- women with Tanner 4 breasts or Stage 4 breasts.

When -- what's important, I think, is the whole picture, like making sure you're able to see completely both at the same time, because when you only have one, you don't know what -- it can make it -- again, if the image has been altered, it could look like

Tanner -- like Stage 1 genitals, and if it's not Stage 1 or 2 of breast development, there's a big disconnect there, something's up.  So it makes it hard.  So you need good images, you need to have the ability to see -- Again, if you have facial features as well, that can help, but, again, I'm not an expert on saying, "That is a face of a 9-year-old, and that's a" -- I don't think there's -- I don't think there's good scientific evidence to state that a certain appearance of somebody's face is a certain age.  That gets more into just hocus-pocus type stuff.

Q   So it's still within the standard of care when you're evaluating the age of a patient in any context to go through the criteria in SMR or Tanner scales in evaluating?  That's still standard of care, right?

A   Yes.  Yes.  It's still -- it's a helpful piece of information, absolutely.

Q   Okay.  But in some cases, it just can't be conclusive?

A   Correct.  And we have to remember two things: One is that Tanner scales were designed for going forward, right, and to make sure kids were making progress.  They weren't designed to go backwards and assign an age to them.

And the second part is the certainty of that

age range. Like for me to see a Tanner 2, I can't tell you if they're 2, 4, 6, 8, 10, 12. Like you can't really give an age, if that makes sense. I think making age range, I think that's why it's like under 18 or -- that would be how I would put it because you just cannot assign an age to -- by an image. It just doesn't work.

Q   Is that the prevailing opinion in the child abuse pediatrics community?

A   I think that a lot of people feel that way, but there are probably others who feel like they have the ability to be a little more precise, but I'm not sure there's good scientific evidence around that, or at least if there is, I haven't seen it. If you have it, please share, but I've never seen anything very specific about that. And when you have -- when you have women who are over 18 with Tanner 4, whatever percent it is, 10, 15, 20, 30, it makes using that very challenging as the -- to have certainty that they're under 18.

Q   So as I understand your answer, the problem, in your opinion, with Dr. Dully's work was not the clinical markers that she used, but, rather, her determination to assign an age range based on those markers?

A   Yes, and the discrepancy between the breast development and the genital development and that not

raising concerns about either the image being altered or the person being shaved or just because it's Genital 1, that is a child in -- you know, I think she put 9 to 13 or something like that. I think that was a bit -- I think that was erroneous. I just -- to be able to have that discrepancy, it just doesn't make any sense.

Q Now, given that discrepancy, do you think Dr. Dully was below the standard of care for an age evaluation, or do you think Dr. Dully is just being too dogmatic?

MR. ROBERTS: I'm going to object to that question.

THE WITNESS: I can't say what -- I think that writing a report that is saying that this child is for sure under 18 when there's uncertainty is -- it's problematic because -- because it has consequences, right? If it was just in a medical chart, you know, and then a year later, it comes out that something's different, that's fine. But when it's being used to go in front of a judge, that's where you have to be -- if you're going to be certain, you got to be certain, and I don't think the -- I don't think that there was enough scientific basis for her conclusion to have the certainty that was in her report.

BY MR. WILSON:

Q Well, taking that, are you able to testify based on your review of the material that Dr. Dully provided deliberately false information?

A No.

Q Are you able to testify that she participated in some sort of conspiracy with law enforcement to achieve a specific result?

A No.

Q Are you able to testify that her report was anything more than negligently applying medical standards?

MR. ROBERTS: I'm going to object to -- and I'm sorry I didn't object earlier to these questions about mental state and mental culpability and that kind of thing. You can answer.

THE WITNESS: I think that's what I would testify to, that last statement, the --

BY MR. WILSON:

Q There's medical negligence?

A Yeah.

Q Okay. And given that you believe medical negligence occurs, can you just state for me and articulate what you believe the bottom line standard of appropriate care for this review should have been?

A   At a minimum in her report, having a line about the potential uncertainty of the images being altered, the child -- or adult in this case -- being, you know, groomed, whether it's waxing, shaving, or whatever, to look like a younger child should have been mentioned.  And, additionally, I do think when there is such a discrepancy between genitals and breasts, you're probably better off not making the conclusion that there -- with certainty that this was a child and that this could be an adult.  And I think if there was hedging, if there -- I don't mean hedging.  If there was some sort of, you know, caveat to these conclusions, that these conclusions are based on what I saw, it just was too concrete and certain given the data that was presented.

Q   All right.  So we've talked a little bit about how you go about doing these evaluations and what the standards are in play.  In Paragraph D of your report, you mentioned that there's "published research that has shown chronological age estimation of models depicted in digital pornographic photographs by physicians is not medically or scientifically supported."  But you've also told me today at SMR-3, it's kind of a different story and you would be comfortable offering an opinion there.

Am I correctly understanding that there's maybe some more qualification to that Paragraph D than

you've given me?

A  Yeah, I think that probably should have been qualified with -- at SMR-4 or 5.  That's probably fair, yes.

Q  So once we're in SMR-4 or 5, it's your opinion all bets are off from a medical certainty standpoint?

A  I don't know if all bets are off, but the degree of certainty goes down substantially and there needs to be -- again, if -- you could come up with a lot of scenarios where, you know, they identify who the person is, they have a birth certificate and they have images, and then you're good, right?  Those probably aren't coming to the doctor, but they might come to the doctor early and say, "Well, it looks like a child, but I'm not a hundred percent sure.  Can you corroborate?" That's where it could be helpful, right?  But to have the image itself and be certain that it is a child, some people might feel comfortable doing that, but I think it's on shaky ground.  That's all I can say.

Q  Okay.  And let's take the image and photograph part out of the analysis for a minute.  If you have a patient come in and you need for clinical reasons to determine their age and you're doing an exam in person with them and they are SMR-4, does that change the reliability of a physician determining the age of that

patient to have them in person and be able to examine them?

A    I'm not sure where -- I mean, I don't think any of us have been trained to determine the age of a pers- -- like it's not -- I'm trying to think of a scenario -- like if someone came in as, like, a Jane Doe in a car crash and someone needs to know an age, you're still just going to be like guessing, right, based on height, weight, size, things like that.  But there is no scenario in which I can think of where I would be like, "Okay, that's a 12-year-old, that's a" -- I don't know if you can.  I mean, there are 12-year-olds out there who look like they're 18, and there's 18-year-olds out there who look like they're 12, and it's really hard. You can't just determine that.

Q    Yeah.  You'd need other information than what you'd get in a clinical patient exam; is that fair to say?

A    Yeah.

Q    And, obviously, because the needs of these kinds of cases is to determine that someone is under 18 to move forward with the prosecution for child pornography possession, promotion, or what have you, is everything we've talked about today on the limitations of aging an image or a patient, is it also true for a

determination that someone is over 18, could you confidently say an SMR-4 or 5 presentation photo was over the age of 18?

A    I don't think -- I mean, no, you can't.  It's -- it goes both ways, and that's the challenge, is that you can have 20-year-olds who can look very much like 12-year-olds -- I think, yes, I would agree with what you said.  It's challenging.

Q    So -- and I know you haven't even seen these pictures, but if you saw these pictures that are the subject of the discussions of this case, would it be medically possible for you to determine that they were over the age of 18?

A    With certainty?

Q    With the degree of medical certainty you expect from a physician doing this kind of review.

A    I would probably say I -- hypothetically, if they're right on that borderline, I would not be able to include one way or the other.  And I think that's probably what my usual response to police in these type of situations is, is "I can't help you."

Q    And that ultimately is the basis of your criticism for Dr. Dully, you believe she should have told them, "I can't help you in this case"?

A    Or "I'm not as" -- or couch the certainty --

yeah. I wouldn't be here if there were a couple lines of, "I'm not" -- you know, unless there's -- you know, if she couched it, there may have been grooming or something -- if she put those things in there, I wouldn't be here today.

Q Gotcha. And you talked about, when we were talking about aging a patient, the possibility of collateral information like passports. Have you gone over the case to the extent that you know that there are passports as evidence related to these images that Dr. Dully reviewed?

A I think that that was in one of the -- in her deposition, that there was mention of that, yes.

Q Did you view any of those passports --

A I did.

Q -- or anything?

Okay. Would it change your opinion to see passports that showed that the images in question had passports showing they were over 18?

MR. ROBERTS: Object to form.

THE WITNESS: I mean, I think it would -- if they're over 18, I think it reinforces my opinion, but I don't think it would change it.

BY MR. WILSON:

Q Would it change your opinion if they had

passports that showed they were clearly under 18?

A    Yeah, because then there would be corroborating evidence that they were under eight- -- I mean, again, I wouldn't be here if that was the case because there would have been -- there would have been a list of things to show that this was a child and her report would have been part of it, not it.  So I think that's the difference.

So I don't think it would change my opinion, but I think, again, it's -- that's where it's super important to have other data or evidence or timestamps or some- -- you know, something to ground the images into an actual timeframe that you can use.

Q    Gotcha.  Let's talk a little bit about the study you've provided that I've had a chance to review the difficult issue of age assessment (inaudible) pornographic material.

So in my lay reading, it looks like a panel of reviewers were given images that were all images of adults --

A    Correct.

Q    -- and asked to do an age determination?

A    Correct.

Q    So there was no possibility that --

A    They actually determined are they over or

under 18.  That was the (inaudible).

Q    Okay.  But there was no -- there was nothing in the panel of images they were showed that was actually under 18, they were all over 18?

A    Correct.

Q    And bringing in a group of pediatricians asking for an over/under age assessment where the only correct answer is over, does that seem to you like you might get a little bit of bias in your results on an exercise like that?

A    I don't -- would you get a bi- -- I mean, I think you could get biased either way like -- so if I'm being brought an image where I'm being told it's a child, then that's going to bias you to child.  If you're told nothing and they're all adults, I think if they said if -- a lot of it will depend on how the question was asked, like "We're doing a study on child sexual abuse materials," and then they bring only 18-year-olds, I would agree with you, yes, that would be biased.  But if they're asked, "Can you make a deter-" -- like it depends on the framing.  I don't know the framing of the question here, but I think the point of the matter is women over 18 can be confused for children under 18.  Whether it's 70 percent or if it's unbiased and asked a different way, it's 20 percent, I

think the point's the same, to be honest with you. But, sure, they could have biased easily how they -- they could have said, "This is child sex abuse material," right, and then that would bias them to think that they're under 18, absolutely.

Q And you're not sure exactly how the question was framed to them in this study?

A No, I am not.

Q Okay. You mentioned you had some other studies. Can you tell me about those?

A They're very similar. One was a systematic review of using these agents where they summarized all the literature. And I can give you the citation.

Q You know, for me, not being in the academic world, it might be easier if you could just give these to Mr. Roberts and he can send me a copy.

A Yeah. I think you might have this one, and I just -- it cited a paper from the U.S., so I reviewed that one, and that's in pediatrics, "Tanner 4 Breast Development in Adults: Forensic Implications."

MR. WILSON: Okay. Yeah, if you could send those to Mr. Roberts, and Mr. Roberts, if you could send them over to us, we'd appreciate that.

THE WITNESS: They pretty much say the same thing that adults can be Tanner 4. That's...

BY MR. WILSON:

Q   Yeah.  And I guess to really simplify it, I don't think anyone's position is that you can obviously know an SMR-4 and 5 one way or the other.  It's hard, difficult work, and maybe it meets the level of scientific scrutiny, maybe it doesn't.  But there are easy child porn cases where they're SMR-3 and under, and there are difficult ones, and different people have different names for those cases, whether they're hard cases, age-difficult (inaudible) --

A   (Inaudible)?

Q   -- indeterminate.  Yeah.  These articles are just reinforcing that general principle that there's a sexual maturity where it is very difficult to determine an age?

A   You summed it up well again.  You're very good at this.  Thank you.

Q   Give me just a minute to take a look at my notes here, but I think I'm wrapping up.

(Brief pause.)

BY MR. WILSON:

Q   All right.  I don't want to belabor this because Dr. Dully was questioned on it at length and she agrees with you, there's no recognized medical method or expertise necessarily in determining whether a model is

shaved or groomed by looking at a digital photograph.

Again, as a matter of qualification, if you can see hair in the photograph, you can have some certainty about shaving; isn't that true?

A   True.  I think the point is if there's no pubic hair, you don't know if there was pubic hair. Like if you can't see pubic hair on the -- but if you see some, like there's a patch here and there's part there, then you know they were shaved, right?  So -- but -- and if they are shaved, then you know that they're at least Tanner 4 probably -- or SMR-4 because they're shaving and grooming certain areas.  So I think it just rules out that they're Tanner 1 if there's shaving going on, and 2 and 3, to be honest with you, because you're not shaving at any of those stages.

Q   Yeah.  And not saying it applies to any of the -- necessarily the photos in question here since you haven't had the opportunity to look at them, but with a sufficiently clear digital image, you could see bumps and follicles that would suggest that shaving occurred? Is that a feeling --

A   You might be able to, but, again, I -- they could be, you know, Photoshop, too, that they're gone.

Q   Yeah.

A   I think if it's there, yes, but in the

absence, you can't say it didn't happen, if that...

Q Sure. Yeah. I just want to make sure we're in agreement that there can be --

A Yes.

Q -- medical markers of shaving or not shaving that can be seen on digital images?

A Correct. Yes, I agree with that.

Q Okay. It's just whether or not they're appropriately observed, characterized, and documented that's the substance of your criticism of Dr. Dully's work?

A Yes.

MR. WILSON: Okay. All right. Dr. Krugman, that's all the questions I have.

Matt, do you have questions?

MR. CARSON: I've got just a couple for you, Dr. Krugman.

EXAMINATION

BY MR. CARSON:

Q My name is Matt Carson. I represent Detective Mikayla Preston, who is also a defendant in this action. I just wanted to ask a couple of clarification questions regarding your time where you would intermittently review pictures as part of your role as director of the child abuse team in Baltimore.

A    Yes.

Q    You said that was approximately 15 years ago?

A    At -- the timeframe when I was doing the primary sex abuse work was 2000 to 2018.  So I don't remember exactly when in that range, but I think it was in the 2010 to 2015 range when I was covering the Child Advocacy Center when I was asked about the images, yes.

Q    Okay.  So just trying to get a picture in my head.  So there was a five-year period, give or take, where you were asked to review pictures, kind of like Dr. Dully was asked to review pictures in this case?

A    Yes.

Q    Okay.  And in the past 10 years or so, you've not reviewed any pictures in that context?

A    Correct.

Q    Okay.  What pictures were you reviewing during that time?  Can you describe the photographs that you were asked to review?

A    I'm not sure I can even remember these.  Like I think they were images of naked women or girl -- I can't describe -- I do not have as good enough memory to remember exactly what I saw that long ago, sorry.

Q    I should have asked my question more artfully than that.  I presumed they were naked individuals or somehow sexually --

A    Yes.

Q    Here's what I meant to ask, and I'll try to ask more for you now:  Did someone come in with printed pictures?  Did someone come in with a computer?  How was it that you were shown these pictures?

A    I was at the Child Advocacy Center, so I'm pretty sure they showed me on a computer screen, if I remember correctly.

Q    Do you remember -- so you were never shown like a 5 by 7 --

A    No.

Q    -- photograph?

You know, I think we're all of the age that we remember a period of time where you would drop your roll of film off at Eckerd's, and two days later, you'd pick up photographs.  But even when you were doing this 10 years ago or so, it was all online or all digital?

A    It was all on a computer, yes.

Q    Do you have any recollection of seeing or learning information about how those images were obtained?

A    No, I did not -- I think it was more, "Can you say with certainty that this is a child, yes or no," and my answer was, "No, I cannot say with certainty," and -- but I did not -- I was not privy or didn't get the whole

this is the whole scoop and all that stuff.

Q   Was there anything on the photographs that you recall that showed whether or not they were downloaded from the internet?

A   I don't have any knowledge of that whatsoever.

Q   Was there any sort of watermark, digital timestamp, anything like that on the photographs that you recall?

A   I don't recall.

Q   And what kind of cases -- if you recall, what kind of cases was law enforcement working on where they would come to you and say, "Hey, could you give us an opinion about the age of the subject?"

A   I honestly don't recall whether -- if it was a -- something they found like on a perpetrator's computer or if it was a report from a national -- I don't recall. It could have been either or both.  I just don't remember.

Q   It didn't matter for purposes of the opinion you were asked to get?

A   It shouldn't, I don't think.

Q   So you don't know if the subject of the photograph was somebody who was in the Baltimore area or in the United States or elsewhere?

A   I have no recollection either way.

Q    And there was no way for you to know based on the information you were given in order to form your opinion?

A    Correct.

Q    You said this in passing, but I picked up on it.  You were talking about different ratings and looking at pictures and opining on the potential age of the subject, and you said, you know, "the child, comma, or adult in this case," and I was wondering -- and you're nodding now.  You remember saying that?

A    Yes.

Q    What makes you so certain that the subjects of the photographs that are at issue in this case are adults?

A    I guess I'm relying on what was presented in Dr. Dully's deposition that the images are of an adult that were taken off the internet and what Mr. Roberts has told me about that.  So that was -- my understanding for the factual base of the case was these were adult images that have been circulating around the internet for a long time.

Q    Okay.  And that's what I thought might have been the basis for your statement, but you don't have any factual knowledge such that you would give an opinion one way or the other as to the age of the

subjects of these photographs at the time the photographs --

A    I am not going to opine on the age of the subject of the photographs at all.

Q    Perfect.  Do you know what happened -- in the cases where you were asked to opine on the age of a subject in a photograph as a member of the child abuse team in Baltimore, do you remember what happened with those cases when you told law enforcement, "I can't help you"?

A    I did not hear any outcomes of those, no.

Q    Did you understand that whether or not you could give an opinion might dictate whether or not a prosecution moved forward?

A    Yeah.  I mean, I think in these type of situations when I'm asked for a report or anything, the assumption is that's going to be used to move forward as part of an evidence package for the judicial process. That's my assumption anytime I'm asked about these things.  So whether or not they went forward without me, I don't know.  It's...

Q    You were never able to give an opinion one way or the other, but during your time and your years of involvement in this area, do you know of situations where coworkers, other members of the child abuse team,

medical folks, medical doctors, did give opinions to law enforcement that they believed -- or that it was their opinion that the subject of a photograph was a child?

A     I honestly don't know.  I'm pretty sure that some of my colleagues have, but I can't say, "Dr. Chudow testified on this case," I just -- we never had those conversations, let's put it that way.

Q     Right.  And I guess my next question is, do you understand that when law enforcement comes to the medical doctors that are part of these teams, or at least as are part of the child abuse team in Baltimore, that they're coming to you because of the inherent difficulty in determining the age of the victim -- or of the subject of the photograph, I'm sorry?

A     Yes.

Q     In other words, you don't know of anybody coming to you with a picture of an obvious --

A     If it's a 5-year-old, I'm guessing they don't need a medical opinion to say it's a 5-year-old, right?

Q     That was my question.  You answered it better than I asked it.

MR. CARSON:  That's all I have for you, Doctor.  I appreciate your time.

THE WITNESS:  Thank you.

MR. ROBERTS:  Doctor, I have just a couple of

follow-ups just to kind of -- and it'll be mixing around a little bit.

EXAMINATION

BY MR. ROBERTS:

Q    But you were asked some questions about the use of imaging in general medical practice by Mr. Wilson.  Do you recall those questions?

A    Yes.

Q    I wanted to -- the question struck me and, you know, I do many types of law and also read medical records, and I see radiologist reports all the time that reference a motion artifact or an inability to read an MRI.  What is a motion artifact and why do radiologists put that in their reports?

A    Yeah.  So that happens a lot in kids because kids don't hold still in the CT scanner or the MRI.  And when there is motion artifact, there's certain images that make it harder to see the details.  So they're doing that to say, "If there is a teeny little brain tumor in that spot I couldn't see, it's not my fault, it's motion artifact."  So they are in a sense hedging their conclusions based on an incomplete image or an image that isn't perfect.

Q    And I know you're not a radiologist, but if there were motion artifact and the radiologist could not

accurately read it, or as you as a physician may actually look at the images yourself and not be able to see -- you know, interpret that, you would expect that rather than relying on an image that was not -- that was affected by motion artifact, you would redo that MRI, generally speaking?

A    If there was clinical concern that you needed to, yes, you would.  So, like, if you were convinced that this child had something and you wanted to make sure and there was more (inaudible), you'd redo it, absolutely.

Q    And sometimes you may be suspicious of a disease or pathology that isn't very well depicted on an MRI; for example, a bleed or a subdural hematoma or something like that.  You might order a CAT scan to see some things differently than you would an MRI, for example?

A    Yeah --

Q    Maybe I gave a bad example, but yeah.

A    The skull fracture is not seen on MRI, but seen on CAT scan.  So that would be a better example.  But, yes, you would order a different test to get a better look at it.

Q    Because some imaging just inherently has limitations in what it reveals?

A    Correct.

Q    All right.  So what I've also seen in reviewing medical records that happens is sometimes, you know, somebody will go in for one condition and -- I assume in your practice, you're familiar with reading radiology reports.  Do I understand that correctly?

A    Right.

Q    There'll be a reason given or a history of present illness or something on there, and it'll say something like "automobile accident" or "back pain secondary to trauma," something like that.  And the radiologist will read an MRI and sometimes tragically will come back with a finding that they weren't expecting.  You hear cases where somebody goes into the hospital for one thing and testing reveals they have a brain tumor and they never really knew it, they didn't even have any symptoms of that.  Are you familiar with things like that happening?

A    Yes.

Q    All right.  And because the radiologists, when they're looking at an MRI, they're not biased or they're not, like, only looking for what is in the history of present illness, correct?

A    Radiology uses a systematic approach to do the entire -- everything, so yeah.

Q   Right.  And the reason I'm bringing this up is because when we talk about medical science -- and I think you testified this earlier -- the goal is to have objective, reliable, scientific opinions when a doctor gives an opinion, correct?

A   Correct.

Q   So if the opinions are greatly affected -- you recall the questions by Mr. Wilson where he says, "Well, you know, the results might be skewed by the way you ask the question"?  Do you recall his questions about that?

A   Yes.

Q   If the results of a test are dramatically skewed by something as simple as how you ask the question, doesn't it follow that the methods being applied are not really scientific in the way that we hope science to function?

A   They're not as objectively reliable as we would like for sure.

Q   Right.  I mean, when I get an opinion from a doctor, or a diagnosis, I hope, as I hope everyone here does, that that diagnosis isn't based on solely my -- you know, what I'm telling them, but based on some sort of science that could include what I'm telling them, but is based on the objective medical testing and differential diagnosis and things like that.  Do you

think that's a reasonable expectation for people understanding --

A    Yes.

Q    Okay.  All right.  Now, in your opinions, you talked about this sort of dividing line with sexual maturity rating and Grade 4 and Grade 3 and all this kind of stuff.  I think what -- I think maybe in the question that -- maybe it was just assumed, but I want to make sure is clear is your testimony that a Grade 3 is pretty -- you know, more likely pretty certain that that's not an 18-year-old, that's based on an accurate sexual maturity rating, though, correct?

A    Correct, yes.

Q    Yeah.  I mean, all of your opinions, what you're talking about is if I have a true, accurate sexual maturity rating, then I could say this person is most likely under the age of 18?  Did I understand that correctly?

A    Yes.

Q    Okay.  And do I also understand from your report and your testimony that one of the real problems of using online pornographic images is it is very, very difficult to obtain an accurate sexual maturity rating from a professionally produced pornographic image?

A    I think the farther you are away from the

patient, the less reliable it is. And, again, the more that it's a photo shoot and -- like we know that people doctor up -- like we're in the Instagram world. Most pictures on Instagram aren't really what people look like, and it's because you can put filters and do things. So I think the farther you are away from the patient, the less reliable it is. So anything that's circulating or been professionally done is going to be a lot less reliable than having the patient or having me taking a picture of a patient or having someone I know take a picture of a pa- -- you know, you can walk down the line, and the farther you get, the less reliable it is.

Q So let me just make a statement and see if you agree with it or not: The absence of visible pubic hair in and of itself on a pornographic model does not establish that they are a sexual maturity rating of 1 with any reliability.

A I would agree with that.

Q I think you said this earlier in your testimony that really to obtain an accurate sexual maturity rating, you need to look, at the very least, both the breast and the pubic region or genital region?

A I believe that's the case. I think there's people who will do it without that, but I think it's

much more accurate if you have both.

Q   Well, and, of course, going to the -- we talked about this study that you pulled it up, I mean, the results were dramatic that -- correct me if I'm wrong.  I think in some instances, pediatricians were wrong about the age ninety something percent of the time?

A   I think it was 75, but it wasn't great.

Q   Yeah.  I mean, pathologists -- it looked like gynecologists or pathologists may be a little bit better than pediatricians in the result.  Did I read that correct?

A   Yeah.

Q   Yeah.  Those types of results are -- what's the takeaway from you as a medical doctor looking at that study?

A   The takeaway from me is it's very hard to have certainty based on an image when an image is of Maturity Levels 4 or 5.  You just -- you can't be certain that it is a child just based on the image alone.

Q   Right.  I think -- and I've just pulled it up here that -- and this is just a quote.  Do you have it there in front of you?

A   I do.

Q   I'm just reading from the last paragraph

before the acknowledgment: "These researchers determined that our study, in fact, proves that it's nearly impossible to say that adults who look like sub-adults are indeed adults, which obviously may apply to all those sub-adults who seem sexually immature."

Did I read that correctly?

A   That's their conclusion, yes.

Q   Yeah.  Isn't that what you were saying, though, when you were talking about, like, look, you know -- I don't know what you said.  18-year-old may look 12 or a 17-year-old may look 22.  Is that really what you're getting at is that you really can't look at someone in this subadult category and say they are above or below the age of 18 with any reliability?

A   At least without any certainty, and the reliability part (inaudible) in question as well.

Q   Yeah.  And so just kind of bringing it back to the analogy of the radiologist and the MRI and talking about the value of talking about that, you know, when a radiologist puts in there, "Hey, there's motion artifact," right, you've talked about what you think the science is or the ability to, you know, accurately sexual immaturity rate an individual from a pornographic image, but you've also talked about, look, if you're going to engage in this, you have to put qualifiers on

there to explain, you know, any limitations in what you're talking about. Is that kind of what you're talking about is, you know, like a radiologist puts, "Hey, the image was unreadable because of motion artifact," or "There are limitations on my opinions because there's motion artifact"? You're talking about that as a child protection team doctor, at the very least you should do the same as a radiologist and notify whoever is reading this that there are limitations, serious limitations, or however you see those limitations, but that should be in any report that you're giving to someone else?

A    I would agree with that, and I think it's -- again, your degree of certainty needs to be communicated and the limitations of the certainty need to be communicated as well, whether it's physical abuse, sexual abuse, pornography. We have to be open and honest about what our abilities are to conclude what we conclude and why we conclude them.

Q    And your opinion is that these three letters were not open and honest about the science that supported the opinions?

A    The science and the limitations.

Q    Right. You've been asked a lot of questions, and we have your affidavit. Is anything that's been

asked of you today changed the opinions that you expressed in your affidavit?

A No.

MR. ROBERTS: I don't have any other questions.

MR. CARSON: John, do you want to follow up with more questions, or are you good?

MR. WILSON: Yeah, I just have one final follow-up.

FURTHER EXAMINATION

BY MR. WILSON:

Q Dr. Krugman, we've talked a lot about the scientific reliability of these age estimations, how doctors should go about doing them, and even in some cases, what other evidence should be used in determining the age of a person.

Is it your opinion that even in an SMR-4 case, that with other reliable evidence to consider other than just photographs, say passports, historical data, birth certificates, an actual interview with patients, the medical evaluation is an important part of determining that age of that person?

MR. ROBERTS: I'm going to object to that question.

THE WITNESS: I think -- is the medical piece

an important part? I think it's -- I believe that there's a role for child abuse pediatricians to produce reports to help put things in context, and there can be definite value of having a medical opinion about these things, but I don't know if you'd be relying on it in the situation you described where you have other corroborating evidence. You know, a lot of times, if that's the case, we're seeing the child just to make sure that they're well taken care of, there's no trauma, you know, we're doing our medical piece to them and not using it to make a determination of the images. So I don't know how to answer that any better than I just did.

BY MR. WILSON:

Q Sure. It was not the most clear question. Let me try one more time then.

Is there a legitimate place for a child abuse pediatrician to provide testimony on a case that's admittedly hard to age the picture?

MR. ROBERTS: Object --

THE WITNESS: There might be, yes.

MR. WILSON: Okay. Thank you. That's the only question.

Okay. Dr. Krugman, are you familiar with the concept of reading or waiving?

THE WITNESS: I am.

MR. WILSON: Would you like to read or waive?

THE WITNESS: I'll read, that's fine, just to make sure I didn't mess anything up and it was transcribed correctly.

(Whereupon, the witness did not waive reading and signing of the deposition, and the deposition was concluded at 9:30 a.m.)

C E R T I F I C A T E

STATE OF FLORIDA    )

COUNTY OF LEON      )

I hereby certify that the foregoing transcript is of a tape-recording taken down by the undersigned, and the contents thereof were reduced to typewriting under my direction;

That the foregoing pages 4 through 59 represent a true, correct, and complete transcript of the tape-recording;

And I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

Dated this 29th day of July, 2025.


CLARA C. ROTRUCK

Notary Public

State of Florida at Large

Commission Expires:

November 13, 2026

Commission No.: HH 327478

For the Record Reporting, Inc.
1500 Mahan Drive, Suite 140
Tallahassee, Florida 32317
850-222-5491

July 29, 2025

Dr. Scott Krugman

C/O Attorney address

RE:   William Lee Lawshe vs.
        Mikayla Preston and Kathleen Dully

Dear Dr. Krugman:

        The deposition of Dr. Scott Krugman, taken on July 16, 2025, in the above-styled case, is ready for review.  Please have the deponent make an appointment to review the transcript in our office.

        In the alternative, if you have ordered a copy of the transcript and will be handling reading and signing, have the deponent note any corrections on the errata sheet provided.  The review must be completed on or before August 29, 2025, and the errata sheet returned to For the Record Reporting, Inc., 1500 Mahan Drive, Suite 140, Tallahassee, Florida 32317 so it may be included with the original transcript.

        Please contact our office if there are any questions you may have.  Thank you for your prompt and careful attention to this matter.

                        Sincerely,

                        For the Record Reporting, Inc.


cc:   Matthew Carson, Esq.
        Michael Roberts, Esq.
        John Wilson, Esq.

ERRATA SHEET

IN RE: Corrections to the Deposition of Dr. Scott Krugman, William Lee Lawshe vs. Mikayla Preston and Kathleen Dully, on July 16, 2025.

PAGE    LINE    CORRECTION

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

____    ____    _____

    Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____        _____

Date                            Signature

# Doc. 85-12

**In the Matter of:**

*WILLIAM LAWSHE*

*vs*

*MIKAYLA PRESTON, et al.*

*WILLIAM LEE LAWSHE*

*March 14, 2025*



1260 North Ponce de Leon Blvd., Suite E
St Augustine, FL 32084
(904) 825-0570     www.staugcr.com

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO. 3:24-cv-00044-MMH-MCR

WILLIAM LAWSHE,

       Plaintiff,

vs.

MIKAYLA PRESTON, in her individual capacity as a detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

      Defendants.

_____

VIDEO RECORDED

DEPOSITION OF:     WILLIAM LEE LAWSHE

DATE TAKEN:      Friday, March 14, 2025

PLACE TAKEN:     1260 North Ponce de Leon Boulevard
                 Suite E
                 St. Augustine, Florida 32084

TIME:            9:16 a.m. - 12:16 p.m

BEFORE:         LAURA DWYER PIERLE, RPR
                 STENOGRAPHIC COURT REPORTER
                 AND NOTARY PUBLIC - STATE
                 OF FLORIDA AT LARGE
*****************************************************

ST. AUGUSTINE COURT REPORTERS
1260 NORTH PONCE DE LEON BOULEVARD, SUITE E
ST. AUGUSTINE, FLORIDA 32084
904-825-0570

APPEARANCES:


        On behalf of the Plaintiff:
            NOONEY AND ROBERTS, P.A.
            1680 EMERSON STREET
            JACKSONVILLE, FLORIDA   32207
            By:  MICHAEL KEITH ROBERTS, II, ESQUIRE


        On behalf of the Defendant Mikayla Preston:
            SNIFFEN & SPELLMAN, P.A.
            123 NORTH MONROE STREET
            TALLAHASSEE, FLORIDA   32301
            By:  MATTHEW J. CARSON, ESQUIRE
                        AND
                CHRISTEN PETRUZZELLI, ESQUIRE
                (Present via videoconference)

        On behalf of the Defendant Dr. Dully:
            BANKER, LOPEZ, GASSLER, PA
            1900 SOUTHEAST 18th AVENUE
            SUITE 300
            OCALA, FLORIDA 34471-8237
            By:  AMY SHEVLIN, ESQUIRE
                (Present via videoconference)

ALSO PRESENT:

            DAN BISHOP, VIDEOGRAPHER

                           -  -  -
                        I N D E X
                           -  -  -
WITNESS:                                                   PAGE
WILLIAM LEE LAWSHE

DIRECT EXAMINATION BY MR. CARSON                           5
CROSS EXAMINATION BY MS. SHEVLIN                           88
REDIRECT EXAMINATION BY MR. CARSON                         121


CERTIFICATE OF OATH                                        127
CERTIFICATE OF REPORTER                                    128


                           -  -  -
                      E X H I B I T S
                           -  -  -
NUMBER                      DESCRIPTION                     PAGE

DEFENDANT'S  EX. 10  PLAINTIFF'S ANSWERS TO DEFENDANT   40
                     MIKAYLA PRESTON'S INTERROGATORIES
DEFENDANT'S  EX. 11  PLAINTIFF'S ANSWERS TO DEFENDANT   40
                     DR. DULLY'S INTERROGATORIES

- - -

VIDEOGRAPHER:  This begins media unit number one to the video recorded deposition of William Lee Lawshe in the matter of William Lee Lawshe versus Mikayla Preston, et al. being heard before the U.S. District Court, Middle District of Florida, Jacksonville Division.  Case Number is 3:24-cv-00044-MMH-MCR.

Today's deposition is being conducted at 1260 North Ponce de Leon Boulevard, Suite E, in St. Augustine, Florida.  Today is March 14th, year 2025.  The time is 9:16 a.m.

My name is Dan Bishop.  And I'm your videographer.  The court reporter this morning is Laura Pierle.

Counsel, will you please state your appearances for the record and then our court reporter may swear in the witness.

MR. ROBERTS:  Michael Roberts for Mr. Lawshe.

MR. CARSON:  Matthew Carson for Detective Mikayla Preston.

MS. SHEVLIN:  Amy Shevlin on behalf of Dr. Dully.

- - -

Thereupon,

WILLIAM LEE LAWSHE,

Being by the undersigned Notary Public first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. CARSON:

Q    **Good morning, Mr. Lawshe.**

A    Good morning.

Q    **My name is Matt Carson.  I represent Detective Mikayla Preston one of the Defendants in this action. You and I just met a couple of minutes ago, correct?**

A    Yes, sir.

Q    **Okay.  And you were having a little bit of a hard time maintaining your composure then, and, you know, you're just getting started and you're already a little bit upset.  I want you to know that if at any point during the deposition today you need to take a break for whatever reason, to use the restroom, to, you know, take a breath, take a walk outside, that's fine. You've just got to let me know.  All right.  As long as there is not a question pending that shouldn't be a problem.  Okay.**

**It's not my intent to unnecessarily prolong the deposition today or to make it any worse for you than it is, but I have to ask questions and this is my**

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 6

one opportunity to do so.  All right?

A    Yes, sir.

Q    Okay.  Have you had your deposition taken before?

A    No, sir.

Q    Okay.  Well, there is a couple of rules that I want to go over at the beginning that will help us get through today hopefully quickly.  One of them is as you see we have a court reporter taking down everything I say, everything you say, everything your attorney says.  And as good as she is at her job, she can only take down one person talking at a time.  So it's critically important that we not talk over one another.  So I'm going to ask you to wait until I'm done asking my question before you start giving your answer.  And I'm going to do my best to let you finish your answer before I ask a follow-up question.  All right?

A    Yes, sir.

Q    Similarly, if I ask you a yes or no question, I'm going to ask you to give a yes or no response as opposed to uh-uh or uh-huh or shaking your head or nodding your head.  I'll tell you, I don't know if I ever sat through a deposition where somebody didn't fall into that uh-huh or uh-uh.  So if that happens and I ask you if that was a yes, sir or was that a no, sir, I

don't want you to think me rude.  I'm just trying to make sure we get a good record.  All right?

A    Yes, sir.

Q    All right.  Are you under the influence of alcohol or drugs right now?

A    No, sir.

Q    Okay.  Is there any reason you can't give a truthful deposition testimony today?

A    No, sir.

Q    Okay.  Why are you -- why are you upset right now?

A    Because of everything I've gone through and still going through.

Q    What do you mean?

A    Just the way that I am treated in the community.  I was very well-known here because I grew up here.  I have been here since 1980.  And I knew half of the town.  And then I was officer of the year.  And it's a small town.  And it's just devastating to me.

Q    Are you nervous about giving your depo today?

A    I'm not nervous as the standpoint of anything, like, that's going to come out of this.  I mean, just having to relive it again and talk about it, and go through the emotions again.

Q    What year were you born?

A    1969.

Q    Okay.  Where were you born?

A    Gainesville, Florida.

Q    Where else have you lived other than Gainesville and St. Augustine?

A    We spent some time in Miramar, Florida and Hollywood, Florida, Savannah, Georgia and I think that's most of -- well, I lived in Hawaii when I was in the military, too.

Q    Okay.  So you said that you've been in St. Augustine since roughly 1980?

A    Yes, sir.

Q    Okay.  And then have there been breaks where you've lived in other areas?

A    Once I become an adult I started living and I got my job with FWC, yes, but other than that I've lived here all of the time.  I was in Stuart, Florida for a little while when I got hired on with FWC.

Q    Okay.  When did you start working with FWC?

A    I'd probably have to look at some of my paperwork you-all sent me.  I don't -- I can't remember the date now.  It was roughly 15 years ago.  I worked for them 15 years.

Q    Okay.  And you worked -- that's Fish and Wildlife Commission, correct?

A     Yes, sir.

Q     And you were a certified law enforcement officer for them?

A     Yes, sir.

Q     What kind of work did you do?

A     Just what they do enforcement of the wildlife laws and, I mean, other laws because we do mainstream law enforcement as well.

Q     So I'm just trying to start our consideration in hopefully a lighthearted way so that, you know, we can get comfortable talking with each other.  Are you looking for people that are catching fish above the limit, undersized, that kind of thing?

A     That's the primary enforcement. Anything to do with wildlife.  I was a -- I was a hill officer so I did more investigative stuff to where I was out in the woods working alone mostly listening for gunshots, going to gunshots, seeing if there any violations of that, DUI, BUI, all that kind of stuff.

Q     Did you say hill officer?

A     Hill officer.

Q     Okay.  And what does that mean?

A     I primarily worked in the woods and didn't work on the water.  They typically put the more seasoned officers on the hill because it's more difficult work,

it's more dangerous.  And you do more investigative stuff than on the water.  On the water is just a contact driven law enforcement.  You just make contacts and ask questions.

Q    Okay.  So hill officer is that kind of slang for more of a wildlife dry land guy?

A    Yeah.  Yeah.  If you remember back in the '90's the agency was two separate things.  It was Fish and Game and Florida Marine Patrol.  In '91 they combined, but they still realized that hill was a different animal altogether working on the hill or in the woods.

Q    Okay.  What was your jurisdiction, if you will?

A    The State of Florida.  I mean, we patrolled any and everywhere.  My office was out of Ocala and we had an area or region we patrolled and mine was mostly St. Johns, Flagler and Putnam Counties.

Q    Okay.  Did you ever go outside of St. Johns -- what did you say St. Johns, Putnam and --

A    St. Johns, Putnam and Flagler.

Q    Did you ever go outside those three counties?

A    Yeah, I mean, we did disaster relief with all the hurricanes.  And we get deployed to all those areas and we help out there.

Q But during your --

A Other states too.

Q Okay. During your kind of regular assignment, those were the three counties that you stayed inside?

A Yes, sir.

Q Okay. How often would you have to go to Ocala?

A It was just for regional meetings and things. So, I mean, it varied.

Q A couple of times a year?

A Sometimes. Sometimes not. I mean, it just depends on when they wanted us over there. A lot of times they would come to us for a meeting.

Q Gotcha. Are you married?

A I am.

Q What's your wife's name?

A Sheila Marie Lawshe.

Q How long have you been married to Mrs. Lawshe?

A Thirty-four years. We met in high school.

Q Do you have any kids?

A I have two sons.

Q Okay. Where do they live?

A One lives in Boston, Massachusetts. The other lives in Canada. I'm trying to think the name of the little town, but in Canada.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 12

Q    Do you know what province?

A    It's one just over the border closest to the border.  Big town.

Q    Toronto, Ontario?

A    Is it Quebec?  Quebec.

Q    Oh.  Okay.

A    Quebec City.

Q    All right.  Very good.  Do you -- what is he doing there?

A    He is with his girlfriend.

Q    Okay.  I'm from Canada that's why I was asking.

A    Okay.  He met her online during COVID.

Q    Okay.  I think it's cool.  So I was going to say good for him.  But, you know --

A    Yeah.

Q    Do you have a good relationship with your sons?

A    I do.

Q    Okay.  Has your relationship with your sons been affected at all by this incident?

A    Yeah.

Q    How so?

A    Well, when it first happened they didn't know what to think just like everybody else.  My son has a

doctorate degree in criminology.  He teaches criminology.  And, of course, with him being in that line he had professors coming to him and asking him what was going on and he was getting counseling.  And I felt so bad for him.  But after he talked to my lawyer and saw what was going on and he was a lot better.  He's probably got more choice words to say than that, but I'm not going to say them.

Q    What do you mean when you say he saw what was going on?

A    Just the fact that once he saw the evidence that was being brought against me and all, after it had been -- the charges had been dropped, my lawyer shared with him some of the photos and they were beyond pissed that those photos were used to say it was CP.

Q    By CP you mean child pornography?

A    Yes, sir.

Q    Okay.  And that's both your sons were beyond pissed?

A    Yes.

Q    Why is that?

A    For obvious reasons.

Q    Well, tell me.

A    They were -- they were obviously pictures of grown adult women and they were like, oh, my God, dad, I

feel so bad for you.

Q   How is it -- we'll get to the pictures, I guess, in a little bit.  Are you currently employed?

A   No.  I can't work.

Q   Why not?

A   I had some jobs lined up that if and when I retired I could do them, but since then I can't work in those jobs just because being such a small town and the liability they just can't hire me.

Q   What jobs did you have lined up for retirement?

A   There was a guy -- I knew the manager at Publix in town here and he was going to sign me on as either like somebody to cut meat in the back or just help out because I have a lot management background from other companies.  I used to work at a lot of Fortune 500 companies prior to becoming law enforcement.

Q   You said you had some jobs lined up.  You mentioned Publix, what else?

A   Oh.  I had a friend that had a car wash that he was like trying to grow it and since then it has gone out of business.  But there was that.  And then I don't know there was any number of other things I could have done in retail marketing and stuff, but with what happened and knowing that I have to sit down in a job

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 15

interview and tell them basically that what I have been accused of and arrested for, no company is going to hire me with that.

Q    Has any company told you that they won't hire you because of that?

A    I have done some online stuff and I have not got anything returned.

Q    Okay.  Has any company told you that they won't hire you because of these criminal charges?

A    That specifically, no.  They just haven't replied back.

Q    And I hate to say it, but that's, you know, that could be systematic of the job market.  That's why I'm asking you if anybody has given you any solid indication that it's because of these criminal charges?

A    No, I don't think legally they can.

Q    Okay.  You had the criminal charges expunged, correct?

A    Yes.

Q    Okay.  Why did you do that?

A    For obvious purposes so I could try to start my life over again and get jobs.

Q    Any other reason?

A    No.

Q    So where have you applied for work since your

arrest?

A    All the online stuff I cannot recall.  I really can't.  It was just --

Q    How many jobs have you applied for?

A    Probably 30.

Q    How many call backs did you get?

A    None.

Q    Have you had any --

A    I'm sorry.

Q    No worries.

Have you done any -- have you done any work for pay since the arrest?

A    I am washing friends and families cars. Basically just odd jobs.  Some friends need their house painted and stuff like that I have done that for them, just because they know I need money.

Q    And that's just kind of free-lance as needed you don't have a business or an LLC or anything like that?

A    No, sir.

Q    Okay.  I think we got some discovery from you in this case and there were some W-2s.  I thought I saw Publix.  Had you done some work for Publix at some point in the past?

A    When I was with FWC we did off duty work.

Yes, I did off duty work for Publix.

Q    Okay.  That's the fellow that stands at the front and makes sure no one is walking out --

A    No.  So, no, for that we didn't do that kind of law enforcement or off duty work.  Ours was -- that was actually during TPC where we would sit outside in our vehicles and any vehicles that would come in and park illegally for TPC and stuff we would ask them to leave.

Q    Gotcha.

What -- are you applying to jobs using websites?

A    Yeah.  I was -- I can't remember which one.  But it was one of them either Hot Jobs or Monster or something.  One of those things.  I did online -- online resume and I submitted a resume and all of that.

Q    Okay.  All right.  Do you still have your law enforcement certification?

A    I believe it would have expired by now, because I haven't had any retraining.

Q    Do you know what it would take to get that law enforcement certification back?

A    No clue.

Q    Do you have any interest in getting it back?

A    No.

Q    Why not?

A    Just with those allegations no agency would ever hire me.

Q    Has anyone told you based on those allegations that no law enforcement agency would hire you?

A    I used to be in hiring so I know.  I did the HR stuff.  But, no.

Q    If you were to apply for a job right now, would you be able to deny that you were ever arrested?

A    No.

Q    Why not?

A    Because I was arrested.

Q    Okay.  But those charges were expunged, correct?

A    Yeah.  But that doesn't matter.  It's all over the internet.

Q    I understand.  But my question was if you apply for a job, would you be able to lawfully deny that you were arrested?

A    In my opinion, no.  I mean, I was arrested. They put handcuffs on me; they took me to jail.  It happened.

Q    Have you read the expungement statute in Florida law?

A    No, sir.

Q    Okay.  Other than this arrest have you ever been arrested?

A    No, sir.

Q    The videographer asked you if you had your phone with you today.  And you said no, correct?

A    Correct.

Q    Okay.  Where is your cellphone?

A    My wife has my cellphone.

Q    Your wife is in the lobby, correct?

A    Yes.

Q    Is it the same cellphone that you had in April 2023?

A    No, sir.

Q    Same phone number?

A    No, sir.

Q    All right.  Let's talk about the arrest, which occurred on April 12, 2023; correct?

A    I don't remember the date.  But if that's the date I'll believe you.

Q    Okay.  Yeah, I won't try to mislead you at all today.  But certainly not about the date of the arrest.

A    That's fine.

Q    Okay.

A    He would here to object if it was wrong.

Q    Sure.  What was -- what was -- what do you remember about that day?

A    I was supposed to go teach man tracking and I got a phone call a couple of days before that they had a missing person.  I had helped them before with finding a missing person and could I meet with them.  I said sure. I went to the Sheriff's Department.  I waited for a short period.  I went back to talk to -- I think it was Tolbert.  I don't remember his -- his classification, detective or whatever.  But anyway I went back there, and I don't know, where I was grabbed by other officers and told I was under arrest.  And I was placed in a room.  They told me they would be back with me.

Q    All right.  Let's -- let's break that down just a little bit.  Who called you regarding a missing person?

A    I don't recall who it was.  It was -- it might have been Tolbert.  I'm not sure.

Q    And had you worked with Detective Tolbert in the past?

A    No, not directly.

Q    Okay.  Did you know him?

A    After it all went down I remembered that, yes, I did know him, because my son and his daughter were in the same karate class together.  So we saw them for

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 21

probably three years, four years in karate every week.

Q    Okay.  Before the incident, before the arrest?

A    Correct.

Q    Okay.  When he called you, did his name show up on your phone?

A    I don't recall that.

Q    Okay.  You don't recall if you had his name stored in your phone or not?

A    No, I know I didn't have his name stored in my phone.  I just -- I didn't work that closely with him.

Q    Did you work closely with anybody at the St. Johns County Sheriff's Office?

A    A lot of the hill deputies.  I mean, probably Sergeant Matuse and I am trying to think of their names.  I used to know them all.  But I just -- they don't call me; I don't call them.  There was a K9 deputy I was real close with.  All the deputies that worked at Hastings I was close with because that was -- I backed them up all of the time.  I don't remember names.

Q    Okay.  You said hill deputies, what does that mean?

A    Just they kind of work the same areas as me in the woods.  They would come out and be my backup because we didn't have a lot of backup.  So if I needed something they would come into the woods where I was at

just for backup.  Because like I told you we worked by ourselves a lot.

Q    Okay.  You said that you had helped St. Johns County Sheriff's deputies with missing person in the past?

A    Yes, sir.

Q    Do you remember who you worked with at that time?

A    It would have been at the time Commander Strickland called me specifically because he knew that I did man tracking and was good at tracking.  It was when they had -- I forget her last name.  But it was a lady that was missing.  She worked at the restaurant right here in town.  She actually served us and she was suspected to have been murdered and actually that morning me and another officer found her body within probably 20 minutes of the search.  I forget her name now too which is bad.  But we were called in for that.

Q    What makes you good at finding missing people?

A    Just my training and my attention to detail. I did it in the military as well.  I went through ranger training and airborne ranger training and just attention to detail, I guess.  And I enjoyed it.  I liked to be in the woods and to just be observant and not overlook things that a lot of other people did.  I guess I am

part Indian, so maybe that is part of it.  Just tracking

piece of it.  It takes a lot of attention to detail.

I need some more water.

MR. ROBERTS:  Yeah.  Just real quick I will

grab some.  We don't need to go off the record.  I

will just --

MR. CARSON:  No worries.  No worries.

MR. ROBERTS:  Is it right down here?

THE WITNESS:  Thank you.

BY MR. CARSON:

Q    **So you're called by somebody with the St. Johns County Sheriff's Office?**

A    Commander Strickland called me specifically.

Q    **Okay.  The first time or the second time?**

A    I am losing track.  First, second.

Q    **Yeah.  Let me be clear then.  I am talking about in April 2023?**

A    Okay.  No, he didn't call me for that.

Q    **Yeah.**

A    It was just Tolbert.

Q    **You believe it was Tolbert?**

A    Well, I think -- I think he said it was Tolbert on the phone when he called me.

Q    **And he said need your help with a missing person, can you come in?**

A    Yes, sir.

Q    Okay.  What phone did he call?

A    It would have been the phone that I had at that time which was, I guess, the phone that you-all got all the data off of still.

Q    Is that your personal phone?

A    That was my personal phone.

Q    Okay.  Because I understand at the time you had a personal cellphone and then you had a cellphone that had been issued by Fish and Wildlife, correct?

A    Yes, sir.  Yes, sir.

Q    So when he called you and said we need help with a missing person, did you believe that that was the purpose for you going to the Sheriff's Office to meet with him?

A    Of course.  I mean, I had no other reason not to believe it.

Q    All right.  You get there.  You said that you waited a while and then you went back and met with some folks; correct?

A    Yes, sir.

Q    Okay.  Who did you meet with?

A    The only one I know was Tolbert or deputy or Officer, Detective Tolbert, whatever his nomenclature is.

Q    I'll just tell you this, we have been calling everyone detective, because they have rank and then they get promoted.  And so detective, I think, covers it.

A    Okay.

Q    No one will fault you if you call everyone you dealt with detective.

A    Okay.

Q    All right.  Was anybody else in the room when you meet with Detective Tolbert?

A    Not at the time.

Q    What did Detective Tolbert and you talk about during the initial meeting?

A    Nothing really.  There wasn't time for it.  He asked me if I wanted to sit down.  I went to sit down and out of nowhere two other officers appeared and grabbed me by my left and right hand and told me don't move.  And asked me where my -- well, they didn't ask me where my gun was because they seen my gun.  But they basically stripped me of all my equipment.

Q    Do you know the two other officers that entered the room?

A    No, sir.

Q    Okay.  Did they appear to be uniformed deputies?

A    As best I can recall they were uniformed.  But

honestly as soon as it happened I was in such shock if I could have known them I wouldn't even be able to tell you I knew them.

Q    Sure.  You said that they took your gun, they took your other equipment?

A    Yes, sir.

Q    Okay.  Were you in full Fish and Wildlife Commission garb?

A    I was.

Q    Okay.  So you had your duty belt?

A    Vest, everything.

Q    Okay.

A    They took it all off.

Q    So before you and Detective Tolbert, or really anyone at the Sheriff's Office had any opportunity to talk that was the first thing that happened?

A    Yes, sir.

Q    Okay.  What did you think was going on?

A    I really had no idea I was in shock.  I kept asking, "What's going on?  What's going on?  What is this all about?"

And he kept telling me or he told me several times, "We'll get to that.  We'll get to that."

And I don't remember at what point they escorted me to a room and I actually started to deal

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 27

with Detective Greene, I think I saw him first, and Detective Preston.  It was a while before they entered the room.

Q    Can you estimate how long?

A    Honestly, no.  I mean, it was a while.  In light of the situation it could have been 10 minutes.  It could have been an hour.  I don't know, because time was just like -- my mind was just spinning.

Q    And at that point you still had no idea why?

A    I didn't know until they walked in and they started their questioning.

Q    Okay.

A    And they didn't want to tell me anything then either.

Q    Okay.  So let's do this.  The first person you see after you are moved to a different room is Detective Greene; correct?

A    I think so.

Q    Okay.  And then did you have any conversation with Detective Greene, was anything said at that time?

A    I think, I mean, I can't remember, but I am sure it's all being -- it was all recorded because in those rooms it's all recorded so you can probably look at that.  But I honestly don't recall.  But I think he asked me something.  I asked him what was going on.  He

said, we'll get to that.  Just to sit tight.  And I think he had to ask -- he asked me something about my phone.  Like where is my phone, because I guess they went through my equipment and couldn't find the phone in question that they were looking for.

Q    Where was the phone?

A    I had forgotten it at home.

Q    Did you have your work issued phone?

A    I think I did, but I'm not positive.

Q    All right.  And a short time or some period of time later Detective Preston joins you and Detective Greene?

A    Yes, sir.

Q    And what, if anything, do you remember being said during that time?

A    It was all focused around the phone.  They came and asked me where is my phone and then they asked specifically where is my phone.  And it took me a little bit to realize that I left it -- I thought it was in my truck or on me.  But I guess in getting ready that morning I just forgot it.  Anyway I told them it must be at home.

And they were asking me maybe where.  And so I kind of went back through my mind where it could be. They left for a little bit.  They came back in.  They

said they were getting a search warrant.  That they needed to know specifically where it was at.  They left a little bit, they came back, they said they couldn't get into my house.  So I think I gave them a garage door number to get in the garage door.  And then some more time went by when they weren't in there.  And then they came back and said okay.  I don't know if they told me they got my phone or not.  I just assumed maybe they got it.  And I think that's when they started questioning.  So, yeah, I think.  That's the best I can recall.

Q    And that's fine.  You know, the purpose of today is for me to find out what you remember.  And I don't expect you to remember everything.  But you are doing a really good job of trying and I appreciate that.

Other than what you've already said, do you remember anything that was said during your time being interviewed, questioned at the St. Johns County Sheriff's Office on April 12, 2023?

A    I mean, is there something I'm not saying?

Q    No.  Listen.  I'll be clear.  I'll just put this out there.  What I am trying to do and, you know, your lawyer may tell you the same kind of thing when you meet with him privately.  Lawyers like to know what the witnesses are going to say at trial.  And what I don't want to do is get to trial and have you all of a sudden

**remember that Detective Greene or Detective Tolbert or Detective Preston said this or that.  I prefer to know that now.  So when I ask you those kind of questions saying is there anything else, I am not suggesting that there is anything else that you should remember, what I am trying to do is prevent me leaving here today not knowing everything I need to know.  Does that make sense?**

A    Yes, sir.  Well, I think I'm pretty sure they were recording it.  So I don't want to say something that's inappropriate wrong.  I do remember at some point them asking me or them telling me finally what it was about.  And I don't remember how she said it.  I remember him kind of cracking a joke about something.  And I just thought that was weird about why is he cracking a joke with this going on.  And then that's when I told him I wanted a lawyer.  I wasn't going to talk to him anymore.

Q    **Who cracked a joke?**

A    Greene.

Q    **Okay.  Do you remember what he said?**

A    I don't.  It had something to do about the name of a school, the school or training center that we have in Tallahassee.

Q    **What's the name of the school?**

A    Now it's -- I don't even know if I can remember.  Tallahassee something Institute.  I can't remember.

Q    Is it the Old Pat Thomas?

A    Yeah.  He made a joke about the name of Pat Thomas versus what the new name is.  It was just weird.

Q    It wasn't inappropriate?  It wasn't rude --

A    I don't know.  Anything at that point in my life would have been inappropriate.

Q    Okay.

A    But, no, there was nothing like lude or lascivious about it.

Q    Gotcha.  What happened after you said that you wanted a lawyer?

A    They got up and walked out.

Q    Were you in handcuffs at this point?

A    I think they had taken -- I think they took them off once they put me in the room.

Q    At some point were you placed back in handcuffs?

A    And walked into the jail.  I'm fine.

Q    All right.  Do you remember anything being said either by you or the detectives as you were walked into the jail?

A    I don't.  I remember walking by a deputy and

he called me a piece of shit.

Q    Who was that?

A    I don't know.  I was crying.  I was --

Q    Why were you crying?

A    For obvious reasons.  I was upset that I am going to jail and being arrested for something that I had no idea what was going on.

Q    Well, at that point you knew?

A    I knew what they were allegating, yes.

Q    Can you describe the deputy that called you a piece of shit?

A    No.  He was white.  I know that.

Q    Uniformed guy?

A    Yeah.  I'm sorry.  Yes, sir.

Q    Yeah, you're good.

My reason for asking that is separate from thinking it's relevant to this case.  I'm just wanting to know who it was.

A    Yeah.  No.  Nothing will ever be done to them.

Q    Well, ultimately where was your cellphone?

A    At that point they had it.

Q    I'm sorry.  Let me rephrase my question. Where was it before law enforcement located your cellphone?

A    It was in my house in my room where I take all

my equipment off.

Q    And where is that?

A    It's like -- it's like -- it's like a utility room, I guess.  I have lyme disease and once I got diagnosed with that I had to be very careful.  I didn't want to bring ticks home to my wife.  So there is just a room when you enter in from the garage.  It's a utility room that's where I would take everything off or put everything on because I didn't want to get ticks in the house and stuff.  It's just easy to keep track of all my equipment.

Q    So is it like a mud room?

A    That's a good -- yeah.

Q    What does that room attach to?

A    The garage and the rest of the house.

Q    Is it in between the garage and the rest of the house?

A    Uh-huh.  Yes, sir.

Q    Okay.  If you're walking from the garage into the mud room and then into the house, what room are you in when you enter the house?

A    Well, you enter into the mud room from the garage.

Q    Okay.  And then if you were to enter into the house from the mud room where would you be?

A     The kitchen.

Q     Okay.  If law enforcement said that they found your phone above the refrigerator --

A     No.  That's inaccurate.

Q     Okay.

A     There is no frig in that room at all.

Q     If they said they found it above the refrigerator in your kitchen would that be inaccurate?

A     That's inaccurate.  It was in the mud room. There is -- I don't know what you even call it, maybe a chest of drawers would be maybe the most accurate description.  It was on top of that.

That's where I usually set it.  And I'm sure it wasn't on top of the frig because that is a whole another room.

Q     Okay.  Did you ever put your personal cellphone above your refrigerator?

A     No, sir.

Q     It was reported -- you understand that it was reported that that's where they located the cellphone?

A     No, I didn't know that.

Q     This is the first time you're hearing that?

A     Yes, sir.  That's hundred percent inaccurate and false.

Q     Okay.  It's been reported that when they

located your personal cellphone it was in airplane mode?

A     That's possible.

Q     Okay.  Did you frequently put your personal cellphone in airplane mode?

A     I did.

Q     Why is that?

A     Well, again, with my lyme and airplane mode, I was like -- I don't think I'm a, quote unquote -- what's the word I'm looking for -- oh, gosh.  Give me a second. I've got to think of the word.  Not a health activist or anything.  But cellphone -- having a cellphone on all of the time, they've shown it causes cancer and things like that with the EMP and like all that kind of stuff.  So I would any time when I took it off I would always put it in airplane mode generally.  Didn't sleep with it in the room with me, nothing like that because it's unhealthy. And that was pointed out by my doctor and just research that I've done with effects of that microwave stuff.

Q     Which doctor told you that?

A     I believe it was my lyme's doctor.

Q     What's his or her name?

A     Oh.  She's on the paperwork the questions you asked me about my doctor.

Q     Okay.  No worries then.  Don't -- don't stress yourself.  We'll get to it.

What are the -- what are the symptoms that you have as a result of having lyme disease?

A    Lyme, I mean, the worse things are the heart palpitations and it caused my blood pressure to drop.  I have cognitive issues.  When I am having really, really bad lyme symptoms there's times that I've actual lost track of where I was at.  I was sitting at an intersection one day with my wife and I just looked at her and she was scared out of her mind, because I was like "Where are we at?"  I mean, we were sitting at an intersection that I had been at a thousand million times and I had no clue for like 30 seconds where I was at all.

The most common symptom that I have that I am having right now because of the stress that I'm under, is just debilitating tiredness.  It doesn't matter how much I sleep.  I'm exhausted and I'll sleep 12, 13 hours a day.  I wake up I'm exhausted.  I have no energy.

The other milder symptoms are just like skeletal bone pain, nauseous -- nauseousness really bad.  I mean, those are the things that I typically fight.

Q    Are you on any medication for your lyme disease?

A    I am on medications, yes.

Q    Okay.  Are you on any medications for your

lyme disease?

A    I am.

Q    Okay.  What are they?

A    I couldn't -- I don't know the name of them.  It's mostly all -- I'm on what they call a -- I'm off the heavy meds.  I'm on like it's all homeopathic medications and stuff.  Like tinctures and there is a bunch of Chinese herbs like called tick support I think is the name of the pill that she gives me now that I take every day.  But I am off like all the heavy, heavy antibiotic stuff now.  I was on that for two years.  I'm kind of in a remission kind of state for the most part.

Q    Do you frequently carry your cellphone with you now?

A    Yeah.

Q    Do you leave it on airplane mode or do you leave it off airplane mode?

A    It just depends, I mean, if I'm using it.  During the time it's off airplane mode if when I go to sleep or go to bed I'll generally still put it in airplane mode.

Q    Are you at all concerned about somebody needing to contact you in the middle of the night?

A    No.  I mean, my wife has got hers.  But we put them in other rooms so that way, I mean, if it rings it

rings, but it's not right there with you.

Q    Gotcha.

How long were you in jail?

A    Honestly I don't remember.  I think it was a full day.

Q    You were able to bond out the following day or was it the same day?

A    I don't remember.  I know I was on like a 72-hour suicide watch.  It was before the 72 hours up because I was still in the suicide watch cell.

Q    What did that entail?

A    Basically once I got in-process they stripped all my clothes down naked; they put a burlap sack kind of on me and threw me in there.  It was filthy.  There was shit all over the toilet.  It hadn't been cleaned.

Q    Anything else that you remember about your time in the St. Johns County jail?

A    I tried to talk to the jailer a couple of times.  He didn't want to talk to me.  He also walked over and told me I was a piece of shit.

Q    When you say the jailer, are you talking about a corrections deputy?

A    Whoever was on duty, yeah.  It was a white guy.  I kept asking him about -- I can't remember what I kept asking him.

Q    Yeah.  What were you trying to talk to him about?

A    I don't remember.  I don't know if it was trying to get a phone call.  I think it was.  I think I was trying to see when I could get a phone call to call my wife to see what was going on.

Q    Were you able to get a phone call?

A    Eventually, yes, sir.

Q    How long after you were placed in the jail were you able to make a phone call?

A    It was a while.  It was absolutely the next day, because it got dark and the sun came up.  That's all I could tell because there was really no clocks to look at.

Q    Did you have to eat any meals while you were in the jail?

A    Yeah.

Q    How many meals do you recall?

A    It was just one.  I really couldn't eat.  You had to eat with your hands because they didn't give you any silverware or anything.

Q    Do you know why you were placed on suicide watch?

A    I imagine because of what I was in for.

MR. CARSON:  I am going to mark some exhibits.

Michael, if it's okay with you I am just going to start at 10?

MR. ROBERTS:  Just do a better job than I did yesterday.

MR. CARSON:  Yeah.  All right.  So I am going to mark Plaintiff's Answers to Defendant Mikayla Preston's Interrogatories as Exhibit 10.  I am not going to ask you to look at these right now, sir.  I am just marking them and putting them in front of you.

I am going to mark Plaintiff's Answers to Defendant Kathleen Dully's interrogatories as Exhibit 11.

(Defendant's Exhibit Nos. 10 and 11 were marked for identification.)

BY MR. CARSON:

Q    Do you recognize those documents, sir?

A    I think those are the ones where you sent questions to me.

Q    It is.  So it's one of the ways we do discovery in civil cases.  It's propounding what we call interrogatories, which are questions.  I'll just refer you to the last page of these documents which if I printed them correctly should include your declaration.  Do you remember signing that either in person or

electronically?

A    Yes, sir.

Q    Okay.  I am actually going to give you a minute to look at these.  I think now might be a good time to take a brief break, because we've been going about an hour.  Actually we started a little bit late.  Maybe not a full hour.  Let me take a quick break.  Let you review those and then when we get back we'll get into the meat of it.

VIDEOGRAPHER:  All right.  We're off the record at 10:03.

(Whereupon, recess was taken 10:03 to 10:10 a.m.)

VIDEOGRAPHER:  We are back on the record at 10:10.

BY MR. CARSON:

Q    All right.  Mr. Lawshe, before we went on a break, I identified for -- as exhibits your answers to Detective Preston's interrogatories and your answers to Dr. Dully's interrogatories as Exhibits 10 and 11 respectively.  During the break did you have a chance to review those documents?

A    Yes, sir.

Q    All right.  Does everything in both of those documents still appear to be true to the best of your

knowledge?

A    They look the same, yes, sir.

Q    Okay.  And they are the documents that you prepared with the assistance of counsel and ultimately signed declaration pages too, correct?

A    As best I can tell, yes, sir.

Q    Okay.  So I want to go over some of the questions.  I want to direct you to question number 8 on Detective Preston's interrogatories, which is Exhibit 10.

A    Okay.

Q    And I'm going to go ahead and take 11 back from you for now.

So Interrogatory Number 8 asks you information or asks you questions trying to elicit information regarding some of the photographs that are at issue in this case.  They have been identified as Composite Exhibit 8 in this case.  And so what I would like to do is go through some of those now and ask you some questions about them.  All right?

A    Yes, sir.

Q    All right.  I am going to try to do it in order that we -- that they appear in Detective Preston's interrogatories.  And so if you go to the next page following where Question 8 is found there is an image

that ends in ac18e?

A    Yes, sir.

Q    I'm going to show you what has been marked as Exhibit 8F.

A    8F.

Q    And that's a redacted version of the photograph.  Do you recognize that photograph?

A    I don't, no, sir.

Q    Okay.  Had that image ever been on your cellphone?

A    I mean, if they got it off it it was, but I don't remember this photo.

Q    How would you get photos on your cell phone; how would they be transmitted, transferred, downloaded onto your cell phone?

A    I don't -- I mean, however it would be done. I mean, I don't remember -- I think depending on the website you go you hit whatever it asks to download it and you download it.

Q    And that's exactly what I'm asking for.  So you don't specifically remember that picture ever being on your phone?

A    No, sir.

Q    But generally pictures that were on your phone were downloaded from websites?

A    Yes, sir.

Q    Okay.  And how would you access these websites?

A    Just via the internet.

Q    What kind of phone did you have?

A    I don't recall.  I mean, it was -- not Iphone.  It was an android.

Q    Do you know the name of the web browser that you used?

A    If I said, I wouldn't -- I'd be lying if I was truthful I knew that's what it was.  I really don't.

Q    Okay.  Is it one that came on the phone?

A    I would -- I would think so.

Q    Did you ever download onto your phone the one that you had in April 2023 any browser other than the one that came on the phone?

A    I think it had -- I think the phone had several browsers on it, but I don't recall what they were.

Q    Did you download any additional browsers?

A    I don't recall.

Q    Did you download any other program that would allow you to access, view or download photographs?

A    I honestly don't recall.

Q    Did you download anything that would conceal

your identity as you browse the internet?

A    I don't believe so, no, sir.

Q    Did you ever download a VPN?

A    No, sir.

Q    Did you ever download an anonymizer?

A    Not that I am aware of, no, sir.

Q    When you searched did you search in regular mode?

A    I'm not sure regular mode.

Q    So a lot of web browsers will have what they call an incognito mode?

A    Okay.  Um.  I don't recall.  I -- whatever the settings were if I downloaded something or whatever was there I just used what was there.

Q    Okay.  Did you ever delete your search history?

A    Not that I recall.

Q    Did you ever use a search engine or a browser that does not save your search history?

A    Didn't know that was possible.  I'm not aware that I did.

Q    You're assuming that that picture was found on your phone because I'm representing to you that it was found on your phone.  But as we sit here today you have no recollection of that photograph ever being on your

phone; is that correct?

A   No, sir.  Correct.

Q   Do you have any reason to dispute the assertion that that photograph was found on your phone?

A   No, sir.

Q   All right.  Do you know what your -- you had Verizon at the time, correct?

A   The provider that was provided Verizon.

Q   Okay.  Did Verizon as part of your subscription, as part of your plan with Verizon was there any sort of cloud storage that accompanied your cellphone?

A   I think they all come with it.

Q   Are you familiar with what Verizon uses for its cloud storage?

A   No, sir.

Q   Are you aware, do you know if the photos that you downloaded to your phone were also simultaneously or later uploaded to a cloud storage site?

A   No, sir.

Q   Let me take that one back.

A   Although I can say it was alleged it did go to a cloud.  I think that's what they said at some point during the lawsuit.

Q   And I'll just tell you this for whatever it's

worth, there are a lot of questions that I might ask you that other people are better suited to answer and that's fine.  My point today is to find out what your understanding and what your knowledge is.

A   Okay.

Q   And I believe this is 8B, which if you skip ahead a couple of pages, sir -- I am going to help you find it.  This is the next image that we're going to talk about.  It's the one that ends in f6a487.

A   Okay.

Q   And we have marked that as Exhibit B -- 8B. Excuse me.  Do you recall ever seeing that image?

A   I recognize the face, but that's all I can say that I recognize.

Q   Okay.  What do you recognize the face as?

A   Just one of the models that was on a site that I guess I saw.  I can't tell you the site.

Q   Do you remember downloading that photograph?

A   No, sir.

Q   Do you remember having that phone on your phone -- I'm sorry -- that image on your phone?

A   No, sir.

Q   Do you remember -- if I represent to you that that image was at some point on your phone, would you have any reason to dispute that?

A    I mean other than I don't know that -- they found it and they say it was there, other than that, no, I mean.  I don't know if that makes sense.  But...

Q    Well, I'm trying to -- there is a bunch of questions that follow which are based on the presumption that that photograph was on your phone at some point.  If you can't answer those questions because you don't know for certain that it was ever on your phone, that's fine, but I'm going to ask you those questions anyway.

A    No, I understand.

Q    Yeah.  Because the answers to interrogatories you were having -- you were unable to respond because you didn't know --

A    Correct.

Q    -- what the images were.

A    No, I would be lying to you if I told you I remember that being on my phone.

Q    Okay.  Do you know where you might have found that photograph?

A    On the internet.  I believe -- see, I hate to say I don't know for a fact.  I don't want to say something that's not a fact.  But I think she was a model of Med-Art, but I'm not positive.

Q    What is Med-Art?

A    It was just an art site that had supposedly

high resolution, good, you know, photos of, I guess, naked models.

Q    Is it a paid site?

A    It was.

Q    Did you pay to subscribe?

A    I don't recall.

Q    Have you ever paid and subscribed to a website?

A    Yes, sir.

Q    Have you ever paid or subscribed to a website that includes nudity or sexual content of any kind?

A    Yes, sir.

Q    Do you remember what those are?

A    The only one that comes to mind was -- is -- I guess he is a famous artist Petter Hegre.  I don't know how to spell his last name.  And it was called Hegre Art.  Hegre Art I think.  And I just -- I think she was a model of him too.  But Hegre Art.

Q    What's her name?

A    I have no clue.

Q    In your complaint you allege that these photographs could be found through a simply goggle search.  What would I search to try to find that picture?

A    That you would have to have refer to my

lawyer, because I think he is the one that did that.

Q    So you don't know that a Google search would find that picture?

A    Other than him telling me.

Q    Okay.

A    He called me and told me.

Q    Hold on.  Hold on.  I don't --

MR. ROBERTS:  It's okay.  And we talked about this.  And you are referring to your criminal attorney, correct?

THE WITNESS:  Correct.

MR. ROBERTS:  Yeah, you don't have to disclose --

THE WITNESS:  Okay.

MR. CARSON:  -- attorney/client privilege. But at the same time it's nothing that we are hiding.

THE WITNESS:  I'm sorry.

MR. CARSON:  No, it's fine.  And, again, I appreciate you clarifying that it's not your knowledge, it's what somebody else told you. That's not going to be helpful to me today.  I want to know what you know.

THE WITNESS:  Okay.

BY MR. CARSON:

Q    Do we need to take break?

A    No.  I just don't want --

Q    You don't want to what?

A    I don't want to mess anything up.  I don't want to say anything that I'm not supposed to.  I'm nervous.

Q    Well, listen, as long as you are being truthful and as long as you don't divulge attorney/client privilege, you're doing fine.  All right.

A    I guess I almost did.

Q    No, you --

MR. CARSON:  No, it's okay.

THE WITNESS:  Sorry.

MR. ROBERTS:  And we spoke about this.  It's okay.

BY MR. CARSON:

Q    I don't know if you noticed, but as soon as you said my attorney, I was like hold on.  You know, I don't -- I don't want to hear that either.  So you're doing just fine.

All right.  Do you know if you -- did you ever search for these types of photos on a search engine?

A    I mean, type -- I don't know.  I mean, all --

no.  I mean, I just would -- I went to one or two sites usually and that was it, because I wanted to be careful.

Q    Of what?

A    Well, there is a lot of shit on the internet. And I'm a police officer and I know I uphold and represent and I don't want to go to some website that is shady or have something that's not legal.

Q    **What do you mean there is lots of shit on the internet?**

A    Just that.  I mean, you turn on anything on the internet.  I mean, I've made -- what was this thing I did the other night.  On Snapchat people were just putting stuff that is not appropriate.  And on Snapchat there was a picture that obviously somebody had like monochrome to make it monochrome.  So I guess to get past their AI stuff so kids could still see it and it was obviously two people having sex.  And it's like so I reported that as an inappropriate image to them and so they could take it off.  That's just something that shouldn't be on a site like that.

Q    **Was there something inappropriate about the two people having sex?**

A    Well, yeah, because kids have access --

Q    **To Snapchat?**

A    -- to Snapchat.

Q   Okay.

A   That's only an adult should be able to see that stuff.  I mean, I would be -- go out of my mind if my five year brought something to me or 10 year old, hey, Dad, what is this?  Can you explain this?

Q   I guess my point is, you know, we're dealing with allegations of minors.

A   Okay.

Q   And I just wanted to make sure your objection to it was that it was on Snapchat, not that the video or the image itself was illegal?

A   Right.  No.  No.  No.  It was -- well, it should be illegal to have -- if somebody put something like that for a kid to see that should be illegal.

Q   Sure.

A   But, no, there was no -- this was an adult site for all intents and purposes.  It had all the USC's down at the bottom of the website.  It was all models were legal under the United States law.  I can't remember the verbiage.  But so I had nothing to assume anything in that website was legal --

Q   Was illegal?

A   Legal.

Q   You believed it was legal?

A   Correct.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 54

Q   Because of the disclaimers?

A   Because of the disclaimers and, I mean, it was a paid site.

Q   You -- and I'm going to ask you again because you said it is a paid site.  Do you recall -- do you have any recollection if you paid?

A   I don't.  Most of those sites offer like three day trial free offers and stuff that you get like two or three days to watch it, to view the site, to see if you want to pay.  And I'm sure that's what I did, because I was cheap.

Q   Okay.  And during that two to three day trial period would you download photographs?

A   Safe to say, yes.

Q   I want to make sure I understand this.  Before you looked at any of the photographs on Med-Art.com you went to the bottom of the web page and checked that there were --

A   I didn't specifically go there for it.  But it was -- it's put on the site.  I mean, you could go to the site and look at it yourself.  It's there in a manner that you can see that it complies with all U.S., I think it even says Canadian laws.

Q   My question to you is this though, before you looked at any of the images did you look to see if it

had those disclaimers?

A    I believe so.  But I'm not 100 percent certain.  But I'm pretty sure I did, because, again, like I told you, I wanted to make sure it was a valid site, you know.  That there was -- because I was a police officer.

Q    If it didn't have the USC sites at the bottom, would you have still looked at the photographs?

A    Probably not.  I mean, I just know.  I mean, you have things that pop up on the phones sometimes, and I would just go away from that site.  I mean, I tried to stay with what I considered to be legitimate sites.

Q    Okay.  What would you be concerned about seeing, viewing on a nonvalid site or non-legitimate site?

A    I mean, I'm concerned, I guess, what some people might construe as being extreme or whatever.  I mean, I just wanted stuff like Playboy or Penthouse, I mean, that's what I grew up.  When I was in the Army I looked at Playboy and Penthouse.  And this site and the Hegre Art site was familiar with and looked just like Playboy and Penthouse.  It was what I called tasteful.

Q    But you said a couple of times you were concerned as a police officer about --

A    Right.

Q    What were you concerned about viewing?

A    I mean anything that potentially could be offensive or brought to be illegal I guess.

Q    Okay.  Was part of your concern about viewing photographs on a website that didn't have a disclaimer, didn't have the USC sites that it might contain child pornography?

A    No, because I don't think that's available on the regular internet.

Q    Okay.  So, I mean, this disclaimer USC sites or not, you can go to any website and you shouldn't be afraid as a law enforcement officer that you're going to see something illegal, correct?

A    Well, illegal and the society we live in, what might -- somebody might find offense may not be illegal but they would find offensive.  And me as a police officer I always try to draw the line on I need to be better than the average person.  I'm also a Christian.  And I didn't want to look at anything that potentially would get into that realm to where, you know, I'm kind of breaking my upbringing with Christ and things like that.  I just look for tasteful pictures.  And if you go to either one of those sites these are tasteful pictures in my opinion.  They don't demoralize women or anything like that.

Q    Do you know if Med-Art is marketed towards -- marketed as having images of young girls and teenagers?

A    No.

Q    You mentioned that, and I think you answered this question in a roundabout way, you said you've only gone to one or two sites, you've mentioned the Hegre Art site, you've mentioned Med-Art.  Any other sites that you've gone to?

A    Not that I can recall.  Best of my memory those were pretty much my -- where I went.

Q    Okay.  Is it your testimony today that there is no image of child pornography available on the internet on a public website today?

A    I would say yes.  I mean, I've never come across it or never heard of another officer telling me they've come across it.  I've always heard the dark web. You know, the dark web, dark web type stuff.

Q    Do you know where you were when -- you don't remember specifically viewing the picture that's 8B, correct?

A    Correct.  But I do recognize her face.

Q    Okay.

A    And that just comes from being a law enforcement officer.

Q    What does that mean?

A    Well, I mean there are certain things, I guess, everybody is good at.  You may be a person that's good at remembering faces, but you can't remember names, those kind of things.  I was always a person that I could remember faces, I couldn't tell you where I saw them or if I arrested them or not, but I could remember the face if that makes sense.

Q    I gotcha.

So it's not because of any sort of specialized training that you have in --

A    No.  No.  No.

Q    -- pornography or CSAM or anything like that?

A    No, sir.

Q    I will have you skip ahead to a couple of pages until you get to the image name 0059, which I believe we have marked as Exhibit 8G -- no, I'm sorry -- 8C.

MR. ROBERTS:  Did you do those in the same way that I did?  Like so my C is your C?

MR. CARSON:  Your exhibits are these exhibits.

MR. ROBERTS:  Okay.  I just wanted -- yeah.  Yeah.

MR. CARSON:  Yeah. I know you labeled them yesterday.  You labeled them as Plaintiff's exhibit.  I don't want to have to start anew.

So...

MR. ROBERTS:  No, I was just when I go back like my 8C is the same as your 8C.

MR. CARSON:  That's right.  I think so.

MR. ROBERTS:  Okay.

MR. CARSON:  I believe that's your handwriting?

MR. ROBERTS:  Yeah.  Yeah, it is.  Yeah.

BY MR. CARSON:

Q    **Mr. Lawshe, do you recognize that photograph?**

A    Not as one that was -- that I downloaded or anything, no, sir.

Q    **You downloaded a fair number of pictures on your phone, correct?**

A    Yes, sir.

Q    **Do you remember how many ballpark rough estimate?**

A    No, sir, I don't.  I was -- I do remember that when they told me how many my forensic guys said that were there, I was like that's a lot.  But I don't remember, no, sir.

Q    **It was in the thousands, correct?**

A    I think it was.

Q    **Okay.  So if you don't remember specifically having that picture on your phone I don't suspect you**

remember when you looked at it?

A    No, sir.  To be honest most of these downloaded I would never ever go back and look at them.

Q    Why were you downloading them then?

A    So of the one things when I was going through my lyme and everything I started struggling with erectile dysfunction.  And one of my doctors, I mean, she actually just was like, "Hey, have you-all tried reading stories?  Have you looked at pictures?"  And she goes, "You know, that sometimes help."

And so I think that's when I started downloading more of the photos just so I thought maybe it would help with my erectile dysfunction.  Because it's -- it's bothered me a lot not being able to kind of be romantic with my wife the way I used to be.  And she knows it.  So we were trying to -- I was trying to just see if it helped.  And so I'm not somebody that looked at a lot of porn historically.  But I started looking at it more so after that just downloading the photos.

Q    Was that your lyme's doctor?

A    Yes, sir.  Dr. Kimberly Kaye.  I remember it now.

Q    Yeah.  Yeah.  You had an opportunity to review your answers.  And that's what I was going to refer you to.

A    Yeah.

Q    So Dr. Kaye told you that maybe to look at stories or pictures?

A    Yeah.  She just said have you tried pornography.  She didn't really -- I don't think she specified exactly what, but -- and she put me on testosterone and some other things to try to help.

Q    Showing you 8B and C.

A    Yes, sir.  That's the same girl.

Q    Yeah.  How old is that girl in that picture?

MR. ROBERTS:  Objection.  You can still answer.

THE WITNESS:  Oh, yeah.  Yeah.

BY MR. CARSON:

Q    You can answer.

A    23, 24.

Q    What makes you say that?

A    Just observation skills.  I mean, just looking at her she looks 23, 24 years old.

Q    Other than just observation skills anything else that leads you to believe that young lady is 23 or 24 years old?

A    No, sir, there is nothing else there.  I mean, I would say she's 23 or 24.

Q    Do you know what website that photograph is

from?  Let me put them in front of you again.  8B, 8C, do you know what website those photographs are from?

A     I'd be lying if I said I did know, sir.  But I know the two websites that I mentioned to you I would assume they were from that one, because that's primarily where I went.

Q     Any other websites you remember going to?

A     None other than the ones I just told you about.

Q     You can go ahead and skip a couple of pages, sir, to actually I think it's the next page.  Maybe one more.  I misled you.

A     Am I looking for a file name again?

Q     You're looking for file -- image number 0065.

A     006 --

Q     There it is, sir, right there?

A     Right here, yes, sir.

Q     Okay.  I am going to show you what we've marked as Exhibit --

MR. ROBERTS:  D.

BY MR. CARSON:

Q     This is 8D.

A     Yes, sir.

Q     I'm going to rename these -- or renumber these with clearer letters before we leave here today.

MR. ROBERTS:  I won't take offense of that, Matt.

BY MR. CARSON:

Q    All right.  So that's image 0065.  0065 (1), do you recognize that photograph?

A    No.  I recognize it to be the same girl, though.

Q    Same girl as 8B and 8C, correct?

A    Yes, sir.

Q    Do you recall when you might have viewed that photograph?

A    No, sir.

Q    Do you recall when you might have downloaded that photograph?

A    No, sir.

Q    And you testified just a minute ago you would download them -- a lot of times download these photos but never look at them, is that the same with this one you downloaded it and might never have looked at it again?

A    I would assume because honestly -- again, being honest, I don't even know why I have that many photos on there because I never looked at them, but, yes.  I would imagine if I looked at it more like repeatedly I could tell you probably more about the

photo but I didn't.

Q    So you were arrested in April 2023.  Do you understand what lead to the investigation that lead to your arrest?

A    I mean, I can describe what I think what I remember is that it was alleged that some photos were flagged that were on my phone through the cloud and that they believe they were of underaged girl and that's the reason I got arrested.

Q    Are you familiar with NCMEC, the National Center for Missing and Exploited Children --

A    Not until all this happened.

Q    Make sure you let me finish my question.

A    Oh, I'm sorry.

Q    No, listen you are not being rude.  We've been doing really, really good.  Oh, man, I don't mean to upset you with that.  Yeah, I just want to make sure we get all of our answers and questions down correctly.  Okay?

A    Yes, sir.

Q    All right.  Are you familiar with cybertips?

A    No, sir.

Q    Okay.  And you wouldn't be, right, your law enforcement career has been --

A    It's wildlife.  We had -- we had training on

human trafficking.  But it was not extensive.

Q   Okay.  So I'll represent to you that the first picture I showed you of the model that we had three pictures of.

A   Yes, sir.

Q   So that's 8B was the subject of a NCMEC cypertip.  Okay.  So that is Verizon and/or its cloud provider finding that picture and tracing it to a phone number that belongs to you.  That was in January of 2023 --

A   Okay.

Q   -- that that NCMEC cypertip was generated. Does that help you at all with when you might have downloaded and viewed these photos?

A   No, sir.  It really doesn't.  I mean, no.

Q   Okay.  So the photograph that we looked at first, which is 8F, was of the subject of a NCMEC cypertip from October 2022?

A   Okay.

Q   And it was determined that this likely was not an underaged female so no investigation was triggered by this photograph?

A   Okay.  This is the first time I seen these photos by the way since all this started.

Q   I understand.

A    Okay.

Q    I understand.  And listen I'm not -- I'm not trying to embarrass you.  But, you know, 3,000 photos I don't expect you to have a photographic memory of each one.  But I do want to talk to you about another thing.  So that's the first -- 8F is the first NCMEC cypertip.  And as far as we know in this case there has only been two.  The second NCMEC cypertip was related to the photograph that's been marked as 8B.  When you were arrested in April of 2023, your phone was searched.  You're aware of that, correct?

A    Yes, sir.

Q    Okay.  They did a Cellebrite extraction, they were able to access the thousands of pictures, correct?

A    Best I know, yes.

Q    Best you know.  These photographs were not on your phone at that time?

A    Okay.

Q    Do you know why?

MR. ROBERTS:  I'm going to object to that question.  Lack of predicate and foundation.

THE WITNESS:  No, sir, I don't.

BY MR. CARSON:

Q    Do you have any reason to dispute that those photographs were not on your phone at that time?

MR. ROBERTS: Objection.

THE WITNESS: Neither way, no, sir.

BY MR. CARSON:

Q Did you have a practice of at some time during the months between and including October 2022 and April 2023 would you deplete photos from your phone from time to time?

A I mean, I'm sure I did because memory would run out and stuff. I think there were programs on my phone that would clean up memory and do stuff, I mean, yeah.

Q Okay. Do you remember ever going through and saying -- whether to clear up memory space or for any other reason, do you remember ever going through your phone and deleting photographs that you had downloaded from the internet?

A Not specifically, no.

Q Other than visiting websites and downloading photos, did you receive any photographs of naked woman or otherwise sexually explicit photographs in any other manner?

A No.

Q Did anyone ever text you a photograph?

A Some officers.

Q Okay. Did you ever save any of those

photographs?

A    They would have been in my text messages probably.  I mean, unless they got cleaned up too.  Because, I mean, but it would be like -- I think I remember one photo that an officer sent me for the Fourth of July it was a topless woman with a flag bottom and somethin' somethin' and it said happy Fourth of July stuff like that.  It was, you know, they were being funny.

Q    That was sent to your personal telephone number?

A    Yes, sir.

Q    Okay.  Did you ever save those to the phone?

A    Not that I am aware of, no.

Q    Did you ever save any picture that was sent to you containing a naked woman or otherwise being sexually explicit to your phone?

A    Can you word -- can you say that again?  I'm sorry.

Q    Sure.  Other than -- I mean, you mentioned specifically a fellow officer sending you --

A    Right.

Q    -- quote unquote, funny, you know, photographs, you didn't save those, but do you recall ever receiving a naked -- a photograph of a naked woman

or otherwise sexually explicit photograph via text message and saving it to your phone?

A    Someone other than officers is what you are asking?

Q    At all.  At all.

A    Maybe.  Maybe not.  I'm not sure.  I mean, I have friends that would send goofy stuff too.  But I don't -- I don't specifically recall.  It wasn't a frequent thing.

Q    Okay.  Has anyone ever sent you a photograph, an image of a naked woman or otherwise sexually explicit image via e-mail?

A    Probably.  But I'm not certain.

Q    Have you ever saved any of those photographs to your phone?

A    I'm not sure.

Q    Are you familiar with file sharing sites?

A    I am after since this occurred.

Q    Okay.  What are file sharing sites?

A    Well, I think -- so I think one of the things that when they questioned my wife they mentioned Discord that's the only thing and my sons have taught me -- taught me about Discord since then.  So I am familiar with discord now.

Q    What is Discord?

A    It's basically, I guess -- well, I really don't even know.  They want me to get on it.  I haven't got on it yet because they play video games.  But I guess it's a site where you can go and you can communicate with other people and I guess according to my sons and my lawyer --

MR. ROBERTS:  Well, let's keep it to what your sons told you.

THE WITNESS:  My son says that people can do -- share stuff on there and you've got to be really careful because you can get into some discords and they'll be CSAM.

BY MR. CARSON:

Q    Okay.

A    And I was like I've never been to Discord.  I didn't have a clue of it.  And I told them that in the first place.

Q    Have you ever used programs, products like One Drive or Share File?  Do you know what they are?

A    No, sir.  Is there another page I need to go to?

Q    Yeah, I'm going to -- I think you skipped forward three, the file name is at the top.

A    Okay.  YCB.

Q    YCB?

A     LVVFQ.

Q     Underscore o.  But we are going to call that --

MR. ROBERTS:  That's actually a different image.  That's it.

BY MR. CARSON:

Q     Exhibit 8A, do you recognize that photograph?

A     Other than being the same girl over there, no. I don't recognize downloading it.

Q     You said same girl, you pointed over here.  I want to --

A     The photos we've been looking at prior it's the same model I believe.

Q     8 B, C and D?

A     It's the same model it looks like.

Q     And you said you kind of have a knack for recognizing faces?

A     Yes, sir.

Q     So you believe that the model in photograph 8A is the same one that's in B, C and D?

A     It appears to be.

Q     Okay.  Do you remember ever viewing that photograph on your phone?

A     Not that one specifically, no, sir.

Q     Do you remember ever downloading that

photograph on your phone?

A    No, sir.

Q    The last photograph I'm going to show you is -- I think skip ahead a couple of pages and I will show you where it appears.

MR. ROBERTS:  The DuckDuckGo.

BY MR. CARSON:

Q    Yeah, we're going to call that the DuckDuckGo?

A    Yes, sir.

Q    And it has been marked as Exhibit 8E.  Do you recognize that photograph?

A    I don't.  But I do remember the name of that site.

Q    What site is that, sir?

A    Amour Angels.

Q    Okay.  Is that a site that you would go to?

A    I think it was a sister site that I remember to -- I forget the name of the other one.  The Med-Art that we were talking about.  I think they are all sister sites with the Petter Hegre one.

Q    If you were subscribed to Petter Hegre your understanding is that you also would have access to Med-Art and Amour Angels?

A    As best I remember I think that was the way it worked.  It was a trial, free trial thing.

Q    Okay.  If you were to subscribe to any one of these sites for more than just the trial period, would that show up as a charge on a credit card?

A    I would of -- well, I guess it has to be because you're paying.

Q    Okay.  I guess that's my follow up question.  Would you be able to look at credit card statements and determine if you ever subscribed?

A    I never paid just because my wife does the bills.  And I didn't want her to see, hey, why are you paying for porn.

Q    And that kind of leads to one of the questions I had for you.  Did your wife know that you were looking at these photographs?

A    She knows I looked at porn, I mean, yeah.

Q    She knew at the time?

A    Yeah.  I mean, we talked to my doctor about it.  And, I mean, she has been married to me my entire life.  So she would not say I didn't look at porn.

Q    We've been referring to this as a screen capture primarily because at the top it appears to have 86 percent battery.  It says 4G.  There is a time in the upper left-hand corner.  To a lot of people this looks like a screen capture of what you might see on a cell phone screen --

A    Yes.

Q    -- when you are browsing the internet; is that accurate?

A    I would say-so, yes, sir.

Q    Did you create this screen capture?

A    I don't recall.  I mean, if it was on my phone potentially.

Q    Did you ever do that?  Did you ever do the screen capture function where whatever you are looking at on your phone gets saved as a photograph?

A    I have used the screen capture mode before, yes, sir.

Q    Is it possible that you created this one?

A    It is possible, yes, sir.

Q    Do you recognize any of the models on that page?

A    No, sir, I don't.

Q    Did you ever use the DuckDuckGo web browser?

A    I mean, I'm sure I have.  But I use -- I mean, I use whatever web browser on the phone.  Sometimes I would -- I think there was the way the phone is set there is one on the front page, there is one on the back page.  Just whatever is easiest to get to.  I mean, a browser was a browser.  So I didn't specifically use any particular one.

Q    Do you know what DuckDuckGo is?

A    It's a web browser.

Q    That's all you know about DuckDuckGo?

A    Yes, sir.

Q    Okay.  How -- if you know, how is it different than Google Chrome or Safari or Internet Explorer?

A    I think -- oh, man, I don't even know if that would be right to say, but I want to say somebody told me like a friend or something was like it's just easier to use.

Q    Okay.  Do you remember who might have told you that?

A    I don't.  And I think it was pre-installed on the phone.  I'm pretty sure it was.

Q    What kind of phone did you have, was it a Samsung?

A    I believe it was a Samsung android.  I think referred to pop ups.  It had fewer pop ups I think is what they said.  Because Google has a bunch of annoying pop ups for ads and stuff.

Q    Was that your experience using Google Chrome on your phone that it had pop ups?

A    Yes.

Q    I've represented to you that the photograph that is in 8F was the target or the subject of what

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 76

we've been calling the first NCPIC -- NCMEC cypertip.

A   Yes, sir.

Q   And so that was not part of the documents that were viewed in order to bring charges against you. We've also talked about 8B, C, D, A and E.  Do you know which of these photographs were used to charge you with possession of CSAM?

A   No, sir.

Q   Do you know who took these photographs or any one of them?

A   No, sir.

Q   Do you know when any of these photographs were taken or any one of them?

A   No, sir.

Q   I'm going to represent to you that one of the photographs that formed the basis of the criminal charges against you was the top photograph on Exhibit 8E, because there is three photographs or portions of photographs.  But I'm going to represent to you and your counsel will correct me if I am wrong, but it was the top photographs on 8E that was one of the photographs that you were charged with possessing.  Okay.

A   Yes, sir.

Q   Do you know who that is?

A   No, sir.

Q    Okay.  The -- underneath it it says Amour Angels Sanija?

MR. ROBERTS:  Sanija.

MR. CARSON:  Sanija.  Thank you.

BY MR. CARSON:

Q    Do you know who that is?

A    No, sir.  Other than a model for that website obviously.

Q    Do you know how old that model is in that picture?

A    No, sir.

Q    Do you know what Med-Art stands for?

A    No, sir.

Q    Do you know if it's an acronym for something?

A    No, sir.

Q    You testified that one of the things that you looked at before you looked at the photographs was that there was some reference to federal age verification law compliance at the bottom of the web page, correct?

A    Yes, sir.

Q    Did you know then that these websites that you visited claimed that these models were adults?

A    Yes, sir.

Q    But don't you just presume that all public websites are only showing adults?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 78

A    I mean, you could presume that.  But, again, like I stated earlier, I really pride myself -- sorry.  I really pride myself for being a law enforcement officer and I just didn't want to go to something that was -- could be construed as bad.

Q    And by bad you mean what?

A    Something that is like, you know, of demoralizing value toward women.

Q    Okay.  But having a federal age verification statute on the web page doesn't necessarily mean it's not going to be demoralizing to women, correct?

A    In my opinion it does.  I mean, like I said, I grew up looking at Playboy and Penthouse and those were very well respected magazines very mainstream.  I mean, hell, Hugh Hefner was famous for taking pictures of models and naked models.  Petter Hegre is the same way.  He's famous.  So I just assumed that those -- they got the laws there.  This is a valid website and they are not -- and they don't -- if you look at the pictures, in my opinion, they are not demoralizing to women.

Q    Okay.  But if there is a 40-year old woman and she is a willing participant, she chooses to allow herself to be photographed in a truly demoralizing way, however you define that word, that would still exist on

a web page that had a federal age verification law certificate at the bottom, correct?

A    I've never experienced that.

Q    Okay.  Is it your experience then if you find a photograph online of a woman being demoralized, again your word, that they are not going to have federal age verification law compliance certificate at the bottom?

A    They may or may not.  It just depends on, like I said, when you look at the website you can see, again my opinion, you can tell if a website looks like a professional website or not just by looking at it, you know.  It's either going to be one that's presented professional -- presented professionally or not.  And I tried to just go to the ones that looked professional. And all of the ones that looked professional have that age verification on it.  Because, again, they are in the business to make money.  They don't make money by not being professional and treating -- treating their models respectfully and so forth.

Q    Is it your testimony that web pages that show what you would consider demoralizing photographs of adult women will not have federal age verification law compliance?

A    Can you repeat that one more time.

Q    Sure.

A    I'm sorry.

Q    In the whole of the internet -- let me start again.  Is it your testimony that in the whole of the internet as it currently exists, and as it existed in April 2023, web pages that contain demoralizing photographs of adult women who have consented wouldn't have federal age verification law compliance referenced on their web page?

A    A hundred percent of the time I don't think there is anything hundred percent of the time.  So, no, there could be valid websites out there that don't demoralize women that don't have that.  But if I remember right, by federal law they have to have that disclaimer for the most part.

Q    I guess what I am trying to differentiate is the difference between subject matter that's demoralizing and subject matter that's illegal?

A    Okay.  I mean, I guess that would be -- I don't even know what you're asking there.

Q    Let me ask you this.  I am to going show you 8F.  It's been redacted, but what we can see is a woman on a bed, she appears to be tied by rope to the post.  She's got a ball gag in her mouth.

A    Yeah.

Q    Would you consider that to be a demoralizing

picture?

A   I would.

Q   Okay.  Is that woman -- is the woman in the picture of lawful age?

A   As best I can tell.

Q   Okay.  Did this come from a legitimate website?

A   Yeah, it would have to be.

Q   Okay.  And if this came from a website that complies with federal law --

A   Right.

Q   -- it would contain a statement somewhere on the web page that says we have complied with or are complying with federal age verification laws, correct?

A   Correct.

Q   So that's my point, this is a demoralizing photograph, we would all agree?

A   Okay.

Q   But it exists and is available for viewing --

A   Right.

Q   -- on a legit web page that says it complies with age verification laws?

A   Okay.

Q   So if your purpose is to avoid seeing pictures like this, what good does checking for federal age

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 82

verification laws do you?

A    Well, that site specifically should be -- it's legal.  They are saying that, hey, we are models, we follow an HR policy, we screen our people to make sure they are of age.  And that's the legality thing.  That's a legality thing and more of a, I guess, a fetish thing.

**Q    And that's my point, right, is you testified is that the reason you looked for age verification laws was not necessarily to make sure that the models were 18 and that the photographs weren't CSAM.  You said it was because you didn't want to see stuff that was demoralizing and that's where I got confused.  Because there are, as I understand it, on the internet, a fair number of web pages that will show stuff that I think you and I would agree are demoralizing but are lawful and comply with all federal age verification laws.  Would you agree with that?**

A    Yeah.

**Q    Okay.**

A    My comment to that was more on the line of, again, me being a law enforcement officer, a Christian, if my wife were to walk in and see me looking at something like that that she would be like, "What are you looking at, Lee?"  And I would be embarrassed.  But I didn't look at that.  I mean, if you went through

those -- I'm sure they went through the photos.  I guarantee you there ain't many like that.  I'm just saying there should not be.

Q    Are there some like that?

A    There might be some like that, but there is not a bunch, because that's not a thing I was into.

Q    You downloaded some like that, correct?

A    It's possible, yes.

Q    Okay.  When you're saying -- well, when you say "like that" we are referring to?

A    I'm talking about the girl tied up.

Q    8F?

A    Yeah.

Q    Okay.  And I knew what you were talking about, but, again, I want to make sure that the record reflects.  So you would have been embraced to be -- if your wife walked in and you were looking at that photograph, correct?

A    Yes.

Q    Okay.  Would you have been embarrassed if you walked in -- if your wife walked in and you were looking at 8B?

A    No.

Q    Okay.  Would you have been embraced if your wife walked in and you were looking at the photograph

that is the top of 8E?

A     No.

Q     And when I say -- when I ask you questions about the photographs obviously we've redacted these for purposes of being able to handle them and not, you know, unnecessarily embarrass the folks that need to look at these when they become part of the record.  But when I'm asking you these questions I'm talking about the unredacted version and stuff?

A     No, I understand.  Yeah, I know.  They're of legal age.

Q     Pardon me.

A     They're of legal age.

Q     Okay.  That's -- your testimony is that they are of legal age?

A     They look legal to me, yes.

Q     Do you know where any of those photographs were taken?

A     No, sir.

Q     In the whole of the internet, is it possible that a website that states it complies with all federal age verification law requirements and tries to comply with all federal age verification requirements might inadvertently fail to comply with federal age verification law requirements and inadvertently post a

picture of say a 17-year old model?

A    Is it possible?  Absolutely.  I guess it's possible.  Anything is possible.

Q    Have you received any medical, psychiatric, mental health treatment as a result of this incident?

A    No.  Can I get more water?

Q    Why don't we take another break.

MR. ROBERTS:  Yeah, I could use the restroom.

VIDEOGRAPHER:  All right.  We are off the record at 11:04.  End of media unit number one.

(Whereupon a recess was taken 11:04 to 11:16 a.m.)

VIDEOGRAPHER:  We are back on the record at 11:16 beginning of media number two.

BY MR. CARSON:

Q    Mr. Lawshe, I've asked you to provide a computation of the damages that you allege that you suffered as a result of this incident.  In your Rule 26 disclosure you've listed past loss of earnings, future loss of earnings, past and future cost of medical care, and pain and suffering, damaged reputation, loss of enjoyment of life, et cetera, past and future.

Let's talk about past loss of earnings.  Have you calculated your past loss of earnings you allege are a result of this incident?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 86

A    Yeah, we have prepared something.  I think we gave it to you already.

MR. CARSON:  Did we get that, Michael?

MR. ROBERTS:  Uh-huh.

MR. CARSON:  What was that?

MR. ROBERTS:  Our expert disclosure economist.

MR. CARSON:  Oh, gotcha.

MR. ROBERTS:  He has like a whole spread sheet of loss earnings.

MR. CARSON:  Has that been provided?

MR. ROBERTS:  Yep.

BY MR. CARSON:

**Q    Okay.  That's past loss of earnings, future loss of earnings?**

A    That and, I mean, he calculated everything also to include my off duty work that I obviously aren't doing, yes.  So its -- he's got everything in there.

**Q    Does that include medical care?**

A    It did.

**Q    Okay.  What future medical care do you allege that you will receive as a result of this incident?**

A    Well, my lyme -- anything that's super stressful aggravates my lyme like I told you.  I mean, I'm in the middle of a lyme flareup right now with all this stress on me.  So it takes meds, it takes me going

to the doctor more often to get my meds.  I may eventually seek some type of counseling.  Probably will, but I am going to get through this.  So I'll get counseling and things like that.  So and just the stress what it's done to me health wise.  I mean, my blood pressure is through the roof.  My doctor can't figure out how to get it down.  It's all directly because of what I deal with every day.  I mean, I'm basically untouchable.  You know what untouchable is.

In India there are these people called untouchables.  They were the ratters.  They cleared the country of rats.  It's part of the cast system.  Well, that's what I am now in this -- I'm untouchable.  Nobody wants to do anything with me.  I get looks out of the side of eyes that people used to know me for 20 plus years.  I go into restaurants.  That's not ever going away.  And I have to deal with that every day.  And my wife has to deal with it.  My wife -- my mom lost her hairdresser.  She just told me this the other day.  And it destroyed me.  We wife -- my mom was like, "Lee, I haven't told you this, but my hairdresser stopped doing my hair because of all of these allegations that came down."  Yeah, that's -- that causes issues.  Sorry.

MR. CARSON:  All right.  Mr. Lawshe, that's all the questions I have for you.  Ms. Shevlin may

have some other questions.

THE WITNESS:  That's fine.

MS. SHEVLIN:  Thank you, Mr. Carson.

CROSS-EXAMINATION

BY MS. SHEVLIN:

Q    Mr. Lawshe, my name is Amy Shevlin. I represent Dr. Dully in this action. I do have some questions for you.  And I'll echo what Mr. Carson said at the beginning of this deposition.  I'm sure some of my questions may be upsetting or make you uncomfortable. It's certainly not my intention.  But this is my opportunity to ask you some questions that I do need to ask you.  Let me go back through my notes here for one second.

You mentioned earlier in your testimony I believe you said that you had two sons, if I am remembering that correctly?

A    Yes, ma'am.

Q    Okay.  And how old are your sons?

A    35 and 24 or 25.

Q    Do they have children?

A    Not yet.  They are talking about it.  We've actually have to have conversations about that, because I told them I can never have a sleepover with my grandkids and stuff, because after this allegation came

up, I don't want them to think in the least that something inappropriate would happen or could happen.

Q    That's something that you told your sons?

A    Yes.  Because they called me and they have been talking about having grandchildren.  They are all excited about it.  And I can't be, because the relationship I would have with my grandkids and I can have now has changed.  Even though they know they trust me.

Q    Are there any legal restriction on you spending --

A    No, there is not.  But once this kind --

Q    I apologize.  I didn't hear your last testimony.  There is a little bit of a delay.  I apologize.

A    Yeah.  No, there is not any kind of restriction.  But once this kind of allegation is made, I have to be careful.  I can't -- I can't act and do the things that I used to do anymore because people are always going to question it.  And I can't open myself up to that.

Q    Did your sons tell you that they did not want you to be alone with their future children?

A    No, just the opposite.  They want it.  But I can't.  I know it's in the back of their minds.  It's in

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 90

the back of everybody's minds.  And that's what's so messed up about this.

Q    Would you characterize your relationship with your sons currently as a positive relationship?

A    Yes, ma'am.  It's a great relationship.  We are a very close family.  They are the only reason I am still here.

Q    In your answers to Dr. Dully's interrogatories you mentioned that you are currently receiving payments from a pension?

A    Yes.

Q    Is that still true to this day, are you still receiving pension payments?

A    Yes, it is.

Q    Can you tell me how much you receive monthly from your pension?

A    I think it's like $1400.  I'm not positive though.  My wife does all of the bills.  But I'm close.

Q    Is that -- I apologize if I speak over you. There is a little --

A    It's about $1400.

Q    -- little bit of a delay.  So it can get a little bit tricky sometimes.  So.

A    It's about $1400 once a month.

Q    And is that -- is that pension from FWC?

A    Yes, ma'am.

Q    And you also stated in your interrogatories that it was less than you would have received had you worked until your full age of retirement.  Do you have any way of knowing how much you would have received from your pension had you worked 'til full age of retirement?

A    I believe the economist miscalculated that.  I think he reached out to the Florida Sunshine State or whatever and tried to calculate it the best he could.

Q    All right.  But you don't have any independent knowledge of how much you're alleging you would have received had you worked through to retirement?

A    I mean, it's -- all you would have to do is, yeah, call them and they could tell me.  Yeah, they can tell you what it is going to be because it's an accrual rate.  They know what the accrual rate is.

Q    And that's -- as we sit here today that's not something that you know off the top of your head, correct?

A    No, ma'am.  No, ma'am.  Right now I don't know that exact number.

Q    You mentioned also early on in your testimony that you had applied to approximately 30 jobs, but you had not heard back from anybody.  Am I remembering that correctly?

A    Yes, ma'am.

Q    Can you tell me what span of time in which you applied to those 30 jobs?

A    Approximate would be maybe the last eight months.  And I probably haven't applied for any more in the last two months.

Q    And the last application that you put in was approximately two months ago?

A    It's probably a little later than that.  Maybe four months ago.  Probably that whole thing could be slide -- slid back a little bit further.

Q    Is there any particular reason you haven't applied for anything in the last two to four months?

A    Other than it's kind of hopeless.  And I'm not going to go to work for some group that a bunch of felons work for, because that's not the kind of person I am.  And that's really only going to be probably the only kind of job that I can get.  So I'm honestly trying to start my own business right now.

Q    What kind of business?

A    Car detailing business.  It's going to be a mobile car detailing business.

Q    Is that -- you mentioned earlier that you had a friend who had a car wash that went out of business, is that related to that in any sort of way?

A     No, he just gave me the idea.  And so all my -- I've got family members -- because I have quite a few family in town.  So I have got about 13 cars I do a month.  Well, no, maybe not that many, about 8 cars I do a month and they pay me.  But it's all family.  So it's -- but I'm trying to expand on that and down the road get a business license and things like that and actually make it a real business.

**Q     And how much are you earning with the, I think you said, eight cars a month?**

A     Well, it's not every month.  But I would say maybe 500, if that, a month.  It's probably more like 300 a month.  Because I don't charge them -- I mean, it's family.  I don't charge them what a car detailer would charge them, if you know what I mean.  You wouldn't charge your family members a couple of hundred dollars.  I charge them like 50, 60 bucks.  And that just helps.

**Q     When -- you stated you're not going to go work where a bunch of felons work.  What exactly did you mean by that?**

A     The restaurant industry is full of felons.  A lot of septic -- septic tank places, jobs that people don't want basically because they are dirty.  I like law enforcement.  I like retail.  I was always served and

worked in the entertainment industry and Fortune 500 Companies.  I worked for Gap, Inc.  I worked for Blockbuster Video.  I worked for Gander Mountain.  All really big Fortune 500 companies and as soon as they find out and I tell them about and they have to be told because everybody in that genre knows me so they're going to walk into the store.  Somebody is going to say something to the manager, oh, hey, do you know this guy was arrested for such and such and they walk over and go, hey, is this true, is this what happened.  How embarrassing that would be.  So, yeah, I can't work in those kind of places.

**Q    When you say you have to tell them about the arrest, is it your understanding that you legally have to tell them about the arrest, or are you saying that you want to tell them up front to avoid the potentially embarrassing situation that you just described?**

A    The second.  I think it's just morally and ethically correct I should let them know about it.  If you were a business owner I think that you would want to know that.

**Q    You mentioned the -- your diagnosis of lyme disease, when were you first diagnosed with lyme disease?**

A    I think it was 2019.  My doctor said I had had

it for probably four or five years undiagnosed which is why it had progressed to the point it had.

Q   What kind of symptoms were you having that led to your diagnosis?

A   Memory loss, my handwriting changed, cognitive abilities, I couldn't write a police report.  A report that would normally take me maybe an hour or two, would take me a week to write.  Debilitating -- debilitating -- I'm sorry.  Debilitating like just fatigue.  I would go -- I might be able to work two or three days and I would sleep for four or five days just straight never get out of bed.  I had very bad stomach cramps and nauseous and also, you know, the main thing, too, was I had five or six instances where I just had -- I didn't know where I was at.  And that's when I had a buddy who also has lyme disease that got me finally in to see his doctor.  I had been to about 15 doctors getting diagnosed.  And I finally got the late stage diagnosis through the doctor that I gave you guys in your paperwork.

Q   That's Dr. Kimberly Kaye?

A   Yes, ma'am.

Q   When is the last time that you saw Dr. Kaye, most recent appointment with her?

A   It was last year.  I'm kind of on a yearly

thing now.  I'm supposed to see her this month.

Q    Your appointment for this month is that your yearly visit with her, you see her in March generally?

A    Yes, ma'am.  It's my yearly visit and she dictates after that how much -- how many symptoms I am still having whether I have to see her more or not.

Q    What was the timeline where -- I just want to pin down, you know, what year, around about, if you recall, you were saying, you know, you were having some cognitive issues and normally a report that would take you about an hour to write would take a week, you would work two days, and then you would sleep for four or five days, what year approximately did that start happening?

A    Give me a second to really think.

Q    Sure.

A    2019.  I think it was like it started in 2019 through up until 2020 is when I was experiencing -- I think I went to the emergency room eight times.  They were about ready to give me a pacemaker, it was a whole bunch of stuff and it was all in my lyme.  So I think -- because I was out of also -- I was out of work for about three or four months bedridden.

Q    Did you take like family medical leave or something like that --

A    I did.

Q      -- while you were working?

A      I was on FMLA from that time all the way to the time I was let go with FWC.

**Q      So when is your last day that you actually worked at FWC before you took FMLA leave?**

A      I'm sorry.  Say that one more time.

**Q      What's the last day that you actually worked before taking FMLA leave from FWC?**

A      So I was on FMLA leave all the way up to the day I was arrested.  There is an FMLA -- there is a part of FMLA that's a flexible FMLA.  And what would happen is whenever I would experience flareups I was able to use FMLA.  So I was on FMLA from about 2019 all the way up to the day I was arrested.

**Q      So the four to five month period when you didn't work at all --**

A      So that was --

**Q      -- that was when?**

A      -- regular traditional FMLA I was just out of work totally.  But there is also part of FMLA that allows you to flexibly work with lyme.  So what it allowed me to do, and this is one of the things that I have issues with trying to find a job, because I got a job I would have to immediately be moved back on FMLA, was that, you know, I could work and I might work during

the summer part of the year and get really hot and really stressful because of the heat and wearing all the stuff that I wore for my vest.  And I would work my regular 13-hour shifts, 12-hour shifts, but because of that I couldn't get the rest I needed and I could then go out on FMLA with what's called flexible FMLA I just -- it was already called in, it was already done. I would just have -- I could take three days off and they couldn't say anything about it because I was on FMLA.  And I then would sleep and do what I need to do and I would come back to work and I would work fine until the next thing happened that would maybe cause my lyme to flare up.

My doctor said I will have my lyme flareups for the rest of my life because of how long I went untreated.  Does that make sense?

Q    The -- it does.  Yes, I am just trying to pin down -- I am not quite sure you answered my question. So I will try to ask it a different way.  The four to five month period where you didn't go into work at all.

A    Yes, ma'am.

Q    When was that?

A    My wife would know.  I can't -- I don't know exactly for sure.  It was -- I think it was in 2019. Because it was after I was off for the year for the

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 99

nation and I think that was -- I honestly I don't know. I could -- I could come back -- get back with you on that, because I could call my lyme's doctor and find out. But I don't know. I really don't. I'm sorry.

**Q Okay. Yeah, that's okay. For purposes of today, I just want to know what your best recollection is. So that's fine. And then the follow-up question I have for you, again, I'm not expecting you to know exact dates and tell me it's January 12th of 2020, but do you recollect when you went back to work and you began working on the flexible FMLA instead of being completely on FMLA?**

A I think I was -- I couldn't tell you the month or date, but I think I was out about three months. So whatever that was. I remember I also had to call -- I had -- I had -- I had a rep for my -- my FOP -- what do you call it. PBA. I had a PBA rep or an IUPA rep. I'm sorry. I had an IUPA rep for my -- my -- give me a second. I'm drawing a blank here.

**Q That's okay.**

A For my union. Because I was being threatened actually by one of my -- I was being threatened by my captain. He didn't believe I was sick and had lyme. He actually came to my house and was like telling me he was going to put me on some kind of investigation for fit

for duty.  And so I called my rep and got him involved and that all went away.  But it took my work a while to understand that -- they didn't believe I was sick at first.

So I remember all that happened when I was out sick because they just -- they were trying to get me to quit or fire me.  And I actually was trying to create a bill -- I had a state congressman that was trying to create a lyme bill for us and I really think they didn't like that anyway.  So I think they were looking for a reason to get rid of me.  But we were trying to create a lyme bill because there is a lot of police officers, there is a lot of people who work for Division of Forestry, and just working the woods in Florida that have all contracted lyme in Florida.  And I hate to say it, I mean, I was a big proponent of this, but it's not being told to the public, that lyme is actually in Florida.

The University of Florida did a study that showed the white-footed mouse from Matanzas State Forest right here in St. Johns County up to the border of Florida and Georgia that all the mice in that area can have lyme disease.  But yet we continue to let people walk in our state forest and recreate and we are not telling people about that.  I believe they looked at

that as a threat.  I mean, I did.  I went to my colonel

about it.  I talked to -- that they were -- what they

were doing was wrong.  They need to educate the public

and they are not.

Q   What's the name of the colonel that you spoke to about this?

A   It would have been, oh, gosh.  It's not the colonel.  It would have been -- it's the one that retired two years ago.  I can't remember his name.  I'm sorry.

Q   That's okay.

A   But he was a big proponent of it too.

Q   Okay.

A   He was not against it.  But his hands were tied because he's elected.

Q   There is a delay.  I'm sorry.  All right.  I think we are back.

You also mentioned your captain at the time came to your house and threatened you with, you know, seeing if you were fit for duty, what's the name of that captain if you recall?

A   Captain Smith.

Q   What's Captain Smith's first name?

A   I can't remember.  I don't think he works for our agency anymore.  He's -- he was -- they fired him

eventually.

Q    You mentioned when we were just speaking about the lyme symptoms you mentioned that you had gone to the emergency room eight times, did you go to the same emergency room every single time?

A    No, ma'am, I went to several because one time I was on vacation.  So I think I had been to Flagler and to what's the really good hospital up in Jacksonville. Mayo Clinic.

Q    Those are the only two, you went to those two eight times between the two of them?

A    Yes, ma'am, I'm pretty sure that's the only two I went for emergency room issues.

Q    Was that before or after you had your lyme diagnosis?

A    It was kind of -- I think it was kind of during, because I had --

Q    You were already seeing Dr. Kaye?

A    Yes.  Well, actually it was probably while I was waiting to see Dr. Kaye.  Because I was -- that's where I had the lyme carditis.  It affected my heart. It got into my heart and it was causing my blood pressure to bottom out and heart palpitations and everything.  And that's what I was going to the emergency rooms for.

Q    Where you say causing your blood pressure to bottom out, what do you mean?

A    So my heartbeat would slow down so much and skip so many beats that they thought I had AFib but I didn't.  It was -- it was what's called lyme carditis. And can be --

Q    Are you under the care of a cardiologist for the lyme carditis?

A    So I have a cardiac doctor at Mayo.  And I see him once a year.  But my primary is with Doc Kaye.  Once they got me on the meds and treated the lyme carditis it's pretty much subsided. I haven't had an incident with that for probably two years now.

Q    What's the name of the cardiologist that you see at Mayo once a year?

A    I can't remember, ma'am.  I'm sorry.

Q    Okay.  When is the last time that you saw that cardiologist?

A    Like I said about two years ago.

Q    I just want to make sure that I am correct, because I -- I think there is some information in the file that is possibly discrepant on my end.  But when you were arrested, did you end up resigning from FWC or were you fired?  Because I am just not sure on that.

A    Okay.  So what happened was I was sitting

there.  They looked at me and my captain and my major said, "We can't tell you what to do, Mr. Lawshe or Lee. We are flabbergasted by this.  I have one question and you have one answer to give."

And I saw said, "Okay."

And they said, "Do you resign or are we firing you?"

And I asked them, "Well, can I talk to somebody?  I have some questions."

And they said, "That's all we can give you right now."

And I said, "Well, I guess I resign."  And that's what happened.

Q     What date was that if you recall?

A     The day that I was arrested.

Q     Where did this occur?

A     In the sheriff's department.

Q     Was that Captain Smith?

A     No.  That was -- it was -- give me a second. It was Major Russel and I had a new captain.  Captain Creech, Captain Robby Creech.

Q     I'm going to guess that's C-r-e-e-c-h?

A     I believe so, ma'am.  I'm not -- I believe so. I'm not positive.

Q     You mentioned that you were on -- and I think

you said currently on some prescription medications for your lyme disease.  Can you tell me what prescription meds you are currently taking?

A    So prescription med I am not actually on a lyme other than I'm taking two what they call tinctures.  They're -- it's a bunch of Chinese herbs really for -- it's like -- and I told him -- I can't remember the name of it now, but Dr. Kaye could probably tell you.  But I do take a lot of supplemental vitamins and things.  I'm off -- I'm off any per se prescription med now because of how I have progressed.

Q    Are you taking any other prescription medications currently that are unrelated to your lyme disease?

A    Yeah, I'm taking one Ramipril for my high blood pressure.  Ramipril.  And she prescribed a few -- a few other meds for me to use as needed for my stress and that I have been under with all this.  I can't tell you the names of them.  But it was like -- I don't like the way they make me feel.  So I don't take them unless I absolutely need it.  It's like -- I can't remember the names of them.  But there is one that's like a benzopine they dumb you down and slow you down and just make you not feel.  But she would -- she would have a list of them.

Q    Sure.  And that's Dr. Kaye as well?

A    Yes, ma'am.  Yeah.  All my medicine I take are prescribed from Doc Kaye.

Q    I mean, I assume based on what you just told there may be like an antianxiety medication?

A    Yes, ma'am.  I mean, if you said a couple of them I will be able to -- if you knew them, but I don't know the name of them.

Q    That's okay.  And so the high blood pressure medication, the antianxiety medication which the name you can't recall right now, you've got the herbal tinctures, and some vitamin supplements, is there anything else that you are currently taking?

A    Just vitamins, you know, that also aid with my lyme.  Vitamin B, Vitamin K, Vitamin D, Magnesium, Vitamin C, Quercetin, there is a couple of them I am not remembering, but that's probably most of them.

Q    Okay.  Were there any prescription medications that you were taking in the past that you are no longer taking for any conditioning including the lyme?

A    Yeah.  There was -- I was taking 60 pills a day when my lyme -- when I was really sick.  I mean, they had me on -- there is a pill that they used to give addicts.  Antabuse.  I was on Antabuse for a long period of time.  I was also on Narcan.  They had me on Narcan

for a while.  A couple of antifungal medicines because with most lyme patients you have fungal overgrowth.  And then I was taking very, very high doses of antibiotics and I can't remember what antibiotics they were, but I was taking super high doses of antibiotics three times a day.  I think it was like Amoxicillin and things like that.

Q   **Anything else that you were prescribed -- any prescription medications that you used to take that you no longer take?**

A   I think that's pretty much it.

Q   **You also mentioned that as a result of the lyme disease, you again experienced some erectile dysfunction.  Do you recollect when that symptom began?**

A   Probably about a year into the medications.  Once I got diagnosed with Doc Kaye I started having issues.  I thought it was the Antabuse.

(Simultaneous talking)

A   Yeah.  I am sorry.  I thought it was the Antabuse because one of the side effects of the Antabuse and she told me was erectile dysfunction.  But she assured me that once I was off that it would go away, but it never really did.

Q   **That would have been roundabout 2020 maybe?**

A   Maybe.  Like I said Doc Kaye would have record

of it when I went on that.  It was when I was really sick and bedridden and couldn't work.

Q    Was she the one that diagnosed you?

A    Yes, ma'am.  She specializes in lyme disease.

Q    And you also mentioned -- I think that you said both you and your wife spoke with Dr. Kaye about her recommendation that you maybe look at pornographic images, do you recall?  Am I remembering that correctly?

A    Yes, ma'am.

Q    Do you recall when that conversation took place?

A    It would have been on one of my visits.  I'm not sure which visit it was.

Q    Do you recall -- again, I know you are not specific with dates, but roundabout maybe what year you began downloading pornographic images after speaking with Dr. Kaye?

A    Not really because I don't remember when the conversation happened.  But, no, I don't.  I really don't.

Q    Have you ever met Dr. Kathleen Dully?

A    No, ma'am.

Q    Do you know if your wife or anyone in your family has ever met her?

A    I would venture to say, no, they've never met

her.

Q    Do you know who Dr. Dully is?

A    Only from the proceedings that we are dealing with now.

Q    Tell me what your understanding of who Dr. Dully is.  And the same thing is going to apply if you have learned anything from your counsel, please do not divulge any attorney/client privileged conversations, but just your independent knowledge as we sit here today of who Dr. Dully is if you could tell me.

A    Well, as best I understand she is just somebody that works for the State of Florida that when NCMEC things come up they can contact her and let her do her supposed scientific process, divulge maybe whether a picture is or isn't or determine their age by looking at pictures.

Q    Do you know who contacts her?

A    I believe it was NCMEC.  And, again, I only know that because of these proceedings.

Q    Sure.  If I represented to you that St. Johns County Sheriff's Office contacted Dr. Dully and NCMEC directly would you have any reason to dispute that?

A    No.

Q    Have you and your wife sought marriage counseling as a result of this incident?

A     No, ma'am.

Q     And how about family counseling with your sons or anyone else in your family, you mentioned your mother earlier as well?

A     I think my oldest son has seeked some counsel, but I don't I think it's directly because of this.

Q     You haven't had family counseling with anyone?

A     No.  No, ma'am.  I'm sorry.

Q     With your mother or anybody else as result of this?

A     No, ma'am.

Q     That's okay.

You mentioned a little bit ago that you may seek counseling in the future.  Why haven't you sought counseling thus far?

A     I -- just the type of person I am, you know, being in the military I've talked to soldiers who were in combat.  I was never specifically in combat.  But I'm a proponent of -- and I've seen what those drugs do to the people that are chronically depressed and so forth. And I -- it's my opinion that those meds actually make things worse for them.  Many of them cause them to commit suicide.  And I just choose not to go that route. This is a scar --

Q     Would you agree with me that --

A   Go ahead.

Q   I'm sorry.  Go ahead.  There was a delay.  I didn't want to cut you off.  Go ahead.

A   Yeah.  There is just a scar that I'm going to have to carry the rest of my life and it is what it is.

Q   Would you agree with me that you could seek counseling without taking medications?

A   You could.  But for me, every time I talk about this and bring it up it brings it back.  And it needs to be compartmentalized in a part of my brain and put away so I can enjoy my life.  I don't smile anymore my wife will tell you.  I'm not the person that I used to be.  And I'm trying.  We have a great marriage.  And I have a great wife.  I'm very thankful she didn't leave me.  But no counseling could make this go away.  Nothing is going to make it better.  I just need time with anything that is going to help I think.

Q   Have you spoken with any of your medical doctors about possibly receiving counseling?

A   Doc Kaye.  Doc Kaye suggested it and I told her I appreciate it.  And I've left it open, but I don't see me seeking any counsel, I don't right now.

Q   What would change that, would make you seek counseling in the future?

A   I don't know.  I guess if I started thinking

more about suicide.  But right now my family is enough to keep me from thinking about that to where I would consider doing it.  But during the process of all this I did think about it.  I would be lying to you if I didn't tell you that.

Q    Is that when you were on the suicide watch?

A    It wasn't when I was on the suicide watch, but it was after I got out and they continued to press charges and didn't want to admit that they made a mistake.  And how I was basically more or less in my opinion being framed that I could end up spending 45 years in prison for this.  Knowing what happens to people in prison for that kind of crime on top of being a law enforcement officer, yeah, it made me consider suicide.

Q    When you say they were pressing charges and they didn't want to admit that they made a mistake, who are you referring to?

A    The state attorney and the Sheriff's Department.

Q    Give me one moment here.  I just want to look through.  I have some documents in front of me.  So I'm looking through here.  Give me just a moment.  I appreciate it.

When was your arrest expunged?

A    It should be in the record somewhere.  I'm not sure.

Q    **Does October 2024 sound right to you?**

A    Honestly I would be lying if I said it did.  I really don't know.  I remember my lawyer calling and telling me that he had received documentation, but I don't remember the date.  And I think right now it's not fully expunged because they had -- there had to be some kind of special thing put in to where you all could leave it open still I think.

Q    **What do you mean, where you all could leave it open?  Who are you referring to?**

A    I guess counsel, because under expungement everything would have been destroyed and gotten rid of but because we're doing this case, there had to be some kind of special something submitted in order to still not got rid of the digital data so you-all could still look at it.

Q    **Okay.  I am not familiar with what you're referring to.  Is there a specific document that you are referring to?  And, again, if the information you know came from your counsel, I don't --**

A    Okay.

Q    **I don't want to know that.**

MR. ROBERTS:  Amy, Matt and I had extensive

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 114

discussions about this.  We can provide you with the documentation. I don't know that he knows anything outside of what I've told him.

MS. SHEVLIN:  Okay.  I believe I just have the expungement order here.  I was just wandering if there was anything else.  So that's fine.

MR. ROBERTS:  There is -- there is an amended order.

MS. SHEVLIN:  I wouldn't suspect Mr. Lawshe would know this.

MR. ROBERTS:  Sorry.  There is an amended order that I'd be happy -- I think it was provided, but like we can do that.

MS. SHEVLIN:  Okay.  Yeah, if you would get that over to me, because I don't see that in my file.  So thank you.

BY MS. SHEVLIN:

Q    As far as the damages that Mr. Carson was discussing with you earlier, Mr. Lawshe, you advised that you had a -- there was an expert that helped you calculate some of your damages?

A    Yes, ma'am.

MS. SHEVLIN:  Michael, I received -- I'm assuming that's Mr. Borg, Michael?

MR. ROBERTS:  Yes.

THE WITNESS:  Yes, ma'am.

MS. SHEVLIN:  Okay.  I received his C.V.  I do not have a report from him.

MR. ROBERTS:  I think I sent it the following day.  I think it was like not in the original.  So like our deadline was the third.  So I think it was like the fourth that I sent it.  It was like in a separate e-mail.

MS. SHEVLIN:  Okay.  I will have Rachel double check.

MR. ROBERTS:  I can resend it.  Yeah.

MS. SHEVLIN:  Thank you.

BY MS. SHEVLIN:

Q    Mr. Lawshe, you also in your answers to Dr. Dully's interrogatories, which were previously marked, I believe, as Defense Exhibit 11, but let me double check, you indicated that you had seen a doctor, I think it was D'Arienzo?

A    Yes.

Q    D'Arienzo?

A    Yes.

Q    Can you tell me who that person is?

A    He was just a doctor that I went to one time to potentially get diagnosed with PTSD.

Q    When did you first see him?

A    I don't know the date honestly.  And, like I said, I only saw him the one time.

Q    Why did you only see him one time?

A    Just because of, like I told you before, my feelings of the psychiatrist and the issuing of all these psychotropic heavy drugs that kill people, I just -- I'm not an anti-vac or anything like that, but I just -- it's they over prescribe these medications that do more harm.  Every one of those medications that you see these doctors issue they tell you side effects are depression, suicidal thoughts.  I don't need to take those kind of meds.

Q    Did Dr. D'Arienzo give you a diagnosis?

A    No.  I don't think I went enough time to get a diagnosis for it, no, ma'am.

Q    Did he attempt to prescribe medications to you?

A    No.  No.  Like I said it was just counsel.  It was just a first visit, I guess.  So it never went that far.

Q    Do you think that would have occurred in 2023, 2024 or was it this year?

A    When was my arrest date?

Q    Hang on.

A    It would have been some time after that when I

saw him.

Q    I can't find the exact date and I apologize, but I know your arrest date was in, I believe, spring of '23.  And if anyone else has it in front of them please feel free to chime in.

MR. CARSON:  April 12th, 2023.

THE WITNESS:  So it would have probably been within twelve months of that date some time.

BY MS. SHEVLIN:

Q    Within twelve months you said?

A    I believe so as best I can recollect.

MR. ROBERTS:  Can we just take a quick -- I want to say something.  Because I made a comment that I sent this to you this report.

MS. SHEVLIN:  Sure.

MR. ROBERTS:  It may be sitting in my drafts because you guys didn't have it. I'm looking.  I have a draft from the next day to send you the report.  So I may not have sent you the report.  But it was completed.  So if it wasn't sent, and I'm not saying it wasn't sent, but if you don't have it it may have just been in a draft, and I am not trying to misrepresent that I sent it to you.  If it was my error, that there was no report.  I think our disclosure said that there was an

attached report.  And so if it wasn't -- but anyway.  Okay.

MS. SHEVLIN:  I don't have it attached to that.  I got the C.V., Michael.  And I certainly -- I mean, you and I've worked together before.  I don't believe you have any intention of pretending you sent me something that you didn't.

MR. ROBERTS:  Right.  I think the original disclosure --

MS. SHEVLIN:  If you could send that over, though, it'd be helpful.

MR. ROBERTS:  Yeah.  Yeah.  Yeah.  Yeah.  Yeah.

MS. SHEVLIN:  Yeah.

BY MS. SHEVLIN:

Q    Okay.  And I assumed from, Mr. Lawshe, from your answers regarding Dr. D'Arienzo that he is a mental health provider of some kind.  Do you know what kind of doctor he is?

A    I don't.  But, yes, he is a mental health.

Q    Aside from Dr. D'Arienzo have you been evaluated or treated by any other mental health provider or counselor after the date of your arrest?

A    No, ma'am.

Q    Okay.

A    My -- my current counselor is my wife.

Q    Checking a document.  Hang on one second, please. I appreciate your patience.

Based on what you told me your understanding of Dr. Dully's role was earlier just a couple of minutes ago, I just want to clarify, do you believe that Dr. Dully is an employee of St. Johns Sheriff's Office or she works for someone else?

A    She works for someone else.  I'm pretty sure she works for the Gainesville college, I think.

Q    Was your understanding that Dr. Dully was asked to assist in St. Johns Sheriff's Office investigation?

A    Yes.

Q    Based on what you told me earlier that you don't believe you or anyone else in your family have met Dr. Dully before, I would assume that there is no history of bad blood between families or anything like that with Dr. Dully?

A    No, ma'am.  I have no clue who she is.

Q    Would you agree with me that if there were sexually explicit photos of minors being taken, that that would be a form of child abuse?

A    Yes, ma'am.

Q    Were you aware that Dr. Dully was not paid or

compensated for her assistance with St. Johns investigation?

A    Could you say that one more time.  I'm sorry.

Q    Sure.  Were you aware that Dr. Dully was never paid or compensated in any form for her assistance with St. Johns investigation?

A    No.

Q    Have you heard of the child protection team before?

A    Only since this incident.

Q    Are you aware that the child protection team is designated by statute to aid in law enforcement investigations of child abuse including suspected CSAM material?

MR. ROBERTS:  Objection.

THE WITNESS:  Only since --

BY MS. SHEVLIN:

Q    Do you know?

A    I'm sorry.

Q    You can answer.  I'm just asking if you know.

A    Only what I know from, I mean, this case.  I mean, I really don't I guess.  I just heard it mentioned since this case.

Q    You don't have an independent -- you don't have any independent knowledge of the role or the

statutory requirements related to the child protection team or any of their employees or directors?

A    No, ma'am.

MS. SHEVLIN:  Mr. Lawshe, I believe that's all I have for you at this time.  There may be some follow-up from Mr. Carson and your counsel may have of some questions for you as well.  I appreciate your time.  Thank you.

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  You go ahead.  I don't have any questions.

MR. CARSON:  Appreciate it.

REDIRECT EXAMINATION

BY MR. CARSON:

Q    I have just a couple of hopefully quick follow-ups with you, Mr. Lawshe.

You mentioned that you were on, I don't want to misquote you, some kind of modified FMLA leave immediately prior or in the years prior to your arrest, correct?

A    Yes, sir.

Q    All right.  In the seven days prior to your arrest, what was your work schedule like?

A    I don't remember.  I know I was planning on -- I had planned a man tracking course for the Flagler

County Sheriff's Department and their SWAT Team and that's what I was going to do that morning as soon as I met with them.  But it was a regular work week.  I don't think I called out sick or anything.

Q    All right.  I'm going to pull up the April 2023 calendar.  I will represent to you April 12th appears to have been a Wednesday.

A    Possible.

Q    Okay.  So you -- when you received -- do you know what time of day it was that you received the call from Detective Tolbert?

A    Oh, it was -- it was like a week or two before that.

Q    Gotcha.

A    And I think that's the reason that morning I was running behind on everything because I had actually forgot about my meeting with him and it popped back into my mind, oh, shit, I was getting ready for man tracking and get all the stuff together for that.

Q    Do you remember what time it was that you met with detectives at the St. Johns County -- St. Johns County Sheriff's Office on April 12, 2023?

A    In whatever that time was that morning that they arrested me.  I mean, because the arrest was pretty much immediate.

Q    Is that the first thing that you did that day was meet with them?

A    Yes.

Q    You had your Fish and Wildlife uniform on, correct?

A    Yes, sir.

Q    So you were going to go directly from that job --

A    To man tracking.

Q    From that meeting to the man tracking training?

A    Yes, sir.

Q    Did you work on April 11?

A    Is that the day before?

Q    Yes, sir, that Tuesday.

A    I don't recall.

Q    You mentioned that you were on Antabuse for a time?

A    Uh-huh.

Q    Is that correct?

A    Uh-huh.  Yes, sir.  I'm sorry.

Q    What were you on Antabuse for?

A    For my lyme.  It's a treatment for lyme.  It's shown to kill the Spirochetes.

Q    It's shown -- it's shown to kill what?

A    Spirochete of -- that's what lyme bacteria is Spirochete.

**Q    Same thing for the Narcan?**

A    Narcan also kills the lyme Spirochete.  It's a known treatment now.  It was -- I think it was being tested then with a lot of good results and that's the reason I was put on it, which caused me difficult went to the hospital, because they thought I was junkie.  They were like, "What are you on?  We never heard of this."

And I am like, "Well, look it up."

They came back, "Hey, we're sorry."  Because I guess they get junkies coming in with those kind of drugs.

**Q    Well, yeah, I mean, I don't know I would call somebody in recovery a junkie, but I get what you are saying.**

A    Well, they didn't have a clue.  Fortunately you can read about it, it's tragic, but lyme in the State of Florida is so undiagnosed.  There are people walking around with it that they are going to die from lyme that they think it's heart disease or something else.  It's just we are not taking care of it here.

**Q    Other than what you've already talked about, do you recall any other conversations or interactions or**

communications with Detective Preston?

A   Prior to or?

Q   At any time.

A   No.

Q   So other than that one day on April 12th, 2023, when you came into the Sheriff's Office to meet with detectives you've had no other opportunity to speak with or correspond with or communicate with Detective Preston; is that accurate?

A   Yeah.  I mean, I've seen her at meetings and stuff at the Sheriff's Department.  Like when they had ceremonies and stuff, but we never -- we never conversated or anything.  Just seen her.

Q   Okay.  And that was before the incident, correct, before the arrest?

A   Yeah, correct.  I haven't seen her afterwards either.

MR. CARSON:  Okay.  That's all I have.

MR. ROBERTS:  Amy, are you good?

MS. SHEVLIN:  Good.  Thank you.

MR. CARSON:  Will he read?

MR. ROBERTS:  Yeah.  Yeah.  We'll read.  Yeah.

VIDEOGRAPHER:  All right.  This concludes the videotaped deposition of William Lee Lawshe.  The time is 12:16 p.m. on March 14th, year 2025.

MS. SHEVLIN:  Are you ordering?

MR. CARSON:  Probably not right now.

(Witness excused.)

(Thereupon, at 12:16 p.m. the deposition was concluded.)

THE STATE OF FLORIDA,      )
COUNTY OF ST. JOHNS.       )


     I, the undersigned authority, certify that

WILLIAM LAWSHE personally appeared before me and was

duly sworn this 14th day of March 2025.


          WITNESS my hand and official seal this 29th

day of July 2025.


                              Laura Dwyer Pierle, RPR
                              Notary Public-State of FL
                              My Commission #HH 598918
                              My Commission Expires
                              10/26/28

C E R T I F I C A T E


The State of Florida       )
County of St. Johns        )


        I, Laura Dwyer Pierle, Court Reporter, do hereby certify that I was authorized to and did report the above deposition in stenotype; and that the foregoing pages numbered from 1 to 126, inclusive, are a true and correct transcription of my stenotype notes taken during said deposition.


        I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.


        The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.


        IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of July, 2025.


                              Laura Dwyer Pierle, Notary
                              Public, in and for the State
                              of Florida at large.
                              My Commission Expires
                              10/26/28
                              My Commission #HH 598918

E R R A T A   S H E E T

In Re: William Lee Lawshe vs. Mikayla Preston, et al
Case No. 3:26-cv-00044-MMH-MCR
Reporter: Laura Dwyer Pierle Date of Deposition: 3-14-25
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

ATTORNEYS: MATTHEW CARSON, ESQUIRE
           MICHAEL ROBERTS, ESQUIRE
PAGE NO.          LINE NO.              CHANGE

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

_____          _____        _____

                                _____

     Under the penalties of perjury, I declare that I
have read the foregoing deposition and that the facts
stated in it are true.

     Dated this _____ day of _____, 2025.


                                _____
                                WILLIAM LEE LAWSHE

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: $1400..allege

## $

**$1400** 90:17,21,24

## (

**(1)** 63:4

## 0

**0059** 58:15

**006** 62:15

**0065** 62:14 63:4

## 1

**10** 27:6 40:2,7,14 41:20 42:10 53:4

**100** 55:2

**10:03** 41:11,12

**10:10** 41:12,15

**11** 40:13,14 41:20 42:12 115:16 123:13

**11:04** 85:10,11

**11:16** 85:11,14

**12** 19:17 29:18 36:17 122:22

**12-hour** 98:4

**1260** 4:9

**12:16** 125:25 126:4

**12th** 99:9 117:6 122:6 125:5

**13** 36:17 93:3

**13-hour** 98:4

**14th** 4:11 125:25

**15** 8:22,23 95:17

**17-year** 85:1

**18** 82:9

**1969** 8:1

**1980** 7:17 8:11

## 2

**20** 22:17 87:15

**2019** 94:25 96:16 97:13 98:24

**2020** 96:17 99:9 107:24

**2022** 65:18 67:5

**2023** 19:12,17 23:17 29:18 44:15 64:2 65:10 66:10 67:6 80:5 116:21 117:6 122:6,22 125:6

**2024** 113:3 116:22

**2025** 4:12 125:25

**23** 61:16,19,21,24 117:4

**24** 61:16,19,22,24 88:20

**25** 88:20

**26** 85:18

## 3

**3,000** 66:3

**30** 16:5 36:12 91:23 92:3

**300** 93:13

**35** 88:20

**3:24-cv-00044-mmh-mcr** 4:8

## 4

**40-year** 78:22

**45** 112:11

**4G** 73:22

## 5

**50** 93:17

**500** 14:16 93:12 94:1,4

## 6

**60** 93:17 106:21

## 7

**72** 38:9

**72-hour** 38:9

## 8

**8** 42:8,14,18,25 71:14 93:4

**86** 73:22

**8A** 71:7,19

**8B** 47:6,11 57:19 61:8 62:1 63:8 65:6 66:9 76:5 83:22

**8C** 58:17 59:3 62:1 63:8

**8D** 62:22

**8E** 72:10 76:18,21 84:1

**8F** 43:4,5 65:17 66:6 75:25 80:21 83:12

**8G** 58:16

## 9

**90's** 10:8

**91** 10:9

**9:16** 4:12

## A

**a.m.** 4:12 41:13 85:12

**abilities** 95:6

**absolutely** 39:11 85:2 105:21

**abuse** 119:23 120:13

**ac18e** 43:1

**access** 44:2,23 52:23 66:14 72:22

**accompanied** 46:11

**accrual** 91:15,16

**accurate** 34:11 74:3 125:9

**accused** 15:2

**acronym** 77:14

**act** 89:18

**action** 5:10 88:7

**activist** 35:10

**actual** 36:6

**addicts** 106:24

**additional** 44:20

**admit** 112:9,17

**ads** 75:20

**adult** 8:15 13:25 53:2,16 79:22 80:6

**adults** 77:22,25

**advised** 114:19

**affected** 12:21 102:21

**AFIB** 103:4

**afraid** 56:12

**age** 77:18 78:9 79:1,6, 16,22 80:7 81:4,14,22, 25 82:5,8,16 84:11,13, 15,22,23,24 91:4,6 109:15

**agency** 10:8 18:2,5 101:25

**aggravates** 86:23

**agree** 81:17 82:15,17 110:25 111:6 119:21

**ahead** 42:12 47:7 58:14 62:10 72:4 111:1,2,3 121:10

**AI** 52:16

**aid** 106:14 120:12

**airborne** 22:22

**airplane** 35:1,4,7,15 37:16,17,19,21

**alcohol** 7:5

**allegating** 32:9

**allegation** 88:25 89:17

**allegations** 18:2,4 53:7 87:22

**allege** 49:21 85:17,24 86:20

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: alleged..brings

**alleged** 46:22 64:6

**alleging** 91:11

**allowed** 97:22

**altogether** 10:11

**amended** 114:7,11

**Amour** 72:15,23 77:1

**Amoxicillin** 107:6

**Amy** 4:22 88:6 113:25 125:19

**and/or** 65:7

**android** 44:7 75:17

**anew** 58:25

**Angels** 72:15,23 77:2

**animal** 10:11

**annoying** 75:19

**anonymizer** 45:5

**answers** 40:6,11 41:18, 19 48:11 60:24 64:18 90:8 115:14 118:17

**Antabuse** 106:24 107:17,20 123:17,22

**anti-vac** 116:7

**antianxiety** 106:5,10

**antibiotic** 37:11

**antibiotics** 107:3,4,5

**antifungal** 107:1

**anymore** 30:18 89:19 101:25 111:11

**apologize** 89:13,15 90:19 117:2

**appearances** 4:17

**appeared** 25:15

**appears** 71:21 72:5 73:21 80:22 122:7

**application** 92:7

**applied** 15:25 16:4 91:23 92:3,5,13

**apply** 18:8,18 109:6

**applying** 17:11

**appointment** 95:24 96:2

**Approximate** 92:4

**approximately** 91:23 92:8 96:13

**April** 19:12,17 23:17 29:18 44:15 64:2 66:10 67:5 80:5 117:6 122:6, 22 123:13 125:5

**area** 10:17 100:22

**areas** 8:14 10:24 21:22

**Army** 55:19

**arrest** 16:1,12 19:1,16, 21 20:12 21:2 64:4 94:14,15 112:25 116:23 117:3 118:23 121:19,23 122:24 125:15

**arrested** 15:2 18:9,12, 19,20 19:2 32:6 58:6 64:2,9 66:10 94:9 97:10, 14 103:23 104:15 122:24

**art** 48:25 49:17,18 55:21 57:6

**artist** 49:15

**asks** 42:14,15 43:18

**assertion** 46:4

**assignment** 11:3

**assist** 119:12

**assistance** 42:4 120:1, 5

**assume** 53:20 62:5 63:21 106:4 119:17

**assumed** 29:8 78:17 118:16

**assuming** 45:22 114:24

**assured** 107:22

**attach** 33:14

**attached** 118:1,3

**attempt** 116:16

**attention** 22:20,22 23:2

**attorney** 6:10 50:10 51:20 112:19

**attorney/client** 50:15 51:10 109:8

**Augustine** 4:11 8:5,11

**average** 56:18

**avoid** 81:24 94:16

**aware** 45:6,20 46:17 66:11 68:14 119:25 120:4,11

**B**

**back** 10:7 14:14 15:11 17:22,24 20:8,10,13 24:19 28:24,25 29:3,7 31:19 41:8,14 42:12 46:21 59:2 60:3 74:22 85:13 88:13 89:25 90:1 91:24 92:11 97:24 98:11 99:2,10 101:17 111:9 122:17 124:12

**backed** 21:18

**background** 14:15

**backs** 16:6

**backup** 21:23,24 22:1

**bacteria** 124:1

**bad** 13:5 14:1 22:18 36:6,20 78:5,6 95:12 119:18

**ball** 80:23

**ballpark** 59:16

**based** 18:4 48:5 106:4 119:4,15

**basically** 15:1 16:14 25:19 38:12 70:1 87:8 93:24 112:10

**basis** 76:16

**battery** 73:22

**beats** 103:4

**bed** 37:20 80:22 95:12

**bedridden** 96:22 108:2

**began** 99:10 107:14 108:16

**beginning** 6:7 85:14 88:9

**begins** 4:2

**behalf** 4:22

**believed** 53:24

**belongs** 65:9

**belt** 26:10

**benzopine** 105:22

**big** 12:3 94:4 100:16 101:12

**bill** 100:8,9,12

**bills** 73:10 90:18

**Bishop** 4:13

**bit** 5:13,16 14:3 20:15 28:19,25 29:3 41:6 89:14 90:22,23 92:11 110:13

**blank** 99:19

**Blockbuster** 94:3

**blood** 36:4 87:5 102:22 103:1 105:16 106:9 119:18

**body** 22:16

**bond** 38:6

**bone** 36:20

**border** 12:2,3 100:21

**Borg** 114:24

**born** 7:25 8:2

**Boston** 11:23

**bothered** 60:14

**bottom** 53:18 54:17 55:7 68:6 77:19 79:2,7 102:23 103:2

**Boulevard** 4:10

**brain** 111:10

**break** 5:18 20:14 41:5,7, 18,21 51:2 85:7

**breaking** 56:21

**breaks** 8:13

**breath** 5:19

**bring** 33:6 76:4 111:9

**brings** 111:9

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: brought..compartmentalized

**brought** 13:12 53:4 56:3

**browse** 45:1

**browser** 44:8,15 45:18 74:18,20,24 75:2

**browsers** 44:18,20 45:10

**browsing** 74:2

**bucks** 93:17

**buddy** 95:15

**BUI** 9:19

**bunch** 37:8 48:4 75:19 83:6 92:15 93:20 96:20 105:6

**burlap** 38:13

**business** 14:22 16:18 79:17 92:19,20,21,22,24 93:7,8 94:20

## C

**C-R-E-E-C-H** 104:22

**C.V.** 115:2 118:4

**calculate** 91:9 114:21

**calculated** 85:24 86:15

**calendar** 122:6

**call** 16:6 20:4 21:15,16 23:18 24:2 25:5 34:10 37:5 39:4,5,7,10 40:21 45:11 71:2 72:8 91:14 99:3,15,17 105:5 122:10 124:15

**called** 20:15 21:4 22:10, 18 23:11,13,23 24:12 32:1,10 37:8 49:16 50:6 55:22 87:10 89:4 98:6,7 100:1 103:5 122:4

**calling** 25:1 76:1 113:5

**Canada** 11:24,25 12:11

**Canadian** 54:23

**cancer** 35:12

**captain** 99:23 101:18, 21,22,23 104:1,18,20,21

**capture** 73:21,24 74:5, 9,11

**car** 14:20 92:21,22,24 93:14

**card** 73:3,7

**cardiac** 103:9

**cardiologist** 103:7,14, 18

**carditis** 102:21 103:5,8, 11

**care** 85:20 86:18,20 103:7 124:23

**career** 64:24

**careful** 33:5 52:2 70:11 89:18

**carry** 37:13 111:5

**cars** 16:13 93:3,4,10

**Carson** 4:20 5:6,9 23:7, 10 39:25 40:5,16 41:16 50:15,19 51:1,14,18 58:20,23 59:4,6,9 61:14 62:21 63:3 66:23 67:3 70:13 71:6 72:7 77:4,5 85:15 86:3,5,7,10,12 87:24 88:3,8 114:18 117:6 121:6,12,14 125:18,21 126:2

**case** 4:7 16:22 32:17 42:17,18 66:7 113:15 120:21,23

**cases** 40:21

**cast** 87:12

**catching** 9:12

**caused** 36:4 124:7

**causing** 102:22 103:1

**cell** 38:10 43:13,15 73:24

**Cellebrite** 66:13

**cellphone** 19:7,8,11 24:9 32:20,24 34:17,20 35:1,4,11 37:13 43:10 46:12

**center** 30:23 64:11

**ceremonies** 125:12

**certificate** 79:2,7

**certification** 17:18,22

**certified** 9:2

**cetera** 85:22

**chance** 41:21

**change** 111:23

**changed** 89:8 95:5

**characterize** 90:3

**charge** 73:3 76:6 93:13, 14,15,16,17

**charged** 76:22

**charges** 13:13 15:9,15, 17 18:13 76:4,17 112:9, 16

**cheap** 54:11

**check** 115:10,17

**checked** 54:17

**checking** 81:25 119:2

**chest** 34:11

**child** 13:16 56:6 57:12 119:23 120:8,11,13 121:1

**children** 64:11 88:21 89:23

**chime** 117:5

**Chinese** 37:8 105:6

**choice** 13:7

**choose** 110:23

**chooses** 78:23

**Christ** 56:21

**Christian** 56:18 82:21

**Chrome** 75:6,21

**chronically** 110:20

**City** 12:7

**civil** 40:21

**claimed** 77:22

**clarify** 119:6

**clarifying** 50:20

**class** 20:25

**classification** 20:9

**clean** 67:10

**cleaned** 38:15 68:3

**clear** 23:16 29:20 67:13

**cleared** 87:11

**clearer** 62:25

**Clinic** 102:9

**clocks** 39:13

**close** 21:17,18 90:6,18

**closely** 21:10,11

**closest** 12:2

**clothes** 38:13

**cloud** 46:11,15,19,23 64:7 65:7

**clue** 17:23 36:12 49:20 70:16 119:20 124:18

**cognitive** 36:5 95:5 96:10

**college** 119:10

**colonel** 101:1,5,8

**combat** 110:18

**combined** 10:10

**comfortable** 9:11

**Commander** 22:9 23:13

**comment** 82:20 117:13

**Commission** 8:25 26:8

**commit** 110:23

**common** 36:14

**communicate** 70:5 125:8

**communications** 125:1

**community** 7:16

**companies** 14:16,17 94:2,4

**company** 15:2,4,8

**compartmentalized** 111:10

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: compensated..deployed

**compensated** 120:1,5

**complaint** 49:21

**completed** 117:20

**completely** 99:11

**compliance** 77:19 79:7,23 80:7

**complied** 81:13

**complies** 54:22 81:10, 21 84:21

**comply** 82:16 84:22,24

**complying** 81:14

**Composite** 42:17

**composure** 5:14

**computation** 85:17

**conceal** 44:25

**concern** 56:4

**concerned** 37:22 55:13,16,24 56:1

**concluded** 126:5

**concludes** 125:23

**conditioning** 106:20

**conducted** 4:9

**confused** 82:12

**congressman** 100:8

**consented** 80:6

**consideration** 9:9

**considered** 55:12

**construe** 55:17

**construed** 78:5

**contact** 10:2 37:23 109:13

**contacted** 109:21

**contacts** 10:3 109:17

**content** 49:11

**continue** 100:23

**continued** 112:8

**contracted** 100:15

**conversated** 125:13

**conversation** 27:19 108:10,19

**conversations** 88:23 109:9 124:25

**cool** 12:14

**corner** 73:23

**correct** 5:11 8:25 15:18 18:14 19:5,6,9,17 21:3 24:10,20 27:17 42:5 46:1,2,7 48:14 50:10,11 53:25 56:13 57:20,21 59:14,22 63:8 66:11,14 76:20 77:19 78:11 79:2 81:14,15 83:7,18 91:19 94:19 103:20 121:20 123:5,20 125:15,16

**corrections** 38:22

**correctly** 40:24 64:18 88:17 91:25 108:8

**correspond** 125:8

**cost** 85:20

**counsel** 4:16 42:4 76:20 109:7 110:5 111:22 113:13,22 116:18 121:6

**counseling** 13:4 87:2,4 109:25 110:2,7,14,15 111:7,15,19,24

**counselor** 118:23 119:1

**counties** 10:18,22 11:4

**country** 87:12

**County** 21:12 22:4 23:12 29:17 38:17 100:21 109:21 122:1,21, 22

**couple** 5:11 6:6 11:10 20:4 38:18 47:7 55:23 58:14 62:10 72:4 93:16 106:6,16 107:1 119:5 121:15

**court** 4:6,14,17 6:9

**covers** 25:3

**COVID** 12:13

**CP** 13:15,16

**cracked** 30:19

**cracking** 30:14,16

**cramps** 95:12

**create** 74:5 100:7,9,11

**created** 74:13

**credit** 73:3,7

**Creech** 104:21

**crime** 112:13

**criminal** 15:9,15,17 50:9 76:16

**criminology** 13:1,2

**critically** 6:12

**CROSS-EXAMINATION** 88:4

**crying** 32:3,4

**CSAM** 58:12 70:12 76:7 82:10 120:13

**current** 119:1

**cut** 14:14 111:3

**cybertips** 64:21

**cypertip** 65:7,12,18 66:6,8 76:1

---

**D**

---

**D'ARIENZO** 115:18,20 116:13 118:17,21

**dad** 13:25 53:5

**damaged** 85:21

**damages** 85:17 114:18, 21

**Dan** 4:13

**dangerous** 10:1

**dark** 39:12 57:16,17

**data** 24:5 113:17

**date** 8:22 19:18,19,21 99:14 104:14 113:7 116:1,23 117:2,3,8 118:23

**dates** 99:9 108:15

**daughter** 20:24

**day** 20:2 36:8,18 37:10 38:5,6,7 39:12 54:8,12 87:8,17,19 90:12 97:4,7, 10,14 104:15 106:22 107:6 115:5 117:18 122:10 123:1,14 125:5

**days** 20:4 54:9 95:10,11 96:12,13 98:8 121:22

**de** 4:10

**deadline** 115:6

**deal** 26:25 87:8,17,18

**dealing** 53:6 109:3

**dealt** 25:6

**debilitating** 36:16 95:8, 9

**declaration** 40:24 42:5

**Defendant** 40:6,12

**defendant's** 40:14

**Defendants** 5:10

**Defense** 115:16

**define** 78:25

**degree** 13:1

**delay** 89:14 90:22 101:16 111:2

**delete** 45:15

**deleting** 67:15

**demoralize** 56:24 80:12

**demoralized** 79:5

**demoralizing** 78:8,11, 20,24 79:21 80:5,17,25 81:16 82:12,15

**deny** 18:9,18

**department** 20:7 104:17 112:20 122:1 125:11

**depending** 43:17

**depends** 11:12 37:18 79:8

**deplete** 67:6

**deployed** 10:24

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: depo..enforcement

**depo** 7:20

**deposition** 4:3,9 5:17, 24 6:3,23 7:8 88:9 125:24 126:4

**depressed** 110:20

**depression** 116:11

**deputies** 21:13,17,20 22:4 25:24

**deputy** 21:16 24:23 31:25 32:10 38:22

**describe** 32:10 64:5

**description** 34:12

**designated** 120:12

**destroyed** 87:20 113:14

**detail** 22:20,23 23:2

**detailer** 93:14

**detailing** 92:21,22

**detective** 4:20 5:9 20:10,19 24:24 25:2,3,6, 9,11 26:14 27:1,2,16,20 28:11 30:1,2 41:19 42:9, 23 122:11 125:1,8

**detectives** 31:23 122:21 125:7

**determine** 73:8 109:15

**determined** 65:20

**devastating** 7:19

**diagnosed** 33:5 94:23 95:18 107:16 108:3 115:24

**diagnosis** 94:22 95:4, 18 102:15 116:13,15

**dictates** 96:5

**die** 124:21

**difference** 80:16

**differentiate** 80:15

**difficult** 9:25 124:7

**digital** 113:17

**direct** 5:5 42:8

**directly** 20:21 87:7 109:22 110:6 123:7

**directors** 121:2

**dirty** 93:24

**disaster** 10:23

**disclaimer** 56:5,10 80:14

**disclaimers** 54:1,2 55:1

**disclose** 50:13

**disclosure** 85:19 86:6 117:25 118:9

**discord** 69:21,23,24,25 70:15

**discords** 70:12

**discovery** 16:21 40:21

**discrepant** 103:22

**discussing** 114:19

**discussions** 114:1

**disease** 33:4 36:2,23 37:1 94:23,24 95:16 100:23 105:2,14 107:13 108:4 124:22

**dispute** 46:3 47:25 66:24 109:22

**District** 4:6

**Division** 4:7 100:13

**divulge** 51:9 109:8,14

**Doc** 103:10 106:3 107:16,25 111:20

**doctor** 35:17,19,20,23 60:20 73:17 87:1,6 94:25 95:17,19 98:14 99:3 103:9 115:17,23 118:19

**doctorate** 13:1

**doctors** 60:7 95:17 111:19 116:10

**document** 113:20 119:2

**documentation** 113:6 114:2

**documents** 40:17,23 41:22,25 42:3 76:3 112:22

**dollars** 93:17

**door** 29:4,5

**doses** 107:3,5

**double** 115:9,17

**download** 43:18,19 44:14,20,22,23,25 45:3, 5 54:13 63:17

**downloaded** 43:14,25 45:13 46:18 59:11,13 60:3 63:13,19 65:14 67:15 83:7

**downloading** 47:18 60:4,12,19 67:18 71:9, 25 108:16

**draft** 117:18,22

**drafts** 117:16

**draw** 56:17

**drawers** 34:11

**drawing** 99:19

**Drive** 70:19

**driven** 10:3

**drop** 36:4

**dropped** 13:13

**drugs** 7:5 110:19 116:6 124:14

**dry** 10:6

**Duckduckgo** 72:6,8 74:18 75:1,3

**DUI** 9:19

**Dully** 4:23 88:7 108:21 109:2,6,10,21 119:7,11, 17,19,25 120:4

**Dully's** 40:12 41:20 90:8 115:15 119:5

**duly** 5:3

**dumb** 105:23

**duty** 16:25 17:1,5 26:10 38:23 86:16 100:1 101:20

**dysfunction** 60:7,13 107:14,21

**E**

**e-mail** 69:12 115:8

**earlier** 78:2 88:15 92:23 110:4 114:19 119:5,15

**early** 91:22

**earning** 93:9

**earnings** 85:19,20,23, 24 86:9,13,14

**easier** 75:9

**easiest** 74:23

**easy** 33:10

**eat** 39:15,19,20

**echo** 88:8

**economist** 86:6 91:7

**educate** 101:3

**effects** 35:18 107:20 116:10

**elected** 101:15

**electronically** 41:1

**elicit** 42:15

**embarrass** 66:3 84:6

**embarrassed** 82:24 83:20

**embarrassing** 94:11, 17

**embraced** 83:16,24

**emergency** 96:18 102:4,5,13,25

**emotions** 7:24

**EMP** 35:13

**employed** 14:3

**employee** 119:7

**employees** 121:2

**end** 85:10 103:22,23 112:11

**ends** 43:1 47:9

**energy** 36:18

**enforcement** 9:2,6,8, 14 10:3 14:17 17:5,18,

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: engine..foundation

22 18:5 32:23 34:2 56:12 57:24 64:24 78:3 82:21 93:25 112:14 120:12

**engine** 45:18 51:24

**enjoy** 111:11

**enjoyed** 22:23

**enjoyment** 85:22

**entail** 38:11

**enter** 33:7,21,22,24

**entered** 25:21 27:2

**entertainment** 94:1

**entire** 73:18

**equipment** 25:19 26:5 28:4 33:1,11

**erectile** 60:7,13 107:13, 21

**error** 117:24

**escorted** 26:25

**estimate** 27:4 59:17

**et al** 4:5

**ethically** 94:19

**evaluated** 118:22

**eventually** 39:8 87:2 102:1

**everybody's** 90:1

**evidence** 13:11

**exact** 91:21 99:8 117:2

**EXAMINATION** 5:5 121:13

**examined** 5:3

**excited** 89:6

**Excuse** 47:12

**excused** 126:3

**exhausted** 36:17,18

**exhibit** 40:7,13,14 42:9, 18 43:4 47:11 58:16,25 62:19 71:7 72:10 76:17 115:16

**exhibits** 39:25 41:18,20 58:20

**exist** 78:25

**existed** 80:4

**exists** 80:4 81:19

**expand** 93:6

**expect** 29:13 66:4

**expecting** 99:8

**experience** 75:21 79:4 97:12

**experienced** 79:3 107:13

**experiencing** 96:17

**expert** 86:6 114:20

**expired** 17:19

**explain** 53:5

**explicit** 67:20 68:17 69:1,11 119:22

**Exploited** 64:11

**Explorer** 75:6

**expunged** 15:17 18:13 112:25 113:8

**expungement** 18:23 113:13 114:5

**extensive** 65:1 113:25

**extraction** 66:13

**extreme** 55:17

**eyes** 87:15

---

**F**

**f6a487** 47:9

**face** 47:13,15 57:21 58:7

**faces** 58:3,5 71:17

**fact** 13:11 48:21,22

**fail** 84:24

**fair** 59:13 82:13

**fall** 6:23

**false** 34:24

**familiar** 46:14 55:21 64:10,21 69:17,23 113:19

**families** 16:13 119:18

**family** 90:6 93:2,3,5,14, 16 96:23 108:24 110:2, 3,7 112:1 119:16

**famous** 49:15 78:15,17

**fatigue** 95:9

**fault** 25:5

**federal** 77:18 78:9 79:1, 6,22 80:7,13 81:10,14, 25 82:16 84:21,23,24

**feel** 14:1 105:20,24 117:5

**feelings** 116:5

**fellow** 17:2 68:21

**felons** 92:16 93:20,22

**felt** 13:4

**female** 65:21

**fetish** 82:6

**fewer** 75:18

**fight** 36:21

**figure** 87:6

**file** 62:13,14 69:17,19 70:19,23 103:22 114:16

**filthy** 38:14

**finally** 30:12 95:16,18

**find** 28:4 29:12 47:3,8 49:23 50:3 56:15,16 79:4 94:5 97:23 99:3 117:2

**finding** 20:5 22:19 65:8

**fine** 5:19 19:22 29:11 31:21 47:3 48:9 50:19 51:10,22 88:2 98:11 99:7 114:6

**finish** 6:16 64:13

**fire** 100:7

**fired** 101:25 103:24

**firing** 104:6

**fish** 8:24 9:12 10:8 24:10 26:7 123:4

**fit** 99:25 101:20

**flabbergasted** 104:3

**flag** 68:6

**flagged** 64:7

**Flagler** 10:18,21 102:7 121:25

**flare** 98:13

**flareup** 86:24

**flareups** 97:12 98:14

**flexible** 97:11 98:6 99:11

**flexibly** 97:21

**Florida** 4:6,11 8:3,6,7, 17 10:9,15 18:24 91:8 100:14,15,18,19,22 109:12 124:20

**FMLA** 97:2,5,8,9,10,11, 13,19,20,24 98:6,10 99:11,12 121:18

**focused** 28:16

**folks** 24:20 84:6

**follow** 48:5 73:6 82:4

**follow-up** 6:17 99:7 121:6

**follow-ups** 121:16

**FOP** 99:16

**forensic** 59:19

**forest** 100:20,24

**Forestry** 100:14

**forget** 22:12,17 72:18

**forgot** 28:21 122:17

**forgotten** 28:7

**form** 119:23 120:5

**formed** 76:16

**Fortunately** 124:18

**Fortune** 14:16 94:1,4

**forward** 70:23

**found** 22:16 34:2,7 42:25 45:22,24 46:4 48:2,18 49:22

**foundation** 66:21

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: fourth..hot

**fourth** 68:6,7 115:7

**framed** 112:11

**free** 54:8 72:25 117:5

**free-lance** 16:17

**frequent** 69:9

**frequently** 35:3 37:13

**friend** 14:20 75:9 92:24

**friends** 16:13,14 69:7

**frig** 34:6,14

**front** 17:3 40:9 62:1 74:22 94:16 112:22 117:4

**full** 26:7 38:5 41:7 91:4, 6 93:22

**fully** 113:8

**function** 74:9

**fungal** 107:2

**funny** 68:9,23

**future** 85:19,20,22 86:13,20 89:23 110:14 111:24

**FWC** 8:16,18,19 16:25 90:25 97:3,5,8 103:23

**G**

**gag** 80:23

**Gainesville** 8:3,5 119:10

**Game** 10:9

**games** 70:3

**Gander** 94:3

**Gap** 94:2

**garage** 29:4,5 33:7,15, 16,19,23

**garb** 26:8

**gave** 29:4 86:2 93:1 95:19

**generally** 35:15 37:20 43:24 96:3

**generated** 65:12

**genre** 94:6

**Georgia** 8:7 100:22

**get all** 64:18 122:19

**girl** 61:9,10 63:6,8 64:8 71:8,10 83:11

**girlfriend** 12:10

**girls** 57:2

**give** 6:20 7:7 35:9 39:20 41:3 96:14,19 99:18 104:4,10,19 106:23 112:21,23 116:13

**giving** 6:15 7:20

**God** 13:25

**goggle** 49:22

**good** 5:7,8 6:11 7:2 12:8,15,17 22:11,19 29:14 32:15 33:13 41:4 49:1 58:2,3 64:16 81:25 102:8 124:6 125:19,20

**goofy** 69:7

**Google** 50:2 75:6,19,21

**gosh** 35:9 101:7

**gotcha** 11:14 17:10 31:13 38:2 58:8 86:7 122:14

**grab** 23:5

**grabbed** 20:11 25:16

**grandchildren** 89:5

**grandkids** 88:25 89:7

**great** 90:5 111:13,14

**Greene** 27:1,17,20 28:12 30:1,20

**grew** 7:16 55:19 78:13

**group** 92:15

**grow** 14:21

**grown** 13:25

**guarantee** 83:2

**guess** 14:3 22:23,25 24:4 28:3,20 33:4 47:17 49:1,15 51:12 52:15 53:6 55:16 56:3 58:2 70:1,4,5 73:4,6 80:15,18

82:6 85:2 104:12,22 111:25 113:13 116:19 120:22 124:13

**gun** 25:18 26:4

**gunshots** 9:17,18

**guy** 10:6 14:12 32:13 38:24 94:8

**guys** 59:19 95:19 117:17

**H**

**hair** 87:22

**hairdresser** 87:19,21

**half** 7:17

**hand** 25:16

**handcuffs** 18:21 31:16, 20

**handle** 84:5

**hands** 39:20 101:14

**handwriting** 59:7 95:5

**Hang** 116:24 119:2

**happen** 89:2 97:11

**happened** 12:24 14:25 18:22 26:1,16 31:13 64:12 94:10 98:12 100:5 103:25 104:13 108:19

**happening** 96:13

**happy** 68:7 114:12

**hard** 5:14

**harm** 116:9

**Hastings** 21:17

**hate** 15:12 48:20 100:15

**Hawaii** 8:8

**head** 6:21,22 91:18

**health** 35:10 85:5 87:5 118:18,20,22

**hear** 51:21 89:13

**heard** 4:5 57:15,16 91:24 120:8,22 124:9

**hearing** 34:22

**heart** 36:3 102:21,22,23 124:22

**heartbeat** 103:3

**heat** 98:2

**heavy** 37:6,10 116:6

**Hefner** 78:15

**Hegre** 49:15,16,17,18 55:21 57:6 72:20,21 78:16

**hell** 78:15

**helped** 20:5 22:3 60:17 114:20

**helpful** 50:22 118:11

**helps** 93:18

**herbal** 106:11

**herbs** 37:8 105:6

**hey** 53:5 60:8 73:10 82:3 94:8,10 124:12

**hiding** 50:17

**high** 11:19 49:1 105:15 106:9 107:3,5

**hill** 9:15,20,21,25 10:5, 10,11 21:13,20

**hire** 14:9 15:2,4,9 18:3,5

**hired** 8:18

**hiring** 18:6

**historically** 60:18

**history** 45:16,19 119:18

**hit** 43:18

**hold** 50:7 51:20

**Hollywood** 8:7

**home** 28:7,22 33:6

**homeopathic** 37:6

**honest** 60:2 63:22

**honestly** 26:1 27:5,24 38:4 44:24 63:21 92:18 99:1 113:4 116:1

**hopeless** 92:14

**hospital** 102:8 124:8

**hot** 17:14 98:1

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: hour..Lawshe

**hour** 27:7 41:6,7 95:7 96:11

**hours** 36:17 38:9

**house** 16:14 29:4 32:25 33:10,15,17,20,21,25 99:24 101:19

**HR** 18:7 82:4

**Hugh** 78:15

**human** 65:1

**hundred** 34:23 80:9,10 93:16

**hurricanes** 10:24

**I**

**idea** 26:19 27:9 32:7 93:1

**identification** 40:15

**identified** 41:18 42:17

**identity** 45:1

**illegal** 53:11,13,14,22 56:3,13,14,15 80:17

**illegally** 17:8

**image** 42:25 43:9 47:8, 12,21,24 52:18 53:11 57:12 58:15 62:14 63:4 69:11,12 71:5

**images** 48:15 54:25 57:2 108:8,16

**imagine** 39:24 63:24

**immediately** 97:24 121:19

**important** 6:13

**in-process** 38:12

**inaccurate** 34:4,8,9,23

**inadvertently** 84:24,25

**inappropriate** 30:11 31:7,9 52:18,21 89:2

**incident** 12:21 21:2 85:5,18,25 86:21 103:12 109:25 120:10 125:14

**include** 40:24 86:16,18

**includes** 49:11

**including** 67:5 106:20 120:13

**incognito** 45:11

**independent** 91:10 109:9 120:24,25

**India** 87:10

**Indian** 23:1

**indication** 15:15

**industry** 93:22 94:1

**influence** 7:4

**information** 42:14,15 103:21 113:21

**initial** 25:12

**inside** 11:4

**instances** 95:14

**Institute** 31:2

**intent** 5:23

**intention** 88:11 118:6

**intents** 53:17

**interactions** 124:25

**interest** 17:24

**internet** 18:16 44:4 45:1 48:20 52:4,9,11 56:9 57:13 67:16 74:2 75:6 80:2,4 82:13 84:20

**interrogatories** 40:7, 12,22 41:19,20 42:9,24 48:11 90:8 91:2 115:15

**Interrogatory** 42:14

**intersection** 36:8,11

**interview** 15:1

**interviewed** 29:17

**investigation** 64:3 65:21 99:25 119:13 120:2,6

**investigations** 120:13

**investigative** 9:16 10:1

**involved** 100:1

**Iphone** 44:6

**issue** 42:16 116:10

**issued** 24:10 28:8

**issues** 36:5 87:23 96:10 97:23 102:13 107:17

**issuing** 116:5

**IUPA** 99:17,18

**J**

**Jacksonville** 4:7 102:8

**jail** 18:21 31:21,24 32:6 38:3,17 39:9,16

**jailer** 38:18,21

**January** 65:9 99:9

**job** 6:11 8:16 14:25 15:13 18:8,18 29:14 40:3 92:18 97:23,24 123:8

**jobs** 14:6,8,10,18 15:22 16:4,14 17:11,14 91:23 92:3 93:23

**Johns** 10:18,19,20,21 21:12 22:3 23:12 29:17 38:17 100:21 109:20 119:7,12 120:1,6 122:21

**joins** 28:11

**joke** 30:14,16,19 31:5

**July** 68:6,7

**junkie** 124:8,16

**junkies** 124:13

**jurisdiction** 10:13

**K**

**K9** 21:16

**karate** 20:25 21:1

**Kathleen** 40:12 108:21

**Kaye** 60:21 61:2 95:21, 23 102:18,20 103:10 105:8 106:1,3 107:16,25 108:6,17 111:20

**kid** 53:14

**kids** 11:20 52:16,23

**kill** 116:6 123:24,25

**kills** 124:4

**Kimberly** 60:21 95:21

**kind** 9:5,13,19 10:5 11:3 16:17 17:4 21:22 28:24 29:22 30:3,14 35:13 37:12 38:13 44:5 49:11 56:20 58:4 60:14 71:16 73:12 75:15 89:12,16,17 92:14,16,18,20 94:12 95:3,25 99:25 102:16 112:13 113:9,16 116:12 118:18 121:18 124:13

**kitchen** 34:1,8

**knack** 71:16

**knew** 7:17 14:12 22:10 26:3 32:8,9 44:11 73:16 83:14 106:7

**knowing** 14:25 30:7 91:5 112:12

**knowledge** 42:1 47:4 50:21 91:11 109:9 120:25

**L**

**labeled** 58:23,24

**Lack** 66:21

**lady** 22:12 61:21

**land** 10:6

**lascivious** 31:12

**late** 41:6 95:18

**Laura** 4:15

**law** 9:2,8 10:3 14:17 17:5,17,21 18:5,24 32:23 34:2 53:19 56:12 57:23 64:23 77:18 78:3 79:1,7,22 80:7,13 81:10 82:21 84:22,25 93:24 112:14 120:12

**lawful** 81:4 82:15

**lawfully** 18:18

**laws** 9:7 54:23 78:18 81:14,22 82:1,8,16

**Lawshe** 4:4,19 5:1,7

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: lawsuit..mentioned

11:17,18 41:17 59:10 85:16 87:24 88:6 104:2 114:9,19 115:14 118:16 121:4,16 125:24

**lawsuit** 46:24

**lawyer** 13:5,13 29:22 30:17 31:14 50:1 70:6 113:5

**Lawyers** 29:23

**lead** 64:3

**leads** 61:21 73:12

**learned** 109:7

**leave** 17:9 37:16,17 62:25 96:23 97:5,8,9 111:14 113:10,11 121:18

**leaving** 30:6

**led** 95:3

**Lee** 4:3,4 5:1 82:24 87:20 104:2 125:24

**left** 25:16 28:19,25 29:2 111:21

**left-hand** 73:23

**legal** 52:7 53:19,21,23, 24 82:3 84:11,13,15,16 89:10

**legality** 82:5,6

**legally** 15:16 94:14

**legit** 81:21

**legitimate** 55:12 81:6

**Leon** 4:10

**letters** 62:25

**liability** 14:9

**license** 93:7

**life** 15:22 31:9 73:19 85:22 98:15 111:5,11

**light** 27:6

**lighthearted** 9:10

**limit** 9:13

**lined** 14:6,10,18

**list** 105:24

**listed** 85:19

**listen** 29:20 51:8 64:15 66:2

**listening** 9:17

**live** 11:22 56:14

**lived** 8:4,8,14,16

**lives** 11:23,24

**living** 8:15

**LLC** 16:18

**lobby** 19:9

**located** 32:23 34:20 35:1

**long** 5:20 11:18 27:4 38:3 39:9 51:8,9 98:15 106:24

**longer** 106:19 107:10

**looked** 36:8 54:16,25 55:8,20,21 60:1,9,17 63:19,23,24 65:16 73:15 77:17 79:14,15 82:8 100:25 104:1

**losing** 23:15

**loss** 85:19,20,21,23,24 86:9,13,14 95:5

**lost** 36:6 87:18

**lot** 11:12 13:6 14:15,16 21:13,24 22:2,25 23:2 45:10 47:1 52:4 59:20 60:14,18 63:17 73:23 93:23 100:12,13 105:9 124:6

**lots** 52:8

**lude** 31:11

**LVVFQ** 71:1

**lying** 44:10 48:16 62:3 112:4 113:4

**lyme** 33:4 35:7 36:2,3,6, 22 37:1 60:6 86:22,23, 24 94:22,23 95:16 96:20 97:21 98:13,14 99:23 100:9,12,15,17,23 102:3,14,21 103:5,8,11 105:2,5,13 106:15,20,22 107:2,13 108:4 123:23 124:1,4,19,22

**lyme's** 35:20 60:20 99:3

---

**M**

**made** 31:5 52:11 89:17 112:9,14,17 117:13

**magazines** 78:14

**Magnesium** 106:15

**main** 95:13

**mainstream** 9:7 78:14

**maintaining** 5:14

**major** 104:1,20

**make** 5:24 7:2 10:3 30:7 39:10 52:15 53:9 54:15 55:4 64:13,17 79:17 82:4,9 83:15 88:10 93:8 98:16 103:20 105:20,23 110:21 111:15,16,23

**makes** 17:3 22:19 48:3 58:7 61:17

**man** 20:3 22:11 64:16 75:7 121:25 122:18 123:9,10

**management** 14:15

**manager** 14:12 94:8

**manner** 54:22 67:21

**March** 4:11 96:3 125:25

**Marie** 11:17

**Marine** 10:9

**mark** 39:25 40:6,11

**marked** 40:14 43:3 47:11 58:16 62:19 66:9 72:10 115:16

**market** 15:13

**marketed** 57:1,2

**marketing** 14:24

**marking** 40:9

**marriage** 109:24 111:13

**married** 11:14,18 73:18

**Massachusetts** 11:23

**Matanzas** 100:20

**material** 120:14

**Matt** 5:9 63:2 113:25

**matter** 4:4 18:15 36:16 80:16,17

**Matthew** 4:20

**Matuse** 21:14

**Mayo** 102:9 103:9,15

**meals** 39:15,18

**meat** 14:14 41:9

**med** 105:4,10

**Med-art** 48:23,24 57:1,7 72:18,23 77:12

**Med-art.com** 54:16

**media** 4:2 85:10,14

**medical** 85:4,20 86:18, 20 96:23 111:18

**medication** 36:22 106:5,10

**medications** 36:24,25 37:7 105:1,13 106:18 107:9,15 111:7 116:8,9, 16

**medicine** 106:2

**medicines** 107:1

**meds** 37:6 86:25 87:1 103:11 105:3,17 110:21 116:12

**meet** 20:6 24:14,22 25:9 29:23 123:2 125:6

**meeting** 11:13 25:12 122:17 123:10

**meetings** 11:8 125:10

**members** 93:2,16

**memory** 57:9 66:4 67:8, 10,13 95:5

**mental** 85:5 118:17,20, 22

**mentioned** 14:19 57:4, 6,7 62:4 68:20 69:21 88:15 90:9 91:22 92:23 94:22 101:18 102:2,3 104:25 107:12 108:5 110:3,13 120:22 121:17

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: mess..pages

123:17

**mess** 51:5

**message** 69:2

**messages** 68:2

**messed** 90:2

**met** 5:11 11:19 12:13 24:19 108:21,24,25 119:16 122:3,20

**mice** 100:22

**Michael** 4:19 40:1 86:3 114:23,24 118:4

**microwave** 35:18

**middle** 4:6 37:23 86:24

**Mikayla** 4:5,21 5:10 40:6

**milder** 36:19

**military** 8:9 22:21 110:17

**million** 36:11

**mind** 27:8 28:24 36:9 49:14 53:3 122:18

**minds** 89:25 90:1

**mine** 10:17

**minors** 53:7 119:22

**minute** 41:4 63:16

**minutes** 5:11 22:17 27:6 119:5

**Miramar** 8:6

**miscalculated** 91:7

**mislead** 19:20

**misled** 62:12

**misquote** 121:18

**misrepresent** 117:23

**missing** 20:5,6,15 22:4, 13,19 23:24 24:13 64:11

**mistake** 112:10,17

**mobile** 92:22

**mode** 35:1,4,7,15 37:16, 17,19,21 45:8,9,11 74:11

**model** 48:23 49:18 65:3 71:13,15,19 77:7,9 85:1

**models** 47:16 49:2 53:18 74:15 77:22 78:16 79:18 82:3,9

**modified** 121:18

**mom** 87:18,20

**moment** 112:21,23

**money** 16:16 79:17

**monochrome** 52:15

**Monster** 17:14

**month** 90:24 93:4,5,10, 11,12,13 96:1,2 97:15 98:20 99:13

**monthly** 90:15

**months** 67:5 92:5,6,8, 10,13 96:22 99:14 117:8,10

**morally** 94:18

**morning** 4:14 5:7,8 22:16 28:21 122:2,15,23

**mother** 110:3,9

**Mountain** 94:3

**mouse** 100:20

**mouth** 80:23

**move** 25:17

**moved** 27:16 97:24

**mud** 33:12,20,22,25 34:9

**murdered** 22:15

---

**N**

**naked** 38:13 49:2 67:19 68:16,25 69:11 78:16

**names** 21:14,19 58:3 105:19,22

**Narcan** 106:25 124:3,4

**nation** 99:1

**National** 64:10

**nauseous** 36:20 95:13

**nauseousness** 36:20

**NCMEC** 64:10 65:6,12, 17 66:6,8 76:1 109:13, 18,21

**NCPIC** 76:1

**necessarily** 78:10 82:9

**needed** 16:17 21:24 29:2 98:5 105:17

**needing** 37:23

**nervous** 7:20,21 51:7

**night** 37:23 52:12

**nodding** 6:22

**nomenclature** 24:24

**non-legitimate** 55:14

**nonvalid** 55:14

**North** 4:10

**Nos** 40:14

**Notary** 5:2

**notes** 88:13

**noticed** 51:19

**nudity** 49:11

**number** 4:2,7 14:23 19:14 29:5 42:8,14 59:13 62:14 65:9 68:11 82:14 85:10,14 91:21

---

**O**

**object** 19:24 66:20

**objection** 53:9 61:11 67:1 120:15

**observant** 22:24

**observation** 61:18,20

**obvious** 13:22 15:21 32:5

**Ocala** 10:16 11:7

**occur** 104:16

**occurred** 19:17 69:18 116:21

**October** 65:18 67:5 113:3

**odd** 16:14

**offense** 56:15 63:1

**offensive** 56:3,16

**offer** 54:7

**offers** 54:8

**office** 10:16 21:12 23:12 24:14 26:15 29:18 109:21 119:7,12 122:22 125:6

**officer** 7:18 9:3,15,20, 21 10:5 22:16 24:24 52:5 55:6,24 56:12,17 57:15,24 68:5,21 78:4 82:21 112:14

**officers** 9:25 20:11 25:15,20 67:24 69:3 100:12

**oldest** 110:5

**online** 12:13 15:6 16:2 17:15 79:5

**Ontario** 12:4

**open** 89:20 111:21 113:10,12

**opinion** 18:20 56:24 78:12,20 79:10 110:21 112:11

**opportunity** 6:1 26:15 60:23 88:12 125:7

**opposed** 6:21

**opposite** 89:24

**order** 42:23 76:4 113:16 114:5,8,12

**ordering** 126:1

**original** 115:5 118:8

**overgrowth** 107:2

**overlook** 22:24

**owner** 94:20

---

**P**

**p.m.** 125:25 126:4

**pacemaker** 96:19

**pages** 42:5 47:7 58:15

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: paid..prior

62:10 72:4 79:20 80:5 82:14

**paid** 49:3,7,10 54:3,5,6 73:9 119:25 120:5

**pain** 36:20 85:21

**painted** 16:15

**palpitations** 36:4 102:23

**paperwork** 8:21 35:22 95:20

**Pardon** 84:12

**park** 17:8

**part** 23:1 37:12 46:9,10 56:4 76:3 80:14 84:7 87:12 97:10,20 98:1 111:10

**participant** 78:23

**past** 16:24 20:20 22:5 52:16 85:19,20,22,23,24 86:13 106:19

**Pat** 31:4,5

**patience** 119:3

**patients** 107:2

**Patrol** 10:9

**patrolled** 10:15,17

**pay** 16:12 49:5 54:10 93:5

**paying** 73:5,11

**payments** 90:9,13

**PBA** 99:17

**pending** 5:21

**pension** 90:10,13,16,25 91:6

**Penthouse** 55:18,20,22 78:13

**people** 9:12 22:19,25 47:2 52:12,17,22 55:17 70:5,9 73:23 82:4 87:10, 15 89:19 93:23 100:13, 23,25 110:20 112:13 116:6 124:20

**percent** 34:23 55:2 73:22 80:9,10

**period** 20:8 28:10 54:13 73:2 97:15 98:20 106:24

**person** 6:12 20:5,6,16 22:4 23:25 24:13 27:15 40:25 56:18 58:2,4 92:16 110:16 111:12 115:22

**personal** 24:6,7,9 34:16 35:1,3 68:10

**Petter** 49:15 72:20,21 78:16

**phone** 19:5,14 20:4 21:5,8,10 23:23 24:2,3, 4,6,7 28:3,4,6,8,16,17, 18 29:8 34:3 39:4,5,7,10 43:13,15,22,24 44:5,12, 14,16,17 45:23,24 46:1, 4,18 47:20,21,24 48:6,8, 17 59:14,25 64:7 65:8 66:10,17,25 67:6,10,15 68:13,17 69:2,15 71:23 72:1 73:25 74:6,10,20, 21 75:14,15,22

**phones** 55:10

**photo** 43:12 64:1 68:5

**photograph** 43:7 45:25 46:4 47:18 48:6,19 59:10 61:25 63:5,11,14 65:16,22 66:9 67:23 68:25 69:1,10 71:7,19, 23 72:1,3,11 74:10 75:24 76:17 79:5 81:17 83:18,25

**photographed** 78:24

**photographic** 66:4

**photographs** 42:16 44:23 49:22 54:13,16 55:8 56:5 62:2 66:16,25 67:15,19,20 68:1,24 69:14 73:14 76:6,9,12, 16,18,19,21 77:17 79:21 80:6 82:10 84:4,17

**photos** 13:14,15 43:13 46:17 49:1 51:24 60:12, 19 63:17,23 64:6 65:14, 24 66:3 67:6,19 71:12 83:1 119:22

**picture** 43:21 45:22 49:24 50:3 52:14 57:19 59:25 61:10 65:3,8

68:15 77:10 81:1,4 85:1 109:15

**pictures** 13:24 14:2 43:24 56:22,23 59:13 60:9 61:3 65:4 66:14 78:15,20 81:24 109:16

**piece** 23:2 32:1,11 38:20

**Pierle** 4:15

**pill** 37:9 106:23

**pills** 106:21

**pin** 96:8 98:17

**pissed** 13:14,19

**place** 70:17 108:11

**places** 93:23 94:12

**Plaintiff's** 40:6,11 58:24

**plan** 46:10

**planned** 121:25

**planning** 121:24

**play** 70:3

**Playboy** 55:18,20,22 78:13

**point** 5:17 16:23 26:24 27:9 30:11 31:8,16,19 32:8,21 46:23 47:3,24 48:6 53:6 81:16 82:7 95:2

**pointed** 35:17 71:10

**police** 52:5 55:6,24 56:16 95:6 100:12

**policy** 82:4

**Ponce** 4:10

**pop** 55:10 75:18,20,22

**popped** 122:17

**porn** 60:18 73:11,15,19

**pornographic** 108:7,16

**pornography** 13:16 56:7 57:12 58:12 61:5

**portions** 76:18

**positive** 28:9 48:23 90:4,17 104:24

**possessing** 76:22

**possession** 76:7

**possibly** 103:22 111:19

**post** 80:22 84:25

**potentially** 56:2,19 74:7 94:16 115:24

**practice** 67:4

**pre-installed** 75:13

**predicate** 66:21

**prefer** 30:2

**prepared** 42:4 86:1

**prescribe** 116:8,16

**prescribed** 105:16 106:3 107:8

**prescription** 105:1,2,4, 10,12 106:18 107:9

**presented** 79:12,13

**press** 112:8

**pressing** 112:16

**pressure** 36:4 87:6 102:23 103:1 105:16 106:9

**Preston** 4:5,21 5:10 27:2 28:11 30:2 125:1,9

**Preston's** 40:7 41:19 42:9,23

**presume** 77:24 78:1

**presumption** 48:5

**pretending** 118:6

**pretty** 30:9 55:3 57:10 75:14 102:12 103:12 107:11 119:9 122:24

**prevent** 30:6

**previously** 115:15

**pride** 78:2,3

**primarily** 9:23 62:5 73:21

**primary** 9:14 103:10

**printed** 40:24

**prior** 14:17 71:12 121:19,22 125:2

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: prison..remember

**prison** 112:12,13

**privately** 29:23

**privilege** 50:15 51:10

**privileged** 109:8

**problem** 5:22

**proceedings** 109:3,19

**process** 109:14 112:3

**products** 70:18

**professional** 79:11,13,
14,15,18

**professionally** 79:13

**professors** 13:3

**program** 44:22

**programs** 67:9 70:18

**progressed** 95:2
105:11

**prolong** 5:23

**promoted** 25:3

**proponent** 100:16
101:12 110:19

**propounding** 40:21

**protection** 120:8,11
121:1

**provide** 85:16 114:1

**provided** 46:8 86:10
114:12

**provider** 46:8 65:8
118:18,22

**province** 12:1

**psychiatric** 85:4

**psychiatrist** 116:5

**psychotropic** 116:6

**PTSD** 115:24

**public** 5:2 57:13 77:24
100:17 101:3

**Publix** 14:13,19 16:23
17:1

**pull** 122:5

**purpose** 24:14 29:11
81:24

**purposes** 15:21 53:17
84:5 99:5

**put** 9:24 18:21 29:20
31:18 33:8 34:16 35:3,
14 37:20,24 38:13 53:13
54:20 61:6 62:1 92:7
99:25 111:11 113:9
124:7

**Putnam** 10:18,20,21

**putting** 40:9 52:13

### Q

**Quebec** 12:5,7

**Quercetin** 106:16

**question** 5:21 6:15,17,
19 18:17 28:5 32:22
42:8,25 54:24 57:5
64:13 66:21 73:6 89:20
98:18 99:7 104:3

**questioned** 29:17
69:21

**questioning** 27:11 29:9

**questions** 5:25 10:4
30:3 35:22 40:19,22
42:8,15,20 47:1 48:5,7,9
64:18 73:12 84:3,8
87:25 88:1,8,10,12
104:9 121:7,11

**quick** 23:4 41:7 117:12
121:15

**quickly** 6:8

**quit** 100:7

**quote** 35:8 68:23

### R

**Rachel** 115:9

**Ramipril** 105:15,16

**ranger** 22:21,22

**rank** 25:2

**rate** 91:16

**rats** 87:12

**ratters** 87:11

**reached** 91:8

**read** 18:23 124:19
125:21,22

**reading** 60:9

**ready** 28:20 96:19
122:18

**real** 21:16 23:4 93:8

**realize** 28:19

**realized** 10:10

**realm** 56:20

**reason** 5:18 7:7 15:23
24:16 32:16 46:3 47:25
64:9 66:24 67:14 82:8
90:6 92:12 100:11
109:22 122:15 124:7

**reasons** 13:22 32:5

**recall** 16:2 20:17 21:6,7
25:25 27:24 29:10 39:18
44:6,18,21,24 45:12,17
47:12 49:6 54:5 57:9
63:10,13 68:24 69:8
74:6 96:9 101:21 104:14
106:11 108:8,10,14
123:16 124:25

**receive** 67:19 86:21
90:15

**received** 85:4 91:3,5,12
113:6 114:23 115:2
122:9,10

**receiving** 68:25 90:9,13
111:19

**recent** 95:24

**recess** 41:12 85:11

**recognize** 40:17 43:7
47:13,14,15 57:21 59:10
63:5,6 71:7,9 72:11
74:15

**recognizing** 71:17

**recollect** 99:10 107:14
117:11

**recollection** 45:25 54:6
99:6

**recommendation**
108:7

**record** 4:17 7:2 23:5

41:11,14 83:15 84:7
85:10,13 107:25 113:1

**recorded** 4:3 27:22,23

**recording** 30:10

**recovery** 124:16

**recreate** 100:24

**redacted** 43:6 80:21
84:4

**REDIRECT** 121:13

**refer** 40:22 49:25 60:24

**reference** 77:18

**referenced** 80:7

**referred** 75:18

**referring** 50:9 73:20
83:10 112:18 113:12,20,
21

**reflects** 83:16

**refrigerator** 34:3,8,17

**region** 10:17

**regional** 11:8

**regular** 11:3 45:7,9 56:9
97:19 98:4 122:3

**related** 66:8 92:25
121:1

**relationship** 12:17,20
89:7 90:3,4,5

**relevant** 32:17

**relief** 10:23

**relive** 7:23

**remember** 8:21 10:7
17:13 19:18 20:2,9
21:19 22:7 26:24 27:21
28:14 29:12,13,16 30:1,
5,11,13,14,21 31:2,3,22,
25 38:4,8,16,24 39:3
40:25 43:12,17,21
47:18,20,23 48:17 49:13
53:20 57:19 58:3,5,6
59:16,18,21,24 60:1,21
62:7 64:6 67:12,14 68:5
71:22,25 72:12,17,24
75:11 80:13 99:15 100:5
101:9,24 103:16 105:7,
21 107:4 108:18 113:5,7

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: remembered..show

121:24 122:20

**remembered** 20:23

**remembering** 58:3 88:17 91:24 106:17 108:8

**remission** 37:12

**rename** 62:24

**renumber** 62:24

**rep** 99:16,17,18 100:1

**repeat** 79:24

**repeatedly** 63:25

**rephrase** 32:22

**replied** 15:11

**report** 95:6 96:10 115:3 117:14,19,24 118:1

**reported** 34:19,20,25 52:18

**reporter** 4:14,18 6:9

**represent** 5:9 47:23 52:6 65:2 76:15,19 88:7 122:6

**represented** 75:24 109:20

**representing** 45:23

**reputation** 85:21

**requirements** 84:22, 23,25 121:1

**research** 35:17

**resend** 115:11

**resign** 104:6,12

**resigning** 103:23

**resolution** 49:1

**respected** 78:14

**respectfully** 79:19

**respond** 48:12

**response** 6:20

**rest** 33:15,16 98:5,15 111:5

**restaurant** 22:13 93:22

**restaurants** 87:16

**restriction** 89:10,17

**restroom** 5:18 85:8

**result** 36:2 85:5,18,25 86:21 107:12 109:25 110:9

**results** 124:6

**resume** 17:16

**retail** 14:24 93:25

**retired** 14:7 101:9

**retirement** 14:11 91:4, 6,12

**retraining** 17:20

**returned** 15:7

**review** 41:8,22 60:23

**rid** 100:11 113:14,17

**rings** 37:25 38:1

**road** 93:7

**Robby** 104:21

**Roberts** 4:19 23:4,8 40:3 50:8,12 51:16 58:18,21 59:2,5,8 61:11 62:20 63:1 66:20 67:1 70:7 71:4 72:6 77:3 85:8 86:4,6,8,11 113:25 114:7,11,25 115:4,11 117:12,16 118:8,12 120:15 121:10 125:19, 22

**role** 119:5 120:25

**romantic** 60:15

**roof** 87:6

**room** 20:13 25:8,21 26:25 27:3,16 31:18 32:25 33:4,7,8,12,14,20, 22,25 34:6,9,15 35:16 96:18 102:4,5,13

**rooms** 27:23 37:25 102:25

**rope** 80:22

**rough** 59:16

**roughly** 8:11,22

**roundabout** 57:5 107:24 108:15

**route** 110:23

**rude** 7:1 31:7 64:15

**Rule** 85:18

**rules** 6:6

**run** 67:9

**running** 122:16

**Russel** 104:20

---

**S**

**sack** 38:13

**Safari** 75:6

**Safe** 54:14

**Samsung** 75:16,17

**Sanija** 77:2,3,4

**sat** 6:23

**Savannah** 8:7

**save** 45:19 67:25 68:13, 15,24

**saved** 69:14 74:10

**saving** 69:2

**say-so** 74:4

**scar** 110:24 111:4

**scared** 36:9

**schedule** 121:23

**school** 11:19 30:23,25

**scientific** 109:14

**screen** 73:20,24,25 74:5,9,11 82:4

**search** 22:17 29:1 45:7, 15,18,19 49:23 50:2 51:24

**searched** 45:7 66:10

**seasoned** 9:24

**seconds** 36:12

**seek** 87:2 110:14 111:6, 23

**seeked** 110:5

**seeking** 111:22

**send** 69:7 117:18 118:10

**sending** 68:21

**sense** 30:8 48:3 58:7 98:16

**separate** 10:8 32:16 115:8

**septic** 93:23

**Sergeant** 21:14

**served** 22:14 93:25

**set** 34:13 74:21

**settings** 45:13

**sex** 52:17,22

**sexual** 49:11

**sexually** 67:20 68:16 69:1,11 119:22

**shady** 52:7

**shaking** 6:21

**share** 70:10,19

**shared** 13:13

**sharing** 69:17,19

**sheet** 86:8

**Sheila** 11:17

**sheriff's** 20:7 21:12 22:4 23:12 24:14 26:15 29:18 104:17 109:21 112:19 119:7,12 122:1, 22 125:6,11

**Shevlin** 4:22 87:25 88:3,5,6 114:4,9,14,17, 23 115:2,9,12,13 117:9, 15 118:3,10,14,15 120:17 121:4 125:20 126:1

**shifts** 98:4

**shit** 32:1,11 38:15,20 52:4,8 122:18

**shock** 26:1,19

**short** 20:8 28:10

**show** 21:4 43:3 62:18 72:3,4 73:3 79:20 80:20 82:14

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: showed..suggesting

**showed** 65:3 100:20

**showing** 61:8 77:25

**shown** 35:12 123:24,25

**sick** 99:23 100:3,6 106:22 108:2 122:4

**side** 87:15 107:20 116:10

**sign** 14:13

**signed** 42:5

**signing** 40:25

**silverware** 39:21

**Similarly** 6:19

**simply** 49:22

**simultaneous** 107:18

**simultaneously** 46:18

**single** 102:5

**sir** 5:12 6:2,5,18,25 7:3, 6,9 8:12 9:1,4 11:5 13:17 16:20 18:25 19:3, 13,15 22:6 24:1,11,21 25:22 26:6,17 28:13 30:9 32:14 33:18 34:18, 23 39:8 40:8,17 41:2,23 42:2,6,21 43:2,8,23 44:1 45:2,4,6 46:2,5,16,20 47:7,19,22 49:9,12 58:13 59:12,15,18,21 60:2,21 61:9,23 62:3,11, 16,17,23 63:9,12,15 64:20,22 65:5,15 66:12, 22 67:2 68:12 70:20 71:18,24 72:2,9,14 74:4, 12,14,17 75:4 76:2,8,11, 14,23,25 77:7,11,13,15, 20,23 84:19 121:21 123:6,12,15,21

**sister** 72:17,19

**sit** 14:25 17:6 25:14 28:1 45:24 91:17 109:10

**site** 46:19 47:16,17 48:25 49:3 52:20 53:17 54:3,5,9,20,21 55:5,11, 14,15,20,21 57:7 70:4 72:13,14,16,17 82:2

**sites** 52:1 54:7 55:7,12 56:6,10,23 57:6,7 69:17, 19 72:20 73:2

**sitting** 36:7,10 103:25 117:16

**situation** 27:6 94:17

**skeletal** 36:20

**skills** 61:18,20

**skip** 47:6 58:14 62:10 72:4 103:4

**skipped** 70:22

**slang** 10:5

**sleep** 35:15 36:17 37:20 95:11 96:12 98:10

**sleepover** 88:24

**slid** 92:11

**slide** 92:11

**slow** 103:3 105:23

**small** 7:19 14:8

**smile** 111:11

**Smith** 101:22 104:18

**Smith's** 101:23

**Snapchat** 52:12,13,24, 25 53:10

**society** 56:14

**soldiers** 110:17

**solid** 15:14

**somethin'** 68:7

**son** 12:25 20:24 70:9 110:5

**sons** 11:21 12:18,20 13:18 69:22 70:6,8 88:16,19 89:3,22 90:4 110:2

**sort** 46:11 58:9 92:25

**sought** 109:24 110:14

**sound** 113:3

**space** 67:13

**span** 92:2

**speak** 90:19 125:7

**speaking** 102:2 108:16

**special** 113:9,16

**specialized** 58:9

**specializes** 108:4

**specific** 108:15 113:20

**specifically** 15:10 22:10 23:13 28:18 29:2 43:21 54:19 57:19 59:24 67:17 68:21 69:8 71:24 74:24 82:2 110:18

**spell** 49:16

**spending** 89:11 112:11

**spent** 8:6

**spinning** 27:8

**Spirochete** 124:1,2,4

**Spirochetes** 123:24

**spoke** 51:16 101:5 108:6

**spoken** 111:18

**spread** 86:8

**spring** 117:3

**St** 4:11 8:5,11 10:18,19, 20,21 21:12 22:3 23:12 29:17 38:17 100:21 109:20 119:7,12 120:1,6 122:21

**stage** 95:18

**standpoint** 7:21

**stands** 17:2 77:12

**start** 6:15 8:19 9:9 15:21 40:2 58:25 80:2 92:19 96:13

**started** 5:15 8:15 26:25 27:11 29:9 41:6 60:6,11, 18 65:24 96:16 107:16 111:25

**state** 4:16 10:15 37:12 91:8 100:8,20,24 109:12 112:19 124:20

**stated** 78:2 91:2 93:19

**statement** 81:12

**statements** 73:7

**states** 11:2 53:19 84:21

**statute** 18:23 78:10 120:12

**statutory** 121:1

**stay** 55:12

**stayed** 11:4

**stomach** 95:12

**stopped** 87:21

**storage** 46:11,15,19

**store** 94:7

**stored** 21:8,9

**stories** 60:9 61:3

**straight** 95:11

**stress** 35:24 36:15 86:25 87:4 105:17

**stressful** 86:23 98:2

**Strickland** 22:10 23:13

**stripped** 25:19 38:12

**struggling** 60:6

**Stuart** 8:17

**study** 100:19

**stuff** 9:16,19 10:2 14:24 15:6 16:2,15 17:8 18:7 33:10 35:13,18 37:7,11 52:13,16 53:3 54:8 55:18 57:17 67:9,10 68:8 69:7 70:10 75:20 82:11,14 84:9 88:25 96:20 98:3 122:19 125:11,12

**subject** 65:6,17 75:25 80:16,17

**submitted** 17:16 113:16

**subscribe** 49:5 73:1

**subscribed** 49:7,10 72:21 73:8

**subscription** 46:10

**subsided** 103:12

**sudden** 29:25

**suffered** 85:18

**suffering** 85:21

**suggested** 111:20

**suggesting** 30:4

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: suicidal..trust

suicidal 116:11

suicide 38:9,10 39:22 110:23 112:1,6,7,15

Suite 4:10

suited 47:2

summer 98:1

sun 39:12

Sunshine 91:8

super 86:22 107:5

supplemental 105:9

supplements 106:12

support 37:8

supposed 20:3 51:6 96:1 109:14

supposedly 48:25

suspect 59:25 114:9

suspected 22:15 120:13

SWAT 122:1

swear 4:18

sworn 5:3

symptom 36:14 107:14

symptoms 36:1,6,19 95:3 96:5 102:3

system 87:12

systematic 15:13

## T

takes 23:2 86:25

taking 6:9 78:15 97:8 105:3,5,12,15 106:13, 19,20,21 107:3,5 111:7 124:23

talk 6:13 7:23 19:16 20:8 25:11 26:16 30:18 38:18,19 39:1 47:9 66:5 85:23 104:8 111:8

talked 13:5 50:8 73:17 76:5 101:2 110:17 124:24

talking 6:12 9:11 23:16

38:21 72:19 83:11,14 84:8 88:22 89:5 107:18

Tallahassee 30:24 31:2

tank 93:23

target 75:25

tasteful 55:22 56:22,23

taught 69:22,23

teach 20:3

teaches 13:1

team 120:8,11 121:2 122:1

teenagers 57:2

telephone 68:10

telling 26:22 30:12 50:4 57:15 99:24 100:25 113:6

tested 124:6

testified 5:3 63:16 77:16 82:7

testimony 7:8 57:11 79:20 80:3 84:14 88:15 89:14 91:22

testosterone 61:7

text 67:23 68:2 69:1

thankful 111:14

thing 9:13 26:16 29:22 52:11 66:5 69:9,22 72:25 82:5,6 83:6 92:10 95:13 96:1 98:12 109:6 113:9 123:1 124:3

things 10:8 11:8 14:23 17:15 22:25 35:12 36:3, 21 55:10 56:21 58:1,4 60:5 61:7 69:20 77:16 87:4 89:19 93:7 97:22 105:9 107:6 109:13 110:22

thinking 32:17 111:25 112:2

Thirty-four 11:19

Thomas 31:4,6

thought 16:22 28:19 30:15 60:12 103:4 107:17,19 124:8

thoughts 116:11

thousand 36:11

thousands 59:22 66:14

threat 101:1

threatened 99:21,22 101:19

threw 38:14

tick 37:8

ticks 33:6,9

tied 80:22 83:11 101:15

tight 28:1

til 91:6

time 4:12 5:14 6:12 8:6, 17 21:19 22:8,9 23:14 24:4,8 25:10,13 27:7,20 28:10,11,15 29:6,16 34:22 35:12,14 37:19 38:17 41:5 46:7 50:16 65:23 66:17,25 67:4,6,7 73:16,22 79:24 80:9,10 92:2 95:23 97:2,3,6 101:18 102:5,6 103:17 106:25 111:8,16 115:23 116:2,3,14,25 117:8 120:3 121:5,8 122:10, 20,23 123:18 125:3,25

timeline 96:7

times 11:10,13 26:23 36:6,11 38:19 55:23 63:17 96:18 102:4,11 107:5

tinctures 37:7 105:5 106:12

tiredness 36:16

today 4:11 5:17,24 6:8 7:8,20 19:5,21 29:12 30:6 45:24 47:3 50:22 57:11,13 62:25 91:17 99:6 109:10

Today's 4:9

toilet 38:15

Tolbert 20:9,18,19 23:20,21,23 24:23,24 25:9,11 26:14 30:1 122:11

told 15:4,8 18:4 20:12, 13 22:1 25:16 26:22 28:21 29:7 30:17 35:19 38:20 48:16 50:6,21 55:4 59:19 61:2 62:8 70:8,16 75:8,11 86:23 87:19,21 88:24 89:3 94:5 100:17 105:7 106:4 107:21 111:20 114:3 116:4 119:4,15

top 34:12,14 70:23 73:21 76:17,21 84:1 91:18 112:13

topless 68:6

Toronto 12:4

totally 97:20

town 7:18,19 11:25 12:3 14:8,13 22:14 93:3

TPC 17:6,8

tracing 65:8

track 23:15 33:10 36:7

tracking 20:3 22:11 23:1 121:25 122:18 123:9,10

traditional 97:19

trafficking 65:1

tragic 124:19

training 22:20,22 30:23 58:10 64:25 123:11

transferred 43:14

transmitted 43:14

treated 7:15 103:11 118:22

treating 79:18

treatment 85:5 123:23 124:5

trial 29:24,25 54:8,12 72:25 73:2

tricky 90:23

triggered 65:21

truck 28:20

true 41:25 90:12 94:10

trust 89:8

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: truthful..work

**truthful** 7:8 44:11 51:9

**Tuesday** 123:15

**turn** 52:10

**twelve** 117:8,10

**type** 51:25 57:17 87:2 110:16

**types** 51:24

**typically** 9:24 36:21

## U

**U.S.** 4:5 54:22

**uh-huh** 6:21,24 33:18 86:4 123:19,21

**uh-uh** 6:21,24

**ultimately** 32:20 42:4

**unable** 48:12

**uncomfortable** 88:10

**underaged** 64:8 65:21

**underneath** 77:1

**Underscore** 71:2

**undersigned** 5:2

**undersized** 9:13

**understand** 18:17 24:8 34:19 48:10 54:15 64:3 65:25 66:2 82:13 84:10 100:3 109:11

**understanding** 47:4 72:22 94:14 109:5 119:4,11

**undiagnosed** 95:1 124:20

**unhealthy** 35:16

**uniform** 123:4

**uniformed** 25:23,25 32:13

**union** 99:21

**unit** 4:2 85:10

**United** 53:19

**University** 100:19

**unnecessarily** 5:23

84:6

**unquote** 35:8 68:23

**unredacted** 84:9

**unrelated** 105:13

**untouchable** 87:9,13

**untouchables** 87:11

**untreated** 98:16

**upbringing** 56:21

**uphold** 52:5

**uploaded** 46:19

**upper** 73:23

**ups** 75:18,20,22

**upset** 5:16 7:10 32:5 64:17

**upsetting** 88:10

**USC** 55:7 56:6,10

**USC's** 53:17

**utility** 33:3,7

## V

**vacation** 102:7

**valid** 55:4 78:18 80:11

**varied** 11:9

**vehicles** 17:7

**venture** 108:25

**verbiage** 53:20

**verification** 77:18 78:9 79:1,7,16,22 80:7 81:14, 22 82:1,8,16 84:22,23, 25

**Verizon** 46:7,8,9,10,14 65:7

**version** 43:6 84:9

**versus** 4:4 31:6

**vest** 26:11 98:3

**video** 4:3 53:10 70:3 94:3

**view** 44:23 54:9

**viewed** 63:10 65:14

76:4

**viewing** 55:14 56:1,4 57:19 71:22 81:19

**violations** 9:18

**visit** 96:3,4 108:13 116:19

**visited** 77:22

**visiting** 67:18

**visits** 108:12

**vitamin** 106:12,15,16

**vitamins** 105:9 106:14

**VPN** 45:3

## W

**W-2S** 16:22

**wait** 6:14

**waited** 20:7 24:19

**waiting** 102:20

**wake** 36:18

**walk** 5:19 82:22 94:7,9 100:24

**walked** 27:10 31:15,21, 23 38:19 83:17,21,25

**walking** 17:3 31:25 33:19 124:21

**wandering** 114:5

**wanted** 11:12 25:14 30:17 31:14 52:2 53:9 55:4,18 58:21

**wanting** 32:17

**warrant** 29:1

**wash** 14:20 92:24

**washing** 16:13

**watch** 38:9,10 39:23 54:9 112:6,7

**water** 9:24 10:2 23:3 85:6

**ways** 40:20

**wearing** 98:2

**web** 44:8 45:10 54:17

57:16,17 74:18,20 75:2 77:19 78:10 79:1,20 80:5,8 81:13,21 82:14

**website** 43:18 49:8,10 52:6 53:18,21 56:5,11 57:13 61:25 62:2 77:7 78:18 79:9,10,11 81:7,9 84:21

**websites** 17:12 43:25 44:3 62:4,7 67:18 77:21, 25 80:11

**Wednesday** 122:7

**week** 21:1 95:8 96:11 122:3,12

**weird** 30:15 31:6

**well-known** 7:16

**white** 32:12 38:23

**white-footed** 100:20

**wife** 19:8,9 33:6 36:8 37:24 39:6 60:15 69:21 73:9,13 82:22 83:17,21, 25 87:18,20 90:18 98:23 108:6,23 109:24 111:12, 14 119:1

**wife's** 11:16

**wildlife** 8:25 9:6,15 10:6 24:10 26:7 64:25 123:4

**William** 4:3,4 5:1 125:24

**wise** 87:5

**witnesses** 29:24

**woman** 67:19 68:6,16, 25 69:11 78:22 79:5 80:21 81:3

**women** 13:25 56:24 78:8,11,21 79:22 80:6, 12

**woods** 9:17,23 10:12 21:23,25 22:24 100:14

**word** 35:9,10 68:18 78:25 79:6

**words** 13:7

**wore** 98:3

**work** 9:5,24,25 14:4,7, 16 15:25 16:11,23,25

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: worked..young

17:1,5 21:10,11,22 28:8
86:16 92:15,16 93:19,20
94:11 95:10 96:12,21
97:16,20,21,25 98:3,11,
20 99:10 100:2,13 108:2
121:23 122:3 123:13

**worked**  8:22,24 9:23
20:19 21:17 22:1,7,13
72:25 91:4,6,12 94:1,2,3
97:5,7 118:5

**working**  8:19 9:17
10:11 97:1 99:11 100:14

**works**  101:24 109:12
119:8,9,10

**worries**  16:10 23:7
35:24

**worse**  5:24 36:3 110:22

**worth**  47:1

**write**  95:6,8 96:11

**wrong**  19:24 30:11
76:20 101:3

---

### Y

**YCB**  70:24,25

**year**  4:11 7:18,25 11:10
53:4 95:25 96:8,13 98:1,
25 103:10,15 107:15
108:15 116:22 125:25

**yearly**  95:25 96:3,4

**years**  8:22,23 11:19
21:1 37:11 61:19,22
87:16 95:1 101:9
103:13,19 112:12
121:19

**yesterday**  40:4 58:24

**you-all**  8:21 24:4 60:8
113:17

**young**  57:2 61:21

*St. Augustine Court Reporters*
*(904) 825-0570 : staugcr.com*